1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF OREGON

3                     PORTLAND DIVISION

4

5   MATTHEW SPONER,                 )
                                    )
6                    Plaintiff,     )   No. 3:17-cv-02035-HZ
                                    )
7           vs.                     )   August 19, 2019
                                    )
8   EQUIFAX INFORMATION SERVICES    )   Portland, Oregon
    LLC and WELLS FARGO BANK N.A.,  )
9                                   )
                     Defendants.    )
10   _____)

11

12

13                 TRANSCRIPT OF PROCEEDINGS

14                   (Pretrial Conference)

15

16       BEFORE THE HONORABLE MARCO A. HERNANDEZ

17          UNITED STATES DISTRICT COURT JUDGE

18

19

20

21

22

23   Court Reporter:          Ryan White, RMR, CRR, CSR/CCR
                              United States District Courthouse
24                            1000 SW 3rd Avenue, Room 301
                              Portland, Oregon 97204
25                            (503) 326-8184

<pre>
 1                                APPEARANCES

 2

 3   For the Plaintiff:         WEINER & SAND LLC
                                By:   JEFFREY B. SAND
 4                              js@atlantaemployeelawyer.com
                                800 Battery Ave SE, Suite 100
 5                              Atlanta, Georgia 30339
                                (404) 205-5029
 6
                                KELLY D. JONES
 7                              ATTORNEY AT LAW
                                kellydonovanjones@gmail.com
 8                              819 SE Morrison Street, Suite 255
                                Portland, Oregon 97214
 9                              (503) 847-4329

10                              OLSEN DAINES
                                By:   MICHAEL R. FULLER
11                              michael@UnderdogLawyer.com
                                111 SW 5th Avenue, Suite 3150
12                              Portland, Oregon 97204
                                (503) 222-2000
13
                                ROBERT S. SOLA, PC
14                              By:   ROBERT S. SOLA
                                rssola@msn.com
15                              1500 SW First Avenue, Suite 800
                                Portland, Oregon 97201
16                              (503) 295-6880

17

18   For the Defendant         COSGRAVE VERGEER KESTER LLP
     Wells Fargo:              By:   TIMOTHY J. FRANSEN
19                              tfransen@cosgravelaw.com
                                By:   DANIEL C. PETERSON
20                              dpeterson@cosgravelaw.com
                                By:   JULIE A. SMITH
21                              jsmith@cosgravelaw.com
                                By:   ROBERT E. SABIDO
22                              rsabido@cosgravelaw.com
                                900 SW 5th Avenue, 24th Floor
23                              Portland, Oregon 97204
                                (503) 323-9000
24

25
</pre>

```
 1                    (August 19, 2019; 1:34 p.m.)

 2

 3                    P R O C E E D I N G S

 4

 5          THE CLERK:  Your Honor, this is the time set for a

 6  pretrial conference in civil case 17-2035-HZ, Sponer versus

 7  Equifax Information Services LLC, et al.

 8          Can I have counsel in court please identify yourself

 9  for the record?

10          MR. FULLER:  Mike Fuller for plaintiff.

11          MR. JONES:  Kelly Jones for plaintiff.

12          MR. SOLA:  Robert Sola for plaintiff.

13          MR. SAND:  Jeff Sand for plaintiff.

14          MR. PETERSON:  Dan Peterson for defendant.

15          MR. FRANSEN:  Tim Fransen for defendant.

16          MS. SMITH:  Julie Smith for the defendant.

17          MR. SABIDO:  And Robert Sabido for the defendant.

18          THE COURT:  Good afternoon.

19          So you all sent me a bunch of stuff.  I spent a bunch

20  of time reading all the bunch of stuff you sent me.

21          What I want to do is go through your motions in limine

22  first, and then we'll talk about some of your other motions.  I

23  think I'll turn then to exhibits, and then we'll talk about

24  witnesses after that.  And then -- but wait.  There's more.

25          You all filed additional motions regarding amending
```

1    the complaint, and then there was a defense motion to supplement

2    an exhibit list that we should talk about, and then we'll see

3    what other kinds of cleanup things that we need to talk about.

4            And then at the very end, I'll kind of describe for

5    you what my expectations are regarding the trial and what I

6    expect it to look like when we get to that place next week.

7            Is that right?

8            MR. PETERSON:  Yes, Your Honor.

9            THE COURT:  Next Tuesday?

10           We're scheduled for four days, Tuesday through Friday.

11   Given the number of witnesses I see you all have listed, you are

12   going to have to become very efficient in processing all those

13   witnesses.  But we'll talk about that more a little later.

14           The way I want to do the pretrial conference this

15   afternoon is, rather than hear a bunch of argument from you

16   given the amount of time that I've already spent with your

17   documents, is just tell you what I plan to do with each of the

18   issues that have been raised before this Court.

19           Before I do that, I want to give you a couple of

20   asterisks.

21           I'm ruling based on what you are telling me is going

22   to be happening during the course of the trial.  In my

23   experience, what you think is going to happen at trial and what

24   actually happens at trial is often different.  Trials are

25   dynamic and fluid, and it doesn't always work precisely like the

1    parties think it does or will, and I'm ruling based on the

2    information I have today.

3         It may be during the course of the trial that I have

4    told you previously that a particular piece of evidence is not

5    admissible or won't be received, but something has happened

6    during the course of the trial that might change my perspective.

7    And to the extent that you think that a door which I had

8    previously closed has now been opened, feel free at that time to

9    say "I have a matter for the court," and I'll send the jury out

10   and reassess whether or not my original ruling still holds.

11   Okay?

12        Then let's get to the motions in limine.

13        I want to begin with plaintiff's motions in limine.

14   The first one was plaintiff's motion in limine 1, to exclude

15   testimony, evidence, or reference to settlements with or claims

16   plaintiff made against Equifax.

17        Again, this is one of those things where I'm operating

18   in a bit of a vacuum because I don't know exactly what the

19   defense is planning to do around that.

20        So let me explain it this way:  To the extent that the

21   plaintiff's experience with Equifax was causing distress and

22   emotional disturbance, that evidence is evidence the jury is

23   allowed to consider.

24        Now, the terms of the settlement, on the other hand, I

25   agree with the plaintiffs, are not relevant to this particular

1    case and should not be received in evidence or offered by the

2    defense.

3         Beyond that, I can't give you much more guidance.  But

4    for now, that's all I've got because I'm not exactly sure how

5    the questions are going to come in, and I'm not exactly sure how

6    the plaintiff is going to respond to those issues.

7         But as regards to emotional distress, that is

8    relevant, and you're free to inquire regarding that complaint,

9    lawsuit, whatever it was, with Equifax on that -- for that

10   particular purpose.

11        MR. SOLA:  Your Honor, if I may be heard.  It's more

12   of a clarification.  Because the way they said they oppose, they

13   said they oppose insofar as it seeks to prohibit Wells Fargo

14   from arguing damages caused by Equifax.  And you -- we don't

15   disagree with that, and that sounds to me like your ruling.

16        And you mentioned a settlement shouldn't come in, and

17   I think the only other thing we're asking is that -- what

18   doesn't come in is that he filed a lawsuit against Equifax.

19        THE COURT:  I think they're going to know that because

20   of the name of this lawsuit.

21        MR. SOLA:  Well, we actually would like to change

22   whatever pleadings there are to reflect Wells Fargo.  But

23   we don't think that's relevant.  The issue of damages, we agree

24   with the Court, that they're entitled to say Equifax caused you

25   damage.  But we would like it be excluded, the claim,

1   that -- the fact that he made a claim.

2           THE COURT:  Again, it's a little bit hard for me to

3   kind of separate those things out.  The fact that he was engaged

4   in a lawsuit and litigation with Equifax is part of the

5   emotional distress that he's suffered.  That's fair game on the

6   part of the defense.  And I don't -- I'm operating in a vacuum.

7   I don't know the answer to that.

8           MR. SOLA:  Can I -- well, actually, that's post his

9   damages, that lawsuit, slightly.  I mean, they fixed the problem

10  in January of -- very end of January of 2018.  He filed his

11  lawsuit in December 2018.  So we definitely want to claim at

12  least that month of damage.

13          But, in other words, there really -- in terms of the

14  litigation, we're not claiming any damage from the litigation,

15  and that's what I think you just said, that there would be

16  stress from the litigation with Equifax.

17          THE COURT:  Precisely.  I don't know the answer to

18  that question.  You're telling me that the litigation ended in

19  January, but at that -- at least they get up through January in

20  that case, assuming that the litigation with Equifax was causing

21  him some level of emotional distress.

22          And this is the problem with motions in limine of this

23  sort because I'm operating in a vacuum.  I don't know the answer

24  to that question.

25          So right now, they get up through January.  We'll put

1    it at that as regards Equifax and its litigation.

2              Let's move on.

3              Number 2, plaintiff's motion to exclude any testimony,

4    evidence, or argument by Wells Fargo in support of any defense

5    based on Wells Fargo's request to plaintiff that he provide

6    certain documents, that motion is denied.

7              Number 3, plaintiff's motion to exclude testimony of

8    any witness who lacks personal knowledge of matters testified

9    to.

10             I'm not, again, quite sure what information or

11   statements are being anticipated on the part of the plaintiff.

12   So I'll just say I'm going to reserve ruling on that, and if you

13   want to make an objection in the course of the trial because

14   somebody doesn't have personal knowledge, make your objection

15   and I will rule at that time.  I'm sorry I can't be more helpful

16   because I don't really know which statements you are referring

17   to.

18             The next one, plaintiff's motion in limine number 4,

19   to exclude testimony of any witness who has not been -- excuse

20   me -- opinion testimony of any witness who has not been

21   designated and admitted as an expert witness.

22             So witnesses who are going to testify about the way

23   Wells Fargo does business, the normal procedures, they do not

24   need to be an expert witness.  And it may include some opinion

25   because they're saying, "I can't tell you in this case, but this

is generally how we do it."  That's admissible evidence if

that's what you're trying to get at.  To the extent that that's

what the objection is, it's overruled.  If there's some other

opinion evidence that you think is inappropriate for a

particular witness to be testifying about, raise it at trial.

I'll rule at the time.

MR. SOLA:  Your Honor, if I could be heard.

THE COURT:  Sure.

MR. SOLA:  We're not claim- -- we're not asking that

they can't talk about procedures they know.  What we're asking,

they can't give an opinion about, like, reasonableness or

necessity or adequacy of those procedures.  That's really -- we

believe that's expert testimony for them to give -- you know, as

to the quality of the -- they can say what they are and why they

have them, but we don't want them to give an opinion, right,

because what they are and why they have them is fact,

characterizing them would be opinion.

THE COURT:  Are you seeking out the opinions of your

fact witnesses to say this is a reasonable --

MR. PETERSON:  No, Your Honor.  I think what we're

getting at here would be a fact witness saying here's the

policies and procedures we have, so in this hypothetical

situation, this is how I would deal with it, exactly as you

expressed from the bench.  I think that's the testimony we're

looking at providing.

1          THE COURT:  Okay.  You're both talking about two

2    different things as I'm listening to this, and what you're

3    suggesting is acceptable.  It is also objectionable if they

4    start talking about the reasonableness of the procedure itself.

5          MR. PETERSON:  Thank you, Your Honor.

6          MR. SOLA:  Well, Your Honor, in their response, they

7    said they want to offer opinion testimony on its business

8    practices under hypothetical scenarios.  That's -- that's about

9    the essence of an expert opinion.

10          THE COURT:  Well, no.  I disagree with you because it

11    could be, "Normally, how do you do this when this happens?"  And

12    then they can say, "Our normal procedure is to do A, B, and C."

13    And somebody that's been doing this for 20 years and this is how

14    we handle this, gets to testify, "Normally, this is how we do

15    it."

16          And that -- if you're saying -- that, I guess, in some

17    ways is a hypothetical, and I don't think you need to be an

18    expert to testify as to kind of our normal processes and

19    procedures.

20          MR. SOLA:  Okay.  But if the -- I mean, why do we even

21    have hypotheticals when the only issue is whether they complied

22    with the procedures in regard to plaintiff's disputes?  Right?

23    No other disputes are relevant.  So I don't see how a

24    hypothetical is relevant at all.

25          THE COURT:  It may or may not be.  I can't answer that

1    question.  I mean, that kind of gets us to a different place.

2    But I haven't heard the trial yet, so I don't know what the

3    facts are and I don't know what -- exactly how it's going to

4    unfold.  There are circumstances where someone can say, "These

5    are what the normal procedures are.  Did you do it in this

6    case?"  "Yes, we did."  Is that admissible?  Of course it is.

7                MR. SOLA:  All right.  But I guess so then you do

8    grant my motion as far as no characterization of the procedures?

9                THE COURT:  As to its reasonableness, yes.

10               I don't know.  I don't know what I did.  I don't know

11   if I granted or denied the motion.  Honestly, I think maybe I

12   granted it in part and denied it in part.

13               MR. SOLA:  I think that's true.

14               THE COURT:  Okay.  Let's say that, then.  You get a

15   partial win on that one.

16               MR. PETERSON:  So did we.

17               THE COURT:  Yeah.  Everybody wins.

18               All right.  Where are we?  What are we on?  Number 5,

19   exclude testimony, evidence, or reference that attempts to blame

20   others for Wells Fargo's failure to comply with F-C-R-A, FCRA.

21               Again, this is that tough situation.  To the extent

22   that what we're talking about is that mental distress was caused

23   by what was happening as a result of what other entities were

24   doing, the motion is denied.  I will leave it at that, and you

25   can go ahead and raise whatever objection you have during the

 1    course of the trial if it's something other than that.

 2            MR. SOLA:  Well, I'm -- you know, we made that very

 3    narrow.  It's not that they can't blame other people for causing

 4    damage.  What it is, is they can't blame other people for

 5    causing them to not comply with the FCRA.

 6            THE COURT:  What are you anticipating?

 7            MR. SOLA:  Well, first, that they're going to blame

 8    plaintiff because they're going say he didn't provide

 9    information.

10            THE COURT:  Yeah, but that's the whole issue that the

11    jury is going to have to decide is whether or not what they were

12    asking for was reasonable or not.  And if you're telling me that

13    they don't get to do that as a matter of law, then make your

14    motion at halftime and I'll decide at halftime.

15            MR. SOLA:  Okay.  Yeah.  I would like, when we

16    get -- I would like to address motion 2 maybe later.  You did

17    deny it, but I would like to be heard.  Or do you want to

18    address that now?

19            THE COURT:  Go ahead.

20            MR. SOLA:  Okay.  So -- and this was narrow.  This was

21    that we don't -- we're asking that they not be allowed to use as

22    a defense the plaintiff -- the request of plaintiff for

23    information and his not providing it, not -- and that's very

24    narrow.

25            In other words, as you know -- as you know from

1    reading the briefing, this is an s-2(b) claim, and under s-2(b),

2    the consumer disputes to the credit recording agency who then

3    makes a decision whether it's frivolous or irrelevant, and if

4    they decide it isn't, they forward it to the furnisher.

5         Under -- our point is, under s-2(b), the language says

6    they shall conduct an investigation.  There's no exception,

7    there's no proviso that they can say, "Wait a minute, we want to

8    ask plaintiff for information before we do our investigation."

9         And, you know, the Sixth Circuit in *Boggio*

10   specifically said you can't require documentation from the

11   consumer before complying with s-2(b).

12        So our motion is very narrow.  It's simply that they

13   can't say that as a defense.  They can say, "We didn't have all

14   the information we wanted," or, "With the information we had, we

15   did a reasonable investigation."  We're not saying they can't do

16   that.  They can do that, and I know that's what they intend to

17   do.

18        What we're saying is they can't say, "Because

19   plaintiff didn't give us information, we didn't have to comply,

20   we didn't have to investigate any further than what we did."

21   And if they're allowed to do that, then basically you've amended

22   s-2(b) because --

23        THE COURT:  Well, that's what I'm thinking.  This is

24   an issue for jury instructions, isn't it?

25        MR. SOLA:  Well, we do have a jury instruction on

1    that.  But I -- their request for information was done pursuant

2    to s-2(a), which is a different section.

3        Okay.  And one other point, they actually did not do

4    that in compliance with s-2(a).  s-2(a) says, if they find a

5    dispute as frivolous or irrelevant -- this is the furnisher now

6    on a direct dispute -- they must notify the consumer of that

7    determination, and then they can ask for information.  They

8    never notified him that they had determined his dispute was

9    frivolous or irrelevant.

10        So my point, Your Honor, is their defense isn't even

11    an s-2(a) defense, much less an s-2(b) defense, which doesn't

12    allow it.  And if the Court allows them to get in that they

13    requested information, now plaintiff needs to point out that

14    they did not determine it was frivolous or irrelevant and, thus,

15    they had no right to ask him for information.  And I don't know

16    we all want to go there.

17        We also have other provisions of s-2(a) that they did

18    not comply with.  And they're opening the door to s-2(a), which

19    we think is improper, but if they do open that door, we should

20    be entitled to point out that they did not comply with s-2(a).

21        You know, you don't have to rule now.  It's -- I find

22    it a complicated issue myself and I've been litigating these

23    cases for over 20 years.  But that's our narrow motion, simply

24    that they not be allowed to raise it as a defense.  And

25    that -- so I would ask that the Court withhold ruling on that,

 1   or we would like more argument.

 2            THE COURT:  I don't want any more argument.  I can

 3   assure you of that.

 4            What it seems to me, though, I don't know that that

 5   makes any difference as to how the -- whether the evidence comes

 6   in, at least as regards that question, that they -- that Wells

 7   Fargo was doing whatever it was they did.

 8            As to what that means ultimately, what the jury's

 9   instructions -- we have a lot to talk about.  But as regards am

10   I going to stop them from introducing evidence that Wells Fargo

11   was asking for information like a Social Security card?  No, I'm

12   not going to stop them from doing that because, from their

13   perspective, that's what a reasonable investigation under

14   section (b) is, that that's part of a reasonable exercise and

15   ultimately the jury is going to have to decide whether that

16   makes any sense at all or not.

17            But that's for a conversation later.  I have to decide

18   what evidence right now is going to be admitted.  That evidence

19   is coming in.

20            We're at 5?

21            MR. SOLA:  Yes, you just --  well, you just --

22            THE COURT:  I addressed 5, did I not?

23            MR. JONES:  Yeah.  On to 6 now.

24            THE COURT:  Okay.  Evidence or reference about what

25   would have happened had plaintiff provided requested

1    information.

2            I mean, again, I think I've already addressed this,

3    and that is the plaintiff's witnesses can testify as to what the

4    normal procedures are.  And other than that, you can go ahead

5    and raise your objections during the course of the trial.  But I

6    am going to allow plaintiffs to tell us what their normal

7    procedures and processes are, and to that extent, the motion is

8    denied.

9            Number 7, "Exclude testimony, evidence, or reference

10   to actions or procedures of Wells Fargo's credit bureau dispute

11   resolution team or fraud department that were not disclosed

12   during discovery."

13           Do you have something in mind on this one?

14           MR. SOLA:  Yes, Your Honor.

15           Actually, just a few days ago, Wells Fargo produced

16   written procedures related to their investigations that they

17   denied even existed in deposition.  So that's a very clear

18   example of something that shouldn't be admitted, you know.  And

19   we can go further but --

20           THE COURT:  Those, we're going to talk about

21   specifically.  Other than that, is there something -- in other

22   words, I'm kind of -- I'm working in a vacuum here because I

23   don't know, is there something you think they're going to do

24   that they haven't done that you want to me anticipate and tell

25   them not to do?

```
 1              MR. SOLA:  Okay.  Well, that -- we did, and now it's
 2   happened.  Okay.  So we did anticipate they would try to offer
 3   new procedures, and they have.
 4              THE COURT:  Were you aware of those procedures?
 5              MR. SOLA:  No.  No, Your Honor.  I asked the
 6   witness --
 7              THE COURT:  Hold on, hold on, hold on.  If you weren't
 8   aware of them, how do you expect me to be aware of them?  In
 9   other words, this is asking me to rule on advance that they're
10   going to do something, I don't know whether they're going to do
11   it or now.  You see?  You understand the trouble that I'm
12   having?
13              MR. SOLA:  I do, Your Honor.  But Rule 37 is very
14   clear.  I mean, it's just sort of a basic rule of trial
15   evidence.  Under Rule 37, if information is not disclosed, then
16   it can't be used at trial.
17              THE COURT:  So your motion is make them follow the
18   rules?
19              MR. SOLA:  That's right.
20              THE COURT:  Oh, okay.
21              Follow the rules.
22              And we'll talk about that other -- the specific.
23              But, again, if you had a specific something that you
24   thought they were going to do, then I could address that.  But
25   right now, it doesn't sound like you have any other idea of
```

```
 1   something else that might -- that the defense might try to
 2   introduce that is going to be a surprise to everybody.
 3            MR. SOLA:  No, I don't, Your Honor.
 4            THE COURT:  Okay.  And we'll talk about the other one
 5   in a minute or several minutes.
 6            So on that one, I'm reserving ruling, because I don't
 7   know what might happen during the course of the trial.
 8            Plaintiff's motion to exclude testimony, evidence, or
 9   reference to actions or investigations performed by Wells Fargo
10   employees or agents that were not disclosed during discovery.
11            This is kind of the same thing; right?  Make them
12   follow the rules.
13            MR. SOLA:  Well, this is more where they come in and
14   say, "Oh, we have -- you know, when we send this request out to
15   other consumers, they comply.  You know, he was different, he
16   didn't give us something."
17            You know, they try to talk about other things that we
18   have no knowledge about that we can't check on that the jury
19   doesn't know the circumstances, you know, or other
20   investigations they have done where that's worked out fine for
21   the consumer.  You know, bringing in all these things that don't
22   relate to his case.
23            THE COURT:  Okay.  Do you have you any reason that
24   they're going to do that?
25            MR. SOLA:  Well, you know, I have seen this in other
```

1   cases where --

2             THE COURT:  Okay.  All right.

3             Are you planning on doing something like that on the

4   defense perspective?

5             MR. FRANSEN:  No, Your Honor.  No.  Not intending to

6   talk about other consumers or other cases.

7             THE COURT:  Okay.  Your motion is granted.

8             Let's move to the defendant's motions in limine.

9             Motion to exclude evidence about the financial

10  condition, net worth, or income of the defendant.

11            Motion is denied.

12            Number two, defendant's motion to limit evidence of or

13  references to defendant's financial condition to its current

14  condition.

15            So I want -- this one I want to spend just a moment

16  talking about.

17            My understanding is that the parties reached an

18  agreement regarding the financial condition of Wells Fargo, and

19  that -- I don't remember the name of the expert that did the

20  financial evaluation -- but that individual issued a report and

21  both sides agreed that that was acceptable.

22            Am I saying that correctly?

23            MR. SOLA:  Well, no.  What we did, we hired an expert

24  on financials, and they hired a rebuttal expert.  But before the

25  depositions took place, we reached a stipulation which basically

1    obviated the need for the experts and plaintiff to offer

2    exhibits.  We were going to offer exhibits on their net worth

3    and income.  We reached a stipulation, we used the current net

4    worth which is 2018.  That's the most current.

5              So we don't disagree with motion 2, that it should be

6    current.

7              The second part of our stipulation was the income for

8    2018, 2017, 2016.  And those are the most recent years.  They

9    don't have any income for 2019.

10             And so we agreed -- because we agreed on that

11   stipulation, then plaintiff said, "We don't need an expert, we

12   don't need our exhibits, we got a stipulation on net worth and

13   income."

14             So we did not call our expert, we did not put him on

15   the list, we did not offer exhibits.  And so we think that

16   there's really nothing left to decide except that they have to

17   abide by their stipulation.

18             THE COURT:  Okay.

19             MR. PETERSON:  Your Honor, I think this gets a little

20   bit to their objection to one of our witnesses, Mr. Santana, who

21   was the witness we had as the rebuttal.  I'm happy to address

22   that now.

23             Mr. Sola is correct.  We reached the stipulation on

24   what these dollar amounts would be, and our position is, if that

25   was admissible, we all agree those are the dollar amounts.  You

1   have now ruled on motion 1 that those are admissible.

2          But our position with offering Mr. Santana

3   as -- initially as a rebuttal to Dr. Fruits, who was their

4   financial expert, our position is that those numbers -- again,

5   you've been talking about being in a vacuum.  When you're

6   talking about these huge numbers with a national banking

7   association, it is difficult for the jury to take those numbers

8   in a vacuum and decide what they mean.

9          So the purpose of Mr. Santana's testimony is to help,

10  with his economic background, is to give some context to those

11  numbers, what does that mean for the purposes of a national

12  banking association.

13         So we believe that testimony, even though they have

14  withdrawn their expert, the testimony that gives the -- that

15  would have given the facts that we have now stipulated to, we

16  should still be allowed to rebut, or a better way to say it is

17  to provide context to those numbers.

18         So that's our position on Mr. Santana and then it

19  flows into your question here.

20         THE COURT:  So tell me about Mr. Santana.

21         MR. SOLA:  Okay.  So as I indicated -- and let

22  me -- Mr. Santana was disclosed solely as a rebuttal expert to

23  our Dr. Fruits.  Okay.  We reached a stipulation and we are not

24  calling Dr. Fruits.  So they -- there's no expert opinion to

25  rebut.

1          Again, he was not offered as an expert witness

2   initially.  If he had been offered as an expert witness

3   initially, then we would have taken his deposition, we would

4   have been deciding whether to call a rebuttal expert to him.

5          But we withdrew our expert based on the stipulation.

6   And they say they want to call Mr. Santana to, I think, rebut a

7   stipulation of fact.  Well, an expert witness doesn't rebut a

8   stipulation of fact.  An expert witness -- a rebuttal expert

9   witness rebuts expert opinion.  A stipulation of fact is not

10  expert opinion.

11         And let's look at what they're really trying to do,

12  Your Honor.  They want Mr. Santana -- he says it himself, he

13  wants to talk about all the good things that Wells Fargo is

14  doing; affordable housing, combating climate change, you know,

15  and things that are totally unrelated to this case.

16         We would not seek to offer evidence of Wells Fargo's

17  unrelated bad acts.  They filed a motion on that, and we have no

18  intent to do so.

19         But they shouldn't be allowed to provide Wells Fargo's

20  unrelated, quote, good acts through their witness.

21         A fact is not something to be rebutted.  We had no

22  opportunity to hire an expert to rebut him, and it basically

23  undermines our stipulation.  We withdrew our expert.  We

24  withdrew our exhibits because we had a stipulation.  There is

25  no -- there is nothing for Mr. Santana to rebut because we don't

1    have an expert witness.

2                    THE COURT:  Thank you.

3                    Now, it's your turn.

4                    MR. PETERSON:  Briefly, Your Honor, we did reach a

5    stipulation that made Mr. Fruits' testimony unnecessary in their

6    opinion.

7                    But, now, if you were to prevent us from calling

8    Mr. Santana, that would essentially penalize us for being

9    cooperative.  I don't think that that is an appropriate way to

10   address that testimony.

11                   THE COURT:  I did have some questions about the

12   portions of his testimony where he's talking about all the

13   wonderful things that Wells Fargo has done and why that has any

14   relevance to this at all, and really it's really not rebutting

15   the value.

16                   MR. PETERSON:  Sure, and I think because the scope has

17   changed with the withdrawal of Dr. Fruits, I think -- I think

18   you're exactly right.  We would be able to prevent -- present

19   rebuttal testimony on those -- those facts, and, like I said,

20   more explaining.  I don't think -- based on the evidence that

21   will come in through the stipulation, I agree with you.  I don't

22   think the good things are necessarily relevant to come from

23   Dr. Santana or Mr. Santana in that point so I don't disagree

24   with that, but I think being able to provide context to what

25   those numbers that what we stipulated to, what those mean, I

1    think that's relevant, appropriate, and will be helpful for the

2    jury.

3              THE COURT:  All right.  Thank you.  As regards

4    Mr. Santana, the plaintiffs are telling me that you would have

5    taken his deposition if you had had an opportunity or inkling

6    that he was going to be called as a witness in this case?

7              MR. SOLA:  If he had been disclosed as an expert which

8    they did with their other experts, yes, we would have taken his

9    deposition.

10             THE COURT:  Yeah.

11             MR. SOLA:  And we didn't have that opportunity, and

12   also, Your Honor, I want to point out, he goes way beyond -- he

13   starts talk about the amount of deposits and that they'd spent

14   considerable capital in areas of compliance.  They -- they have

15   a certain amount of assets.  It's really confusing.  I mean,

16   you've done these cases.  I've done these cases.  What the court

17   admits is net worth and income, you know.  The jury, to try to

18   color that and talk about how many depositors they have and all

19   these other things, it's not relevant.  It's not the kind of

20   evidence that's submitted, but it's also very confusing to the

21   jury, too, you know.  That's why you have financial people and

22   there's really no issue of what their worth is.

23             THE COURT:  Thank you.

24             I'm going to hang on to that thought for a while.

25             What else do you want to tell me?

1            MR. PETERSON:  May I just add one more thing?

2            Just to be clear, and I believe it's attached to

3   Mr. Sola's declaration, when we made the stipulation, it

4   was -- it was expressly acknowledged in that stipulation that we

5   would still intend to call Mr. Santana, and they reserved the

6   right to depose him even after the filing of these motions that

7   said, "We intend to call Mr. Santana," we've heard nothing from

8   them about trying to set a deposition.

9            So for them to now argue that there's some unfair

10  surprise about not being able to depose him is not well-taken.

11           THE COURT:  Thank you.  Let's move on.

12           Let's see.  We were at defendant's 2.

13           MR. FULLER:  Now we're on 3.

14           MS. SMITH:  No, Your Honor, I don't believe I heard a

15  ruling on number 2, and just to clarify, the argument on

16  number 2 is that it should be limited to -- by current financial

17  condition, we mean 2018 numbers.

18           THE COURT:  So as I understand the stipulation, it was

19  current financial conditions and then there was some other

20  evidence regarding 2016, '17, and '18; is that correct?

21           MR. SOLA:  Yeah, so and we did agree that that net

22  worth was considered the current.  So I don't think there's any

23  issue on currency and you've already ruled on the admissibility.

24           MS. SMITH:  The issue is on currency is that plaintiff

25  seeks to put in net income numbers for other -- years other than

1  2018.

2           THE COURT:  I thought that was your stipulation.

3           MS. SMITH:  Well, the stipulation was to the fact not

4  to the admissibility, the scope that -- that's the distinction

5  I'm drawing here is that we did, we did stipulate to the facts,

6  but we didn't stipulate to the admissibility of those facts,

7  which is where our motion in limine number 1 and 2 come from.

8  There's a difference between stipulating to a fact and

9  stipulating to the admissibility of a fact.

10          THE COURT:  Okay.

11          MR. SOLA:  Your Honor, this was a stipulation of fact

12  for trial.  And it's in -- it was not something in the ether.

13  This was to relieve us of the burden of having to offer other

14  evidence of their net worth and income.

15          So it was -- there was not a stipulation just of some

16  fact that might come in.  Otherwise, we would have continued to

17  offer our exhibits and offer our expert testimony.

18          THE COURT:  Thank you.  Anything else?

19          MS. SMITH:  Which we would have opposed.

20          THE COURT:  Okay.  So there a disagreement regarding

21  what the agreement was, as I understand it.  The defendant 's

22  motion to limit evidence to references of its current condition

23  is denied.  You can go ahead and go along with your

24  understanding of the stipulation, three years of income and

25  current year for net worth which is 2018.

1              Thank you.

2              Defendant's motion number 3, "Exclude evidence about

3    references to other bad acts past or present, other lawsuits,"

4    et cetera.  Is the plaintiff planning on offering any of that?

5              MR. SOLA:  We -- we may offer evidence of similar SRA

6    lawsuits based on similar conduct to prove --

7              THE COURT:  It's going to have to be really similar so

8    before you do that, you give me a head's up and tell me you want

9    to go down that path.

10             MR. SOLA:  I will, Your Honor.

11             THE COURT:  And I will send the jury out, and I'll

12   give you a chance to argue it.  Right now I'm not letting it in.

13   I'm reserving the ruling on that issue.

14             MS. SMITH:  Reserving the ruling on that.  Okay.

15             THE COURT:  All right.

16             MS. SMITH:  Okay.  And it will be heard outside the

17   presence of the jury then if it comes up.

18             THE COURT:  Yeah, it would be really silly if we put

19   it in front of the jury, wouldn't it?

20             MS. SMITH:  Yes.  Thank you.

21             THE COURT:  All right.  Thanks.  Let's move on.

22             Defendant's motion in limine number 4, "Exclude

23   evidence about and references to whether defendant should have

24   or failed to apologize or acknowledged its alleged errors."

25             And, again, I'm not quite sure what it is we're

1    getting at here, but is the plaintiff intending on offering any

2    of that -- any such evidence.

3              MR. SOLA:  Well, we do -- we do intend to offer the

4    evidence that they repeatedly, you know, denied that there was

5    identity fraud and they denied that they had violated the Fair

6    Credit Reporting Act and they denied that they did anything

7    wrong, but I wasn't going to say anything about apologizing.

8    But we were sort of going to do the corollary, that they always

9    denied that they did anything for which they should apologize.

10             THE COURT:  Okay.

11             MS. SMITH:  I think plaintiff's response to our motion

12   sheds some light on this.  They indicate in their response that

13   whether an apology or admission would have lessened plaintiff's

14   stress, was -- would it be relevant, so they wanted to put on

15   that evidence to prove that it would have somehow lessened if

16   they had had an apology or some admission of fault earlier, it

17   would have lessened his stress.

18             THE COURT:  They just told me they're not offering

19   anything about apology.

20             MS. SMITH:  Okay.  Well --

21             THE COURT:  When you tell a federal judge that, I

22   expect you to live by your statements, and if you don't, I seek

23   ways to make you pay that aren't good.  And he just told me he's

24   not seeking --

25             MS. SMITH:  I will take his representation now then

1      as --

2              THE COURT:  Also, what he did say, however, is that he

3      would bring out evidence that they denied -- that your clients,

4      Wells Fargo, has denied they had done any wrongdoing and not

5      admitted wrongdoing, I guess, would be another way to say it.  I

6      don't have any problem with that.

7              MS. SMITH:  Well, the other thing that we don't want

8      to see is we don't want to see them offering the prior answer,

9      assuming the court grants the motion to amend the answer, we are

10     admitting fault in part and our understanding was that plaintiff

11     intended to offer as evidence the prior answer.

12             THE COURT:  Yeah, I typically don't allow pleadings to

13     go into evidence anyway.  Okay?

