1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3   MATTHEW SPONER,                    )
                                       )
4            Plaintiff,                ) No. 3:17-cv-02035-HZ
                                       )
5        vs.                           ) August 27, 2019
                                       )
6   EQUIFAX INFORMATION SERVICES,      ) Portland, Oregon
    LLC and WELLS FARGO BANK, N.A.,    )
7                                      )
             Defendants.               )
8   ---------------------------------

9

10

11

12

13

14                        **TRIAL – DAY 1**

15              TRANSCRIPT OF PROCEEDINGS

16         BEFORE THE HONORABLE MARCO A. HERNANDEZ

17            UNITED STATES DISTRICT COURT JUDGE

18

19

20

21

22

23

24

25

```
 1                          APPEARANCES

 2   FOR THE PLAINTIFF:    Jeffrey B. Sand
                           Weiner & Sand LLC
 3                         800 Battery Avenue SE
                           Suite 100
 4                         Atlanta, GA  30339

 5                         Kelly D. Jones
                           Kelly D. Jones, Attorney at Law
 6                         819 S. E. Morrison Street
                           Suite 255
 7                         Portland, OR  97214

 8                         Michael R. Fuller
                           OlsenDaines
 9                         111 S. W. Fifth Avenue
                           Suite 3150
10                         Portland, OR  97204

11                         Robert S. Sola
                           Robert S. Sola, P.C.
12                         1500 S. W. First Avenue
                           Suite 800
13                         Portland, OR  97201

14   FOR THE DEFENDANT
15   WELLS FARGO BANK:     Robert E. Sabido
                           Timothy J. Fransen
16                         Daniel C. Peterson
                           Julie Annette Smith
17                         Cosgrave Vergeer Kester, LLP
                           900 S. W. Fifth Avenue
18                         24th Floor
                           Portland, OR  97204
19
20   COURT REPORTER:       Nancy M. Walker, CSR, RMR, CRR
                           United States District Courthouse
                           1000 S. W. Third Avenue, Room 301
21                         Portland, OR  97204
                           (503) 326-8186
22

23

24

25
```

```
 1                        P R O C E E D I N G S
 2              (The Court, counsel, and the parties convene.)
 3              THE COURT:  Good morning.  Be seated.
 4              THE CLERK:  Your Honor, we're here today for trial in
 5    Sponer versus Wells Fargo Bank, N.A., Case No. 17-cv-02035-HZ.
 6              Counsel, please state your appearances for the
 7    record, starting with the plaintiff.
 8              MR. SOLA:  Robert Sola for plaintiff.
 9              MR. SAND:  Jeff Sand for plaintiff.
10              MR. JONES:  Kelly Jones for plaintiff.
11              MR. PETERSON:  Your Honor, Daniel Peterson for
12    Defendant Wells Fargo.
13              MR. FRANSEN:  Tim Fransen for Defendant Wells Fargo.
14              THE COURT:  Good morning.
15              I have a couple of commercials to wrap up things that
16    we needed to take care of.
17              One was the title of the case.  I will be referring
18    to the case title as Sponer versus Wells Fargo and won't leave
19    Equifax as part of the title of the case.
20              Secondly, one of the things that we didn't talk about
21    were exhibits that there were no objections to the exhibits
22    and what we do about those.  It is my preference that if there
23    wasn't an objection to the exhibits that was brought up to the
24    Court by way of a motion in limine, that we operate by way of
25    the assumption that those exhibits are admissible, so we don't
```

 1   have to go through the process of offering, receiving, and

 2   hearing further objections.  That, after all, is the point of

 3   the pretrial and motions in limine.

 4              Is that acceptable to plaintiff?

 5              MR. SOLA:  Yes, Your Honor.

 6              MR. PETERSON:  Yes, Your Honor.

 7              THE COURT:  All right.  So if I didn't hear an

 8   objection already, it's in, no need to offer it.

 9              And, Jennifer, do you have a list of those?

10              THE CLERK:  I do.

11              MR. SOLA:  Your Honor, just for the record, we have

12   withdrawn Exhibits 3 -- this is plaintiff.  We've withdrawn

13   Exhibits 3 and 21.  And so I just want, you know, those not to

14   be considered as offered or admitted by plaintiff.

15              THE COURT:  All right.  Thank you.

16              Next issues:  One I'm sorry that I did not talk with

17   you about, and it occurred to me afterwards, and that is

18   whether or not to allow the jurors to ask questions.  It is my

19   practice to allow jurors to ask questions.  And I instruct

20   them -- I think there is now a uniform instruction in the

21   Ninth Circuit for allowing them to ask questions.  We didn't

22   really address that.

23              One of the issues that you may be thinking about is,

24   well, if the jurors are asking questions, whose clock is

25   running while that's happening?  And so if it's just very

1    brief, the clock will just continue to run on whoever's turn

2    it is.  If the questions start to get lengthy, I'll just stop

3    the clock; and if I feel like I need to add back to whoever's

4    side it was, I'll just add time back.

5            The way the questions typically work is after both

6    sides are completed with the examination of a particular

7    witness, I will then turn to the jury and ask them if they

8    have any questions.  Their questions are always in writing.

9    I'll have the questions returned to me.  I will review them

10   briefly.

11           If it looks like questions that are just crazy, I

12   will just not ask the question and we'll continue.  If it

13   looks like something that's within the realm of possibilities,

14   I'll call the lawyers up to the sidebar here and let you look

15   at the questions and see whether you have any objections to

16   them or not.  If there is an objection, I will not indicate to

17   the jury who it is that is objecting.

18           Do you have any questions -- either side have any

19   questions about that procedure?

20           MR. PETERSON:  No, Your Honor.  That's fine with

21   defendant.

22           MR. SOLA:  Your Honor, a question on the title of the

23   case.  I don't know that there will be anything that the jury

24   would see, other than the verdict form or the jury

25   instructions.  But I guess that's what I'd just want to know

1  or make sure that if they're on anything, that it says Matthew

2  Sponer versus Wells Fargo.

3          THE COURT:  I don't know about documents that you

4  have prepared as exhibits.  That's not my problem.  That's

5  your problem.  But it does appear on the verdict form, and the

6  caption will be modified so it just says Sponer versus Wells

7  Fargo.

8          MR. SOLA:  Will you be giving the jurors written

9  copies of the instructions?

10          THE COURT:  Yes.

11          MR. SOLA:  So I just ask if you put a caption

12  on -- maybe you don't.

13          THE COURT:  Yes.  I'll make sure that all the

14  captions accurately reflect that.

15          MR. SOLA:  In our pretrial, in our motions in limine,

16  we asked that the jury not hear that there was a claim made

17  against Equifax.  And you seemed inclined or -- I don't want

18  to misstate -- even denied that portion.

19          But I just wanted some clarification, because the

20  defendants said, "We object insofar as they're trying to say

21  we can't blame anybody else or put fault on anybody else."

22  And I said, "We don't oppose that."  My whole thing was the

23  legal claim.  You said the settlement shouldn't be mentioned.

24          But I would just renew my motion, just that they

25  don't mention that there was a legal claim, but certainly are

1   free to say -- to ask whether Equifax caused harm or did

2   anything else.

3              THE COURT:  I think that's consistent with my ruling,

4   in that I didn't want the settlement discussed.  But to the

5   extent that anything that Equifax did caused mental distress

6   to your client, as I recall, I thought that was fair game.

7              MR. SOLA:  That's right.

8              But here's my question.  Can they say, "You sued

9   Equifax, didn't you?"  I don't think that's relevant.  And it

10  sort of ties into the settlement.

11             Do I need to go on, or would the Court agree that

12  they can't ask about that?

13             THE COURT:  I don't know what your client is going to

14  testify to when your client takes the stand regarding his

15  mental distress damages or not.

16             Before the defense mentions Equifax, I'll ask that

17  they tell the Court that there's a matter for the Court; and

18  we'll talk about whether I'm going to allow them to inquire

19  about Equifax and how far I will let them go.

20             MR. SOLA:  Thank you.

21             MR. PETERSON:  Your Honor, just very briefly, also

22  taking a step back, in reference to Exhibits 3 and 21 which

23  were withdrawn, if we decide to introduce those, there is no

24  objection to them, I don't believe, if I'm remembering

25  correctly.  Should we offer them since they've now withdrawn

them?

THE COURT:  Yes.

MR. PETERSON:  Okay.

THE COURT:  And then, finally, the last thing, kind of a cleanup matter that I need to take care of was the supplemental exhibits.

I read the plaintiff's response to the motion to allow supplemental exhibits.  I reviewed the supplemental exhibits.  They amount to, I think, six pages.  I don't know if the right description is policy as much as it is procedure, regarding what's supposed to happen when there is an indirect fraud dispute.

I saw in the supplemental briefing on the part of the plaintiff that a witness was deposed -- it must have been last week -- about the supplemental exhibits.  And at least as regards questions about why the exhibits weren't previously disclosed, that particular witness really wasn't able to be of any assistance to any of the parties about why it wasn't disclosed.

As I review what the issues in this particular case are -- and the case really is about whether or not there was a reasonable investigation in this case and whether or not the defendants acted willfully, to the extent that they fell short of their responsibilities under the Act.  And I then considered whether or not these procedures and what prejudice

1    there is to the plaintiff if these six pages are admitted into

2    evidence, particularly in light of the fact that they had an

3    individual who could respond to the substance of those

4    particular procedures and had an opportunity to question that

5    individual.

6              In light of all of those things and what this case is

7    about, I find that those exhibits are admissible.  I don't

8    believe that the prejudice that the plaintiff will suffer as a

9    result of those six pages is undue prejudice.

10             I don't know that the fact that they had policies or

11   procedures in place really is as important as whether or not

12   those policies or procedures were followed; and, more

13   importantly, notwithstanding any policy or procedure, did the

14   defendants violate the law?  And if they did, then there is

15   liability.  If they didn't, so be it.

16             On the issue of willfulness, the fact that policies

17   exist, if they are not being followed, or they are unaware

18   that they even exist, I don't think that that necessarily

19   answers the question of willfulness or not.  I believe the

20   plaintiff's case is still viable under these circumstances.

21             So to the extent that there is an objection, the

22   objection is overruled.  The exhibits will be received.

23             MR. PETERSON:  Thank you, Your Honor.

24             THE COURT:  Then from plaintiff's perspective -- I'm

25   ready to bring the jury up.  Is there anything else from your

1  perspective that I need to address?

2          MR. SOLA:  No, Your Honor.

3          THE COURT:  From defense perspective?

4          MR. PETERSON:  No, Your Honor.

5          THE COURT:  Jennifer, rack them up.

6          MR. SOLA:  I'm sorry.  Did you want a statement of

7  the case?

8          THE COURT:  I have a very brief and generic statement

9  of the case that I include with the introduction, and it is

10  very brief.  It certainly does not give justice to how

11  complicated and complex the case is from either one of your

12  perspectives.  I leave that to you to fill in -- it's like the

13  coloring book.  I'm just giving the brief outline, and I'm

14  going to let you fill in the colors.

15          MR. SOLA:  So we could offer a brief --

16          THE COURT:  During your opening statement.

17          MR. SOLA:  But I just saw the trial court guidelines

18  indicated one.  But if the Court has prepared its own, then we

19  don't need to do anything to introduce the case to the jury?

20          THE COURT:  No.  But what we will need to be prepared

21  to do -- and you reminded me -- is to tell the jury who

22  everybody you want to introduce is at your table and also who

23  your witnesses are.

24          So have your witness lists available, because at some

25  point during the introduction I'm going to turn to you and ask

Voir Dire

1    you, "Please tell the jurors who your potential witnesses

2    are."

3                MR. SOLA:  Okay.  Does that include the deposition

4    excerpts?

5                THE COURT:  Yeah.  I'm going to ask them if they are

6    familiar with those names or not, so I can judge whether they

7    know those people.

8                I will step off the bench.  Jennifer is going to go

9    get our jury, and we'll be in recess for a few minutes.

10               MR. PETERSON:  Thank you, Your Honor.

11               (A recess is then taken.)

12               (The Court, counsel, the parties, and the panel of

13   prospective jurors convene.)

14               THE COURT:  Good morning.  Be seated.

15               Welcome.  My name is Marco Hernandez.  We are going

16   to be selecting a jury for the matter of Sponer versus Wells

17   Fargo Bank.  And the first step in the process is to get 16

18   jurors in my jury box.

19               Jennifer is going to call your names one by one.  As

20   she calls your name, please fill in the jury box.  And we will

21   do that by beginning on the right-hand side, back row of the

22   jury box.

23               So Juror No. 1 will be in the back row to my right,

24   Juror No. 2 will be then one seat over, et cetera, until we

25   get the first eight.  Then we'll go with Juror No. 9 in the

Voir Dire

1    front row.

2           Note that the jury box has doors on that side.  So if

3    you want to climb over people, you're welcome to do so, but

4    you can also enter from that side and avoid climbing over

5    people if you so desire.

6           With that, I'll have Jennifer get people in place,

7    and then we'll proceed with the process.

8           THE CLERK:  Juror No. 1, Gary Weaverli,

9    W-e-a-v-e-r-l-i.

10          THE COURT:  Come on up, back row, first seat to the

11   right.

12          THE CLERK:  No. 2, Lynn Osterkamp, O-s-t-e-r-k-a-m-p.

13          No. 3, Dianne Horner, H-o-r-n-e-r.

14          No. 4, Natalie Luquin, L-u-q-u-i-n.

15          No. 5, Colleen Spidal, S-p-i-d-a-l.

16          No. 6, James Davis, D-a-v-i-s.

17          No. 7, Robin Collier, C-o-l-l-i-e-r.

18          No. 8, Angela Huss, H-u-s-s.

19          No. 9, Corey Rudolph, R-u-d-o-l-p-h.

20          No. 10, Kristin Walrod, W-a-l-r-o-d.

21          No. 11, Joseph Wiggins, W-i-g-g-i-n-s.

22          No. 12, Daniel Griffin, G-r-i-f-f-i-n.

23          No. 13, Rayna Flye Fairman.

24          No. 14, Brian Kragt, K-r-a-g-t.

25          No. 15, Abiel Stewart, S-t-e-w-a-r-t.

Voir Dire

1          No. 16, James Murphy.

2          No. 17, Alice Burson, B-u-r-s-o-n, if you would just

3   take that corner seat.

4          And then No. 18, Denise Paquette, P-a-q-u-e-t-t-e.

5          No. 19, Dae-Jin Joseph, J-o-s-e-p-h.

6          Juror No. 20, Sarah Gannon, G-a-n-n-o-n.

7          No. 21, Andrew Sharp.

8          No. 22, Bradley Johnson.

9          No. 23, Matthew Corbin, C-o-r-b-i-n.

10          No. 24, Arcus Pierce.

11          25, Kevin Bull, B-u-l-l.

12          And 26, Miriam Feldman.

13          THE COURT:  Potential members of the jury, we want to

14   get to the process where we start learning a little bit about

15   you.  And the way we do that is to ask you to respond to the

16   points that are listed on the monitors there.  For those of

17   you in the gallery, you can't see that, but we'll give you a

18   piece of paper, because we're user friendly and don't expect

19   you to read that that far away.

20          But before you respond to any of those points or you

21   respond to any questions that I may pose to you or the lawyers

22   may pose to you later on, you have to take an oath to answer

23   those questions truthfully.

24          So I need all of the potential jurors at this time to

25   stand up, raise a hand, and take an oath.

Voir Dire

```
 1              (The panel of prospective jurors is then sworn.)
 2              THE COURT:  Thank you.  Please be seated.
 3              So as I told you, I'm Marco Hernandez.  By the way,
 4    this is Jennifer Paget.  She's my courtroom deputy.  She acts
 5    as the bailiff in this case, which means that she swears
 6    witnesses and generally helps move things along.
 7              The plaintiff in this matter is sitting to my right
 8    and is being represented by Kelly Jones, Jeffrey Sand, Robert
 9    Sola.
10              You can all introduce yourselves if you'd like and
11    introduce whoever else is at the table with you.
12              THE PLAINTIFF:  I'm Matthew Sponer.
13              MR. SOLA:  And I'm Mr. Sponer's attorney, Robert
14    Sola.
15              MR. SAND:  I'm also Mr. Sponer's attorney, Jeff Sand.
16              THE COURT:  The defendant in this case, Wells Fargo,
17    is being represented by Daniel Peterson and Tim Fransen, and
18    there is an IT person helping them.
19              You can introduce yourselves.
20              MR. PETERSON:  Good morning.  I'm Daniel Peterson,
21    representing Wells Fargo.
22              With us at counsel table is Megan Braxton.  You'll
23    hear more from Ms. Braxton.  She's an employee of Wells Fargo.
24              MR. FRANSEN:  And I'm Tim Fransen.  I also represent
25    Wells Fargo.
```

Voir Dire

1           THE COURT:  Your job is to apply the facts to the law

2    that I give you.  This is a civil case.  It's not a criminal

3    case.  You may have seen criminal cases on television or in

4    the movies and know that in a criminal case, a prosecutor has

5    to prove his case or her case beyond a reasonable doubt.

6    Civil cases are different.  In a civil case, the party who has

7    to prove something only has to prove that it is more likely

8    true than not true.

9           In a few moments I'm going to be asking you some

10   questions.  And after I've completed my questions, the lawyers

11   will be given an opportunity to ask follow-up questions.  The

12   purpose of questions is not to argue the case or embarrass

13   you, but rather to determine your qualifications to act as

14   jurors in this case.

15          Please respond to our questions honestly and

16   sincerely.  If you don't understand a question, ask us to

17   repeat it or to ask it in another way.

18          Since you are in an unfamiliar setting, among

19   strangers, it may be uncomfortable for you to be open, honest,

20   and complete in answering the questions.  This process

21   requires you to overcome that discomfort and do your best to

22   be open, honest, and complete when you answer.  It's extremely

23   important, and the fairness of the trial depends on it.

24          If you're asked a question that involves something

25   that you consider very private or sensitive, just let me know

Voir Dire

1  that; and we'll figure out a way to take that question up in a

2  more private setting.

3         When the questioning is completed, the lawyers will

4  exercise challenges.  If you are not selected for this jury,

5  please do not feel that your attendance has been without

6  value.  We need a substantial group of potential jurors so

7  that an impartial panel can be selected, and all of you

8  provide an important contribution to this process.  Your

9  presence assures that the process is fair.

10        Before we get to the questions, however, I would like

11 for each of you to provide biographical information by looking

12 at the points that are listed there on the screen, for those

13 of you in the jury box.  And then after that, we'll get to the

14 questioning part of the process.

15        So turning to Juror No. 1, if you wouldn't mind using

16 the microphone.

17        PROSPECTIVE JUROR NO. 1:  Gary Weaverli.  I live in

18 South Tabor.  I live with my wife.  She is a creative person,

19 writing and design.  Education and training, she has a

20 master's degree.  I have a college degree.

21        I'm a member of the Black Rock Mountain Biking

22 Association.  We build mountain bike trails, 6 and 7, and do

23 not really have any court proceeding history.

24        PROSPECTIVE JUROR NO. 2:  My name is Lynn Osterkamp.

25 I live in Gresham.  I live by myself.  I am an accounts

Voir Dire

1   receivable specialist.  I have some college education.

2          I don't belong to any clubs.  I like to read, watch

3   TV.  And I haven't appeared in court before.

4          THE COURT:  Thank you.

5          PROSPECTIVE JUROR NO. 3:  My name is Dianne Horner.

6   I live in West Linn.  I live with my husband and my son, who

7   is currently back home.  My husband is a retired computer

8   systems analyst for the State of Oregon, and I'm a retired

9   copywriter.

10         I'm a chemo pal, and I do Pilates and yoga in my

11  spare time.  And I also have no previous court history.

12         THE COURT:  What's a chemo pal?

13         PROSPECTIVE JUROR NO. 3:  Randall's Children's

14  Hospital or Doernbecher, little kids that are going through

15  chemo, we go and play with them while they are doing their

16  awful stuff.

17         THE COURT:  Thank you.

18         PROSPECTIVE JUROR NO. 4:  My name is Natalie Luquin.

19  I live in Portland, Beaverton, kind of like the boundary line.

20  I live with eight other people.  I have a very big family.  My

21  mom is a stay-at-home mom, and my dad works for Intel.

22         Hobbies:  art and physical fitness.  I've only

23  appeared in, like, a court for, like, an adoption for my

24  younger siblings.  It was like a private adoption and -- yeah.

25         THE COURT:  Thank you.

Voir Dire

1          PROSPECTIVE JUROR NO. 5:  I'm Colleen Spidal.  I live

2    in Northeast Portland, Parkrose area, by myself, with two

3    cats.  I work at U.S. Bank, vice president, trust officer for

4    38 years.

5          I belong to the Portland Estate Planning Council.

6    Hobbies:  art, television, reading.  And I've been on a jury

7    twice:  one civil, one criminal.  That's about it.

8          THE COURT:  Was there anything about your jury

9    experience that left a negative taste in your mouth regarding

10   our justice system?

11         PROSPECTIVE JUROR NO. 5:  I love serving on jury

12   duty.

13         THE COURT:  Is there anything about your banking

14   experience that would cause you difficulty in being fair and

15   impartial in this particular case?

16         PROSPECTIVE JUROR NO. 5:  Absolutely not.

17         THE COURT:  Thank you.

18         PROSPECTIVE JUROR NO. 6:  My name is James Davis.  I

19   am from West Linn, and I reside with my parents.  And I am

20   unemployed, and I don't belong to any organizations or clubs.

21   I like to play basketball.  And I've never been on a jury.

22         PROSPECTIVE JUROR NO. 7:  My name is Robin Collier.

23   I live in Hillsboro with my wife.  I work at Moore Furniture,

24   salesperson.  My wife works for Albertson's.  Some college.

25         I belong to the Sierra Club, read as a hobby.  And

Voir Dire

1    I've appeared in court as a party.

2              THE COURT:  Hang on just a second.  You were a party

3    in a case?  Was it -- I assume it was a civil case.  Is that

4    correct?

5              PROSPECTIVE JUROR NO. 7:  No.  I was a defendant.

6              THE COURT:  A defendant in a criminal case?

7              PROSPECTIVE JUROR NO. 7:  DUI.

8              THE COURT:  Okay.  Anything about that experience

9    that would cause you difficulty being neutral in this case?

10             PROSPECTIVE JUROR NO. 7:  No.

11             THE COURT:  Thank you.

12             PROSPECTIVE JUROR NO. 8:  My name is Angie Huss.  I

13   live in Gresham by myself.  I'm divorced.  I work for

14   Providence Health and Services.  I belong to AA and am part of

15   the Hood to Coast.  And I have appeared as both a juror and a

16   party.

17             THE COURT:  How long ago was your jury experience?

18             PROSPECTIVE JUROR NO. 8:  Thirty-five years ago in

19   the state of Texas.

20             THE COURT:  And you were a party in a case as well?

21             PROSPECTIVE JUROR NO. 8:  Yes, also in Texas, about

22   30 years ago.

23             THE COURT:  Anything about those experiences that

24   would cause you difficulty being neutral in this case?

25             PROSPECTIVE JUROR NO. 8:  No.

Voir Dire

1          THE COURT:  Thank you.  Pass the microphone up.

2          PROSPECTIVE JUROR NO. 9:  Hi.  I am Corey Rudolph,

3  and I live in Lake Oswego with my wife and our two kids.  I

4  went to the University of Oregon, and my wife got her master's

5  degree at PSU.  And I am a real estate broker in the Portland

6  area.

7          I have not been in court in any -- as any party or

8  witness or a juror.  And for hobbies, free time is just with

9  the family.

10          THE COURT:  Thank you.

11          PROSPECTIVE JUROR NO. 10:  Hi.  I'm Kristin Walrod.

12  I live in Portland, North Portland.  I live with my husband

13  and three school-age kids.  And my husband is a venture

14  capitalist with a company here locally, and I am a writer and

15  have a master's in creative writing, and I do some teaching.

16          I'm on a couple of organizational boards, the Gray

17  Family Foundation and Sitka Center for Art and Ecology, which

18  is out on the coast.  And I like to write and read and have a

19  very active family life.  And I haven't appeared in a court

20  proceeding before.

21          THE COURT:  Thank you.

22          PROSPECTIVE JUROR NO. 11:  I'm Joseph Wiggins.  I

23  live in Gresham with my wife and stepdaughter.  I work for

24  Tri-Met and also on a business cleaning carpets.  My wife and

25  I both have college educations.  Not a lot of hobbies or

Voir Dire

1  activities.  I have been a juror twice.

2          THE COURT:  How long ago were you a juror?

3          PROSPECTIVE JUROR NO. 11:  I think once was about 12

4  years ago and the other probably about eight years ago maybe.

5          THE COURT:  Do you remember what the nature of the

6  cases were?

7          PROSPECTIVE JUROR NO. 11:  Both were criminal cases.

8          THE COURT:  Anything about those experiences that

9  left a negative taste in your mouth regarding our justice

10 system?

11         PROSPECTIVE JUROR NO. 11:  Nothing at all.

12         THE COURT:  Anything about your experiences that

13 would cause you difficulty being neutral in this case?

14         PROSPECTIVE JUROR NO. 11:  No.

15         THE COURT:  Thank you.

16         PROSPECTIVE JUROR NO. 12:  My name is Daniel Griffin.

17 I live in Lake Oswego with my parents.  I work as a warehouse

18 associate for Amazon.com.  I don't belong to any organizations

19 or clubs.

20         I do a lot of gaming and like reading; that sort of

21 stuff is my hobbies.  And I have appeared in a court

22 proceeding as a party.

23         THE COURT:  How long ago was that?

24         PROSPECTIVE JUROR NO. 12:  About 15 years ago.

25         THE COURT:  Anything about that experience that

Voir Dire

1  causes you difficulty being neutral in this case?

2           PROSPECTIVE JUROR NO. 12:  No.

3           THE COURT:  Thank you.

4           PROSPECTIVE JUROR NO. 13:  My name is Rayna Flye

5  Fairman.  I live in Beaverton with my husband.  We're both

6  researchers.  We both have doctorates.

7           Organizations, New Sweden and Romance Writers of

8  America.  Hobbies -- sorry -- reading, writing, crafting,

9  gardening.  And I've never appeared in a court proceeding.

10          THE COURT:  Thank you.

11          PROSPECTIVE JUROR NO. 14:  Brian Kragt.  I live in

12  Banks with my wife.  I'm a telecommunications contractor,

13  semi-retired.  Incidentally, one of my customers is Wells

14  Fargo.  I don't know if that's an issue.  My wife is a

15  preschool teacher.

16          I just belong to our local church.  Hobbies, I enjoy

17  golf and hiking.  I did appear one time as a juror many years

18  ago.  I don't remember exactly, probably 10.

19          THE COURT:  Do you remember the nature of the case?

20          PROSPECTIVE JUROR NO. 14:  It was a criminal case.

21  It was very brief.  It was -- the case completed within one

22  day.

23          THE COURT:  You said that Wells Fargo is one of your

24  customers?

25          PROSPECTIVE JUROR NO. 14:  Yes.

Voir Dire

1            THE COURT:  Can you tell me what it is you do for
2     Wells Fargo?
3            PROSPECTIVE JUROR NO. 14:  Repair work.  They have a
4     project now where they're replacing a lot of their phone
5     systems, so showing up and replacing phone equipment or
6     repairing things, so --
7            THE COURT:  Is there anything about that relationship
8     that causes you difficulty being neutral in this case?
9            PROSPECTIVE JUROR NO. 14:  I don't believe so.
10           THE COURT:  Thank you.
11           PROSPECTIVE JUROR NO. 15:  Abiel Stewart.  I live in
12    Oregon City with my brother and dad.  I'm a data entry clerk.
13    I don't belong to any clubs.  I read.  And I was a juror over
14    10 years ago.
15           THE COURT:  Do you remember the nature of the case?
16           PROSPECTIVE JUROR NO. 15:  It was criminal.
17           THE COURT:  Anything about that experience that
18    causes you difficulty being neutral in this case?
19           PROSPECTIVE JUROR NO. 15:  The judge just basically
20    dismissed us after three days and decided for us.
21           THE COURT:  Anything about that that --
22           PROSPECTIVE JUROR NO. 15:  I just thought it was a
23    waste of three days and a lot of arguing.
24           THE COURT:  That happens sometimes.
25           Again, back to my original question:  The overall

Voir Dire

experience, anything about that experience that left a bad

taste in your mouth that causes you difficulty being neutral

in this case?

PROSPECTIVE JUROR NO. 15:  No.

PROSPECTIVE JUROR NO. 16:  My name is Jake Murphy.

I live in Milwaukie with my fiancee and my children.  I am a

sales representative and she is a bookkeeper.  I have some

college education and she has her GED.

I don't belong to any organizations or clubs.

Activities would be golf and chasing the kids around.

I was a party about four years ago to a DUI.

THE COURT:  Again, anything about the justice system

that causes or what happened to you that causes you concern in

being neutral in this case?

PROSPECTIVE JUROR NO. 16:  No, sir.

PROSPECTIVE JUROR NO 17:  My name is Alice Burson.

I live in Carlton, Oregon.  I live with my husband.  He's

retired from metal polishing.  I've retired twice from

accounting.  I currently work a couple days painting pet

portraits in Yamhill.

I don't belong to any clubs.  We do go to church on

Sundays.  Besides painting, I spin wool, do all sorts of

needlecraft.  And I have appeared in court twice as a juror,

twice as a witness.

THE COURT:  So let's talk about that.  How long ago

Voir Dire

1    were you a juror?

2            PROSPECTIVE JUROR NO 17:  It's probably been 15 years

3    ago the last time.

4            THE COURT:  And do you remember the nature of the

5    cases?

6            PROSPECTIVE JUROR NO. 17:  Yeah.  One was civil and

7    one was criminal.

8            THE COURT:  Did you have any strong feelings or

9    responses to the experience?

10            PROSPECTIVE JUROR NO. 17:  No.  It was really

11    fascinating.

12            THE COURT:  And there was something else?

13            PROSPECTIVE JUROR NO. 17:  Witnesses.

14            THE COURT:  You were a witness in the case.  How long

15    ago was that?

16            PROSPECTIVE JUROR NO. 17:  One was months ago, and

17    the other was six years ago.  And both of them were family

18    cases.  I was Sunday school teacher to the children.

19            THE COURT:  Anything about your experiences with the

20    court system that causes you difficulty being neutral in this

21    case?

22            PROSPECTIVE JUROR NO. 17:  Not at all.

23            THE COURT:  You said that you retired from

24    accounting?

25            PROSPECTIVE JUROR NO. 17:  Twice.

Voir Dire

1          THE COURT:  Twice.  Was Wells Fargo ever one of
2     your --
3          PROSPECTIVE JUROR NO. 17:  No.  I retired from
4     Bonneville Power and then again from an organization, a
5     private organization, that dealt with the disabilities of
6     adults.
7          THE COURT:  Okay.  Thank you.
8          PROSPECTIVE JUROR NO. 18:  My name is Denise
9     Paquette.  I live in Astoria, alone, and I'm retired.  I have
10    a bachelor's degree.  No organizations or clubs.  And I like
11    to read and cook and paint.  And I've been a juror once in the
12    past.
13         THE COURT:  How long ago was that?
14         PROSPECTIVE JUROR NO. 18:  About four years.
15         THE COURT:  Do you remember the nature of the case?
16         PROSPECTIVE JUROR NO. 18:  It was criminal.
17         THE COURT:  Anything about that experience that would
18    cause you difficulty being neutral in this case?
19         PROSPECTIVE JUROR NO. 18:  Not at all.
20         THE COURT:  Thank you.
21         PROSPECTIVE JUROR NO. 19:  My name is Dae-Jin Joseph.
22    I live in Hillsboro.  I live with my wife and two kids.  She
23    is a textile designer, and I work in manufacturing.  She has a
24    BFA.  I have a BA.
25         I don't belong to any organizations or clubs.  I

Voir Dire

1    enjoy fishing and camping for hobbies.  I proceed -- or I was

2    in a court proceedings as a juror in California about 11 years

3    ago, and it was a criminal case.

4              THE COURT:  Anything about that experience that

5    causes you difficulty being neutral?

6              PROSPECTIVE JUROR NO. 19:  No.

7              THE COURT:  Thank you.

8              PROSPECTIVE JUROR NO. 20:  My name is Sarah Gannon.

9    I live out in Beaverton.  I live with my mother.  I am a

10   kitchen worker at a nursing home, and I have some college.

11             I don't belong to any clubs.  My hobbies are running

12   and wasting time on the Internet, and I've never been in court

13   before.

14             THE COURT:  Thank you.

15             PROSPECTIVE JUROR NO. 21:  My name is Andrew Sharp.

16   I live in Southwest Portland with my wife and two sons.  My

17   wife works for a financial software company.  One of her

18   clients was Wells Fargo, no longer.  I am a high school

19   teacher.  We both have master's degrees.

20             We belong to our local church.  I enjoy skiing and

21   playing soccer.  And I received an MIP 14 years ago.

22             THE COURT:  Did your wife ever express any strong

23   feelings about her relationship with Wells Fargo?  And, by the

24   way, that's a yes or no question.

25             PROSPECTIVE JUROR NO. 21:  Will you repeat that

Voir Dire

1  again?

2          THE COURT:  Yes.  Did your wife ever express strong

3  feelings regarding her relationship with Wells Fargo?

4          PROSPECTIVE JUROR NO. 21:  No.

5          THE COURT:  Thank you.

6          PROSPECTIVE JUROR NO. 22:  My name is Bradley

7  Johnson.  I live in the Washington County part of Portland.  I

8  live with my mother and father.  I work in physical therapy

9  for OHSU Tuality, out in Forest Grove.  I have a bachelor's

10  degree.

11          Organizations, I belong to the 107IST.  Hobbies and

12  activities is soccer.  And then I've been a party in a court

13  proceeding before.

14          THE COURT:  How long ago were you a party?

15          PROSPECTIVE JUROR NO. 22:  About 14 years ago.

16          THE COURT:  Do you remember if that was civil or

17  criminal case?

18          PROSPECTIVE JUROR NO. 22:  Criminal.

19          THE COURT:  Anything about that experience that

20  causes you difficulty being neutral?

21          PROSPECTIVE JUROR NO. 22:  No.

22          THE COURT:  I'm sorry.  Did you have any other court

23  experiences as well?

24          PROSPECTIVE JUROR NO. 22:  No.

25          THE COURT:  Thank you.

Voir Dire

 1            PROSPECTIVE JUROR NO. 23:  Good morning.  My name is

 2    Matt Corbin.  I live in west Beaverton.  My wife is currently

 3    living out of state.  We are both professional drivers.  She

 4    has a degree.  I have a high school diploma.

 5            We attend our local church.  Currently don't have

 6    time for hobbies, unfortunately.  And I have been in court

 7    proceedings as a juror and a witness.

 8            THE COURT:  How long ago were you a juror?

 9            PROSPECTIVE JUROR NO. 23:  Approximately 20 to 30

10    years ago.

11            THE COURT:  How long ago were you a witness?

12            PROSPECTIVE JUROR NO. 23:  Two years ago.

13            THE COURT:  What kind of a case was it?

14            PROSPECTIVE JUROR NO. 23:  The witness one?  It was a

15    prowler in our neighborhood.

16            THE COURT:  Was there anything about your experiences

17    with the justice system that would cause you difficulty being

18    neutral in this case?

19            PROSPECTIVE JUROR NO. 23:  No.

20            THE COURT:  Thank you.

21            PROSPECTIVE JUROR NO. 24:  Good morning.  My name is

22    Arcus Pierce.  I live over in Southeast Portland.  I live with

23    my wife and two kids.  I work for the USDA as a statistician;

24    and my wife works over at the hospital, ER department, for

25    admitting.

```
 1              I don't belong to any organizations or clubs.  I've
 2   got a college degree in ag business management.  My wife has a
 3   high school diploma.  Activities:  hunting, fishing, camping.
 4              I was a juror once about 20 years ago in the state of
 5   Texas.
 6              THE COURT:  Anything about that that causes you
 7   problems being neutral in this case?
 8              PROSPECTIVE JUROR NO. 24:  No, sir.
 9              THE COURT:  Thank you.
10              PROSPECTIVE JUROR NO. 25:   Hi.  My name is Kevin
11   Bull.  I live in North Portland with my girlfriend.  I just
12   moved in about a month ago.  I have my own business.  It's a
13   start-up.  I help real estate developers connect with
14   investors.  My girlfriend, she's in marketing at a mortgage
15   company.
16              I don't belong to any organizations or clubs.
17   Hobbies:  hiking, snowboarding, camping.  And I have not
18   appeared in any court.
19              THE COURT:  Thank you.
20              PROSPECTIVE JUROR NO. 26:  I am Miriam Feldman, and I
21   live with my husband in Lake Oswego.  We are both retired.
22   We're both college educated.
23              Don't belong to any organizations or clubs.  My
24   hobbies are gardening, traveling, and volunteer work.  And I
25   was an alternate juror in a civil case about 13, 14 years ago.
```

 1          THE COURT:  Anything about that experience that makes

 2    it difficult for you to be neutral in this case?

 3          PROSPECTIVE JUROR NO. 26:  No.

 4          THE COURT:  Thank you.

 5          Then turning to some of the more formalized

 6    questioning process, now that we've gotten to know a little

 7    bit about each of you, I want to know whether any of you know

 8    the people that have introduced themselves to you, any of the

 9    lawyers or the parties in this case.

10          If you know the people sitting at the tables or think

11    you might be familiar with them, please raise a hand.

12          The lawyers are going to introduce and tell us who

13    their potential witnesses are.  Please listen to the names

14    carefully.  I'm going to ask the same question after they've

15    done that.

16          MR. SOLA:  Thank you, Your Honor.

17          Mr. Sponer's witnesses in this trial will be himself,

18    Matthew Sponer; his wife, Ana Rodighiero; his mother, Mary

19    Frances Barron; Evan Hendricks; Thomas Tarter; and also these

20    people that are affiliated with Wells Fargo:  Ashley Grier,

21    Montressa Ebron, Brian Funsch, Colin Hollomon, William

22    Brady -- I'm sorry.  I have my back to you -- Bets Berg; and

23    then a representative of Equifax named Celestina Gobin.

24          THE COURT:  Thank you.

25          For the defense?

Voir Dire

1          MR. PETERSON:  Thank you.

2          We're going to be calling Megan Braxton as a witness.

3    We're going to be calling an individual named John Cooper,

4    William Brady, Dean Binder, and Brian Kelley.

5          THE COURT:  So you've heard the potential witness

6    list.  If any of you think you might know those individuals or

7    be familiar with them in some way, please raise a hand.

8          Hang on just a second.  We're going to put a

9    microphone in your hand, so our court reporter can hear what

10   you want to tell us.  And if you wouldn't mind starting by

11   saying your name.

12         PROSPECTIVE JUROR NO. 3:  Dianne Horner.  And a

13   friend of mine has a brother named Brian Kelley.  I don't know

14   if it's the same one.

15         THE COURT:  Let's assume for just the sake of

16   conversation that it is the same one, although that seems like

17   a very common name.  Is there anything about your relationship

18   with that Brian Kelley that would make it difficult for you to

19   be neutral in this case?

20         PROSPECTIVE JUROR NO. 3:  No.

21         THE COURT:  Would you be able to listen to and judge

22   his testimony as you would anybody you didn't happen to know?

23         PROSPECTIVE JUROR NO. 3:  Yes.

24         THE COURT:  Thank you.

25         Anybody else?

Voir Dire

1          Next question.  This case involves Mr. Sponer suing

2     Wells Fargo.  The plaintiff alleges that the defendant

3     negligently and willfully violated the Fair Credit Reporting

4     Act after the defendant reported to a national credit

5     reporting agency that a car loan account that was opened by a

6     thief using plaintiff's identity belonged to plaintiff.

7          Have any of you heard or read about this case?  If

8     so, please raise a hand.

9          This case will take approximately four days to try.

10    I believe the jury will have the case in their hands this

11    Friday.  It is possible that you will not finish deliberating

12    on Friday.  It may be that you won't complete your

13    deliberations until Tuesday.  Because Monday is a holiday, we

14    won't be working on Monday, so the case would be carried over

15    to complete your deliberations on Tuesday if you're not

16    finished by Friday.  It's possible you will finish by Friday,

17    but I don't know the answer to that.

18         I'm fairly confident that the case will be done, all

19    of the lawyers' work will be done, and it will be in the hands

20    of the jury on Friday.  And once that happens, I lose control.

21    It is up to the jury to decide how long they're going to

22    deliberate.

23         I need to know whether the fact that they may be

24    carried over until the following Tuesday creates an

25    impossibility -- I will use the word -- for any of the

1    potential jurors.

2           But before you raise your hand on that question,

3    please realize that your definition of "impossibility" and my

4    definition of "impossibility" will differ.  And with that

5    caveat, is there anybody that cannot sit between now and the

6    possibility that it will end on next Tuesday, although it may

7    end on Friday?  If that creates a special problem for you,

8    please raise a hand.

9           Again, say your name first.

10          PROSPECTIVE JUROR NO. 1:  It's Gary Weaverli.

11          I have a six-day vacation starting tomorrow morning.

12   And if I miss it, I'll be very cranky.

13          THE COURT:  Are you going out of town?

14          PROSPECTIVE JUROR NO. 1:  Yes, yes, out of town.

15   It's our summer vacation we've been planning for about three

16   months.  My wife would also be very cranky.

17          THE COURT:  Oh, I don't want that.

18          All right.  Thank you.  I'll get back to you in just

19   a minute.

20          Anybody else?

21          PROSPECTIVE JUROR NO. 25:  Hi.  I'm Kevin Bull.  I

22   have an important business meeting tomorrow in Bend,

23   introducing two business partners.

24          I say important.  I'm kind of a startup business for

25   myself, and it means a lot for the future of my company.

Voir Dire

```
1            THE COURT:  Thank you.

2            Anybody else?

3            PROSPECTIVE JUROR NO. 24:  Arcus Pierce.

4            More just a clarification, as far as next Friday

5    evening, I'm flying out to put my dad in a nursing facility in

6    Texas.  If it's not going to be going that long, it's not a

7    problem.

8            THE COURT:  It will go until Friday.  I leave it up

9    to the jurors to decide how late in the evening to deliberate.

10   So if you have to fly out Friday evening, for example, and

11   you're back by Tuesday morning, because the deliberations

12   would continue on Tuesday morning, that's okay.  That works

13   for me.

14           PROSPECTIVE JUROR NO. 24:  Oh, I'm sorry.  I wasn't

15   clear.  I fly out on September 6th, the following Friday.

16           THE COURT:  Oh, the following Friday.  No worries.

17   This will not last that long.

18           PROSPECTIVE JUROR NO. 23:  Matt Corbin.  My employer

19   has asked that I convey how inconvenient it is that I'm away

20   from work for this situation, because basically I'm their only

21   delivery driver.

22           THE COURT:  Thank you, Mr. Corbin.

23           PROSPECTIVE JUROR NO. 22:  Brad Johnson.  I recently

24   started a new position in my company.  And due to staffing of

25   my clinic, I'm missing 70 percent of the training.  I'm
```

Voir Dire

1  currently only attending 30 percent.

2          That position starts on September 9th, so my training

3  is mixed in with staffing my clinic between now and then.  So

4  if I was attending the trial, I would be able to attend

5  exactly zero of my training to go live on September 9th.

6          THE COURT:  Thank you.  Anybody else?

7          PROSPECTIVE JUROR NO. 21:  Andrew Sharp.  I'm a high

8  school teacher.  Today was our first day of school.  I'll be

9  missing the first week of school with my students.  I'm also

10  the boys soccer coach.  Our first game is the 5th.  So I'd

11  also be missing the first week of training with my boys.

12          THE COURT:  Thank you, Mr. Sharp.

13          PROSPECTIVE JUROR NO. 18:  Denise Paquette.  Mine is

14  a financial hardship.  I live in Astoria, and so I have to

15  stay in a hotel during this period, and I'm on a fixed income

16  and can't afford to pay for it.

17          THE COURT:  For a hotel?

18          PROSPECTIVE JUROR NO. 18:  Uh-huh.

19          THE COURT:  Oh, we'll pay for that.

20          PROSPECTIVE JUROR NO. 18:  If that can be arranged.

21  I had to pay last night, and it's my rent money that I had to

22  use.

23          THE COURT:  Yeah, I'm sorry.  If you are chosen for

24  this jury --

25          PROSPECTIVE JUROR NO. 18:  I'm happy to serve

Voir Dire

1   otherwise.

2           THE COURT:  -- I'll make sure that it gets paid for.

3           PROSPECTIVE JUROR NO. 18:  Okay.  Thank you.

4           THE COURT:  You're welcome.

5           PROSPECTIVE JUROR NO. 4:  I just have a question.

6   You said it could carry over until Tuesday?  How late would

7   that last or is it up to like --

8           THE COURT:  Judges -- if you didn't know this, I'll

9   give you a secret -- ultimate control freaks, right, because

10  we have total control, we think, over this kind of section of

11  the world until the jury gets the case; and then it is

12  completely up to the jury how they want to do their

13  deliberations, how late they want to stay.  It's all up to the

14  jury on that point, and we stay out of that.  That's your

15  business.

16          PROSPECTIVE JUROR NO. 4:  Okay.

17          THE COURT:  Okay.  Any other questions?

18          So Juror No. 1, Mr. Weaverli, I am excusing you,

19  because I don't want you to be cranky and I want you to go on

20  your vacation.  You are excused.  Thank you so much for your

21  service.

22          PROSPECTIVE JUROR NO. 1:  Thank you very much.  My

23  wife will be delighted.

24          THE COURT:  Sure.

25          And, Mr. Bull, thank you for your service.  You are

Voir Dire

1   excused.

2           PROSPECTIVE JUROR NO. 25:   Thank you, sir.

3           THE COURT:  Mr. Johnson, you are excused.  Thank you

4   for your service.

5           Mr. Sharp, you are excused.  Thank you for your

6   service.  Good luck with your teaching.

7           PROSPECTIVE JUROR NO. 21:  Thank you.

8           THE COURT:  And I'm hanging on to everybody else.

9           For those of you that remain, have any of you, anyone

10  in your family or any of your close friends worked for a bank

11  or credit union?  If so, please raise a hand.

12          And I'm going to ask you to just kind of explain a

13  little bit what your experience was, if you wouldn't mind.

14          PROSPECTIVE JUROR NO. 2:  My mother worked for Wells

15  Fargo in accounts receivable for 20 years.

16          THE COURT:  All right.  Is there anything about that

17  that causes you -- I mean, Wells Fargo is one of the parties.

18  You've supposed to be neutral in this case.  Can you do your

19  job?

20          PROSPECTIVE JUROR NO. 2:  Yeah.

21          PROSPECTIVE JUROR NO. 3:  My father was an appraiser

22  for banks and credit unions in Spokane.

23          THE COURT:  Okay.

24          PROSPECTIVE JUROR NO. 5:  My mother worked at various

25  credit unions for 30 years.

Voir Dire

1          THE COURT REPORTER:  And would you please state your

2   name.

3          PROSPECTIVE JUROR NO. 5:  Colleen Spidal.

4          PROSPECTIVE JUROR NO, 7:  My name is Robin Collier.

5          In my job in sales in Moore Furniture, I sell Wells

6   Fargo products or I have sold Wells Fargo products, as their

7   financing.

8          THE COURT:  Anything about that connection that

9   causes you difficulty being neutral in this case?

10          PROSPECTIVE JUROR NO. 7:  I had to, several times,

11   listen to complaints about Wells Fargo.  And our company

12   discontinued their relationship with Wells Fargo.

13          THE COURT:  Okay.

14          PROSPECTIVE JUROR NO. 7:  In general, I don't think I

15   have a great opinion.

16          THE COURT:  So what's going to happen is you're going

17   to hear evidence and testimony from witnesses that are either

18   here or testifying through their depositions.  At the end of

19   the case, I'm going to give you instructions.

20          At the end you're going to have to decide the case

21   based on the evidence here in court, not based on your

22   experience outside of court.  Do you understand that?

23          PROSPECTIVE JUROR NO. 7:  Yes.

24          THE COURT:  Can you do that fair and impartially?

25          PROSPECTIVE JUROR NO. 7:  Yes.

Voir Dire

1           PROSPECTIVE JUROR NO. 8:  My name is Angie Huss.  And

2   30 years ago I worked for U.S. Bank in Texas, not related to

3   U.S. Bank that we have here, in the finance department.  I was

4   basically a clerk.  I didn't do any decision-making.

5           THE COURT:  Thank you.

6           PROSPECTIVE JUROR NO. 9:  My name is Corey Rudolph.

7   And I work with lenders regularly for work as a broker.  And

8   also my mother-in-law works for Columbia -- Columbia Bank.

9           THE COURT:  Thank you.

10          There is somebody right there, Jennifer, to your

11  right.

12          PROSPECTIVE JUROR NO. 11:  I'm Joseph Wiggins.  My

13  mother worked for what's now Bank of America.  And my brother

14  worked for several different banks, including Wells Fargo.

15          THE COURT:  Anything about the connection with Wells

16  Fargo that causes you difficulty being neutral in this case?

17          PROSPECTIVE JUROR NO. 11:  Not at all.

18          THE COURT:  Thank you.

19          PROSPECTIVE JUROR NO. 17:  This is a long time.

20  About 45 years ago I worked for U.S. Bank in the check paying

21  department.

22          THE COURT REPORTER:  Please state your name.

23          PROSPECTIVE JUROR NO. 17:  Alice Burson.

24          THE COURT:  Anybody else raise their hand?

25          For those of you that raised your hand and I didn't

1  ask this question, I will ask it now.  Is there anything about

2  the association that you had with someone -- with someone that

3  worked with a bank that would cause you difficulty being

4  neutral in this case?  If so, please raise a hand again.

5          Have any of you or anyone in your family, close

6  friends or associates, worked for a collection agency or a

7  collections department?  If so, please raise a hand.

8          PROSPECTIVE JUROR NO. 9:  My name is Corey Rudolph.

9  And one of my best friends worked in collections at Wells

10 Fargo.

11         THE COURT:  Same question.  Anything about that

12 relationship that causes you difficulty being neutral in this

13 case?

14         PROSPECTIVE JUROR NO. 9:  No.

15         THE COURT:  Thank you.

16         PROSPECTIVE JUROR NO. 2:  Lynn Osterkamp.  I work for

17 collections at Franz Bakery.

18         THE COURT:  And, again, anything about that that

19 causes you difficulty being neutral in this case?

20         PROSPECTIVE JUROR NO. 2:  (Shakes head.)

21         THE COURT:  Answer out loud, please.

22         PROSPECTIVE JUROR NO. 2:  No.

23         THE COURT:  All right.  Next question:  Have any of

24 you or members of your family or close associates ever worked

25 in an accounts receivable department?  If so, please raise a

Voir Dire

1   hand.

2          PROSPECTIVE JUROR NO. 2:  Lynn Osterkamp.  I work at

3   accounts receivables at Franz Bakery as a collector.

4          THE COURT:  Thank you.

5          And then I think there is a hand at the very end.

6          PROSPECTIVE JUROR NO. 8:  Angie Huss.  I'm currently

7   an accounts receivable specialist for Providence Health and

8   Services.

9          THE COURT:  Thank you.

10          Anybody else?

11          PROSPECTIVE JUROR NO. 16:  Jake Murphy.  I'm like

12   co-partner in accounts receivable at our office.  Whenever our

13   actual accountant is out of the office, I take care of all of

14   it.

15          THE COURT:  Thank you.

16          Again, for any of you that raised your hand, is there

17   anything about the experience with accounts receivable that

18   causes you difficulty being neutral in this case?  If so,

19   please raise a hand again.

20          Have any of you or any members of your family or

21   close associates been employed by a credit reporting agency?

22   If so, please raise a hand.

23          Have any of you or members of your family or close

24   associates ever had a job or a company that furnished credit

25   information to credit reporting agencies?

Voir Dire

1         Have any of you or members of your family ever had a

2    job that involved the handling of customer complaints?  If so,

3    please raise a hand.

4         PROSPECTIVE JUROR NO. 7:  I already talked about it,

5    though.

6         THE COURT:  Go ahead.  Say your name, please.

7         PROSPECTIVE JUROR NO. 7:  Robin Collier.  And the

8    customers that I would -- I did handle complaints about some

9    of those products that I sold from Wells Fargo.

10        THE COURT:  Yes.  Thank you.  Okay.

11        More hands?

12        PROSPECTIVE JUROR NO. 12:  Daniel Griffin.  I used to

13   do, like, customer support for, like, Apple and, like,

14   Microsoft over the phone.  And a lot of times we'd get people

15   calling in, complaining about how, like, their kids would buy

16   random video games on their account.

17        THE COURT:  Okay.  Thank you.

18        Anybody else?

19        PROSPECTIVE JUROR NO. 11:  Joseph Wiggins.  I've had

20   to deal with some complaints in the business that I own, but

21   also working for Tri-Met, driving a bus, I get complaints

22   every day.

23        THE COURT:  Yes, you do.

24        All right.  For those of you that raised your hand to

25   the initial question, the same question applies:  Anything

Voir Dire

1    about those experiences that causes you difficulty being

2    neutral?  If so, please raise a hand.

3              Have any of you held a position that required you to

4    extend or deny credit, that was your job to make that

5    decision?  If so, please raise a hand.

6              Is there anyone here that believes that there is too

7    much business regulation?  If so, please raise a hand.

8              Do any of you have a negative reaction or negative

9    sense about somebody simply because that individual has

10   brought a lawsuit?  If so, please raise a hand.

11             Is there anybody here who starts off with an

12   assumption that in this world there are simply too many

13   lawsuits?  If that describes you, please raise a hand.

14             And can you describe your feelings about that,

15   please?

16             PROSPECTIVE JUROR NO. 15:  Abiel Stewart.  I think

17   way too many are suit happy.  They just need to take

18   responsibility for what they do in their life and not expect

19   other people to pay for it.

20             THE COURT:  Thank you for sharing your feelings about

21   that.

22             Is there anything about that feeling that would cause

23   you difficulty in being neutral in this case?

24             PROSPECTIVE JUROR NO. 15:  I don't think so.

25             THE COURT:  Again, your job is to decide this case on

1   its merits, so notwithstanding that you don't like the fact

2   that there are too many lawsuits, you're going to have to

3   decide this case based on the evidence you hear and the law

4   that I give you.  Are you okay with that?

5           PROSPECTIVE JUROR NO. 15:  Yeah.

6           THE COURT:  Thank you.

7           Is there anybody who thinks there are too many

8   lawsuits against banks?  If that describes you, please raise a

9   hand.

10          Do any of you have a perspective that says that it's

11  not possible or appropriate to award damages for non-monetary

12  harm, like emotional distress?  Is there anybody that says, we

13  shouldn't be giving awards to people that suffer emotional

14  distress, that's just not a good thing?  If that describes

15  you, please raise a hand.

16          Is there anybody who feels that if the plaintiff has

17  proven their case, that they would not consider awarding

18  damages?  If that describes you, please raise a hand.

19          That's kind of a packed question.

20          Is there anybody here who feels that even if the

21  plaintiff has proven its case and proven its entitlement to

22  punitive damages, that you have something against punitive

23  damages that you're unwilling to consider even awarding them?

24  If that describes you, please raise a hand.

25          Is there anybody here that has held or holds a Wells

Voir Dire

1   Fargo account?  If so, please raise a hand.

2           There's lots of you.  I'm not going to go through you

3   individually.

4           Is there anything about the fact that you hold a

5   Wells Fargo account that would cause you difficulty in being

6   neutral in this case?  If so, raise your hand again.

7           Have any of you been observing or following news

8   reports regarding Wells Fargo?  And, if so, please raise a

9   hand.

10          A few of you have.

11          For those of you that raised your hand, is there

12  anything about your familiarity with those news stories that

13  would cause you difficulty being neutral in this case?  If so,

14  please raise your hand again.

15          Is there anyone here that has trouble with the notion

16  that, again, this case cannot be decided on news stories that

17  you read outside?  It has to be decided on what happens here

18  in court.  Does anybody have any difficulty with that notion?

19  If so, please raise a hand.

20          Is there anybody here who starts off with a negative

21  impression of Wells Fargo, that there's just something about

22  that bank that you don't like?  If that describes you, please

23  raise a hand.

24          Okay.  Use the microphone and say your name, please.

25          PROSPECTIVE JUROR NO. 9:  Corey Rudolph.

Voir Dire

1          THE COURT:  And before you get into the details of

2     why you might have that sense, is that a feeling that, from

3     your perspective, is a strongly held feeling?

4          PROSPECTIVE JUROR NO. 9:  In the middle.

5          THE COURT:  Okay.  Somewhere in the middle.

6          And is there anything about that in-the-middle

7     feeling that would cause you difficulty, again, being neutral

8     in this case, deciding this case on its merits?

9          PROSPECTIVE JUROR NO. 9:  No.

10          THE COURT:  Anybody else?

11          PROSPECTIVE JUROR NO. 19:  My name is Dae-Jin Joseph.

12     Coming into this case, I already have some negative

13     perspective of Wells Fargo Bank.  I do not --

14          THE COURT:  Hang on just a second.  Let me ask you

15     some questions about that.  I want to focus the question on

16     whether or not that feeling is a strongly held impression,

17     middle-of-the-road impression, or it's just something --

18          PROSPECTIVE JUROR NO. 19:  I'd have to say it would

19     be a strong feeling.

20          THE COURT:  And is the feeling strong enough that you

21     feel you cannot be neutral in this case?

22          PROSPECTIVE JUROR NO. 19:  No.

23          THE COURT:  I'm not quite sure what that means.

24          PROSPECTIVE JUROR NO. 19:  I would be able to be

25     neutral in this case.

Voir Dire

1           THE COURT:  Okay.  Thank you.

2           Anybody else?

3           Thank you for sharing that, both of you.  Thank you.

4           Do any of you have, start off with, again, a negative

5    sense about banks, lenders, or credit bureaus?  If that

6    describes you, please raise a hand.

7           Have any of you been engaged in a dispute with a

8    bank, lender, or credit bureau about the information on your

9    report?  If that describes you, please raise a hand.

10          Have any of you ever been the victim of identity

11   theft?  If that describes you, please raise a hand.

12          Again, for those of you that raised your hand, is

13   there anything about that experience that would cause you

14   difficulty being neutral in this case?  If so, raise your hand

15   again.

16          Have any of you been a plaintiff in a lawsuit,

17   unrelated to a family matter, that you were a plaintiff, that

18   you brought a lawsuit against somebody?  If that describes

19   you, please raise a hand.

20          So let me then turn to the plaintiff in this case and

21   see whether or not there are any follow-up questions.

22          Turning to the plaintiff?

23          MR. SOLA:  Thank you, Your Honor.

24          First, for Ms. Osterkamp, because you answered a

25   couple of questions yes, being the nature of your job,

```
 1    accounts receivable and collections, and as you heard from the
 2    Court, Mr. Sponer is the victim of identity theft, but there
 3    was an account that was attributed to him falsely.  And so I'm
 4    just wondering, as a collector, my assumption is you probably
 5    get some people that say they don't owe money that maybe they
 6    do owe.  Have you experienced that?
 7              PROSPECTIVE JUROR NO. 2:  Well, I collect for
 8    businesses.
 9              I collect for businesses, so it's a lot of
10    researching and providing backup and then resubmitting
11    invoices, but it's for other companies.  It's not individuals.
12              MR. SOLA:  All right.  I guess, as the Court has
13    phrased some of these questions, because you're on the
14    collections side, do you sort of favor the bank over the
15    individual or the collector over the business?
16              PROSPECTIVE JUROR NO. 2:  I don't think so.  I mean,
17    I think it's -- I guess it can go both ways, you know, where
18    you're working and you're trying to collect, you have
19    that -- you want to, you know, make sure you're collecting for
20    your company.  You might get frustrated, but I don't usually
21    take it personally.
22              MR. SOLA:  Have you ever run into situations where
23    your company is trying to collect something that is absolutely
24    not owed or there is a mistake, you're trying to collect a
25    certain amount --
```

Voir Dire

1          PROSPECTIVE JUROR NO. 2:  Yes.

2          MR. SOLA:  -- and it turns out you're not entitled to

3      that much amount?

4          PROSPECTIVE JUROR NO. 2:  That's correct, yes.

5          MR. SOLA:  And what do you do in those situations

6      where you realize that the person you're claiming owes the

7      money doesn't owe that much money?

8          PROSPECTIVE JUROR NO. 2:  Then in my case, we might

9      provide backup to get the money, and they provide the proof

10     that they don't owe it.  And so at that point we no longer go

11     after that, you know.

12         MR. SOLA:  Do you think it's important to try to

13     resolve --

14         PROSPECTIVE JUROR NO. 2:  Absolutely, yes.

15         MR. SOLA:  -- a situation like that very quickly?

16         PROSPECTIVE JUROR NO. 2:  Yes, yes.

17         MR. SOLA:  Let me ask Daniel Griffin.  You were party

18     to a case, and so I just wanted to know a little bit more

19     about that.  I don't mean to intrude.  I know sometimes

20     litigants come out of the system with a bad view.  And so what

21     was your case about?

22         PROSPECTIVE JUROR NO. 12:  It was criminal.  I was

23     with someone that was shoplifting, and I got tagged with it as

24     well, because he was a friend and I couldn't actually fight it

25     or anything because I was moving at, like, the end of the

1   month, and I had to deal with it that way.

2            MR. SOLA:  Did you feel the system was unfair?

3            PROSPECTIVE JUROR NO. 12:  I felt the situation

4   needed just a perspective.  I was like in a catch-22 sort of.

5   I don't really have much of an option here.  And, you know, it

6   kind of -- to be completely honest, it kind of screwed up my

7   life for 10 years or so, until I could get it taken care of

8   and get it expunged.

9            MR. SOLA:  So it sounds like you felt you weren't

10  really responsible, you were just caught in that situation,

11  but you were accused of something you didn't really do.  Is

12  that fair to say?

13           PROSPECTIVE JUROR NO. 12:  Right.

14           MR. SOLA:  And because of that false accusation, to

15  use your word, it screwed up your life for quite a while; is

16  that right?

17           PROSPECTIVE JUROR NO. 12:  Yes.

18           MR. SOLA:  But in this case, could you still be fair

19  to a person on a plaintiff's side?  Since you were a defendant

20  and you felt that it didn't work out for you, could you be

21  fair to the plaintiff?

22           PROSPECTIVE JUROR NO. 12:  Yeah.

23           MR. SOLA:  Thank you.

24           Ms. Stewart, I think you raised your hand about too

25  many lawsuits, and I don't think that's an uncommon view.  But

Voir Dire

1   you didn't raise your hand when asked whether there were too

2   many lawsuits about banks.  And so could you explain to us

3   why -- you know, why you view too many lawsuits, but why you

4   don't think there's too many against banks?

5        PROSPECTIVE JUROR NO. 15:  I honestly don't know of

6   many towards banks.

7        MR. SOLA:  What types of lawsuits do you think should

8   not be filed?

9        PROSPECTIVE JUROR NO. 15:  When there's no damage to

10  anything, when it's just more like a personal -- people having

11  issues with other people or they think they're owed a right to

12  something when they're not.

13       MR. SOLA:  So personal, like there might be a

14  personal dispute between neighbors or between people and one

15  of them just says, "I'm going to sue you," just to make it

16  really hard for that other person?

17       PROSPECTIVE JUROR NO. 15:  Yeah, yeah.

18       MR. SOLA:  You don't think -- do you think there are

19  too many lawsuits by people or consumers against businesses?

20       PROSPECTIVE JUROR NO. 15:  Yes.

21       MR. SOLA:  So you think there are too many lawsuits

22  by consumers against businesses?

23       PROSPECTIVE JUROR NO. 15:  I think they see an easy

24  mark and they go for it.

25       MR. SOLA:  Okay.  Because this is a case about a

Voir Dire

1   consumer suing a business here, and it sounds like you have a

2   strong feeling that those kind of lawsuits are often not

3   valid.

4           PROSPECTIVE JUROR NO. 15:  Yeah.

5           MR. SOLA:  So would you agree, it would be hard for

6   you to fairly judge a lawsuit of a consumer against a

7   business?

8           PROSPECTIVE JUROR NO. 15:  Possibly.

9           MR. SOLA:  Possibly you could not be fair; is that

10  true?

11          PROSPECTIVE JUROR NO. 15:  Yeah.

12          MR. SOLA:  We just want to know.  We all want a fair

13  jury here.  I don't mean to pry.

14          All right.  Ms. Burson, I just wanted to know about

15  the case -- I'm sorry.

16          You were on a civil jury.  So could you tell us what

17  that case involved?

18          PROSPECTIVE JUROR NO. 17:  Yeah.  It was

19  paratroopers, whatever, para -- landing in a farmer's crop of

20  trees and breaking off the tops.  That's what it was.

21          MR. SOLA:  And what was your view of that claim?

22          PROSPECTIVE JUROR NO. 17:  It was pretty confusing,

23  because I don't know anything about crops of trees or, you

24  know, whatever they do from airplanes in the sky, but it did

25  break off the trees and it did harm the farmer's crop.  But,

Voir Dire

1   again, when you fall out of a plane, can you really keep

2   yourself from the farmer's crops?  It was right next to the

3   place where they land.  So it turned out okay.

4          MR. SOLA:  Did that leave you with any impression as

5   to whether plaintiffs are making claims that they should not

6   make?

7          PROSPECTIVE JUROR NO. 17:  No, no, no.

8          MR. SOLA:  Just another question, not to pry, but

9   part of our claims do involve Mr. Sponer's relationship with

10  his family and especially one of his children.

11         And who here has children?

12         Most of you.

13         Could you leave your hands up?

14         Okay.  So we have Jurors 2, 3, 7, 8, 9, 10, 14, 16,

15  17, 18, 19, and I don't know these two numbers back there.

16         All right.  Thank you.

17         That's all the questions I have.

18         THE COURT:  Follow-up questions for the defense?

19         MR. PETERSON:  Thank you, Your Honor.

20         Several of you raised your hands about being victims

21  of identity theft.  So if you could raise your hands again,

22  and leave them raised for a moment.

23         Thank you.  You can put them down.

24         Ms. Huss, what were the circumstances of when you

25  were a victim of identity theft?

Voir Dire

1          PROSPECTIVE JUROR NO. 8:  I have no idea how they got

2    my identity.  They actually opened up some credit cards in my

3    name.  I didn't have any trouble whatsoever with the credit

4    card companies.  My difficulty was with the State of Oregon

5    and my ID number.

6          MR. PETERSON:  And what was that difficulty with the

7    State of Oregon?

8          PROSPECTIVE JUROR NO. 8:  I wanted a new ID number,

9    and they did not want to give me one.  They say they never do

10   that.  So I had to get police reports.  I had to get credit

11   reports.  Everybody was very helpful except for DMV.

12         MR. PETERSON:  Did you feel that that request to have

13   you provide more information was unreasonable by the State?

14         PROSPECTIVE JUROR NO. 8:  Not unreasonable.  I just

15   felt like at least the worker that I was directly in contact

16   with was very resistant to helping me.

17         MR. PETERSON:  Thank you.

18         And, Mr. Wiggins, same question.  Can you describe

19   the circumstances of when your identity was stolen?

20         PROSPECTIVE JUROR NO. 11:  Someone filed a tax

21   return, a joint tax return, me and a Jamie Young, where they

22   would get a $7,000 tax refund.  I never heard of Jamie Young.

23   I wasn't getting a tax return that year.

24         And the IRS handled it very nicely.  They gave me a

25   PIN number.  And every time I file my taxes now, I have never

1    had anything happen since.

2              MR. PETERSON:  When was that?

3              PROSPECTIVE JUROR NO. 11:  I think it was

4    probably -- probably about five years ago.

5              MR. PETERSON:  Thank you.

6              Mr. Griffin, you also mentioned you had your identity

7    stolen?  Oh, you did not?

8              PROSPECTIVE JUROR NO. 12:  No.

9              MR. PETERSON:  I apologize.

10             Ms. Flye Fairman, thank you.  You mentioned you had

11   your identity stolen?

12             PROSPECTIVE JUROR NO. 13:  Yeah.  Probably like 2003,

13   2004, I was contacted because someone was using my -- a number

14   associated with my debit card at a gas station in a state

15   several states over.  And it was wrapped up quickly, and no

16   real issues.

17             MR. PETERSON:  And did you contact the company?

18             PROSPECTIVE JUROR NO. 13:  The bank, yeah.

19             MR. PETERSON:  Did they request any additional

20   information from you?

21             PROSPECTIVE JUROR NO. 13:  Not that I recall.  It was

22   pretty apparent that I couldn't have made a purchase across

23   the country, so --

24             MR. PETERSON:  Thank you.

25             And, Mr. Murphy, you mentioned you had your identity

Voir Dire

1    stolen?

2              PROSPECTIVE JUROR NO. 16:  Yes.  It was like hers,

3    where it got marked and somebdy bought something on my card in

4    Boston.  And the credit card -- or U.S. Bank e-mailed me and

5    said, "Hey, this is going on."  So I went in, they sat me

6    down, talked for a little bit, cancelled everything and got it

7    up and regoing.

8              MR. PETERSON:  Do you have any idea how the thief got

9    your information?

10             PROSPECTIVE JUROR NO. 16:  No idea.  I've never been

11   that far away from home.

12             MR. PETERSON:  And there were a couple over here, I

13   believe Mr. Joseph.

14              Mr. Joseph, what were the circumstances of having

15   your identity stolen?

16             PROSPECTIVE JUROR NO. 19:  A bank I was banking with,

17   somebody opened up some credit cards under my name.

18             MR. PETERSON:  What bank was that?

19             PROSPECTIVE JUROR NO. 19:  U.S. Bank.

20             MR. PETERSON:  And was that matter resolved?

21             PROSPECTIVE JUROR NO. 19:  It was resolved.  The

22   matter happened in the early 2000s, but it took a while for it

23   to be resolved?

24             MR. PETERSON:  A year?

25             PROSPECTIVE JUROR NO. 19:  Probably about a half a

 1   year, six months, six to eight months.

 2           MR. PETERSON:  And did they require you to provide

 3   information?

 4           PROSPECTIVE JUROR NO. 19:  I did, yes.  I had to give

 5   proof of identity, Social Security.  Then we had to go through

 6   the major credit agencies.

 7           MR. PETERSON:  And under the circumstances, did you

 8   have a belief that it was unreasonable for the bank to request

 9   that type of information from you?

10           PROSPECTIVE JUROR NO. 19:  No.

11           MR. PETERSON:  Thank you.

12           And I believe Mr. Pierce; is that correct?

13           Same question, Mr. Pierce.  What were the

14   circumstances of the identity theft?

15           PROSPECTIVE JUROR NO. 24:  Well, I guess I've been

16   fortunate that it's happened more than once, so --

17           MR. PETERSON:  One of the lucky ones.

18           PROSPECTIVE JUROR NO. 24:  Pretty much.  For the most

19   part, like everybody here, got a notification that a card was

20   used in a strange location, once in California, once was in

21   Florida.  We did trace it back to an ATM machine, though, that

22   had a skimmer on it.

23           MR. PETERSON:  And were those resolved?

24           PROSPECTIVE JUROR NO. 24:  Yeah.  Typically they were

25   resolved within a day or two.

Voir Dire

1           MR. PETERSON:  Thanks.

2           Just a couple more questions.

3           Mr. Rudolph, you mentioned that you have a

4    preconceived negative opinion of Wells Fargo.  What is the

5    basis for that?

6           PROSPECTIVE JUROR NO. 9:  I would say it's probably

7    most big banks, and it has to do more with from my business

8    side and lending.  There's so much fine print that catches

9    people in situations that they're unaware of, that I find that

10   most the time fine print is a spot to do that.

11          MR. PETERSON:  And so you're -- have you had better

12   or your customers had better experiences with smaller banks?

13          PROSPECTIVE JUROR NO. 9:  I would say the customer

14   service has typically been better at the smaller banks.

15          MR. PETERSON:  And you were mentioning the small

16   print issue and that sort of thing.  Have you had that issue

17   specific to Wells Fargo with customers or clients of yours?

18          PROSPECTIVE JUROR NO. 9:  Yes.

19          MR. PETERSON:  Thank you.

20          And Mr. Joseph.  Mr. Joseph, you also mentioned that

21   you have -- I think you said a strong negative opinion of

22   Wells Fargo.  What is the basis for that negative opinion?

23          PROSPECTIVE JUROR NO. 19:  In the early 2000s I

24   roomed with somebody who was a client of Wells Fargo Bank, and

25   I had to watch him go through also identity theft and issues

Voir Dire

1  with his bank account that made my life difficult, because we

2  couldn't get the rent paid.

3              And then, also, in 2008, 2009, following the

4  mortgage-backed security rollovers and the downturn in the

5  economy, I really educated myself in how big banks do

6  business.  So that's where my negative opinion comes with big

7  banks.

8              MR. PETERSON:  Thank you.

9              I don't have any further questions.

10             THE COURT:  Thank you.

11             Does the plaintiff have any challenges for cause?

12             MR. SOLA:  Yes, we do, Your Honor.  Do we do those

13  privately or --

14             THE COURT:  No.  You can do it right now.

15             MR. SOLA:  Yes.  We challenge Ms. Stewart for cause.

16             THE COURT:  Thank you.

17             Ms. Stewart, you are excused.  Thank you for your

18  service.

19             Do you have any further challenges for cause?

20             MR. SOLA:  No, Your Honor.

21             THE COURT:  You're passing the rest of the panel?

22             MR. SOLA:  As far as cause, Your Honor, yes.

23             THE COURT:  Correct.  I'm sorry.  For cause, yes.

24             Challenges for cause?

25             MR. PETERSON:  Yes, Your Honor, Juror No. 7.

Voir Dire

```
 1              THE COURT:  I'm sorry.  I don't know the basis of
 2     that challenge.
 3              MR. PETERSON:  Clear bias against Wells Fargo based
 4     on his business dealings with them.
 5              THE COURT:  Your challenge is denied.
 6              Anybody else?
 7              MR. PETERSON:  No, Your Honor.
 8              THE COURT:  Thank you.
 9              You may exercise your peremptory challenges.
10     Jennifer will be at your table in just a moment.
11              MR. SOLA:  Your Honor, just as a matter of procedure,
12     can we pass and still have our peremptory?
13              THE COURT:  No.
14              Members of the jury, this is a portion of the process
15     where we all look at each other and wonder what's going on.
16     And this is a good opportunity -- while we tell you to turn
17     your cell phones off, I'm going to let you turn them on, with
18     a couple caveats.  If you want to respond to e-mails and text
19     messages and those kinds of things, feel free to do so.  The
20     caveat is I don't want you doing anything that communicates
21     anything about this case to anybody.
22              So don't text, "Yeah, this is what I'm doing.  I'm in
23     the court right now."  Don't do anything like that.  But if
24     you need to respond to an e-mail or send a message to somebody
25     saying you might be tied up for a while, you can do that right
```

Voir Dire

1   now.  No phone calls, but if you need to message somebody, go

2   ahead and do so while we're just kind of staring at each

3   other.

4           Also, please don't get on the Internet and try to

5   research anything about this case or anybody connected with

6   this case.

7           (There is a brief pause in the proceedings.)

8           MR. SOLA:  All right.  We're ready.

9           (The challenges are taken.)

10          THE COURT:  Would you make sure your microphones are

11  off at your tables, please.

12          (The challenges are taken.)

13          THE COURT:  So, members of the jury, we're just about

14  there, for those of you who turned your cell phones on, to

15  turn them off at this time.

16          Thank you.

17          Members of the jury, I'm going to read some names.

18  If I read your name, please stand up.

19          Lynn Osterkamp, Dianne Horner, Angela Huss, Corey

20  Rudolph, Kristin Walrod, Joseph Wiggins, Rayna Flye Fairman,

21  Brian Kragt.  There should be eight of you.

22          Please raise a hand and be sworn.

23          (The jury is then sworn.)

24          THE COURT:  Thank you.  You are our jury.  Please be

25  seated.

Voir Dire

1           As for everybody who did not stand up and take an

2    oath, you are excused.  Thank you very much for your service.

3    It is appreciated.  You are free to go.  Thank you very much.

4           (The remaining prospective jurors leave the

5    courtroom.)

6           THE COURT:  You can stay in the front row.  The idea

7    is to get you as close as possible to the witnesses who will

8    be testifying.  That's why we move everybody down.

9           Members of the jury, we're going to take our morning

10   recess at this time.  We'll be in recess for about 15 minutes.

11          After the recess, I will bring you back and I'll give

12   you your preliminary instructions that kind of tells you how

13   to listen to the evidence and decide the case and those kinds

14   of things.  More instructions will come at the end of the

15   trial, but really just kind of giving a foreshadowing of

16   what's going to happen and your job and duties as a juror.

17          While you're in the jury room and taking your break,

18   please do not discuss the case amongst yourselves, communicate

19   anything about the case with anybody outside, do any research

20   into any law connected with the case, do any research about

21   any of the individuals involved in this case.  Don't use your

22   devices in order to gather any information from an outside

23   source about anything to do with this case.

24          By the time I'm done with the instructions, you will

25   hear that admonishment I don't know how many times.  You will

Preliminary Instructions

1    be very sick of it by the time we're over, but it's really

2    important that you not seek out information from any outside

3    sources.

4            With that, I'm going to let you take a break.  We'll

5    be in recess for 15 minutes.  We'll come back and then we'll

6    get started.

7            Thank you.  Take 15.

8            (A recess is then taken.)

9            (The Court, counsel, and the parties reconvene.)

10           THE COURT:  Go get them, Jen.

11           (The jury enters the courtroom.)

12           THE COURT:  Go ahead and be seated.

13           Be seated.

14           Ladies and gentlemen of the jury, you are now the

15   jury in this case, and I want to take a few minutes to tell

16   you something about your duties as jurors and to give you some

17   instructions.  At the end of the trial I will give you more

18   detailed instructions.  Those instructions will control your

19   deliberations.

20           It will be your duty to decide what the facts are

21   from the evidence.  You, and you alone, are the judges of the

22   facts.  You will hear the evidence, decide the facts, and then

23   apply those facts to the law I will give you; and that is how

24   you will reach your verdict.  In doing so, you must follow the

25   law, whether you agree with it or not.

Preliminary Instructions

1        The evidence will consist of the testimony of
2   witnesses, documents and other things received into evidence
3   as exhibits, and any facts on which the lawyers agree or which
4   I instruct you to accept.

5        You should not take anything I say or do during the
6   trial as indicating what I think of the evidence or what your
7   verdict should be.

8        The following things are not evidence, and you must
9   not consider them as evidence in deciding the facts of this
10  case:  one, statements and arguments by the attorneys; two,
11  questions and objections of the attorneys; three, testimony
12  that I told you to disregard; and, four, anything you may have
13  seen or heard when the court is not in session.

14       Do not communicate any private or special knowledge
15  about any of the facts of this particular case to your fellow
16  jurors.  Decide the case only on the evidence received here in
17  court.

18       Some evidence may be admitted for a limited purpose.
19  When I instruct you that some evidence is admitted for a
20  limited purpose, you must consider it only for that limited
21  purpose.

22       Evidence may be direct or circumstantial.  Direct
23  evidence is evidence about -- or, excuse me, by a witness
24  about what that witness personally saw or heard or did.
25  Circumstantial evidence is indirect evidence; that is, it is

Preliminary Instructions

1   proof of one or more facts from which one can find another

2   fact.

3        You are to consider both direct and circumstantial

4   evidence.  The law permits you to give equal weight to both,

5   but it is for you to decide how much weight to give to any

6   evidence.

7        There are rules of evidence which control what can be

8   received into evidence.  When a lawyer asks a question or

9   offers an exhibit into evidence and the lawyer on the other

10  side thinks it is not permitted by the rules of evidence, that

11  lawyer may object.  If I overrule an objection, the question

12  may be answered or the exhibit received.  If I sustain an

13  objection, the question cannot be answered and the exhibit

14  cannot be received.  Whenever I sustain an objection to a

15  question, ignore the question and do not guess what the answer

16  might have been.

17       Sometimes I may order that evidence be stricken from

18  the record and that you disregard or ignore the evidence.

19  That means that when you're deciding the case, you must not

20  consider the evidence which I told you to disregard.

21       In deciding the facts of this case, you may decide

22  which testimony to believe and which testimony not to believe.

23  You may believe everything a witness says or part of it or

24  some of it or none of it.

25       In considering the testimony of any witness you may

1    take into account the opportunity and ability of the witness

2    to see or hear or know the things testified to, the witness's

3    memory, the witness's manner while testifying, the witness's

4    interest in the outcome of the case and any bias or prejudice,

5    whether other evidence contradicted the witness's testimony,

6    the reasonableness of the witness's testimony in light of all

7    the evidence, and any other factors that bear on

8    believability.

9         The weight of the evidence as to a fact does not

10   necessarily depend on the number of witnesses who testify.

11   You are to weigh the evidence, not simply count the witnesses.

12        You will be allowed to propose written questions to

13   witnesses after the lawyers have completed their questioning

14   of each witness.  You may propose questions in order to

15   clarify the testimony, but you are not to express any opinion

16   about the testimony or argue with the witness.  If you propose

17   any questions, remember that your role is that of a neutral

18   factfinder, not an advocate.

19        Before I excuse each witness, I will offer you the

20   opportunity to write out a question on a form provided by the

21   Court, which is actually a piece of paper on your notebook

22   which I provided to you.  Do not sign the question.  I will

23   review the question with the lawyers to determine if it is

24   legally proper.

25        There are some proposed questions that I will not

Preliminary Instructions

permit and will not ask in the wording submitted by the juror.
This might happen either due to the rules of evidence or other
legal reasons or because the question is expected to be
answered later in the case.  If I do not ask a proposed
question or if I rephrase it, do not speculate as to the
reasons.

Do not give undue weight to questions you or other
jurors propose.  You should evaluate the answers to those
questions in the same manner you evaluate all of the other
evidence.

By giving you the opportunity to propose questions,
I'm not requesting or suggesting that you should do so.  It
will often be the case that the lawyer has not asked a
question because it is legally objectionable or because a
later witness may be addressing that subject.

From time to time during the trial it may become
necessary for me to talk with the attorneys out of the hearing
of the jury, either by having a conference at the bench when
the jury is present in the courtroom or by calling a recess.
Please understand that while you're waiting, we are working.
The purpose of these conferences is not to keep relevant
information from you, but to decide how certain evidence is to
be treated under the rules of evidence and to avoid confusion
and error.

We will, of course, do what we can to keep the number

Preliminary Instructions

and length of these conferences to a minimum.  And I may not

always grant an attorney's request for a conference.  Do not

consider my granting or denying a request for a conference as

any indication of my opinion of the case or what your verdict

should be.

I will now say a few words about your conduct as

jurors.

First, keep an open mind throughout the trial.  Do

not decide what the verdict should be until you and your

fellow jurors have completed your deliberations at the end of

the case.

Second, because you must decide the case only on the

evidence received in the case and on my instructions as to the

law that applies, you must not be exposed to any other

information about the case or to the issues it involves during

the course of your jury duty.

Thus, until the end of the case or until I tell you

otherwise, do not communicate with anyone in any way and do

not let anyone else communicate with you in any way about the

merits of the case or anything to do with it.

This includes discussing the case in person, in

writing, by phone or electronic means, via e-mail, text

message, or any Internet chat room, blog, website, or other

feature.

This applies to communicating with your fellow jurors

1   until I give you the case for deliberation, and it applies

2   with -- or applies to communicating with everyone else,

3   including your family members, your employer, the media or

4   press, and the people involved in the trial, although you may

5   notify your family and your employer that you've been seated

6   as a juror in the case.  But if you are asked or approached in

7   any way about your jury service or anything to do about this

8   case, you must respond that you've been ordered not to discuss

9   the matter and then you should report that contact to the

10  Court.

11          Because you will receive all the evidence and legal

12  instruction you properly may consider to return a verdict, do

13  not read, watch, or listen to any news or media accounts or

14  commentary about the case or anything to do with it.  Do not

15  do any research, such as consulting dictionaries or searching

16  the Internet or using other reference materials.  Do not make

17  any investigation or in any other way try to learn about the

18  case on your own.

19          The law requires these instructions to ensure the

20  parties have a fair trial based on the same evidence that each

21  party has had an opportunity to address.  A juror who violates

22  these restrictions jeopardizes the fairness of the

23  proceedings.  If any juror is exposed to any outside

24  information, please notify the Court immediately.

25          At the end of the trial you'll have to make your

Preliminary Instructions

1   decision based on what you recall of the evidence.  Although
2   you will have all the admitted exhibits with you in the jury
3   room, you will not have a written transcript to refer to, so I
4   urge you to pay close attention to testimony as it's given.
5           If you wish, you may take notes to help you remember
6   what witnesses said.  If you do take notes, please keep them
7   to yourself until you and your fellow jurors go to the jury
8   room to decide the case.  Do not let your note-taking distract
9   you from hearing other answers or watching the witnesses.
10  It's important that you watch the witnesses as their
11  appearance may assist you in deciding whether you believe
12  their testimony and how much weight you give their testimony.
13  When you leave in the evening, your notes should be left in
14  the jury room.
15          If you do not take notes, you should rely on your own
16  memory of what was said and not be overly influenced by the
17  notes of other jurors.
18          If at any time you cannot clearly hear a witness or
19  lawyer or cannot see any documents that are presented on the
20  evidence presentation system, please speak up and alert the
21  Court to the problem.
22          If you need to communicate with me, simply give a
23  signed note to Jennifer, the bailiff, and she will give it to
24  me.
25          The trial is about to begin.  Each side may make an

Opening Statement - Plaintiff

1  opening statement.  An opening statement is not evidence.  It
2  is simply an outline to help you understand what the party
3  expects the evidence will show.  By the way, a party is not
4  required to make an opening statement.

5          The plaintiff will then present his evidence, and
6  counsel for the defendant may cross-examine.  Following the
7  plaintiff's case, the defendant may present evidence and the
8  plaintiff's counsel may cross-examine.

9          After all the evidence has been presented, the
10 lawyers will make closing arguments to summarize and interpret
11 the evidence for you.  I will then instruct you on the law.
12 And after that, you will retire to deliberate on your verdict.

13         Opening statement for the plaintiff.

14         MR. SOLA:  Your Honor, my assistant, Adam Wolf, is it
15 okay if he comes up and sits at counsel table?

16         THE COURT:  Of course, of course.

17         He's your IT person?

18         MR. SOLA:  Yes, and a recent law school graduate.

19         THE COURT:  Congratulations and welcome, and make
20 yourself at home.

21         MR. SOLA:  Thank you, Your Honor.

22         Thank you, ladies and gentlemen.  I am Robert Sola,
23 and my co-counsel is Jeff Sand.  We are proud to represent
24 Matthew Sponer, who has brought this case against Wells Fargo
25 Bank.  We are here today because Wells Fargo broke the law,

1   not once, not twice, but many times.

2          That law is the Fair Credit Reporting Act.  That's a

3   mouthful, so I'll often use the term "FCRA."  That's the law

4   that governs this case, and that FCRA governs the credit

5   reporting industry.  Wells Fargo is a gigantic bank, plays a

6   large role in that industry.  It provides credit information

7   to the credit reporting agencies; and, therefore, Wells Fargo,

8   in FCRA or credit industry jargon, is called a furnisher,

9   because they furnish information.

10          We are here to hold Wells Fargo accountable for its

11   illegal conduct.

12          Now, Matthew Sponer is a victim of identity theft.

13   He is also a 20-year customer of Wells Fargo.  In July 2016

14   Wells Fargo gave a car loan to an identity thief who was using

15   Mr. Sponer's identity.  Wells Fargo then reported that

16   fraudulent account to the credit reporting agencies, and it

17   appeared on Mr. Sponer's credit reports.  The loan was for

18   more than $29,000.

19          A few months after the theft, the police caught the

20   thief, and the police tell Wells Fargo that the car loan was

21   the result of the theft of Mr. Sponer's identity and they say

22   they've caught the thief.  They tell Wells Fargo that the car

23   is being held as evidence for the criminal case against the

24   thief.

25          Mr. Sponer sends disputes about that account to the

Opening Statement - Plaintiff

1   credit reporting agencies and to Wells Fargo.  More than 10
2   times he disputes, but Wells Fargo does not remove the
3   account, not for more than 14 months, and only after
4   Mr. Sponer sues Wells Fargo.  Wells Fargo kept insisting the
5   debt was his.
6           Our claim is that Wells Fargo violated the Fair
7   Credit Reporting Act, a law designed to ensure the accuracy of
8   information on credit reports, which are an essential
9   component in our credit-based economy.
10          You will hear our witnesses discuss the various uses
11  of credit reports and how the FCRA has been amended to make
12  sure that furnishers report accurate information and correct
13  inaccurate information that is disputed.  Mr. Sponer is
14  entitled to the protections of the FCRA.
15          Now, my first chart I want to show you is called
16  "Building a Credit Report."
17          Just put the whole thing up.
18          What you start with is the furnisher.  Okay.  They
19  have the data.  The furnishers are banks, loan companies,
20  collection agencies, anybody who has credit information.  They
21  then report that information to the credit reporting agency,
22  sometimes referred to as a consumer reporting agency, but
23  often I will use the phrase "CRA."
24          Then the CRAs take that information from the
25  furnisher and they turn it into an individual credit report

Opening Statement - Plaintiff

1    for an individual consumer.

2              Now, my next chart is the dispute mechanism.  And the

3    mechanism begins with a consumer who sees their credit report

4    or otherwise learns they have an error on their report.  They

5    then dispute the information to the credit reporting agency.

6    All consumers have a right to make a dispute, and all

7    consumers have a right to have that dispute investigated under

8    the terms of the FCRA, which I will discuss.

9              They make the dispute to a credit reporting agency,

10   and then a credit reporting agency goes back to the furnisher,

11   the source of the information, and asks the furnisher, "Is the

12   information accurate?"  Whatever the dispute is, the CRA will

13   tell the furnisher if it's identity theft, if it's that the

14   account was not late -- whatever the consumer has said, the

15   credit reporting agency will tell the furnisher and ask them

16   to investigate and respond as to whether the information is

17   accurate.

18             So the furnisher then is supposed to do an

19   investigation and respond.  They respond to the CRA.  And then

20   based on the furnisher's response, the CRA sends results of

21   the dispute back to the consumer.  And you can have two

22   outcomes.  You can have a consumer who gets the error

23   corrected, then they're happy; and you can have a consumer

24   whose error is not corrected, and they would be unhappy.

25             Now, Mr. Sponer's claim is for violation of one

1   section of the FCRA.  We call it s-2(b).  I'll try not to use

2   too much legal jargon here, but I may slip into saying

3   "s-2(b)" or "furnisher duties."  And Section s-2(b) sets forth

4   the requirements that Wells Fargo must comply with after

5   receiving a notice of a dispute from the CRA.

6           And so if you could put up -- this is the text of

7   s-2(b).  It may be hard to read.  But the key point is after

8   the furnisher gets that notice from the CRA of the dispute,

9   they must conduct an investigation.  That's the first line

10  below the big paragraph.  They must conduct an investigation.

11          And I believe the Court will inform you at the end of

12  the case in his jury instructions that that investigation must

13  be reasonable, not superficial, not cursory, but a true, real

14  investigation to determine if the information is accurate,

15  because that's the purpose of this section of the Fair Credit

16  Reporting Act, to assure accuracy and to get inaccurate

17  information that's disputed corrected.  And that's why the law

18  requires Wells Fargo to do an investigation and make sure the

19  information that it reports is accurate.  But the evidence

20  will show that Wells Fargo's procedures do not ensure that

21  inaccurate information gets investigated and corrected.

22          Matthew Sponer lives here in Portland with his wife,

23  Ana, and his two daughters, Zelda and Farah.

24          He is a computer programmer.  He has always been

25  interested in programming.  Several years ago he joined a

Opening Statement - Plaintiff

1  company that was just starting up.  He got a 5 percent share

2  of that company and worked very hard to make it successful.

3          Later that hard work paid off.  The company was sold,

4  and he got a small share of the sale price.  He felt he had

5  been working too much, and he wanted to take some time off.

6  And because he had two children, he also thought, "This is a

7  great time to spend with my children, before they grow up and

8  leave home."

9          He and his wife always had a dream of sailing, taking

10 a long sailing trip, and they realized this was the chance for

11 them to pursue that dream.  And so they bought a sailboat and

12 they started on a once-in-a-lifetime trip with their children.

13         But Mr. Sponer had an extra reason to take that

14 family vacation.  One of his daughters, Farah, has a profound

15 intellectual disability.  She cannot talk.  She can't walk

16 without assistance.  So she connects with people through being

17 close with them and touching them and sharing moments with

18 them.  She's a very social and loving person, and she loves

19 her father.  But the only way for her to share her love and

20 socialize with her father is to spend time, a lot of time,

21 with him and to be next to him.  The family sailing trip was a

22 perfect opportunity and a wonderful way to get her social

23 needs met and for their special relationship to grow.

24         Now, before Mr. Sponer leaves for his vacation, he

25 does the right thing.  He contacts Wells Fargo, because they

Opening Statement - Plaintiff

1   have his credit card, and he tells them that he's going to be

2   out of the country for at least a year.  But nine months

3   later, Wells Fargo allows a thief to get a car loan with Wells

4   Fargo using Mr. Sponer's name.

5          In October 2016 the police catch the thief.

6   Mr. Sponer learns about the identity theft through his

7   brother, who has been contacted by the Chula Vista Police

8   Department, who are looking for Mr. Sponer because they know

9   he's a victim.  They've caught the thief.

10         And then Mr. Sponer, since he's on his vacation, he

11  contacts an attorney that he happened to know to assist him in

12  dealing with the identity theft.

13         On October 19, 2016, this attorney, James Charne,

14  faxes a letter to Wells Fargo.  He tells Wells Fargo that

15  Mr. Sponer is the victim of identity theft in regard to this

16  car loan with Wells Fargo.  He says that the police, Police

17  Detective Tugashov, told him that the perpetrator has been

18  caught and that he is now in custody and that the automobile

19  has been recovered and Wells Fargo will get that automobile

20  back.

21         The letter states that Detective Tugashov can confirm

22  all this information.  And it also makes a request.  He

23  requests that if any negative information about

24  Mr. Sponer -- well, he first requests that any negative

25  information about this loan not be reported to the credit

Opening Statement - Plaintiff

1  reporting agencies, and if it has already been reported, that

2  it be corrected.

3          A week later, on October 26th, Wells Fargo speaks

4  with Police Detective Tugashov about the theft of Mr. Sponer's

5  identity for the car loan.  And Wells Fargo makes a record of

6  that call in their own account notes that they maintain.

7          And here's an excerpt from that record that Wells

8  Fargo made of that call with the police.  And it says, "Spoke

9  with Detective Tugashov.  He stated that they are

10  investigating this as fraud.  Unit was purchased by Jason

11  Yochum 10-4-79, after he stole customer's identity.  Unit will

12  be held until 11-1 for investigation and will be released to

13  us then with no fees.  Customer attorney is Jim Charne."

14          Look at those words from the police, from Detective

15  Tugashov:  "The unit was purchased by Jason Yochum after he

16  stole customer's identity."  The police confirm to Wells Fargo

17  that the loan was the result of identity theft.  As of

18  October 26th, 2016, Wells Fargo knew this loan did not belong

19  to Mr. Sponer, yet it tells the credit reporting agencies over

20  and over that it is Mr. Sponer's loan.  Each time, Mr. Sponer

21  disputes it.

22          But Wells Fargo learns even more about the theft.  A

23  few days later, on November 3rd, they have another

24  conversation with Detective Tugashov, again recorded in Wells

25  Fargo's notes of the car loan.  And those notes show exactly

Opening Statement - Plaintiff

1   what Wells Fargo was told by the police:  "Suspect pled
2   guilty.  Sentencing is on November 30th.  And between now and
3   then suspect can change their mind.  And, if so, the car would
4   have to be kept as evidence for trial."

5         The suspect has pled guilty to stealing Mr. Sponer's
6   identity.  The car is being held as evidence.  If you are a
7   bank, like Wells Fargo, you really cannot have better proof of
8   identity theft than the police telling you it was identity
9   theft, telling you the suspect pled guilty to the crime, and
10  that the police are holding the car as evidence in the
11  prosecution.

12        Wells Fargo has all this information in its records
13  when Mr. Sponer disputes the account over the next 14 months.
14  But, as you will see, Wells Fargo ignores the information and
15  keeps insisting that that is his.

16        Now, Mr. Sponer is a 20-year customer of Wells Fargo.
17  He has a Wells Fargo credit card and other accounts.  Wells
18  Fargo knows who Mr. Sponer is and that he is claiming the
19  account is fraud, but they won't fix his credit report and
20  agree the debt is not his.

21        At the same time that Mr. Charne has notified Wells
22  Fargo about the identity theft, he's notifying the credit
23  reporting agencies.  Those credit reporting agencies then
24  notify Wells Fargo of Mr. Sponer's dispute through that
25  process we just looked at.

1        This is where Wells Fargo's duties to investigate the
2   dispute under the FCRA arise.  The dispute notice from the
3   CRAs to Wells Fargo is called an an Automated Consumer Dispute
4   Verification form.  That's a mouthful.  I'm going to refer to
5   that as an ACDV.  It's sent electronically.
6        When you hear those words, "ACDV," that's the notice
7   from the CRA to Wells Fargo that the consumer is disputing.
8   That's the notice that requires that Wells Fargo do a
9   reasonable investigation of the dispute in order to comply
10  with the FCRA.
11       Wells Fargo gets an ACDV in 2016 and then they must
12  investigate.  They do.  They respond to the ACDV.  They don't
13  investigate, but they do respond to the ACDV.  But instead of
14  telling the CRAs to delete the account, they tell the CRAs the
15  information is accurate, even though they know from the police
16  that it's identity theft. So the fraudulent account stays on
17  Mr. Sponer's credit report.
18       We'll look at some of these ACDVs in a few minutes.
19       Our next exhibit is Exhibit 5.  And there are a lot
20  of documents in this case, and that's essentially the nature
21  of a case like this.  When there are many disputes and many
22  credit reports, those are the evidence we will be showing you.
23  So most of the evidence in our case are documents.
24       The TransUnion credit report from November 9th, 2016,
25  TransUnion is another credit reporting agency.  And since

Opening Statement - Plaintiff

1  Wells Fargo has told the CRAs the information is accurate,

2  it's on this TransUnion report.  You can see it right there.

3  It's called Wells Fargo Dealer Services.  Just so you

4  understand, those words typically are with it, because that's

5  the auto loan division of Wells Fargo Bank, Wells Fargo Dealer

6  Services.  Balance of $29,419.  Now it's reporting 60 days

7  late because, of course, the thief has not paid.

8        Our next exhibit is Exhibit 60.  This is a notice --

9  Could you go to the second page?  Yes.

10        This is a notice that TransUnion sends to Wells

11  Fargo, dated November 13, 2016, stating they have permanently

12  blocked this item from TransUnion's reports because it is

13  fraudulent.  And the notice advises Wells Fargo to, quote,

14  take all the necessary steps to ensure that this account is

15  not reported by you or by a third party -- i.e., collection

16  agency -- in your behalf.

17        Wells Fargo does not investigate the account after

18  getting this notice, and it does not ensure that it does not

19  report the account.  Just the opposite:  It ensures that it

20  keeps reporting the account, and it also keeps telling the

21  CRAs that it belongs to Mr. Sponer, so it will stay on his

22  credit report.

23        Wells Fargo's records show that they keep talking to

24  the police through November and December about the criminal

25  case against the thief, but those records show that Wells

Opening Statement - Plaintiff

1   Fargo only wants to know when they can get the car back from

2   the police and "When is this criminal case going to finish so

3   we can get the car?"  That's all they care about.

4         The records do not show that Wells Fargo has any

5   concern for the fact that it's reporting inaccurate

6   information on Mr. Sponer's credit report.

7         Wells Fargo gets another ACDV of Mr. Sponer -- with

8   Mr. Sponer's disputes in November of 2016 and again tells the

9   CRA that this $29,000 debt is his.

10        Mr. Sponer will testify that he sees the Wells Fargo

11  is still on his report, despite the disputes, and that Wells

12  Fargo is still insisting he owes $29,000.  He worries Wells

13  Fargo will cancel his credit card.  He's now on his trip and

14  in New Zealand, and that's the card he's using for the family

15  expenses.  If they cancel it, he'll basically be without

16  money, or he worries that Wells Fargo will just take the money

17  out of one of his other accounts or that they will sue him.

18        The family is in New Zealand, but they have to change

19  their plans to travel around the country so they can deal with

20  this identity theft.

21        Now, there were other fraudulent accounts.  To be

22  clear, it's not just Wells Fargo.  There were other fraudulent

23  accounts on his file by November of 2016.  So he rents an

24  office, because in New Zealand there's not really good

25  Internet.  So he rents an office in a town so he can get

Opening Statement - Plaintiff

1    Internet, so he can research what to do and how to fix this

2    problem.

3          He's going into that office almost every day.  And

4    it's very hard for him because he's away from Farah, his

5    daughter with the disability.  And you'll hear his mother

6    testify about this time apart and how it caused him and Farah

7    to suffer.

8          In January 2017 Wells Fargo gets the car back because

9    the identity theft case is completed, but they keep reporting

10   the account as if it belongs to Mr. Sponer.  Because Wells

11   Fargo has not deleted the account by January 2017, he writes a

12   dispute letter to Wells Fargo.  That is Exhibit 11.

13         Mr. Sponer sends Wells Fargo this letter, saying he's

14   the victim of identity theft.  And you'll have a chance to

15   review this later.  He encloses the police report that

16   mentions him as the victim of identity theft, because the

17   police had prepared a large report on this crime, because they

18   caught the guy.

19         Mr. Sponer includes a notarized Federal Trade

20   Commission identity theft victim's complaint and affidavit.

21   And in his dispute letter, he provides the name of the thief,

22   Jason Yochum, the San Diego criminal court case number, the

23   Chula Vista Police Department case number, and the Chula Vista

24   Police Department police report number.  All this information

25   that Wells Fargo has now, mimicking information they actually

Opening Statement - Plaintiff

1 already got from Detective Tugashov.

2          But you will hear Mr. Sponer say that he sent a

3 similar letter with the police report and with the fraud

4 affidavit to the other creditors who also were reporting

5 fraudulent accounts.  As a result, those other creditors took

6 the account off his credit report.  But not Wells Fargo.

7          Next is Exhibit 12.  This is Wells Fargo's response

8 to that January dispute letter.  It's dated February 15, 2017,

9 and it states that it has verified that the information being

10 sent to the consumer credit reporting agencies on this account

11 is accurate.  You will see that that is not true.  And we know

12 it can't be true, because it's identity theft.

13          Wells Fargo also says, in the next paragraph, if he

14 has cancelled checks or receipts, to send those in.  This

15 shows that Wells Fargo has not even read his letter.  His

16 letter was a dispute of identity theft, with a police report

17 and a fraud affidavit.  But Wells Fargo acts as if he's made

18 some kind of claim about a billing error.  Mr. Sponer will

19 discuss how disappointed he is to get this response.

20          In February the family decides to come back to the

21 United States for two reasons:  one, to deal more with the

22 identity theft, because it's not getting fixed by Wells Fargo;

23 and so his wife can donate a kidney to her brother.

24          Wells Fargo continues to report the account, but it

25 gets much worse.  It becomes a charge-off, which means it's

Opening Statement - Plaintiff

1  written off, for $29,000.  You will hear testimony from our

2  witnesses that the status of charge-off is very derogatory.

3          Next we have Exhibit 13.  In August 2017 Mr. Sponer

4  sends Wells Fargo another dispute.  He adds even more

5  information so Wells Fargo knows that this is not his account.

6  He indicates how long he's been trying to get them to agree it

7  is not his and remove it from his credit report.  He encloses

8  the February 15 response from Wells Fargo so they can see how

9  they had treated his prior dispute, and he encloses the police

10  report and the FTC affidavit.  Wells Fargo does not even

11  respond to this letter.

12          Next we have Exhibit 15.  Mr. Sponer writes again on

13  November 3rd, 2017.  He again states that he's the victim of

14  identity theft.  He asks Wells Fargo to remove this from his

15  credit files.  He details all the previous correspondence.

16          You will hear him say he really didn't know what to

17  do.  He's a computer programmer.  He's not a financial credit

18  reporting expert.  But he figures, "I'll give them everything

19  that happened, so if anybody gets this letter, they won't have

20  to look at anything else.  They can look at this letter and

21  see what has happened already, all the previous disputes, all

22  the information that Mr. Charne gave."  So he lays it all out

23  and he encloses a passport with his identification, the police

24  report, and the FDC affidavit.

25          Now, at the same time he's disputing with Wells

Opening Statement - Plaintiff

1    Fargo, he thinks, "I'll dispute with Equifax, too.  That will
2    be another approach to get this fixed," because you saw under
3    the system of disputing, if he disputes with Equifax, they'll
4    notify Wells Fargo.

5          But let's go to Exhibit 18.  This is Wells Fargo's
6    response to his November 3rd, 2017 letter.  It's dated
7    November 21, and it says they received his documents but,
8    quote, Before we can proceed with our investigation, we will
9    need to receive a copy of your Social Security card.

10         Mr. Sponer will tell you he was incredulous to get
11   that.  The language "Before we can proceed with the
12   investigation" means that they're not going to even read his
13   letter, they're not even going to investigate -- that's what
14   he hears -- because they don't have a Social Security card.
15   He will say that it made him feel like Wells Fargo was just
16   blowing him off.  He could not see why they needed his Social
17   Security card to investigate if the account was identity
18   theft.  They already had all the information showing it was
19   identity theft.  He did not have his Social Security card.
20   But he was a 20-year customer of Wells Fargo with various
21   accounts.  They knew who he was.

22         You will hear a Wells Fargo employee who sent this
23   letter, you will hear his testimony that it was sent because
24   that is Wells Fargo's policy.  No matter what other
25   information Wells Fargo had showing it was identity theft,

Opening Statement - Plaintiff

1    they demand the Social Security card from a consumer to

2    proceed with an investigation.  The evidence will show this is

3    a needless policy that just erects an unnecessary hurdle for

4    consumers who want to get their credit report corrected.

5            Wells Fargo receives more ACDVs from Equifax in

6    November, stating that Mr. Sponer is disputing it as identity

7    theft; and the evidence will show that Wells Fargo does not

8    conduct a reasonable investigation of those disputes nor does

9    it stop reporting the account.  Wells Fargo responds to the

10   ACDVs by telling Equifax that the account belongs to

11   Mr. Sponer, so it stays on his report.

12           Exhibit 20, this is an example of one of the

13   responses that Mr. Sponer gets from Equifax.  It's dated

14   November 30th.  Now, if you look at the first page, Equifax

15   tells Mr. Sponer their procedure for investigating, and it's

16   the procedure that I showed you on the chart.  They say the

17   procedure is to contact the company reporting the information

18   and ask it to verify its accuracy.  Here that company is Wells

19   Fargo.

20           If we turn to page 3, we see the results.  This has

21   been verified as belonging to him.  If he has questions, go to

22   Wells Fargo, a place that he's already written many times.

23           He's now been disputing for more than one year, and

24   Wells Fargo has known for more than one year that the account

25   was the result of identity theft, but it will not remove it

1    and will not say this $29,000 debt is not his.  He worries

2    about that debt.  It's a constant concern.  $29,000, a lot of

3    money, and he doesn't know if one day Wells Fargo will sue him

4    or try to get that money another way.

5            Next is Exhibit 22.  Mr. Sponer sends a response to

6    Wells Fargo, another dispute, after he got the November 21

7    letter saying they needed his Social Security card to

8    investigate.  And he states he does not have a copy of his

9    Social Security card.  He states they have more than enough

10   information to investigate.  And he points out all this other

11   information he has sent, not just about his identity, but

12   about the crime itself.

13           Next we have Wells Fargo's letter of December 5th.

14   Now Wells Fargo says it has forwarded his request -- there we

15   go.  Thank you.

16           Wells Fargo says it has forwarded his request to the

17   Wells Fargo Dealer Services fraud department.  Mr. Sponer will

18   testify he was really upset when he got this letter.  He has

19   already been disputing with the fraud department for more than

20   one year and nothing is getting fixed.  It's like going in

21   circles.  All they're saying now is "We're going to give it to

22   the fraud department," where it's been for more than a year.

23           He continues disputing with Equifax, hoping that if

24   Equifax tells Wells Fargo about his dispute, that maybe

25   someone at Wells Fargo will tell Equifax to delete it.  But he

Opening Statement - Plaintiff

1    gets more results from his disputes to Equifax on

2    December 6th.  And, again, the results are "Wells Fargo

3    verified this belongs to you."

4            And if we look at Exhibit 26, he gets more results

5    from Equifax.  Oh, I'm sorry.  Exhibit 26 is a letter that

6    Wells Fargo sends to Mr. Sponer, right?  I'm getting mixed up

7    here.

8            Exhibit 25, have we looked at that?

9            All right.  And then Exhibit 26.  Exhibit 26 is a

10   letter that Wells Fargo sends Mr. Sponer, dated December 14,

11   2017.  It states that he may be the victim of identity theft.

12   I mean, it would almost be comical if it wasn't so serious,

13   that they're telling him something he has been telling them

14   for 14 months.  It's like Wells Fargo has not seen or heard

15   any of the information he's provided, Mr. Charne has provided,

16   or the police have provided.  But all that information is in

17   Wells Fargo's records.

18           The evidence will show that Wells Fargo ignores all

19   that information and keeps saying the account belongs to

20   Mr. Sponer.  We're now 14 months since his first dispute.  The

21   CRAs have sent 10 ACDVs notifying Wells Fargo of his dispute,

22   and TransUnion sent that fraud block notice, telling Wells

23   Fargo not to report it.

24           Mr. Sponer sees it's hopeless.  He files this lawsuit

25   against Wells Fargo on December 22nd, 2017.  But even after

Opening Statement - Plaintiff

1    that, if you show Exhibit 29, he gets results from Equifax

2    showing the account has, again, been verified by Wells Fargo

3    as his.

4           But the lawsuit finally does get Wells Fargo's

5    attention.  About five weeks after the lawsuit, the legal

6    department gets involved.  You will see the deposition of

7    Wells Fargo employee William Brady, who states that after the

8    legal department got involved, his manager came to him and

9    told him to validate the dispute as fraud.  Wells Fargo only

10   takes it off his credit report because he sues them.

11          But for the past 15 months, he has worried about this

12   $29,000 debt that Wells Fargo insists that he owed.

13          Now let's talk about Wells Fargo's investigations.

14   As you saw earlier, the FCRA requires that Wells Fargo conduct

15   a reasonable investigation of Mr. Sponer's dispute to

16   determine if the account resulted from identity theft.  But

17   the evidence will show that Wells Fargo did not do a

18   reasonable investigation, not once.

19          Moreover, Wells Fargo's procedures do not even

20   require that a reasonable investigation be conducted and that

21   information that's inaccurate be corrected.

22          You will hear the deposition of Wells Fargo's

23   employees who actually processed those ACDVs that they got

24   from the credit reporting agencies.  One of those employees is

25   Ashley Grier.  And if you look at Exhibit 52, this is one of

Opening Statement - Plaintiff

1    the ACDVs she worked on.

2            Now, I know it looks pretty jumbled, and we will have

3    a witness to explain this ACDV form to you.  But the key thing

4    is his dispute, at the top, is "claims true identity fraud."

5    And Ms. Grier will explain, she did not investigate whether

6    the account resulted from identity fraud.  Instead, what she

7    did was compare the identifying information.  There's name,

8    address, Social Security number, and date of birth.  She'll

9    compare what Equifax provided, which is on the left.  That's

10   the ID of the person disputing, and she compared the

11   information in Wells Fargo's records -- in other words, the

12   information they have on the person who opens the account --

13   and she just checks boxes, whether it's the same or different.

14           And because the first and last name, the Social

15   Security number, and the date of birth matched, she verified

16   that the account was accurate.  Other than that, and modifying

17   some numbers about the account, she didn't do anything to

18   investigate.  She also confirmed that this was consistent with

19   Wells Fargo's policies and procedures.

20           But verifying an account because the information

21   matches is not an investigation.  You will hear our experts

22   discuss that.

23           In fact, in an identity theft situation, the thief

24   uses the consumer's identity.  So it's going to match.  The

25   thief used Mr. Sponer's name, Social Security number, date of

Opening Statement - Plaintiff

1    birth.  That's what identity theft is.  So using this matching
2    process to try to determine if there's identity theft is
3    useless.
4           A reasonable investigation would involve looking at
5    the information in Wells Fargo's own records, information from
6    the police, information from Mr. Sponer.  But Wells Fargo
7    doesn't consider any of that information.
8           Ms. Grier did as she was trained to do.  She followed
9    Wells Fargo's procedures, but those procedures violate the
10   law.
11          Next we have Exhibit 51.  This is an ACDV from
12   November 2016, processed by a Wells Fargo employee named
13   Montressa Ebron, same dispute of identity fraud.  And you will
14   see her deposition.  We'll show you a videotape of her
15   deposition, which is a sworn statement, in which she verified
16   the account -- she will testify she verified the account
17   belonged to Mr. Sponer by matching the identification
18   information, the same procedure that Ms. Grier used.  And
19   Ms. Ebron will state this is the system Wells Fargo uses.  She
20   stated that this verification of identity was all she did to
21   determine if the account should remain on Mr. Sponer's credit
22   report.
23          Finally, she confirmed she followed Wells Fargo's
24   policies and procedures.  So she sends a response to Equifax
25   saying it is Mr. Sponer's account.

Opening Statement - Plaintiff

1    Thank you.

2    It stays on his credit report.  There's no

3  investigation of his dispute whether the account was identity

4  theft.  The evidence will show that following Wells Fargo's

5  procedures and policy does not comply with the FCRA.

6    You will also see the deposition testimony of Bets

7  Berg.  This was a person Wells Fargo gave us as their

8  corporate representative for us to question about the facts of

9  this case.  And she agrees all the ACDVs were processed

10  consistent with Wells Fargo's policies and procedures.

11    This isn't the case of some employee making a mistake

12  or doing something wrong.  We're not making any blame on any

13  of these employees.  They're following the policies and

14  procedures.  The policies and procedures are the problem.  And

15  what's worse, under those policies and procedures, the ACDV

16  employee cannot even investigate a dispute of identity theft.

17    You will hear Ms. Berg state that, that the person

18  who handles the ACDVs does not investigate disputes about

19  fraud or identity theft and cannot conclude that there's

20  identity theft.  In other words, they cannot investigate

21  Mr. Sponer's dispute, although the FCRA requires that they

22  investigate that dispute.

23    The ACDV employees also testified that they handle 10

24  disputes an hour for identity theft disputes.  That means they

25  spend an average of six minutes per dispute.

Opening Statement - Plaintiff

1          You will see a deposition of Brian Funsch.  He's a

2    Wells Fargo employee who processed an ACDV in 2017.  He'll

3    state that the whole investigation just took a few minutes.

4    But that's enough time for the employees to do what Wells

5    Fargo wants them to do and tells them to do:  Look at the

6    ACDV.  Compare the identifying name, address, Social Security

7    number, and date of birth between their records and the ACDV.

8    Check the box as to whether they're the same or different, say

9    the information is verified, and send the ACDV back.  Doing

10   that doesn't take very long.  A real investigation takes time.

11          Under Wells Fargo's procedures, only the fraud

12   department can investigate whether there's identity theft.

13   But you saw Mr. Sponer's letters to the fraud department.

14   They weren't investigating.  And the fraud department is not

15   the department communicating with the CRAs as to whether the

16   account stays on the credit report.

17          And that's Mr. Sponer's claim, that when Wells Fargo

18   got those ACDVs, it did not do an investigation and tell the

19   CRAs to delete.  That's separate from the fraud department,

20   who is not involved in the ACDVs.

21          Now, Wells Fargo, they don't want to discuss the

22   ACDVs and how they handle them, but that's the issue you're

23   going to decide.  So instead, Wells Fargo, they're going to

24   call witnesses from the fraud department.  Again, that

25   department took no actions regarding the ACDVs.  We will show

Opening Statement - Plaintiff

you the deposition testimony of the employees who processed the ACDVs, the real issue in this case.

Now, Wells Fargo might say, "Oh, the agent handling the ACDV would be working with the fraud department." That is not so. Ms. Grier did not work with the fraud department in doing her investigation. She just did her matching and provide some information and responded that it was his account. Brian Funsch, who handled an ACDV in 2017, testified he had no communication with the fraud department about whether this account resulted from identity theft.

Wells Fargo had numerous opportunities to fix the false credit reporting for more than 14 months, but did not do it. It has denied all wrongdoing throughout this case. You'll hear the corporate representative testify that Wells Fargo did not violate the Fair Credit Reporting Act.

But Wells Fargo may now decide to admit some limited liability and say they were negligent. If so, it is only because we are here before you, a jury, and they don't want to look so bad.

But their conduct was much more than negligent. As you will see from the evidence, Wells Fargo's actions were reckless and willful violations of the FCRA. Even if they admit some fault, they will still blame others and not take true responsibility. They may even try to blame Matt Sponer, the victim of their own misconduct, by claiming he did not

1  send them documents they requested, such as a Social Security

2  card.  Of course, they did not need documents from him to know

3  it was identity theft.  They knew that from the police.  And

4  they also had Mr. Sponer's Social Security and other

5  information from Mr. Charne and because he's their customer.

6          Once he disputed and Wells Fargo learned from the

7  police the account was from identity theft, they should have

8  removed it so that his credit report would be accurate.  They

9  did not need anything else.  Wells Fargo received 10 ACDVs.

10  Not once did they do a reasonable investigation that the FCRA

11  requires.  A reasonable investigation would have fixed this

12  problem in the first dispute in 2016.

13          Our witnesses, the first, Matthew Sponer, he will

14  discuss the evidence you've seen and all the letters back and

15  forth, the credit report, and everything he went through with

16  Wells Fargo.  And his damages are extensive.  He had emotional

17  distress and discomfort.  He had damage to his reputation,

18  because this account was on his report.  He did not seek

19  credit because this information was on his report.  He had to

20  spend a lot of time dealing with this Wells Fargo issue.  It

21  disrupted his life, it affected his family's vacation, and it

22  affected his relationship with his family, especially his

23  daughter, Farah.

24          You will hear from Evan Hendricks, a nationally

25  recognized expert on credit reporting, the FCRA, and identity

Opening Statement - Plaintiff

1    theft.  He will explain the credit reporting industry and

2    provide his opinion that the investigations of Mr. Sponer's

3    disputes by Wells Fargo were not reasonable.

4         Another witness is Thomas Tarter.  He's an expert in

5    the field of banking and credit reporting.  He will discuss

6    this fraudulent loan in the context of the banking industry

7    and state his opinion that Wells Fargo's actions did not meet

8    industry standards.

9         You'll also hear testimony from Mr. Sponer's spouse

10   and his mother about how the actions of Wells Fargo affected

11   him and his relationship with his daughter, Farah.

12        And we'll read a deposition from Equifax's

13   representative, Celestina Gobin.  She will testify about all

14   the ACDVs that Wells Fargo responded to with Equifax and kept

15   telling Equifax how the account was accurate, and how, in

16   reliance on Wells Fargo's assurance that the account was

17   accurate, Equifax kept it on his credit report.  She will also

18   discuss two occasions where Equifax provided Mr. Sponer's

19   credit report to companies while the Wells Fargo account was

20   on it.

21        As you hear the evidence, we ask that you keep your

22   focus on Wells Fargo's actions in response to the notices of

23   his disputes on the ACDVs from the CRAs.

24        As you saw, the FCRA requires that Wells Fargo do a

25   reasonable investigation and take other action in response to

Opening Statement - Defendant

1   those ACDVs.  Our claim is that it did not take those required
2   actions in handling the ACDVs.  Wells Fargo may try to shift
3   the focus from the ACDVs to other things that are not relevant
4   to our claim.

5        The account was identity theft.  Wells Fargo knew
6   that in 2016.  There were 10 ACDVs, but Wells Fargo never did
7   an investigation and tell the CRAs to delete this fraudulent
8   account.

9        After the evidence is presented, I will have the
10  opportunity to address you again, and we will ask that you
11  hold Wells Fargo accountable for its corporate misconduct with
12  a verdict in favor of Matthew Sponer.

13        Thank you for your attention.

14        THE COURT:  Do you want to do your opening statement
15  now or would you prefer to wait until after lunch?

16        MR. PETERSON:  What time is it, Your Honor?

17        THE COURT:  It's a quarter after noon.

18        MR. PETERSON:  I'm fine waiting or proceeding, your
19  preference.

20        THE COURT:  Go ahead and do your opening statement.

21        MR. PETERSON:  Thank you.

22        Good afternoon, ladies and gentlemen.  Thank you very
23  much for your time on this case and for your attention.

24        As I mentioned previously, my name is Dan Peterson.
25  I'm one of the lawyers for Wells Fargo Bank.  My co-counsel is

Opening Statement - Defendant

1   Tim Fransen.  And with us at the counsel table is Megan
2   Braxton.  Megan is a Wells Fargo employee who is the head of
3   credit bureau operations for Wells Fargo Auto.
4           Your time and attention is very important, because
5   this is obviously an important case.  It's important to
6   Mr. Sponer.  It's important to Wells Fargo.
7           You've heard from Mr. Sola, and he has told you the
8   facts of the case, the background.  And in many respects we
9   all agree on what happened.  We agree on the order letters
10  were received and sent.  We agree on what was in those
11  letters.  But, of course, we wouldn't be here if there weren't
12  some differences.  And what I think is important is to go
13  through our timeline, and I have a little different starting
14  point than Mr. Sola.
15          As he mentioned -- as Mr. Sola mentioned, this case
16  started with identity theft.  Identity theft is, as you're
17  going to hear from several witnesses and as you likely
18  know -- some of you experienced it, and many in the original
19  jury pool experienced it -- it's a significant and substantial
20  problem that faces many consumers in the country.
21          This case started when a criminal in Southern
22  California stole Mr. Sponer's identity.  That criminal in this
23  case, you'll hear reference that this is what's referred to as
24  "true name fraud" or "true identity fraud."  This isn't a case
25  where an identity thief skimmed a debit card number or

1    otherwise stole a debit card.  This is a case where the

2    identity thief or thieves stole all of the information.  They

3    stole Social Security cards -- Social Security numbers.  They

4    stole IDs.  They created fake IDs with the thief's picture and

5    Mr. Sponer's name.  They used old addresses of Mr. Sponer's.

6    It was a sophisticated identity theft ring.

7            And in the spring or summer of 2016, that's when this

8    happened, when the thief in California stole Mr. Sponer's

9    identity and began opening accounts.  And you're going to see

10   evidence that there were multiple accounts.  Wells Fargo

11   certainly was one of them, but there were dozens of accounts

12   opened, some significant, some less so, but all opened by the

13   thief, with the intent of stealing Mr. Sponer's identity and

14   stealing from the companies from which he sought credit.

15           In July of 2016 that identity thief purchased a car.

16   He went into a used car dealership in Southern California with

17   an ID that had his picture and Mr. Sponer's name.  He went

18   into the car dealership with other identifying information of

19   Mr. Sponer, and he filled out an application, and he purchased

20   a used car from the car dealership.

21           That car dealership used Wells Fargo Auto Services,

22   Dealer Services, to finance the loan.  This isn't a situation

23   where a thief walked into a Wells Fargo branch and talked to a

24   banker and took out a loan.  This is he went into the used car

25   dealership.  That dealership happened to use Wells Fargo.

Opening Statement - Defendant

1          Sometime in October of 2016 Mr. Sponer finds out

2    about this, while he's on his trip.  I believe the detectives

3    contact Mr. Sponer's brother, and they inform him that this is

4    going on.  Mr. Sponer is contacted and gets the information.

5          And shortly thereafter, as Mr. Sola told you,

6    Mr. Sponer contacted an attorney that he knew named James

7    Charne.  And Mr. Charne in October, October 19th of 2016, he

8    sent a letter to Wells Fargo.  And you'll see that letter and

9    you'll see what was included with it.

10          A week later Wells Fargo employee Will

11   Brady -- you're going to hear from Mr. Brady.  You're going to

12   hear from Mr. Brady in person.  He'll be here to explain to

13   you his involvement in this case.  His involvement starts on

14   October 26th, when he sends a letter, after reviewing the

15   letter from Mr. Charne.  And in that letter on October 26th,

16   Mr. Brady, following Wells Fargo's policies and procedures,

17   asks for additional information from Mr. Sponer.

18          I want to talk about policies and procedures very

19   quickly.  Wells Fargo, it's no secret, it's a huge national

20   bank.  You were here when we were asking the jury questions

21   and asked who had a Wells Fargo account, and lots of people

22   raised their hands.  It is a huge bank that has to have

23   policies and procedures that it follows.  And those policies

24   and procedures, it's not realistic to think that they can

25   cover every single situation, but they have to be policies and

Opening Statement - Defendant

1    procedures that make sense in most situations, that help the

2    employees to address problems that come from consumers, and

3    that are reasonably based to identify and solve problems.

4            And in those policies and procedures, when the fraud

5    department receives a complaint of identity theft, they ask

6    for certain information from the consumer.  They ask the

7    consumer to do a fraud affidavit, their statement -- their

8    signed and sworn statement that they are the victim of fraud.

9            They ask for a police report if there is one.  They

10   ask for a photocopy of a driver's license or picture

11   identification.  And they ask for a Social Security card.

12           You're going to hear evidence, testimony, about the

13   reason why those four items are important and especially

14   important in a true name identity theft like this one,

15   because, for example, the Social Security card, most of the

16   time, the vast majority of the time, an identity thief does

17   not get the physical card.

18           I don't know about you, but when I was a kid, I was

19   really excited to carry around my Social Security card in my

20   wallet, but rarely do people do that anymore.  That is the

21   type of information that is not often stolen by the identity

22   thief.  And so a photocopy of that is an additional way that a

23   bank such as Wells Fargo can confirm that they are talking to

24   the victim of identity theft.

25           The request for this information from Mr. Sponer is

Opening Statement - Defendant

1    in the letter, and you saw a copy, and you'll see it more, and

2    it will be admitted into evidence.  Bullet points, "Here's

3    what you need to send us," clear, concise, nothing hidden.

4    "Send us this information as part of our investigation into

5    your fraud complaint."

6            You're also going to hear testimony from our experts

7    the difficulty in dealing with fraud and the importance of

8    confirming the personal information of the person claiming

9    fraud.

10           In this same general time frame between October 29th

11   and October 17th, Wells Fargo received four ACDVs.  And you

12   are going to -- well, you're going to get tired of hearing all

13   these acronyms, but you're going to hear a lot about ACDVs.

14   And, again, as Mr. Sola stated, it's the response to those

15   ACDVs that Mr. Sponer is complaining about for Wells Fargo's

16   conduct.

17           So this is -- they received the ACDVs, four of them,

18   between October 29th and November 17th of '16, and respond

19   between November 3rd and December 2nd.  The statute, the law,

20   requires a response within 30 days.

21           The policies and procedures of Wells Fargo, when they

22   receive an ACDV that alleges identity theft or fraud, is to

23   forward those complaints, those ACDVs, to the fraud department

24   to make the fraud department aware.  The fraud department is

25   better equipped to deal with the unique circumstances of an

Opening Statement - Defendant

1    ACDV-related fraud.

2            You are going to hear testimony that ACDVs cover a

3    wide variety of complaints.  Identity theft and fraud is just

4    a part of it.  They also cover, "I got a statement and my

5    balance is wrong.  You didn't update my address.  You've got

6    the wrong thing," other things like that, and so there's a

7    wide variety of circumstances.

8            When Wells Fargo receives an ACDV alleging fraud, it

9    gets forwarded to the fraud department.  And you're going to

10   hear testimony from expert witnesses, including plaintiff's

11   own expert, saying that's fine to have two divisions within

12   the bank that deal with that.

13           After Mr. Brady's October 26th letter, on

14   January 24th, several months later, Wells Fargo received a

15   letter from Mr. Sponer.  And in that letter, four months

16   later, in that letter it includes certain information that was

17   requested, but not all of the information that was requested.

18           You're also going to see the information -- I

19   mentioned in the beginning that the identity thieves were

20   sophisticated and they were vicious.  They opened many

21   accounts.  You're going to see -- you're going to hear

22   testimony that at this same time, January 24th, Mr. Sponer was

23   sending several other letters to other creditors as a result

24   of the identity thief's actions.

25           You're going to hear evidence that this letter, the

Opening Statement - Defendant

1   January 24th letter, did not get forwarded to the fraud
2   department.  And you're going to hear testimony from Wells
3   Fargo that it should have.  It should have gone to the fraud
4   department, and it didn't.
5           Now, on February 15th Wells Fargo responded.  And
6   Mr. Sola showed you that letter, the response on
7   February 15th.  I suspect you didn't like it.  I know
8   Mr. Sponer didn't like it.  And, at the end of the day, the
9   bank doesn't like it.  The January 24th letter didn't get to
10  the right place.  And we'll talk about that with Mr. Brady,
11  we'll talk about that with an individual named John Cooper,
12  and we'll talk about that with Ms. Braxton.
13          At this point in the story, right around here, right
14  around February 15th, Mr. Sponer and his family return to the
15  States.  They're back here.  I believe the testimony will be
16  that Mr. Sponer was back in the United States when he received
17  the February 15th letter.
18          On February 15th, and then approximately six months
19  later, no correspondence in between February 15th, on
20  August 18th Mr. Sponer purports to send a letter to Wells
21  Fargo.  You will hear testimony that Wells Fargo -- you will
22  see in their records that there are records of receiving
23  correspondence, of phone calls, of everything that happened in
24  this case, but you won't see a record of the August 18th
25  letter.  Wells Fargo doesn't receive it.

Opening Statement - Defendant

1          You'll see -- no one knows exactly if that letter was
2   sent, if it got lost in the mail, if it didn't get received.
3   We know that Wells Fargo doesn't have any note of it and
4   couldn't find it in its files.  You'll also see evidence that
5   any other letter that was sent to Wells Fargo had a return
6   receipt, a certified mail.  The August 18th letter doesn't
7   have certified mail.  So Wells Fargo does not believe it
8   received that letter.
9          But it's also important that right around that same
10  time frame, Mr. Sponer is writing to multiple other creditors
11  complaining about the problems that are being caused by the
12  identity thief, by the theft, and by the fraudulent accounts
13  that have been opened in his name, including some creditors
14  that he wrote to initially back in January of 2017.
15         The next letter that Wells Fargo actually received
16  from Mr. Sponer, has a record of receiving, happened about
17  another three months later, a little less than three months
18  later.  On November 3rd of 2017 Mr. Sponer sends a letter to
19  Wells Fargo.  Again, it's important to note that in this time
20  frame, he continued to deal with several other accounts that
21  were fraudulently opened that are now showing on his credit
22  report as derogatory accounts.  And that included,
23  November 3rd of 2017, it also had some creditors that, again,
24  were in his first wave of correspondence from back in January.
25         On November 21st of 2017 Wells Fargo responded to

Opening Statement - Defendant

1   Mr. Sponer's early November letter, requesting missing

2   identifying information, the Social Security card.  The

3   November 3rd letter includes additional information, but again

4   didn't include the Social Security card.  And you're going to

5   hear -- as I said, you're going to hear from Will Brady, who

6   authored that letter.  And he going to discuss the policies

7   and procedures behind doing that.  He's going to discuss what

8   his actions were in requesting that information.

9           The same time frame again, about a year after the

10  first ACDVs were received, Wells Fargo receives three more

11  ACDVs.  And Wells Fargo responds to those ACDVs in a timely

12  manner.

13          On December 1st of 2017 Mr. Sponer sends another

14  correspondence -- you looked at it with Mr. Sola -- stating

15  that he doesn't have a Social Security card.  That is

16  approximately 14 months, 13 months after Wells Fargo first

17  said, "Please send us this information so we can verify your

18  identity."  Fourteen months later Mr. Sponer says, "I'm sorry.

19  I don't have a Social Security card."

20          And you're going to hear testimony from Wells Fargo

21  about what the next steps were when they got that information

22  that he didn't have a card and what the steps would have been

23  had they received that same statement earlier.

24          There are additional ACDVs received, then, at the end

25  of November and into December, which Wells Fargo timely

Opening Statement - Defendant

 1   responds to.  Again, it's the ACDV responses that are at issue
 2   in this lawsuit.

 3         On December 22nd, as Mr. Sola stated, plaintiff filed
 4   the lawsuit that we're here about today.  And in January of
 5   2018, the trade line -- you'll hear it referred to as a trade
 6   line -- the account was deleted from his credit.  You'll hear
 7   testimony that based on the information that had been
 8   received, that likely would have been the outcome without the
 9   filing of the lawsuit.  But the facts are the facts.  It
10   happened after the filing.

11         Who will you hear from?  Mr. Sola already told you,
12   you'll hear from plaintiff's witnesses, and we'll have the
13   opportunity to ask them some questions as well.

14         You're going to hear from Megan Braxton.  As I said,
15   Ms. Braxton is the head of the credit bureau operations for
16   Wells Fargo.  She's going to explain Wells Fargo's policies
17   and procedures.  She's going to explain more for you about
18   what happens in the ACDV process, about the ACDV responses and
19   obligations with that.

20         You're going to hear from Will Brady.  Mr. Brady was
21   the person who was actually dealing with this in the fraud
22   department, who was receiving and reviewing the letters that
23   were forwarded to him, who was requesting information, and who
24   was reviewing what was sent back in response to his requests.

25         You're going to hear from John Cooper, who is the

Opening Statement - Defendant

1  head of the fraud department for Wells Fargo Dealer Services

2  or Wells Fargo Auto.  And Mr. Cooper is going to talk about

3  the fraud department, what it does, what it did in this case,

4  and its interplay with the credit bureau team.

5           And you're going to hear from our expert witnesses,

6  Dean Binder and Brian Kelley, who are both recognized experts

7  in their fields of credit, credit dispute resolution.

8  Mr. Kelley has particular experience and background in

9  banking.  And they're going to discuss with you Wells Fargo's

10 policies and procedures and the reasonableness of those

11 policies and procedures and the reasonableness, under all the

12 circumstances of this case, of Wells Fargo's conduct.

13          After all that evidence comes in, lots of documents,

14 lots of witnesses in the witness stand up there telling you

15 their stories, I'll have a chance to talk to you again as

16 well.  And at the close of evidence, you're going to be asked

17 to make several decisions.  You're going to be asked to decide

18 whether Wells Fargo was negligent in the way it investigated

19 and responded to the ACDVs.  Did it make a mistake?  You're

20 going to be asked to decide, as Mr. Sola said, did Wells Fargo

21 willfully violate the FCRA?

22          And Judge Hernandez is going to instruct you on that,

23 what "willfully" means in this context.  Even Mr. Sola

24 admitted, it's a heightened standard.  It's malicious, it's

25 oppressive.  Did Wells Fargo willfully violate the FCRA?

Opening Statement - Defendant

 1          And then the final questions will be related to

 2   damages.  If you determine Wells Fargo was negligent or

 3   willful, what damages did Mr. Sponer suffer and how should he

 4   be compensated for those damages if he did suffer them?

 5          It's going to be very important throughout this case

 6   that you pay very close attention to the evidence that's

 7   presented about the true cause of the damages, if any, that

 8   Mr. Sponer suffered.  You can't hold Wells Fargo responsible

 9   for damages that he suffered related to what the identity

10   thief did.  The identity thief caused him to have to deal with

11   a dozen accounts.  You can't hold Wells Fargo responsible for

12   what Home Depot did, requiring four notices or three notices

13   being sent before they would deal with the account.

14          Wells Fargo, if you decide that they have

15   responsibility here, you need to rationally and reasonably

16   base that liability on conduct that is attributable to Wells

17   Fargo.

18          I appreciate, again, your time and attention to this

19   case, and we will look forward to presenting our evidence to

20   you over the next few days.

21          Thank you.

22          THE COURT:  Members of the jury, we're going to take

23   our midday recess at this time.  It's about 12:35.  Let's get

24   back together at 1:30.

25          During the course of the recess -- you're going to

1   hear me repeat this a number of times -- remember the

2   precautionary instruction directing you not to discuss the

3   case with anyone or use your devices to do research,

4   et cetera.

5          Jennifer will escort you into the jury room.  She'll

6   get you settled in there.  She might point you to places where

7   you can grab a bite to eat if that's what you wish to do.

8          One of the things that happens when you come back

9   from lunch, you have to buzz to get back into the jury room.

10  Jennifer will explain this to you.  Jennifer isn't always

11  there to unlock the door to let you back into the chambers

12  area, and that means that somebody else in my chambers needs

13  to decide whether to let you in or not.  The way they know

14  whether to let you in is if you turn back towards the

15  camera -- so the door is facing one way.  You have to turn

16  back towards the camera and display your juror button, and

17  then they'll buzz you in.  If you remember to do that, it will

18  make life much easier.

19         So if you can be back a few minutes before 1:30,

20  we'll try to get started right at 1:30, judge time, and then

21  we'll proceed apace.

22         Thank you very much.  Have a good lunch.

23         (A lunch recess is then taken.)

24         (The Court, counsel, the parties, and the jury

25  reconvene.)

Sponer - D

1          THE COURT:  Good afternoon.  Be seated.

2          Call your witness.

3          MR. SOLA:  We call Matthew Sponer.

4          THE COURT:  Step forward and be sworn.

5          MR. SOLA:  Matthew Sponer.

6          THE CLERK:  There are stairs right there.

7          Raise your right hand.

8

9                    MATTHEW JOHN SPONER

10  called as a witness in his own behalf, having been first duly

11  sworn, is examined and testifies as follows:

12

13          THE CLERK:  Please have a seat.  State your name and

14  spell it.

15          THE WITNESS:  My name is Matthew Sponer.  I guess the

16  middle name is John.  M-a-t-t-h-e-w J-o-h-n S-p-o-n-e-r.

17

18                    DIRECT EXAMINATION

19  BY MR. SOLA:

20  Q.  Mr. Sponer, where do you live?

21  A.  I live in Sellwood, in Portland, Oregon.

22  Q.  Do you have a family?

23  A.  Yes.  I have a wife, Ana, that I've known since college,

24  and two daughters.

25  Q.  And what is your profession?

Sponer - D

1   A.   I'm a computer programmer.

2   Q.   Could you explain what that means, being a computer

3   programmer?

4   A.   It's kind of like I just throw myself at problems really

5   hard and just stay at it like a dog until I figure out what it

6   is.

7   Q.   Are you working on a certain kind of computer program or

8   certain profession now?

9   A.   Yes.  I'm working with some folks that are making a

10  website for first-time home buyers.

11  Q.   Do you have any special interests or hobbies?

12  A.   I really like to just focus on my family; and my wife

13  does, too.  And the way that we've kind of enabled that is by

14  going camping a lot and spending time in nature, so we also

15  sail.  And then by myself, I like to read a lot.

16  Q.   Can you give us some background on your work history?

17  A.   I've been programming my whole life.  And in high school,

18  I fixed networks for a company.  Then I moved on to fixing

19  databases for companies.  And then after that, my wife and I

20  started a little video game company; and we did that for

21  several years.  And after that, I was invited to join a

22  company that was just starting.

23  Q.   So would that be called a startup?

24  A.   Yes.

25  Q.   Can you tell us a little bit about that startup.

Sponer - D

1  A.   It's mobile technology.  It's like a software company that

2  deals in the mobile app ad space.

3  Q.   And so did that take a lot of your time?

4  A.   Yeah.  It was an extraordinary amount of work.  I really

5  enjoyed it professionally and it was really challenging and

6  difficult and it was just a fun story, but it was working all

7  the time.

8  Q.   And did your hard work eventually pay off?

9  A.   It did.  Our company was purchased by a larger company.

10  Q.   And then did you have a share in the sale price?

11  A.   Yeah.  I wasn't like a super duper person, so I had a 5

12  percent ownership in the company and -- but then ultimately I

13  had less because the investors take some as they invest in it.

14  Q.   And so what did you end up getting out of that, your

15  share?

16  A.   About $635,000.

17  Q.   And what did that mean to you?  Was that a big payday?

18  A.   Yeah.  It was enormous.  I mean, and I -- I was real

19  grateful that it worked out.

20  Q.   All right.  And then what is it you decided you wanted to

21  do at that point?

22  A.   I felt like I was caught up in work too much and that my

23  kids were young and I wanted to focus on them and spend more

24  time with them.

25              So instead of being prudent and saving for

Sponer - D

1   retirement, we decided to take off sailing.  That had been
2   like a thing we had been planning for a long time, and we were
3   just wanting to do it, but it was never the right time.  And
4   we figured, if it's not now, then when?
5   Q.  And did you feel like you had a limited window of time to
6   do that trip?
7   A.  Yes.  Both my daughters are -- I don't know.  They're at
8   an age where they want to be with us all the time, so we want
9   to travel and focus on them with that.  And then, also, my
10  special needs daughter has health issues, and it's just kind
11  of uncertain with her, so we really value, like, any time that
12  we have, that we can spend with her, like, you know, measured
13  on a scale of months or years or something like that.
14  Q.  Really because you're worried about her health?
15  A.  Yes.
16  Q.  Why don't you mention your daughter Farah and tell us a
17  little bit about her.
18  A.  She's 16 now.  She has a rare genetic condition called
19  Angelman's syndrome.
20          THE COURT REPORTER:  Say it again.
21          THE WITNESS:  Angelman's syndrome.
22  BY MR. SOLA:  (continuing)
23  Q.  It might help if you sit a little closer.
24  A.  I'm learning.
25          It's -- it yields a profound intellectual disability.

Sponer - D

1    And she has epilepsy, scoliosis, poor motor control, and she

2    can't talk.

3    Q.   And how about her mobility?  Is she able to walk?

4    A.   Not independently.

5    Q.   Was Farah's condition a factor in taking this family trip?

6    A.   Yes.

7    Q.   Could you explain that?

8    A.   Well, part of it was like we're already living outside the

9    bounds of a normal family, so we didn't feel like we'd be

10   losing that much.  It's not like she'd be missing school or

11   anything.  And it's also that other children, they just die

12   unexpectedly or they have problems, or their behavior, they

13   get more medically intense, so you can't go far away from

14   civilization or -- yeah, so it just -- people get more tied to

15   where they are and have to be near hospitals and stuff.  So we

16   just felt she's healthy now.  She's in a good group now.

17   Let's go.

18   Q.   How is Farah's social life if she can't talk?

19   A.   It's all, like, being in the moment with people,

20   like -- it's like certain people, she just sees them and she

21   resonates with them.  And it's just like they look into her

22   eyes and she looks into their eyes and it's like -- you have

23   to, like, be really present with her.  And she's a really

24   social person and she's really loving, but that's her whole

25   experience of people.

Sponer - D

1  Q.   Does proximity or touching factor into that?

2  A.   Yes.   It's like -- one of her favorite things to do is

3  just be like sitting on the couch beside somebody and showing

4  them her toys or having them do it with her.   But even in the

5  same room, it's important to her that someone is in the same

6  room.

7  Q.   All right.   So is that how you spend your time socializing

8  with her?

9  A.   Yeah.   I felt like since she can't talk and she's not

10 that -- she doesn't really know what's going on, like -- so

11 like school starts and her experience of it, she doesn't know

12 school is starting.   She just knows she's getting on a bus and

13 she's going to a different room of people, and then she comes

14 back.   So I felt like it naturally causes a lot of anxiety or

15 uncertainty unless she feels super centered and loved.   So

16 it's always been my priority to just give her as much as I

17 possibly can.

18 Q.   Now, you mentioned about this dream of going sailing.   And

19 so did you get to take that trip?

20 A.   Yes.

21 Q.   Tell us about what it is to live on a sailboat.

22 A.   My wife calls it wet camping.   And it's like -- sort of

23 like a tiny house that floats, and I consider it more like

24 RV-ing, but you're not -- so, you know, instead of driving

25 around America, you're driving around the world.

Sponer - D

1          And I really enjoy it.  It's like one of

2     my -- there's just so many beautiful moments that come from

3     it.

4     Q.  A lot of us might have different pictures of what it might

5     involve, but are you and your family and friends sailing the

6     boat or do you have some professional crew?

7     A.  No, it's just us.  Yeah, we do everything.

8          One of the most compelling things about it for me

9     and us is that it's like -- by getting away from civilization,

10    it's like you get to focus on each other, and it's like it

11    deepens the love.  And there's no Internet and no distractions

12    from normal everyday life.  And somehow, after months,

13    you -- like your mind clears and you're just more present.

14    Q.  And so who cooks?

15    A.  It's usually me.  I don't know why.  I think I'm just more

16    energetic, so --

17    Q.  And then what about maintenance?  Do the boats require

18    maintenance?

19    A.  Yeah.  They need constant maintenance.  I mean, it's

20    just -- stuff is breaking and you're really far away from

21    everything and you're just trying to -- you know, sometimes

22    things work well and it's like smaller things that are

23    breaking.  But sometimes we get stuck, like the engine breaks

24    and we just can't move until we figure out how to fix it.

25    Q.  And did you take a lot of responsibility for the

Sponer - D

1  maintenance?

2  A.  Yes.  I mean, my wife is also really good at it.  She can

3  fix little gas-powered generators and, you know, all that kind

4  of -- she's good, too.

5  Q.  But it's not like you've got some mechanic on board,

6  right?

7  A.  Oh, no, not while we're traveling.  When we're in port,

8  you know, sometimes we have people help us figure stuff out.

9  Q.  All right.  Are you a customer of Wells Fargo?

10  A.  Yes.

11  Q.  And how long have you been a customer?

12  A.  I think for about 20 years.

13  Q.  And what accounts do you have?

14  A.  I have a checking, a credit card, and a retirement account

15  and other accounts.

16  Q.  Now, before you took your trip, did you contact Wells

17  Fargo?

18  A.  Yes.

19  Q.  And then would this have been -- what year would we be

20  talking about that you're going to contact them?

21  A.  Oh, it was November 2015.

22  Q.  All right.  What did you tell them?

23  A.  I made travel plans with them, where I said I was going to

24  be out of the country for more than a year.  And I listed all

25  the countries with, like, approximate dates that I'd be in

Sponer - D

1    these places.

2    Q.   And then did you learn of a problem while you were on your

3    trip?

4    A.   Yes.

5    Q.   And what was that problem?

6    A.   I guess the simple answer is my identity was stolen.

7    Q.   How did you learn about that?

8    A.   A Detective Tugashov from the Chula Vista Police

9    Department sent an e-mail to my brother or, actually --

10   sorry -- he made a phone call to my brother, which went to my

11   brother's e-mail because it was transcribed, and my brother

12   forwarded that e-mail to me.

13   Q.   And where were you?  You were overseas?

14   A.   Yes.

15   Q.   And what did you learn the identity theft involved?

16   A.   Actually, I haven't seen -- okay.  Eventually I learned

17   that it involved like a very expensive car purchased through

18   Wells Fargo.

19   Q.   And so Wells Fargo made a loan to somebody using your name

20   during the time you told them you'd be out of the country?

21   A.   Yes.

22   Q.   And then what did you do after you learned you were a

23   victim of identity theft in terms of trying to resolve it?

24   A.   Well, we weren't in a place where we could just, like,

25   talk on the phone easily or be scratchy or sound weird or have

Sponer - D

1    like, fast wifi like you do in America, where you go to

2    whatever website you want and it works.  So we -- I knew an

3    attorney, and I wrote to him and asked him to handle it for

4    me.

5    Q.  And then between the attorney and you, did you end up

6    making many disputes to Wells Fargo?

7    A.  Yes.

8    Q.  And did any of those disputes fix it?

9    A.  No.

10   Q.  And how was it eventually fixed?

11   A.  I sued Wells Fargo.

12   Q.  All right.  So after you learned you were a victim of

13   identity theft, did you contact an attorney?

14   A.  Yes.

15   Q.  All right.  And how did you have an attorney?

16   A.  When we had our video game company, this guy had helped us

17   with, like, copyrights because we didn't know anything about

18   that kind of stuff.  So it had been, like, a long time, like

19   maybe 10 years, since I had last contacted him.  I'm not sure

20   actually.  But I had his e-mail and I e-mailed him.

21   Q.  All right.  And then what did you want him to do?

22   A.  Just -- the first step was just to call the detective

23   back, because I just had this voicemail with this phone

24   number, and I just wasn't able to call him effectively.  So it

25   was like, "Please call him and figure out what's going on."

Sponer - D

1  Q.   And did he do that?

2  A.   Yes.

3  Q.   All right.  And then did he contact other people to try to

4  resolve the problem?

5  A.   Yes.  I know he contacted three credit reporting agencies,

6  and he contacted Wells Fargo.  I'm not sure if he contacted

7  anybody else.

8  Q.   All right.  Let's look at Exhibit 2.

9         And do you recognize Exhibit 2?

10 A.   Yes.

11 Q.   And what is it?

12 A.   This is a letter that Mr. Charne sent to Wells Fargo.

13 Q.   All right.  And just trying to summarize the first

14 paragraph, what is that?

15 A.   It says he's been engaged by me to act on my behalf in

16 connection with identity theft and that I'm a victim of that.

17 I've been out of the country since November of 2015, traveling

18 by sailboat with my family.  Yeah, that's the first paragraph

19 basically.

20 Q.   And then the third paragraph, could you tell us what that

21 says?

22 A.   "Mr. Sponer first became aware of the fraud on October 13

23 when his brother was contacted by Detective Edward Tugashov of

24 the Chula Vista California Police Department.  According to

25 Detective Tugashov, among the acts of identity theft, the

Sponer - D

1   perpetrator fraudulently purchased and financed through Wells

2   Fargo a BMW automobile."

3   Q.   And what about the next paragraph?

4   A.   "Fortunately a suspect" --

5   Q.   Or you can paraphrase.  You don't have to read it.

6   A.   Okay.  The suspect is in custody, and the automobile has

7   been recovered.  The police can confirm it.  And the police

8   officer says that the car will be returned to Wells Fargo.

9   Q.   And then there's two requests; is that right?

10  A.   Yes.

11  Q.   And what's the first request?

12  A.   Since this loan was not taken -- is not mine, we request

13  that no damaging information be reported to credit agencies,

14  or if information has already been reported, that it be

15  corrected.

16  Q.   And then the second request, you don't have to read the

17  whole thing, but what is he requesting?

18  A.   Oh, that they just not make a mistake and turn off my

19  checking and credit card account.

20  Q.   And why was it important they not turn off your checking

21  or credit card account?

22  A.   That was our only access for money, so we'd kind of be

23  really stuck if they accidentally turned off our ATM and Visa

24  card.

25  Q.   As far as you know, was this the first contact with Wells

Sponer - D

1  Fargo advising them of the identity theft?

2  A.   Yes.

3  Q.   And so it was through your attorney that they, Wells

4  Fargo, learned how they could recover their car; is that

5  right?

6  A.   Yes.

7  Q.   Now, I see at page 3 is a limited power of attorney.   Why

8  was that enclosed?

9  A.   I believe Mr. Charne had to prove to Wells Fargo or

10  whoever he wrote to that he had authority to act for me.   So

11  he had me fill out this limited power of attorney.

12  Q.   And was that notarized?

13  A.   Yes.

14  Q.   And so did you have to give the notary some proof of

15  identity?

16  A.   Yes.   I had to show them -- I think I usually showed them

17  both my passport and my driver's license.

18  Q.   Did Mr. Charne end up talking to Wells Fargo?

19  A.   Yes.

20  Q.   Do you know what happened in that conversation?

21  A.   I remember -- so Mr. Charne related to me --

22            MR. PETERSON:  Objection, hearsay.

23            THE COURT:  Sustained.

24  BY MR. SOLA:  (continuing)

25  Q.   Were you aware of false items on your credit reports

Sponer - D

1   around the end of October to mid November?

2   A.   Yes.

3   Q.   Would you look at Exhibit 4.  Do you recognize this?

4   A.   Yes.  This is my credit report dated October 27th, 2016.

5   Q.   Could you turn to page 6 of 7.  And what do you see on

6   page 6?

7   A.   I see the account, the Wells Fargo Dealer Services

8   account.

9   Q.   And by "account," do you mean the fraudulent account?

10  A.   Yes.

11  Q.   Did you ask Mr. Charne to contact credit reporting

12  agencies?

13  A.   Yes.

14  Q.   Do you know if he did so?

15  A.   Yes.

16  Q.   All right.  Now, you end up -- let's move to the middle of

17  November.  Where are you then?

18  A.   I'm in New Zealand.

19  Q.   Would you look at Exhibit 5.  And do you recognize this?

20  A.   Yes.  This is my credit report from November 9th, 2016.

21  Q.   All right.  And could you turn to page 2.  What do you see

22  of concern to you on page 2?

23  A.   The Wells Fargo account that's fraudulent is still on

24  there, and it says, "60 days past due."

25  Q.   All right.  What do you understand that means?

Sponer - D

1    A.   They are saying that I took out a loan and never made a

2    payment.

3    Q.   And do you see a balance?  What is that showing?

4    A.   It shows $29,419.

5    Q.   And then just above that box that had the balance, there's

6    a thing called "remarks."  Can you read that?

7    A.   Yes.  I believe it says, "Dispute investigated completed.

8    Consumer disagrees."

9    Q.   What does that mean?

10   A.   My understanding of that is that they're aware I disputed

11   it, they've completed their investigation, and they're just

12   marking for their system that I disagree with them.

13   Q.   And who is "they"?

14   A.   Wells Fargo.

15   Q.   So was it your understanding that this was after -- well,

16   obviously.  So you understood that Wells Fargo had already

17   investigated and rejected your dispute?

18   A.   Yes.

19   Q.   How did you feel about that?

20   A.   I -- I really expected that when -- you know, by the time

21   I got to New Zealand or whatever, that -- I trusted them at

22   that point.  So I thought that they would handle it.  So I was

23   disappointed and kind of confused that they just didn't remove

24   it from my credit report.

25   Q.   All right.  And then while you were in New Zealand, did

Sponer - D

1   you then decide you needed to take some additional steps to

2   try to address the credit reporting and identity theft?

3   A.   Yes.

4   Q.   And what did you do?

5   A.   So I was just worried that this was going to be much -- be

6   more complicated than I thought it would be.  So we didn't

7   have good Internet on our sailboat, so I found a place, like a

8   temporary office place, where you can rent a desk.  So I did

9   this thing where I could rent a desk for a day.

10  Q.   All right.  And how long did you -- well, let me -- so you

11  had an office; is that right?

12  A.   Yes.

13  Q.   And how often did you go there?

14  A.   Not like every day, but it seemed like about five days a

15  week.

16  Q.   And approximately how long was that?

17  A.   It was from the end of November to the early part of

18  January.

19  Q.   All right.  And what were you doing during that time?

20  A.   Well, I really had no clue of what identity -- I mean, how

21  to resolve identity theft or even how the whole system worked.

22  So I was looking on the Internet and just reading about it.

23       I found, you know, the FTC has a website that has a

24  lot of information.  And then there's a lot of other things.

25  And then later, when I found out that there were all these

Sponer - D

1  things I had to do, I just started doing them, and that took

2  time.

3  Q.  And you said "FTC."  What does that refer to?

4  A.  Federal Trade Commission.

5  Q.  All right.  So what did you learn, specifically, on the

6  FTC website about what you, as a victim of identity theft,

7  should do?

8  A.  They have kind of like a -- you know, instructions.  And

9  it's fill out an FTC identity theft affidavit.  Oh, attach a

10  police report, get a police report.  And use this kind of like

11  template letter that you put them all together and then mail

12  to the creditors, the people that have the fraudulent

13  accounts.

14  Q.  All right.  And so you started working on the letter, the

15  affidavit, and getting the police report?

16  A.  Yes.

17  Q.  And then was your plan to send that material to the

18  creditors who had opened fraudulent accounts?

19  A.  Yeah.  That was my understanding of how you fix identity

20  theft.

21  Q.  Now, having this office and spending all this time there,

22  did that affect your plans that your family had previously

23  made to visit New Zealand?

24  A.  Yes.  We bought a used car, and our plan was just to drive

25  around and see the whole country, like to see the south island

Sponer - D

1    and the big volcanos and the Kauri forests I think they're

2    called.

3                But I felt like this was the most pressing thing we

4    had to do, like we had to just get our finances in order.  I

5    was just worried that it would just get more complicated.  So,

6    yeah, we just didn't travel there as much as we planned.

7    Q.   Did you end up doing some traveling in New Zealand?

8    A.   Yes.  We did a few day trips, and then we did a couple

9    like overnight trips.

10   Q.   All right.  So could you approximate how much of your

11   plans you were able to carry out?

12   A.   We were there from mid November, then left in mid

13   February.  And I think from the receipts of the office space,

14   I kind of -- or, actually, when these letters were sent, so

15   around that.  I'm sorry to make it complicated.  I'd say about

16   two or three weeks.

17   Q.   Out of --

18   A.   Oh, out of --

19   Q.   -- months?

20   A.   -- December, January -- out of three months.

21   Q.   And then going to this office almost every day, did that

22   affect your relationship with Farah?

23   A.   Yes.

24   Q.   Could you explain how?

25   A.   She's just so in the moment, like she doesn't -- she wants

Sponer - D

1   you to be with her and she wants you to be next to her and she

2   wants you to be looking at her and playing with her and stuff

3   like that.  So she doesn't understand when people, like,

4   disappear.

5           And -- and she needs like a lot of prompting, like to

6   keep learning to use utensils so she doesn't go backwards to

7   eating with her hands, all these, like, habits that we've been

8   working on for years and years that just take her a long time

9   to learn.

10  Q.   All right.  So it sounds like you tried to get her into

11  good habits.  And then was the fact that you were away, did

12  that affect her continuing to keep good habits?

13  A.   Yeah.  For one reason or another in our family, it's kind

14  of like she's -- like when our second daughter was born, it's

15  kind of like I took over, I became more primary for Farah,

16  like the person that does these things for her and spends the

17  time with her while my wife kind of, you know, was

18  breast-feeding our daughter, the other -- sorry, our younger

19  daughter.

20  Q.   Did you see a regression with Farah during the time that

21  you were working at that office?

22  A.   Yes.

23  Q.   What kind of things?

24  A.   The most problematic for us is like the toileting, because

25  it just -- it took us a really, really long time to get her

Sponer - D

1  out of diapers and it has a big impact on how she's -- like

2  how much she can go out in the world, you know -- you know,

3  ride a bus or just do different, things and how independent

4  she can be from us ultimately, because we're always thinking

5  farther, like when she's 20 or 30 or something like that, like

6  it makes a big difference.

7  Q.  Can you tell us your feelings when you see that kind of

8  regression?

9  A.  I blame myself and it makes me sad because, like, I'm just

10  a normal person that has this really complicated daughter, and

11  I'm like trying to step up and do everything that she needs.

12  And when I fail at that, I just feel like I'm just letting her

13  down.

14  Q.  And how about physically?  Do you have a role in terms of

15  physically helping her move?

16  A.  Yeah.  She's almost as big as my wife or maybe -- it

17  depends on how you measure, by weight or height.  I think

18  she's heavier.  But yeah.  So Farah needs a lot of assistance,

19  like going and just -- even pushing a grocery cart or

20  something, you have to be like her hands on the cart and walk

21  beside her and keep her hands on the cart, but walking, you

22  have to hold on to her and anticipate like if she's going to

23  trip or if she's going to have a problem stepping up on a curb

24  or something like that or going upstairs.  It's kind of like,

25  if there's not a good, like, ADA-type railing, you really have

Sponer - D

1   to support her and you have to have, like, your hand under her

2   armpit and another on her waist and kind of be like helping

3   her and making her safe.

4           So it's a lot easier for me.  Sorry.  I rambled.  But

5   it's a lot easier for me because I'm just bigger, and my wife

6   isn't.  So when I'm not there for these types of things,

7   it -- yeah.

8   Q.  I'm sorry.  I didn't mean to cut you off.

9   A.  I was just going to say, Farah doesn't get to go out and

10  see much because it's not easy to take her places, to get her

11  in and out of the car and or to get her up and down stairs and

12  do all these things, and also it's just harder on my wife.

13  Q.  All right.  Would you look at Exhibit 6.  Do you recognize

14  that?

15  A.  Yes.

16  Q.  What is it?

17  A.  This is an e-mail that I sent to a Detective Mark Kelly.

18  I forget.  There are multiple police departments involved with

19  this, and I forget which one he's at.

20          MR. PETERSON:  Your Honor, objection to this exhibit,

21  hearsay.

22          THE COURT:  I think I sustained the objection to this

23  during the pretrial conference.

24          MR. SOLA:  I am so sorry.  I apologize, Your Honor.

25          All right.  Are there others in this vein?  Was it 7

Sponer - D

1   or 8?

2           THE COURT:  I'm checking my notes right now.  You

3   might be right.

4           (There is a brief pause in the proceedings.)

5           THE COURT:  You are correct, 6 through 9 are

6   received.  You can go back to that.  I apologize for that

7   confusion.

8           MR. PETERSON:  Your Honor, for the record, we renew

9   our objection to 6 through 9.

10          THE COURT:  Thank you.

11          MR. SOLA:  All right.  Let's go back to Exhibit 6.

12          THE COURT:  Members of the jury, the problem with

13  these exhibits is they contain hearsay statements.  Hearsay

14  statements are statements by other individuals.  Typically

15  they're offered for the truth of the matter asserted, and

16  that's objectionable.  And I overruled the objection.

17          But I'm going to instruct you that you cannot take

18  these statements for their truth, but only for explaining why

19  the plaintiff took his next steps.  It's not for -- you're not

20  to assume that whatever is in there is true, but it does help

21  explain why he did what he did next.  It's for those reasons

22  that these exhibits are being received.

23          You may proceed.

24          MR. SOLA:  Thank you.

25

Sponer - D

1    BY MR. SOLA:   (continuing)

2    Q.   Do you recognize Exhibit 6?

3    A.   Yes.  It's an e-mail that I sent to one of the police

4    officers involved in the identity theft.

5    Q.   And were you responding to something he had sent you?

6    A.   Yes.  He had contacted me through Facebook Messenger, but

7    it was when I didn't have good Internet, so I didn't receive

8    it until I was in the rented office space in New Zealand.

9    Q.   And why were you contacting him?

10   A.   It was an older message that he had sent to me, and I was

11   just following up with him to see if I needed to do anything

12   because -- I don't know -- a police officer writes you a

13   message, it felt prudent to write him back and make sure he

14   had everything he needed from me.

15   Q.   Everything he needed in regard to what?

16   A.   To prosecuting the thief.  I don't know.

17   Q.   And did he respond?

18   A.   Yes.

19   Q.   And do you see that at the bottom -- well, the lower half

20   of the exhibit?

21   A.   Yes.  He said, "A subject was arrested by Chula Vista

22   police for unlawfully using your personal identity to commit

23   the theft.  If you have already been in contact with that

24   agency, no further action is required.  If not, I encourage

25   you to reach out to Detective Tugashov."

Sponer - D

1  Q.  And then would you look at Exhibit 7.  What is that?

2  A.  This is a similar e-mail that I wrote to two other police

3  officers who had contacted me.

4  Q.  And who is this one to?

5  A.  It's Edward Tugashov, and I believe the other police

6  officer is Glenn Gosset, but I'm not sure on that.  Oh, it

7  says that -- sorry -- right on the piece of paper.

8  Q.  I see.  What date is this?

9  A.  I wrote this on November 23rd.  But I'm not sure, from

10 looking at this Facebook Messenger thing, what date they tried

11 to contact me.

12 Q.  And why were you writing to these officers?

13 A.  The same thing:  to check in that there wasn't anything

14 more I needed to do as far as they were concerned.

15 Q.  And if we scroll down on that, is there a response?

16 Actually, it might be the next page.  Yes.

17         Did you get a response from Detective Tugashov?

18 A.  Yes.

19         He said, "No, sir.  I think we are good.  The suspect

20 who purchased a BMW and opened credit card accounts using your

21 identity was arrested.  He already pled guilty and his

22 sentencing is scheduled" -- I think that's "for

23 November 30th."  And he was writing this on November 23rd, so

24 it was just six or seven days later.

25         "Make sure you follow up with the credit bureaus to

Sponer - D

1    repair your credit."

2    Q.   Now, were you working on the FTC identity theft affidavit

3    in the latter part of 2016?

4    A.   Yes.

5    Q.   And did you need your credit report to fill out that

6    affidavit?

7    A.   Yes.

8    Q.   Were you able to obtain it?

9    A.   Yes.

10   Q.   And then how did you use that to fill out the FTC

11   affidavit?

12   A.   I copied all of the account numbers and company names and

13   amounts.  The FTC affidavit has a lot of little fields, where

14   it's the date, the account number, the various things for the

15   different -- then the names of the creditor.  And I just had

16   to copy it, you know, into the affidavit.

17   Q.   All right.  And was Wells Fargo one of the accounts you

18   saw on your report at that time?

19   A.   Yes.

20   Q.   And can you tell us how that made you feel?

21   A.   I think I was just frustrated because I'd -- I felt like

22   it was handled with them, with Wells Fargo specifically.

23   Q.   Why did you think it shouldn't have been on your report

24   with Wells Fargo at that time?

25   A.   Because I knew they had talked to the police and my lawyer

Sponer - D

1  had already contacted them and, according to the detective, I

2  think -- I think the detective said the car had been returned.

3            MR. PETERSON:  Objection, hearsay.

4            THE COURT:  Sustained.

5            THE WITNESS:  Sorry.

6  BY MR. SOLA:  (continuing)

7  Q.  Would you look at Exhibit 8.  Now, this is what date?

8  A.  Oh, this is an e-mail I sent to Detective Tugashov -- no,

9  sorry -- yeah, it's Edward Tugashov, on January 10th, 2017.

10  Q.  And can you read the title at the top?

11  A.  "Do you have court documentation for Jason Yochum's case?"

12  Q.  And why were you seeking that documentation?

13  A.  I felt like with Wells Fargo not just solving it for me,

14  like I was expecting, that maybe they just needed more

15  information or maybe it would be that much more obvious if I

16  could, like, send the thief's guilty plea or -- I don't know.

17  I've never seen court documentation, so I don't know what it

18  looks like, but yeah.

19  Q.  And did he respond?

20  A.  Yes.

21  Q.  And it might be farther down -- let's see -- or the next

22  page.

23            All right.  And so what was the gist of his response

24  to your request for court documentation?

25  A.  He gave me some extra case numbers and just tracking

Sponer - D

1   numbers that go within the court and police system.  Then he
2   said that he couldn't provide it to me directly, but that I
3   could get it either by visiting them in San Diego or
4   contacting the district attorney who prosecuted the case.
5   Q.  All right.  Were you able to go to San Diego?
6   A.  No.
7   Q.  Why not?
8   A.  It would be obscenely expensive and time-consuming to get
9   there.
10  Q.  Okay.  You were still in New Zealand?
11  A.  Oh, yes.  Sorry.
12  Q.  And so what did you do after this?
13  A.  I contacted the district attorney that he mentions.
14  Q.  Would you look at Exhibit 9.  What is Exhibit 9?
15  A.  This is the e-mail that I sent to the district attorney.
16  Q.  And what date is it?
17  A.  January 10th, 2017.
18  Q.  All right.  And what are you asking her for?
19  A.  I'm asking that she send me anything that might be
20  appropriate for the case to then forward on to the various
21  credit agencies and creditors.  And then I tell her that I've
22  been trying to use the San Diego court's website for the last
23  few weeks, and it wasn't working.
24  Q.  All right.  Could you explain to us what problem you had
25  there?

Sponer - D

1    A.   I would try to do a search, and I thought that I was using

2    it right and it should just work, but it would kind of like

3    hang and not do anything.  So I tried multiple times of days,

4    multiple days of the week, just to see if it was overloaded

5    and if there was a good time to be able to fetch the

6    documentation.

7    Q.   Now, were you seeking this information in regard to your

8    dispute with Wells Fargo?

9    A.   Yes.

10   Q.   Now, did Ms. French respond?

11   A.   Yes.

12   Q.   Okay.  Let's see.  I think it's in the lower right there.

13             And what was the essence of her response?

14             MR. PETERSON:  Objection, hearsay.

15             THE COURT:  Has this exhibit been received?

16             MR. PETERSON:  It has.

17             THE COURT:  I'm sorry?

18             Then he can read the response.  Your objection is

19   overruled.

20             You may respond.

21             THE WITNESS:  It's an e-mail from the district

22   attorney, and it says, "Unfortunately, I cannot provide you

23   with any documentation because it is court documents" --

24             THE COURT:  Can you slow down when you read?

25             THE WITNESS:  Sorry.

Sponer - D

1   BY MR. SOLA:  (continuing)

2   Q.  And you can just summarize.

3   A.  Okay.  I'll do better.

4        THE COURT:  The other rule, by the way, is when I'm

5   speaking, nobody else speaks.  And when a witness or a lawyer

6   is speaking, only one person speaks at a time.  Again, she

7   can't take more than one person speaking at a time, and we

8   want a complete record, so try to keep those rules in mind:

9   Slow, one person at a time.

10       Go ahead.

11       THE WITNESS:  "You may be able to request copies of

12   the minute orders showing the defendant has been convicted,

13   but that has to be requested through the Court."

14       Then she gave me the phone number.  I believe that's

15   the court.  It says South Bay Criminal Division.  Then she

16   referred me back to Detective Tugashov to get police reports.

17   BY MR. SOLA:  (continuing)

18   Q.  All right.  And were you able to get the documents while

19   you were in New Zealand, the court records?

20   A.  No.

21   Q.  Now, how did the Wells Fargo account compare to the other

22   fraudulent accounts?

23   A.  It was by far the largest.  I think it was for 29,000 and

24   some hundreds.  And the next largest account was about 3,000

25   or less than $3,000.

Sponer - D

1  Q.   Did you have any -- well, were there specific worries

2  about the fact that it was Wells Fargo that was stating that

3  you owed them more than $29,000?

4  A.   Yes.  So, too, it's that I had a long -- had been a

5  long-time customer of theirs and had accounts with them.  So I

6  didn't want them to just accidentally turn off any of my

7  accounts.

8           But I also feared that if there was, like,

9  some -- maybe there's some internal process of theirs where

10 they would just pull it out of my accounts.  And then there

11 was another one where it's like if they don't get it, if I

12 can't resolve it with them, I mean, they're my bank, and they

13 know a lot more than me than other companies, that it would be

14 just much harder.

15 Q.   What did they know about you?

16 A.   All my credit card transactions, all my ATM transactions.

17 I mean, my complete -- I mean, not my complete financial life,

18 but, I mean, the part that I do stuff with day to day.

19 Q.   Would you look at Exhibit 11.  What is Exhibit 11?

20 A.   This is a letter that I sent to Wells Fargo on

21 January 19th, 2017.

22 Q.   Why did you send this letter?

23 A.   This was to dispute the fraudulent account with them.

24 Q.   And who did you send it to?

25 A.   Wells Fargo.

Sponer - D

1   Q.  And then after you identified the account number, the

2   first paragraph, what's the -- again, I don't want you to read

3   it, because I know it makes it hard for the court reporter,

4   but if you could summarize it.

5   A.  I say there's a police report.  I point out which pages.

6   My name is specifically mentioned in the police report.  I say

7   that the case is prosecuted by the Chula Vista Police

8   Department and San Diego criminal court.  The defendant pled

9   guilty and was sentenced.  And, further, I'm in New Zealand

10  and have not been in the United States since November 2015.

11  Q.  All right.  How about the first paragraph?  What do you

12  say you're enclosing?

13  A.  Oh, a copy of the police report.

14  Q.  And what else?

15  A.  Oh, the FTC identity theft report.

16  Q.  And then there's a box.  What did you put in this box?

17  A.  The defendant's -- I guess the thief's name, the criminal

18  court case number, the police department case number, and the

19  police report number.

20  Q.  And why did you put that information in?

21  A.  I thought if they didn't trust me or maybe for their own

22  records, they could go and look it up themselves.

23  Q.  Why did you mention the pages of the police report that

24  referenced you?

25  A.  Because it was a really long report, and I thought someone

Sponer - D

1   might not read it carefully, so I just wanted to make it easy

2   on them, so that they could flip straight to the pages and see

3   my name.

4           MR. SOLA:  All right.  Could we see the bottom of the

5   document.

6   BY MR. SOLA:  (continuing)

7   Q.  Down below the box, what do you tell them?

8   A.  I tell them that Mr. Charne contacted them in 2016 and

9   confirmed with them that the vehicle in question was recovered

10  by the police and returned to them.

11  Q.  And then you also enclose a notice; is that right?

12  A.  Yes.

13          The basis of this letter was a letter that I got from

14  the Federal Trade Commission's website, and for some reason

15  they want you to include like an excerpt from the Fair Credit

16  Reporting Act to these letters.

17  Q.  All right.  Then what do you ask in the last sentence?

18  A.  In that paragraph it says, "Please cease reporting this

19  information to the CRAs.  Investigate this and delete the

20  disputed items as soon as possible."  And I wasn't sure which

21  last sentence you meant.

22  Q.  I meant the last sentence on this page.

23  A.  "Please send me a letter documenting the actions you have

24  taken to absolve me of any responsibility for the information

25  I am disputing which result from the identity theft."

Sponer - D

1   Q.   Did you ever get any such letter?

2   A.   No.

3   Q.   All right.  Let's turn to the next page.  And then it

4   lists attachments.

5            Actually, let's go to the next page.  And what's

6   this?

7   A.   This is the identity theft affidavit that I got from the

8   FTC website.

9   Q.   Let's look at the first section.  What did you put in this

10  section about you?

11  A.   I put in various ways to identify myself.  I put my name,

12  my birth date, my Social Security number and my driver's

13  license number and my mailing address -- oh, and also my phone

14  number and e-mail address.

15  Q.   All right.

16           MR. SOLA:  Then next section, if we could keep going

17  below that and then the next page.

18  BY MR. SOLA:  (continuing)

19  Q.   All right.  The declarations, what do you say there?

20  A.   I'll paraphrase it so it's not like enormous for the

21  transcriber or the court reporter.

22           It says I didn't authorize this person to use my

23  identity and I did not receive any benefit as a result of the

24  events of this report and that I'm willing to work with law

25  enforcement.

Sponer - D

1    Q.   Then the next section about the fraud, what did you put in

2    there?

3    A.   I put the name of the person that was caught and pled

4    guilty and sentenced.  And then I put all of the court and,

5    you know, government numbers that I had.

6    Q.   Then let's turn to the next page.  This Section 15,

7    "Additional Information," what did you write in there?

8    A.   I just tried to give some background, that I'm in New

9    Zealand, I've been out of the United States since

10   November 12th, 2015.  I again say which pages of the police

11   report they can find my name.  And then I explain because

12   since, when we go, our home address isn't a good place to

13   receive mail, we use a mail service that scans the mail for

14   us.  So I explained that.

15   Q.   And then in the next section, "Documentation," do you

16   indicate that you could verify your identity?

17   A.   Yes.  I say I'm capable of verifying my identity.

18            MR. SOLA:  All right.  Could we turn to the next

19   page.

20   BY MR. SOLA:  (continuing)

21   Q.   And then what is in this section?

22   A.   This is where I started listing all of the fraudulent

23   accounts that were on my credit report.

24   Q.   All right.

25            MR. SOLA:  Let's scroll down to the bottom of the

Sponer - D

1    page and then next page.

2    BY MR. SOLA:  (continuing)

3    Q.  And then on the bottom of that page, what did you enter?

4    A.  This is the entry for Wells Fargo, and there I got the

5    $29,419 amount and, you know, part of the account number and

6    other dates.

7            MR. SOLA:  All right.  Could you turn to the next

8    page.  And then let's go to page 10.

9    BY MR. SOLA:  (continuing)

10   Q.  Oh, just for the a moment, could you look at those -- no,

11   let's move on.  It's too many numbers.

12           All right.  This page, what do we have?

13   A.  This is my signature, and then below that is the

14   notarization of this affidavit.

15           MR. SOLA:  Let me see the top of it again.

16   BY MR. SOLA:  (continuing)

17   Q.  All right.  And so by signing, what are you certifying?

18   A.  That the information in the affidavit is true.

19   Q.  All right.  And look at the last sentence above your

20   signature.  What does that say?

21   A.  "I understand that knowingly making any false or

22   fraudulent statement or representation to the government may

23   violate" -- then it lists a bunch of laws, and then it says,

24   "and result in a fine, imprisonment, or both."

25   Q.  And then you sign, right?

Sponer - D

1  A.   Yes.

2  Q.   And then below that it says your affidavit.

3         Did you get a notary to notarize it?

4  A.   Yes.

5  Q.   How were you able to get it notarized?

6  A.   I couldn't find one in New Zealand near me, so I found

7  that there is an online notary service, where you go on a

8  video call with them and show them your identification and I

9  guess whatever you normally do with a notary.

10  Q.   All right.  Then the next attachment, let's look at that.

11  And what is this?

12  A.   This is the first page of the police report.

13  Q.   All right.  And, as you said, it's long, so I won't go

14  through it all, but how about page 7?  And I'm going to use

15  the number at the top, because I think it's a little easier to

16  find on these documents.

17         Are you on page 7?

18  A.   Yes.  I'm listed as victim No. 14.  It says, "Sponer,

19  Matthew."

20  Q.   All right.  So there were other victims by this thief?

21  A.   Yes.  But all I know about that is what's on this police

22  report.

23  Q.   Would you look at page 16.  And are you mentioned here?

24  A.   Yes.  It says that there is a debit card that is a piece

25  of evidence -- sorry, a debit card in my name.

Sponer - D

1   Q.   Would you look at page 20.  Are you mentioned in the first

2   paragraph?

3   A.   Yes.

4        It says that someone rented the hotel room using a

5   stolen credit card belonging to Matthew Sponer and that they

6   checked into the hotel room using my identification.  The

7   person has been identified as Jason Yochum.

8   Q.   What about page 23?  Could we look at that?  And are you

9   again mentioned there?

10  A.   Yes.

11       In the second paragraph, I just saw -- I've never

12  read police reports really.  I mean, this is my first one, but

13  I think there are multiple police departments involved or

14  detectives, so the writer of this one is saying that Edward

15  Tugashov -- that he met Edward Tugashov, and he said he was

16  already investigating the theft of my identity and, let's see,

17  his investigation yielded a fingerprint match on a forged

18  check passed in my name.  Oh, wait.  Yeah.

19       Let's see.  He was going to a local casino using my

20  identity, and that Mr. Yochum was using a fake ID with my name

21  on it.

22  Q.   All right.

23       I'm sorry.  Did I cut you off?

24  A.   Yes.  Sorry.  Oh, and that this information is -- let's

25  see.  "Yochum is also believed to have purchased a new BMW

Sponer - D

1  vehicle with Sponer's identity."

2  Q.  And what does that refer to?

3  A.  The Wells Fargo fraudulent account.

4  Q.  Okay.  I note that it says, "Detective Tugashov informed

5  me that Sponer is a world traveler and is currently on a

6  cruise ship in the ocean."  Is that accurate?

7  A.  No.  Our sailing trips are nothing like a cruise ship.

8  Q.  All right.

9       MR. SOLA:  And could you just turn back to the first

10 page again, the first page of the letter.

11 BY MR. SOLA:  (continuing)

12 Q.  In that second paragraph where you said about the police

13 report, that references to your identity could be found at

14 those pages, is that what you were referring to, the ones we

15 just went through?

16 A.  Yes.  I was trying to be helpful, you know, and point it

17 out.

18 Q.  Helpful to who?

19 A.  Whoever read the letter, that they could just go there and

20 see.

21 Q.  But who was your letter sent to?

22 A.  To Wells Fargo.

23 Q.  All right.  Now, gathering the letter, or making your

24 dispute letter and getting the fraud affidavit completed,

25 going through the police report, did that take you some time?

Sponer - D

1  A.   Yes.

2  Q.   Is that part of the things you did while you rented the

3  office in New Zealand?

4  A.   Yes.

5  Q.   So what did you expect would happen after you sent Wells

6  Fargo this letter with all the detail, the notarized FTC fraud

7  affidavit, the police report that mentioned you as a victim

8  several times?

9  A.   I felt since I was -- I felt like I was doing everything

10 right.  I mean, I was following the FTC website.  And I also

11 felt like I had way more evidence than anyone else that

12 has -- I mean, not anyone else, sorry -- but just than a

13 typical identity theft case.  So I expected them to just

14 resolve it.

15 Q.   Did that happen?

16 A.   No.

17 Q.   Did you get a response to your letter?

18 A.   Yes.

19 Q.   Could you look at Exhibit 12.  What is Exhibit 12?

20 A.   This is a letter I received from Wells Fargo on

21 February 15th, 2017.

22 Q.   All right.  And what does the first sentence say?

23 A.   "Thank you for your recent correspondence regarding the

24 above-referenced account."

25 Q.   And what does the second sentence say?

Sponer - D

1    A.    "Wells Fargo Dealer Services has verified that the

2    information being sent to the consumer credit reporting

3    agencies on this account is accurate."

4            Do you want me to go on?

5    Q.    Well, first, what did you think when you read those words?

6    A.    I guess kind of shock and fear that this wouldn't be easy,

7    because, like I just said, I just -- I wasn't sure what was

8    going on.

9    Q.    All right.  And then what does the second sentence say?

10   A.    "Our verification is based on a review of our records, as

11   well as the information for this account on file with Equifax,

12   Experian, and TransUnion."

13   Q.    And what were your thoughts when you read that sentence?

14   A.    It -- it didn't make sense to me, because I knew that they

15   had talked to the police and to my lawyer, and I couldn't

16   understand --

17           MR. PETERSON:  Objection, lacks foundation.

18           THE COURT:  Sustained.

19   BY MR. SOLA:  (continuing)

20   Q.    Okay.  What had you sent them that was in their records,

21   in addition to anything else they might have had?

22   A.    A 20- to 30-page police report, my identity theft

23   affidavit, yeah.

24   Q.    All right.  And the third -- the third paragraph, that

25   first sentence, what does that say?

Sponer - D

```
 1  A.   "If your records do not agree, please provide additional
 2  information, such as copies of cancelled checks or receipts
 3  and any other detailed information" -- I'm sorry -- "related
 4  information that may substantiate a potential discrepancy."
 5  Q.   And what did you think that meant?
 6  A.   That they just weren't organized or that they -- to me it
 7  meant that my letter that I had spent so much time on landed
 8  on someone's desk at Wells Fargo and they clicked the wrong
 9  button.  So they sent me a form letter that was completely
10  inappropriate, or at least that paragraph.  And I don't know.
11  I wasn't sure what they were doing.
12  Q.   Well, what kind of dispute does this seem to refer to?
13  A.   Oh, it seems to be that I'm -- like it's as if I didn't
14  pay a bill instead of fraud.
15  Q.   So I think -- did you refer to this as a form letter?
16  A.   Yes.
17  Q.   Was that offensive to you?
18  A.   I don't know what -- I mean, to me it's understandable
19  that large companies have computers and form letters.  But I
20  think it's like there's always people sitting at their desk
21  and they see something.  And to me, it's like -- there's sort
22  of a moral responsibility or an importance to treating, you
23  know, when you're at work, other people as if they're like a
24  relative or a child or a parent, like to just try to do the
25  right thing versus just kind of click or -- I don't know.
```

Sponer - D

1   Q.   Did you feel like your letter and documents were read?

2   A.   No.

3   Q.   And then after you got this letter, did you know what to

4   do?

5   A.   No.

6   Q.   So did you not do anything for a while?

7   A.   Yeah.  I mean, we received this when we had just returned

8   back to the United States, and we were caught up in kind of

9   turning back on our United States lives, of like kind of

10  moving back into our house and things like that.

11          But I also -- I just didn't -- I didn't know what to

12  do.  So I, like -- you know, I looked on the Internet, and I

13  didn't find another thing as easy as the FTC checklist with

14  step-by-step instructions for what you do if they deny a

15  clearly -- you know, a clear-cut case of identity theft.

16  Q.   Now, you had told us that you had gathered this

17  information, the police report and the FTC affidavit.  I

18  believe you had -- I don't want to misspeak.  Was your

19  intention to send that letter and these materials to the other

20  creditors?

21  A.   Yes.

22  Q.   And did you do that?

23  A.   Yes.

24  Q.   And did anybody respond like Wells Fargo and say they

25  verified?

Sponer - D

1    A.   No.

2    Q.   Now, I know you -- well, do you remember every letter you

3    wrote then and every response you got?

4    A.   No.   There were a lot of them.   And I even made a

5    spreadsheet, because I'm kind of a nerd, but it just got too

6    disorganized because the cases and branches kept changing.

7    Q.   What is your general recollection as to the results of

8    those dispute letters to the other creditors?

9    A.   That it was very easy.   In general, I'd send this enormous

10   letter, and it would be resolved.

11   Q.   All right.   But there might have been one or two or some

12   that didn't fix it; is that right?

13   A.   Yes.   I know that -- I don't remember which specific

14   cases, but there were some companies where it felt like I

15   timed it wrong with their internal processes, so like I'd send

16   it, and it would get resolved at the company, but it had

17   already been referred to a collection agency, and so then the

18   collection agency would go after me.   But to me, that was like

19   just -- there was a little bit of understandable, you know,

20   chaos or something.   I don't know.

21            But then -- and then I think another set of

22   companies, it wasn't clear what their mailing address was, so

23   I had to try multiple times in order to hit the right mailing

24   address, because there's one on their website for where to

25   secondhand disputes to, and then there's one on the credit

Sponer - D

1   report that also says where to send the disputes to, and it
2   seems like I had to hit the right one of those.
3   Q.  Is there any one of those that wrote back to you fairly
4   quickly and said it was resolved?
5   A.  Macy's.
6   Q.  Do you recall if any of the creditors requested a Social
7   Security card?
8   A.  No.
9   Q.  Okay.  You indicated you were back in the United States.
10  Can you tell us why you returned?
11  A.  Partly to handle this.  We felt like -- we didn't feel
12  like we were safe with our money situation.  We thought that
13  there could be a mistake from Wells Fargo or that -- like
14  either they would turn off the account or they would just pull
15  it out of our accounts.  So it felt like a big priority to fix
16  the identity theft.
17           And it's also like we were -- you know, we were in
18  New Zealand, but we weren't really like traveling and doing as
19  much as we wanted.  And then my wife's brother was dying, and
20  she decided to donate her kidney to him.
21  Q.  When you got back to the States, did you still think that
22  Wells Fargo might fix its inaccurate reporting?
23  A.  I had some hope that, like, yeah, maybe it would -- like
24  it was sitting on some part of their internal machinery or
25  process, and it just needed to wind its way through properly,

Sponer - D

1   so that if I just give it some time, maybe they would figure
2   it out.
3   Q.   All right.   And so you gave it some time; is that right?
4   A.   Yes.
5   Q.   And then your wife was doing some things about the kidney
6   donation?
7   A.   Yeah.   There were a lot of tests and she had to go to
8   Atlanta for more tests.   And then we kept thinking her
9   donation would happen, you know, that we'd find out about it
10  and it would be in a couple weeks she would then have it.   So
11  it was kind of a lot of uncertainty, but also thinking that we
12  were almost -- that she was about to do it.
13  Q.   And what time frame are we talking about now?
14  A.   This is -- it's in that year, but I'm not sure.
15          At some point her brother got a blood transfusion and
16  it changed her antibodies or something like that and she was
17  no longer a match for him and she had to go into some kind of
18  chain donation, thing.   I feel like I'm rambling.   But, yeah,
19  I don't remember when all these parts of the story happened.
20  Q.   Okay.   In March 2017 did something happen regarding your
21  homeowner's insurance?
22  A.   Yes.   I was renewing our homeowner's insurance, and it got
23  significantly more expensive.
24  Q.   And do you know if your credit report was pulled by your
25  homeowner's insurance company?

Sponer - D

1  A.  Yes.

2  Q.  And how do you know that?

3  A.  Because it showed up on my credit report.  The insurance

4  company's name was on there.

5  Q.  And do you know if the credit report -- well, I guess they

6  pulled it to check your credit.  Is that your understanding?

7  A.  Yes.

8        And when I asked why it got significantly more

9  expensive --

10        MR. PETERSON:  Objection, relevance.

11        THE COURT:  Sustained.

12  BY MR. SOLA:  (continuing)

13  Q.  And how did you feel about your home insurance company

14  seeing your credit report while Wells Fargo was on it?

15  A.  I'd always taken a sort of pride in my credit report,

16  because I try to be just fair and honest and pay my bills and

17  all that kind of stuff, so I felt like the credit report sort

18  of reflects that, that I'm conscientious or something.  So I

19  was embarrassed that it was in there.

20        And then it felt kind of shady or like a criminal,

21  because if anybody sees it, it's like they're going to say

22  that, you know, you did this horrible thing.  It says on it

23  that you stole a car, like you went to a lot and drove it away

24  and never made a payment.  I mean --

25  Q.  Is that how you felt it portrayed you, as someone who had

Sponer - D

1    stolen a car?

2    A.   Yes.

3    Q.   All right.  Then did you check your credit report in

4    August of 2017?

5    A.   Yes.

6    Q.   And what did you see on there related to Wells Fargo?

7    A.   The account was -- the fraudulent account was still on

8    there.

9    Q.   And so then did you decide to try to tackle it again?

10   A.   Yes.

11   Q.   Would you look at Exhibit 13.  What is Exhibit 13?

12   A.   This is the letter I wrote to them on August 18th, 2017.

13   Q.   Why did you write this letter?

14   A.   I thought I'd try again.

15   Q.   Let's look at the letter.  Up above the "Dear sir or

16   madam," what do you say in terms of the notice?

17   A.   "Third notice."

18   Q.   And why did you put that in?

19   A.   Because they were being difficult, like I felt like I

20   should just make it sort of -- I just imagined it landing on

21   someone's desk, and when someone is at work, someone is

22   looking at it and thinking, what should I do about this?  And

23   I felt like putting "third notice" on it, maybe they will perk

24   up their mind and they'll pay more attention to it.

25   Q.   Then in the first paragraph, this looks similar to the

Sponer - D

1   last letter; is that right?

2   A.   Yes.   I used the previous letter and then added to it.

3   Q.   Let's look down there to the paragraphs below that.   It

4   looks like you're adding a chronology of the prior disputes

5   and responses; is that right?

6   A.   Yeah.   I wanted each letter to kind of, as much as I could

7   be, just make it stand on its own, because I had imagined it

8   landing on someone's desk and they'd kind of flip through it.

9   And I want them to do what's fair or do what's honest, so I

10  just put a timeline of what had happened so far so that they

11  could see, and it wasn't like they'd just pass it off to

12  someone else.   You know, I wanted it to be complete.

13  Q.   And then you referenced their response on February 15,

14  2017, where they say the information is accurate.   And you

15  said, "Given this enormous amount of evidence, I don't see how

16  that makes any sense."

17       So what are you trying to convey there?

18  A.   Sometimes like with a giant corporation, there's all this

19  machinery and something will fall out wrong or something, and

20  I just wanted to, like, highlight, "You're not -- you're

21  doing" -- I don't know, just highlight that "I need to get off

22  some path you've put me in" or something.

23  Q.   And then did you provide a police report?

24  A.   Yes.

25       MR. SOLA:   And let's scroll down, the next page.

Sponer - D

1   BY MR. SOLA:   (continuing)

2   Q.   All right.   And what did you put in that box at the top?

3   A.   That's again all the criminal court case numbers, police

4   department numbers, and the name of the thief.

5   Q.   Then it looks like there's something that says "Equifax."

6   What is that excerpt you put in there?

7   A.   That's like a screenshot of my credit report, an excerpt

8   of my Equifax credit report.

9   Q.   And just one portion.   Which account is this?

10   A.   This is the Wells Fargo account.

11   Q.   Why did you put that excerpt of Wells Fargo on your

12   Equifax credit report into this letter?

13   A.   I wanted to make it obvious this wasn't a line item on

14   some spreadsheet in their system, that they were actually

15   reporting this to someone else, I mean, that they were saying

16   this about me.

17   Q.   Now let's look at that entry from Equifax.   Below the

18   account number, do you see a word?

19   A.   "Derogatory."

20   Q.   All right.   What does that mean to you?

21   A.   That it's a negative item on my credit report.

22   Q.   And then if you go down below the date of October 1, 2016,

23   what do you see?

24   A.   "Collection, charge-off."

25   Q.   And what does that mean to you?

Sponer - D

1   A.   It meant to me that I was now in their collection

2   machinery, that at any point there could be, you know, like

3   phone calls or a letter from a lawyer or that they would just

4   take it out of my account.

5   Q.   Did that worry you?

6   A.   Yes.

7   Q.   And then at the bottom of that excerpt, "Consumer disputes

8   after resolution, charged-off account," what does that first

9   part, "Consumer disputes after resolution," mean?

10  A.   That as far as they're concerned, yeah -- I mean, they're

11  aware of my dispute, but I don't know what else it means,

12  yeah.

13  Q.   Did you feel there was resolution in regard to this

14  dispute?

15  A.   No.

16  Q.   Then did you enclose documents again?

17  A.   Yes, all the attachments from the previous letter, and I

18  don't remember if I added more to this one.

19  Q.   Why did you enclose those documents?

20  A.   Again, I just wanted it to --

21           MR. SOLA:  Can we turn to the next page, so we can

22  see the attachments.  Okay.  Thank you.

23           THE WITNESS:  I just wanted it to be more obvious.

24  I wanted this letter to stand on its own as enough

25  information, because I felt like if I reached the right person

Sponer - D

1   there at Wells Fargo, they would see this and be like, "Oh,

2   look, this is wrong," and then just fix it for me.

3   BY MR. SOLA:  (continuing)

4   Q.   Can we look at the last enclosure, the last two pages.

5   Where did you -- this says, "Notice to furnishers of

6   information, obligations."  Where did you obtain that?

7   A.   This was part of the template letter from -- I think it's

8   called IdentityTheft.org, but it's the FTC's website.

9   Q.   Why did you include it?

10  A.   It was part of their instructions to include it, and yeah.

11  Q.   All right.  Did you get a response to that August letter?

12  A.   No.

13  Q.   Are you sure you mailed it?

14  A.   Yes.

15  Q.   And what kind of mailing did you make?

16  A.   So in New Zealand I was using a service called Letter

17  Stream, which would send letters for me.  It would upload PDFs

18  and they would print it and put it in envelopes and send it.

19  But since we were back in the United States, to save money,

20  I'd just start mailing things myself.

21  Q.   I'm sorry?

22  A.   Mail things myself, like print it out at home and put it

23  in the mail.

24  Q.   Did you do regular mail or something different?

25  A.   No.  I went to the post office and did the thing where

Sponer - D

they give you a receipt with a number.  But I went back to
Letter Stream after this set of mailings I did because I lost
the receipt, because it looks like any other receipt.

Q.   Now, in August, while you're working on this letter and
trying to address Wells Fargo, was your daughter going to
enroll -- your daughter, Farah, going to enroll in school?

A.   Yes.

Q.   And did working on the Wells Fargo program affect your
ability to participate in that?

A.   Yes.

Q.   Could you explain that?

A.   So she had been out of school as we sailed, and then the
year before that she had a big surgery and was out of school.
So we were enrolling her in school for the first time in a
long time.

        With a child in special education, there's a ton of
personal work to make sure they're safe and all their needs
are met and a lot of meetings and negotiations with the
teacher and therapist, and even the nurse wants like a seizure
plan.  Even the cafeteria wants an eating plan to make sure
she doesn't choke.

Q.   So how did that affect your ability to participate in that
process?

A.   It's -- it's a -- sorry.  I don't want to cry.  It's just
a horrible process because -- like we love her and we accept

Sponer - D

1  her as whoever she is and we forget she's disabled and we

2  don't think about it, and as far as we're concerned, she's

3  perfect.  But to do this kind of thing, we're breaking down

4  all of the things that are wrong with her, and it's just a

5  huge emotional load, but it is also one of those times we have

6  to step up as parents and negotiate strongly on her behalf,

7  like represent her interests with the school as we're pushing

8  for more -- even silly things:  If there's a fire, is she

9  going to be left at the top of the stairs, things like that.

10 There's just a lot of details.

11         So usually with all those life things with my -- with

12 my wife and I, we try to share those as much as possible, so

13 no one person is burdened by this emotional load.  But I was

14 caught up in, you know, figuring out what to do next, and I

15 just wasn't able to spend as much time helping my wife do

16 that.  So I felt like -- like I wasn't being the kind of

17 person I want to be.  I always aspire to be like -- just to

18 try to do everything.

19 Q.  And do you attribute your not being able to be the person

20 you want to be to spending time on the Wells Fargo issue?

21 A.  Yeah.

22         I mean, I felt like I was doing everything right, and

23 I kept -- and I didn't know what to do next, and I didn't want

24 to hire another lawyer.  So I just spent a lot of time like

25 reading about what you can possibly do and, you know,

Sponer - D

1    thinking, "Oh, well, what if I try to send this documentation
2    or this?"  I just didn't know.
3           So I'm sorry.  I rambled and I got lost in what I was
4    talking about.
5    Q.   Thank you.
6           So let's look at Exhibit 14.  Now, what is this?
7    A.   This is an e-mail that I sent to my neighbor, who is an
8    attorney.  She's just a couple doors down, and she has a sign
9    out that says she's an attorney.
10   Q.   And what's the heading?
11   A.   "Help write a letter with identity theft."
12   Q.   And what are you asking her to help with?  Well, first,
13   what are you informing her about?
14   A.   I said, "I'm your neighbor a couple houses down.  My
15   identity was stolen.  It's a very cut-and-dry case.  The
16   police caught the gentleman and he pled guilty.  I have a
17   26-page police report that goes into a ton of detail.  We were
18   out of the country from 2015 to 2017, and all these accounts
19   were created in the middle of 2016."
20          I go on to say, "I've been writing a lot of letters
21   to clear up our credit.  Most creditors have taken this off
22   our report.  A few have not.  A few have sent the accounts to
23   collection agencies even after I have notified them."
24   Q.   Okay.  Slow down a little.
25   A.   Sorry.

Sponer - D

1    Q.   Then the next paragraph, what does that say?

2    A.   "Notably, Wells Fargo Dealer Services.  The gentleman

3    bought a BMW in my name, which the police returned to them.

4    That seems like a slam dunk, but they reported the car loan to

5    the credit reporting agencies.  I wrote a dispute letter to

6    them with 30 pages of information, and they replied with a

7    form letter that after their investigation, the information

8    they are reporting to the credit bureaus is accurate."

9         And then I said, "I'm kind of at a loss for what to

10   do next."  Then I ask her if she wants to help me write the

11   letter.

12   Q.   And then did you get a response?

13   A.   Yes.

14   Q.   What did she say?

15   A.   She said it's not her area of practice and that I should

16   contact a bankruptcy lawyer.

17   Q.   What did you think about contacting a bankruptcy lawyer?

18   A.    It's kind of demeaning.  I don't know.  I didn't seriously

19   consider bankruptcy as an option, but I just felt like this is

20   not -- yeah, this is not at all what we would do.

21   Q.   All right.  Could you turn to Exhibit 15.  And what is

22   Exhibit 15?

23   A.   This is a letter that I wrote to Wells Fargo on

24   November 3rd.

25   Q.   All right.  And then do you indicate -- what do you

Sponer - D

1  indicate after the "regarding" or in the "regarding" line?

2  A.   "Identity theft, fourth notice."

3  Q.   And why are you sending this letter?

4  A.   After -- I think this is the letter where I attached even

5  more information.  I can't remember.  But, yeah, I wanted to

6  try again, so --

7  Q.   Did you feel you were being persistent?

8  A.   Yes.

9  Q.   All right.  And then I know you indicate in the first

10  paragraph what your dispute is, but then if we -- let's scroll

11  down a little more, and now it looks like the chronology is

12  even longer, because you enter your August letter.  Why are

13  you putting that in?

14  A.   I felt it was important, again, to whoever this arrives at

15  and sees it, then they can just quickly read the story.  So I

16  started putting stuff in bold and shorter sentences and more

17  clear what the timeline has been.

18  Q.   I see.  You changed the length of your sentences?

19  A.   Yes.

20  Q.   Why?

21  A.   I couldn't understand how they were concluding that this

22  this was identity -- that this was my account.  So I was kind

23  of at a loss, thinking, well, maybe people are just busy and

24  not reading.  I don't know.  I just thought -- I was trying to

25  make it as clear as possible.

Sponer - D

1   Q.   All right.  And why did you put some words in bold print?

2   A.   I was just thinking like, okay, maybe these people are

3   overworked and -- I don't know.  I wanted it like they'd

4   glance at it and they don't have this wall of text at them.

5   They just see key phrases that pop out that say, you know, my

6   identity was stolen.

7   Q.   Okay.  You mentioned the identity thief was caught and

8   prosecuted -- I see how you bolded "plead guilty" -- and

9   sentenced.

10          The next sentence, why did you explain you were out

11  of the country when the fraudulent accounts were created?

12  A.   I was trying to think of other ways that I could prove to

13  them that I didn't buy a car in San Diego, you know.  And then

14  one of my ideas was like, you know, I wasn't there, you know.

15  I wasn't in the United States that whole year.

16  Q.   Now, I notice it says, "I was sailing my yacht between the

17  Caribbean and New Zealand."  That sounds like a -- you know,

18  I've got to be honest.  It sounds like it's not entirely true.

19  A.   Yeah.  That's like calling our car a limo or something.  I

20  thought, okay.  If I've got someone's attention, it will be

21  even more -- like this guy sounds kind of rich or something,

22  you know.  Why would he steal a car?

23  Q.   I see.  You thought it might make them take your dispute

24  more seriously?

25  A.   Yeah.  I was just trying to do whatever I could.

Sponer - D

1   Q.  All right.  Then let's go to -- let me see the bottom

2   paragraph.

3            All right.  You mentioned the Fair Credit Reporting

4   Act.  Do you see that?

5   A.  Yes.

6   Q.  And how did you learn about the Fair Credit Reporting Act?

7   A.  It probably started with those two pages on the end of the

8   letters, but I had also read a lot online, just trying to

9   figure out what I could possibly do, and I read about that.

10  Q.  You read about it on a website?

11  A.  Yeah, some -- I probably initially heard of it through the

12  FTC website, but then I wandered all over the place.

13  Q.  And why did you decide to put that into your letter?

14  A.  I'm sorry.  I'm not sure if this is a letter where I

15  started cc-ing their legal department.

16  Q.  Let's look at the next page.  Sorry.  Let's look at the

17  next page, because it may indicate that, or the next page

18  after that.

19  A.  Oh, yes.  Sorry.

20  Q.  Do you see the cc there?

21  A.  Yes.

22           So my next strategy there was I'll start copying

23  their -- I looked up their legal registered agent, I think

24  it's called, for Oregon, and I think on some national level.

25  I'm not sure where I got the other address from.  But I

Sponer - D

1   thought for some -- the people that I had been trying to deal

2   with hadn't been listening to me or hadn't been even reading

3   my letters or -- and then I thought, okay.  I need to just try

4   more, different paths into this company.  And maybe my letters

5   will get in front of somebody that's -- you know, that's going

6   to read it or that maybe has empathy -- I don't know -- just

7   maybe a little bit more time.  I'm not sure.

8            So then your original -- I'm sorry.  I'm rambling.

9   Q.   That's okay.  There's a lot behind this.

10  A.   So --

11  Q.   But my question was about why did you put in a reference

12  to the Fair Credit Reporting Act?

13  A.   Oh, because I was including the legal contacts in the

14  letter, and I was imagining a lawyer person sitting at his

15  desk.  And one way to, like, make them see that this is not

16  just, you know, I'm complaining about something minor, you

17  know, some minor customer experience or something, was to try

18  and be like, "Hey, look, here's a law that I think you're

19  breaking."

20  Q.   All right.  But you're not a lawyer, are you?

21  A.   No.

22  Q.   And did Wells Fargo fix the problem after they got this

23  letter?

24  A.   No.

25  Q.   Now let's look at page 2.  Let's go to the very top, just

Sponer - D

 1   to make sure.

 2           Okay.  Then what is that section with Equifax?

 3   A.   This is where Wells Fargo is -- this is what they're

 4   adding to my credit report.

 5   Q.   All right.  And why did you include that?

 6   A.   Just to make it more obvious or more end to end, like this

 7   is -- okay.  Here's what we're doing.  And we're

 8   actually -- we're actually reporting this to Equifax.  This

 9   isn't, like I said, some thing that's wrong internally, you

10   know, like --

11   Q.   All right.  Let's go to page 4.  Now, this is -- well,

12   what is page 4?

13   A.   That was my other idea, was like if I could prove some

14   other way, like -- you know, they didn't -- apparently didn't

15   listen to the police, you know, to the district attorney, I

16   mean, to all these government people.  I just didn't know what

17   was going on.  So I thought, okay.  I'll just try to prove

18   that I was out of the country that entire year.

19   Q.   And then you -- let's go to the next page.  And what is

20   that?

21   A.   That's the identity section of my passport, the first page

22   of it.

23   Q.   And then what is below that?

24   A.   It was then several pages of stamps.  I just wasn't sure

25   how to do it, so I scanned all the pages with stamps that were

Sponer - D

1  relevant, and then I made the table that was on the page
2  before.  It was like, "Go to this page and you'll see me
3  stamping out of this country, and go to this page and you'll
4  see me stamping into this country."
5  Q.  So let's go to the next page.  So these stamps, what are
6  they indicating?
7  A.  Oh, when you enter or leave a country, especially by
8  sailboat, because it's not like an airport, often you're not
9  on the computer, it's kind of like you're -- they use stamps
10 to say when you arrived and left.
11 Q.  And so this was to prove that you weren't in the U.S.
12 buying a car at the time they said you were?
13 A.  Yes.
14 Q.  All right.  And then let's go to the -- well, those
15 cc -- we don't need to go back.  Did you send copies of the
16 letter to them, too?
17 A.  Yes.
18 Q.  And then were there more attachments?
19     MR. SOLA:  Let's look at the next attachment.
20 BY MR. SOLA:  (continuing)
21 Q.  Okay.  Just briefly, what is this?
22 A.  That's the original letter that Mr. Charne sent to Wells
23 Fargo, I think at this point over a year ago.
24 Q.  Why did you include that?
25 A.  Again, just to make it that it did land on someone's desk

Sponer - D

1   who was going to pay attention to it.  It was like proving the
2   timeline that I put on the first page, where it's like, you
3   know, "Here's about Mr. Charne contacting you on October 19th,
4   2016.  This is what happened."
5                   MR. SOLA:  And can we see the next attachment.  Keep
6   going.
7   BY MR. SOLA:  (continuing)
8   Q.  All right.  Why did you include Wells Fargo's -- well, let
9   me try to -- you included attachments that proved your
10  timeline; is that fair to say?
11  A.  Yeah, and told the whole story.  I thought especially
12  since I was sending it to random lawyers or random -- trying
13  to reach new people, I didn't know if everybody's computer
14  could pull up everything, so I thought, "Okay.  Here's
15  everything that I have, and you can see for yourself."
16                  MR. SOLA:  And let's go to the next attachment.
17  BY MR. SOLA:  (continuing)
18  Q.  What is this?
19  A.  That's the FTC identity theft affidavit.
20  Q.  The same one you sent before?
21  A.  Yes, that was attached to the letter from February.
22  Q.  All right.  And then did you also include the police
23  report farther down?
24  A.  I'm sorry.  I said February, but I think I sent that
25  letter in January.

Sponer - D

1   Q.   Okay.  And this is the police report?

2   A.   Yes.

3   Q.   Did you feel this was sufficient for Wells Fargo to then

4   remove it from your credit report?

5   A.   I felt like it was way, way more than sufficient.

6            MR. SOLA:  Can we look at Exhibit 16.

7   BY MR. SOLA:  (continuing)

8   Q.   All right.  And what is Exhibit 16?

9   A.   This is another letter.  I believe I sent it on the same

10  day as the one we just looked at.  It's dated November 3rd,

11  2017, and it's to Wells Fargo.

12  Q.   And under the "regarding" section, what does that say?

13  A.   Oh, "Request for records pursuant to Section 609 of the

14  Fair Credit Reporting Act."

15  Q.   And what is that -- why are you making a request for

16  records?

17  A.   In all my Internet time and research, I found that it was

18  my right, as a consumer, to write a letter like this and

19  request the internal business records of a company that

20  related to the fraudulent account.

21  Q.   Okay.  And why did you want the letters -- I mean, why did

22  you want the business records of Wells Fargo that related to

23  the fraudulent account?

24  A.   I was really running out of ideas of what more I could

25  possibly say to them.  And then I thought, oh, if I can get

Sponer - D

1   their internal records, it will show, you know, somebody

2   that's obviously not me.  And then in the subsequent letter, I

3   could then point out, "Look, here's this other attachment, and

4   here's where the guy's signature doesn't look anything like

5   mine," whatever I'd find out.

6   Q.  To get more -- all right.

7        And did you get a response to this letter?

8   A.  No.  They ignored this one.

9   Q.  Did you have high hopes for this letter?

10  A.  Yes.  I thought every time I came up with a new trajectory

11  or way, I kind of -- yes, I was hoping that it would work.

12  Q.  You thought it was a new tack that might work?

13  A.  Yes.

14  Q.  And how did it feel not to get any response at all to

15  this?

16  A.  Kind of dehumanizing and sad.  With each of these things,

17  it's like a little packet of yourself, like you're trying your

18  best to communicate with somebody.  And it's arriving

19  somewhere and, you know, who knows what happened to some of

20  these letters that I sent.  They just didn't -- you know, are

21  they intentionally just ignoring this kind of letter or did

22  someone click the wrong button again or something?

23        THE COURT:  Why don't we take our mid afternoon

24  recess at this time.

25        Members of the jury, we'll be in recess for about 15

Sponer - D

1   minutes.  Jennifer will escort you out.  Remember the

2   precautionary instruction.  I'll see you in about 15.

3           (The jury leaves the courtroom.)

4           THE COURT:  Fifteen minutes.

5           MR. PETERSON:  Thank you, Your Honor.

6           (A recess is then taken.)

7           (The Court, counsel, the parties, and the jury

8   reconvene.)

9           THE COURT:  Be seated.  Good afternoon.  Welcome

10  back.

11          You may proceed.

12  BY MR. SOLA:  (continuing)

13  Q.  Would you look at Exhibit 17.

14          What is Exhibit 17?

15  A.  This is a dispute letter that I wrote to Equifax about the

16  Wells Fargo account on November 3rd.

17  Q.  All right.  And why did you begin a dispute with Equifax?

18  A.  I'd read that that was another set of options that I had.

19  And I thought maybe Wells Fargo's internal, like, machinery,

20  if I disputed through Equifax, it would end up with somebody

21  else, you know, at their desk.

22  Q.  So you thought this might be effective?

23  A.  Yes.

24  Q.  And did you make other disputes to Equifax over the next

25  couple of months?

Sponer - D

1  A.   Yes.

2  Q.   And what were the results to those disputes?

3  A.   Wells Fargo denied all of them.

4  Q.   Would you look at Exhibit 18.  What is Exhibit 18?

5  A.   This is the letter that I received from Wells Fargo on

6  November 21st.

7  Q.   All right.  And what did you understand this was in

8  response to?

9  A.   To the November 3rd letter that I had sent them.

10 Q.   The dispute letter?

11 A.   Yes.

12 Q.   And what does the first paragraph say?

13      Well, I'm sorry.  Go ahead.

14 A.   "We received your affidavit regarding the Wells Fargo

15 Dealer Services account listed above and your claim that this

16 is a fraudulent loan.  However, the affidavit does not include

17 all the needed information."

18 Q.   And then under what you need to do, read that sentence.

19 A.   "Before we can proceed with our investigation, we will

20 need to receive a copy of your Social Security card."

21 Q.   All right.  And what were your feelings upon receiving

22 this letter?

23 A.   Just extraordinarily like -- I'm sorry.  I said "pissed"

24 before, and that was the wrong word, and now I'm drawing a

25 blank.  That, but also sad, like it just -- it didn't feel

Sponer - D

1   like anything I was doing was working.

2   Q.   Now, what about the language, "Before we can proceed with

3   our investigation"?  What did you understand that to mean?

4   A.   That they hadn't even made an attempt to read my letter

5   or -- I mean, to look at this, like, as me, the person living

6   in Sellwood and, you know, them, as another individual

7   somewhere in North Carolina or wherever, but at an office,

8   yeah, that they weren't even trying.

9   Q.   Now, do you remember you got a letter in February,

10  February 15th, I think, 2017, from Wells Fargo?

11  A.   Yes.

12  Q.   Do you recall, did they ask for your Social Security card

13  then?

14  A.   No.

15  Q.   Throughout the rest of 2017, in all your communications

16  with Wells Fargo, did they ask for your Social Security card

17  then?

18  A.   No.

19  Q.   Did you have your Social Security card?

20  A.   No.  I thought it was in the basement somewhere in some

21  box of all papers, and I tore it apart and just could not find

22  it.

23  Q.   All right.  Did you have any manifestations of your

24  feelings when you saw this letter?

25  A.   It felt like being kicked in the gut.  I mean, it's like

Sponer - D

1  just sick, in a way.  I -- I felt like I was just -- they

2  were -- no matter what I tried, they were blowing me off.

3  Q.  So you saw this as blowing you off?

4  A.  Yes.

5  Q.  Did you think Wells Fargo needed your Social Security card

6  to determine if the account was the result of identity theft?

7  A.  Not at all.

8  Q.  Why not?

9  A.  I mean, so many reasons.  They knew me as a customer.

10  They were sending this letter to an address that they sent

11  other correspondence to as an accountholder.  They had seen my

12  passport.  They'd seen two -- what's it called -- notarized

13  documents that were notarized by me that were attached

14  attached to the letter.  They talked to the police.  I'm

15  forgetting.  But it just -- oh, and I felt like I proved that

16  I was out of the country.  It was like, how much more can I

17  tell you that this is fraud and not my account?

18  Q.  And who you were, right?

19  A.  Oh, yes.  Sorry.  I got lost.

20  Q.  Do you recall if any other creditors requested your Social

21  Security card?

22  A.  None.

23  Q.  Would you look at Exhibit 19.  What is that?

24  A.  That's an e-mail that I wrote to Mr. Charne, who had

25  previously tried to help me resolve the identity theft.

Sponer - D

1   Q.   Why were you going back to Mr. Charne?

2   A.   Well, I didn't want to, but I felt like I really have no

3   idea -- I mean, I felt, like, what I could do.  I just felt

4   stuck in some, you know, maze or labyrinth that they had made

5   up.

6   Q.   I'm sorry.  Did I cut you off?

7   A.   No.  Sorry.

8   Q.   Why didn't you want to go back to Mr. Charne?

9   A.   He was extraordinarily expensive.

10  Q.   So your letter has a title.  What is that?

11  A.   "Help with identity theft letter."

12  Q.   So what were you asking him to do?

13  A.   I thought, like, there was some special legal words he

14  could use or argument or special numbers of sections or laws

15  or something that would make them like actually take a look at

16  it instead of, you know, click "ignore" or whatever they were

17  doing in their internal systems or that he'd know how to reach

18  someone there that would be able to help me.

19  Q.   All right.  And then the third paragraph, the first

20  sentence about Wells Fargo, what do you say there?

21  A.   "Wells Fargo Dealer Services is being willfully stupid."

22  Q.   Why did you say that?

23  A.   I didn't know how else to describe it.  It just felt

24  like -- it didn't -- to me it was so ineffective that I

25  started to wonder, like, is this just -- I mean, is this like

Sponer - D

1   an accident or is this part of some plan they have?  I don't

2   know.  It was just like a degree of stupidity, you know.

3   Q.  What did you feel when you wrote this e-mail and said

4   that?

5   A.  I was still the P word.  Sorry.

6   Q.  Can you use another word?

7   A.  Oh, angry.

8   Q.  Then did Mr. Charne respond?

9   A.  Yes.

10  Q.  And what did he say?

11  A.  I believe he suggested a handful of changes.

12  Q.  I'm sorry.  I shouldn't ask you a question when I'm not

13  sure what was in the document.

14  A.  I think it's farther down.  I don't know actually.

15       Oh, here he said, "I'm sorry to hear this horrible

16  ordeal is going on.  I've read through the letter and

17  attachments, would not change a word, except to add a demand

18  at the end of the letter that this be resolved and any

19  negative report to any credit reporting agency be removed and

20  that Wells Fargo respond to you within 14 days minimum."

21  Q.  Did you also do more research to figure out what to do?

22  A.  Yes.  I spent a lot of time.  Even in the middle of the

23  night, I'd wake up and look on my phone, to try to figure

24  out -- I mean, yeah.  I was just at a total loss of what to

25  do.

Sponer - D

1  Q.  And did you still have concern about what Wells Fargo

2  might do to collect?

3  A.  Yes.  I didn't know where I was in their machinery.  And

4  at this point, when I started to feel like it was willful

5  stupidity, that they had some ulterior motive, that this was

6  like -- they're not admitting that it's a fraudulent account

7  for some purpose.

8  Q.  What kind of purpose?

9  A.  I thought that they would try to extort money -- "extort"

10  is the wrong word.  I'm sorry.  But like take it out of my

11  account or send it to a collection agency and sue me

12  or -- yeah, that.

13  Q.  Would you look at Exhibit 20.  And what is that?

14  A.  This is a letter from Equifax dated November 30th.

15  Q.  Now, would you look at -- well, what is this in response

16  to?

17  A.  One of my disputes with them.

18  Q.  And would you look at -- there is a section called "In

19  This Situation."  Do you see that, the first three bullet

20  points?

21  A.  Oh, yes.

22  Q.  And what are you understanding they're indicating they're

23  going to do with your dispute or they've done with your

24  dispute?

25  A.  That they contacted Wells Fargo, asked them to verify it.

Sponer - D

1    Equifax sent them the information that I provided to them to

2    consider as part of their investigation.  And then Equifax had

3    asked Wells Fargo, you know, to investigate it and tell us

4    what this is.

5    Q.  And then can you turn to page 3 of this Equifax response?

6    And do you see the results here?

7    A.  Yes.

8    Q.  And what does it say the results are in regard to the

9    Wells Fargo account?

10   A.  "We verified that this item belongs to you."

11   Q.  And what did you understand that meant?

12   A.  They are continuing -- they were continuing to say that

13   this was my account.

14   Q.  Who is "they"?

15   A.  Wells Fargo.

16   Q.  Okay.  And then they indicate, "You can contact Wells

17   Fargo"; is that right?

18   A.  Yeah.  It says, "If you have additional questions about

19   this, contact Wells Fargo."

20          I think that's the same address -- I don't know if

21   that's the same address.  It's the same city.

22   Q.  All right.  And what was your reaction to getting these

23   results?

24   A.  Just defeated.  I mean, because this was -- if you

25   remember, I don't know what number of avenues I tried to reach

Sponer - D

1  someone at Wells Fargo and resolve this, because I tried

2  through their -- you know, like their legal department, their

3  other corporate contact, the fraud department.  And now I was

4  trying this other way to try and get to somebody there,

5  through telling Equifax.

6       And then my understanding of this, the Equifax thing,

7  is that they then ask Wells Fargo.  And I thought, well, maybe

8  they will pay attention if it comes from Equifax, like it

9  arrives at a different person's desk or something.  But it

10  just wasn't working.  I mean, this didn't work either.

11  Q.  And then would you turn to page 7.  And what do you see on

12  that page?

13       Oh, first, what is this page from?

14  A.  Oh, whenever I had made a dispute with Equifax, they would

15  send me, like, that cover section and then, like, my credit

16  report at that moment.

17  Q.  All right.  And so this is part of your Equifax credit

18  report?

19  A.  Yes.

20  Q.  And what's on your Equifax credit report?

21  A.  That I stole a car.  I mean, here's Wells Fargo saying,

22  you know, I took $29,419 from them and -- yeah.

23  Q.  And you mentioned a $29,419.  Does it also indicate a

24  balance?

25  A.  Yes.  $11,456.

Sponer - D

1  Q.  And does it indicate an amount past due?

2  A.  $11,456.

3  Q.  And what else does it indicate under "status," on the left

4  side?  Do you see that?

5  A.  "Charge-off."

6  Q.  All right.  Let's go back to page 3.  And in the second

7  paragraph of the results, it refers to several different

8  accounts.  I don't want to read it all, the numbers, but do

9  you see, what does it tell you about those disputed accounts?

10 A.  Those are accounts that I disputed and have been deleted

11 from my credit report.

12 Q.  All right.  Had you made disputes to those companies?

13 A.  I'm not clear.  It's not clear to me.  I think I made

14 these disputes with Equifax.

15 Q.  All right.  And now they're gone from your report?

16 A.  Yes.

17 Q.  Would you look at page 8.

18 A.  You know what?  I'm sorry.  I'm wrong.

19        I don't know if it matters, but the Macy's, I

20 recognize Macy's specifically, because they're the ones I

21 wrote to directly, and they wrote back, you know, in about a

22 month, that they took it off.  So I think I'm wrong.  At least

23 Macy's, I disputed directly with them early in January,

24 whenever that was, as part of the first -- the same letter I

25 sent to Wells Fargo.

Sponer - D

1  Q.  So you disputed -- with some companies you disputed

2  directly and/or through Equifax --

3  A.  Yes.

4  Q.  -- like you did with Wells Fargo?

5  A.  Yes.

6  Q.  And these accounts -- Best Buy, Kohl's, Office Depot, and

7  Macy's -- were not on your Equifax report at this time that

8  Wells Fargo was on, right?

9  A.  Yes.

10  Q.  Look at page 8, please.  And there's a section where it

11  says a request for your credit history is called an inquiry.

12  Do you see that?

13  A.  Yes.

14  Q.  And what do you understand an inquiry is?

15  A.  That's when a company asks to see a copy of your credit

16  report.

17  Q.  And would you look at page 11  and the fourth item down.

18  A.  That's my home insurance company, Foremost Property and

19  Casualty.

20  Q.  And what date did they see your credit report?

21  A.  March 6th, 2017.

22  Q.  And how did you feel about that?

23  A.  I felt like that's the reason my home insurance got super

24  expensive.

25          MR. PETERSON:  Objection, relevance.

Sponer - D

1          THE COURT:  Objection sustained.

2          MR. SOLA:  I'll withdraw the --

3   BY MR. SOLA:  (continuing)

4   Q.   Did you have any kind of emotional or kinds of distress

5   knowing that Foremost Insurance had seen your credit report

6   with the Wells Fargo account on it?

7   A.   Yeah.  It was embarrassing because, like I said, you know,

8   there's this big black mark on my credit, and my home

9   insurance company had seen it.

10  Q.   Now, around this time -- well, or any time, did you want

11  to talk to Wells Fargo on the phone?

12  A.   No.

13  Q.   Why not?

14  A.   My experience with dealing with large companies over the

15  phone is that usually the person who answers isn't capable of

16  helping you with something complicated.  And, also, I've had

17  where they just don't do what they're going to say, so I

18  thought I should do it in writing.

19  Q.   What about the fact that the Wells Fargo account had

20  indicated collection.  Did that dissuade you from telephone

21  communications?

22  A.   Yeah, definitely.  I'd received mean collection calls from

23  other creditors.  And I just didn't want to have -- I didn't

24  want to call Wells Fargo and be treated like a criminal.

25  Q.   I'm sorry.  I lost my place.

Sponer - D

1          Could you look at Exhibit 22.  And what is this?

2   A.   This was another letter to Wells Fargo.

3   Q.   And what's the date?

4   A.   December 1st.

5   Q.   And was this in response to some other letter from Wells

6   Fargo?

7   A.   Yes.  This was to the letter where they said they wouldn't

8   do anything until they saw my Social Security card.

9   Q.   And why did you send this letter?

10  A.   Sort of desperation.  I don't know.  I mean, to get it off

11  my credit report, but like, you know -- yeah, I was just

12  trying again.

13  Q.   And after you mentioned their letter asking for your

14  Social Security card and telling them you don't have it, you

15  say, "However, I believe your request is unnecessary and in

16  bad faith.  You have more than enough information to

17  investigate this fraudulent account."

18          Why did you say that?

19  A.   That's what I completely believed, I mean, that it should

20  have been so obvious.  And I'd written them so many letters.

21  Yeah, I was just trying to be more plain and straight.

22  Q.   What do you mean by "bad faith"?

23  A.   That they weren't even trying at all, like somehow I was

24  landing on all these different people's desks there or like

25  all these different ways of trying to get -- get them to do

Sponer - D

1  the right thing or whatever, and -- yeah, I just like -- I

2  mean, it wasn't -- they weren't reading -- I just didn't see

3  how it was possible that they were still saying it was my car.

4  Q.  All right.  And then you state that they have several

5  sufficient ways to verify your identity.  You don't have to

6  read the list.  But why are you telling them all the different

7  ways they can verify your identity?

8  A.  Because I didn't have my Social Security card, and I was

9  just saying, "But you really don't need it.  I mean, you've

10  got so many ways to know this is me writing to you."

11  Q.  Then the paragraph, "Therefore" -- I won't read it, but

12  you mention that you don't think they're resolving this in

13  good faith, with standard business practices, or the statutory

14  requirements of the Fair Credit Reporting Act.

15         So I think since you said "bad faith" above, is that

16  what you mean there, by "not in good faith"?

17  A.  Yes.

18  Q.  What about "standard business practices"?  What did you

19  mean when you said you didn't think they were attempting to

20  resolve it with standard business practices?

21  A.  I thought that there was like minimum -- I don't

22  know -- standards of decorum or, like, expectations for a

23  company, and that they weren't meeting those.

24  Q.  And then the statutory requirements of the Fair Credit

25  Reporting Act, is that something you learned on the FTC

Sponer - D

1   website?

2   A.   Yeah.  And I thought that since, again, I was cc-ing their

3   lawyers, I thought maybe that would pop out to them and they'd

4   pay attention.

5   Q.   The next line is "I have suffered material damages from

6   this identity theft."

7           Why did -- well, first, why did you include that

8   sentence?

9   A.   To say that this is not just some weird paper game that

10  they're playing, that it was actually hurting my family.

11  Q.   At this point in time, what would you say was the most

12  acute damage?  We're at December 1st.  Is there something that

13  stood out more than the others, or is it just the things that

14  we've been discussing?

15  A.   What I remember from this period was not sleeping well and

16  just getting worn down because I wasn't sleeping well for, you

17  know, more than one day at a time, and then just not -- yeah,

18  just not being there for my family as much as I want to be,

19  not -- and then there was -- I felt like I was just -- like

20  this was super important to resolve.  I mean, it was very

21  important.  I mean, it's like my family's finances, you know.

22  But I also felt like I had this other huge responsibility to

23  spending time with Farah and, like, being -- giving her enough

24  attention.

25  Q.   Let's talk about the not sleeping well.  Can you describe

Sponer - D

1   what that was?  You know, some people can't get to sleep.

2   Some people sleep and then wake up.

3   A.   Yeah.  For me, it's like I wake up at 4:00 and my -- Farah

4   would get on the bus at, like, 6:00.  And I just couldn't go

5   back to sleep and then couldn't sleep in because I would have

6   to -- I'd have to -- she needs help getting dressed and up and

7   in the shower.  And she has to -- feed her breakfast and then

8   clean up after breakfast, so it's this whole big process.

9            Yeah.  I'm sorry I'm rambling again, but it was

10  just -- yeah, I ramble too much.

11  Q.   You're a computer guy, not a public speaker; is that fair?

12  A.   Yeah.  I'm a total nerd.

13  Q.   So then do you attribute your trouble sleeping to your

14  concern about the Wells Fargo account?

15  A.   Yes.  I mean, they're the ones that made it so complicated

16  and hard.  And the reason that I -- I mean, I had other

17  identity theft accounts, but, you know, Wells Fargo is the one

18  that kept denying me and made me try to figure out, okay, what

19  other possible way can I get to them or get them to say that

20  this is not my loan?

21           So, yeah, it's the one I thought about and it seemed

22  like the most important because it was for the largest amount,

23  and, you know, I believe it was the one that had been going on

24  for the longest.

25  Q.   Okay.  Most important because it was the largest amount

Sponer - D

1   and the longest and --

2   A.   -- my bank.

3   Q.   You mentioned "worn down."  So can you explain to us how

4   you felt worn down, what that meant?

5   A.   Well, both like with my sleep and also with just, like,

6   willpower or initiative or like an ability to, like -- to do

7   what I need to do every day.  And the sleep affects that.

8          It's like -- you know, I've learned like spending,

9   you know -- you know, time at sea, like someone always has to

10  stay awake and drive the boat.  It's just critical not to get

11  worn out.  You have to pace yourself so that -- but with this

12  situation, it wasn't like I was choosing to think about Wells

13  Fargo or whatever.  I mean, it was like I wasn't choosing to

14  stay up driving the boat longer so that I would not sleep as

15  much, you know.

16  Q.   All right.  Let's look at page 2 of that.

17          And now on this page, you say, "To summarize this

18  case so far" -- and then if we could scroll down a little bit,

19  we see what looks like a detailed itinerary or chronology of

20  the events.  Why did you put that in?

21  A.   I switched to a numbered format for all the things that

22  had happened and even shorter sentences, more bold.  And,

23  again, I was trying to just reach someone there that would

24  treat me like a person or give this, you know, enough

25  attention to be like -- that they would be able to look at it

Sponer - D

1    and easily understand that they were making a big mistake.

2              MR. SOLA:  All right.  Could you scroll down just a

3    little more, just to see -- and then turn to the next page.

4    BY MR. SOLA:  (continuing)

5    Q.  All right.  And then you gave them more personal

6    information; is that right?

7    A.  Yeah.  I just started to include every -- whatever I could

8    think that they would need.

9    Q.  Would you turn to page 5.  And what is that?

10   A.  That's the letter from Wells Fargo, the November 21st

11   letter, that said they need my Social Security card.

12   Q.  Why did you include that?

13   A.  Again, just to make it like a complete thing, so that -- I

14   felt like if I could reach someone there that could just make

15   a decision or actually carefully read it, and if they felt

16   like they had everything, they could do it, they could click,

17   "Take this off of Matt's credit report and take it out of

18   collections."  That was my idea.

19   Q.  Could you look at the next page.

20              This says "credit card charges overseas," and it

21   looks like, again, a chronology.  Why did you put that in?

22   A.  Well, they ignored my request for records.  And then I was

23   thinking, oh, I have a credit card, an ATM card with them, and

24   these are line items from their own credit card and ATM card

25   that show me buying groceries in Tahiti on the same day that,

Sponer - D

1  you know, they're saying to the credit reporting agencies that

2  I bought a car in San Diego.

3  Q.  I see.  But actually they already had this information,

4  right, because these are your credit card charges and Wells

5  Fargo is your credit card, right?

6  A.  Yes.

7  Q.  Then if we look at the remaining documents, just tell us

8  what those -- well, passport pages, I think you discussed that

9  in your last letter, right?

10  A.  Yes.

11  Q.  And then a dispute --

12  A.  Yes.  That's the letter that James Charne had written to

13  them over a year ago.

14  Q.  That one is to Equifax, though, right?

15  A.  Oh, sorry.

16  Q.  All right.  Without going through all these, do you have

17  any estimate about how long it took to write this letter and

18  gather all the information, put it together?

19  A.  No.

20       I mean, there's like the physical act of typing it

21  and editing it.  But it's sort of like programming, where you

22  have to know what to type first or it's not effective.  So I

23  spent a lot of time trying to figure out what tack to take.

24  So, no, I don't know how much time I spent on that.

25  Q.  Okay.  A substantial amount of time?

Sponer - D

1   A.   Yes.

2   Q.   It seems like you're the kind of person who put a lot of

3   time into all these letters, because you're trying to say the

4   thing that would get it fixed?

5   A.   Yeah.  This was important to me, and I was trying to the

6   best of my ability.  I mean, I really throw myself at, you

7   know, work problems, but even -- but, you know, also these

8   types of, to me, like personal finance are important problems.

9   Q.   You referred to finances earlier.  You said, "This is our

10  family's finance.  That's why it was so important."

11          Are you the primary breadwinner?

12  A.   Yes.  My wife doesn't remember that when we got married, I

13  said she would work and I would play with the kids.  So, yeah,

14  I'm the person that makes money, I guess the most -- or the

15  majority of our money.

16  Q.   Let's look at Exhibit 23.  And what is this?  Well --

17  A.   This is a letter from Wells Fargo on December 5th.

18  Q.   All right.  And does it indicate they received

19  correspondence from you?

20  A.   Yes.  It says this is our response to the letter that we

21  received on November 10th.

22  Q.   And then under "Regarding your concerns," could you read

23  that first sentence?

24  A.   "We have forwarded your request to our Wells Fargo Dealer

25  Services fraud department."

Sponer - D

1   Q.   And what was your feeling when you read that?

2   A.   Just kind of crushed and sad.  I mean, I felt this -- to

3   me, like figuring out what's going on inside, trying to think,

4   like, this is another person that got my huge letter and then

5   clicked, you know -- that didn't read it or take a look at it

6   carefully and said, "Oh, this is about a fraud thing.  Let's

7   send it back to the fraud department."  And at this point I

8   had been dealing with the fraud department for over a year.

9   Q.   Did you feel progress was being made?

10  A.   No.  This was like -- yeah, it was like Groundhog Day or

11  going in circles or something.

12  Q.   Did you see this as a form letter?

13  A.   Yes.

14  Q.   And how did you feel about getting another form letter?

15  A.   It's -- it's just more dehumanizing and disempowering.

16           You know, I'm just imagining, okay, this is

17  another -- another opportunity I have for someone to do the

18  right thing or to pay attention to what I'm writing or to

19  bother to read it.  And they just, you know, probably typed in

20  my address to some form and then clicked a button and then

21  some printer somewhere printed it out.

22  Q.   Okay.  We've looked at quite a few letters from you and

23  back from Wells Fargo in November, December.  So all that time

24  that you're spending doing this, what are you not doing in

25  your life that you would want to be or would be doing?

Sponer - D

1    A.   I just wasn't spending enough time with Farah, and she

2    takes a lot of care.  And her whole experience of people is

3    being present with them and them being -- them being on the

4    same, like -- I don't know what you call it, like clear mind,

5    like moment with them.  And, you know, with me caught up in

6    this, I just wasn't there with her.

7            And then there's all the physical stuff and just the

8    workload of having her, because it's sort of like having

9    a -- I don't know.  She's probably as much work as an infant,

10   but she's 16, so there's all this stuff all the time, like

11   taking her to the bathroom every 20 minutes because she's time

12   trained, and all these things.

13           So I just felt like I was missing out on all this

14   time with her.  And we've always really -- I've really valued

15   the time I have with her, because medically, she's just

16   complicated.  And we just -- we never know what's going to

17   happen or like -- with her.

18   Q.   All right.  And is that time you can get back?

19   A.   No.

20   Q.   Now, you mentioned every 20 minutes you'd have to check

21   with her or take her to the bathroom.  Are there other things

22   that require almost constant attention in caring for Farah?

23   A.   Yeah.  We have to keep things out of her mouth.  We have

24   to keep her -- I mean, she has sort of like a wheelchair that

25   we hacked together, because wheelchairs are expensive.  It's

Sponer - D

1   just a folding office chair.  And she's fascinated by the

2   basement.  So I'm always -- in the back of my mind, I have to

3   check that the basement door is closed and locked.

4           And, I mean, there's like all these little things

5   that I'm aware of as part of being a good caregiver for her,

6   and keeping things off of -- just out of her reach that are

7   dangerous.

8           I got lost.

9   Q.  So if you go to the computer and try to work for an hour,

10  then she's not monitored as she should be?

11  A.  Yeah.  And we worked for so long to get her toilet trained

12  and out of diapers, sometimes just because I was caught up in

13  figuring out what this -- what to do, I missed that.  I mean,

14  I missed the time or the cue from her, kind of like a

15  nonverbal cue.  And, you know, she's embarrassed, I feel

16  awful, and it's also just bad for her habits, because she can

17  get out of good habits.

18  Q.  Does she understand when you're away why you're away?

19  A.  No.

20  Q.  What do you mean by that?

21  A.  I just don't think she's bright enough to understand

22  things like that.  So her experience is very much like what's

23  immediately -- the people immediately in front of her and,

24  yeah, so -- and for her being social in relationships is all

25  this, like, you know, immediate, close proximity level.

Sponer - D

1  Q.   Would you look at Exhibit 24.  What is Exhibit 24?

2  A.   This is a letter from Equifax dated December 6th.

3  Q.   And why don't we turn to page 3.

4         Well, first, why were you continuing to dispute with

5  Equifax the Wells Fargo account?

6  A.   I didn't know what else to do.

7  Q.   All right.  And now we have the results on page 3.  And

8  the second paragraph, what does that indicate?

9  A.   "We verified that this item belongs to you.  If you have

10 additional questions, contact Wells Fargo."

11 Q.   And then the last paragraph, same thing, right?

12 A.   Yes.

13 Q.   Do you know why it's on there twice?

14 A.   I'm not sure.  I could only guess it's multiple disputes

15 they're talking about.  I don't know.

16         MR. PETERSON:  Objection, lacks foundation.

17         THE COURT:  Sustained.

18         You'll strike that last portion of the answer.  He's

19 not allowed to speculate why something may or may not be

20 there.

21         THE WITNESS:  Sorry.

22         THE COURT:  That's okay.  He'll ask you another

23 question.

24 BY MR. SOLA:  (continuing)

25 Q.   Then let's look at the last part of that.  It indicates

Sponer - D

1   Sprint, Kohl's, Best Buy, and indicates why they're not on

2   your file.  Can you tell us why they're not on your file?

3   A.   Because I disputed them, and those companies chose to read

4   my letter or chose to take enough of a look to decide that

5   it's fraud.

6   Q.   And then the third paragraph says the disputed Verizon,

7   Home Depot, Macy's and Kohl's are not reporting.  Why aren't

8   they reporting?

9   A.   I believe for the same reason.

10  Q.   That you disputed with them?

11  A.   Yes.

12  Q.   All right.  How did you feel when you got these results

13  saying Wells Fargo was verified?

14  A.   It was just more failure.  And I kind of took it as a

15  personal failure, that I couldn't figure it out.

16  Q.   All right.  You just said "personal failure."  That's

17  different than being upset or sad or the other.  So what do

18  you mean by "personal failure"?

19  A.   Just ineffective as a person or like, you know, just

20  unable to figure this out.

21  Q.   So a reflection of your self-esteem?  Would that be fair

22  to say?

23  A.   Oh, yes.

24  Q.   And I'm not sure if you said it.  A problem solver, is

25  that a way you would describe yourself?

Sponer - D

1    A.    Yes.

2    Q.    And so this was one problem you couldn't solve?

3    A.    That's correct.

4    Q.    All right.  Do you feel that Wells Fargo treated you

5    differently than other creditors that had fraudulent accounts?

6    A.    Definitely, yes.

7    Q.    And how did they treat you differently?

8    A.    They didn't remove it from my credit report for however

9    long this was.  And they asked for my Social Security card

10   that no one else did.  And they sent me back letters that

11   said, "Yes, this is yours."

12   Q.    Turn to page 7 of the Equifax report.  And do you see the

13   Wells Fargo account?

14   A.    Yes.

15   Q.    And in addition to when you read the results saying

16   "verified," is there additional stress or other negative

17   feelings corresponding with seeing it in black and white on

18   your credit report?

19   A.    Yes.  It's -- I don't know.  I felt like a criminal.  I

20   felt ashamed and embarrassed that my credit report was that

21   bad with this really large loan.

22   Q.    All right.  Let's turn to -- well, why don't you look to

23   the first page.

24          Actually, let's just move on.

25          MR. SOLA:  Exhibit 25, could we look at that.

Sponer - D

1   BY MR. SOLA:   (continuing)

2   Q.   What is Exhibit 25?

3   A.   Oh, this is another letter from Equifax dated

4   December 13th.

5   Q.   All right.  And why did you get this?

6   A.   It was them telling me the results of another dispute.

7   Q.   All right.  And let's look at page 3.  And what are the

8   results from Wells Fargo?

9   A.   "We verified that this item belongs to you.  If you have

10  additional questions about this item, please contact Wells

11  Fargo."

12  Q.   I know I've asked you this so many times, but how did you

13  feel when you saw this again December 13th or thereabouts?

14  A.   I don't know.  Like someone keeps kicking me.  This was a

15  whole stupid situation that didn't have to exist.

16  Q.   Anything else about your feelings at that time?

17  A.   I think I already said helpless.  I don't know.  I just --

18  Q.   Did you feel you had power over your credit information?

19  A.   No.  I mean, this is just -- yeah, I mean, Wells Fargo was

20  putting this thing on it, and I had no ability to take it off.

21  Q.   Would you look at Exhibit 26.  Do you recognize that?

22  A.   Yes.  This is a letter from Wells Fargo on December 14th.

23  Q.   And what does the first sentence say?

24  A.   "Contact requested about possible identity theft."

25  Q.   And then what does the sentence under your name say?

Sponer - D

1  A.  "We're writing to let you know you may be a victim of

2  identity theft, according to information provided by banker

3  connection."

4  Q.  And what was your reaction to getting this letter?

5  A.  More just going in circles with them, and also just

6  extremely frustrated that, you know, I wasn't getting

7  anywhere.  But also just sad that like, to me, this is another

8  person at Wells Fargo that evidently was aware of my identity

9  theft that, you know -- and had chosen not to take

10  responsibility or to try to fix it for me, to treat me like a

11  person.  So it's like, you know, somebody clicked, "Oh, send

12  him an identity theft repair packet," you know.

13  Q.  Let's look at the next exhibit, or Exhibit 27.  And what

14  is this?

15  A.  This is -- I think I received both of these letters on the

16  same day.  And this says, "We're sorry to learn you may have

17  been the victim of identity theft.  To help you secure and

18  protect your identity, we are enclosing an identity theft

19  repair kit."

20  Q.  And let's look at the next page.  And it looks like it has

21  a repair kit with a resolution checklist.  Do you see that?

22  A.  Yes.

23  Q.  And if we could just go through -- well, what was your

24  feeling about getting this document?

25  A.  I felt like I was already doing all that stuff, and then

Sponer - D

1   they're telling me to do it and it would be fixed.  And I'm
2   like -- and then it's like, I'm thinking, "Geez, guys, it's
3   been over a year and you haven't fixed it.  I mean, your
4   own -- your own checklist isn't effective."  But, also, again,
5   just going in circles and not being able to -- just not being
6   able to reach anyone there that would pay attention.
7   Q.   All right.  Just to note a couple of things on the
8   checklist, you indicated that you had already done these
9   things.  First item, "Contact Wells Fargo," had you already
10  done that?
11  A.   Yes.
12  Q.   Next item down, "Contact the major credit bureaus," you
13  had done that?
14  A.   Yes.
15  Q.   Next, "Contact other creditors"?
16  A.   Yes.
17  Q.   Next, "File a report with the police"?
18  A.   I felt like I triple-checked that, because the police
19  investigated and made a report for me.
20  Q.   Okay.  "Report the criminal activity to the FTC."  I don't
21  know.  Maybe you hadn't done that?
22  A.   No, it's true, I hadn't done that.
23  Q.   But you got their affidavit, right?
24  A.   Yes.
25  Q.   Next page, you had done that, "Continue to review your

Sponer - D

1  accounts"?

2  A.   Yes.

3  Q.   And then they're giving you this resolution worksheet.

4          Is any of this, in your opinion, going to help you

5  solve your problem at Wells Fargo?

6  A.   No.

7  Q.   You mentioned it affected your sleep.  Were there other

8  manifestations you can think of beyond sleep and lack of

9  motivation?

10  A.   I mentioned sometimes feeling sick to my stomach.  And as

11  far as physical manifestations, I had headaches, but that was

12  rare.  Yeah, that's it.

13  Q.   Can you look at Exhibit 28.

14          MR. SOLA:  And why don't you scroll back so we can

15  see the whole page.

16  BY MR. SOLA:  (continuing)

17  Q.   There's a few of these in here, but we'll just start with

18  the first one.  It looks like -- well, what is it?

19  A.   Is an e-mail from Equifax.  Do you want me to describe it?

20  Q.   Yeah.  What are they telling you, in one or two sentences?

21  A.   They've completed processing a dispute, and that I can go

22  and view the results online or wait for them to mail it to me.

23  Q.   And if you can look through them -- well, they start

24  December 11th, right?

25  A.   Yes.

Sponer - D

1  Q.  And let's just go to the last page.  And what date is
2  that?
3  A.  January 9th.
4  Q.  All right.  So these notices cover about four weeks; is
5  that right?
6  A.  Yes.
7  Q.  Why were you getting these?
8  A.  It's part of their computer that when I made a dispute,
9  they would send me an e-mail like this.
10  Q.  And how did you feel about getting these frequent
11  reminders that your dispute results were available online?
12  A.  It was just harder to put away this problem I was having
13  with Wells Fargo, because I kept receiving e-mails saying, you
14  know, "We've investigated it again."
15  Q.  I'm sorry.  I didn't hear the beginning of your sentence.
16  It was harder --
17  A.  Oh, it was harder to put away this whole part of my life.
18  Q.  All right.  So these were reminders that you still had the
19  problem with Wells Fargo?
20  A.  Yes.
21  Q.  Would you look at Exhibit 29.
22  A.  This is a letter from Equifax dated January 2nd.
23  Q.  And are these -- why did you get these?
24  A.  I think this is -- it's the results of the dispute.
25  Q.  And let's turn to page 3 and look at the results.  And

Sponer - D

1  what does the second paragraph indicate?

2  A.  "We verified that this item belongs to you.  If you have

3  additional questions, contact Wells Fargo."

4  Q.  And then the paragraph above?

5  A.  That lists accounts that I disputed that were no longer on

6  my credit report.

7  Q.  Okay.  Which ones are those?

8  A.  Progressive, Sprint.  I don't know what "phone" is.  And

9  the other one doesn't have a name.

10  Q.  So those -- those came off after your dispute?

11  A.  Yes.

12  Q.  And after you got -- let's go back to December.  We looked

13  at your letters to Wells Fargo and their response on

14  December 5th, December 14th.  And then in December did you

15  take some other action against Wells Fargo?

16  A.  Yes.  I was at even more of a total loss of what to do.

17  And I started looking for a lawyer to give me advice, to tell

18  me what to do next.

19  Q.  And what did you do?

20  A.  I searched around the Internet.

21  Q.  No.  I meant, did you sue Wells Fargo?

22  A.  Oh, yes.

23  Q.  And why did you sue Wells Fargo?

24  A.  I didn't feel that there was any other way out of this.

25  Q.  Any other way to what?

Sponer - D

1  A.   To resolve my credit report and them saying that I stole a
2  car and possibly collected money.
3  Q.   And then after you sued Wells Fargo, did you -- well,
4  let's look at Exhibit 30.   What is this?
5  A.   This is a letter that I received from Wells Fargo that's
6  dated January 30th, 2018.
7  Q.   And then the first sentence, what does it say, after your
8  name?
9  A.   "We have completed our research, and your identity theft
10  claim appears to be valid."
11  Q.   And how did you feel when you got this?
12  A.   I was like, who words their form letters with "claim
13  appears"?   I mean, they're using like -- you know, not even
14  admitting.   I mean, I don't understand it.   But it's not
15  like -- it just seems like they're still kind of holding back
16  being honest and open.
17  Q.   But was there some relief?
18  A.   Oh, yes.   Yeah, it was finally off my credit report.
19  Q.   So you finally found something that worked:   suing them?
20  A.   Yes.
21  Q.   Now, let's discuss some more about your damages.   You're
22  claiming damage to your reputation.   And so can you explain to
23  us how you feel your reputation was damaged?
24  A.   They were basically lying about me and telling the credit
25  reporting agencies, and anybody that looked at the -- my

Sponer - D

1  credit report would see these wrong things that they were

2  saying about me.

3  Q.  All right.  You mentioned they were telling the credit

4  reporting agencies.

5  A.  Yes.

6  Q.  So who do you understand -- well, we know one was Equifax,

7  right?

8  A.  Yeah.  There's TransUnion and Experian.

9  Q.  All right.  And then other people that saw your report as

10  far as you know?

11  A.  The insurance company.  And then I don't know all the

12  companies that saw it, because I don't think it shows for

13  certain types of data sharing that the credit reporting agency

14  does.

15  Q.  Now, before you had the identity theft problem, what was

16  your credit like?

17  A.  It had no derogatory marks on it.

18  Q.  Is that something you were proud of?

19  A.  Yes.

20  Q.  How did you achieve having no derogatory marks on your

21  credit?

22  A.  I was just conscientious and I feel just responsible for,

23  like, paying bills and -- I don't know -- not buying cars and

24  not making payments and all those things.

25  Q.  All right.  Now, you mentioned your distress and some of

Sponer - D

1   the manifestations of that.  So what time period would that

2   cover that you attribute to Wells Fargo?

3   A.   Mostly from when I discovered that it was still on my

4   credit report, when I was in New Zealand.  Before then, I kind

5   of thought Mr. Charne could handle it and it would just be

6   fine.  But all the way through until, you know, they resolved

7   it.

8   Q.   So would that -- New Zealand, I know you saw a report

9   November 9 from TransUnion.

10  A.   Yes.

11  Q.   And you don't know that you saw that report on November 9;

12  is that fair to say?  It might have been later?

13  A.   Yeah, definitely not.  Because it took us almost a week

14  for us to sail from Fiji to New Zealand, and we were at sea at

15  that time.

16  Q.   But would you say sometime in November you knew that it

17  wasn't getting fixed?

18  A.   Yes.

19  Q.   So November 2016, right?

20  A.   Yes.

21  Q.   Through January 2018?

22  A.   Yes.

23  Q.   And we've looked at a lot of documents here.  So can

24  you -- I'm not going to ask you to tell us every time that you

25  were affected by this Wells Fargo, because I don't want to be

Sponer - D

1   here any later than we need to be, but were all these

2   documents that we've seen related to the stress you felt from

3   Wells Fargo?

4   A.   Yes.

5   Q.   Were there other things beyond these documents, other

6   events, research, or communications or thoughts in your mind

7   at other times that also were stressful because of Wells

8   Fargo?

9   A.   Yes.

10  Q.   And what about the 15 months that they said you owed them

11  the money and they wouldn't take it off your report?  How

12  often were you concerned about that?

13  A.   Well, we just didn't feel settled or like all of our

14  finances were in order.  I mean, in a way it's like you feel

15  less safe, because you don't know when the shoe is going to

16  drop on you, the next part of their collections or whatever it

17  would be.

18          And then I got lost on -- talking about --

19  Q.   Well, I said -- I'm not even sure I remember my question.

20  But was it a constant concern of yours that you had this on

21  your report and this debt that they said you owed?

22  A.   Yes.

23  Q.   Now, did you feel that spending all this time working on

24  the Wells Fargo problem and your thoughts about it kept you

25  from doing things with your family, other than the things with

Sponer - D

1  Farah that you've already mentioned?

2  A.   I just felt like I wasn't being the kind of father I

3  wanted to be.  I just -- I guess, you know, I didn't -- during

4  the intense parts of this, those years, since I wasn't as

5  energetic, I wasn't -- I'm normally the energetic one in the

6  family:  "Hey, let's go to the park.  Let's do all these

7  things."  So there were a lot of, like, missed opportunities

8  to engage.

9  Q.   Now, how about your privacy?  Did you feel that this was

10  an invasion of your privacy, dealing with Wells Fargo?

11  A.   Yes.  I felt like they were putting me on a path where I

12  was sending a lot of private information to multiple people at

13  their company, through multiple ways.

14  Q.   And how did you feel -- you were a victim of identity

15  theft.  How did you feel about having to constantly send Wells

16  Fargo identifying information, like passport or Social

17  Security number, things like that?

18  A.   It seemed like a really bad idea.

19  Q.   Did you feel you had control of the information on your

20  credit report related to Wells Fargo?

21  A.   No.

22  Q.   Who had control over that?

23  A.   Wells Fargo did.

24  Q.   Now, after you learned that the account -- or after you

25  were told that the account was removed from your credit report

Sponer - D

1    in 2018, did you still worry about it?

2    A.    Yes.    I mean, not as much, but I just didn't trust them

3    as, like, whatever they are.    I mean, they're a bank, but

4    they're also just a collection of people with machinery in

5    there that puts them all together as a group.    And I just no

6    longer trusted them to do the right thing.    I mean, I

7    wondered, okay, they took it off like that, but I don't know.

8    They're just disorganized.

9    Q.    Did you not seek credit because the Wells Fargo was on

10   your credit report?

11   A.    Yes.

12   Q.    Can you tell us which instances in which you decided not

13   to seek credit?

14            MR. PETERSON:    Objection, relevance.

15            THE COURT:    Sustained.

16            MR. SOLA:    May I be heard, Your Honor?

17            THE COURT:    No.

18   BY MR. SOLA:    (continuing)

19   Q.    Do you feel this problem with Wells Fargo affected your

20   freedom?

21   A.    Yes.    We didn't -- we real like to just travel and be

22   together.    But, also, there's sort of like a financial

23   freedom.    So we didn't -- I didn't feel it was prudent to go

24   on any long trips during this period, because I felt like at

25   any moment, like they could sue me or take it out of the bank

Sponer - X

 1    account, and I wouldn't be able to handle it again from

 2    somewhere far away.  So it felt prudent to stay in Portland.

 3              MR. SOLA:  That's all the questions I have.

 4              THE COURT:  Cross-exam.

 5

 6                    CROSS-EXAMINATION

 7    BY MR. PETERSON:

 8    Q.  Good afternoon, Mr. Sponer.

 9         What year did you -- did your company that you had

10    the interest in sell?

11    A.  I'm bad at -- let me see.  Sorry.  It's been a long day.

12    I was 36 or 37, and I was born in 1976, so what is that?  2012

13    or '13, yeah.

14    Q.  Okay.  And is that when -- after that sale, is that when

15    you purchased your boat?

16    A.  Yes, after that sale.

17    Q.  And you had mentioned -- when Mr. Sola was asking you

18    questions, you stated that this trip was -- this New Zealand,

19    Fiji trip was a trip of a lifetime.  But it wasn't your first

20    extended sailing trip as a family, was it?

21    A.  So you're talking about the period after I sold the

22    company?

23    Q.  You sailed around the Caribbean for a couple of years, you

24    said, correct?

25    A.  Yes.

Sponer - X

1    Q.   And then came back to Portland for a while, correct?

2    A.   Yes.  That was for my daughter's surgery.

3    Q.   And then left again on the trip that is at issue here,

4    correct?

5    A.   Yes.

6    Q.   We need to get our technology caught up here just for a

7    second, so -- how did you -- where did you grow up?

8    A.   In a small town in Pennsylvania called Point Marion.

9    Q.   How did you get involved with sailing?

10   A.   My brother knew how to sail and took me out one day on,

11   like, a rented boat, and I just got an interest in it.  So I

12   read a lot of books on it and found something really

13   compelling and fun.

14   Q.   And was the boat that you purchased in 2012, '13, was that

15   the first boat you owned?

16   A.   No.

17   Q.   What had been your past ownership history of boats?

18   A.   I had -- I don't know when my first boat was purchased.  I

19   don't know.

20   Q.   What type of boats have you owned?

21   A.   The first one was called a Passport 40, which is like a

22   late seventies -- sorry.  I'm not answering the right

23   questions.

24   Q.   What type of boats?

25   A.   Oh, sailboats.

Sponer - X

1   Q.  You looked at a series of documents with Mr. Sola, and

2   we're going to look at a couple of them again, if you

3   could -- we're going to show you Exhibit No. 2.

4           Do you have it on your screen now?

5   A.  Yes.

6   Q.  It made it.

7           And you testified about this.  This is the letter

8   that your attorney, Mr. Charne, wrote to Wells Fargo, correct?

9   A.  Yes.

10  Q.  And did Wells Fargo respond to this letter?

11  A.  I don't know.

12  Q.  I'll have you look at what's been marked as Exhibit 501.

13  Have you seen this document before, Mr. Sponer?

14  A.  Yes.

15  Q.  And what's the date on this document?

16  A.  October 26th, 2016.

17  Q.  And how would you describe this document?

18  A.  This is the cover letter to the fraud affidavit packet

19  that you sent.

20  Q.  And this is a letter from William Brady of the Wells Fargo

21  Dealer Services fraud department, correct?

22  A.  Yes.

23  Q.  And if I could have you look, there's some bullet points.

24  And one of them is under the "What you need to do," and it

25  lists several things.  Do you see that?

1   A.   Yes.

2   Q.   And it states to complete the fraud affidavit, to obtain

3   and provide a copy of your Social Security card, a copy of

4   your driver's license, and a copy of the police report,

5   correct?

6   A.   Yes.

7   Q.   And this was in October of 2016, shortly after

8   Mr. Charne's first letter, correct?

9   A.   Yes.

10  Q.   And you reviewed -- this letter is dated October 26th, and

11  we've already established you were largely unavailable during

12  that time period; is that correct?

13  A.   Yes.

14  Q.   But you received this letter ultimately?

15  A.   Yes.

16  Q.   And you received this letter prior to your January 19th

17  letter to Wells Fargo, correct?

18  A.   No, I'm not sure.

19  Q.   You had your deposition taken in this case, correct?

20  A.   Yes.

21  Q.   And do you recall in your deposition that you answered a

22  similar question that you had, in fact, reviewed this letter,

23  Exhibit 501, prior to drafting your January 19th letter?

24  A.   Oh, the date is January of 2018?

25  Q.   Sorry.  Your January 2017 letter, your first

Sponer - X

1    correspondence to Wells Fargo.

2    A.   I believe I was wrong.

3    Q.   In your deposition, when you testified that you reviewed

4    the letter of October 26th, you were incorrect at the time of

5    your deposition?

6    A.   Yes.

7    Q.   Now, you filled out -- after your deposition, you reviewed

8    it and filled out a piece of paper that's called an errata,

9    that lists what the mistakes were, correct?

10   A.   Uh-huh.

11   Q.   And is that on the list of mistakes that you provided?

12   A.   I don't think so.

13   Q.   But your testimony now, today, has changed; and that is

14   that you didn't, in fact, see the October 26th letter before

15   your January letter?

16   A.   Yes.

17   Q.   Looking at Exhibit 501, does that have direct contact

18   information for Mr. Brady on it?

19   A.   I don't see any.  I don't know.

20   Q.   Well, if I could have look, there's a numeral 3 right in

21   the middle of the page.  It says, "Mail your documents to,"

22   and do you see an address there?

23   A.   Yes.

24   Q.   And then if you look in the bottom, right before the

25   signature block, it actually has a phone number as well as an

Sponer - X

1   extension to this individual in the fraud department who is

2   dealing with your claim, correct?

3   A.   I believe that's what it says.  I'm not clear if the

4   extension goes to that person directly.

5   Q.   Well, it says, "Please call me," correct, and it's signed

6   by Mr. Brady?

7   A.   No, you're right, yes.

8   Q.   You never called Mr. Brady, did you?

9   A.   No.

10  Q.   At the time that Mr. Charne wrote his initial letter to

11  Wells Fargo in October -- or on October 19th, he wrote several

12  letters to other creditors at that time, didn't he?

13  A.   I don't know.  I don't think so.

14  Q.   At the time he wrote this letter, October 19th, you don't

15  believe he wrote to other creditors?  Do you know if he wrote

16  to any of the credit reporting agencies?

17  A.   Oh, I know that he wrote to the three credit reporting

18  agencies.

19  Q.   One of the attachments -- and I just want to talk about

20  this briefly.  One of the attachments is the limited power of

21  attorney, on Exhibit 2.  And I believe you testified, maybe in

22  respect to a different notary, that you used an online notary;

23  is that correct?

24  A.   Yes.

25  Q.   And describe that process for us.  Where were you when you

Sponer - X

1    had this limited power of attorney on Exhibit 2 notarized?

2    And that's on page 3 of Exhibit 2.

3    A.   I was in Fiji.

4    Q.   And so you testified earlier that you had a very poor

5    Internet connection with Fiji, correct?

6    A.   Yes.

7    Q.   How was the video with that online notary?

8    A.   There's a lot of different types of Internet.  And I

9    believe I did this when I had wifi.

10   Q.   So it was a clear picture?

11   A.   I don't remember.

12   Q.   I'll have you look at what's been marked as Exhibit No. 4.

13        Exhibit No. 4 is one of the credit reports that you

14   identified.  This one is dated October 27th, 2016.  And if I

15   could have you look at the second page of the exhibit, and I

16   want to look at a couple of these accounts.  There's an

17   account there on the page that says "Best Buy."  It says "days

18   past due."

19        Now, that Best Buy account was a fraudulent account,

20   wasn't it?

21   A.   I'm sorry.  I didn't understand.  It was a what?

22   Q.   The Best Buy account was the result of the identity theft,

23   correct?

24   A.   Yes.

25   Q.   And towards the bottom of that page, there was a Kohl's

Sponer - X

1    account.  That was the result of identity theft, correct?

2    A.   Yes.

3    Q.   And on the next page, there's a Macy's account.  That one,

4    I believe you also testified, was identity theft related?

5    A.   Yes.

6    Q.   And there's also -- on that same page there's an Office

7    Depot account.  Is that also identity theft related?

8    A.   Yes.

9    Q.   And on the bottom of that page, there's one that's

10   THD/CBNA.  Is that a credit report -- or, sorry, an identity

11   theft-related report?

12   A.   Yes.

13   Q.   So it's certainly fair to say as of October 27th, the

14   Wells Fargo account was nowhere near the only fraudulent

15   account on your credit report; is that true?

16   A.   Yes.

17   Q.   I don't -- I know towards the end of your testimony with

18   Mr. Sola, you talked about when you received the first

19   reports.  I know you mentioned the November 9th report, but do

20   you know when you received this October 27th report, when you

21   actually saw it?

22   A.   No.

23   Q.   If I could have you look at Exhibit No. 5 -- actually, I

24   find these TransUnion reports much easier to read.  There is a

25   nice heading in the middle of the page that says "Adverse

Sponer - X

1  Accounts."  Do you see that?

2  A.   Yes.

3  Q.   And there are several adverse accounts listed on this

4  November 9th report, correct?

5  A.   Yes.

6  Q.   And that includes Best Buy, Kohl's, Office Depot, and the

7  Wells Fargo Auto; is that correct?

8  A.   I'm sorry.  I didn't see them all on the --

9  Q.   So moving on to the next page, it continues on to the next

10  page.

11  A.   I want to be right.  I believe you're right, but you

12  listed four companies, and then I don't know.

13  Q.   Sure.  So going back to the first page of this, there's

14  Best Buy and Kohl's.  Those were both fraudulent, correct?

15  A.   Yes.

16  Q.   And on the second page, there's Office Depot?

17  A.   Yes.

18  Q.   And there's also the Wells Fargo account, correct?

19  A.   Yes.

20  Q.   And further down that page 2 of this exhibit, there's a

21  heading that says "Satisfactory Accounts."  And those first

22  three accounts listed there, are those all true accounts?

23  A.   Yes.

24  Q.   And then looking on the second page -- or, sorry, on the

25  third page, on the top -- and this is a continuation of that

Sponer - X

1    Satisfactory Accounts section.  It lists -- the first two

2    accounts on that page are Macy's and Home Depot.  Are those

3    accounts that ultimately became part of the fraudulent

4    accounts?

5    A.   Yes.

6    Q.   You testified that you rented -- or made an office

7    available for you to rent on a daily basis; is that right?

8    A.   Yeah.  It was a desk, like at one of those -- I think here

9    they're called work space or something.

10   Q.   And you could just rent by the day, whenever you felt like

11   it?  You didn't have to sign any sort of lease?

12   A.   That's correct.

13   Q.   And I believe you testified that time frame was end of

14   November through end of December?

15   A.   No.  End of November to the beginning -- I think it

16   was -- I guess -- I'm not supposed to guess, but it was in

17   January.

18   Q.   Well, did you -- you sent a series of letters to a variety

19   of creditors in January of 2017, correct?

20   A.   Yes.

21   Q.   Did you write those letters from that office?

22   A.   I don't remember.

23   Q.   I'd like to have you look at what was marked as Exhibit

24   No. 9.

25            Mr. Sponer, you identified this as your

1    correspondence with one of the district attorneys, I believe,
2    involved in the prosecution of the identity thief; is that
3    correct?
4    A.   Yes.
5    Q.   And I'd like to have you look at -- there's a
6    paragraph -- I think it's the third paragraph in the top
7    e-mail from you that said, "May I ask that you send me what
8    you think may be appropriate about this case?"  Do you see
9    that paragraph?
10   A.   Yes.
11   Q.   And it says you're looking to forward to various debt
12   collection agencies, creditors, and credit reporting
13   companies, correct?
14   A.   Yes.
15   Q.   So you were looking for information to send to all your
16   creditors, not just to Wells Fargo, correct?
17   A.   That's correct.
18   Q.   Did other creditors request a copy of any police reports?
19   A.   I don't know actually.
20   Q.   Did you send the police report to other creditors?
21   A.   Yes, but -- I don't know if it's appropriate.  Can I add
22   something about -- probably not.  Like two questions ago.
23   Q.   Well --
24   A.   Okay.  I won't.  Sorry.
25   Q.   Let's have you look at Exhibit 10.

1           THE COURT:  This is a good time to stop, as we're
2    turning to another exhibit.

3           Members of the jury, we'll take our evening recess at
4    this time.  When you get home, those people that are there are
5    going to want to know what it is that you're doing.  Please
6    let them know that you cannot discuss the case because
7    Hernandez said so.

8           And when the case is over, by the way, you can talk
9    about it to your heart's delight.  But until that time, I will
10   remind you of the precautionary instruction directing you not
11   to discuss the case or do research or any of those things.

12          With that, have a pleasant evening.  I will ask you
13   to be in your jury space -- let's say at about 10 minutes to
14   9:00.  We'll try to get started right at 9:00.

15          If you have any further questions, you can pose them
16   to Jennifer at this time.

17          Have a pleasant evening.  Thank you again, and I will
18   see you tomorrow morning.

19          (The jury leaves the courtroom.)

20          THE COURT:  Be seated.

21          Mr. Sola, I noticed, as some of the exhibits were
22   flashing through, that your client's Social Security number is
23   fully set forth in at least one of the exhibits.  That's not
24   appropriate.  It needs to be blacked out.  And so to the
25   extent that those -- you should check to make sure that his

1    Social Security -- because these become public records, all

2    the exhibits.  So please make sure that your client's Social

3    Security number gets blacked out on any exhibits, or at least

4    the first two-thirds of it.

5         MR. PETERSON:  Your Honor, on that point, we raised

6    that issue with plaintiff's counsel and heard no response.

7    They have provided us also with unredacted copies.  So what's

8    uploaded on our technology are all unredacted copies.  So we'd

9    ask that they redact and send us the new copies, so we can

10   upload rather than our having to go through and redact their

11   documents.

12        THE COURT:  Okay.  You can get that done.  It's just

13   in your client's interest not to have those things as part or

14   the public record.

15        MR. SOLA:  Yes, I understand.

16        THE COURT:  And as regards the objection made towards

17   the end, you were asking questions about whether or not your

18   client had decided not to apply for credit.  It was that line

19   of questioning.  And he stated that he had not.  And you were

20   asking him to talk about some of the places where he may have

21   been wanting to ask for credit.  There was an objection.  It

22   was sustained.  You wanted to be heard on it.  I said no.

23        But so you understand my ruling, I don't want to know

24   about specifically other creditors.  I think that's not

25   relevant.  To the extent that he was affected by that decision

1    or by what was going on in his decision not to apply for other

2    creditors, again, if it goes to the emotional distress, I will

3    allow you to go down that line of inquiry.  But there aren't

4    any economic damages, and I don't want the jury to get

5    confused that this application for credit may have triggered

6    some economic issues that are not part of this case.  That was

7    the reason for my ruling.

8              MR. SOLA:  I appreciate that, Your Honor.  And the

9    chilling -- we call it chilling, and that's seeking credit.

10   So we believe it's separate damages, sort of like the freedom.

11   He's not --

12             THE COURT:  Mr. Sola, I am letting you ask questions

13   that get to that point without asking about the specific

14   creditors.  And so you're a clever lawyer, smart guy; you'll

15   figure out a way to do that.  And on redirect I will allow

16   that area of questioning to be explored, again, to the extent

17   that it directly relates to emotional distress damages.

18             MR. SOLA:  It's not a specific creditor.  I just want

19   clarification, Your Honor.  So it's more like "I was thinking

20   of getting another credit card, but because I knew my credit

21   report was bad, I didn't do that because it would have been

22   fruitless," and the emotional distress of just not being able

23   to do what you want to do.

24             THE COURT:  That's fine.  That's acceptable.

25             MR. SOLA:  Okay.  Thank you, Your Honor.

1          THE COURT:  All right.  Anything else?

2          I will see you tomorrow morning.  Be here a little

3     early.  I want you here at least 15 minutes before we start

4     trial to make sure everybody is here, in place, and ready to

5     go.

6          We're in recess.

7          By the way, if you want to check where you are on the

8     clock, Claire is the clock keeper.  I think you have about

9     seven hours and 11 minutes was my recollection.

10          MR. SOLA:  Okay.  Thank you.

11          (The proceedings are adjourned on August 27, 2019 and

12     reconvened on August 28, 2019.)

1                        --oOo--

2

3          I certify, by signing below, that the

4      foregoing is a correct transcript of the record

5      of proceedings in the above-titled cause.  A

6      transcript without an original signature,

7      conformed signature or digitally signed signature

8      is not certified.

9

10

11

          /s/ Nancy M. Walker              10-16-19
12      _____    _____
        NANCY M. WALKER, CSR, RMR, CRR         DATE
13      Official Court Reporter
        Oregon CSR No. 90-0091
14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$11,456** [2] - 185:25, 186:2
**$29,000** [8] - 73:18, 83:9, 83:12, 86:1, 89:1, 89:2, 91:12, 142:3
**$29,419** [5] - 82:6, 127:4, 147:5, 185:22, 185:23
**$3,000** [1] - 141:25
**$635,000** [1] - 115:16
**$7,000** [1] - 55:22

**'**

**'13** [2] - 215:13, 216:14
**'16** [1] - 104:18

**/**

**/s** [1] - 230:11

**1**

**1** [10] - 1:14, 11:23, 12:8, 16:15, 16:17, 34:10, 34:14, 37:18, 37:22, 161:22
**10** [15] - 12:20, 20:11, 22:18, 23:14, 51:7, 54:14, 74:1, 90:21, 94:23, 97:9, 99:6, 122:19, 147:8, 225:25, 226:13
**10-16-19** [1] - 230:11
**10-4-79** [1] - 79:11
**100** [1] - 2:3
**1000** [1] - 2:20
**107IST** [1] - 28:11
**10th** [3] - 138:9, 139:17, 196:21
**11** [17] - 12:21, 20:22, 21:3, 21:7, 21:11, 21:14, 27:2, 40:12, 40:17, 43:19, 55:20, 56:3, 84:12, 142:19, 187:17, 229:9
**11-1** [1] - 79:12
**111** [1] - 2:9
**11th** [1] - 206:24
**12** [15] - 12:22, 21:3, 21:16, 21:24, 22:2, 43:12, 50:22, 51:3, 51:13, 51:17, 51:22, 56:8, 85:7, 151:19
**12:35** [1] - 111:23
**12th** [1] - 146:10
**13** [12] - 12:23, 22:4, 30:25, 56:12, 56:18, 56:21, 82:11, 86:3, 108:16, 123:22, 159:11
**13th** [2] - 203:4, 203:13
**14** [20] - 12:24, 22:11, 22:20, 22:25, 23:3, 23:9, 27:21, 28:15, 30:25, 54:14, 74:3, 80:13, 90:10, 90:14, 90:20, 96:12, 108:16, 148:18, 166:6, 182:20
**14th** [2] - 203:22, 208:14
**15** [34] - 12:25, 21:24, 23:11, 23:16, 23:19, 23:22, 24:4, 25:2, 44:16, 44:24, 45:5, 52:5, 52:9, 52:17, 52:20, 52:23, 53:4, 53:8, 53:11, 63:10, 64:5, 64:7, 85:8, 86:8, 86:12, 91:11, 146:6, 160:13, 167:21, 167:22, 176:25,

177:2, 212:10, 229:3
**1500** [1] - 2:12
**15th** [8] - 106:5, 106:7, 106:14, 106:17, 106:18, 106:19, 151:21, 179:10
**16** [13] - 11:17, 13:1, 24:5, 24:15, 42:11, 54:14, 57:2, 57:10, 116:18, 148:23, 175:6, 175:8, 198:10
**17** [18] - 13:2, 24:16, 25:2, 25:6, 25:10, 25:13, 25:16, 25:22, 25:25, 26:3, 40:19, 40:23, 53:18, 53:22, 54:7, 54:15, 177:13, 177:14
**17-cv-02035-HZ** [1] - 3:5
**17th** [2] - 104:11, 104:18
**18** [14] - 13:4, 26:8, 26:14, 26:16, 26:19, 36:13, 36:18, 36:20, 36:25, 37:3, 54:15, 87:5, 178:4
**18th** [4] - 106:20, 106:24, 107:6, 159:12
**19** [17] - 13:5, 26:21, 27:6, 47:11, 47:18, 47:22, 47:24, 54:15, 57:16, 57:19, 57:21, 57:25, 58:4, 58:10, 59:23, 78:13, 180:23
**1976** [1] - 215:12
**19th** [7] - 102:7, 142:21, 174:3, 218:16, 218:23, 220:11, 220:14
**1:30** [3] - 111:24, 112:19, 112:20
**1st** [3] - 108:13, 189:4, 191:12

**2**

**2** [28] - 11:24, 12:12, 16:24, 38:14, 38:20, 41:16, 41:20, 41:22, 42:2, 49:7, 49:16, 50:1, 50:4, 50:8, 50:14, 50:16, 54:14, 123:8, 123:9, 126:21, 126:22, 171:25, 193:16, 217:3, 220:21, 221:1, 221:2, 223:20
**20** [13] - 13:6, 27:8, 29:9, 30:4, 38:15, 88:12, 120:12, 132:5, 149:1, 152:22, 183:13, 198:11, 198:20
**20-year** [3] - 73:13, 80:16, 87:20
**2000s** [2] - 57:22, 59:23
**2003** [1] - 56:12
**2004** [1] - 56:13
**2008** [1] - 60:3
**2009** [1] - 60:3
**2012** [2] - 215:12, 216:14
**2015** [5] - 120:21, 123:17, 143:10, 146:10, 166:18
**2016** [27] - 73:13, 78:5, 78:13, 79:18, 81:11, 81:24, 82:11, 83:8, 83:23, 93:12, 97:12, 99:6, 101:7, 101:15, 102:1, 102:7, 126:4, 126:20, 137:3, 144:8, 161:22, 166:19, 174:4, 211:19, 217:16, 218:7, 221:14
**2017** [30] - 84:8, 84:11, 85:8, 86:3, 86:13, 87:6, 90:11, 90:25, 95:2, 96:8, 107:14, 107:18, 107:23, 107:25, 108:13, 138:9, 139:17, 142:21, 151:21, 157:20, 159:4, 159:12, 160:14, 166:18, 175:11, 179:10, 179:15, 187:21, 218:25, 224:19

**2018** [5] - 109:5, 209:6, 211:21, 214:1, 218:24
**2019** [3] - 1:5, 229:11, 229:12
**21** [10] - 4:13, 7:22, 13:7, 27:15, 27:25, 28:4, 36:7, 38:7, 87:7, 89:6
**21st** [3] - 107:25, 178:6, 194:10
**22** [9] - 13:8, 28:6, 28:15, 28:18, 28:21, 28:24, 35:23, 89:5, 189:1
**22nd** [2] - 90:25, 109:3
**23** [3] - 13:9, 29:1, 29:9, 29:12, 29:14, 29:19, 35:18, 149:8, 196:16
**23rd** [2] - 136:9, 136:23
**24** [13] - 13:10, 29:21, 30:8, 35:3, 35:14, 58:15, 58:18, 58:24, 200:1
**24th** [5] - 2:18, 105:14, 105:22, 106:1, 106:9
**25** [7] - 13:11, 30:10, 34:21, 38:2, 90:8, 202:25, 203:2
**255** [1] - 2:6
**26** [8] - 13:12, 30:20, 31:3, 90:4, 90:5, 90:9, 203:21
**26-page** [1] - 166:17
**26th** [9] - 79:3, 79:18, 102:14, 102:15, 105:13, 217:16, 218:10, 219:4, 219:14
**27** [3] - 1:5, 204:13, 229:11
**27th** [4] - 126:4, 221:14, 222:13, 222:20
**28** [2] - 206:13, 229:12
**29** [2] - 91:1, 207:21
**29,000** [1] - 141:23
**29th** [2] - 104:10, 104:18
**2nd** [2] - 104:19, 207:22

**3**

**3** [21] - 4:12, 4:13, 7:22, 12:13, 17:5, 17:13, 32:12, 32:20, 32:23, 38:21, 54:14, 88:20, 125:7, 184:5, 186:6, 200:3, 200:7, 203:7, 207:25, 219:20, 221:2
**3,000** [1] - 141:24
**30** [9] - 19:22, 29:9, 36:1, 38:25, 40:2, 104:20, 132:5, 167:6, 209:4
**30-page** [1] - 152:22
**301** [1] - 2:20
**30339** [1] - 2:4
**30th** [5] - 80:2, 88:14, 136:23, 183:14, 209:6
**3150** [1] - 2:9
**326-8186** [1] - 2:21
**36** [1] - 215:12
**37** [1] - 215:12
**38** [1] - 18:4
**3:17-cv-02035-HZ** [1] - 1:4
**3rd** [11] - 79:23, 86:13, 87:6, 104:19, 107:18, 107:23, 108:3, 167:24, 175:10, 177:16, 178:9

**4**

**4** [9] - 12:14, 17:18, 37:5, 37:16, 126:3,

1

172:11, 172:12, 221:12, 221:13
**40** [1] - 216:21
**45** [1] - 40:20
**4:00** [1] - 192:3

## 5

**5** [12] - 12:15, 18:1, 18:11, 18:16, 38:24,
39:3, 77:1, 81:19, 115:11, 126:19,
194:9, 222:23
**501** [3] - 217:12, 218:23, 219:17
**503** [1] - 2:21
**51** [1] - 93:11
**52** [1] - 91:25
**5th** [4] - 36:10, 89:13, 196:17, 208:14

## 6

**6** [10] - 12:16, 16:22, 18:18, 126:5,
126:6, 133:13, 134:5, 134:9, 134:11,
135:2
**60** [3] - 82:6, 82:8, 126:24
**609** [1] - 175:13
**6:00** [1] - 192:4
**6th** [4] - 35:15, 90:2, 187:21, 200:2

## 7

**7** [22] - 12:17, 16:22, 18:22, 19:5, 19:7,
19:10, 39:4, 39:10, 39:14, 39:23,
39:25, 43:4, 43:7, 54:14, 60:25, 126:5,
133:25, 136:1, 148:14, 148:17,
185:11, 202:12
**70** [1] - 35:25

## 8

**8** [15] - 12:18, 19:12, 19:18, 19:21,
19:25, 40:1, 42:6, 54:14, 55:1, 55:8,
55:14, 134:1, 138:7, 186:17, 187:10
**800** [2] - 2:3, 2:12
**819** [1] - 2:6

## 9

**9** [20] - 11:25, 12:19, 20:2, 40:6, 41:8,
41:14, 46:25, 47:4, 47:9, 54:14, 59:6,
59:13, 59:18, 134:5, 134:9, 139:14,
211:9, 211:11, 224:24
**90-0091** [1] - 230:13
**900** [1] - 2:17
**97201** [1] - 2:13
**97204** [3] - 2:10, 2:18, 2:21
**97214** [1] - 2:7
**9:00** [2] - 226:14
**9th** [7] - 36:2, 36:5, 81:24, 126:20,
207:3, 222:19, 223:4

## A

**AA** [1] - 19:14
**Abiel** [3] - 12:25, 23:11, 44:16
**ability** [6] - 67:1, 164:9, 164:22, 193:6,
196:6, 203:20
**able** [21] - 8:17, 32:21, 36:4, 47:24,
117:3, 122:24, 130:11, 137:8, 139:5,
140:5, 141:11, 141:18, 148:5, 165:15,
165:19, 181:18, 193:25, 205:5, 205:6,
215:1, 228:22
**above-referenced** [1] - 151:24
**above-titled** [1] - 230:5
**absolutely** [3] - 18:16, 49:23, 50:14
**absolve** [1] - 144:24
**accept** [2] - 65:4, 164:25
**acceptable** [2] - 4:4, 228:24
**access** [1] - 124:22
**accident** [1] - 182:1
**accidentally** [2] - 124:23, 142:6
**according** [3] - 123:24, 138:1, 204:2
**account** [113] - 33:5, 43:16, 46:1, 46:5,
49:3, 60:1, 67:1, 73:16, 73:25, 74:3,
75:14, 79:6, 80:13, 80:19, 81:14,
81:16, 82:14, 82:17, 82:19, 82:20,
84:10, 84:11, 85:6, 85:10, 85:24, 86:5,
87:17, 88:9, 88:10, 88:24, 90:19, 91:2,
91:16, 92:6, 92:12, 92:16, 92:17,
92:20, 93:16, 93:21, 93:25, 94:3,
95:16, 96:8, 96:10, 97:7, 97:18, 98:15,
98:16, 98:19, 99:5, 99:8, 102:21,
109:6, 111:13, 120:14, 124:19,
124:21, 126:7, 126:8, 126:9, 126:23,
137:12, 137:14, 141:21, 141:24,
142:23, 143:1, 147:5, 150:3, 151:24,
152:3, 152:11, 156:14, 159:7, 161:9,
161:10, 161:18, 162:4, 162:8, 168:22,
175:20, 175:23, 177:16, 178:15,
180:6, 180:17, 183:6, 183:11, 184:9,
184:13, 188:6, 188:19, 189:17,
192:14, 200:5, 202:13, 213:24,
213:25, 215:1, 221:17, 221:19,
221:22, 222:1, 222:3, 222:7, 222:14,
222:15, 223:18
**accountable** [2] - 73:10, 99:11
**accountant** [1] - 42:13
**accountholder** [1] - 180:11
**accounting** [2] - 24:19, 25:24
**accounts** [53] - 16:25, 38:15, 41:25,
42:3, 42:7, 42:12, 42:17, 49:1, 70:13,
80:17, 83:17, 83:21, 83:23, 85:5,
87:21, 101:9, 101:10, 101:11, 105:21,
107:12, 107:20, 107:22, 111:11,
120:13, 120:15, 129:13, 129:18,
136:20, 137:17, 141:22, 142:5, 142:7,
142:10, 146:23, 156:15, 166:18,
166:22, 169:11, 186:8, 186:9, 186:10,
187:6, 192:17, 202:5, 206:1, 208:5,
221:16, 223:3, 223:22, 224:2, 224:3,
224:4

**Accounts** [3] - 223:1, 223:21, 224:1
**accuracy** [3] - 74:7, 76:16, 88:18
**accurate** [16] - 74:12, 75:12, 75:17,
76:14, 76:19, 81:15, 82:1, 85:11,
92:16, 97:8, 98:15, 98:17, 150:6,
152:3, 160:14, 167:8
**accurately** [1] - 6:14
**accusation** [1] - 51:14
**accused** [1] - 51:11
**ACDV** [22] - 81:5, 81:6, 81:11, 81:12,
81:13, 83:7, 92:3, 93:11, 94:15, 94:23,
95:2, 95:6, 95:7, 95:9, 96:4, 96:8,
104:22, 105:1, 105:8, 109:1, 109:18
**ACDV-related** [1] - 105:1
**ACDVs** [31] - 81:18, 88:5, 88:10, 90:21,
91:23, 92:1, 94:9, 94:18, 95:18, 95:20,
95:22, 95:25, 96:2, 97:9, 98:14, 98:23,
99:1, 99:2, 99:3, 99:6, 104:11, 104:13,
104:15, 104:17, 104:23, 105:2,
108:10, 108:11, 108:24, 110:19
**achieve** [1] - 210:20
**acronyms** [1] - 104:13
**act** [4] - 15:13, 123:15, 125:10, 195:20
**Act** [13] - 8:24, 33:4, 73:2, 74:7, 76:16,
96:15, 144:16, 170:4, 170:6, 171:12,
175:14, 190:14, 190:25
**acted** [1] - 8:23
**action** [3] - 98:25, 135:24, 208:15
**actions** [9] - 95:25, 96:21, 98:7, 98:10,
98:22, 99:2, 105:24, 108:8, 144:23
**active** [1] - 20:19
**activities** [4] - 21:1, 24:10, 28:12, 30:3
**activity** [1] - 205:20
**acts** [3] - 14:4, 85:17, 123:25
**actual** [1] - 42:13
**acute** [1] - 191:12
**ad** [1] - 115:2
**ADA** [1] - 132:25
**ADA-type** [1] - 132:25
**Adam** [1] - 72:14
**add** [4] - 5:3, 5:4, 182:17, 225:21
**added** [2] - 160:2, 162:18
**adding** [1] - 160:4, 172:4
**addition** [2] - 152:21, 202:15
**additional** [12] - 56:19, 102:17, 103:22,
108:3, 108:24, 128:1, 153:1, 184:18,
200:10, 202:16, 203:10, 208:3
**Additional** [1] - 146:7
**address** [21] - 4:22, 10:1, 70:21, 92:8,
95:6, 99:10, 103:2, 105:5, 128:2,
145:13, 145:14, 146:12, 155:22,
155:24, 164:5, 170:25, 180:10,
184:20, 184:21, 197:20, 219:22
**addresses** [1] - 101:5
**addressing** [1] - 68:15
**adds** [1] - 86:4
**adjourned** [1] - 229:11
**admissible** [2] - 3:25, 9:7
**admit** [2] - 96:16, 96:23
**admitted** [7] - 4:14, 9:1, 65:18, 65:19,

71:2, 104:2, 110:24
**admitting** [3] - 29:25, 183:6, 209:14
**admonishment** [1] - 63:25
**adoption** [2] - 17:23, 17:24
**adults** [1] - 26:6
**Adverse** [1] - 222:25
**adverse** [1] - 223:3
**advice** [1] - 208:17
**advises** [1] - 82:13
**advising** [1] - 125:1
**advocate** [1] - 67:18
**affect** [5] - 129:22, 130:22, 131:12, 164:8, 164:22
**affected** [7] - 97:21, 97:22, 98:10, 206:7, 211:25, 214:19, 227:25
**affects** [1] - 193:7
**affidavit** [27] - 84:20, 85:4, 85:17, 86:10, 86:24, 103:7, 129:9, 129:15, 137:2, 137:6, 137:11, 137:13, 137:16, 145:7, 147:14, 147:18, 148:2, 150:24, 151:7, 152:23, 154:17, 174:19, 178:14, 178:16, 205:23, 217:18, 218:2
**affiliated** [1] - 31:20
**afford** [1] - 36:16
**afternoon** [5] - 99:22, 113:1, 176:23, 177:9, 215:8
**afterwards** [1] - 4:17
**ag** [1] - 30:2
**age** [2] - 20:13, 116:8
**agencies** [25] - 42:25, 58:6, 73:7, 73:16, 74:1, 74:20, 79:1, 79:19, 80:23, 85:10, 91:24, 123:5, 124:13, 126:12, 139:21, 152:3, 166:23, 167:5, 195:1, 209:25, 210:4, 220:16, 220:18, 225:12
**agency** [17] - 33:5, 41:6, 42:21, 74:21, 74:22, 75:5, 75:9, 75:10, 75:15, 81:25, 82:16, 135:24, 155:17, 155:18, 182:19, 183:11, 210:13
**agent** [2] - 96:3, 170:23
**ago** [35] - 19:17, 19:18, 19:22, 21:2, 21:4, 21:23, 21:24, 22:18, 23:14, 24:11, 24:25, 25:3, 25:15, 25:16, 25:17, 26:13, 27:3, 27:21, 28:14, 28:15, 29:8, 29:10, 29:11, 29:12, 30:4, 30:12, 30:25, 40:2, 40:20, 56:4, 76:25, 173:23, 195:13, 225:22
**agree** [10] - 7:11, 53:5, 64:25, 65:3, 80:20, 86:6, 100:9, 100:10, 153:1
**agrees** [1] - 94:9
**ahead** [6] - 43:6, 62:2, 64:12, 99:20, 141:10, 178:13
**airplanes** [1] - 53:24
**airport** [1] - 173:8
**Albertson's** [1] - 18:24
**alert** [1] - 71:20
**Alice** [3] - 13:2, 24:16, 40:23
**alleges** [2] - 33:2, 104:22
**alleging** [1] - 105:8
**allow** [6] - 4:18, 4:19, 7:18, 8:8, 228:3, 228:15

**allowed** [2] - 67:12, 200:19
**allowing** [1] - 4:21
**allows** [1] - 78:3
**almost** [7] - 84:3, 90:12, 130:21, 132:16, 157:12, 198:22, 211:13
**alone** [2] - 26:9, 64:21
**alternate** [1] - 30:25
**Amazon.com** [1] - 21:18
**amended** [1] - 74:11
**America** [4] - 22:8, 40:13, 118:25, 122:1
**amount** [10] - 8:9, 49:25, 50:3, 115:4, 147:5, 160:15, 186:1, 192:22, 192:25, 195:25
**amounts** [1] - 137:13
**Ana** [3] - 31:18, 76:23, 113:23
**analyst** [1] - 17:8
**Andrew** [3] - 13:7, 27:15, 36:7
**Angela** [2] - 12:18, 62:19
**Angelman's** [1] - 116:19
**angelman's** [1] - 116:21
**Angie** [3] - 19:12, 40:1, 42:6
**angry** [1] - 182:7
**Annette** [1] - 2:16
**answer** [7] - 13:22, 15:22, 33:17, 41:21, 66:15, 121:6, 200:18
**answered** [5] - 48:24, 66:12, 66:13, 68:4, 218:21
**answering** [2] - 15:20, 216:22
**answers** [4] - 9:19, 68:8, 71:9, 188:15
**antibodies** [1] - 157:16
**anticipate** [1] - 132:22
**anxiety** [1] - 118:14
**apace** [1] - 112:21
**apart** [2] - 84:6, 179:21
**apologize** [3] - 56:9, 133:24, 134:6
**app** [1] - 115:2
**apparent** [1] - 56:22
**appear** [2] - 6:5, 22:17
**appearance** [1] - 71:11
**APPEARANCES** [1] - 2:1
**appearances** [1] - 3:6
**appeared** [10] - 17:3, 17:23, 19:1, 19:15, 20:19, 21:21, 22:9, 24:23, 30:18, 73:17
**Apple** [1] - 43:13
**application** [2] - 101:19, 228:5
**applies** [5] - 43:25, 69:14, 69:25, 70:1, 70:2
**apply** [4] - 15:1, 64:23, 227:18, 228:1
**appraiser** [1] - 38:21
**appreciate** [2] - 111:18, 228:8
**appreciated** [1] - 63:3
**approach** [1] - 87:2
**approached** [1] - 70:6
**appropriate** [5] - 45:11, 139:20, 225:8, 225:21, 226:24
**approximate** [2] - 120:25, 130:10
**Arcus** [3] - 13:10, 29:22, 35:3
**area** [5] - 18:2, 20:6, 112:12, 167:15,

228:16
**argue** [2] - 15:12, 67:16
**arguing** [1] - 23:23
**argument** [1] - 181:14
**arguments** [2] - 65:10, 72:10
**arise** [1] - 81:2
**armpit** [1] - 133:2
**arranged** [1] - 36:20
**arrested** [2] - 135:21, 136:21
**arrived** [1] - 173:10
**arrives** [2] - 168:14, 185:9
**arriving** [1] - 176:18
**Art** [1] - 20:17
**art** [2] - 17:22, 18:6
**ashamed** [1] - 202:20
**Ashley** [2] - 31:20, 91:25
**aspire** [1] - 165:17
**asserted** [1] - 134:15
**assist** [2] - 71:11, 78:11
**assistance** [3] - 8:18, 77:16, 132:18
**assistant** [1] - 72:14
**associate** [1] - 21:18
**associated** [1] - 56:14
**associates** [4] - 41:6, 41:24, 42:21, 42:24
**Association** [1] - 16:22
**association** [1] - 41:2
**assume** [3] - 19:3, 32:15, 134:20
**assumption** [3] - 3:25, 44:12, 49:4
**assurance** [1] - 98:16
**assure** [1] - 76:16
**assures** [1] - 16:9
**Astoria** [2] - 26:9, 36:14
**Atlanta** [2] - 2:4, 157:8
**ATM** [5] - 58:21, 124:23, 142:16, 194:23, 194:24
**attach** [1] - 129:9
**attached** [4] - 168:4, 174:21, 180:13, 180:14
**attachment** [5] - 148:10, 173:19, 174:5, 174:16, 176:3
**attachments** [8] - 145:4, 162:17, 162:22, 173:18, 174:9, 182:17, 220:19, 220:20
**attempt** [1] - 179:4
**attempting** [1] - 190:19
**attend** [2] - 29:5, 36:4
**attendance** [1] - 16:5
**attending** [2] - 36:1, 36:4
**attention** [17] - 71:4, 91:5, 99:13, 99:23, 100:4, 111:6, 111:18, 159:24, 169:20, 174:1, 185:8, 191:4, 191:24, 193:25, 197:18, 198:22, 205:6
**attorney** [23] - 14:13, 14:15, 78:11, 78:13, 79:13, 102:6, 122:3, 122:5, 122:13, 122:15, 125:3, 125:7, 125:11, 139:4, 139:13, 139:15, 140:22, 166:8, 166:9, 172:15, 217:8, 220:21, 221:1
**Attorney** [1] - 2:5

**attorney's** [1] - 69:2
**attorneys** [4] - 65:10, 65:11, 68:17, 225:1
**attributable** [1] - 111:16
**attribute** [3] - 165:19, 192:13, 211:2
**attributed** [1] - 49:3
**August** [12] - 1:5, 86:3, 106:20, 106:24, 107:6, 159:4, 159:12, 163:11, 164:4, 168:12, 229:11, 229:12
**authored** [1] - 108:6
**authority** [1] - 125:10
**authorize** [1] - 145:22
**Auto** [4] - 100:3, 101:21, 110:2, 223:7
**auto** [1] - 82:5
**Automated** [1] - 81:3
**automobile** [4] - 78:18, 78:19, 124:2, 124:6
**available** [3] - 10:24, 207:11, 224:7
**Avenue** [5] - 2:3, 2:9, 2:12, 2:17, 2:20
**avenues** [1] - 184:25
**average** [1] - 94:25
**avoid** [2] - 12:4, 68:23
**awake** [1] - 193:10
**award** [1] - 45:11
**awarding** [2] - 45:17, 45:23
**awards** [1] - 45:13
**aware** [7] - 104:24, 123:22, 125:25, 127:10, 162:11, 199:5, 204:8
**awful** [2] - 17:16, 199:16

### B

**B-u-l-l** [1] - 13:11
**BA** [1] - 26:24
**bachelor's** [2] - 26:10, 28:9
**backed** [1] - 60:4
**background** [4] - 100:8, 110:8, 114:16, 146:8
**backup** [2] - 49:10, 50:9
**backwards** [1] - 131:6
**bad** [11] - 24:1, 50:20, 96:19, 189:16, 189:22, 190:15, 199:16, 202:21, 213:18, 215:11, 228:21
**bailiff** [2] - 14:5, 71:23
**Bakery** [2] - 41:17, 42:3
**balance** [5] - 82:6, 105:5, 127:3, 127:5, 185:24
**bank** [21] - 38:10, 41:3, 46:22, 48:8, 49:14, 56:18, 57:16, 57:18, 58:8, 60:1, 73:5, 80:7, 102:20, 102:22, 103:23, 105:12, 106:9, 142:12, 193:2, 214:3, 214:25
**BANK** [2] - 1:6, 2:15
**Bank** [15] - 3:5, 11:17, 18:3, 40:2, 40:3, 40:8, 40:13, 40:20, 47:13, 57:4, 57:19, 59:24, 72:25, 82:5, 99:25
**banker** [2] - 101:24, 204:2
**banking** [5] - 18:13, 57:16, 98:5, 98:6, 110:9
**bankruptcy** [3] - 167:16, 167:17, 167:19

**Banks** [1] - 22:12
**banks** [13] - 38:22, 40:14, 45:8, 48:5, 52:2, 52:4, 52:6, 59:7, 59:12, 59:14, 60:5, 60:7, 74:19
**Barron** [1] - 31:19
**base** [1] - 111:16
**based** [11] - 39:21, 45:3, 61:3, 70:20, 71:1, 74:9, 75:20, 103:3, 109:7, 152:10
**basement** [3] - 179:20, 199:2, 199:3
**basis** [5] - 59:5, 59:22, 61:1, 144:13, 224:7
**basketball** [1] - 18:21
**bathroom** [2] - 198:11, 198:21
**Battery** [1] - 2:3
**Bay** [1] - 141:15
**bear** [1] - 67:7
**beautiful** [1] - 119:2
**Beaverton** [4] - 17:19, 22:5, 27:9, 29:2
**became** [2] - 123:22, 131:15, 224:3
**become** [2] - 68:16, 227:1
**becomes** [1] - 85:25
**BEFORE** [1] - 1:16
**began** [1] - 101:9
**begin** [2] - 71:25, 177:17
**beginning** [4] - 11:21, 105:19, 207:15, 224:15
**begins** [1] - 75:3
**behalf** [4] - 82:16, 113:10, 123:15, 165:6
**behavior** [1] - 117:12
**behind** [2] - 108:7, 171:9
**belief** [1] - 58:8
**believability** [1] - 67:8
**believes** [1] - 44:6
**belong** [18] - 17:2, 18:5, 18:20, 18:25, 19:14, 21:18, 22:16, 23:13, 24:9, 24:21, 26:25, 27:11, 27:20, 28:11, 30:1, 30:16, 30:23, 79:18
**belonged** [2] - 33:6, 93:17
**belonging** [2] - 88:21, 149:5
**belongs** [9] - 82:21, 84:10, 88:10, 90:3, 90:19, 184:10, 200:9, 203:9, 208:2
**below** [10] - 76:10, 144:7, 145:17, 147:13, 148:2, 160:3, 161:17, 161:22, 172:23, 230:3
**bench** [2] - 11:8, 68:18
**Bend** [1] - 34:22
**benefit** [1] - 145:23
**Berg** [3] - 31:22, 94:7, 94:17
**beside** [2] - 118:3, 132:21
**best** [4] - 15:21, 41:9, 176:18, 196:6
**Best** [7] - 187:6, 201:1, 221:17, 221:19, 221:22, 223:6, 223:14
**Bets** [2] - 31:22, 94:6
**better** [6] - 59:11, 59:12, 59:14, 80:7, 104:25, 141:3
**between** [12] - 34:5, 36:3, 52:14, 80:2, 95:7, 104:10, 104:18, 104:19, 106:19, 122:5, 169:16

**beyond** [3] - 15:5, 206:8, 212:5
**BFA** [1] - 26:24
**bias** [2] - 61:3, 67:4
**big** [15] - 17:20, 59:7, 60:5, 60:6, 76:10, 115:17, 130:1, 132:1, 132:6, 132:16, 156:15, 164:13, 188:8, 192:8, 194:1
**bigger** [1] - 133:5
**bike** [1] - 16:22
**Biking** [1] - 16:21
**bill** [1] - 153:14
**billing** [1] - 85:18
**bills** [2] - 158:16, 210:23
**Binder** [2] - 32:4, 110:6
**biographical** [1] - 16:11
**birth** [5] - 92:8, 92:15, 93:1, 95:7, 145:12
**bit** [10] - 13:14, 31:7, 38:13, 50:18, 57:6, 114:25, 116:17, 155:19, 171:7, 193:18
**bite** [1] - 112:7
**black** [2] - 188:8, 202:17
**Black** [1] - 16:21
**blacked** [2] - 226:24, 227:3
**blame** [5] - 6:21, 94:12, 96:23, 96:24, 132:9
**blank** [1] - 178:25
**block** [2] - 90:22, 219:25
**blocked** [1] - 82:12
**blog** [1] - 69:23
**blood** [1] - 157:15
**blowing** [3] - 87:16, 180:2, 180:3
**BMW** [4] - 124:2, 136:20, 149:25, 167:3
**board** [1] - 120:5
**boards** [1] - 20:16
**boat** [6] - 119:6, 193:10, 193:14, 215:15, 216:11, 216:14, 216:15, 216:18
**boats** [4] - 119:17, 216:17, 216:20, 216:24
**bold** [3] - 168:16, 169:1, 193:22
**bolded** [1] - 169:8
**Bonneville** [1] - 26:4
**book** [1] - 10:13
**bookkeeper** [1] - 24:7
**books** [1] - 216:12
**born** [2] - 131:14, 215:12
**Boston** [1] - 57:4
**bother** [1] - 197:19
**bottom** [9] - 135:19, 144:4, 146:25, 147:3, 162:7, 170:1, 219:24, 221:25, 222:9
**bought** [5] - 57:3, 77:11, 129:24, 167:3, 195:2
**boundary** [1] - 17:19
**bounds** [1] - 117:9
**box** [12] - 11:18, 11:20, 11:22, 12:2, 16:13, 95:8, 127:5, 143:16, 144:7, 161:2, 179:21
**boxes** [1] - 92:13
**boys** [2] - 36:10, 36:11
**brad** [1] - 35:23

**Bradley** [2] - 13:8, 28:6
**Brady** [15] - 31:22, 32:4, 91:7, 102:11, 102:12, 102:16, 106:10, 108:5, 109:20, 217:20, 219:18, 220:6, 220:8
**Brady's** [1] - 105:13
**branch** [1] - 101:23
**branches** [1] - 155:6
**Braxton** [7] - 14:22, 14:23, 32:2, 100:2, 106:12, 109:14, 109:15
**breadwinner** [1] - 196:11
**break** [3] - 53:25, 63:17, 64:4
**breakfast** [2] - 192:7, 192:8
**breaking** [5] - 53:20, 119:20, 119:23, 165:3, 171:19
**breaks** [1] - 119:23
**breast** [1] - 131:18
**breast-feeding** [1] - 131:18
**Brian** [10] - 12:24, 22:11, 31:21, 32:4, 32:13, 32:18, 62:21, 95:1, 96:8, 110:6
**brief** [8] - 5:1, 10:8, 10:10, 10:13, 10:15, 22:21, 62:7, 134:4
**briefing** [1] - 8:13
**briefly** [4] - 5:10, 7:21, 173:21, 220:20
**bright** [1] - 199:21
**bring** [2] - 9:25, 63:11
**broke** [1] - 72:25
**broker** [2] - 20:5, 40:7
**brother** [13] - 23:12, 32:13, 40:13, 78:7, 85:23, 102:3, 121:9, 121:10, 121:11, 123:23, 156:19, 157:15, 216:10
**brother's** [1] - 121:11
**brought** [4] - 3:23, 44:10, 48:18, 72:24
**build** [1] - 16:22
**Building** [1] - 74:16
**Bull** [3] - 13:11, 30:11, 34:21
**bull** [1] - 37:25
**bullet** [3] - 104:2, 183:19, 217:23
**bunch** [1] - 147:23
**burdened** [1] - 165:13
**bureau** [4] - 48:8, 100:3, 109:15, 110:4
**bureaus** [4] - 48:5, 136:25, 167:8, 205:12
**Burson** [4] - 13:2, 24:16, 40:23, 53:14
**BURSON** [1] - 13:2
**bus** [4] - 43:21, 118:12, 132:3, 192:4
**business** [20] - 20:24, 30:2, 30:12, 34:22, 34:23, 34:24, 37:15, 43:20, 44:7, 49:15, 53:1, 53:7, 59:7, 60:6, 61:4, 175:19, 175:22, 190:13, 190:18, 190:20
**businesses** [4] - 49:8, 49:9, 52:19, 52:22
**busy** [1] - 168:23
**button** [4] - 112:16, 153:9, 176:22, 197:20
**buy** [2] - 43:15, 169:13
**Buy** [7] - 187:6, 201:1, 221:17, 221:19, 221:22, 223:6, 223:14
**buyers** [1] - 114:10

**buying** [3] - 173:12, 194:25, 210:23
**buzz** [2] - 112:9, 112:17
**BY** [30] - 113:19, 116:22, 125:24, 135:1, 138:6, 141:1, 141:17, 144:6, 145:18, 146:20, 147:2, 147:9, 147:16, 150:11, 152:19, 158:12, 161:1, 163:3, 173:20, 174:7, 174:17, 175:7, 177:12, 188:3, 194:4, 200:24, 203:1, 206:16, 214:18, 215:7

# C

**C-o-l-l-i-e-r** [1] - 12:17
**C-o-r-b-i-n** [1] - 13:9
**cafeteria** [1] - 164:20
**California** [6] - 27:2, 58:20, 100:22, 101:8, 101:16, 123:24
**camera** [2] - 112:15, 112:16
**camping** [5] - 27:1, 30:3, 30:17, 114:14, 118:22
**cancel** [2] - 83:13, 83:15
**cancelled** [3] - 57:6, 85:14, 153:2
**cannot** [15] - 34:5, 46:16, 47:21, 66:13, 66:14, 71:18, 71:19, 77:15, 80:7, 94:16, 94:19, 94:20, 134:17, 140:22, 226:6
**capable** [2] - 146:17, 188:15
**capitalist** [1] - 20:14
**caption** [2] - 6:6, 6:11
**captions** [1] - 6:14
**car** [38] - 33:5, 73:14, 73:20, 73:22, 78:3, 78:16, 79:5, 79:25, 80:3, 80:6, 80:10, 83:1, 83:3, 84:8, 101:15, 101:16, 101:18, 101:20, 101:21, 101:24, 121:17, 124:8, 125:4, 129:24, 133:11, 138:2, 158:23, 159:1, 167:4, 169:13, 169:19, 169:22, 173:12, 185:21, 190:3, 195:2, 209:2
**card** [58] - 55:4, 56:14, 57:3, 57:4, 58:19, 78:1, 80:17, 83:13, 83:14, 87:9, 87:14, 87:17, 87:19, 88:1, 89:7, 89:9, 97:2, 100:25, 101:1, 103:11, 103:15, 103:17, 103:19, 108:2, 108:4, 108:15, 108:19, 108:22, 120:14, 124:19, 124:21, 124:24, 136:20, 142:16, 148:24, 148:25, 149:5, 156:7, 178:20, 179:12, 179:16, 179:19, 180:5, 180:21, 189:8, 189:14, 190:8, 194:11, 194:20, 194:23, 194:24, 195:4, 195:5, 202:9, 218:3, 228:20
**cards** [3] - 55:2, 57:17, 101:3
**care** [6] - 3:16, 8:5, 42:13, 51:7, 83:3, 198:2
**carefully** [4] - 31:14, 144:1, 194:15, 197:6
**caregiver** [1] - 199:5
**Caribbean** [2] - 169:17, 215:23
**caring** [1] - 198:22
**Carlton** [1] - 24:17
**Carolina** [1] - 179:7

**carpets** [1] - 20:24
**carried** [2] - 33:14, 33:24
**carry** [3] - 37:6, 103:19, 130:11
**cars** [1] - 210:23
**cart** [3] - 132:19, 132:20, 132:21
**Case** [1] - 3:5
**case** [173] - 3:17, 3:18, 3:19, 5:23, 8:20, 8:21, 8:22, 9:6, 9:20, 10:7, 10:9, 10:11, 10:19, 14:5, 14:16, 15:2, 15:3, 15:4, 15:5, 15:6, 15:12, 15:14, 18:15, 19:3, 19:6, 19:9, 19:20, 19:24, 21:13, 22:1, 22:19, 22:20, 22:21, 23:8, 23:15, 23:18, 24:3, 24:14, 25:14, 25:21, 26:15, 26:18, 27:3, 28:17, 29:13, 29:18, 30:7, 30:25, 31:2, 31:9, 32:19, 33:1, 33:7, 33:9, 33:10, 33:14, 33:18, 37:11, 38:18, 39:9, 39:19, 39:20, 40:16, 41:4, 41:13, 41:19, 42:18, 44:23, 44:25, 45:3, 45:17, 45:21, 46:6, 46:13, 46:16, 47:8, 47:12, 47:21, 47:25, 48:14, 48:20, 50:8, 50:18, 50:21, 51:18, 52:25, 53:15, 53:17, 61:21, 62:5, 62:6, 63:13, 63:18, 63:19, 63:20, 63:21, 63:23, 64:15, 65:10, 65:15, 65:16, 66:19, 66:21, 67:4, 68:4, 68:13, 69:4, 69:11, 69:12, 69:13, 69:15, 69:17, 69:20, 69:21, 70:1, 70:6, 70:8, 70:14, 70:18, 71:8, 72:7, 72:24, 73:4, 73:23, 76:12, 81:20, 81:21, 81:23, 82:25, 83:2, 84:9, 84:22, 84:23, 94:9, 94:11, 96:2, 96:13, 99:23, 100:5, 100:8, 100:15, 100:21, 100:23, 100:24, 101:1, 102:13, 106:24, 110:3, 110:12, 111:5, 111:19, 112:3, 138:11, 138:25, 139:4, 139:20, 143:7, 143:18, 151:13, 154:15, 161:3, 166:15, 193:18, 218:19, 225:8, 226:6, 226:8, 226:11, 228:6
**cases** [8] - 15:3, 15:6, 21:6, 21:7, 25:5, 25:18, 155:6, 155:14
**casino** [1] - 149:19
**Casualty** [1] - 187:19
**catch** [1] - 78:5
**catch-22** [1] - 51:4
**catches** [1] - 59:8
**cats** [1] - 18:3
**caught** [15] - 51:10, 73:19, 73:22, 78:9, 78:18, 84:18, 115:22, 146:3, 154:8, 165:14, 166:16, 169:7, 198:5, 199:12, 216:6
**caused** [5] - 7:1, 7:5, 84:6, 107:11, 111:10
**causes** [18] - 22:1, 23:8, 23:18, 24:2, 24:13, 25:20, 27:5, 28:20, 30:6, 38:17, 39:9, 40:16, 41:12, 41:19, 42:18, 44:1, 118:14
**caveat** [2] - 34:5, 61:20
**caveats** [1] - 61:18
**cc** [4] - 170:15, 170:20, 173:15, 191:2
**cc-ing** [2] - 170:15, 191:2

**cease** [1] - 144:18
**Celestina** [2] - 31:23, 98:13
**cell** [2] - 61:17, 62:14
**Center** [1] - 20:17
**centered** [1] - 118:15
**certain** [8] - 49:25, 68:22, 103:6, 105:16, 114:7, 114:8, 117:20, 210:13
**certainly** [4] - 6:25, 10:10, 101:11, 222:13
**certified** [3] - 107:6, 107:7, 230:8
**certify** [1] - 230:3
**certifying** [1] - 147:17
**cetera** [2] - 11:24, 112:4
**chain** [1] - 157:18
**chair** [1] - 199:1
**challenge** [3] - 60:15, 61:2, 61:5
**challenges** [7] - 16:4, 60:11, 60:19, 60:24, 61:9, 62:9, 62:12
**challenging** [1] - 115:5
**chambers** [2] - 112:11, 112:12
**chance** [3] - 77:10, 84:14, 110:15
**change** [3] - 80:3, 83:18, 182:17
**changed** [3] - 157:16, 168:18, 219:13
**changes** [1] - 182:11
**changing** [1] - 155:6
**chaos** [1] - 155:20
**charge** [4] - 85:25, 86:2, 161:24, 186:5
**charge-off** [4] - 85:25, 86:2, 161:24, 186:5
**charged** [1] - 162:8
**charged-off** [1] - 162:8
**charges** [2] - 194:20, 195:4
**Charne** [25] - 78:13, 79:13, 80:21, 86:22, 90:15, 97:5, 102:7, 102:15, 123:12, 125:9, 125:18, 125:21, 126:11, 144:8, 173:22, 174:3, 180:24, 181:1, 181:8, 182:8, 195:12, 211:5, 217:8, 220:10
**Charne's** [1] - 218:8
**chart** [3] - 74:15, 75:2, 88:16
**chasing** [1] - 24:10
**chat** [1] - 69:23
**check** [10] - 40:20, 95:8, 136:13, 149:18, 158:6, 159:3, 198:20, 199:3, 226:25, 229:7
**checked** [2] - 149:6, 205:18
**checking** [4] - 120:14, 124:19, 124:20, 134:2
**checklist** [4] - 154:13, 204:21, 205:4, 205:8
**checks** [3] - 85:14, 92:13, 153:2
**chemo** [3] - 17:10, 17:12, 17:15
**child** [2] - 153:24, 164:16
**children** [8] - 24:6, 25:18, 54:10, 54:11, 77:6, 77:7, 77:12, 117:11
**Children's** [1] - 17:13
**chilling** [2] - 228:9
**choke** [1] - 164:21
**choosing** [2] - 193:12, 193:13

**chose** [2] - 201:3, 201:4
**chosen** [2] - 36:23, 204:9
**chronology** [4] - 160:4, 168:11, 193:19, 194:21
**Chula** [7] - 78:7, 84:23, 121:8, 123:24, 135:21, 143:7
**church** [4] - 22:16, 24:21, 27:20, 29:5
**circles** [4] - 89:21, 197:11, 204:5, 205:5
**Circuit** [1] - 4:21
**circumstances** [9] - 9:20, 54:24, 55:19, 57:14, 58:7, 58:14, 104:25, 105:7, 110:12
**circumstantial** [3] - 65:22, 65:25, 66:3
**city** [1] - 184:21
**City** [1] - 23:12
**civil** [9] - 15:2, 15:6, 18:7, 19:3, 25:6, 28:16, 30:25, 53:16
**civilization** [2] - 117:14, 119:9
**claim** [14] - 6:16, 6:23, 6:25, 53:21, 74:6, 75:25, 85:18, 95:17, 99:1, 99:4, 178:15, 209:10, 209:12, 220:2
**claiming** [5] - 50:6, 80:18, 96:25, 104:8, 209:22
**claims** [3] - 54:5, 54:9, 92:4
**Claire** [1] - 229:8
**clarification** [3] - 6:19, 35:4, 228:19
**clarify** [1] - 67:15
**clean** [1] - 192:8
**cleaning** [1] - 20:24
**cleanup** [1] - 8:5
**clear** [14] - 35:15, 61:3, 83:22, 104:3, 154:15, 155:22, 166:21, 168:17, 168:25, 186:13, 198:4, 220:3, 221:10
**clear-cut** [1] - 154:15
**clearly** [2] - 71:18, 154:15
**clears** [1] - 119:13
**clerk** [2] - 23:12, 40:4
**CLERK** [6] - 3:4, 4:10, 12:8, 12:12, 113:6, 113:13
**clever** [1] - 228:14
**click** [4] - 153:25, 176:22, 181:16, 194:16
**clicked** [4] - 153:8, 197:5, 197:20, 204:11
**client** [5] - 7:6, 7:13, 7:14, 59:24, 227:18
**client's** [3] - 226:22, 227:2, 227:13
**clients** [2] - 27:18, 59:17
**climb** [1] - 12:3
**climbing** [1] - 12:4
**clinic** [2] - 35:25, 36:3
**clock** [5] - 4:24, 5:1, 5:3, 229:8
**close** [11] - 38:10, 41:5, 41:24, 42:21, 42:23, 63:7, 71:4, 77:17, 110:16, 111:6, 199:25
**closed** [1] - 199:3
**closer** [1] - 116:23
**closing** [1] - 72:10
**Club** [1] - 18:25
**clubs** [12] - 17:2, 18:20, 21:19, 23:13,

24:9, 24:21, 26:10, 26:25, 27:11, 30:1, 30:16, 30:23
**clue** [1] - 128:20
**co** [3] - 42:12, 72:23, 99:25
**co-counsel** [2] - 72:23, 99:25
**co-partner** [1] - 42:12
**coach** [1] - 36:10
**Coast** [1] - 19:15
**coast** [1] - 20:18
**Colin** [1] - 31:21
**collect** [6] - 49:7, 49:9, 49:18, 49:23, 49:24, 183:2
**collected** [1] - 209:2
**collecting** [1] - 49:19
**collection** [13] - 41:6, 74:20, 82:15, 155:17, 155:18, 161:24, 162:1, 166:23, 183:11, 188:20, 188:22, 214:4, 225:12
**collections** [7] - 41:7, 41:9, 41:17, 49:1, 49:14, 194:18, 212:16
**collector** [3] - 42:3, 49:4, 49:15
**Colleen** [3] - 12:15, 18:1, 39:3
**college** [9] - 16:20, 17:1, 18:24, 20:25, 24:8, 27:10, 30:2, 30:22, 113:23
**Collier** [4] - 12:17, 18:22, 39:4, 43:7
**coloring** [1] - 10:13
**colors** [1] - 10:14
**Columbia** [2] - 40:8
**comical** [1] - 90:12
**coming** [1] - 47:12
**commentary** [1] - 70:14
**commercials** [1] - 3:15
**Commission** [2] - 84:20, 129:4
**Commission's** [1] - 144:14
**commit** [1] - 135:22
**common** [1] - 32:17
**communicate** [6] - 63:18, 65:14, 69:18, 69:19, 71:22, 176:18
**communicates** [1] - 61:20
**communicating** [3] - 69:25, 70:2, 95:15
**communication** [1] - 96:9
**communications** [3] - 179:15, 188:21, 212:6
**companies** [17] - 49:11, 55:4, 74:19, 98:19, 101:14, 114:19, 142:13, 153:19, 155:14, 155:22, 186:12, 187:1, 188:14, 201:3, 210:12, 223:12, 225:13
**company** [37] - 20:14, 27:17, 30:15, 34:25, 35:24, 39:11, 42:24, 49:20, 49:23, 56:17, 77:1, 77:2, 77:3, 88:17, 88:18, 114:18, 114:20, 114:22, 115:1, 115:9, 115:12, 122:16, 137:12, 155:16, 157:25, 158:13, 171:4, 175:19, 187:15, 187:18, 188:9, 190:23, 210:11, 213:13, 215:9, 215:22
**company's** [1] - 158:4
**compare** [4] - 92:7, 92:9, 95:6, 141:21
**compared** [1] - 92:10
**compelling** [2] - 119:8, 216:13

**compensated** [1] - 111:4
**complaining** [4] - 43:15, 104:15, 107:11, 171:16
**complaint** [3] - 84:20, 103:5, 104:5
**complaints** [7] - 39:11, 43:2, 43:8, 43:20, 43:21, 104:23, 105:3
**complete** [10] - 15:20, 15:22, 33:12, 33:15, 141:8, 142:17, 160:12, 194:13, 218:2
**completed** [12] - 5:6, 15:10, 16:3, 22:21, 67:13, 69:10, 84:9, 127:7, 127:11, 150:24, 206:21, 209:9
**completely** [4] - 37:12, 51:6, 153:9, 189:19
**complex** [1] - 10:11
**complicated** [8] - 10:11, 128:6, 130:5, 130:15, 132:10, 188:16, 192:15, 198:16
**comply** [3] - 76:4, 81:9, 94:5
**component** [1] - 74:9
**computer** [11] - 17:7, 76:24, 86:17, 114:1, 114:2, 114:7, 173:9, 174:13, 192:11, 199:9, 207:8
**computers** [1] - 153:19
**concern** [7] - 24:13, 83:5, 89:2, 126:22, 183:1, 192:14, 212:20
**concerned** [4] - 136:14, 162:10, 165:2, 212:12
**concerns** [1] - 196:22
**concise** [1] - 104:3
**conclude** [1] - 94:19
**concluding** [1] - 168:21
**condition** [2] - 116:18, 117:5
**conduct** [10] - 69:6, 73:11, 76:9, 76:10, 88:8, 91:14, 96:20, 104:16, 110:12, 111:16
**conducted** [1] - 91:20
**conference** [4] - 68:18, 69:2, 69:3, 133:23
**conferences** [2] - 68:21, 69:1
**confident** [1] - 33:18
**confirm** [4] - 78:21, 79:16, 103:23, 124:7
**confirmed** [3] - 92:18, 93:23, 144:9
**confirming** [1] - 104:8
**conformed** [1] - 230:7
**confused** [2] - 127:23, 228:5
**confusing** [1] - 53:22
**confusion** [2] - 68:23, 134:7
**congratulations** [1] - 72:19
**connect** [1] - 30:13
**connected** [2] - 62:5, 63:20
**connection** [5] - 39:8, 40:15, 123:16, 204:3, 221:5
**connects** [1] - 77:16
**conscientious** [2] - 158:18, 210:22
**consider** [13] - 15:25, 45:17, 45:23, 65:9, 65:20, 66:3, 66:20, 69:3, 70:12, 93:7, 118:23, 167:19, 184:2
**considered** [2] - 4:14, 8:25

**considering** [1] - 66:25
**consist** [1] - 65:1
**consistent** [3] - 7:3, 92:18, 94:10
**constant** [4] - 89:2, 119:19, 198:22, 212:20
**constantly** [1] - 213:15
**consulting** [1] - 70:15
**consumer** [17] - 53:1, 53:6, 74:22, 75:1, 75:3, 75:14, 75:21, 75:22, 75:23, 81:7, 85:10, 88:1, 103:6, 103:7, 127:8, 152:2, 175:18
**Consumer** [2] - 81:3, 162:7, 162:9
**consumer's** [1] - 92:24
**consumers** [7] - 52:19, 52:22, 75:6, 75:7, 88:4, 100:20, 103:2
**consuming** [1] - 139:8
**contact** [22] - 55:15, 56:17, 70:9, 88:17, 102:3, 120:16, 120:20, 122:13, 123:3, 124:25, 126:11, 135:23, 136:11, 167:16, 184:16, 184:19, 185:3, 200:10, 203:10, 203:24, 208:3, 219:17
**Contact** [3] - 205:9, 205:12, 205:15
**contacted** [15] - 56:13, 78:7, 102:4, 102:6, 122:19, 123:5, 123:6, 123:23, 135:6, 136:3, 138:1, 139:13, 144:8, 183:25
**contacting** [4] - 135:9, 139:4, 167:17, 174:3
**contacts** [3] - 77:25, 78:11, 171:13
**contain** [1] - 134:13
**context** [2] - 98:6, 110:23
**continuation** [1] - 223:25
**continue** [3] - 5:1, 5:12, 35:12
**Continue** [1] - 205:25
**continued** [1] - 107:20
**continues** [3] - 85:24, 89:23, 223:9
**continuing** [32] - 116:22, 125:24, 131:12, 135:1, 138:6, 141:1, 141:17, 144:6, 145:18, 146:20, 147:2, 147:9, 147:16, 150:11, 152:19, 158:12, 161:1, 163:3, 173:20, 174:7, 174:17, 175:7, 177:12, 184:12, 188:3, 194:4, 200:4, 200:24, 203:1, 206:16, 214:18
**contractor** [1] - 22:12
**contradicted** [1] - 67:5
**contribution** [1] - 16:8
**control** [8] - 33:20, 37:9, 37:10, 64:18, 66:7, 117:1, 213:19, 213:22
**convene** [2] - 3:2, 11:13
**conversation** [3] - 32:16, 79:24, 125:20
**convey** [2] - 35:19, 160:17
**convicted** [1] - 141:12
**cook** [1] - 26:11
**cooks** [1] - 119:14
**Cooper** [4] - 32:3, 106:11, 109:25, 110:2
**copied** [1] - 137:12
**copies** [7] - 6:9, 141:11, 153:2, 173:15, 227:7, 227:8, 227:9
**copy** [11] - 87:9, 89:8, 104:1, 137:16, 143:13, 178:20, 187:15, 218:3, 218:4,

225:18
**copying** [1] - 170:22
**copyrights** [1] - 122:17
**copywriter** [1] - 17:9
**Corbin** [4] - 13:9, 29:2, 35:18, 35:22
**Corey** [6] - 12:19, 20:2, 40:6, 41:8, 46:25, 62:19
**corner** [1] - 13:3
**corporate** [4] - 94:8, 96:14, 99:11, 185:3
**corporation** [1] - 160:18
**correct** [35] - 19:4, 50:4, 58:12, 60:23, 74:12, 134:5, 202:3, 215:24, 216:1, 216:4, 217:8, 217:21, 218:5, 218:8, 218:12, 218:17, 218:19, 219:9, 220:2, 220:5, 220:23, 221:5, 221:23, 222:1, 223:4, 223:7, 223:14, 223:18, 224:12, 224:19, 225:3, 225:13, 225:16, 225:17, 230:4
**corrected** [8] - 75:23, 75:24, 76:17, 76:21, 79:2, 88:4, 91:21, 124:15
**correctly** [1] - 7:25
**correspondence** [10] - 86:15, 106:19, 106:23, 107:24, 108:14, 151:23, 180:11, 196:19, 219:1, 225:1
**corresponding** [1] - 202:17
**Cosgrave** [1] - 2:17
**couch** [1] - 118:3
**Council** [1] - 18:5
**counsel** [14] - 3:2, 3:6, 11:12, 14:22, 64:9, 72:6, 72:8, 72:15, 72:23, 99:25, 100:1, 112:24, 177:7, 227:6
**count** [1] - 67:11
**countries** [1] - 120:25
**country** [15] - 56:23, 78:2, 83:19, 100:20, 120:24, 121:20, 123:17, 129:25, 166:18, 169:11, 172:18, 173:3, 173:4, 173:7, 180:16
**County** [1] - 28:7
**couple** [16] - 3:15, 20:16, 24:19, 48:25, 57:12, 59:2, 61:18, 130:8, 157:10, 166:8, 166:14, 177:25, 205:7, 215:23, 217:2, 221:16
**course** [8] - 68:25, 69:16, 72:16, 82:7, 97:2, 100:11, 111:25
**Court** [19] - 3:2, 3:24, 7:11, 7:17, 10:18, 11:12, 49:2, 49:12, 64:9, 67:21, 70:10, 70:24, 71:21, 76:11, 112:24, 141:13, 177:7, 230:13
**COURT** [209] - 1:1, 1:17, 2:19, 3:3, 3:14, 4:7, 4:15, 6:3, 6:10, 6:13, 7:3, 7:13, 8:2, 8:4, 9:24, 10:3, 10:5, 10:8, 10:16, 10:20, 11:5, 11:14, 12:10, 13:13, 14:2, 14:16, 15:1, 17:4, 17:12, 17:17, 17:25, 18:8, 18:13, 18:17, 19:2, 19:6, 19:8, 19:11, 19:17, 19:20, 19:23, 20:1, 20:10, 20:21, 21:2, 21:5, 21:8, 21:12, 21:15, 21:23, 21:25, 22:3, 22:10, 22:19, 22:23, 23:1, 23:7, 23:10, 23:15, 23:17, 23:21, 23:24, 24:12, 24:25, 25:4, 25:8, 25:12, 25:14, 25:19, 25:23,

26:1, 26:7, 26:13, 26:15, 26:17, 26:20, 27:4, 27:7, 27:14, 27:22, 28:2, 28:5, 28:14, 28:16, 28:19, 28:22, 28:25, 29:8, 29:11, 29:13, 29:16, 29:20, 30:6, 30:9, 30:19, 31:1, 31:4, 31:24, 32:5, 32:15, 32:21, 32:24, 34:13, 34:17, 35:1, 35:8, 35:16, 35:22, 36:6, 36:12, 36:17, 36:19, 36:23, 37:2, 37:4, 37:8, 37:17, 37:24, 38:3, 38:8, 38:16, 38:23, 39:1, 39:8, 39:13, 39:16, 39:24, 40:5, 40:9, 40:15, 40:18, 40:22, 40:24, 41:11, 41:15, 41:18, 41:21, 41:23, 42:4, 42:9, 42:15, 43:6, 43:10, 43:17, 43:23, 44:20, 44:25, 45:6, 47:1, 47:5, 47:10, 47:14, 47:20, 47:23, 48:1, 54:18, 60:10, 60:14, 60:16, 60:21, 60:23, 61:1, 61:5, 61:8, 61:13, 62:10, 62:13, 62:24, 63:6, 64:10, 64:12, 72:16, 72:19, 99:14, 99:17, 99:20, 111:22, 113:1, 113:4, 116:20, 125:23, 133:22, 134:2, 134:5, 134:10, 134:12, 138:4, 140:15, 140:17, 140:24, 141:4, 152:18, 158:11, 176:23, 177:4, 177:9, 188:1, 200:17, 200:22, 214:15, 214:17, 215:4, 226:1, 226:20, 227:12, 227:16, 228:12, 228:24, 229:1

**court** [39] - 10:17, 16:23, 17:3, 17:11, 17:23, 19:1, 20:7, 20:19, 21:21, 22:9, 24:23, 25:20, 27:2, 27:12, 28:12, 28:22, 29:6, 30:18, 32:9, 39:21, 39:22, 46:18, 61:23, 65:13, 65:17, 84:22, 138:11, 138:17, 138:24, 139:1, 140:23, 141:15, 141:19, 143:3, 143:8, 143:18, 145:21, 146:4, 161:3

**court's** [1] - 139:22

**Courthouse** [1] - 2:20

**courtroom** [6] - 14:4, 63:5, 64:11, 68:19, 177:3, 226:19

**cover** [7] - 102:25, 105:2, 105:4, 185:15, 207:4, 211:2, 217:18

**CRA** [8] - 74:23, 75:12, 75:19, 75:20, 76:5, 76:8, 81:7, 83:9

**crafting** [1] - 22:8

**cranky** [1] - 34:12, 34:16, 37:19

**CRAs** [12] - 74:24, 81:3, 81:14, 82:1, 82:21, 90:21, 95:15, 95:19, 98:23, 99:7, 144:19

**crazy** [1] - 5:11

**created** [3] - 101:4, 166:19, 169:11

**creates** [2] - 33:24, 34:7

**creative** [2] - 16:18, 20:15

**Credit** [13] - 33:3, 73:2, 74:7, 74:16, 76:15, 96:15, 144:15, 170:3, 170:6, 171:12, 175:14, 190:14, 190:24

**credit** [164] - 33:4, 38:11, 38:22, 38:25, 42:21, 42:24, 42:25, 44:4, 48:5, 48:8, 55:2, 55:3, 55:10, 57:4, 57:17, 58:6, 73:4, 73:6, 73:7, 73:8, 73:16, 73:17, 74:1, 74:8, 74:9, 74:11, 74:20, 74:21, 74:25, 75:3, 75:5, 75:9, 75:10, 75:15,

78:1, 78:25, 79:19, 80:17, 80:19, 80:22, 80:23, 81:17, 81:22, 81:24, 81:25, 82:22, 83:6, 83:13, 85:6, 85:10, 86:7, 86:15, 86:17, 88:4, 91:10, 91:24, 93:21, 94:2, 95:16, 96:12, 97:8, 97:15, 97:19, 97:25, 98:1, 98:5, 98:17, 98:19, 100:3, 101:14, 107:21, 109:6, 109:15, 110:4, 110:7, 120:14, 123:5, 124:13, 124:19, 124:21, 125:25, 126:4, 126:11, 126:20, 127:24, 128:2, 136:20, 136:25, 137:1, 137:5, 139:21, 142:16, 146:23, 149:5, 152:2, 155:25, 157:24, 158:3, 158:5, 158:6, 158:14, 158:15, 158:17, 159:3, 161:7, 161:8, 161:12, 161:21, 166:21, 167:5, 167:8, 172:4, 175:4, 182:19, 185:15, 185:17, 185:20, 186:11, 187:11, 187:15, 187:20, 188:5, 188:8, 189:11, 194:17, 194:20, 194:23, 194:24, 195:1, 195:4, 195:5, 202:8, 202:18, 202:20, 203:18, 205:12, 208:6, 209:1, 209:18, 209:24, 210:1, 210:3, 210:13, 210:16, 210:21, 211:4, 213:20, 213:25, 214:9, 214:10, 214:13, 220:16, 220:17, 221:13, 222:10, 222:15, 225:12, 227:18, 227:21, 228:5, 228:9, 228:20

**credit-based** [1] - 74:9

**creditor** [2] - 137:15, 228:18

**creditors** [27] - 85:4, 85:5, 105:23, 107:10, 107:13, 107:23, 129:12, 129:18, 139:21, 154:20, 155:8, 156:6, 166:21, 180:20, 188:23, 202:5, 205:15, 220:12, 220:15, 224:19, 225:12, 225:16, 225:18, 225:20, 227:24, 228:2, 228:14

**crew** [1] - 119:6

**crime** [3] - 80:9, 84:17, 89:12

**criminal** [27] - 15:2, 15:3, 15:4, 18:7, 19:6, 21:7, 22:20, 23:16, 25:7, 26:16, 27:3, 28:17, 28:18, 50:22, 73:23, 82:24, 83:2, 84:22, 100:21, 100:22, 143:8, 143:17, 158:20, 161:3, 188:24, 202:19, 205:20

**Criminal** [1] - 141:15

**critical** [1] - 193:10

**crop** [2] - 53:19, 53:25

**crops** [2] - 53:23, 54:2

**cross** [3] - 72:6, 72:8, 215:4

**CROSS** [1] - 215:6

**cross-exam** [1] - 215:4

**CROSS-EXAMINATION** [1] - 215:6

**cross-examine** [2] - 72:6, 72:8

**CRR** [2] - 2:19, 230:12

**cruise** [2] - 150:6, 150:7

**crushed** [1] - 197:2

**cry** [1] - 164:24

**CSR** [3] - 2:19, 230:12, 230:13

**cue** [2] - 199:14, 199:15

**curb** [1] - 132:23

**cursory** [1] - 76:13

**custody** [2] - 78:18, 124:6

**customer** [13] - 43:2, 43:13, 59:13, 73:13, 79:13, 80:16, 87:20, 97:5, 120:9, 120:11, 142:5, 171:17, 180:9

**customer's** [2] - 79:11, 79:16

**customers** [5] - 22:13, 22:24, 43:8, 59:12, 59:17

**cut** [5] - 133:8, 149:23, 154:15, 166:15, 181:6

**cut-and-dry** [1] - 166:15

## D

**D-a-v-i-s** [1] - 12:16

**dad** [3] - 17:21, 23:12, 35:5

**Dae** [3] - 13:5, 26:21, 47:11

**Dae-Jin** [3] - 13:5, 26:21, 47:11

**daily** [1] - 224:7

**damage** [4] - 52:9, 97:17, 191:12, 209:22

**damaged** [1] - 209:23

**damages** [16] - 7:15, 45:11, 45:18, 45:22, 45:23, 97:16, 111:2, 111:3, 111:4, 111:7, 111:9, 191:5, 209:21, 228:4, 228:10, 228:17

**damaging** [1] - 124:13

**Dan** [1] - 99:24

**dangerous** [1] - 199:7

**Daniel** [8] - 2:16, 3:11, 12:22, 14:17, 14:20, 21:16, 43:12, 50:17

**data** [3] - 23:12, 74:19, 210:13

**databases** [1] - 114:19

**date** [16] - 92:8, 92:15, 92:25, 95:7, 136:8, 136:10, 137:14, 138:7, 139:16, 145:12, 161:22, 187:20, 189:3, 207:1, 217:15, 218:24

**DATE** [1] - 230:12

**dated** [14] - 82:11, 85:8, 87:6, 88:13, 90:10, 126:4, 175:10, 183:14, 200:2, 203:3, 207:22, 209:6, 218:10, 221:14

**dates** [2] - 120:25, 147:6

**daughter** [11] - 84:5, 97:23, 98:11, 116:10, 116:16, 131:14, 131:18, 131:19, 132:10, 164:5, 164:6

**daughter's** [1] - 216:2

**daughters** [4] - 76:23, 77:14, 113:24, 116:7

**Davis** [2] - 12:16, 18:18

**DAY** [1] - 1:14

**days** [15] - 23:20, 23:23, 24:19, 33:9, 79:23, 82:6, 104:20, 111:20, 126:24, 128:14, 136:24, 140:3, 140:4, 182:20, 221:17

**deal** [10] - 43:20, 51:1, 83:19, 85:21, 104:25, 105:12, 107:20, 111:10, 111:13, 171:1

**Dealer** [12] - 82:3, 82:5, 89:17, 101:22, 110:1, 126:7, 152:1, 167:2, 178:15, 181:21, 196:24, 217:21

**dealership** [6] - 101:16, 101:18, 101:20,

101:21, 101:25
**dealing** [8] - 78:12, 97:20, 104:7, 109:21, 188:14, 197:8, 213:10, 220:2
**dealings** [1] - 61:4
**deals** [1] - 115:2
**dealt** [1] - 26:5
**Dean** [2] - 32:4, 110:6
**Dear** [1] - 159:15
**debit** [5] - 56:14, 100:25, 101:1, 148:24, 148:25
**debt** [8] - 74:5, 80:20, 83:9, 89:1, 89:2, 91:12, 212:21, 225:11
**December** [24] - 82:24, 89:13, 90:2, 90:10, 90:25, 104:19, 108:13, 108:25, 109:3, 130:20, 189:4, 191:12, 196:17, 197:23, 200:2, 203:4, 203:13, 203:22, 206:24, 208:12, 208:14, 224:14
**decide** [26] - 7:23, 33:21, 35:9, 39:20, 44:25, 45:3, 63:13, 64:20, 64:22, 65:16, 66:5, 66:21, 68:22, 69:9, 69:12, 71:8, 95:23, 96:16, 110:17, 110:20, 111:14, 112:13, 128:1, 159:9, 170:13, 201:4
**decided** [8] - 23:20, 46:16, 46:17, 115:20, 116:1, 156:20, 214:12, 227:18
**decides** [1] - 85:20
**deciding** [5] - 47:8, 65:9, 66:19, 66:21, 71:11
**decision** [6] - 40:4, 44:5, 71:1, 194:15, 227:25, 228:1
**decision-making** [1] - 40:4
**decisions** [1] - 110:17
**declarations** [1] - 145:19
**decorum** [1] - 190:22
**deepens** [1] - 119:11
**defeated** [1] - 184:24
**Defendant** [2] - 3:12, 3:13
**DEFENDANT** [1] - 2:14
**defendant** [11] - 5:21, 14:16, 19:5, 19:6, 33:2, 33:4, 51:19, 72:6, 72:7, 141:12, 143:8
**defendant's** [1] - 143:17
**defendants** [3] - 6:20, 8:23, 9:14
**Defendants** [1] - 1:7
**defense** [4] - 7:16, 10:3, 31:25, 54:18
**definitely** [3] - 188:22, 202:6, 211:13
**definition** [2] - 34:3, 34:4
**degree** [8] - 16:20, 20:5, 26:10, 28:10, 29:4, 30:2, 182:2
**degrees** [1] - 27:19
**dehumanizing** [2] - 176:16, 197:15
**delete** [5] - 81:14, 89:25, 95:19, 99:7, 144:19
**deleted** [3] - 84:11, 109:6, 186:10
**deliberate** [3] - 33:22, 35:9, 72:12
**deliberating** [1] - 33:11
**deliberation** [1] - 70:1
**deliberations** [6] - 33:13, 33:15, 35:11, 37:13, 64:19, 69:10
**delight** [1] - 226:9

**delighted** [1] - 37:23
**delivery** [1] - 35:21
**demand** [2] - 88:1, 182:17
**demeaning** [1] - 167:18
**denied** [4] - 6:18, 61:5, 96:13, 178:3
**Denise** [3] - 13:4, 26:8, 36:13
**deny** [2] - 44:4, 154:14
**denying** [2] - 69:3, 192:18
**department** [40] - 29:24, 40:3, 40:21, 41:7, 41:25, 89:17, 89:19, 89:22, 91:6, 91:8, 95:12, 95:13, 95:14, 95:15, 95:19, 95:24, 95:25, 96:4, 96:5, 96:9, 103:5, 104:23, 104:24, 105:9, 106:2, 106:4, 109:22, 110:1, 110:3, 143:18, 161:4, 170:15, 185:2, 185:3, 196:25, 197:7, 197:8, 217:21, 220:1
**Department** [6] - 78:8, 84:23, 84:24, 121:9, 123:24, 143:8
**departments** [2] - 133:18, 149:13
**deposed** [1] - 8:14
**deposition** [14] - 11:3, 91:6, 91:22, 93:14, 93:15, 94:6, 95:1, 96:1, 98:12, 218:19, 218:21, 219:3, 219:5, 219:7
**depositions** [1] - 39:18
**Depot** [7] - 111:12, 187:6, 201:7, 222:7, 223:6, 223:16, 224:2
**deputy** [1] - 14:4
**derogatory** [5] - 86:2, 107:22, 161:19, 210:17, 210:20
**describe** [8] - 44:14, 55:18, 181:23, 191:25, 201:25, 206:19, 217:17, 220:25
**describes** [10] - 44:13, 45:8, 45:14, 45:18, 45:24, 46:22, 48:6, 48:9, 48:11, 48:18
**description** [1] - 8:10
**design** [1] - 16:19
**designed** [1] - 74:7
**designer** [1] - 26:23
**desire** [1] - 12:5
**desk** [11] - 128:8, 128:9, 153:8, 153:20, 159:21, 160:8, 171:15, 173:25, 177:21, 185:9, 224:8
**desks** [1] - 189:24
**desperation** [1] - 189:10
**despite** [1] - 195:16
**detail** [2] - 151:6, 166:17
**detailed** [3] - 64:18, 153:3, 193:19
**details** [3] - 47:1, 86:15, 165:10
**Detective** [16] - 78:17, 78:21, 79:4, 79:9, 79:14, 79:24, 85:1, 121:8, 123:23, 123:25, 133:17, 135:25, 136:17, 138:8, 141:16, 150:4
**detective** [3] - 122:22, 138:1, 138:2
**detectives** [2] - 102:2, 149:14
**determine** [8] - 15:13, 67:23, 76:14, 91:16, 93:2, 93:21, 111:2, 180:6
**developers** [1] - 30:13
**devices** [2] - 63:22, 112:3
**Dianne** [4] - 12:13, 17:5, 32:12, 62:19

**diapers** [2] - 132:1, 199:12
**dictionaries** [1] - 70:15
**die** [1] - 117:11
**Diego** [7] - 84:22, 139:3, 139:5, 139:22, 143:8, 169:13, 195:2
**differ** [1] - 34:4
**difference** [1] - 132:6
**differences** [1] - 100:12
**different** [19] - 15:6, 40:14, 92:13, 95:8, 100:13, 118:13, 119:4, 132:3, 137:15, 163:24, 171:4, 185:9, 186:7, 189:24, 189:25, 190:6, 201:17, 220:22, 221:8
**differently** [2] - 202:5, 202:7
**difficult** [5] - 31:2, 32:18, 60:1, 115:6, 159:19
**difficulty** [29] - 18:14, 19:9, 19:24, 21:13, 22:1, 23:8, 23:18, 24:2, 25:20, 26:18, 27:5, 28:20, 29:17, 39:9, 40:16, 41:3, 41:12, 41:19, 42:18, 44:1, 44:23, 46:5, 46:13, 46:18, 47:7, 48:14, 54:4, 55:6, 104:7
**digitally** [1] - 230:7
**diploma** [2] - 29:4, 30:3
**DIRECT** [1] - 113:18
**direct** [4] - 65:22, 66:3, 219:17
**directing** [2] - 112:2, 226:10
**directly** [7] - 55:15, 139:2, 186:21, 186:23, 187:2, 220:4, 228:17
**disabilities** [1] - 26:5
**disability** [3] - 77:15, 84:5, 116:25
**disabled** [1] - 165:1
**disagree** [1] - 127:12
**disagrees** [1] - 127:8
**disappear** [1] - 131:4
**disappointed** [2] - 85:19, 127:23
**disclosed** [2] - 8:17, 8:19
**discomfort** [2] - 15:21, 97:17
**discontinued** [1] - 39:12
**discovered** [1] - 211:3
**discrepancy** [1] - 153:4
**discuss** [17] - 63:18, 70:8, 74:10, 75:8, 85:19, 92:22, 95:21, 97:14, 98:5, 98:18, 108:6, 108:7, 110:9, 112:2, 209:21, 226:6, 226:11
**discussed** [2] - 7:4, 195:8
**discussing** [2] - 69:21, 191:14
**disempowering** [1] - 197:15
**dismissed** [1] - 23:20
**disorganized** [2] - 155:6, 214:8
**display** [1] - 112:16
**dispute** [8] - 8:12, 48:7, 52:14, 75:2, 75:5, 75:6, 75:7, 75:9, 75:12, 75:21, 76:5, 76:8, 80:24, 81:2, 81:9, 84:12, 84:21, 85:8, 85:16, 86:4, 86:9, 87:1, 89:6, 89:24, 90:20, 90:21, 91:9, 91:15, 92:4, 93:13, 94:3, 94:16, 94:21, 94:22, 94:25, 97:12, 110:7, 127:17, 140:8, 142:23, 150:24, 153:12, 155:8, 162:11, 162:14, 167:5, 168:10, 169:23, 177:15, 177:17, 178:10,

183:23, 183:24, 185:14, 195:11, 200:4, 203:6, 206:21, 207:8, 207:11, 207:24, 208:10
**Dispute** [2] - 81:3, 127:7
**disputed** [15] - 74:13, 76:17, 97:6, 127:10, 144:20, 177:20, 186:9, 186:10, 186:23, 187:1, 201:3, 201:6, 201:10, 208:5
**disputes** [29] - 73:25, 74:2, 79:21, 80:13, 81:21, 83:8, 83:11, 86:21, 87:3, 88:8, 90:1, 94:18, 94:24, 98:3, 98:23, 122:6, 122:8, 155:25, 156:1, 160:4, 162:7, 162:9, 177:24, 178:2, 183:17, 186:12, 186:14, 200:14
**disputing** [9] - 81:7, 86:25, 87:3, 88:6, 88:23, 89:19, 89:23, 92:10, 144:25
**disregard** [3] - 65:12, 66:18, 66:20
**disrupted** [1] - 97:21
**dissuade** [1] - 188:20
**distract** [1] - 71:8
**distractions** [1] - 119:11
**distress** [10] - 7:5, 7:15, 45:12, 45:14, 97:17, 188:4, 210:25, 228:2, 228:17, 228:22
**District** [1] - 2:20
**DISTRICT** [3] - 1:1, 1:2, 1:17
**district** [6] - 139:4, 139:13, 139:15, 140:21, 172:15, 225:1
**division** [1] - 82:5
**Division** [1] - 141:15
**divisions** [1] - 105:11
**divorced** [1] - 19:13
**DMV** [1] - 55:11
**doctorates** [1] - 22:6
**document** [6] - 144:5, 182:13, 204:24, 217:13, 217:15, 217:17
**Documentation** [1] - 146:15
**documentation** [7] - 138:11, 138:12, 138:17, 138:24, 140:6, 140:23, 166:1
**documenting** [1] - 144:23
**documents** [23] - 6:3, 65:2, 71:19, 81:20, 81:23, 87:7, 97:1, 97:2, 110:13, 140:23, 141:18, 148:16, 154:1, 162:16, 162:19, 180:13, 195:7, 211:23, 212:2, 212:5, 217:1, 219:21, 227:11
**Doernbecher** [1] - 17:14
**dog** [1] - 114:5
**donate** [2] - 85:23, 156:20
**donation** [3] - 157:6, 157:9, 157:18
**done** [12] - 31:15, 33:18, 33:19, 63:24, 183:23, 205:8, 205:10, 205:13, 205:21, 205:22, 205:25, 227:12
**door** [3] - 112:11, 112:15, 199:3
**doors** [2] - 12:2, 166:8
**doubt** [1] - 15:5
**down** [29] - 54:23, 57:6, 63:8, 132:13, 133:11, 136:15, 138:21, 140:24, 144:7, 146:25, 160:3, 160:25, 161:22, 165:3, 166:8, 166:14, 166:24, 168:11,

174:23, 182:14, 187:17, 191:16, 193:3, 193:4, 193:18, 194:2, 205:12, 223:20, 228:3
**downturn** [1] - 60:4
**dozen** [1] - 111:11
**dozens** [1] - 101:11
**drafting** [1] - 218:23
**drawing** [1] - 178:24
**dream** [3] - 77:9, 77:11, 118:18
**dressed** [1] - 192:6
**drive** [2] - 129:24, 193:10
**driver** [1] - 35:21
**driver's** [4] - 103:10, 125:17, 145:12, 218:4
**drivers** [1] - 29:3
**driving** [4] - 43:21, 118:24, 118:25, 193:14
**drop** [1] - 212:16
**drove** [1] - 158:23
**dry** [1] - 166:15
**due** [5] - 35:24, 68:2, 126:24, 186:1, 221:18
**DUI** [2] - 19:7, 24:11
**duly** [1] - 113:10
**dunk** [1] - 167:4
**duper** [1] - 115:11
**during** [14] - 10:16, 10:25, 36:15, 65:5, 68:16, 69:15, 111:25, 121:20, 128:19, 131:20, 133:23, 213:3, 214:24, 218:11
**duties** [4] - 63:16, 64:16, 76:3, 81:1
**duty** [3] - 18:12, 64:20, 69:16
**dying** [1] - 156:19

---

# E

**e-mail** [19] - 61:24, 69:22, 121:9, 121:11, 121:12, 122:20, 133:17, 135:3, 136:2, 138:8, 139:15, 140:21, 145:14, 166:7, 180:24, 182:3, 206:19, 207:9, 225:7
**e-mailed** [2] - 57:4, 122:20
**e-mails** [2] - 61:18, 207:13
**early** [6] - 57:22, 59:23, 108:1, 128:17, 186:23, 229:3
**easier** [5] - 112:18, 133:4, 133:5, 148:15, 222:24
**easily** [2] - 121:25, 194:1
**easy** [6] - 52:23, 133:10, 144:1, 152:6, 154:13, 155:9
**eat** [1] - 112:7
**eating** [2] - 131:7, 164:20
**Ebron** [3] - 31:21, 93:13, 93:19
**Ecology** [1] - 20:17
**economic** [2] - 228:4, 228:6
**economy** [2] - 60:5, 74:9
**editing** [1] - 195:21
**educated** [2] - 30:22, 60:5
**education** [4] - 16:19, 17:1, 24:8, 164:16
**educations** [1] - 20:25

**Edward** [5] - 123:23, 136:5, 138:9, 149:14, 149:15
**effective** [3] - 177:22, 195:22, 205:4
**effectively** [1] - 122:24
**eight** [5] - 11:25, 17:20, 21:4, 58:1, 62:21
**either** [8] - 5:18, 10:11, 39:17, 68:2, 68:18, 139:3, 156:14, 185:10
**electronic** [1] - 69:22
**electronically** [1] - 81:5
**embarrass** [1] - 15:12
**embarrassed** [3] - 158:19, 199:15, 202:20
**embarrassing** [1] - 188:7
**emotional** [9] - 45:12, 45:13, 97:16, 165:5, 165:13, 188:4, 228:2, 228:17, 228:22
**empathy** [1] - 171:6
**employed** [1] - 42:21
**employee** [9] - 14:23, 87:22, 91:7, 93:12, 94:11, 94:16, 95:2, 100:2, 102:10
**employees** [7] - 91:23, 91:24, 94:13, 94:23, 95:4, 96:1, 103:2
**employer** [3] - 35:18, 70:3, 70:5
**enabled** [1] - 114:13
**enclose** [3] - 144:11, 162:16, 162:19
**enclosed** [1] - 125:8
**encloses** [4] - 84:15, 86:7, 86:9, 86:23
**enclosing** [2] - 143:12, 204:18
**enclosure** [1] - 163:4
**encourage** [1] - 135:24
**end** [31] - 34:6, 34:7, 39:18, 39:20, 42:5, 50:25, 63:14, 64:17, 69:10, 69:17, 70:25, 76:11, 106:8, 108:24, 115:14, 122:5, 125:18, 126:1, 126:16, 128:17, 130:7, 170:7, 172:6, 177:20, 182:18, 222:17, 224:13, 224:14, 224:15, 227:17
**energetic** [3] - 119:16, 213:5
**enforcement** [1] - 145:25
**engage** [1] - 213:8
**engaged** [2] - 48:7, 123:15
**engine** [1] - 119:23
**enjoy** [4] - 22:16, 27:1, 27:20, 119:1
**enjoyed** [1] - 115:5
**enormous** [4] - 115:18, 145:20, 155:9, 160:15
**enroll** [2] - 164:6
**enrolling** [1] - 164:14
**ensure** [5] - 70:19, 74:7, 76:20, 82:14, 82:18
**ensures** [1] - 82:19
**enter** [4] - 12:4, 147:3, 168:12, 173:7
**enters** [1] - 64:11
**entire** [1] - 172:18
**entirely** [1] - 169:18
**entitled** [2] - 50:2, 74:14
**entitlement** [1] - 45:21

**entry** [3] - 23:12, 147:4, 161:17
**envelopes** [1] - 163:18
**epilepsy** [1] - 117:1
**equal** [1] - 66:4
**EQUIFAX** [1] - 1:6
**Equifax** [58] - 3:19, 6:17, 7:1, 7:5, 7:9, 7:16, 7:19, 31:23, 87:1, 87:3, 88:5, 88:10, 88:13, 88:14, 89:23, 89:24, 89:25, 90:1, 90:5, 91:1, 92:9, 93:24, 98:14, 98:15, 98:17, 98:18, 152:11, 161:5, 161:8, 161:12, 161:17, 172:2, 172:8, 177:15, 177:17, 177:20, 177:24, 183:14, 184:1, 184:2, 184:5, 185:5, 185:6, 185:8, 185:14, 185:17, 185:20, 186:14, 187:2, 187:7, 195:14, 200:2, 200:5, 202:12, 203:3, 206:19, 207:22, 210:6
**Equifax's** [1] - 98:12
**equipment** [1] - 23:5
**equipped** [1] - 104:25
**ER** [1] - 29:24
**erects** [1] - 88:3
**errata** [1] - 219:8
**error** [5] - 68:24, 75:4, 75:22, 75:24, 85:18
**escort** [2] - 112:5, 177:1
**especially** [5] - 54:10, 97:22, 103:13, 173:7, 174:11
**essence** [1] - 140:13
**essential** [1] - 74:8
**essentially** [1] - 81:20
**established** [1] - 218:11
**Estate** [1] - 18:5
**estate** [2] - 20:5, 30:13
**esteem** [1] - 201:21
**estimate** [1] - 195:17
**et** [2] - 11:24, 112:4
**evaluate** [2] - 68:8, 68:9
**Evan** [2] - 31:19, 97:24
**evening** [7] - 35:5, 35:9, 35:10, 71:13, 226:3, 226:12, 226:17
**events** [3] - 145:24, 193:20, 212:6
**eventually** [3] - 115:8, 121:16, 122:10
**everyday** [1] - 119:12
**evidence** [76] - 9:2, 39:17, 39:21, 45:3, 63:13, 64:21, 64:22, 65:1, 65:2, 65:6, 65:8, 65:9, 65:16, 65:18, 65:19, 65:22, 65:23, 65:25, 66:4, 66:6, 66:7, 66:8, 66:9, 66:10, 66:17, 66:18, 66:20, 67:5, 67:7, 67:9, 67:11, 68:2, 68:10, 68:22, 68:23, 69:13, 70:11, 70:20, 71:1, 71:20, 72:1, 72:3, 72:5, 72:7, 72:9, 72:11, 73:23, 76:19, 80:4, 80:6, 80:10, 81:22, 81:23, 88:2, 88:7, 90:18, 91:17, 94:4, 96:21, 97:14, 98:21, 99:9, 101:10, 103:12, 104:2, 105:25, 107:4, 110:13, 110:16, 111:6, 111:19, 148:25, 151:11, 160:15
**evidently** [1] - 204:8
**exactly** [4] - 22:18, 36:5, 79:25, 107:1

**exam** [1] - 215:4
**examination** [1] - 5:6
**EXAMINATION** [2] - 113:18, 215:6
**examine** [2] - 72:6, 72:8
**examined** [1] - 113:11
**example** [3] - 35:10, 88:12, 103:15
**except** [2] - 55:11, 182:17
**excerpt** [6] - 79:7, 144:15, 161:6, 161:7, 161:11, 162:7
**excerpts** [1] - 11:4
**excited** [1] - 103:19
**excuse** [2] - 65:23, 67:19
**excused** [6] - 37:20, 38:1, 38:3, 38:5, 60:17, 63:2
**excusing** [1] - 37:18
**exercise** [2] - 16:4, 61:9
**exhibit** [12] - 66:9, 66:12, 66:13, 81:19, 82:8, 133:20, 135:20, 140:15, 204:13, 221:15, 223:20, 226:2
**Exhibit** [68] - 81:19, 82:8, 84:12, 85:7, 86:3, 86:12, 87:5, 88:12, 89:5, 90:4, 90:5, 90:8, 90:9, 91:1, 91:25, 93:11, 123:8, 123:9, 126:3, 126:19, 133:13, 134:11, 135:2, 136:1, 138:7, 139:14, 142:19, 151:19, 159:11, 166:6, 167:21, 167:22, 175:6, 175:8, 177:13, 177:14, 178:4, 180:23, 183:13, 189:1, 196:16, 200:1, 202:25, 203:2, 203:21, 204:13, 206:13, 207:21, 209:4, 217:3, 217:12, 218:23, 219:17, 220:21, 221:1, 221:2, 221:12, 221:13, 222:23, 224:23, 225:25
**exhibits** [20] - 3:21, 3:23, 3:25, 6:4, 8:6, 8:8, 8:9, 8:15, 8:16, 9:7, 9:22, 65:3, 71:2, 134:13, 134:22, 226:21, 226:23, 227:2, 227:3
**Exhibits** [3] - 4:12, 4:13, 7:22
**exist** [3] - 9:17, 9:18, 203:15
**expect** [3] - 13:18, 44:18, 151:5
**expectations** [1] - 190:22
**expected** [3] - 68:3, 127:20, 151:13
**expecting** [1] - 138:14
**expects** [1] - 72:3
**expenses** [1] - 83:15
**expensive** [7] - 121:17, 139:8, 157:23, 158:9, 181:9, 187:24, 198:25
**Experian** [2] - 152:12, 210:8
**experience** [24] - 18:9, 18:14, 19:8, 19:17, 21:25, 23:17, 24:1, 25:9, 26:17, 27:4, 28:19, 31:1, 38:13, 39:22, 42:17, 48:13, 110:8, 117:25, 118:11, 171:17, 188:14, 198:2, 199:22
**experienced** [3] - 49:6, 100:18, 100:19
**experiences** [8] - 19:23, 21:8, 21:12, 25:19, 28:23, 29:16, 44:1, 59:12
**expert** [6] - 86:18, 97:25, 98:4, 105:10, 105:11, 110:5
**experts** [3] - 92:21, 104:6, 110:6
**explain** [19] - 38:12, 52:2, 92:3, 92:5, 98:1, 102:12, 109:16, 109:17, 112:10,

114:2, 117:7, 130:24, 134:21, 139:24, 146:11, 164:11, 169:10, 193:3, 209:22
**explained** [1] - 146:14
**explaining** [1] - 134:18
**explored** [1] - 228:16
**exposed** [2] - 69:14, 70:23
**express** [3] - 27:22, 28:2, 67:15
**expunged** [1] - 51:8
**extend** [1] - 44:4
**extended** [1] - 215:20
**extension** [2] - 220:1, 220:4
**extensive** [1] - 97:16
**extent** [6] - 7:5, 8:23, 9:21, 226:25, 227:25, 228:16
**extort** [2] - 183:9
**extra** [2] - 77:13, 138:25
**extraordinarily** [2] - 178:23, 181:9
**extraordinary** [1] - 115:4
**extremely** [2] - 15:22, 204:6
**eyes** [2] - 117:22

## F

**Facebook** [2] - 135:6, 136:10
**faces** [1] - 100:20
**facility** [1] - 35:5
**facing** [1] - 112:15
**fact** [15] - 9:2, 9:10, 9:16, 33:23, 45:1, 46:4, 66:2, 67:9, 83:5, 92:23, 131:11, 142:2, 188:19, 218:22, 219:14
**factfinder** [1] - 67:18
**factor** [2] - 117:5, 118:1
**factors** [1] - 67:7
**facts** [14] - 15:1, 64:20, 64:22, 64:23, 65:3, 65:9, 65:15, 66:1, 66:21, 94:8, 100:8, 100:9
**fail** [1] - 132:12
**failure** [4] - 201:14, 201:15, 201:16, 201:18
**Fair** [12] - 33:3, 73:2, 74:6, 76:15, 96:15, 144:15, 170:3, 170:6, 171:12, 175:14, 190:14, 190:24
**fair** [17] - 7:6, 16:9, 18:14, 39:24, 51:12, 51:18, 51:21, 53:9, 53:12, 70:20, 158:16, 160:9, 174:10, 192:11, 201:21, 211:12, 222:13
**fairly** [3] - 33:18, 53:6, 156:3
**Fairman** [4] - 12:23, 22:5, 56:10, 62:20
**fairness** [2] - 15:23, 70:22
**faith** [5] - 189:16, 189:22, 190:13, 190:15, 190:16
**fake** [2] - 101:4, 149:20
**fall** [2] - 54:1, 160:19
**false** [4] - 51:14, 96:12, 125:25, 147:21
**falsely** [1] - 49:3
**familiar** [3] - 11:6, 31:11, 32:7
**familiarity** [1] - 46:12
**Family** [1] - 20:17
**family** [34] - 17:20, 20:9, 20:19, 25:17, 38:10, 41:5, 41:24, 42:20, 42:23, 43:1,

48:17, 54:10, 70:3, 70:5, 77:14, 77:21, 83:14, 83:18, 85:20, 97:22, 106:14, 113:22, 114:12, 117:5, 117:9, 119:5, 123:18, 129:22, 131:13, 191:10, 191:18, 212:25, 213:6, 215:20

**family's** [3] - 97:21, 191:21, 196:10

**far** [17] - 7:19, 13:19, 35:4, 57:11, 60:22, 117:13, 119:20, 124:25, 136:14, 141:23, 160:10, 162:10, 165:2, 193:18, 206:11, 210:10, 215:2

**Farah** [18] - 76:23, 77:14, 84:4, 84:6, 97:23, 98:11, 116:16, 130:22, 131:15, 131:20, 132:18, 133:9, 164:6, 191:23, 192:3, 198:1, 198:22, 213:1

**Farah's** [2] - 117:5, 117:18

**FARGO** [2] - 1:6, 2:15

**Fargo** [349] - 3:5, 3:12, 3:13, 3:18, 6:2, 6:7, 11:17, 14:16, 14:21, 14:23, 14:25, 22:14, 22:23, 23:2, 26:1, 27:18, 27:23, 28:3, 31:20, 33:2, 38:15, 38:17, 39:6, 39:11, 39:12, 40:14, 40:16, 41:10, 43:9, 46:1, 46:5, 46:8, 46:21, 47:13, 59:4, 59:17, 59:22, 59:24, 61:3, 72:24, 72:25, 73:5, 73:7, 73:10, 73:13, 73:14, 73:15, 73:20, 73:22, 74:1, 74:2, 74:4, 74:6, 76:4, 76:18, 77:25, 78:3, 78:4, 78:14, 78:16, 78:19, 79:3, 79:5, 79:8, 79:16, 79:18, 79:22, 80:1, 80:7, 80:12, 80:14, 80:16, 80:17, 80:18, 80:22, 80:24, 81:3, 81:7, 81:8, 81:11, 82:1, 82:3, 82:5, 82:11, 82:13, 82:17, 83:1, 83:4, 83:7, 83:10, 83:12, 83:13, 83:16, 83:22, 84:8, 84:11, 84:12, 84:13, 84:25, 85:6, 85:13, 85:15, 85:17, 85:22, 85:24, 86:4, 86:5, 86:8, 86:10, 86:14, 87:1, 87:4, 87:15, 87:20, 87:22, 87:25, 88:5, 88:7, 88:9, 88:19, 88:22, 88:24, 89:3, 89:6, 89:14, 89:16, 89:17, 89:24, 89:25, 90:2, 90:6, 90:10, 90:14, 90:18, 90:21, 90:23, 90:25, 91:2, 91:7, 91:9, 91:12, 91:14, 91:17, 93:6, 93:12, 93:19, 94:7, 95:2, 95:5, 95:17, 95:21, 95:23, 96:3, 96:11, 96:15, 96:16, 97:6, 97:9, 97:16, 97:20, 98:3, 98:10, 98:14, 98:19, 98:24, 99:2, 99:5, 99:6, 99:11, 99:25, 100:2, 100:3, 100:6, 101:10, 101:21, 101:23, 101:25, 102:8, 102:10, 102:19, 102:21, 103:23, 104:11, 104:21, 105:8, 105:14, 106:3, 106:5, 106:21, 106:25, 107:3, 107:5, 107:7, 107:15, 107:19, 107:25, 108:10, 108:11, 108:16, 108:20, 108:25, 109:16, 110:1, 110:2, 110:18, 110:20, 110:25, 111:2, 111:8, 111:11, 111:14, 111:17, 120:9, 120:17, 121:18, 121:19, 122:6, 122:11, 123:6, 123:12, 124:2, 124:8, 125:1, 125:4, 125:9, 125:18, 126:7, 126:23, 127:14, 127:16, 137:17, 137:22, 137:24, 138:13, 140:8, 141:21, 142:2, 142:20,

142:25, 147:4, 150:3, 150:22, 151:6, 151:20, 152:1, 153:8, 154:24, 156:13, 156:22, 158:14, 159:6, 161:10, 161:11, 163:1, 164:5, 164:8, 165:20, 167:2, 167:23, 171:22, 172:3, 173:23, 175:3, 175:11, 175:22, 177:16, 178:3, 178:5, 178:14, 179:10, 179:16, 180:5, 181:20, 181:21, 182:20, 183:1, 183:25, 184:3, 184:9, 184:15, 184:17, 184:19, 185:1, 185:7, 185:21, 186:25, 187:4, 187:8, 188:6, 188:11, 188:19, 188:24, 189:2, 189:6, 192:14, 192:17, 193:13, 194:10, 195:5, 196:17, 196:24, 197:23, 200:5, 200:10, 201:13, 202:4, 202:13, 203:8, 203:11, 203:19, 203:22, 204:8, 205:9, 206:5, 207:13, 207:19, 208:3, 208:13, 208:15, 208:21, 208:23, 209:3, 209:5, 211:2, 211:25, 212:3, 212:8, 212:24, 213:10, 213:16, 213:20, 213:23, 214:9, 214:19, 217:8, 217:10, 217:20, 218:17, 219:1, 220:11, 222:14, 223:7, 223:18, 225:16

**Fargo's** [32] - 76:20, 79:25, 81:1, 82:23, 85:7, 87:5, 87:24, 89:13, 90:17, 91:4, 91:13, 91:19, 91:22, 92:11, 92:19, 93:5, 93:9, 93:23, 94:4, 94:10, 95:11, 96:21, 98:7, 98:16, 98:22, 102:16, 104:15, 109:16, 110:9, 110:12, 174:8, 177:19

**farmer's** [3] - 53:19, 53:25, 54:2

**fascinated** [1] - 199:1

**fascinating** [1] - 25:11

**fast** [1] - 122:1

**father** [5] - 28:8, 38:21, 77:19, 77:20, 213:2

**fault** [2] - 6:21, 96:23

**favor** [2] - 49:14, 99:12

**favorite** [1] - 118:2

**faxes** [1] - 78:14

**FCRA** [18] - 73:3, 73:4, 73:8, 74:11, 74:14, 75:8, 76:1, 81:2, 81:10, 91:14, 94:5, 94:21, 96:22, 97:10, 97:25, 98:24, 110:21, 110:25

**FDC** [1] - 86:24

**fear** [1] - 152:6

**feared** [1] - 142:8

**feature** [1] - 69:24

**February** [16] - 85:8, 85:20, 86:8, 106:5, 106:7, 106:14, 106:17, 106:18, 106:19, 130:13, 151:21, 160:13, 174:21, 174:24, 179:9, 179:10

**Federal** [3] - 84:19, 129:4, 144:14

**feed** [1] - 192:7

**feeding** [1] - 131:18

**feelings** [10] - 25:8, 27:23, 28:3, 44:14, 44:20, 132:7, 178:21, 179:24, 202:17, 203:16

**fees** [1] - 79:13

**Feldman** [2] - 13:12, 30:20

**fell** [1] - 8:23

**fellow** [4] - 65:15, 69:10, 69:25, 71:7

**felt** [55] - 51:3, 51:9, 51:20, 55:15, 77:4, 115:22, 117:16, 118:9, 118:14, 130:3, 135:13, 137:21, 138:13, 151:9, 151:11, 155:14, 156:11, 156:15, 158:17, 158:20, 158:25, 159:19, 159:23, 162:25, 165:16, 165:22, 167:19, 168:14, 175:5, 179:25, 180:1, 180:15, 181:2, 181:3, 181:23, 187:23, 191:19, 191:22, 193:4, 194:14, 194:15, 197:2, 198:13, 202:19, 202:20, 204:25, 205:18, 212:2, 213:2, 213:11, 214:24, 215:2, 224:10

**fetch** [1] - 140:5

**few** [17] - 11:9, 15:9, 46:10, 64:15, 69:6, 73:19, 79:23, 81:18, 95:3, 111:20, 112:19, 130:8, 139:23, 166:22, 197:22, 206:17

**fiancee** [1] - 24:6

**field** [1] - 98:5

**fields** [2] - 110:7, 137:13

**fifteen** [1] - 177:4

**Fifth** [2] - 2:9, 2:17

**fight** [1] - 50:24

**figure** [14] - 16:1, 114:5, 119:24, 120:8, 122:25, 157:1, 170:9, 182:21, 182:23, 192:18, 195:23, 201:15, 201:20, 228:15

**figured** [1] - 116:4

**figures** [1] - 86:18

**figuring** [3] - 165:14, 197:3, 199:13

**Fiji** [4] - 211:14, 215:19, 221:3, 221:5

**file** [5] - 55:25, 83:23, 152:11, 201:2

**File** [1] - 205:17

**filed** [3] - 52:8, 55:20, 109:3

**files** [3] - 86:15, 90:24, 107:4

**filing** [2] - 109:9, 109:10

**fill** [7] - 10:12, 10:14, 11:20, 125:11, 129:9, 137:5, 137:10

**filled** [3] - 101:19, 219:7, 219:8

**final** [1] - 111:1

**finally** [5] - 8:4, 91:4, 93:23, 209:18, 209:19

**finance** [4] - 40:3, 101:22, 196:8, 196:10

**financed** [1] - 124:1

**finances** [4] - 130:4, 191:21, 196:9, 212:14

**financial** [5] - 27:17, 36:14, 86:17, 142:17, 214:22

**financing** [1] - 39:7

**fine** [8] - 5:20, 59:8, 59:10, 99:18, 105:11, 147:24, 211:6, 228:24

**fingerprint** [1] - 149:17

**finish** [3] - 33:11, 33:16, 83:2

**finished** [1] - 33:16

**fire** [1] - 165:8

**First** [1] - 2:12

**first** [72] - 11:17, 11:25, 12:10, 34:9, 36:8, 36:9, 36:10, 36:11, 48:24, 69:8,

74:15, 76:9, 78:24, 88:14, 90:20,
92:14, 97:12, 97:13, 107:24, 108:10,
108:16, 113:10, 114:10, 122:22,
123:13, 123:18, 123:22, 124:11,
124:25, 143:2, 143:11, 145:9, 148:12,
149:1, 149:12, 150:9, 150:10, 151:22,
152:5, 152:25, 159:25, 162:8, 164:14,
166:12, 168:9, 172:21, 174:2, 178:12,
181:19, 183:19, 185:13, 186:24,
191:7, 195:22, 196:23, 200:4, 202:23,
203:23, 205:9, 206:18, 209:7, 215:19,
216:15, 216:18, 216:21, 218:8,
218:25, 222:18, 223:13, 223:21,
224:1, 227:4
**first-time** [1] - 114:10
**fishing** [2] - 27:1, 30:3
**fitness** [1] - 17:22
**five** [4] - 19:18, 56:4, 91:5, 128:14
**fix** [13] - 80:19, 84:1, 96:11, 119:24,
120:3, 122:8, 129:19, 155:12, 156:15,
156:22, 163:2, 171:22, 204:10
**fixed** [11] - 36:15, 85:22, 87:2, 89:20,
97:11, 114:18, 122:10, 196:4, 205:1,
205:3, 211:17
**fixing** [1] - 114:18
**flashing** [1] - 226:22
**flip** [2] - 144:2, 160:8
**floats** [1] - 118:23
**Floor** [1] - 2:18
**Florida** [1] - 58:21
**fly** [2] - 35:10, 35:15
**Flye** [4] - 12:23, 22:4, 56:10, 62:20
**flying** [1] - 35:5
**focus** [7] - 47:15, 98:22, 99:3, 114:12,
115:23, 116:9, 119:10
**folding** [1] - 199:1
**folks** [1] - 114:9
**follow** [5] - 15:11, 48:21, 54:18, 64:24,
136:25
**follow-up** [3] - 15:11, 48:21, 54:18
**followed** [4] - 9:12, 9:17, 93:8, 93:23
**following** [12] - 33:24, 35:15, 35:16,
46:7, 60:3, 65:8, 72:6, 94:4, 94:13,
102:16, 135:11, 151:10
**follows** [2] - 102:23, 113:11
**FOR** [3] - 1:2, 2:2, 2:14
**foregoing** [1] - 230:4
**Foremost** [2] - 187:18, 188:5
**foreshadowing** [1] - 63:15
**Forest** [1] - 28:9
**forests** [1] - 130:1
**forged** [1] - 149:17
**forget** [3] - 133:18, 133:19, 165:1
**forgetting** [1] - 180:15
**form** [13] - 5:24, 6:5, 67:20, 81:4, 92:3,
153:9, 153:15, 153:19, 167:7, 197:12,
197:14, 197:20, 209:12
**formalized** [1] - 31:5
**format** [1] - 193:21
**forth** [3] - 76:3, 97:15, 226:23

**fortunate** [1] - 58:16
**fortunately** [1] - 124:4
**forward** [5] - 104:23, 111:19, 113:4,
139:20, 225:11
**forwarded** [7] - 89:14, 89:16, 105:9,
106:1, 109:23, 121:12, 196:24
**foundation** [2] - 152:17, 200:16
**Foundation** [1] - 20:17
**four** [11] - 24:11, 26:14, 33:9, 65:12,
103:13, 104:11, 104:17, 105:15,
111:12, 207:4, 223:12
**fourteen** [1] - 108:18
**fourth** [2] - 168:2, 187:17
**frame** [6] - 104:10, 107:10, 107:20,
108:9, 157:13, 224:13
**Frances** [1] - 31:19
**FRANSEN** [2] - 3:13, 14:24
**Fransen** [5] - 2:15, 3:13, 14:17, 14:24,
100:1
**Franz** [2] - 41:17, 42:3
**fraud** [59] - 8:12, 79:10, 80:19, 85:3,
85:17, 89:17, 89:19, 89:22, 90:22,
91:9, 92:4, 92:6, 93:13, 94:19, 95:11,
95:13, 95:14, 95:19, 95:24, 96:4, 96:5,
96:9, 100:24, 103:4, 103:7, 103:8,
104:5, 104:7, 104:9, 104:22, 104:23,
104:24, 105:1, 105:3, 105:8, 105:9,
106:1, 106:3, 109:21, 110:1, 110:3,
123:22, 146:1, 150:24, 151:6, 153:14,
180:17, 185:3, 196:25, 197:6, 197:7,
197:8, 201:5, 217:18, 217:21, 218:2,
220:1
**fraudulent** [30] - 73:16, 81:16, 82:13,
83:21, 83:22, 85:5, 98:6, 99:7, 107:12,
126:9, 126:23, 129:12, 129:18,
141:22, 142:23, 146:22, 147:22,
150:3, 159:7, 169:11, 175:20, 175:23,
178:16, 183:6, 189:17, 202:5, 221:19,
222:14, 223:14, 224:3
**fraudulently** [2] - 107:21, 124:1
**freaks** [1] - 37:9
**free** [4] - 7:1, 20:8, 61:19, 63:3
**freedom** [3] - 214:20, 214:23, 228:10
**French** [1] - 140:10
**frequent** [1] - 207:10
**Friday** [11] - 33:11, 33:12, 33:16, 33:20,
34:7, 35:4, 35:8, 35:10, 35:15, 35:16
**friend** [2] - 32:13, 50:24
**friendly** [1] - 13:18
**friends** [4] - 38:10, 41:6, 41:9, 119:5
**front** [4] - 12:1, 63:6, 171:5, 199:23
**fruitless** [1] - 228:22
**frustrated** [2] - 49:20, 137:21, 204:6
**FTC** [18] - 86:10, 128:23, 129:3, 129:6,
129:9, 137:2, 137:10, 137:13, 143:15,
145:8, 151:6, 151:10, 154:13, 154:17,
170:12, 174:19, 190:25, 205:20
**FTC's** [1] - 163:8
**fuller** [1] - 2:8
**fully** [1] - 226:23

**fun** [2] - 115:6, 216:13
**Funsch** [3] - 31:21, 95:1, 96:8
**furnish** [1] - 73:9
**furnished** [1] - 42:24
**furnisher** [10] - 73:8, 74:18, 74:25,
75:10, 75:11, 75:13, 75:15, 75:18,
76:3, 76:8
**furnisher's** [1] - 75:20
**furnishers** [3] - 74:12, 74:19, 163:5
**Furniture** [2] - 18:23, 39:5
**future** [1] - 34:25

## G

**G-a-n-n-o-n** [1] - 13:6
**G-r-i-f-f-i-n** [1] - 12:22
**GA** [1] - 2:4
**gallery** [1] - 13:17
**game** [5] - 7:6, 36:10, 114:20, 122:16,
191:9
**games** [1] - 43:16
**gaming** [1] - 21:20
**Gannon** [2] - 13:6, 27:8
**gardening** [2] - 22:9, 30:24
**Gary** [3] - 12:8, 16:17, 34:10
**gas** [2] - 56:14, 120:3
**gas-powered** [1] - 120:3
**gather** [2] - 63:22, 195:18
**gathered** [1] - 154:16
**gathering** [1] - 150:23
**GED** [1] - 24:8
**Geez** [1] - 205:2
**general** [4] - 39:14, 104:10, 155:7,
155:9
**generally** [1] - 14:6
**generators** [1] - 120:3
**generic** [1] - 10:8
**genetic** [1] - 116:18
**gentleman** [2] - 166:16, 167:2
**gentlemen** [3] - 64:14, 72:22, 99:22
**giant** [1] - 160:18
**gigantic** [1] - 73:5
**girlfriend** [2] - 30:11, 30:14
**gist** [1] - 138:23
**Given** [1] - 160:15
**given** [2] - 15:11, 71:4
**glance** [1] - 169:4
**Glenn** [1] - 136:6
**Gobin** [2] - 31:23, 98:13
**golf** [2] - 22:17, 24:10
**Gosset** [1] - 136:6
**government** [3] - 146:5, 147:22, 172:16
**governs** [2] - 73:4
**grab** [1] - 112:7
**graduate** [1] - 72:18
**grant** [1] - 69:2
**granting** [1] - 69:3
**grateful** [1] - 115:19
**Gray** [1] - 20:16

14

**great** [2] - 39:15, 77:7
**Gresham** [3] - 16:25, 19:13, 20:23
**Grier** [6] - 31:20, 91:25, 92:5, 93:8, 93:18, 96:5
**Griffin** [5] - 12:22, 21:16, 43:12, 50:17, 56:6
**groceries** [1] - 194:25
**grocery** [1] - 132:19
**Groundhog** [1] - 197:10
**group** [3] - 16:6, 117:16, 214:5
**Grove** [1] - 28:9
**grow** [3] - 77:7, 77:23, 216:7
**guess** [16] - 5:25, 49:12, 49:17, 58:15, 66:15, 113:15, 121:6, 143:17, 148:9, 152:6, 158:5, 196:14, 200:14, 213:3, 224:16
**guidelines** [1] - 10:17
**guilty** [9] - 80:2, 80:5, 80:9, 136:21, 138:16, 143:9, 146:4, 166:16, 169:8
**gut** [1] - 179:25
**guy** [5] - 84:18, 122:16, 169:21, 192:11, 228:14
**guys** [1] - 205:2

## H

**H-o-r-n-e-r** [1] - 12:13
**H-u-s-s** [1] - 12:18
**habits** [5] - 131:7, 131:11, 131:12, 199:16, 199:17
**hacked** [1] - 198:25
**half** [2] - 57:25, 135:19
**hand** [47] - 11:21, 13:25, 31:11, 32:7, 32:9, 33:8, 34:2, 34:8, 38:11, 40:24, 40:25, 41:4, 41:7, 42:1, 42:5, 42:16, 42:19, 42:22, 43:3, 43:24, 44:2, 44:5, 44:7, 44:10, 44:13, 45:9, 45:15, 45:18, 45:24, 46:1, 46:6, 46:9, 46:11, 46:14, 46:19, 46:23, 48:6, 48:9, 48:11, 48:12, 48:14, 48:19, 51:24, 52:1, 62:22, 113:7, 133:1
**handful** [1] - 182:11
**handle** [8] - 43:8, 94:23, 95:22, 122:3, 127:22, 156:11, 211:5, 215:1
**handled** [1] - 55:24, 96:8, 137:22
**handles** [1] - 94:18
**handling** [3] - 43:2, 96:3, 99:2
**hands** [10] - 33:10, 33:19, 43:11, 54:13, 54:20, 54:21, 102:22, 131:7, 132:20, 132:21
**hang** [4] - 19:2, 32:8, 47:14, 140:3
**hanging** [1] - 38:8
**happy** [3] - 36:25, 44:17, 75:23
**hard** [10] - 52:16, 53:5, 76:7, 77:2, 77:3, 84:4, 114:5, 115:8, 143:3, 192:16
**harder** [5] - 133:12, 142:14, 207:12, 207:16, 207:17
**hardship** [1] - 36:14
**harm** [3] - 7:1, 45:12, 53:25
**head** [4] - 41:20, 100:2, 109:15, 110:1

**headaches** [1] - 206:11
**heading** [3] - 166:10, 222:25, 223:21
**health** [2] - 116:10, 116:14
**Health** [2] - 19:14, 42:7
**healthy** [1] - 117:16
**hear** [52] - 4:7, 6:16, 14:23, 32:9, 39:17, 45:3, 63:25, 64:22, 67:2, 71:18, 74:10, 81:6, 84:5, 85:2, 86:1, 86:16, 87:22, 87:23, 91:22, 92:21, 94:17, 96:14, 97:24, 98:9, 98:21, 100:17, 100:23, 102:11, 102:12, 103:12, 104:6, 104:13, 105:2, 105:10, 105:21, 105:25, 106:2, 106:21, 108:5, 108:20, 109:5, 109:6, 109:11, 109:12, 109:14, 109:20, 109:25, 110:5, 112:1, 182:15, 207:15
**heard** [12] - 32:5, 33:7, 49:1, 55:22, 65:13, 65:24, 90:14, 100:7, 170:11, 214:16, 227:6, 227:22
**hearing** [4] - 4:2, 68:17, 71:9, 104:12
**hears** [1] - 87:14
**hearsay** [2] - 125:22, 133:21, 134:13, 138:3, 140:14
**heart's** [1] - 226:9
**heavier** [1] - 132:18
**height** [1] - 132:17
**heightened** [1] - 110:24
**held** [7] - 44:3, 45:25, 47:3, 47:16, 73:23, 79:12, 80:6
**help** [16] - 30:13, 71:5, 72:2, 103:1, 116:23, 120:8, 134:20, 166:11, 166:12, 167:10, 180:25, 181:11, 181:18, 192:6, 204:17, 206:4
**helped** [1] - 122:16
**helpful** [3] - 55:11, 150:16, 150:18
**helping** [6] - 14:18, 55:16, 132:15, 133:2, 165:15, 188:16
**helpless** [1] - 203:17
**helps** [1] - 14:6
**Hendricks** [2] - 31:19, 97:24
**Hernandez** [4] - 11:15, 14:3, 110:22, 226:7
**HERNANDEZ** [1] - 1:16
**hi** [4] - 20:2, 20:11, 30:10, 34:21
**hidden** [1] - 104:3
**high** [6] - 27:18, 29:4, 30:3, 36:7, 114:17, 176:9
**highlight** [2] - 160:20, 160:21
**hiking** [2] - 22:17, 30:17
**Hillsboro** [2] - 18:23, 26:22
**himself** [1] - 31:17
**hire** [1] - 165:24
**history** [5] - 16:23, 17:11, 114:16, 187:11, 216:17
**hit** [2] - 155:23, 156:2
**hobbies** [14] - 17:22, 18:6, 20:8, 20:25, 21:21, 22:8, 22:16, 27:1, 27:11, 28:11, 29:6, 30:17, 30:24, 114:11
**hobby** [1] - 18:25
**hold** [6] - 46:4, 73:10, 99:11, 111:8,

111:11, 132:22
**holding** [2] - 80:10, 209:15
**holds** [1] - 45:25
**holiday** [1] - 33:13
**Hollomon** [1] - 31:21
**home** [14] - 17:7, 17:21, 27:10, 57:11, 72:20, 77:8, 114:10, 146:12, 158:13, 163:22, 187:18, 187:23, 188:8, 226:4
**Home** [1] - 111:12, 201:7, 224:2
**homeowner's** [1] - 157:21, 157:22, 157:25
**honest** [7] - 15:19, 15:22, 51:6, 158:16, 160:9, 169:18, 209:16
**honestly** [2] - 15:15, 52:5
**Honor** [33] - 3:4, 3:11, 4:5, 4:6, 4:11, 5:20, 5:22, 7:21, 9:23, 10:2, 10:4, 11:10, 31:16, 48:23, 54:19, 60:12, 60:20, 60:22, 60:25, 61:7, 61:11, 72:14, 72:21, 99:16, 133:20, 133:24, 134:8, 177:5, 214:16, 227:5, 228:8, 228:19, 228:25
**HONORABLE** [1] - 1:16
**Hood** [1] - 19:15
**hope** [1] - 156:23
**hopeless** [1] - 90:24
**hopes** [1] - 176:9
**hoping** [2] - 89:23, 176:11
**Horner** [4] - 12:13, 17:5, 32:12, 62:19
**horrible** [3] - 158:22, 164:25, 182:15
**hospital** [1] - 29:24
**Hospital** [1] - 17:14
**hospitals** [1] - 117:15
**hotel** [4] - 36:15, 36:17, 149:4, 149:6
**hour** [2] - 94:24, 199:9
**hours** [1] - 229:9
**house** [2] - 118:23, 154:10
**houses** [1] - 166:14
**huge** [5] - 102:19, 102:22, 165:5, 191:22, 197:4
**hundreds** [1] - 141:24
**hunting** [1] - 30:3
**hurdle** [1] - 88:3
**hurting** [1] - 191:10
**husband** [7] - 17:6, 17:7, 20:12, 20:13, 22:5, 24:17, 30:21
**Huss** [5] - 12:18, 19:12, 40:1, 42:6, 54:24, 62:19

## I

**i.e** [1] - 82:15
**ID** [5] - 55:5, 55:8, 92:10, 101:17, 149:20
**idea** [6] - 55:1, 57:8, 57:10, 63:6, 172:13, 181:3, 194:18, 213:18
**ideas** [2] - 169:14, 175:24
**identification** [5] - 86:23, 93:17, 103:11, 148:8, 149:6
**identified** [2] - 143:1, 149:7, 221:14, 224:25
**identify** [2] - 103:3, 145:11

**identifying** [5] - 92:7, 95:6, 101:18, 108:2, 213:16
**identity** [153] - 33:6, 48:10, 49:2, 54:21, 54:25, 55:2, 55:19, 56:6, 56:11, 56:25, 57:15, 58:5, 58:14, 59:25, 73:12, 73:14, 73:15, 73:21, 75:13, 78:6, 78:12, 78:15, 79:5, 79:11, 79:16, 79:17, 80:6, 80:8, 80:22, 81:16, 83:20, 84:9, 84:14, 84:16, 84:20, 85:12, 85:16, 85:22, 86:14, 87:17, 87:19, 87:25, 88:6, 88:25, 89:11, 90:11, 91:16, 92:4, 92:6, 92:23, 92:24, 93:1, 93:2, 93:13, 93:20, 94:3, 94:16, 94:19, 94:20, 94:24, 95:12, 96:10, 97:3, 97:7, 97:25, 99:5, 100:16, 100:22, 100:24, 100:25, 101:2, 101:6, 101:9, 101:13, 101:15, 103:5, 103:14, 103:16, 103:21, 103:24, 104:22, 105:3, 105:19, 105:24, 107:12, 108:18, 111:9, 111:10, 121:6, 121:15, 121:23, 122:13, 123:16, 123:25, 125:1, 125:15, 128:2, 128:20, 128:21, 129:6, 129:9, 129:19, 135:4, 135:22, 136:21, 137:2, 143:15, 144:25, 145:7, 145:23, 146:16, 146:17, 149:16, 149:20, 150:1, 150:13, 151:13, 152:22, 154:15, 156:16, 166:11, 166:15, 168:2, 168:22, 169:6, 169:7, 172:21, 174:19, 180:6, 180:25, 181:11, 190:5, 190:7, 191:6, 192:17, 203:24, 204:2, 204:8, 204:12, 204:17, 204:18, 209:9, 210:15, 213:14, 221:22, 222:1, 222:4, 222:7, 222:10, 225:2
**IdentityTheft.org** [1] - 163:8
**IDs** [2] - 101:4
**ignore** [3] - 66:15, 66:18, 181:16
**ignored** [2] - 176:8, 194:22
**ignores** [2] - 80:14, 90:18
**ignoring** [1] - 176:21
**illegal** [1] - 73:11
**imagined** [2] - 159:20, 160:7
**imagining** [2] - 171:14, 197:16
**immediate** [1] - 199:25
**immediately** [3] - 70:24, 199:23
**impact** [1] - 132:1
**impartial** [2] - 16:7, 18:15
**impartially** [1] - 39:24
**importance** [2] - 104:7, 153:22
**important** [28] - 9:11, 15:23, 16:8, 34:22, 34:24, 50:12, 64:2, 71:10, 100:4, 100:5, 100:6, 100:12, 103:13, 103:14, 107:9, 107:19, 111:5, 118:5, 124:20, 168:14, 191:20, 191:21, 192:22, 192:25, 196:5, 196:8, 196:10
**importantly** [1] - 9:13
**impossibility** [1] - 33:25, 34:3, 34:4
**impression** [4] - 46:21, 47:16, 47:17, 54:4
**imprisonment** [1] - 147:24
**IN** [1] - 1:1

**in-the-middle** [1] - 47:6
**inaccurate** [6] - 74:13, 76:16, 76:21, 83:5, 91:21, 156:22
**inappropriate** [1] - 153:10
**incidentally** [1] - 22:13
**inclined** [1] - 6:17
**include** [14] - 10:9, 11:3, 108:4, 144:15, 163:9, 163:10, 172:5, 173:24, 174:8, 174:22, 178:16, 191:7, 194:7, 194:12
**included** [3] - 102:9, 107:22, 174:9
**includes** [5] - 69:21, 84:19, 105:16, 108:3, 223:6
**including** [5] - 40:14, 70:3, 105:10, 107:13, 171:13
**income** [1] - 36:15
**inconvenient** [1] - 35:19
**incorrect** [1] - 219:4
**incredulous** [1] - 87:10
**independent** [1] - 132:3
**independently** [1] - 117:4
**indicate** [13] - 5:16, 146:16, 167:25, 168:1, 168:9, 170:17, 184:16, 185:23, 186:1, 186:3, 196:18, 200:8, 208:1
**indicated** [4] - 10:18, 156:9, 188:20, 205:8
**indicates** [3] - 86:6, 200:25, 201:1
**indicating** [3] - 65:6, 173:6, 183:22
**indication** [1] - 69:4
**indirect** [2] - 8:11, 65:25
**individual** [10] - 9:3, 9:5, 32:3, 44:9, 49:15, 74:25, 75:1, 106:11, 179:6, 220:1
**individually** [1] - 46:3
**individuals** [4] - 32:6, 49:11, 63:21, 134:14
**industry** [6] - 73:5, 73:6, 73:8, 98:1, 98:6, 98:8
**ineffective** [2] - 181:24, 201:19
**infant** [1] - 198:9
**influenced** [1] - 71:16
**inform** [2] - 76:11, 102:3
**Information** [1] - 146:7
**information** [118] - 16:11, 42:25, 48:8, 55:13, 56:20, 57:9, 58:3, 58:9, 63:22, 64:2, 68:22, 69:15, 70:24, 73:6, 73:9, 74:8, 74:12, 74:13, 74:20, 74:21, 74:24, 75:5, 75:11, 75:12, 75:16, 76:14, 76:17, 76:19, 76:21, 78:22, 78:23, 78:25, 80:12, 80:14, 81:15, 82:1, 83:6, 84:24, 84:25, 85:9, 86:5, 86:22, 87:18, 87:25, 88:17, 89:10, 89:11, 90:15, 90:16, 90:19, 91:21, 92:7, 92:11, 92:12, 92:20, 93:5, 93:6, 93:7, 93:18, 95:9, 96:7, 97:5, 97:19, 101:2, 101:18, 102:4, 102:17, 103:6, 103:21, 103:25, 104:4, 104:8, 105:16, 105:17, 105:18, 108:2, 108:3, 108:8, 108:17, 108:21, 109:7, 109:23, 124:13, 124:14, 128:24, 138:15, 140:7, 143:20, 144:19, 144:24,

147:18, 149:24, 152:2, 152:11, 153:2, 153:3, 153:4, 154:17, 160:14, 162:25, 163:6, 167:6, 167:7, 168:5, 178:17, 184:1, 189:16, 194:6, 195:3, 195:18, 203:18, 204:2, 213:12, 213:16, 213:19, 219:18, 225:15
**INFORMATION** [1] - 1:6
**informed** [1] - 150:4
**informing** [1] - 166:13
**ing** [3] - 118:24, 170:15, 191:2
**initial** [2] - 43:25, 220:10
**initiative** [1] - 193:6
**inquire** [1] - 7:18
**inquiry** [3] - 187:11, 187:14, 228:3
**inside** [1] - 197:3
**insisting** [3] - 74:4, 80:15, 83:12
**insists** [1] - 91:12
**insofar** [1] - 6:20
**instances** [1] - 214:12
**instead** [7] - 81:13, 92:6, 95:23, 115:25, 118:24, 153:14, 181:16
**instruct** [6] - 4:19, 65:4, 65:19, 72:11, 110:22, 134:17
**instruction** [5] - 4:20, 70:12, 112:2, 177:2, 226:10
**instructions** [15] - 5:25, 6:9, 39:19, 63:12, 63:14, 63:24, 64:17, 64:18, 69:13, 70:19, 76:12, 129:8, 154:14, 163:10
**insurance** [9] - 157:21, 157:22, 157:25, 158:3, 158:13, 187:18, 187:23, 188:9, 210:11
**Insurance** [1] - 188:5
**Intel** [1] - 17:21
**intellectual** [2] - 77:15, 116:25
**intense** [2] - 117:13, 213:4
**intent** [1] - 101:13
**intention** [1] - 154:19
**intentionally** [1] - 176:21
**interest** [4] - 67:4, 215:10, 216:11, 227:13
**interested** [1] - 76:25
**interests** [2] - 114:11, 165:7
**internal** [7] - 142:9, 155:15, 156:24, 175:19, 176:1, 177:19, 181:17
**internally** [1] - 172:9
**Internet** [15] - 27:12, 62:4, 69:23, 70:16, 83:25, 84:1, 119:11, 128:7, 128:22, 135:7, 154:12, 175:17, 208:20, 221:5, 221:8
**interplay** [1] - 110:4
**interpret** [1] - 72:10
**introduce** [7] - 7:23, 10:19, 10:22, 14:10, 14:11, 14:19, 31:12
**introduced** [1] - 31:8
**introducing** [1] - 34:23
**introduction** [2] - 10:9, 10:25
**intrude** [1] - 50:19
**invasion** [1] - 213:10
**invest** [1] - 115:13

**investigate** [19] - 75:16, 81:1, 81:12, 81:13, 82:17, 87:13, 87:17, 89:8, 89:10, 92:5, 92:18, 94:16, 94:18, 94:20, 94:22, 95:12, 144:19, 184:3, 189:17
**investigated** [7] - 75:7, 76:21, 110:18, 127:7, 127:17, 205:19, 207:14
**investigating** [4] - 79:10, 88:15, 95:14, 149:16
**investigation** [35] - 8:22, 70:17, 75:19, 76:9, 76:10, 76:12, 76:14, 76:18, 79:12, 81:9, 87:8, 87:12, 88:2, 88:8, 91:15, 91:18, 91:20, 92:21, 93:4, 94:3, 95:3, 95:10, 95:18, 96:6, 97:10, 97:11, 98:25, 99:7, 104:4, 127:11, 149:17, 167:7, 178:19, 179:3, 184:2
**investigations** [2] - 91:13, 98:2
**investors** [2] - 30:14, 115:13
**invited** [1] - 114:21
**invoices** [1] - 49:11
**involve** [3] - 54:9, 93:4, 119:5
**involved** [14] - 43:2, 53:17, 63:21, 70:4, 91:6, 91:8, 95:20, 121:15, 121:17, 133:18, 135:4, 149:13, 216:9, 225:2
**involvement** [2] - 102:13
**involves** [3] - 15:24, 33:1, 69:15
**IRS** [1] - 55:24
**island** [1] - 129:25
**issue** [11] - 9:16, 22:14, 59:16, 95:22, 96:2, 97:20, 109:1, 165:20, 216:3, 227:6
**issues** [9] - 4:16, 4:23, 8:20, 52:11, 56:16, 59:25, 69:15, 116:10, 228:6
**IT** [2] - 14:18, 72:17
**item** [11] - 82:12, 161:13, 161:21, 184:10, 187:17, 200:9, 203:9, 203:10, 205:9, 205:12, 208:2
**items** [4] - 103:13, 125:25, 144:20, 194:24
**itinerary** [1] - 193:19
**itself** [1] - 89:12

## J

**J-o-s-e-p-h** [1] - 13:5
**Jake** [2] - 24:5, 42:11
**James** [6] - 12:16, 13:1, 18:18, 78:13, 102:6, 195:12
**Jamie** [2] - 55:21, 55:22
**January** [28] - 84:8, 84:11, 85:8, 105:14, 105:22, 106:1, 106:9, 107:14, 107:24, 109:4, 128:18, 130:20, 138:9, 139:17, 142:21, 174:25, 186:23, 207:3, 207:22, 209:6, 211:21, 218:16, 218:23, 218:24, 218:25, 219:15, 224:17, 224:19
**jargon** [2] - 73:8, 76:2
**Jason** [5] - 79:10, 79:15, 84:22, 138:11, 149:7
**Jeff** [3] - 3:9, 14:15, 72:23

**Jeffrey** [2] - 2:2, 14:8
**Jen** [1] - 64:10
**Jennifer** [14] - 4:9, 10:5, 11:8, 11:19, 12:6, 14:4, 40:10, 61:10, 71:23, 112:5, 112:10, 177:1, 226:16
**jeopardizes** [1] - 70:22
**Jim** [1] - 79:13
**Jin** [3] - 13:5, 26:21, 47:11
**job** [9] - 15:1, 38:19, 39:5, 42:24, 43:2, 44:4, 44:25, 48:25, 63:16
**JOHN** [2] - 113:9, 113:16
**John** [4] - 32:3, 106:11, 109:25, 113:16
**Johnson** [4] - 13:8, 28:7, 35:23, 38:3
**join** [1] - 114:21
**joined** [1] - 76:25
**joint** [1] - 55:21
**Jones** [4] - 2:5, 2:5, 3:10, 14:8
**JONES** [1] - 3:10
**Joseph** [12] - 12:21, 13:5, 20:22, 26:21, 40:12, 43:19, 47:11, 57:13, 57:14, 59:20, 62:20
**Judge** [1] - 110:22
**judge** [5] - 11:6, 23:19, 32:21, 53:6, 112:20
**JUDGE** [1] - 1:17
**judges** [2] - 37:8, 64:21
**Julie** [1] - 2:16
**July** [2] - 73:13, 101:15
**jumbled** [1] - 92:2
**juror** [20] - 19:15, 20:8, 21:1, 21:2, 22:17, 23:13, 24:23, 25:1, 26:11, 27:2, 29:7, 29:8, 30:4, 30:25, 63:16, 68:1, 70:6, 70:21, 70:23, 112:16
**Juror** [8] - 11:23, 11:24, 11:25, 12:8, 13:6, 16:15, 37:18, 60:25
**JUROR** [180] - 16:17, 16:24, 17:5, 17:13, 17:18, 18:1, 18:11, 18:16, 18:18, 18:22, 19:5, 19:7, 19:10, 19:12, 19:18, 19:21, 19:25, 20:2, 20:11, 20:22, 21:3, 21:7, 21:11, 21:14, 21:16, 21:24, 22:2, 22:4, 22:11, 22:20, 22:25, 23:3, 23:9, 23:11, 23:16, 23:19, 23:22, 24:4, 24:5, 24:15, 24:16, 25:2, 25:6, 25:10, 25:13, 25:16, 25:22, 25:25, 26:3, 26:8, 26:14, 26:16, 26:19, 26:21, 27:6, 27:8, 27:15, 27:25, 28:4, 28:6, 28:15, 28:18, 28:21, 28:24, 29:1, 29:9, 29:12, 29:14, 29:19, 29:21, 30:8, 30:10, 30:20, 31:3, 32:12, 32:20, 32:23, 34:10, 34:14, 34:21, 35:3, 35:14, 35:18, 35:23, 36:7, 36:13, 36:18, 36:20, 36:25, 37:3, 37:5, 37:16, 37:22, 38:2, 38:7, 38:14, 38:20, 38:21, 38:24, 39:3, 39:4, 39:10, 39:14, 39:23, 39:25, 40:1, 40:6, 40:12, 40:17, 40:19, 40:23, 41:8, 41:14, 41:16, 41:20, 41:22, 42:2, 42:6, 42:11, 43:4, 43:7, 43:12, 43:19, 44:16, 44:24, 45:5, 46:25, 47:4, 47:9, 47:11, 47:18, 47:22, 47:24, 49:7, 49:16, 50:1, 50:4, 50:8, 50:14, 50:16, 50:22, 51:3, 51:13,

51:17, 51:22, 52:5, 52:9, 52:17, 52:20, 52:23, 53:4, 53:8, 53:11, 53:18, 53:22, 54:7, 55:1, 55:8, 55:14, 55:20, 56:3, 56:8, 56:12, 56:18, 56:21, 57:2, 57:10, 57:16, 57:19, 57:21, 57:25, 58:4, 58:10, 58:15, 58:18, 58:24, 59:6, 59:13, 59:18, 59:23
**jurors** [22] - 4:18, 4:19, 4:24, 6:8, 11:1, 11:13, 11:18, 13:24, 14:1, 15:14, 16:6, 34:1, 35:9, 63:4, 64:16, 65:16, 68:8, 69:7, 69:10, 69:25, 71:7, 71:17
**Jurors** [1] - 54:14
**jury** [64] - 5:7, 5:17, 5:23, 5:24, 6:16, 9:25, 10:19, 10:21, 11:9, 11:16, 11:18, 11:20, 11:22, 12:2, 13:13, 16:4, 16:13, 18:6, 18:8, 18:11, 18:21, 19:17, 33:10, 33:20, 33:21, 36:24, 37:11, 37:12, 37:14, 53:13, 53:16, 61:14, 62:13, 62:17, 62:23, 62:24, 63:9, 63:17, 64:11, 64:14, 64:15, 68:18, 68:19, 69:16, 70:7, 71:2, 71:7, 71:14, 76:12, 96:18, 100:19, 102:20, 111:22, 112:5, 112:9, 112:24, 134:12, 176:25, 177:3, 177:7, 226:3, 226:13, 226:19, 228:4
**justice** [5] - 10:10, 18:10, 21:9, 24:12, 29:17

## K

**K-r-a-g-t** [1] - 12:24
**Kauri** [1] - 130:1
**keep** [16] - 54:1, 68:21, 68:25, 69:8, 71:6, 82:23, 84:9, 98:21, 131:6, 131:12, 132:21, 141:8, 145:16, 174:5, 198:23, 198:24
**keeper** [1] - 229:8
**keeping** [1] - 199:6
**keeps** [5] - 80:15, 82:20, 90:19, 203:14
**Kelley** [5] - 32:4, 32:13, 32:18, 110:6, 110:8
**Kelly** [5] - 2:5, 2:5, 3:10, 14:8, 133:17
**kept** [10] - 74:4, 80:4, 98:14, 98:17, 155:6, 157:8, 165:23, 192:18, 207:13, 212:24
**Kester** [1] - 2:17
**Kevin** [3] - 13:11, 30:10, 34:21
**key** [3] - 76:7, 92:3, 169:5
**kicked** [1] - 179:25
**kicking** [1] - 203:14
**kid** [1] - 103:18
**kidney** [3] - 85:23, 156:20, 157:5
**kids** [9] - 17:14, 20:3, 20:13, 24:10, 26:22, 29:23, 43:15, 115:23, 196:13
**kind** [65] - 8:4, 17:19, 29:13, 34:24, 37:10, 38:12, 45:19, 51:6, 53:2, 62:2, 63:12, 63:15, 85:18, 114:4, 114:7, 114:13, 116:10, 120:3, 122:18, 124:22, 127:23, 129:8, 129:10, 130:14, 131:13, 131:15, 131:17, 131:23, 132:7, 132:24, 133:2, 140:2,

152:6, 153:12, 153:25, 154:8, 154:9, 155:5, 157:11, 157:17, 158:17, 158:20, 160:6, 160:8, 163:15, 165:3, 165:16, 167:9, 167:18, 168:22, 169:21, 173:9, 176:11, 176:16, 176:21, 183:8, 188:4, 196:2, 197:2, 199:14, 201:14, 209:15, 211:4, 213:2
**kinds** [3] - 61:19, 63:13, 188:4
**kit** [2] - 204:19, 204:21
**kitchen** [1] - 27:10
**knowing** [1] - 188:5
**knowingly** [1] - 147:21
**knowledge** [1] - 65:14
**known** [2] - 88:24, 113:23
**knows** [5] - 80:18, 86:5, 107:1, 118:12, 176:19
**Kohl's** [6] - 187:6, 201:1, 201:7, 221:25, 223:6, 223:14
**Kragt** [3] - 12:24, 22:11, 62:21
**Kristin** [3] - 12:20, 20:11, 62:20

# L

**L-u-q-u-i-n** [1] - 12:14
**labyrinth** [1] - 181:4
**lack** [1] - 206:8
**lacks** [2] - 152:17, 200:16
**ladies** [3] - 64:14, 72:22, 99:22
**Lake** [3] - 20:3, 21:17, 30:21
**land** [2] - 54:3, 173:25
**landed** [1] - 153:7
**landing** [4] - 53:19, 159:20, 160:8, 189:24
**language** [2] - 87:11, 179:2
**large** [5] - 73:6, 84:17, 153:19, 188:14, 202:21
**largely** [1] - 218:11
**larger** [1] - 115:9
**largest** [4] - 141:23, 141:24, 192:22, 192:25
**last** [21] - 8:4, 8:14, 25:3, 35:17, 36:21, 37:7, 92:14, 122:19, 139:22, 144:17, 144:21, 144:22, 147:19, 160:1, 163:4, 195:9, 200:11, 200:18, 200:25, 207:1
**late** [6] - 35:9, 37:6, 37:13, 75:14, 82:7, 216:22
**latter** [1] - 137:3
**law** [21] - 9:14, 15:1, 40:8, 45:3, 63:20, 64:23, 64:25, 66:4, 69:14, 70:19, 72:11, 72:18, 72:25, 73:2, 73:3, 74:7, 76:17, 93:10, 104:19, 145:24, 171:18
**Law** [1] - 2:5
**laws** [2] - 147:23, 181:14
**lawsuit** [10] - 44:10, 48:16, 48:18, 53:6, 90:24, 91:4, 91:5, 109:2, 109:4, 109:9
**lawsuits** [10] - 44:13, 45:2, 45:8, 51:25, 52:2, 52:3, 52:7, 52:19, 52:21, 53:2
**lawyer** [16] - 66:8, 66:9, 66:11, 68:13, 71:19, 137:25, 141:5, 152:15, 162:3, 165:24, 167:16, 167:17, 171:14,

171:20, 208:17, 228:14
**lawyers** [13] - 5:14, 13:21, 15:10, 16:3, 31:9, 31:12, 65:3, 67:13, 67:23, 72:10, 99:25, 174:12, 191:3
**lawyers'** [1] - 33:19
**lays** [1] - 86:22
**learn** [8] - 70:17, 121:2, 121:7, 121:15, 129:5, 131:9, 170:6, 204:16
**learned** [8] - 97:6, 121:16, 121:22, 122:12, 125:4, 190:25, 193:8, 213:24
**learning** [3] - 13:14, 116:24, 131:6
**learns** [3] - 75:4, 78:6, 79:22
**lease** [1] - 224:11
**least** [8] - 8:15, 55:15, 78:2, 153:10, 186:22, 226:23, 227:3, 229:3
**leave** [10] - 3:18, 10:12, 35:8, 54:4, 54:13, 54:22, 63:4, 71:13, 77:8, 173:7
**leaves** [3] - 77:24, 177:3, 226:19
**left** [10] - 18:9, 21:9, 24:1, 71:13, 92:9, 130:12, 165:9, 173:10, 186:3, 216:3
**legal** [12] - 6:23, 6:25, 68:3, 70:11, 76:2, 91:5, 91:8, 170:15, 170:23, 171:13, 181:13, 185:2
**legally** [2] - 67:24, 68:14
**lender** [1] - 48:8
**lenders** [2] - 40:7, 48:5
**lending** [1] - 59:8
**length** [2] - 69:1, 168:18
**lengthy** [1] - 5:2
**less** [5] - 101:12, 107:17, 115:13, 141:25, 212:15
**letter** [161] - 78:14, 78:21, 84:12, 84:13, 84:21, 85:3, 85:8, 85:15, 85:16, 86:11, 86:19, 86:20, 87:6, 87:13, 87:23, 89:7, 89:13, 89:18, 90:5, 90:10, 102:8, 102:14, 102:15, 104:1, 105:13, 105:15, 105:16, 105:25, 106:1, 106:6, 106:9, 106:17, 106:20, 106:25, 107:1, 107:5, 107:6, 107:8, 107:15, 107:18, 108:1, 108:3, 108:6, 123:12, 129:11, 129:14, 142:20, 142:22, 144:13, 144:23, 145:1, 150:10, 150:19, 150:21, 150:23, 150:24, 151:6, 151:17, 151:20, 153:7, 153:9, 153:15, 154:1, 154:3, 154:19, 155:2, 155:10, 159:12, 159:13, 159:15, 160:1, 160:2, 160:6, 161:12, 162:3, 162:17, 162:24, 163:7, 163:11, 164:4, 166:11, 167:5, 167:7, 167:11, 167:23, 168:3, 168:4, 168:12, 170:13, 170:14, 171:14, 171:23, 173:16, 173:22, 174:21, 174:25, 175:9, 175:18, 176:2, 176:7, 176:9, 176:21, 177:15, 178:5, 178:9, 178:10, 178:22, 179:4, 179:9, 179:24, 180:10, 180:14, 181:10, 181:11, 182:16, 182:18, 183:14, 186:24, 189:2, 189:5, 189:7, 189:9, 189:13, 194:10, 194:11, 195:9, 195:12, 195:17, 196:17, 196:20, 197:4, 197:12, 197:14, 200:2, 201:4, 203:3,

203:22, 204:4, 207:22, 209:5, 217:7, 217:10, 217:18, 217:20, 218:8, 218:10, 218:14, 218:16, 218:17, 218:22, 218:23, 218:25, 219:4, 219:14, 219:15, 220:10, 220:14
**Letter** [2] - 163:16, 164:2
**letters** [27] - 95:13, 97:14, 100:9, 100:11, 105:23, 109:22, 130:14, 144:16, 153:19, 155:8, 163:17, 166:20, 170:8, 171:3, 171:4, 175:21, 176:20, 189:20, 196:3, 197:22, 202:10, 204:15, 208:13, 209:12, 220:12, 224:18, 224:21
**letting** [2] - 132:12, 228:12
**level** [2] - 170:24, 199:25
**liability** [3] - 9:15, 96:17, 111:16
**license** [4] - 103:10, 125:17, 145:13, 218:4
**life** [14] - 20:19, 44:18, 51:7, 51:15, 60:1, 97:21, 112:18, 114:17, 117:18, 119:12, 142:17, 165:11, 197:25, 207:17
**lifetime** [2] - 77:12, 215:19
**light** [3] - 9:2, 9:6, 67:6
**likely** [3] - 15:7, 100:17, 109:8
**limine** [3] - 3:24, 4:3, 6:15
**limited** [7] - 65:18, 65:20, 96:16, 116:5, 125:7, 125:11, 220:20, 221:1
**limo** [1] - 169:19
**line** [10] - 17:19, 76:9, 109:5, 109:6, 161:13, 168:1, 191:5, 194:24, 227:18, 228:3
**Linn** [2] - 17:6, 18:19
**list** [4] - 4:9, 32:6, 190:6, 219:11
**listed** [8] - 13:16, 16:12, 120:24, 148:18, 178:15, 223:3, 223:12, 223:22
**listen** [6] - 31:13, 32:21, 39:11, 63:13, 70:13, 172:15
**listening** [1] - 171:2
**listing** [1] - 146:22
**lists** [7] - 10:24, 145:4, 147:23, 208:5, 217:25, 219:9, 224:1
**litigants** [1] - 50:20
**live** [40] - 16:17, 16:18, 16:25, 17:6, 17:19, 17:20, 18:1, 18:23, 19:13, 20:3, 20:12, 20:23, 21:17, 22:5, 22:11, 23:11, 24:6, 24:17, 26:9, 26:22, 27:9, 27:16, 28:7, 28:8, 29:2, 29:22, 30:11, 30:21, 36:5, 36:14, 113:20, 113:21, 118:21
**lives** [2] - 76:22, 154:9
**living** [3] - 29:3, 117:8, 179:5
**LLC** [2] - 1:6, 2:2
**LLP** [1] - 2:17
**load** [2] - 165:5, 165:13
**loan** [24] - 33:5, 73:14, 73:17, 73:20, 74:19, 78:3, 78:16, 78:25, 79:5, 79:17, 79:18, 79:20, 79:25, 82:5, 98:6, 101:22, 101:24, 121:19, 124:12, 127:1, 167:4, 178:16, 192:20, 202:21

local [4] - 22:16, 27:20, 29:5, 149:19
locally [1] - 20:14
location [1] - 58:20
locked [1] - 199:3
long-time [1] - 142:5
longest [2] - 192:24, 193:1
look [89] - 5:14, 61:15, 79:14, 81:18, 86:20, 88:14, 90:4, 91:25, 95:5, 96:19, 111:19, 117:21, 123:8, 126:3, 126:19, 133:13, 136:1, 138:7, 139:14, 142:19, 143:22, 145:9, 147:10, 147:19, 148:10, 148:23, 149:1, 149:8, 151:19, 159:11, 159:15, 160:3, 161:17, 163:2, 163:4, 166:6, 170:16, 171:18, 171:25, 173:19, 175:6, 176:4, 177:13, 178:4, 179:5, 180:23, 181:15, 182:23, 183:13, 183:15, 183:18, 186:17, 187:10, 187:17, 189:1, 193:16, 193:25, 194:19, 195:7, 196:16, 197:5, 200:1, 200:25, 201:4, 202:22, 202:25, 203:7, 203:21, 204:13, 204:20, 206:13, 206:23, 207:21, 207:25, 209:4, 217:2, 217:12, 217:23, 219:20, 219:24, 221:12, 221:15, 221:16, 222:23, 224:23, 225:5, 225:25
Look [1] - 176:3
looked [11] - 80:25, 90:8, 108:14, 154:12, 170:23, 175:10, 197:22, 208:12, 209:25, 211:23, 217:1
looking [12] - 16:11, 78:8, 93:4, 128:22, 131:2, 136:10, 159:22, 208:17, 219:17, 223:24, 225:11, 225:15
looks [14] - 5:11, 5:13, 92:2, 117:22, 138:18, 159:25, 160:4, 161:5, 164:3, 168:11, 193:19, 194:21, 204:20, 206:18
lose [1] - 33:20
losing [1] - 117:10
loss [4] - 167:9, 168:23, 182:24, 208:16
lost [7] - 107:2, 164:2, 166:3, 180:19, 188:25, 199:8, 212:18
loud [1] - 41:21
love [4] - 18:11, 77:19, 119:11, 164:25
loved [1] - 118:15
loves [1] - 77:18
loving [2] - 77:18, 117:24
lower [2] - 135:19, 140:12
luck [1] - 38:6
lucky [1] - 58:17
lunch [4] - 99:15, 112:9, 112:22, 112:23
Luquin [2] - 12:14, 17:18
lying [1] - 209:24
Lynn [5] - 12:12, 16:24, 41:16, 42:2, 62:19

---

# M

machine [1] - 58:21
machinery [6] - 156:24, 160:19, 162:2, 177:19, 183:3, 214:4

Macy's [4] - 156:5, 186:19, 186:20, 186:23, 187:7, 201:7, 222:3, 224:2
madam [1] - 159:16
Mail [1] - 219:21
mail [30] - 61:24, 69:22, 107:2, 107:6, 107:7, 121:9, 121:11, 121:12, 122:20, 129:11, 133:17, 135:3, 136:2, 138:8, 139:15, 140:21, 145:14, 146:13, 163:22, 163:23, 163:24, 166:7, 180:24, 182:3, 206:19, 206:22, 207:9, 225:7
mailed [3] - 57:4, 122:20, 163:13
mailing [5] - 145:13, 155:22, 155:23, 163:15, 163:20
mailings [1] - 164:2
mails [2] - 61:18, 207:13
maintain [1] - 79:6
maintenance [4] - 119:17, 119:18, 119:19, 120:1
major [2] - 58:6, 205:12
majority [2] - 103:16, 196:15
malicious [1] - 110:24
management [1] - 30:2
manager [1] - 91:8
manifestations [4] - 179:23, 206:8, 206:11, 211:1
manner [3] - 67:3, 68:9, 108:12
manufacturing [1] - 26:23
March [2] - 157:20, 187:21
MARCO [1] - 1:16
Marco [2] - 11:15, 14:3
Marion [1] - 216:8
mark [2] - 52:24, 188:8
Mark [1] - 133:17
marked [4] - 57:3, 217:12, 221:12, 224:23
marketing [1] - 30:14
marking [1] - 127:12
marks [2] - 210:17, 210:20
married [1] - 196:12
Mary [1] - 31:18
master's [4] - 16:20, 20:4, 20:15, 27:19
match [3] - 92:24, 149:17, 157:17
matched [1] - 92:15
matches [1] - 92:21
matching [3] - 93:1, 93:17, 96:6
material [2] - 129:17, 191:5
materials [2] - 70:16, 154:19
Matt [3] - 29:2, 35:18, 96:24
Matt's [1] - 194:17
matter [12] - 7:17, 8:5, 11:16, 14:7, 48:17, 57:20, 57:22, 61:11, 70:9, 87:24, 134:15, 180:2
matters [1] - 186:19
Matthew [14] - 6:1, 13:9, 14:12, 31:18, 72:24, 73:12, 76:22, 97:13, 99:12, 113:3, 113:5, 113:15, 148:19, 149:5
MATTHEW [3] - 1:3, 113:9, 113:16
maze [1] - 181:4

mean [71] - 38:17, 49:16, 50:19, 53:13, 90:12, 115:17, 115:18, 119:19, 120:2, 126:9, 127:9, 128:20, 133:8, 142:12, 142:17, 142:18, 149:12, 151:10, 151:12, 153:18, 154:7, 158:24, 161:15, 161:20, 161:25, 162:9, 162:10, 165:22, 172:16, 175:21, 179:3, 179:5, 179:25, 180:9, 181:3, 181:25, 182:24, 184:24, 185:10, 185:21, 188:22, 189:10, 189:19, 189:22, 190:2, 190:9, 190:16, 190:19, 191:20, 191:21, 192:15, 192:16, 193:13, 195:20, 196:6, 197:2, 198:24, 199:4, 199:13, 199:20, 201:18, 203:19, 205:3, 209:13, 209:14, 212:14, 214:2, 214:3, 214:6
means [13] - 14:5, 34:25, 47:23, 66:19, 69:22, 85:25, 87:12, 94:24, 110:23, 112:12, 114:2, 126:25, 162:11
meant [8] - 144:21, 144:22, 153:5, 153:7, 162:1, 184:11, 193:4, 208:21
measure [1] - 132:17
measured [1] - 116:12
mechanic [1] - 120:5
mechanism [2] - 75:2, 75:3
media [2] - 70:3, 70:13
medically [2] - 117:13, 198:15
meet [1] - 98:7
meeting [2] - 34:22, 190:23
meetings [1] - 164:18
Megan [5] - 14:22, 32:2, 100:1, 100:2, 109:14
member [1] - 16:21
members [14] - 13:13, 41:24, 42:20, 42:23, 43:1, 61:14, 62:13, 62:17, 63:9, 70:3, 111:22, 134:12, 176:25, 226:3
memory [2] - 67:3, 71:16
mental [2] - 7:5, 7:15
mention [4] - 6:25, 116:16, 143:23, 190:12
mentioned [29] - 6:23, 56:6, 56:10, 56:25, 59:3, 59:20, 99:24, 100:15, 105:19, 118:18, 143:6, 148:23, 149:1, 149:9, 151:7, 169:7, 170:3, 185:23, 189:13, 193:3, 198:20, 206:7, 206:10, 210:3, 210:25, 213:1, 215:17, 222:19
mentioning [1] - 59:15
mentions [3] - 7:16, 84:16, 139:13
merits [3] - 45:1, 47:8, 69:20
message [5] - 61:24, 62:1, 69:23, 135:10, 135:13
messages [1] - 61:19
Messenger [2] - 135:6, 136:10
met [3] - 77:23, 149:15, 164:18
Met [2] - 20:24, 43:21
metal [1] - 24:18
Michael [1] - 2:8
microphone [4] - 16:16, 20:1, 32:9, 46:24
microphones [1] - 62:10

**Microsoft** [1] - 43:14
**mid** [4] - 126:1, 130:12, 176:23
**midday** [1] - 111:23
**middle** [10] - 47:4, 47:5, 47:6, 47:17, 113:16, 126:16, 166:19, 182:22, 219:21, 222:25
**middle-of-the-road** [1] - 47:17
**might** [27] - 31:11, 32:6, 47:2, 49:20, 50:8, 52:13, 61:25, 66:16, 68:2, 96:3, 112:6, 116:23, 119:4, 134:3, 136:16, 138:21, 139:19, 144:1, 152:21, 155:11, 156:22, 169:23, 176:12, 177:22, 183:2, 211:12
**Milwaukie** [1] - 24:6
**mimicking** [1] - 84:25
**mind** [11] - 16:15, 32:10, 38:13, 69:8, 80:3, 119:13, 141:8, 159:24, 198:4, 199:2, 212:6
**mine** [4] - 32:13, 36:13, 124:12, 176:5
**minimum** [3] - 69:1, 182:20, 190:21
**minor** [2] - 171:16, 171:17
**minute** [2] - 34:19, 141:12
**minutes** [15] - 11:9, 63:10, 64:5, 64:15, 81:18, 94:25, 95:3, 112:19, 177:1, 177:4, 198:11, 198:20, 226:13, 229:3, 229:9
**MIP** [1] - 27:21
**Miriam** [2] - 13:12, 30:20
**misconduct** [2] - 96:25, 99:11
**miss** [1] - 34:12
**missed** [3] - 199:13, 199:14, 213:7
**missing** [6] - 35:25, 36:9, 36:11, 108:1, 117:10, 198:13
**misspeak** [1] - 154:18
**misstate** [1] - 6:18
**mistake** [6] - 49:24, 94:11, 110:19, 124:18, 156:13, 194:1
**mistakes** [2] - 219:9, 219:11
**mixed** [2] - 36:3, 90:6
**mobile** [2] - 115:1, 115:2
**mobility** [1] - 117:3
**modified** [1] - 6:6
**modifying** [1] - 92:16
**mom** [2] - 17:21
**moment** [8] - 54:22, 61:10, 117:19, 130:25, 147:10, 185:16, 198:5, 214:25
**moments** [3] - 15:9, 77:17, 119:2
**Monday** [2] - 33:13, 33:14
**monetary** [1] - 45:11
**money** [17] - 36:21, 49:5, 50:7, 50:9, 83:16, 89:3, 89:4, 124:22, 156:12, 163:19, 183:9, 196:14, 196:15, 209:2, 212:11
**monitored** [1] - 199:10
**monitors** [1] - 13:16
**month** [2] - 30:12, 51:1, 186:22
**months** [26] - 25:16, 34:16, 58:1, 73:19, 74:3, 78:2, 80:13, 90:14, 90:20, 91:11, 96:12, 105:14, 105:15, 106:18, 107:17, 108:16, 108:18, 116:13,

119:12, 130:19, 130:20, 177:25, 212:10
**Montressa** [2] - 31:21, 93:13
**Moore** [2] - 18:23, 39:5
**moral** [1] - 153:22
**moreover** [1] - 91:19
**morning** [12] - 3:3, 3:14, 11:14, 14:20, 29:1, 29:21, 34:11, 35:11, 35:12, 63:9, 226:18, 229:2
**Morrison** [1] - 2:6
**mortgage** [2] - 30:14, 60:4
**mortgage-backed** [1] - 60:4
**most** [15] - 54:12, 58:18, 59:7, 59:10, 81:23, 103:1, 103:15, 119:8, 130:3, 131:24, 166:21, 191:11, 192:22, 192:25, 196:14
**mostly** [1] - 211:3
**mother** [9] - 27:9, 28:8, 31:18, 38:14, 38:24, 40:8, 40:13, 84:5, 98:10
**mother-in-law** [1] - 40:8
**motion** [3] - 3:24, 6:24, 8:7
**motions** [2] - 4:3, 6:15
**motivation** [1] - 206:9
**motive** [1] - 183:5
**motor** [1] - 117:1
**Mountain** [1] - 16:21
**mountain** [1] - 16:22
**mouth** [4] - 18:9, 21:9, 24:2, 198:23
**mouthful** [2] - 73:3, 81:4
**move** [7] - 14:6, 63:8, 119:24, 126:16, 132:15, 147:11, 202:24
**moved** [2] - 30:12, 114:18
**movies** [1] - 15:4
**moving** [3] - 50:25, 154:10, 223:9
**MR** [167] - 3:8, 3:9, 3:10, 3:11, 3:13, 4:5, 4:6, 4:11, 5:20, 5:22, 6:8, 6:11, 6:15, 7:7, 7:20, 7:21, 8:3, 9:23, 10:2, 10:4, 10:6, 10:15, 10:17, 11:3, 11:10, 14:13, 14:15, 14:20, 14:24, 31:16, 32:1, 48:23, 49:12, 49:22, 50:2, 50:5, 50:12, 50:15, 50:17, 51:2, 51:9, 51:14, 51:18, 51:23, 52:7, 52:13, 52:18, 52:21, 52:25, 53:5, 53:9, 53:12, 53:21, 54:4, 54:8, 54:19, 55:6, 55:12, 55:17, 56:2, 56:5, 56:9, 56:17, 56:19, 56:24, 57:8, 57:12, 57:18, 57:20, 57:24, 58:2, 58:7, 58:11, 58:17, 58:23, 59:1, 59:11, 59:15, 59:19, 60:8, 60:12, 60:15, 60:20, 60:22, 60:25, 61:3, 61:7, 61:11, 62:8, 72:14, 72:18, 72:21, 99:16, 99:18, 99:21, 113:3, 113:5, 113:19, 116:22, 125:22, 125:24, 133:20, 133:24, 134:8, 134:11, 134:24, 135:1, 138:3, 138:6, 140:14, 140:16, 141:1, 141:17, 144:4, 144:6, 145:16, 145:18, 146:18, 146:20, 146:25, 147:2, 147:7, 147:9, 147:15, 147:16, 150:9, 150:11, 152:17, 152:19, 158:10, 158:12, 160:25, 161:1, 162:21, 163:3, 173:19, 173:20, 174:5, 174:7, 174:16, 174:17,

175:6, 175:7, 177:5, 177:12, 187:25, 188:2, 188:3, 194:2, 194:4, 200:16, 200:24, 202:25, 203:1, 206:14, 206:16, 214:14, 214:16, 214:18, 215:3, 215:7, 227:5, 227:15, 228:8, 228:18, 228:25, 229:10
**multiple** [10] - 101:10, 107:10, 133:18, 140:3, 140:4, 149:13, 155:23, 200:14, 213:12, 213:13
**Murphy** [4] - 13:1, 24:5, 42:11, 56:25
**must** [5] - 8:14, 64:24, 65:8, 65:20, 66:19, 69:12, 69:14, 70:8, 76:4, 76:9, 76:10, 76:12, 81:11

**N**

**N.A** [2] - 1:6, 3:5
**name** [66] - 11:15, 11:20, 16:24, 17:5, 17:18, 18:18, 18:22, 19:12, 21:16, 22:4, 24:5, 24:16, 26:8, 26:21, 27:8, 27:15, 28:6, 29:1, 29:21, 30:10, 32:11, 32:17, 34:9, 39:2, 39:4, 40:1, 40:6, 40:22, 41:8, 43:6, 46:24, 47:11, 55:3, 57:17, 62:18, 78:4, 84:21, 92:7, 92:14, 92:25, 95:6, 99:24, 100:24, 101:5, 101:17, 103:14, 107:13, 113:13, 113:15, 113:16, 121:19, 143:6, 143:17, 144:3, 145:11, 146:3, 146:11, 148:25, 149:18, 149:20, 158:4, 161:4, 167:3, 203:25, 208:9, 209:8
**named** [6] - 31:23, 32:3, 32:13, 93:12, 102:6, 106:11
**names** [6] - 11:6, 11:19, 31:13, 62:17, 137:12, 137:15
**Nancy** [1] - 230:11
**nancy** [1] - 2:19
**NANCY** [1] - 230:12
**Natalie** [2] - 12:14, 17:18
**national** [3] - 33:4, 102:19, 170:24
**nationally** [1] - 97:24
**naturally** [1] - 118:14
**nature** [8] - 21:5, 22:19, 23:15, 25:4, 26:15, 48:25, 81:20, 114:14
**near** [3] - 117:15, 148:6, 222:14
**necessarily** [2] - 9:18, 67:10
**necessary** [2] - 68:17, 82:14
**need** [33] - 4:8, 5:3, 7:11, 8:5, 10:1, 10:19, 10:20, 13:24, 16:6, 33:23, 44:17, 61:24, 62:1, 71:22, 87:9, 97:2, 97:9, 104:3, 111:15, 119:19, 137:5, 160:21, 171:3, 173:15, 178:18, 178:20, 190:9, 193:7, 194:8, 194:11, 212:1, 216:6, 217:24
**needed** [13] - 3:16, 51:4, 87:16, 89:7, 128:1, 135:11, 135:14, 135:15, 136:14, 138:14, 156:25, 178:17, 180:5
**needlecraft** [1] - 24:23
**needless** [1] - 88:3
**needs** [9] - 77:23, 112:12, 116:10, 131:5, 132:11, 132:18, 164:17, 192:6,

226:24
**negative** [16] - 18:9, 21:9, 44:8, 46:20, 47:12, 48:4, 59:4, 59:21, 59:22, 60:6, 78:23, 78:24, 161:21, 182:19, 202:16
**negligent** [4] - 96:17, 96:20, 110:18, 111:2
**negligently** [1] - 33:3
**negotiate** [1] - 165:6
**negotiations** [1] - 164:18
**neighbor** [2] - 166:7, 166:14
**neighborhood** [1] - 29:15
**neighbors** [1] - 52:14
**nerd** [2] - 155:5, 192:12
**networks** [1] - 114:18
**neutral** [32] - 19:9, 19:24, 21:13, 22:1, 23:8, 23:18, 24:2, 24:14, 25:20, 26:18, 27:5, 28:20, 29:18, 30:7, 31:2, 32:19, 38:18, 39:9, 40:16, 41:4, 41:12, 41:19, 42:18, 44:2, 44:23, 46:6, 46:13, 47:7, 47:21, 47:25, 48:14, 67:17
**never** [15] - 18:21, 22:9, 27:12, 55:9, 55:22, 55:25, 57:10, 99:6, 116:3, 127:1, 138:17, 149:11, 158:24, 198:16, 220:8
**New** [23] - 22:7, 83:14, 83:18, 83:24, 126:18, 127:21, 127:25, 129:23, 130:7, 135:8, 139:10, 141:19, 143:9, 146:8, 148:6, 151:3, 156:18, 163:16, 169:17, 211:4, 211:8, 211:14, 215:18
**new** [7] - 35:24, 55:8, 149:25, 174:13, 176:10, 176:12, 227:9
**news** [4] - 46:7, 46:12, 46:16, 70:13
**next** [70] - 4:16, 33:1, 34:6, 35:4, 41:23, 54:2, 75:2, 77:21, 80:13, 81:19, 82:8, 85:7, 85:13, 86:3, 86:12, 89:5, 89:13, 93:11, 107:15, 108:21, 111:20, 124:3, 131:1, 134:19, 134:21, 136:16, 138:21, 141:24, 145:3, 145:5, 145:16, 145:17, 146:1, 146:6, 146:15, 146:18, 147:1, 147:7, 148:10, 160:25, 162:21, 165:14, 165:23, 167:1, 167:10, 169:10, 170:16, 170:17, 170:22, 172:19, 173:5, 173:19, 174:5, 174:16, 177:24, 191:5, 194:3, 194:19, 204:13, 204:20, 205:12, 205:15, 205:17, 205:25, 208:18, 212:16, 222:3, 223:9
**nice** [1] - 222:25
**nicely** [1] - 55:24
**night** [2] - 36:21, 182:23
**nine** [1] - 78:2
**Ninth** [1] - 4:21
**NO** [180] - 16:17, 16:24, 17:5, 17:13, 17:18, 18:1, 18:11, 18:16, 18:18, 18:22, 19:5, 19:7, 19:10, 19:12, 19:18, 19:21, 19:25, 20:2, 20:11, 20:22, 21:3, 21:7, 21:11, 21:14, 21:16, 21:24, 22:2, 22:4, 22:11, 22:20, 22:25, 23:3, 23:9, 23:11, 23:16, 23:19, 23:22, 24:4, 24:5, 24:15, 24:16, 25:2, 25:6, 25:10, 25:13, 25:16, 25:22, 25:25, 26:3, 26:8, 26:14,

26:16, 26:19, 26:21, 27:6, 27:8, 27:15, 27:25, 28:4, 28:6, 28:15, 28:18, 28:21, 28:24, 29:1, 29:9, 29:12, 29:14, 29:19, 29:21, 30:8, 30:10, 30:20, 31:3, 32:12, 32:20, 32:23, 34:10, 34:14, 34:21, 35:3, 35:14, 35:18, 35:23, 36:7, 36:13, 36:18, 36:20, 36:25, 37:3, 37:5, 37:16, 37:22, 38:2, 38:7, 38:14, 38:20, 38:21, 38:24, 39:3, 39:4, 39:10, 39:14, 39:23, 39:25, 40:1, 40:6, 40:12, 40:17, 40:19, 40:23, 41:8, 41:14, 41:16, 41:20, 41:22, 42:2, 42:6, 42:11, 43:4, 43:7, 43:12, 43:19, 44:16, 44:24, 45:5, 46:25, 47:4, 47:9, 47:11, 47:18, 47:22, 47:24, 49:7, 49:16, 50:1, 50:4, 50:8, 50:14, 50:16, 50:22, 51:3, 51:13, 51:17, 51:22, 52:5, 52:9, 52:17, 52:20, 52:23, 53:4, 53:8, 53:11, 53:18, 53:22, 54:7, 55:1, 55:8, 55:14, 55:20, 56:3, 56:8, 56:12, 56:18, 56:21, 57:2, 57:10, 57:16, 57:19, 57:21, 57:25, 58:4, 58:10, 58:15, 58:18, 58:24, 59:6, 59:13, 59:18, 59:23
**nobody** [1] - 141:5
**non** [1] - 45:11
**non-monetary** [1] - 45:11
**none** [2] - 66:24, 180:22
**nonverbal** [1] - 199:15
**noon** [1] - 99:17
**normal** [3] - 117:9, 119:12, 132:10
**normally** [2] - 148:9, 213:5
**North** [3] - 20:12, 30:11, 179:7
**Northeast** [1] - 18:2
**notably** [1] - 167:2
**notarization** [1] - 147:14
**notarize** [1] - 148:3
**notarized** [7] - 84:19, 125:12, 148:5, 151:6, 180:12, 180:13, 221:1
**notary** [7] - 125:14, 148:3, 148:7, 148:9, 220:22, 221:7
**note** [7] - 12:2, 71:8, 71:23, 107:3, 107:19, 150:4, 205:7
**note-taking** [1] - 71:8
**notebook** [1] - 67:21
**notes** [9] - 71:5, 71:6, 71:13, 71:15, 71:17, 79:6, 79:25, 134:2
**nothing** [4] - 21:11, 89:20, 104:3, 150:7
**notice** [16] - 76:5, 76:8, 81:2, 81:6, 81:8, 82:8, 82:10, 82:13, 82:18, 90:22, 144:11, 159:16, 159:17, 159:23, 168:2, 169:16
**Notice** [1] - 163:5
**noticed** [1] - 226:21
**notices** [4] - 98:22, 111:12, 207:4
**notification** [1] - 58:19
**notified** [2] - 80:21, 166:23
**notify** [4] - 70:5, 70:24, 80:24, 87:4
**notifying** [2] - 80:22, 90:21
**notion** [2] - 46:15, 46:18
**notwithstanding** [2] - 9:13, 45:1

**November** [51] - 79:23, 80:2, 81:24, 82:11, 82:24, 83:8, 83:23, 86:13, 87:6, 87:7, 88:6, 88:14, 89:6, 93:12, 104:18, 104:19, 107:18, 107:23, 107:25, 108:1, 108:3, 108:25, 120:21, 123:17, 126:1, 126:17, 126:20, 128:17, 130:12, 136:9, 136:23, 143:10, 146:10, 167:24, 175:10, 177:16, 178:6, 178:9, 183:14, 194:10, 196:21, 197:23, 211:9, 211:11, 211:16, 211:19, 222:19, 223:4, 224:14, 224:15
**nowhere** [1] - 222:14
**number** [34] - 55:5, 55:8, 55:25, 56:13, 67:10, 68:25, 84:22, 84:23, 84:24, 92:8, 92:15, 92:25, 95:7, 100:25, 112:1, 122:24, 137:14, 141:14, 143:1, 143:18, 143:19, 145:12, 145:13, 145:14, 147:5, 148:15, 161:18, 164:1, 184:25, 213:17, 219:25, 226:22, 227:3
**numbered** [1] - 193:21
**numbers** [12] - 54:15, 92:17, 101:3, 137:12, 138:25, 139:1, 146:5, 147:11, 161:3, 161:4, 181:14, 186:8
**numeral** [1] - 219:20
**numerous** [1] - 96:11
**nurse** [1] - 164:19
**nursing** [2] - 27:10, 35:5

**O**

**O-s-t-e-r-k-a-m-p** [1] - 12:12
**oath** [3] - 13:22, 13:25, 63:2
**object** [2] - 6:20, 66:11
**objecting** [1] - 5:17
**objection** [25] - 3:23, 4:8, 5:16, 7:24, 9:21, 9:22, 66:11, 66:13, 66:14, 125:22, 133:20, 133:22, 134:9, 134:16, 138:3, 140:14, 140:18, 152:17, 158:10, 187:25, 188:1, 200:16, 214:14, 227:16, 227:21
**objectionable** [2] - 68:14, 134:16
**objections** [4] - 3:21, 4:2, 5:15, 65:11
**obligations** [2] - 109:19, 163:6
**obscenely** [1] - 139:8
**observing** [1] - 46:7
**obtain** [3] - 137:8, 163:6, 218:2
**obvious** [5] - 138:15, 161:13, 162:23, 172:6, 189:20
**obviously** [3] - 100:5, 127:16, 176:2
**occasions** [1] - 98:18
**occurred** [1] - 4:17
**ocean** [1] - 150:6
**October** [29] - 78:5, 78:13, 79:3, 79:18, 102:1, 102:7, 102:14, 102:15, 104:10, 104:11, 104:18, 105:13, 123:22, 126:1, 126:4, 161:22, 174:3, 217:16, 218:7, 218:10, 219:4, 219:14, 220:11, 220:14, 221:14, 222:13, 222:20
**OF** [2] - 1:2, 1:15
**offensive** [1] - 153:17

**offer** [4] - 4:8, 7:25, 10:15, 67:19
**offered** [2] - 4:14, 134:15
**offering** [1] - 4:1
**offers** [1] - 66:9
**office** [18] - 42:12, 42:13, 83:24, 83:25, 84:3, 128:8, 128:11, 129:21, 130:13, 130:21, 131:21, 135:8, 151:3, 163:25, 179:7, 199:1, 224:6, 224:21
**Office** [4] - 187:6, 222:6, 223:6, 223:16
**officer** [4] - 18:3, 124:8, 135:12, 136:6
**officers** [3] - 135:4, 136:3, 136:12
**Official** [1] - 230:13
**often** [8] - 53:2, 68:13, 73:3, 74:23, 103:21, 128:13, 173:8, 212:12
**OHSU** [1] - 28:9
**old** [1] - 101:5
**older** [1] - 135:10
**OlsenDaines** [1] - 2:8
**once** [12] - 21:3, 26:11, 30:4, 33:20, 58:16, 58:20, 73:1, 77:12, 91:18, 97:6, 97:10
**once-in-a-lifetime** [1] - 77:12
**one** [104] - 3:17, 3:20, 4:16, 4:23, 10:11, 10:18, 11:19, 11:24, 18:7, 22:13, 22:17, 22:21, 22:23, 25:6, 25:7, 25:16, 26:1, 27:17, 29:14, 32:14, 32:16, 38:17, 41:9, 52:14, 54:10, 55:9, 58:17, 65:10, 66:1, 75:25, 77:14, 83:17, 85:21, 88:12, 88:23, 88:24, 89:3, 89:20, 91:24, 91:25, 99:25, 101:11, 103:9, 103:14, 107:1, 112:8, 112:15, 118:2, 119:1, 119:8, 131:13, 133:19, 135:3, 136:4, 137:17, 141:6, 141:7, 141:9, 142:11, 148:6, 149:12, 149:14, 155:11, 155:24, 155:25, 156:2, 156:3, 161:9, 162:18, 165:5, 165:13, 169:14, 171:15, 174:20, 175:10, 176:8, 183:17, 191:17, 192:17, 192:21, 192:23, 195:14, 202:2, 202:10, 206:18, 206:20, 208:9, 210:6, 213:5, 216:10, 216:21, 217:24, 220:19, 220:20, 221:13, 221:14, 222:3, 222:9, 224:8, 225:1, 226:23
**ones** [5] - 58:17, 150:14, 186:20, 192:15, 208:7
**online** [6] - 148:7, 170:8, 206:22, 207:11, 220:22, 221:7
**oOo** [1] - 230:1
**open** [4] - 15:19, 15:22, 69:8, 209:16
**opened** [10] - 33:5, 55:2, 57:17, 101:12, 105:20, 107:13, 107:21, 129:18, 136:20
**opening** [8] - 10:16, 72:1, 72:4, 72:13, 99:14, 99:20, 101:9
**opens** [1] - 92:12
**operate** [1] - 3:24
**operations** [2] - 100:3, 109:15
**opinion** [10] - 39:15, 59:14, 59:21, 59:22, 60:6, 67:15, 69:4, 98:2, 98:7, 206:4
**opportunities** [2] - 96:11, 213:7

**opportunity** [11] - 9:4, 15:11, 61:16, 67:1, 67:20, 68:11, 70:21, 77:22, 99:10, 109:13, 197:17
**oppose** [1] - 6:22
**opposite** [1] - 82:19
**oppressive** [1] - 110:25
**option** [2] - 51:5, 167:19
**options** [1] - 177:18
**OR** [5] - 2:7, 2:10, 2:13, 2:18, 2:21
**ordeal** [1] - 182:16
**order** [8] - 63:22, 66:17, 67:14, 81:9, 100:9, 130:4, 155:23, 212:14
**ordered** [1] - 70:8
**orders** [1] - 141:12
**OREGON** [1] - 1:2
**Oregon** [11] - 1:6, 17:8, 20:4, 23:12, 24:17, 55:4, 55:7, 113:21, 170:24, 230:13
**organization** [2] - 26:4, 26:5
**organizational** [1] - 20:16
**organizations** [10] - 18:20, 21:18, 22:7, 24:9, 26:10, 26:25, 28:11, 30:1, 30:16, 30:23
**organized** [1] - 153:6
**original** [5] - 23:25, 100:18, 171:8, 173:22, 230:6
**Osterkamp** [6] - 12:12, 16:24, 41:16, 42:2, 48:24, 62:19
**Oswego** [3] - 20:3, 21:17, 30:21
**otherwise** [4] - 37:1, 69:18, 75:4, 101:1
**outcome** [2] - 67:4, 109:8
**outcomes** [1] - 75:22
**outline** [2] - 10:13, 72:2
**outside** [7] - 39:22, 46:17, 63:19, 63:22, 64:2, 70:23, 117:8
**overall** [1] - 23:25
**overcome** [1] - 15:21
**overloaded** [1] - 140:4
**overly** [1] - 71:16
**overnight** [1] - 130:9
**overrule** [1] - 66:11
**overruled** [3] - 9:22, 134:16, 140:19
**overseas** [2] - 121:13, 194:20
**overworked** [1] - 169:3
**owe** [4] - 49:5, 49:6, 50:7, 50:10
**owed** [6] - 49:24, 52:11, 91:12, 142:3, 212:10, 212:21
**owes** [1] - 50:6, 83:12
**own** [16] - 10:18, 30:12, 43:20, 70:18, 71:15, 79:6, 93:5, 96:25, 105:11, 113:10, 143:21, 160:7, 162:24, 194:24, 205:4
**owned** [2] - 216:15, 216:20
**ownership** [2] - 115:12, 216:17

**P**

**P-a-q-u-e-t-t-e** [1] - 13:4
**P.C** [1] - 2:11
**pace** [1] - 193:11

**packed** [1] - 45:19
**packet** [3] - 176:17, 204:12, 217:18
**page** [85] - 82:9, 88:14, 88:20, 125:7, 126:5, 126:6, 126:21, 126:22, 136:16, 138:22, 144:22, 145:3, 145:5, 145:17, 146:6, 146:19, 147:1, 147:3, 147:8, 147:12, 148:12, 148:14, 148:17, 148:23, 149:1, 149:8, 150:10, 160:25, 162:21, 170:16, 170:17, 171:25, 172:11, 172:12, 172:19, 172:21, 173:1, 173:2, 173:3, 173:5, 174:2, 184:5, 185:11, 185:12, 185:13, 186:6, 186:17, 187:10, 187:17, 193:16, 193:17, 194:3, 194:9, 194:19, 200:3, 200:7, 202:12, 202:23, 203:7, 204:20, 205:25, 206:15, 207:1, 207:25, 219:21, 221:2, 221:15, 221:17, 221:25, 222:3, 222:6, 222:9, 222:25, 223:9, 223:10, 223:13, 223:16, 223:20, 223:24, 223:25, 224:2
**pages** [14] - 8:9, 9:1, 9:9, 143:5, 143:23, 144:2, 146:10, 150:14, 163:4, 167:6, 170:7, 172:24, 172:25, 195:8
**Paget** [1] - 14:4
**paid** [4] - 37:2, 60:2, 77:3, 82:7
**paint** [1] - 26:11
**painting** [2] - 24:19, 24:22
**pal** [2] - 17:10, 17:12
**panel** [4] - 11:12, 14:1, 16:7, 60:21
**paper** [5] - 13:18, 67:21, 136:7, 191:9, 219:8
**papers** [1] - 179:21
**Paquette** [3] - 13:4, 26:9, 36:13
**para** [1] - 53:19
**paragraph** [30] - 76:10, 85:13, 123:14, 123:18, 123:20, 124:3, 143:2, 143:11, 144:18, 149:2, 149:11, 150:12, 152:24, 153:10, 159:25, 167:1, 168:10, 170:2, 178:12, 181:19, 186:7, 190:11, 200:8, 200:11, 201:6, 208:1, 208:4, 225:6, 225:9
**paragraphs** [1] - 160:3
**paraphrase** [2] - 124:5, 145:20
**paratroopers** [1] - 53:19
**parent** [1] - 153:24
**parents** [3] - 18:19, 21:17, 165:6
**park** [1] - 213:6
**Parkrose** [1] - 18:2
**part** [32] - 3:19, 8:13, 16:14, 19:14, 28:7, 54:9, 58:19, 66:23, 104:4, 105:4, 117:8, 128:17, 137:3, 142:18, 147:5, 151:2, 156:24, 162:9, 163:7, 163:10, 182:1, 184:2, 185:17, 186:24, 199:5, 200:25, 207:8, 207:17, 212:16, 224:3, 227:13, 228:6
**participate** [2] - 164:9, 164:22
**particular** [7] - 5:6, 8:17, 8:20, 9:4, 18:15, 65:15, 110:8
**particularly** [1] - 9:2
**parties** [9] - 3:2, 8:18, 11:12, 31:9,

38:17, 64:9, 70:20, 112:24, 177:7
**partly** [1] - 156:11
**partner** [1] - 42:12
**partners** [1] - 34:23
**parts** [2] - 157:19, 213:4
**party** [15] - 15:6, 19:1, 19:2, 19:16, 19:20, 20:7, 21:22, 24:11, 28:12, 28:14, 50:17, 70:21, 72:2, 72:3, 82:15
**pass** [3] - 20:1, 61:12, 160:11
**passed** [1] - 149:18
**passing** [1] - 60:21
**passport** [6] - 86:23, 125:17, 172:21, 180:12, 195:8, 213:16
**Passport** [1] - 216:21
**past** [6] - 26:12, 91:11, 126:24, 186:1, 216:17, 221:18
**path** [2] - 160:22, 213:11
**paths** [1] - 171:4
**pause** [2] - 62:7, 134:4
**pay** [15] - 36:16, 36:19, 36:21, 44:19, 71:4, 111:6, 115:8, 153:14, 158:16, 159:24, 174:1, 185:8, 191:4, 197:18, 205:6
**payday** [1] - 115:17
**paying** [2] - 40:20, 210:23
**payment** [2] - 127:2, 158:24
**payments** [1] - 210:24
**PDFs** [1] - 163:17
**Pennsylvania** [1] - 216:8
**people** [45] - 11:7, 12:3, 12:5, 12:6, 17:20, 31:8, 31:10, 31:20, 43:14, 44:19, 45:13, 49:5, 52:10, 52:11, 52:14, 52:19, 59:9, 70:4, 77:16, 102:21, 103:20, 117:14, 117:19, 117:20, 117:25, 118:13, 120:8, 123:3, 129:12, 131:3, 153:20, 153:23, 168:23, 169:2, 171:1, 172:16, 174:13, 192:1, 192:2, 198:2, 199:23, 210:9, 213:12, 214:4, 226:4
**people's** [1] - 189:24
**per** [1] - 94:25
**percent** [4] - 35:25, 36:1, 77:1, 115:12
**peremptory** [2] - 61:9, 61:12
**perfect** [2] - 77:22, 165:3
**period** [6] - 36:15, 191:15, 211:1, 214:24, 215:21, 218:12
**perk** [1] - 159:23
**permanently** [1] - 82:11
**permit** [1] - 68:1
**permits** [1] - 66:4
**permitted** [1] - 66:10
**perpetrator** [2] - 78:17, 124:1
**persistent** [1] - 168:7
**person** [40] - 14:18, 16:18, 50:6, 51:19, 52:16, 69:21, 72:17, 77:18, 92:10, 92:12, 94:7, 94:17, 102:12, 104:8, 109:21, 115:11, 117:24, 131:16, 132:10, 141:6, 141:7, 141:9, 145:22, 146:3, 149:7, 162:25, 165:13, 165:17, 165:19, 171:14, 179:5, 188:15,

193:24, 196:2, 196:14, 197:4, 201:19, 204:8, 204:11, 220:4
**person's** [1] - 185:9
**personal** [11] - 52:10, 52:13, 52:14, 104:8, 135:22, 164:17, 194:5, 196:8, 201:15, 201:16, 201:18
**personally** [2] - 49:21, 65:24
**perspective** [7] - 9:24, 10:1, 10:3, 45:10, 47:3, 47:13, 51:4
**perspectives** [1] - 10:12
**pet** [1] - 24:19
**PETERSON** [55] - 3:11, 4:6, 5:20, 7:21, 8:3, 9:23, 10:4, 11:10, 14:20, 32:1, 54:19, 55:6, 55:12, 55:17, 56:2, 56:5, 56:9, 56:17, 56:19, 56:24, 57:8, 57:12, 57:18, 57:20, 57:24, 58:2, 58:7, 58:11, 58:17, 58:23, 59:1, 59:11, 59:15, 59:19, 60:8, 60:25, 61:3, 61:7, 99:16, 99:18, 99:21, 125:22, 133:20, 134:8, 138:3, 140:14, 140:16, 152:17, 158:10, 177:5, 187:25, 200:16, 214:14, 215:7, 227:5
**peterson** [1] - 2:16
**Peterson** [4] - 3:11, 14:17, 14:20, 99:24
**phone** [17] - 23:4, 23:5, 43:14, 62:1, 69:22, 106:23, 121:10, 121:25, 122:23, 141:14, 145:13, 162:3, 182:23, 188:11, 188:15, 208:8, 219:25
**phones** [2] - 61:17, 62:14
**photocopy** [2] - 103:10, 103:22
**phrase** [1] - 74:23
**phrased** [1] - 49:13
**phrases** [1] - 169:5
**physical** [6] - 17:22, 28:8, 103:17, 195:20, 198:7, 206:11
**physically** [2] - 132:14, 132:15
**picture** [4] - 101:4, 101:17, 103:10, 221:10
**pictures** [1] - 119:4
**piece** [5] - 13:18, 67:21, 136:7, 148:24, 219:8
**pierce** [2] - 58:12, 58:13
**Pierce** [3] - 13:10, 29:22, 35:3
**Pilates** [1] - 17:10
**PIN** [1] - 55:25
**pissed** [1] - 178:23
**place** [12] - 9:11, 12:6, 54:3, 88:22, 106:10, 121:24, 128:7, 128:8, 146:12, 170:12, 188:25, 229:4
**places** [4] - 112:6, 121:1, 133:10, 227:20
**plain** [1] - 189:21
**plaintiff** [25] - 3:7, 3:8, 3:9, 3:10, 4:4, 4:12, 4:14, 8:14, 9:1, 9:8, 14:7, 33:2, 33:6, 45:16, 45:21, 48:16, 48:17, 48:20, 48:22, 51:21, 60:11, 72:5, 72:13, 109:3, 134:19
**Plaintiff** [1] - 1:4
**PLAINTIFF** [2] - 2:2, 14:12
**plaintiff's** [10] - 8:7, 9:20, 9:24, 33:6,

51:19, 72:7, 72:8, 105:10, 109:12, 227:6
**plaintiffs** [1] - 54:5
**plan** [5] - 129:17, 129:24, 164:20, 182:1
**plane** [1] - 54:1
**planned** [1] - 130:6
**planning** [2] - 34:15, 116:2
**Planning** [1] - 18:5
**plans** [4] - 83:19, 120:23, 129:22, 130:11
**play** [3] - 17:15, 18:21, 196:13
**playing** [3] - 27:21, 131:2, 191:10
**plays** [1] - 73:5
**plea** [1] - 138:16
**plead** [1] - 169:8
**pleasant** [2] - 226:12, 226:17
**pled** [7] - 80:1, 80:5, 80:9, 136:21, 143:8, 146:3, 166:16
**Point** [1] - 216:8
**point** [21] - 4:2, 10:25, 37:14, 50:10, 76:7, 100:14, 106:13, 112:6, 115:21, 127:22, 143:5, 150:16, 157:15, 162:2, 173:23, 176:3, 183:4, 191:11, 197:7, 227:5, 228:13
**points** [7] - 13:16, 13:20, 16:12, 89:10, 104:2, 183:20, 217:23
**police** [72] - 55:10, 73:19, 73:20, 78:5, 78:16, 79:8, 79:14, 79:16, 80:1, 80:8, 80:10, 81:15, 82:24, 83:2, 84:15, 84:17, 84:24, 85:3, 85:16, 86:9, 86:23, 90:16, 93:6, 97:3, 97:7, 103:9, 124:7, 129:10, 129:15, 133:18, 135:3, 135:12, 135:22, 136:2, 136:5, 137:25, 139:1, 141:16, 143:5, 143:6, 143:13, 143:18, 143:19, 143:23, 144:10, 146:10, 148:12, 148:21, 149:12, 149:13, 150:12, 150:25, 151:7, 152:15, 152:22, 154:17, 160:23, 161:3, 166:16, 166:17, 167:3, 172:15, 174:22, 175:1, 180:14, 205:17, 205:18, 218:4, 225:18, 225:20
**Police** [8] - 78:7, 78:16, 79:4, 84:23, 84:24, 121:8, 123:24, 143:7
**policies** [20] - 9:10, 9:12, 9:16, 92:19, 93:24, 94:10, 94:13, 94:14, 94:15, 102:16, 102:18, 102:23, 102:25, 103:4, 104:21, 108:6, 109:16, 110:10, 110:11
**policy** [5] - 8:10, 9:13, 87:24, 88:3, 94:5
**polishing** [1] - 24:18
**pool** [1] - 100:19
**poor** [2] - 117:1, 221:4
**pop** [2] - 169:5, 191:3
**port** [1] - 120:7
**portion** [4] - 6:18, 61:14, 161:9, 200:18
**Portland** [20] - 1:6, 2:7, 2:10, 2:13, 2:18, 2:21, 17:19, 18:2, 18:5, 20:5, 20:12, 27:16, 28:7, 29:22, 30:11, 76:22, 113:21, 215:2, 216:1
**portraits** [1] - 24:20

**portrayed** [1] - 158:25
**pose** [3] - 13:21, 13:22, 226:15
**position** [3] - 35:24, 36:2, 44:3
**possibilities** [1] - 5:13
**possibility** [1] - 34:6
**possible** [10] - 33:11, 33:16, 45:11, 63:7, 144:20, 165:12, 168:25, 190:3, 192:19, 203:24
**possibly** [7] - 53:8, 53:9, 118:17, 165:25, 170:9, 175:25, 209:2
**post** [1] - 163:25
**potential** [8] - 11:1, 13:13, 13:24, 16:6, 31:13, 32:5, 34:1, 153:4
**power** [5] - 125:7, 125:11, 203:18, 220:20, 221:1
**Power** [1] - 26:4
**powered** [1] - 120:3
**practice** [2] - 4:19, 167:15
**practices** [3] - 190:13, 190:18, 190:20
**precautionary** [3] - 112:2, 177:2, 226:10
**preconceived** [1] - 59:4
**prefer** [1] - 99:15
**preference** [2] - 3:22, 99:19
**prejudice** [4] - 8:25, 9:8, 9:9, 67:4
**preliminary** [1] - 63:12
**prepared** [4] - 6:4, 10:18, 10:20, 84:17
**preschool** [1] - 22:15
**presence** [1] - 16:9
**present** [6] - 68:19, 72:5, 72:7, 117:23, 119:13, 198:3
**presentation** [1] - 71:20
**presented** [4] - 71:19, 72:9, 99:9, 111:7
**presenting** [1] - 111:19
**president** [1] - 18:3
**press** [1] - 70:4
**pressing** [1] - 130:3
**pretrial** [3] - 4:3, 6:15, 133:23
**pretty** [4] - 53:22, 56:22, 58:18, 92:2
**previous** [5] - 17:11, 86:15, 86:21, 160:2, 162:17
**previously** [4] - 8:16, 99:24, 129:22, 180:25
**price** [2] - 77:4, 115:10
**pride** [1] - 158:15
**primary** [2] - 131:15, 196:11
**print** [6] - 59:8, 59:10, 59:16, 163:18, 163:22, 169:1
**printed** [1] - 197:21
**printer** [1] - 197:21
**priority** [2] - 118:16, 156:15
**privacy** [2] - 213:9, 213:10
**private** [6] - 15:25, 16:2, 17:24, 26:5, 65:14, 213:12
**privately** [1] - 60:13
**problem** [24] - 6:4, 6:5, 34:7, 35:7, 71:21, 84:2, 94:14, 97:12, 100:20, 121:2, 121:5, 123:4, 132:23, 134:12, 139:24, 171:22, 201:24, 202:2, 206:5, 207:12, 207:19, 210:15, 212:24,

214:19
**problematic** [1] - 131:24
**problems** [8] - 30:7, 103:2, 103:3, 107:11, 114:4, 117:12, 196:7, 196:8
**procedure** [8] - 5:19, 8:10, 9:13, 61:11, 88:15, 88:16, 88:17, 93:18
**procedures** [27] - 8:25, 9:4, 9:11, 9:12, 76:20, 91:19, 92:19, 93:9, 93:24, 94:5, 94:10, 94:14, 94:15, 95:11, 102:16, 102:18, 102:23, 102:24, 103:1, 103:4, 104:21, 108:7, 109:17, 110:10, 110:17
**proceed** [10] - 12:7, 27:1, 87:8, 87:11, 88:2, 112:21, 134:23, 177:11, 178:19, 179:2
**proceeding** [6] - 16:23, 20:20, 21:22, 22:9, 28:13, 99:18
**PROCEEDINGS** [1] - 1:15
**proceedings** [7] - 27:2, 29:7, 62:7, 70:23, 134:4, 229:11, 230:5
**process** [19] - 4:1, 11:17, 12:7, 13:14, 15:20, 16:8, 16:9, 16:14, 31:6, 61:14, 80:25, 93:2, 109:18, 142:9, 156:25, 164:23, 164:25, 192:8, 220:25
**processed** [5] - 91:23, 93:12, 94:9, 95:2, 96:1
**processes** [1] - 155:15
**processing** [1] - 206:21
**products** [3] - 39:6, 43:9
**profession** [2] - 113:25, 114:8
**professional** [2] - 29:3, 119:6
**professionally** [1] - 115:5
**profound** [2] - 77:14, 116:25
**program** [2] - 114:7, 164:8
**programmer** [4] - 76:24, 86:17, 114:1, 114:3
**programming** [3] - 76:25, 114:17, 195:21
**progress** [1] - 197:9
**progressive** [1] - 208:8
**project** [1] - 23:4
**prompting** [1] - 131:5
**proof** [5] - 50:9, 58:5, 66:1, 80:7, 125:14
**proper** [1] - 67:24
**properly** [2] - 70:12, 156:25
**Property** [1] - 187:18
**propose** [5] - 67:12, 67:14, 67:16, 68:8, 68:11
**proposed** [2] - 67:25, 68:4
**prosecuted** [3] - 139:4, 143:7, 169:8
**prosecuting** [1] - 135:16
**prosecution** [2] - 80:11, 225:2
**prosecutor** [1] - 15:4
**PROSPECTIVE** [180] - 16:17, 16:24, 17:5, 17:13, 17:18, 18:1, 18:11, 18:16, 18:18, 18:22, 19:5, 19:7, 19:10, 19:12, 19:18, 19:21, 19:25, 20:2, 20:11, 20:22, 21:3, 21:7, 21:11, 21:14, 21:16, 21:24, 22:2, 22:4, 22:11, 22:20, 22:25, 23:3, 23:9, 23:11, 23:16, 23:19, 23:22, 24:4, 24:5, 24:15, 24:16, 25:2, 25:6,

25:10, 25:13, 25:16, 25:22, 25:25, 26:3, 26:8, 26:14, 26:16, 26:19, 26:21, 27:6, 27:8, 27:15, 27:25, 28:4, 28:6, 28:15, 28:18, 28:21, 28:24, 29:1, 29:9, 29:12, 29:14, 29:19, 29:21, 30:8, 30:10, 30:20, 31:3, 32:12, 32:20, 32:23, 34:10, 34:14, 34:21, 35:3, 35:14, 35:18, 35:23, 36:7, 36:13, 36:18, 36:20, 36:25, 37:3, 37:5, 37:16, 37:22, 38:2, 38:7, 38:14, 38:20, 38:21, 38:24, 39:3, 39:4, 39:10, 39:14, 39:23, 39:25, 40:1, 40:6, 40:12, 40:17, 40:19, 40:23, 41:8, 41:14, 41:16, 41:20, 41:22, 42:2, 42:6, 42:11, 43:4, 43:7, 43:12, 43:19, 44:16, 44:24, 45:5, 46:25, 47:4, 47:9, 47:11, 47:18, 47:22, 47:24, 49:7, 49:16, 50:1, 50:4, 50:8, 50:14, 50:16, 50:22, 51:3, 51:13, 51:17, 51:22, 52:5, 52:9, 52:17, 52:20, 52:23, 53:4, 53:8, 53:11, 53:18, 53:22, 54:7, 55:1, 55:8, 55:14, 55:20, 56:3, 56:8, 56:12, 56:18, 56:21, 57:2, 57:10, 57:16, 57:19, 57:21, 57:25, 58:4, 58:10, 58:15, 58:18, 58:24, 59:6, 59:13, 59:18, 59:23
**prospective** [3] - 11:13, 14:1, 63:4
**protect** [1] - 204:18
**protections** [1] - 74:14
**proud** [2] - 72:23, 210:18
**prove** [8] - 15:5, 15:7, 125:9, 169:12, 172:13, 172:17, 173:11
**proved** [2] - 174:9, 180:15
**proven** [2] - 45:17, 45:21
**provide** [13] - 16:8, 16:11, 50:9, 55:13, 58:2, 96:7, 98:2, 139:2, 140:22, 153:1, 160:23, 218:3
**provided** [11] - 67:20, 67:22, 90:15, 90:16, 92:9, 98:18, 184:1, 204:2, 219:11, 227:7
**Providence** [2] - 19:14, 42:7
**provides** [2] - 73:6, 84:21
**providing** [1] - 49:10
**proving** [1] - 174:1
**prowler** [1] - 29:15
**proximity** [2] - 118:1, 199:25
**prudent** [4] - 115:25, 135:13, 214:23, 215:2
**pry** [2] - 53:13, 54:8
**PSU** [1] - 20:5
**public** [3] - 192:11, 227:1, 227:14
**pull** [3] - 142:10, 156:14, 174:14
**pulled** [2] - 157:24, 158:6
**punitive** [2] - 45:22
**purchase** [1] - 56:22
**purchased** [12] - 79:10, 79:15, 101:15, 101:19, 115:9, 121:17, 124:1, 136:20, 149:25, 215:15, 216:14, 216:18
**purports** [1] - 106:20
**purpose** [8] - 15:12, 65:18, 65:20, 65:21, 68:21, 76:15, 183:7, 183:8

**pursuant** [1] - 175:13
**pursue** [1] - 77:11
**pushing** [2] - 132:19, 165:7
**put** [34] - 6:11, 6:21, 32:8, 35:5, 54:23, 74:17, 76:6, 129:11, 143:16, 143:20, 145:9, 145:11, 146:1, 146:3, 146:4, 159:18, 160:10, 160:22, 161:2, 161:6, 161:11, 163:18, 163:22, 169:1, 170:13, 171:11, 174:2, 193:20, 194:21, 195:18, 196:2, 207:12, 207:17
**puts** [1] - 214:5
**putting** [5] - 159:23, 168:13, 168:16, 203:20, 213:11

## Q

**qualifications** [1] - 15:13
**quarter** [1] - 99:17
**questioning** [6] - 16:3, 16:14, 31:6, 67:13, 227:19, 228:16
**questions** [55] - 4:18, 4:19, 4:21, 4:24, 5:2, 5:5, 5:8, 5:9, 5:11, 5:15, 5:18, 5:19, 8:16, 13:21, 13:23, 15:10, 15:11, 15:12, 15:15, 15:20, 16:10, 37:17, 47:15, 48:21, 48:25, 49:13, 54:17, 54:18, 59:2, 60:9, 65:11, 67:12, 67:14, 67:17, 67:25, 68:7, 68:9, 68:11, 88:21, 102:20, 109:13, 111:1, 184:18, 200:10, 203:10, 208:3, 215:3, 215:18, 216:23, 225:22, 226:15, 227:17, 228:12
**quickly** [5] - 50:15, 56:15, 102:19, 156:4, 168:15
**quite** [3] - 47:23, 51:15, 197:22
**quote** [2] - 82:13, 87:8

## R

**R-u-d-o-l-p-h** [1] - 12:19
**rack** [1] - 10:5
**railing** [1] - 132:25
**raise** [38] - 13:25, 31:11, 32:7, 33:8, 34:2, 34:8, 38:11, 40:24, 41:4, 41:7, 41:25, 42:19, 42:22, 43:3, 44:2, 44:5, 44:7, 44:10, 44:13, 45:8, 45:15, 45:18, 45:24, 46:1, 46:6, 46:8, 46:14, 46:19, 46:23, 48:6, 48:9, 48:11, 48:14, 48:19, 52:1, 54:21, 62:22, 113:7
**raised** [10] - 40:25, 42:16, 43:24, 46:11, 48:12, 51:24, 54:20, 54:22, 102:22, 227:5
**ramble** [1] - 192:10
**rambled** [2] - 133:4, 166:3
**rambling** [3] - 157:18, 171:8, 192:9
**Randall's** [1] - 17:13
**random** [3] - 43:16, 174:12
**rare** [2] - 116:18, 206:12
**rarely** [1] - 103:20
**rather** [2] - 15:13, 227:10
**rationally** [1] - 111:15

**Rayna** [3] - 12:23, 22:4, 62:20
**reach** [9] - 64:24, 135:25, 174:13, 181:17, 184:25, 193:23, 194:14, 199:6, 205:6
**reached** [1] - 162:25
**reaction** [4] - 44:8, 184:22, 204:4
**read** [51] - 8:7, 13:19, 17:2, 18:25, 20:18, 23:13, 26:11, 33:7, 46:17, 62:17, 62:18, 70:13, 76:7, 85:15, 87:12, 98:12, 114:15, 124:5, 124:16, 127:6, 138:10, 140:18, 140:24, 143:2, 144:1, 149:12, 150:19, 152:5, 152:13, 154:1, 168:15, 170:8, 170:9, 170:10, 171:6, 177:18, 178:18, 179:4, 182:16, 186:8, 190:6, 190:11, 194:15, 196:22, 197:1, 197:5, 197:19, 201:3, 202:15, 216:12, 222:24
**reading** [8] - 18:6, 21:20, 22:8, 128:22, 165:25, 168:24, 171:2, 190:2
**ready** [3] - 9:25, 62:8, 229:4
**real** [8] - 20:5, 30:13, 56:16, 76:13, 95:10, 96:2, 115:18, 214:21
**realistic** [1] - 102:24
**realize** [2] - 34:3, 50:6
**realized** [1] - 77:10
**really** [51] - 4:22, 8:17, 8:21, 9:11, 16:23, 25:10, 51:5, 51:10, 51:11, 52:16, 54:1, 60:5, 63:15, 64:1, 80:7, 83:24, 86:16, 89:18, 103:19, 114:4, 114:12, 115:4, 115:5, 116:11, 116:14, 117:23, 117:24, 118:10, 119:1, 119:20, 120:2, 124:23, 127:20, 128:20, 131:25, 132:10, 132:25, 143:25, 149:12, 156:18, 175:24, 181:2, 190:9, 196:6, 198:14, 202:21, 213:18, 216:12
**realm** [1] - 5:13
**reason** [8] - 77:13, 103:13, 131:13, 144:14, 187:23, 192:16, 201:9, 228:7
**reasonable** [13] - 8:22, 15:5, 76:13, 81:9, 88:8, 91:15, 91:18, 91:20, 93:4, 97:10, 97:11, 98:3, 98:25
**reasonableness** [3] - 67:6, 110:10, 110:11
**reasonably** [2] - 103:3, 111:15
**reasons** [5] - 68:3, 68:6, 85:21, 134:21, 180:9
**receipt** [4] - 107:6, 164:1, 164:3
**receipts** [3] - 85:14, 130:13, 153:2
**receivable** [7] - 17:1, 38:15, 41:25, 42:7, 42:12, 42:17, 49:1
**receivables** [1] - 42:3
**receive** [8] - 70:11, 87:9, 104:22, 106:25, 135:7, 145:23, 146:13, 178:20
**received** [38] - 9:22, 27:21, 65:2, 65:16, 66:8, 66:12, 66:14, 69:13, 87:7, 97:9, 100:10, 104:11, 104:17, 105:14, 106:16, 107:2, 107:8, 107:15, 108:10, 108:23, 108:24, 109:8, 134:6, 134:22, 140:15, 151:20, 154:7, 178:5, 178:14,

188:22, 196:18, 196:21, 204:15, 209:5, 218:14, 218:16, 222:18, 222:20
**receives** [4] - 88:5, 103:5, 105:8, 108:10
**receiving** [7] - 4:1, 76:5, 106:22, 107:16, 109:22, 178:21, 207:13
**recent** [2] - 72:18, 151:23
**recently** [1] - 35:23
**recess** [16] - 11:9, 11:11, 63:10, 63:11, 64:5, 64:8, 68:19, 111:23, 111:25, 112:23, 176:24, 176:25, 177:6, 226:3, 229:6
**reckless** [1] - 96:22
**recognize** [7] - 123:9, 126:3, 126:19, 133:13, 135:2, 186:20, 203:21
**recognized** [2] - 97:25, 110:6
**recollection** [2] - 155:7, 229:9
**reconvene** [3] - 64:9, 112:25, 177:8
**reconvened** [1] - 229:12
**record** [11] - 3:7, 4:11, 66:18, 79:5, 79:7, 106:24, 107:16, 134:8, 141:8, 227:14, 230:4
**recorded** [1] - 79:24
**records** [22] - 80:12, 82:23, 82:25, 83:4, 90:17, 92:11, 93:5, 95:7, 106:22, 141:19, 143:22, 152:10, 152:20, 153:1, 175:13, 175:16, 175:19, 175:22, 176:1, 194:22, 227:1
**recover** [1] - 125:4
**recovered** [3] - 78:19, 124:7, 144:9
**redact** [2] - 227:9, 227:10
**redirect** [1] - 228:15
**refer** [6] - 71:3, 81:4, 129:3, 150:2, 153:12, 153:15
**reference** [4] - 7:22, 70:16, 100:23, 171:11
**referenced** [3] - 143:24, 151:24, 160:13
**references** [1] - 150:13
**referred** [6] - 77:22, 100:23, 109:5, 141:16, 155:17, 196:9
**referring** [2] - 3:17, 150:14
**refers** [1] - 186:7
**reflect** [1] - 6:14
**reflection** [1] - 201:21
**reflects** [1] - 158:18
**refund** [1] - 55:22
**regard** [5] - 78:15, 135:15, 140:7, 162:13, 184:8
**Regarding** [1] - 196:22
**regarding** [13] - 7:14, 8:11, 18:9, 21:9, 28:3, 46:8, 95:25, 151:23, 157:20, 168:1, 175:12, 178:14
**regards** [2] - 8:16, 227:16
**registered** [1] - 170:23
**regoing** [1] - 57:7
**regression** [2] - 131:20, 132:8
**regular** [1] - 163:24
**regularly** [1] - 40:7
**regulation** [1] - 44:7
**rejected** [1] - 127:17

**related** [14] - 40:2, 105:1, 111:1, 111:9, 125:21, 153:3, 159:6, 175:20, 175:22, 212:2, 213:20, 222:4, 222:7, 222:11
**relates** [1] - 228:17
**relationship** [11] - 23:7, 27:23, 28:3, 32:17, 39:12, 41:12, 54:9, 77:23, 97:22, 98:11, 130:22
**relationships** [1] - 199:24
**relative** [1] - 153:24
**released** [1] - 79:12
**relevance** [3] - 158:10, 187:25, 214:14
**relevant** [5] - 7:9, 68:21, 99:3, 173:1, 227:25
**reliance** [1] - 98:16
**relief** [1] - 209:17
**rely** [1] - 71:15
**remain** [2] - 38:9, 93:21
**remaining** [2] - 63:4, 195:7
**remarks** [1] - 127:6
**remember** [25] - 21:5, 22:18, 22:19, 23:15, 25:4, 26:15, 28:16, 67:17, 71:5, 112:1, 112:17, 125:21, 155:2, 155:13, 157:19, 162:18, 168:5, 177:1, 179:9, 184:25, 191:15, 196:12, 212:19, 221:11, 224:22
**remembering** [1] - 7:24
**remind** [1] - 226:10
**reminded** [1] - 10:21
**reminders** [2] - 207:11, 207:18
**remove** [7] - 74:2, 86:7, 86:14, 88:25, 127:23, 175:4, 202:8
**removed** [3] - 97:8, 182:19, 213:25
**renew** [2] - 6:24, 134:8
**renewing** [1] - 157:22
**rent** [6] - 36:21, 60:2, 128:8, 128:9, 224:7, 224:10
**rented** [5] - 135:8, 149:4, 151:2, 216:11, 224:6
**rents** [2] - 83:23, 83:25
**repair** [5] - 23:3, 137:1, 204:12, 204:19, 204:21
**repairing** [1] - 23:6
**repeat** [3] - 15:17, 27:25, 112:1
**rephrase** [1] - 68:5
**replacing** [2] - 23:4, 23:5
**replied** [1] - 167:6
**report** [126] - 48:9, 70:9, 74:12, 74:21, 74:25, 75:3, 75:4, 80:19, 81:17, 81:24, 82:2, 82:19, 82:22, 83:6, 83:11, 84:15, 84:17, 84:24, 85:3, 85:6, 85:16, 85:24, 86:7, 86:10, 86:24, 88:4, 88:11, 90:23, 91:10, 93:22, 94:2, 95:16, 97:8, 97:15, 97:18, 97:19, 98:17, 98:19, 103:9, 107:22, 126:4, 126:20, 127:24, 129:10, 129:15, 137:5, 137:18, 137:23, 143:5, 143:6, 143:13, 143:15, 143:19, 143:23, 143:25, 145:24, 146:11, 146:23, 148:12, 148:22, 150:13, 150:25, 151:7, 152:22, 154:17, 156:1, 157:24, 158:3, 158:5,

158:14, 158:15, 158:17, 159:3, 160:23, 161:7, 161:8, 161:12, 161:21, 166:17, 166:22, 172:4, 174:23, 175:1, 175:4, 182:19, 185:16, 185:18, 185:20, 186:11, 186:15, 187:7, 187:16, 187:20, 188:5, 189:11, 194:17, 202:8, 202:12, 202:18, 202:20, 205:17, 205:19, 205:20, 208:6, 209:1, 209:18, 210:1, 210:9, 211:4, 211:8, 211:11, 212:11, 212:21, 213:20, 213:25, 214:10, 218:4, 222:10, 222:11, 222:15, 222:19, 222:20, 223:4, 225:20, 228:21
**Report** [1] - 74:16
**reported** [8] - 33:4, 73:15, 78:25, 79:1, 82:15, 124:13, 124:14, 167:4
**Reporter** [1] - 230:13
**REPORTER** [4] - 2:19, 39:1, 40:22, 116:20
**reporter** [3] - 32:9, 143:3, 145:21
**Reporting** [12] - 33:3, 73:2, 74:7, 76:16, 96:15, 144:16, 170:3, 170:6, 171:12, 175:14, 190:14, 190:25
**reporting** [52] - 33:5, 42:21, 42:25, 73:5, 73:7, 73:16, 74:1, 74:21, 74:22, 75:5, 75:9, 75:10, 75:15, 79:1, 79:19, 80:23, 81:25, 82:6, 82:20, 83:5, 84:9, 85:4, 85:10, 86:18, 88:9, 88:17, 91:24, 96:12, 97:25, 98:1, 98:5, 123:5, 126:11, 128:2, 144:18, 152:2, 156:22, 161:15, 167:5, 167:8, 172:8, 182:19, 195:1, 201:7, 201:8, 209:25, 210:4, 210:13, 220:16, 220:17, 225:12
**reports** [16] - 46:8, 55:10, 55:11, 73:17, 74:8, 74:11, 76:19, 81:22, 82:12, 125:25, 141:16, 149:12, 221:13, 222:19, 222:24, 225:18
**represent** [3] - 14:24, 72:23, 165:7
**representation** [1] - 147:22
**representative** [5] - 24:7, 31:23, 94:8, 96:14, 98:13
**represented** [2] - 14:8, 14:17
**representing** [1] - 14:21
**reputation** [3] - 97:17, 209:22, 209:23
**request** [21] - 55:12, 56:19, 58:8, 69:2, 69:3, 78:22, 89:14, 89:16, 103:25, 124:11, 124:12, 124:16, 138:24, 141:11, 175:15, 175:19, 187:11, 189:15, 194:22, 196:24, 225:18
**Request** [1] - 175:13
**requested** [7] - 97:1, 105:17, 141:13, 156:6, 180:20, 203:24
**requesting** [5] - 68:12, 108:1, 108:8, 109:23, 124:17
**requests** [4] - 78:23, 78:24, 109:24, 124:9
**require** [4] - 58:2, 91:20, 119:17, 198:22
**required** [4] - 44:3, 72:4, 99:1, 135:24
**requirements** [3] - 76:4, 190:14, 190:24
**requires** [9] - 15:21, 70:19, 76:18, 81:8,

91:14, 94:21, 97:11, 98:24, 104:20
**requiring** [1] - 111:12
**research** [11] - 62:5, 63:19, 63:20, 70:15, 84:1, 112:3, 175:17, 182:21, 209:9, 212:6, 226:11
**researchers** [1] - 22:6
**researching** [1] - 49:10
**reside** [1] - 18:19
**resistant** [1] - 55:16
**resolution** [6] - 110:7, 162:8, 162:9, 162:13, 204:21, 206:3
**resolve** [11] - 50:13, 121:23, 123:4, 128:21, 142:12, 151:14, 180:25, 185:1, 190:20, 191:20, 209:1
**resolved** [10] - 57:20, 57:21, 57:23, 58:23, 58:25, 155:10, 155:16, 156:4, 182:18, 211:6
**resolving** [1] - 190:12
**resonates** [1] - 117:21
**respect** [1] - 220:22
**respects** [1] - 100:8
**respond** [23] - 9:3, 13:15, 13:20, 13:21, 15:15, 61:18, 61:24, 70:8, 75:16, 75:19, 81:12, 81:13, 86:11, 104:18, 135:17, 138:19, 140:10, 140:20, 154:24, 182:8, 182:20, 217:10
**responded** [5] - 96:7, 98:14, 106:5, 107:25, 110:19
**responding** [1] - 135:5
**responds** [3] - 88:9, 108:11, 109:1
**response** [33] - 8:7, 75:20, 85:7, 85:19, 86:8, 87:6, 89:5, 93:24, 98:22, 98:25, 104:14, 104:20, 106:6, 109:24, 136:15, 136:17, 138:23, 140:13, 140:18, 151:17, 155:3, 160:13, 163:11, 167:12, 176:7, 176:14, 178:8, 183:15, 184:5, 189:5, 196:20, 208:13, 227:6
**responses** [5] - 25:9, 88:13, 109:1, 109:18, 160:5
**responsibilities** [1] - 8:24
**responsibility** [8] - 44:18, 96:24, 111:15, 119:25, 144:24, 153:22, 191:22, 204:10
**responsible** [4] - 51:10, 111:8, 111:11, 210:22
**rest** [2] - 60:21, 179:15
**restrictions** [1] - 70:22
**resubmitting** [1] - 49:10
**result** [12] - 9:9, 73:21, 79:17, 85:5, 88:25, 105:23, 144:25, 145:23, 147:24, 180:6, 221:22, 222:1
**resulted** [3] - 91:16, 92:6, 96:10
**results** [21] - 75:20, 88:20, 90:1, 90:2, 90:4, 91:1, 155:7, 178:2, 184:6, 184:8, 184:23, 186:7, 200:7, 201:12, 202:15, 203:6, 203:8, 206:22, 207:11, 207:24, 207:25
**retire** [1] - 72:12
**retired** [9] - 17:7, 17:8, 22:13, 24:18,

25:23, 26:3, 26:9, 30:21
**retirement** [2] - 116:1, 120:14
**return** [6] - 55:21, 55:23, 70:12, 106:14, 107:5
**returned** [7] - 5:9, 124:8, 138:2, 144:10, 154:7, 156:10, 167:3
**review** [6] - 5:9, 8:20, 67:23, 84:15, 152:10, 205:25
**reviewed** [5] - 8:8, 218:10, 218:22, 219:3, 219:7
**reviewing** [3] - 102:14, 109:22, 109:24
**rich** [1] - 169:21
**ride** [1] - 132:3
**right-hand** [1] - 11:21
**ring** [1] - 101:6
**RMR** [2] - 2:19, 230:12
**road** [1] - 47:17
**Robert** [7] - 2:11, 2:11, 2:15, 3:8, 14:8, 14:13, 72:22
**Robin** [4] - 12:17, 18:22, 39:4, 43:7
**Rock** [1] - 16:21
**Rodighiero** [1] - 31:18
**role** [3] - 67:17, 73:6, 132:14
**rollovers** [1] - 60:4
**Romance** [1] - 22:7
**room** [12] - 63:17, 69:23, 71:3, 71:8, 71:14, 112:5, 112:9, 118:5, 118:6, 118:13, 149:4, 149:6
**Room** [1] - 2:20
**roomed** [1] - 59:24
**row** [5] - 11:21, 11:23, 12:1, 12:10, 63:6
**Rudolph** [7] - 12:19, 20:2, 40:6, 41:8, 46:25, 59:3, 62:20
**rule** [1] - 141:4
**rules** [5] - 66:7, 66:10, 68:2, 68:23, 141:8
**ruling** [3] - 7:3, 227:23, 228:7
**run** [2] - 5:1, 49:22
**running** [3] - 4:25, 27:11, 175:24
**RV** [1] - 118:24
**RV-ing** [1] - 118:24

## S

**s-2(b** [2] - 76:3
**s-2(b)** [2] - 76:1, 76:7
**S-p-i-d-a-l** [1] - 12:15
**S-p-o-n-e-r** [1] - 113:16
**S-t-e-w-a-r-t** [1] - 12:25
**Sabido** [1] - 2:15
**sad** [6] - 132:9, 176:16, 178:25, 197:2, 201:17, 204:7
**safe** [4] - 133:3, 156:12, 164:17, 212:15
**sail** [3] - 114:15, 211:14, 216:10
**sailboat** [5] - 77:11, 118:21, 123:18, 128:7, 173:8
**sailboats** [1] - 216:25
**sailed** [2] - 164:12, 215:23
**sailing** [10] - 77:9, 77:10, 77:21, 116:1,

118:18, 119:5, 150:7, 169:16, 215:20, 216:9
**sake** [1] - 32:15
**sale** [4] - 77:4, 115:10, 215:14, 215:16
**sales** [2] - 24:7, 39:5
**salesperson** [1] - 18:24
**San** [7] - 84:22, 139:3, 139:5, 139:22, 143:8, 169:13, 195:2
**sand** [1] - 2:2
**SAND** [2] - 3:9, 14:15
**Sand** [5] - 2:2, 3:9, 14:8, 14:15, 72:23
**Sarah** [2] - 13:6, 27:8
**sat** [1] - 57:5
**Satisfactory** [2] - 223:21, 224:1
**save** [1] - 163:19
**saving** [1] - 115:25
**saw** [19] - 8:13, 10:17, 65:24, 87:2, 91:14, 95:13, 98:24, 104:1, 137:18, 149:11, 179:24, 180:3, 189:8, 203:13, 210:9, 210:12, 211:8, 211:11, 222:21
**scale** [1] - 116:13
**scanned** [1] - 172:25
**scans** [1] - 146:13
**scheduled** [1] - 136:22
**school** [18] - 20:13, 25:18, 27:18, 29:4, 30:3, 36:8, 36:9, 72:18, 114:17, 117:10, 118:11, 118:12, 164:6, 164:12, 164:13, 164:14, 165:7
**school-age** [1] - 20:13
**scoliosis** [1] - 117:1
**scratchy** [1] - 121:25
**screen** [2] - 16:12, 217:4
**screenshot** [1] - 161:7
**screwed** [1] - 51:6, 51:15
**scroll** [7] - 136:15, 146:25, 160:25, 168:10, 193:18, 194:2, 206:14
**SE** [1] - 2:3
**sea** [2] - 193:9, 211:14
**search** [1] - 140:1
**searched** [1] - 208:20
**searching** [1] - 70:15
**seat** [4] - 11:24, 12:10, 13:3, 113:13
**seated** [10] - 3:3, 11:14, 14:2, 62:25, 64:12, 64:13, 70:5, 113:1, 177:9, 226:20
**second** [18] - 19:2, 32:8, 47:14, 69:12, 82:9, 124:16, 131:14, 149:11, 150:12, 151:25, 152:9, 186:6, 200:8, 208:1, 216:7, 221:15, 223:16, 223:24
**secondhand** [1] - 155:25
**secondly** [1] - 3:20
**secret** [2] - 37:9, 102:19
**Section** [3] - 76:3, 146:6, 175:13
**section** [16] - 37:10, 76:1, 76:15, 145:9, 145:10, 145:16, 146:1, 146:15, 146:21, 172:2, 172:21, 175:12, 183:18, 185:15, 187:10, 224:1
**sections** [1] - 181:14
**secure** [1] - 204:17

**Security** [41] - 58:5, 87:9, 87:14, 87:17, 87:19, 88:1, 89:7, 89:9, 92:8, 92:15, 92:25, 95:6, 97:1, 97:4, 101:3, 103:11, 103:15, 103:19, 108:2, 108:4, 108:15, 108:19, 145:12, 156:7, 178:20, 179:12, 179:16, 179:19, 180:5, 180:21, 189:8, 189:14, 190:8, 194:11, 202:9, 213:17, 218:3, 226:22, 227:1, 227:3
**security** [1] - 60:4
**see** [100] - 5:15, 5:24, 13:17, 48:21, 52:23, 67:2, 71:19, 80:14, 82:2, 85:11, 86:8, 86:21, 87:16, 88:20, 91:6, 93:14, 94:6, 95:1, 96:21, 101:9, 102:8, 102:9, 104:1, 105:18, 105:21, 106:22, 106:24, 107:1, 107:4, 125:7, 126:5, 126:7, 126:21, 127:3, 129:25, 131:20, 132:7, 133:10, 135:11, 135:19, 136:8, 138:21, 140:4, 140:12, 144:2, 144:4, 147:15, 149:16, 149:19, 149:25, 150:20, 153:21, 159:6, 160:11, 160:15, 161:18, 161:23, 162:22, 163:1, 168:18, 169:5, 169:8, 169:23, 170:1, 170:4, 170:20, 171:15, 173:2, 173:4, 174:15, 174:15, 177:2, 183:19, 184:6, 185:11, 186:4, 186:9, 187:12, 187:15, 187:20, 190:2, 193:19, 194:3, 195:3, 197:12, 202:12, 204:21, 206:15, 210:1, 215:11, 217:25, 219:14, 219:19, 219:22, 223:1, 223:8, 225:8, 226:18, 229:2
**seeing** [2] - 158:14, 202:17
**seek** [4] - 64:2, 97:18, 214:9, 214:13
**seeking** [3] - 138:12, 140:7, 228:9
**seem** [1] - 153:12
**sees** [6] - 75:3, 83:10, 90:24, 117:20, 158:21, 168:15
**seizure** [1] - 164:19
**selected** [2] - 16:4, 16:7
**selecting** [1] - 11:16
**self** [1] - 201:21
**self-esteem** [1] - 201:21
**sell** [2] - 39:5, 215:10
**Sellwood** [2] - 113:21, 179:6
**semi** [1] - 22:13
**semi-retired** [1] - 22:13
**send** [33] - 61:24, 85:14, 95:9, 97:1, 104:3, 104:4, 106:20, 108:17, 129:17, 138:16, 139:19, 142:22, 142:24, 144:23, 154:19, 155:9, 155:15, 156:1, 163:17, 163:18, 166:1, 173:15, 183:11, 185:15, 189:9, 197:7, 204:11, 207:9, 213:15, 225:7, 225:15, 225:20, 227:9
**sending** [5] - 105:23, 168:3, 174:12, 180:10, 213:12
**sends** [12] - 73:25, 75:20, 82:10, 84:13, 86:4, 89:5, 90:6, 90:10, 93:24, 102:14, 107:18, 108:13
**sense** [6] - 44:9, 47:2, 48:5, 103:1,

152:14, 160:16
**sensitive** [1] - 15:25
**sent** [43] - 81:5, 85:2, 85:10, 87:22, 87:23, 89:11, 90:21, 90:22, 100:10, 102:8, 107:2, 107:5, 109:24, 111:13, 121:9, 123:12, 130:14, 133:17, 135:3, 135:5, 135:10, 138:8, 139:15, 142:20, 150:21, 151:5, 152:2, 152:20, 153:9, 166:7, 166:22, 173:22, 174:20, 174:24, 175:9, 176:20, 178:9, 180:10, 184:1, 186:25, 202:10, 217:19, 224:18
**sentence** [18] - 144:17, 144:21, 144:22, 147:19, 151:22, 151:25, 152:9, 152:13, 152:25, 169:10, 178:18, 181:20, 191:8, 196:23, 203:23, 203:25, 207:15, 209:7
**sentenced** [3] - 143:9, 146:4, 169:9
**sentences** [4] - 168:16, 168:18, 193:22, 206:20
**sentencing** [2] - 80:2, 136:22
**separate** [2] - 95:19, 228:10
**September** [3] - 35:15, 36:2, 36:5
**series** [2] - 217:1, 224:18
**serious** [1] - 90:12
**seriously** [2] - 167:18, 169:24
**serve** [1] - 36:25
**service** [11] - 37:21, 37:25, 38:4, 38:6, 59:14, 60:18, 63:2, 70:7, 146:13, 148:7, 163:16
**Services** [15] - 19:14, 42:8, 82:3, 82:6, 89:17, 101:21, 101:22, 110:1, 126:7, 152:1, 167:2, 178:15, 181:21, 196:25, 217:21
**SERVICES** [1] - 1:6
**serving** [1] - 18:11
**session** [1] - 65:13
**set** [4] - 155:21, 164:2, 177:18, 226:23
**sets** [1] - 76:3
**setting** [2] - 15:18, 16:2
**settled** [2] - 112:6, 212:13
**settlement** [3] - 6:23, 7:4, 7:10
**seven** [2] - 136:24, 229:9
**seventies** [1] - 216:22
**several** [18] - 39:10, 40:14, 54:20, 56:15, 76:25, 100:17, 105:14, 105:23, 107:20, 110:17, 114:21, 151:8, 172:24, 186:7, 190:4, 217:25, 220:11, 223:3
**shady** [1] - 158:20
**Shakes** [1] - 41:20
**share** [6] - 77:1, 77:4, 77:19, 115:10, 115:15, 165:12
**sharing** [4] - 44:20, 48:3, 77:17, 210:13
**Sharp** [3] - 13:7, 27:15, 36:7
**sharp** [2] - 36:12, 38:5
**shift** [1] - 99:2
**ship** [2] - 150:6, 150:7
**shock** [1] - 152:6
**shoe** [1] - 212:15
**shoplifting** [1] - 50:23

**short** [1] - 8:23
**shorter** [2] - 168:16, 193:22
**shortly** [2] - 102:5, 218:7
**show** [20] - 72:3, 74:15, 76:20, 79:25, 82:23, 82:25, 83:4, 88:2, 88:7, 90:18, 91:1, 91:17, 93:14, 94:4, 95:25, 125:16, 148:8, 176:1, 194:25, 217:3
**showed** [4] - 88:16, 106:6, 125:16, 158:3
**shower** [1] - 192:7
**showing** [9] - 23:5, 81:22, 87:18, 87:25, 91:2, 107:21, 118:3, 127:3, 141:12
**shows** [3] - 85:15, 127:4, 210:12
**siblings** [1] - 17:24
**sick** [3] - 64:1, 180:1, 206:10
**side** [11] - 5:4, 5:18, 11:21, 12:2, 12:4, 49:14, 51:19, 59:8, 66:10, 71:25, 186:4
**sidebar** [1] - 5:14
**sides** [1] - 5:6
**Sierra** [1] - 18:25
**sign** [4] - 67:22, 147:25, 166:8, 224:11
**signature** [7] - 147:13, 147:20, 176:4, 219:25, 230:6, 230:7
**signed** [4] - 71:23, 103:8, 220:5, 230:7
**significant** [2] - 100:19, 101:12
**significantly** [2] - 157:23, 158:8
**signing** [2] - 147:17, 230:3
**silly** [1] - 165:8
**similar** [4] - 85:3, 136:2, 159:25, 218:22
**simple** [1] - 121:6
**simply** [5] - 44:9, 44:12, 67:11, 71:22, 72:2
**sincerely** [1] - 15:16
**single** [1] - 102:25
**sit** [2] - 34:5, 116:23
**Sitka** [1] - 20:17
**sits** [1] - 72:15
**sitting** [6] - 14:7, 31:10, 118:3, 153:20, 156:24, 171:14
**situation** [10] - 35:20, 50:15, 51:3, 51:10, 92:23, 101:22, 102:25, 156:12, 193:12, 203:15
**Situation** [1] - 183:19
**situations** [4] - 49:22, 50:5, 59:9, 103:1
**six** [10] - 8:9, 9:1, 9:9, 25:17, 34:11, 58:1, 94:25, 106:18, 136:24
**six-day** [1] - 34:11
**skiing** [1] - 27:20
**skimmed** [1] - 100:25
**skimmer** [1] - 58:22
**sky** [1] - 53:24
**slam** [1] - 167:4
**sleep** [6] - 192:1, 192:2, 192:5, 193:5, 193:7, 193:14, 206:7, 206:8
**sleeping** [4] - 191:15, 191:16, 191:25, 192:13
**slip** [1] - 76:2
**slow** [3] - 140:24, 141:9, 166:24

**small** [3] - 59:15, 77:4, 216:8
**smaller** [3] - 59:12, 59:14, 119:22
**smart** [1] - 228:14
**Smith** [1] - 2:16
**snowboarding** [1] - 30:17
**soccer** [3] - 27:21, 28:12, 36:10
**social** [5] - 77:18, 77:22, 117:18, 117:24, 199:24
**Social** [41] - 58:5, 87:9, 87:14, 87:16, 87:19, 88:1, 89:7, 89:9, 92:8, 92:14, 92:25, 95:6, 97:1, 97:4, 101:3, 103:11, 103:15, 103:19, 108:2, 108:4, 108:15, 108:19, 145:12, 156:6, 178:20, 179:12, 179:16, 179:19, 180:5, 180:20, 189:8, 189:14, 190:8, 194:11, 202:9, 213:16, 218:3, 226:22, 227:1, 227:2
**socialize** [1] - 77:20
**socializing** [1] - 118:7
**software** [2] - 27:17, 115:1
**Sola** [21] - 2:11, 3:8, 14:9, 14:14, 72:22, 100:7, 100:14, 100:15, 102:5, 104:14, 106:6, 108:14, 109:3, 109:11, 110:20, 110:23, 215:17, 217:1, 222:18, 226:21, 228:12
**SOLA** [107] - 3:8, 4:5, 4:11, 5:22, 6:8, 6:11, 6:15, 7:7, 7:20, 10:2, 10:6, 10:15, 10:17, 11:3, 14:13, 31:16, 48:23, 49:12, 49:22, 50:2, 50:5, 50:12, 50:15, 50:17, 51:2, 51:9, 51:14, 51:18, 51:23, 52:7, 52:13, 52:18, 52:21, 52:25, 53:5, 53:9, 53:12, 53:21, 54:4, 54:8, 60:12, 60:15, 60:20, 60:22, 61:11, 62:8, 72:14, 72:18, 72:21, 113:3, 113:5, 113:19, 116:22, 125:24, 133:24, 134:11, 134:24, 135:1, 138:6, 141:1, 141:17, 144:4, 144:6, 145:16, 145:18, 146:18, 146:20, 146:25, 147:2, 147:7, 147:9, 147:15, 147:16, 150:9, 150:11, 152:19, 158:12, 160:25, 161:1, 162:21, 163:3, 173:19, 173:20, 174:5, 174:7, 174:16, 174:17, 175:6, 175:7, 177:12, 188:2, 188:3, 194:2, 194:4, 200:24, 202:25, 203:1, 206:14, 206:16, 214:16, 214:18, 215:3, 227:15, 228:8, 228:18, 228:25, 229:10
**sola** [1] - 2:11
**sold** [4] - 39:6, 43:9, 77:3, 215:21
**solve** [3] - 103:3, 202:2, 206:5
**solver** [1] - 201:24
**solving** [1] - 138:13
**somebdy** [1] - 57:3
**someone** [22] - 41:2, 50:23, 55:20, 56:13, 89:25, 118:5, 143:25, 149:4, 158:25, 159:21, 160:12, 161:15, 176:22, 181:18, 185:1, 193:9, 193:23, 194:14, 197:17, 203:14
**sometime** [2] - 102:1, 211:16
**sometimes** [10] - 23:24, 50:19, 66:17,

74:22, 119:21, 119:23, 120:8, 160:18, 199:12, 206:10
**somewhere** [6] - 47:5, 176:19, 179:7, 179:20, 197:21, 215:2
**son** [1] - 17:6
**sons** [1] - 27:16
**soon** [1] - 144:20
**sophisticated** [2] - 101:6, 105:20
**sorry** [62] - 4:16, 10:6, 22:8, 28:22, 31:22, 35:14, 36:23, 53:15, 60:23, 61:1, 90:5, 108:18, 121:10, 130:15, 131:18, 133:4, 133:8, 133:24, 136:7, 138:5, 138:9, 139:11, 140:17, 140:25, 148:25, 149:23, 149:24, 151:12, 153:3, 163:21, 164:24, 166:3, 166:25, 170:14, 170:16, 170:19, 171:8, 174:24, 178:13, 178:23, 180:19, 181:6, 181:7, 182:5, 182:12, 182:15, 183:10, 186:18, 188:25, 192:9, 195:15, 200:21, 204:16, 207:15, 215:11, 216:22, 218:25, 221:21, 222:10, 223:8, 223:24, 225:24
**sort** [17] - 7:10, 21:20, 49:14, 51:4, 59:16, 118:22, 153:21, 158:15, 158:17, 159:20, 189:10, 195:21, 198:8, 198:24, 214:22, 224:11, 228:10
**sorts** [1] - 24:22
**sought** [1] - 101:14
**sound** [1] - 121:25
**sounds** [6] - 51:9, 53:1, 131:10, 169:17, 169:18, 169:21
**source** [2] - 63:23, 75:11
**sources** [1] - 64:3
**South** [2] - 16:18, 141:15
**south** [1] - 129:25
**Southeast** [1] - 29:22
**Southern** [2] - 100:21, 101:16
**Southwest** [1] - 27:16
**space** [5] - 115:2, 130:13, 135:8, 224:9, 226:13
**spare** [1] - 17:11
**speaker** [1] - 192:11
**speaking** [3] - 141:5, 141:6, 141:7
**speaks** [3] - 79:3, 141:5, 141:6
**special** [8] - 34:7, 65:14, 77:23, 114:11, 116:10, 164:16, 181:13, 181:14
**specialist** [2] - 17:1, 42:7
**specific** [5] - 59:17, 142:1, 155:13, 228:13, 228:18
**specifically** [5] - 129:5, 137:22, 143:6, 186:20, 227:24
**speculate** [2] - 68:5, 200:19
**spell** [1] - 113:14
**spend** [8] - 77:7, 77:20, 94:25, 97:20, 115:23, 116:12, 118:7, 165:15
**spending** [6] - 114:14, 129:21, 165:20, 191:23, 193:8, 197:24, 198:1, 212:23
**spends** [1] - 131:16
**spent** [5] - 153:7, 165:24, 182:22, 195:23, 195:24

**Spidal** [3] - 12:15, 18:1, 39:3
**spin** [1] - 24:22
**Spokane** [1] - 38:22
**Sponer** [85] - 3:5, 3:18, 6:2, 6:6, 11:16, 14:12, 31:18, 33:1, 49:2, 72:24, 73:12, 73:25, 74:4, 74:13, 76:22, 77:13, 77:24, 78:6, 78:8, 78:10, 78:15, 78:24, 79:19, 79:20, 80:13, 80:16, 80:18, 82:21, 83:7, 83:10, 84:10, 84:13, 84:19, 85:2, 85:18, 86:3, 86:12, 87:10, 88:6, 88:11, 88:13, 88:15, 89:5, 89:17, 90:6, 90:10, 90:20, 90:24, 93:6, 93:17, 96:24, 97:13, 99:12, 100:6, 101:19, 102:1, 102:4, 102:6, 102:17, 103:25, 104:15, 105:15, 105:22, 106:8, 106:14, 106:16, 106:20, 107:10, 107:16, 107:18, 108:13, 108:18, 111:3, 111:8, 113:3, 113:5, 113:15, 113:20, 123:22, 148:18, 149:5, 150:5, 215:8, 217:13, 224:25
**SPONER** [2] - 1:3, 113:9
**Sponer's** [36] - 14:13, 14:15, 31:17, 54:9, 73:15, 73:17, 73:21, 75:25, 78:4, 79:4, 79:20, 80:5, 80:24, 81:17, 83:6, 83:8, 91:15, 92:25, 93:21, 93:25, 94:21, 95:13, 95:17, 97:4, 98:2, 98:9, 98:18, 100:22, 101:5, 101:8, 101:13, 101:17, 102:3, 108:1, 150:1
**spot** [1] - 59:10
**spouse** [1] - 98:9
**spreadsheet** [2] - 155:5, 161:14
**spring** [1] - 101:7
**Sprint** [2] - 201:1, 208:8
**staffing** [2] - 35:24, 36:3
**stairs** [3] - 113:6, 133:11, 165:9
**stamping** [2] - 173:3, 173:4
**stamps** [4] - 172:24, 172:25, 173:5, 173:9
**stand** [7] - 7:14, 13:25, 62:18, 63:1, 110:14, 160:7, 162:24
**standard** [4] - 110:24, 190:13, 190:18, 190:20
**standards** [2] - 98:8, 190:22
**staring** [1] - 62:2
**start** [10] - 5:2, 13:14, 30:13, 48:4, 74:18, 163:20, 170:22, 206:17, 206:23, 229:3
**start-up** [1] - 30:13
**started** [18] - 35:24, 64:6, 77:12, 100:16, 100:21, 112:20, 114:20, 129:1, 129:14, 146:22, 168:16, 170:7, 170:15, 181:25, 183:4, 194:7, 208:17, 226:14
**starting** [7] - 3:7, 32:10, 34:11, 77:1, 100:13, 114:22, 118:12
**starts** [5] - 36:2, 44:11, 46:20, 102:13, 118:11
**startup** [3] - 34:24, 114:23, 114:25
**State** [4] - 17:8, 55:4, 55:7, 55:13
**state** [13] - 3:6, 19:19, 29:3, 30:4, 39:1,

40:22, 56:14, 93:19, 94:17, 95:3, 98:7, 113:13, 190:4
**statement** [15] - 10:6, 10:8, 10:16, 72:1, 72:4, 72:13, 93:15, 99:14, 99:20, 103:7, 103:8, 105:4, 108:23, 147:22
**statements** [5] - 65:10, 134:13, 134:14, 134:18
**States** [12] - 2:20, 85:21, 106:15, 106:16, 143:10, 146:9, 154:8, 154:9, 156:9, 156:21, 163:19, 169:15
**STATES** [2] - 1:1, 1:17
**states** [9] - 56:15, 78:21, 85:9, 86:13, 89:8, 89:9, 90:11, 91:7, 218:2
**stating** [4] - 82:11, 88:6, 108:14, 142:2
**station** [1] - 56:14
**statistician** [1] - 29:23
**status** [2] - 86:2, 186:3
**statute** [1] - 104:19
**statutory** [2] - 190:13, 190:24
**stay** [10] - 17:21, 36:15, 37:13, 37:14, 63:6, 82:21, 114:5, 193:10, 193:14, 215:2
**stay-at-home** [1] - 17:21
**stays** [4] - 81:16, 88:11, 94:2, 95:16
**steal** [1] - 169:22
**stealing** [3] - 80:5, 101:13, 101:14
**step** [9] - 7:22, 11:8, 11:17, 113:4, 122:22, 132:11, 154:14, 165:6
**step-by-step** [1] - 154:14
**stepdaughter** [1] - 20:23
**stepping** [1] - 132:23
**steps** [5] - 82:14, 108:21, 108:22, 128:1, 134:19
**Stewart** [6] - 12:25, 23:11, 44:16, 51:24, 60:15, 60:17
**still** [17] - 9:20, 51:18, 61:12, 83:11, 83:12, 96:23, 126:23, 139:10, 156:21, 159:7, 182:5, 183:1, 190:3, 207:18, 209:15, 211:3, 214:1
**stole** [11] - 79:11, 79:16, 100:22, 101:1, 101:2, 101:3, 101:4, 101:8, 158:23, 185:21, 209:1
**stolen** [11] - 55:19, 56:7, 56:11, 57:1, 57:15, 103:21, 121:6, 149:5, 159:1, 166:15, 169:6
**stomach** [1] - 206:10
**stood** [1] - 191:13
**stop** [3] - 5:2, 88:9, 226:1
**stories** [3] - 46:12, 46:16, 110:15
**story** [3] - 106:13, 115:6, 157:19, 168:15, 174:11
**straight** [2] - 144:2, 189:21
**strange** [1] - 58:20
**strangers** [1] - 15:19
**strategy** [1] - 170:22
**Stream** [2] - 163:17, 164:2
**Street** [1] - 2:6
**stress** [2] - 202:16, 212:2
**stressful** [1] - 212:7
**stricken** [1] - 66:17

**strike** [1] - 200:18
**strong** [7] - 25:8, 27:22, 28:2, 47:19, 47:20, 53:2, 59:21
**strongly** [3] - 47:3, 47:16, 165:6
**stuck** [3] - 119:23, 124:23, 181:4
**students** [1] - 36:9
**stuff** [13] - 17:16, 21:21, 117:15, 119:20, 120:8, 122:18, 131:2, 142:18, 158:17, 168:16, 198:7, 198:10, 204:25
**stupid** [2] - 181:21, 203:15
**stupidity** [2] - 182:2, 183:5
**subject** [2] - 68:15, 135:21
**submitted** [1] - 68:1
**subsequent** [1] - 176:2
**substance** [1] - 9:3
**substantial** [3] - 16:6, 100:19, 195:25
**substantiate** [1] - 153:4
**successful** [1] - 77:2
**sue** [7] - 52:15, 83:17, 89:3, 183:11, 208:21, 208:23, 214:25
**sued** [3] - 7:8, 122:11, 209:3
**sues** [2] - 74:4, 91:10
**suffer** [5] - 9:8, 45:13, 84:7, 111:3, 111:4
**suffered** [3] - 111:8, 111:9, 191:5
**sufficient** [3] - 175:3, 175:5, 190:5
**suggested** [1] - 182:11
**suggesting** [1] - 68:12
**suing** [3] - 33:1, 53:1, 209:19
**suit** [1] - 44:17
**Suite** [4] - 2:3, 2:6, 2:9, 2:12
**summarize** [5] - 72:10, 123:13, 141:2, 143:4, 193:17
**summer** [2] - 34:15, 101:7
**Sunday** [1] - 25:18
**Sundays** [1] - 24:22
**super** [4] - 115:11, 118:15, 187:23, 191:20
**superficial** [1] - 76:13
**supplemental** [5] - 8:6, 8:8, 8:13, 8:15
**support** [2] - 43:13, 133:1
**supposed** [4] - 8:11, 38:18, 75:18, 224:16
**surgery** [2] - 164:13, 216:2
**suspect** [8] - 80:1, 80:3, 80:5, 80:9, 106:7, 124:4, 124:6, 136:19
**sustain** [2] - 66:12, 66:14
**sustained** [9] - 125:23, 133:22, 138:4, 152:18, 158:11, 188:1, 200:17, 214:15, 227:22
**swears** [1] - 14:5
**Sweden** [1] - 22:7
**switched** [1] - 193:21
**sworn** [7] - 14:1, 62:22, 62:23, 93:15, 103:8, 113:4, 113:11
**syndrome** [2] - 116:19, 116:21
**system** [14] - 18:10, 21:10, 24:12, 25:20, 29:17, 50:20, 51:2, 71:20, 87:3, 93:19, 127:12, 128:21, 139:1, 161:14

**systems** [3] - 17:8, 23:5, 181:17

# T

**table** [7] - 10:22, 14:11, 14:22, 61:10, 72:15, 100:1, 173:1
**tables** [2] - 31:10, 62:11
**Tabor** [1] - 16:18
**tack** [2] - 176:12, 195:23
**tackle** [1] - 159:9
**tagged** [1] - 50:23
**Tahiti** [1] - 194:25
**Tarter** [2] - 31:19, 98:4
**taste** [3] - 18:9, 21:9, 24:2
**tax** [4] - 55:20, 55:21, 55:22, 55:23
**taxes** [1] - 55:25
**teacher** [5] - 22:15, 25:18, 27:19, 36:8, 164:19
**teaching** [2] - 20:15, 38:6
**team** [1] - 110:4
**technology** [3] - 115:1, 216:6, 227:8
**telecommunications** [1] - 22:12
**telephone** [1] - 188:20
**television** [2] - 15:3, 18:6
**template** [2] - 129:11, 163:7
**temporary** [1] - 128:8
**term** [1] - 73:3
**terms** [4] - 75:8, 121:23, 132:14, 159:16
**testified** [10] - 67:2, 94:23, 96:8, 217:7, 219:3, 220:21, 221:4, 222:4, 224:6, 224:13
**testifies** [1] - 113:11
**testify** [8] - 7:14, 67:10, 83:10, 84:6, 89:18, 93:16, 96:14, 98:13
**testifying** [3] - 39:18, 63:8, 67:3
**testimony** [31] - 32:22, 39:17, 65:11, 65:11, 66:22, 66:25, 67:5, 67:6, 67:15, 67:16, 71:4, 71:12, 86:1, 87:23, 94:6, 96:1, 98:9, 103:12, 104:6, 105:2, 105:10, 105:22, 106:2, 106:15, 106:21, 108:20, 109:7, 219:13, 222:17
**tests** [2] - 157:7, 157:8
**Texas** [5] - 19:19, 19:21, 30:5, 35:6, 40:2
**text** [5] - 61:18, 61:22, 69:22, 76:6, 169:4
**textile** [1] - 26:23
**THD/CBNA** [1] - 222:10
**THE** [226] - 1:1, 1:2, 1:16, 2:2, 2:14, 3:3, 3:4, 3:14, 4:7, 4:10, 4:15, 6:3, 6:10, 6:13, 7:3, 7:13, 8:2, 8:4, 9:24, 10:3, 10:5, 10:8, 10:16, 10:20, 11:5, 11:14, 12:8, 12:10, 12:12, 13:13, 14:2, 14:12, 14:16, 15:1, 17:4, 17:12, 17:17, 17:25, 18:8, 18:13, 18:17, 19:2, 19:6, 19:8, 19:11, 19:17, 19:20, 19:23, 20:1, 20:10, 20:21, 21:2, 21:5, 21:8, 21:12, 21:15, 21:23, 21:25, 22:3, 22:10, 22:19, 22:23, 23:1, 23:7, 23:10, 23:15, 23:17, 23:21, 23:24, 24:12, 24:25,

25:4, 25:8, 25:12, 25:14, 25:19, 25:23, 26:1, 26:7, 26:13, 26:15, 26:17, 26:20, 27:4, 27:7, 27:14, 27:22, 28:2, 28:5, 28:14, 28:16, 28:19, 28:22, 28:25, 29:8, 29:11, 29:13, 29:16, 29:20, 30:6, 30:9, 30:19, 31:1, 31:4, 31:24, 32:5, 32:15, 32:21, 32:24, 34:13, 34:17, 35:1, 35:8, 35:16, 35:22, 36:6, 36:12, 36:17, 36:19, 36:23, 37:2, 37:4, 37:8, 37:17, 37:24, 38:3, 38:8, 38:16, 38:23, 39:1, 39:8, 39:13, 39:16, 39:24, 40:5, 40:9, 40:15, 40:18, 40:22, 40:24, 41:11, 41:15, 41:18, 41:21, 41:23, 42:4, 42:9, 42:15, 43:6, 43:10, 43:17, 43:23, 44:20, 44:25, 45:6, 47:1, 47:5, 47:10, 47:14, 47:20, 47:23, 48:1, 54:18, 60:10, 60:14, 60:16, 60:21, 60:23, 61:1, 61:5, 61:8, 61:13, 62:10, 62:13, 62:24, 63:6, 64:10, 64:12, 72:16, 72:19, 99:14, 99:17, 99:20, 111:22, 113:1, 113:4, 113:6, 113:13, 113:15, 116:20, 116:21, 125:23, 133:22, 134:2, 134:5, 134:10, 134:12, 138:4, 138:5, 140:15, 140:17, 140:21, 140:24, 140:25, 141:4, 141:11, 152:18, 158:11, 162:23, 176:23, 177:4, 177:9, 188:1, 200:17, 200:21, 200:22, 214:15, 214:17, 215:4, 226:1, 226:20, 227:12, 227:16, 228:12, 228:24, 229:1
**theft** [103] - 48:11, 49:2, 54:21, 54:25, 58:14, 59:25, 73:12, 73:19, 73:21, 75:13, 78:6, 78:12, 78:15, 79:4, 79:17, 79:22, 80:8, 80:9, 80:22, 81:16, 83:20, 84:9, 84:14, 84:16, 84:20, 85:12, 85:16, 85:22, 86:14, 87:18, 87:19, 87:25, 88:7, 88:25, 90:11, 91:16, 92:23, 93:1, 93:2, 94:4, 94:16, 94:19, 94:20, 94:24, 95:12, 96:10, 97:3, 97:7, 98:1, 99:5, 100:16, 101:6, 103:5, 103:14, 103:24, 104:22, 105:3, 107:12, 121:15, 121:23, 122:13, 123:16, 123:25, 125:1, 128:2, 128:21, 129:6, 129:9, 129:20, 135:4, 135:23, 137:2, 143:15, 144:25, 145:7, 149:16, 151:13, 152:22, 154:15, 156:16, 166:11, 168:2, 174:19, 180:6, 180:25, 181:11, 191:6, 192:17, 203:24, 204:2, 204:9, 204:12, 204:17, 204:18, 209:9, 210:15, 213:15, 221:22, 222:1, 222:4, 222:7, 222:11
**theft-related** [1] - 222:11
**theirs** [2] - 142:5, 142:9
**themselves** [2] - 31:8, 143:22
**therapist** [1] - 164:19
**therapy** [1] - 28:8
**thereabouts** [1] - 203:13
**thereafter** [1] - 102:5
**therefore** [1] - 73:7
**Therefore** [1] - 190:11

**they've** [7] - 7:25, 31:14, 73:22, 78:9, 127:11, 183:23, 206:21
**thief** [30] - 33:6, 57:8, 73:14, 73:20, 73:22, 73:24, 78:3, 78:5, 78:9, 82:7, 82:25, 84:21, 92:23, 92:25, 100:25, 101:2, 101:8, 101:13, 101:15, 101:23, 103:16, 103:22, 107:12, 111:10, 135:16, 148:20, 161:4, 169:7, 225:2
**thief's** [4] - 101:4, 105:24, 138:16, 143:17
**thieves** [2] - 101:2, 105:19
**thinking** [11] - 4:23, 132:4, 157:8, 157:11, 159:22, 166:1, 168:23, 169:2, 194:23, 205:2, 228:19
**thinks** [3] - 45:7, 66:10, 87:1
**third** [10] - 82:15, 123:20, 152:24, 159:17, 159:23, 181:19, 201:6, 223:25, 225:6
**Third** [1] - 2:20
**thirds** [1] - 227:4
**thirty** [1] - 19:18
**thirty-five** [1] - 19:18
**Thomas** [2] - 31:19, 98:4
**thoughts** [3] - 152:13, 212:6, 212:24
**three** [15] - 20:13, 23:20, 23:23, 34:15, 65:11, 107:17, 108:10, 111:12, 123:5, 130:16, 130:20, 183:19, 220:17, 223:22
**throughout** [4] - 69:8, 96:13, 111:5, 179:15
**throw** [2] - 114:4, 196:6
**tied** [2] - 61:25, 117:14
**ties** [1] - 7:10
**Tim** [4] - 3:13, 14:17, 14:24, 100:1
**time-consuming** [1] - 139:8
**timed** [1] - 155:15
**timeline** [5] - 100:13, 160:10, 168:17, 174:2, 174:10
**timely** [2] - 108:11, 108:25
**Timothy** [1] - 2:15
**tiny** [1] - 118:23
**tired** [1] - 104:12
**title** [6] - 3:17, 3:18, 3:19, 5:22, 138:10, 181:10
**titled** [1] - 230:5
**today** [5] - 3:4, 36:8, 72:25, 109:4, 219:13
**together** [6] - 111:24, 129:11, 195:18, 198:25, 214:5, 214:22
**toilet** [1] - 199:11
**toileting** [1] - 131:24
**tomorrow** [4] - 34:11, 34:22, 226:18, 229:2
**ton** [2] - 164:16, 166:17
**took** [18] - 57:22, 85:5, 95:3, 95:25, 101:24, 120:16, 127:1, 129:1, 131:15, 131:25, 134:19, 185:22, 186:22, 195:17, 201:14, 211:13, 214:7, 216:10
**top** [9] - 92:4, 138:10, 147:15, 148:15, 161:2, 165:9, 171:25, 223:25, 225:6

**tops** [1] - 53:20
**tore** [1] - 179:21
**total** [4] - 37:10, 182:24, 192:12, 208:16
**touching** [2] - 77:17, 118:1
**towards** [6] - 52:6, 112:14, 112:16, 221:25, 222:17, 227:16
**town** [4] - 34:13, 34:14, 83:25, 216:8
**toys** [1] - 118:4
**trace** [1] - 58:21
**tracking** [1] - 138:25
**trade** [2] - 109:5
**Trade** [3] - 84:19, 129:4, 144:14
**trails** [1] - 16:22
**trained** [3] - 93:8, 198:12, 199:11
**training** [5] - 16:19, 35:25, 36:2, 36:5, 36:11
**trajectory** [1] - 176:10
**transactions** [2] - 142:16
**transcribed** [1] - 121:11
**transcriber** [1] - 145:21
**TRANSCRIPT** [1] - 1:15
**transcript** [3] - 71:3, 230:4, 230:6
**transfusion** [1] - 157:15
**TransUnion** [9] - 81:24, 81:25, 82:2, 82:10, 90:22, 152:12, 210:8, 211:9, 222:24
**TransUnion's** [1] - 82:12
**travel** [5] - 83:19, 116:9, 120:23, 130:6, 214:21
**traveler** [1] - 150:5
**traveling** [5] - 30:24, 120:7, 123:17, 130:7, 156:18
**treat** [3] - 193:24, 202:7, 204:10
**treated** [4] - 68:23, 86:9, 188:24, 202:4
**treating** [1] - 153:22
**trees** [3] - 53:20, 53:23, 53:25
**Tri** [2] - 20:24, 43:21
**Tri-Met** [2] - 20:24, 43:21
**TRIAL** [1] - 1:14
**trial** [16] - 3:4, 10:17, 15:23, 31:17, 36:4, 63:15, 64:17, 65:6, 68:16, 69:8, 70:4, 70:20, 70:25, 71:25, 80:4, 229:4
**tried** [8] - 131:10, 136:10, 140:3, 146:8, 180:2, 180:25, 184:25, 185:1
**triggered** [1] - 228:5
**trip** [16] - 77:10, 77:12, 77:21, 83:13, 102:2, 116:6, 117:5, 118:19, 120:16, 121:3, 132:23, 215:18, 215:19, 215:20, 216:3
**triple** [1] - 205:18
**triple-checked** [1] - 205:18
**trips** [4] - 130:8, 130:9, 150:7, 214:24
**trouble** [3] - 46:15, 55:3, 192:13
**true** [18] - 15:8, 53:10, 76:13, 85:11, 85:12, 92:4, 96:24, 100:24, 103:14, 111:7, 134:20, 147:18, 169:18, 205:22, 222:15, 223:22
**trust** [3] - 18:3, 143:21, 214:2
**trusted** [2] - 127:21, 214:6

**truth** [2] - 134:15, 134:18
**truthfully** [1] - 13:23
**try** [34] - 33:9, 50:12, 62:4, 70:17, 76:1, 89:4, 93:2, 96:24, 99:2, 112:20, 123:3, 128:2, 140:1, 141:8, 153:24, 155:23, 158:16, 159:9, 159:14, 165:12, 165:18, 166:1, 168:6, 171:3, 171:17, 172:17, 174:9, 182:23, 183:9, 185:4, 192:18, 199:9, 204:10, 226:14
**trying** [31] - 6:20, 49:18, 49:23, 49:24, 86:6, 119:21, 121:23, 123:13, 132:11, 139:22, 150:16, 160:17, 164:5, 168:24, 169:12, 169:25, 170:8, 171:1, 174:12, 176:17, 179:8, 185:4, 189:12, 189:21, 189:23, 189:25, 193:23, 195:23, 196:3, 196:5, 197:3
**Tuality** [1] - 28:9
**Tuesday** [7] - 33:13, 33:15, 33:24, 34:6, 35:11, 35:12, 37:6
**Tugashov** [19] - 78:17, 78:21, 79:4, 79:9, 79:15, 79:24, 85:1, 121:8, 123:23, 123:25, 135:25, 136:5, 136:17, 138:8, 138:9, 141:16, 149:15, 150:4
**turn** [32] - 5:1, 5:7, 10:25, 48:20, 61:16, 61:17, 62:15, 74:25, 88:20, 112:14, 112:15, 124:18, 124:20, 126:5, 126:21, 142:6, 145:3, 146:6, 146:18, 147:7, 150:9, 156:14, 162:21, 167:21, 184:5, 185:11, 194:3, 194:9, 200:3, 202:12, 202:22, 207:25
**turned** [3] - 54:3, 62:14, 124:23
**turning** [5] - 16:15, 31:5, 48:22, 154:9, 226:2
**turns** [1] - 50:2
**TV** [1] - 17:3
**twice** [9] - 18:7, 21:1, 24:18, 24:23, 24:24, 25:25, 26:1, 73:1, 200:13
**two** [28] - 18:2, 20:3, 26:22, 27:16, 29:12, 29:23, 34:23, 54:15, 58:25, 65:10, 75:21, 76:23, 77:6, 85:21, 98:18, 105:11, 113:24, 124:9, 130:16, 136:2, 155:11, 163:4, 170:7, 180:12, 206:20, 224:1, 225:22, 227:4
**two-thirds** [1] - 227:4
**type** [6] - 58:9, 103:21, 132:25, 195:22, 216:20, 216:24
**typed** [1] - 197:19
**types** [5] - 52:7, 133:6, 196:8, 210:13, 221:8
**typical** [1] - 151:13
**typically** [5] - 5:5, 58:24, 59:14, 82:4, 134:14
**typing** [1] - 195:20

# U

**U.S** [7] - 18:3, 40:2, 40:3, 40:20, 57:4, 57:19, 173:11
**ulterior** [1] - 183:5

**ultimate** [1] - 37:9
**ultimately** [4] - 115:12, 132:4, 218:14, 224:3
**unable** [1] - 201:20
**unavailable** [1] - 218:11
**unaware** [2] - 9:17, 59:9
**uncertain** [1] - 116:11
**uncertainty** [2] - 118:15, 157:11
**uncomfortable** [1] - 15:19
**uncommon** [1] - 51:25
**under** [18] - 8:24, 9:20, 57:17, 58:7, 68:23, 75:7, 81:2, 87:2, 94:15, 95:11, 110:11, 133:1, 175:12, 178:18, 186:3, 196:22, 203:25, 217:24
**understandable** [2] - 153:18, 155:19
**understood** [1] - 127:16
**undue** [2] - 9:9, 68:7
**unemployed** [1] - 18:20
**unexpectedly** [1] - 117:12
**unfair** [1] - 51:2
**unfamiliar** [1] - 15:18
**unfortunately** [1] - 29:6
**Unfortunately** [1] - 140:22
**unhappy** [1] - 75:24
**uniform** [1] - 4:20
**union** [1] - 38:11
**unions** [2] - 38:22, 38:25
**unique** [1] - 104:25
**unit** [3] - 79:10, 79:11, 79:15
**UNITED** [2] - 1:1, 1:17
**United** [10] - 2:20, 85:21, 106:16, 143:10, 146:9, 154:8, 154:9, 156:9, 163:19, 169:15
**University** [1] - 20:4
**unlawfully** [1] - 135:22
**unless** [1] - 118:15
**unlock** [1] - 112:11
**unnecessary** [2] - 88:3, 189:15
**unreasonable** [3] - 55:13, 55:14, 58:8
**unredacted** [2] - 227:7, 227:8
**unrelated** [1] - 48:17
**unwilling** [1] - 45:23
**up** [71] - 3:15, 3:23, 5:14, 9:25, 10:5, 12:10, 13:25, 15:11, 16:1, 20:1, 23:5, 30:13, 33:21, 35:8, 37:7, 37:12, 37:13, 48:21, 51:6, 51:15, 54:13, 54:18, 55:2, 56:15, 57:7, 57:17, 61:25, 62:18, 63:1, 71:20, 72:15, 74:17, 76:6, 77:1, 77:7, 90:6, 110:14, 115:14, 115:22, 122:5, 125:18, 126:16, 130:7, 132:11, 132:23, 133:11, 135:11, 136:25, 143:22, 154:8, 158:3, 159:15, 159:24, 165:6, 165:14, 166:21, 170:23, 174:14, 176:10, 177:20, 181:5, 182:23, 192:2, 192:3, 192:6, 192:8, 193:14, 198:5, 199:12, 216:6, 216:7
**update** [1] - 105:5
**upload** [2] - 163:17, 227:10
**uploaded** [1] - 227:8

**upset** [2] - 89:18, 201:17
**upstairs** [1] - 132:24
**urge** [1] - 71:4
**USDA** [1] - 29:23
**useless** [1] - 93:3
**user** [1] - 13:18
**uses** [3] - 74:10, 92:24, 93:19
**utensils** [1] - 131:6

## V

**vacation** [7] - 34:11, 34:15, 37:20, 77:14, 77:24, 78:10, 97:21
**valid** [2] - 53:3, 209:10
**validate** [1] - 91:9
**value** [2] - 16:6, 116:11
**valued** [1] - 198:14
**variety** [3] - 105:3, 105:7, 224:18
**various** [7] - 38:24, 74:10, 87:20, 137:14, 139:20, 145:11, 225:11
**vast** [1] - 103:16
**vehicle** [2] - 144:9, 150:1
**vein** [1] - 133:25
**venture** [1] - 20:13
**verdict** [9] - 5:24, 6:5, 64:24, 65:7, 69:4, 69:9, 70:12, 72:12, 99:12
**Vergeer** [1] - 2:17
**verification** [2] - 93:20, 152:10
**Verification** [1] - 81:4
**verified** [16] - 85:9, 88:21, 90:3, 91:2, 92:15, 93:15, 93:16, 95:9, 152:1, 154:25, 184:10, 200:9, 201:13, 202:16, 203:9, 208:2
**verify** [6] - 88:18, 108:17, 146:16, 183:25, 190:5, 190:7
**verifying** [2] - 92:20, 146:17
**Verizon** [1] - 201:6
**versus** [6] - 3:5, 3:18, 6:2, 6:6, 11:16, 153:25
**via** [1] - 69:22
**viable** [1] - 9:20
**vice** [1] - 18:3
**vicious** [1] - 105:20
**victim** [22] - 48:10, 49:2, 54:25, 73:12, 78:9, 78:15, 84:14, 84:16, 86:13, 90:11, 96:25, 103:8, 103:24, 121:23, 122:12, 123:16, 129:6, 148:18, 151:7, 204:1, 204:17, 213:14
**victim's** [1] - 84:20
**victims** [2] - 54:20, 148:20
**video** [5] - 43:16, 114:20, 122:16, 148:8, 221:7
**videotape** [1] - 93:14
**view** [5] - 50:20, 51:25, 52:3, 53:21, 206:22
**violate** [6] - 9:14, 93:9, 96:15, 110:21, 110:25, 147:23
**violated** [2] - 33:3, 74:6
**violates** [1] - 70:21
**violation** [1] - 75:25

**violations** [1] - 96:22
**Visa** [1] - 124:23
**visit** [1] - 129:23
**visiting** [1] - 139:3
**Vista** [7] - 78:7, 84:23, 121:8, 123:24, 135:21, 143:7
**voicemail** [1] - 122:23
**volcanos** [1] - 130:1
**volunteer** [1] - 30:24
**vs** [1] - 1:5

## W

**W-a-l-r-o-d** [1] - 12:20
**W-e-a-v-e-r-l-i** [1] - 12:9
**W-i-g-g-i-n-s** [1] - 12:21
**waist** [1] - 133:2
**wait** [3] - 99:15, 149:18, 206:22
**waiting** [2] - 68:20, 99:18
**wake** [3] - 182:23, 192:2, 192:3
**walk** [3] - 77:15, 117:3, 132:20
**walked** [1] - 101:23
**Walker** [2] - 2:19, 230:11
**WALKER** [1] - 230:12
**walking** [1] - 132:21
**wall** [1] - 169:4
**wallet** [1] - 103:20
**Walrod** [3] - 12:20, 20:11, 62:20
**wandered** [1] - 170:12
**wants** [8] - 83:1, 95:5, 130:25, 131:1, 131:2, 164:19, 164:20, 167:10
**warehouse** [1] - 21:17
**Washington** [1] - 28:7
**waste** [1] - 23:23
**wasting** [1] - 27:12
**watch** [4] - 17:2, 59:25, 70:13, 71:10
**watching** [1] - 71:9
**wave** [1] - 107:24
**ways** [8] - 49:17, 145:11, 169:12, 189:25, 190:5, 190:7, 190:10, 213:13
**Weaverli** [4] - 12:8, 16:17, 34:10, 37:18
**website** [14] - 69:23, 114:10, 122:2, 128:23, 129:6, 139:22, 144:14, 145:8, 151:10, 155:24, 163:8, 170:10, 170:12, 191:1
**week** [8] - 8:15, 36:9, 36:11, 79:3, 102:10, 128:15, 140:4, 211:13
**weeks** [5] - 91:5, 130:16, 139:23, 157:10, 207:4
**weigh** [1] - 67:11
**weight** [6] - 66:4, 66:5, 67:9, 68:7, 71:12, 132:17
**Weiner** [1] - 2:2
**weird** [2] - 121:25, 191:9
**welcome** [5] - 11:15, 12:3, 37:4, 72:19, 177:9
**WELLS** [2] - 1:6, 2:15
**Wells** [381] - 3:5, 3:12, 3:13, 3:18, 6:2, 6:6, 11:16, 14:16, 14:21, 14:23, 14:25,

22:13, 22:23, 23:2, 26:1, 27:18, 27:23, 28:3, 31:20, 33:2, 38:14, 38:17, 39:5, 39:6, 39:11, 39:12, 40:14, 40:15, 41:9, 43:9, 45:25, 46:5, 46:8, 46:21, 47:13, 59:4, 59:17, 59:22, 59:24, 61:3, 72:24, 72:25, 73:5, 73:7, 73:10, 73:13, 73:14, 73:15, 73:20, 73:22, 74:1, 74:2, 74:4, 74:6, 76:4, 76:18, 76:20, 77:25, 78:3, 78:14, 78:16, 78:19, 79:3, 79:5, 79:7, 79:16, 79:18, 79:22, 79:24, 80:1, 80:7, 80:12, 80:14, 80:16, 80:17, 80:21, 80:24, 81:1, 81:3, 81:7, 81:8, 81:11, 82:1, 82:3, 82:5, 82:10, 82:13, 82:17, 82:23, 82:25, 83:4, 83:7, 83:10, 83:11, 83:12, 83:16, 83:22, 84:8, 84:10, 84:12, 84:13, 84:25, 85:6, 85:7, 85:13, 85:15, 85:17, 85:22, 85:24, 86:4, 86:5, 86:8, 86:10, 86:14, 86:25, 87:4, 87:5, 87:15, 87:20, 87:22, 87:24, 87:25, 88:5, 88:7, 88:9, 88:18, 88:22, 88:24, 89:3, 89:6, 89:13, 89:14, 89:16, 89:17, 89:24, 89:25, 90:2, 90:6, 90:10, 90:14, 90:17, 90:18, 90:21, 90:22, 90:25, 91:2, 91:4, 91:7, 91:9, 91:12, 91:13, 91:14, 91:17, 91:19, 91:22, 92:11, 92:19, 93:5, 93:6, 93:9, 93:12, 93:19, 93:23, 94:4, 94:7, 94:10, 95:2, 95:4, 95:11, 95:17, 95:21, 95:23, 96:3, 96:11, 96:14, 96:16, 96:21, 97:6, 97:9, 97:16, 97:20, 98:3, 98:7, 98:10, 98:14, 98:16, 98:19, 98:22, 98:24, 99:2, 99:5, 99:6, 99:11, 99:25, 100:2, 100:3, 100:6, 101:10, 101:21, 101:23, 101:25, 102:8, 102:10, 102:16, 102:19, 102:21, 103:23, 104:11, 104:15, 104:21, 105:8, 105:14, 106:2, 106:5, 106:20, 106:21, 106:25, 107:3, 107:5, 107:7, 107:15, 107:19, 107:25, 108:10, 108:11, 108:16, 108:20, 108:25, 109:16, 110:1, 110:2, 110:9, 110:12, 110:18, 110:20, 110:25, 111:2, 111:8, 111:11, 111:14, 111:16, 120:9, 120:16, 121:18, 121:19, 122:6, 122:11, 123:6, 123:12, 124:1, 124:8, 124:25, 125:3, 125:9, 125:18, 126:7, 126:23, 127:14, 127:16, 137:17, 137:22, 137:24, 138:13, 140:8, 141:21, 142:2, 142:20, 142:25, 147:4, 150:3, 150:22, 151:5, 151:20, 152:1, 153:8, 154:24, 156:13, 156:22, 158:14, 159:6, 161:10, 161:11, 163:1, 164:5, 164:8, 165:20, 167:2, 167:23, 171:22, 172:3, 173:22, 174:8, 175:3, 175:11, 175:22, 177:16, 177:19, 178:3, 178:5, 178:14, 179:10, 179:16, 180:5, 181:20, 181:21, 182:20, 183:1, 183:25, 184:3, 184:9, 184:15, 184:16, 184:19, 185:1, 185:7, 185:21, 186:25, 187:4, 187:8, 188:6, 188:11, 188:19, 188:24, 189:2, 189:5, 192:14, 192:17, 193:12, 194:10, 195:4, 196:17,

196:24, 197:23, 200:5, 200:10, 201:13, 202:4, 202:13, 203:8, 203:10, 203:19, 203:22, 204:8, 205:9, 206:5, 207:13, 207:19, 208:3, 208:13, 208:15, 208:21, 208:23, 209:3, 209:5, 211:2, 211:25, 212:3, 212:7, 212:24, 213:10, 213:15, 213:20, 213:23, 214:9, 214:19, 217:8, 217:10, 217:20, 218:17, 219:1, 220:11, 222:14, 223:7, 223:18, 225:16
**West** [2] - 17:6, 18:19
**west** [1] - 29:2
**wet** [1] - 118:22
**whatsoever** [1] - 55:3
**wheelchair** [1] - 198:24
**wheelchairs** [1] - 198:25
**white** [1] - 202:17
**whoever's** [2] - 5:1, 5:3
**whole** [15] - 6:22, 74:17, 95:3, 114:17, 117:24, 124:17, 128:21, 129:25, 169:15, 174:11, 192:8, 198:2, 203:15, 206:15, 207:17
**wide** [2] - 105:3, 105:7
**wife** [37] - 16:18, 18:23, 18:24, 20:3, 20:4, 20:23, 20:24, 22:12, 22:14, 26:22, 27:16, 27:17, 27:22, 28:2, 29:2, 29:23, 29:24, 30:2, 31:18, 34:16, 37:23, 76:22, 77:9, 85:23, 113:23, 114:12, 114:19, 118:22, 120:2, 131:17, 132:16, 133:5, 133:12, 157:5, 165:12, 165:15, 196:12
**wife's** [1] - 156:19
**wifi** [2] - 122:1, 221:9
**Wiggins** [6] - 12:21, 20:22, 40:12, 43:19, 55:18, 62:20
**willful** [3] - 96:22, 111:3, 183:4
**willfully** [6] - 8:23, 33:3, 110:21, 110:23, 110:25, 181:21
**willfulness** [2] - 9:16, 9:19
**William** [4] - 31:21, 32:4, 91:7, 217:20
**willing** [1] - 145:24
**willpower** [1] - 193:6
**wind** [1] - 156:25
**window** [1] - 116:5
**wish** [2] - 71:5, 112:7
**withdraw** [1] - 188:2
**withdrawn** [4] - 4:12, 7:23, 7:25
**witness** [28] - 5:7, 8:14, 8:17, 10:24, 20:8, 24:24, 25:14, 29:7, 29:11, 29:14, 32:2, 32:5, 65:23, 65:24, 66:23, 66:25, 67:1, 67:14, 67:16, 67:19, 68:15, 71:18, 92:3, 98:4, 110:14, 113:2, 113:10, 141:5
**WITNESS** [8] - 113:15, 116:21, 138:5, 140:21, 140:25, 141:11, 162:23, 200:21
**witness's** [5] - 67:2, 67:3, 67:5, 67:6
**witnesses** [24] - 10:23, 11:1, 14:6, 25:13, 31:13, 31:17, 39:17, 63:7, 65:2, 67:10, 67:11, 67:13, 71:6, 71:9, 71:10,

74:10, 86:2, 95:24, 97:13, 100:17, 105:10, 109:12, 110:5, 110:14
**Wolf** [1] - 72:14
**wonder** [2] - 61:15, 181:25
**wondered** [1] - 214:7
**wonderful** [1] - 77:22
**wondering** [1] - 49:4
**wool** [1] - 24:22
**word** [8] - 33:25, 51:15, 161:18, 178:24, 182:5, 182:6, 182:17, 183:10
**wording** [1] - 68:1
**words** [10] - 69:6, 79:14, 81:6, 82:4, 92:11, 94:20, 152:5, 169:1, 181:13, 209:12
**worker** [2] - 27:10, 55:15
**workload** [1] - 198:8
**works** [7] - 17:21, 18:24, 27:17, 29:24, 35:12, 40:8, 122:2
**worksheet** [1] - 206:3
**world** [5] - 37:11, 44:12, 118:25, 132:2, 150:5
**worn** [4] - 191:16, 193:3, 193:4, 193:11
**worried** [4] - 91:11, 116:14, 128:5, 130:5
**worries** [5] - 35:16, 83:12, 83:16, 89:1, 142:1
**worry** [2] - 162:5, 214:1
**worse** [2] - 85:25, 94:15
**wrap** [1] - 3:15
**wrapped** [1] - 56:15
**write** [10] - 20:18, 67:20, 135:13, 146:7, 159:13, 166:11, 167:10, 175:18, 195:17, 224:21
**writer** [2] - 20:14, 149:14
**Writers** [1] - 22:7
**writes** [3] - 84:11, 86:12, 135:12
**writing** [13] - 5:8, 16:19, 20:15, 22:8, 69:22, 107:10, 136:12, 136:23, 166:20, 188:18, 190:10, 197:18, 204:1
**written** [7] - 6:8, 67:12, 71:3, 86:1, 88:22, 189:20, 195:12
**wrongdoing** [1] - 96:13
**wrote** [22] - 107:14, 122:3, 125:10, 136:2, 136:9, 155:3, 156:3, 159:12, 167:5, 167:23, 177:15, 180:24, 182:3, 186:21, 217:8, 220:10, 220:11, 220:14, 220:15, 220:17

## Y

**yacht** [1] - 169:16
**Yamhill** [1] - 24:20
**year** [20] - 55:23, 57:24, 58:1, 78:2, 88:23, 88:24, 89:20, 89:22, 108:9, 120:19, 120:24, 157:14, 164:13, 169:15, 172:18, 173:23, 195:13, 197:8, 205:3, 215:9
**years** [34] - 18:4, 19:18, 19:22, 21:4, 21:24, 22:17, 23:14, 24:11, 25:2, 25:17, 26:14, 27:2, 27:21, 28:15,

29:10, 29:12, 30:4, 30:25, 38:15, 38:25, 40:2, 40:20, 51:7, 56:4, 76:25, 114:21, 116:13, 120:12, 122:19, 131:8, 213:4, 215:23

**yielded** [1] - 149:17

**yields** [1] - 116:25

**Yochum** [6] - 79:11, 79:15, 84:22, 149:7, 149:20, 149:25

**Yochum's** [1] - 138:11

**yoga** [1] - 17:10

**young** [1] - 115:23

**Young** [2] - 55:21, 55:22

**younger** [2] - 17:24, 131:18

**yourself** [7] - 54:2, 71:7, 72:20, 174:15, 176:17, 193:11, 201:25

**yourselves** [3] - 14:10, 14:19, 63:18

## Z

**Zealand** [22] - 83:14, 83:18, 83:24, 126:18, 127:21, 127:25, 129:23, 130:7, 135:8, 139:10, 141:19, 143:9, 146:9, 148:6, 151:3, 156:18, 163:16, 169:17, 211:4, 211:8, 211:14, 215:18

**Zelda** [1] - 76:23

**zero** [1] - 36:5