14             MS. SMITH:  Okay.  Thank you.

15             THE COURT:  Let's move on.

16             Defendant's motion in limine number 5, "Exclude

17     evidence about reference to attorneys' fees and costs."  I think

18     we're all in agreement on that one.  That motion is granted.

19             Number 6, "Exclude evidence about references to any

20     obligations defendant might have beyond obligations triggered by

21     ACDVs if received."  Is this going back to the same

22     what's -- defenses the defendant allowed to raise in the first

23     place issue?

24             MR. SABIDO:  Your Honor, it is related to a discussion

25     we had just a few minutes ago the whole s-2(a) versus s-2(b)

distinction, and the point of our motion is to make sure that

plaintiff does not attempt to use s-2(a) obligations as a basis

for a private right of action because there is no such private

right of action.  It's only based on s-2(b).

THE COURT:  I think there is no disagreement that this

case is brought under s-2(b).  That is not in dispute.

MR. SABIDO:  I understand that, however, their

position is that we have opened the door to s-2(a) provisions,

and I think as the Court has already pointed out that's not the

case.  We're not claiming in any of our submissions or at any

time in this case that there was no duty to investigate.  We're

simply saying that in the process of investigating, the

information that it had asked for and had received plays into

how it's able to investigate.

THE COURT:  The issue is whether or not what Wells

Fargo was doing was reasonable as far as a reasonable

investigation or not.

MR. SABIDO:  Yes, and part of that reasonableness will

turn on the information that it had.

So, again, just to sort of pull it back, we're not

claiming any s-2(a) provisions.  We're simply saying as part of

the s-2(b) obligations, they should not be able to, in the

process of that analysis, be able to introduce s-2(a)

provisions, for example, the duty to report information

accurately or duties that relate to the direct disputes that are

1    lodged directly with the furnisher of information as opposed to

2    through the credit reporting agency.  Those are all s-2(a)

3    duties.

4              MR. SOLA:  Your Honor, if I may, because you point out

5    you're operating in a vacuum, and that's typical, so let's put

6    this argument in context.

7              Plaintiff's lawyer wrote to Wells Fargo on

8    October 19th, 2016, a direct dispute.  A week later before any

9    notice from any CRA --

10             THE COURT:  Right.

11             MR. SABIDO:  -- they wrote back to the lawyer and

12   said, "Here's information we want the consumer to provide."

13             That has nothing do with s-2(b) because there was not

14   even an ACDV at that time, okay, but they want to use that as a

15   defense, that we requested information he did not provide.  So

16   they can't have it both ways.  Here they're saying, "Plaintiff,

17   don't get into s-2(a), but let us get into our request for

18   information that was made pursuant to s-2(a)."

19             And they just shouldn't be allowed to have both

20   if -- because that request could not have been an s-2(b).  Their

21   request could not have been an s-2(b) request because they had

22   not even gotten an ACDV.

23             THE COURT:  Not at that time.

24             MR. SABIDO:  What?

25             THE COURT:  They hadn't gotten it yet.

1          MR. SABIDO:  They hadn't gotten it yet.  That's right.

2     So it was -- the request was made under s-2(a).  And now they're

3     saying we shouldn't be allowed to bring in any provision of

4     s-2(a) when they're trying to offer evidence that was done

5     pursuant to s-2(a); so --

6          THE COURT:  Thank you.

7          MR. SOLA:  Okay.

8          MR. PETERSON:  Your Honor, the factual background for

9     the investigation goes all the way back to these letters that

10    Mr. Sola is describing.  We're not using the legal theory that

11    s-2(a) provisions come into play.  We're simply saying the

12    request for information dating back to October 2016 and the

13    responses thereto are relevant to the body of information that

14    Wells Fargo had in the process of attempting to comply with its

15    reasonable investigation obligations.

16         So this whole notion that they now get into s-2(a), in

17    our opinion, is not well-taken.

18         THE COURT:  But it seems to me that they're correct in

19    that when Wells Fargo asked for the initial information that it

20    asked for from the plaintiff, wasn't that pursuant to 16 s-2(a).

21         MR. SABIDO:  It is, but at the end of the day, we're

22    not -- I want to make to clear -- we're not claiming that

23    because there was some sort of violation of an s-2(a) provision

24    that their, therefore, excuse is the duty to investigate.

25    That's where s-2(a), as far as I understand, plaintiff's

1  argument, comes into play because the provision in s-2(a)8 talks

2  about what happens under those circumstances and --

3          THE COURT:  Can I interrupt you for a second just so

4  I -- I want to make sure I understand Wells Fargo's position.

5          So Wells Fargo made the initial request pursuant to

6  2(a), didn't get the information that it wanted pursuant to

7  2(a), then had responsibilities under 2(b), and the failure

8  that -- failure to get information under 2(a) was part of the

9  reason that Wells Fargo didn't process under 2(b) as quickly as

10 it might otherwise have.

11         Am I saying that --

12         MR. SABIDO:  I wouldn't quite characterize it that

13 way, Your Honor.

14         THE COURT:  How would you say it?

15         MR. SABIDO:  The request for information is simply

16 part of the investigation.  Yes, it was done in response to a

17 direct dispute that was made and then that does fall within

18 2(a).  But as far as I know, these requests were not, okay,

19 pursuant to 2(a), now please send us this information.  And just

20 to take that to its logical conclusion, the reason why 2(a) may

21 come into play is that if Wells Fargo then takes the position

22 that the dispute is either -- get the wording here, frivolous or

23 irrelevant.

24         At no time did we ever take the position that because

25 of the failure to provide this information we now have deemed

```
 1    the dispute irrelevant or frivolous.  That's where 2(a) comes
 2    into play so that's not in play here at all.  We're simply
 3    saying, yes, the request for information was made and in the
 4    context of receiving the information or lack thereof,
 5    that's -- that was -- that's part of the analysis of whether the
 6    investigation subsequently conducted after assuming the ACDVs
 7    was reasonable.  What information did Wells Fargo have at the
 8    time it received the ACDVs in order to conduct its reasonable
 9    investigation obligations.  We're not saying, "You did not
10    provide this information, therefore, you violated 2(a);
11    therefore, we now get to deem your dispute irrelevant or
12    frivolous."  That's not the position we're taking.
13            THE COURT:  I don't think that what you're saying was
14    different from what I was saying.  You might have said it with
15    more words, but I don't think it was that -- that it was
16    inconsistent with my perspective of Wells Fargo's position.
17            MR. SABIDO:  What I'm trying to avoid, Your Honor,
18    is -- or what we're trying to avoid is a situation where they
19    then get to open up all these s-2(a) provisions and say, "You
20    had a duty to accurately report information.  You had a duty to
21    respond in the following manner to a direct dispute, because
22    there is no private cause of action arising out of those
23    provisions."
24            THE COURT:  I get it.  You're trying to kind of
25    control exactly how much information regarding 2(a) comes in.
```

1          MR. SABIDO:  Correct.

2          THE COURT:  And what you're trying to avoid are the

3    responsibilities under 2(a), but I think it is relevant that the

4    initial request was made pursuant to 2(a).  And that makes some

5    sense to me that we and the jury learn that.

6          And I think that the jury then needs to have some

7    information, well, why is this happening in the first place, and

8    that's because 2(a) requires the -- or Wells Fargo, I guess, the

9    furnisher to do certain things at least initially.

10         And that's what Wells Fargo did.  That makes some

11   sense to me that they would learn at least that much.  Whether

12   they then have to learn about the other responsibilities under

13   2(a), I'm not so sure because it seems that the case then took a

14   different turn once they started getting reports from credit

15   reporting agencies.

16         I have to think about that.

17         MR. SOLA:  Can I offer a suggestion?

18         THE COURT:  Yeah.

19         MR. SOLA:  Because, you know, I hear -- it sounds like

20   you're saying the fact that the request was made under s-2(a)

21   made be relevant, okay, and then we do open the door to s-2(a).

22   We are okay not opening that door as they want.  And I think the

23   compromise solution here is they can still testify that they did

24   a reasonable investigation based on the information they had.

25   In other words.  They can say, "We didn't have a Social Security

 1    card," or "We didn't have a driver's license," or "We didn't

 2    have this that we needed."

 3            They just shouldn't be allowed to say, "And we

 4    requested that from plaintiff and he didn't give it to us,"

 5    because then you get into s-2(a).  So I think that gives them

 6    their full defense under s-2(b) which is, you know, that they

 7    have to investigate based on what they have.

 8            But if you open up the s-2(a) -- now, he pointed out,

 9    they did not determine the dispute was frivolous or irrelevant

10    so actually they had to reinvestigate that direct dispute.

11    Their letter to him was meaningless under s-2(a) because the

12    only way they could avoid investigating under s-2(a) was to send

13    the frivolous or irrelevant letter.

14            So they can't have it both ways.  They can't say,

15    "Well, we didn't comply with s-2(a) but the jury should hear

16    about our request made under s-2(a)," and I think the compromise

17    I propose is one that would work.  They just can't say that

18    plaintiff was asked and plaintiff did not respond.

19            MR. SABIDO:  Your Honor, if I may?

20            THE COURT:  Sure.

21            MR. SABIDO:  The date of that letter is very relevant

22    to our defense because part of their theory is that he made a

23    dispute and it took so long to correct this information.  So to

24    take the position that our letter, back in 2016, should not be

25    admissible into evidence, I think, is not well-taken because

that goes to our defense of, yes, you sent the letter; yes, we

responded; yes, you requested this information.  So to take that

out of the equation and somehow just -- and at the same time

claim we've been damaged for over a year, I think, would be

inconsistent.

THE COURT:  When was the -- I don't have the timeline

in my head, which I think is important in this case.  What was

amount of time from Wells Fargo's perspective that this was

initially a 2(a) problem and then at some point thereafter

became a 2(b) problem?  What's the time?

MR. SABIDO:  I don't think it's necessarily a -- at

least from Wells Fargo's perspective, they're not looking at it

as a, okay, we received this, that's a 2(a) dispute; we received

this, it's a 2(b) dispute.  They're simply receiving this

information -- there is a unit that addresses this -- these

disputes.  They simply received the direct dispute, they look

into it, and then they receive the ACDVs from the CRA so it's

not like they're making some internal determination, 2(a), 2(b).

THE COURT:  But is part of your defense as regards

2(b) that you didn't get the information that you requested as a

result of a 2(a) investigation.

MR. SABIDO:  In part.  In order to --

THE COURT:  Well, as long as it's in part, then it

matters, at least it matters to me.

MR. SABIDO:  Sure.  I mean, the investigation is

1   substantially impacted by the information that Wells Fargo has,

2   and part of that information is whatever response or nonresponse

3   they had gotten from the plaintiff.

4          THE COURT:  What was the time frame between your

5   initial 2(a) letter or communication you got from the

6   plaintiff's lawyer and when you got your first communication

7   from the credit reporting agency?

8          MR. SOLA:  Your Honor, could -- well, I'm sorry.

9          THE COURT:  I'll give you a chance, I promise.

10          MR. SOLA:  No, I meant for the dates, but that's no

11   problem.

12          MR. SABIDO:  I was going to say it appears that the

13   direct letter was sent in October 2016, and then the first ACDV

14   was -- I believe it was November 2000 -- correct me if I'm

15   wrong.  Was that consistent with your notes, Tim?

16          THE COURT:  Okay.

17          MR. SABIDO:  That was November 2017, yeah.

18          THE COURT:  So a month?

19          MR. SABIDO:  Yeah.

20          THE COURT:  So at least right now, to the extent that

21   Wells Fargo was responding under 1681s-2(a), in October of '16,

22   the jury gets to learn that that's what was happening.  As

23   regards whether or not they get to learn whether or not Wells

24   Fargo complied with the other responsibilities under 1681(2)(a),

25   I'm not convinced that it's relevant.  At least I'm not

1    convinced that it's relevant yet.  It may be, but I

2    haven't -- you know, kind of operating a little bit in a vacuum

3    here.  I'm not certain it is relevant now, and I'm leaving that

4    information out for now.

5              MR. SOLA:  Your Honor, I'd like to point out, so the

6    first ACDV response, the first ACDV I see was sent on 10/28.

7    You know, and Wells Fargo might have said they got it on a day

8    or two later, but they responded on November 3rd.

9              THE COURT:  Okay.

10             MR. SOLA:  And we have been very careful, Your Honor,

11   as that is the date our case begins, our damages begin because

12   that's the first ACDV and implicates s-2(b).

13             THE COURT:  Right.

14             MR. SOLA:  And so, you know, that's, I think, another

15   reason that that other information is not relevant because we're

16   not claiming damages from October 19th through November 3rd, in

17   other words, from the date of the first dispute.  We are only

18   claiming the date of the first verification on an ACDV.  We have

19   separated our claim and limited it only to s-2(b), and we think

20   that's all that the jury should be apprised of.

21             THE COURT:  Right.  I think you and I disagree about

22   that.  Let's move on.

23             Where are we?  What number are we on?

24             MR. FRANSEN:  Number 7.

25             THE COURT:  So that's a motion to exclude evidence

1    about references to alleged economic losses and damages,

2    including those associated with lost opportunity to obtain

3    credit or damage to reputation.  So I know plaintiff is not

4    seeking economic damages in this case.

5              MR. SOLA:  Yes, Your Honor, so I think that's moot.

6              THE COURT:  Okay.

7              MR. SABIDO:  Your Honor, I just wanted to make sure

8    everybody is on the same page on this.

9              And this arises out of way plaintiff responded to this

10   motion.

11             Lost opportunity to obtain credit, in our opinion, is

12   an economic loss, if anything.  It's not cognizable as a

13   noneconomic loss so what they've said in their response to our

14   motion is that they're not seeking economic damages for lost

15   opportunity to obtain credit.  What we want to be clear on is

16   that that should not be a basis either to seek a lost

17   opportunity to obtain credit.  It's not a basis to seek

18   noneconomic damages.  That's an economic loss, not a noneconomic

19   loss.

20             THE COURT:  Okay.

21             MR. SOLA:  No, it isn't, Your Honor.  Economic loss is

22   you -- you know, you lost money.  You had to pay an extra

23   interest rate.  Lost opportunity to attain credit and -- was in

24   this case is that he knew his credit report was bad so he did

25   not seek credit.  It's not an economic loss and the --

```
 1              THE COURT:  And that caused him emotional distress.

 2              MR. SOLA:  And that caused him emotional distress and

 3    other related types -- yeah, but no economic damage.  He's not

 4    coming in -- and yeah.  So I think that we -- we don't really

 5    have a dispute.

 6              THE COURT:  You're not offering anything regarding

 7    reputation damage, I assume.

 8              MR. SOLA:  Yes, we are, Your Honor.  That's a --

 9              THE COURT:  In what way.

10              MR. SOLA:  I mean, that's basically one of the main

11    damages in these cases is they are saying that he didn't pay a

12    $29,000 bill that he owed, and that's not true.  So that's

13    our -- his reputation damage.  They are saying that he's

14    bad -- has bad credit, he didn't pay his bills.  I could go on

15    and on, and that's not true, so they damaged his reputation;

16    right?  His reputation for being a bill payer, for being honest,

17    for being credible.

18              THE COURT:  Are you seeking damages for the emotional

19    distress that he suffered because he felt that his reputation

20    was damaged?  Or are you seeking damages for --

21              MR. SOLA:  Both, both.

22              THE COURT:  -- his reputation, loss of his -- and so

23    who's going to testify as to loss of reputation itself?

24              MR. SOLA:  Okay.  So we have evidence that his credit

25    report went out to two companies, okay, and so he knows about
```

1    one of those.  So that's our proof of damage to reputation that

2    somebody saw his report with this fraudulent account on it that

3    made him look bad.  That's the damaged reputation.

4            Then emotional distress is --

5            THE COURT:  That part you don't need to explain to me.

6    That part is understandable to me.

7            The other part I had some question because I didn't

8    see anything in the materials that I had read that said someone

9    was going to come in and testify that -- for the reputation

10    damage to exist, somebody else has to see it, and I didn't know

11    who that somebody else was.

12            MR. SOLA:  Let me just clarify.

13            He knows that they saw it because he talked with them.

14    And then also, Equifax testified that they gave his report out,

15    and then his report indicates that his insurance company got his

16    file.  So there's three different ways we can prove damage to

17    his reputation.

18            THE COURT:  Okay.

19            MR. SABIDO:  I just want to make sure, Your Honor,

20    that again, these are -- they're not claiming economic damages,

21    they haven't filed a statement of economic damages.  And to the

22    extent these damages are properly characterized as economic as

23    opposed to noneconomic, then they should not come in.

24            THE COURT:  All right.  Thank you.

25            So at least as regards the damages associated with an

1    economic loss, I think that that question is moot, that the

2    plaintiff has agreed they're not seeking those damages.

3            They are seeking emotional distress damages, I don't

4    know whether reputation damages fall under emotional -- like

5    emotional distress damages or economic damages.

6    That's -- actually, I don't know the answer to that question.

7            MR. SOLA:  Well --

8            THE COURT:  I think typically they're not, but I don't

9    know the answer to that.

10            MR. SOLA:  Well, the way I try to divide it,

11    Your Honor, is damage to reputation is someone saying something

12    negative about you that's not true.  As you pointed out, you can

13    be bothered by that.  We all would be.

14            So -- but -- so your reputation is damaged when

15    someone sees your report, okay, and then you suffer emotional

16    distress knowing someone has seen your report that paints you in

17    a bad light.  But that's why I separate the damaged reputation.

18    You have to have a third party.

19            THE COURT:  That's what I said, you have to have a

20    third party.  I'm still not sure actually how you're going to

21    prove that.  But that's not my issue right now.

22            All right.  I'm going to put in a little note next to

23    that so I watch out for it as it happens.

24            So I'm going to just say granted in part, and then

25    I'll reserve ruling on the other portions of that, in

1    particular, the reputation damages.

2            Defendant's motion in limine, moving to number 8,

3    "Exclude evidence about references to defendant having liability

4    insurance."  That motion is granted.

5            Number 9, "Exclude expert testimony regarding any

6    legal conclusions or interpretations of case law."

7            This gets to, I think, the expert reports, which I

8    read.  Are you planning on -- I assume that you're calling an

9    expert who will be testifying.  Are you also offering the report

10   of your expert?

11           MR. SOLA:  Mr. Sand is going to take the -- I'm sorry,

12   I should stand -- the bulk.  But, no, we're not going to offer

13   any reports.

14           THE COURT:  Okay.  It's just your witness that's going

15   to be testifying to that?

16           MR. SOLA:  Yes.

17           THE COURT:  Okay.  And then I don't remember which of

18   your experts was testifying.

19           MR. SOLA:  Do you want the names, Your Honor?

20           THE COURT:  No.  I can just tell you, generally, there

21   were some statements in there that were clearly not admissible

22   in the expert reports that I read.

23           I don't have any trouble with an expert saying this is

24   what the standard is in the profession, this is what the

25   standard is for banking, and I don't even have trouble if they

1    said -- if their opinion is that the standard was not met.

2              But opinions that the defendant acted willfully or

3    that the defense is specious -- I think is one of the words I

4    read in one of the reports -- that's not helpful to the jury and

5    not admissible.

6              And I don't want to go through -- because it took me

7    too long to, kind of, go through line by line what I thought was

8    admissible and what wasn't.

9              But in general, if your experts are talking about the

10   standards in the profession, whether or not plaintiffs met those

11   standards, that's admissible.  I'm completely okay with that.

12   When you get to the areas of willfulness, then I have a problem

13   because that's not helpful to the jury.  That's something the

14   jury is going to have to decide.

15             MR. PETERSON:  And just for clarification, Your Honor,

16   other similar words such as - other phrases that were used, I

17   think, in both reports were reckless disregard, willful

18   violation.  So you've mentioned willful, but we would argue that

19   should extend to other words that have meaning specific to the

20   statute.

21             THE COURT:  Yeah.  To the extent that you're telling

22   the jury how to decide that issue, or your expert is attempting

23   to tell the jury how to decide that issue, it's not admissible.

24             MR. PETERSON:  Thank you, Your Honor.

25             THE COURT:  Similarly, there was a couple of legal

1    points that I had a little bit of trouble with.  One was your

2    expert was citing cases.  I think it was out of the Sixth

3    Circuit -- might have been a different circuit, I don't

4    remember -- and a district court case out of that same circuit.

5    It might have even been the same case.  I don't know.

6          But your -- one of your experts said, in that case the

7    court decided that what the defendant was doing was willful or

8    whatever it was.  And again, I don't have trouble with your

9    expert talking about the standard in the field.  But citing a

10   particular case out of another circuit in another district, I

11   don't want him doing that.

12         MR. SOLA:  I believe the purpose of that was simply to

13   say that Wells Fargo was on notice because a court had ruled on

14   what the standard is, and I think that's admissible.

15         THE COURT:  Well, I don't have him -- any trouble

16   saying, you know, I've read cases and it's admissible, bla, bla,

17   bla, bla, bla -- or excuse me -- that this helps formulate my

18   opinion about the standards.  I don't have any trouble with

19   that.  But that's different than saying, in another case, they

20   did exactly what they did in this case and that court ruled that

21   it was willful.

22         MR. SOLA:  Okay.  We agree with you on that,

23   Your Honor.

24         THE COURT:  And that's really what I'm trying to get

25   at.  Again, I can't remember which expert it was, but I remember

1  reading that specifically and that crosses the line.

2          MR. SOLA:  Okay.

3          THE COURT:  I assume, if you're familiar with your

4  experts, you know which one I'm talking about and probably know

5  where in the report it's located.

6          So, again, defendant's motion is granted on that,

7  number 9.

8          Number 10 is "Defendant's motion to exclude expert

9  testimony regarding emotional distress damages and damages that

10 an individual could suffer."

11         If expert is speaking in general terms -- as opposed

12 to specifically as regards to this case, motion is denied.  To

13 that extent, it is denied.  They can -- your expert can testify,

14 generally, in my experience, and what I've read about, people

15 suffer emotional distress, that's okay and I will allow that.

16         Next one, number 11, "Defendant's move to exclude

17 expert testimony regarding topics not set forth in their expert

18 reports."  That's another one of those "make them follow the

19 rules" motions, and I'm going to reserve ruling on that because

20 I don't know what it is you're talking about.  I cannot

21 anticipate it.

22         Number 11 is "Defendant's motion in limine" -- excuse

23 me.  That was 11.  We're on 12 to "Exclude Golden Rule arguments

24 or comments."  That motion is granted.

25         MR. SOLA:  Your Honor, if I might.

1          We have no intention to argue the Golden Rule.  But it

2     went beyond that and they said nothing in a book, I think it's

3     called "Reptile" or something, you know.

4          And to be honest, I haven't read the book, Your Honor,

5     so I wouldn't even know if I'm violating the rule.  It's so

6     vague.  I mean, the prohibition.

7          So I would ask that you just limit it, that we can't

8     say, you know, what they said, put your shoes in the -- put

9     yourself in the shoes of plaintiff, or something like that.  We

10    won't argue that.  But I can't avoid -- I don't know what's in

11    this book.  So I don't know what they mean.

12         MR. SABIDO:  Your Honor may be familiar with the whole

13    reptilian theory.  It goes -- it's essentially an extension of

14    the Golden Rule argument, and that goes beyond simply putting

15    yourself in plaintiff's position and saying, think about what it

16    would be like to be in an identity theft situation, or we need

17    society to send a message here, or Wells Fargo needs to learn in

18    order to protect society that it needs to do things differently.

19    Those are all reptilian-type theories, extensions of the Golden

20    Rule argument.  And we can't anticipate every potential argument

21    made along those lines so we've simply provided some examples in

22    our motion.

23         THE COURT:  So that's an argument issue, not a --

24         MR. SOLA:  Your argument about sending a message, I

25    mean, that's, like, your standard argument on punitive damages.

```
 1   That's the purpose of punitive damages, to punish and deter
 2   future conduct.  You might phrase it as a message, but, I mean,
 3   that -- that would eviscerate the whole model jury instruction.
 4            So we're not going to put -- say "put yourself in the
 5   shoes of the plaintiff," any of the Golden Rule stuff.
 6            THE COURT:  Thank you.
 7            Anything else?
 8            MR. SABIDO:  Nothing further, Your Honor.
 9            THE COURT:  All right.  I think they're right on
10   punitive damages issues.  I think, in fact, the instruction
11   says -- I don't know if you're familiar with the instruction off
12   the top of your head, but I think that there's language in the
13   instruction, and anything that's in the instruction, you can
14   argue.  I'll leave it at that.
15            If there's something beyond what's in the instruction
16   regarding the purpose of punitive damages that you intend on
17   arguing, before you get there, will you just let me know so I
18   can take a look at it and refresh my memory on that.
19            MR. SABIDO:  If I can add real briefly, Your Honor,
20   that ties into the motion to bifurcate, which I'm sure the Court
21   will address later, at what point do they get to hear that type
22   of argument.
23            THE COURT:  Okay.  Let's see.  Fact witnesses from the
24   courtroom are excluded.  Evidence -- we're at number 14.
25   "Exclude evidence of a purported TransUnion 'block notice.'"
```

1          I wrote the motion was denied, but I cannot remember

2     what it was about.  Somebody remind me.

3          MR. SOLA:  Well, they complained, one, that the

4     documents weren't produced timely, but we pointed out that we

5     served the subpoena timely and that that's the standard for

6     timeliness.

7          And then they argued that -- I think that they needed

8     to be explained, and we had a -- we argued that we had a

9     certification -- they're not business records.

10          Do you want me to go on?  You denied it, so I don't

11     want to play snatch defeat from the jaws of victory.

12          THE COURT:  Yeah.  I just didn't remember what it was.

13          Was there anything else on the part of defendants on

14     this issue?

15          MR. FRANSEN:  Your Honor, the letter at issue is one

16     that at Wells Fargo deposition they did not believe they had

17     received and plaintiff has gotten a copy of this letter from

18     TransUnion they're going to put into evidence, and they are

19     going to claim Wells Fargo received it.  There's no actual proof

20     of that.

21          They have a proof of the mailing, but they don't have

22     anybody -- you know, there was nobody from TransUnion for us to

23     ask, for example, "Well, if TransUnion sends a block notice and

24     they get it back, is that notated in the record?"  Something

25     like that.  So all we have is just sort of a bare document with

1    no one to explain it.

2            And it's not just about the receipt.  It's also the

3    content of it.  The document itself isn't really evidence of

4    anything of importance in the case.  TransUnion and other credit

5    reporting agencies are under totally different standards for

6    when they block information as to when furnishers do.  This has

7    got considerable potential to mislead the jury into thinking,

8    "Oh, TransUnion blocked it, Wells Fargo should have blocked it

9    too."

10           THE COURT:  Thank you.

11           Is there anything else you all want to tell me?

12           MR. SOLA:  Well, in terms of the lack of receipt, they

13   can raise that issue, you know.  And then, you know, I can cite

14   case law.  There's a Ninth Circuit case saying a fraud block

15   notice is equivalent to an ACDV, and that's out content.  It's

16   *Drew v. Equifax*.  It's in the material.

17           So they can argue they didn't get it and that's why

18   they didn't have to do anything.  But we have evidence that it

19   was mailed and it's -- they should have done something.

20           THE COURT:  I think I was right the first time.  That

21   motion is denied.

22           We're at number 15, "Exclude deposition testimony

23   where defendant's nonmanagerial employees were asked to testify

24   on behalf of the defendant."  That motion is denied.

25           And then a motion to amend the answer, is -- I think I

1    read everything in that -- in that motion.  I don't -- did I

2    just read a reply in the motion to amend?  Or did you -- are you

3    filing a reply in that one?

4            MR. FRANSEN:  We filed a reply on --

5            THE COURT:  Friday?

6            MR. FRANSEN:  -- Thursday or Friday, and I think we

7    had a copy delivered to your chambers as well.

8            THE COURT:  Yeah.  I think I just read it before I

9    took the bench, as I recall.  I was reading a bunch of stuff

10   that just came in on Friday.

11           So let me first turn to the plaintiffs on the motion

12   to amend.

13           Actually, let me hear from the defendants first.

14           Your motion.  What do you want to tell me?

15           MR. FRANSEN:  Your Honor, the standard for amendment

16   is, I assume, very familiar to everybody.

17           Wells Fargo would like to amend its answer to simplify

18   the issues for trial.  It's -- we're not adding anything new to

19   the case.  It doesn't change anything else that's been

20   submitted.

21           Plaintiffs have complained it might cause them to

22   change their strategy a little bit but that's not a valid reason

23   for denying leave to amend; so --

24           THE COURT:  Why did it take you so long?

25           MR. FRANSEN:  Well, you know, when we have to answer

originally, obviously, the case is very new.  And we conduct

discovery, we do our investigation.  It does take time.  And I

don't know that there's a requirement to admit liability faster

than -- by some specific time.

You know, the issue -- the issue, as we understand it,

for the standard is you look to if there's any prejudice to the

other side and you look to the reasons for doing it.  And those

are the two most important issues.  And here, there is no

prejudice, and our reasons for doing it are to simplify issues

for trial.

Defendant is going to argue at trial, we're going to

submit evidence and witnesses are going to testify that are

consistent with this admission of negligence, this limited

admission of negligence.  So all we're doing is amending the

answer to be the evidence that's going to end up being

presented.

THE COURT:  What difference does it make whether you

amend your answer or not?  I mean, you stand up at opening

statement and say we admit we were negligent in this short

period of time.

MR. FRANSEN:  It seems to us to be the proper thing to

do to make sure the admission is official and then goes into the

jury instructions as well.

You know, plaintiff has made a big deal today, and in

some of their filings, about Wells Fargo never admitting this,

1   never apologizing, never saying that, and that's all been sort

2   of in response to us seeking this leave to amend to say there

3   was limited negligence, and we want to put that in the jury

4   instructions and simplify issues for the jury.

5          THE COURT:  Thank you.

6          Is there anything you all want to tell me?

7          MR. SOLA:  Well, I think you, first, hit the nail on

8   the head.

9          Under Rule 16, they need good cause to modify a

10  scheduling order.  There's no good cause here.  They haven't

11  even tried to argue good cause.

12         Under Rule 15, an amendment of a pleading, you look at

13  undue delay, bad faith, and prejudice.  They lose on all three.

14  Undue delay, I mean, the amended -- that deadline was last June

15  of 2018, okay.  They waited more than a year.

16         Bad faith?  I think we can see bad faith, Your Honor,

17  because you asked that question.  Why did you wait so long?  And

18  they basically are admitting they could do it at trial, but they

19  want to do it here, and they don't just want to do their

20  amendment, they don't want the jury to know they made an

21  amendment, Your Honor.  They don't want the jury -- the want the

22  jury to think that they admitted liability long ago.

23         And, under prejudice to us, our experts would be very

24  different, our deposition would have been different, our

25  discovery would have been different if they would have admitted

1    partial negligence.

2            The question I would have loved to ask them is, "Okay.

3    What did you do that was negligent in 2017 that you didn't do

4    that was negligent in 2016?"

5            And then if they told me, I'd say, "Why didn't you do

6    that in 2017?"  So there were a lot of questions I could have

7    asked.

8            So I think that it's too late, they should have done

9    it earlier, we're prejudiced.

10           And as you said -- oh, and it complicates the case,

11   Your Honor.  We have one claim for negligent failure to comply.

12   We don't break it up by ACDV, we don't break it up by year.

13   They have artificially decided to split our claim in two, and

14   that's going to cause the jury to have to answer more questions.

15           And they can't -- you know, as the plaintiff, we get

16   to bring our claim as a unified claim for negligence.  They

17   should not be allowed to split our claim and then ask the jury

18   to decide two different sections.  It doesn't streamline the

19   case, it makes it more confusing.

20           Their verdict form has more questions than our verdict

21   form.  The jury instructions are going to be longer.  And

22   especially with negligence versus willful, which isn't always

23   the clearest thing for a jury, now they're saying partial

24   negligence.  You know, we think it -- you know, it should have

25   been denied, it should have been done earlier, and they have no

1  basis, good cause to do it.

2          THE COURT:  Thank you.

3          I'm supposed to consider undue delay, bad faith,

4  prejudice to the opposing party, futility of the amendment, and

5  whether the pleading was previously amended.

6          In this case, I find that the delay was, in fact,

7  undue.  I'm not willing to find that there was bad faith.  I

8  think this is a trial tactic that the defense is asking this

9  Court to consider.  It does not simplify the case to any

10  significant degree.  I find that the plaintiffs are prejudiced

11  should I grant such a motion.

12          And just based on those three factors, I'm ordering

13  that the motion be denied.  I'm not addressing futility of the

14  amendment, although, I don't see what real function it serves in

15  that defendant can tell the jury that they are conceding

16  liability for the period of time that they are now conceding

17  liability.

18          So under those -- or with those findings, I'm denying

19  the motion.

20          Secondly, the defendants move to bifurcate this trial,

21  to separate out the question of, I believe, willfulness in this

22  case and damages in this case -- excuse me -- damages in this

23  case should the jury come back with a verdict so that a separate

24  jury would then consider the damages portion or whether punitive

25  damages should be imposed.

1          The motion to bifurcate is denied.  This matter will

2    be resolved by one jury at the same time.

3          MS. SMITH:  Your Honor, if I could just clarify.

4          Our motion in that regard was not to have willfulness

5    decided separately, just the damages.

6          THE COURT:  Yes.  I'm sorry.  I misstated that.

7          MS. SMITH:  Thank you.

8          THE COURT:  Thank you.

9          Then let's see.  Let's get to the other motions, and

10   I'm now turning to exhibits.

11         The first set of exhibits are in, I think, a series of

12   emails between plaintiff and the -- was it the investigating

13   police agency?  I think that's what they were.  And those are

14   Exhibits 1, 6, 7, 8.  I don't know if 9 falls into that or not.

15   Let me find my notes.

16         MR. FRANSEN:  I think 9 does.

17         THE COURT:  Same thing?

18         MR. FRANSEN:  But 1 is not with the police or part of

19   it, at least.

20         THE COURT:  So Exhibit Number 1 is, I think, the

21   first -- is that the first communication that plaintiff had

22   letting him know that there was a problem?

23         MR. SOLA:  Yes, Your Honor.

24         THE COURT:  The motion to exclude Number 1 is denied.

25   It can be offered for the purpose of explaining that this is how

1  I found out that there was a problem.

2           Exhibit Number 2 -- excuse me -- Number 6, then -- and

3  excuse me -- through 9 are, again, communications with the

4  police regarding what was going on with the criminal prosecution

5  of the individual that took the plaintiff's identity.

6           I assume the purpose of these exhibits is, again, just

7  to simply explain why the plaintiff was doing what he was doing

8  as regards Wells Fargo.

9           MR. SOLA:  Yeah.  They go to damages.  Because they

10  hadn't fixed his report, he was following up with the police.

11  Especially the ones in January, where he's actually asking them

12  about documentation, because he feels he needs to do more to get

13  Wells Fargo to take it off.

14           THE COURT:  So 6 through 9 are admissible.

15           If you want a limiting instruction regarding the

16  hearsay aspect, I'll give it to them.  I don't know that it's

17  worth the trouble.

18           MR. SOLA:  Your Honor, don't we -- I think there's an

19  exception there because these officers are informing a victim, a

20  crime victim.  So that's --

21           THE COURT:  There's an exception for police reports?

22           MR. SOLA:  There's an exception for a statement on a

23  matter observed by law enforcement personnel in a criminal case,

24  and that's what they're doing.  They're telling him what they

25  learned in his criminal case.

1          THE COURT:  Yeah.  This is your client's statements

2     back and forth; correct?

3          MR. SOLA:  It's both.  It's -- but I'm saying the

4     officer's statements are not hearsay because they come under the

5     exception.

6          THE COURT:  What about your client's statements?

7          MR. SOLA:  My client's statements are not offered for

8     the truth of the matter asserted.  They are offered just to show

9     that he took this action.

10          THE COURT:  So that gives them a limiting instruction;

11     right?  Because it's not -- you get it because it's not hearsay,

12     but that means there's a limiting instruction because it's not

13     offered for its truth.  That's what the limiting instruction --

14          MR. SOLA:  I misunderstood.  I didn't realize that you

15     were also -- that you did accept the hearsay exception for the

16     officer's statement.

17          THE COURT:  But, again, my point was I don't know that

18     it's worth the trouble, giving them a limiting instruction.  You

19     all can think about it and decide whether you want one or not.

20          MR. FRANSEN:  Thank you, Your Honor.  And we would

21     dispute this qualifies for the police report exception.

22          THE COURT:  I'm not sure that it does either.  Be that

23     as it may, I think there's a nonhearsay purpose for all of it

24     anyway, so I think it comes in.

25          Number 28 were Equifax emails to the plaintiff.  The

1   objection is overruled.

2           Exhibit 45, Wells Fargo loan documents, the objection

3   is overruled.

4           46, 48, 49, 50 and 51, the objections are overruled.

5   52, 53, 54, and 55, the objections are overruled.  56, 57, and

6   58, the objections are overruled.  59, 60, 61, and 62,

7   objections are overruled.  63 and 64, overruled.  65 is the

8   section of the law, the motion is granted.  66 --

9           MR. SOLA:  Your Honor, if I might.

10          I just want to -- I want to use that as a

11  demonstrative exhibit in the -- in my opening statement.

12          THE COURT:  You want to point out what law says in

13  your opening statement?  That's fine.

14          MR. SOLA:  Okay.  So that -- because that's our

15  standard.  So that's okay?  I just want to show those sections

16  in our opening statement.

17          THE COURT:  Yeah.  Yeah.  If you want to kind of

18  anticipate what the jury instructions are going to say and use

19  those in your opening statement, you're welcome to do so.

20          MR. SOLA:  Thank you.

21          MR. FRANSEN:  We would object to that just because we

22  were just talking about the Section 1681 procedures, and you

23  were hedging a little bit on whether it might be relevant to

24  talk about them, and it might not be relevant based on where the

25  case is going.

1          But here, he's -- Counsel wants to put up the

2    statements for the jury from 1681(a) and show them to them

3    before evidence has even been put in the case.

4          THE COURT:  Yeah.  I understand what you're saying.  I

5    was actually just focused on this of whether or not you get to

6    put the law up and whether or not it was marked as an exhibit.

7    I thought it was going to be offered as an exhibit to go to the

8    jury and I wasn't going to allow that.  I hadn't really analyzed

9    whether he was putting up section (a) and section (b).

10          MR. SOLA:  Can I clarify?  It's not s-2(a).

11          THE COURT:  I'm sorry.  Okay.

12          MR. SOLA:  Because I know that's a quagmire.  No, no,

13    this is actually the congressional finding; so --

14          THE COURT:  Is that right?

15          MR. FRANSEN:  We don't find that to have any bearing

16    on the case and there's some argument in the jury instructions

17    about that as well.  It doesn't matter to the jury why congress

18    passed the FCRA or what the legislative political purpose of it

19    was.  What matters is what the statute says and whether or not

20    the defendant violated it.

21          THE COURT:  Go ahead.  I'm going to grant the motion

22    to exclude the exhibit to the extent that it runs to the

23    congressional intent of 61 -- 1681 (a)(1).  You're welcome to

24    put on 1681 (2)(b) in front of jury.  This is something you

25    wanted to do in your opening statement?

MR. SOLA: I do, but (a)(1) basically says that Congress has found that the accuracy of credit reporting is essential to our banking system. And that underlies the entire purpose and meaning of the act, the accuracy. And I think the jury, since they're deciding whether the FCRA was complied with, they should know why Congress enacted it and, again, it's only one or two sentences and accuracy is our argument.

THE COURT: I'm sorry, say again.

MR. SOLA: It's only one or two sentences and basically our main part of our case is this was not accurate information. It should have been fixed.

And that's why Congress enacted the Fair Credit Reporting Act, to make sure that inaccurate information got corrected. And I don't think the jury can properly decide if the law was complied with if they don't know the context and know the purpose for the law that they're trying to decide was complied with.

THE COURT: Yeah, I completely disagree with the last statement.

MR. SOLA: Well, but agree with the first part.

THE COURT: Yeah. I understand why you want to do it. The answer is still no. Let me think about whether I let you do it in closing argument. I think it -- if it comes in at all, it would be more argument than it is appropriate in opening statement.

```
 1         MR. FRANSEN:  And, Your Honor, just last final point,

 2   I just want to correct something Mr. Sola said, inaccuracy isn't

 3   the standard under s-2(b).  It's whether the investigation was

 4   reasonable so they can't sue us for reporting inaccurate

 5   information.  They can sue us for failure to correct a report

 6   without doing a reasonable investigation.  That's all.

 7         THE COURT:  This is going to be a fun trial to watch.

 8         Let's see.  We're at 66.  The answer I already told

 9   you.  I don't send answers to the jury.  So your motion is

10   granted.

11         67, the request for admissions also has a request for

12   admission and its response, the information may be admissible,

13   but the request itself is not going to be received.  Your motion

14   is granted.

15         As regards motion for partial summary judgment, never

16   does that go to the jury.  That motion is granted.

17         MR. SOLA:  Okay.  I'm sorry.  I withdrew that motion.

18   I informed them and didn't inform you.

19         THE COURT:  Okay.  Thank you.  I didn't catch up with

20   you on that one.  Thanks.

21         Then Defendants' Exhibit 501, it's a letter from Wells

22   Fargo to the plaintiff.  We've been talking about this a lot,

23   haven't we?  That motion is overruled -- or the -- yeah, the

24   motion to exclude 501 is overruled.

25         509, I'm going to reserve ruling on that one.  Before
```

1   you offer that one, give me a head's up, and the same with 510.

2   I need to think about those.

3           MR. FRANSEN:  Your Honor, is there an issue with 509

4   or 510 that perhaps --

5           THE COURT:  There may be.  I just don't recall right

6   now because I have too many things on my brain, and I just don't

7   remember what it was for this one so I'm just going to have to

8   go back and take a look at it.

9           MR. FRANSEN:  Okay.  Thank you.

10          THE COURT:  509 was -- I'm just not sure how relevant

11  they are to this case.  I think it was a relevancy issue, and

12  they may be.  I just don't know, and by the time you offer them,

13  I'll say, "Oh, yeah, makes complete sense to me."

14          MR. FRANSEN:  Would it help the court if we provided

15  some supplemental briefing on the relevancy of it?

16          THE COURT:  I don't think so.  I mean, I just think I

17  need to wait to see how the case unfolds, and then I'll be able

18  to make a determination at that point.

19          MR. FRANSEN:  Thank you.

20          THE COURT:  And then I'll allow you to make whatever

21  argument if I'm deciding -- if I rule against you or I don't

22  think it's coming in, I'll give you a chance to make an

23  argument.

24          Then I want to turn to objections to witnesses and

25  deposition designations.

1          I'm first looking at -- there's an objection to

2     witness Mary Frances Barron.  You -- both sides have witnesses

3     that you're complaining were not known until, I think, you filed

4     your first wave of documents with the court.  The defense

5     is -- complains about Ms. Barron, and I think the plaintiffs

6     complain about two witnesses, as I recall, that you

7     weren't -- weren't familiar with until, I assume, you got the

8     waves of documents from both sides.

9          So I hate to give you homework, but I also hate to get

10    rid of witnesses.

11          MR. SOLA:  There's a great difference.  Let me just

12    point out, Ms. Barron was disclosed in deposition on October 12,

13    2018, months before the deadline.

14          The other witnesses weren't disclosed until the first

15    wave when we had no opportunity to dispose.  So I think it's

16    really apples and oranges on the two witnesses.

17          THE COURT:  Of course you do.  And I don't disagree

18    with some of what you're telling me.

19          I don't know that a witness saying something during

20    the course of the deposition, however, gets to the same place as

21    a lawyer saying, "Hey, these are our witnesses" or "These are

22    the people I intend to call at trial."

23          MR. SOLA:  But let me -- he actually -- they asked,

24    "Is there a witness to your frustration that your experience

25    with Wells Fargo?"  And he said, "Definitely my mom."  So, I

1    mean, that's not just a disclosure of someone with incidental

2    knowledge.  That's actually a disclosure of a witness so

3    I -- you know, so I think that's different than other types of

4    disclosures.

5          THE COURT:  All right.  In any event, both of your

6    problems are we didn't know about these people.  Now, one of

7    them was a person that -- that was -- that's a substitute

8    witness on the part of the defense.  Is that correct that you

9    had somebody that had moved to a different job and is now --

10         MR. FRANSEN:  Yeah, that's correct.  Megan Braxton is

11   intended to be our representative at the trial, sitting at

12   counsel table.  She has the same job as the person who was

13   deposed as a 30(b)(6) witness on two occasions earlier this

14   year.  The other individual is not going to be sitting at

15   counsel table, but he is simply a manager in another department

16   who will be able to explain that department's specific roles,

17   and those -- those, in fact, relate to Exhibits 509 and 510.

18         THE COURT:  And that's John Cooper; right?

19         MR. FRANSEN:  That's correct.

20         THE COURT:  So I get Megan Braxton, the -- Wells

21   Fargo, big organization, things change, and you want to use

22   Ms. Braxton and tell them nothing is really changed.  All right.

23   Put that aside for a second, but Mr. Cooper seems like brand new

24   stuff.

25         MR. FRANSEN:  Well, he -- we've disclosed through our

1  initial disclosures what -- really what you can do as a big

2  company as you say, we're going to have a representative at

3  trial who is going to talk about policies and procedures.  We

4  did not endeavor to specifically decide who that person was

5  going to be previously.

6          THE COURT:  Is that what Ms. Braxton is doing?

7          MR. FRANSEN:  Ms. Braxton is talking about -- she

8  works in the credit bureau resolution department.  John Cooper

9  works in the fraud department.  So they are two separate

10 departments, but they work together on these types of disputes,

11 and of course, as you know, that's a very big issue in this case

12 is whether it's reasonable how that's set up.  But Mr. Cooper is

13 manager of -- he would be the manager of -- or he would be one

14 of the managers of somebody like William Brady who is one of our

15 witnesses.  So he's in a better position to testify about

16 those -- well, I should say he's in a good position to testify

17 about those -- those items.

18          Now, when they sent the 30(b)(6) deposition notice,

19 they had a very lengthy list and, I believe, we had some

20 negotiation about what all is going to be on it, but at that

21 time we simply identified Bets Berg as our witness and she

22 talked about credit bureau and fraud issues.  For purposes of

23 trial, though, we'd like to have Megan Braxton talk about credit

24 bureau resolution department issues, and we'd like to have

25 another witness who is actually in the fraud department talk

1    about fraud issues.

2            There was no complaint after either of Bets Berg's

3    depositions that she was not adequately prepared to talk about

4    the topics on the list.  There were some discussions about

5    whether Wells Fargo produced all its documents, but there wasn't

6    a discussion about Bets Berg not being properly prepared for the

7    deposition.

8            So we believe, under the rules, Wells Fargo is not

9    bound forever to make the same designation that it made a year

10   ago in the case for trial.  And so that's why we've designated

11   two witnesses where it was previously designated one.

12           THE COURT:  All right.  Thank you.

13           MR. FRANSEN:  I do want to clarify.  I'm sorry.  And

14   we are not taking the position -- for example, John Cooper's

15   testimony is still impeachable or whatever with Bets Berg's

16   testimony on the same topics.  We wouldn't dispute that.

17           THE COURT:  Okay.

18           MR. SOLA:  Well, Your Honor, actually in their initial

19   disclosures, they said "Representative of Wells Fargo to be

20   identified," and then they said, "Knowledge of events alleged in

21   the complaint," so they said they were going to identify the

22   witness in their initial disclosures and they do need to

23   identify the witnesses.

24           And they did.  The only person they identified was

25   Bets Berg.  And she testified -- we never -- well, Megan Braxton

1   was incidentally mentioned.  I don't know if Mr. Cooper was,

2   but, you know, that didn't give us the opportunity to depose

3   these people.

4          He also says, "Well, we can switch our corporate

5   representative."  Your Honor, they were not designated corporate

6   representative.  They were listed as lay fact witnesses in their

7   witness statement.  Lay fact witnesses, that's how they

8   designated them.  It was only after we objected that they had

9   not been identified that they switched and said, "Oh, these are

10  our 30(b)(6) witnesses."  They can't switch how they identify a

11  witness in a witness statement.

12         Also, well, rule 30(b)(6) is not a trial rule.  It's a

13  deposition rule.  And it's a deposition rule that's given so the

14  either side can get information that's known by a corporation.

15  Otherwise, I could never get the information.

16         So 30(b)(6) is actually done to the benefit of the

17  opposing party.  They now want to come in and say, "This is a

18  30(b)(6) witness," and they can testify even if they don't have

19  personal knowledge on their own behalf, on Wells Fargo's own

20  behalf.  That's not what 30(b)(6) allows, and, again, 30(b)(6)

21  doesn't override Federal Rule of Evidence 602, which requires

22  personal knowledge.  Now, I know I'm shifting a little here,

23  getting from nondisclosure to personal knowledge, but I just

24  want it clear that they said they would identify these people

25  and they didn't.

1         And you hit the nail on the head, Mr. Cooper is not a

2    substitute for Ms. Burg.  He's a new -- he's a new guy, and they

3    already are calling Mr. Brady.  He's in the fraud department.

4         So they got a fraud department witness in Mr. Brady,

5    and, you know, I could go on.  There's -- it was great prejudice

6    to plaintiff because they hadn't been identified.  We tried to

7    depose everybody in this case.  We went to you, Your Honor, and

8    we said, "We want to depose nine employees about this case."

9    And you said that -- go ahead.  If we would have known about

10   Cooper and Braxton, we would have deposed them.

11        And we didn't get that chance.

12        THE COURT:  Thank you.

13        So why do you need somebody in addition Brady?

14        MR. FRANSEN:  Well, couple of reasons, first off,

15   Mr. Brady no longer works in the Wells Fargo fraud department.

16   He's still employed by the bank but in a different capacity now.

17        THE COURT:  Yeah, but he didn't forget everything that

18   he once knew while he was working in the fraud department.

19        MR. FRANSEN:  I don't know that that's true or not.  I

20   mean, obviously he's -- we know he knows some things and he is

21   being called to testify about what he does remember, but he's

22   not the manager of that department.  Plaintiffs have submitted

23   some arguments in this case that, basically, anyone who works

24   for Wells Fargo, as a managing agent, disagree with that

25   position.

1          William Brady -- John Cooper is the type of person who

2    would oversee William Brady's work, and I should clarify, they

3    did not work below and above each other at any specific time.

4    Again, people have come in and out of different roles with the

5    bank.

6          But John Cooper is in a position to testify about what

7    the policies and procedures were at the time in question and

8    what they are now.  And he's in a better position to testify to

9    all that information.

10         A corporation can only testify through its

11   employees -- or its managers.  We don't have the option to call

12   Wells Fargo and just put something up there.  We've got to have

13   people to do it.

14         And in this case, we think it makes a lot more sense

15   to have two people, one from each of the departments, who are at

16   issue, come up.  I'm not sure I understood some of plaintiff's

17   counsel arguments.  30(b)(6) is the way corporations give

18   testimony at deposition.  I think the only -- the only reason

19   we'd ever bring it up is to show that it's a similar standard

20   for when those people need to have personal knowledge.  The rule

21   being manager -- and there's a Ninth Circuit case on this that

22   we've cited.  Managers of departments are presumed to have

23   knowledge of the policies and procedures of their departments so

24   Megan Braxton has personal knowledge of her department.  John

25   Cooper has personal knowledge of his department's policies.  And

 1   they'll be -- they'll be able to present to the jury evidence of

 2   what those policies were, what they are now, and what they used

 3   to be, and they'll be able to explain whether certain conduct

 4   was taken consistent with those policies or not consistent with

 5   those policies.

 6           THE COURT:  Thank you.  All right.  You want them, you

 7   can have them, but you need to make them available for

 8   deposition between now and the time of trial.  Understood?

 9           MR. FRANSEN:  Does it need to be in person?  Can it be

10   remotely?

11           THE COURT:  I don't know.  Do you have a preference?

12           MR. SOLA:  Well, Your Honor, I mean, I appreciate

13   that, but we have a week.  We're --

14           THE COURT:  I know.

15           MR. SOLA:  -- preparing for trial here, and I think

16   it's prejudicial to have us have to depose these two witnesses,

17   you know, a couple days before trial.

18           THE COURT:  I know, but I'm loathe to exclude evidence

19   by witnesses unless there's no other alternative.  And you have

20   a bunch of lawyers there.  You can get this taken care of and

21   get these people deposed.

22           MR. SOLA:  I mean, Bets Berg is still there.  You

23   know, I don't know why they can't call her, but anyway let me

24   make one other point and this goes to their personal knowledge.

25           They say they're going to talk about plaintiff's

1    receipt and reinvestigation -- or investigation and response to

2    plaintiff's disputes.  They don't have any personal knowledge of

3    that.  That's different than what are the procedures of the

4    fraud department.

5              In fact, Ms. Berg was asked, does Ms. Braxton, was she

6    involved in plaintiff's disputes, and she said no.  She wasn't

7    there at the time.

8              So I would move to exclude that portion of their

9    testimony because they have no personal knowledge of anything

10   related to plaintiff's disputes.

11             THE COURT:  Take the deposition, and then you'll be in

12   a much better place to make your motion.

13             MR. FRANSEN:  May I ask a clarifying question?  Since

14   Megan Braxton is essentially just replacing Bets Berg, does she

15   still also need to be deposed again to cover the same topics

16   that Bets Berg already covered?

17             THE COURT:  Yes.  If you want a witness that they

18   haven't seen before, they get a chance a depose them.

19             MR. FRANSEN:  Okay.

20             THE COURT:  Absolutely.  And by the same token, if you

21   want to depose Ms. Barron, they're going to make her available

22   for you.

23             MR. FRANSEN:  Thank you.

24             THE COURT:  Let's move on.

25             Evan Hendricks.  I think we've already talked about

1    this.  Testimony prohibiting from rendering legal opinions,

2    again, they're allowed to speak in generalities.  They're

3    allowed to talk about standards and whether the standards were

4    met.  So I will grant the motion in part.  Witness Thomas

5    Carter, same thing.  I've already talked about emotional

6    distress.  Do you need any further clarification regarding that?

7                MR. PETERSON:  Your Honor, if I could just ask one

8    question to clarify, so one of the things we object to and I

9    just want to make sure I understood you in your earlier ruling,

10    they spend a lot of time in their reports talking about the sort

11    of generically what harm a person could suffer as opposed to

12    what harm this plaintiff suffered.  Is it your ruling that that

13    is okay for them to testify about?

14                THE COURT:  I think the way I put it was, an expert

15    can testify that based on his experience and research and

16    education, that people who have gone through this suffer these

17    kind of harms.

18                MR. PETERSON:  Okay.  Thank you.

19                THE COURT:  Mr. Brady, so the defendants wanted to use

20    the deposition testimony of Mr. Brady -- excuse me.  The

21    plaintiffs wanted to use the deposition testimony, and defense

22    is objecting because he's going to be here.  That's fine, if

23    he's going to be here, but you've got to bring him and have him

24    here for their case-in-chief.  And if he's there for their

25    case-in-chief, then use live Brady.  If he's not here for your

1   case-in-chief, then use the deposition.

2          MR. SOLA:  All right.  Well, I mean, it's --

3          THE COURT:  One of the things that I -- that you cite

4   was the rule, and I disagree with you that the rule applies in

5   this particular case for using his deposition because if he's

6   here, he's available, he's right there behind you.  And

7   secondly, I don't believe he's a manager.

8          MR. SOLA:  Your Honor, it would just be ten minutes.

9   I think it would just be more efficient if I just read his

10  deposition in our case-in-chief, and then he doesn't have to

11  show up a day or two earlier.

12         THE COURT:  Work it out.  It will save a lot of money

13  by not having to bring him here a day or two earlier.  But if

14  they're insisting that he use live testimony, we'll bring him

15  here a day or two earlier.

16         MR. SOLA:  Okay.

17         MR. PETERSON:  Your Honor, will we have the

18  opportunity as part of this today to talk about some of those

19  logistics, about how long plaintiff's case will be and so we

20  know when we have to have out-of-state witnesses here?  Is that

21  part of what we'll discuss in the logistics portion of this?

22         THE COURT:  Yes.

23         MR. PETERSON:  Thank you.

24         Dean Binder.  This is a defense witness.  Do I need to

25  talk about him, or have we already resolved that by way of

1    motions in limine?

2         MR. SOLA:  No, I think we have a motion Mr. Sand is

3    going to address.

4         MR. SAND:  This bleeds into what we were talking

5    about, the s-2(a), s-2(b) division, but the majority of

6    Mr. Binder's expert testimony, expert report, discusses s-2(a),

7    discusses the reasonableness of -- his opinion on the

8    reasonableness of Wells Fargo's policy to request the Social

9    Security number.  But the majority of his report does not

10   discuss anything about s-2(b), so we're seeking to exclude or

11   prohibit him from testifying about s-2(a).  The concern is it's

12   going to further confuse the jury here if he's testifying about

13   industry standards and practices with respect to s-2(a) when

14   this is a trial entirely about s-2(b).

15        THE COURT:  Okay.  Thank you.

16        Who's talking about --

17        MR. PETERSON:  Your Honor, our position -- and this is

18   really both with Mr. Binder and Mr. Kelly, two of our three

19   experts.  And, again, we had a long conversation with Mr. Sabido

20   about this, but it gets back to a mischaracterization of what

21   both the testimony is and what the argument is.

22        It doesn't have to do with s-2(a) versus s-2(b).  It

23   has to do with -- what our experts are testifying about is that

24   a reasonable investigation in this case is for Wells Fargo to

25   look at its system of record, look at the information that it

1    has.  And so the testimony is, that if that information would

2    have come in, the additional stuff they would have asked for,

3    that would become part of the system of record and, therefore,

4    that information would have been part of what could be used to

5    verify.

6          And so what our experts will testify to is that

7    looking at your internal information is a reasonable

8    investigation, and as part of that reasonable investigation, it

9    includes everything you pull in about that defendant, whether or

10   not it comes from the fraud department as a result of a direct

11   report or other sources.  It's what becomes part of the system

12   of record that Wells Fargo then looks at to verify or not verify

13   the identification.

14         And so our position is that the testimony that

15   Mr. Binder and Mr. Kelly are giving on those topics is very

16   relevant and admissible.

17         THE COURT:  The other objections regarding Binder had

18   to do with speculation about what would happen if the plaintiff

19   had sent Wells Fargo information it requested, and to the extent

20   he's speculating, I'm not going to allow him to do that.

21         And then, finally, there was an objection regarding

22   damages in that Mr. Binder isn't qualified regarding the issue

23   of damages.  And, again, I tend to agree with plaintiffs on that

24   point.

25         As regards to the other objection, whether or not he

1   gets to testify at all because of the possibility he might be

2   addressing s-(2)(a), that objection is overruled.

3            MR. PETERSON:  Your Honor, can I briefly address the

4   damages piece?

5            THE COURT:  Sure.

6            MR. PETERSON:  So one of the arguments that he'll

7   make, what he'll -- not arguments, what he'll describe to the

8   jury, what he will inform them on is what effect a negative

9   report has on a person's credit, and that will go directly to

10  providing the jury with a basis for what are reasonable damages

11  in this case.

12           Mr. Binder will be able to explain, here's

13  what -- when this derogatory report from Wells Fargo showed up

14  on Mr. Sponer's report, here is how that affected him, here's

15  how that affected his credit.  And then the jury will be able to

16  decide, based in part on that testimony, whether or not the

17  damages he's requesting in relation to the actual harm, whether

18  those are reasonable.

19           So with respect to damages, I think Mr. Binder's

20  ability to testify about what actually happens with these

21  derogatory reports is an important piece of information for the

22  jury to have.

23           THE COURT:  Thank you.

24           Do you want to respond?

25           MR. SAND:  Yeah.  Real quickly, Your Honor.

1          Mr. Binder's testimony is primarily that plaintiff did

2    not apply for credit.  That's not something that we need expert

3    testimony on to introduce into evidence.  It's not a matter of

4    expert testimony.  The fact that he didn't apply for credit

5    during that time period is not something that we need Mr. Binder

6    to explain to the jury with any degree of expertise or need for

7    expertise.

8          THE COURT:  What about the other part where they're

9    saying that he's going to be testifying as to what happens with

10   the actual reports and that's relevant to determine what damages

11   Mr. Sponer may have suffered?

12         MR. SAND:  I'm not sure that he gets into that degree

13   of nuance with it.  I think it boils down to essentially he did

14   not apply for credit, and as a result, Mr. Binder's opining that

15   he was not damaged from a creditworthiness standpoint.

16         THE COURT:  Well, and you're also seeking damages

17   because his reputation was affected as well.  It sounds to me

18   like what Mr. Binder is testifying may be relevant to that point

19   as well, in other words, what actually happens to these things.

20         The objection on that point is overruled.

21         MR. SOLA:  Your Honor, if we could just maybe -- I

22   think we're all agreed, he can't go beyond what he's stated in

23   his report.  Is that fair?

24         THE COURT:  You're asking me about your own --

25         MR. SOLA:  I'm sorry.  Okay.  You've got to wait for

1    trial for that.  I just thought it might clear up -- because,

2    you know, there was sort of an argument about what he was going

3    to testify to.  But we'll just reserve that.

4              THE COURT:  The other thing I would caution the

5    defense about is you're being very careful and surgical, I might

6    say, in making sure that the s-2(a) information is limited.  I

7    don't know what your experts are going to say, but it may well

8    be, by the time they're finished testifying, that they have

9    opened the door to the entirety of that provision, and I will be

10   listening carefully to see whether or not that door has been

11   opened or not.

12             MR. PETERSON:  Thank you, Your Honor.

13             THE COURT:  As regards Brian Kelly, do I need

14   to -- based on what I've already told you, is that something I

15   need to spend more time with?  Or do you have an understanding

16   based on what I've already said about what my expectations are?

17             MR. PETERSON:  Your Honor, I think there's one

18   additional objection they made to Mr. Kelly's testimony.  I'll

19   let Mr. Sola correct me if I'm wrong, or Mr. Sand, but I think

20   they objected to his introduction related to just identity theft

21   in general.  I think if you'll review Mr. Kelly's credentials,

22   he certainly has enough experience in his decades in the credit

23   industry to discuss the problem of identity theft in general

24   terms.

25             THE COURT:  Okay.

1          MR. SAND:  Your Honor, it's precisely the introduction

2     of his expert report where he discussed things about a supposed

3     cottage industry of credit repair organizations and

4     industry-wide identity theft procedures.  I think he quotes a

5     website from an insurance company regarding identity theft.

6          More importantly, though, at his deposition, he

7     conceded that identity theft specifically is not an area for

8     which he considers himself an expert.  He does in credit

9     reporting, banking, I believe it is.  But all the -- that entire

10    introduction would be subsumed within that identity theft

11    expertise that he's conceding he doesn't have.

12         THE COURT:  Thank you.

13         The objection is overruled.

14         That takes care of Mr. Kelly.

15         MR. PETERSON:  Yes, Your Honor.

16         THE COURT:  We're at Jose Santana.  I think we've

17    already talked about Mr. Santana.

18         Certainly, much of his testimony is not relevant,

19    particularly about all the great things that Wells Fargo has

20    done in the community.

21         The question to me isn't that.  The question is

22    whether or not he gets to testify, and we're kind of back to

23    where we were before where you have witnesses that

24    the -- Mr. Sponer, the plaintiff in this case, is learning about

25    late and then some confusion regarding what -- or disagreement

regarding what the stipulation regarding Wells Fargo's finances were, what the stipulations were or was, and what it meant, and whether or not Mr. Santana's testimony was precluded based on that stipulation.

I don't find that the stipulation precluded Mr. Santana from testifying.  However, I've already stated that much of his testimony is irrelevant and should be excluded, and that has to do with the topics that I've already mentioned.

I also believe it important that Mr. Santana be made available to the plaintiffs should they choose to depose him ahead of time.

Let's move on.

Megan Braxton, do we need to talk any more about Megan Braxton or John Cooper?  I think we've already resolved those issues.

Now we're to deposition designations.  Oh, my goodness.  Get your pencils out.

Let's see.  Montressa Ebron, Brian Funsch, Ashley Grier, Colin Hollomon, all the way down to Celestina Gobin, all of those objections are overruled.

Then Celestina Gobin, I want -- you have the same chart I do.  The objections where it says "Plaintiff's designation," and then it begins with page 35 and above, those are the first two blocks for Celestina Gobin, yes, those are overruled.

1            And then pages 46, 47, and 51, those objections are

2    sustained.  That's Berg.

3            Pages 35, line 11, and page 60, lines 1 through 3, the

4    objections are sustained; otherwise, overruled.

5            Page 43, 11 through 13, the objection is sustained;

6    otherwise, overruled.

7            Page 58 and below, overruled.

8            And all the rest of the objections are overruled.

9            MR. SOLA:  Your Honor, can I just ask

10   about -- Ms. Gobin was 46, 47, and 51.  And that's because they

11   were leading questions?  I mean --

12           THE COURT:  Ms. Gobin, I didn't -- I overruled all of

13   the objections.

14           Oh, I'm sorry.

15           MR. SOLA:  I thought I heard you --

16           THE COURT:  No, no.  You're correct.  You're correct.

17   46, 47, and 51, they were leading questions.  The objection was

18   to form of the question.  Those objections were sustained.

19           MR. SOLA:  Okay.  So I mean -- so your ruling is they

20   weren't an adverse party?  I mean, we get to ask -- the Rule

21   611, I believe, says an adverse party, you can ask leading

22   questions.  They were the defendant in the case and now you've

23   actually indicated that you may let the jury hear they were

24   defendant.

25           THE COURT:  Let me look.  I might have mismarked that.

1          Do you remember if that was in the first or second

2    notebook?

3          MR. SOLA:  Second notebook.

4          THE COURT:  Thank you.

5          I'm wrong on that one, at least as regards 46, 10

6    through 23.

7          Let me look at 47.

8          MR. SOLA:  Your Honor, 47, they didn't object.

9          Oh, no.  I'm sorry.  They didn't object on 46 and 51.

10   And then my argument was, on 47, that they weren't leading.  Of

11   course my primary argument is I could lead because they were an

12   adverse party.

13         MR. FRANSEN:  And I'd just point out they weren't

14   adverse anymore.  They had settled with Equifax and one of terms

15   of the settlement was --

16         THE COURT:  That's what it was.  That's what it was.

17         Were they still adverse parties with Equifax?  Equifax

18   had already settled when you took the deposition; right?

19         MR. SOLA:  They had, Your Honor.  I don't think that

20   eliminates them as an adverse party.  I mean, when people

21   settle, they don't become friends.

22         But even so, first, they didn't object on 46 and 51,

23   so they waived it.

24         THE COURT:  Okay.  What do you want to tell me about

25   that one?  There was no objection for leading.

MR. FRANSEN: Some of them -- some of them, there are. But the two -- just the ones he's talking about?

THE COURT: Yeah. 46 and 51. And then he says there was an objection on 47, although, let me look because I don't know if I see it.

Yeah, there was an objection on that one.

Actually -- go ahead.

MR. FRANSEN: I'd just say the transcript does not contain an objection. I can't tell you for sure if -- this was a deposition done via telephone. Nobody was in the same room. So I can't say for sure that there's an objection that wasn't caught. I can't say that. But it's not in the transcript; so --

I still think they're leading questions and, objection or not, they're inappropriate.

THE COURT: Did you make the standard stipulations at the beginning of your deposition which says you object to the form of the question and all other objections are reserved?

MR. FRANSEN: Did we do that at the beginning of the --

THE COURT: Deposition. I assume that that's what you did. I was operating under that assumption.

MR. SOLA: Well, Your Honor, leading, that's a form objection.

THE COURT: I'm kind of with you this -- right now.

1    Settle down over there.  I'm agreeing with you right now.

2            Is that correct?

3            MR. FRANSEN:  Is it correct that that was -- that

4    stipulation was made?

5            THE COURT:  Yeah.  Because otherwise you waived all of

6    your objections.  So I assume you made those objections, or you

7    made that stipulation.

8            MR. FRANSEN:  I don't think we made that stipulation

9    at the beginning of the deposition.

10           But our understanding of the rules would be that, for

11   objections that we do make, if there are objections to the form,

12   that's sufficient because the rules don't allow us to make

13   speaking objections --

14           THE COURT:  Correct.

15           MR. FRANSEN:  -- and interrupt.

16           So from understanding Your Honor, you're going to deem

17   that we've waived the objections were there is no objection on

18   the record.

19           THE COURT:  At least not to the -- yeah.  On these,

20   you have -- as to the form of the objection.  And where

21   you -- on one of these, you did object to the form.  It's on

22   page 47.  I'll sustain that objection.

23           As regards pages 46 and 51, there is no objection.

24   It's waived.

25           MR. SOLA:  Your Honor, if you note, on page 47,

1    actually, the objection is from Equifax's counsel.  Okay.  I

2    think that supports my argument that it's an adverse party.

3    Just because we settled -- I sued them, and so they have no love

4    for plaintiff.

5        THE COURT:  Wait a minute.  You made an agreement with

6    Equifax that they were going to cooperate with you and that they

7    were going to testify in order to support your case against

8    Wells Fargo.

9        MR. SOLA:  No.  We made an agreement that they would

10   give us deposition testimony, and that saved them from having to

11   comply with the subpoena.

12       THE COURT:  Yeah.  They're not an adverse party

13   anymore.  That's part of your deal.

14       MR. SOLA:  All right.  But my question isn't leading,

15   though, Your Honor.  My question is -- let's see.  It's 20 to

16   24.  "And what about Foremost Insurance?  Do you think it could

17   be them?"

18       I don't -- I don't think that's leading.  They -- the

19   prior answer was, "I know it's an insurance company because of

20   the IG," which is a code.  Okay.  So --

21       THE COURT:  Hang on just a second.  Let me read the

22   whole thing.

23       All right.  Is there anything else you want to tell

24   me?

25       MR. FRANSEN:  I think we didn't only object to that as

1   leading.  It's also speculation.  He says -- she's thinking it's

2   an insurance company, and he gives her the insurance company he

3   wants her to say, and she says, "Yeah, that sounds right."

4           THE COURT:  Anything else?

5           MR. SOLA:  Well -- and, Your Honor, I -- I think

6   "objection to the form" also isn't an adequate objection because

7   it doesn't specify the grounds.

8           As we know, only objections to form can be made, and

9   by saying "objection to form," I'm not apprised -- does he mean

10  compound, leading, calls for speculation, beyond the scope of

11  the designation?  And I just think it's too vague to be a proper

12  objection.  But -- that's one argument.

13          But the other thing is I don't think it's leading

14  because she said "insurance," and so I just followed up.  If I

15  would have pulled that out of thin air, it would be leading.

16          THE COURT:  Yeah.  All of the -- you have a lot of

17  leading questions in your examination because the one before

18  that is leading.  But this one was not.  I agree with you.

19          When you say, "So it's an insurance company because of

20  the IG; right?" and she answers, "Correct,"  that part is

21  leading.  That starts at 17 and goes to 19.  But I don't know if

22  that's the part they're objecting to.  They're objecting to 20

23  to 24.

24          I will overrule that objection.  It's a close call.  I

25  don't know that it's speculation.  It's not leading.  Okay.

1          MR. SOLA:  Can we talk about Bets Berg, too,

2     Your Honor?

3          THE COURT:  Sure.

4          MR. SOLA:  So I don't know I heard everything, and I'm

5     sorry to make you repeat it.

6          But you sustained -- was it page 35?  Maybe you can

7     tell me and then I can address it.

8          THE COURT:  35, 11, line 11.

9          MR. SOLA:  35, 11.

10         THE COURT:  Actually, it looks like it was 34, 22,

11    through 35, line 11.

12         MR. SOLA:  All right.  I won't contest that then.

13         And 43, 11 through 13; is that right?

14         THE COURT:  Yes.

15         MR. SOLA:  All right.  And on what ground is the

16    objection being sustained?

17         THE COURT:  You're at 43, 11 through 13?

18         MR. SOLA:  Yes.

19         THE COURT:  Hang on.

20         Hearsay.

21         MR. SOLA:  Well, these are from the note -- well, I

22    guess that -- okay.  So just 11 to 13?

23         THE COURT:  Yeah.

24         MR. SOLA:  Okay.  I won't contest that.

25         And was there one other one on Berg you sustained?

1          THE COURT:  Yeah.  60, 1 through 3.

2          MR. SOLA:  60, 1 through 3.  Okay.  And what's your

3   basis?

4          THE COURT:  She doesn't have personal knowledge of

5   this.  The only reason she knows is because she was told or

6   learned it through hearsay.

7          MR. SOLA:  Okay.  That's not offered to prove the

8   truth.  That's offered to prove they were told he was guilty,

9   which is really, actually, more important for my case,

10  Your Honor.  It's not so much that Wells Fargo knows there's

11  identity theft, although it's important, it's that they're told

12  by the police that there's identity theft, which is equivalent

13  to proof it's identity theft.

14         THE COURT:  Well, that's not the way you asked your

15  question.

16         MR. SOLA:  Okay.

17         THE COURT:  By the way, this particular point is going

18  to be established numerous times over -- through other evidence,

19  I suspect.

20         MR. SOLA:  Yeah.

21         Do you mind if I ask some tangential questions?  I

22  know it's been a long day.

23         THE COURT:  We're just warming up.  We've got more to

24  go.

25         MR. SOLA:  It is, you know, that -- my beef about

1   objection to the form.  I'd love to hear a federal judge tell me

2   if there's any basis, you know, for that, but you don't have to

3   do it now.

4          THE COURT:  Okay.  We'll talk about that after the

5   trial is over and you know my philosophy on form of the question

6   or not.

7          Anything else that we need to talk about regarding

8   those witnesses?  I don't know if I got through all the

9   witnesses or not.

10          MR. FRANSEN:  I think you did get through all the

11   deposition designations and the witnesses.

12          THE COURT:  Okay.  I'd like to think my work is done,

13   but, wait, there's more.

14          Motion to supplement exhibit list filed by the

15   defense.

16          And you -- did I just get a response this afternoon

17   from plaintiff, I think?  Right?  Or Friday.

18          MR. JONES:  Friday.

19          THE COURT:  I didn't see it until this afternoon.

20          That's not a criticism, by the way, but I just got it

21   recently.

22          So remind me, because you're right, it has been a long

23   day.  Is there anything in here that's harmful to you in their

24   supplemental documents?

25          MR. SOLA:  It does talk about identity theft disputes.

1        I mean, I didn't really -- I really can't answer that,

2   Your Honor.  I'm sorry.  But it's just that I never got a chance

3   to question them about it.

4        And you were very strict in your scheduling order.

5   You said anything supplemented, you need good cause.  That was

6   covering things that had been produced.  Right?  This wasn't

7   even produced.

8        So I just don't see the good cause.  They don't even

9   try to say good cause.  They say it was inadvertent.  And,

10  actually, no one from Wells Fargo says that.  We don't have an

11  affidavit or declaration; we have the lawyer.

12       So I just think that based on, you know, the rules,

13  and the discovery rules in your own order, it shouldn't come in.

14  I'm greatly prejudiced because I would have questioned about it.

15       I do think it harms me because it's one more thing

16  they can point to.  And I don't mean "I do think."  It does harm

17  me because it's one more thing to point to to say "We have good

18  procedures."

19       MR. FRANSEN:  Your Honor, I'd point out -- and

20  certainly if you have any other questions about it, I'm happy to

21  respond.

22       But we agreed to make a witness available before we

23  got to court to talk about these policies, and Your Honor's just

24  instructed us we need to make that same exact witness available

25  to testify just more generally if we want to call her at trial.

1     So if their harm is that they didn't get to ask deposition

2     questions, that's going to be addressed by the proposal we

3     already made and then your order just now.

4            THE COURT:  Who is the witness?

5            MR. FRANSEN:  Megan Braxton.

6            THE COURT:  And she's the one that's taking somebody

7     else's place; is that right?

8            MR. FRANSEN:  She's taking Bets Berg's role.  And

9     these are specific to that department at Wells Fargo.

10            THE COURT:  All right.  Anything else?

11            MR. FRANSEN:  Well, you know, Your Honor, we

12     acknowledge these should have been produced before.  There is no

13     question of that.  They're relevant.  But they don't harm the

14     plaintiff.

15            And I hope it's made clear in our briefing, but Bets

16     Berg, even though she was mistaken in her deposition about all

17     policies having been provided, which is clear because she said

18     that and it's here, she testified about the content of these

19     policies.  So she did -- she did know about what they would say,

20     she just didn't understand that the written documents weren't a

21     part of the case at that point, or at least that's what we

22     understand the facts to be.

23            So there's nothing, to my knowledge, that's actually

24     new about these policies, it's just simply this is the written

25     form.

1          We submit that, even though it's irregular to allow

2   exhibits in that weren't produced during the discovery -- before

3   the discovery deadline, it's helpful to the jury here.  They're

4   going to hear about the policies and they're also going to get

5   to see them.

6          MR. SOLA:  Your Honor, I took that deposition.  She

7   did not refer to any other policies like these at all.  And I

8   was very clear.  They produced about 40 pages of records, and I

9   said, "Are these pages that you produced all the policies that

10  Wells Fargo has on handling consumer disputes?"

11          And she says at that time, or general.  Then she goes,

12  "There were other ones, but they're not relevant to the case."

13          "Well, are there any other policies or procedures that

14  relate to credit bureau disputes than these?"  And I'm talking

15  about the documents they produced.

16          "I believe that there could be other procedures that

17  are related to credit bureau disputes, yes, but were not

18  relevant to this case.  They did not -- they don't have anything

19  to do with identity theft procedures."

20          That's totally false.  Whether it was inadvertent or

21  intentional, I stopped seeking any procedures because I took

22  that as true.  And now the first page of their procedures says

23  "Fraud disputes" and talks about identity theft.

24          So, you know, I -- they shouldn't get away with this.

25  It's just that simple.  They shouldn't get away with withholding

1   documents, saying they don't exist, and then offering them on

2   the eve of trial.

3        THE COURT:  What happened?

4        MR. FRANSEN:  The best we can tell -- and obviously

5   I'm a little cognizant about any attorney-client privileged

6   information.  But there is a department within Wells Fargo, or a

7   team, that's responsible for managing and maintaining policies

8   and procedures and keeping track of when they change so that you

9   can get old versions of them, and they are tasked with gathering

10  them when a discovery request comes in.  Obviously discovery

11  requests for Wells Fargo policies and procedures come in.  They

12  gather the information.

13       I don't know sitting here today why they didn't gather

14  this, but they didn't gather these in their original set.  The

15  set that we produced and that the witness testified about under

16  deposition, Bets Berg, didn't notice that they were missing

17  either.

18       So plaintiff's counsel says we withheld them.  Well,

19  we didn't withhold anything intentionally.  Certainly there's a

20  mistake -- obviously a mistake had to have been made for these

21  to not be --

22       THE COURT:  So how did you -- what made you go back to

23  Wells Fargo and look?  I mean, what triggered them suddenly

24  finding these documents?

25       MR. FRANSEN:  Part of our preparations for trial.

1          THE COURT:  So explain that to me.

2          MR. FRANSEN:  Well, I don't know how much -- I don't

3    know that I can.

4          THE COURT:  Did you direct them to go back and look

5    again to make sure that you had all the documents, and then

6    that's when they found them?  And if you can't tell me, that's

7    fine.

8          MR. FRANSEN:  No, I can.  There's two parts to it.

9          One, they filed a motion, and you remember the

10   discussion, you were saying -- this was their motion in limine

11   number 7, and you said, "Well, was there some procedure you were

12   thinking of?" and they said, "No," and it turned out there was

13   one.  But -- so there was a motion they filed that made us

14   consider do they know something we don't know.

15         And then also, in preparing for trial with trial

16   witnesses and going over exhibits with those witnesses, that's

17   when we first got the idea that something may have been missing,

18   and then immediately went back, said something might be missing,

19   immediately found something was missing, immediately got the

20   correct version of that and immediately produced it.

21         I think -- and I think I'm -- I think within 48 hours

22   of having the policies, they were in plaintiff's hands as well.

23   And a day after that, we said, "If you want to talk to Megan

24   Braxton about these, we'll make her available in person in

25   Portland, we'll fly her out here specifically for that."

1          THE COURT:  Megan Braxton is coming out here?

2          MR. FRANSEN:  We had -- I'm sorry.  I don't mean to

3    confuse things.

4          She had been disclosed as our trial witness already,

5    obviously, and we're cognizant of the fact that they did not get

6    to ask Bets Berg about these policies, so we said we would bring

7    Megan Braxton out.  We thought an hour would be sufficient.  But

8    we said we'll bring her out, and we gave them three days that

9    she'd be able to come out here and do it.  They didn't respond

10   to that request.  Their tactic, instead, is to say you simply

11   can't bring the documents into evidence.

12         But now Your Honor has already directed us to make

13   Megan Braxton available anyway for general purposes, and those

14   can include talking about these policies and procedures.

15         THE COURT:  Thank you.

16         Do you want to pop up again?

17         MR. SOLA:  I do, unless you're going to deny --

18         THE COURT:  No.  go ahead.

19         MR. SOLA:  Okay.  A couple things.

20         They haven't shown good cause, and that's what you

21   were searching for.  How did this happen?  They haven't shown

22   good cause.

23         In fact, what it sounds like is they didn't really

24   care in discovery to look for all the procedures, even though

25   they're obligated to, but then when it came to trial

1    preparation, they wanted to find some procedures they could use

2    to defend this case and so they found what they should have

3    given us months ago, you know, and that's not how the federal

4    rules of discovery work, and it's certainly not the spirit.

5            And, you know, offering me a deposition, the deadline

6    for discovery closed in February, Your Honor.  They invited me

7    to violate your order, the way I read that.  Do you want to take

8    a deposition after the deadline is disclosed?  I'm not going to

9    violate an order on discovery.  So we didn't respond to that.

10           Finally, these documents themselves refer to documents

11   we do not have, Your Honor.  So these, by themselves, aren't all

12   the procedures.  There's something called a "handle fraud

13   disputes dealer service process map."  We don't have that.  That

14   wasn't produced.

15           So I'm really handicapped even if I were to depose her

16   on these.

17           THE COURT:  Thank you.

18           I'm going to reserve ruling on the exhibits.  I want

19   you to depose her, ask her anything you want about those

20   exhibits, and then I'll let you know after I hear back from you

21   what I'm going to do about the supplemental exhibit list.

22           MR. FRANSEN:  Thank you, Your Honor.

23           THE COURT:  Is that -- so that's all of my to-do list

24   that I have for this afternoon.  That was kind of on the motions

25   side of things.

1           I want to spend a couple minutes explaining to you

2    what the trial will look like.  But before I do that, I want to

3    make sure there isn't anything that I missed from any of your

4    perspectives.

5           Let me turn first to the plaintiff.

6           Are there any other rulings that were before the Court

7    that I have not already addressed?

8           MR. SOLA:  Not that I'm aware of.  We have a couple

9    things we do want to bring up.

10          THE COURT:  I'll give you a chance to do that.  Let me

11   just make sure that I've got everything that kind of was on my

12   table.

13          MR. PETERSON:  Your Honor, the only things that

14   are -- were part of the order for this conference were the

15   proposed voir dire questions and technology issues.  I don't

16   know if you're planning to handle those.

17          THE COURT:  I've read the voir dire questions, and

18   generally they seem fine to me.  I don't think that any of the

19   questions that I looked at seem particularly out of line.  We'll

20   talk about how the process is going to look.

21          MR. PETERSON:  Could I raise an issue with just two of

22   plaintiff's questions?

23          They asked a couple of questions about if anyone is

24   related to someone who's worked for a collection agency or

25   collection department, and also for anyone who worked in

1   accounts receivable.

2          Our only concern with that is -- you know, this is not

3   a Fair Debt Collection Practices Act case, and we have some

4   level of concern that by raising those issues, have you worked

5   for a credit agency, have you done collection work, that that

6   might make the jury think this is a case about something that's

7   it's not about.

8          THE COURT:  Okay.  Yeah.  I'm going to ask that

9   question or something related.  I typically don't ask the

10  questions exactly like the parties ask me to proffer them.  I

11  change the language, not in all of them, but some of them,

12  they'll sound a little bit different --

13         MR. PETERSON:  Okay.

14         THE COURT:  -- to you.  But I will ask that.  I will

15  ask those questions.

16         Okay.  So other than that, was there anything else on

17  the table that you thought I needed to address?

18         All right.  So then let's get to the plaintiff's other

19  things you want me to think about or consider.

20         MR. SOLA:  Okay.  Well, first, it sounds like we're

21  not going to discuss jury instructions today.  Is that right?

22         THE COURT:  Correct.

23         MR. SOLA:  Okay.  Because we are trying to do some

24  stipulations, and we may have some new instructions.

25         We have a question about Wells Fargo designated more

1    than 40 -- what they called impeachment exhibits, and that means

2    we don't get to see them.  And I'm really puzzled how they can

3    have 40 or more impeachment exhibits, and I have a concern that

4    they're actually rebuttal exhibits.

5         Like, something I might think of is they want to show

6    he wasn't damaged because they've got a photograph of him off

7    Instagram where he's doing something fun, you know, and that

8    would be rebuttal, not impeachment.  And I know you -- I guess

9    you get to look at them.

10        But if these are actually rebuttal exhibits, we are

11   severely prejudiced because we don't get to see them until the

12   moment they're used.  And so I guess I'm asking the Court to

13   look at these impeachment exhibits and determine if they are

14   rebuttal exhibits, and if they are, not to allow them because

15   then they should have been produced with the third wave.

16        THE COURT:  Thank you.

17        Is there anything you want to say about that?

18        I haven't looked at the exhibits because I had enough

19   to kind of work through without getting to the impeachment

20   exhibits.

21        MR. PETERSON:  Just very briefly, Your Honor.

22        Every exhibit we identified, we will ask the witness a

23   question, you know, "Is it true that X happened?"  And if they

24   give the right answer, the true answer, we won't use the

25   exhibit.  If they say something else, we'll use the exhibit.

```
 1          That, to me, is the definition of impeachment.  If I'm
 2   incorrect on that definition, then I'd appreciate the head's up,
 3   and if we need to add something else -- but I think impeachment
 4   goes not just were you lying about being damaged because you
 5   were off having fun on Instagram, it goes with I ask a question,
 6   did you send -- "Did the identity thief also open ten other
 7   credit cards for you?"  And if Mr. Sponer says, "No," I think if
 8   I have an exhibit that says, well, you complained about -- you
 9   know, here's the letters you sent, I think that's impeachment.
10          THE COURT:  Okay.
11          Anything else?
12          MR. SOLA:  Yes.
13          So in your order, you indicated in the first wave that
14   if both parties want to use a deposition, that they should
15   jointly mark it -- I believe we were in yellow and they were in
16   blue -- and submit it.  So I notified them of the depositions we
17   intended to use and said, you know, if you want to use these,
18   notify me so we'll submit a joint marked-up version.  They
19   didn't give me any deposition designations.
20          Then, in the third wave, they marked what they call
21   "rebuttal" designations, and I think that's improper, because if
22   they would have done it in the first wave, then I might have
23   been able to object to those designations or offered additional
24   designations to address those.
25          And so I'm asking that you, you know, strike those
```

1    rebuttal designations because there isn't such a thing.  They
2    should have put those in their first wave designations.  I've
3    been prejudiced because I couldn't object to them.
4              THE COURT:  Do you have objections to their
5    designations?
6              MR. SOLA:  I have some objections to them.  Should I
7    submit those on paper?
8              THE COURT:  Yeah.  Let me take a look at them.
9              MR. SOLA:  And then would I -- and should I also offer
10   my additional designations?  Because that's some way I could
11   address those.  And they're not long.
12             THE COURT:  It sounds like maybe you should confer
13   with each other.  All right?  So talk to each other.  And if
14   there's some way that you can ameliorate what you're describing
15   as a problem by a more complete disclosure, more complete
16   designation, then resolve it that way.
17             And then if you're unable to resolve it, then send me
18   your -- you know, what it is you want me to get rid of because
19   they didn't give it to you until the third wave.
20             MR. SOLA:  All right.  Then my final thing is I have
21   some demonstrative exhibits.  I suppose what I should do is show
22   them these before trial, see if they object, and then if they
23   do, you would decide?
24             THE COURT:  Yeah.
25             MR. PETERSON:  We also have demonstrative exhibits and

1  we'll confer.

2          THE COURT:  Yeah.  Nowadays, everybody is using

3  technology with all kinds of charts and arrows and circles and

4  demonstrative exhibits during opening statements and closing

5  arguments.  It's helpful if you share them with each other so we

6  don't get in the middle of a statement and me having to tell

7  somebody to turn it off.

8          Anything else from plaintiff's perspective?

9          MR. SOLA:  Just as you listed, technology.  You know,

10  how are we going to -- when we discuss that.

11          THE COURT:  So this isn't Jennifer.  Jennifer usually

12  works for me.  This is Mary, she works for Judge Simon, and I'm

13  borrowing her today.

14          But Jennifer's going to be here I think -- is she back

15  this week or next week?

16          She's not back until next week.  And you're going to

17  need to get in here to kind of -- do you plan on coming in here

18  this week sometime in order to try things out?

19          MR. SOLA:  Yes, we would, if we could -- if you could

20  just give us a number or name to call.

21          THE COURT:  Okay.  So check with -- can they check

22  with you?

23          THE CLERK:  Yeah.

24          THE COURT:  Okay.  So check with Mary and she can help

25  you out on that.  That's kind of outside my expertise.

1           MR. PETERSON:  And we'll also want to come in and make

2    sure everything works.

3           THE COURT:  Yeah.  And then when you get here, even

4    though it worked when you tried it, it won't work.

5           All right.  Anything else from your side?

6           MR. SOLA:  No, Your Honor.

7           THE COURT:  All right.

8           MR. PETERSON:  I don't believe there's anything

9    else -- oh.

10          MR. SOLA:  Well, the question was -- well, first, let

11   me clarify.  Are you allowing Braxton and Cooper?  Or is that

12   going to be reserved until after we --

13          THE COURT:  No, I'm allowing them to testify, and you

14   get to take their depositions.  The only issue that I'm kind of

15   holding off on is whether these exhibits are going to be

16   admitted or not.  I'm going to give you a chance to talk to them

17   and go ahead and do your deposition with them.  And I want to

18   think about these exhibits and what they say.  I haven't looked

19   at them carefully.

20          MR. SOLA:  Okay.  And can we use the depositions that

21   we're taking at trial, even if they call that person?

22          THE COURT:  For impeachment purposes?

23          MR. SOLA:  No.  For any purpose.  Because I think they

24   established these are 30(b)(6) people, at least Braxton.  Well,

25   and Cooper.

1                THE COURT:  You can use their depositions in any way

2      that you would otherwise be able to use their depositions.

3                MR. SOLA:  Okay.

4                THE COURT:  Okay.  Anything else?

5                MR. SABIDO:  Your Honor, there's one other item on the

6      trial management order, and it has to do with settlement and

7      mediation efforts.  I don't know if you would like us to go into

8      that now or save it for a different time.

9                THE COURT:  What is it you want to tell me?

10               MR. SABIDO:  I think it's well-chronicled.  We filed a

11     motion to set a settlement conference in this case back in May

12     of this year and the Court denied that for the reasons given in

13     its order.  I just want to point out that, ever since then,

14     three offers of judgment in substantial amounts have been served

15     and we've gotten no response to it.

16               THE COURT:  Okay.  That's just a matter of

17     recordkeeping.  That's fine.

18               Anything else?

19               Let's talk about how we're going to try the case.

20               I will put into the jury box 16 jurors.

21               Can't remember.  Did we use the -- I moved from one

22     courtroom to the other and I'm still trying to adjust.

23               I believe our Juror Number 1 -- is it the back row?

24               THE CLERK:  I think it's the back row from what --

25               THE COURT:  Yeah.  It's the back row.  So 1 through 8,

1  9 through 16 in the front row.

2          I will then put the balance of the jurors, beginning

3  to my left, that will be Juror Number 17, 18, 19, 20, et cetera,

4  in my gallery.

5          There are a series of biographical questions that I

6  ask all of the jurors to respond to.  Get a copy of those before

7  you leave so you know what they are.

8          But they have tell us your name, where you live

9  generally, what your occupation is, who you live with, what are

10  the occupations of the people that live with you, your level of

11  education, have you been involved in a jury before as a witness

12  or a party, whether you have prior jury experience.  I think

13  that's it as far as biographical questions.

14          After I do the biographical questions, I'll turn to

15  your questions.  And after I have completed your questions, I

16  will ask each of you whether you have follow-up questions.

17          I will then have Jennifer -- first, I will ask each

18  side whether you are -- have any challenges for cause, and then

19  I will ask each side to begin to exercise their preemptory

20  challenges.  Jennifer will go to the plaintiff first, and she'll

21  just have a sheet of paper that lets you pick who to deselect

22  from the pool, and back and forth until you've used your

23  challenges.

24          We will seat -- actually, this is a civil case, so

25  we're going to be seating eight jurors and we won't use any

1    alternates.  It will just be eight jurors.

2            MR. SOLA:  Your Honor, is that -- I mean, I would

3    prefer six with two alternates, if you would entertain that.

4            THE COURT:  See, it doesn't really matter because

5    there's eight of them.  And so if somebody gets sick, I excuse

6    that person.  Then they proceed with seven.  If somebody else

7    gets sick, then they proceed with six; so --

8            MR. SOLA:  But if all eight stay, then they all

9    deliberate?

10           THE COURT:  They all deliberate, and eight -- your

11   jury is a jury of eight.

12           MR. SOLA:  All right.

13           THE COURT:  All right.  So I guess from your

14   perspective, it might -- you would rather try to convince six

15   than eight.

16           MR. SOLA:  That's right.  And I know you have

17   discretion there, so I would ask that we have six.

18           THE COURT:  We're going to use eight.

19           All right.  Anything else on kind of that part of the

20   process?

21           I usually have a jury -- in this case,

22   eight -- probably by 11:00.  So be ready for opening statements

23   in the morning.  I would have at least one witness available as

24   well.

25           You have four days to try this case.  I generally get

1    about five hours of trial testimony a day, is what it averages

2    out to.  I'm going to divide the time in half.  So that means

3    each of you will have about ten hours for your case.  I don't

4    count opening statements and I don't count closing arguments.

5    But other than that, the check -- the chess clock is running.

6            Claire is the official keeper of the clock.

7            Any questions about that process?

8            And then other than that, do you all have any

9    questions about --

10           MR. PETERSON:  Your Honor, just --

11           THE COURT:  -- what the trial is going to look like?

12           We'll have a lectern out here for your opening

13   statements.

14           MR. PETERSON:  And then what about a -- getting back

15   to the technology issue -- a screen?  Or how are the -- we could

16   bring in a screen.  Or how are the exhibits projected to the --

17           THE COURT:  So the jurors all have screens in front of

18   them.  And so it -- it's called a jury -- I don't know -- jury

19   something screen.  Jury evidence screen, I think.  And so, yeah,

20   they can just look at them, and when you put them up there,

21   they're going to be on their screen.

22           MR. PETERSON:  And that will work for demonstratives

23   as well?

24           THE COURT:  Yeah.  I'm not exactly sure how it works.

25   But people use their laptops, they hook them up somewhere --

1              MR. PETERSON:  Something happens.

2              THE COURT:  -- and then they pop up on my screen and

3    all of their screens and that large screen there as well.

4              MR. PETERSON:  Okay.  And then, Your Honor, one

5    clarification with Mr. Brady.  He was the person who we objected

6    to their use of his deposition transcript because he will be

7    here live as a testifying witness.  He is coming from North

8    Carolina.

9              You said if -- I'm not sure what we're going to do

10   about his deposition transcript, but you said he would have to

11   be here as part of their case-in-chief.  Can we have him come

12   at -- towards the end of their case-in-chief?  Or does he need

13   to be here from the start of trial if we want to prevent them

14   from using his deposition --

15             THE COURT:  Deposition testimony?

16             MR. PETERSON:  In other words, could we have him be

17   here by, say, Tuesday afternoon for them to finish their case?

18             THE COURT:  I'd get him here Tuesday morning.

19             MR. PETERSON:  Okay.

20             THE COURT:  You'll have him by Tuesday morning.

21             MR. PETERSON:  Okay.  Thank you, Your Honor.

22             Does that work?

23             MR. SOLA:  Well, I hope you can just agree to use his

24   deposition.

25             MR. PETERSON:  Well, we'll see.

1    THE COURT:  Any other questions about the process?

2    MS. SMITH:  When do you expect to talk about jury

3  instructions?

4    THE COURT:  I will have a draft of the jury

5  instructions based on what I think the law is to you hopefully

6  by the end of your second day.

7    MS. SMITH:  Okay.  Thank you.

8    THE COURT:  And I saw all your witness lists.  I can't

9  remember how many you're calling.  Maybe ten witnesses.  Is that

10  what it looks like?

11    MR. SOLA:  Well, if you count the deposition excerpts,

12  then it's -- yeah, it's -- I think it's more than ten.

13    THE COURT:  I want live witnesses.

14    MR. SOLA:  Live witnesses, you're allowing -- I'm

15  sorry.  We all forgot the rulings.  Ms. Barron, you're allowing,

16  but they can depose her.  So five.

17    THE COURT:  Okay.  All right.  So you'll get through

18  your case pretty quickly then.  We may be done in a day and a

19  half.

20    I'm not -- you don't -- you have ten hours, so you can

21  spend it however you want.

22    MR. SOLA:  No, I know.  It's -- yeah.  I hope we do.

23  I really do.  But then I have to read the depositions, and I

24  want to -- or play them.  So that's going to add on too.

25    THE COURT:  Okay, okay, okay.  All right.  So it will

1   probably take you two days for your part of the case.

2           Okay.  Anything else from your side?  Any other

3   questions?

4           MR. PETERSON:  I don't believe so, Your Honor.

5           THE COURT:  Thank you.  Then we're in recess.

6

7       (The proceedings concluded at 4:19 p.m.)

1                    C E R T I F I C A T E

2

3            I certify, by signing below, that the foregoing is a

4    true and correct transcript of the record, taken by stenographic

5    means, of the proceedings in the above-titled cause.   A

6    transcript without an original signature, conformed signature,

7    or digitally signed signature is not certified.

8

9            DATED this 20th day of August, 2019.

10

11

12                                    *// Ryan White*
                                      _____
13                                    RYAN WHITE
                                      Registered Merit Reporter
                                      Certified Realtime Reporter
14                                    Expires 9/30/2019
                                      Washington CCR No. 3220
15                                    Expires 10/25/2019
                                      Oregon CSR No. 10-0419
16                                    Expires 12/31/2020

17

18

19

20

21

22

23

24

25

1

## $

**$29,000** [1] - 41:12

## '

**'16** [1] - 38:21
**'17** [1] - 25:20
**'18** [1] - 25:20
**'block** [1] - 49:25

## 1

**1** [12] - 5:14, 21:1, 26:7, 57:14, 57:18, 57:20, 57:24, 83:3, 90:1, 90:2, 106:23, 106:25
**10** [2] - 47:8, 84:5
**10-0419** [1] - 113:15
**10/25/2019** [1] - 113:15
**10/28** [1] - 39:6
**100** [1] - 2:4
**1000** [1] - 1:24
**11** [12] - 47:16, 47:22, 47:23, 83:3, 83:5, 89:8, 89:9, 89:11, 89:13, 89:17, 89:22
**111** [1] - 2:11
**11:00** [1] - 108:22
**12** [2] - 47:23, 65:12
**12/31/2020** [1] - 113:16
**13** [4] - 83:5, 89:13, 89:17, 89:22
**14** [1] - 49:24
**15** [2] - 51:22, 54:12
**1500** [1] - 2:15
**16** [4] - 32:20, 54:9, 106:20, 107:1
**1681** [3] - 60:22, 61:23, 61:24
**1681(2)(a** [1] - 38:24
**1681(a** [1] - 61:2
**1681s-2(a** [1] - 38:21
**17** [2] - 88:21, 107:3
**17-2035-HZ** [1] - 3:6
**18** [1] - 107:3
**19** [4] - 1:7, 3:1, 88:21, 107:3
**19th** [2] - 31:8, 39:16
**1:34** [1] - 3:1

## 2

**2** [8] - 8:3, 12:16, 20:5, 25:12, 25:15, 25:16, 26:7, 58:2
**2(a** [16] - 33:6, 33:7, 33:8, 33:19, 33:20, 34:1, 34:10, 34:25, 35:3, 35:8, 35:13, 37:9, 37:13, 37:18, 37:21, 38:5
**2(a)** [1] - 33:18, 35:4
**2(b** [5] - 33:7, 33:9, 37:10, 37:14, 37:20
**2(b)** [1] - 37:18
**2)(b** [1] - 61:24
**20** [5] - 10:13, 14:23, 87:15, 88:22, 107:3
**2000** [1] - 38:14
**2016** [7] - 20:8, 25:20, 31:8, 32:12, 36:24, 38:13, 55:4
**2017** [4] - 20:8, 38:17, 55:3, 55:6
**2018** [9] - 7:10, 7:11, 20:4, 20:8, 25:17, 26:1, 26:25, 54:15, 65:13
**2019** [4] - 1:7, 3:1, 20:9, 113:9
**205-5029** [1] - 2:5

**20th** [1] - 113:9
**22** [1] - 89:10
**222-2000** [1] - 2:12
**23** [1] - 84:6
**24** [2] - 87:16, 88:23
**24th** [1] - 2:22
**255** [1] - 2:8
**28** [1] - 59:25
**295-6880** [1] - 2:16

## 3

**3** [6] - 8:7, 25:13, 27:2, 83:3, 90:1, 90:2
**30(b)(6** [10] - 66:13, 67:18, 69:10, 69:12, 69:16, 69:18, 69:20, 71:17, 105:24
**301** [1] - 1:24
**30339** [1] - 2:5
**3150** [1] - 2:11
**3220** [1] - 113:14
**323-9000** [1] - 2:23
**326-8184** [1] - 1:25
**34** [1] - 89:10
**35** [6] - 82:23, 83:3, 89:6, 89:8, 89:9, 89:11
**37** [2] - 17:13, 17:15
**3:17-cv-02035-HZ** [1] - 1:6
**3rd** [3] - 1:24, 39:8, 39:16

## 4

**4** [2] - 8:18, 27:22
**40** [3] - 94:8, 101:1, 101:3
**404** [1] - 2:5
**43** [3] - 83:5, 89:13, 89:17
**45** [1] - 60:2
**46** [9] - 60:4, 83:1, 83:10, 83:17, 84:5, 84:9, 84:22, 85:3, 86:23
**47** [9] - 83:1, 83:10, 83:17, 84:7, 84:8, 84:10, 85:4, 86:22, 86:25
**48** [2] - 60:4, 96:21
**49** [1] - 60:4
**4:19** [1] - 112:7

## 5

**5** [4] - 11:18, 15:20, 15:22, 29:16
**50** [1] - 60:4
**501** [2] - 63:21, 63:24
**503** [5] - 1:25, 2:9, 2:12, 2:16, 2:23
**509** [4] - 63:25, 64:3, 64:10, 66:17
**51** [8] - 60:4, 83:1, 83:10, 83:17, 84:9, 84:22, 85:3, 86:23
**510** [3] - 64:1, 64:4, 66:17
**52** [1] - 60:5
**53** [1] - 60:5
**54** [1] - 60:5
**55** [1] - 60:5
**56** [1] - 60:5
**57** [1] - 60:5
**58** [2] - 60:6, 83:7
**59** [1] - 60:6
**5th** [2] - 2:11, 2:22

## 6

**6** [5] - 15:23, 29:19, 57:14, 58:2, 58:14
**60** [4] - 60:6, 83:3, 90:1, 90:2
**602** [1] - 69:21
**61** [2] - 60:6, 61:23
**611** [1] - 83:21
**62** [1] - 60:6
**63** [1] - 60:7
**64** [1] - 60:7
**65** [1] - 60:7
**66** [2] - 60:8, 63:8
**67** [1] - 63:11

## 7

**7** [4] - 16:9, 39:24, 57:14, 96:11

## 8

**8** [3] - 44:2, 57:14, 106:25
**800** [2] - 2:4, 2:15
**819** [1] - 2:8
**847-4329** [1] - 2:9

## 9

**9** [7] - 44:5, 47:7, 57:14, 57:16, 58:3, 58:14, 107:1
**9/30/2019** [1] - 113:14
**900** [1] - 2:22
**97201** [1] - 2:15
**97204** [3] - 1:24, 2:12, 2:23
**97214** [1] - 2:8

## A

**a)(1** [1] - 62:1
**a)(1)** [1] - 61:23
**abide** [1] - 20:17
**ability** [1] - 78:20
**able** [15] - 23:18, 23:24, 25:10, 30:14, 30:22, 30:23, 64:17, 66:16, 72:1, 72:3, 78:12, 78:15, 97:9, 102:23, 106:2
**above-titled** [1] - 113:5
**absolutely** [1] - 73:20
**accept** [1] - 59:15
**acceptable** [2] - 10:3, 19:21
**account** [1] - 42:2
**accounts** [1] - 100:1
**accuracy** [3] - 62:2, 62:4, 62:7
**accurate** [1] - 62:10
**accurately** [2] - 30:25, 34:20
**ACDV** [9] - 31:14, 31:22, 38:13, 39:6, 39:12, 39:18, 51:15, 55:12
**ACDVs** [4] - 29:21, 34:6, 34:8, 37:17
**acknowledge** [1] - 93:12
**acknowledged** [2] - 25:4, 27:24
**act** [1] - 62:4
**Act** [3] - 28:6, 62:13, 100:3
**acted** [1] - 45:2
**action** [4] - 30:3, 30:4, 34:22, 59:9
**actions** [2] - 16:10, 18:9
**acts** [3] - 22:17, 22:20, 27:3
**actual** [3] - 50:19, 78:17, 79:10

**add** [4] - 25:1, 49:19, 102:3, 111:24
**adding** [1] - 52:18
**addition** [1] - 70:13
**additional** [5] - 3:25, 77:2, 80:18, 102:23, 103:10
**address** [12] - 12:16, 12:18, 17:24, 20:21, 23:10, 49:21, 76:3, 78:3, 89:7, 100:17, 102:24, 103:11
**addressed** [4] - 15:22, 16:2, 93:2, 99:7
**addresses** [1] - 37:15
**addressing** [2] - 56:13, 78:2
**adequacy** [1] - 9:12
**adequate** [1] - 88:6
**adequately** [1] - 68:3
**adjust** [1] - 106:22
**admissibility** [4] - 25:23, 26:4, 26:6, 26:9
**admissible** [16] - 5:5, 9:1, 11:6, 20:25, 21:1, 36:25, 44:21, 45:5, 45:8, 45:11, 45:23, 46:14, 46:16, 58:14, 63:12, 77:16
**admission** [6] - 28:13, 28:16, 53:13, 53:14, 53:22, 63:12
**admissions** [1] - 63:11
**admit** [2] - 53:3, 53:19
**admits** [1] - 24:17
**admitted** [7] - 8:21, 15:18, 16:18, 29:5, 54:22, 54:25, 105:16
**admitting** [3] - 29:10, 53:25, 54:18
**advance** [1] - 17:9
**adverse** [8] - 83:20, 83:21, 84:12, 84:14, 84:17, 84:20, 87:2, 87:12
**affected** [1] - 78:14, 78:15, 79:17
**affidavit** [1] - 92:11
**affordable** [1] - 22:14
**afternoon** [6] - 3:18, 4:15, 91:16, 91:19, 98:24, 110:17
**agencies** [2] - 35:15, 51:5
**agency** [6] - 13:2, 31:2, 38:7, 57:13, 99:24, 100:5
**agent** [1] - 70:24
**agents** [1] - 18:10
**ago** [5] - 16:15, 29:25, 54:22, 68:10, 98:3
**agree** [10] - 5:25, 6:23, 20:25, 23:21, 25:21, 46:22, 62:20, 77:23, 88:18, 110:23
**agreed** [6] - 19:21, 20:10, 43:2, 79:22, 92:22
**agreeing** [1] - 86:1
**agreement** [5] - 19:18, 26:21, 29:18, 87:5, 87:9
**ahead** [10] - 11:25, 12:19, 16:4, 26:23, 61:21, 70:9, 82:11, 85:7, 97:18, 105:17
**air** [1] - 88:15
**al** [1] - 3:7
**alleged** [3] - 27:24, 40:1, 68:20
**allow** [10] - 14:12, 16:6, 29:12, 47:15, 61:8, 64:20, 77:20, 86:12, 94:1, 101:14
**allowed** [13] - 5:23, 12:21, 13:21, 14:24, 21:16, 22:19, 29:22, 31:19, 32:3, 36:3, 55:17, 74:2, 74:3
**allowing** [4] - 105:11, 105:13, 111:14, 111:15
**allows** [2] - 14:12, 69:20
**alternates** [2] - 108:1, 108:3
**alternative** [1] - 72:19
**ameliorate** [1] - 103:14
**amend** [8] - 29:9, 51:25, 52:2, 52:12, 52:17, 52:23, 53:18, 54:2
**amended** [3] - 13:21, 54:14, 56:5
**amending** [2] - 3:25, 53:14
**amendment** [6] - 52:15, 54:12, 54:20, 54:21, 56:4, 56:14
**amount** [4] - 4:16, 24:13, 24:15, 37:8
**amounts** [3] - 20:24, 20:25, 106:14
**analysis** [2] - 30:23, 34:5
**analyzed** [1] - 61:8
**answer** [21] - 7:7, 7:17, 7:23, 10:25, 29:8, 29:9, 29:11, 43:6, 43:9, 51:25, 52:17, 52:25, 53:15, 53:18, 55:14, 62:22, 63:8, 87:19, 92:1, 101:24
**answers** [2] - 63:9, 88:20
**anticipate** [5] - 16:24, 17:2, 47:21, 48:20, 60:18
**anticipated** [1] - 8:11
**anticipating** [1] - 12:6
**anyway** [4] - 29:13, 59:24, 72:23, 97:13
**apologize** [2] - 27:24, 28:9
**apologizing** [2] - 28:7, 54:1
**apology** [3] - 28:13, 28:16, 28:19
**APPEARANCES** [1] - 2:1
**apples** [1] - 65:16
**applies** [1] - 75:4
**apply** [3] - 79:2, 79:4, 79:14
**appreciate** [2] - 72:12, 102:2
**apprised** [2] - 39:20, 88:9
**appropriate** [3] - 23:9, 24:1, 62:24
**area** [1] - 81:7
**areas** [2] - 24:14, 45:12
**argue** [9] - 25:9, 27:12, 45:18, 48:1, 48:10, 49:14, 51:17, 53:11, 54:11
**argued** [2] - 50:7, 50:8
**arguing** [2] - 6:14, 49:17
**argument** [26] - 4:15, 8:4, 15:1, 15:2, 25:15, 31:6, 33:1, 48:14, 48:20, 48:23, 48:24, 48:25, 49:22, 61:16, 62:7, 62:23, 62:24, 64:21, 64:23, 76:21, 80:2, 84:10, 84:11, 87:2, 88:12
**arguments** [7] - 47:23, 70:23, 71:17, 78:6, 78:7, 104:5, 109:4
**arises** [1] - 40:9
**arising** [1] - 34:22
**arrows** [1] - 104:3
**artificially** [1] - 55:13
**Ashley** [1] - 82:18
**aside** [1] - 66:23
**aspect** [1] - 58:16
**asserted** [1] - 59:8
**assets** [1] - 24:15
**associated** [2] - 40:2, 42:25
**association** [2] - 21:7, 21:12
**assume** [8] - 41:7, 44:8, 47:3, 52:16, 58:6, 65:7, 85:21, 86:6
**assuming** [3] - 7:20, 29:9, 34:6
**assumption** [1] - 85:22
**assure** [1] - 15:3
**asterisks** [1] - 4:20
**AT** [1] - 2:7
**Atlanta** [1] - 2:5
**attached** [1] - 25:2
**attain** [1] - 40:23
**attempt** [1] - 30:2
**attempting** [2] - 32:14, 45:22
**attempts** [1] - 11:19
**attorney** [1] - 95:5
**ATTORNEY** [1] - 2:7
**attorney-client** [1] - 95:5
**attorneys'** [1] - 29:17
**August** [3] - 1:7, 3:1, 113:9
**available** [9] - 72:7, 73:21, 75:6, 82:10, 92:22, 92:24, 96:24, 97:13, 108:23
**Ave** [1] - 2:4
**Avenue** [4] - 1:24, 2:11, 2:15, 2:22
**averages** [1] - 109:1
**avoid** [5] - 34:17, 34:18, 35:2, 36:12, 48:10
**aware** [4] - 17:4, 17:8, 99:8

**B**

**b)** [1] - 61:9
**background** [2] - 21:10, 32:8
**bad** [12] - 22:17, 27:3, 40:24, 41:14, 42:3, 43:17, 54:13, 54:16, 56:3, 56:7
**balance** [1] - 107:2
**BANK** [1] - 1:8
**bank** [2] - 70:16, 71:5
**banking** [5] - 21:6, 21:12, 44:25, 62:3, 81:9
**bare** [1] - 50:25
**Barron** [5] - 65:2, 65:5, 65:12, 73:21, 111:15
**based** [18] - 4:21, 5:1, 8:5, 22:5, 23:20, 27:6, 30:4, 35:24, 36:7, 56:12, 60:24, 74:15, 78:16, 80:14, 80:16, 82:3, 92:12, 111:5
**basic** [1] - 17:14
**basis** [7] - 30:2, 40:16, 40:17, 56:1, 78:10, 90:3, 91:2
**Battery** [1] - 2:4
**bearing** [1] - 61:15
**became** [1] - 37:10
**become** [3] - 4:12, 77:3, 84:21
**becomes** [1] - 77:11
**beef** [1] - 90:25
**BEFORE** [1] - 1:16
**begin** [3] - 5:13, 39:11, 107:19
**beginning** [4] - 85:17, 85:19, 86:9, 107:2
**begins** [2] - 39:11, 82:23
**behalf** [3] - 51:24, 69:19, 69:20
**behind** [1] - 75:6
**below** [3] - 71:3, 83:7, 113:3
**bench** [2] - 9:24, 52:9
**benefit** [1] - 69:16
**berg** [1] - 73:5

**Berg** [12] - 67:21, 68:6, 68:25, 72:22, 73:14, 73:16, 83:2, 89:1, 89:25, 93:16, 95:16, 97:6
**Berg's** [3] - 68:2, 68:15, 93:8
**best** [1] - 95:4
**Bets** [13] - 67:21, 68:2, 68:6, 68:15, 68:25, 72:22, 73:14, 73:16, 89:1, 93:8, 93:15, 95:16, 97:6
**better** [4] - 21:16, 67:15, 71:8, 73:12
**between** [4] - 26:8, 38:4, 57:12, 72:8
**beyond** [8] - 6:3, 24:12, 29:20, 48:2, 48:14, 49:15, 79:22, 88:10
**bifurcate** [3] - 49:20, 56:20, 57:1
**big** [4] - 53:24, 66:21, 67:1, 67:11
**bill** [2] - 41:12, 41:16
**bills** [1] - 41:14
**binder** [6] - 76:18, 77:15, 77:22, 78:12, 79:5, 79:18
**Binder** [2] - 75:24, 77:17
**binder's** [4] - 76:6, 78:19, 79:1, 79:14
**biographical** [3] - 107:5, 107:13, 107:14
**bit** [8] - 5:18, 7:2, 20:20, 39:2, 46:1, 52:22, 60:23, 100:12
**bla** [5] - 46:16, 46:17
**blame** [4] - 11:19, 12:3, 12:4, 12:7
**bleeds** [1] - 76:4
**block** [3] - 50:23, 51:6, 51:14
**blocked** [2] - 51:8
**blocks** [1] - 82:24
**blue** [1] - 102:16
**body** [1] - 32:13
**Boggio** [1] - 13:9
**boils** [1] - 79:13
**book** [3] - 48:2, 48:4, 48:11
**borrowing** [1] - 104:13
**bothered** [1] - 43:13
**bound** [1] - 68:9
**box** [1] - 106:20
**Brady** [10] - 67:14, 70:3, 70:4, 70:13, 70:15, 71:1, 74:19, 74:20, 74:25, 110:5
**Brady's** [1] - 71:2
**brain** [1] - 64:6
**brand** [1] - 66:23
**Braxton** [20] - 66:10, 66:20, 66:22, 67:6, 67:7, 67:23, 68:25, 70:10, 71:24, 73:5, 73:14, 82:13, 82:14, 93:5, 96:24, 97:1, 97:7, 97:13, 105:11, 105:24
**break** [2] - 55:12
**Brian** [2] - 80:13, 82:18
**briefing** [3] - 13:1, 64:15, 93:15
**briefly** [4] - 23:4, 49:19, 78:3, 101:21
**bring** [12] - 29:3, 32:3, 55:16, 71:19, 74:23, 75:13, 75:14, 97:6, 97:8, 97:11, 99:9, 109:16
**bringing** [1] - 18:21
**brought** [1] - 30:6
**bulk** [1] - 44:12
**bunch** [6] - 3:19, 3:20, 4:15, 52:9, 72:20
**burden** [1] - 26:13
**bureau** [6] - 16:10, 67:8, 67:22, 67:24, 94:14, 94:17
**burg** [1] - 70:2

**business** [3] - 8:23, 10:7, 50:9

## C

**cannot** [2] - 47:20, 50:1
**capacity** [1] - 70:16
**capital** [1] - 24:14
**card** [2] - 15:11, 36:1
**cards** [1] - 102:7
**care** [3] - 72:20, 81:14, 97:24
**careful** [2] - 39:10, 80:5
**carefully** [2] - 80:10, 105:19
**Carolina** [1] - 110:8
**Carter** [1] - 74:5
**case** [80] - 3:6, 6:1, 7:20, 8:25, 11:6, 18:22, 22:15, 24:6, 30:6, 30:10, 30:11, 35:13, 37:7, 39:11, 40:4, 40:24, 44:6, 46:4, 46:5, 46:6, 46:10, 46:19, 46:20, 47:12, 51:4, 51:14, 52:19, 53:1, 55:10, 55:19, 56:6, 56:9, 56:22, 56:23, 58:23, 58:25, 60:25, 61:3, 61:16, 62:10, 64:11, 64:17, 67:11, 68:10, 70:7, 70:8, 70:23, 71:14, 71:21, 74:24, 74:25, 75:1, 75:5, 75:10, 75:19, 76:24, 78:11, 81:24, 83:22, 87:7, 90:9, 93:21, 94:12, 94:18, 98:2, 100:3, 100:6, 106:11, 106:19, 107:24, 108:21, 108:25, 109:3, 110:11, 110:12, 110:17, 111:18, 112:1
**case-in-chief** [6] - 74:24, 74:25, 75:1, 75:10, 110:11, 110:12
**cases** [8] - 14:23, 19:1, 19:6, 24:16, 41:11, 46:2, 46:16
**catch** [1] - 63:19
**caught** [1] - 85:12
**caused** [5] - 6:14, 6:24, 11:22, 41:1, 41:2
**causing** [4] - 5:21, 7:20, 12:3, 12:5
**caution** [1] - 80:4
**CCR** [1] - 113:14
**Celestina** [3] - 82:19, 82:21, 82:24
**certain** [5] - 8:6, 24:15, 35:9, 39:3, 72:3
**certainly** [5] - 80:22, 81:18, 92:20, 95:19, 98:4
**certification** [1] - 50:9
**certified** [1] - 113:7
**Certified** [1] - 113:13
**certify** [1] - 113:3
**cetera** [2] - 27:4, 107:3
**challenges** [3] - 107:18, 107:20, 107:23
**chambers** [1] - 52:7
**chance** [8] - 27:12, 38:9, 64:22, 70:11, 73:18, 92:2, 99:10, 105:16
**change** [8] - 5:6, 6:21, 22:14, 52:19, 52:22, 66:21, 95:8, 100:11
**changed** [2] - 23:17, 66:22
**characterization** [1] - 11:8
**characterize** [1] - 33:12
**characterized** [1] - 42:22
**characterizing** [1] - 9:17
**chart** [1] - 82:22
**charts** [1] - 104:3
**check** [5] - 18:18, 104:21, 104:24, 109:5

**chess** [1] - 109:5
**chief** [6] - 74:24, 74:25, 75:1, 75:10, 110:11, 110:12
**choose** [1] - 82:10
**chronicled** [1] - 106:10
**circles** [1] - 104:3
**circuit** [3] - 46:3, 46:4, 46:10
**Circuit** [4] - 13:9, 46:3, 51:14, 71:21
**circumstances** [3] - 11:4, 18:19, 33:2
**cite** [2] - 51:13, 75:3
**cited** [1] - 71:22
**citing** [2] - 46:2, 46:9
**civil** [2] - 3:6, 107:24
**claim** [13] - 6:25, 7:1, 7:11, 9:9, 13:1, 37:4, 39:19, 50:19, 55:11, 55:13, 55:16, 55:17
**claiming** [7] - 7:14, 30:10, 30:21, 32:22, 39:16, 39:18, 42:20
**claims** [1] - 5:15
**claire** [1] - 109:6
**clarification** [4] - 6:12, 45:15, 74:6, 110:5
**clarify** [8] - 25:15, 42:12, 57:3, 61:10, 68:13, 71:2, 74:8, 105:11
**clarifying** [1] - 73:13
**cleanup** [1] - 4:3
**clear** [10] - 16:17, 17:14, 25:2, 32:22, 40:15, 69:24, 80:1, 93:15, 93:17, 94:8
**clearest** [1] - 55:23
**clearly** [1] - 44:21
**CLERK** [3] - 3:5, 104:23, 106:24
**client** [1] - 95:5
**client's** [3] - 59:1, 59:6, 59:7
**clients** [1] - 29:3
**climate** [1] - 22:14
**clock** [2] - 109:5, 109:6
**close** [1] - 88:24
**closed** [2] - 5:8, 98:6
**closing** [3] - 62:23, 104:4, 109:4
**code** [1] - 87:20
**cognizable** [1] - 40:12
**cognizant** [2] - 95:5, 97:5
**Colin** [1] - 82:19
**collection** [3] - 99:24, 99:25, 100:5
**Collection** [1] - 100:3
**color** [1] - 24:18
**combating** [1] - 22:14
**coming** [6] - 15:19, 41:4, 64:22, 97:1, 104:17, 110:7
**comments** [1] - 47:24
**communication** [3] - 38:5, 38:6, 57:21
**communications** [1] - 58:3
**community** [1] - 81:20
**companies** [1] - 41:25
**company** [7] - 42:15, 67:2, 81:5, 87:19, 88:2, 88:19
**complain** [1] - 65:6
**complained** [3] - 50:3, 52:21, 102:8
**complaining** [1] - 65:3
**complains** [1] - 65:5
**complaint** [4] - 4:1, 6:8, 68:2, 68:21
**complete** [2] - 64:13, 103:15
**completed** [1] - 107:15

**completely** [2] - 45:11, 62:18
**compliance** [2] - 14:4, 24:14
**complicated** [1] - 14:22
**complicates** [1] - 55:10
**complied** [5] - 10:21, 38:24, 62:5, 62:15, 62:17
**comply** [10] - 11:20, 12:5, 13:19, 14:18, 14:20, 18:15, 32:14, 36:15, 55:11, 87:11
**complying** [1] - 13:11
**compound** [1] - 88:10
**compromise** [2] - 35:23, 36:16
**conceded** [1] - 81:7
**conceding** [3] - 56:15, 56:16, 81:11
**concern** [4] - 76:11, 100:2, 100:4, 101:3
**concluded** [1] - 112:7
**conclusion** [1] - 33:20
**conclusions** [1] - 44:6
**condition** [6] - 19:10, 19:13, 19:14, 19:18, 25:17, 26:22
**conditions** [1] - 25:19
**conduct** [6] - 13:6, 27:6, 34:8, 49:2, 53:1, 72:3
**conducted** [1] - 34:6
**confer** [2] - 103:12, 104:1
**Conference** [1] - 1:14
**conference** [4] - 3:6, 4:14, 99:14, 106:11
**conformed** [1] - 113:6
**confuse** [2] - 76:12, 97:3
**confusing** [3] - 24:15, 24:20, 55:19
**confusion** [1] - 81:25
**Congress** [3] - 62:2, 62:6, 62:12
**congress** [1] - 61:17
**congressional** [2] - 61:13, 61:23
**consider** [6] - 5:23, 56:3, 56:9, 56:24, 96:14, 100:19
**considerable** [2] - 24:14, 51:7
**considered** [1] - 25:22
**considers** [1] - 81:8
**consistent** [4] - 38:15, 53:13, 72:4
**consumer** [6] - 13:2, 13:11, 14:6, 18:21, 31:12, 94:10
**consumers** [2] - 18:15, 19:6
**contain** [1] - 85:9
**content** [3] - 51:3, 51:15, 93:18
**contest** [2] - 89:12, 89:24
**context** [6] - 21:10, 21:17, 23:24, 31:6, 34:4, 62:15
**continued** [1] - 26:16
**control** [1] - 34:25
**conversation** [2] - 15:17, 76:19
**convince** [1] - 108:14
**convinced** [2] - 38:25, 39:1
**Cooper** [11] - 66:18, 67:8, 69:1, 70:1, 70:10, 71:1, 71:6, 71:25, 82:14, 105:11, 105:25
**cooper** [2] - 66:23, 67:12
**Cooper's** [1] - 68:14
**cooperate** [1] - 87:6
**cooperative** [1] - 23:9
**copy** [3] - 50:17, 52:7, 107:6
**corollary** [1] - 28:8

**corporate** [2] - 69:4, 69:5
**corporation** [2] - 69:14, 71:10
**corporations** [1] - 71:17
**correct** [21] - 20:23, 25:20, 32:18, 35:1, 36:23, 38:14, 59:2, 63:2, 63:5, 66:8, 66:10, 66:19, 80:19, 83:16, 86:2, 86:3, 86:14, 96:20, 100:22, 113:4
**Correct** [1] - 88:20
**corrected** [1] - 62:14
**correctly** [1] - 19:22
**COSGRAVE** [1] - 2:18
**costs** [1] - 29:17
**cottage** [1] - 81:3
**counsel** [6] - 3:8, 66:12, 66:15, 71:17, 87:1, 95:18
**Counsel** [1] - 61:1
**count** [3] - 109:4, 111:11
**couple** [8] - 4:19, 45:25, 70:14, 72:17, 97:19, 99:1, 99:8, 99:23
**course** [12] - 4:22, 5:3, 5:6, 8:13, 11:6, 12:1, 16:5, 18:7, 65:17, 65:20, 67:11, 84:11
**COURT** [262] - 1:1, 1:17, 3:18, 4:9, 6:19, 7:2, 7:17, 9:8, 9:18, 10:1, 10:10, 10:25, 11:9, 11:14, 11:17, 12:6, 12:10, 12:19, 13:23, 15:2, 15:22, 15:24, 16:20, 17:4, 17:7, 17:17, 17:20, 18:4, 18:23, 19:2, 19:7, 20:18, 21:20, 23:2, 23:11, 24:3, 24:10, 24:23, 25:11, 25:18, 26:2, 26:10, 26:18, 26:20, 27:7, 27:11, 27:15, 27:18, 27:21, 28:10, 28:18, 28:21, 29:2, 29:12, 29:15, 30:5, 30:15, 31:10, 31:23, 31:25, 32:6, 32:18, 33:3, 33:14, 34:13, 34:24, 35:2, 35:18, 36:20, 37:6, 37:19, 37:23, 38:4, 38:9, 38:16, 38:18, 38:20, 39:9, 39:13, 39:21, 39:25, 40:6, 40:20, 41:1, 41:6, 41:9, 41:18, 41:22, 42:5, 42:18, 42:24, 43:8, 43:19, 44:14, 44:17, 44:20, 45:21, 45:25, 46:15, 46:24, 47:3, 48:23, 49:6, 49:9, 49:23, 50:12, 51:10, 51:20, 52:5, 52:8, 52:24, 53:17, 54:5, 56:2, 57:6, 57:8, 57:17, 57:20, 57:24, 58:14, 58:21, 59:1, 59:6, 59:10, 59:17, 59:22, 60:12, 60:17, 61:4, 61:11, 61:14, 61:21, 62:8, 62:18, 62:21, 63:7, 63:19, 64:5, 64:10, 64:16, 64:20, 65:17, 66:5, 66:18, 66:20, 67:6, 68:12, 68:17, 70:12, 70:17, 72:6, 72:11, 72:14, 72:18, 73:11, 73:17, 73:20, 73:24, 74:14, 74:19, 75:3, 75:12, 75:22, 76:15, 77:17, 78:5, 78:23, 79:8, 79:16, 79:24, 80:4, 80:13, 80:25, 81:12, 81:16, 83:12, 83:16, 83:25, 84:4, 84:16, 84:24, 85:3, 85:16, 85:21, 85:25, 86:5, 86:14, 86:19, 87:5, 87:12, 87:21, 88:4, 88:16, 89:3, 89:8, 89:10, 89:14, 89:17, 89:19, 89:23, 90:1, 90:4, 90:14, 90:17, 90:23, 91:4, 91:12, 91:19, 93:4, 93:6, 93:10, 95:3, 95:22, 96:1, 96:4, 97:1, 97:15, 97:18, 98:17, 98:23, 99:10, 99:17, 100:8, 100:14, 100:22, 101:16, 102:10, 103:4, 103:8, 103:12, 103:24, 104:2, 104:11, 104:21, 104:24, 105:3, 105:7, 105:13, 105:22, 106:1, 106:4, 106:9, 106:16, 106:25, 108:4, 108:10, 108:13, 108:18, 109:11, 109:17, 109:24, 110:2, 110:15, 110:18, 110:20, 111:1, 111:4, 111:8, 111:13, 111:17, 111:25, 112:5
**court** [12] - 3:8, 5:9, 24:16, 29:9, 46:4, 46:7, 46:13, 46:20, 64:14, 65:4, 92:23
**Court** [11] - 1:23, 4:18, 6:24, 14:12, 14:25, 30:9, 49:20, 56:9, 99:6, 101:12, 106:12
**Courthouse** [1] - 1:23
**courtroom** [2] - 49:24, 106:22
**cover** [1] - 73:15
**covered** [1] - 73:16
**covering** [1] - 92:6
**CRA** [2] - 31:9, 37:17
**credentials** [1] - 80:21
**credible** [1] - 41:17
**credit** [31] - 13:2, 16:10, 31:2, 35:14, 38:7, 40:3, 40:11, 40:15, 40:17, 40:23, 40:24, 40:25, 41:14, 41:24, 51:4, 62:2, 67:8, 67:22, 67:23, 78:9, 78:15, 79:2, 79:4, 79:14, 80:22, 81:3, 81:8, 94:14, 94:17, 100:5, 102:7
**Credit** [2] - 28:6, 62:12
**creditworthiness** [1] - 79:15
**crime** [1] - 58:20
**criminal** [3] - 58:4, 58:23, 58:25
**criticism** [1] - 91:20
**crosses** [1] - 47:1
**CRR** [1] - 1:23
**CSR** [1] - 113:15
**CSR/CCR** [1] - 1:23
**currency** [2] - 25:23, 25:24
**current** [9] - 19:13, 20:3, 20:4, 20:6, 25:16, 25:19, 25:22, 26:22, 26:25

**D**

**DAINES** [1] - 2:10
**damage** [12] - 6:25, 7:12, 7:14, 12:4, 40:3, 41:3, 41:7, 41:13, 42:1, 42:10, 42:16, 43:11
**damaged** [9] - 37:4, 41:15, 41:20, 42:3, 43:14, 43:17, 79:15, 101:6, 102:4
**damages** [42] - 6:14, 6:23, 7:9, 39:11, 39:16, 40:1, 40:4, 40:14, 40:18, 41:11, 41:18, 41:20, 42:20, 42:21, 42:22, 42:25, 43:2, 43:3, 43:4, 43:5, 44:1, 47:9, 48:25, 49:1, 49:10, 49:16, 56:22, 56:24, 56:25, 57:5, 58:9, 77:22, 77:23, 78:4, 78:10, 78:17, 78:19, 79:10, 79:16
**dan** [1] - 3:14
**DANIEL** [1] - 2:19
**date** [4] - 36:21, 39:11, 39:17, 39:18
**DATED** [1] - 113:9
**dates** [1] - 38:10
**dating** [1] - 32:12
**days** [6] - 4:10, 16:15, 72:17, 97:8, 108:25, 112:1
**deadline** [5] - 54:14, 65:13, 94:3, 98:5,

98:8
**deal** [3] - 9:23, 53:24, 87:13
**dealer** [1] - 98:13
**dean** [1] - 75:24
**Debt** [1] - 100:3
**decades** [1] - 80:22
**December** [1] - 7:11
**decide** [17] - 12:11, 12:14, 13:4, 15:15, 15:17, 20:16, 21:8, 45:14, 45:22, 45:23, 55:18, 59:19, 62:14, 62:16, 67:4, 78:16, 103:23
**decided** [3] - 46:7, 55:13, 57:5
**deciding** [3] - 22:4, 62:5, 64:21
**decision** [1] - 13:3
**declaration** [2] - 25:3, 92:11
**deem** [2] - 34:11, 86:16
**deemed** [1] - 33:25
**defeat** [1] - 50:11
**defend** [1] - 98:2
**defendant** [19] - 3:14, 3:15, 3:16, 3:17, 19:10, 26:21, 27:23, 29:20, 29:22, 44:3, 45:2, 46:7, 51:24, 53:11, 56:15, 61:20, 77:9, 83:22, 83:24
**Defendant** [1] - 2:18
**Defendant's** [3] - 47:8, 47:16, 47:22
**defendant's** [10] - 19:8, 19:12, 19:13, 25:12, 27:2, 27:22, 29:16, 44:2, 47:6, 51:23
**Defendants** [1] - 1:9
**defendants** [4] - 50:13, 52:13, 56:20, 74:19
**Defendants'** [1] - 63:21
**defense** [26] - 4:1, 5:19, 6:2, 7:6, 8:4, 12:22, 13:13, 14:10, 14:11, 14:24, 18:1, 19:4, 31:15, 36:6, 36:22, 37:1, 37:19, 45:3, 56:8, 65:4, 66:8, 74:21, 75:24, 80:5, 91:15
**defenses** [1] - 29:22
**definitely** [1] - 7:11
**Definitely** [1] - 65:25
**definition** [2] - 102:1, 102:2
**degree** [3] - 56:10, 79:6, 79:12
**delay** [4] - 54:13, 54:14, 56:3, 56:6
**deliberate** [2] - 108:9, 108:10
**delivered** [1] - 52:7
**demonstrative** [4] - 60:11, 103:21, 103:25, 104:4
**demonstratives** [1] - 109:22
**denied** [25] - 8:6, 11:11, 11:12, 11:24, 16:8, 16:17, 19:11, 26:23, 28:4, 28:5, 28:6, 28:9, 29:3, 29:4, 47:12, 47:13, 50:1, 50:10, 51:21, 51:24, 55:25, 56:13, 57:1, 57:24, 106:12
**deny** [2] - 12:17, 97:17
**denying** [2] - 52:23, 56:18
**department** [17] - 16:11, 66:15, 67:8, 67:9, 67:24, 67:25, 70:3, 70:4, 70:15, 70:18, 70:22, 71:24, 73:4, 77:10, 93:9, 95:6, 99:25
**department's** [2] - 66:16, 71:25
**departments** [4] - 67:10, 71:15, 71:22, 71:23
**depose** [12] - 25:6, 25:10, 69:2, 70:7,

70:8, 72:16, 73:18, 73:21, 82:10, 98:15, 98:19, 111:16
**deposed** [4] - 66:13, 70:10, 72:21, 73:15
**deposition** [47] - 16:17, 22:3, 24:5, 24:9, 25:8, 50:16, 51:22, 54:24, 64:25, 65:12, 65:20, 67:18, 68:7, 69:13, 71:18, 72:8, 73:11, 74:20, 74:21, 75:1, 75:5, 75:10, 81:6, 82:16, 84:18, 85:10, 85:17, 85:21, 86:9, 87:10, 91:11, 93:1, 93:16, 94:6, 95:16, 98:5, 98:8, 102:14, 102:19, 105:17, 110:6, 110:10, 110:14, 110:15, 110:24, 111:11
**depositions** [8] - 19:25, 68:3, 102:16, 105:14, 105:20, 106:1, 106:2, 111:23
**depositors** [1] - 24:18
**deposits** [1] - 24:13
**derogatory** [2] - 78:13, 78:21
**describe** [2] - 4:4, 78:7
**describing** [2] - 32:10, 103:14
**deselect** [1] - 107:21
**designated** [6] - 8:21, 68:10, 68:11, 69:5, 69:8, 100:25
**designation** [4] - 68:9, 82:23, 88:11, 103:16
**designations** [11] - 64:25, 82:16, 91:11, 102:19, 102:21, 102:23, 102:24, 103:1, 103:2, 103:5, 103:10
**deter** [1] - 49:1
**determination** [3] - 14:7, 37:18, 64:18
**determine** [4] - 14:14, 36:9, 79:10, 101:13
**determined** [1] - 14:8
**difference** [4] - 15:5, 26:8, 53:17, 65:11
**different** [22] - 4:24, 10:2, 11:1, 14:2, 18:15, 34:14, 35:14, 42:16, 46:3, 46:19, 51:5, 54:24, 54:25, 55:18, 66:3, 66:9, 70:16, 71:4, 73:3, 100:12, 106:8
**differently** [1] - 48:18
**difficult** [1] - 21:7
**digitally** [1] - 113:7
**dire** [2] - 99:15, 99:17
**direct** [10] - 14:6, 30:25, 31:8, 33:17, 34:21, 36:10, 37:16, 38:13, 77:10, 96:4
**directed** [1] - 97:12
**directly** [2] - 31:1, 78:9
**disagree** [9] - 6:15, 10:10, 20:5, 23:23, 39:21, 62:18, 65:17, 70:24, 75:4
**disagreement** [3] - 26:20, 30:5, 81:25
**disclosed** [10] - 16:11, 17:15, 18:10, 21:22, 24:7, 65:12, 65:14, 66:25, 97:4, 98:8
**disclosure** [3] - 66:1, 66:2, 103:15
**disclosures** [4] - 66:4, 67:1, 68:19, 68:22
**discovery** [13] - 16:12, 18:10, 53:2, 54:25, 92:13, 94:2, 94:3, 95:10, 97:24, 98:4, 98:6, 98:9
**discretion** [1] - 108:17
**discuss** [5] - 75:21, 76:10, 80:23, 100:21, 104:10
**discussed** [1] - 81:2
**discusses** [2] - 76:6, 76:7

**discussion** [3] - 29:24, 68:6, 96:10
**discussions** [1] - 68:4
**dispose** [1] - 65:15
**dispute** [21] - 14:5, 14:6, 14:8, 16:10, 30:6, 31:8, 33:17, 33:22, 34:1, 34:11, 34:21, 36:9, 36:10, 36:23, 37:13, 37:14, 37:16, 39:17, 41:5, 59:21, 68:16
**disputes** [15] - 10:22, 10:23, 13:2, 30:25, 37:16, 67:10, 73:2, 73:6, 73:10, 91:25, 94:10, 94:14, 94:17, 94:23, 98:13
**disregard** [1] - 45:17
**distinction** [2] - 26:4, 30:1
**distress** [15] - 5:21, 6:7, 7:5, 7:21, 11:22, 41:1, 41:2, 41:19, 42:4, 43:3, 43:5, 43:16, 47:9, 47:15, 74:6
**DISTRICT** [3] - 1:1, 1:2, 1:17
**district** [2] - 46:4, 46:10
**District** [1] - 1:23
**disturbance** [1] - 5:22
**divide** [2] - 43:10, 109:2
**DIVISION** [1] - 1:3
**division** [1] - 76:5
**document** [2] - 50:25, 51:3
**documentation** [2] - 13:10, 58:12
**documents** [16] - 4:17, 8:6, 50:4, 60:2, 65:4, 65:8, 68:5, 91:24, 93:20, 94:15, 95:1, 95:24, 96:5, 97:11, 98:10
**dollar** [2] - 20:24, 20:25
**done** [19] - 14:1, 16:24, 18:20, 23:13, 24:16, 29:4, 32:4, 33:16, 51:19, 55:8, 55:25, 69:16, 81:20, 85:10, 91:12, 100:5, 102:22, 111:18
**door** [8] - 5:7, 14:18, 14:19, 30:8, 35:21, 35:22, 80:9, 80:10
**down** [4] - 27:9, 79:13, 82:19, 86:1
**dpeterson@cosgravelaw.com** [1] - 2:20
**Dr** [5] - 21:3, 21:23, 21:24, 23:17, 23:23
**draft** [1] - 111:4
**drawing** [1] - 26:5
**Drew** [1] - 51:16
**driver's** [1] - 36:1
**during** [12] - 4:22, 5:3, 5:6, 11:25, 16:5, 16:12, 18:7, 18:10, 65:19, 79:5, 94:2, 104:4
**duties** [2] - 30:25, 31:3
**duty** [5] - 30:11, 30:24, 32:24, 34:20
**dynamic** [1] - 4:25

**E**

**Ebron** [1] - 82:18
**economic** [14] - 21:10, 40:1, 40:4, 40:12, 40:14, 40:18, 40:21, 40:25, 41:3, 42:20, 42:21, 42:22, 43:1, 43:5
**education** [2] - 74:16, 107:11
**effect** [1] - 78:8
**efficient** [2] - 4:12, 75:9
**efforts** [1] - 106:7
**eight** [9] - 107:25, 108:1, 108:5, 108:8, 108:10, 108:11, 108:15, 108:18,

108:22
**either** [6] - 33:22, 40:16, 59:22, 68:2, 69:14, 95:17
**eliminates** [1] - 84:20
**emails** [2] - 57:12, 59:25
**emotional** [15] - 5:22, 6:7, 7:5, 7:21, 41:1, 41:2, 41:18, 42:4, 43:3, 43:4, 43:5, 43:15, 47:9, 47:15, 74:5
**employed** [1] - 70:16
**employees** [4] - 18:10, 51:23, 70:8, 71:11
**enacted** [2] - 62:6, 62:12
**end** [6] - 4:4, 7:10, 32:21, 53:15, 110:12, 111:6
**endeavor** [1] - 67:4
**ended** [1] - 7:18
**enforcement** [1] - 58:23
**engaged** [1] - 7:3
**entertain** [1] - 108:3
**entire** [2] - 62:3, 81:9
**entirely** [1] - 76:14
**entirety** [1] - 80:9
**entities** [1] - 11:23
**entitled** [2] - 6:24, 14:20
**equation** [1] - 37:3
**EQUIFAX** [1] - 1:8
**Equifax** [18] - 3:7, 5:16, 5:21, 6:9, 6:14, 6:18, 6:24, 7:4, 7:16, 7:20, 8:1, 42:14, 51:16, 59:25, 84:14, 84:17, 87:6
**Equifax's** [1] - 87:1
**equivalent** [2] - 51:15, 90:12
**errors** [1] - 27:24
**especially** [2] - 55:22, 58:11
**essence** [1] - 10:9
**essential** [1] - 62:3
**essentially** [4] - 23:8, 48:13, 73:14, 79:13
**established** [2] - 90:18, 105:24
**et** [3] - 3:7, 27:4, 107:3
**ether** [1] - 26:12
**evaluation** [1] - 19:20
**Evan** [1] - 73:25
**eve** [1] - 95:2
**event** [1] - 66:5
**events** [1] - 68:20
**evidence** [55] - 5:4, 5:15, 5:22, 6:1, 8:4, 9:1, 9:4, 11:19, 15:5, 15:10, 15:18, 15:24, 16:9, 17:15, 18:8, 19:9, 19:12, 22:16, 23:20, 24:20, 25:20, 26:14, 26:22, 27:2, 27:5, 27:23, 28:2, 28:4, 28:15, 29:3, 29:11, 29:13, 29:17, 29:19, 32:4, 36:25, 39:25, 41:24, 44:3, 49:24, 49:25, 50:18, 51:3, 51:18, 53:12, 53:15, 61:3, 72:1, 72:18, 79:3, 90:18, 97:11, 109:19
**Evidence** [1] - 69:21
**eviscerate** [1] - 49:3
**exact** [1] - 92:24
**exactly** [10] - 5:18, 6:4, 6:5, 9:23, 11:3, 23:18, 34:25, 46:20, 100:10, 109:24
**examination** [1] - 88:17
**example** [4] - 16:18, 30:24, 50:23, 68:14
**examples** [1] - 48:21

**except** [1] - 20:16
**exception** [7] - 13:6, 58:19, 58:21, 58:22, 59:5, 59:15, 59:21
**excerpts** [1] - 111:11
**exclude** [16] - 5:14, 8:3, 8:7, 8:19, 11:19, 18:8, 19:9, 39:25, 47:8, 47:16, 57:24, 61:22, 63:24, 72:18, 73:8, 76:10
**Exclude** [10] - 16:9, 27:2, 27:22, 29:16, 29:19, 44:3, 44:5, 47:23, 49:25, 51:22
**excluded** [3] - 6:25, 49:24, 82:7
**excuse** [9] - 8:19, 32:24, 46:17, 47:22, 56:22, 58:2, 58:3, 74:20, 108:5
**exercise** [2] - 15:14, 107:19
**Exhibit** [4] - 57:20, 58:2, 60:2, 63:21
**exhibit** [11] - 4:2, 60:11, 61:6, 61:7, 61:22, 91:14, 98:21, 101:22, 101:25, 102:8
**Exhibits** [2] - 57:14, 66:17
**exhibits** [28] - 3:23, 20:2, 20:12, 20:15, 22:24, 26:17, 57:10, 57:11, 58:6, 94:2, 96:16, 98:18, 98:20, 101:1, 101:3, 101:4, 101:10, 101:13, 101:14, 101:18, 101:20, 103:21, 103:25, 104:4, 105:15, 105:18, 109:16
**exist** [2] - 42:10, 95:1
**existed** [1] - 16:17
**expect** [4] - 4:6, 17:8, 28:22, 111:2
**expectations** [2] - 4:5, 80:16
**experience** [7] - 4:23, 5:21, 47:14, 65:24, 74:15, 80:22, 107:12
**expert** [50] - 8:21, 8:24, 9:13, 10:9, 10:18, 19:19, 19:23, 19:24, 20:11, 20:14, 21:4, 21:14, 21:22, 21:24, 22:1, 22:2, 22:4, 22:5, 22:7, 22:8, 22:9, 22:10, 22:22, 22:23, 23:1, 24:7, 26:17, 44:5, 44:7, 44:9, 44:10, 44:22, 44:23, 45:22, 46:2, 46:9, 46:25, 47:8, 47:11, 47:13, 47:17, 74:14, 76:6, 79:2, 79:4, 81:2, 81:8
**expertise** [4] - 79:6, 79:7, 81:11, 104:25
**experts** [11] - 20:1, 24:8, 44:18, 45:9, 46:6, 47:4, 54:23, 76:19, 76:23, 77:6, 80:7
**Expires** [3] - 113:14, 113:15, 113:16
**explain** [9] - 5:20, 42:5, 51:1, 58:7, 66:16, 72:3, 78:12, 79:6, 96:1
**explained** [1] - 50:8
**explaining** [3] - 23:20, 57:25, 99:1
**expressed** [1] - 9:24
**expressly** [1] - 25:4
**extend** [1] - 45:19
**extension** [1] - 48:13
**extensions** [1] - 48:19
**extent** [11] - 5:7, 5:20, 9:2, 11:21, 16:7, 38:20, 42:22, 45:21, 47:13, 61:22, 77:19
**extra** [1] - 40:22

**F**

**fact** [25] - 7:1, 7:3, 9:16, 9:19, 9:21, 22:7, 22:8, 22:9, 22:21, 26:3, 26:8, 26:9, 26:11, 26:16, 35:20, 49:10, 49:23, 56:6, 66:17, 69:6, 69:7, 73:5, 79:4,

97:5, 97:23
**factors** [1] - 56:12
**facts** [6] - 11:3, 21:15, 23:19, 26:5, 26:6, 93:22
**factual** [1] - 32:8
**failed** [1] - 27:24
**failure** [6] - 11:20, 33:7, 33:8, 33:25, 55:11, 63:5
**Fair** [3] - 28:5, 62:12, 100:3
**fair** [2] - 7:5, 79:23
**faith** [5] - 54:13, 54:16, 56:3, 56:7
**fall** [2] - 33:17, 43:4
**falls** [1] - 57:14
**false** [1] - 94:20
**familiar** [5] - 47:3, 48:12, 49:11, 52:16, 65:7
**far** [5] - 11:8, 30:16, 32:25, 33:18, 107:13
**Fargo** [60] - 2:18, 6:13, 6:22, 8:4, 8:23, 15:7, 15:10, 16:15, 18:9, 19:18, 22:13, 23:13, 29:4, 30:16, 31:7, 32:14, 32:19, 33:5, 33:9, 33:21, 34:7, 35:8, 35:10, 38:1, 38:21, 38:24, 39:7, 46:13, 48:17, 50:16, 50:19, 51:8, 52:17, 53:25, 58:8, 58:13, 60:2, 63:22, 65:25, 66:21, 68:5, 68:8, 68:19, 70:15, 70:24, 71:12, 76:24, 77:12, 77:19, 78:13, 81:19, 87:8, 90:10, 92:10, 93:9, 94:10, 95:6, 95:11, 95:23, 100:25
**FARGO** [1] - 1:8
**Fargo's** [8] - 8:5, 11:20, 16:10, 22:16, 22:19, 33:4, 34:16, 37:8, 37:12, 69:19, 76:8, 82:1
**faster** [1] - 53:3
**fault** [2] - 28:16, 29:10
**FCRA** [5] - 11:20, 12:5, 61:18, 62:5
**February** [1] - 98:6
**Federal** [1] - 69:21
**federal** [3] - 28:21, 91:1, 98:3
**fees** [1] - 29:17
**felt** [1] - 41:19
**few** [2] - 16:15, 29:25
**field** [1] - 46:9
**file** [1] - 42:16
**filed** [11] - 3:25, 6:18, 7:10, 22:17, 42:21, 52:4, 65:3, 91:14, 96:9, 96:13, 106:10
**filing** [2] - 25:6, 52:3
**filings** [1] - 53:25
**final** [2] - 63:1, 103:20
**finally** [2] - 77:21, 98:10
**finances** [1] - 82:1
**financial** [8] - 19:9, 19:13, 19:18, 19:20, 21:4, 24:21, 25:16, 25:19
**financials** [1] - 19:24
**findings** [1] - 56:18
**fine** [6] - 18:20, 60:13, 74:22, 96:7, 99:18, 106:17
**finish** [1] - 110:17
**finished** [1] - 80:8
**First** [1] - 2:15
**first** [37] - 3:22, 5:14, 12:7, 29:22, 35:7, 38:6, 38:13, 39:6, 39:12, 39:17, 39:18, 51:20, 52:11, 52:13, 54:7, 57:11,

57:21, 62:20, 65:1, 65:4, 65:14, 70:14, 82:24, 84:1, 84:22, 94:22, 96:17, 99:5, 100:20, 102:13, 102:22, 103:2, 105:10, 107:17, 107:20
**five** [2] - 109:1, 111:16
**fixed** [3] - 7:9, 58:10, 62:11
**Floor** [1] - 2:22
**flows** [1] - 21:19
**fluid** [1] - 4:25
**fly** [1] - 96:25
**focused** [1] - 61:5
**follow** [5] - 17:17, 17:21, 18:12, 47:18, 107:16
**follow-up** [1] - 107:16
**followed** [1] - 88:14
**following** [2] - 34:21, 58:10
**FOR** [1] - 1:2
**foregoing** [1] - 113:3
**Foremost** [1] - 87:16
**forever** [1] - 68:9
**forget** [1] - 70:17
**forgot** [1] - 111:15
**form** [14] - 55:20, 55:21, 83:18, 85:18, 85:23, 86:11, 86:20, 86:21, 88:6, 88:8, 88:9, 91:1, 91:5, 93:25
**formulate** [1] - 46:17
**forth** [3] - 47:17, 59:2, 107:22
**forward** [1] - 13:4
**four** [2] - 4:10, 108:25
**frame** [1] - 38:4
**Frances** [1] - 65:2
**Fransen** [1] - 3:15
**FRANSEN** [50] - 2:18, 3:15, 19:5, 39:24, 50:15, 52:4, 52:6, 52:15, 52:25, 53:21, 57:16, 57:18, 59:20, 60:21, 61:15, 63:1, 64:3, 64:9, 64:14, 64:19, 66:10, 66:19, 66:25, 67:7, 68:13, 70:14, 70:19, 72:9, 73:13, 73:19, 73:23, 84:13, 85:1, 85:8, 85:19, 86:3, 86:8, 86:15, 87:25, 91:10, 92:19, 93:5, 93:8, 93:11, 95:4, 95:25, 96:2, 96:8, 97:2, 98:22
**Fraud** [1] - 94:23
**fraud** [14] - 16:11, 28:5, 51:14, 67:9, 67:22, 67:25, 68:1, 70:3, 70:4, 70:15, 70:18, 73:4, 77:10, 98:12
**fraudulent** [1] - 42:2
**free** [2] - 5:8, 6:8
**Friday** [6] - 4:10, 52:5, 52:6, 52:10, 91:17, 91:18
**friends** [1] - 84:21
**frivolous** [9] - 13:3, 14:5, 14:9, 14:14, 33:22, 34:1, 34:12, 36:9, 36:13
**front** [4] - 27:19, 61:24, 107:1, 109:17
**fruits** [4] - 21:3, 21:23, 21:24, 23:17
**Fruits'** [1] - 23:5
**frustration** [1] - 65:24
**full** [1] - 36:6
**FULLER** [3] - 2:10, 3:10, 25:13
**Fuller** [1] - 3:10
**fun** [3] - 63:7, 101:7, 102:5
**function** [1] - 56:14
**Funsch** [1] - 82:18

**furnisher** [4] - 13:4, 14:5, 31:1, 35:9
**furnishers** [1] - 51:6
**futility** [2] - 56:4, 56:13
**future** [1] - 49:2

**G**

**gallery** [1] - 107:4
**game** [1] - 7:5
**gather** [3] - 95:12, 95:13, 95:14
**gathering** [1] - 95:9
**general** [6] - 45:9, 47:11, 80:21, 80:23, 94:11, 97:13
**generalities** [1] - 74:2
**generally** [7] - 9:1, 44:20, 47:14, 92:25, 99:18, 107:9, 108:25
**generically** [1] - 74:11
**Georgia** [1] - 2:5
**given** [6] - 4:11, 4:16, 21:15, 69:13, 98:3, 106:12
**Gobin** [5] - 82:19, 82:21, 82:24, 83:10, 83:12
**Golden** [5] - 47:23, 48:1, 48:14, 48:19, 49:5
**goodness** [1] - 82:17
**grant** [4] - 11:8, 56:11, 61:21, 74:4
**granted** [12] - 11:11, 11:12, 19:7, 29:18, 43:24, 44:4, 47:6, 47:24, 60:8, 63:10, 63:14, 63:16
**grants** [1] - 29:9
**great** [3] - 65:11, 70:5, 81:19
**greatly** [1] - 92:14
**Grier** [1] - 82:19
**ground** [1] - 89:15
**grounds** [1] - 88:7
**guess** [8] - 10:16, 11:7, 29:5, 35:8, 89:22, 101:8, 101:12, 108:13
**guidance** [1] - 6:3
**guilty** [1] - 90:8
**guy** [1] - 70:2

**H**

**half** [2] - 109:2, 111:19
**halftime** [2] - 12:14
**hand** [1] - 5:24
**handicapped** [1] - 98:15
**handle** [3] - 10:14, 98:12, 99:16
**handling** [1] - 94:10
**hands** [1] - 96:22
**hang** [3] - 24:24, 87:21, 89:19
**happy** [2] - 20:21, 92:20
**hard** [1] - 7:2
**harm** [6] - 74:11, 74:12, 78:17, 92:16, 93:1, 93:13
**harmful** [1] - 91:23
**harms** [2] - 74:17, 92:15
**hate** [2] - 65:9
**head** [4] - 37:7, 49:12, 54:8, 70:1
**head's** [3] - 27:8, 64:1, 102:2
**hear** [9] - 4:15, 35:19, 36:15, 49:21, 52:13, 83:23, 91:1, 94:4, 98:20
**heard** [9] - 6:11, 9:7, 11:2, 12:17, 25:7, 25:14, 27:16, 83:15, 89:4

**hearsay** [6] - 58:16, 59:4, 59:11, 59:15, 89:20, 90:6
**hedging** [1] - 60:23
**help** [3] - 9:19, 64:14, 104:24
**helpful** [6] - 8:15, 24:1, 45:4, 45:13, 94:3, 104:5
**helps** [1] - 46:17
**Hendricks** [1] - 73:25
**HERNANDEZ** [1] - 1:16
**himself** [2] - 22:12, 81:8
**hire** [1] - 22:22
**hired** [2] - 19:23, 19:24
**hit** [2] - 54:7, 70:1
**hold** [3] - 17:7
**holding** [1] - 105:15
**holds** [1] - 5:10
**Hollomon** [1] - 82:19
**homework** [1] - 65:9
**honest** [2] - 41:16, 48:4
**honestly** [1] - 11:11
**Honor** [98] - 3:5, 4:8, 6:11, 9:7, 9:20, 10:5, 10:6, 14:10, 16:14, 17:5, 17:13, 18:3, 19:5, 20:19, 22:12, 23:4, 24:12, 25:14, 26:11, 27:10, 29:24, 31:4, 32:8, 33:13, 34:17, 36:19, 38:8, 39:5, 39:10, 40:5, 40:7, 40:21, 41:8, 42:19, 43:11, 44:19, 45:15, 45:24, 46:23, 47:25, 48:4, 48:12, 49:8, 49:19, 50:15, 52:15, 54:16, 54:21, 55:11, 57:3, 57:23, 58:18, 59:20, 60:9, 63:1, 64:3, 68:18, 69:5, 70:7, 72:12, 74:7, 75:8, 75:17, 76:17, 78:3, 78:25, 79:21, 80:12, 80:17, 81:1, 81:15, 83:9, 84:8, 84:19, 85:23, 86:16, 86:25, 87:15, 88:5, 89:2, 90:10, 92:2, 92:19, 93:11, 94:6, 97:12, 98:6, 98:11, 98:22, 99:13, 101:21, 105:6, 106:5, 108:2, 109:10, 110:4, 110:21, 112:4
**Honor's** [1] - 92:23
**HONORABLE** [1] - 1:16
**hook** [1] - 109:25
**hope** [3] - 93:15, 110:23, 111:22
**hopefully** [1] - 111:5
**hour** [1] - 97:7
**hours** [4] - 96:21, 109:1, 109:3, 111:20
**housing** [1] - 22:14
**huge** [1] - 21:6
**hypothetical** [4] - 9:22, 10:8, 10:17, 10:24
**hypotheticals** [1] - 10:21

**I**

**idea** [2] - 17:25, 96:17
**identification** [1] - 77:13
**identified** [6] - 67:21, 68:20, 68:24, 69:9, 70:6, 101:22
**identify** [5] - 3:8, 68:21, 68:23, 69:10, 69:24
**identity** [16] - 28:5, 48:16, 58:5, 80:20, 80:23, 81:4, 81:5, 81:7, 81:10, 90:11, 90:12, 90:13, 91:25, 94:19, 94:23, 102:6
**IG** [2] - 87:20, 88:20

**immediately** [4] - 96:18, 96:19, 96:20
**impacted** [1] - 38:1
**impeachable** [1] - 68:15
**impeachment** [9] - 101:1, 101:3, 101:8, 101:13, 101:19, 102:1, 102:3, 102:9, 105:22
**implicates** [1] - 39:12
**importance** [1] - 51:4
**important** [6] - 37:7, 53:8, 78:21, 82:9, 90:9, 90:11
**importantly** [1] - 81:6
**imposed** [1] - 56:25
**improper** [2] - 14:19, 102:21
**IN** [1] - 1:1
**inaccuracy** [1] - 63:2
**inaccurate** [2] - 62:13, 63:4
**inadvertent** [2] - 92:9, 94:20
**inappropriate** [2] - 9:4, 85:15
**incidental** [1] - 66:1
**incidentally** [1] - 69:1
**include** [2] - 8:24, 97:14
**includes** [1] - 77:9
**including** [1] - 40:2
**income** [9] - 19:10, 20:3, 20:7, 20:9, 20:13, 24:17, 25:25, 26:14, 26:24
**inconsistent** [2] - 34:16, 37:5
**incorrect** [1] - 102:2
**indicate** [1] - 28:12
**indicated** [3] - 21:21, 83:23, 102:13
**indicates** [1] - 42:15
**individual** [4] - 19:20, 47:10, 58:5, 66:14
**industry** [4] - 76:13, 80:23, 81:3, 81:4
**industry-wide** [1] - 81:4
**inform** [2] - 63:18, 78:8
**INFORMATION** [1] - 1:8
**Information** [1] - 3:7
**information** [63] - 5:2, 8:10, 12:9, 12:23, 13:8, 13:14, 13:19, 14:1, 14:7, 14:13, 14:15, 15:11, 16:1, 17:15, 30:13, 30:19, 30:24, 31:1, 31:12, 31:15, 31:18, 32:12, 32:13, 32:19, 33:6, 33:8, 33:15, 33:19, 33:25, 34:3, 34:4, 34:7, 34:10, 34:20, 34:25, 35:7, 35:24, 36:23, 37:2, 37:15, 37:20, 38:1, 38:2, 39:4, 39:15, 51:6, 62:11, 62:13, 63:5, 63:12, 69:14, 69:15, 71:9, 76:25, 77:1, 77:4, 77:7, 77:19, 78:21, 80:6, 95:6, 95:12
**informed** [1] - 63:18
**informing** [1] - 58:19
**initial** [7] - 32:19, 33:5, 35:4, 38:5, 67:1, 68:18, 68:22
**inkling** [1] - 24:5
**inquire** [1] - 6:8
**insisting** [1] - 75:14
**insofar** [1] - 6:13
**Instagram** [2] - 101:7, 102:5
**instead** [1] - 97:10
**instructed** [1] - 92:24
**instruction** [12] - 13:25, 49:3, 49:10, 49:11, 49:13, 49:15, 58:15, 59:10, 59:12, 59:13, 59:18
**instructions** [11] - 13:24, 15:9, 53:23,

54:4, 55:21, 60:18, 61:16, 100:21, 100:24, 111:3, 111:5
**Insurance** [1] - 87:16
**insurance** [8] - 42:15, 44:4, 81:5, 87:19, 88:2, 88:14, 88:19
**intend** [6] - 13:16, 25:5, 25:7, 28:3, 49:16, 65:22
**intended** [3] - 29:11, 66:11, 102:17
**intending** [2] - 19:5, 28:1
**intent** [2] - 22:18, 61:23
**intention** [1] - 48:1
**intentional** [1] - 94:21
**intentionally** [1] - 95:19
**interest** [1] - 40:23
**internal** [2] - 37:18, 77:7
**interpretations** [1] - 44:6
**interrupt** [2] - 33:3, 86:15
**introduce** [3] - 18:2, 30:23, 79:3
**introducing** [1] - 15:10
**introduction** [3] - 80:20, 81:1, 81:10
**investigate** [5] - 13:20, 30:11, 30:14, 32:24, 36:7
**investigating** [3] - 30:12, 36:12, 57:12
**investigation** [20] - 13:6, 13:8, 13:15, 15:13, 30:17, 32:9, 32:15, 33:16, 34:6, 34:9, 35:24, 37:21, 37:25, 53:2, 63:3, 63:6, 73:1, 76:24, 77:8
**investigations** [3] - 16:16, 18:9, 18:20
**invited** [1] - 98:6
**involved** [2] - 73:6, 107:11
**irregular** [1] - 94:1
**irrelevant** [10] - 13:3, 14:5, 14:9, 14:14, 33:23, 34:1, 34:11, 36:9, 36:13, 82:7
**issue** [28] - 6:23, 10:21, 12:10, 13:24, 14:22, 24:22, 25:23, 25:24, 27:13, 29:23, 30:15, 43:21, 45:22, 45:23, 48:23, 50:14, 50:15, 51:13, 53:5, 64:3, 64:11, 67:11, 71:16, 77:22, 99:21, 105:14, 109:15
**issued** [1] - 19:20
**issues** [13] - 4:18, 6:6, 49:10, 52:18, 53:8, 53:9, 54:4, 67:22, 67:24, 68:1, 82:15, 99:15, 100:4
**item** [1] - 106:5
**items** [1] - 67:17
**itself** [4] - 10:4, 41:23, 51:3, 63:13

## J

**January** [6] - 7:10, 7:19, 7:25, 58:11
**jaws** [1] - 50:11
**Jeff** [1] - 3:13
**JEFFREY** [1] - 2:3
**Jennifer** [4] - 104:11, 107:17, 107:20
**Jennifer's** [1] - 104:14
**job** [2] - 66:9, 66:12
**John** [7] - 66:18, 67:8, 68:14, 71:1, 71:6, 71:24, 82:14
**joint** [1] - 102:18
**jointly** [1] - 102:15
**JONES** [4] - 2:6, 3:11, 15:23, 91:18
**Jones** [1] - 3:11
**Jose** [1] - 81:16

**js@atlantaemployeelawyer.com** [1] - 2:4
**jsmith@cosgravelaw.com** [1] - 2:21
**judge** [2] - 28:21, 91:1
**Judge** [1] - 104:12
**JUDGE** [1] - 1:17
**judgment** [2] - 63:15, 106:14
**JULIE** [1] - 2:20
**Julie** [1] - 3:16
**June** [1] - 54:14
**Juror** [2] - 106:23, 107:3
**jurors** [6] - 106:20, 107:2, 107:6, 107:25, 108:1, 109:17
**jury** [72] - 5:9, 5:22, 12:11, 13:24, 13:25, 15:15, 18:18, 21:7, 24:2, 24:17, 24:21, 27:11, 27:17, 27:19, 35:5, 35:6, 36:15, 38:22, 39:20, 45:4, 45:13, 45:14, 45:22, 45:23, 49:3, 51:7, 53:23, 54:3, 54:4, 54:20, 54:21, 54:22, 55:14, 55:17, 55:21, 55:23, 56:15, 56:23, 56:24, 57:2, 60:18, 61:2, 61:8, 61:16, 61:17, 61:24, 62:5, 62:14, 63:9, 63:16, 72:1, 76:12, 78:8, 78:10, 78:15, 78:22, 79:6, 83:23, 94:3, 100:6, 100:21, 106:20, 107:11, 107:12, 108:11, 108:21, 109:19, 109:19, 111:2, 111:4
**jury's** [1] - 15:8

## K

**keeper** [1] - 109:6
**keeping** [1] - 95:8
**KELLY** [1] - 2:6
**Kelly** [5] - 3:11, 76:18, 77:15, 80:13, 81:14
**Kelly's** [2] - 80:18, 80:21
**kellydonovanjones@gmail.com** [1] - 2:2
**KESTER** [1] - 2:18
**kind** [21] - 4:4, 7:3, 10:18, 11:1, 16:22, 18:11, 24:19, 34:24, 39:2, 45:7, 60:17, 74:17, 81:22, 85:25, 98:24, 99:11, 101:19, 104:17, 104:25, 105:14, 108:19
**kinds** [2] - 4:3, 104:3
**knowing** [1] - 43:16
**knowledge** [16] - 8:8, 8:14, 18:18, 66:2, 69:19, 69:22, 69:23, 71:20, 71:23, 71:24, 71:25, 72:24, 73:2, 73:9, 90:4, 93:23
**Knowledge** [1] - 68:20
**known** [3] - 65:3, 69:14, 70:9
**knows** [5] - 41:25, 42:13, 70:20, 90:5, 90:10

## L

**lack** [2] - 34:4, 51:12
**lacks** [1] - 8:8
**language** [3] - 13:5, 49:12, 100:11
**laptops** [1] - 109:25
**large** [1] - 110:3
**last** [3] - 54:14, 62:18, 63:1
**late** [2] - 55:8, 81:25

**law** [10] - 12:13, 44:6, 51:14, 58:23, 60:8, 60:12, 61:6, 62:15, 62:16, 111:5
**LAW** [1] - 2:7
**lawsuit** [6] - 6:9, 6:18, 6:20, 7:4, 7:9, 7:11
**lawsuits** [2] - 27:3, 27:6
**lawyer** [5] - 31:7, 31:11, 38:6, 65:21, 92:11
**lawyers** [1] - 72:20
**lay** [2] - 69:6, 69:7
**lead** [1] - 84:11
**leading** [17] - 83:11, 83:17, 83:21, 84:10, 84:25, 85:14, 85:23, 87:14, 87:18, 88:1, 88:10, 88:13, 88:15, 88:17, 88:18, 88:21, 88:25
**learn** [3] - 35:5, 35:11, 35:12, 38:22, 38:23, 48:17
**learned** [2] - 58:25, 90:6
**learning** [1] - 81:24
**least** [16] - 7:12, 7:19, 15:6, 35:9, 35:11, 37:12, 37:24, 38:20, 38:25, 42:25, 57:19, 84:5, 86:19, 93:21, 105:24, 108:23
**leave** [5] - 11:24, 49:14, 52:23, 54:2, 107:7
**leaving** [1] - 39:3
**lectern** [1] - 109:12
**left** [2] - 20:16, 107:3
**legal** [4] - 32:10, 44:6, 45:25, 74:1
**legislative** [1] - 61:18
**lengthy** [1] - 67:19
**less** [1] - 14:11
**lessened** [3] - 28:13, 28:15, 28:17
**letter** [10] - 36:11, 36:13, 36:21, 36:24, 37:1, 38:5, 38:13, 50:15, 50:17, 63:21
**letters** [2] - 32:9, 102:9
**letting** [2] - 27:12, 57:22
**level** [3] - 7:21, 100:4, 107:10
**liability** [4] - 44:3, 53:3, 54:22, 56:16, 56:17
**license** [1] - 36:1
**light** [2] - 28:12, 43:17
**limine** [14] - 3:21, 5:12, 5:13, 5:14, 7:22, 8:18, 19:8, 26:7, 27:22, 29:16, 44:2, 47:22, 76:1, 96:10
**limit** [3] - 19:12, 26:22, 48:7
**limited** [5] - 25:16, 39:19, 53:13, 54:3, 80:6
**limiting** [5] - 58:15, 59:10, 59:12, 59:13, 59:18
**line** [7] - 45:7, 47:1, 83:3, 89:8, 89:11, 99:19
**lines** [2] - 48:21, 83:3
**list** [7] - 4:2, 20:15, 67:19, 68:4, 91:14, 98:21, 98:23
**listed** [3] - 4:11, 69:6, 104:9
**listening** [2] - 10:2, 80:10
**lists** [1] - 111:8
**litigating** [1] - 14:22
**litigation** [7] - 7:4, 7:14, 7:16, 7:18, 7:20, 8:1
**live** [9] - 28:22, 74:25, 75:14, 107:8, 107:9, 107:10, 110:7, 111:13, 111:14

**LLC** [3] - 1:8, 2:3, 3:7
**LLP** [1] - 2:18
**loan** [1] - 60:2
**loathe** [1] - 72:18
**located** [1] - 47:5
**lodged** [1] - 31:1
**logical** [1] - 33:20
**logistics** [2] - 75:19, 75:21
**look** [24] - 4:6, 22:11, 37:16, 42:3, 49:18, 53:6, 53:7, 54:12, 64:8, 76:25, 83:25, 84:7, 85:4, 95:23, 96:4, 97:24, 99:2, 99:20, 101:9, 101:13, 103:8, 109:11, 109:20
**looked** [3] - 99:19, 101:18, 105:18
**looking** [4] - 9:25, 37:12, 65:1, 77:7
**looks** [3] - 77:12, 89:10, 111:10
**lose** [1] - 54:13
**loss** [9] - 40:12, 40:13, 40:18, 40:19, 40:21, 40:25, 41:22, 41:23, 43:1
**losses** [1] - 40:1
**lost** [6] - 40:2, 40:11, 40:14, 40:16, 40:22, 40:23
**love** [2] - 87:3, 91:1
**loved** [1] - 55:2
**lying** [1] - 102:4

# M

**mailed** [1] - 51:19
**mailing** [1] - 50:21
**main** [2] - 41:10, 62:10
**maintaining** [1] - 95:7
**majority** [2] - 76:5, 76:9
**management** [1] - 106:6
**manager** [6] - 66:15, 67:13, 70:22, 71:21, 75:7
**managers** [3] - 67:14, 71:11, 71:22
**managing** [2] - 70:24, 95:7
**manner** [1] - 34:21
**map** [1] - 98:13
**MARCO** [1] - 1:16
**mark** [1] - 102:15
**marked** [3] - 61:6, 102:18, 102:20
**marked-up** [1] - 102:18
**Mary** [3] - 65:2, 104:12, 104:24
**material** [1] - 51:16
**materials** [1] - 42:8
**matter** [9] - 5:9, 12:13, 57:1, 58:23, 59:8, 61:17, 79:3, 106:16, 108:4
**matters** [4] - 8:8, 37:24, 61:19
**MATTHEW** [1] - 1:5
**mean** [34] - 7:9, 10:20, 11:1, 16:2, 17:14, 21:8, 21:11, 23:25, 24:15, 25:17, 37:25, 41:10, 48:6, 48:11, 48:25, 49:2, 53:18, 54:14, 64:16, 66:1, 70:20, 72:12, 72:22, 75:2, 83:11, 83:19, 83:20, 84:20, 88:9, 92:1, 92:16, 95:23, 97:2, 108:2
**meaning** [2] - 45:19, 62:4
**meaningless** [1] - 36:11
**means** [5] - 15:8, 59:12, 101:1, 109:2, 113:5
**meant** [2] - 38:10, 82:2

**mediation** [1] - 106:7
**Megan** [13] - 66:10, 66:20, 67:23, 68:25, 71:24, 73:14, 82:13, 93:5, 96:23, 97:1, 97:7, 97:13
**memory** [1] - 49:18
**mental** [1] - 11:22
**mentioned** [4] - 6:16, 45:18, 69:1, 82:8
**Merit** [1] - 113:13
**message** [3] - 48:17, 48:24, 49:2
**met** [3] - 45:1, 45:10, 74:4
**MICHAEL** [1] - 2:10
**michael@UnderdogLawyer.com** [1] - 2:11
**middle** [1] - 104:6
**might** [26] - 5:6, 18:1, 18:7, 26:16, 29:20, 33:10, 34:14, 39:7, 46:3, 46:5, 47:25, 49:2, 52:21, 60:9, 60:23, 60:24, 78:1, 80:1, 80:5, 83:25, 96:18, 100:6, 101:5, 102:22, 108:14
**mike** [1] - 3:10
**mind** [2] - 16:13, 90:21
**minute** [3] - 13:7, 18:5, 87:5
**minutes** [4] - 18:5, 29:25, 75:8, 99:1
**mischaracterization** [1] - 76:20
**mislead** [1] - 51:7
**mismarked** [1] - 83:25
**missed** [1] - 99:3
**missing** [4] - 95:16, 96:17, 96:18, 96:19
**misstated** [1] - 57:6
**mistake** [2] - 95:20
**mistaken** [1] - 93:16
**misunderstood** [1] - 59:14
**model** [1] - 49:3
**modify** [1] - 54:9
**mom** [1] - 65:25
**moment** [2] - 19:15, 101:12
**money** [2] - 40:22, 75:12
**month** [2] - 7:12, 38:18
**months** [2] - 65:13, 98:3
**montressa** [1] - 82:18
**moot** [2] - 40:5, 43:1
**morning** [3] - 108:23, 110:18, 110:20
**Morrison** [1] - 2:8
**most** [3] - 20:4, 20:8, 53:8
**motion** [75] - 4:1, 5:14, 8:3, 8:6, 8:7, 8:18, 11:8, 11:11, 11:24, 12:14, 12:16, 13:12, 14:23, 16:7, 17:17, 18:8, 19:7, 19:9, 19:11, 19:12, 20:5, 21:1, 22:17, 26:7, 26:22, 27:2, 27:24, 28:11, 29:9, 29:16, 29:18, 30:1, 39:25, 40:10, 40:14, 44:2, 44:4, 47:6, 47:8, 47:12, 47:22, 47:24, 48:22, 49:20, 50:1, 51:21, 51:24, 51:25, 52:1, 52:2, 52:11, 52:14, 56:11, 56:13, 56:19, 57:1, 57:4, 57:24, 60:8, 61:21, 63:9, 63:13, 63:15, 63:16, 63:17, 63:23, 63:24, 73:12, 74:4, 76:2, 91:14, 96:9, 96:10, 96:13, 106:11
**motions** [12] - 3:21, 3:22, 3:25, 5:12, 5:13, 7:22, 19:8, 25:6, 47:19, 57:9, 76:1, 98:24
**move** [11] - 8:2, 19:8, 25:11, 27:21, 29:15, 39:22, 47:16, 56:20, 73:8,

73:24, 82:12
**moved** [2] - 66:9, 106:21
**moving** [1] - 44:2
**MR** [265] - 3:10, 3:11, 3:12, 3:13, 3:14,
3:15, 3:17, 4:8, 6:11, 6:21, 7:8, 9:7,
9:9, 9:20, 10:5, 10:6, 10:20, 11:7,
11:13, 11:16, 12:2, 12:7, 12:15, 12:20,
13:25, 15:21, 15:23, 16:14, 17:1, 17:5,
17:13, 17:19, 18:3, 18:13, 18:25, 19:5,
19:23, 20:19, 21:21, 23:4, 23:16, 24:7,
25:1, 25:13, 25:21, 26:11, 27:5, 27:10,
28:3, 29:24, 30:7, 30:18, 31:4, 31:11,
31:24, 32:1, 32:7, 32:8, 32:21, 33:12,
33:15, 34:17, 35:1, 35:17, 35:19,
36:19, 36:21, 37:11, 37:22, 37:25,
38:8, 38:10, 38:12, 38:17, 38:19, 39:5,
39:10, 39:14, 39:24, 40:5, 40:7, 40:21,
41:2, 41:8, 41:10, 41:21, 41:24, 42:12,
42:19, 43:7, 43:10, 44:11, 44:16,
44:19, 45:15, 45:24, 46:12, 46:22,
47:2, 47:25, 48:12, 48:24, 49:8, 49:19,
50:3, 50:15, 51:12, 52:4, 52:6, 52:15,
52:25, 53:21, 54:7, 57:16, 57:18,
57:23, 58:9, 58:18, 58:22, 59:3, 59:7,
59:14, 59:20, 60:9, 60:14, 60:20,
60:21, 61:10, 61:12, 61:15, 62:1, 62:9,
62:20, 63:1, 63:17, 64:3, 64:9, 64:14,
64:19, 65:11, 65:23, 66:10, 66:19,
66:25, 67:7, 68:13, 68:18, 70:14,
70:19, 72:9, 72:12, 72:15, 72:22,
73:13, 73:19, 73:23, 74:7, 74:18, 75:2,
75:8, 75:16, 75:17, 75:23, 76:2, 76:4,
76:17, 78:3, 78:6, 78:25, 79:12, 79:21,
79:25, 80:12, 80:17, 81:1, 81:15, 83:9,
83:15, 83:19, 84:3, 84:8, 84:13, 84:19,
85:1, 85:8, 85:19, 85:23, 86:3, 86:8,
86:15, 86:25, 87:9, 87:14, 87:25, 88:5,
89:1, 89:4, 89:9, 89:12, 89:15, 89:18,
89:21, 89:24, 90:2, 90:7, 90:16, 90:20,
90:25, 91:10, 91:18, 91:25, 92:19,
93:5, 93:8, 93:11, 94:6, 95:4, 95:25,
96:2, 96:8, 97:2, 97:17, 97:19, 98:22,
99:8, 99:13, 99:21, 100:13, 100:20,
100:23, 101:21, 102:12, 103:6, 103:9,
103:20, 103:25, 104:9, 104:22, 105:1,
105:6, 105:8, 105:10, 105:20, 105:23,
106:3, 106:5, 106:10, 108:2, 108:8,
108:12, 108:16, 109:10, 109:14,
109:22, 110:1, 110:4, 110:16, 110:19,
110:21, 110:23, 110:25, 111:11,
111:14, 111:22, 112:4
**MS** [17] - 3:16, 25:14, 25:24, 26:3, 26:19,
27:14, 27:16, 27:20, 28:11, 28:20,
28:25, 29:7, 29:14, 57:3, 57:7, 111:2,
111:7
**must** [1] - 14:6

# N

**N.A** [1] - 1:8
**nail** [2] - 54:7, 70:1
**name** [4] - 6:20, 19:19, 104:20, 107:8
**names** [1] - 44:19
**narrow** [5] - 12:3, 12:20, 12:24, 13:12,

14:23
**national** [2] - 21:6, 21:11
**necessarily** [2] - 23:22, 37:11
**necessity** [1] - 9:12
**need** [31] - 4:3, 8:24, 10:17, 20:1, 20:11,
20:12, 42:5, 48:16, 54:9, 64:2, 64:17,
68:22, 70:13, 71:20, 72:7, 72:9, 73:15,
74:6, 75:24, 79:2, 79:5, 79:6, 80:13,
80:15, 82:13, 91:7, 92:5, 92:24, 102:3,
104:17, 110:12
**needed** [3] - 36:2, 50:7, 100:17
**needs** [5] - 14:13, 35:6, 48:17, 48:18,
58:12
**negative** [2] - 43:12, 78:8
**negligence** [7] - 53:13, 53:14, 54:3,
55:1, 55:16, 55:22, 55:24
**negligent** [4] - 53:19, 55:3, 55:4, 55:11
**negotiation** [1] - 67:20
**net** [9] - 19:10, 20:2, 20:3, 20:12, 24:17,
25:21, 25:25, 26:14, 26:25
**never** [8] - 14:8, 53:25, 54:1, 63:15,
68:25, 69:15, 92:2
**new** [8] - 17:3, 52:18, 53:1, 66:23, 70:2,
93:24, 100:24
**next** [7] - 4:6, 4:9, 8:18, 43:22, 47:16,
104:15, 104:16
**nine** [1] - 70:8
**Ninth** [2] - 51:14, 71:21
**nobody** [2] - 50:22, 85:10
**nondisclosure** [1] - 69:23
**noneconomic** [4] - 40:13, 40:18, 42:23
**nonhearsay** [1] - 59:23
**nonmanagerial** [1] - 51:23
**nonresponse** [1] - 38:2
**normal** [6] - 8:23, 10:12, 10:18, 11:5,
16:4, 16:6
**Normally** [2] - 10:11, 10:14
**North** [1] - 110:7
**notated** [1] - 50:24
**note** [3] - 43:22, 86:25, 89:21
**notebook** [2] - 84:2, 84:3
**notes** [2] - 38:15, 57:15
**nothing** [8] - 20:16, 22:25, 25:7, 31:13,
48:2, 49:8, 66:22, 93:23
**notice** [7] - 31:9, 46:13, 49:25, 50:23,
51:15, 67:18, 95:16
**notified** [2] - 14:8, 102:16
**notify** [2] - 14:6, 102:18
**notion** [1] - 32:16
**November** [4] - 38:14, 38:17, 39:8,
39:16
**nowadays** [1] - 104:2
**nuance** [1] - 79:13
**number** [28] - 4:11, 8:3, 8:7, 8:18, 11:18,
16:9, 19:12, 25:15, 25:16, 26:7, 27:2,
27:22, 29:16, 29:19, 39:23, 39:24,
44:2, 44:5, 47:7, 47:8, 47:16, 47:22,
49:24, 51:22, 59:25, 76:9, 96:11,
104:20
**Number** [6] - 57:20, 57:24, 58:2, 106:23,
107:3
**numbers** [8] - 21:4, 21:6, 21:7, 21:11,
21:17, 23:25, 25:17, 25:25

**numerous** [1] - 90:18

# O

**object** [9] - 60:21, 74:22, 84:8, 84:9,
84:22, 85:17, 86:21, 87:25, 102:23,
103:3, 103:22
**objected** [3] - 69:8, 80:20, 110:5
**objecting** [3] - 74:22, 88:22
**objection** [35] - 8:13, 8:14, 9:3, 11:25,
20:20, 60:1, 60:2, 65:1, 77:21, 77:25,
78:2, 79:20, 80:18, 81:13, 83:5, 83:17,
84:25, 85:4, 85:6, 85:9, 85:11, 85:14,
85:24, 86:17, 86:20, 86:22, 86:23,
87:1, 88:6, 88:9, 88:12, 88:24, 89:16,
91:1
**objectionable** [1] - 10:3
**objections** [24] - 16:5, 60:4, 60:5, 60:6,
60:7, 64:24, 77:17, 82:20, 82:22, 83:1,
83:4, 83:8, 83:13, 83:18, 85:18, 86:6,
86:11, 86:13, 86:17, 88:8, 103:4,
103:6
**obligated** [1] - 97:25
**obligations** [6] - 29:20, 30:2, 30:22,
32:15, 34:9
**observed** [1] - 58:23
**obtain** [4] - 40:2, 40:11, 40:15, 40:17
**obviated** [1] - 20:1
**obviously** [6] - 53:1, 70:20, 95:4, 95:10,
95:20, 97:5
**occasions** [1] - 66:13
**occupation** [1] - 107:9
**occupations** [1] - 107:10
**October** [6] - 31:8, 32:12, 38:13, 38:21,
39:16, 65:12
**OF** [2] - 1:2, 1:13
**offer** [18] - 10:7, 17:2, 20:1, 20:2, 20:15,
22:16, 26:13, 26:17, 27:5, 28:3, 29:11,
32:4, 35:17, 44:12, 64:1, 64:12, 103:9
**offered** [11] - 6:1, 22:1, 22:2, 57:25,
59:7, 59:8, 59:13, 61:7, 90:7, 90:8,
102:23
**offering** [9] - 21:2, 27:4, 28:1, 28:18,
29:8, 41:6, 44:9, 95:1, 98:5
**offers** [1] - 106:14
**officer's** [2] - 59:4, 59:16
**officers** [1] - 58:19
**official** [2] - 53:22, 109:6
**often** [1] - 4:24
**old** [1] - 95:9
**OLSEN** [1] - 2:10
**once** [2] - 35:14, 70:18
**one** [66] - 5:14, 5:17, 8:18, 11:15, 14:3,
16:13, 18:4, 18:6, 19:15, 20:20, 25:1,
29:18, 36:17, 41:10, 42:1, 45:3, 45:4,
46:1, 46:6, 47:4, 47:16, 47:18, 50:3,
50:15, 51:1, 52:3, 55:11, 57:2, 59:19,
62:7, 62:9, 63:20, 63:25, 64:1, 64:7,
66:6, 67:13, 67:14, 68:11, 71:15,
72:24, 74:7, 74:8, 75:3, 78:6, 80:17,
84:5, 84:14, 84:25, 85:6, 86:21, 88:12,
88:17, 88:18, 89:25, 92:10, 92:15,
92:17, 93:6, 96:9, 96:13, 106:5,
106:21, 108:23, 110:4

**ones** [3] - 58:11, 85:2, 94:12
**open** [5] - 14:19, 34:19, 35:21, 36:8, 102:6
**opened** [4] - 5:8, 30:8, 80:9, 80:11
**opening** [13] - 14:18, 35:22, 53:18, 60:11, 60:13, 60:16, 60:19, 61:25, 62:24, 104:4, 108:22, 109:4, 109:12
**operating** [6] - 5:17, 7:6, 7:23, 31:5, 39:2, 85:22
**opining** [1] - 79:14
**opinion** [17] - 8:20, 8:24, 9:4, 9:11, 9:15, 9:17, 10:7, 10:9, 21:24, 22:9, 22:10, 23:6, 32:17, 40:11, 45:1, 46:18, 76:7
**opinions** [3] - 9:18, 45:2, 74:1
**opportunity** [11] - 22:22, 24:5, 24:11, 40:2, 40:11, 40:15, 40:17, 40:23, 65:15, 69:2, 75:18
**oppose** [2] - 6:12, 6:13
**opposed** [5] - 26:19, 31:1, 42:23, 47:11, 74:11
**opposing** [2] - 56:4, 69:17
**option** [1] - 71:11
**oranges** [1] - 65:16
**order** [15] - 34:8, 37:22, 48:18, 54:10, 87:7, 92:4, 92:13, 93:3, 98:7, 98:9, 99:14, 102:13, 104:18, 106:6, 106:13
**ordering** [1] - 56:12
**OREGON** [1] - 1:2
**Oregon** [7] - 1:8, 1:24, 2:8, 2:12, 2:15, 2:23, 113:15
**organization** [1] - 66:21
**organizations** [1] - 81:3
**original** [3] - 5:10, 95:14, 113:6
**originally** [1] - 53:1
**otherwise** [7] - 26:16, 33:10, 69:15, 83:4, 83:6, 86:5, 106:2
**out-of-state** [1] - 75:20
**outside** [2] - 27:16, 104:25
**override** [1] - 69:21
**overrule** [1] - 88:24
**overruled** [20] - 9:3, 60:1, 60:3, 60:4, 60:5, 60:6, 60:7, 63:23, 63:24, 78:2, 79:20, 81:13, 82:20, 82:25, 83:4, 83:6, 83:7, 83:8, 83:12
**oversee** [1] - 71:2
**owed** [1] - 41:12
**own** [4] - 69:19, 79:24, 92:13

## P

**p.m** [2] - 3:1, 112:7
**page** [9] - 40:8, 82:23, 83:3, 83:5, 83:7, 86:22, 86:25, 89:6, 94:22
**pages** [3] - 83:1, 83:3, 86:23, 94:8, 94:9
**paints** [1] - 43:16
**paper** [2] - 103:7, 107:21
**part** [45] - 7:4, 7:6, 8:11, 11:12, 15:14, 20:7, 29:10, 30:18, 30:21, 33:8, 33:16, 34:5, 36:22, 37:19, 37:22, 37:23, 38:2, 42:5, 42:6, 42:7, 43:24, 50:13, 57:18, 62:10, 62:20, 66:8, 74:4, 75:18, 75:21, 77:3, 77:4, 77:8, 77:11, 78:16, 79:8, 87:13, 88:20, 88:22, 93:21, 95:25, 99:14, 108:19, 110:11, 112:1

**partial** [4] - 11:15, 55:1, 55:23, 63:15
**particular** [8] - 5:4, 5:25, 6:10, 9:5, 44:1, 46:10, 75:5, 90:17
**particularly** [2] - 81:19, 99:19
**parties** [5] - 5:1, 19:17, 84:17, 100:10, 102:14
**parts** [1] - 96:8
**party** [11] - 43:18, 43:20, 56:4, 69:17, 83:20, 83:21, 84:12, 84:20, 87:2, 87:12, 107:12
**passed** [1] - 61:18
**past** [1] - 27:3
**path** [1] - 27:9
**pay** [4] - 28:23, 40:22, 41:11, 41:14
**payer** [1] - 41:16
**PC** [1] - 2:13
**penalize** [1] - 23:8
**pencils** [1] - 82:17
**people** [18] - 12:3, 12:4, 24:21, 47:14, 65:22, 66:6, 69:3, 69:24, 71:4, 71:13, 71:15, 71:20, 72:21, 74:16, 84:20, 105:24, 107:10, 109:25
**performed** [1] - 18:9
**perhaps** [1] - 64:4
**period** [3] - 53:20, 56:16, 79:5
**person** [11] - 66:7, 66:12, 67:4, 68:24, 71:1, 72:9, 74:11, 96:24, 105:21, 108:6, 110:5
**person's** [1] - 78:9
**personal** [12] - 8:8, 8:14, 69:19, 69:22, 69:23, 71:20, 71:24, 71:25, 72:24, 73:2, 73:9, 90:4
**personnel** [1] - 58:23
**perspective** [8] - 5:6, 15:13, 19:4, 34:16, 37:8, 37:12, 104:8, 108:14
**perspectives** [1] - 99:4
**PETERSON** [40] - 2:19, 3:14, 4:8, 9:20, 10:5, 11:16, 20:19, 23:4, 23:16, 25:1, 32:8, 45:15, 45:24, 74:7, 74:18, 75:17, 75:23, 76:17, 78:3, 78:6, 80:12, 80:17, 81:15, 99:13, 99:21, 100:13, 101:21, 103:25, 105:1, 105:8, 109:10, 109:14, 109:22, 110:1, 110:4, 110:16, 110:19, 110:21, 110:25, 112:4
**Peterson** [1] - 3:14
**philosophy** [1] - 91:5
**photograph** [1] - 101:6
**phrase** [1] - 49:2
**phrases** [1] - 45:16
**pick** [1] - 107:21
**piece** [3] - 5:4, 78:4, 78:21
**place** [8] - 4:6, 11:1, 19:25, 29:23, 35:7, 65:20, 73:12, 93:7
**Plaintiff** [3] - 1:6, 2:3, 31:16
**plaintiff** [50] - 3:10, 3:11, 3:12, 3:13, 5:16, 6:6, 8:5, 8:11, 12:8, 12:22, 13:8, 13:19, 14:13, 15:25, 20:1, 20:11, 25:24, 27:4, 28:1, 29:10, 30:2, 32:20, 36:4, 36:18, 38:3, 40:3, 40:9, 43:2, 48:9, 49:5, 50:17, 53:24, 55:15, 57:12, 57:21, 58:7, 59:25, 63:22, 70:6, 74:12, 77:18, 79:1, 81:24, 87:4, 91:17, 93:14, 99:5, 107:20

**plaintiff's** [27] - 5:13, 5:14, 5:21, 8:3, 8:7, 8:18, 10:22, 16:3, 18:8, 28:11, 28:13, 31:7, 32:25, 38:6, 48:15, 58:5, 71:16, 72:25, 73:2, 73:6, 73:10, 75:19, 95:18, 96:22, 99:22, 100:18, 104:8
**Plaintiff's** [1] - 82:22
**plaintiffs** [12] - 5:25, 16:6, 24:4, 45:10, 52:11, 52:21, 56:10, 65:5, 70:22, 74:21, 77:23, 82:10
**plan** [2] - 4:17, 104:17
**planning** [5] - 5:19, 19:3, 27:4, 44:8, 99:16
**play** [7] - 32:11, 33:1, 33:21, 34:2, 50:11, 111:24
**plays** [1] - 30:13
**pleading** [2] - 54:12, 56:5
**pleadings** [2] - 6:22, 29:12
**point** [28] - 13:5, 14:3, 14:10, 14:13, 14:20, 23:23, 24:12, 30:1, 31:4, 37:9, 39:5, 49:21, 59:17, 60:12, 63:1, 64:18, 65:12, 72:24, 77:24, 79:18, 79:20, 84:13, 90:17, 92:16, 92:17, 92:19, 93:21, 106:13
**pointed** [4] - 30:9, 36:8, 43:12, 50:4
**points** [1] - 46:1
**police** [7] - 57:3, 57:18, 58:4, 58:10, 58:21, 59:21, 90:12
**policies** [21] - 9:22, 67:3, 71:7, 71:23, 71:25, 72:2, 72:4, 72:5, 92:23, 93:17, 93:19, 93:24, 94:4, 94:7, 94:9, 94:13, 95:7, 95:11, 96:8, 96:22, 97:6, 97:14
**policy** [1] - 76:8
**political** [1] - 61:18
**pool** [1] - 107:22
**pop** [2] - 97:16, 110:2
**portion** [3] - 56:24, 73:8, 75:21
**portions** [2] - 23:12, 43:25
**PORTLAND** [1] - 1:3
**Portland** [7] - 1:8, 1:24, 2:8, 2:12, 2:15, 2:23, 96:25
**position** [20] - 20:24, 21:2, 21:4, 21:18, 30:8, 33:4, 33:21, 33:24, 34:12, 34:16, 36:24, 48:15, 67:15, 67:16, 68:14, 70:25, 71:6, 71:8, 76:17, 77:14
**possibility** [1] - 78:1
**post** [1] - 7:8
**potential** [2] - 48:20, 51:7
**practices** [2] - 10:8, 76:13
**Practices** [1] - 100:3
**precisely** [3] - 4:25, 7:17, 81:1
**precluded** [2] - 82:3, 82:5
**preemptory** [1] - 107:19
**prefer** [1] - 108:3
**preference** [1] - 72:11
**prejudice** [6] - 53:6, 53:9, 54:13, 54:23, 56:4, 70:5
**prejudiced** [5] - 55:9, 56:10, 92:14, 101:11, 103:3
**prejudicial** [1] - 72:16
**preparation** [1] - 98:1
**preparations** [1] - 95:25
**prepared** [2] - 68:3, 68:6
**preparing** [2] - 72:15, 96:15

**presence** [1] - 27:17
**present** [3] - 23:18, 27:3, 72:1
**presented** [1] - 53:16
**presumed** [1] - 71:22
**Pretrial** [1] - 1:14
**pretrial** [2] - 3:8, 4:14
**pretty** [1] - 111:18
**prevent** [3] - 23:7, 23:18, 110:13
**previously** [5] - 5:4, 5:8, 56:5, 67:5, 68:11
**primarily** [1] - 79:1
**primary** [1] - 84:11
**private** [3] - 30:3, 34:22
**privileged** [1] - 95:5
**problem** [11] - 7:9, 7:22, 29:6, 37:9, 37:10, 38:11, 45:12, 57:22, 58:1, 80:23, 103:15
**problems** [1] - 66:6
**procedure** [3] - 10:4, 10:12, 96:11
**procedures** [32] - 8:23, 9:10, 9:12, 9:22, 10:19, 10:22, 11:5, 11:8, 16:4, 16:7, 16:10, 16:16, 17:3, 17:4, 60:22, 67:3, 71:7, 71:23, 73:3, 81:4, 92:18, 94:13, 94:16, 94:19, 94:21, 94:22, 95:8, 95:11, 97:14, 97:24, 98:1, 98:12
**proceed** [2] - 108:6, 108:7
**PROCEEDINGS** [1] - 1:13
**proceedings** [2] - 112:7, 113:5
**process** [9] - 30:12, 30:23, 32:14, 33:9, 98:13, 99:20, 108:20, 109:7, 111:1
**processes** [2] - 10:18, 16:7
**processing** [1] - 4:12
**produced** [14] - 16:15, 50:4, 68:5, 92:6, 92:7, 93:12, 94:2, 94:8, 94:9, 94:15, 95:15, 96:20, 98:14, 101:15
**profession** [2] - 44:24, 45:10
**proffer** [1] - 100:10
**prohibit** [2] - 6:13, 76:11
**prohibiting** [1] - 74:1
**prohibition** [1] - 48:6
**projected** [1] - 109:16
**promise** [1] - 38:9
**proof** [4] - 42:1, 50:19, 50:21, 90:13
**proper** [2] - 53:21, 88:11
**properly** [3] - 42:22, 62:14, 68:6
**proposal** [1] - 93:2
**propose** [1] - 36:17
**proposed** [1] - 99:15
**prosecution** [1] - 58:4
**protect** [1] - 48:18
**prove** [6] - 27:6, 28:15, 42:16, 43:21, 90:7, 90:8
**provide** [9] - 8:5, 12:8, 21:17, 22:19, 23:24, 31:12, 31:15, 33:25, 34:10
**provided** [4] - 15:25, 48:21, 64:14, 93:17
**providing** [3] - 9:25, 12:23, 78:10
**provision** [4] - 32:3, 32:23, 33:1, 80:9
**provisions** [7] - 14:17, 30:8, 30:21, 30:24, 32:11, 34:19, 34:23
**proviso** [1] - 13:7
**pull** [2] - 30:20, 77:9
**pulled** [1] - 88:15

**punish** [1] - 49:1
**punitive** [5] - 48:25, 49:1, 49:10, 49:16, 56:24
**purported** [1] - 49:25
**purpose** [12] - 6:10, 21:9, 46:12, 49:1, 49:16, 57:25, 58:6, 59:23, 61:18, 62:4, 62:16, 105:23
**purposes** [4] - 21:11, 67:22, 97:13, 105:22
**pursuant** [8] - 14:1, 31:18, 32:5, 32:20, 33:5, 33:6, 33:19, 35:4
**put** [24] - 7:25, 20:14, 25:25, 27:18, 28:14, 31:5, 43:22, 48:8, 49:4, 50:18, 54:3, 61:1, 61:3, 61:6, 61:24, 66:23, 71:12, 74:14, 103:2, 106:20, 107:2, 109:20
**putting** [2] - 48:14, 61:9
**puzzled** [1] - 101:2

### Q

**quagmire** [1] - 61:12
**qualified** [1] - 77:22
**qualifies** [1] - 59:21
**quality** [1] - 9:14
**questioned** [1] - 92:14
**questions** [30] - 6:5, 23:11, 55:6, 55:14, 55:20, 83:11, 83:17, 83:22, 85:14, 88:17, 90:21, 92:20, 93:2, 99:15, 99:17, 99:19, 99:22, 99:23, 100:10, 100:15, 107:5, 107:13, 107:14, 107:15, 107:16, 109:7, 109:9, 111:1, 112:3
**quickly** [3] - 33:9, 78:25, 111:18
**quite** [3] - 8:10, 27:25, 33:12
**quote** [1] - 22:20
**quotes** [1] - 81:4

### R

**raise** [7] - 9:5, 11:25, 14:24, 16:5, 29:22, 51:13, 99:21
**raised** [1] - 4:18
**raising** [1] - 100:4
**rate** [1] - 40:23
**rather** [2] - 4:15, 108:14
**reach** [1] - 23:4
**reached** [5] - 19:17, 19:25, 20:3, 20:23, 21:23
**read** [15] - 42:8, 44:8, 44:22, 45:4, 46:16, 47:14, 48:4, 52:1, 52:2, 52:8, 75:9, 87:21, 98:7, 99:17, 111:23
**reading** [4] - 3:20, 13:1, 47:1, 52:9
**ready** [1] - 108:22
**real** [3] - 49:19, 56:14, 78:25
**realize** [1] - 59:14
**really** [27] - 7:13, 8:16, 9:12, 20:16, 22:11, 23:14, 24:15, 24:22, 27:7, 27:18, 41:4, 46:24, 51:3, 61:8, 65:16, 66:22, 67:1, 76:18, 90:9, 92:1, 97:23, 98:15, 101:2, 108:4, 111:23
**Realtime** [1] - 113:13
**reason** [7] - 18:23, 33:9, 33:20, 39:15, 52:22, 71:18, 90:5

**reasonable** [19] - 9:19, 12:12, 13:15, 15:13, 15:14, 30:16, 32:15, 34:7, 34:8, 35:24, 63:4, 63:6, 67:12, 76:24, 77:7, 77:8, 78:10, 78:18
**reasonableness** [6] - 9:11, 10:4, 11:9, 30:18, 76:7, 76:8
**reasons** [4] - 53:7, 53:9, 70:14, 106:12
**reassess** [1] - 5:10
**rebut** [6] - 21:16, 21:25, 22:6, 22:7, 22:22, 22:25
**rebuts** [1] - 22:9
**rebuttal** [13] - 19:24, 20:21, 21:3, 21:22, 22:4, 22:8, 23:19, 101:4, 101:8, 101:10, 101:14, 102:21, 103:1
**rebutted** [1] - 22:21
**rebutting** [1] - 23:14
**receipt** [3] - 51:2, 51:12, 73:1
**receivable** [1] - 100:1
**receive** [1] - 37:17
**received** [11] - 5:5, 6:1, 29:21, 30:13, 34:8, 37:13, 37:16, 50:17, 50:19, 63:13
**receiving** [2] - 34:4, 37:14
**recent** [1] - 20:8
**recently** [1] - 91:21
**recess** [1] - 112:5
**reckless** [1] - 45:17
**record** [7] - 3:9, 50:24, 76:25, 77:3, 77:12, 86:18, 113:4
**recording** [1] - 13:2
**recordkeeping** [1] - 106:17
**records** [2] - 50:9, 94:8
**refer** [2] - 94:7, 98:10
**reference** [6] - 5:15, 11:19, 15:24, 16:9, 18:9, 29:17
**references** [7] - 19:13, 26:22, 27:3, 27:23, 29:19, 40:1, 44:3
**referring** [1] - 8:16
**reflect** [1] - 6:22
**refresh** [1] - 49:18
**regard** [2] - 10:22, 57:4
**regarding** [23] - 3:25, 4:5, 6:8, 19:18, 25:20, 26:20, 34:25, 41:6, 44:5, 47:9, 47:17, 49:16, 58:4, 58:15, 74:6, 77:17, 77:21, 77:22, 81:5, 81:25, 82:1, 91:7
**regards** [15] - 6:7, 8:1, 15:6, 15:9, 24:3, 37:19, 38:23, 42:25, 47:12, 58:8, 63:15, 77:25, 80:13, 84:5, 86:23
**Registered** [1] - 113:13
**reinvestigate** [1] - 36:10
**reinvestigation** [1] - 73:1
**relate** [4] - 18:22, 30:25, 66:17, 94:14
**related** [8] - 16:16, 29:24, 41:3, 73:10, 80:20, 94:17, 99:24, 100:9
**relation** [1] - 78:17
**relevance** [1] - 23:14
**relevancy** [2] - 64:11, 64:15
**relevant** [27] - 5:25, 6:8, 6:23, 10:23, 10:24, 23:22, 24:1, 24:19, 28:14, 32:13, 35:3, 35:21, 36:21, 38:25, 39:1, 39:3, 39:15, 60:23, 60:24, 64:10, 77:16, 79:10, 79:18, 81:18, 93:13, 94:12, 94:18

**relieve** [1] - 26:13
**remember** [13] - 19:19, 44:17, 46:4, 46:25, 50:1, 50:12, 64:7, 70:21, 84:1, 96:9, 106:21, 111:9
**remind** [2] - 50:2, 91:22
**remotely** [1] - 72:10
**rendering** [1] - 74:1
**repair** [1] - 81:3
**repeat** [1] - 89:5
**repeatedly** [1] - 28:4
**replacing** [1] - 73:14
**reply** [3] - 52:2, 52:3, 52:4
**report** [23] - 19:20, 30:24, 34:20, 40:24, 41:25, 42:2, 42:14, 42:15, 43:15, 43:16, 44:9, 47:5, 58:10, 59:21, 63:5, 76:6, 76:9, 77:11, 78:9, 78:13, 78:14, 79:23, 81:2
**Reporter** [3] - 1:23, 113:13, 113:13
**Reporting** [2] - 28:6, 62:13
**reporting** [7] - 31:2, 35:15, 38:7, 51:5, 62:2, 63:4, 81:9
**reports** [11] - 35:14, 44:7, 44:13, 44:22, 45:4, 45:17, 47:18, 58:21, 74:10, 78:21, 79:10
**representation** [1] - 28:25
**representative** [4] - 66:11, 67:2, 69:5, 69:6
**Representative** [1] - 68:19
**Reptile** [1] - 48:3
**reptilian** [2] - 48:13, 48:19
**reptilian-type** [1] - 48:19
**reputation** [18] - 40:3, 41:7, 41:13, 41:15, 41:16, 41:19, 41:22, 41:23, 42:1, 42:3, 42:9, 42:17, 43:4, 43:11, 43:14, 43:17, 44:1, 79:17
**request** [22] - 8:5, 12:22, 14:1, 18:14, 31:17, 31:20, 31:21, 32:2, 32:12, 33:5, 33:15, 34:3, 35:4, 35:20, 36:16, 63:11, 63:13, 76:8, 95:10, 97:10
**requested** [7] - 14:13, 15:25, 31:15, 36:4, 37:2, 37:20, 77:19
**requesting** [1] - 78:17
**requests** [2] - 33:18, 95:11
**require** [1] - 13:10
**requirement** [1] - 53:3
**requires** [2] - 35:8, 69:21
**research** [1] - 74:15
**reserve** [6] - 8:12, 43:25, 47:19, 63:25, 80:3, 98:18
**reserved** [3] - 25:5, 85:18, 105:12
**reserving** [2] - 18:6, 27:13
**Reserving** [1] - 27:14
**resolution** [3] - 16:11, 67:8, 67:24
**resolve** [2] - 103:16, 103:17
**resolved** [3] - 57:2, 75:25, 82:14
**respect** [2] - 76:13, 78:19
**respond** [8] - 6:6, 34:21, 36:18, 78:24, 92:21, 97:9, 98:9, 107:6
**responded** [3] - 37:2, 39:8, 40:9
**responding** [1] - 38:21
**response** [12] - 10:6, 28:11, 28:12, 33:16, 38:2, 39:6, 40:13, 54:2, 63:12, 73:1, 91:16, 106:15

**responses** [1] - 32:13
**responsibilities** [4] - 33:7, 35:3, 35:12, 38:24
**responsible** [1] - 95:7
**rest** [1] - 83:8
**result** [4] - 11:23, 37:21, 77:10, 79:14
**review** [1] - 80:21
**rid** [2] - 65:10, 103:18
**RMR** [1] - 1:23
**ROBERT** [3] - 2:13, 2:14, 2:21
**Robert** [2] - 3:12, 3:17
**role** [1] - 93:8
**roles** [2] - 66:16, 71:4
**room** [1] - 85:10
**Room** [1] - 1:24
**row** [4] - 106:23, 106:24, 106:25, 107:1
**rsabido@cosgravelaw.com** [1] - 2:22
**rssola@msn.com** [1] - 2:14
**rule** [14] - 8:15, 9:6, 14:21, 17:9, 17:14, 48:5, 64:21, 69:12, 69:13, 71:20, 75:4
**Rule** [11] - 17:13, 17:15, 47:23, 48:1, 48:14, 48:20, 49:5, 54:9, 54:12, 69:21, 83:20
**ruled** [4] - 21:1, 25:23, 46:13, 46:20
**rules** [10] - 17:18, 17:21, 18:12, 47:19, 68:8, 86:10, 86:12, 92:12, 92:13, 98:4
**ruling** [17] - 4:21, 5:1, 5:10, 6:15, 8:12, 14:25, 18:6, 25:15, 27:13, 27:14, 43:25, 47:19, 63:25, 74:9, 74:12, 83:19, 98:18
**rulings** [2] - 99:6, 111:15
**running** [1] - 109:5
**runs** [1] - 61:22
**Ryan** [2] - 1:23, 113:12
**RYAN** [1] - 113:12

## S

**s-(2)(a** [1] - 78:2
**s-2(a** [30] - 14:2, 14:4, 14:11, 14:17, 14:18, 29:25, 30:2, 30:8, 30:21, 30:23, 31:2, 31:17, 32:4, 32:5, 32:11, 32:16, 32:23, 32:25, 34:19, 35:20, 36:8, 36:11, 36:12, 36:15, 36:16, 76:5, 76:6, 76:13, 76:22, 80:6
**s-2(a)** [9] - 14:4, 14:20, 31:18, 32:2, 32:20, 35:21, 36:5, 61:10, 76:11
**s-2(a)8** [1] - 33:1
**s-2(b** [13] - 13:1, 13:5, 13:22, 14:11, 29:25, 30:22, 31:13, 31:21, 36:6, 39:19, 76:5, 76:10
**s-2(b)** [8] - 13:11, 30:4, 30:6, 31:20, 39:12, 63:3, 76:14, 76:22
**SABIDO** [28] - 2:21, 3:17, 29:24, 30:7, 30:18, 31:11, 31:24, 32:1, 32:21, 33:12, 33:15, 34:17, 35:1, 36:19, 36:21, 37:11, 37:22, 37:25, 38:12, 38:17, 38:19, 40:7, 42:19, 48:12, 49:8, 49:19, 106:5, 106:10
**Sabido** [2] - 3:17, 76:19
**SAND** [7] - 2:3, 2:3, 3:13, 76:4, 78:25, 79:12, 81:1
**sand** [3] - 44:11, 76:2, 80:19

**Sand** [1] - 3:13
**Santana** [18] - 20:20, 21:2, 21:18, 21:20, 21:22, 22:6, 22:12, 22:25, 23:8, 23:23, 24:4, 25:5, 25:7, 81:16, 81:17, 82:6, 82:9
**Santana's** [2] - 21:9, 82:3
**save** [2] - 75:12, 106:8
**saved** [1] - 87:10
**saw** [3] - 42:2, 42:13, 111:8
**scenarios** [1] - 10:8
**scheduled** [1] - 4:10
**scheduling** [2] - 54:10, 92:4
**scope** [3] - 23:16, 26:4, 88:10
**screen** [7] - 109:15, 109:16, 109:19, 109:21, 110:2, 110:3
**screens** [2] - 109:17, 110:3
**SE** [2] - 2:4, 2:8
**searching** [1] - 97:21
**seat** [1] - 107:24
**seating** [1] - 107:25
**second** [7] - 20:7, 33:3, 66:23, 84:1, 84:3, 87:21, 111:6
**secondly** [2] - 56:20, 75:7
**Section** [1] - 60:22
**section** [5] - 14:2, 15:14, 60:8, 61:9
**sections** [2] - 55:18, 60:15
**Security** [3] - 15:11, 35:25, 76:9
**see** [28] - 4:2, 4:11, 10:23, 17:11, 25:12, 29:8, 39:6, 42:8, 42:10, 49:23, 54:16, 56:14, 57:9, 63:8, 64:17, 80:10, 82:18, 85:5, 87:15, 91:19, 92:8, 94:5, 101:2, 101:11, 103:22, 108:4, 110:25
**seek** [5] - 22:16, 28:22, 40:16, 40:17, 40:25
**seeking** [12] - 9:18, 28:24, 40:4, 40:14, 41:18, 41:20, 43:2, 43:3, 54:2, 76:10, 79:16, 94:21
**seeks** [2] - 6:13, 25:25
**seem** [2] - 99:18, 99:19
**sees** [1] - 43:15
**send** [9] - 5:9, 18:14, 27:11, 33:19, 36:12, 48:17, 63:9, 102:6, 103:17
**sending** [1] - 48:24
**sends** [1] - 50:23
**sense** [5] - 15:16, 35:5, 35:11, 64:13, 71:14
**sent** [8] - 3:19, 3:20, 37:1, 38:13, 39:6, 67:18, 77:19, 102:9
**sentences** [2] - 62:7, 62:9
**separate** [5] - 7:3, 43:17, 56:21, 56:23, 67:9
**separated** [1] - 39:19
**separately** [1] - 57:5
**series** [2] - 57:11, 107:5
**served** [2] - 50:5, 106:14
**serves** [1] - 56:14
**service** [1] - 98:13
**SERVICES** [1] - 1:8
**Services** [1] - 3:7
**set** [8] - 3:5, 25:8, 47:17, 57:11, 67:12, 95:14, 95:15, 106:11
**settle** [2] - 84:21, 86:1
**settled** [3] - 84:14, 84:18, 87:3

**settlement** [5] - 5:24, 6:16, 84:15, 106:6, 106:11
**settlements** [1] - 5:15
**seven** [1] - 108:6
**several** [1] - 18:5
**severely** [1] - 101:11
**shall** [1] - 13:6
**share** [1] - 104:5
**sheds** [1] - 28:12
**sheet** [1] - 107:21
**shifting** [1] - 69:22
**shoes** [3] - 48:8, 48:9, 49:5
**short** [1] - 53:19
**show** [7] - 59:8, 60:15, 61:2, 71:19, 75:11, 101:5, 103:21
**showed** [1] - 78:13
**shown** [2] - 97:20, 97:21
**sick** [2] - 108:5, 108:7
**side** [7] - 53:7, 69:14, 98:25, 105:5, 107:18, 107:19, 112:2
**sides** [3] - 19:21, 65:2, 65:8
**signature** [3] - 113:6, 113:7
**signed** [1] - 113:7
**significant** [1] - 56:10
**signing** [1] - 113:3
**silly** [1] - 27:18
**similar** [5] - 27:5, 27:6, 27:7, 45:16, 71:19
**similarly** [1] - 45:25
**Simon** [1] - 104:12
**simple** [1] - 94:25
**simplify** [4] - 52:17, 53:9, 54:4, 56:9
**simply** [17] - 13:12, 14:23, 30:12, 30:21, 32:11, 33:15, 34:2, 37:14, 37:16, 46:12, 48:14, 48:21, 58:7, 66:15, 67:21, 93:24, 97:10
**sitting** [3] - 66:11, 66:14, 95:13
**situation** [4] - 9:23, 11:21, 34:18, 48:16
**six** [4] - 108:3, 108:7, 108:14, 108:17
**Sixth** [2] - 13:9, 46:2
**slightly** [1] - 7:9
**SMITH** [18] - 2:20, 3:16, 25:14, 25:24, 26:3, 26:19, 27:14, 27:16, 27:20, 28:11, 28:20, 28:25, 29:7, 29:14, 57:3, 57:7, 111:2, 111:7
**Smith** [1] - 3:16
**snatch** [1] - 50:11
**Social** [3] - 15:11, 35:25, 76:8
**society** [2] - 48:17, 48:18
**SOLA** [143] - 2:13, 2:14, 3:12, 6:11, 6:21, 7:8, 9:7, 9:9, 10:6, 10:20, 11:7, 11:13, 12:2, 12:7, 12:15, 12:20, 13:25, 15:21, 16:14, 17:1, 17:5, 17:13, 17:19, 18:3, 18:13, 18:25, 19:23, 21:21, 24:7, 24:11, 25:21, 26:11, 27:5, 27:10, 28:3, 31:4, 32:7, 35:17, 35:19, 38:8, 38:10, 39:5, 39:10, 39:14, 40:5, 40:21, 41:2, 41:8, 41:10, 41:21, 41:24, 42:12, 43:7, 43:10, 44:11, 44:16, 44:19, 46:12, 46:22, 47:2, 47:25, 48:24, 50:3, 51:12, 54:7, 57:23, 58:9, 58:18, 58:22, 59:3, 59:7, 59:14, 60:9, 60:14, 60:20, 61:10, 61:12, 62:1, 62:9, 62:20, 63:17, 65:11,

65:23, 68:18, 72:12, 72:15, 72:22, 75:2, 75:8, 75:16, 76:2, 79:21, 79:25, 83:9, 83:15, 83:19, 84:3, 84:8, 84:19, 85:23, 86:25, 87:9, 87:14, 88:5, 89:1, 89:4, 89:9, 89:12, 89:15, 89:18, 89:21, 89:24, 90:2, 90:7, 90:16, 90:20, 90:25, 91:25, 94:6, 97:17, 97:19, 99:8, 100:20, 100:23, 102:12, 103:6, 103:9, 103:20, 104:9, 104:19, 105:6, 105:10, 105:20, 105:23, 106:3, 108:2, 108:8, 108:12, 108:16, 110:23, 111:11, 111:14, 111:22
**Sola** [1] - 3:12
**sola** [4] - 20:23, 32:10, 63:2, 80:19
**sola's** [1] - 25:3
**solely** [1] - 21:22
**solution** [1] - 35:23
**someone** [4] - 11:4, 42:8, 43:11, 43:15, 43:16, 66:1, 99:24
**sometime** [1] - 104:18
**somewhere** [1] - 109:25
**sorry** [15] - 8:15, 38:8, 44:11, 57:6, 61:11, 62:8, 63:17, 68:13, 79:25, 83:14, 84:9, 89:5, 92:2, 97:2, 111:15
**sort** [9] - 7:23, 17:14, 28:8, 30:20, 32:23, 50:25, 54:1, 74:10, 80:2
**sound** [2] - 17:25, 100:12
**sounds** [7] - 6:15, 35:19, 79:17, 88:3, 97:23, 100:20, 103:12
**sources** [1] - 77:11
**speaking** [2] - 47:11, 86:13
**specific** [7] - 17:22, 17:23, 45:19, 53:4, 66:16, 71:3, 93:9
**specifically** [7] - 13:10, 16:21, 47:1, 47:12, 67:4, 81:7, 96:25
**specify** [1] - 88:7
**specious** [1] - 45:3
**speculating** [1] - 77:20
**speculation** [4] - 77:18, 88:1, 88:10, 88:25
**spend** [5] - 19:15, 74:10, 80:15, 99:1, 111:21
**spent** [3] - 3:19, 4:16, 24:13
**spirit** [1] - 98:4
**split** [2] - 55:13, 55:17
**Sponer** [4] - 3:6, 79:11, 81:24, 102:7
**SPONER** [1] - 1:5
**Sponer's** [1] - 78:14
**SRA** [1] - 27:5
**stand** [2] - 44:12, 53:18
**standard** [13] - 44:24, 44:25, 45:1, 46:9, 46:14, 48:25, 50:5, 52:15, 53:6, 60:15, 63:3, 71:19, 85:16
**standards** [7] - 45:10, 45:11, 46:18, 51:5, 74:3, 76:13
**standpoint** [1] - 79:15
**start** [2] - 10:4, 110:13
**started** [1] - 35:14
**starts** [2] - 24:13, 88:21
**state** [1] - 75:20
**statement** [14] - 42:21, 53:19, 58:22, 59:16, 60:11, 60:13, 60:16, 60:19, 61:25, 62:19, 62:25, 69:7, 69:11,

104:6
**statements** [13] - 8:11, 8:16, 28:22, 44:21, 59:1, 59:4, 59:6, 59:7, 61:2, 104:4, 108:22, 109:4, 109:13
**STATES** [2] - 1:1, 1:17
**States** [1] - 1:23
**statute** [2] - 45:20, 61:19
**stay** [1] - 108:8
**stenographic** [1] - 113:4
**still** [13] - 5:10, 21:16, 25:5, 35:23, 43:20, 62:22, 68:15, 70:16, 72:22, 73:15, 84:17, 85:14, 106:22
**stipulate** [2] - 26:5, 26:6
**stipulated** [2] - 21:15, 23:25
**stipulating** [2] - 26:8, 26:9
**stipulation** [30] - 19:25, 20:3, 20:7, 20:11, 20:12, 20:17, 20:23, 21:23, 22:5, 22:7, 22:8, 22:9, 22:23, 22:24, 23:5, 23:21, 25:3, 25:4, 25:18, 26:2, 26:3, 26:11, 26:15, 26:24, 82:1, 82:4, 82:5, 86:4, 86:7, 86:8
**stipulations** [3] - 82:2, 85:16, 100:24
**stop** [2] - 15:10, 15:12
**stopped** [1] - 94:21
**strategy** [1] - 52:22
**streamline** [1] - 55:18
**Street** [1] - 2:8
**stress** [3] - 71:8, 28:14, 28:17
**strict** [1] - 92:4
**strike** [1] - 102:25
**stuff** [6] - 3:19, 3:20, 49:5, 52:9, 66:24, 77:2
**submissions** [1] - 30:10
**submit** [5] - 53:12, 94:1, 102:16, 102:18, 103:7
**submitted** [3] - 24:20, 52:20, 70:22
**subpoena** [2] - 50:5, 87:11
**subsequently** [1] - 34:6
**substantial** [1] - 106:14
**substantially** [1] - 38:1
**substitute** [2] - 66:7, 70:2
**subsumed** [1] - 81:10
**suddenly** [1] - 95:23
**sue** [2] - 63:4, 63:5
**sued** [1] - 87:3
**suffer** [5] - 43:15, 47:10, 47:15, 74:11, 74:16
**suffered** [4] - 7:5, 41:19, 74:12, 79:11
**sufficient** [2] - 86:12, 97:7
**suggesting** [1] - 10:3
**suggestion** [1] - 35:17
**Suite** [4] - 2:4, 2:8, 2:11, 2:15
**summary** [1] - 63:15
**supplement** [2] - 4:1, 91:14
**supplemental** [3] - 64:15, 91:24, 98:21
**supplemented** [1] - 92:5
**support** [2] - 8:4, 87:7
**supports** [1] - 87:2
**suppose** [1] - 103:21
**supposed** [2] - 56:3, 81:2
**surgical** [1] - 80:5
**surprise** [2] - 18:2, 25:10
**suspect** [1] - 90:19

**sustain** [1] - 86:22
**sustained** [7] - 83:2, 83:4, 83:5, 83:18, 89:6, 89:16, 89:25
**SW** [4] - 1:24, 2:11, 2:15, 2:22
**switch** [2] - 69:4, 69:10
**switched** [1] - 69:9
**system** [4] - 62:3, 76:25, 77:3, 77:11

**T**

**table** [4] - 66:12, 66:15, 99:12, 100:17
**tactic** [2] - 56:8, 97:10
**talks** [2] - 33:1, 94:23
**tangential** [1] - 90:21
**tasked** [1] - 95:9
**team** [2] - 16:11, 95:7
**technology** [4] - 99:15, 104:3, 104:9, 109:15
**telephone** [1] - 85:10
**ten** [6] - 75:8, 102:6, 109:3, 111:9, 111:12, 111:20
**tend** [1] - 77:23
**terms** [5] - 5:24, 7:13, 47:11, 51:12, 80:24, 84:14
**testified** [5] - 8:8, 42:14, 68:25, 93:18, 95:15
**testify** [27] - 8:22, 10:14, 10:18, 16:3, 35:23, 41:23, 42:9, 47:13, 51:23, 53:12, 67:15, 67:16, 69:18, 70:21, 71:6, 71:8, 71:10, 74:13, 74:15, 77:6, 78:1, 78:20, 80:3, 81:22, 87:7, 92:25, 105:13
**testifying** [12] - 9:5, 44:9, 44:15, 44:18, 76:11, 76:12, 76:23, 79:9, 79:18, 80:8, 82:6, 110:7
**testimony** [46] - 5:15, 8:3, 8:7, 8:19, 8:20, 9:13, 9:24, 10:7, 11:19, 16:9, 18:8, 21:9, 21:13, 21:14, 23:5, 23:10, 23:12, 23:19, 26:17, 44:5, 47:9, 47:17, 51:22, 68:15, 68:16, 71:18, 73:9, 74:1, 74:20, 74:21, 75:14, 76:6, 76:21, 77:1, 77:14, 78:16, 79:1, 79:3, 79:4, 80:18, 81:18, 82:3, 82:7, 87:10, 109:1, 110:15
**tfransen@cosgravelaw.com** [1] - 2:19
**THE** [266] - 1:1, 1:2, 1:16, 3:5, 3:18, 4:9, 6:19, 7:2, 7:17, 9:8, 9:18, 10:1, 10:10, 10:25, 11:9, 11:14, 11:17, 12:6, 12:10, 12:19, 13:23, 15:2, 15:22, 15:24, 16:20, 17:4, 17:7, 17:17, 17:20, 18:4, 18:23, 19:2, 19:7, 20:18, 21:20, 23:2, 23:11, 24:3, 24:10, 24:23, 25:11, 25:18, 26:2, 26:10, 26:18, 26:20, 27:7, 27:11, 27:15, 27:18, 27:21, 28:10, 28:18, 28:21, 29:2, 29:12, 29:15, 30:5, 30:15, 31:10, 31:23, 31:25, 32:6, 32:18, 33:3, 33:14, 34:13, 34:24, 35:2, 35:18, 36:20, 37:6, 37:19, 37:23, 38:4, 38:9, 38:16, 38:18, 38:20, 39:9, 39:13, 39:21, 39:25, 40:6, 40:20, 41:1, 41:6, 41:9, 41:18, 41:22, 42:5, 42:18, 42:24, 43:8, 43:19, 44:14, 44:17, 44:20, 45:21, 45:25, 46:15, 46:24, 47:3, 48:23, 49:6, 49:9, 49:23, 50:12, 51:10,

51:20, 52:5, 52:8, 52:24, 53:17, 54:5, 56:2, 57:6, 57:8, 57:17, 57:20, 57:24, 58:14, 58:21, 59:1, 59:6, 59:10, 59:17, 59:22, 60:12, 60:17, 61:4, 61:11, 61:14, 61:21, 62:8, 62:18, 62:21, 63:7, 63:19, 64:5, 64:10, 64:16, 64:20, 65:17, 66:5, 66:18, 66:20, 67:6, 68:12, 68:17, 70:12, 70:17, 72:6, 72:11, 72:14, 72:18, 73:11, 73:17, 73:20, 73:24, 74:14, 74:19, 75:3, 75:12, 75:22, 76:15, 77:17, 78:5, 78:23, 79:8, 79:16, 79:24, 80:4, 80:13, 80:25, 81:12, 81:16, 83:12, 83:16, 83:25, 84:4, 84:16, 84:24, 85:3, 85:16, 85:21, 85:25, 86:5, 86:14, 86:19, 87:5, 87:12, 87:21, 88:4, 88:16, 89:3, 89:8, 89:10, 89:14, 89:17, 89:19, 89:23, 90:1, 90:4, 90:14, 90:17, 90:23, 91:4, 91:12, 91:19, 93:4, 93:6, 93:10, 95:3, 95:22, 96:1, 96:4, 97:1, 97:15, 97:18, 98:17, 98:23, 99:10, 99:17, 100:8, 100:14, 100:22, 101:16, 102:10, 103:4, 103:8, 103:12, 103:24, 104:2, 104:11, 104:21, 104:23, 104:24, 105:3, 105:7, 105:13, 105:22, 106:1, 106:4, 106:9, 106:16, 106:24, 106:25, 108:4, 108:10, 108:13, 108:18, 109:11, 109:17, 109:24, 110:2, 110:15, 110:18, 110:20, 111:1, 111:4, 111:8, 111:13, 111:17, 111:25, 112:5
**theft** [13] - 48:16, 80:20, 80:23, 81:4, 81:5, 81:7, 81:10, 90:11, 90:12, 90:13, 91:25, 94:19, 94:23
**themselves** [2] - 98:10, 98:11
**theories** [1] - 48:19
**theory** [3] - 32:10, 36:22, 48:13
**thereafter** [1] - 37:9
**therefore** [4] - 32:24, 34:10, 34:11, 77:3
**thereof** [1] - 34:4
**thereto** [1] - 32:13
**they've** [2] - 40:13, 101:6
**thief** [1] - 102:6
**thin** [1] - 88:15
**thinking** [4] - 13:23, 51:7, 88:1, 96:12
**third** [5] - 43:18, 43:20, 101:15, 102:20, 103:19
**Thomas** [1] - 74:4
**three** [7] - 26:24, 42:16, 54:13, 56:12, 76:18, 97:8, 106:14
**Thursday** [1] - 52:6
**ties** [1] - 49:20
**Tim** [2] - 3:15, 38:15
**timeline** [1] - 37:6
**timeliness** [1] - 50:6
**timely** [2] - 50:4, 50:5
**TIMOTHY** [1] - 2:18
**titled** [1] - 113:5
**to-do** [1] - 98:23
**today** [6] - 5:2, 53:24, 75:18, 95:13, 100:21, 104:13
**together** [1] - 67:10
**token** [1] - 73:20
**took** [10] - 19:25, 35:13, 36:23, 45:6,

52:9, 58:5, 59:9, 84:18, 94:6, 94:21
**top** [1] - 49:12
**topics** [6] - 47:17, 68:4, 68:16, 73:15, 77:15, 82:8
**totally** [3] - 22:15, 51:5, 94:20
**tough** [1] - 11:21
**towards** [1] - 110:12
**track** [1] - 95:8
**transcript** [6] - 85:8, 85:12, 110:6, 110:10, 113:4, 113:6
**TRANSCRIPT** [1] - 1:13
**TransUnion** [6] - 49:25, 50:18, 50:22, 50:23, 51:4, 51:8
**trial** [48] - 4:5, 4:22, 4:23, 4:24, 5:3, 5:6, 8:13, 9:5, 11:2, 12:1, 16:5, 17:14, 17:16, 18:7, 26:12, 52:18, 53:10, 53:11, 54:18, 56:8, 56:20, 63:7, 65:22, 66:11, 67:3, 67:23, 68:10, 69:12, 72:8, 72:15, 72:17, 76:14, 80:1, 91:5, 92:25, 95:2, 95:25, 96:15, 97:4, 97:25, 99:2, 103:22, 105:21, 106:6, 109:1, 109:11, 110:13
**trials** [1] - 4:24
**tried** [3] - 54:11, 70:6, 105:4
**triggered** [2] - 29:20, 95:23
**trouble** [9] - 17:11, 44:23, 44:25, 46:1, 46:8, 46:15, 46:18, 58:17, 59:18
**true** [9] - 11:13, 41:12, 41:15, 43:12, 70:19, 94:22, 101:23, 101:24, 113:4
**truth** [3] - 59:8, 59:13, 90:8
**try** [10] - 17:2, 18:1, 18:17, 24:17, 43:10, 92:9, 104:18, 106:19, 108:14, 108:25
**trying** [9] - 9:2, 22:11, 25:8, 32:4, 34:17, 34:18, 34:24, 35:2, 46:24, 62:16, 100:23, 106:22
**Tuesday** [5] - 4:9, 4:10, 110:17, 110:18, 110:20
**turn** [9] - 3:23, 23:3, 30:19, 35:14, 52:11, 64:24, 99:5, 104:7, 107:14
**turned** [1] - 96:12
**turning** [1] - 57:10
**two** [26] - 10:1, 19:12, 39:8, 41:25, 53:8, 55:13, 55:18, 62:7, 62:9, 65:6, 65:16, 66:13, 67:9, 68:11, 71:15, 72:16, 75:11, 75:13, 75:15, 76:18, 82:24, 85:2, 96:8, 99:21, 108:3, 112:1
**type** [3] - 48:19, 49:21, 71:1
**types** [3] - 41:3, 66:3, 67:10
**typical** [1] - 31:5
**typically** [3] - 29:12, 43:8, 100:9

**U**

**ultimately** [2] - 15:8, 15:15
**unable** [1] - 103:17
**under** [32] - 10:8, 13:1, 13:5, 15:13, 17:15, 30:6, 32:2, 33:2, 33:7, 33:8, 33:9, 35:3, 35:12, 35:20, 36:6, 36:11, 36:12, 36:16, 38:21, 38:24, 43:4, 51:5, 54:9, 54:12, 54:23, 56:18, 59:4, 63:3, 68:8, 85:22, 95:15
**underlies** [1] - 62:3
**undermines** [1] - 22:23
**understandable** [1] - 42:6

understood [3] - 71:16, 72:8, 74:9
undue [4] - 54:13, 54:14, 56:3, 56:7
unfair [1] - 25:9
unfold [1] - 11:4
unfolds [1] - 64:17
unified [1] - 55:16
unit [1] - 37:15
UNITED [2] - 1:1, 1:17
United [1] - 1:23
unless [2] - 72:19, 97:17
unnecessary [1] - 23:5
unrelated [3] - 22:15, 22:17, 22:20
up [33] - 7:19, 7:25, 27:8, 27:17, 34:19,
   36:8, 53:15, 53:18, 55:12, 58:10, 61:1,
   61:6, 61:9, 63:19, 64:1, 67:12, 71:12,
   71:16, 71:19, 75:11, 78:13, 80:1,
   88:14, 90:23, 97:16, 99:9, 102:2,
   102:18, 107:16, 109:20, 109:25, 110:2

### V

vacuum [8] - 5:18, 7:6, 7:23, 16:22,
   21:5, 21:8, 31:5, 39:2
vague [2] - 48:6, 88:11
valid [1] - 52:22
value [1] - 23:15
verdict [3] - 55:20, 56:23
VERGEER [1] - 2:18
verification [1] - 39:18
verify [3] - 77:5, 77:12
version [2] - 96:20, 102:18
versions [1] - 95:9
versus [4] - 3:6, 29:25, 55:22, 76:22
via [1] - 85:10
victim [2] - 58:19, 58:20
victory [1] - 50:11
violate [2] - 98:7, 98:9
violated [3] - 28:5, 34:10, 61:20
violating [1] - 48:5
violation [2] - 32:23, 45:18
voir [2] - 99:15, 99:17
vs [1] - 1:7

### W

Wait [1] - 13:7
wait [6] - 3:24, 54:17, 64:17, 79:25,
   87:5, 91:13
waited [1] - 54:15
waived [4] - 84:23, 86:5, 86:17, 86:24
wants [3] - 22:13, 61:1, 88:3
warming [1] - 90:23
Washington [1] - 113:14
watch [2] - 43:23, 63:7
wave [8] - 65:4, 65:15, 101:15, 102:13,
   102:20, 102:22, 103:2, 103:19
waves [1] - 65:8
ways [5] - 10:17, 28:23, 31:16, 36:14,
   42:16
website [1] - 81:5
week [7] - 4:6, 31:8, 72:13, 104:15,
   104:16, 104:18
WEINER [1] - 2:3
welcome [2] - 60:19, 61:23

well-chronicled [1] - 106:10
well-taken [3] - 25:10, 32:17, 36:25
WELLS [1] - 1:8
Wells [72] - 2:18, 6:13, 6:22, 8:4, 8:5,
   8:23, 11:20, 15:6, 15:10, 16:10, 16:15,
   18:9, 19:18, 22:13, 22:16, 22:19,
   23:13, 29:4, 30:15, 31:7, 32:14, 32:19,
   33:4, 33:5, 33:9, 33:21, 34:7, 34:16,
   35:8, 35:10, 37:8, 37:12, 38:1, 38:21,
   38:23, 39:7, 46:13, 48:17, 50:16,
   50:19, 51:8, 52:17, 53:25, 58:8, 58:13,
   60:2, 63:21, 65:25, 66:20, 68:5, 68:8,
   68:19, 69:19, 70:15, 70:24, 71:12,
   76:8, 76:24, 77:12, 77:19, 78:13,
   81:19, 82:1, 87:8, 90:10, 92:10, 93:9,
   94:10, 95:6, 95:11, 95:23, 100:25
WHITE [1] - 113:12
White [2] - 1:23, 113:12
whole [6] - 12:10, 29:25, 32:16, 48:12,
   49:3, 87:22
wide [1] - 81:4
willful [5] - 45:17, 45:18, 46:7, 46:21,
   55:22
willfully [1] - 45:2
willfulness [3] - 45:12, 56:21, 57:4
William [3] - 67:14, 71:1, 71:2
willing [1] - 56:7
win [1] - 11:15
wins [1] - 11:17
withdrawal [1] - 23:17
withdrawn [1] - 21:14
withdrew [4] - 22:5, 22:23, 22:24, 63:17
withheld [1] - 95:18
withhold [2] - 14:25, 95:19
withholding [1] - 94:25
witness [45] - 8:8, 8:19, 8:20, 8:21, 8:24,
   9:5, 9:21, 17:6, 20:21, 22:1, 22:2,
   22:7, 22:8, 22:9, 22:20, 23:1, 24:6,
   44:14, 65:2, 65:19, 65:24, 66:2, 66:8,
   66:13, 67:21, 67:25, 68:22, 69:7,
   69:11, 69:18, 70:4, 73:17, 74:4, 75:24,
   92:22, 92:24, 93:4, 95:15, 97:4,
   101:22, 107:11, 108:23, 110:7, 111:18
witnesses [34] - 3:24, 4:11, 4:13, 8:22,
   9:19, 16:3, 20:20, 49:23, 53:12, 64:24,
   65:2, 65:6, 65:10, 65:14, 65:16, 65:21,
   67:15, 68:11, 68:23, 69:6, 69:7, 69:10,
   72:16, 72:19, 75:20, 81:23, 91:8, 91:9,
   91:11, 96:16, 111:9, 111:13, 111:14
wonderful [1] - 23:13
wording [1] - 33:22
words [12] - 7:13, 12:25, 16:22, 17:9,
   34:15, 35:25, 39:17, 45:3, 45:16,
   45:19, 79:19, 110:16
works [8] - 67:8, 67:9, 70:15, 70:23,
   104:12, 105:2, 109:24
worth [11] - 19:10, 20:2, 20:4, 20:12,
   24:17, 24:22, 25:22, 26:14, 26:25,
   58:17, 59:18
written [3] - 16:16, 93:20, 93:24
wrongdoing [2] - 29:4, 29:5
wrote [3] - 31:7, 31:11, 50:1

### Y

year [7] - 26:25, 37:4, 54:15, 55:12,
   66:14, 68:9, 106:12
years [5] - 10:13, 14:23, 20:8, 25:25,
   26:24
yellow [1] - 102:15
yourself [4] - 3:8, 48:9, 48:15, 49:4