1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF OREGON

3  MATTHEW SPONER,              )

                              )

4          Plaintiff,      )  No. 3:17-cv-02035-HZ

                              )

5      vs.                )  August 28, 2019

                              )

6  EQUIFAX INFORMATION SERVICES,  )  Portland, Oregon

    LLC and WELLS FARGO BANK, N.A.,  )

7                        )

          Defendants.       )

8  --------------------------------

9

10

11

12

13

14                    **TRIAL - DAY 2**

15             TRANSCRIPT OF PROCEEDINGS

16       BEFORE THE HONORABLE MARCO A. HERNANDEZ

17        UNITED STATES DISTRICT COURT JUDGE

18

19

20

21

22

23

24

25

```
1                           APPEARANCES

2    FOR THE PLAINTIFF:    Jeffrey B. Sand
                           Weiner & Sand LLC
3                          800 Battery Avenue SE
                           Suite 100
4                          Atlanta, GA  30339

5                          Kelly D. Jones
                           Kelly D. Jones, Attorney at Law
6                          819 S. E. Morrison Street
                           Suite 255
7                          Portland, OR  97214

8                          Michael R. Fuller
                           OlsenDaines
9                          111 S. W. Fifth Avenue
                           Suite 3150
10                         Portland, OR  97204

11                         Robert S. Sola
                           Robert S. Sola, P.C.
12                         1500 S. W. First Avenue
                           Suite 800
13                         Portland, OR  97201

14   FOR THE DEFENDANT
15   WELLS FARGO BANK:     Robert E. Sabido
                           Timothy J. Fransen
16                         Daniel C. Peterson
                           Julie Annette Smith
17                         Cosgrave Vergeer Kester, LLP
                           900 S. W. Fifth Avenue
18                         24th Floor
                           Portland, OR  97204
19
     COURT REPORTER:       Nancy M. Walker, CSR, RMR, CRR
20                         United States District Courthouse
                           1000 S. W. Third Avenue, Room 301
21                         Portland, OR  97204
                           (503) 326-8186
22

23

24

25
```

Sponer - X

1                   P R O C E E D I N G S

2              (The Court, counsel, the parties, and the jury

3      reconvene.)

4              THE COURT:  Good morning.  Welcome back.  Please be

5      seated.

6              Mr. Sponer, you need to retake the stand, please.

7      You are still under oath.

8              (The witness retakes the witness stand.)

9              THE COURT:  You may proceed.

10

11                        MATTHEW SPONER

12     called as a witness in his own behalf, having been previously

13     duly sworn, is examined and testifies as follows:

14

15                      CROSS-EXAMINATION

16     BY MR. PETERSON:  (continuing)

17     Q.  Good morning, Mr. Sponer.

18              I want to take a quick look at Exhibit No. 2.  It

19     should flash up on the screen.  And on the second page of

20     Exhibit 2 there is a list of addresses.  This was the letter

21     that Mr. Charne sent to Wells Fargo in October of 2016.

22     There's a list of addresses there.

23              And I just have a quick question.  The first one

24     listed, it says 2008, and it is 100 Harbor Drive in San Diego.

25     Do you see that?

Sponer - X

1   A.   Yes.

2   Q.   And you stopped using that address in 2008; is that

3   correct?

4   A.   I believe so.

5   Q.   And you don't currently use that address for anything?

6   A.   No.

7   Q.   Thank you.

8           All right.  Exhibit No. 10 -- and you talked about

9   this yesterday as well.  This is the identity theft victim's

10  complaint and affidavit.  And I just have a couple of

11  questions for you on this.

12          Do you know how long, approximately, it took you to

13  complete this identity theft affidavit?

14  A.   It was difficult, because I -- oh, sorry.  I'll answer

15  shorter.

16          No.  I'm sorry, I don't.

17  Q.   Ten hours?

18  A.   I don't remember.

19  Q.   No recollection of how long it would have taken?

20  A.   Yeah.  I don't want to guess.  I mean, I can add up in my

21  head what each step --

22  Q.   What steps did you take to complete this?

23  A.   I had to collect all the information.  I had to go to the

24  FTC website and find it in the first place, do the

25  PDF -- like, you know, punting the fonts over and things like

Sponer - X

1    that.  And I had to get it notarized.

2              I'm sorry.  This isn't a complete list of steps.

3    Q.  Do you believe the process was slowed down because you

4    were in the South Pacific at the time?

5    A.  I was in New Zealand when I did this, yes.

6    Q.  And do you believe the process was slowed down because of

7    that?

8    A.  You know, I'm not sure, because I had Internet, and it was

9    mostly Internet and computer stuff.  So, no, I don't agree

10   with that.

11   Q.  If you could turn to page 8 of 9, or we'll turn to it for

12   you.  Sorry.

13             That's your signature on this page, isn't it,

14   Mr. Sponer?

15   A.  Yes.

16   Q.  And what date did you sign this?

17   A.  I'm not sure, but it says January 18th, 2017.

18   Q.  Thank you.

19             Exhibit No. 11, this is your January 19th letter to

20   Wells Fargo.  Do you recall how long it took you to draft this

21   letter?

22   A.  No.

23   Q.  You testified yesterday, I believe, that this was

24   primarily a form letter, based on a form you found on the

25   Internet; is that correct?

Sponer - X

1   A.   Yes.

2   Q.   And I'm going to refer to the numbers on the bottom of the

3   page.  This total exhibit is 39 pages.  And starting on page 3

4   is a copy of your identity theft affidavit.

5            Is this the same affidavit that we just looked at as

6   Exhibit 10?

7   A.   I -- I'm not sure.

8   Q.   Well, let's turn to page 9 of the exhibit.  And this has

9   your signature dated January 18th, 2017.

10            I'm sorry.  Page 10 of the exhibit, January 18th,

11   2017, do you see that?

12   A.   Yes.

13   Q.   And that's the same date we looked at previously?

14   A.   Yes.

15   Q.   So it's your understanding this is the same affidavit?

16   A.   I had an electric -- an electronic copy.  So I don't know

17   exactly the same or --

18   Q.   And moving forward, the next exhibit in this is the

19   sheriff's report.  And how long did it take you -- as far as

20   efforts that you made, how long did it take you to obtain the

21   sheriff's report, the police report?

22   A.   It was pretty quick because my lawyer, Mr. Charne, had

23   e-mailed it to me.

24   Q.   And then the last attachment here is the notice to

25   furnishers, and that starts on page 36 of the exhibit.  And

Sponer - X

1    the notice to furnishers, that's something you also obtained

2    off the Internet, isn't it?

3    A.   Yes.

4    Q.   And was that something that you -- I believe you testified

5    yesterday that was something you knew to include because that

6    was on the FTC website; is that right?

7    A.   Yes.  This document was included in there, yeah.  Yes.

8    Q.   Now, it's true, isn't it, that about this same day,

9    somewhere in mid-January of 2015, you sent virtually identical

10   letters to six other creditors, isn't it?

11   A.   I believe so.

12   Q.   And do you recall, you sent a letter to an entity that was

13   collecting on behalf of Verizon, didn't you?

14   A.   I'm sorry.  I don't.

15   Q.   Well, let's look at Exhibit 527.  Do you recognize

16   Exhibit 527?

17            MR. SOLA:  Your Honor, we were not provided with this

18   exhibit.

19            THE CLERK:  It's listed as an impeachment exhibit.

20            THE COURT:  Okay.  Do you want to approach for just a

21   second?

22            (The Court and counsel confer off the record.)

23   BY MR. PETERSON:  (continuing)

24   Q.   Okay.  Mr. Sponer, Exhibit 527, this appears to be a

25   letter dated January 10th from you to McCarthy & Burgess

Sponer - X

1  regarding a Verizon wireless account.  Do you recall writing
2  this letter?
3  A.   No.
4  Q.   On the second page of this exhibit, is that your
5  signature --
6  A.   Yes.
7  Q.   -- and a picture of your passport?
8  A.   Yes.
9  Q.   Do you have any reason to believe you didn't write this
10 letter?
11 A.   I just don't remember at all.
12 Q.   And on or around this same time frame, you also wrote a
13 letter to Best Buy, didn't you?
14 A.   I don't remember every letter that I wrote.
15 Q.   So if we can look at Exhibit 528, that's a letter from you
16 to Best Buy fraud department dated January 18th.  Do you see
17 that?
18 A.   Yes.
19 Q.   And the content of this letter is virtually the same as
20 the letter you sent to Wells Fargo, isn't it?
21          "I'm a victim of identity theft.  Enclosed is a copy
22 of the police report."  Do you see that?
23 A.   Yes.
24 Q.   And do you have any reason to believe you didn't write
25 this letter?

Sponer - X

1   A.   No.

2   Q.   And you also, in this same time frame, around

3   January 18th, 19th, you sent a letter to Home Depot, didn't

4   you?

5   A.   I don't remember every letter.

6   Q.   Exhibit 529, and this is a letter dated January 19th from

7   you to Home Depot with, again, virtually the same statements.

8   The first paragraph starts with "I am a victim of identity

9   theft"; the second paragraph, "Enclosed is a copy of the

10  police report."

11         Do you have any reason to believe you didn't write

12  this letter?

13  A.   No.

14  Q.   And did you also -- do you recall writing a letter to

15  Kohl's at this time frame?

16         THE COURT:   Hang on a second.

17         These exhibits I think have been -- they're not

18  showing up in front of the jury.  I don't know whether you

19  want them to be showing up in front of the jury or not.

20         MR. PETERSON:   I would like that, Your Honor.  I was

21  going to get through this and then offer them.  I don't know

22  how you handle these type of exhibits.

23         THE COURT:   That's fine.  Your system works for that.

24         So take them off the screen, please.  They will be

25  displayed later on.

Sponer - X

1          MR. PETERSON:  Well, I would like to offer them as I
2    go, then.

3          THE COURT:  Okay.  Is 529 up?

4          MR. PETERSON:  Yes, Your Honor.  That would be 527
5    through 529 offered.

6          THE COURT:  They are received.

7          You may display them.

8          MR. PETERSON:  And, Your Honor, while we're waiting
9    for that, I intend to offer 530, 531, 532 as well.

10          THE COURT:  We'll wait until we get to those.

11          (There is a brief pause in the proceedings.)

12          THE COURT:  They're up.

13          MR. PETERSON:  Thank you.

14    BY MR. PETERSON:  (continuing)

15    Q.  Okay.  Mr. Sponer, on the screen is Exhibit 529, and this
16    is a letter to Home Depot.

17          And then moving to Exhibit 530, Exhibit 530 is,
18    again, the same form letter, virtually the same, this one to
19    Kohl's department store.  Do you recall writing that letter?

20    A.  I don't remember most letters.

21    Q.  Do you have any reason to believe you didn't send this
22    letter?

23    A.  No.

24          MR. PETERSON:  Offer Exhibit 530.

25          THE COURT:  Received.

1  BY MR. PETERSON:  (continuing)

2  Q.  And, Mr. Sponer, what's been marked as Exhibit 531, do you

3  recall writing a letter to Macy's?

4  A.  Yes, I do.

5  Q.  What do you recall about that letter?

6  A.  I remember that I wrote a letter to Macy's.

7  Q.  Is this that letter?

8  A.  I believe so.

9        MR. PETERSON:  Offer 531.

10       THE COURT:  Any objection to 531?

11       MR. SOLA:  No, Your Honor.

12       THE COURT:  It's received.

13  BY MR. PETERSON:  (continuing)

14  Q.  And do you recall writing a letter to Office Depot in this

15  same time frame, January 19th?

16  A.  No.  I don't have, like, in my memory every company and

17  date.

18  Q.  Exhibit 532 is a letter dated January 19th from you to

19  Home Depot, again with the same information, and --

20       THE COURT:  Excuse me.  You said Home Depot.

21       MR. PETERSON:  I'm sorry.  Office Depot is this one.

22       Thank you, Your Honor.

23  BY MR. PETERSON:  (continuing)

24  Q.  Do you have any reason to believe you didn't write

25  Exhibit 532?

1  A.   No.

2           MR. PETERSON:  Offer 532.

3           THE COURT:  Any objection to 532?

4           MR. SOLA:  No, Your Honor.

5           THE COURT:  Received.

6  BY MR. PETERSON:  (continuing)

7  Q.   Yesterday did I understand your testimony correctly that

8  you believed all of the other accounts, other than Wells

9  Fargo, were resolved quickly upon your sending a letter?

10          MR. SOLA:  I'll -- well, let me object.  I don't

11  think --

12          THE COURT:  Overruled.  He can answer the question.

13          THE WITNESS:  I don't remember precisely what I said,

14  but yeah.

15  BY MR. PETERSON:  (continuing)

16  Q.   But that's not actually the case, is it, that all of your

17  other accounts were resolved quickly?

18  A.   I don't think I said all.

19  Q.   Okay.  So the answer to my question is that not all of the

20  accounts were resolved quickly; is that correct?

21  A.   Yes.

22  Q.   These letters that you wrote on January 19th, these were,

23  generally speaking, to the creditors that you listed on your

24  fraud affidavit; is that correct?

25  A.   I believe so.

Sponer - X

1  Q.  And you don't actually know how quickly any of those
2  creditors removed their accounts from your credit report, do
3  you?
4  A.  I don't agree with that statement, no.  I mean -- I'm
5  sorry.  What timeline?
6  Q.  Well, I'm just asking you if you know how quickly these
7  creditors removed their accounts, the six creditors, other
8  than Wells Fargo, that you sent letters to in January of 2017.
9  A.  No.  I did not memorize the dates that they took it off my
10  credit report.
11  Q.  Do you recall obtaining a copy of your credit report any
12  time between February of 2017 and August of 2017?
13  A.  I'm not sure, but I used a -- like a website where you
14  check.
15  Q.  You didn't print any copies of those at any time?
16  A.  No, I don't think so.
17  Q.  What website was that?
18  A.  I believe it was TransUnion, but I'm not sure.
19  Q.  So as you sit here today, you don't actually know when
20  certain debts came off your credit report; is that true?
21  A.  Not with precision.
22  Q.  Mr. Sponer, if we could look at Exhibit No. 12 -- and you
23  spoke with Mr. Sola about this letter yesterday, and I believe
24  you testified that it was understandable that large companies
25  would -- I think your phrase that you used was that they would

Sponer - X

1   have computers and form letters.  Is that what you testified

2   to, that it's understandable?

3   A.  Yes, to an extent.

4   Q.  So I understand that at the time you received this, you

5   were very frustrated by the identity theft situation.  But you

6   believed at the time, on February 15th or about that, when you

7   received this, you believed that receiving this type of letter

8   from Wells Fargo was understandable, didn't you?

9   A.  No.

10  Q.  Well, you testified yesterday that form letters like this

11  were understandable.  Is your testimony different today?

12  A.  It is not different.

13          Wells Fargo contacted the police.  They talked to my

14  lawyer.  They talked to the police.  They got the car back

15  from them.  To me it's understandable if I send a single

16  letter and it's just out of the blue and there's a delay.

17  Q.  You testified, I believe, yesterday that this letter

18  caused you shock and fear.  Do you remember that testimony?

19  A.  Yes.

20  Q.  What did you do after receiving this letter on

21  February 15th of 2017 to address your shock and fear?

22  A.  I'm not sure.

23  Q.  There's a contact phone number listed on here, on the last

24  line; is that correct?

25  A.  Yes.

1  Q.   Did you call that number?

2  A.   No.

3  Q.   If I could have you look at Exhibit 13 -- and this is your

4  letter to Wells Fargo dated August 18th of 2017.  This was

5  your next communication with Wells Fargo following the

6  February 2017 letter they sent to you, wasn't it?

7  A.   No.

8  Q.   What communication did you have between February 15th,

9  2017, and August 18th, 2017?

10  A.   I had several -- I don't know how many accounts with them,

11  so there was normal communications about those.

12  Q.   Thank you for the clarification.

13         So those were related to your bank accounts, credit

14  card account, but not related to the identity theft, correct?

15  A.   Yes.

16  Q.   And this August 18th letter, it does vary some from your

17  January letters, from the letters about eight months earlier,

18  but I believe you testified yesterday that this is also based

19  primarily on a form you found on the Internet; is that true?

20  A.   It's based on the previous letter.

21  Q.   And how long did it take you to write this letter?

22  A.   I'm not sure, but there's the mechanical act of writing

23  and there's the research part, figuring out what to write.

24  Q.   And you said this was based on the prior letter you had

25  already written, correct?

1    A.   Yes.

2    Q.   And then how long did it take you to compile the exhibits

3    to this letter?

4    A.   I'm not aware -- I don't remember specifically what

5    exhibits are with this letter.

6    Q.   Okay.  So the exhibits you attached with this letter,

7    starting on page 4 of the exhibit, this is the letter that

8    Mr. Charne sent on your behalf.  So you already had a copy of

9    this, correct?

10   A.   Yes.

11   Q.   And the next exhibit is on page 7, and this is Wells

12   Fargo's letter to you of February 15th.  So you already had a

13   copy of this, correct?

14   A.   Yes.

15   Q.   And on page 8 through page 16, that's a fraud affidavit,

16   or identity theft victim's complaint and affidavit.  Is this

17   the same one you originally did in January of 2018?

18   A.   I believe so.  I mean, it was files on my computer.

19   Q.   Okay.  Let's look at page 15 of Exhibit 13.  And that

20   shows your signature dated January 18th, 2017, correct?

21   A.   Yes.

22   Q.   And that was the same date as the prior affidavit?

23   A.   Yes.

24   Q.   And the next attachment to this letter is found on page 17

25   of this exhibit, and that's the police report.  You already

Sponer - X

1  had a copy of that, correct?

2  A.   Yes.

3  Q.   And then the last exhibit, again, is the notice to

4  furnishers.  And you had previously obtained that and sent it,

5  correct?

6  A.   Yes.

7  Q.   And on or about August 18th, in the same general time

8  frame, you recall sending nearly identical letters to six

9  other creditors, don't you?

10 A.   The letters to other creditors were not identical.

11 Q.   And that's correct.  They have some differences,

12 certainly.

13        If I could have you look at Exhibit 533 -- and this

14 is a letter to an entity called Caine & Weiner.

15        THE COURT:  This particular letter should not yet be

16 displayed to the jury.

17        Thank you.  Go ahead.

18 BY MR. PETERSON:   (continuing)

19 Q.   This is a letter from you dated August 16th, to Caine &

20 Weiner, regarding Progressive Insurance.  Do you see that?

21 A.   Yes.

22 Q.   Do you have any reason to believe you did not send this

23 letter?

24 A.   No.

25 Q.   And the first paragraph says, "I'm a victim of identity

1   theft."  The second paragraph starts with "Enclosed is a copy

2   of the police report."

3           Would you agree that that language is also found in

4   your August 18th letter to Wells Fargo?

5   A.  Yes.  But Wells Fargo had additional information.

6           MR. PETERSON:  I'll offer Exhibit 533.

7           THE COURT:  Any objection?

8           MR. SOLA:  No, Your Honor.

9           THE COURT:  Received.

10  BY MR. PETERSON:  (continuing)

11  Q.  And, Mr. Sponer, on the second page of this there's a

12  screenshot of what appears to be a portion of a credit report.

13  Do you see that?

14          THE COURT:  Wait a second.  Once I say, "Received,"

15  you have to ask to have it published to the jury.  Otherwise,

16  they're not going to see it.

17          MR. PETERSON:  Your Honor, may we please publish that

18  to the jury.

19          Thank you.

20  BY MR. PETERSON:  (continuing)

21  Q.  Mr. Sponer, on the second page of this exhibit, 533,

22  there's a screenshot, what looks to me to be a screenshot of a

23  credit report entry.  Do you see that?

24  A.  Yes.

25  Q.  And you also sent a similar credit report screen entry to

Sponer - X

1  Wells Fargo in the same time frame, correct?

2  A.   Yes.

3  Q.   And on this particular one, on Exhibit 533, it says

4  "placed for collection."  Do you see that?

5  A.   Yes.

6  Q.   And is it your understanding that Caine & Weiner is a

7  collection agency?

8  A.   Yes.

9  Q.   You recall sending a letter to an entity known as Ad Astra

10  Recovery Services around this time frame, don't you?

11  A.   I remember the company name, but I don't remember the

12  letter.

13  Q.   Exhibit 534 is a letter to Ad Astra regarding a fraudulent

14  account at Speedy Cash, dated August 16th.  Do you have any

15  reason to believe you didn't write this letter?

16  A.   No.

17            MR. PETERSON:  Offer Exhibit 534.

18            MR. SOLA:  No objection.

19            THE COURT:  Received.

20            MR. PETERSON:  And please publish to the jury.

21  BY MR. PETERSON:  (continuing)

22  Q.   And would you agree this is very similar to the other

23  letters you sent in this time frame?

24  A.   Yes, except for the Wells Fargo one.

25  Q.   And when you say, "except for the Wells Fargo one," that's

1  because you listed a little bit more information, a couple of

2  extra paragraphs in the Wells Fargo one?

3  A.   Yes.

4  Q.   And, obviously, each of these has, for example, a

5  different screenshot because you're dealing with a specific

6  debt, correct?

7  A.   Yes.

8  Q.   And in this time frame, August 16th of 2017, you were

9  still having trouble with Home Depot, weren't you?

10  A.   I don't remember the timeline.

11  Q.   If I could have you look at Exhibit 535 -- and this is a

12  letter dated August 16th to the Home Depot fraud department,

13  and it says "second notice" on that.  Do you see that?

14  A.   Oh, yes.  I remember this letter now.

15          MR. PETERSON:  Offer Exhibit 535.

16          MR. SOLA:  No objection.

17          THE COURT:  Received.

18          MR. PETERSON:  Please publish.

19  BY MR. PETERSON:   (continuing)

20  Q.   Home Depot was difficult to get attention from, weren't

21  they?

22  A.   I'm not sure how many letters they took.  I believe it was

23  three.

24  Q.   And in between January of 2017 and August of 2017, when

25  you sent this letter, did you have any communications with

Sponer - X

1    Home Depot regarding the fraudulent account?

2    A.   I'm not sure.  I mean, if it's in my computer --

3    Q.   But you don't recall any communications?

4    A.   No.

5    Q.   And there was also a fraudulent Citibank account at this

6    time, wasn't there?

7    A.   I'm not sure, because I think Citibank was the financer or

8    something.  I'm not sure.

9    Q.   If we could look at Exhibit 536 -- and this is a letter

10   dated August 16th to an entity known as JH Portfolio regarding

11   a Citibank account.

12   A.   So I believe that some of the store credit cards, like

13   Home Depot and Office Depot and some of the other ones -- I

14   can't remember -- they would use Citibank.  So sometimes it

15   was the same account.

16   Q.   And you recall writing this letter?

17   A.   Not specifically.

18   Q.   In reviewing this exhibit, 536, including the second page

19   with your signature, do you have any reason to believe you

20   didn't send this letter?

21   A.   No.

22            MR. PETERSON:  Offer Exhibit 536.

23            MR. SOLA:  No objection.

24            THE COURT:  Received.

25            MR. PETERSON:  Publish that to the jury as well, Your

Sponer - X

1    Honor?

2    BY MR. PETERSON:  (continuing)

3    Q.  Again, was it also your understanding that JH Portfolio

4    was a debt collection agency?

5    A.  I believe so, yes.

6    Q.  And there was also an issue with an AT&T account in this

7    time frame, wasn't there?

8    A.  I don't remember an AT&T account.

9    Q.  If I could have you look at Exhibit 537 -- and this is a

10   letter dated August 18th from you to an entity known as

11   Diversified Consultants regarding an AT&T Mobility account.

12   Does that refresh your memory?

13   A.  I don't remember AT&T, but it looks like this is me, so --

14   Q.  You have no reason to believe you didn't send this letter?

15   A.  No.

16           MR. PETERSON:  Offer Exhibit 537.

17           MR. SOLA:  No objection.

18           THE COURT:  Received.

19           MR. PETERSON:  I ask that you publish it to the jury.

20   BY MR. PETERSON:  (continuing)

21   Q.  And, again, Diversified Consultants, did you understand or

22   you now understand that's a collection agency?

23   A.  Yes.

24   Q.  And at that same time frame that you sent something

25   to -- or sent this letter to Diversified Consultants, you also

Sponer - X

1  sent a letter directly to AT&T, didn't you?

2  A.   Is that the exhibits you were just flipping through?  I'm

3  lost.

4  Q.   Let's take a look at Exhibit 538.

5  A.   Okay.

6  Q.   And that's a letter dated August 18th to the AT&T fraud

7  department regarding the AT&T Mobility account.  Do you have

8  any reason to believe you didn't send this letter?

9  A.   No.  At this phase I learned to dispute, if it was both

10 a -- if it was a collection agency, to do it to the original

11 company and the collection agency at the same time.

12           MR. PETERSON:  Offer Exhibit 538.

13           MR. SOLA:  No objection.

14           THE COURT:  Received.

15           MR. PETERSON:  Please publish.

16 BY MR. PETERSON:  (continuing)

17 Q.   The Wells Fargo account was never placed with a collection

18 agency, was it?

19 A.   I don't know.

20 Q.   You don't recall it ever being placed with a collection

21 agency?

22 A.   Many accounts were in collections.  And the first notice

23 I'd get of them was -- I wasn't sure how long they'd been in

24 collections.

25 Q.   In the documents you went through yesterday with Mr. Sola,

Sponer - X

1    there were no collection letters related to the Wells Fargo

2    account, were there?

3    A.   That's correct.

4    Q.   There was some discussion yesterday about the mailing of

5    this group of August 18th letters, and I believe your -- or

6    mid-August letters, and I believe your testimony was that you

7    lost the certified mail receipts; is that correct?

8    A.   For a certain batch of them.

9    Q.   And would that include these exhibits that we've just gone

10   through, 533 through 538, that you lost all those?

11   A.   I don't remember.

12   Q.   I'd like to turn to Exhibit 15.  And I recognize that

13   there is -- in this Exhibit 15 there's some additional

14   information about your specific communications with Wells

15   Fargo.  But, generally speaking, is this a form letter you

16   found on the Internet or based on that?

17   A.   I'm not sure what "based" means, after you've changed it a

18   certain number of times.

19   Q.   So you changed a letter that you found on the Internet?

20   A.   I started with an original letter and then kept evolving

21   it.

22   Q.   And when you say that, the original letter you wrote in

23   January of 2017, and it was sort of revised over time.  Is

24   that your testimony?

25   A.   Yes.

Sponer - X

1   Q.   In the bottom page here -- and you spoke to Mr. Sola about

2   this yesterday.   The bottom of the first page of this exhibit,

3   it says -- it discusses that you are not in the United States,

4   and it says you are sailing your yacht between the Caribbean

5   and New Zealand.   And you testified that that was sort of an

6   exaggeration; is that right?

7   A.   Yes.   I used the word "yacht" instead of "sailboat."

8   Q.   And how big is your sailboat, how many feet?

9   A.   The waterline is 46 feet, and overall is 57 feet.

10  Q.   Fifty-seven feet.

11       I'd like to look at the exhibits to this August 15th

12  letter -- I'm sorry, the November 3rd letter, Exhibit 15, the

13  exhibits here.   And starting on page 4, there are some

14  additions to this.

15       I believe this is the first time you included your

16  passport information.   Does that match your recollection?

17  A.   I'm really not sure.

18  Q.   Do you recall how long it took you to draft or create

19  these five pages related to your passport information?

20  A.   I remember it was a project.

21  Q.   All the information came directly out of your passport,

22  correct?

23  A.   Yes.

24  Q.   And the project included making some photocopies of some

25  pages?

Sponer - X

1    A.   I remember scanning tables and stuff like that.

2    Q.   So the first page of this, page 4, is that the table

3    you're referring to?

4    A.   Yes.

5    Q.   And then pages 5, 6, 7, and 8, is that the scanning you're

6    referring to?

7    A.   Yes.

8    Q.   And the next exhibit is the letter from Mr. Charne to

9    Wells Fargo.  That starts on page 9.  And that's something you

10   had before, correct?

11   A.   Yes.

12   Q.   And starting on page 14, the next exhibit is -- or the

13   next attachment, I should say, is the letter you received from

14   Wells Fargo on February 15th, correct?

15   A.   Yes.

16   Q.   And then the next attachment starts on page 15 of this

17   exhibit, and that's the identity theft affidavit.  And that's

18   shown on page 22 of this exhibit.  It shows the signature date

19   of January 18th, 2017.  And that's the same one we've looked

20   at in the past, correct?

21   A.   Yes.

22   Q.   Now, why didn't you update the identity theft affidavit to

23   reflect current creditors showing on your report?

24   A.   It didn't seem necessary.

25   Q.   And then starting on page 24 of this exhibit, you attach

Sponer - X

1   or enclosed the police report again, correct?

2   A.   Yes.

3   Q.   And that's the same police report you had initially,

4   correct?

5   A.   Yes.

6   Q.   And then you enclosed the notice to furnishers that you

7   previously enclosed, and that starts on page 48, correct?

8   A.   I don't see what page it's on.

9        Oh, yes.

10  Q.   Thank you.

11       Would it surprise you to learn that between

12  November 2nd of 2017 and November 15th, you sent approximately

13  13 letters to creditors and credit reporting agencies other

14  than Wells Fargo?

15  A.   I don't remember dates when letters were sent.

16  Q.   In this time frame, early to mid November of 2017, you

17  were still dealing with many negative accounts, weren't you?

18  A.   I'm not sure.

19  Q.   Were you still -- at this time frame, you recall that you

20  were still dealing with Office Depot, don't you?

21  A.   I'm not sure.  I believe they took three letters, but I

22  don't know.

23  Q.   I'm going to have you look at Exhibit 544.  That's a

24  November 3rd letter to Office Depot, drafted by you, correct?

25  A.   Yes.

1              MR. PETERSON:  I'll offer Exhibit 544.

2              MR. SOLA:  No objection.

3              THE COURT:  Received.

4              MR. PETERSON:  Publish to the jury.

5    BY MR. PETERSON:  (continuing)

6    Q.  And you had been dealing with Office Depot since your

7    original letter in January of 2019.  We looked at that

8    earlier, correct?

9              I'm sorry.  January of 2017.

10   A.  Oh, yeah.

11             Yes, but I think this was one of the Citibank ones.

12   There was one where it went to the wrong address, because they

13   were putting the wrong address on the credit report.

14   Q.  And that -- if you look at what is the third paragraph

15   down that starts in bold, "I notified your collection

16   agency" -- do you see that?

17   A.  Yes, I see it.

18   Q.  So really, this says -- on the top in the "re" line it

19   says "second notice," but really you had been making efforts

20   with this one through the collection agency as well, correct?

21   A.  I don't remember the timeline for this one.

22   Q.  You wrote in here that you had been dealing with the

23   collection agency.  You don't have any reason, as you sit here

24   today, to think that that was untrue, do you?

25   A.  No.

Sponer - X

1   Q.  And you were still dealing with Home Depot at this time
2   frame, too, weren't you?
3   A.  Again, I never memorized the dates.
4   Q.  And that's reasonable.  You were dealing with a lot of
5   creditors.
6           If you could look at Exhibit 546 -- and this is a
7   letter from you to Home Depot, dated November 3rd.  Do you see
8   that?
9   A.  Yes.
10  Q.  And it took several attempts to deal with Home Depot,
11  didn't it?
12  A.  I don't want to misstate, but I think that's one of the
13  Citibank ones.  I'm not sure.
14  Q.  And we looked earlier.  You had originally sent a letter
15  directly to Home Depot in January of 2017, correct?
16  A.  I'm not sure, but that's my hazy memory of what went on
17  with that one.
18  Q.  And your understanding, looking at this letter that's been
19  marked 546 --
20          MR. PETERSON:  I'll offer 546.
21          MR. SOLA:  No objection.
22          THE COURT:  Received.
23          MR. PETERSON:  And publish, please.
24  BY MR. PETERSON:  (continuing)
25  Q.  And if you look at this letter, your recollection is that

Sponer - X

 1   Home Depot was still showing on your credit report at this

 2   time frame.  And did you also testify it's been in collection

 3   at this time as well?

 4   A.   I'm not sure.

 5   Q.   I'll have you look at Exhibit 16.  And this was dated the

 6   same date that you sent Exhibit 15 to Wells Fargo.  You also

 7   sent this to a different part of Wells Fargo; is that correct?

 8   A.   That's -- that's what I remember, yes.

 9   Q.   And is your recollection that it included all the same

10   attachments that we've talked about before or most of them?

11   A.   No.  If you can turn the page --

12   Q.   Sure.

13   A.   Oh, yes.  These types of letters the FTC said to attach

14   like a passport or, you know, a driver's license.

15   Q.   And on that page that we're looking at below your picture,

16   there's a list of bullet points with the attachments.  And

17   it's accurate, isn't it, that those are the same attachments

18   we looked at before?

19   A.   Yes.

20           Oh, wait.  I'm sorry.  The very last attachment is

21   different between this letter and the dispute letter.

22   Q.   Let's turn to page 38 of this exhibit, 38.

23           Is this the new enclosure you referenced?

24   A.   Yes, for this type of letter.

25   Q.   And this is something you obtained through the FTC,

Sponer - X

1    correct?

2    A.   I believe so.

3    Q.   And then Exhibit 17 is a letter from you to Equifax

4    related to the Wells Fargo dispute, correct?

5    A.   Yes.

6    Q.   And if I could have you turn to page 4 of this

7    exhibit -- and, again, that has bullet points that list the

8    attachments you included.  Do you see that?

9    A.   Yes.

10   Q.   And this lists several different letters from Mr. Charne

11   to Equifax, correct?

12   A.   Yes.

13   Q.   So at the same time that -- well, let's look at those.

14           So turning to page 10 of this exhibit -- and that's a

15   letter dated October 18th from Mr. Charne to Equifax.  Do you

16   see that?

17   A.   Yes.

18   Q.   And turning to page 18 of this exhibit, that's also a

19   letter from Mr. Charne to Equifax?

20   A.   Yes.

21   Q.   And looking at page 20, that's also a letter from

22   Mr. Charne to Equifax?

23   A.   Yes.

24   Q.   And I believe we hadn't seen those exhibits before, but

25   those are all letters that Mr. Charne wrote.

Sponer - X

1          You didn't have to do anything to write those
2    letters, correct?
3    A.   No.  I had to coordinate with him.
4    Q.   Back in October of 2016, when you first -- when this issue
5    first arose?
6    A.   Yes.
7    Q.   Now, Exhibits 15, 16, and 17 were all letters that you
8    wrote -- well, I should back up.
9          Exhibits 15 and 16, those are both letters you wrote
10   to Wells Fargo or various departments at Wells Fargo, correct?
11   A.   I didn't memorize the exhibit numbers.
12   Q.   Okay.  I believe you testified yesterday that Wells Fargo
13   didn't respond to your November 3rd letters.  Did I understand
14   that correctly?
15   A.   I remember that they didn't respond to the request for
16   records --
17   Q.   Okay.  Thank you.
18   A.   -- on November 3rd.
19   Q.   Okay.  Thank you.
20          So Exhibit 18, this is a letter from Will Brady to
21   you, requesting a copy of your Social Security card that you
22   discussed yesterday.
23          I believe at some point yesterday you testified you
24   never knew who to contact at Wells Fargo.  Did I understand
25   that correctly?

Sponer - X

1  A.  I'm not sure that's correct, because there was a -- I

2  think there was a person's name on the January letter.  I'm

3  not sure when I was writing to who or at what address.

4  Q.  And if you look at Exhibit 18, right in the middle of the

5  page there's an address there with Mr. Brady's name and

6  address, correct?

7  A.  Yes.

8  Q.  And it also has his phone number and his direct extension,

9  correct?

10 A.  Yes.

11 Q.  And we talked about this last evening, just before we

12 finished, but that same information was in his October 26th

13 letter to you, correct?

14 A.  Yes.  Oh, I think so.

15 Q.  I also believe you testified yesterday -- and correct me

16 if I'm wrong -- you testified that in all of 2017, up until

17 this letter, you never received a request from Wells Fargo for

18 your Social Security card.  Am I remembering that correctly?

19 A.  There's a difference between, like, received by e-mail and

20 actually opened and read.

21 Q.  The October 26th, 2016 letter contained a request for a

22 copy of your Social Security card, didn't it?

23 A.  Yes.

24 Q.  And you testified in your deposition in this case that you

25 had received and read that letter, correct?

1   A.  Yes, but I'm not sure when I read it.  When I arrived in

2   New Zealand, I had a lot of attachments from my lawyer.  And

3   he sent the affidavits separately from the cover letter for

4   it.

5   Q.  So you read some information from your lawyer, but not all

6   information?  Is that what you're testifying to?

7   A.  I'm not sure.  I mean, there was a lot of attachments.

8   Q.  But you do recall you did eventually read the

9   October 26th, 2016 letter, correct?

10  A.  Yes.

11  Q.  And if I could have you look at Exhibit 20 -- and this is

12  another one you discussed with Mr. Sola yesterday.  And this

13  is an Equifax response, correct?

14  A.  Yes.

15  Q.  I just want you to look at page 4 of this.  Right in the

16  middle of the page is a section or a heading that says

17  "Collection Agency Information."  Do you see that?

18  A.  Yes.

19  Q.  Is it your understanding it shows that at this time --

20  November 30th, 2017 -- you had, according to Equifax, at least

21  one account that was in collection?

22  A.  Yes, for $93.

23  Q.  And you testified earlier that you never -- that Wells

24  Fargo never assigned -- to your knowledge, Wells Fargo never

25  assigned your account to collections; is that right?

Sponer - X

1  A.   I witnessed no actions from Wells Fargo, yeah.

2  Q.   Did you receive any collection phone calls from Wells

3  Fargo on this account?

4  A.   No.

5  Q.   Did anyone else you know or any family members you know

6  receive any collection calls about this account?

7  A.   I don't believe so.

8  Q.   You received collection calls from other creditors, didn't

9  you?

10 A.   Yes.

11 Q.   Were those distressing to receive?

12 A.   Yes.

13 Q.   I'll have you turn to Exhibit 21.  Do you recognize

14 Exhibit 21?

15 A.   Yes.

16 Q.   And this is a letter you received from Wells Fargo, an

17 e-mail or a letter you received from Wells Fargo?

18 A.   I believe an e-mail.

19         MR. PETERSON:  Offer Exhibit 21.

20         MR. SOLA:  No objection.

21         THE COURT:  Received.

22         MR. PETERSON:  Publish.

23 BY MR. PETERSON:  (continuing)

24 Q.   And in this Exhibit 21, this is a letter to you related to

25 your communications with Dealer Services, requesting that they

Sponer - X

1  want to follow up with you, correct?

2  A.  Yes.

3  Q.  And in the bottom of that first paragraph, it says, "Wells

4  Fargo Dealer Services prefers to discuss personal and

5  account-specific follow-up by telephone rather than mail."

6          Do you see that?

7  A.  Yes.

8  Q.  And then in the next paragraph down, there's a phone

9  number and the name of an individual; and in the individual's

10  signature block is also her extension number.  Do you see

11  that?

12  A.  No, I don't notice -- I'm not sure what you mean.

13  Q.  Sure.  If you look, there's a signature, a signature block

14  for a person named Yakeeta B.  Do you see that?

15  A.  Oh, okay.  I got confused.  I thought you meant she signed

16  it in the shape of her extension --

17  Q.  No.

18          Okay.  In her signature block, below there's an

19  extension, isn't there?

20  A.  Yes.

21  Q.  And did you respond to this letter with a phone call?

22  A.  No.

23  Q.  And if we could look at Exhibit 22, this is your letter to

24  Mr. Brady, responding to his request for a Social Security

25  card, correct?

1   A.   Yes.

2   Q.   Do you recall how long it took you to write this letter?

3   A.   No.

4          Oh, I believe this is the one I sent to my attorney

5   to review, Mr. Charne.  I'm not sure.

6   Q.   As you sit here today, you don't recall how long it took

7   you to write this letter?

8   A.   No.

9   Q.   And this is the first time you informed Wells Fargo that

10  you didn't have a copy of your Social Security card, isn't it?

11  A.   Yes.

12  Q.   And if we could look at Exhibit 24, this is also another

13  response to an Equifax dispute, correct?

14  A.   Yes.

15  Q.   And on page 4 -- this is dated December 6th.  On page 4,

16  this also shows a collection agency account, correct?

17  A.   Yeah.  I believe that's the same $93 account.

18  Q.   Are you aware that there are multiple credit reporting

19  agencies?

20  A.   Yes.

21  Q.   You're familiar with Equifax.  We've seen a lot of their

22  documents.  You're familiar with TransUnion?

23  A.   Yes.

24  Q.   And you're familiar with Experian?

25  A.   Yes.

Sponer - X

1   Q.   And did you regularly check those other credit reporting

2   agencies' credit reports?

3   A.   The website I used would show me one of them.  And then if

4   I paid $45 or $60, it would show me all three.

5   Q.   And did you do that sometimes?

6   A.   Yes.

7   Q.   Did they always show the same thing?

8   A.   No.

9   Q.   It's true, isn't it, that, for example, in this general

10  time frame that TransUnion didn't show your Wells Fargo

11  account?

12  A.   I don't remember.

13  Q.   I'll have you look at Exhibit 524.  And this is a credit

14  report with your name on it, correct?

15  A.   I'm having trouble finding it.

16  Q.   Right towards the top, below "Personal Information," it

17  says, "Names Reported."

18  A.   Oh, yes.

19  Q.   And right above that, the last four digits of your Social

20  Security number, correct?

21  A.   Yes.

22  Q.   And are those -- it says, "Addresses Reported."  Are those

23  addresses that were, at some point in time, associated with

24  you?

25  A.   I'm not sure how some of them are associated.

Sponer - X

1  Q.  Do you have any reason to believe that this isn't your

2  credit report?

3  A.  No.

4          MR. PETERSON:  Offer Exhibit 524.

5          MR. SOLA:  No objection.

6          THE COURT:  Received.

7          MR. PETERSON:  Publish, please.

8  BY MR. PETERSON:  (continuing)

9  Q.  And at the bottom of page 1 -- and this is -- this is

10  dated November 10th, 2017, correct?

11  A.  Yes.

12  Q.  And on the bottom of page 1 it says, "Adverse Accounts,"

13  correct?

14  A.  Yes.

15  Q.  And in that section, is there any -- and then continuing

16  on to page 2 --

17  A.  Oh, there's Citibank on Home Depot.  I'm sorry.

18  Q.  Okay.  Let's go back to page 1.

19          That's what you were referring to earlier, the CBNA,

20  the Citibank, Home Depot?

21  A.  Yes.

22  Q.  And that's still showing up as an adverse account here?

23  At least, it's in the heading that says "Adverse Accounts"?

24  A.  Oh, yes.  Yeah.

25  Q.  And then if you turn to page 2, the next thing is

Sponer - X

1  "Satisfactory Accounts."  Do you see that?

2  A.  Yes.

3  Q.  So based on the first two pages here, what's shown as

4  adverse accounts are -- there's no Wells Fargo account there,

5  correct?

6  A.  Yes.

7  Q.  So is it accurate that sometimes there can be differences

8  between what the various credit reporting agencies actually

9  report?

10  A.  I'm sorry.  Actually report, is that like a qualifier?

11  Q.  No.  What shows.

12  A.  What shows.  Yes.

13  Q.  Exhibit 25 -- I'm sorry, Exhibit 26.  I'm sorry, Exhibit

14  29 -- sorry.

15         THE CLERK:  529?

16         MR. PETERSON:  I'm sorry.  Exhibit 29.

17  BY MR. PETERSON:  (continuing)

18  Q.  And on page 4 of this, this shows a collection account,

19  correct, page 4?

20  A.  Yes.  There's Caine & Weiner for $93 again.

21  Q.  Is it fair to say, Mr. Sponer, that at all relevant times

22  you had multiple derogatory accounts that you were dealing

23  with?

24  A.  I'm not sure how many there were at different periods.

25  Q.  More than -- more than one?

Sponer - X

1   A.   If that one is Wells Fargo.

2   Q.   So more than one?

3   A.   Oh, sorry.  Yeah, I'm not sure.

4   Q.   We've looked at a lot of documents that show you were

5   dealing with multiple accounts, correct?

6   A.   Yes.

7   Q.   And you actually -- well, you talked yesterday, the Wells

8   Fargo account was deleted towards the end of January in 2018,

9   correct?

10  A.   Yes.

11  Q.   And you continued to have to dispute other accounts after

12  that, didn't you?

13  A.   I'm not sure.  I think that was near the end of disputing

14  accounts.

15  Q.   I'll have you look at Exhibit 555.  And this is a letter

16  dated January 31st, 2018, correct?

17  A.   Yes.

18  Q.   And this is a dispute letter to TransUnion related to

19  Global Payments Check Service.  Do you see that?

20  A.   Yes.

21  Q.   And did you author this letter?

22  A.   It looks like something I would do.

23          MR. PETERSON:  I'll offer Exhibit 555.

24          MR. SOLA:  No objection.

25          THE COURT:  Received.

Sponer - X

1          MR. PETERSON:  Please publish.

2    BY MR. PETERSON:  (continuing)

3    Q.  So this is dated January 31st, 2018, correct?

4    A.  Yes.

5    Q.  And then if I could have you look at Exhibit 31, on

6    Exhibit 31, in the second paragraph it references that Wells

7    Fargo submitted a request on January 25th.  Do you see that, a

8    request to Equifax, Experian, and TransUnion?

9    A.  Yes.

10   Q.  And so it's accurate, isn't it, that even after Wells

11   Fargo deleted your account, you were still sending disputes to

12   other creditors?

13   A.  I really don't remember many accounts in the beginning of

14   2018.

15   Q.  You testified that during the time frame we're talking

16   about here, you had a lot of other fairly major things going

17   on in your life; is that correct?

18   A.  Yes.

19   Q.  Your wife and her kidney donation, correct?

20   A.  Yes.

21   Q.  Your brother-in-law's illness, correct?

22   A.  I didn't understand.

23   Q.  I believe you testified the reason your wife was going to

24   donate a kidney is because her brother was dying.  Is that

25   correct?

Sponer - X

1    A.   Yes.

2    Q.   And your wife did ultimately donate a kidney, but not to

3    her brother?  Am I to understand that correctly?

4    A.   Yes.

5    Q.   And there was a lot of effort involved in caring for

6    Farah, who we talked about yesterday, correct?

7    A.   Yes.

8    Q.   So it's fair to say that during this time frame you had a

9    lot of major things going on, correct?

10   A.   Yes, and we didn't need extra things.

11   Q.   Did those other life events cause you stress and concern?

12   A.   Yes, but it was out of love and who we are and choosing to

13   be married and give a kidney.

14   Q.   You testified yesterday about concern that your access to

15   money through Wells Fargo would be cut off; is that correct?

16   A.   Yes.

17   Q.   And did that happen?

18   A.   No.

19   Q.   Did you ever call your credit card company to explain what

20   was -- or the credit card part of Wells Fargo, to explain what

21   was going on?

22   A.   I'm not sure.

23   Q.   You testified yesterday about trouble sleeping; is that

24   correct?

25   A.   Yes.

Sponer - ReD

1   Q.   Is that something you've dealt with at other times in your
2   life, trouble sleeping?
3   A.   Yes.
4   Q.   Mr. Sponer, I don't have any other questions right now.
5   Thank you.
6            THE COURT:  Redirect.
7            MR. SOLA:  Thank you, Your Honor.
8
9                    REDIRECT EXAMINATION
10  BY MR. SOLA:
11  Q.   Mr. Sponer, did you not seek credit because of the Wells
12  Fargo account being on your credit report?
13  A.   Yes.
14  Q.   Could you tell us about that or those decisions not to --
15            MR. PETERSON:  Your Honor, I have a brief matter for
16  the Court.
17            THE COURT:  Step over here, please.
18            (The Court and counsel confer off the record.)
19  BY MR. SOLA:  (continuing)
20  Q.   All right.  I think you were going to explain to us
21  occasions when you decided not to seek credit because of the
22  Wells Fargo account being on your credit report.
23  A.   Oh, yes.  I was going to -- we planned to return to
24  traveling, and I planned to get a mileage Visa card or some
25  kind of mileage card.

1          MR. PETERSON:  Objection, relevance.

2          THE COURT:  Overruled.

3   BY MR. SOLA:  (continuing)

4   Q.   All right.  And why did you not seek that?

5   A.   Because we had a $29,000 fraudulent account on our credit

6   report.

7   Q.   All right.  And then was there another item you wanted to

8   finance that you did not seek?

9   A.   Yes.  We wanted to build an auxiliary dwelling unit on our

10  house.

11  Q.   Within your house?

12  A.   Yes.

13  Q.   And what were your plans for that?

14  A.   We wanted to be able to rent out the basement to earn

15  extra money.

16  Q.   All right.  And could you pay for that in cash if you were

17  going to do it?

18  A.   No.

19  Q.   And so that's why you needed financing?

20  A.   Yes.

21  Q.   And why didn't you seek the financing?

22  A.   I -- I believed it was completely impossible to get a home

23  mortgage if you have a $29,000 debt that you didn't pay.

24  Q.   Now, we've looked at other creditors that you had to deal

25  with because of being a victim of identity theft.  Were there

Sponer - ReD

1   any creditors you had to dispute the accounts as many times as

2   Wells Fargo?

3   A.   No.

4   Q.   Were there any creditors that were as difficult to get the

5   account off as Wells Fargo?

6   A.   No.

7   Q.   Were there any that you disputed 10 times but could not

8   get fixed?

9   A.   No.

10  Q.   Were there any that you had accounts with, companies that

11  were your creditors?

12  A.   I want to be accurate, and I can't think of a

13  single -- yeah, no.

14  Q.   You can't think of any; is that fair?

15  A.   Yes.

16  Q.   Now, can we look at Exhibit --

17           MR. SOLA:  We have a rebuttal exhibit, Your Honor.

18           (There is a brief pause in the proceedings.)

19  BY MR. SOLA:   (continuing)

20  Q.   Let me ask, while we're waiting for this one -- oh, there

21  it is.

22           All right.  So I believe you looked at this in

23  cross-examination, this letter to the AT&T fraud department.

24  A.   Yes.

25  Q.   It's a letter that you wrote -- well, tell us what this

1   is.

2   A.   This is the dispute letter that I kind of evolved and

3   learned to send to creditors.

4   Q.   I'm sorry.  I was speaking.  That was impolite of me.

5   A.   This was a dispute letter to AT&T.

6   Q.   And what was the date?

7   A.   August 18th, 2017.

8   Q.   Okay.  Then let's go to the last page.  And what is this

9   letter?

10  A.   This is a letter from AT&T to me, dated October 15th.

11  Q.   And what did they say in response to your dispute?

12  A.   "Dear Matthew Sponer, You recently contacted us regarding

13  a bill in your name dated October 4th, 2016, for a

14  former" -- do you want me to read the whole thing? -- "for a

15  former account," with a number, "owed to AT&T in the amount of

16  $3,000.  Based on our investigation, we have concluded that

17  you are not responsible for this bill.  We have sent

18  authorization to our outside collection agency to remove all

19  negative references in your credit record regarding this debt.

20  Please allow 60 to 90 days for your credit record to reflect

21  this removal.  Please accept our apologies for any

22  inconvenience this may have caused you."

23  Q.   Now, among those other creditors you were dealing with,

24  were there ones that also responded quickly and told you they

25  had concluded it was identity theft?

Sponer - ReD

1    A.    Yes.

2    Q.    I know you mentioned Macy's yesterday.  Do you remember

3    any others just off the top of your head?  I know you had a

4    lot of letters and it was a long time ago.

5    A.    I think some of the other wireless carriers were really

6    good.

7    Q.    What about Kohl's?

8    A.    Yes.

9    Q.    Now, you've seen records from other creditors.  In this

10   case are you seeking damages from Wells Fargo related to the

11   actions or your actions towards any other creditors besides

12   Wells Fargo?

13   A.    No.

14   Q.    And we looked at -- let's look at Exhibit 20.

15          All right.  This is -- well, let us know what this

16   is, please.

17   A.    This is my Equifax credit report from November 30th, 2017.

18   Q.    All right.  And do you see in the middle, there's a

19   collection agency?

20   A.    Yes, the Caine & Weiner $93 account.

21   Q.    I believe you misspoke and said 92 earlier.  Do you recall

22   that?

23   A.    Yes, I did.

24   Q.    All right.  And that account, does it indicate the date

25   reported?

Sponer - ReD

1  A.  April 2017.  I think that's how to read it.

2  Q.  All right.  So that wasn't one of the original, so to

3  speak, fraud accounts?

4  A.  No.

5  Q.  All right.  And then other than this Caine & Weiner

6  collection for $93, would you look through this report and see

7  if there are other fraud accounts?

8         All right.  Are those all your accounts?

9  A.  Yes.

10        MR. SOLA:  Next page.  Stop.  Let's see that one.

11  BY MR. SOLA:  (continuing)

12  Q.  And which is this account?

13  A.  That's the fraudulent Wells Fargo account.

14  Q.  All right.  And then the next page?

15        All right.  I think we're at the end of the report

16  there.

17        You looked at Exhibit 21.  I believe it was an e-mail

18  from Wells Fargo in December 2017, indicating they wanted to

19  communicate by telephone; is that right?

20  A.  Yes.

21  Q.  And you indicated you did not call them; is that right?

22  A.  Yes.

23  Q.  Could you tell us why?

24  A.  It's never been productive for me to, like, solve

25  complicated problems with a large company over the phone.

1    They usually -- yeah, and then sometimes like the person just

2    can't do anything.

3    Q.  And what about the fact that this they were claiming you

4    owed them this debt?  Was that a factor in your not calling?

5              MR. PETERSON:  Objection.

6              THE COURT:  Sustained.

7    BY MR. SOLA:  (continuing)

8    Q.  Were you already communicating with them by mail at the

9    same time and getting responses?

10   A.  Yes.

11             MR. SOLA:  No more questions.

12             THE COURT:  You have limited redirect?

13             MR. PETERSON:  Very briefly, Your Honor.

14             THE COURT:  Sorry.  Limited recross.

15             MR. PETERSON:  Thank you.

16

17                    RECROSS-EXAMINATION

18   BY MR. PETERSON:

19   Q.  Mr. Sponer, you testified, I believe yesterday, that your

20   credit is back to normal now, today?

21   A.  I believe so.

22   Q.  And I think you testified in your deposition that it's

23   back to perfect, correct?

24   A.  I believe so.

25   Q.  Have you applied for the mileage card you were referencing

Sponer - ReD

1  a few minutes ago?

2  A.  No.

3  Q.  Have you applied for a loan to do an ADU?

4  A.  No.

5            MR. PETERSON:  No further questions.

6            THE COURT:  Anything else from plaintiff?

7            MR. SOLA:  Yes.

8

9                  REDIRECT EXAMINATION

10 BY MR. SOLA:

11 Q.  Could you explain why you haven't applied for the mileage

12 card?

13 A.  We're no longer traveling, and we don't want the ADU

14 because we're no longer traveling.  It's a thing for when we

15 start moving again.

16           MR. SOLA:  No more questions.

17           THE COURT:  You may step down.

18           Call your next witness.

19           (The Court and court reporter confer off the record.)

20           THE COURT:  Members of the jury, we'll take our mid

21 morning recess at this time.  We'll be in recess for 15

22 minutes.  Because of the way our time is going, I want it to

23 be 15 minutes.  So be aware of the clock.  It's going to be 15

24 minutes.  I want to be sitting here on the bench in 15, okay?

25           Thank you.  We're in recess.

Rodighiero - D

1           (A recess is then taken.)

2           (The Court, counsel, the parties, and the jury

3    reconvene.)

4           THE COURT:  Be seated.

5           Call your next witness.

6           MR. SAND:  Plaintiffs call Ana Rodighiero.

7           THE CLERK:  Raise your hand.

8

9                    ANA RODIGHIERO

10   called as a witness in behalf of the Plaintiff, having been

11   first duly sworn, is examined and testifies as follows:

12

13          THE CLERK:  Please state your name and spell it.

14          THE WITNESS:  My name is Ana Rodighiero.  It's A-n-a

15   R-o-d-i-g-h-i-e-r-o.

16

17                  DIRECT EXAMINATION

18   BY MR. SAND:

19   Q.  Hi, Ms. Rodighiero.

20          How do you know Mr. Sponer?

21   A.  He's my husband of 17 years.

22   Q.  When did you guys meet?

23   A.  In college.  We were in a chemistry lab together.  That

24   was the beginning.

25   Q.  Where did you guys go to college?

Rodighiero - D

1  A.  I went to Claremont-McKenna, and Matt went to Pitzer.

2  It's in Los Angeles.

3  Q.  Were you guys science majors?

4  A.  Yeah.

5  Q.  Can you give us some background about Matt's work history?

6  A.  He's worked as a computer programmer since he was in high

7  school.  He started working for his mom.  And after college he

8  worked for a little health insurance company or, like,

9  software for health insurance.  And after we were married, he

10  couldn't find a job because it was right after the dot-com

11  crash thing, so we started a company together, writing games

12  for cell phones.

13        And then out of that came an opportunity for him at

14  another startup company in Irvine, and he took that job.  We

15  moved to Irvine.  Then we moved to San Francisco.  And when

16  this startup was sold, he had some shares in it, and suddenly

17  we had enough money to -- to take off for a couple years and

18  be with our kids.

19  Q.  And you talk about your kids.  You have two children?

20  A.  Yeah.

21  Q.  What are their names?

22  A.  Farah and Zelda.

23  Q.  You talked about this trip you decided to go on.

24        Did you and Matt feel that you had a limited period

25  of time to take this trip?

Rodighiero - D

1   A.   Yeah.  We only had enough money to take off for a few

2   years, and we wanted to do it then instead of saving it for

3   later because the kids were young, and we felt this was a

4   great opportunity to spend time with them, while we were all a

5   family.

6           We were worried about my older daughter potentially

7   developing some serious health problems, and we wanted to go

8   while we were all healthy enough and didn't have to be near a

9   hospital or have any other issues.

10  Q.   When did you leave on the sailing trip?

11  A.   We left, I think, in 2013 for the first time.  And we

12  spent a year getting to know ourselves as sailors in the

13  Caribbean, learning how to take longer trips and see how we

14  did before -- our big plan was to cross the Pacific.

15  Q.   You said you started in 2013.

16  A.   Uh-huh.

17  Q.   Did you take a break in between at some point?

18  A.   Yes.  In 2014 -- yeah, I think it was the summer of 2014

19  we came back home, and the kids went to their doctors'

20  appointments for their checkups and things like that.

21          Our older daughter, it was found that her scoliosis

22  had progressed to the point that she needed spinal fusion

23  surgery.  So we knew we were not going to be able to go back

24  to sailing.  They said the recovery would be six to eight

25  months before you could be sure you were out of the woods with

Rodighiero - D

1   it.

2         So we found -- we found a place up here in Portland.

3   We knew that the hospital here was really good.  We could stay

4   with Kaiser, our health insurance of several years.  So we

5   moved up here to have a nice place to stay while Farah was

6   recovering from that surgery.

7   Q.  So when did you resume the trip, the sailing trip, after

8   Farah recovered?

9   A.  In the fall of 2015.

10   A.  Did you notify Wells Fargo before you left for your trip

11   in 2015?

12   A.  Yes.

13         MR. FRANSEN:  Objection, lacks foundation.

14         THE COURT:  Overruled.

15   BY MR. SAND:  (continuing)

16   Q.  You can answer.

17   A.  Yes, we told them.  Because in the past when we traveled,

18   sometimes the credit card, they would think -- because we were

19   making purchases in another city, suddenly they would cut it

20   off and call us and say that there was fraud on our account.

21   So we told them ahead of time so that that wouldn't happen,

22   that we were going to be gone for a whole year.

23   Q.  So how did you intend to pay for things while on this

24   trip?

25   A.  The reason we did that was because all of our expenses

1  were going to be paid on the credit card.  It's easier than

2  getting cash in each different country you go to.  You

3  certainly don't want to carry a bunch of cash on the boat.  So

4  everything was going to be done through credit card.

5  Q.  And who was your credit card with?

6  A.  Wells Fargo.

7  Q.  When did you learn that your husband was the victim of

8  identity theft?

9  A.  I think it was in October of 2016.  He got a voicemail or

10  an e-mail from his brother, saying that someone had contacted

11  him to tell him that he was the victim of identity theft.

12  Q.  What did -- where were you guys when you learned that he

13  was the victim of identity theft?

14  A.  We were in Fiji.  We were on a small island in Fiji.

15  Q.  Did you change your plans as a result of learning about

16  the identity theft?

17  A.  Yes.  We decided that we needed to get to a larger city in

18  Fiji to get the boat ready so that we could move it to New

19  Zealand as quickly as possible, so that we would have good

20  Internet and the boat would be safe for the hurricane season.

21  We wouldn't have to worry, if we suddenly lost our credit card

22  or didn't have access to funds, that we wouldn't be able to

23  get out of Fiji into New Zealand in time.

24  Q.  Do you recall roughly how long it took to get to New

25  Zealand?

Rodighiero - D

1    A.   The passage itself was only six days, but waiting for the

2    weather window and getting the engine fixed, I think it took

3    about a month.  We got to New Zealand in the middle of

4    November.

5    Q.   What did Matt do while you were in New Zealand?

6    A.   Once he was in New Zealand, he was able to get on the

7    Internet and follow the instructions that his lawyer had given

8    him and start to tackle the identity theft.

9    Q.   How much time per day was Matt spending at this office

10   working on the identity theft?

11   A.   I would say it was three to five hours every morning, like

12   five days a week, a normal work week kind of thing.

13   Q.   And did taking that time away to go to the office to work

14   on this, how did that affect Matt?

15   A.   He was frustrated that he had to spend so much time on it

16   when we could have been traveling and enjoying ourselves in

17   New Zealand.  He apologized to us for not --

18            MR. FRANSEN:  Objection, hearsay.

19            THE COURT:  Sustained.

20            THE WITNESS:  He --

21            THE COURT:  No.  When I say "sustained," that means

22   he'll ask you --

23            THE WITNESS:  Oh, a different question.  I was going

24   to say it a different way.

25

Rodighiero - D

1   BY MR. SAND:  (continuing)

2   Q.   When Matt was not at the office and the family was in New

3   Zealand, were you able to do some fun things in New Zealand?

4   A.   Yeah.  We took two short road trips in the north island.

5   We had bought a little camper van kind of thing -- not really

6   a camper van, just a van we could get around and explore New

7   Zealand.

8           But I was doing all the planning for these trips.

9   Matt was really not into it.  He was nervous about using the

10  credit card, about being away from our home base.

11          MR. FRANSEN:  Objection, lacks foundation,

12  hearsay.

13          THE COURT:  Overruled.

14          Go ahead.

15          THE WITNESS:  He was worried about the -- our car

16  breaking down and not being able to pay for it, so he wanted

17  to stick close to the boat as much as possible.

18  BY MR. SAND:  (continuing)

19  Q.   Now, you mentioned you did a lot of the planning.  Because

20  Matt was at the office, did you have to subsume or carry other

21  duties that Matt would typically do while he was at the

22  office?

23          MR. FRANSEN:  Objection, relevance.

24          THE COURT:  Sustained.

25

Rodighiero - D

1    BY MR. SAND:  (continuing)

2    Q.   In this 2016 time period, do you know if Wells Fargo took

3    the account off of Matt's credit report?

4    A.   No, they didn't.

5    Q.   Prior to the identity theft, did Matt have good credit?

6    A.   Yes.  He had excellent credit.

7    Q.   Do you know if it was important for him to have good

8    credit?

9    A.   I know that he was proud of having good credit, even as a

10   college student.  He had built it early.  I don't know.  So he

11   had talked about it before.

12   Q.   How long was the family in New Zealand?

13   A.   We were there until the middle of February.

14   Q.   Why did you decide to return to the U.S.?

15   A.   There were two reasons.  I was going to go back home to

16   donate a kidney to my brother.  I thought that I could just do

17   that in a quick trip, more or less.  I could stay with my

18   family, and Matt could stay with the kids on the boat instead

19   of flying out and living in a hotel for a month.

20           So I had planned to return, and I was already

21   starting to do the testing for that in New Zealand.  But once

22   Matt decided that this Wells Fargo thing was a bigger deal and

23   it wasn't fun to go traveling when we were afraid every moment

24   that something worse was going to happen, he decided that he

25   would come home so that he could deal with it, and then we

Rodighiero - D

1   would go back together and continue our trip.

2   Q.   While you were in New Zealand, had Wells Fargo deleted the

3   fraudulent account --

4   A.   No.

5   Q.   I'm sorry.  Let me finish the question.  That was the

6   first part of the question.

7            While you were in New Zealand, had Wells Fargo

8   deleted the fraudulent account from Matt's credit report,

9   would the family have continued their vacation?

10            MR. FRANSEN:  Objection, speculation.

11            THE COURT:  Overruled.

12            You can answer that question.

13            THE WITNESS:  Yes.  That was the plan.  He thought he

14   would do it really quickly, and we would just move on.

15   BY MR. SAND:   (continuing)

16   Q.   And where would you have gone?

17   A.   We were going to spend some time in New Zealand, sailing

18   around the outside of it and maybe a road trip in the southern

19   island.  Then afterwards, our super plan was to sail the boat

20   up to Japan, Alaska, and then back down and leave it in the

21   Pacific Northwest, so once we went back to work, we'd still be

22   able to take short trips on vacations.

23   Q.   And, roughly, when did you return to the U.S.?

24   A.   We returned in February of 2017.

25   Q.   When you returned to the U.S., was there any news from

Rodighiero - D

1   Wells Fargo?

2   A.   I don't read the letters.  Matt said that it was -- the

3   account was still --

4           MR. FRANSEN:  Objection.

5           THE WITNESS:  -- on.

6           THE COURT:  Sustained.

7   BY MR. SAND:  (continuing)

8   Q.   Can you help the jury understand your observations about

9   how Matt was doing at this point in time in 2017 after

10  returning to the U.S.?

11  A.   When we first returned, what I mostly noticed from him was

12  just kind of withdrawal from the whole activity.  We had told

13  people about the identity theft.  And so when we returned, we

14  were getting a lot of advice about it; and Matt just would not

15  be in those conversations.  He just couldn't handle it,

16  because this was all advice that he had already taken and had

17  gotten him nowhere.

18          He was feeling like he must have done something

19  wrong, must not have been doing it correctly.  He just felt

20  vulnerable and like at any moment Wells Fargo could call in

21  this loan and make us pay this debt.  They could cut off our

22  credit card.  And he just didn't know what to do about it.

23  Q.   When your family returned to the U.S., did the family

24  change any plan because of the Wells Fargo account being on

25  Matt's credit report?

Rodighiero - D

1   A.   Yes.   We had been talking about -- or Matt had been

2   talking about starting a company.   He wanted to --

3              MR. FRANSEN:   Objection, hearsay.

4              THE COURT:   Overruled.

5              You can answer the question.

6              THE WITNESS:   He wanted to write a program that would

7   make it easier for sailors and other people with limited

8   Internet to access the Internet and be able to download web

9   pages faster and things like that.

10             When we got back to the U.S., and he thought -- his

11  plan was to clear up the Wells Fargo thing and then start

12  working on that business.   But he kind of just let it drop.

13             Also, we were thinking that since we had lost that

14  one year with Farah's surgery, that we were kind of going to

15  run out of money earlier, we're not going to be able to do our

16  whole plan.   So we were thinking about spending a little time

17  making our basement into a separate unit so we could rent it

18  while we were gone -- or, actually, we were going to live in

19  it and rent the upper part to earn some income while we were

20  sailing, so that we could finish our trip on the money that we

21  had.

22  BY MR. SAND:   (continuing)

23  Q.   And just to be clear, you did not end up applying -- the

24  family did not end up applying for that loan for this

25  auxiliary unit?

Rodighiero - D

1  A.  No.  Matt said he had to fix the credit first.

2            MR. FRANSEN:  Objection.

3            THE COURT:  Wait a second.

4            That objection is sustained.

5  BY MR. SAND:  (continuing)

6  Q.  Do you recall if Matt applied for the loan?

7  A.  No.

8  Q.  Let's move into the summer and early fall of 2017.

9            Would this have been the first full school year after

10  returning from the trip that you were enrolling the kids in

11  school here in Portland?

12  A.  Yes, uh-huh.

13  Q.  Farah has some special needs.  Does she go to a school for

14  children with special needs?

15            MR. FRANSEN:  Objection, relevance.

16            THE COURT:  Overruled.

17            THE WITNESS:  She goes to regular high school,

18  Cleveland High School, but she has a special day class and has

19  an IEP, an individual plan describing her goals for the year.

20  And that's something we negotiate with the teachers for every

21  year.

22  BY MR. SAND:  (continuing)

23  Q.  Is the process of enrolling Farah more cumbersome than

24  enrolling Zelda, your other daughter?

25  A.  Yes.  We have to -- Farah can't talk.  She doesn't

Rodighiero - D

1    communicate in any way.  So we really need to meet the

2    teachers and show them how to keep her safe.  She has balance

3    issues, coordination issues.  So -- and then we also have to

4    spend a lot of time figuring out -- helping the teachers

5    understand how to develop expectations for her, what she can

6    and can't do.

7              If you just throw her into school, it will just look

8    like she can't do anything, because she'll let other people do

9    everything for her, you know.  But you have to educate people

10   as to what she should be expected to do, so that she can grow

11   and learn new things.

12   Q.   And during this enrollment process, was Matt involved?

13   A.   Normally he is, but this time he wasn't.  I felt like I

14   was going through it alone.  I had to do the research --

15             MR. FRANSEN:  Objection, relevance.

16             THE COURT:  Sustained.

17   BY MR. SAND:   (continuing)

18   Q.   Let's move into November of 2017.  Is Matt still disputing

19   the fraudulent Wells Fargo account?

20   A.   Yes.

21   Q.   At this point in time are you observing -- based on your

22   observations, was he taking a lot of time disputing the Wells

23   Fargo account?

24   A.   Yes.  My observation is that he was on his computer for a

25   few hours every day.  I don't know everything that he was

Rodighiero - D

1   doing there, but what he would talk about are letters that he

2   was sending, new evidence that he had found for, like, our

3   whereabouts at the time of the theft, and I don't remember

4   what else.  But, yeah, he was researching and figuring things

5   out.

6   Q.  How did losing all of this time affect Matt, based on your

7   observations of him?

8   A.  When he was able to find new evidence or new things to

9   write in the letters, he was excited about it.  But

10  when -- between times, he was just withdrawn and -- I mean,

11  there were a lot of days he just spent in his room not doing

12  anything that I could tell.

13           He was not sleeping well at night.  He was sleeping

14  during the day.  Sometimes he would just close the door to the

15  room.  And when I'd go in later, he's just sitting in there

16  quietly, in a corner.  He was just, like, really not getting

17  on with his life and his ambitions and feeling -- he seemed to

18  be feeling like he couldn't do anything.

19  Q.  And how long did you say you and Matt have been married?

20  A.  Seventeen years.

21  Q.  Was it unusual to see him like that?

22  A.  Yes.  He's always been driven.  He's always been the

23  energy of our family.  And he's the one with the big hobbies

24  and the big dreams.

25  Q.  Do you recall Wells Fargo's responses to Matt's disputes?

Rodighiero - D

1    A.   I know that they said that the debt was ours.  I know that
2    they said that we owed them $30,000.
3    Q.   Do you recall any particular letters from Wells Fargo in
4    particular?
5    A.   I know one that was -- in that time of the November,
6    December, that said that they would send his report to the
7    fraud department.  And I remember him just being, like,
8    totally angry about that, totally upset, because he had
9    already sent it to the fraud department.  I mean, he'd been
10   doing that for a year.  And this was their concession to him
11   was, like, "Oh, here, send this to the fraud department and
12   we'll take a look at it."
13   Q.   Did you observe any other symptoms you can remember about
14   Matt's stress during this time period?
15   A.   Over this time period he was -- he was having headaches.
16   He was just -- sleeplessness and sleeping during the day,
17   having headaches at night, and just generally not wanting to
18   go out or do anything or talk with anybody.
19   Q.   Thank you, Ms. Rodighiero.
20           MR. SAND:  We'd pass the witness.
21           THE COURT:  Cross-exam.
22           MR. FRANSEN:  Thank you.
23
24
25

Rodighiero - X

CROSS-EXAMINATION

1

2   BY MR. FRANSEN:

3   Q.   Ms. Rodighiero, you testified a moment ago that the family

4   made a decision in 2016 to come back to the United States?

5   A.   Yeah.  We decided, I think, in January, but yeah.

6   Q.   And I'm sorry.  I didn't catch your answer.  You said

7   January 2016?

8   A.   No, January 2017 I think is when we --

9   Q.   I apologize.  My mistake.

10           At that point in January 2016 -- I'm sorry, at that

11   point in January 2017, when you made the decision, do you know

12   if Mr. Sponer had seen any correspondence from Wells Fargo?

13   A.   I don't know if he had had a letter from them or if it was

14   just the credit report still showing the debt on it.

15   Q.   Okay.  And what about other negative accounts on his

16   credit report?  Were you aware of those accounts?

17   A.   Yes.

18   Q.   And is it your understanding he was also aware of those

19   accounts at the same time?

20   A.   Yeah.

21   Q.   So it wasn't just the Wells Fargo account?  It was --

22   A.   No.  In January he was sending letters to a lot of people.

23   Q.   Yeah.  But the reason to come home had to do with the

24   larger problem of identity theft?

25   A.   The reason to come home had to do with our worry about the

Rodighiero - X

1    credit card.

2    Q.   Okay.  Did you see any of the credit reports that your

3    husband obtained?

4    A.   Not that the details -- or that I remember them.

5    Q.   Do you remember the dates of any credit reports?

6    A.   Not specifically, no.

7    Q.   Do you have an idea of the first time you might have seen

8    a credit report related to the -- following the identity

9    theft?

10   A.   I'm sure he showed me the one in January.  I just don't

11   remember any of the details of it.

12   Q.   All right.  You were asked a moment ago or you testified a

13   moment ago that if Wells Fargo would have deleted the auto

14   account -- I believe you testified you wouldn't have come back

15   home?

16   A.   The whole -- well, the whole family wouldn't have come

17   back home.  And, at the very least, we all would have gone

18   back sailing again as soon as possible.

19   Q.   So is that the case, if the Wells Fargo account was

20   deleted, but all the other multiple derogatory accounts were

21   still on his credit, you're saying you wouldn't have come back

22   home?

23   A.   The one we worried about was Wells Fargo because it was

24   the biggest one.  We thought that that was the one that would

25   cause Wells Fargo to stop our credit card.

1   Q.   And Wells Fargo never stopped your credit card?

2   A.   No.

3   Q.   And they never threatened to stop your credit card, that

4   you're aware of?

5   A.   No, not that I'm aware of.

6   Q.   Did you ever have any communications with Wells Fargo

7   following July 2016?

8   A.   Me?

9   Q.   Right, you.

10  A.   I don't think so.

11  Q.   I believe you said you did see some letters that Wells

12  Fargo sent.  And the one I believe you related to explained

13  that Wells Fargo was referring something to the fraud

14  department.

15  A.   In the -- at the end of 2017.

16  Q.   And that was my question.  Do you recall when you saw

17  that?

18  A.   I thought he said 2016.  Well, I recall Matt talking about

19  that letter.  I don't know if I saw any of the letters.

20  Q.   You don't know if you saw any of the letters?

21  A.   Right.

22  Q.   What about the letters that your husband sent to Wells

23  Fargo?  Did you see any of those?

24  A.   No.  He did later send me his template for reporting

25  fraudulent accounts, which I don't think that was the same as

1    his Wells Fargo letters, so no, I don't think so.

2    Q.   All right.  Are you aware of how many other accounts the

3    identity thief opened in your husband's name?

4    A.   Several.  I don't know how many.

5    Q.   Okay.  Did you know it was more than 10?

6    A.   No, I didn't know that.

7    Q.   Now, I asked you about the communications with Wells

8    Fargo, which you said, if I'm correct, you did not -- you

9    don't recall reading any of Wells Fargo's letters, and you

10   don't recall seeing any of your husband's letters to Wells

11   Fargo.  Did I get that right?

12   A.   That's right.

13   Q.   How about for the other accounts that were out there?

14   Would your answer be the same?  You didn't see the letters

15   that came in?  You didn't see the letters that went out?

16   A.   I didn't see the letters that came in, if there were any.

17   But I did sort of see generally what went out, because I was

18   the victim of identity theft at around the same time and I had

19   fraudulent accounts on my credit, and Matt told me, "Oh, I

20   have a template for this.  This template will work for most of

21   them.  Just use this."  So I adapted his template for my

22   fraudulent accounts.

23   Q.   Is it fair to say that your testimony about the

24   communications with Wells Fargo, that's not based on what you

25   personally observed, but it's what you were told?

301

Rodighiero - X

1    A.   Yeah.   I don't think I saw the letters at the time.   It's

2    hard for me to know now, because now I have seen them.

3    Q.   And I wanted to confirm just a couple things.   You

4    explained at one point that you witnessed your husband on the

5    computer for a few hours every day.   That was in -- is this

6    the November, December period we're talking about?

7    A.   Yeah.   It was around -- I think it was like October,

8    November.   What I remember is like -- I think our IEP meeting

9    was in the end of October, and it was just right around that

10   same time that he was working on that.

11   Q.   What did you say?   What meeting?

12   A.   The IEP meeting for our daughter Farah.

13   Q.   Okay.   I'm sorry.   I didn't understand that.

14        Do you know if anybody from Wells Fargo tried to call

15   your husband to talk to him?

16   A.   I don't know.

17   Q.   All right.   No further questions.   Thank you.

18        MR. SAND:   And we have no redirect, Your Honor.

19        THE COURT:   You may step down.

20        Do you want this witness to be excused?

21        MR. SAND:   Yes.

22        THE COURT:   Any objection?

23        MR. FRANSEN:   No objection.

24        THE COURT:   You are excused.

25        Call your next witness.

Barron - D

```
 1              MR. SAND:  Plaintiff calls Ms. Mary Frances Barron.
 2              THE COURT:  Would counsel please approach.
 3              (The Court and counsel confer off the record.)
 4              THE COURT:  Swear the witness.
 5
 6                        MARY FRANCES BARRON
 7   called as a witness in behalf of the Plaintiff, having been
 8   first duly sworn, is examined and testifies as follows:
 9
10              THE CLERK:  Please have a seat.  State your name and
11   spell it.
12              THE WITNESS:  My name is Mary Frances Barron,
13   B-a-r-r-o-n.
14
15                       DIRECT EXAMINATION
16   BY MR. SAND:
17   Q.   Good morning, Ms. Barron.
18              How do you know Matthew Sponer?
19   A.   Matthew is my son.
20   Q.   Do you have any grandchildren?
21   A.   Two.
22   Q.   What are their names?
23   A.   Farah and Zelda.
24   Q.   What kinds of things does Matt do for Farah?
25   A.   Matt is Farah's primary caregiver.  He does -- he gets her
```

1   up in the morning.  He dresses her.  He takes her to the
2   bathroom.  He showers her.  He sits her down at the table,
3   puts a bib on her, and sets up food for her.  She tries to
4   feed herself as best she can, and then he feeds her.

5           He gets her ready for school, puts her on the bus,
6   waits for the bus, straps her in, if she's going to school.
7   Otherwise, he does all her toileting.  He does -- he helps her
8   walk.  He gets her up out of a chair and then guides her as
9   she walks.

10  Q.  Is it fair to say they have a close relationship?
11  A.  Yes.  Matt and Farah are very close.  He's been her
12  primary caregiver her whole life.
13  Q.  When did you learn that your son was the victim of
14  identity theft?
15  A.  In October of 2016.
16  Q.  And in that time frame, October 2016, what did you do
17  after you learned?

18          MR. FRANSEN:  Objection, relevance.

19          THE COURT:  Overruled.

20          THE WITNESS:  Matt called me on the -- on the phone
21  and said that he was having a problem in terms of being a
22  victim of identity theft.

23          MR. FRANSEN:  Objection.

24          THE COURT:  When there is an objection, please stop
25  talking.

```
 1                THE WITNESS:  Sorry.
 2                THE COURT:  That's okay.
 3                You may continue.
 4                THE WITNESS:  He asked me to come to the South
 5      Pacific and help him take his boat to a place where he could
 6      communicate better.
 7      BY MR. SAND:  (continuing)
 8      Q.   And, Ms. Barron, where do you live?
 9      A.   Las Vegas, Nevada.
10      Q.   So you flew from Las Vegas to --
11      A.   -- to Nueve in the South Pacific.
12      Q.   And what did you do when you arrived in the South Pacific?
13      A.   What did I do?
14      Q.   Well, I think we're learning about some geography.  Is
15      that in Fiji?
16      A.   Yes.  My husband and I got tickets as quick as we could.
17      Matt said that he needed us to go with him and his wife and
18      his children on a trip across the ocean, without land, about a
19      nine-day trip.  And so we left on October 31st and arrived in
20      the South Pacific on November 2nd.
21      Q.   And where was this trip across the ocean?  Where were you
22      going?
23      A.   We were going to Fiji.
24      Q.   I'm sorry.  You landed in Fiji?
25      A.   We landed in Fiji.
```

1  Q.   Where were you going with Matt?

2  A.   Oh, he wanted to get to Whangerei, New Zealand, because he

3  wasn't able to communicate well enough on the Internet or by

4  telephone or just communicate from Fiji.  It was very remote.

5  Q.   When you arrived -- when you arrived in New Zealand, what

6  was Matt's routine?

7  A.   Matt's routine was that he immediately rented an office in

8  New Zealand.  We were able to find a place on the city dock.

9  And so he rented an office where he could go and isolate

10  himself every day, he and Ana, and work on the identity theft

11  issue.

12  Q.   So while he was working on the identity theft issue, what

13  were you doing?

14  A.   I was -- my job was to take care of the grandbabies.  We

15  have Farah, who was 13 at the time, and Zelda, who was 10.

16  Q.   How were the grandbabies handling having their father away

17  working on these issues at the office?

18          MR. FRANSEN:  Objection, relevance.

19          THE COURT:  Sustained.

20  BY MR. SAND:  (continuing)

21  Q.   How much time was Matt spending away from his family in

22  New Zealand?

23  A.   He was spending most of the day is my recollection.  And

24  he was always going -- getting up.  He wasn't sleeping well.

25  I saw that he was up most of the night.  He was very

Barron - D

 1  concerned.

 2          He would get up in the morning.  And I needed help

 3  getting Farah off the boat, because it was at a city dock.

 4  But she's very, very cumbersome.  She's hard to stand.  I had

 5  to get her up kind of a ladder and then have her go off the

 6  side of the boat to take her up the dock to the showers, to

 7  the bathroom, to toilet her, et cetera.  So I had a hard time,

 8  so he -- he would help me get her out.  And then I would -- my

 9  husband and I would have to get her back on the boat.

10  Q.  How long did you and your husband stay in New Zealand

11  helping Matt and his family?

12  A.  We stayed until December 26th.

13  Q.  So about two months?

14  A.  About two months, yes.

15  Q.  Do you know why Matt and his family ended this vacation?

16  A.  Yes.  This was a trip of a lifetime for them.  They had

17  been planning on doing this for a year.  They had finally

18  gotten Farah to the point that she was pretty well potty

19  trained.  But we had to time her bathroom visits.  And they

20  had moved to Portland to go to the Doernbecher Children's

21  Hospital so she could have major surgery.  They finished that.

22  They got her up and going.  And then they hoped to sail for

23  the first time as a family.

24          And, sadly, they had to cut their trip short because

25  Matt was very, very concerned that his -- his banking

Barron - D

1   relationship was going to go away and his accounts would die.

2   So they cut their trip short.

3   Q.   Were there any other reasons that they cut the trip short?

4   A.   When they -- Ana, my daughter-in-law, who is an amazing

5   person, had decided that she was going to donate a kidney to

6   her brother.  They had planned that Ana was going to leave

7   Matt and the girls on the boat and continue traveling.  And

8   she was going to come back, donate the kidney, and then rejoin

9   the family.  She was a match at that time for her brother, and

10  that's what they planned to do.

11          But instead they took the boat out of the water, put

12  it on the horn, had to batten everything down, rent a space,

13  and come back to America to hopefully resolve this issue that

14  they had with Wells Fargo.

15  Q.   Do you recall when they returned to the U.S.?

16  A.   I do not recall exactly.  I think it was around February.

17  Q.   And did you keep in touch with Matt when he and his family

18  returned to the U.S.?

19  A.   I always kept in touch with Matt.  If he had -- when he

20  was sailing, if he had Internet connection, we could Skype.

21  Otherwise I would e-mail him and he would e-mail me.  And then

22  when he had an Internet connection, he could pick it up.

23  Q.   Let's move forward to the fall of 2017.  Did you see Matt

24  in that time frame?

25  A.   I did.  My husband and I went to Portland to visit with

Barron - D

1    Matt and Ana and the girls in late October, and we stayed

2    until early November.  It was about a five- or six-day trip.

3            And we -- when I got there, I was surprised to see

4    how Farah had regressed, that she was falling.

5            MR. FRANSEN:  Objection.

6            THE COURT:  Sustained.

7    BY MR. SAND:  (continuing)

8    Q.   How was Matt doing when you saw him in October?

9    A.   Matt had not been sleeping.  He had big circles under his

10   eyes.  He was spending all his time at his computer, trying to

11   resolve this problem.

12   Q.   When was the next time you saw Matt?

13   A.   I saw him in December of 2017, just --

14   Q.   Do you know if in December, was Matt still trying to get

15   the Wells Fargo account off his credit report?

16   A.   Yes.  Yes, he was.  He came to see me, me and my husband,

17   in Las Vegas, and he brought Farah with him.

18   Q.   And -- I'm sorry.  I didn't mean to cut you off.

19   A.   He was still working on it.

20   Q.   Can you tell the jury, at this point, December of 2017,

21   what you observed about Matt, how he was doing?

22   A.   He was sad.  Matt was sad.  He wasn't himself.  He was not

23   able to spend the amount of time that he normally did with his

24   daughter, taking care of her.  And he was -- continued with

25   the circles under his eyes, and he was more what I would call

1  ataxic.  He was, you know, nervous.

2           He said that he felt that his reputation had been

3  damaged, and he wasn't getting -- he wasn't moving forward

4  with his life.

5  Q.  You used the word "ataxic."  That's a medical term.

6  A.  I'm a nurse.

7           He was kind of jumpy.  He was jumpy and anxious

8  because -- and I said -- I had talked to him about it, and he

9  said he wasn't able to spend the time with Farah.

10           MR. FRANSEN:  Objection.

11           THE COURT:  Sustained.

12           THE WITNESS:  Sorry.

13  BY MR. SAND:  (continuing)

14  Q.  Are there any other symptoms that you recall Matt having

15  of stress in this time period around December of 2017?

16  A.  He wasn't sleeping.  He was not eating consistently.  And

17  he had big circles under his eyes and he was more sad than he

18  had been.

19  Q.  Was it unusual for you to see your son like this?

20  A.  Yes, yes.  I was very concerned.  Yeah.  He's -- yes.

21           MR. SAND:  Thank you.  No further questions.

22           THE COURT:  Cross-exam.

23

24

25

1         CROSS-EXAMINATION

2    BY MR. FRANSEN:

3    Q.   Ms. Barron, you testified a little bit ago that after

4    Farah's surgery, the family was able to go on its first

5    sailing trip.  Do you recall that testimony?

6    A.   I -- no.  They were able to go on the trip of a lifetime

7    after she had her surgery, yes.

8    Q.   Okay.  Didn't they -- hadn't they just been on a sailing

9    trip for about a year before that?

10   A.   They had sailed before, but it was not this major, just

11   dream trip.  They had sailed before.  But Farah needed to have

12   major surgery, so they came back.  And they wanted to get

13   Farah totally well, and they wanted to get her seizures

14   controlled.  They wanted to get her on a good routine.  And

15   they wanted to start the program of Zelda having home school.

16   Q.   Okay.  My question was about whether they had been sailing

17   before the surgery.  And your answer is yes, you're aware they

18   were?

19   A.   Yes, they had sailed some, yes.

20   Q.   Well, you say "some."  I believe it was quite an extended

21   trip.  Isn't that correct?

22   A.   What they did is they went from -- they went around the

23   Caribbean.

24   Q.   Okay.

25   A.   This was -- this other trip was the trip -- as I've said,

1   it was the trip of a lifetime.  It was to go --

2   Q.   Okay.  Thank you.

3   A.   Okay.

4   Q.   How many times per year do you normally see your son and

5   his family?

6   A.   I normally see them four times a year, every three or four

7   months.

8   Q.   And how many times -- you testified, I believe, that you

9   saw your son in November, December -- yeah, November,

10  December, 2016 in New Zealand.

11  A.   Yes.

12  Q.   Yes.  Okay.

13       You saw your son and his family in New Zealand

14  November, December 2016, correct?

15  A.   Yes.

16  Q.   Okay.  When was the next time you saw them or you saw your

17  son?

18  A.   March 2017.

19  Q.   Okay.  And was the next time in November 2017?

20  A.   October, November 2017.

21  Q.   Okay.

22       MR. FRANSEN:  No further questions.

23       THE COURT:  Redirect?

24       MR. SAND:  No redirect, Your Honor.

25       THE COURT:  You may step down.

Grier Deposition

1          Do you want this witness to be excused?

2          MR. SAND:  That's fine with us.

3          MR. FRANSEN:  No objection.

4          THE COURT:  You are excused.  You're free to go.

5          Call your next witness.

6          MR. SOLA:  Your Honor, we wish to play a videotaped

7     deposition of Ashley Grier.  This would be Court Exhibit 601.

8          MR. FRANSEN:  No objection.

9          (Court Exhibit No. 601, the videotaped deposition of

10    Ashley Grier, is then played for the jury.)

11         MR. SOLA:  Is that -- and let us know if the volume

12    is too high.

13         (Court Exhibit No. 601, the videotaped deposition of

14    Ashley Grier, is then played for the jury.)

15         MR. SOLA:  Your Honor, counsel has just asked me to

16    indicate the mechanism in which this was taken, just so that

17    it doesn't look -- anyway, if I might just make a comment?

18         THE COURT:  I have no idea what you're talking about.

19         MR. PETERSON:  Please.

20         MR. SOLA:  All right.  This was done by a video call,

21    and so she's looking down at the video screen.

22         He didn't want you to believe that I was there and

23    she wasn't looking at me.  And so that's why she's looking

24    down.

25         THE COURT:  Thank you.

Funsch and Ebron Depositions

1          Do you have additional information on this one, or

2    are you calling your next witness?

3          MR. SOLA:  We're calling our next witness.

4          This will be Brian Funsch, Court Exhibit 602.

5          (Court Exhibit No. 602, the videotaped deposition of

6    Brian Funsch, is then played for the jury.)

7          MR. SOLA:  Our next deposition tape is Montressa

8    Ebron, Court Exhibit 603.

9          THE COURT:  How long is that?

10          MR. SOLA:  I think about 10 minutes.

11          THE COURT:  We'll go ahead and play it.

12          MR. SOLA:  Oh, it's six minutes.

13          THE COURT:  Perfect.

14          (Court Exhibit No. 603, the videotaped deposition of

15    Montressa Ebron, is then played for the jury.)

16          THE COURT:  Members of the jury, we'll be taking our

17    midday recess at this time.  Jennifer will escort you out in

18    just a moment.

19          I have a couple of commercials before we take our

20    break.  We'll be in recess until 1:00.  I have another matter

21    that I need to hear during my lunch hour.  And as it works, I

22    actually have to give these people a break to eat lunch,

23    et cetera.

24          So we will be in recess until 1:00, or you will be in

25    recess until 1:00.  We will be doing other things.

1              Two commercials.  One, I told you at the beginning of

2    the trial that I would allow the jury the opportunity to ask

3    questions of any witnesses that they were intrigued about and

4    wanted to ask further questions of the witnesses that didn't

5    get asked by the party.

6              The parties and I decided in the interest of

7    time -- and I think time is going to be a little tighter than

8    I thought it would be -- that we were going to forgo that

9    practice.  That explains why I have not turned to you and

10   said, "Do you have any questions?"

11             The second commercial is that on the exhibits you

12   received, at least some of them, you may have noticed that

13   personal identifying information on Mr. Sponer has been

14   redacted.

15             That was redacted because it's a court rule that

16   requires exhibits here received as part of the court

17   proceeding to be redacted, and it's for the protection of

18   everybody, because we are a public body and that means that

19   those records become publicly available.

20             So at my request, those exhibits have now redacted

21   the personal information of Mr. Sponer.  And if anybody else's

22   personal information comes into this case, it will be

23   similarly redacted.

24             The commercial part of this is that the originals

25   were not redacted.  They've only been redacted for purposes of

1   this trial.  So when you look at them, please understand that

2   what you're looking at, although they are redacted, they

3   weren't like that during the course of the interactions

4   between the parties.

5          With that, have a pleasant lunch.  I will see you in

6   an hour.

7          (The jury leaves the courtroom.)

8          THE COURT:  We'll see you in an hour.

9          If you wouldn't mind kind of moving your things to

10  one side or the other on the tables, because there are some

11  lawyers coming in behind you.  You don't need to take things

12  off the table.  I promise they won't investigate or look into

13  your notebooks or anything like that, but they will need to

14  use a bit of your space.

15         MR. SAND:  Can we get a tally on time, just so we can

16  know where we are?

17         THE COURT:  So for plaintiff, it is 5:53.

18         MR. PETERSON:  Remaining or taken?

19         THE COURT:  Remaining.  And 18 seconds.

20         For defense, it is 8:21 and 56 seconds.

21         MR. PETERSON:  Thank you, Your Honor.

22         (A lunch recess is then taken.)

23         (The Court, counsel, the parties, and the jury

24  reconvene.)

25         THE COURT:  Be seated.  Good afternoon.

Hollomon and Brady Depositions

1          Call your next witness.

2          MR. SOLA:  Your Honor, the fact that we can't look at

3     or talk to the jurors, I don't think you gave them that

4     instruction.  I don't want them to think we're unfriendly.

5          THE COURT:  Lawyers get nervous.

6          So when you're walking around in the hallway and they

7     don't say anything to you, they wanted me to assure you it's

8     not because they don't like you or don't think you're swell

9     people; it's because I directed them not to have communication

10    with you.  So to the extent you're in an elevator and they're

11    not saying anything, that's why.

12         MR. SOLA:  Our next deposition by videotape is Colin

13    Hollomon, Court Exhibit 604.

14         (Court Exhibit No. 604, the videotaped deposition of

15    Colin Hollomon, is then played to the jury.)

16         MR. SOLA:  The next videotaped deposition is William

17    Brady, Court Exhibit 605.

18         (Court Exhibit No. 605, the videotaped deposition of

19    William Brady, is then played for the jury.)

20         MR. SOLA:  We need to confer.

21         MR. PETERSON:  Just briefly.

22         (Counsel confer off the record.)

23         (Court Exhibit No. 605, the videotaped deposition of

24    William Brady, is then played for the jury.)

25         MR. SOLA:  Next we have the videotaped deposition of

Berg and Gobin Depositions

1   Bets Berg, Court Exhibit 606.

2           (Court Exhibit No. 606, the videotaped deposition of

3   Bets Berg, is then played for the jury.)

4           (Counsel confer off the record.)

5           MR. SOLA:  At this time we wish to read a deposition

6   excerpt, and this young woman is going to read from the

7   Equifax portion.

8           THE COURT:  Okay.

9           MR. SOLA:  And do we need to do a court exhibit

10  number for this?

11          It's Celestina Gobin, for Equifax Information

12  Services, LLC.

13          (The deposition testimony of Celestina Gobin is read

14  as follows:)

15

16                      DIRECT EXAMINATION

17  BY MR. SOLA:

18  Q.   Would you state your name.

19  A.   Yes.  Celestina Gobin.

20  Q.   And you have been designated to testify on behalf of

21  Equifax regarding the topics in the deposition notice; is that

22  correct?

23  A.   That's correct.

24  Q.   Okay.  And primarily we're going to be talking about

25  Automated Consumer Dispute Verification forms that were sent

Gobin Deposition - D

1   by Equifax to Wells Fargo.  Have you seen those forms?

2   A.   Yes, I have.

3   Q.   Okay.  And is it okay, instead of saying the full title,

4   if we refer to those as ACDVs?

5   A.   Yes.

6   Q.   Okay.  And then I think to complete the process, then a

7   notice is sent to the furnisher of the disputed information

8   regarding the dispute; is that right?

9   A.   That's correct.  The ACDV is then generated and is sent to

10  the data furnisher, along with the image and any documentation

11  that would have been provided from the consumer, yes.

12  Q.   Okay.  And that -- then the furnisher that gets the ACDV,

13  they're supposed to investigate the disputed information; is

14  that right?

15  A.   That's correct.

16  Q.   And then after they complete their -- and they're

17  investigating as to whether the disputed information is

18  accurate or not; is that fair to say?

19  A.   That's correct.

20  Q.   And based on their response, then Equifax will either

21  decide to keep the information as it is, to remove it, or to

22  modify it; is that right?

23  A.   That's correct.

24  Q.   And Equifax relies on the furnisher to tell it if the

25  disputed information is accurate or not; is that right?

Gobin Deposition - D

1    A.   Yes, that's correct.

2    Q.   Now, would you look -- there should be a series of ACDVs.

3    And the first one I want you to look at, if the court reporter

4    would mark that as Exhibit 1, it's got a Bates number of 110

5    through 113.

6    A.   Yes.  I have that in front of me.

7    Q.   Okay.  And do you recognize this as an ACDV?

8    A.   Yes, I do.

9    Q.   By sending this ACDV to Wells Fargo, Equifax expects Wells

10   Fargo to investigate whether this account is fraudulent or

11   not; is that right?

12   A.   That's correct.

13   Q.   And then Wells Fargo is supposed to report the results of

14   its investigation back to Equifax; is that right?

15   A.   That's the expectation, yes.

16   Q.   Then Wells Fargo, they responded to the ACDV; is that

17   right?

18   A.   Yes, they did.

19   Q.   And we actually see a response date listed of 11-16-2016.

20   Do you see that?

21   A.   I do.

22   Q.   Now, Wells Fargo entered a response code that's just below

23   the response date.  Do you see that?

24   A.   Yes, I do.

25   Q.   And here Wells Fargo checked off the box "modify as

Gobin Deposition - D

1   shown"; is that right?

2   A.   That's correct.

3   Q.   The "modify as shown" response, that indicates that Wells

4   Fargo is providing some different account information about

5   the account; is that right?

6   A.   That's correct.

7   Q.   Okay.  But they're not telling Equifax to delete the

8   account, are they?

9   A.   That's correct.  They're not telling us to delete it.

10  Q.   Okay.  So based on this response, Equifax understood that

11  Wells Fargo did not determine that the account was fraudulent,

12  right?

13  A.   Correct.

14  Q.   And based on this response, Equifax is going to keep

15  reporting the account on plaintiff's report, correct?

16  A.   Yes.  Based on this answer, they did not ask us to delete

17  it, so it would continue to report.

18  Q.   That's right.  If Wells Fargo had checked either of the

19  two boxes that say "delete," then Equifax would have deleted

20  the account, correct?

21  A.   That's correct.

22  Q.   And then the account would not be on plaintiff's credit

23  report, right?

24  A.   Well, Equifax would have deleted the account, yes.

25  Q.   Yeah.  I'm just trying to understand the effect of the

Gobin Deposition - D

1  deletion.  The deletion would have removed it from plaintiff's

2  credit report, right?

3  A.  That's correct.

4  Q.  And because of the response that Wells Fargo submitted on

5  this ACDV, Equifax kept reporting the Wells Fargo account on

6  plaintiff's credit report, correct?

7  A.  Correct.

8  Q.  All right.  Would you turn to the next exhibit, which is

9  Exhibit 2.

10 A.  Okay.  I have that in front of me.

11 Q.  And this is just two pages; is that right?

12 A.  That's correct.

13 Q.  Page 123 and 124?

14 A.  Yes.

15 Q.  And this is another ACDV that was sent by Equifax to Wells

16 Fargo, correct?

17 A.  Yes, that's correct.

18 Q.  And this one was created on November 13th, 2016, right?

19 A.  Yes.

20 Q.  And it identifies the consumer as Matthew J. Sponer,

21 right?

22 A.  Yes.

23 Q.  And the dispute is "claims true identity fraud, account

24 fraudulently opened, initiate investigation," correct?

25 A.  Correct.

Gobin Deposition - D

1   Q.   So, again, Equifax expects Wells Fargo to do an

2   investigation to determine if the account was fraudulently

3   opened, correct?

4   A.   Yes, that's correct.

5   Q.   And Wells Fargo did respond to this ACDV; is that right?

6   A.   Yes, they did respond.

7   Q.   And it shows a response date of 12-2-2016, correct?

8   A.   Correct.

9   Q.   And the responder's name is Ashley Grier; is that right?

10  A.   That's correct.

11  Q.   And Equifax -- I'm sorry, Wells Fargo again checked the

12  "modify as shown" box, right?

13  A.   Yes, that's correct.

14  Q.   And so they were, again, telling Equifax to modify some of

15  the account information, right?

16  A.   That's correct.

17  Q.   But Wells Fargo did not tell Equifax to delete the

18  account, did it?

19  A.   They did not ask us to delete it, that's correct.

20  Q.   And based on their response, Equifax would keep reporting

21  the account, right?

22  A.   That's correct.

23  Q.   All right.  Looking at Exhibit 3, this is another ACDV; is

24  that right?

25  A.   Yes, it is.

Gobin Deposition - D

1    Q.   And this was sent by Equifax to Wells Fargo, right?

2    A.   Yes.

3    Q.   And looking at Exhibit 3, Wells Fargo sent a response that

4    has a response date of December 2nd, 2016; is that right?

5    A.   Yes, that's correct.

6    Q.   And they checked the box "modify as shown," right?

7    A.   Yes.

8    Q.   And Equifax would understand from this response that Wells

9    Fargo did not determine that the account was fraudulently

10   opened; is that right?

11   A.   That's correct.

12   Q.   And as a result of this response by Wells Fargo, Equifax

13   kept reporting this account on plaintiff's credit report,

14   correct?

15   A.   That's correct.

16   Q.   All right.  Could you turn to Exhibit 4.

17   A.   Okay.  I have Exhibit 4.

18   Q.   And this is an ACDV that was sent by Equifax to Wells

19   Fargo, correct?

20   A.   Yes, that's correct.

21   Q.   And Wells Fargo responded, and there's -- is that right?

22   A.   Yes.  There's a response date, yes.

23   Q.   And the response date is 11-24-2017; is that right?

24   A.   Yes.

25   Q.   And Wells Fargo checked the box "verified as reported."

Gobin Deposition - D

1    Do you see that?

2    A.   I do, yes.

3    Q.   And so by that, Wells Fargo is saying that they believe

4    all the information that Equifax has on the account is

5    accurate, right?

6    A.   That's correct.

7    Q.   Would you look at Exhibit 5.

8    A.   Okay.  I have 5 before me.

9    Q.   And this is an ACDV that was sent by Equifax to Wells

10   Fargo, correct?

11   A.   Yes, that's correct.

12   Q.   And Wells Fargo responded on or about November 28th, 2017;

13   is that right?

14   A.   Yes.

15   Q.   And they checked the box to read "disputed info accurate,

16   updated account info unrelated to the dispute"; is that right?

17   A.   Yes.

18   Q.   Okay.  And by "disputed info accurate," does that mean

19   that they're saying that it's not identity fraud?

20   A.   I think it speaks for itself.  They're saying that the

21   information that was disputed is accurate.

22   Q.   And based on this response, is it Equifax's understanding

23   that Wells Fargo investigated the account and did not

24   determine it was identity fraud?

25   A.   Yes, that's correct.

Gobin Deposition - D

1   Q.   And based on this response, Equifax continued to report

2   the account on plaintiff's credit report, right?

3   A.   Yes, that's correct.

4   Q.   Would you turn to Exhibit 6.

5   A.   I have 6 in front of me.

6   Q.   And this is an ACDV sent by Equifax to Wells Fargo,

7   correct?

8   A.   Yes.

9   Q.   And Wells Fargo responded, and there's a response date of

10  11-30-2017; is that right?

11  A.   Yes, that's correct.

12  Q.   And they responded that -- by checking the box "disputed

13  info accurate, updated account info unrelated to the dispute,"

14  right?

15  A.   Right.

16  Q.   And so essentially Wells Fargo is telling Equifax that the

17  account is not identity fraud, right?

18  A.   That's correct.

19  Q.   And based on this response from Wells Fargo, Equifax

20  continued to report the account on plaintiff's credit report,

21  right?

22  A.   Correct.

23  Q.   Would you turn to Exhibit 7.

24  A.   I have Exhibit 7.

25  Q.   And this is an ACDV sent by Equifax to Wells Fargo,

Gobin Deposition - D

1   correct?

2   A.   Yes.

3   Q.   All right.  And then Wells Fargo responded, and there's a

4   response date of December 4th, 2017; is that right?

5   A.   Yes.

6   Q.   And their response was to check the box "disputed info

7   accurate, updated account info unrelated to dispute"; is that

8   right?

9   A.   Yes, that's correct.

10  Q.   All right.  And that response essentially tells Equifax

11  that Wells Fargo does not believe the account is identity

12  fraud, right?

13  A.   That's correct.

14  Q.   And if Wells Fargo thought it was identity fraud, then

15  they should have checked either "delete account" or "delete

16  fraud," right?

17  A.   Yes, that's correct.  They would have chosen "delete" in

18  either of those two fashions in order to have it removed.

19  Q.   Because if it is identity fraud, then it shouldn't be on

20  plaintiff's credit report, right?

21  A.   That's correct.

22  Q.   And based on this response, Equifax continued to keep the

23  account in plaintiff's credit file, right?

24  A.   Yes.

25  Q.   And then when that credit file got issued to a third

327

Gobin Deposition - D

1  party, it would include the Wells Fargo account, right?

2  A.   Yes.

3  Q.   All right.  Will you turn to Exhibit 8.

4  A.   Okay.  I have 8 in front of me.

5  Q.   And this is an ACDV from Equifax to Wells Fargo?

6  A.   That is correct.

7  Q.   And Wells Fargo responded with a response date of

8  12-4-2017; is that right?

9  A.   Yes, that's correct.

10 Q.   And they checked the box "verified as reported"; is that

11 right?

12 A.   Yes.

13 Q.   And so that was an indication to Equifax that it was not

14 identity fraud, right?

15 A.   That's correct.

16 Q.   By checking the box "verified as reported," Wells Fargo is

17 essentially telling Equifax that this account belongs to

18 Matthew Sponer, right?

19 A.   Essentially, yes.

20 Q.   And as a result of that response from Wells Fargo, Equifax

21 kept reporting the account, right?

22 A.   Yes, that's correct.

23 Q.   Okay.  Would you look at Exhibit 9.

24 A.   I have Exhibit 9.

25 Q.   And this is an ACDV sent by Equifax to Wells Fargo,

Gobin Deposition - D

1  correct?

2  A.   Yes.

3  Q.   And Wells Fargo responded with a response date of

4  12-22-17?

5  A.   Yes.

6  Q.   And they checked the box "verified as reported," right?

7  A.   Yes.

8  Q.   So they were telling Equifax to keep reporting this

9  account, right?

10  A.   They -- they verified that the data is reporting correctly

11  as it is.

12  Q.   And as a result of this response, Equifax continued to

13  report this account on plaintiff's credit report, right?

14  A.   Yes, continued to report it to the credit file, yes.

15  Q.   All right.  Would you look at Exhibit 10.

16  A.   I have that in front of me.

17  Q.   And this is called "terminal audit info."  Do you see

18  that?

19  A.   I do.

20  Q.   All right.  And this would reflect that one of your

21  subscribers requested a report for plaintiff, right?

22  A.   That -- that is correct.

23  Q.   And it indicates, also, that a report for plaintiff was

24  provided to that subscriber, right?

25  A.   That's correct.

Gobin Deposition - D

1   Q.  And that -- that would have -- the report would have been

2   issued on March 6th, 2017; is that right?

3   A.  Correct.

4   Q.  Can you tell who that inquiry company is, based on either

5   the subscriber number or that information with the FOR?

6   A.  Well, I know it to be an insurance company simply because

7   I know the initials in the middle of the number are IG, but I

8   don't recall.  I did look at it, but I don't recall the actual

9   name of the company.

10  Q.  So you know it's an insurance company because of the IG,

11  right?

12  A.  Yes.

13  Q.  And what about Foremost Insurance?  Do you think it could

14  be them?

15  A.  That sounds about right, yes.

16  Q.  Would you turn to page 757, which is the next page.

17  A.  Okay.  I have that.

18  Q.  All right.  And this indicates that a company made a

19  request for plaintiff's credit file on or about December 21st,

20  2017, correct?

21  A.  That's correct.

22  Q.  And they received his file, right?

23  A.  It does appear they did, yes.

24  Q.  All right.  And can you identify which company it is?

25  A.  I know from the member number that it's a bank.  The BB in

Gobin Deposition - X

1  that number is for a bank.

2         MR. SOLA:  Go ahead.  Cross-examination.

3

4                    CROSS-EXAMINATION

5  BY MR. FRANSEN:

6  Q.  Hi, Ms. Gobin.  My name is Tim Fransen.  I'm an attorney

7  representing Wells Fargo in this case, and I have a couple

8  questions for you, mainly just to clarify or get a little bit

9  more detail on some questions Mr. Sola asked you.

10         I assume you understand you're still under oath for

11  my questions as well?

12  A.  Yes.

13  Q.  Okay.  My question for you is -- and I don't -- I'm not

14  intending to get into any details of any investigations

15  Equifax may or may not do, but is it true that Equifax does

16  its own investigation at times, depending on the dispute

17  raised by the consumer?

18  A.  That is correct.

19  Q.  Okay.  And, again, I don't -- I'm not interested in any

20  details at all about this account even, but is it possible for

21  Equifax to delete an account or to stop reporting an account

22  even if a furnisher doesn't tell them to delete the account?

23  A.  Yes, that is correct.

24         MR. SOLA:  That's the end of this witness.

25         THE COURT:  And for our record -- I know you're

Tarter - D

1   playing the part of Celestina Gobin.  Can you tell us your

2   name?

3           MS. MORENO:  Michelle Moreno.

4           THE COURT:  Thank you.  You may step down.

5           Call your next witness.

6           MR. SAND:  Plaintiff calls Tom Tarter.

7           THE CLERK:  There are a couple stairs right there.

8

9                        THOMAS TARTER

10  called as a witness in behalf of the Plaintiff, having been

11  first duly sworn, is examined and testifies as follows:

12

13          THE CLERK:  Please have a seat.  State your name and

14  spell it.

15          THE WITNESS:  Thank you.

16          My name is Thomas Tarter.  Last name is spelled

17  T-a-r-t-e-r.

18

19                     DIRECT EXAMINATION

20  BY MR. SAND:

21  Q.  Mr. Tarter, what is your current profession?

22  A.  I am primarily a consultant, and the predominance of my

23  work involves expert witness services.

24  Q.  And do those expert witness services have a focus?

25  A.  Yes, primarily involving banking and financial

Tarter - D

1  institutions.

2  Q.  Can you describe for the jury your experience in the

3  banking industry?

4  A.  Yes, sir.  I started my banking career in 1967 while I was

5  assigned to Fort Ord and served as an ex officio member of the

6  Fort Ord Credit Union.

7          In 1969 I started my more intensive consumer and

8  commercial banking career, and that included consumer credit

9  as well as commercial credit.

10         During my period of direct banking, I was the

11  president of two banks.  One was a troubled bank, where I was

12  approved by the FDIC and the Office of the Controller of the

13  Currency, because if you're working for a troubled bank,

14  there's a reason for it, and they want to approve whoever

15  would be an officer of that bank.

16  Q.  And, Mr. Tarter, has your experience in banking involved

17  handling consumer credit disputes?

18  A.  It has, both from a mortgage as well as indirect lending

19  programs, where loans are purchased from car dealers, used or

20  new.

21  Q.  Has your experience in banking involved disputes of

22  identity theft?

23  A.  Yes, on a number of occasions.

24  Q.  About how many times have you been retained as an expert

25  in the banking industry?

Tarter - D

1  A.   Well, probably now more than 1600, but -- excuse
2  me -- this is over a 25-year period of time.  So it could be
3  higher.
4  Q.   In connection with your experience, have you become
5  familiar with the industry standards for banks handling
6  consumer credit reporting disputes?
7  A.   I have.  And that included while I was doing work as a
8  retained expert by Gonzaga University's law school, on behalf
9  of some of their clients, as well as Harvard University's law
10  school, on behalf of some of their students, and cases that
11  they were involved with.  And the standards haven't really
12  changed since I started in banking.
13  Q.   Well, let me ask you this.  The jury has heard the term
14  "ACDV" a lot in the course of this trial.  What is the
15  standard for banks when investigating an ACDV?
16  A.   Well, there are several.  The first -- and these aren't in
17  a direct order.  I shouldn't have said "the first."  But
18  basically being timely, being accurate, being fair, and being
19  honest, and have an established and an enforced internal
20  control set of systems.
21  Q.   Now, you mentioned, I think, four things:  timely,
22  accurate, fair, and honest.  What is the industry standard in
23  banking, when conducting an ACDV, to ensure accuracy?
24  A.   To --
25  Q.   To ensure -- I'm sorry.

1    A.   To have established and enforced policies and procedures

2    and systems, such as, in this case, that everybody could speak

3    to everybody else within the bank, and that there would be a

4    thorough investigation.  And by "thorough," not just

5    departmental, but you could -- if you're reading the iTop

6    notes, you would be able to see exactly what was happening,

7    and you'd know that there was a sequence of events that

8    involved a police department, an acknowledgment, the bank had

9    a record of knowing their customer.  He's not just an isolated

10   customer, but a person who was sailing offshore and had

11   notified Wells that they were not going to be in the country,

12   but "Don't stop my credit card payments, not only payments,

13   but charges, because I'm going to be basically living off of

14   my credit card."

15          So they already had prior knowledge.  And, among

16   other things that they had in their file, they knew that this

17   was a high-risk loan because it wasn't directly originated by

18   Wells.  It was bought from a third party, a used car dealer.

19   This was not a new vehicle.

20          And, as a result, indirect loan programs, ILP, are

21   known in the industry to have a greater degree of risk than if

22   a customer walks through the door and says, "I would like to

23   buy a car.  Will you make a loan to me?"  Much different.

24   Q.  In your opinion, does Wells Fargo meet the industry

25   standards for investigating consumer credit disputes of

1  identity theft?

2  A.   In this case, absolutely no.

3  Q.   And why do you say "no"?

4  A.   Well, let's look at the history.   There's a mountain of

5  information available.

6       Wells knew that this was -- I'll call it an ILP,

7  indirect loan program.   It had a history with its customer.

8  It had another account product that it would sell.   It also

9  had spoken with the police department in Southern California,

10  in Chula Vista.   It can't get much better than that.   They

11  went right to the source.

12       But there were no payments made.   And going back to

13  the first payment default, that should have set off red flags,

14  which are warning signs, because the account number that was

15  given was disputed by the person whose account was drawn on

16  and was rejected.   There were never any payments made on this

17  loan.

18  Q.   Wells Fargo had, early on, asked Mr. Sponer to submit his

19  Social Security card so that it could proceed with its

20  investigation.   Was this within the industry norm?

21  A.   No, sir, not generally.   It really wasn't needed because

22  if you're an ID theft -- thief, chances are highly likely that

23  the Social Security card that they're asking to have a copy

24  of, that number will match the one that they wrote the loan

25  on.   So it's really not necessary, particularly in view of all

Tarter - D

1   of the information that it had in its files.

2           I used the term before, "a mountain."  It was a big

3   pile.

4   Q.  Does Mr. Sponer's Social Security card have any bearing on

5   whether the account was opened by an identity thief?

6   A.  Card?  No, sir.

7           There are hackers out there all the time who steal

8   IDs.  And included in the police report is a reference.  I

9   mean, the thief here was -- there were other people who were

10  also victims.

11  Q.  Would it have been within industry standards for Wells

12  Fargo to wait to investigate this account because it was

13  waiting for Mr. Sponer to call them?

14  A.  That's absurd.  No, sir.

15  Q.  Why do you say that's absurd?

16  A.  Because it had all sorts of information.  I mean, the

17  reality is they had spoken with the police department.  The

18  police department had indicated it was ID theft, that they had

19  the culprit, the thief.  They had the car.  I mean, it doesn't

20  get much better than that.  You're not fishing around.  You

21  have information that is really, I would say, rock solid.

22  Q.  Do you recall how many ACDV disputes Wells Fargo received

23  related to Mr. Sponer's identity theft dispute?

24  A.  I believe I do.  I think it was 10.

25  Q.  And did Wells Fargo delete the account in response to any

1    of those ACDV investigations?

2    A.   No, sir.

3    Q.   Is that something that might raise a red flag within the

4    industry, when there are multiple ACDV disputes?

5    A.   Sure.  The reason -- if you have multiple disputes, and

6    you look at the body of information that's in the file,

7    something is wrong, and it should elevate to some higher legal

8    of management that would say, "We're jerking this man around.

9    He didn't do anything wrong.  We should come to a bottom line,

10   and maybe there is a degree of -- there's a high probability

11   that this man is not lying to us."  And that's where

12   management should step in.

13   Q.   Based on the information that Wells Fargo had in its file,

14   how many disputes do you believe it should have taken for

15   Wells Fargo to delete the account?

16   A.   Well, you could say one, but even before it got there, it

17   should have investigated it, the underwriting.  And they

18   should have deleted it immediately upon them becoming aware of

19   the ID thief and having spoken with the police department.

20   This isn't rocket science.  This is pretty simple, I think.

21   Q.   Do you have an opinion about Mr. Sponer's efforts over the

22   course of the 14 months to get Wells Fargo to delete this

23   fraudulent account from his credit report?

24   A.   Yes, sir.

25   Q.   What is your opinion?

Tarter - D

1    A.   I think he worked pretty hard.  And it takes time to

2    dispute.  The first effort indicated responsibility.  He was

3    in the South Pacific.  He asked an attorney to send a letter

4    and send relevant information to Wells.  And even before, he

5    had contacted Wells.  So they should have known he was

6    legitimate.

7    Q.   In your 50-plus years of experience in the banking

8    industry, do you have an opinion about why a bank might have

9    investigation procedures that fall short of industry

10   standards?

11   A.   Sure.

12   Q.   What is that opinion?

13   A.   It's been my opinion that the reason is that fraud

14   departments or ACDV dispute departments are not profit

15   centers.  So they have them, they operate them, but they don't

16   invest the amount of money.  They try to minimize it simply

17   because the fraud department or the ACDV department isn't

18   generating revenue.

19        So it might be cheaper just to pay legal expenses or

20   try to enter into settlements with clients who are really

21   innocent.  It never should be a situation.

22   Q.   Earlier the jury heard Wells Fargo employees testify, the

23   ACDV employees we heard testify that they have a production

24   quota of approximately 10 disputes per hour for identity

25   theft --

1    A.    Yes.

2    Q.    -- identity disputes.

3            Do you have an opinion about production quota for

4    ACDV investigators?

5    A.    Yes.

6    Q.    What is that opinion?

7    A.    It limits their productivity, having the quota, relative

8    to their ability to dig in, pull up files, read it, and go to

9    their supervisor.  I mean, we're talking about time.  And time

10   is valuable.  And, you know, you're talking -- and the range

11   here today has been five to 10.  But 10 is not an unusual

12   number that I've seen.  And that's one every six minutes, just

13   to open the file, read the file, go on the computer -- it all

14   takes time -- and then to go to your supervisor if something

15   just doesn't seem right.  And if you're getting 10 ACDVs and

16   you're getting other information -- this should have been

17   escalated right away.

18   Q.    In your experience, your 50-plus years of experience in

19   banking, have you ever seen a company that has procedures that

20   prohibit ACDV investigators from investigating identity theft?

21   A.    No, sir.  And I've seen the policies and procedures of

22   many of the large banks.  And no.

23   Q.    All right.  Thank you.

24           MR. SAND:  No further questions.

25           THE COURT:  Cross-exam.

Tarter - X

<u>CROSS-EXAMINATION</u>

BY MR. PETERSON:

Q.   Good afternoon, Mr. Tarter.  I have a couple questions.

You testified, I believe, that you have been retained in approximately 1600 or more cases?

A.   Yes.  And that would involve almost close to 300 depositions, trials.

Q.   And that was my next question.

I believe when we talked before, you told me that you had testified approximately 300 times, correct?

A.   Yes, sir.

Q.   And in how many of those 300 times of testifying have you testified that the bank did it right?

A.   In a number of occasions, because my role -- I'm independent.  And if I think the bank did it right, I tell them, because a gentleman such as yourself is later going to be asking me questions, and so it would be a slippery slope not to tell the truth.

Q.   And you told me before that you're primarily hired by attorneys for the consumer, correct?

A.   In consumer credit, yes.  But I do a fair amount of work involving commercial loans as well as loans that might relate to general banking or financial matters.

Q.   And in how many times -- in how many cases that you've testified on behalf of the consumer have you testified that

Tarter - X

1  the bank or the CRA did it right?

2  A.   I can't give you a number, but --

3  Q.   You don't know?

4  A.   No, I don't, because I've had a lot of cases.  But I have

5  told them -- I've also been hired by insurance companies.  And

6  they want to know the bottom line:  Is there something wrong

7  or not?  And also in the consumer area, credit unions I do a

8  lot of work with.  They want to know if their policies and

9  procedures are consistent or auditable, a certain number of

10 loans.

11 Q.   You testified about the iTop notes.  Do you remember that

12 testimony?

13 A.   iTop, yes, sir.

14 Q.   And I believe you testified that those weren't available

15 to be seen by the Wells Fargo -- by the ACDV operators?  Is

16 that your testimony?

17 A.   At the time, I thought that.  And you're speaking --

18 Q.   Well, I think that was just a few minutes ago that you

19 testified.

20 A.   No.

21 Q.   Did I misunderstand?

22 A.   I thought you mentioned at the time of my depo.

23        But I was, and I heard the same discussion and

24 testimony that everybody heard here this afternoon.

25 Q.   The ACDV operators at Wells Fargo did have access to the

1   iTop notes, correct?

2   A.  Yes, sir.

3   Q.  You testified about the mountain of information that Wells

4   Fargo had, correct?

5   A.  Yes, sir.

6   Q.  And that information came in over a period of months,

7   correct?  They didn't have all that information right at the

8   beginning of the dispute, did they?

9   A.  Well, we have to look at timing.  But in the beginning,

10  they had a lot of information.

11  Q.  That wasn't my question, though.  They didn't have all the

12  information, the mountain you're referring to, correct?  They

13  didn't have the formal police report, did they?

14  A.  They had spoken to the police.

15  Q.  That wasn't my question, Mr. Tarter.  Did they have the

16  police report before January of 2017?

17  A.  I can't say.  I don't know.

18  Q.  Did they have the fraud affidavit before January of 2017?

19  A.  No.  But they didn't need that.

20       You have to be reasonable and look at the facts that

21  are laid out in front of you.  I mean, if you're trying to go

22  back and create a track, that's really, in some ways, victim

23  blaming.  I mean, you would think, if you had a $30,000

24  loan --

25       THE COURT:  Mr. Tarter, can I direct you to just

1  answer the question?  And if there's more explaining to do,

2  you can bet that the other side is going to give you an

3  opportunity to do that.

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  Thank you.

6          Ask your next question.

7  BY MR. PETERSON:  (continuing)

8  Q.  You talked about the fact that Wells Fargo received 10

9  ACDVs over the period of the year should have been a red flag.

10 Do you recall that testimony?

11 A.  Yes, sir.

12 Q.  It's true, isn't it, that some credit repair agencies or

13 other such similar groups actually recommend flooding the

14 banks with ACDVs, don't they?

15 A.  Not necessarily.  It depends.

16 Q.  But they do recommend that sometimes?

17 A.  It depends on whether they're a legitimate credit repair

18 organization or not.  But sometimes, yes.

19 Q.  If a consumer were to search the Internet and say, "What's

20 the best way to fix my credit?," they'd find that there's lots

21 of recommendations that say, "Flood the banks with ACDVs,"

22 correct?

23 A.  Yes, sir, there's information out there.

24 Q.  You testified that Mr. Sponer worked hard on this issue.

25 I think we've all heard that.  We would all agree with that.

1   That was your testimony, correct?

2   A.   Yes, sir.

3   Q.   And isn't it also true that because of the difficult

4   nature of identity theft, just by its very nature, it requires

5   participation by the consumer?

6   A.   In many cases, yes, sir, but not necessarily.

7   Q.   You, I believe, testified that banks have an incentive to

8   underfund their dispute resolution departments, their ACDV

9   departments.   Was that your testimony?

10   A.   In some ways not adequately fund it, yes, sir, that's

11   correct.

12   Q.   And that's an indictment on the entire banking industry?

13   That has nothing to do specifically with Wells Fargo, does it?

14   A.   Well, some banks are more egregious than others.   But from

15   a general perspective, there are some other financial

16   institutions that do that.

17   Q.   But you don't have any information that that's what Wells

18   Fargo intentionally does, do you?

19   A.   That is the general feeling that I have, having read about

20   all of the internal problems that Wells Fargo has had.

21        MR. PETERSON:   I don't have any further questions.

22   Thank you.

23        THE COURT:   Redirect?

24        MR. SAND:   Yes, Your Honor.

25

1          REDIRECT EXAMINATION

2    BY MR. SAND:

3    Q.   We talked about the 2016 time frame and that Wells Fargo

4    did not have a police report in that time frame from

5    Mr. Sponer.  Do you recall that testimony a minute ago?

6    A.   Yes, sir.

7    Q.   Could Wells -- in your opinion, could a bank like Wells

8    Fargo contact the police and ask for a police report?

9    A.   Sure, yes.

10   Q.   Would that be within industry norms?

11   A.   Yes, sir.

12   Q.   How about in a situation, also, where the bank is in

13   contact with the police during that time frame?

14   A.   Yes, sir.  That's why I said you couldn't get better

15   feedback or support or evidence.

16   Q.   All right.  Thank you.

17              MR. SAND:  No further questions.

18              THE COURT:  You may step down.

19              THE WITNESS:  Thank you, Your Honor.

20              THE COURT:  And do you want this witness to be

21   excused?

22              MR. SAND:  Yes.

23              THE COURT:  Any objection?

24              MR. PETERSON:  No objection.

25              THE COURT:  You may step down.

1                    Members of the jury, we're going to take our mid

2      afternoon recess at this time.  We'll be in recess for about

3      15 minutes.

4                    Jennifer will escort you out.

5                    Mr. Tarter, you can go ahead and step down.

6                    THE WITNESS:  I was just going to wait.  I move

7      pretty slowly these days.

8                    THE COURT:  Thank you very much.

9                    MR. PETERSON:  Your Honor --

10                    (The jury leaves the courtroom.)

11                    THE COURT:  What do you need?

12                    MR. PETERSON:  I think, unless I'm incorrect, we're

13      getting near the end of plaintiff's case.

14                    MR. SAND:  That's correct.

15                    MR. PETERSON:  We will have a couple issues for the

16      Court at the close of plaintiff's case.  I just wanted to

17      alert the Court so --

18                    THE COURT:  Can we take those up after you call your

19      witnesses and the jury is gone for the afternoon?

20                    MR. PETERSON:  That would be fine with us, Your

21      Honor.

22                    THE COURT:  And you can reserve whatever motions that

23      you would have made.  I will consider the evidence that was

24      received only in plaintiff's case in chief.

25                    MR. PETERSON:  Thank you.

1          THE COURT:  Is that acceptable to you?

2          MR. PETERSON:  That works for us.

3          THE COURT:  Is that acceptable to the plaintiff?

4          MR. SOLA:  Do you mean judgment as a matter of law

5  motions?

6          THE COURT:  Correct, halftime motions.

7          So he wants to make halftime motions.  I don't want

8  to interrupt the flow of the trial.  I want to take them up

9  after I let the jury go for the afternoon.

10          MR. SOLA:  Okay, Your Honor.

11          MR. PETERSON:  And then, Your Honor, our

12  understanding from the pretrial conference was we might talk

13  about jury instructions today at the close of evidence.  Is

14  that still on the schedule?

15          THE COURT:  I hope so.

16          MR. PETERSON:  Okay.

17          THE COURT:  I'm still kind of wrestling with it for a

18  little bit.

19          MR. PETERSON:  Okay.

20          MR. SOLA:  Actually, we had a small revision to one

21  of our suggested instructions, and maybe we'll just raise that

22  later.

23          MR. PETERSON:  Thank you, Judge.

24          THE COURT:  Thank you.  We're in recess.

25          (A recess is then taken.)

Hendricks - D

1          (The Court, counsel, the parties, and the jury

2     reconvene.)

3          THE COURT:  There is one more commercial I want to

4     leave you with so I don't forget.

5          The reporter from The Oregonian was in the back of

6     the courtroom for a portion of the testimony that was given.

7     That alerts me there might be a story coming out as regards

8     this case.  I would direct you not to read anything in the

9     newspaper as regards this case.  It might appear this evening

10    or tomorrow or on Oregonlive.  Just avoid any stories about

11    it.  Just ignore it, if you wouldn't mind.

12         Thank you.

13         Call your next witness.

14         MR. SAND:  Plaintiff calls Evan Hendricks.

15         THE CLERK:  Please raise your hand.

16

17                     EVAN HENDRICKS

18    called as a witness in behalf of the Plaintiff, having been

19    first duly sworn, is examined and testifies as follows:

20

21         THE CLERK:  Please have a seat.  State your name and

22    spell it.

23         THE WITNESS:  Good afternoon.  My name is Evan

24    Hendricks.  It's E-v-a-n H-e-n-d-r-i-c-k-s.

25

Hendricks - D

DIRECT EXAMINATION

1
BY MR. SAND:

2

3    Q.   And, Mr. Hendricks, can you tell the jury a little bit

4    about your professional background?

5    A.   Sure.  I've been following the credit reporting industry

6    for more than 40 years now.  When I got out of school -- I

7    went to University of Oregon for two years, then transferred

8    to Columbia.  After that I got a job at a newsletter company,

9    in September 1977, writing a specialized newsletter for

10   professionals and lawyers called Access Reports Privacy, which

11   covered the Fair Credit Reporting Act and other privacy laws.

12          And three years later that company dissolved, and I

13   started my own newsletter called Privacy Times in January

14   1981.  And that's where I continued to report on information

15   privacy issues, like the Fair Credit Reporting Act, because

16   that was the very first information privacy law passed in the

17   United States in 1970.  And so it was a newsletter for

18   specialists in the field.

19          And I accumulated a lot of specialized knowledge

20   following the industry doing that for 33 years.  And I finally

21   closed the newsletter in December 2013.

22   Q.   Have you been recognized as an expert in the field by any

23   members of government?

24   A.   Yes.  I've served as a member of the panel of privacy

25   experts of the U.S. Social Security Administration.  I also

Hendricks - D

1    have been invited to testify to Congress 10 times.  It's

2    always by invitation, most of the time on credit reporting

3    issues, sometimes on other financial privacy issues.

4    Q.  As part of your credit reporting experience, how much of

5    it -- or could you describe for the jury what part of it is

6    involved in identity theft?

7    A.  Oh, yes.  Well, identity theft is, like, intertwined with

8    credit reporting, because identity theft first came on the

9    radar through credit reporting, TransUnion studies showing

10   there were 35,000 inquiries back in 1992.  Then the number of

11   them went up like a hockey stick on the chart.  And by 2000 it

12   was recognized that identity theft was epidemic.  There was

13   like 9 to 10 million victims per year.

14       And the reason it's tied to credit reporting is

15   because it's a direct threat to credit reporting accuracy.  If

16   the thief steals the identity and then creates an account that

17   goes on the victim's credit report, that's per se inaccurate.

18   And so that was actually recognized.

19       And when I talk about testifying before Congress, in

20   2003 Congress dedicated the entire year to strengthening the

21   Fair Credit Reporting Act to make it better against identity

22   theft, to help victims.  And I testified before the Senate

23   Banking Committee and the House Financial Services Committee

24   that year and contributing ideas of how to make it better for

25   consumers, put stronger duties on the furnishers relating to

Hendricks - D

1  their credit report accuracy.

2  Q.  Have you been recognized as an expert in the field by the

3  credit reporting industry?

4  A.  Yes.  I served on -- during that time period, for two

5  years I served on, by invitation, on Experian's Consumer

6  Advisory Council.  They had a panel of experts of people like

7  me, people from industry, American Express, Capital One --

8              THE COURT REPORTER:  I'm going to have you slow down.

9              THE WITNESS:  So I did that for two years.

10             Then when Equifax did an opinion survey on

11  information privacy, in the acknowledgements they acknowledged

12  their thanks for my contribution to their survey.

13  BY MR. SAND:  (continuing)

14  Q.  And, Mr. Hendricks, it sounds like maybe you've been asked

15  to slow down by a court reporter before.

16  A.  Yes.  Even by judges, too.

17  Q.  Have you published any books?

18  A.  Yes.  I've published several books, but the most relevant

19  one for us today is my book "Credit Scores and Credit Reports,

20  How the System Really Works, What You Can Do."  I first wrote

21  that in 2004, after that 2003 year I told you about.  And then

22  there came two more editions, so there's three editions all

23  together.  It's a 400-page book with lots of footnotes and it

24  covers -- I don't know -- about 20 chapters.

25             But it covers -- the first part of the book covers

Hendricks - D

1    how the credit scoring system works, because that's the first
2    thing people are interested in.  You hear about credit scores.
3    And it goes on to explain the credit scores.  The next 15 or
4    so chapters explains how the credit reporting system works,
5    and because all the information in the credit score is based
6    on information in your credit report.
7    Q.   How long have you been serving as an expert regarding the
8    credit reporting industry and identity theft?
9    A.   I started regularly doing expert witness work probably
10   about 12, 15 years ago.  I was still doing my newsletter, got
11   retained in a few cases as an expert, and then it just kept
12   snowballing and taking more and more of my time.
13   Q.   And how has serving as an expert helped provide you with
14   specialized knowledge in the industry?
15   A.   I think that's important, because the policies, practices,
16   and procedures of the participants in the credit reporting
17   industry, like the big three credit bureaus, the furnishers
18   like Wells and Chase and all the rest of them, those are not
19   publicly available.  But because I'm an expert, I get to sign
20   a protective order and I get to review those as part of the
21   case, so I get to accumulate all the specialized knowledge
22   about what are their practices and procedures.  And even more
23   importantly, like you see here, I get to read deposition
24   testimony.  So they talk about, well, how do we apply these in
25   specific situations.

Hendricks - D

1   Q.   I'd like to start with some basics, because we've used a

2   lot of terminology in this case.

3              What is a credit report?

4   A.   A credit report is a compilation of information that

5   reflects your credit history.  It typically has three parts to

6   it, and that's -- the top part is the identification, shows

7   your identifiers.  The second part is the biggest part

8   usually.  That has your credit history, all your accounts,

9   which they call trade lines.  And the third part is the

10  inquiries, showing who has accessed your credit and for what

11  purpose.

12             Now, some people will have a fourth part, which you

13  don't want to have, and that's public records, and that

14  includes tax liens and bankruptcy and things that are usually

15  very derogatory.

16  Q.   How is a credit report created?

17  A.   It's created -- you saw a chart, which was very good, in

18  the opening, that the furnishers -- which you know what it

19  means by now -- the creditors furnish that information through

20  electronic means nowadays to the big three credit reporting

21  agencies.

22             The credit reporting agencies compile that

23  information and they assemble it.  And then through the

24  identifiers, they're able to assign the trade line or account

25  information to individual consumers through a matching process

1   that they have.

2           And another thing that they do is they collect

3   information, have vendors go to courthouses and get that

4   public record information in case you're going to have that

5   section 4 I mentioned.

6   Q.   Is there a standard for the information in credit reports?

7   A.   There are many standards, but by far the most important

8   standard in the credit reporting industry is accuracy, because

9   it's -- everything depends on accuracy.  And all the policies

10  are built around trying to assure accuracy or restore it.

11  Q.   And you talked about furnishers.  What is a furnisher like

12  Wells Fargo's role in ensuring the accuracy of information in

13  credit reports?

14  A.   Well, their most important role -- they have a couple.

15  But the most important role that a furnisher like Wells has in

16  the accuracy regime is, after getting an ACDV dispute, to

17  conduct a reasonable investigation and determine whether

18  disputed information is accurate or not accurate.  And if they

19  can't verify that it's accurate, they're supposed to delete

20  it.  That's the standard.

21  Q.   And that actually brings me to my next question.  If a

22  consumer finds inaccurate information in their credit report,

23  how do they go about disputing that information to get the

24  credit report accurate?

25  A.   Well, the best way -- and, actually, in my book I say that

Hendricks - D

1    you -- you make your rights the strongest and you make the

2    creditor's duty the strongest as well, the duty to do it, is

3    when you dispute through the credit reporting agencies,

4    because the law set up this filtering process so that -- you

5    know, when they first -- in the 1996 amendment -- remember, I

6    said it was enacted in 1970.  Well, for the first 26 years

7    there was no duty on furnishers.  They added those in 1996.

8    But they didn't want -- they wanted to make sure the disputes

9    continued to go through the credit reporting agencies.

10          So answering his question, I'm saying that consumers

11   dispute to the credit reporting agencies.  And then the credit

12   reporting agencies, as you've now seen, forwards that dispute

13   to the furnisher; and that's kind of a filtering process

14   that's built into the system.

15          I also think it's a good idea to -- I recommend doing

16   direct disputes as well, so you have the direct dispute going

17   to the furnisher and you have the other dispute going to the

18   CRA.  So you maximize the chances of getting bad information

19   corrected.

20   Q.   Okay.  And the jury has heard the term "ACDV" a lot.  And

21   in those two different methods you talked about, where does

22   the ACDV fall?

23   A.   That's the indirect dispute or the one through the credit

24   reporting agencies.  They're the ones that when you dispute to

25   them, as you've seen, they create the ACDV; and then they

Hendricks - D

1  forward that, the ACDV, which then the furnisher uses to

2  respond with its instructions to the credit reporting

3  agencies.

4  Q.  And what must a furnisher do -- a furnisher like Wells

5  Fargo do upon receiving a consumer's ACDV dispute from the

6  credit reporting agency?

7  A.  Well, they're supposed to do an investigation.  And the

8  purpose -- the investigation is supposed to have a purpose.

9  It's supposed to determine whether the disputed information is

10  accurate and/or complete.  So if they fail to do that and they

11  cannot verify it, then they're supposed to delete it.  But

12  their investigation has to be reasonably calculated.  So

13  depending on what the consumer has disputed, they're looking

14  at the right information, they're asking the right questions,

15  they're taking the right investigative steps.

16  Q.  And how are furnishers like Wells Fargo on notice of their

17  responsibility to conduct a reasonable investigation?

18  A.  Well, the -- what's really important to understand

19  here -- that's a good question, because many years before

20  Mr. Sponer became the victim of identity theft or made any of

21  the disputes here, furnishers like Wells Fargo were on notice

22  that doing the kind of superficial comparison of identifiers

23  that they did in this case was wholly unacceptable.

24       The industry -- notice was given to the industry, you

25  know, 10 years ago and even farther back that that does not

Hendricks - D

1    amount to a reasonable investigation and that you have to

2    consider the relevant information, its relevance to the

3    dispute, and you have to do a close examination or a searching

4    inquiry that requires some degree of care to turn up

5    what -- if the information is accurate or not.

6              MR. PETERSON:  Your Honor, may I ask a question in

7    aid of objection?

8              THE COURT:  Sure.

9              MR. PETERSON:  Mr. Hendricks, what put the furnishers

10   on notice 10 years ago?

11             THE WITNESS:  That was done by the -- FCRA has

12   various enforcement authorities, and the -- so there were a

13   couple of enforcement authorities that gave specific notice on

14   what kind of standards that furnishers had to follow to

15   qualify as a reasonable investigation.

16             So the FCRA's enforcement authorities include the

17   FTC, the CFPB, the state attorney generals, and the courts.

18             THE COURT:  You may proceed.

19   BY MR. SAND:  (continuing)

20   Q.  So let's talk about what brings you here today.  In light

21   of what you just discussed, can you tell the jury your opinion

22   about the investigations that Wells Fargo did in Mr. Sponer's

23   case?

24   A.  Okay.  Yes.

25             My opinion is that by the real meaning -- the plain

Hendricks - D

 1   meaning of the word "investigation," Wells Fargo never really

 2   investigated the disputes because they didn't do a careful

 3   examination.  They didn't do a systematic inquiry.

 4        They did -- what they did, as you heard, they just

 5   compared the identifiers of the information that was on the

 6   ACDV to what they had with an account.

 7        Now, I think you've heard enough to understand my

 8   opinion that in identity theft, the thief is using the Social

 9   Security number of the victim, and so they're going to match.

10   That doesn't tell you what they did.

11        And the problem that I have with Wells Fargo is

12   that -- Wells Fargo Auto is that they didn't do a searching

13   inquiry, because they had the information in their own

14   possession.  They had information from the police detective.

15   They had information from the ACDV saying it was fraud.

16   Eventually they had police reports.  They had the fraud

17   affidavit.  And they had the fraud block notice from

18   TransUnion.  And they had other ACDVs indicating the fraud

19   disputes were flying all around with this.

20        And so I agree with Mr. Tarter who came before me:

21   They had a mountain of evidence.  And not only did they not

22   use it, they disregarded all this information.  This is the

23   information they should have been paying the most attention

24   to, but instead they disregard it and say, "Is this the same

25   Social Security number?  Is this the same name?"

Hendricks - D

1           And, to me, that's just wholly unacceptable because

2    it's so superficial.

3    Q.   Let's talk about the chronology in this case a little bit.

4    Based on your review of the documents in the record and the

5    testimony, do you -- what was the earliest notice, in your

6    opinion, that Wells Fargo received that Mr. Sponer was the

7    victim of identity theft?

8    A.   I believe that was Mr. Charne's letter, the most explicit

9    notice that it received.

10   Q.   I'm going to -- the jury has seen this letter, but I'm

11   going to put it up briefly so you can discuss it.  I'll get

12   this to zoom out a little bit.

13           Is this the letter that you were referring to?

14   A.   Yes.

15   Q.   And why -- in your opinion, why would this letter be

16   relevant to Mr. Sponer's ACDV disputes?

17   A.   Yeah, because the big question is:  What did Wells Fargo

18   know at the time that it received an ACDV?  And so this is

19   relevant because an ACDV came after this.  So by the time they

20   got an ACDV, they already knew the information in this letter.

21           And this information -- this is a really good letter.

22   It tells you the name of the police detective, gives his phone

23   number, tells them it's Chula Vista, California.  It also

24   tells them that they're foreseeing that it's likely that there

25   could be reporting of really bad information, inaccurate

Hendricks - D

1    information, to credit reporting agencies, and saying, "If

2    you've done that, please correct it.  If you haven't done

3    that, don't do it."

4         So there's that.  And they're telling them that

5    Mr. Sponer is a long-standing customer of Wells Fargo.

6         So Wells Fargo, if Wells Fargo -- in a system like

7    this, when you have disputes, you should have a mechanism to

8    remember what you already know.  Now, they know Mr. Sponer is

9    a customer, but this letter is reminding them, and that he's

10   also saying, "Please don't cut off my credit cards, because

11   I'm depending on that."

12        Now, those credit cards have transactions showing

13   what he's buying and where he is and what time he's doing it.

14   It has very detailed information, the kind that police like to

15   get if they're investigating a crime.

16        And so Wells Fargo is sitting on all that

17   information, and it pretty much already verifies that -- could

18   verify, if they looked at it, if they considered it, but they

19   didn't.  They disregarded it.  They didn't even consider

20   looking at it.

21   Q.  Mr. Hendricks, I'm going to show you another document.

22   This is Exhibit 43.  Do you recognize this document?

23   A.  Yes.  This is the suspected unusual activity form that

24   someone in Wells Fargo did to make -- to memorialize this

25   letter that they received, so it would be in the system.  So

Hendricks - D

1  this is a way to -- a mechanism for trying to remember what
2  they're supposed to know and what they'll need to know later.
3  Q.   And do you see the date on this document?
4  A.   That says 10-19-2016.
5  Q.   Do you recall if this document precedes Mr. Sponer's first
6  ACDV dispute?
7  A.   Yes, it does.
8  Q.   And could you read for the jury the description of unusual
9  activity field or summarize it?
10  A.   Where it starts "type of activity, ID theft"?
11  Q.   Yes.
12  A.   Yes, it says, "Client was" -- this is where I've got to be
13  careful not to go too fast.
14           (Reading) Client was victim of identity theft.
15  Customer out of the country, was contacted by police
16  department BC -- because they arrested the suspect for getting
17  a BMW with his client's info.  Doesn't want to affect client's
18  credit report.  Client is a WF customer.  No indication any
19  other WF accounts are compromised.  Client's SSN ends in
20  2298 -- the whole one is listed there internally for Wells
21  Fargo.
22           Attorney will leave country November 1st and will be
23  back in February.  Can contact James Charne, James, attorney,
24  phone number, starts with 310.  Address is on Mifflin Street,
25  Madison, Wisconsin, and his e-mail address.

1    Q.   Now, this document, we said, precedes Mr. Sponer's first

2    ACDV dispute?

3    A.   Yes.

4    Q.   Okay.  I'm going to have you take a look at Exhibit 32,

5    and these are the iTop notes.  I'm going to turn to

6    page -- this is going to be page 21 of Exhibit 32.  I'll zoom

7    in a little bit, make it easier to read.

8    A.   That's good.

9    Q.   Is that good?

10   A.   Yes.

11   Q.   Do you see an entry on 10-26-2016?

12   A.   There's actually two.  One's the encrypted one that says,

13   "Call Detective Edward Tugashov."  And then "LMOVM" means left

14   message on voicemail.

15           And below that, would you like me to read the one

16   below that?

17   Q.   Yes, please.

18   A.   (Reading) Got a note from Will here on John Miller's team

19   that this vehicle was impounded.  They give a number.

20           (Reading) Detective Edward Tugashov is the person we

21   need to contact to arrange to pick up the unit.  They have

22   determined this is a fraud.  We have not.  We are waiting to

23   hear back from the victim.  We need to arrange to take

24   possession of our unit ASAP.

25   Q.   I'm going to have you look at one more entry on 10-26.

Hendricks - D

1    This is actually on page 20.  Let's see if the auto focus
2    kicks in.  There we go.
3           Do you see the other 10-26 entry?
4    A.  Yes.
5    Q.  Can you read that for the jury, please.
6    A.  Sure.
7           (Reading) Spoke with Detective Tugashov.  He stated
8    that they are investigating this as fraud.  Unit was purchased
9    by Jason Yochum, 10-4-79, after he stole customer's identity.
10   Unit will be held until 11-1 for investigation and will be
11   released to us then with no fees.  Customer attorney is Jim
12   Charne.
13   Q.  Okay.  What is your opinion about the information we just
14   read in the iTop notes relevant to Mr. Sponer's upcoming
15   ACDVs?
16   A.  Well, it's hard to put it any better than Mr. Tarter put
17   it.  Usually you just don't get right from the source of the
18   detective investigating the case that this is the guy, this is
19   the bad guy, and the customer is the identity.
20          So that's -- that's about as robust notice as you can
21   get in an identity theft case.  It leaves no doubt to any
22   reasonable person that the thief is Yochum and the victim is
23   Mr. Sponer.
24   Q.  I'm going to show you another document.  We've heard a lot
25   about ACDVs, but I don't know that we've actually looked at a

Hendricks - D

1    number of them, so we're going to take a look at one or two.

2                THE CLERK:  What's the exhibit number?

3                MR. SAND:  This is Exhibit 50.

4    BY MR. SAND:  (continuing)

5    Q.  Do you recognize this document?

6    A.  Yes.

7    Q.  Can you explain to the jury what this is?

8    A.  This is the ACDV we've talked so much about.  This one is

9    dated -- sent on October 28, 2016, and the response date is

10   11-03-2016.  This one is from Experian.  And the ACDV dispute

11   reason is 103.  And that means consumer claims true identity

12   fraud, account fraudulently opened, provide complete ID.

13   Q.  So based on the information that Equifax had -- I'm sorry.

14   Based on the information that Wells Fargo had at this time

15   that we've reviewed, what is your opinion about what an

16   investigation should have concluded?

17   A.  Well, the investigation -- they should have done an

18   investigation, which, in my opinion, they didn't.

19                Second of all, they should have looked at the

20   information they had readily available to it and the

21   information that is in their possession and concluded that,

22   yes, indeed, the accurate conclusion was Mr. Sponer was a

23   victim of identity theft, and therefore used this ACDV to

24   instruct Experian in this case that this information should be

25   deleted from his Experian file.

Hendricks - D

1          And when there's a fraud dispute, because of those

2    2003 amendments, all fraud disputes, once they go to one CRA

3    and there's a response, it goes to all three CRAs.  They did

4    that because they saw -- in the old days, when consumers had

5    to dispute to each CRA, and then they'd have to dispute to

6    each creditor, and they tried to streamline it so there would

7    be a loop, and fraud disputes and fraud information disputes

8    would circulate throughout the industry.

9    Q.   Circling back to the iTop notes, to show you another page,

10   this is page 19 of the iTop notes, which is Exhibit 32.

11          So the ACDV we just looked at, do you recall the time

12   period roughly?

13   A.   Late October when it was first sent, responded

14   November 3rd.

15   Q.   Okay.  Let's take a look.  Do you see the bottom entry of

16   the iTop notes?

17   A.   The very last one?  Yes, I do.

18   Q.   Can you read that for the jury, please.

19   A.   (Reading) Received call from Detective Tugashov.  He

20   states suspect plead guilty and sentencing is on 11-30, and

21   between now and then the suspect can change their mind; and,

22   if so, car would have to be kept as evidence for trial.  He

23   will try and speak with DA and have them release to us.  He

24   said he would let me know ASAP.  And if DA approves, we can

25   get car as early as next Tuesday.

Hendricks - D

1  Q.  Was this evidence that Wells Fargo should have considered

2  in future ACDV disputes?

3  A.  Absolutely.

4  Q.  I'm going to show you what's been marked as Exhibit 60.

5  Do you recognize this document?  There are two pages.  I'm

6  showing you the first page right now.

7  A.  Yes.  I talked about the new systems that were put in

8  place around 2003.

9         THE COURT:  This exhibit has not yet been received.

10        MR. SAND:  60.

11        THE CLERK:  I'm sorry.

12        THE COURT:  Go ahead.

13        THE WITNESS:  This is the fraud blocking note.  So I

14  said that when information is determined to be fraud -- and so

15  in this case TransUnion has followed the industry standards

16  and determined this is fraud, so they're sending the fraud

17  block notice to Wells Fargo Dealer Services.  So that serves

18  as additional notice and a very robust kind of notice because,

19  you know, TransUnion is very expert at this.  Credit reports

20  is what they do.

21  BY MR. SAND:  (continuing)

22  Q.  And so who would have put this document together?

23  A.  TransUnion.

24  Q.  And is there a field that shows where they sent it?

25  A.  Yeah.  They sent it to mail to credit and grantor at Wells

Hendricks - D

1   Fargo Dealer Services, P. O. Box 1997, Winterville, North
2   Carolina.
3   Q.   Let's take a look at page 2 of this document.
4        Can you explain for this jury what the
5   document -- explain to the jury what a fraud block notice is
6   and how this works within the industry, please.
7   A.   It's that TransUnion has determined that this is fraud and
8   they want to block that information from showing up on his
9   credit reports.  And so some accounts are opened fraudulently.
10  And so this one focuses on the Wells Fargo account.  And it's
11  communicating that to -- TransUnion is communicating that to
12  Wells Fargo.  And they're saying that they received the
13  documentation and notification from the above-referenced
14  consumer.
15       And it goes on to say, "We have permanently blocked
16  that account from our records as of November 13th, 2016."  And
17  this is the important part of it in terms of, you know, making
18  it robust.  They say, "Additionally, please take all the
19  necessary steps to ensure this account is not reported by you
20  or by a third party -- i.e. collection agency -- on your
21  behalf."
22       Because we've seen other accounts that the creditor
23  forwarded it to a collections agency, so then the bad news is
24  multiplying like rabbits on the credit report.  So they're
25  foreseeing that as a possibility, too.

Hendricks - D

1  Q.   What is the date?

2  A.   The date on the letter is November 13th, 2016.

3  Q.   Let's take a look at Mr. Sponer's second ACDV dispute.

4  This is Exhibit 51.  Do you recognize this document?

5  A.   Yes.  This is an Equifax ACDV to Wells Fargo.

6  Q.   Okay.  The jury has heard a lot about ACDVs, but I don't

7  think we've taken a long time to actually -- or a period of

8  time to explain exactly what they are.  Can you explain to the

9  jury exactly what they're looking at?

10  A.   Sure.  An ACDV is an electronic format, but when you print

11  it out, this is what it looks like, Equifax's version.  So

12  they're looking at the ACDV.  You see that the date created is

13  on here and the response date.  The date created is

14  10-30-2016.  The response date is 11-16-2016.  The dispute, as

15  you know by now, is 020, claims true identity fraud, account

16  fraudulently opened, initiate investigation.

17          Then you drop down just a little bit, and you'll see

18  FCRA relevant information, and that from Experian on

19  10-29-2016 is an example of what I was talking about, when one

20  fraud dispute has gone through Experian, then Experian sends

21  it through a system called e-OSCAR, so then Equifax as well

22  gets notice of it, and then Equifax gets the notice from

23  Eperian, creates the ACDV to send to Wells Fargo saying

24  basically, "You need to investigate this."

25  Q.   And the jury heard earlier today testimony from Wells

Hendricks - D

1    Fargo's employees about the matching procedure that the ACDV

2    investigators do when they receive an ACDV disputing identity

3    theft.

4              Looking at the document, can you explain what that

5    means?

6    A.   Sure.  I mean, you see -- if you look in the middle top of

7    the document, you'll see the check marks.  Thank you.

8              You'll see, that's when she said, "We looked.  He had

9    the same name, the same Social Security number, and the same

10   date of birth."  They checked those boxes.  And then even

11   above that, you'll see that's where they checked the box

12   "modify as shown."

13             And if you look down below, this is so early in the

14   process, this account has not gone derogatory yet.  If you --

15   you can see the type and rate, where it says I1.  Can you put

16   your pen on there?  Keep going across there.  Right there.

17             That means it's an installment loan that's not late.

18   1 means you're not late, you're on time.  So that's how early

19   in the process this is.  And it doesn't have a past due

20   balance either.  It's blank.  It says that the current balance

21   is $29,090.

22   Q.   In terms of the matching procedure you described, is it

23   your opinion that is a reasonable procedure to investigate

24   identity theft?

25   A.   No.  It's -- it's so unreasonable because the thief is

1   using his Social Security number and name, so you're not even

2   investigating the most important aspects of it.  I think

3   accurate means correct in all cases.

4           And they're not even -- the most important thing

5   about the dispute is it's identity theft.  Yet you heard that

6   they, instead of investigating, "Okay.  Is that true?  Is this

7   a product of identity theft?," no, they just matched the

8   identifiers, which are going to match anyway.  So it's pretty

9   frustrating to listen that they do this.

10  Q.   And what was the result of this dispute?

11  A.   They basically instructed Equifax to keep the derogatory

12  information on, that this does belong to our plaintiff,

13  Matthew Sponer, and that, you know -- to keep this $29,000

14  balance and this account on his credit report.

15  Q.   And let's take a look.  There are three fields.  There's

16  "verified as reported," "modify as shown," "delete account"

17  and "delete fraud."

18          Why are there two different boxes for "delete

19  account" versus "delete fraud"?

20  A.   Because with 9 million victims per year and being a

21  direct threat to the accuracy of credit reporting that it

22  deserves -- it's so common that it deserves its own category,

23  "delete fraud."

24  Q.   And all the documents we talked about before this ACDV

25  that were in Wells Fargo's file, is it your opinion that those

Hendricks - D

1  should have been relevant to their investigation of this ACDV
2  dispute?
3  A.  Yeah.  They should have had laser focus on the relevant
4  information that you just cited:  the police detective, you
5  know, the other information they got from the police detective
6  at this point, the fraud block notice.  All of that should
7  have been enough to persuade them to send back an ACDV saying,
8  "Yeah, this is a fraud.  Please delete it from Mr. Sponer's
9  file."
10 Q.  Let me show you one more entry out of the iTop notes.
11 This is page 16 of the iTop notes.
12      Let me ask this this way.  Do you see any entries
13 here that should have been relevant for Wells Fargo's ACDV
14 dispute when plaintiff is disputing because of identity theft?
15 A.  Sure.  I think all of the ones that are referencing
16 Detective Tugashov and the thief, fraudster Jason Yochum, are
17 all relevant.  So at first blush, I see four.
18 Q.  Let's start with the entries on 12-13.  There's a large
19 paragraph here.  Can you describe for the jury what that says
20 and why that would be relevant to an ACDV investigation of
21 identity theft?
22 A.  Well, it says that the car was impounded, so the car that
23 was fraudulently purchased was in police custody.  They had
24 it.  It was determined to be fraud.  It was purchased by the
25 named -- the fraudster, Jason Yochum, and that he stole

Hendricks - D

1    our -- Wells Fargo's -- customer's identity, that Mr. Yochum
2    is in custody, that the car is being held as evidence.  The
3    sentencing has been rescheduled, so they won't get the car
4    back as quickly as they might have wanted.  They have to wait
5    until probably January 2017, and the district attorney will
6    not release that vehicle until that time.  And then they say,
7    "SAR," which means suspicious activity report, I believe,
8    "sent to Wells Fargo Dealer Services, fraud."
9    Q.  Is there any better evidence of identity theft than a
10   detective telling the bank that this account is identity
11   theft?
12   A.  I've done lots of identity theft cases, and I can't think
13   of any --
14   Q.  All right.
15   A.  -- anything better than this.
16   Q.  And all of the documents that we've reviewed, is it your
17   testimony Wells Fargo should have been considering those
18   documents as part of its investigation of Mr. Sponer's ACDV
19   disputes?
20   A.  Yes.  It was incumbent that Wells Fargo would review this
21   information, because it's probably the most relevant
22   information in the dispute.  And, unfortunately, they not only
23   did not consider it; they discarded it.
24   Q.  And Mr. Sponer, do you recall, he filed more ACDV disputes
25   in 2016 than the ones we've looked at?

Hendricks - D

1  A.   Yes.  We're just looking at a sample so far.

2  Q.   Do you recall how many he sent to Wells Fargo?

3  A.   I thought in 2016 there were four.

4  Q.   I'm going to show you what's been marked as Exhibit 11.

5  And we spent a good deal of time on these letters, so I don't

6  want to go through it page by page, but have you seen this

7  document before?

8  A.   Yes.

9  Q.   Can you describe for the jury what this document is?

10  A.   That's the direct dispute letter sent via certified mail

11  to Wells Fargo Dealer Services fraud department.

12  Q.   And in this letter -- let me zoom out a little bit

13  more -- is it your opinion that Mr. Sponer provided

14  information that should have been relevant to Wells Fargo --

15  A.   Yes.

16  Q.   -- on future ACDV disputes?

17  A.   Yes, he did.  He was very thorough.  I'm very impressed by

18  the job he did.  Obviously his training as a computer

19  programmer is about problem solving; and when the first route

20  doesn't work, he'd try a different route.  So this is one of

21  the early routes he tried, after trying his ACDV disputes.

22  Q.   And we'll look at this page.  It's the second page of

23  Exhibit 11.  There are several attachments Mr. Sponer had to

24  this letter.  There was an FTC identity theft affidavit, a

25  police report, and a notice to furnishers of information.

Hendricks - D

1    Are those documents relevant to a bank's

2    investigation of identity theft?

3    A.   Absolutely.  I mean, this was part of those 2003

4    amendments was making sure -- trying to streamline it for

5    consumers.  The FTC affidavit was a part of that.  They

6    created that to make it easier.

7         Another grand irony here is on Wells' website, they

8    tell people who are afraid they're victims of identity theft

9    to do these first two things, to do a FTC identity theft

10   affidavit and to do a police report.

11   Q.   Do you recall, did Wells Fargo remove the fraudulent

12   account from Mr. Sponer's credit report after receiving this

13   letter?

14   A.   No.

15   Q.   And this letter is dated January 19th.  Why would this

16   letter on January 19th, 2017, be relevant for Mr. Sponer's

17   future ACDV disputes?

18   A.   Because when the future ACDVs came in, disputes came in,

19   they would have known this information.  They would have had

20   all those attachments, the FTC affidavit, police reports, and

21   all the other details he provided in this, which you've

22   already seen.

23   Q.   Let me show you -- moving forward in time, I'm showing you

24   a letter, one of Mr. Sponer's letters.  This is November 3rd,

25   2017.  Mr. Sponer sent several direct disputes.  Do you recall

Hendricks - D

1  that?

2  A.   Yes.

3  Q.   And this is one of them.  As of November 3rd,

4  2017 -- we'll go to the second page here -- the third page,

5  there are additional documents that Mr. Sponer submitted to

6  Wells Fargo.  Do you see those?

7  A.   Yes.

8  Q.   Would these documents also be relevant for future ACDV

9  disputes?

10  A.   Yes.

11  Q.   And why would that be the case?

12  A.   Well, we've already talked about the identity theft

13  affidavit and the police report.  But here you have the

14  relevant passport pages.  That shows which islands in the

15  South Pacific he was on during the time in question.  So

16  that's very authoritative and compelling information.  That's

17  official stamps of your location in time.  So that would be

18  him trying another route.  The other ones aren't working, so

19  we're trying this other avenue.  And I consider those very

20  relevant, helpful.

21        And, by the way, I mentioned earlier, Wells Fargo has

22  those transactional data from his credit card, so they could

23  have matched those passport pages with the credit card

24  information they already had and said, "Yeah, I guess he's

25  telling us the truth."

Hendricks - D

1    Q.   And do you recall what Wells Fargo's response was to this

2    letter?

3    A.   I remember that they didn't agree that they were going to

4    delete the account.  I don't remember what wording they used

5    this time.

6    Q.   They didn't delete the account, though?

7    A.   No, no.  All I remember is -- I'll stop right there.

8              THE CLERK:  What was that exhibit number?

9              MR. SAND:  This is Exhibit 53.

10   BY MR. SAND:  (continuing)

11   Q.   After Wells Fargo had received that letter -- I'm going to

12   show you another ACDV.  We looked at the ACDV back in -- I

13   think it was October and November of 2016.  Can you explain

14   for the jury what has changed about this account at this

15   point?

16   A.   Okay.  Oh, good point, yes.  This is --

17   Q.   Oh, I'm sorry.  I'm showing you --

18   A.   No, this is right.  This is after the first one, because

19   the first one showed it had not even gone derogatory.  But on

20   this one, it's 30 days -- I don't know if it's even 30 days

21   later.

22             If you go down -- and you'll see the "claims true

23   identity fraud" is the same dispute.  But if you go down where

24   it says type and rate -- and I don't know if you can point

25   that out again.  And it says -- I3 is what they had.  That

1    means 90 days late, installment loan, 90 days.  And now it's
2    I4, so it's climbing the ladder to 120 days later.  And then
3    eventually it will go to 150.  And then once it passes 180,
4    which happens later this year, it goes to charge-off status;
5    and those, of course, are a highly derogatory status.
6    Q.  And do you recall if Mr. Sponer sent more ACDV disputes to
7    Wells Fargo in November and December of 2017?
8    A.  Yes.
9    Q.  Do you recall what Wells Fargo's response was to those
10   ACDV disputes?
11   A.  It was more of the same.  They compared identifiers.  They
12   disregarded all the important information they had even in
13   their own possession, and they never investigated the
14   ACDV -- the ACDV operators never investigated whether it was a
15   product of identity theft.
16   Q.  Do you recall how many ACDVs Wells Fargo received
17   disputing this fraudulent account?
18   A.  I believe it was 10.
19   Q.  Did Wells Fargo ever delete the account in response to an
20   ACDV dispute?
21   A.  Never deleted the account, never conducted an
22   investigation.
23   Q.  Okay.  So we've talked globally about these ACDVs.  What
24   is your opinion about Wells Fargo's investigation of
25   Mr. Sponer's ACDV disputes?

Hendricks - D

1  A.  Well, that they -- like I said, this is their most

2  important duty in credit reporting accuracy, and they totally

3  disregarded that duty.  They disregarded the notice that was

4  sent to all furnishers that you can't do this superficial

5  comparison and call it an investigation.  You've got to do

6  something -- more of a searching inquiry or detailed

7  examination.  So it was just different levels of disregard, up

8  and down the chart.

9           MR. PETERSON:  Move to strike.

10          THE COURT:  The objection is overruled.

11 BY MR. SAND:  (continuing)

12 Q.  And in part of your preparation to testify today, you

13 reviewed the deposition transcripts of Wells Fargo's

14 employees?

15 A.  Yes.

16 Q.  And that's the same testimony we heard in court today, I

17 believe?

18 A.  And more.

19 Q.  We heard that testimony about Wells Fargo's policies for

20 its ACDV dispute investigators.  What is your opinion about

21 those policies?

22 A.  They're -- I mean, the whole point is to have an

23 investigation that identifies inaccuracies and makes sure

24 they're corrected and removed.  But these policies of refusing

25 to investigate an identity theft instead means that it's going

Hendricks - D

1   to ensure that inaccuracies persist.

2           And so under their policy or procedure, as we saw in

3   this case, an identity theft dispute to an ACDV operator is

4   not going to get corrected.  The inaccuracy is going to

5   persist.

6   Q.  In your experience -- experience in the industry, have you

7   ever seen a company that has procedures that prohibit ACDV

8   employees from investigating identity theft?

9   A.  No.  And it was stunning to see them here.

10  Q.  What risks does Wells Fargo's ACDV investigations

11  procedures create for victims of identity theft?

12  A.  It just means that there -- instead of being corrected

13  within a reasonable period of time, which is 30 days, 30 to 45

14  days, you're going to ensure that a lot of innocent people

15  become victims of chronic credit reporting inaccuracy.

16  Q.  Now, Wells Fargo claims that it was waiting for

17  Mr. Sponer's Social Security card to proceed with its

18  investigation.  In your opinion, was this reasonable to do?

19  A.  No, it's not.  And I've never seen that requirement.  They

20  had plenty of information to identify that this was an

21  identity theft situation.

22          It's not about the identity of the person disputing

23  as much as about the inaccuracy of the information that

24  they're furnishing.  And so it's hard for me to conclude

25  anything else but that this Social Security card requirement

1   was just a flimsy excuse for doing nothing.

2   Q.   When you say you've never seen that requirement, I want to

3   unpack that.  Do you mean you've never seen a furnisher

4   request a Social Security card in response to an ACDV dispute?

5   A.   No.  Sometimes you can request a Social Security card.

6   But, again, that's never an excuse -- if you don't get it, you

7   still have to do an investigation.  That's where the strongest

8   duty is.  And there's other ways of verifying identities.  But

9   to not get a Social Security card does not amount to an excuse

10  not to do your duty to investigate.

11  Q.   In your experience, are Social Security cards -- let me

12  ask this a different way.

13          Was Wells -- was it necessary for Wells Fargo to have

14  Mr. Sponer's Social Security card in order to determine

15  whether or not an identity thief opened this account?

16  A.   No.

17  Q.   And why is that?

18  A.   Because they had the information from the police

19  detective.  They had all the information from his file as a

20  Wells Fargo customer.  They had his passport location and time

21  and location information.

22          I don't know.  I'd rather not spend the rest of the

23  day listing all of it, but you get the idea, right?

24  Q.   Let me ask you this.  Do you have an opinion about why

25  banks like Wells Fargo would have substandard ACDV dispute

Hendricks - D

1  procedures?

2          MR. PETERSON:  Objection, relevance.

3          THE COURT:  Sustained.

4          THE WITNESS:  Okay.

5  BY MR. SAND:  (continuing)

6  Q.  Did you have an opinion about why banks like Wells

7  Fargo --

8          MR. PETERSON:  Objection, relevance.

9          THE COURT:  Sustained.

10  BY MR. SAND:  (continuing)

11  Q.  Let's talk about the real world consequences of identity

12  theft and credit reporting errors.  Mr. Sponer was the victim

13  of identity theft.  Can you help the jury understand the

14  intersection of credit reporting and identity theft?

15  A.  Right.  I mean, I've talked about how it's a systematic

16  threat to accuracy.  But when you're the victim of chronic

17  inaccuracy, there are several categories of problems you're

18  foreseeably going to endure.  I wrote about these back in 2004

19  in the first edition of my book.

20          One of them is that you're going to be inaccurately

21  described as not creditworthy or less creditworthy than you

22  already are.  You're also going to have to take time and

23  energy to try and fix a problem that was not of your making.

24  And when you have to devote time and energy to that, that

25  means you lose other opportunities that you would have taken

Hendricks - D

1    with your time.

2            Another one is that you -- any reasonable person that

3    knows they have this kind of derogatory information in their

4    credit report knows that it's senseless to try to apply for

5    credit.  It would be like banging your head against the wall.

6    You're just asking for more frustration and humiliation

7    because you're going to get rejected.  So another harm or

8    problem is that you're chilled from applying for credit.

9            And we've seen throughout the years, as I've listened

10   to victims tell their stories, that a lot of them have

11   sleeplessness and physical symptoms.

12           Another thing that happens here is that you lose

13   reasonable control over your personal information.  You know,

14   what people care most about is having control they're supposed

15   to have.  And that's the whole purpose of the law and the

16   policies is that you do have reasonable control.  When you

17   have stuff that's not accurate, especially showing you're a

18   fraudster, and you can't correct it, you lose reasonable

19   control.

20           And I think another final category that sort of sums

21   it all up is -- and experts who are qualified have found this

22   in their research, is that there is emotional distress and

23   frustration and anger stemming from all these things; and

24   that's a real problem for consumers.

25   Q.  So within those categories you described, can you explain

Hendricks - D

1    or help the jury understand the different factors used for

2    assessing the severity of the negative impact of a credit

3    reporting error?

4            MR. PETERSON:  Objection.  The witness isn't

5    qualified to to testify about the effect of --

6            THE COURT:  I'm sorry?

7            MR. PETERSON:  Well, may I ask a question in aid of

8    objection?

9            THE COURT:  Sure.

10           MR. PETERSON:  Mr. Hendricks, do you have any special

11   training in psychology?

12           THE WITNESS:  No.  This is not about psychology.

13   This is about the factors that I included in my expert report.

14           MR. SAND:  We're not going that direction.

15           THE COURT:  Go ahead.

16   BY MR. SAND:  (continuing)

17   Q.  Go ahead.

18           Do you want me to ask it again?

19   A.  If you wouldn't mind.

20   Q.  Sure.

21           Can you explain factors that can be used for

22   assessing the severity of a negative impact for victims of

23   inaccurate credit reporting?

24   A.  Yes.  I mean, the thing is -- one of them is the nature

25   and substance of the category of damage.  So let's say if

1    you're shown to be 30 days late one time, but it happens,

2    that's not very serious, right.  But if you're shown as a

3    charge-off that's a result of fraud, to me, the nature and

4    category is a very serious and very significant.  So in terms

5    of gauging the severity of how bad this is, that's one factor

6    to consider.

7            Another is I talked about you have to spend time and

8    energy.  Another factor is,  well, how much time and energy do

9    you have to do?  I don't think we have a good quantification

10   of how much time Mr. Sponer put into it, but to me it seems

11   like he spent a significant amount of time trying to fix this

12   problem.

13           Another factor, was there a reasonable expectation

14   that the problem is going to be solved?  And I think, my

15   opinion, Mr. Sponer had that.  He kept trying these different

16   routes, saying, "Okay.  This is what's going to fix it."  And

17   I think his expectation that it was going to be fixed was

18   reasonable.

19           And the last factor you want to consider is the

20   period of time over which the problem persisted.  Is this

21   three or four months or is it 14 months?  And so the more, the

22   longer it persists, the more severe it is, I think.

23   Q.  You mentioned the first factor.  I think you called it the

24   nature and substance of the category damage.

25           How derogatory was the Wells Fargo account on

1    Mr. Sponer's credit report?

2    A.   It's one of the most derogatory -- charge-off is one of

3    the most derogatory statuses you can have on your credit

4    because it shows that the creditor gave up on you, not

5    even -- they just wrote it off.

6              MR. SAND:  No further questions.

7              THE COURT:  Cross-exam.

8

9                       CROSS-EXAMINATION

10   BY MR. PETERSON:

11   Q.   Mr. Hendricks, I want to start with your discussion about

12   Wells Fargo's policies and investigation.  I believe you said

13   they failed to investigate; is that correct?

14   A.   Yes.

15   Q.   It's true, isn't it, that there's nothing wrong with two

16   different departments doing an ACDV investigation, correct?

17   A.   I guess in the most general hypothetical sense, no, I

18   don't think there's anything wrong with that.  Somebody is

19   doing it.

20   Q.   So, for example, if the ACDV comes in and it says

21   "identity theft," it's proper or it wouldn't be unreasonable

22   for the ACDV operator to then involve the fraud department,

23   correct?

24   A.   Yeah, if they were going to be -- if that was going to be

25   part of a reasonable investigation, sure.  The more the

1  merrier you can get to get that reasonable investigation
2  accomplished, sure.
3  Q.  And that's -- you reviewed the policies and procedures,
4  and that's Wells Fargo's policy and procedure, correct, when a
5  fraud -- when an ACDV comes in with an identity theft
6  complaint, that gets forwarded to fraud, correct?
7  A.  I'm sorry.  That's not consistent with my understanding of
8  all the material I reviewed in this case, and that's certainly
9  not what happened in Mr. Sponer's case.
10  Q.  A Social Security card is a good way to confirm
11  that -- requesting a copy of the Social Security card is a
12  good way to confirm that you're talking to the person you
13  should be talking to, correct?
14  A.  It depends.  It's certainly one avenue to try.  But you'd
15  have to keep in mind that Social Security cards can be made
16  fraudulently, just like other identification.  It doesn't have
17  a photo on it, like a passport or a driver's license.
18          And, of course, I'm old enough to remember when a
19  Social Security card said, "This is not to be used for
20  identification."
21  Q.  Do you remember when you and I talked before at your
22  deposition?
23  A.  Yes.
24  Q.  And I asked you then, "Isn't it therefore reasonable that
25  asking for a copy of the actual card is a good way for a bank

1  or any financial institution to confirm they're actually

2  talking to the right person?"

3          And you responded, "I think the question is, is that

4  a good way to do it, asking for it?  Yes, I think asking for

5  it is a good way to do it."

6          Do you agree with that prior testimony?

7  A.   Yes.   I see no problem with asking for it.

8          The problem is when you fail to do your duty to

9  investigate because you don't get it, when you have plenty of

10  other information.  That's very problematic, in my opinion.

11  Q.   And there's nothing wrong with asking a consumer for more

12  information, correct?

13  A.   I mean, again, generally, in a hypothetical situation, if

14  you're doing something to ensure accuracy, it's good.

15  Q.   I'd like to have you look at Exhibit 501.  Have you

16  reviewed this letter?

17  A.   You're doing this so I have to take out my glasses.

18  Q.   Sorry.

19  A.   Yes.  Yes.

20  Q.   And the date on this letter is October 26th, 2016,

21  correct?

22  A.   Yes.

23  Q.   And you see that there's a request for additional

24  information.

25          I should back up.  This follows the first letter from

Hendricks - X

1    Mr. Charne, correct?

2    A.   Yes.

3    Q.   And this, then, asked for some additional information,

4    correct?

5    A.   Yes.

6    Q.   And there's nothing unreasonable about taking that step in

7    the investigation, is there?

8    A.   No.

9    Q.   And you spent a fair amount of time in your testimony

10   discussing all of the information that Wells Fargo had in its

11   file.

12         Speaking about the first set of ACDVs -- I refer to

13   them as a set.  I think you testified there were four ACDVs in

14   the fall of 2016?

15   A.   That was my recollection, yes.

16   Q.   Do you remember the date that Wells Fargo responded to the

17   last of those?

18   A.   I don't -- I don't remember the exact date.  I thought it

19   would be in December of 2016, mid to late December 2016.

20   Q.   And I think the documents show it was December 3rd.

21   A.   Oh, was it the 3rd?

22   Q.   Would you disagree with that?

23   A.   No.  If you represent that to me, I have no reason to

24   dispute your representation.

25   Q.   So taking that representation, then, as far as responding

Hendricks - X

1   to the first set of ACDVs, anything that Wells Fargo received

2   after December 3rd or anyone they talked to after December 3rd

3   wouldn't have been available to them in responding to that

4   first set of ACDVs, correct?

5   A.   Okay, yes.  I think I follow you.

6          So if -- in those first set of ACDVs, if the last one

7   was December 3rd, then they would only have available to it --

8   at least the easily available information that's already in

9   its own possession would be that which it received prior to

10  December 3rd.

11  Q.   That's right.

12         And so you were looking at the iTop notes, for

13  example, so anything that happened after December 3rd wouldn't

14  be relevant to those first set of ACDV responses, correct?

15  A.   I'm trying to be careful here because --

16  Q.   I mean, they didn't have it, right?

17  A.   Well, they didn't have it, but the information that came

18  after, some of that information, if Wells would have done a

19  reasonable investigation, they would have covered it.  So

20  that's why I'm sort of hemming and hawing on that.

21  Q.   But they didn't have the information?

22  A.   They didn't have it because they didn't investigate.  If

23  they had investigated it, they would have gotten it, and their

24  duty is to investigate, so --

25  Q.   And you also testified about the letters that Mr. Sponer

1   sent beginning in January of '17 and the information that was

2   included with those, the fraud affidavit, the police report,

3   other information.

4          That wasn't information that Wells Fargo had when it

5   responded to the first set of ACDVs, correct?

6   A.   That's correct.  The first set of ACDVs, they did not yet

7   have the police report or the FTC fraud affidavit.

8   Q.   And in review of all the documents, you're aware, aren't

9   you, that the Wells Fargo account was not the only derogatory

10  account on Mr. Sponer's credit report, correct?

11  A.   That's correct.

12  Q.   And any derogatory report can have negative impact on the

13  consumer, correct?

14  A.   Yes.

15  Q.   And the factors you were going through, those could be

16  related to any derogatory report on someone's credit, correct?

17  A.   Yes.  I mean, derogatory information causes problems and

18  harm to someone's creditworthiness.  And I think we've seen,

19  there were other accounts on his credit report that were

20  derogatory, yes.

21  Q.   And one other question.  You said part of your -- the book

22  you wrote had to do with credit scoring, correct?

23  A.   Yes, sir.

24  Q.   Now, with a credit score, it's true, isn't it, that the

25  amount of an account that's in collections doesn't matter as

1  much as the existence of it?

2  A.   That's generally true.  But the past due balance is a big

3  scarlet letter, both within credit scoring and even

4  for -- when you apply for credit, like the underwriting,

5  underwriters like Fannie Mae and Freddie Mac in the mortgage

6  realm, they will scan the credit report for information.  If

7  they see past due balances, it pops up as an immediate red

8  flag.  So the past due balance hurts your credit score, but it

9  also hurts you whenever they do that kind of close look at

10  your.

11  Q.   So when we talked before, I asked you, "In credit scoring,

12  does the amount of the delinquency matter or is it just the

13  existence of the delinquency?"

14       And you stated, "In FICO scoring, my best

15  recollection and best understanding is that the amount of the

16  delinquency, at least under the classic FICO models, is not

17  the issue.  It's the existence."

18       Is that consistent --

19  A.   Right.  Because it gives the status of it, but the -- the

20  fact that there is -- and it's also the existence of a past

21  due amount.  So it's the existence, but not the amount, when

22  it comes to strictly for credit scoring.  The credit scoring

23  system just looks to see, is there a derogatory status like

24  collection or charge-off, and is there a charged-off amount or

25  a past due amount?

Hendricks - X

1  Q.  And the police information -- it sounds like you carefully

2  reviewed those iTop notes; is that correct?

3  A.  Yes, sir.

4  Q.  And there wasn't initially a conviction, was there?

5  A.  No.  I mean, it took a few weeks, I thought.

6  Q.  And there wasn't a guilty plea initially?

7  A.  No.  I think what we just went through showed that it took

8  three to four weeks to get it wrapped up.  I can't remember

9  the exact amount of time, but it was more than two weeks,

10 because there was some -- the communications show that there

11 was expectation on Wells or at least a hope that they'd be

12 able to get the car back by -- before December, and that

13 didn't happen.  It took longer than that.

14 Q.  And there was a statement in the notes we looked at, even

15 after the guilty plea, it says, "The defendant could change

16 his mind," right?

17 A.  Yes.

18 Q.  So at that point no one had proven that Mr. Yochum had

19 stolen Mr. Sponer's identity, correct?

20 A.  Um -

21 Q.  As far as the pleas go.

22 A.  Yeah, in terms of if you're going by a criminal standard,

23 then --

24 Q.  Well, if --

25          THE COURT REPORTER:  One at a time.

1          THE WITNESS:  If you're going by a criminal standard,

2     that means -- I think it would mean beyond a reasonable doubt.

3     But under the FCRA it's a civil standard, so you have a duty

4     to investigate whether the information is accurate, not

5     whether the guy is guilty beyond a reasonable doubt.

6     BY MR. PETERSON:  (continuing)

7     Q.  But you testified that Wells Fargo had everything it

8     needed to know because it heard from the detective, so weren't

9     you referring to a criminal standard?

10    A.  No.  No.  I was referring to sufficient information to

11    complete an investigation that would conclude that you should

12    not be reporting a fraudulently purchased car on Mr. Sponer's

13    credit report.

14    Q.  But the police hadn't concluded their investigation yet,

15    had they?

16    A.  But they had given enough information, which in my opinion

17    would have easily allowed any reasonable person, including

18    Wells Fargo, which is a person under the FCRA, to conclude

19    that he's a victim of identity theft.

20          MR. PETERSON:  I don't have any further questions for

21    Mr. Hendricks.

22          THE WITNESS:  Thank you.

23          THE COURT:  Redirect?

24          MR. SAND:  Yes, Your Honor.

25

Hendricks - ReD

REDIRECT EXAMINATION

1

2  BY MR. SAND:

3  Q.  Mr. Hendricks, earlier when we were talking, you mentioned

4  that the ACDV process has a filtering mechanism.  Can you

5  explain that a little bit further?

6  A.  Sure.

7       When you dispute to the credit reporting agencies,

8  they usually need to authenticate your identity before they go

9  on.  If they have some problems with your identity, they'll

10 make you provide additional information to prove -- to

11 authenticate you, to prove you are who you say you are.  And

12 so by the time they send the ACDV to a furnisher like Wells,

13 they've already satisfied their authentication requirements.

14 Q.  And so let me understand.  Are you saying that by the time

15 the ACDV arrives to the furnisher, it's already been

16 filtered --

17 A.  Yes.

18 Q.  -- for purposes of identifying the consumer, that this is

19 the person disputing it?

20 A.  Yes.  The CRAs have authenticated that consumer to their

21 satisfaction.

22 Q.  Now, you were asked about time periods of when Mr. Sponer

23 received -- when Mr. Sponer sent the police report to Wells

24 Fargo, and I think it was January of 2017.

25 A.  Yes.

Hendricks - ReD

1   Q.   Could Wells Fargo, prior to that, have reached out to the
2   police department to obtain the police report?
3   A.   Well, sure.  And they did reach out.  I believe Wells
4   Fargo called the police.  But the only thing their notes
5   reflected they were interested in doing was recovering the
6   car.  They weren't interested in, you know, ensuring accuracy
7   for what they were reporting about Mr. Sponer.
8   Q.   And Wells Fargo could have gotten a police report had they
9   wanted to do so?
10  A.   In my opinion, yes.
11  Q.   And I want to show -- go back to the iTop notes.  You were
12  talking about the date that Wells Fargo learned the identity
13  thief pled guilty.  We looked at the iTop note previously.
14  This November 3rd note, can you tell from that date the
15  suspect had pled guilty?
16  A.   Yes.  It looks like on November 3rd, suspect had pleaded
17  guilty.
18  Q.   Thank you.
19          MR. SAND:  No further questions, Your Honor.
20          MR. PETERSON:  Your Honor, I believe that the
21  question about filtering was outside the scope of my cross.
22  I'd like to ask one follow-up question.
23          THE COURT:  Sure.
24
25

Hendricks - ReX

1                    RECROSS-EXAMINATION

2    BY MR. PETERSON:

3    Q.   Mr. Hendricks, I want to make sure I understood correctly.

4    Did you say that because the CRA has a filtering process, the

5    furnisher should always just take the ACDV as true?

6    A.   Well, no.  I mean, there are no "always" or "nevers."

7    There are no absolutes in credit reporting, just like there

8    are always going to be errors in credit reports.  So there are

9    no absolutes, except there's the absolute there are no

10   absolutes.  That's why we have the reasonable standard,

11   because it really depends on the circumstances.

12             MR. PETERSON:  Thank you.

13             THE COURT:  Anything else?

14             MR. SAND:  Nothing further, Your Honor.

15             THE COURT:  You may step down.

16             THE WITNESS:  Thank you.

17             THE COURT:  Do you want this witness to be excused?

18             MR. SAND:  That's fine with us.

19             THE COURT:  Any objection?

20             MR. PETERSON:  No objection.

21             THE COURT:  Call your next witness.

22             MR. SOLA:  Mr. Sponer rests his case.

23             THE COURT:  Thank you.

24             Do you have witnesses available?

25             MR. PETERSON:  We do, Your Honor, one we can start.

Braxton - D

1   We won't finish.

2            THE COURT:  That's okay.  Let's get started.

3            MR. FRANSEN:  Defendant calls Megan Braxton.

4

5                     MEGAN BRAXTON

6   called as a witness in behalf of the Defendant, having been

7   first duly sworn, is examined and testifies as follows:

8

9            THE CLERK:  Please have a seat.  State your name and

10   spell it.

11           THE WITNESS:  My name is Megan Braxton, M-e-g-a-n

12   B-r-a-x-t-o-n.

13

14                   DIRECT EXAMINATION

15   BY MR. FRANSEN:

16   Q.   Good afternoon, Ms. Braxton.  Can you tell -- explain to

17   the jury who your employer is.

18   A.   Wells Fargo Auto.

19   Q.   Okay.  Wells Fargo Auto, is that a division within Wells

20   Fargo Bank?

21   A.   It is.

22   Q.   All right.  Are there multiple divisions within Wells

23   Fargo Bank?

24   A.   There are, such as home lending, card services, student

25   loans.

Braxton - D

1    Q.   Okay.  How long have you worked for Wells Fargo Auto?

2    A.   I've been in Wells Fargo Auto for going on almost nine

3    years.

4    Q.   Okay.  And what is your job title at this point?

5    A.   Head of credit bureau operations for Wells Fargo Auto.

6    Q.   Okay.  What other roles have you had with Wells Fargo Auto

7    in the past?

8    A.   I was a business liaison consultant.  I was also a

9    bankruptcy manager for about five years with the company.

10   Q.   Now, the jury previously saw some testimony from Bets

11   Berg.  Do you recall that?

12   A.   Yes.

13   Q.   Okay.  Now, do you know why Bets Berg isn't here today?

14   A.   I do.

15   Q.   Can you explain it to the jury, please.

16   A.   Yes.  Bets Berg accepted a new role with Wells Fargo Auto

17   in quality assurance.

18   Q.   Okay.  Do you now have the job that she had when she gave

19   that testimony?

20   A.   I do.

21   Q.   And how long have you been the head of the credit bureau

22   operations department?

23   A.   I've been head of credit bureau operations since April of

24   2019.

25   Q.   Okay.  Can you briefly describe your duties as head the

399

Braxton - D

1   credit bureau operations for Wells Fargo Auto?

2   A.   I can.

3            So I have many responsibilities.  One of those

4   responsibilities is ensuring that we -- when we receive an

5   electronic ACDV, also known as a dispute, we investigate that

6   dispute and we provide a response and send that back to the

7   credit reporting agencies within 30 days.

8            Another big function is data furnishing, which you've

9   heard of, also known as credit reporting, ensuring that we're

10  sending that transmission file out to the credit reporting

11  agencies.

12  Q.   Okay.  Now, do your duties then include managing the team

13  that's responsible for responding to ACDVs?

14  A.   Yes.

15  Q.   The jury heard and we all saw testimony from Montressa

16  Ebron, Colin Hollomon, Ashley Grier, and Brian Funsch.  Do

17  those people work in your department?

18  A.   Yes, they do.

19  Q.   Now, we heard from one of plaintiff's experts about ACDVs,

20  but I wanted to ask you if you could please explain, generally

21  speaking, what an ACDV is from your perspective.

22  A.   An ACDV is when a consumer finds something on their credit

23  report that they may disagree with, they will open up a

24  dispute with the credit reporting agencies, and they will send

25  over that electronic form of an ACDV to us, Wells Fargo Auto.

Braxton - D

1  Q.  And then what does Wells Fargo Auto do when it receives an

2  ACDV?

3  A.  Our ACDV team members will go ahead and perform an

4  investigation and provide a response and transmit that back

5  out to the credit reporting agency.

6  Q.  How long do you have to respond to an ACDV?

7  A.  We have 30 days to reply to an ACDV.

8  Q.  And do you get the entire 30 days?

9  A.  We do not.  So typically we will respond within a 15-day

10  window of that 30 days.

11  Q.  What happens if Wells Fargo Auto fails to respond to an

12  ACDV within the 30-day time frame?

13  A.  If we fail to respond to an ACDV, then the credit

14  reporting agency will automatically delete that trade line,

15  also known as the customer's account.

16  Q.  Okay.  Now, we know from the testimony that one type of

17  dispute that you might receive is for identity theft, correct?

18  A.  That is correct.

19  Q.  Okay.  What are some other types of disputes that your

20  department could receive?

21  A.  We may receive a dispute in regards to late payments, also

22  change of address, a change of last name.

23  Q.  Now, how big is the team that responds to ACDVs?

24  A.  The team is 58 team members.

25  Q.  Are they full-time employees or not?

Braxton - D

1    A.   They are full-time employees.

2    Q.   And to clarify, are these employees only responding to

3    ACDVs for Wells Fargo Auto?

4    A.   That is correct.  They only respond for Wells Fargo Auto.

5    Q.   So does that mean that the other divisions of Wells Fargo

6    have totally separate teams for responding to ACDVs?

7    A.   Yes.  I have peers across the different products that

8    manage the same process as I do.

9    Q.   All right.  Now, can you give a brief summary to the jury

10   of how the ACDV response team is trained?

11   A.   Yes.

12        So when an ACDV team member starts with Wells Fargo

13   Auto, they go through a three-week training.  They learn about

14   ACDVs, the process, as well as how to handle an investigation,

15   and respond on to the dispute back to the CRA.

16   Q.   About how long is the training process, would you say?

17   A.   The training process is two weeks in classroom training,

18   not actually on the floor.  They're going through the process

19   and learning about the dispute process within that training

20   room.

21   Q.   And then after the training room, what do they do?

22   A.   They move into their work homes, which is their desk.  And

23   then they will work on the floor with the rest of the team, as

24   well as do side-by-side -- shadowing is what we call it, and

25   so they'll watch other team members that are handling ACDVs

Braxton - D

1    and shadow and follow and continue their training that way.

2    Q.   And about how long is that entire process, would you say?

3    A.   I would say it's roughly around 30 to 35 days that they're

4    in a continuous learning development training.

5    Q.   Okay.  Do they -- after they finish that training, do they

6    have any kind of follow-up testing that might happen?

7    A.   Yes.

8            So we do annual certifications.  And that typically

9    lasts from about the beginning of the year until about April.

10   Q.   Thank you.

11           Now, turning specifically to the type of dispute

12   called an identity theft dispute, can you maybe give a brief

13   outline of the general process that the ACDV team members

14   would use when reviewing an identity theft dispute?

15   A.   Yes.

16           So an ACDV team member, once they receive the ACDV

17   form, they're going to go ahead and look at the information

18   provided from the credit reporting agency.  They're going to

19   look at what's in our system of record and compare it to what

20   we received within the ACDV.

21           Once they have looked at all of those factors and

22   looked at the system of record notes, they're going to provide

23   a response and their decision on what happened within that

24   investigation with the information provided back to the credit

25   reporting agency.

Braxton - D

1  Q.  All right.  Now, can the ACDV have information attached to

2  it?

3  A.  Yes.

4  Q.  Okay.  Who attaches that information?

5  A.  The consumer would attach that information when opening up

6  the dispute with the credit reporting agency.

7  Q.  Okay.  If information is attached, what do the team

8  members do?

9  A.  So when they receive that ACDV from the credit reporting

10  agency with an attachment, they will also look at the attached

11  documents to see if there's anything in there that they need

12  to review.

13  Q.  All right.

14        MR. FRANSEN:  Can we pull up Exhibit 560, please.

15  BY MR. FRANSEN:  (continuing)

16  Q.  Okay.  Ms. Braxton, do you see Exhibit 560 there in front

17  of you?

18  A.  I do.

19        MR. FRANSEN:  Give me a quick second to pull it up on

20  the big screen.

21        THE COURT:  Do you see that on the screen?

22        THE WITNESS:  I do.

23        THE COURT:  You may continue.

24        MR. FRANSEN:  Can we publish it to the jury?  I

25  believe it's been admitted.

Braxton - D

1          THE COURT:  560?

2          MR. FRANSEN:  I believe this was a supplemental

3   exhibit entered before trial.

4          THE COURT:  Oh, we talked about this earlier.  I

5   understand.

6          MR. SOLA:  I just wanted to place an objection on the

7   record.

8          THE COURT:  It's overruled.  It's received.

9          MR. FRANSEN:  Thank you.

10  BY MR. FRANSEN:  (continuing)

11  Q.   Exhibit 560, have you seen this document before?

12  A.   I have.

13  Q.   Okay.  Can you describe, generally speaking, what we're

14  looking at?

15  A.   We're looking at the procedure the ACDV members would

16  follow to perform their investigation of the dispute.

17  Q.   Okay.  And I believe you said that the first thing they'll

18  do is open up the account in iTop.  Is that what your

19  testimony was?

20  A.   Yes.

21  Q.   And do we see that on this procedure?

22  A.   We do.

23  Q.   And can you maybe flag for everybody what you're looking

24  at?

25  A.   I'm looking at the numeric No. 1.

Braxton - D

1    Q.   Okay.

2             THE COURT:  By the way, that's a touch screen, so if

3    you touch it --

4             THE WITNESS:  Okay.  That helps.

5             MR. FRANSEN:  And can we look at the next page.

6    BY MR. FRANSEN:  (continuing)

7    Q.   And is this the remainder of that policy we were just

8    looking at?

9    A.   It is.

10            MR. FRANSEN:  If you wouldn't mind turning to the

11   next page.

12   BY MR. FRANSEN:  (continuing)

13   Q.   Now, can you explain -- first off, do you recognize the

14   document we're looking at?

15   A.   Yes, I do.

16   Q.   Can you explain what this policy is?

17   A.   So this policy says "ACDVs accounts easily identified as

18   fraud accounts."  This is another procedure internally that an

19   ACDV team member would use when reviewing a dispute for

20   identity theft.

21   Q.   Okay.  Do you have a general understanding about an

22   account easily identified as a fraud account?

23   A.   I do.

24   Q.   Can you explain that?

25   A.   So when the ACDV is performing that investigation that I

Braxton - D

1    spoke of, when they're in the system of record known as iTop,

2    if they look at the notations from former -- other team

3    members within Wells Fargo Auto, they'll see notations from

4    other team members that may state that this account has been

5    determined fraud or they will see the fraud indicators, such

6    as a warning flag or any other key identifiers that are within

7    the procedure to look for.

8    Q.   Okay.  And to be clear, they are looking for if another

9    Wells Fargo person has identified it as fraud?

10   A.   Correct.

11   Q.   Okay.

12            MR. FRANSEN:  Can we look at the next page.

13   BY MR. FRANSEN:  (continuing)

14   Q.   And, now, this is another procedure.  Can you -- first

15   off, are you familiar with this procedure?

16   A.   I am.

17   Q.   Can you explain what this procedure is?

18   A.   This procedure is ACDVs that are not easily identified as

19   fraud.

20   Q.   Okay.  Can you briefly summarize what the procedure is

21   when an ACDV team member receives an account that is not

22   easily identified as fraud?

23   A.   Yes.

24            So following that same ACDV process receiving the

25   dispute, the team member would go into the system of record as

Braxton - D

1   well and be looking for those same indicators, notations,

2   identifying factors that another Wells Fargo team member would

3   have placed on the account in order to determine the status of

4   fraud.

5   Q.   Okay.  And on this procedure that we're looking at, can

6   you point out where it says the team members will look at the

7   account notes?

8   A.   Yes.  Let me do that.  I'm trying to circle.  It's not

9   working.  So it's No. 3 on the procedure.

10  Q.   And, actually, I believe No. 3 continues onto the next

11  page.  Can you read what No. 3 says they're looking for?

12  A.   It says, "Review the comments in iTop to determine if" --

13  and then it goes into bullet points.

14  Q.   Can you read the bullet points out loud?

15  A.   I can.

16          The account was opened fraudulently, and the second

17  is the account is currently under investigation.

18  Q.   Would you turn to the next page?

19  A.   Would you like me to continue?

20  Q.   Yes, please.

21  A.   A fraud package was sent to the customer and is awaiting

22  response.  The account was reviewed and no fraud was

23  confirmed.

24  Q.   Okay.  Can you summarize now what they do, what the ACDV

25  team members will do after they've reviewed iTop for that

Braxton - D

1   purpose?

2   A.   Yes.

3          So based off of one of those factors in the bullet

4   points, the team member will look at the notes and see if that

5   was easily identified and there in the comments.  And if it's

6   not, they're going to go ahead and respond to the ACDV.  If it

7   is, they're still going to respond to the ACDV and act

8   accordingly.

9   Q.   So if Wells Fargo Auto receives an ACDV claiming identity

10  theft and the ACDV responder sees that a fraud investigation

11  is currently underway, what does this procedure tell them to

12  do?

13  A.   It tells them to move forward with their investigation of

14  the ACDV and respond back to the credit reporting agency.

15  Q.   What does it tell them to do with respect to the fraud

16  department?

17  A.   It's telling them to allow fraud to continue their

18  investigation.  There's nothing there for them to -- to do in

19  regards to the fraud investigation.

20  Q.   And is that -- that's because the team member -- is that

21  because the team member has seen there is a fraud

22  investigation going on?

23  A.   Correct.

24  Q.   Okay.  Now, how about a situation where there's no fraud

25  investigation going on and an identity theft dispute is

Braxton - D

1  received, and there's something, maybe an attachment or

2  something like that, that suggests something is going on?

3  A.   So if they receive an ACDV with an attachment, like I

4  mentioned earlier, and it has attached documents that we need

5  to get over to fraud, we would forward that on to fraud.

6  Q.   Okay.  And does this policy instruct the team members to

7  do that?

8  A.   Yes.

9  Q.   Okay.  Now, if -- if the fraud department completes its

10  investigation and has determined that fraud occurred, does

11  this policy describe what the fraud department then does?

12  A.   Yes.

13  Q.   And what is that?

14  A.   The fraud department would reach out to the credit bureau

15  team directly to let us know that they've ended their

16  investigation and what the next step should be.

17  Q.   And what would that next step be if fraud has

18  determined -- if fraud has determined -- sorry.  What would

19  the next step be if the fraud department has determined that

20  the account is fraudulent?

21  A.   So the next step would be the deletion of the trade line,

22  also known as the account.  The team member with the credit

23  bureau would then submit an AUD to the credit reporting agency

24  the same day so that action can take place.

25  Q.   And the AUD -- in that case, would the AUD result in

Braxton - D

1    deletion of the account?

2    A.   It would.

3    Q.   Okay.  Do they -- so the fraud department, do they wait

4    for a new ACDV to come in?

5    A.   They do not.

6    Q.   Now, in this case the evidence has already been submitted

7    that Wells Fargo employee William Brady, who worked for the

8    fraud department, sent a letter to Mr. Sponer before there was

9    ever an ACDV received.  Do you recall that?

10   A.   Yes.

11   Q.   So when the ACDV team members are responding to later

12   ACDVs, are they going to be aware that Mr. Brady has started

13   that investigation?

14   A.   Yes.

15          MR. SOLA:  I'll object.  Calls for information she

16   doesn't have, beyond personal knowledge.

17          THE COURT:  It sounds like she does have that

18   information.

19          Do you want to ask a question in aid of objection?

20   That might be helpful.

21          MR. SOLA:  What's the basis for your knowledge as to

22   what those ACDVs operators knew?

23          THE WITNESS:  Based off of system record information,

24   they would see the notation in the system that the account was

25   under fraud investigation.

Braxton - D

```
 1            MR. SOLA:  What's your basis of knowledge, knowing
 2    they looked at that system of record?
 3            THE WITNESS:  I would not -- I'm not there to witness
 4    what the team member would see, but if they're following
 5    policy and procedure, that would be my belief, that they would
 6    see that note.
 7            THE COURT:  Your objection is overruled.
 8            Go ahead.
 9    BY MR. FRANSEN:  (continuing)
10    Q.   In fact, why don't we look at Exhibit 32, please, page 20.
11            Now, just to remind everybody, what are we looking
12    at?
13    A.   This is iTop comments.
14    Q.   And iTop, is that what you mean by the account notes?
15    A.   Yes, the system of record account notes.
16            MR. FRANSEN:  Are you able to blow up the bottom one?
17    BY MR. FRANSEN:  (continuing)
18    Q.   That is, unfortunately, a little bit blurry.  But if
19    you're able to, can you read what -- the date and read what
20    the entry says?
21    A.   I will do my best.
22            The date is 10-26-2016.  The note entry is by William
23    Brady.
24    Q.   And then what does the entry say?
25    A.   (Reading) Spoke with Matthew's attorney and faxed a packet
```

Braxton - D

1   to him to have Matthew fill out, and then his initials, WJB.

2   Q.   Thank you.

3          So if an ACDV response comes in after October 26th,

4   2016, would the ACDV team member be able to learn that by

5   looking at this note?

6   A.   Yes.

7   Q.   Okay.  And now I'd like you to look at Exhibit 33.

8          Now, I don't know that the jury has seen a document

9   that looks like this yet.  And it's got a ton of information

10  on it.  Can you describe just what we're looking at here?

11  A.   So you're looking at a screen print from CDRS, known as

12  the Credit Dispute Resolution System.  That system is the --

13  what the team member uses to respond to the ACDV that

14  transmits through e-OSCAR.

15  Q.   So is this Wells Fargo's record of its ACDV response?

16  A.   It is.

17         MR. FRANSEN:  Can we zoom in on the bottom

18  screenshot.

19  BY MR. FRANSEN:  (continuing)

20  Q.   All right.  Again, it's a little blurry.  I apologize for

21  that.

22         Are you able to see where it says "date resolved"?

23  A.   Yes.

24  Q.   What does it appear that "date resolved" says?

25  A.   I believe it's November 3rd, 2016.

413

Braxton - D

1    Q.   And I believe the evidence has already been submitted that
2    the first ACDV response by Wells Fargo was November 3rd, 2016.
3    A.   Yes.
4    Q.   Is this that response?
5    A.   Yes.
6    Q.   Or, should I say, this is Wells Fargo's record of that
7    response?
8    A.   That is correct.
9    Q.   Okay.  There's a block of text under -- towards the bottom
10   there.  Can you -- can you make that out?
11   A.   I'll do my best.
12   Q.   It looks like it's written in maybe a shorthand.
13   A.   That is correct.
14   Q.   Are you able to interpret, generally speaking, the
15   shorthand that the team members use?
16   A.   Yes.
17   Q.   If you're able to, can you read that?  If you're not able
18   to, let me know.
19   A.   It's just a little bit blurry, so I can't see -- make out
20   the first -- let me take off my glasses.
21   Q.   We can make it small again.
22   A.   It's too small.
23   Q.   Okay.  Try it again.  Sorry.
24   A.   Okay.
25          (Reading) Verified ID, account info, CCC, XC, date of

Braxton - D

1    first delinquency, 10-22-16, 1 by 30, 1 by 60, 10-16, sent to

2    fraud, affidavit sent, no fraud found, images.  And I believe

3    it says CC at the end.

4    Q.  Now, when the ACDV responder is writing "sent to fraud,"

5    do you have an understanding of what they're trying to convey?

6    A.  Yes.

7            MR. SOLA:  Objection, Your Honor, lack of personal

8    knowledge, asking for the thoughts of another person she

9    hasn't spoken to.

10           THE COURT:  As I understand it, she's translating

11   what these letters and initials mean.  For that purpose,

12   overruled.

13   BY MR. FRANSEN:  (continuing)

14   Q.  I'll ask you a new question.  Is "sent to fraud," is that

15   a common shorthand to use by an ACDV responder?

16   A.  It is.

17   Q.  And what does that normally mean?

18   A.  It means that this account has been sent over to fraud.

19   Q.  And by that, do you mean that the fraud department is

20   investigating the account?

21   A.  I do.

22   Q.  And the next set of words say "affidavit sent."  Do you

23   have an understanding of what that normally would mean?

24   A.  Yes.

25   Q.  What is that?

Braxton - D

1   A.   That the affidavit is sent to the customer.

2   Q.   By "affidavit," are we talking about an identity theft

3   packet or something like that?

4   A.   Yes.

5   Q.   Okay.  And then the last line that you read said "no fraud

6   found."  Do you have an understanding what that phrase would

7   mean?

8   A.   Yes.

9   Q.   What is that?

10  A.   At the moment of the investigation of dispute, the fraud

11  investigation has not been completed.

12  Q.   Okay.  Now, the date we looked at a minute ago on this was

13  November 3rd.  And the date of William Brady's note in the

14  account notes was 10-26.  Do you recall that?

15  A.   Yes.

16  Q.   So does this, in your mind, confirm that the ACDV

17  responder was following the policy?

18  A.   Yes.

19  Q.   Okay.  All right.  The first -- the first set of -- or the

20  first code you essentially deciphered for us, I believe you

21  said it was "verify ID"?

22  A.   Correct.

23  Q.   Okay.  We've heard a lot about verifying ID, or I believe

24  they've called it matching -- other witnesses have called it

25  matching.  Do you recall hearing about that?

Braxton - D

1   A.   Yes.

2   Q.   Okay.  Can you explain why the ACDV responder is verifying

3   ID in this situation?

4   A.   It's following policy and procedures.  ACDV team members

5   are responsible for looking at the information that the

6   consumer provided to the credit reporting agency and the

7   information that was provided to Wells Fargo Auto, within our

8   system of record.

9   Q.   Do they verify the ID every single time?

10  A.   Yes.

11  Q.   All right.  Now, I believe we heard testimony of some

12  witnesses who thought that that's all that Wells Fargo did was

13  verify ID.  Do you recall that?

14  A.   Yes.

15  Q.   Does this description suggest they did more?

16  A.   Yes, it does.

17  Q.   Okay.  And is that because of the things we read about

18  checking to see that the fraud investigation was ongoing,

19  status of the fraud investigation?

20  A.   That's correct.

21  Q.   We heard some talk earlier about the options for response

22  codes.  Do you recall that?

23  A.   Yes.

24  Q.   Okay.  And it's a little -- it's too hard to read on this

25  thing we're looking at, but do you remember the -- do you

Braxton - D

1    recall the discussion about one such option was modify account
2    information, one was verify?  Do you recall that?
3    A.    Yes.
4    Q.    And then there were two for delete?
5    A.    Correct.
6    Q.    Okay.  Is there a -- are those codes that Wells Fargo
7    created or are those codes that came from the CRAs?
8    A.    They're codes that came from the CRA.
9    Q.    So the CRA is giving you the options of using these codes?
10   A.    Correct.
11   Q.    So there's no option -- or is there an option to use a
12   response code that would say something along the lines of
13   "Fraud investigation underway.  We're not ready to respond"?
14   A.    There is not a code for that.
15   Q.    Okay.  Is there something that you can do that at least
16   conveys information about the existence of a dispute?
17   A.    Yes.
18   Q.    Okay.  And what is that?
19   A.    That's a compliance condition code.
20   Q.    Okay.  Did we read a compliance condition code in the text
21   blocks you were looking at earlier?
22   A.    We did.
23   Q.    And what was that code?
24   A.    If you see on the screen, it says "CCC."  That's
25   compliance condition code, and it has XC after.

Braxton - D

1   Q.   Can you -- and you don't have to know it by heart, but
2   what does the XC code mean?
3   A.   The XC code means that we performed an investigation and
4   the consumer disagrees.
5   Q.   Is that considered, in the industry, a dispute code?
6   A.   It is.
7   Q.   So if somebody reads a credit report and they see "XC" on
8   it, will they be conveyed information that says that the
9   account is disputed?
10  A.   They will.
11  Q.   Okay.  Is there another dispute code that Wells Fargo can
12  use?
13  A.   There is.
14  Q.   What is that code?
15  A.   That compliance condition code is known as XB.
16  Q.   All right.  And XB means what?
17  A.   That the account is in dispute, in investigation dispute.
18  Q.   Okay.  Do you know if it's Wells Fargo's policy to always
19  report accounts that have been disputed by ACDVs with either
20  the XB or XC code?
21  A.   Yes.
22  Q.   And that was kind of a compound question.  What is the
23  policy?
24  A.   So the policy, the requirement is that we always have to
25  have a compliance condition code.  While we're reviewing the

Braxton - D

1    ACDV received from the consumer, the account will report in an

2    XB.  Once we perform our investigation and provide our

3    response determining -- based on that response, then we will

4    provide an additional compliance condition code, such as XC.

5    Q.   Okay.  Did you review all 10 of the ACDV responses that

6    Wells Fargo performed?

7    A.   Yes, I did.

8    Q.   In your recollection, did all 10 of those involve

9    reporting the XC code?

10   A.   Yes.

11   Q.   Does that mean that every time Wells Fargo responded to a

12   dispute -- I'm sorry -- every time Wells Fargo responded to an

13   ACDV, that it reported that the account was disputed?

14   A.   Yes.

15   Q.   And you're familiar -- you've read the ACDVs, and you also

16   heard and have read the testimony of Montressa Ebron, Colin

17   Hollomon, Ashley Grier, and Brian Funsch; is that correct?

18   A.   That is correct.

19   Q.   Based on that review, do you believe they complied with

20   Wells Fargo's policies and procedures that were in place at

21   the time?

22   A.   I do believe that they followed our procedures.

23   Q.   Okay.  Now, the jury has heard that -- well, the jury has

24   heard that -- and seen that Wells Fargo did have information

25   in its account notes that the police had been in contact with

Braxton - D

1    Wells Fargo about the suspected identity theft criminal case.
2    Do you recall that?
3    A.   Yes.
4    Q.   Okay.  Is there -- is there a reason why that's not enough
5    to delete the account from an ACDV response perspective?
6    A.   The ACDV response team members are responsible for
7    investigating the dispute.  The fraud team members would be
8    the ones that would handle the fraud investigation.
9    Q.   Is there an exception in Wells Fargo's policy for the odd
10   time that it gets a call from the police about an identity
11   theft victim being -- or an identity theft perpetrator being
12   arrested?
13   A.   So there's not an exception, if a team member were to see
14   those notes in the system, to do anything outside of the
15   policy and procedure that they followed.
16   Q.   The policy and procedure, would that -- but if they saw
17   that, would the policy and procedure require them to report
18   that to fraud?
19   A.   Yes.
20   Q.   And then I believe you testified at that point the fraud
21   team will handle it?
22   A.   That is correct.
23        THE COURT:  Why don't we stop right here.  There are
24   some things we need to take up this afternoon.  This witness
25   is going to be here for a while in any event.

```
 1              Members of the jury, I'm going to stop because there
 2    is some other work I need to get done before the afternoon
 3    ends.  I'm going to let you go for the evening.  We'll start
 4    tomorrow right at 9:00.
 5              Remember the precautionary instruction.  The reporter
 6    is still in the back of the courtroom, so don't read The
 7    Oregonian.  And I will see you tomorrow at 9:00.
 8              Thank you very much.  Have a good evening.
 9              (The jury leaves the courtroom.)
10              THE COURT:  You may have a seat.
11              Go ahead and step down.
12              THE WITNESS:  Okay.
13              (The witness leaves the witness stand.)
14              THE COURT:  Before we get to your halftime motions,
15    I need to make a phone call, so let me step off the bench for
16    about 15 minutes.  I'll come back.  We'll take your halftime
17    motions.
18              I have a draft of the jury instructions.  It is not a
19    complete set of the instructions.  There are some issues that
20    I'm still working on.  And it is only a draft.
21              So just start working through them this evening, and
22    we'll be prepared to talk and adjust when your case is
23    completed, but it will give you an idea about where I'm
24    headed.
25              Okay.  Let's take 15.  Thank you.
```

Motion for Partial Judgment as a Matter of law

 1          (A recess is then taken.)

 2          (The Court, counsel, and the parties reconvene.)

 3          MR. SAND:  Mr. Sola is coming back.

 4          THE COURT:  We'll wait.  Have a seat.

 5          (Mr. Sola returns to the courtroom.)

 6          THE COURT:  Are you making motions?

 7          MS. SMITH:  I am, Your Honor.  For the record, Julie

 8  Smith on behalf of Wells Fargo.

 9          THE COURT:  Go ahead.

10          MS. SMITH:  Defendant Wells Fargo moves for partial

11  judgment as a matter of law on several issues.  I intend to

12  file this evening a memorandum.  So at this point I only plan

13  to give the Court sort of the highlight reel of what will be

14  in the memorandum that we file tonight.

15          THE COURT:  Do you want to wait until you file that

16  and then make your motion?  I'm happy to do it either way, by

17  the way.

18          MS. SMITH:  I think now is a good time.  I think it

19  would make sense to reserve your ruling until you've had a

20  chance to read it, and I think it would also give plaintiff's

21  counsel a chance to, before I file it, have an idea what's

22  coming down.

23          So pretrial we filed a memorandum on the issue of the

24  very subsections of s-2(b), and one of those subsections is

25  (e).  And in that supplemental memorandum we explained why the

Motion for Partial Judgment as a Matter of law

1   obligations in subsection (e) were not triggered in this case

2   as a matter of law, because those obligations are only

3   triggered when the furnisher makes actual findings.  So the

4   first motion that we make is that there was no violation of

5   2(b)(1)(e) as a matter of law.

6           And it's clear that plaintiff intends on asking the

7   jury to find that sort of a violation, because it's included

8   in the proposed instructions.

9           The alternative to that motion, the first one, is

10  that the Court find as a matter of law that there was no

11  willful violation of 2(b)(1)(e).

12          And willfulness, we'll describe in our memorandum,

13  occurs when a furnisher adopts a reading of the FCRA that runs

14  a risk of error substantially greater than the risk associated

15  with a reading of the statute that was merely reckless.

16          And the argument is that -- that the position

17  presented -- or the reading that we have offered in this

18  supplemental memorandum that we filed is not objectively

19  unreasonable and, therefore, not a willful violation.  I think

20  this will be easier to understand when you read the

21  memorandum.  It's hard to explain it sort of in the abstract.

22          The other arguments relate to damages, the scope of

23  damages.  And there are three issues that we're raising here.

24  And it's really more of a withdrawal of certain issues from

25  the jury -- well, except for the first one.

Motion for Partial Judgment as a Matter of law

1      The first one is really an argument I'm presenting

2   now for the purposes of preserving it, because it really would

3   require the Ninth Circuit to change its reading of the FCRA,

4   so I'll preface it with that, that I understand that you are

5   currently bound by the Ninth Circuit case law, but there is

6   some tension between the Ninth Circuit's case law on what the

7   FCRA allows -- how the Ninth Circuit interprets actual damages

8   for purposes of the FCRA with a Supreme Court case called *FAA*

9   *v. Cooper*, which was interpreting the Privacy Act.  And the

10  phrase "actual damages" appears in the Privacy Act as well,

11  and the Supreme Court concluded that actual damages are

12  actually limited to pecuniary losses, so economic losses.  So

13  the argument is that the FCRA does not allow for non-economic

14  damage awards, only recovery for pecuniary losses.

15      But in any event, at most, plaintiff can recover only

16  for emotional distress damages.  And there is -- *Drew*, the

17  Ninth Circuit case I was just talking about, *Drew v. Equifax*,

18  said that a plaintiff can recover for emotional distress

19  damages in a FCRA case.

20      But what plaintiff has tried to do, both in the

21  Complaint and in the proposed instructions, is to expand

22  beyond emotional distress.  The Complaint alleges not only

23  emotional distress, but separate categories of, I guess,

24  non-economic damages:  lost opportunity to receive credit,

25  damage to reputation, or interference with plaintiff's normal

Motion for Partial Judgment as a Matter of law

1    and usual activities.  In plaintiff's proposed instructions,

2    they expand on that and they list discomfort, time spent

3    dealing -- spent by plaintiff dealing with Wells Fargo's

4    inaccurate credit report, and it goes on, invasion of privacy.

5         So I would ask that a limiting instruction be given

6    to the jury that plaintiff can, at most, recover just

7    emotional distress damages, not for any of those other things,

8    which arguably might be subsumed, but shouldn't be listed

9    separately in the instruction that's been proposed.

10        And if loss of reputation, which is one of the things

11   that plaintiff is claiming, if it is a separate category of

12   non-pecuniary losses, plaintiff has not offered evidence

13   establishing an actual, cognizable loss of reputation.

14        And then the last category of motions that we have is

15   the problem with establishing the causal relationship between

16   Wells Fargo's investigations of the notices it received from

17   Equifax and some of plaintiff's claimed damages.

18        There's been a lot of evidence put on by plaintiff of

19   distress that preceded any of the ACDV responses, stress that

20   is attributable to things other than Wells Fargo's responses.

21   And the FCRA only allows the recovery of damages sustained as

22   a result of the failure to reasonably investigate the ACDV

23   notices.  So it has to be tied to that particular -- the

24   responses that plaintiff got.

25        THE COURT:  I don't know see how you get to a

Motion for Partial Judgment as a Matter of law

1   judgment as a matter of law on that issue.  It may be at the

2   end I instruct the jury that "These are what you can consider

3   in reaching damages," but I don't see how you get to --

4          MS. SMITH:  I understand your concern.  I think what

5   I'm getting at is that we need a limiting instruction on this

6   issue.

7          THE COURT:  Don't waste my time on that.  We'll get

8   to that at the end of the trial.  I want to know where you're

9   entitled to judgment as a matter of law now.

10          MS. SMITH:  That one is hard to remove those from the

11   jury, because they're already swimming around.  So I will

12   propose a limiting instruction on that issue.

13          THE COURT:  Okay.

14          Anything else?

15          MS. SMITH:  That's it.  Thank you.

16          THE COURT:  I'll look forward to reading your memo.

17          You don't need to respond now.  I'll give you a

18   chance to look at their memo.

19          MR. SOLA:  I might, Your Honor -- it just might save

20   us some work, because the limiting instruction on damages,

21   that's a summary judgment -- she's not claiming we didn't have

22   evidence to support our claims for damages.  They're saying

23   now you can't seek those damages.

24          That should have been filed long ago.  You know,

25   that's not -- again, that's not a JMOL.  JMOL is "You did not

Motion for Partial Judgment as a Matter of law

1   present sufficient proof of your claims."  And this is saying

2   "You don't have claims."  So, you know, I don't think we

3   should even have to respond to that.  That could have been

4   done through summary judgment.  Same with --

5            THE COURT:  Well, yeah, but just because something

6   isn't raised at summary judgment doesn't mean that it's

7   waived.

8            MR. SOLA:  Well, I do differ, because that's why we

9   have deadlines for summary judgment.

10           THE COURT:  A lot of people don't do anything;

11  summary judgment is never filed at all.  Does that mean you

12  give up your negligence claim or your defense to a negligence

13  claim because you didn't file summary judgment on it?  No.

14  You still get to fight that issue.

15           MR. SOLA:  Okay.  I think there's a difference

16  between fighting it because we haven't presented evidence and

17  fighting it because it's not recoverable, but --

18           THE COURT:  I understand what you're saying.  And

19  those are two different things, and those are both things that

20  I need to consider.  But if they're saying just simply as a

21  matter of law -- which is why it's called judgment as a matter

22  of law -- because, one, there isn't any evidence of it, that

23  could be one point, or, two, it just isn't supportable by way

24  of law, those are both things I'm going to have to resolve

25  before we get to the end of this trial.

Motion for Partial Judgment as a Matter of law

1          MR. SOLA:  I'm not clear.  What's the third -- the

2     second one is you can't get certain damages, right?  And

3     what's the third one?

4          MR. SAND:  Causal.

5          MS. SMITH:  Sorry.  I closed out my notes.

6          Well, we raised the issue on subsection (e).  Then we

7     raised an issue about actual damages, including only pecuniary

8     losses.

9          And then, at most, plaintiff can only recover for

10    emotional distress damages.  This will be in the memorandum

11    that we file.  And the causal relationship between the ACDV

12    responses and the damages that plaintiff is claiming, some of

13    the damages.  I'm not moving as a matter of law on all of the

14    damages, some of the damages.

15         THE COURT:  And that will go to your causation

16    instruction.

17         MS. SMITH:  And I will present a limiting instruction

18    on that issue.  I intend to file briefing on it as well.

19         THE COURT:  Okay.

20         MS. SMITH:  But yes.

21         MR. SOLA:  Your Honor, I think there is one real easy

22    solution on the evidence of damages pre-ACDV, and we just say,

23    "You can only get damages starting at" -- we believe it would

24    be November 3rd, because that was the first time they

25    verified.  And, actually, I put that in my trial memorandum,

Motion for Partial Judgment as a Matter of law

1    that we're only entitled to damages from November 3rd because

2    that's the date of the first violation.

3              MS. SMITH:  Your Honor, I will circulate my draft

4    limiting instruction to counsel first.

5              THE COURT:  Okay.  So you're going to give us your

6    limiting instruction and your JMOL motions in writing.

7              And, as I indicated earlier, the plaintiff will have

8    an opportunity to respond.

9              MS. SMITH:  Thank you, Your Honor.

10             THE COURT:  Anything else?

11             MS. SMITH:  Not from me.

12             THE COURT:  Thank you very much.  I look forward to

13    reading your memo.  Really, I do.

14             MR. SOLA:  We were just talking about scheduling,

15    Your Honor.  And defendant is not sure when they will finish,

16    but in the event that they do finish Thursday, we would both

17    request that we do our closing arguments Friday.

18             THE COURT:  Yeah, I don't see any way you'll get your

19    closings tomorrow.  But maybe I'm wrong about that.

20             MR. PETERSON:  When I'm looking at the clock and who

21    we've got left, I think we'll be fairly streamlined.  I could

22    see a universe in which we finish sometime around 3:30 or

23    4:00.  And at that late point, we'd like to close Friday.

24             THE COURT:  Yes.  We won't be done by then.  Even if

25    you finish at 3:30 or 4:00, you're going to have all these

1    things you want to tell me before we get to closing arguments.

2    And, again, I can't wait to hear all those things, but I know

3    that the list is going to be comprehensive, particularly

4    because I just gave you the jury instructions, and I know

5    there's going to be a lot of debate about the jury

6    instructions before we get to closing.  And I'm not going to

7    have time to do that until you're done with your part of the

8    case.

9            So you anticipate you might be able to finish by 3:00

10   or 4:00 tomorrow with your witnesses?

11           MR. PETERSON:  I think so, Your Honor.

12           THE COURT:  And you might have a rebuttal witness?

13           MR. SOLA:  Maybe.

14           If I might, on the jury instructions, there are prior

15   FCRA cases in which there were jury instructions --

16           THE COURT:  Mr. Sola, I'm going to give you all the

17   opportunity you need and want to have this same conversation

18   with me tomorrow around 3:30 or 4:00.

19           MR. SOLA:  I just meant that -- well, I don't know if

20   you consulted those.  I mean, I know when I did my second

21   trial with Judge Mosman, I mentioned that Judge Jelderks had

22   given jury instructions a few years earlier, and he said

23   something like, "Well, I would really like to see those as

24   guidance."  That's all.

25           THE COURT:  We looked at all of the instructions that

1    have been submitted.

2            MR. SOLA:  Okay.  I just meant like instructions from

3    another case.

4            THE COURT:  Weren't those included in some of the

5    ones you submitted?

6            MR. SOLA:  Well, some of them, yes, I do mimic,

7    because there are some that are given in any case.

8            THE COURT:  So, again, I will look at anything you

9    want me to.  So if you have instructions from Judge Jelderks

10   or Judge Mosman or any other judge, for that matter, that you

11   think are relevant and important and will help you or anybody

12   else, including the jury, reach the right decision in this

13   case, I'll certainly consider them.

14           MS. SMITH:  Your Honor, at this point what would be

15   the most efficient way to present new proposed instructions?

16   Do you want us to -- obviously you want us to confer.  But do

17   you want us to file them or submit them by e-mail?  We'll

18   create a proper record eventually.  But if there are just more

19   efficient ways to communicate then --

20           THE COURT:  Well, other than the causation

21   instruction and the limiting instruction regarding damages, do

22   you anticipate submitting to this Court any other

23   instructions?

24           MS. SMITH:  I don't know yet, because I haven't had a

25   chance to go through the draft that you prepared.

1          THE COURT:  Well, assume I took all of your

2   instructions and said, "You're the best.  We're going to use

3   all and only your instructions."

4          MS. SMITH:  None come to mind, other than those two.

5          THE COURT:  Those two, okay.

6          I mean, we might disagree on ones you submitted

7   before.  I don't want you to submit another one because I said

8   no.

9          MS. SMITH:  No, that's not what I mean.  I don't

10  know.  I haven't had a chance to review it.

11         THE COURT:  Take a look at what we've done, and then

12  we'll have a conversation tomorrow.  And I will consider again

13  any instructions you want me to consider.  What I don't want

14  to do is be here until 9:00 tomorrow arguing about jury

15  instructions.

16         MS. SMITH:  I don't think any of us want that.

17         MR. SOLA:  I don't want that either.  Thank you.

18         THE COURT:  So back to your original question, you

19  can send them to us by e-mail, PDF format.

20         Do you want PDF or do you want Word?

21         THE LAW CLERK:  Word.

22         THE COURT:  Word.

23         Then if you want to get them filed as well so you can

24  preserve any objections if I tell you no, you'll have that in

25  the record.

1           MS. SMITH:  All right.  Thank you.

2           MR. PETERSON:  Thank you, Your Honor.

3           THE COURT:  Anything else?

4           MR. SOLA:  No, Your Honor.

5           THE COURT:  Okay.  Have a good evening.

6      Thank you.

7           MR. SAND:  Your Honor, can we get a take on the chess

8      clock?

9           THE COURT:  Oh, you have plenty of time.

10          And the take is plaintiffs have 3:35:53.  Defendants

11     have 7:34:01.

12          So, actually, out of a 20-hour set, you're only about

13     halfway through.

14          Okay.  Thank you.

15          (The proceedings are adjourned on August 28, 2019 and

16     reconvened on August 29, 2019.)

17

18

19

20

21

22

23

24

25

1                              --oOo--

2

3          I certify, by signing below, that the

4      foregoing is a correct transcript of the record

5      of proceedings in the above-titled cause.  A

6      transcript without an original signature,

7      conformed signature or digitally signed signature

8      is not certified.

9

10

11

       /s/ Nancy M. Walker                 10-16-19
12     _____   _____
       NANCY M. WALKER, CSR, RMR, CRR          DATE
13     Official Court Reporter
       Oregon CSR No. 90-0091
14

15

16

17

18

19

20

21

22

23

24

25

## $

**$29,000** [3] - 275:5, 275:23, 370:13
**$29,090** [1] - 369:21
**$3,000** [1] - 277:16
**$30,000** [2] - 296:2, 342:23
**$45** [1] - 268:4
**$60** [1] - 268:4
**$93** [5] - 264:22, 267:17, 270:20, 278:20, 279:6

## '

**'17** [1] - 390:1

## /

**/s** [1] - 434:11

## 0

**020** [1] - 368:15

## 1

**1** [8] - 269:9, 269:12, 269:18, 319:4, 369:18, 404:25, 414:1
**10** [22] - 234:8, 236:6, 236:10, 261:14, 276:7, 300:5, 305:15, 313:10, 328:15, 336:24, 338:24, 339:11, 339:15, 343:8, 350:1, 350:13, 356:25, 357:10, 377:18, 419:5, 419:8
**10-16** [1] - 414:1
**10-16-19** [1] - 434:11
**10-19-2016** [1] - 361:4
**10-22-16** [1] - 414:1
**10-26** [3] - 362:25, 363:3, 415:14
**10-26-2016** [2] - 362:11, 411:22
**10-29-2016** [1] - 368:19
**10-30-2016** [1] - 368:14
**10-4-79** [1] - 363:9
**100** [2] - 232:3, 233:24
**1000** [1] - 232:20
**103** [1] - 364:11
**10th** [2] - 237:25, 269:10
**11** [3] - 235:19, 373:4, 373:23
**11-03-2016** [1] - 364:10
**11-1** [1] - 363:10
**11-16-2016** [2] - 319:19, 368:14
**11-24-2017** [1] - 323:23
**11-30** [1] - 365:20
**11-30-2017** [1] - 325:10
**110** [1] - 319:4
**111** [1] - 232:9
**113** [1] - 319:5
**12** [2] - 243:22, 352:10
**12-13** [1] - 371:18
**12-2-2016** [1] - 322:7
**12-22-17** [1] - 328:4
**12-4-2017** [1] - 327:8

**120** [1] - 377:2
**123** [1] - 321:13
**124** [1] - 321:13
**13** [4] - 245:3, 246:19, 257:13, 305:15
**13th** [3] - 321:18, 367:16, 368:2
**14** [3] - 256:12, 337:22, 384:21
**15** [17] - 246:19, 254:12, 254:13, 255:12, 256:16, 260:6, 262:7, 262:9, 281:21, 281:23, 281:24, 346:3, 352:3, 352:10, 421:16, 421:25
**15-day** [1] - 400:9
**150** [1] - 377:3
**1500** [1] - 232:12
**15th** [8] - 244:6, 244:21, 245:8, 246:12, 255:11, 256:14, 257:12, 277:10
**16** [5] - 246:15, 260:5, 262:7, 262:9, 371:11
**1600** [2] - 333:1, 340:5
**16th** [5] - 247:19, 249:14, 250:8, 250:12, 251:10
**17** [4] - 246:24, 261:3, 262:7, 282:21
**18** [3] - 261:18, 262:20, 263:4, 315:19
**180** [1] - 377:3
**18th** [17] - 235:17, 236:9, 236:10, 238:16, 239:3, 245:4, 245:9, 245:16, 246:20, 247:7, 248:4, 252:10, 253:6, 254:5, 256:19, 261:15, 277:7
**19** [1] - 365:10
**1967** [1] - 332:4
**1969** [1] - 332:7
**1970** [2] - 349:17, 355:6
**1977** [1] - 349:9
**1981** [1] - 349:14
**1992** [1] - 350:10
**1996** [2] - 355:5, 355:7
**1997** [1] - 367:1
**19th** [8] - 235:19, 239:3, 239:6, 241:15, 241:18, 242:22, 374:15, 374:16
**1:00** [3] - 313:20, 313:24, 313:25
**1st** [1] - 361:22

## 2

**2** [7] - 231:14, 233:18, 233:20, 269:16, 269:25, 321:9, 367:3
**2(b)(1)(e)** [1] - 423:5
**2(b)(1)(e)** [1] - 423:11
**20** [6] - 261:21, 264:11, 278:14, 351:24, 363:1, 411:10
**20-hour** [1] - 433:12
**2000** [1] - 350:11
**2003** [5] - 350:20, 351:21, 365:2, 366:8, 374:3
**2004** [2] - 351:21, 381:18
**2008** [2] - 233:24, 234:2
**2013** [3] - 284:11, 284:15, 349:21
**2014** [1] - 284:18
**2015** [3] - 237:9, 285:9, 285:11
**2016** [32] - 233:21, 262:4, 263:21, 264:9, 277:13, 286:9, 289:2, 297:4, 297:7,

297:10, 299:7, 299:18, 303:15, 303:16, 311:10, 311:14, 321:18, 323:4, 345:3, 364:9, 367:16, 368:2, 372:25, 373:3, 376:13, 387:20, 388:14, 388:19, 412:4, 412:25, 413:2
**2017** [54] - 235:17, 236:9, 236:11, 243:8, 243:12, 244:21, 245:4, 245:6, 245:9, 246:20, 250:8, 250:24, 254:23, 256:19, 257:12, 257:16, 258:9, 259:15, 263:16, 264:20, 269:10, 277:7, 277:17, 279:1, 279:18, 290:24, 291:9, 293:8, 294:18, 297:8, 297:11, 299:15, 307:23, 308:13, 308:20, 309:15, 311:18, 311:19, 311:20, 324:12, 326:4, 329:2, 329:20, 342:16, 342:18, 372:5, 374:16, 374:25, 375:4, 377:7, 394:24
**2018** [5] - 246:17, 271:8, 271:16, 272:3, 272:14
**2019** [5] - 231:5, 258:7, 398:24, 433:15, 433:16
**21** [6] - 265:13, 265:14, 265:19, 265:24, 279:17, 362:6
**21st** [1] - 329:19
**22** [2] - 256:18, 266:23
**2298** [1] - 361:20
**24** [2] - 256:25, 267:12
**24th** [1] - 232:18
**25** [1] - 270:13
**25-year** [1] - 333:2
**255** [1] - 232:6
**25th** [1] - 272:7
**26** [2] - 270:13, 355:6
**26th** [6] - 263:12, 263:21, 264:9, 306:12, 387:20, 412:3
**28** [3] - 231:5, 364:9, 433:15
**28th** [1] - 324:12
**29** [3] - 270:14, 270:16, 433:16
**2nd** [3] - 257:12, 304:20, 323:4

## 3

**3** [6] - 236:3, 322:23, 323:3, 407:9, 407:10, 407:11
**30** [11] - 376:20, 379:13, 384:1, 399:7, 400:7, 400:8, 400:10, 402:3, 414:1
**30-day** [1] - 400:12
**300** [3] - 340:6, 340:10, 340:12
**301** [1] - 232:20
**30339** [1] - 232:4
**30th** [2] - 264:20, 278:17
**31** [2] - 272:5, 272:6
**310** [1] - 361:24
**3150** [1] - 232:9
**31st** [3] - 271:16, 272:3, 304:19
**32** [4] - 362:4, 362:6, 365:10, 411:10
**326-8186** [1] - 232:21
**33** [2] - 349:20, 412:7
**35** [1] - 402:3
**35,000** [1] - 350:10

**36** [1] - 236:25
**38** [2] - 260:22
**39** [1] - 236:3
**3:00** [1] - 430:9
**3:17-cv-02035-HZ** [1] - 231:4
**3:30** [3] - 429:22, 429:25, 430:18
**3:35:53** [1] - 433:10
**3rd** [22] - 255:12, 257:24, 259:7, 262:13, 262:18, 365:14, 374:24, 375:3, 388:20, 388:21, 389:2, 389:7, 389:10, 389:13, 395:14, 395:16, 412:25, 413:2, 415:13, 428:24, 429:1

### 4

**4** [12] - 246:7, 255:13, 256:2, 261:6, 264:15, 267:15, 270:18, 270:19, 323:16, 323:17, 354:5
**40** [1] - 349:6
**400-page** [1] - 351:23
**43** [1] - 360:22
**45** [1] - 379:13
**46** [1] - 255:9
**48** [1] - 257:7
**4:00** [4] - 429:23, 429:25, 430:10, 430:18
**4th** [2] - 277:13, 326:4

### 5

**5** [3] - 256:5, 324:7, 324:8
**50** [1] - 364:3
**50-plus** [2] - 338:7, 339:18
**501** [1] - 387:15
**503** [1] - 232:21
**51** [1] - 368:4
**524** [2] - 268:13, 269:4
**527** [4] - 237:15, 237:16, 237:24, 240:4
**528** [1] - 238:15
**529** [5] - 239:6, 240:3, 240:5, 240:15, 270:15
**53** [1] - 376:9
**530** [4] - 240:9, 240:17, 240:24
**531** [4] - 240:9, 241:2, 241:9, 241:10
**532** [5] - 240:9, 241:18, 241:25, 242:2, 242:3
**533** [5] - 247:13, 248:6, 248:21, 249:3, 254:10
**534** [2] - 249:13, 249:17
**535** [2] - 250:11, 250:15
**536** [3] - 251:9, 251:18, 251:22
**537** [2] - 252:9, 252:16
**538** [3] - 253:4, 253:12, 254:10
**544** [2] - 257:23, 258:1
**546** [3] - 259:6, 259:19, 259:20
**555** [2] - 271:15, 271:23
**56** [1] - 315:20
**560** [4] - 403:14, 403:16, 404:1, 404:11
**57** [1] - 255:9
**58** [1] - 400:24

**5:53** [1] - 315:17

### 6

**6** [3] - 256:5, 325:4, 325:5
**60** [4] - 277:20, 366:14, 366:10, 414:1
**601** [3] - 312:7, 312:9, 312:13
**602** [2] - 313:4, 313:5
**603** [2] - 313:8, 313:14
**604** [2] - 316:13, 316:14
**605** [3] - 316:17, 316:18, 316:23
**606** [2] - 317:1, 317:2
**6th** [2] - 267:15, 329:2

### 7

**7** [4] - 246:11, 256:5, 325:23, 325:24
**757** [1] - 329:16
**7:34:01** [1] - 433:11

### 8

**8** [5] - 235:11, 246:15, 256:5, 327:3, 327:4
**800** [2] - 232:3, 232:12
**819** [1] - 232:6
**8:21** [1] - 315:20

### 9

**9** [7] - 235:11, 236:8, 256:9, 327:23, 327:24, 350:13, 370:20
**90** [3] - 277:20, 377:1
**90-0091** [1] - 434:13
**900** [1] - 232:17
**92** [1] - 278:21
**97201** [1] - 232:13
**97204** [3] - 232:10, 232:18, 232:21
**97214** [1] - 232:7
**9:00** [3] - 421:4, 421:7, 432:14

### A

**ability** [1] - 339:8
**able** [27] - 275:14, 284:23, 286:22, 287:6, 288:3, 288:16, 290:22, 292:8, 292:15, 295:8, 305:3, 305:8, 308:23, 309:9, 310:4, 310:6, 334:6, 353:24, 392:12, 411:16, 411:19, 412:4, 412:22, 413:14, 413:17, 430:9
**above-referenced** [1] - 367:13
**above-titled** [1] - 434:5
**absolute** [1] - 349:9
**absolutely** [3] - 335:2, 366:3, 374:3
**absolutes** [3] - 396:7, 396:9, 396:10
**abstract** [1] - 423:21
**absurd** [2] - 336:14, 336:15
**accept** [4] - 277:21
**acceptable** [2] - 347:1, 347:3
**accepted** [1] - 398:16

**access** [4] - 273:14, 286:22, 292:8, 341:25
**Access** [1] - 349:10
**accessed** [1] - 353:10
**accomplished** [1] - 386:2
**according** [1] - 264:20
**accordingly** [1] - 408:8
**account** [145] - 238:1, 245:14, 249:14, 251:1, 251:5, 251:11, 251:15, 252:6, 252:8, 252:11, 253:7, 253:17, 254:2, 264:21, 264:25, 265:3, 265:6, 266:5, 267:16, 267:17, 268:11, 269:22, 270:4, 270:18, 271:8, 272:11, 274:12, 274:22, 275:5, 276:5, 277:15, 278:20, 278:24, 279:12, 279:13, 285:20, 289:3, 290:3, 290:8, 291:3, 291:24, 294:19, 294:23, 297:21, 298:14, 298:19, 308:15, 319:10, 320:4, 320:5, 320:8, 320:11, 320:15, 320:20, 320:22, 320:24, 321:5, 321:23, 322:2, 322:15, 322:18, 322:21, 323:9, 323:13, 324:4, 324:16, 324:23, 325:2, 325:13, 325:17, 325:20, 326:7, 326:11, 326:15, 326:23, 327:1, 327:17, 327:21, 328:9, 328:13, 330:20, 330:21, 330:22, 335:8, 335:14, 335:15, 336:5, 336:12, 336:25, 337:15, 337:23, 350:16, 353:24, 358:6, 364:12, 367:10, 367:16, 367:19, 368:15, 369:14, 370:14, 370:16, 370:19, 372:10, 374:12, 376:4, 376:6, 376:14, 377:17, 377:19, 377:21, 380:15, 384:25, 390:9, 390:10, 390:25, 400:15, 404:18, 405:22, 406:4, 406:21, 407:3, 407:7, 407:16, 407:17, 407:22, 409:20, 409:22, 410:1, 410:24, 411:14, 411:15, 413:25, 414:18, 414:20, 415:14, 417:1, 418:9, 418:17, 419:1, 419:13, 419:25, 420:5
**account-specific** [1] - 266:5
**accounts** [38] - 242:8, 242:17, 242:20, 243:2, 243:7, 245:10, 245:13, 253:22, 257:17, 270:4, 270:22, 271:5, 271:11, 271:14, 272:13, 276:1, 276:10, 279:3, 279:7, 279:8, 297:15, 297:16, 297:19, 298:20, 299:25, 300:2, 300:13, 300:19, 300:22, 307:1, 353:8, 361:19, 367:9, 367:22, 390:19, 405:17, 405:18, 418:19
**Accounts** [3] - 269:12, 269:23, 270:1
**accumulate** [1] - 352:21
**accumulated** [1] - 349:19
**accuracy** [13] - 333:23, 350:15, 351:1, 354:8, 354:9, 354:10, 354:12, 354:16, 370:21, 378:2, 381:16, 387:14, 395:6
**accurate** [24] - 260:17, 270:7, 272:10, 276:12, 318:18, 318:25, 324:5, 324:15, 324:18, 324:21, 325:13, 326:7, 333:18, 333:22, 354:18,

354:19, 354:24, 356:10, 357:5,
364:22, 370:3, 382:17, 393:4
**ACDV** [141] - 318:9, 318:12, 319:7,
319:9, 319:16, 321:5, 321:15, 322:5,
322:23, 323:18, 324:9, 325:6, 325:25,
327:5, 327:25, 333:14, 333:15,
333:23, 336:22, 337:1, 337:4, 338:14,
338:17, 338:23, 339:4, 339:20,
341:15, 341:25, 344:8, 354:16,
355:20, 355:22, 355:25, 356:1, 356:5,
358:6, 358:15, 359:16, 359:18,
359:19, 359:20, 361:6, 362:2, 364:8,
364:10, 364:23, 365:11, 366:2, 368:3,
368:5, 368:10, 368:12, 368:23, 369:1,
369:2, 370:24, 371:1, 371:7, 371:13,
371:20, 372:18, 372:24, 373:16,
373:21, 374:17, 375:8, 376:12, 377:6,
377:10, 377:14, 377:20, 377:25,
378:20, 379:3, 379:7, 379:10, 380:4,
380:25, 385:16, 385:20, 385:22,
386:5, 389:14, 394:4, 394:12, 394:15,
396:5, 399:5, 399:21, 399:22, 399:25,
400:2, 400:3, 400:6, 400:7, 400:12,
400:13, 401:10, 401:12, 402:13,
402:16, 402:20, 403:1, 403:9, 404:15,
405:19, 405:25, 406:21, 406:24,
407:24, 408:6, 408:7, 408:9, 408:10,
408:14, 409:3, 410:4, 410:9, 410:11,
412:3, 412:4, 412:13, 412:15, 413:2,
414:4, 414:15, 415:16, 416:2, 416:4,
419:1, 419:5, 419:13, 420:5, 420:6,
425:19, 425:22, 428:11, 428:22
**ACDVs** [33] - 318:4, 319:2, 339:15,
343:9, 343:14, 343:21, 358:18,
363:15, 363:25, 368:6, 374:18,
377:16, 377:23, 388:12, 388:13,
389:1, 389:4, 389:6, 390:5, 390:6,
399:13, 399:19, 400:23, 401:3, 401:6,
401:14, 401:25, 405:17, 406:18,
410:12, 410:22, 418:19, 419:15
**acknowledged** [1] - 351:11
**acknowledgements** [1] - 351:11
**acknowledgment** [1] - 334:8
**act** [2] - 245:22, 408:7
**Act** [5] - 349:11, 349:15, 350:21, 424:9,
424:10
**action** [1] - 409:24
**actions** [2] - 235:9, 278:11
**activities** [1] - 425:1
**activity** [5] - 291:12, 360:23, 361:9,
361:10, 372:7
**actual** [8] - 329:8, 386:25, 423:3, 424:7,
424:10, 424:11, 425:13, 428:7
**Ad** [2] - 249:9, 249:13
**adapted** [1] - 300:21
**add** [1] - 234:20
**added** [1] - 355:7
**additional** [9] - 248:5, 254:13, 313:1,
366:18, 375:5, 387:23, 388:3, 394:10,
419:4

**Additionally** [1] - 367:18
**additions** [1] - 255:14
**address** [11] - 234:2, 234:5, 244:21,
258:12, 258:13, 263:3, 263:5, 263:6,
361:24, 361:25, 400:22
**Addresses** [1] - 268:22
**addresses** [3] - 233:20, 233:22, 268:23
**adequately** [1] - 344:10
**adjourned** [1] - 433:15
**adjust** [1] - 421:22
**Administration** [1] - 349:25
**admitted** [1] - 403:25
**adopts** [1] - 423:13
**ADU** [2] - 281:3, 281:13
**Adverse** [2] - 269:12, 269:23
**adverse** [2] - 269:22, 270:4
**advice** [2] - 291:14, 291:16
**Advisory** [1] - 351:6
**affect** [3] - 287:14, 295:6, 361:17
**affidavit** [24] - 234:10, 234:13, 236:4,
236:5, 236:15, 242:24, 246:15,
246:16, 246:22, 256:17, 256:22,
342:18, 358:17, 373:24, 374:5,
374:10, 374:20, 375:13, 390:2, 390:7,
414:2, 414:22, 415:1, 415:2
**affidavits** [1] - 264:3
**afraid** [2] - 289:23, 374:8
**afternoon** [10] - 315:25, 340:3, 341:24,
346:2, 346:19, 347:9, 348:23, 397:16,
420:24, 421:2
**afterwards** [1] - 290:19
**agencies** [17] - 257:13, 267:19, 270:8,
343:12, 353:21, 353:22, 355:3, 355:9,
355:11, 355:12, 355:24, 356:3, 360:1,
394:7, 399:7, 399:11, 399:24
**agencies'** [1] - 268:2
**agency** [25] - 249:7, 252:4, 252:22,
253:10, 253:11, 253:18, 253:21,
258:16, 258:20, 258:23, 267:16,
277:18, 278:19, 356:6, 367:20,
367:23, 400:5, 400:14, 402:18,
402:25, 403:6, 403:10, 408:14,
409:23, 416:6
**Agency** [1] - 264:17
**ago** [13] - 278:4, 281:1, 297:3, 298:12,
298:13, 310:3, 341:18, 345:5, 352:10,
356:25, 357:10, 415:12, 426:24
**agree** [8] - 235:9, 243:4, 248:3, 249:22,
343:25, 358:20, 376:3, 387:6
**ahead** [15] - 247:17, 285:21, 288:14,
313:11, 330:2, 346:5, 366:12, 383:15,
383:17, 400:3, 402:17, 408:6, 411:8,
421:11, 422:9
**aid** [3] - 357:7, 383:7, 410:19
**Alaska** [1] - 290:20
**alert** [1] - 346:17
**alerts** [1] - 348:7
**alleges** [1] - 424:22
**allow** [4] - 277:20, 314:2, 408:17,
424:13

**allowed** [1] - 393:17
**allows** [2] - 424:7, 425:21
**almost** [2] - 340:6, 398:2
**alone** [1] - 294:14
**alternative** [1] - 423:9
**amazing** [1] - 307:4
**ambitions** [1] - 295:17
**amendment** [1] - 355:5
**amendments** [2] - 365:2, 374:4
**America** [1] - 307:13
**American** [1] - 351:7
**amount** [16] - 277:15, 308:23, 338:16,
340:21, 357:1, 380:9, 384:11, 388:9,
390:25, 391:12, 391:15, 391:21,
391:24, 391:25, 392:9
**Ana** [6] - 282:6, 282:14, 305:10, 307:4,
307:6, 308:1
**ANA** [2] - 282:9, 282:14
**Angeles** [1] - 283:2
**anger** [1] - 382:23
**angry** [1] - 296:8
**Annette** [1] - 232:16
**annual** [1] - 402:8
**answer** [11] - 234:14, 242:12, 242:19,
285:16, 290:12, 292:5, 297:6, 300:14,
310:17, 320:16, 343:1
**answering** [1] - 355:10
**anticipate** [2] - 430:9, 431:22
**anxious** [1] - 309:7
**anyway** [2] - 312:17, 370:8
**apologies** [1] - 277:21
**apologize** [2] - 297:9, 412:20
**apologized** [1] - 287:17
**appear** [2] - 329:23, 348:9, 412:24
**APPEARANCES** [1] - 232:1
**applied** [4] - 280:25, 281:3, 281:11,
293:6
**apply** [1] - 352:24, 382:4, 391:4
**applying** [3] - 292:23, 292:24, 382:8
**appointments** [1] - 284:20
**approach** [2] - 237:20, 302:2
**approve** [1] - 332:14
**approved** [1] - 332:12
**approves** [1] - 365:24
**April** [3] - 279:1, 398:23, 402:9
**area** [1] - 341:7
**arguably** [1] - 425:8
**arguing** [1] - 432:14
**argument** [3] - 423:16, 424:1, 424:13
**arguments** [3] - 423:22, 429:17, 430:1
**arose** [1] - 262:5
**arrange** [2] - 362:21, 362:23
**arrested** [2] - 361:16, 420:12
**arrived** [3] - 264:1, 304:12, 304:19,
305:5
**arrives** [1] - 394:15
**ASAP** [2] - 362:24, 365:24
**Ashley** [6] - 312:7, 312:10, 312:14,
322:9, 399:16, 419:17

**aspects** [1] - 370:2
**assemble** [1] - 353:23
**assessing** [2] - 383:2, 383:22
**assign** [1] - 353:24
**assigned** [3] - 264:24, 264:25, 332:5
**associated** [3] - 268:23, 268:25, 423:14
**assume** [2] - 330:10, 432:1
**assurance** [1] - 398:17
**assure** [2] - 316:7, 354:10
**Astra** [2] - 249:9, 249:13
**AT&T** [11] - 252:6, 252:8, 252:11, 252:13, 253:1, 253:6, 253:7, 276:23, 277:5, 277:10, 277:15
**ataxic** [2] - 309:1, 309:5
**Atlanta** [1] - 232:4
**attach** [3] - 256:20, 260:13, 403:5
**attached** [5] - 246:6, 403:1, 403:7, 403:10, 409:4
**attaches** [1] - 403:4
**attachment** [8] - 236:24, 246:24, 256:13, 256:16, 260:20, 403:10, 409:1, 409:3
**attachments** [8] - 260:10, 260:16, 260:17, 261:8, 264:2, 264:7, 373:23, 374:20
**attempts** [1] - 259:10
**attention** [2] - 250:20, 358:23
**Attorney** [1] - 232:5
**attorney** [9] - 267:4, 330:6, 338:3, 357:17, 361:22, 361:23, 363:11, 372:5, 411:25
**attorneys** [1] - 340:20
**attributable** [1] - 425:20
**AUD** [3] - 409:23, 409:25
**audit** [1] - 328:17
**auditable** [1] - 341:9
**August** [21] - 231:5, 243:12, 245:4, 245:9, 245:16, 247:7, 247:19, 248:4, 249:14, 250:8, 250:12, 250:24, 251:10, 252:10, 253:6, 254:5, 254:6, 255:11, 277:7, 433:15, 433:16
**authenticate** [2] - 394:8, 394:11
**authenticated** [1] - 394:20
**authentication** [1] - 394:13
**author** [1] - 271:21
**authoritative** [1] - 375:16
**authorities** [3] - 357:12, 357:13, 357:16
**authorization** [1] - 277:18
**auto** [2] - 298:13, 363:1
**Auto** [18] - 358:12, 397:18, 397:19, 398:1, 398:2, 398:5, 398:6, 398:16, 399:1, 399:25, 400:1, 400:11, 401:3, 401:4, 401:13, 406:3, 408:9, 416:7
**Automated** [1] - 317:25
**automatically** [1] - 400:14
**auxiliary** [2] - 275:9, 292:25
**available** [9] - 314:19, 335:5, 341:14, 352:19, 364:20, 389:3, 389:7, 389:8, 396:24

**Avenue** [5] - 232:3, 232:9, 232:12, 232:17, 232:20
**avenue** [2] - 375:19, 386:14
**avoid** [1] - 348:10
**awaiting** [1] - 407:21
**awards** [1] - 424:14
**aware** [12] - 246:4, 267:18, 281:23, 297:16, 297:18, 299:4, 299:5, 300:2, 310:17, 337:18, 390:8, 410:12

## B

**B-a-r-r-o-n** [1] - 302:13
**B-r-a-x-t-o-n** [1] - 397:12
**background** [2] - 283:5, 349:4
**bad** [5] - 355:18, 359:25, 363:19, 367:23, 384:5
**balance** [6] - 294:2, 369:20, 370:14, 391:2, 391:8
**balances** [1] - 391:7
**banging** [1] - 382:5
**bank** [16] - 245:13, 329:25, 330:1, 332:11, 332:13, 332:15, 334:3, 334:8, 338:8, 340:13, 340:15, 341:1, 345:7, 345:12, 372:10, 386:25
**BANK** [2] - 231:6, 232:15
**Bank** [2] - 397:20, 397:23
**bank's** [1] - 374:1
**banking** [15] - 306:25, 331:25, 332:3, 332:4, 332:8, 332:10, 332:16, 332:21, 332:25, 333:12, 333:23, 338:7, 339:19, 340:23, 344:12
**Banking** [1] - 350:23
**bankruptcy** [2] - 353:14, 398:9
**banks** [10] - 332:11, 333:5, 333:15, 339:22, 343:14, 343:21, 344:7, 344:14, 380:25, 381:6
**Barron** [5] - 302:1, 302:12, 302:17, 304:8, 310:3
**BARRON** [1] - 302:6
**base** [1] - 288:10
**based** [30] - 235:24, 245:18, 245:20, 245:24, 254:16, 254:17, 270:3, 277:16, 294:21, 295:6, 300:24, 318:20, 320:10, 320:14, 320:16, 322:20, 324:22, 325:1, 325:19, 326:22, 329:4, 337:13, 352:5, 359:4, 364:13, 364:14, 408:3, 410:23, 419:3, 419:19
**basement** [3] - 275:14, 292:17
**basics** [1] - 353:1
**basis** [2] - 410:21, 411:1
**batch** [1] - 254:8
**Bates** [1] - 319:4
**bathroom** [3] - 303:2, 306:7, 306:19
**batten** [1] - 307:12
**Battery** [1] - 232:3
**BB** [1] - 329:25
**BC** [1] - 361:16
**bearing** [1] - 336:4

**became** [1] - 356:20
**become** [3] - 314:19, 333:4, 379:15
**becoming** [1] - 337:18
**BEFORE** [1] - 231:16
**beginning** [7] - 272:13, 282:24, 314:1, 342:8, 342:9, 390:1, 402:9
**behalf** [14] - 233:12, 237:13, 246:8, 282:10, 302:7, 317:20, 331:10, 333:8, 333:10, 340:25, 348:18, 367:21, 397:6, 422:8
**behind** [1] - 315:11
**belief** [1] - 411:5
**belong** [1] - 370:12
**belongs** [1] - 327:17
**below** [8] - 260:15, 266:18, 268:16, 319:22, 362:15, 362:16, 369:13, 434:3
**bench** [1] - 281:24, 421:15
**Berg** [5] - 317:1, 317:3, 398:11, 398:13, 398:16
**best** [8] - 303:4, 343:20, 354:25, 391:14, 391:15, 411:21, 413:1, 432:2
**Best** [2] - 238:13, 238:16
**bet** [1] - 343:2
**Bets** [5] - 317:1, 317:3, 398:10, 398:13, 398:16
**better** [9] - 304:6, 335:10, 336:20, 345:14, 350:21, 350:24, 363:16, 372:9, 372:15
**between** [16] - 243:12, 245:8, 250:24, 255:4, 257:11, 260:21, 263:19, 270:8, 284:17, 295:10, 315:4, 365:21, 424:6, 425:15, 427:16, 428:11
**beyond** [4] - 393:2, 393:5, 410:16, 424:22
**bib** [1] - 303:3
**big** [14] - 255:8, 284:14, 295:23, 295:24, 308:9, 309:17, 336:2, 352:17, 353:20, 359:17, 391:2, 399:8, 400:23, 403:20
**bigger** [1] - 289:22
**biggest** [2] - 298:24, 353:7
**bill** [2] - 277:13, 277:17
**birth** [1] - 369:10
**bit** [14] - 250:1, 310:3, 315:14, 330:8, 347:18, 349:3, 359:3, 359:12, 362:7, 368:17, 373:12, 394:5, 411:18, 413:19
**blaming** [1] - 342:23
**blank** [1] - 369:20
**block** [9] - 266:10, 266:13, 266:18, 358:17, 366:17, 367:5, 367:8, 371:6, 413:9
**blocked** [1] - 367:15
**blocking** [1] - 366:13
**blocks** [1] - 417:21
**blow** [1] - 411:16
**blue** [1] - 244:16
**blurry** [3] - 411:18, 412:20, 413:19
**blush** [1] - 371:17
**BMW** [1] - 361:17
**boat** [12] - 286:3, 286:18, 286:20, 288:17, 289:18, 290:19, 304:5, 306:3,

306:6, 306:9, 307:7, 307:11
**body** [2] - 314:18, 337:6
**bold** [1] - 258:15
**book** [6] - 351:19, 351:23, 351:25, 354:25, 381:19, 390:21
**books** [1] - 351:17, 351:18
**bottom** [12] - 236:2, 255:1, 255:2, 266:3, 269:9, 269:12, 337:9, 341:6, 365:15, 411:16, 412:17, 413:9
**bought** [2] - 288:5, 334:18
**bound** [1] - 424:5
**box** [11] - 319:25, 322:12, 323:6, 323:25, 324:15, 325:12, 326:6, 327:10, 327:16, 328:6, 369:11
**Box** [1] - 367:1
**boxes** [3] - 320:19, 369:10, 370:18
**Brady** [8] - 262:20, 266:24, 316:17, 316:19, 316:24, 410:7, 410:12, 411:23
**Brady's** [2] - 263:5, 415:13
**Braxton** [4] - 397:3, 397:11, 397:16, 403:16
**BRAXTON** [1] - 397:5
**break** [3] - 284:17, 313:20, 313:22
**breaking** [1] - 288:16
**Brian** [4] - 313:4, 313:6, 399:16, 419:17
**brief** [5] - 240:11, 274:15, 276:18, 401:9, 402:12
**briefing** [1] - 428:18
**briefly** [5] - 280:13, 316:21, 359:11, 398:25, 406:20
**brings** [2] - 354:21, 357:20
**brother** [7] - 272:21, 272:24, 273:3, 286:10, 289:16, 307:6, 307:9
**brother-in-law's** [1] - 272:21
**brought** [1] - 308:17
**build** [1] - 275:9
**built** [3] - 289:10, 354:10, 355:14
**bullet** [5] - 260:16, 261:7, 407:13, 407:14, 408:3
**bunch** [1] - 286:3
**bureau** [6] - 398:5, 398:21, 398:23, 399:1, 409:14, 409:23
**bureaus** [1] - 352:17
**Burgess** [1] - 237:25
**bus** [2] - 303:5, 303:6
**business** [2] - 292:12, 398:8
**buy** [1] - 334:23
**Buy** [2] - 238:13, 238:16
**buying** [1] - 360:13
**BY** [78] - 233:16, 237:23, 240:14, 241:1, 241:13, 241:23, 242:6, 242:15, 247:18, 248:10, 248:20, 249:21, 250:19, 252:2, 252:20, 253:16, 258:5, 259:24, 265:23, 269:8, 270:17, 272:2, 274:10, 274:19, 275:3, 276:19, 279:11, 280:7, 280:18, 281:10, 282:18, 285:15, 288:1, 288:18, 289:1, 290:15, 291:7, 292:22, 293:5, 293:22, 294:17, 297:2, 302:16, 304:7, 305:20, 308:7, 309:13, 310:2, 317:17, 330:5,

331:20, 340:2, 343:7, 345:2, 349:2, 351:13, 357:19, 364:4, 366:21, 376:10, 378:11, 381:5, 381:10, 383:16, 385:10, 393:6, 394:2, 396:2, 397:15, 403:15, 404:10, 405:6, 405:12, 406:13, 411:9, 411:17, 412:19, 414:13

## C

**Caine** [6] - 247:14, 247:19, 249:6, 270:20, 278:20, 279:5
**calculated** [1] - 356:12
**California** [2] - 335:9, 359:23
**camper** [2] - 288:5, 288:6
**cannot** [1] - 356:11
**Capital** [1] - 351:7
**car** [15] - 244:14, 288:15, 332:19, 334:18, 334:23, 336:19, 365:22, 365:25, 371:22, 372:2, 372:3, 392:12, 393:12, 395:6
**card** [42] - 245:14, 262:21, 263:18, 263:22, 266:25, 267:10, 273:19, 273:20, 274:24, 274:25, 280:25, 281:12, 285:18, 286:1, 286:4, 286:5, 286:21, 288:10, 291:22, 298:1, 298:25, 299:1, 299:3, 334:12, 334:14, 335:19, 335:23, 336:4, 336:6, 375:22, 375:23, 379:17, 379:25, 380:4, 380:5, 380:9, 380:14, 386:10, 386:11, 386:19, 386:25, 397:24
**cards** [5] - 251:12, 360:10, 360:12, 380:11, 386:15
**care** [4] - 305:14, 308:24, 357:4, 382:14
**career** [2] - 332:4, 332:8
**careful** [3] - 358:2, 361:13, 389:15
**carefully** [1] - 392:1
**caregiver** [2] - 302:25, 303:12
**Caribbean** [3] - 255:4, 284:13, 310:23
**caring** [1] - 273:5
**Carolina** [1] - 367:2
**carriers** [1] - 278:5
**carry** [2] - 286:3, 288:20
**case** [42] - 242:16, 263:24, 278:10, 298:19, 314:22, 330:7, 334:2, 335:2, 346:13, 346:16, 346:24, 348:8, 348:9, 352:21, 353:2, 354:4, 356:23, 357:23, 359:3, 363:18, 363:21, 364:24, 366:15, 375:11, 379:3, 386:8, 386:9, 396:22, 409:25, 410:6, 420:1, 421:22, 423:1, 424:5, 424:6, 424:8, 424:17, 424:19, 430:8, 431:3, 431:7, 431:13
**cases** [9] - 333:10, 340:5, 340:24, 341:4, 344:6, 352:11, 370:3, 372:12, 430:15
**Cash** [1] - 249:14
**cash** [3] - 275:16, 286:2, 286:3
**catch** [1] - 297:6
**categories** [1] - 381:17, 382:25, 424:23
**category** [7] - 370:22, 382:20, 383:25,

384:4, 384:24, 425:11, 425:14
**causal** [3] - 425:15, 428:4, 428:11
**causation** [2] - 428:15, 431:20
**caused** [2] - 244:18, 277:22
**causes** [1] - 390:17
**CBNA** [1] - 269:19
**CC** [1] - 414:3
**CCC** [2] - 413:25, 417:24
**CDRS** [1] - 412:11
**Celestina** [4] - 317:11, 317:13, 317:19, 331:1
**cell** [1] - 283:12
**centers** [1] - 338:15
**certain** [6] - 243:20, 254:8, 254:18, 341:9, 423:24, 428:2
**certainly** [5] - 247:12, 286:3, 386:8, 386:14, 431:13
**certifications** [1] - 402:8
**certified** [3] - 254:7, 373:10, 434:8
**certify** [1] - 434:3
**cetera** [2] - 306:7, 313:23
**CFPB** [1] - 357:17
**chair** [1] - 303:8
**chance** [5] - 422:20, 422:21, 426:18, 431:25, 432:10
**chances** [2] - 335:22, 355:18
**change** [7] - 286:15, 291:24, 365:21, 392:15, 400:22, 424:3
**changed** [4] - 254:17, 254:19, 333:12, 376:14
**chapters** [2] - 351:24, 352:4
**charge** [4] - 377:4, 384:3, 385:2, 391:24
**charge-off** [4] - 377:4, 384:3, 385:2, 391:24
**charged** [1] - 391:24
**charged-off** [1] - 391:24
**charges** [1] - 334:13
**Charne** [13] - 233:21, 236:22, 246:8, 256:8, 261:10, 261:15, 261:19, 261:22, 261:25, 267:5, 361:23, 363:12, 388:1
**Charne's** [1] - 359:8
**chart** [3] - 350:11, 353:17, 378:8
**Chase** [1] - 352:18
**cheaper** [1] - 338:19
**Check** [1] - 271:19
**check** [4] - 243:14, 268:1, 326:6, 369:7
**checked** [11] - 319:25, 320:18, 322:11, 323:6, 323:25, 324:15, 326:15, 327:10, 328:6, 369:10, 369:11
**checking** [3] - 325:12, 327:16, 416:18
**checkups** [1] - 284:20
**chemistry** [1] - 282:23
**chess** [1] - 433:7
**chief** [1] - 346:24
**children** [3] - 283:19, 293:14, 304:18
**Children's** [1] - 306:20
**chilled** [1] - 382:8
**choosing** [1] - 273:12

**chosen** [1] - 326:17
**chronic** [2] - 379:15, 381:16
**chronology** [1] - 359:3
**Chula** [2] - 335:10, 359:23
**circle** [1] - 407:8
**circles** [3] - 308:9, 308:25, 309:17
**circling** [1] - 365:9
**Circuit** [4] - 424:3, 424:5, 424:7, 424:17
**Circuit's** [1] - 424:6
**circulate** [2] - 365:8, 429:3
**circumstances** [1] - 396:11
**cited** [1] - 371:4
**Citibank** [8] - 251:5, 251:7, 251:11, 251:14, 258:11, 259:13, 269:17, 269:20
**city** [4] - 285:19, 286:17, 305:8, 306:3
**civil** [1] - 393:3
**claim** [2] - 427:12, 427:13
**claimed** [1] - 425:17
**claiming** [5] - 280:3, 408:9, 425:11, 426:21, 428:12
**claims** [8] - 321:23, 364:11, 368:15, 376:22, 379:16, 426:22, 427:1, 427:2
**Claremont** [1] - 283:1
**Claremont-McKenna** [1] - 283:1
**clarification** [1] - 245:12
**clarify** [2] - 330:8, 401:2
**class** [1] - 293:18
**classic** [1] - 391:16
**classroom** [1] - 401:17
**clear** [5] - 292:11, 292:23, 406:8, 423:6, 428:1
**CLERK** [14] - 237:19, 270:15, 282:7, 282:13, 302:10, 331:7, 331:13, 348:15, 348:21, 364:2, 366:11, 376:8, 397:9, 432:21
**Cleveland** [1] - 293:18
**Client** [2] - 361:12, 361:14
**client** [1] - 361:18
**client's** [3] - 361:17, 361:19
**clients** [2] - 333:9, 338:20
**climbing** [1] - 377:2
**clock** [3] - 281:23, 429:20, 433:8
**close** [10] - 288:17, 295:14, 303:10, 303:11, 340:6, 346:16, 347:13, 357:3, 391:9, 429:23
**closed** [2] - 349:21, 428:5
**closing** [3] - 429:17, 430:1, 430:6
**closings** [1] - 429:19
**code** [18] - 319:22, 415:20, 417:12, 417:14, 417:19, 417:20, 417:23, 417:25, 418:2, 418:3, 418:5, 418:11, 418:14, 418:15, 418:20, 418:25, 419:4, 419:9
**codes** [5] - 416:22, 417:6, 417:7, 417:8, 417:9
**cognizable** [1] - 425:13
**Colin** [4] - 316:12, 316:15, 399:16, 419:16

**collect** [2] - 234:23, 354:2
**collecting** [1] - 237:13
**collection** [24] - 249:4, 249:7, 252:4, 252:22, 253:10, 253:11, 253:17, 253:20, 254:1, 258:15, 258:20, 258:23, 260:2, 264:21, 265:2, 265:6, 265:8, 267:16, 270:18, 277:18, 278:19, 279:6, 367:20, 391:24
**Collection** [1] - 264:17
**collections** [5] - 253:22, 253:24, 264:25, 367:23, 390:25
**college** [4] - 282:23, 282:25, 283:7, 289:10
**Columbia** [1] - 349:8
**com** [1] - 283:10
**coming** [4] - 315:11, 348:7, 422:3, 422:22
**comment** [1] - 312:17
**comments** [3] - 407:12, 408:5, 411:13
**commercial** [6] - 314:11, 314:24, 332:8, 332:9, 340:22, 348:3
**commercials** [2] - 313:19, 314:1
**Committee** [2] - 350:23
**common** [2] - 370:22, 414:15
**communicate** [6] - 279:19, 294:1, 304:6, 305:3, 305:4, 431:19
**communicating** [1] - 280:8, 367:11
**communication** [3] - 245:5, 245:8, 316:9
**communications** [9] - 245:11, 250:25, 251:3, 254:14, 265:25, 299:6, 300:7, 300:24, 392:10
**companies** [3] - 243:24, 276:10, 341:5
**company** [20] - 241:16, 249:11, 253:11, 273:19, 279:25, 283:8, 283:11, 283:14, 292:2, 329:4, 329:6, 329:9, 329:10, 329:18, 329:24, 339:19, 349:8, 349:12, 379:7, 398:9
**compare** [1] - 402:19
**compared** [2] - 358:5, 377:11
**comparison** [2] - 356:22, 378:5
**compelling** [1] - 375:16
**compilation** [1] - 353:4
**compile** [2] - 246:2, 353:22
**complaint** [3] - 234:10, 246:16, 386:6
**Complaint** [2] - 424:21, 424:22
**complete** [9] - 234:13, 234:22, 235:2, 318:6, 318:16, 356:10, 364:12, 393:11, 421:19
**completed** [2] - 415:11, 421:23
**completely** [1] - 275:22
**completes** [1] - 409:9
**compliance** [6] - 417:19, 417:20, 417:25, 418:15, 418:25, 419:4
**complicated** [1] - 279:25
**complied** [1] - 419:19
**compound** [1] - 418:22
**comprehensive** [1] - 430:3
**compromised** [1] - 361:19
**computer** [9] - 235:9, 246:18, 251:2,

283:6, 294:24, 301:5, 308:10, 339:13, 373:18
**computers** [1] - 244:1
**concern** [3] - 273:11, 273:14, 426:4
**concerned** [3] - 306:1, 306:25, 309:20
**concession** [1] - 296:10
**conclude** [3] - 379:24, 393:11, 393:18
**concluded** [6] - 277:16, 277:25, 364:16, 364:21, 393:14, 424:11
**conclusion** [1] - 364:22
**condition** [6] - 417:19, 417:20, 417:25, 418:15, 418:25, 419:4
**conduct** [2] - 354:17, 356:17
**conducted** [1] - 377:21
**conducting** [1] - 333:23
**confer** [8] - 237:22, 274:18, 281:19, 302:3, 316:20, 316:22, 317:4, 431:16
**conference** [1] - 347:12
**confirm** [5] - 301:3, 386:10, 386:12, 387:1, 415:16
**confirmed** [1] - 407:23
**conformed** [1] - 434:7
**confused** [1] - 266:15
**Congress** [3] - 350:1, 350:19, 350:20
**connection** [3] - 307:20, 307:22, 333:4
**consequences** [1] - 381:11
**consider** [12] - 346:23, 357:2, 360:19, 372:23, 375:19, 384:6, 384:19, 426:2, 427:20, 431:13, 432:12, 432:13
**considered** [3] - 360:18, 366:1, 418:5
**considering** [1] - 372:17
**consistent** [3] - 341:9, 386:7, 391:18
**consistently** [1] - 309:16
**consultant** [2] - 331:22, 398:8
**Consultants** [3] - 252:11, 252:21, 252:25
**consulted** [1] - 430:20
**Consumer** [2] - 317:25, 351:5
**consumer** [27] - 318:11, 321:20, 330:17, 332:7, 332:8, 332:17, 333:6, 334:25, 340:20, 340:21, 340:25, 341:7, 343:19, 344:5, 354:22, 356:13, 364:11, 367:14, 387:11, 390:13, 394:18, 394:20, 399:22, 403:5, 416:6, 418:4, 419:1
**consumer's** [1] - 356:5
**consumers** [6] - 350:25, 353:25, 355:10, 365:4, 374:5, 382:24
**contact** [7] - 244:23, 262:24, 345:8, 345:13, 361:23, 362:21, 419:25
**contacted** [5] - 244:13, 277:12, 286:10, 338:5, 361:15
**contained** [1] - 263:21
**content** [1] - 238:19
**continue** [8] - 290:1, 304:3, 307:7, 320:17, 402:1, 403:23, 407:19, 408:17
**continued** [10] - 271:11, 290:9, 308:24, 325:1, 325:20, 326:22, 328:12, 328:14, 349:14, 355:9
**continues** [1] - 407:10

**continuing** [62] - 233:16, 237:23, 240:14, 241:1, 241:13, 241:23, 242:6, 242:15, 247:18, 248:10, 248:20, 249:21, 250:19, 252:2, 252:20, 253:16, 258:5, 259:24, 265:23, 269:8, 269:15, 270:17, 272:2, 274:19, 275:3, 276:19, 279:11, 280:7, 285:15, 288:1, 288:18, 289:1, 290:15, 291:7, 292:22, 293:5, 293:22, 294:17, 304:7, 305:20, 308:7, 309:13, 343:7, 351:13, 357:19, 364:4, 366:21, 376:10, 378:11, 381:5, 381:10, 383:16, 393:6, 403:15, 404:10, 405:6, 405:12, 406:13, 411:9, 411:17, 412:19, 414:13

**continuous** [1] - 402:4
**contributing** [1] - 350:24
**contribution** [1] - 351:12
**control** [5] - 333:20, 382:13, 382:14, 382:16, 382:19
**controlled** [1] - 310:14
**Controller** [1] - 332:12
**conversation** [2] - 430:17, 432:12
**conversations** [1] - 291:15
**convey** [1] - 414:5
**conveyed** [1] - 418:8
**conveys** [1] - 417:16
**conviction** [1] - 392:4
**Cooper** [1] - 424:9
**coordinate** [1] - 262:3
**coordination** [1] - 294:3
**copies** [1] - 243:15
**copy** [15] - 236:4, 236:16, 238:21, 239:9, 243:11, 246:8, 246:13, 247:1, 248:1, 262:21, 263:22, 267:10, 335:23, 386:11, 386:25
**corner** [1] - 295:16
**correct** [182] - 234:3, 235:25, 242:20, 242:24, 244:24, 245:14, 245:25, 246:9, 246:13, 246:20, 247:1, 247:5, 247:11, 249:1, 250:6, 254:3, 254:7, 255:22, 256:10, 256:14, 256:20, 257:1, 257:4, 257:7, 257:24, 258:8, 258:20, 259:15, 260:7, 261:1, 261:4, 261:11, 262:2, 262:10, 263:1, 263:6, 263:9, 263:13, 263:15, 263:25, 264:9, 264:13, 266:1, 266:25, 267:13, 267:16, 268:14, 268:20, 269:10, 269:13, 270:5, 270:19, 271:5, 271:9, 271:16, 272:3, 272:17, 272:19, 272:21, 272:25, 273:6, 273:9, 273:15, 273:24, 280:23, 300:8, 310:21, 311:14, 317:22, 317:23, 318:9, 318:15, 318:19, 318:23, 319:1, 319:12, 320:2, 320:6, 320:9, 320:13, 320:15, 320:20, 320:21, 321:3, 321:6, 321:7, 321:12, 321:16, 321:17, 321:24, 321:25, 322:3, 322:4, 322:7, 322:8, 322:10, 322:12, 322:16, 322:19, 322:22, 323:5, 323:11, 323:14, 323:15, 323:19, 323:20,

324:6, 324:10, 324:11, 324:25, 325:3, 325:7, 325:11, 325:18, 325:22, 326:1, 326:9, 326:13, 326:17, 326:21, 327:6, 327:9, 327:15, 327:22, 328:1, 328:22, 328:25, 329:3, 329:20, 329:21, 330:18, 330:23, 340:10, 340:20, 342:1, 342:4, 342:7, 342:12, 343:22, 344:1, 344:11, 346:14, 347:6, 360:2, 370:3, 382:18, 385:13, 385:16, 385:23, 386:4, 386:6, 386:13, 387:12, 387:21, 388:1, 388:4, 389:4, 389:14, 390:5, 390:6, 390:10, 390:11, 390:13, 390:16, 390:22, 392:2, 392:19, 400:17, 400:18, 401:4, 406:10, 408:23, 413:8, 413:13, 415:22, 416:20, 417:5, 417:10, 419:17, 419:18, 420:22, 434:4
**corrected** [4] - 355:19, 378:24, 379:4, 379:12
**correctly** [8] - 242:7, 262:14, 262:25, 263:18, 273:3, 291:19, 328:10, 396:3
**correspondence** [1] - 297:12
**Cosgrave** [1] - 232:17
**Council** [1] - 351:6
**counsel** [14] - 233:2, 237:22, 274:18, 282:2, 302:2, 302:3, 312:15, 315:23, 316:22, 317:4, 348:1, 422:2, 422:21, 429:4
**country** [4] - 286:2, 334:11, 361:15, 361:22
**couple** [11] - 234:10, 250:1, 283:17, 301:3, 313:19, 330:7, 331:7, 340:3, 346:15, 354:14, 357:13
**course** [5] - 315:3, 333:14, 337:22, 377:5, 386:18
**court** [7] - 281:19, 314:15, 314:16, 317:9, 319:3, 351:15, 378:16
**Court** [32] - 233:2, 237:22, 274:16, 274:18, 281:19, 282:2, 302:3, 312:7, 312:9, 312:13, 313:4, 313:5, 313:8, 313:14, 315:23, 316:13, 316:14, 316:17, 316:18, 316:23, 317:1, 317:2, 346:16, 346:17, 348:1, 422:2, 422:13, 423:10, 424:8, 424:11, 431:22, 434:13
**COURT** [169] - 231:1, 231:17, 232:19, 233:4, 233:9, 237:20, 239:16, 239:23, 240:3, 240:6, 240:10, 240:12, 240:25, 241:10, 241:12, 241:20, 242:3, 242:5, 242:12, 247:15, 248:7, 248:9, 248:14, 249:19, 250:17, 251:24, 252:18, 253:14, 258:3, 259:22, 265:21, 269:6, 271:25, 274:6, 274:17, 275:2, 280:6, 280:12, 280:14, 281:6, 281:17, 281:20, 282:4, 285:14, 287:19, 287:21, 288:13, 288:24, 290:11, 291:6, 292:4, 293:3, 293:16, 294:16, 296:21, 301:19, 301:22, 301:24, 302:2, 302:4, 303:19, 303:24, 304:2, 305:19, 308:6, 309:11, 309:22, 311:23, 311:25, 312:4, 312:18,

312:25, 313:9, 313:11, 313:13, 313:16, 315:8, 315:17, 315:19, 315:25, 316:5, 317:8, 330:25, 331:4, 339:25, 342:25, 343:5, 344:23, 345:18, 345:20, 345:23, 345:25, 346:8, 346:11, 346:18, 346:22, 347:1, 347:3, 347:6, 347:15, 347:17, 347:24, 348:3, 351:8, 357:8, 357:18, 366:9, 366:12, 378:10, 381:3, 381:9, 383:6, 383:9, 383:15, 385:7, 392:25, 393:23, 395:23, 396:13, 396:15, 396:17, 396:19, 396:21, 396:23, 397:2, 403:21, 403:23, 404:1, 404:4, 404:8, 405:2, 410:17, 411:7, 414:10, 420:23, 421:10, 421:14, 422:4, 422:6, 422:9, 422:15, 425:25, 426:7, 426:13, 426:16, 427:5, 427:10, 427:18, 428:15, 428:19, 429:5, 429:10, 429:12, 429:18, 429:24, 430:12, 430:16, 430:25, 431:4, 431:8, 431:20, 432:1, 432:5, 432:11, 432:18, 432:22, 433:3, 433:5, 433:9
**Courthouse** [1] - 232:20
**courthouses** [1] - 354:3
**courtroom** [6] - 315:7, 346:10, 348:6, 421:6, 421:9, 422:5
**courts** [1] - 357:17
**cover** [1] - 264:3
**covered** [2] - 349:11, 389:19
**covers** [3] - 351:24, 351:25
**CRA** [8] - 341:1, 355:18, 365:2, 365:5, 396:4, 401:15, 417:8, 417:9
**CRAs** [3] - 365:3, 394:20, 417:7
**crash** [1] - 283:11
**create** [5] - 255:18, 342:22, 355:25, 379:11, 431:18
**created** [7] - 321:18, 353:16, 353:17, 368:12, 368:13, 374:6, 417:7
**creates** [2] - 350:16, 368:23
**Credit** [7] - 332:6, 349:11, 349:15, 350:21, 351:19, 412:12
**credit** [183] - 243:2, 243:10, 243:11, 243:20, 245:13, 248:12, 248:23, 248:25, 251:12, 257:13, 258:13, 260:1, 267:18, 268:1, 268:2, 268:13, 269:2, 270:8, 273:19, 273:20, 274:11, 274:12, 274:21, 274:22, 275:5, 277:19, 277:20, 278:17, 280:20, 285:18, 286:1, 286:4, 286:5, 286:21, 288:10, 289:3, 289:5, 289:6, 289:8, 289:9, 290:8, 291:22, 291:25, 293:1, 297:14, 297:16, 298:1, 298:2, 298:5, 298:8, 298:21, 298:25, 299:1, 299:3, 300:19, 308:15, 320:22, 321:2, 321:6, 323:13, 325:2, 325:20, 326:20, 326:23, 326:25, 328:13, 328:14, 329:19, 332:8, 332:9, 332:17, 333:6, 334:12, 334:14, 334:25, 337:23, 340:21, 341:7, 343:12, 343:17, 343:20, 349:5, 350:2, 350:4, 350:8,

350:9, 350:14, 350:15, 350:17, 351:1,
351:3, 352:1, 352:2, 352:3, 352:4,
352:5, 352:6, 352:8, 352:16, 352:17,
353:3, 353:4, 353:5, 353:8, 353:10,
353:16, 353:20, 353:22, 354:6, 354:8,
354:13, 354:22, 354:24, 355:3, 355:9,
355:11, 355:23, 356:2, 356:6, 360:1,
360:10, 360:12, 361:18, 366:19,
366:25, 367:9, 367:24, 370:14,
370:21, 374:12, 375:22, 375:23,
378:2, 379:15, 381:12, 381:14, 382:4,
382:5, 382:8, 383:2, 383:23, 385:1,
385:3, 390:10, 390:16, 390:19,
390:22, 390:24, 391:3, 391:4, 391:6,
391:8, 391:11, 391:22, 393:13, 394:7,
396:7, 396:8, 398:5, 398:21, 398:23,
399:1, 399:7, 399:9, 399:10, 399:22,
399:24, 400:5, 400:13, 402:18,
402:24, 403:6, 403:9, 408:14, 409:14,
409:22, 409:23, 416:6, 418:7, 424:24,
425:4
**creditor** [3] - 365:6, 367:22, 385:4
**creditor's** [1] - 355:2
**creditors** [21] - 237:10, 242:23, 243:2,
243:7, 247:9, 247:10, 256:23, 257:13,
259:5, 265:8, 272:12, 275:24, 276:1,
276:4, 276:11, 277:3, 277:23, 278:9,
278:11, 353:19
**creditworthiness** [1] - 390:18
**creditworthy** [2] - 381:21
**crime** [1] - 360:15
**criminal** [4] - 392:22, 393:1, 393:9,
420:1
**cross** [8] - 276:23, 284:14, 296:21,
309:22, 330:2, 339:25, 385:7, 395:21
**CROSS** [6] - 233:15, 297:1, 310:1,
330:4, 340:1, 385:9
**cross-exam** [4] - 296:21, 309:22,
339:25, 385:7
**cross-examination** [2] - 276:23, 330:2
**CROSS-EXAMINATION** [6] - 233:15,
297:1, 310:1, 330:4, 340:1, 385:9
**CRR** [2] - 232:19, 434:12
**CSR** [3] - 232:19, 434:12, 434:13
**culprit** [1] - 336:19
**cumbersome** [2] - 293:23, 306:4
**Currency** [1] - 332:13
**current** [2] - 256:23, 331:21, 369:20
**custody** [2] - 371:23, 372:2
**customer** [13] - 334:9, 334:10, 334:22,
335:7, 360:5, 360:9, 361:15, 361:18,
363:11, 363:19, 380:20, 407:21, 415:1
**customer's** [3] - 363:9, 372:1, 400:15
**cut** [8] - 273:15, 285:19, 291:21, 306:24,
307:2, 307:3, 308:18, 360:10

# D

**DA** [2] - 365:23, 365:24
**damage** [4] - 383:25, 384:24, 424:14,
424:25
**damaged** [1] - 309:3
**damages** [27] - 278:10, 423:22, 423:23,
424:7, 424:10, 424:11, 424:16,
424:19, 424:24, 425:7, 425:17,
425:21, 426:3, 426:20, 426:22,
426:23, 428:2, 428:7, 428:10, 428:12,
428:13, 428:14, 428:22, 428:23,
429:1, 431:21
**Daniel** [1] - 232:16
**data** [4] - 318:10, 328:10, 375:22, 399:8
**DATE** [1] - 434:12
**date** [40] - 235:16, 236:13, 241:17,
246:22, 256:18, 260:6, 277:6, 278:24,
319:19, 319:23, 322:7, 323:4, 323:22,
323:23, 325:9, 326:4, 327:7, 328:3,
361:3, 364:9, 368:1, 368:2, 368:12,
368:13, 368:14, 369:10, 387:20,
388:16, 388:18, 395:12, 395:14,
411:19, 411:22, 412:22, 412:24,
413:25, 415:12, 415:13, 429:2
**dated** [24] - 236:9, 237:25, 238:16,
239:6, 241:18, 245:4, 246:20, 247:19,
249:14, 250:12, 251:10, 252:10,
253:6, 259:7, 260:5, 261:15, 267:15,
269:10, 271:16, 272:3, 277:10,
277:13, 364:9, 374:15
**dates** [4] - 243:9, 257:15, 259:3, 298:5
**daughter** [6] - 284:6, 284:21, 293:24,
301:12, 307:4, 308:24
**daughter-in-law** [1] - 307:4
**DAY** [1] - 231:14
**days** [19] - 277:20, 287:1, 287:12,
295:11, 346:7, 365:4, 376:20, 377:1,
377:2, 379:13, 379:14, 384:1, 399:7,
400:7, 400:8, 400:10, 402:3
**deadlines** [1] - 427:9
**deal** [5] - 259:10, 275:24, 289:22,
289:25, 373:5
**Dealer** [6] - 265:25, 266:4, 366:17,
367:1, 372:8, 373:11
**dealer** [1] - 334:18
**dealers** [1] - 332:19
**dealing** [12] - 250:5, 257:17, 257:20,
258:6, 258:22, 259:1, 259:4, 270:22,
271:5, 277:23, 425:3
**dealt** [1] - 274:1
**dear** [1] - 277:12
**debate** [1] - 430:5
**debt** [8] - 250:6, 252:4, 275:23, 277:19,
280:4, 291:21, 296:7, 297:14
**debts** [1] - 243:20
**December** [26] - 267:15, 279:18, 296:6,
301:6, 306:12, 308:13, 308:14,
308:20, 309:15, 311:9, 311:10,
311:14, 323:4, 326:4, 329:19, 349:21,
377:7, 388:19, 388:20, 389:2, 389:7,
389:10, 389:13, 392:12
**decide** [2] - 289:14, 318:21
**decided** [8] - 274:21, 283:23, 286:17,

289:22, 289:24, 297:5, 307:5, 314:6
**deciphered** [1] - 415:20
**decision** [4] - 297:4, 297:11, 402:23,
431:12
**decisions** [1] - 274:14
**dedicated** [1] - 350:20
**default** [1] - 335:13
**DEFENDANT** [1] - 232:14
**defendant** [3] - 392:15, 397:3, 429:15
**Defendant** [2] - 397:6, 422:10
**defendants** [1] - 433:10
**Defendants** [1] - 231:7
**defense** [2] - 315:20, 427:12
**degree** [3] - 334:21, 337:10, 357:4
**delay** [1] - 244:16
**delete** [28] - 320:7, 320:9, 320:16,
320:19, 322:17, 322:19, 326:15,
326:17, 330:21, 330:22, 336:25,
337:15, 337:22, 354:19, 356:11,
370:16, 370:17, 370:18, 370:19,
370:23, 371:8, 376:4, 376:6, 377:19,
400:14, 417:4, 420:5
**deleted** [11] - 271:8, 272:11, 290:2,
290:8, 298:13, 298:20, 320:19,
320:24, 337:18, 364:25, 377:21
**deletion** [4] - 321:1, 409:21, 410:1
**delinquency** [4] - 391:12, 391:13,
391:16, 414:1
**department** [31] - 238:16, 240:19,
250:12, 253:7, 276:23, 296:7, 296:9,
296:11, 299:14, 334:8, 335:9, 336:17,
336:18, 337:19, 338:17, 361:16,
373:11, 385:22, 395:2, 398:22,
399:17, 400:20, 408:16, 409:9,
409:11, 409:14, 409:19, 410:3, 410:8,
414:19
**departmental** [1] - 334:5
**departments** [6] - 262:10, 338:14,
344:8, 344:9, 385:16
**depo** [1] - 341:22
**deposition** [21] - 263:24, 280:22, 312:7,
312:9, 312:13, 313:5, 313:7, 313:14,
316:12, 316:14, 316:16, 316:18,
316:23, 316:25, 317:2, 317:5, 317:13,
317:21, 352:23, 378:13, 386:22
**depositions** [1] - 340:7
**Depot** [23] - 239:3, 239:7, 240:16,
241:14, 241:19, 241:20, 241:21,
250:9, 250:12, 250:20, 251:1, 251:13,
257:20, 257:24, 258:6, 259:1, 259:7,
259:10, 259:15, 260:1, 269:17, 269:20
**derogatory** [17] - 270:22, 298:20,
353:15, 369:14, 370:11, 376:19,
377:5, 382:3, 384:25, 385:2, 385:3,
390:9, 390:12, 390:16, 390:17,
390:20, 391:23
**describe** [9] - 332:2, 350:5, 371:19,
373:9, 398:25, 404:13, 409:11,
412:10, 423:12
**described** [3] - 369:22, 381:21, 382:25

**describing** [1] - 293:19
**description** [2] - 361:8, 416:15
**deserves** [2] - 370:22
**designated** [1] - 317:20
**desk** [1] - 401:22
**detail** [1] - 330:9
**detailed** [2] - 360:14, 378:6
**details** [5] - 298:4, 298:11, 330:14, 330:20, 374:21
**Detective** [5] - 362:13, 362:20, 363:7, 365:19, 371:16
**detective** [8] - 358:14, 359:22, 363:18, 371:4, 371:5, 372:10, 380:19, 393:8
**determine** [9] - 320:11, 322:2, 323:9, 324:24, 354:17, 356:9, 380:14, 407:3, 407:12
**determined** [10] - 362:22, 366:14, 366:16, 367:7, 371:24, 406:5, 409:10, 409:18, 409:19
**determining** [1] - 419:3
**develop** [1] - 294:5
**developing** [1] - 284:7
**development** [1] - 402:4
**devote** [1] - 381:24
**die** [1] - 307:1
**Diego** [1] - 233:24
**differ** [1] - 427:8
**difference** [2] - 263:19, 427:15
**differences** [2] - 247:11, 270:7
**different** [22] - 244:11, 244:12, 250:5, 260:7, 260:21, 261:10, 270:24, 286:2, 287:23, 287:24, 320:4, 334:23, 355:21, 370:18, 373:20, 378:7, 380:12, 383:1, 384:15, 385:16, 401:7, 427:19
**difficult** [4] - 234:14, 250:20, 276:4, 344:3
**dig** [1] - 339:8
**digitally** [1] - 434:7
**digits** [1] - 268:19
**direct** [11] - 263:8, 332:10, 333:17, 342:25, 348:8, 350:15, 355:16, 370:21, 373:10, 374:25
**DIRECT** [6] - 282:17, 302:15, 317:16, 331:19, 349:1, 397:14
**directed** [1] - 316:9
**direction** [1] - 383:14
**directly** [5] - 253:1, 255:21, 259:15, 334:17, 409:15
**disagree** [3] - 388:22, 399:23, 432:6
**disagrees** [1] - 418:4
**discarded** [1] - 372:23
**discomfort** [1] - 425:2
**discuss** [2] - 266:4, 359:11
**discussed** [3] - 262:22, 264:12, 357:21
**discusses** [1] - 255:3
**discussing** [1] - 388:10
**discussion** [4] - 254:4, 341:23, 385:11, 417:1

**display** [1] - 240:7
**displayed** [2] - 239:25, 247:16
**Dispute** [2] - 317:25, 412:12
**dispute** [77] - 253:9, 260:21, 261:4, 267:13, 271:11, 271:18, 276:1, 277:2, 277:5, 277:11, 318:8, 321:23, 324:16, 325:13, 326:7, 330:16, 336:23, 338:2, 338:14, 342:8, 344:8, 354:16, 355:3, 355:11, 355:12, 355:16, 355:17, 355:23, 355:24, 356:5, 357:3, 361:6, 362:2, 364:10, 365:1, 365:5, 368:3, 368:14, 368:20, 370:5, 370:10, 371:2, 371:14, 372:22, 373:10, 376:23, 377:20, 378:20, 379:3, 380:4, 380:25, 388:24, 394:7, 399:5, 399:6, 399:24, 400:17, 400:21, 401:15, 401:19, 402:11, 402:12, 402:14, 403:6, 404:16, 405:19, 406:25, 408:25, 415:10, 417:16, 418:5, 418:11, 418:17, 419:12, 420:7
**disputed** [17] - 276:7, 318:7, 318:13, 318:17, 318:25, 324:15, 324:18, 324:21, 325:12, 326:6, 335:15, 354:18, 356:9, 356:13, 418:9, 418:19, 419:13
**disputes** [35] - 272:11, 295:25, 332:17, 332:21, 333:6, 334:25, 336:22, 337:4, 337:5, 337:14, 338:24, 339:2, 355:8, 355:16, 356:21, 358:2, 358:19, 359:16, 360:7, 365:2, 365:7, 366:2, 372:19, 372:24, 373:16, 373:21, 374:17, 374:18, 374:25, 375:9, 377:6, 377:10, 377:25, 400:19
**disputing** [9] - 271:13, 294:18, 294:22, 354:23, 369:2, 371:14, 377:17, 379:22, 394:19
**disregard** [2] - 358:24, 378:7
**disregarded** [5] - 358:22, 360:19, 377:12, 378:3
**dissolved** [1] - 349:12
**distress** [8] - 382:22, 424:16, 424:18, 424:22, 424:23, 425:7, 425:19, 428:10
**distressing** [1] - 265:11
**DISTRICT** [3] - 231:1, 231:2, 231:17
**District** [1] - 232:20
**district** [1] - 372:5
**Diversified** [3] - 252:11, 252:21, 252:25
**division** [1] - 397:19
**divisions** [2] - 397:22, 401:5
**dock** [3] - 305:8, 306:3, 306:6
**doctors'** [1] - 284:19
**document** [20] - 237:7, 360:21, 360:22, 361:3, 361:5, 362:1, 363:24, 364:5, 366:5, 366:22, 367:3, 367:5, 368:4, 369:4, 369:7, 373:7, 373:9, 404:11, 405:14, 412:8
**documentation** [2] - 318:10, 367:13
**documents** [14] - 253:25, 267:22, 271:4, 359:4, 370:24, 372:16, 372:18, 374:1, 375:5, 375:8, 388:20, 390:8, 403:11,

409:4
**Doernbecher** [1] - 306:20
**donate** [5] - 272:24, 273:2, 289:16, 307:5, 307:8
**donation** [1] - 272:19
**done** [14] - 286:4, 291:18, 312:20, 357:11, 360:2, 364:17, 372:12, 389:18, 421:2, 427:4, 429:24, 430:7, 432:11
**door** [2] - 295:14, 334:22
**dot** [1] - 283:10
**dot-com** [1] - 283:10
**doubt** [3] - 363:21, 393:2, 393:5
**down** [27] - 235:3, 235:6, 258:15, 266:8, 281:17, 288:16, 290:20, 301:19, 303:2, 307:12, 311:25, 312:21, 312:24, 331:4, 345:18, 345:25, 346:5, 351:8, 351:15, 368:17, 369:13, 376:22, 376:23, 378:8, 396:15, 421:11, 422:22
**download** [1] - 292:8
**draft** [6] - 235:20, 255:18, 421:18, 421:20, 429:3, 431:25
**drafted** [1] - 257:24
**drawn** [1] - 335:15
**dream** [1] - 310:11
**dreams** [1] - 295:24
**dresses** [1] - 303:1
**Drew** [2] - 424:16, 424:17
**Drive** [1] - 233:24
**driven** [1] - 295:22
**driver's** [2] - 260:14, 386:17
**drop** [2] - 292:12, 368:17
**due** [6] - 369:19, 391:2, 391:7, 391:8, 391:21, 391:25
**duly** [6] - 233:13, 282:11, 302:8, 331:11, 348:19, 397:7
**during** [12] - 272:15, 273:8, 294:12, 295:14, 296:14, 296:16, 313:21, 315:3, 332:10, 345:13, 351:4, 375:15
**duties** [4] - 288:21, 350:25, 398:25, 399:12
**duty** [10] - 355:2, 355:7, 378:2, 378:3, 380:8, 380:10, 387:8, 389:24, 393:3
**dwelling** [1] - 275:9
**dying** [1] - 272:24

## E

**e)** [2] - 422:25, 428:6
**e-mail** [10] - 263:19, 265:17, 265:18, 279:17, 286:10, 307:21, 361:25, 431:17, 432:19
**e-mailed** [1] - 236:23
**e-OSCAR** [2] - 368:21, 412:14
**earliest** [1] - 359:5
**early** [9] - 257:16, 289:10, 293:8, 308:2, 335:18, 365:25, 369:13, 369:18, 373:21
**earn** [2] - 275:14, 292:19

**easier** [5] - 286:1, 292:7, 362:7, 374:6, 423:20
**easily** [7] - 389:8, 393:17, 405:17, 405:22, 406:18, 406:22, 408:5
**easy** [1] - 428:21
**eat** [1] - 313:22
**eating** [1] - 309:16
**Ebron** [4] - 313:8, 313:15, 399:16, 419:16
**economic** [3] - 424:12, 424:13, 424:24
**edition** [1] - 381:19
**editions** [2] - 351:22
**educate** [1] - 294:9
**Edward** [2] - 362:13, 362:20
**effect** [2] - 320:25, 383:5
**efficient** [2] - 431:15, 431:19
**effort** [2] - 273:5, 338:2
**efforts** [3] - 236:20, 258:19, 337:21
**egregious** [1] - 344:14
**eight** [2] - 245:17, 284:24
**either** [9] - 318:20, 320:18, 326:15, 326:18, 329:4, 369:20, 418:19, 422:16, 432:17
**electric** [1] - 236:16
**electronic** [5] - 236:16, 353:20, 368:10, 399:5, 399:25
**elevate** [1] - 337:7
**elevator** [1] - 316:10
**emotional** [7] - 382:22, 424:16, 424:18, 424:22, 424:23, 425:7, 428:10
**employee** [1] - 410:7
**employees** [8] - 338:22, 338:23, 369:1, 378:14, 379:8, 400:25, 401:1, 401:2
**employer** [1] - 397:17
**enacted** [1] - 355:6
**enclosed** [4] - 238:21, 257:1, 257:6, 257:7
**Enclosed** [2] - 239:9, 248:1
**enclosure** [1] - 260:23
**encrypted** [1] - 362:12
**end** [13] - 271:8, 271:13, 279:15, 292:23, 292:24, 299:15, 301:9, 330:24, 346:13, 414:3, 426:2, 426:8, 427:25
**ended** [2] - 306:15, 409:15
**ends** [2] - 361:19, 421:3
**endure** [1] - 381:18
**energy** [5] - 295:23, 381:23, 381:24, 384:8
**enforced** [2] - 333:19, 334:1
**enforcement** [3] - 357:12, 357:13, 357:16
**engine** [1] - 287:2
**enjoying** [1] - 287:16
**enrolling** [3] - 293:10, 293:23, 293:24
**enrollment** [1] - 294:12
**ensure** [6] - 333:23, 333:25, 367:19, 379:1, 379:14, 387:14
**ensuring** [4] - 354:12, 395:6, 399:4,

399:9
**enter** [1] - 338:20
**entered** [2] - 319:22, 404:3
**entire** [4] - 344:12, 350:20, 400:8, 402:2
**entitled** [2] - 426:9, 429:1
**entity** [5] - 237:12, 247:14, 249:9, 251:10, 252:10
**entries** [2] - 371:12, 371:18
**entry** [10] - 248:23, 248:25, 362:11, 362:25, 363:3, 365:15, 371:10, 411:20, 411:22, 411:24
**Eperian** [1] - 368:23
**epidemic** [1] - 350:12
**Equifax** [62] - 261:3, 261:11, 261:15, 261:19, 261:22, 264:13, 264:20, 267:13, 267:21, 272:8, 278:17, 317:7, 317:11, 317:21, 318:1, 318:20, 318:24, 319:9, 319:14, 320:7, 320:10, 320:14, 320:19, 320:24, 321:5, 321:15, 322:1, 322:11, 322:14, 322:17, 322:20, 323:1, 323:8, 323:12, 323:18, 324:4, 324:9, 325:1, 325:6, 325:16, 325:19, 325:25, 326:10, 326:22, 327:5, 327:13, 327:17, 327:20, 327:25, 328:8, 328:12, 330:15, 330:21, 351:10, 364:13, 368:5, 368:21, 368:22, 370:11, 417:24, 425:17
**EQUIFAX** [1] - 231:6
**Equifax's** [2] - 324:22, 368:11
**error** [2] - 383:3, 423:14
**errors** [2] - 381:12, 396:8
**escalated** [1] - 339:17
**escort** [2] - 313:17, 346:4
**especially** [1] - 382:17
**essentially** [5] - 325:16, 326:10, 327:17, 327:19, 415:20
**established** [3] - 333:19, 334:1
**establishing** [2] - 425:13, 425:15
**et** [2] - 306:7, 313:23
**Evan** [2] - 348:14, 348:23
**EVAN** [2] - 348:17, 348:24
**evening** [7] - 263:11, 348:9, 421:3, 421:8, 421:21, 422:12, 433:5
**event** [3] - 420:25, 424:15, 429:16
**events** [2] - 273:11, 334:7
**eventually** [4] - 264:8, 358:16, 377:3, 431:18
**evidence** [18] - 295:2, 295:8, 345:15, 346:23, 347:13, 358:21, 365:22, 366:1, 372:2, 372:9, 410:6, 413:1, 425:12, 425:18, 426:22, 427:16, 427:22, 428:22
**evolved** [1] - 277:2
**evolving** [1] - 254:20
**ex** [1] - 332:5
**exact** [2] - 388:18, 392:9
**exactly** [5] - 236:17, 307:16, 334:6, 368:8, 368:9
**exaggeration** [1] - 255:6

**exam** [4] - 296:21, 309:22, 339:25, 385:7
**examination** [5] - 276:23, 330:2, 357:3, 358:3, 378:7
**EXAMINATION** [18] - 233:15, 274:9, 280:17, 281:9, 282:17, 297:1, 302:15, 310:1, 317:16, 330:4, 331:19, 340:1, 345:1, 349:1, 385:9, 394:1, 396:1, 397:14
**examined** [6] - 233:13, 282:11, 302:8, 331:11, 348:19, 397:7
**example** [5] - 250:4, 268:9, 368:19, 385:20, 389:13
**excellent** [1] - 289:6
**except** [4] - 249:24, 249:25, 396:9, 423:25
**exception** [2] - 420:9, 420:13
**excerpt** [1] - 317:6
**excited** [1] - 295:9
**excuse** [5] - 241:20, 333:1, 380:1, 380:6, 380:9
**excused** [6] - 301:20, 301:24, 312:1, 312:4, 345:21, 396:17
**exhibit** [33] - 236:3, 236:8, 236:10, 236:18, 236:25, 237:18, 237:19, 238:4, 246:7, 246:11, 246:25, 247:3, 248:21, 251:18, 255:2, 256:8, 256:12, 256:17, 256:18, 256:25, 260:22, 261:7, 261:14, 261:18, 262:11, 276:17, 317:9, 321:8, 364:2, 366:9, 376:8, 404:3, 404:11
**Exhibit** [107] - 233:18, 233:20, 234:8, 235:19, 236:6, 237:15, 237:16, 237:24, 238:15, 239:6, 240:15, 240:17, 240:24, 241:2, 241:18, 241:25, 243:22, 245:3, 246:19, 247:13, 248:6, 249:3, 249:13, 249:17, 250:11, 250:15, 251:9, 251:22, 252:9, 252:16, 253:4, 253:12, 254:12, 254:13, 255:12, 257:23, 258:1, 259:6, 260:5, 260:6, 261:3, 262:20, 263:4, 264:11, 265:13, 265:14, 265:19, 265:24, 266:23, 267:12, 268:13, 269:4, 270:13, 270:16, 271:15, 271:23, 272:5, 272:6, 276:16, 278:14, 279:17, 312:7, 312:9, 312:13, 313:4, 313:5, 313:8, 313:14, 316:13, 316:14, 316:17, 316:18, 316:23, 317:1, 317:2, 319:4, 321:9, 322:23, 323:3, 323:16, 323:17, 324:7, 325:4, 325:23, 325:24, 327:3, 327:23, 327:24, 328:15, 360:22, 362:4, 362:6, 364:3, 365:10, 366:4, 368:4, 373:4, 373:23, 376:9, 387:15, 403:14, 403:16, 411:10, 412:7
**Exhibits** [1] - 262:7
**exhibits** [14] - 239:17, 239:22, 246:2, 246:5, 246:6, 253:2, 254:9, 255:11, 255:13, 261:24, 262:9, 314:11, 314:16, 314:20
**existence** [6] - 391:1, 391:13, 391:17,

391:20, 391:21, 417:16
**expand** [2] - 424:21, 425:2
**expectation** [4] - 319:15, 384:13, 384:17, 392:11
**expectations** [1] - 294:5
**expected** [1] - 294:10
**expects** [2] - 319:9, 322:1
**expenses** [2] - 285:25, 338:19
**Experian** [8] - 267:24, 272:8, 364:10, 364:24, 364:25, 368:18, 368:20
**Experian's** [1] - 351:5
**experience** [11] - 332:2, 332:16, 332:21, 333:4, 338:7, 339:18, 350:4, 379:6, 380:11
**expert** [13] - 331:23, 331:24, 332:24, 333:8, 349:22, 351:2, 352:7, 352:9, 352:11, 352:13, 352:19, 366:19, 383:13
**experts** [4] - 349:25, 351:6, 382:21, 399:19
**explain** [24] - 273:19, 273:20, 274:20, 281:11, 352:3, 364:7, 367:4, 367:5, 368:8, 369:4, 376:13, 382:25, 383:21, 394:5, 397:16, 398:15, 399:20, 405:13, 405:16, 405:24, 406:17, 416:2, 423:21
**explained** [3] - 299:12, 301:4, 422:25
**explaining** [1] - 343:1
**explains** [2] - 314:9, 352:4
**explicit** [1] - 359:8
**explore** [1] - 288:6
**Express** [1] - 351:7
**extended** [1] - 310:20
**extension** [4] - 263:8, 266:10, 266:16, 266:19
**extent** [2] - 244:3, 316:10
**extra** [3] - 250:2, 273:10, 275:15
**eyes** [3] - 308:10, 308:25, 309:17

## F

**FAA** [1] - 424:8
**fact** [5] - 280:3, 316:2, 343:8, 391:20, 411:10
**factor** [6] - 280:4, 384:5, 384:8, 384:13, 384:19, 384:23
**factors** [7] - 383:1, 383:13, 383:21, 390:15, 402:21, 407:2, 408:3
**facts** [1] - 342:20
**fail** [3] - 356:10, 387:8, 400:13
**failed** [1] - 385:13
**fails** [1] - 400:11
**failure** [1] - 425:22
**fair** [10] - 270:21, 273:8, 276:14, 300:23, 303:10, 318:18, 333:18, 333:22, 340:21, 388:9
**Fair** [3] - 349:11, 349:15, 350:21
**fairly** [2] - 272:16, 429:21
**fall** [6] - 285:9, 293:8, 307:23, 338:9, 355:22, 388:14

**falling** [1] - 308:4
**familiar** [6] - 267:21, 267:22, 267:24, 333:5, 406:15, 419:15
**family** [21] - 265:5, 284:5, 288:2, 289:12, 289:18, 290:9, 291:23, 292:24, 295:23, 297:3, 298:16, 305:21, 306:11, 306:15, 306:23, 307:9, 307:17, 310:4, 311:5, 311:13
**Fannie** [1] - 391:5
**far** [5] - 236:19, 354:7, 373:1, 388:25, 392:21
**Farah** [19] - 273:6, 283:22, 285:5, 285:8, 293:13, 293:23, 293:25, 301:12, 302:23, 302:24, 303:11, 305:15, 306:3, 306:18, 308:4, 308:17, 309:9, 310:11, 310:13
**Farah's** [3] - 292:14, 302:25, 310:4
**Fargo** [234] - 233:21, 235:20, 238:20, 242:9, 243:8, 244:8, 244:13, 245:4, 245:5, 248:4, 248:5, 249:1, 249:24, 249:25, 250:2, 253:17, 254:1, 254:15, 256:9, 256:14, 257:14, 260:6, 260:7, 261:4, 262:10, 262:12, 262:24, 263:17, 264:24, 265:1, 265:3, 265:16, 265:17, 266:4, 267:9, 268:10, 270:4, 271:1, 271:8, 272:7, 272:11, 273:15, 273:20, 274:12, 274:22, 276:2, 276:5, 278:10, 278:12, 279:13, 279:18, 285:10, 286:6, 289:2, 289:22, 290:2, 290:7, 291:1, 291:20, 291:24, 292:11, 294:19, 294:23, 296:3, 297:12, 297:21, 298:13, 298:19, 298:23, 298:25, 299:1, 299:6, 299:12, 299:13, 299:23, 300:1, 300:8, 300:11, 300:24, 301:14, 307:14, 308:15, 318:1, 319:9, 319:10, 319:13, 319:16, 319:22, 319:25, 320:4, 320:11, 320:18, 321:4, 321:5, 321:16, 322:1, 322:5, 322:11, 322:17, 323:1, 323:3, 323:9, 323:12, 323:19, 323:21, 323:25, 324:3, 324:10, 324:12, 324:23, 325:6, 325:9, 325:16, 325:19, 325:25, 326:3, 326:11, 326:14, 327:1, 327:5, 327:7, 327:16, 327:20, 327:25, 328:3, 330:7, 334:24, 335:18, 336:12, 336:22, 336:25, 337:13, 337:15, 337:22, 338:22, 341:15, 341:25, 342:4, 343:8, 344:13, 344:18, 344:20, 345:3, 345:8, 356:5, 356:16, 356:21, 357:22, 358:1, 358:11, 358:12, 359:6, 359:17, 360:5, 360:6, 360:16, 360:24, 361:21, 364:14, 366:1, 366:17, 367:1, 367:10, 367:12, 368:5, 368:23, 372:8, 372:17, 372:20, 373:2, 373:11, 373:14, 374:11, 375:6, 375:21, 376:11, 377:7, 377:16, 377:19, 379:16, 380:13, 380:20, 380:25, 381:7, 384:25, 388:10, 388:16, 389:1, 390:4, 390:9, 393:7, 393:18, 394:24, 395:1, 395:4, 395:8, 395:12, 397:18, 397:19,

397:20, 397:23, 398:1, 398:2, 398:5, 398:6, 398:16, 399:1, 399:25, 400:1, 400:11, 401:3, 401:4, 401:5, 401:12, 406:3, 406:9, 407:2, 408:9, 410:7, 413:2, 416:7, 416:12, 417:6, 418:11, 419:6, 419:11, 419:12, 419:24, 420:1, 422:8, 422:10
**FARGO** [2] - 231:6, 232:15
**Fargo's** [24] - 246:12, 295:25, 300:9, 354:12, 369:1, 370:25, 371:13, 372:1, 376:1, 377:9, 377:24, 378:13, 378:19, 379:10, 385:12, 386:4, 412:15, 413:6, 418:18, 419:20, 420:9, 425:3, 425:16, 425:20
**fashions** [1] - 326:18
**fast** [1] - 361:13
**faster** [1] - 292:9
**father** [1] - 305:16
**faxed** [1] - 411:25
**FCRA** [12] - 357:11, 368:18, 393:3, 393:18, 423:13, 424:3, 424:7, 424:8, 424:13, 424:19, 425:21, 430:15
**FCRA's** [1] - 357:16
**FDIC** [1] - 332:12
**fear** [2] - 244:18, 244:21
**February** [11] - 243:12, 244:6, 244:21, 245:6, 245:8, 246:12, 256:14, 289:13, 290:24, 307:16, 361:23
**feed** [1] - 303:4
**feedback** [1] - 345:15
**feeds** [1] - 303:4
**fees** [1] - 363:11
**feet** [4] - 255:8, 255:9, 255:10
**felt** [4] - 284:3, 291:19, 294:13, 309:2
**few** [8] - 281:1, 284:1, 294:25, 301:5, 341:18, 352:11, 392:5, 430:22
**FICO** [2] - 391:14, 391:16
**field** [5] - 349:18, 349:22, 351:2, 361:9, 366:24
**fields** [1] - 370:15
**Fifth** [2] - 232:9, 232:17
**fifty** [1] - 255:10
**fifty-seven** [1] - 255:10
**fight** [1] - 427:14
**fighting** [2] - 427:16, 427:17
**figuring** [3] - 245:23, 294:4, 295:4
**Fiji** [9] - 286:14, 286:18, 286:23, 304:15, 304:23, 304:24, 304:25, 305:4
**file** [24] - 326:23, 326:25, 328:14, 329:19, 329:22, 334:16, 337:6, 337:13, 339:13, 364:25, 370:25, 371:9, 380:19, 388:11, 399:10, 422:12, 422:14, 422:15, 422:21, 427:13, 428:11, 428:18, 431:17
**filed** [6] - 372:24, 422:23, 423:18, 426:24, 427:11, 432:23
**files** [3] - 246:18, 336:1, 339:8
**fill** [1] - 412:1
**filtered** [1] - 394:16
**filtering** [5] - 355:4, 355:13, 394:4,

395:21, 396:4
**final** [1] - 382:20
**finally** [2] - 306:17, 349:20
**finance** [1] - 275:8
**financer** [1] - 251:7
**financial** [5] - 331:25, 340:23, 344:15, 350:3, 387:1
**Financial** [1] - 350:23
**financing** [2] - 275:19, 275:21
**findings** [1] - 423:3
**fine** [4] - 239:23, 312:2, 346:20, 396:18
**finish** [9] - 290:5, 292:20, 397:1, 402:5, 429:15, 429:16, 429:22, 429:25, 430:9
**finished** [2] - 263:12, 306:21
**first** [73] - 233:23, 234:24, 239:8, 247:25, 253:22, 255:2, 255:15, 256:2, 262:4, 262:5, 266:3, 267:9, 270:3, 282:11, 284:11, 290:6, 291:11, 293:1, 293:9, 298:7, 302:8, 306:23, 310:4, 319:3, 331:11, 333:16, 333:17, 335:13, 338:2, 348:19, 349:16, 350:8, 351:20, 351:25, 352:1, 355:5, 355:6, 361:5, 362:1, 365:13, 366:6, 371:17, 373:19, 374:9, 376:18, 376:19, 381:19, 384:23, 387:25, 388:12, 389:1, 389:4, 389:6, 389:14, 390:5, 390:6, 397:7, 404:17, 405:13, 406:14, 413:2, 413:20, 414:1, 415:19, 415:20, 423:4, 423:9, 423:25, 424:1, 428:24, 429:2, 429:4
**First** [1] - 232:12
**fishing** [1] - 336:20
**five** [6] - 255:19, 287:11, 287:12, 308:2, 339:11, 398:9
**fix** [5] - 293:1, 343:20, 381:23, 384:11, 384:16
**fixed** [3] - 276:8, 287:2, 384:17
**flag** [5] - 337:3, 343:9, 391:8, 404:23, 406:6
**flags** [1] - 335:13
**flash** [1] - 233:19
**flew** [1] - 304:10
**flimsy** [1] - 380:1
**flipping** [1] - 253:2
**Flood** [1] - 343:21
**flooding** [1] - 343:13
**floor** [2] - 401:18, 401:23
**Floor** [1] - 232:18
**flow** [1] - 347:8
**flying** [2] - 289:19, 358:19
**focus** [3] - 331:24, 363:1, 371:3
**focuses** [1] - 367:10
**follow** [9] - 266:1, 266:5, 287:7, 357:14, 389:5, 395:22, 402:1, 402:6, 404:16
**follow-up** [3] - 266:5, 395:22, 402:6
**followed** [3] - 366:15, 419:22, 420:15
**following** [9] - 245:5, 298:8, 299:7, 349:5, 349:20, 406:24, 411:4, 415:17, 416:4
**follows** [8] - 233:13, 282:11, 302:8,

317:14, 331:11, 348:19, 387:25, 397:7
**fonts** [1] - 234:25
**food** [1] - 303:3
**footnotes** [1] - 351:23
**FOR** [4] - 231:2, 232:2, 232:14, 329:5
**foregoing** [1] - 434:4
**Foremost** [1] - 329:13
**foreseeably** [1] - 381:18
**foreseeing** [2] - 359:24, 367:25
**forget** [1] - 348:4
**forgo** [1] - 314:8
**form** [10] - 235:24, 240:18, 244:1, 244:10, 245:19, 254:15, 360:23, 399:25, 402:17
**formal** [1] - 342:13
**format** [2] - 368:10, 432:19
**former** [3] - 277:14, 277:15, 406:2
**forms** [2] - 317:25, 318:1
**Fort** [2] - 332:5, 332:6
**forward** [9] - 236:18, 307:23, 309:3, 356:1, 374:23, 408:13, 409:5, 426:16, 429:12
**forwarded** [2] - 367:23, 386:6
**forwards** [1] - 355:12
**foundation** [2] - 285:13, 288:11
**four** [9] - 268:19, 311:6, 333:21, 371:17, 373:3, 384:21, 388:13, 392:8
**fourth** [1] - 353:12
**frame** [24] - 238:12, 239:2, 239:15, 241:15, 247:8, 249:1, 249:10, 249:23, 250:8, 252:7, 252:24, 257:16, 257:19, 259:2, 260:2, 268:10, 272:15, 273:8, 303:16, 307:24, 345:3, 345:4, 345:13, 400:12
**Frances** [2] - 302:1, 302:12
**FRANCES** [1] - 302:6
**Francisco** [1] - 283:15
**Fransen** [2] - 232:15, 330:6
**FRANSEN** [44] - 285:13, 287:18, 288:11, 288:23, 290:10, 291:4, 292:3, 293:2, 293:15, 294:15, 296:22, 297:2, 301:23, 303:18, 303:23, 305:18, 308:5, 309:10, 310:2, 311:22, 312:3, 312:8, 330:5, 397:3, 397:15, 403:14, 403:15, 403:19, 403:24, 404:2, 404:9, 404:10, 405:5, 405:6, 405:10, 405:12, 406:12, 406:13, 411:9, 411:16, 411:17, 412:17, 412:19, 414:13
**fraud** [101] - 238:16, 242:24, 246:15, 250:12, 253:6, 276:23, 279:3, 279:7, 285:20, 296:7, 296:9, 296:11, 299:13, 321:23, 324:19, 324:24, 325:17, 326:12, 326:14, 326:16, 326:19, 327:14, 338:13, 338:17, 342:18, 358:15, 358:16, 358:17, 358:18, 362:22, 363:8, 364:12, 365:1, 365:2, 365:7, 366:13, 366:14, 366:16, 367:5, 367:7, 368:15, 368:20, 370:17, 370:19, 370:23, 371:6, 371:8, 371:24, 372:8, 373:11, 376:23, 384:3, 385:22,

386:5, 386:6, 390:2, 390:7, 405:18, 405:22, 406:5, 406:9, 406:19, 406:22, 407:4, 407:21, 407:22, 408:10, 408:15, 408:17, 408:19, 408:21, 408:24, 409:5, 409:9, 409:10, 409:11, 409:14, 409:17, 409:18, 409:19, 410:3, 410:8, 410:25, 414:2, 414:4, 414:14, 414:18, 414:19, 415:5, 415:10, 416:18, 416:19, 420:7, 420:8, 420:18, 420:20
**Fraud** [1] - 417:13
**fraudster** [3] - 371:16, 371:25, 382:18
**fraudulent** [17] - 249:13, 251:1, 251:5, 275:5, 279:13, 290:3, 290:8, 294:19, 299:25, 300:19, 300:22, 319:10, 320:11, 337:23, 374:11, 377:17, 409:20
**fraudulently** [10] - 321:24, 322:2, 323:9, 364:12, 367:9, 368:16, 371:23, 386:16, 393:12, 407:16
**Freddie** [1] - 391:5
**free** [1] - 312:4
**Friday** [2] - 429:17, 429:23
**front** [9] - 239:18, 239:19, 319:6, 321:10, 325:5, 327:4, 328:16, 342:21, 342:16
**frustrated** [2] - 244:5, 287:15
**frustrating** [1] - 370:9
**frustration** [2] - 382:6, 382:23
**FTC** [10] - 234:24, 237:6, 260:13, 260:25, 357:17, 373:24, 374:5, 374:9, 374:20, 390:7
**full** [4] - 293:9, 318:3, 400:25, 401:1
**full-time** [2] - 400:25, 401:1
**fuller** [1] - 232:8
**fun** [2] - 288:3, 289:23
**function** [1] - 399:8
**fund** [1] - 344:10
**funds** [1] - 286:22
**Funsch** [4] - 313:4, 313:6, 399:16, 419:17
**furnish** [1] - 353:19
**furnisher** [18] - 318:7, 318:10, 318:12, 318:24, 330:22, 354:11, 354:15, 355:13, 355:17, 356:1, 356:4, 380:3, 394:12, 394:15, 396:5, 423:3, 423:13
**furnishers** [15] - 236:25, 237:1, 247:4, 257:6, 350:25, 352:17, 353:18, 354:11, 355:7, 356:16, 356:21, 357:9, 357:14, 373:25, 378:4
**furnishing** [2] - 379:24, 399:8
**fusion** [1] - 284:22
**future** [5] - 366:2, 373:16, 374:17, 374:18, 375:8

---

# G

**GA** [1] - 232:4
**games** [1] - 283:11
**gauging** [1] - 384:5

**general** [8] - 247:7, 268:9, 340:23, 344:15, 344:19, 385:17, 402:13, 405:21
**generally** [10] - 242:23, 254:15, 296:17, 300:17, 335:21, 387:13, 391:2, 399:20, 404:13, 413:14
**generals** [1] - 357:17
**generated** [1] - 318:9
**generating** [1] - 338:18
**gentleman** [1] - 340:16
**geography** [1] - 304:14
**girls** [2] - 307:7, 308:1
**given** [8] - 287:7, 335:15, 348:6, 356:24, 393:16, 425:5, 430:22, 431:7
**glasses** [2] - 387:17, 413:20
**Global** [1] - 271:19
**globally** [1] - 377:23
**goals** [1] - 293:19
**Gobin** [5] - 317:11, 317:13, 317:19, 330:6, 331:1
**Gonzaga** [1] - 333:8
**government** [1] - 349:23
**grand** [1] - 374:7
**grandbabies** [2] - 305:14, 305:16
**grandchildren** [1] - 302:20
**grantor** [1] - 366:25
**great** [1] - 284:4
**greater** [2] - 334:21, 423:14
**Grier** [6] - 312:7, 312:10, 312:14, 322:9, 399:16, 419:17
**group** [1] - 254:5
**groups** [1] - 343:13
**grow** [1] - 294:10
**guess** [4] - 234:20, 375:24, 385:17, 424:23
**guidance** [1] - 430:24
**guides** [1] - 303:8
**guilty** [7] - 365:20, 392:6, 392:15, 393:5, 395:13, 395:15, 395:17
**guy** [3] - 363:18, 363:19, 393:5
**guys** [4] - 282:22, 282:25, 283:3, 286:12

### H

**H-e-n-d-r-i-c-k-s** [1] - 348:24
**hackers** [1] - 336:7
**halftime** [4] - 347:6, 347:7, 421:14, 421:16
**halfway** [1] - 433:13
**hallway** [1] - 316:6
**hand** [2] - 282:7, 348:15
**handle** [5] - 239:22, 291:15, 401:14, 420:8, 420:21
**handling** [4] - 305:16, 332:17, 333:5, 401:25
**hang** [1] - 239:16
**happy** [1] - 422:16
**Harbor** [1] - 233:24
**hard** [10] - 301:2, 306:4, 306:7, 338:1,

343:24, 363:16, 379:24, 416:24, 423:21, 426:10
**harm** [2] - 382:7, 390:18
**Harvard** [1] - 333:9
**hawing** [1] - 389:20
**hazy** [1] - 259:16
**head** [7] - 234:21, 278:3, 382:5, 398:5, 398:21, 398:23, 398:25
**headaches** [2] - 296:15, 296:17
**headed** [1] - 421:24
**heading** [2] - 264:16, 269:23
**health** [4] - 283:8, 283:9, 284:7, 285:4
**healthy** [1] - 284:8
**hear** [4] - 313:21, 352:2, 362:23, 430:2
**heard** [25] - 333:13, 338:22, 338:23, 341:23, 341:24, 343:25, 355:20, 358:4, 358:7, 363:24, 368:6, 368:25, 370:5, 378:16, 378:19, 393:8, 399:9, 399:15, 399:19, 415:23, 416:11, 416:21, 419:16, 419:23, 419:24
**hearing** [1] - 415:25
**hearsay** [4] - 287:18, 288:12, 292:3
**heart** [1] - 418:1
**held** [2] - 363:10, 372:2
**help** [8] - 291:8, 304:5, 306:2, 306:8, 350:22, 381:13, 383:1, 431:11
**helped** [1] - 352:13
**helpful** [2] - 375:20, 410:20
**helping** [2] - 294:4, 306:11
**helps** [2] - 303:7, 405:4
**hemming** [1] - 389:20
**Hendricks** [11] - 348:14, 348:24, 349:3, 351:14, 357:9, 360:21, 383:10, 385:11, 393:21, 394:3, 396:3
**HENDRICKS** [1] - 348:17
**HERNANDEZ** [1] - 231:16
**herself** [1] - 303:4
**hi** [2] - 282:19, 330:6
**High** [1] - 293:18
**high** [5] - 283:6, 293:17, 312:12, 334:17, 337:10
**high-risk** [1] - 334:17
**higher** [2] - 333:3, 337:7
**highlight** [1] - 422:13
**highly** [2] - 335:22, 377:5
**himself** [2] - 305:10, 308:22
**hired** [2] - 340:19, 341:5
**history** [5] - 283:5, 335:4, 335:7, 353:5, 353:8
**hobbies** [1] - 295:23
**hockey** [1] - 350:11
**Hollomon** [4] - 316:13, 316:15, 399:16, 419:17
**home** [12] - 275:22, 284:19, 288:10, 289:15, 289:25, 297:23, 297:25, 298:15, 298:17, 298:22, 310:15, 397:24
**Home** [17] - 239:3, 239:7, 240:16, 241:19, 241:20, 250:9, 250:12,

250:20, 251:1, 251:13, 259:1, 259:7, 259:10, 259:15, 260:1, 269:17, 269:20
**homes** [1] - 401:22
**honest** [2] - 333:19, 333:22
**Honor** [45] - 237:17, 239:20, 240:4, 240:8, 241:11, 241:22, 242:4, 248:8, 248:17, 252:1, 274:7, 274:15, 276:17, 280:13, 301:18, 311:24, 312:6, 312:15, 315:21, 316:2, 343:4, 344:24, 345:19, 346:9, 346:21, 347:10, 347:11, 357:6, 393:14, 395:19, 395:20, 396:14, 396:25, 414:7, 422:7, 426:19, 428:21, 429:3, 429:9, 429:15, 430:11, 431:14, 433:2, 433:4, 433:7
**HONORABLE** [1] - 231:16
**hope** [2] - 347:15, 392:11
**hoped** [1] - 306:22
**hopefully** [1] - 307:13
**horn** [1] - 307:12
**hospital** [2] - 284:9, 285:3
**Hospital** [1] - 306:21
**hotel** [1] - 289:19
**hour** [4] - 313:15, 315:6, 315:8, 338:24
**hours** [4] - 234:17, 287:11, 294:25, 301:5
**house** [2] - 275:10, 275:11
**House** [1] - 350:23
**humiliation** [1] - 382:6
**hurricane** [1] - 286:20
**hurts** [2] - 391:8, 391:9
**husband** [11] - 282:21, 286:7, 298:3, 299:22, 301:4, 301:15, 304:16, 306:9, 306:10, 307:25, 308:16
**husband's** [2] - 300:3, 300:10
**hypothetical** [2] - 385:17, 387:13

### I

**i.e** [1] - 367:20
**I1** [1] - 369:15
**I3** [1] - 376:25
**I4** [1] - 377:2
**ID** [11] - 335:22, 336:18, 337:19, 361:10, 364:12, 413:25, 415:21, 415:23, 416:3, 416:9, 416:13
**idea** [6] - 298:7, 312:18, 355:15, 380:23, 421:23, 422:21
**ideas** [1] - 350:24
**identical** [3] - 237:9, 247:8, 247:10
**identification** [3] - 353:6, 386:16, 386:20
**identified** [6] - 405:17, 405:22, 406:9, 406:18, 406:22, 408:5
**identifiers** [7] - 353:7, 353:24, 356:22, 358:5, 370:8, 377:11, 406:6
**identifies** [2] - 321:20, 378:23
**identify** [2] - 329:24, 379:20
**identifying** [3] - 314:13, 394:18, 407:2
**identities** [1] - 380:8
**identity** [106] - 234:9, 234:13, 236:4,

238:21, 239:8, 244:5, 245:14, 246:16, 247:25, 256:17, 256:22, 275:25, 277:25, 286:8, 286:11, 286:13, 286:16, 287:8, 287:10, 289:5, 291:13, 297:24, 298:8, 300:3, 300:18, 303:14, 303:22, 305:10, 305:12, 321:23, 324:19, 324:24, 325:17, 326:11, 326:14, 326:19, 327:14, 332:22, 335:1, 336:5, 336:23, 338:24, 339:2, 339:20, 344:4, 350:6, 350:7, 350:8, 350:12, 350:16, 350:21, 352:8, 356:20, 358:8, 359:7, 361:14, 363:9, 363:19, 363:21, 364:11, 364:23, 368:15, 369:2, 369:24, 370:5, 370:7, 371:14, 371:21, 372:1, 372:9, 372:10, 372:12, 373:24, 374:2, 374:8, 374:9, 375:12, 376:23, 377:15, 378:25, 379:3, 379:8, 379:11, 379:21, 379:22, 380:15, 381:11, 381:13, 381:14, 385:21, 386:5, 392:19, 393:19, 394:8, 394:9, 395:12, 400:17, 402:12, 402:14, 405:20, 408:9, 408:25, 415:2, 420:1, 420:10, 420:11
**IDs** [1] - 336:8
**IEP** [3] - 293:19, 301:8, 301:12
**IG** [2] - 329:7, 329:10
**ignore** [1] - 348:11
**illness** [1] - 272:21
**ILP** [2] - 334:20, 335:6
**image** [1] - 318:10
**images** [1] - 414:2
**immediate** [1] - 391:7
**immediately** [2] - 305:7, 337:18
**impact** [3] - 383:2, 383:22, 390:12
**impeachment** [1] - 237:19
**impolite** [1] - 277:4
**important** [12] - 289:7, 352:15, 354:7, 354:14, 354:15, 356:18, 367:17, 370:2, 370:4, 377:12, 378:2, 431:11
**importantly** [1] - 352:23
**impossible** [1] - 275:22
**impounded** [2] - 362:19, 371:22
**impressed** [1] - 373:17
**IN** [1] - 231:1
**inaccuracies** [2] - 378:23, 379:1
**inaccuracy** [4] - 379:4, 379:15, 379:23, 381:17
**inaccurate** [5] - 350:17, 354:22, 359:25, 383:23, 425:4
**inaccurately** [1] - 381:20
**incentive** [1] - 344:7
**include** [5] - 237:5, 254:9, 327:1, 357:16, 399:12
**included** [12] - 237:7, 255:15, 255:24, 260:9, 261:8, 332:8, 333:7, 336:8, 383:13, 390:2, 423:7, 431:4
**includes** [1] - 353:14
**including** [4] - 251:18, 393:17, 428:7, 431:12
**income** [1] - 292:19

**inconvenience** [1] - 277:22
**incorrect** [1] - 346:12
**incumbent** [1] - 372:20
**indeed** [1] - 364:22
**independent** [1] - 340:15
**indicate** [2] - 278:24, 312:16
**indicated** [4] - 279:21, 336:18, 338:2, 429:7
**indicates** [3] - 320:3, 328:23, 329:18
**indicating** [2] - 279:18, 358:18
**indication** [2] - 327:13, 361:18
**indicators** [2] - 406:5, 407:1
**indictment** [1] - 344:12
**indirect** [4] - 332:18, 334:20, 335:7, 355:23
**individual** [3] - 266:9, 293:19, 353:25
**individual's** [1] - 266:9
**industry** [28] - 332:3, 332:25, 333:5, 333:22, 334:21, 334:24, 335:20, 336:11, 337:4, 338:8, 338:9, 344:12, 345:10, 349:5, 349:20, 351:3, 351:7, 352:8, 352:14, 352:17, 354:8, 356:24, 365:8, 366:15, 367:6, 379:6, 418:5
**info** [10] - 324:15, 324:16, 324:18, 325:13, 326:6, 326:7, 328:17, 361:17, 413:25
**Information** [3] - 264:17, 268:16, 317:11
**INFORMATION** [1] - 231:6
**information** [136] - 234:23, 241:19, 248:5, 250:1, 254:14, 255:16, 255:19, 255:21, 263:12, 264:5, 264:6, 313:1, 314:13, 314:21, 314:22, 318:7, 318:13, 318:17, 318:21, 318:25, 320:4, 322:15, 324:4, 324:21, 329:5, 335:5, 336:1, 336:16, 336:21, 337:6, 337:13, 338:4, 339:16, 342:3, 342:6, 342:7, 342:10, 342:12, 343:23, 344:17, 349:14, 349:16, 351:11, 352:5, 352:6, 353:4, 353:19, 353:23, 353:25, 354:3, 354:4, 354:6, 354:12, 354:18, 354:22, 354:23, 355:18, 356:9, 356:14, 357:2, 357:5, 358:5, 358:13, 358:14, 358:15, 358:22, 358:23, 359:20, 359:21, 359:25, 360:1, 360:14, 360:17, 363:13, 364:13, 364:14, 364:20, 364:21, 364:24, 365:7, 366:14, 367:8, 368:18, 370:12, 371:4, 371:5, 372:21, 372:22, 373:14, 373:25, 374:19, 375:16, 375:24, 377:12, 379:20, 379:23, 380:18, 380:19, 380:21, 382:3, 382:13, 387:10, 387:12, 387:24, 388:3, 388:10, 389:8, 389:17, 389:18, 389:21, 390:1, 390:3, 390:4, 390:17, 391:6, 392:1, 393:4, 393:10, 393:16, 394:10, 402:17, 402:24, 403:1, 403:4, 403:5, 403:7, 410:15, 410:18, 410:23, 412:9, 416:5, 416:7, 417:2, 417:16, 418:8, 419:24

**informed** [1] - 267:9
**initials** [3] - 329:7, 412:1, 414:11
**initiate** [2] - 321:24, 368:16
**innocent** [2] - 338:21, 379:14
**inquiries** [2] - 350:10, 353:10
**inquiry** [5] - 329:4, 357:4, 358:3, 358:13, 378:6
**installment** [2] - 369:17, 377:1
**instead** [9] - 255:7, 284:2, 289:18, 307:11, 318:3, 358:24, 370:6, 378:25, 379:12
**institution** [1] - 387:1
**institutions** [2] - 332:1, 344:16
**instruct** [3] - 364:24, 409:6, 426:2
**instructed** [1] - 370:11
**instruction** [13] - 316:4, 421:5, 425:5, 425:9, 426:5, 426:12, 426:20, 428:16, 428:17, 429:4, 429:6, 431:21
**instructions** [23] - 287:7, 347:13, 347:21, 356:2, 421:18, 421:19, 423:8, 424:21, 425:1, 430:4, 430:6, 430:14, 430:15, 430:22, 430:25, 431:2, 431:9, 431:15, 431:23, 432:2, 432:3, 432:13, 432:15
**insurance** [6] - 283:8, 283:9, 285:4, 329:6, 329:10, 341:5
**Insurance** [2] - 247:20, 329:13
**intend** [4] - 240:9, 285:23, 422:11, 428:18
**intending** [1] - 330:14
**intends** [1] - 423:6
**intensive** [1] - 332:7
**intentionally** [1] - 344:18
**interactions** [1] - 315:3
**interest** [1] - 314:6
**interested** [4] - 330:19, 352:2, 395:5, 395:6
**interference** [1] - 424:25
**internal** [2] - 333:19, 344:20
**internally** [2] - 361:20, 405:18
**Internet** [15] - 235:8, 235:9, 235:25, 237:2, 245:19, 254:16, 254:19, 286:20, 287:7, 292:8, 305:3, 307:20, 307:22, 343:19
**interpret** [1] - 413:14
**interpreting** [1] - 424:9
**interprets** [1] - 424:7
**interrupt** [1] - 347:8
**intersection** [1] - 381:14
**intertwined** [1] - 350:7
**intrigued** [1] - 314:3
**invasion** [1] - 425:4
**invest** [1] - 338:16
**investigate** [15] - 315:12, 318:13, 319:10, 336:12, 368:24, 369:23, 378:25, 380:10, 385:13, 387:9, 389:22, 389:24, 393:4, 399:5, 425:22
**investigated** [6] - 324:23, 337:17, 358:2, 377:13, 377:14, 389:23
**investigating** [12] - 318:17, 333:15,

334:25, 339:20, 360:15, 363:8, 363:18, 370:2, 370:6, 379:8, 414:20, 420:7
**investigation** [64] – 277:16, 319:14, 321:24, 322:2, 330:16, 334:4, 335:20, 338:9, 354:17, 356:7, 356:8, 356:12, 356:17, 357:1, 357:15, 358:1, 363:10, 364:16, 364:17, 364:18, 368:16, 371:1, 371:20, 372:18, 374:2, 377:22, 377:24, 378:5, 378:23, 379:18, 380:7, 385:12, 385:16, 385:25, 386:1, 388:7, 389:19, 393:11, 393:14, 400:4, 401:14, 402:24, 404:16, 405:25, 407:17, 408:10, 408:13, 408:18, 408:19, 408:22, 408:25, 409:10, 409:16, 410:13, 410:25, 415:10, 415:11, 416:18, 416:19, 417:13, 418:3, 418:17, 419:2, 420:8
**investigations** [5] – 330:14, 337:1, 357:22, 379:10, 425:16
**investigative** [1] – 356:15
**investigators** [4] – 339:4, 339:20, 369:2, 378:20
**invitation** [2] – 350:2, 351:5
**invited** [1] – 350:1
**involve** [3] – 340:6, 385:22, 419:8
**involved** [7] – 273:5, 294:12, 332:16, 332:21, 333:11, 334:8, 350:6
**involves** [1] – 331:23
**involving** [2] – 331:25, 340:22
**irony** [1] – 374:7
**Irvine** [2] – 283:14, 283:15
**island** [3] – 286:14, 288:4, 290:19
**islands** [1] – 375:14
**isolate** [1] – 305:9
**isolated** [1] – 334:9
**issue** [15] – 252:6, 262:4, 305:11, 305:12, 307:13, 343:24, 391:17, 422:23, 426:1, 426:6, 426:12, 427:14, 428:6, 428:7, 428:18
**issued** [2] – 326:25, 329:2
**issues** [12] – 284:9, 294:3, 305:17, 346:15, 349:15, 350:3, 421:19, 422:11, 423:23, 423:24
**item** [1] – 275:7
**iTop** [21] – 334:5, 341:11, 341:13, 342:1, 362:5, 363:14, 365:9, 365:10, 365:16, 371:10, 371:11, 389:12, 392:2, 395:11, 395:13, 404:18, 406:1, 407:12, 407:25, 411:13, 411:14
**itself** [2] – 287:1, 324:20

**J**

**James** [2] – 361:23
**January** [42] – 235:17, 235:19, 236:9, 236:10, 237:9, 237:25, 238:16, 239:3, 239:6, 241:15, 241:18, 242:22, 243:8, 245:17, 246:17, 246:20, 250:24, 254:23, 256:19, 258:7, 258:9, 259:15,

263:2, 271:8, 271:16, 272:3, 272:7, 297:5, 297:7, 297:8, 297:10, 297:11, 297:22, 298:10, 342:16, 342:18, 349:13, 372:5, 374:15, 374:16, 390:1, 394:24
**Japan** [1] – 290:20
**Jason** [3] – 363:9, 371:16, 371:25
**Jeffrey** [1] – 232:2
**Jelderks** [2] – 430:21, 431:9
**Jennifer** [2] – 313:17, 346:4
**jerking** [1] – 337:8
**JH** [2] – 251:10, 252:3
**Jim** [1] – 363:11
**JMOL** [3] – 426:25, 429:6
**job** [7] – 283:10, 283:14, 305:14, 349:8, 373:18, 398:4, 398:18
**John** [1] – 362:18
**Jones** [2] – 232:5, 232:5
**judge** [1] – 431:10
**Judge** [5] – 347:23, 430:21, 431:9, 431:10
**JUDGE** [1] – 231:17
**judges** [1] – 351:16
**judgment** [11] – 347:4, 422:11, 426:1, 426:9, 426:21, 427:4, 427:6, 427:9, 427:11, 427:13, 427:21
**Julie** [2] – 232:16, 422:7
**July** [1] – 299:7
**jumpy** [2] – 309:7
**jurors** [1] – 316:3
**jury** [78] – 233:2, 239:18, 239:19, 247:16, 248:15, 248:18, 249:20, 251:25, 252:19, 258:4, 281:20, 282:2, 291:8, 308:20, 312:10, 312:14, 313:6, 313:15, 313:16, 314:2, 315:7, 315:23, 316:15, 316:19, 316:24, 317:3, 332:2, 333:13, 338:22, 346:1, 346:10, 346:19, 347:9, 347:13, 348:1, 349:3, 350:5, 355:20, 357:21, 359:10, 361:8, 363:5, 364:7, 365:18, 367:4, 367:5, 368:6, 368:9, 368:25, 371:19, 373:9, 376:14, 381:13, 383:1, 397:17, 398:10, 398:15, 399:15, 401:9, 403:24, 412:8, 419:23, 421:1, 421:9, 421:18, 423:7, 423:25, 425:6, 426:2, 426:11, 430:4, 430:5, 430:14, 430:15, 430:22, 431:12, 432:14

**K**

**Kaiser** [1] – 285:4
**keep** [11] – 294:2, 307:17, 318:21, 320:14, 322:20, 326:22, 328:8, 369:16, 370:11, 370:13, 386:15
**Kelly** [2] – 232:5, 232:5
**kept** [8] – 254:20, 307:19, 321:5, 323:13, 327:21, 352:11, 365:22, 384:15
**Kester** [1] – 232:17
**key** [1] – 406:6
**kicks** [1] – 363:2

**kidney** [7] – 272:19, 272:24, 273:2, 273:13, 289:16, 307:5, 307:8
**kids** [6] – 283:18, 283:19, 284:3, 284:19, 289:18, 293:10
**kind** [20] – 274:25, 277:2, 287:12, 288:5, 291:12, 292:12, 292:14, 306:5, 309:7, 315:9, 347:17, 355:13, 356:22, 357:14, 360:14, 366:18, 382:3, 391:9, 402:6, 418:22
**kinds** [1] – 302:24
**knowing** [2] – 334:9, 411:1
**knowledge** [9] – 264:24, 334:15, 349:19, 352:14, 352:21, 410:16, 410:21, 411:1, 414:8
**known** [13] – 249:9, 251:10, 252:10, 334:21, 338:5, 374:19, 399:5, 399:9, 400:15, 406:1, 409:22, 412:11, 418:15
**knows** [2] – 382:3, 382:4
**Kohl's** [3] – 239:15, 240:19, 278:7

**L**

**lab** [1] – 282:23
**lack** [1] – 414:7
**lacks** [2] – 285:13, 288:11
**ladder** [2] – 306:5, 377:2
**laid** [1] – 342:21
**land** [1] – 304:18
**landed** [2] – 304:24, 304:25
**language** [1] – 248:3
**large** [4] – 243:24, 279:25, 339:22, 371:18
**larger** [2] – 286:17, 297:24
**Las** [2] – 304:9, 304:10, 308:17
**laser** [1] – 371:3
**last** [15] – 236:24, 244:23, 247:3, 260:20, 263:11, 268:19, 277:8, 331:16, 365:17, 384:19, 388:17, 389:6, 400:22, 415:5, 425:14
**lasts** [1] – 402:9
**late** [9] – 308:1, 365:13, 369:17, 369:18, 377:1, 384:1, 388:19, 400:21, 429:23
**LAW** [1] – 432:21
**law** [19] – 307:4, 333:8, 333:9, 347:4, 349:16, 355:4, 382:15, 422:11, 423:2, 423:5, 423:10, 424:5, 424:6, 426:1, 426:9, 427:21, 427:22, 427:24, 428:13
**Law** [1] – 232:5
**law's** [1] – 272:21
**laws** [1] – 349:11
**lawyer** [5] – 236:22, 244:14, 264:2, 264:5, 287:7
**lawyers** [3] – 315:11, 316:5, 349:10
**learn** [6] – 257:11, 286:7, 294:11, 303:13, 401:13, 412:4
**learned** [5] – 253:9, 277:3, 286:12, 303:17, 395:12
**learning** [5] – 284:13, 286:15, 304:14, 401:19, 402:4
**least** [8] – 264:20, 269:23, 298:17,

314:12, 389:8, 391:16, 392:11, 417:15
**leave** [5] - 284:10, 290:20, 307:6, 348:4, 361:22
**leaves** [5] - 315:7, 346:10, 363:21, 421:9, 421:13
**left** [5] - 284:11, 285:10, 304:19, 362:13, 429:21
**legal** [2] - 337:7, 338:19
**legitimate** [2] - 338:6, 343:17
**lending** [2] - 332:18, 397:24
**less** [2] - 289:17, 381:21
**letter** [139] - 233:20, 235:19, 235:21, 235:24, 237:12, 237:25, 238:2, 238:10, 238:13, 238:14, 238:15, 238:19, 238:20, 238:25, 239:3, 239:5, 239:6, 239:12, 239:14, 240:16, 240:18, 240:19, 240:22, 241:3, 241:5, 241:6, 241:7, 241:14, 241:18, 242:9, 243:23, 244:7, 244:16, 244:17, 244:20, 245:4, 245:6, 245:16, 245:20, 245:21, 245:24, 246:3, 246:5, 246:6, 246:7, 246:12, 246:24, 247:14, 247:15, 247:19, 247:23, 248:4, 249:9, 249:12, 249:13, 249:15, 250:12, 250:14, 250:25, 251:9, 251:16, 251:20, 252:10, 252:14, 252:25, 253:1, 253:6, 253:8, 254:15, 254:19, 254:20, 254:22, 255:12, 256:8, 256:13, 257:24, 258:7, 259:7, 259:14, 259:18, 259:25, 260:21, 260:24, 261:3, 261:15, 261:19, 261:21, 262:20, 263:2, 263:13, 263:17, 263:21, 263:25, 264:3, 264:9, 265:16, 265:17, 265:24, 266:21, 266:23, 267:2, 267:7, 271:15, 271:18, 271:21, 276:23, 276:25, 277:2, 277:5, 277:9, 277:10, 297:13, 299:19, 338:3, 359:8, 359:10, 359:13, 359:15, 359:20, 359:21, 360:9, 360:25, 368:2, 373:10, 373:12, 373:24, 374:13, 374:15, 374:16, 374:24, 376:2, 376:11, 387:16, 387:20, 387:25, 391:3, 410:8
**letters** [46] - 237:10, 240:20, 242:22, 243:8, 244:1, 244:10, 245:17, 247:8, 247:10, 249:23, 250:22, 254:1, 254:5, 254:6, 257:13, 257:15, 257:21, 260:13, 261:10, 261:25, 262:2, 262:7, 262:9, 262:13, 278:4, 291:2, 295:1, 295:9, 296:3, 297:22, 299:11, 299:19, 299:20, 299:22, 300:1, 300:9, 300:10, 300:14, 300:15, 300:16, 301:1, 373:5, 374:24, 389:25, 414:11
**levels** [1] - 378:7
**liaison** [1] - 398:8
**license** [2] - 260:14, 386:17
**liens** [1] - 353:14
**life** [6] - 272:17, 273:11, 274:2, 295:17, 303:12, 309:4
**lifetime** [3] - 306:16, 310:6, 311:1
**light** [1] - 357:20

**likely** [2] - 335:22, 359:24
**limited** [5] - 280:12, 280:14, 283:24, 292:7, 424:12
**limiting** [8] - 425:5, 426:5, 426:12, 426:20, 428:17, 429:4, 429:6, 431:21
**limits** [1] - 339:7
**line** [8] - 244:24, 258:18, 337:9, 341:6, 353:24, 400:14, 409:21, 415:5
**lines** [2] - 353:9, 417:12
**list** [7] - 233:20, 233:22, 235:2, 260:16, 261:7, 425:2, 430:3
**listed** [8] - 233:24, 237:19, 242:23, 244:23, 250:1, 319:19, 361:20, 425:8
**listen** [1] - 370:9
**listened** [1] - 382:9
**listing** [1] - 380:23
**lists** [1] - 261:10
**live** [2] - 292:18, 304:8
**living** [2] - 289:19, 334:13
**LLC** [3] - 231:6, 232:2, 317:12
**LLP** [1] - 232:17
**LMOVM** [1] - 362:13
**loan** [13] - 281:3, 291:21, 292:24, 293:6, 334:17, 334:20, 334:23, 335:7, 335:17, 335:24, 342:24, 369:17, 377:1
**loans** [5] - 332:19, 340:22, 341:10, 397:25
**location** [3] - 375:17, 380:20, 380:21
**long-standing** [1] - 360:5
**look** [74] - 233:18, 237:15, 238:15, 243:22, 245:3, 246:19, 247:13, 250:11, 251:9, 252:9, 253:4, 255:11, 257:23, 258:14, 259:6, 259:25, 260:5, 261:13, 263:4, 264:11, 264:15, 266:13, 266:23, 267:12, 268:13, 271:15, 272:5, 276:16, 278:14, 279:6, 294:7, 296:12, 312:17, 315:1, 315:12, 316:2, 319:2, 319:3, 324:7, 327:23, 328:15, 329:8, 335:4, 337:6, 342:9, 342:20, 362:4, 362:25, 364:1, 365:15, 367:3, 368:3, 369:6, 369:13, 370:15, 373:22, 387:15, 391:9, 402:17, 402:19, 403:10, 405:5, 406:2, 406:7, 406:12, 407:6, 408:4, 411:10, 412:7, 426:16, 426:18, 429:12, 431:8, 432:11
**looked** [25] - 236:5, 236:13, 256:19, 258:7, 259:14, 260:18, 271:4, 275:24, 276:22, 278:14, 279:17, 360:18, 363:25, 364:19, 365:11, 369:8, 372:25, 376:12, 392:14, 395:13, 402:21, 402:22, 411:2, 415:12, 430:25
**looking** [34] - 259:18, 260:15, 261:21, 312:21, 312:23, 315:2, 322:23, 323:3, 356:13, 360:20, 368:9, 368:12, 369:4, 373:1, 389:12, 404:14, 404:15, 404:23, 404:25, 405:8, 405:14, 406:8, 407:1, 407:5, 407:11, 411:11, 412:5, 412:10, 412:11, 416:5, 416:25, 417:21, 429:20
**looks** [8] - 248:22, 252:13, 271:22,

368:11, 391:23, 395:16, 412:9, 413:12
**loop** [1] - 365:7
**Los** [1] - 283:2
**lose** [3] - 381:25, 382:12, 382:18
**losing** [1] - 295:6
**loss** [2] - 425:10, 425:13
**losses** [5] - 424:12, 424:14, 425:12, 428:8
**lost** [6] - 253:3, 254:7, 254:10, 286:21, 292:13, 424:24
**loud** [1] - 407:14
**love** [1] - 273:12
**lunch** [4] - 313:21, 313:22, 315:5, 315:22
**lying** [1] - 337:11

# M

**Mac** [1] - 391:5
**Macy's** [3] - 241:3, 241:6, 278:2
**Madison** [1] - 361:25
**Mae** [1] - 391:5
**mail** [15] - 254:7, 263:19, 265:17, 265:18, 266:5, 279:17, 280:8, 286:10, 307:21, 361:25, 366:25, 373:10, 431:17, 432:19
**mailed** [1] - 236:23
**mailing** [1] - 254:25
**major** [5] - 272:16, 273:9, 306:21, 310:10, 310:12
**majors** [1] - 283:3
**man** [2] - 337:8, 337:11
**manage** [1] - 401:8
**management** [2] - 337:8, 337:12
**manager** [1] - 398:9
**managing** [1] - 399:12
**March** [2] - 311:18, 329:2
**MARCO** [1] - 231:16
**mark** [1] - 319:4
**marked** [4] - 241:2, 259:19, 366:4, 373:4
**marks** [1] - 369:7
**married** [3] - 273:13, 283:9, 295:19
**Mary** [2] - 302:1, 302:12
**MARY** [1] - 302:6
**match** [5] - 255:16, 307:9, 335:24, 358:9, 370:8
**matched** [2] - 370:7, 375:23
**matching** [5] - 353:25, 369:1, 369:22, 415:24, 415:25
**material** [1] - 386:8
**Matt** [46] - 283:1, 283:24, 287:5, 287:9, 287:14, 288:2, 288:9, 288:20, 288:21, 289:5, 289:18, 289:22, 291:2, 291:9, 291:14, 292:1, 293:1, 293:6, 294:12, 294:18, 295:6, 295:19, 299:18, 300:19, 302:24, 302:25, 303:11, 303:20, 304:17, 305:1, 305:21, 306:11, 306:15, 306:25, 307:7, 307:17, 307:19, 307:23, 308:1, 308:8, 308:9, 308:12, 308:14, 308:21,

308:22, 309:14
**Matt's** [8] - 283:5, 289:3, 290:8, 291:25, 295:25, 296:14, 305:6, 305:7
**matter** [15] - 274:15, 313:20, 347:4, 390:25, 391:12, 422:11, 423:2, 423:5, 423:10, 426:1, 426:9, 427:21, 428:13, 431:10
**matters** [1] - 340:23
**MATTHEW** [2] - 231:3, 233:11
**Matthew** [7] - 277:12, 302:18, 302:19, 321:20, 327:18, 370:13, 412:1
**Matthew's** [1] - 411:25
**maximize** [1] - 355:18
**McCarthy** [1] - 237:25
**McKenna** [1] - 283:1
**mean** [43] - 234:20, 243:4, 246:18, 251:2, 264:7, 266:12, 295:10, 296:9, 308:18, 324:18, 336:9, 336:16, 336:19, 339:9, 342:21, 342:23, 347:4, 369:6, 374:3, 378:22, 380:3, 381:15, 383:24, 387:13, 389:16, 390:17, 392:5, 393:2, 396:6, 401:5, 411:14, 414:11, 414:17, 414:19, 414:23, 415:7, 418:2, 419:11, 427:6, 427:11, 430:20, 432:6, 432:9
**meaning** [2] - 357:25, 358:1
**means** [20] - 254:17, 287:21, 314:18, 353:19, 353:20, 362:13, 364:11, 369:5, 369:17, 369:18, 370:3, 372:7, 377:1, 378:25, 379:12, 381:25, 393:2, 414:18, 418:3, 418:16
**meant** [3] - 266:15, 430:19, 431:2
**mechanical** [1] - 245:22
**mechanism** [4] - 312:16, 360:7, 361:1, 394:4
**medical** [1] - 309:5
**meet** [3] - 282:22, 294:1, 334:24
**meeting** [3] - 301:8, 301:11, 301:12
**Megan** [2] - 397:3, 397:11
**MEGAN** [2] - 397:5, 397:11
**member** [17] - 329:25, 332:5, 349:24, 401:12, 402:16, 405:19, 406:21, 406:25, 407:2, 408:4, 408:20, 408:21, 409:22, 411:4, 412:4, 412:13, 420:13
**members** [22] - 265:5, 281:20, 313:16, 346:1, 349:23, 400:3, 400:24, 401:25, 402:13, 403:8, 404:15, 406:3, 406:4, 407:6, 407:25, 409:6, 410:11, 413:15, 416:4, 420:6, 420:7, 421:1
**memo** [3] - 426:16, 426:18, 429:13
**memorandum** [9] - 422:12, 422:14, 422:23, 422:25, 423:12, 423:18, 423:21, 428:10, 428:25
**memorialize** [1] - 360:24
**memorize** [2] - 243:9, 262:11
**memorized** [1] - 259:3
**memory** [3] - 241:16, 252:12, 259:16
**mentioned** [10] - 278:2, 288:19, 333:21, 341:22, 354:5, 375:21, 384:23, 394:3, 409:4, 430:21

**merely** [1] - 423:15
**merrier** [1] - 386:1
**message** [1] - 362:14
**methods** [1] - 355:21
**Michael** [1] - 232:8
**Michelle** [1] - 331:3
**mid** [6] - 237:9, 254:6, 257:16, 281:20, 346:1, 388:19
**mid-August** [1] - 254:6
**mid-January** [1] - 237:9
**midday** [1] - 313:17
**middle** [7] - 263:4, 264:16, 278:18, 287:3, 289:13, 329:7, 369:6
**Mifflin** [1] - 361:24
**might** [20] - 298:7, 312:17, 337:3, 338:8, 338:19, 340:22, 347:12, 348:7, 348:9, 372:4, 400:17, 402:6, 410:20, 425:8, 426:19, 430:9, 430:12, 430:14, 432:6
**mileage** [4] - 274:24, 274:25, 280:25, 281:11
**Miller's** [1] - 362:18
**million** [2] - 350:13, 370:20
**mimic** [1] - 431:6
**mind** [9] - 315:9, 348:11, 365:21, 383:19, 386:15, 392:16, 405:10, 415:16, 432:4
**minimize** [1] - 338:16
**minute** [2] - 345:5, 415:12
**minutes** [10] - 281:1, 281:22, 281:23, 281:24, 313:10, 313:12, 339:12, 341:18, 346:3, 421:16
**misspoke** [1] - 278:21
**misstate** [1] - 259:12
**mistake** [1] - 297:9
**misunderstand** [1] - 341:21
**Mobility** [2] - 252:11, 253:7
**models** [1] - 391:16
**modify** [9] - 318:22, 319:25, 320:3, 322:12, 322:14, 323:6, 369:12, 370:16, 417:1
**mom** [1] - 283:7
**moment** [7] - 289:23, 291:20, 297:3, 298:12, 298:13, 313:18, 415:10
**money** [7] - 273:15, 275:15, 283:17, 284:1, 292:15, 292:20, 338:16
**month** [2] - 287:3, 289:19
**months** [9] - 245:17, 284:25, 306:13, 306:14, 311:7, 337:22, 342:6, 384:21
**Montressa** [4] - 313:7, 313:15, 399:15, 419:16
**MORENO** [1] - 331:3
**Moreno** [1] - 331:3
**morning** [7] - 233:4, 233:17, 281:21, 287:11, 302:17, 303:1, 306:2
**Morrison** [1] - 232:6
**mortgage** [3] - 275:23, 332:18, 391:5
**Mosman** [2] - 430:21, 431:10
**most** [24] - 240:20, 260:10, 300:20, 305:23, 305:25, 350:2, 351:18, 354:7,

354:14, 354:15, 358:23, 359:8, 370:2, 370:4, 372:21, 378:1, 382:14, 385:2, 385:3, 385:17, 424:15, 425:6, 428:9, 431:15
**mostly** [2] - 235:9, 291:11
**motion** [3] - 422:16, 423:4, 423:9
**motions** [9] - 346:22, 347:5, 347:6, 347:7, 421:14, 421:17, 422:6, 425:14, 429:6
**mountain** [5] - 335:4, 336:2, 342:3, 342:12, 358:21
**move** [9] - 286:18, 290:14, 293:8, 294:18, 307:23, 346:6, 378:9, 401:22, 408:13
**moved** [4] - 283:15, 285:5, 306:20
**moves** [1] - 422:10
**moving** [7] - 236:18, 240:17, 281:15, 309:3, 315:9, 374:23, 428:13
**MR** [266] - 233:16, 237:17, 237:23, 239:20, 240:1, 240:4, 240:8, 240:13, 240:14, 240:24, 241:1, 241:9, 241:11, 241:13, 241:21, 241:23, 242:2, 242:4, 242:6, 242:10, 242:15, 247:18, 248:6, 248:8, 248:10, 248:17, 248:20, 249:17, 249:18, 249:20, 249:21, 250:15, 250:16, 250:18, 250:19, 251:22, 251:23, 251:25, 252:2, 252:16, 252:17, 252:19, 252:20, 253:12, 253:13, 253:15, 253:16, 258:1, 258:2, 258:4, 258:5, 259:20, 259:21, 259:23, 259:24, 265:19, 265:20, 265:22, 265:23, 269:4, 269:5, 269:7, 269:8, 270:16, 270:17, 271:23, 271:24, 272:1, 272:2, 274:7, 274:10, 274:15, 274:19, 275:1, 275:3, 276:17, 276:19, 279:10, 279:11, 280:5, 280:7, 280:11, 280:13, 280:15, 280:18, 281:5, 281:7, 281:10, 281:16, 282:6, 282:18, 285:13, 285:15, 287:18, 288:1, 288:11, 288:18, 288:23, 289:1, 290:10, 290:15, 291:4, 291:7, 292:3, 292:22, 293:2, 293:5, 293:15, 293:22, 294:15, 294:17, 296:20, 296:22, 297:2, 301:18, 301:21, 301:23, 302:1, 302:16, 303:18, 303:23, 304:7, 305:18, 305:20, 308:5, 308:7, 309:10, 309:13, 309:21, 310:2, 311:22, 311:24, 312:2, 312:3, 312:6, 312:8, 312:11, 312:15, 312:19, 312:20, 313:3, 313:7, 313:10, 313:12, 315:15, 315:18, 315:21, 316:2, 316:12, 316:16, 316:20, 316:21, 316:25, 317:5, 317:9, 317:17, 330:2, 330:5, 330:24, 331:6, 331:20, 339:24, 340:2, 343:7, 344:21, 344:24, 345:2, 345:17, 345:22, 345:24, 346:9, 346:12, 346:14, 346:15, 346:20, 346:25, 347:2, 347:4, 347:10, 347:11, 347:16, 347:19, 347:20, 347:23, 348:14, 349:2, 351:13, 357:6, 357:9, 357:19,

364:3, 364:4, 366:10, 366:21, 376:9, 376:10, 378:9, 378:11, 381:2, 381:5, 381:8, 381:10, 383:4, 383:7, 383:10, 383:14, 383:16, 385:6, 385:10, 393:6, 393:20, 393:24, 394:2, 395:19, 395:20, 396:2, 396:12, 396:14, 396:18, 396:20, 396:22, 396:25, 397:3, 397:15, 403:14, 403:15, 403:19, 403:24, 404:2, 404:6, 404:9, 404:10, 405:5, 405:6, 405:10, 405:12, 406:12, 406:13, 410:15, 410:21, 411:1, 411:9, 411:16, 411:17, 412:17, 412:19, 414:7, 414:13, 422:3, 426:19, 427:8, 427:15, 428:1, 428:4, 428:21, 429:14, 429:20, 430:11, 430:13, 430:19, 431:2, 431:6, 432:17, 433:2, 433:4, 433:7

**MS** [19] - 331:3, 422:7, 422:10, 422:18, 426:4, 426:10, 426:15, 428:5, 428:17, 428:20, 429:3, 429:9, 429:11, 431:14, 431:24, 432:4, 432:9, 432:16, 433:1
**multiple** [7] - 267:18, 270:22, 271:5, 298:20, 337:4, 337:5, 397:22
**multiplying** [1] - 367:24
**must** [3] - 291:18, 291:19, 356:4

## N

**N.A** [1] - 231:6
**name** [28] - 249:11, 263:2, 263:5, 266:9, 268:14, 277:13, 282:13, 282:14, 300:3, 302:10, 302:12, 317:18, 322:9, 329:9, 330:6, 331:2, 331:13, 331:16, 348:21, 348:23, 358:25, 359:22, 369:9, 370:1, 397:9, 397:11, 400:22
**named** [2] - 266:14, 371:25
**names** [2] - 283:21, 302:22
**Names** [1] - 268:17
**Nancy** [1] - 434:11
**nancy** [1] - 232:19
**NANCY** [1] - 434:12
**nature** [5] - 344:4, 383:24, 384:3, 384:24
**near** [3] - 271:13, 284:8, 346:13
**nearly** [1] - 247:8
**necessarily** [2] - 343:15, 344:6
**necessary** [4] - 256:24, 335:25, 367:19, 380:13
**need** [24] - 233:6, 273:10, 294:1, 313:21, 315:11, 315:13, 316:20, 317:9, 342:19, 346:11, 361:2, 362:21, 362:23, 368:24, 394:8, 403:11, 409:4, 420:24, 421:2, 421:15, 426:5, 426:17, 427:20, 430:17
**needed** [8] - 275:19, 284:22, 286:17, 304:17, 306:2, 310:11, 335:21, 393:8
**needs** [2] - 293:13, 293:14
**negative** [6] - 257:17, 277:19, 297:15, 383:2, 383:22, 390:12
**negligence** [2] - 427:12

**negotiate** [1] - 293:20
**nervous** [3] - 288:9, 309:1, 316:5
**Nevada** [1] - 304:9
**never** [22] - 253:17, 259:3, 262:24, 263:17, 264:23, 264:24, 279:24, 299:1, 299:3, 335:16, 338:21, 358:1, 377:13, 377:14, 377:21, 379:19, 380:2, 380:3, 380:6, 427:11
**nevers** [1] - 396:6
**New** [25] - 235:5, 255:5, 264:2, 286:18, 286:23, 286:24, 287:3, 287:5, 287:6, 287:17, 288:2, 288:3, 288:6, 289:12, 289:21, 290:2, 290:7, 290:17, 305:2, 305:5, 305:8, 305:22, 306:10, 311:10, 311:13
**new** [12] - 260:23, 294:11, 295:2, 295:8, 332:20, 334:19, 366:7, 398:16, 410:4, 414:14, 431:15
**news** [2] - 290:25, 367:23
**newsletter** [6] - 349:8, 349:9, 349:13, 349:17, 349:21, 352:10
**newspaper** [1] - 348:9
**next** [46] - 236:18, 245:5, 246:11, 246:24, 256:8, 256:12, 256:13, 256:16, 266:8, 269:25, 279:10, 279:14, 281:18, 282:5, 301:25, 308:12, 311:16, 311:19, 312:5, 313:2, 313:3, 313:7, 316:1, 316:12, 316:16, 316:25, 321:8, 329:16, 331:5, 340:8, 343:6, 348:13, 352:3, 354:21, 365:25, 396:21, 405:5, 405:11, 406:12, 407:10, 407:18, 409:16, 409:17, 409:19, 409:21, 414:22
**nice** [1] - 285:5
**night** [3] - 295:13, 296:17, 305:25
**nine** [2] - 304:19, 398:2
**nine-day** [1] - 304:19
**Ninth** [5] - 424:3, 424:5, 424:6, 424:7, 424:17
**non** [2] - 424:13, 424:24, 425:12
**non-economic** [2] - 424:13, 424:24
**non-pecuniary** [1] - 425:12
**none** [1] - 432:4
**norm** [1] - 335:20
**normal** [4] - 245:11, 280:20, 287:12, 424:25
**normally** [6] - 294:13, 308:23, 311:4, 311:6, 414:17, 414:23
**norms** [1] - 345:10
**North** [1] - 367:1
**north** [1] - 288:4
**Northwest** [1] - 290:21
**notarized** [1] - 235:1
**notation** [1] - 410:24
**notations** [3] - 406:2, 406:3, 407:1
**note** [8] - 362:18, 366:13, 395:13, 395:14, 411:6, 411:22, 412:5, 415:13
**notebooks** [1] - 315:13
**notes** [24] - 334:6, 341:11, 342:1, 362:5, 363:14, 365:9, 365:10, 365:16,

371:10, 371:11, 389:12, 392:2, 392:14, 395:4, 395:11, 402:22, 407:7, 408:4, 411:14, 411:15, 415:14, 419:25, 420:14, 428:5
**nothing** [7] - 344:13, 380:1, 385:15, 387:11, 388:6, 396:14, 408:18
**notice** [28] - 236:24, 237:1, 247:3, 250:13, 253:22, 257:6, 258:19, 266:12, 317:21, 318:7, 356:16, 356:21, 356:24, 357:10, 357:13, 358:17, 359:5, 359:9, 363:20, 366:17, 366:18, 367:5, 368:22, 371:6, 373:25, 378:3
**noticed** [2] - 291:11, 314:12
**notices** [2] - 425:16, 425:23
**notification** [1] - 367:13
**notified** [2] - 258:15, 334:11
**notify** [1] - 285:10
**November** [40] - 255:12, 257:12, 257:16, 257:24, 259:7, 262:13, 262:18, 264:20, 269:10, 278:17, 287:4, 294:18, 296:5, 301:6, 301:8, 304:20, 308:2, 311:9, 311:14, 311:19, 311:20, 321:18, 324:12, 361:22, 365:14, 367:16, 368:2, 374:24, 375:3, 376:13, 377:7, 395:14, 395:16, 412:25, 413:2, 415:13, 428:24, 429:1
**nowadays** [1] - 353:20
**nowhere** [1] - 291:17
**Nueve** [1] - 304:11
**number** [32] - 244:23, 245:1, 254:18, 263:8, 266:9, 266:10, 268:20, 277:15, 317:10, 319:4, 329:5, 329:7, 329:25, 330:1, 332:23, 335:14, 335:24, 339:12, 340:14, 341:2, 341:9, 350:10, 358:9, 358:25, 359:23, 361:24, 362:19, 364:1, 364:2, 369:9, 370:1, 376:8
**numbers** [2] - 236:2, 262:11
**numeric** [1] - 404:25
**nurse** [1] - 309:6

## O

**oath** [2] - 233:7, 330:10
**object** [2] - 242:10, 410:15
**objection** [50] - 241:10, 242:3, 248:7, 249:18, 250:16, 251:23, 252:17, 253:13, 258:2, 259:21, 265:20, 269:5, 271:24, 275:1, 280:5, 285:13, 287:18, 288:11, 288:23, 290:10, 291:4, 292:3, 293:2, 293:4, 293:15, 294:15, 301:22, 301:23, 303:18, 303:23, 303:24, 305:18, 308:5, 309:10, 312:3, 312:8, 345:23, 345:24, 357:7, 378:10, 381:2, 381:8, 383:4, 383:8, 396:19, 396:20, 404:6, 410:19, 411:7, 414:7
**objections** [1] - 432:24
**objectively** [1] - 423:18
**obligations** [2] - 423:1, 423:2

**observation** [1] - 294:24
**observations** [3] - 291:8, 294:22, 295:7
**observe** [1] - 296:13
**observed** [2] - 300:25, 308:21
**observing** [1] - 294:21
**obtain** [2] - 236:20, 395:2
**obtained** [4] - 237:1, 247:4, 260:25, 298:3
**obtaining** [1] - 243:11
**obviously** [3] - 250:4, 373:18, 431:16
**occasions** [3] - 274:21, 332:23, 340:14
**occurred** [1] - 409:10
**occurs** [1] - 423:13
**ocean** [2] - 304:18, 304:21
**October** [22] - 233:21, 261:15, 262:4, 263:12, 263:21, 264:9, 277:10, 277:13, 286:9, 301:7, 301:9, 303:15, 303:16, 304:19, 308:1, 308:8, 311:20, 364:9, 365:13, 376:13, 387:20, 412:3
**odd** [1] - 420:9
**OF** [2] - 231:2, 231:15
**offer** [17] - 239:21, 240:1, 240:9, 240:24, 241:9, 242:2, 248:6, 249:17, 250:15, 251:22, 252:16, 253:12, 258:1, 259:20, 265:19, 269:4, 271:23
**offered** [3] - 240:5, 423:17, 425:12
**office** [8] - 287:9, 287:13, 288:2, 288:20, 288:22, 305:7, 305:9, 305:17
**Office** [7] - 241:14, 241:21, 251:13, 257:20, 257:24, 258:6, 332:12
**officer** [1] - 332:15
**official** [1] - 375:17
**Official** [1] - 434:13
**officio** [1] - 332:5
**offshore** [1] - 334:10
**old** [2] - 365:4, 386:18
**older** [2] - 284:6, 284:21
**OlsenDaines** [1] - 232:8
**once** [9] - 248:14, 287:6, 289:21, 290:21, 365:2, 377:3, 402:16, 402:21, 419:2
**One** [1] - 351:7
**one** [99] - 233:23, 240:18, 241:21, 246:17, 249:3, 249:24, 249:25, 250:2, 256:19, 258:11, 258:12, 258:20, 258:21, 259:12, 259:17, 264:12, 264:21, 267:4, 268:3, 270:25, 271:1, 271:2, 276:20, 279:2, 279:10, 292:14, 295:23, 296:5, 298:10, 298:23, 298:24, 299:12, 301:4, 313:1, 314:1, 315:10, 319:3, 321:18, 328:20, 332:11, 335:24, 337:16, 339:12, 347:20, 348:3, 351:19, 355:23, 361:20, 362:12, 362:15, 362:25, 364:1, 364:8, 364:10, 365:2, 365:17, 367:10, 368:19, 371:10, 373:20, 374:24, 375:3, 376:18, 376:19, 376:20, 381:20, 382:2, 383:24, 384:1, 384:5, 385:2, 386:14, 389:6, 390:21, 392:18, 392:25, 395:22, 396:25,

399:3, 399:19, 400:16, 408:3, 411:16, 417:1, 417:2, 422:24, 423:9, 423:25, 424:1, 425:10, 426:10, 427:22, 427:23, 428:2, 428:3, 428:21, 432:7
**one's** [1] - 362:12
**ones** [11] - 251:13, 258:11, 259:13, 277:24, 355:24, 371:15, 372:25, 375:18, 420:8, 431:5, 432:6
**ongoing** [1] - 416:18
**oOo** [1] - 434:1
**open** [3] - 339:13, 399:23, 404:18
**opened** [11] - 263:20, 300:3, 321:24, 322:3, 323:10, 336:5, 364:12, 367:9, 368:16, 380:15, 407:16
**opening** [2] - 353:18, 403:5
**operate** [1] - 338:15
**operations** [4] - 398:5, 398:22, 398:23, 399:1
**operator** [2] - 379:3, 385:22
**operators** [4] - 341:15, 341:25, 377:14, 410:22
**opinion** [30] - 334:24, 337:21, 337:25, 338:8, 338:12, 338:13, 339:3, 339:6, 345:7, 351:10, 357:21, 357:25, 358:8, 359:6, 359:15, 363:13, 364:15, 364:18, 369:23, 370:25, 373:13, 377:24, 378:20, 379:18, 380:24, 381:6, 384:15, 387:10, 393:16, 395:10
**opportunities** [1] - 381:25
**opportunity** [7] - 283:13, 284:4, 314:2, 343:3, 424:24, 429:8, 430:17
**option** [3] - 417:1, 417:11
**options** [2] - 416:21, 417:9
**OR** [5] - 232:7, 232:10, 232:13, 232:18, 232:21
**Ord** [2] - 332:5, 332:6
**order** [5] - 326:18, 333:17, 352:20, 380:14, 407:3
**OREGON** [1] - 231:2
**Oregon** [3] - 231:6, 349:7, 434:13
**Oregonian** [2] - 348:5, 421:7
**Oregonlive** [1] - 348:10
**organization** [1] - 343:18
**original** [7] - 253:10, 254:20, 254:22, 258:7, 279:2, 432:18, 434:6
**originally** [2] - 246:17, 259:14
**originals** [1] - 314:24
**originated** [1] - 334:17
**OSCAR** [2] - 368:21, 412:14
**otherwise** [3] - 248:15, 303:7, 307:21
**ourselves** [2] - 284:12, 287:16
**outline** [1] - 402:13
**outside** [4] - 277:18, 290:18, 395:21, 420:14
**overall** [1] - 255:9
**overruled** [12] - 242:12, 275:2, 285:14, 288:13, 290:11, 292:4, 293:16, 303:19, 378:10, 404:8, 411:7, 414:12
**owed** [3] - 277:15, 280:4, 296:2
**own** [7] - 233:12, 330:16, 349:13,

358:13, 370:22, 377:13, 389:9

# P

**P.C** [1] - 232:11
**Pacific** [9] - 235:4, 284:14, 290:21, 304:5, 304:11, 304:12, 304:20, 338:3, 375:15
**package** [1] - 407:21
**packet** [2] - 411:25, 415:3
**page** [79] - 233:19, 235:11, 235:13, 236:3, 236:8, 236:10, 236:25, 238:4, 246:7, 246:11, 246:15, 246:19, 246:24, 248:11, 248:21, 251:18, 255:1, 255:2, 255:13, 256:2, 256:9, 256:12, 256:16, 256:18, 256:25, 257:7, 257:8, 260:11, 260:15, 260:22, 261:6, 261:14, 261:18, 261:21, 263:5, 264:15, 264:16, 267:15, 269:9, 269:12, 269:16, 269:18, 269:25, 270:18, 270:19, 277:8, 279:10, 279:14, 321:13, 329:16, 362:6, 363:1, 365:9, 365:10, 366:6, 367:3, 371:11, 373:6, 373:22, 375:4, 405:5, 405:11, 406:12, 407:11, 407:18, 411:10
**pages** [10] - 236:3, 255:19, 255:25, 256:5, 270:3, 292:9, 321:11, 366:5, 375:14, 375:23
**paid** [2] - 268:4, 286:1
**panel** [2] - 349:24, 351:6
**paragraph** [9] - 239:8, 239:9, 247:25, 248:1, 258:14, 266:3, 266:8, 272:6, 371:19
**paragraphs** [1] - 250:2
**part** [25] - 245:23, 260:7, 273:20, 290:6, 292:19, 314:16, 314:24, 331:1, 350:4, 350:5, 351:25, 352:20, 353:6, 353:7, 353:9, 353:12, 367:17, 372:18, 374:3, 374:5, 378:12, 385:25, 390:21, 430:7
**partial** [1] - 422:10
**participants** [1] - 352:16
**participation** [1] - 344:5
**particular** [5] - 247:15, 249:3, 296:3, 296:4, 425:23
**particularly** [2] - 335:25, 430:3
**parties** [7] - 233:2, 282:2, 314:6, 315:4, 315:23, 348:1, 422:2
**parts** [1] - 353:5
**party** [4] - 314:5, 327:1, 334:18, 367:20
**pass** [1] - 296:20
**passage** [1] - 287:1
**passed** [1] - 349:16
**passes** [1] - 377:3
**passport** [9] - 238:7, 255:16, 255:19, 255:21, 260:14, 375:14, 375:23, 380:20, 386:17
**past** [9] - 256:20, 285:17, 369:19, 391:2, 391:7, 391:8, 391:20, 391:25, 398:7
**pause** [1] - 240:11, 276:18
**pay** [6] - 275:16, 275:23, 285:23,

288:16, 291:21, 338:19
**paying** [1] - 358:23
**payment** [1] - 335:13
**Payments** [1] - 271:19
**payments** [5] - 334:12, 335:12, 335:16, 400:21
**PDF** [3] - 234:25, 432:19, 432:20
**pecuniary** [4] - 424:12, 424:14, 425:12, 428:7
**peers** [1] - 401:7
**pen** [1] - 369:16
**people** [17] - 291:13, 292:7, 294:8, 294:9, 297:22, 313:22, 316:9, 336:9, 351:6, 351:7, 352:2, 353:12, 374:8, 379:14, 382:14, 399:17, 427:10
**per** [6] - 287:9, 311:4, 338:24, 350:13, 350:17, 370:20
**perfect** [2] - 280:23, 313:13
**perform** [3] - 400:3, 404:16, 419:2
**performed** [2] - 418:3, 419:6
**performing** [1] - 405:25
**period** [15] - 283:24, 289:2, 296:14, 296:15, 301:6, 309:15, 332:10, 333:2, 342:6, 343:9, 351:4, 365:12, 368:7, 379:13, 384:20
**periods** [2] - 270:24, 394:22
**permanently** [1] - 367:15
**perpetrator** [1] - 420:11
**persist** [2] - 379:1, 379:5
**persisted** [1] - 384:20
**persists** [1] - 384:22
**person** [16] - 266:14, 280:1, 307:5, 334:10, 335:15, 362:20, 363:22, 379:22, 382:2, 386:12, 387:2, 393:17, 393:18, 394:19, 406:9, 414:8
**person's** [1] - 263:2
**personal** [7] - 266:4, 314:13, 314:21, 314:22, 382:13, 410:16, 414:7
**Personal** [1] - 268:16
**personally** [1] - 300:25
**perspective** [3] - 344:15, 399:21, 420:5
**persuade** [1] - 371:7
**PETERSON** [98] - 233:16, 237:23, 239:20, 240:1, 240:4, 240:8, 240:13, 240:14, 240:24, 241:1, 241:9, 241:13, 241:21, 241:23, 242:2, 242:6, 242:15, 247:18, 248:6, 248:10, 248:17, 248:20, 249:17, 249:20, 249:21, 250:15, 250:18, 250:19, 251:22, 251:25, 252:2, 252:16, 252:19, 252:20, 253:12, 253:15, 253:16, 258:1, 258:4, 258:5, 259:20, 259:23, 259:24, 265:19, 265:22, 265:23, 269:4, 269:7, 269:8, 270:16, 270:17, 271:23, 272:1, 272:2, 274:15, 275:1, 280:5, 280:13, 280:15, 280:18, 281:5, 312:19, 315:18, 315:21, 316:21, 340:2, 343:7, 344:21, 345:24, 346:9, 346:12, 346:15, 346:20, 346:25, 347:2, 347:11, 347:16, 347:19,

347:23, 357:6, 357:9, 378:9, 381:2, 381:8, 383:4, 383:7, 383:10, 385:10, 393:6, 393:20, 395:20, 396:2, 396:12, 396:20, 396:25, 429:20, 430:11, 433:2
**peterson** [1] - 232:16
**phase** [1] - 253:9
**phone** [10] - 244:23, 263:8, 265:2, 266:8, 266:21, 279:25, 303:20, 359:22, 361:24, 421:15
**phones** [1] - 283:12
**photo** [1] - 386:17
**photocopies** [1] - 255:24
**phrase** [3] - 243:25, 415:6, 424:10
**physical** [1] - 382:11
**pick** [2] - 307:22, 362:21
**picture** [2] - 238:7, 260:15
**pile** [1] - 336:3
**Pitzer** [1] - 283:1
**place** [9] - 234:24, 285:2, 285:5, 304:5, 305:8, 366:8, 404:6, 409:24, 419:20
**placed** [4] - 249:4, 253:17, 253:20, 407:3
**plain** [1] - 357:25
**Plaintiff** [5] - 231:4, 282:10, 302:7, 331:10, 348:18
**plaintiff** [23] - 281:6, 302:1, 315:17, 328:21, 328:23, 331:6, 347:3, 348:14, 370:12, 371:14, 423:6, 424:15, 424:18, 424:20, 425:3, 425:6, 425:11, 425:12, 425:18, 425:24, 428:9, 428:12, 429:7
**PLAINTIFF** [1] - 232:2
**plaintiff's** [19] - 320:15, 320:22, 321:1, 321:6, 323:13, 325:2, 325:20, 326:20, 326:23, 328:13, 329:19, 346:13, 346:16, 346:24, 399:19, 422:20, 424:25, 425:1, 425:17
**plaintiffs** [2] - 282:6, 433:10
**plan** [8] - 284:14, 290:13, 290:19, 291:24, 292:11, 292:16, 293:19, 422:12
**planned** [5] - 274:23, 274:24, 289:20, 307:6, 307:10
**planning** [3] - 288:8, 288:19, 306:17
**plans** [2] - 275:13, 286:15
**play** [2] - 312:6, 313:11
**played** [8] - 312:10, 312:14, 313:6, 313:15, 316:15, 316:19, 316:24, 317:3
**playing** [1] - 331:1
**plea** [2] - 392:6, 392:15
**plead** [1] - 365:20
**pleaded** [1] - 395:16
**pleas** [1] - 392:21
**pleasant** [1] - 315:5
**pled** [2] - 395:13, 395:15
**plenty** [3] - 379:20, 387:9, 433:9
**point** [24] - 262:23, 268:23, 284:17, 284:22, 291:9, 294:21, 297:10, 297:11, 301:4, 306:18, 308:20, 371:6, 376:15, 376:16, 376:24, 378:22,

392:18, 398:4, 407:6, 420:20, 422:12, 427:23, 429:23, 431:14
**points** [5] - 260:16, 261:7, 407:13, 407:14, 408:4
**police** [46] - 236:21, 238:22, 239:10, 244:13, 244:14, 246:25, 248:2, 257:1, 257:3, 334:8, 335:9, 336:8, 336:17, 336:18, 337:19, 342:13, 342:14, 342:16, 345:4, 345:8, 345:13, 358:14, 358:16, 359:22, 360:14, 361:15, 371:4, 371:5, 371:23, 373:25, 374:10, 374:20, 375:13, 380:18, 390:2, 390:7, 392:1, 393:14, 394:23, 395:2, 395:4, 395:8, 419:25, 420:10
**policies** [12] - 334:1, 339:21, 341:8, 352:15, 354:9, 378:19, 378:21, 378:24, 382:16, 385:12, 386:3, 419:20
**policy** [17] - 379:2, 386:4, 405:7, 405:16, 405:17, 409:6, 409:11, 411:5, 415:17, 416:4, 418:18, 418:23, 418:24, 420:9, 420:15, 420:16, 420:17
**pops** [1] - 391:7
**Portfolio** [2] - 251:10, 252:3
**portion** [3] - 248:12, 317:7, 348:6
**Portland** [10] - 231:6, 232:7, 232:10, 232:13, 232:18, 232:21, 285:2, 293:11, 306:20, 307:25
**position** [1] - 423:16
**possession** [5] - 358:14, 362:24, 364:21, 377:13, 389:9
**possibility** [1] - 367:25
**possible** [4] - 286:19, 288:17, 298:18, 330:20
**potentially** [1] - 284:6
**potty** [1] - 306:18
**practice** [1] - 314:9
**practices** [2] - 352:15, 352:22
**pre** [1] - 428:22
**pre-ACDV** [1] - 428:22
**precautionary** [1] - 421:5
**preceded** [1] - 425:19
**precedes** [2] - 361:5, 362:1
**precisely** [1] - 242:13
**precision** [1] - 243:21
**predominance** [1] - 331:22
**preface** [1] - 424:4
**prefers** [1] - 266:4
**preparation** [1] - 378:12
**prepared** [2] - 421:22, 431:25
**present** [3] - 427:1, 428:17, 431:15
**presented** [2] - 423:17, 427:16
**presenting** [1] - 424:1
**preserve** [1] - 432:24
**preserving** [1] - 424:2
**president** [1] - 332:11
**pretrial** [2] - 347:12, 422:23
**pretty** [7] - 236:22, 306:18, 337:20, 338:1, 346:7, 360:17, 370:8
**previous** [1] - 245:20
**previously** [6] - 233:12, 236:13, 247:4,

257:7, 395:13, 398:10
**primarily** [6] - 235:24, 245:19, 317:24, 331:22, 331:25, 340:19
**primary** [2] - 302:25, 303:12
**print** [3] - 243:15, 368:10, 412:11
**Privacy** [4] - 349:10, 349:13, 424:9, 424:10
**privacy** [7] - 349:11, 349:15, 349:16, 349:24, 350:3, 351:11, 425:4
**probability** [1] - 337:10
**problem** [14] - 297:24, 303:21, 308:11, 358:11, 373:19, 381:23, 382:8, 382:24, 384:12, 384:14, 384:20, 387:7, 387:8, 425:15
**problematic** [1] - 387:10
**problems** [6] - 279:25, 284:7, 344:20, 381:17, 390:17, 394:9
**procedure** [21] - 369:1, 369:22, 369:23, 379:2, 386:4, 404:15, 404:21, 405:18, 406:7, 406:14, 406:15, 406:17, 406:18, 406:20, 407:5, 407:9, 408:11, 411:5, 420:15, 420:16, 420:17
**procedures** [14] - 334:1, 338:9, 339:19, 339:21, 341:9, 352:16, 352:22, 379:7, 379:11, 381:1, 386:3, 416:4, 419:20, 419:22
**proceed** [4] - 233:9, 335:19, 357:18, 379:17
**proceeding** [1] - 314:17
**PROCEEDINGS** [1] - 231:15
**proceedings** [4] - 240:11, 276:18, 433:15, 434:5
**process** [21] - 235:3, 235:6, 293:23, 294:12, 318:6, 353:25, 355:4, 355:13, 369:14, 369:19, 394:4, 396:4, 401:8, 401:14, 401:16, 401:17, 401:18, 401:19, 402:2, 402:13, 406:24
**product** [3] - 335:8, 370:7, 377:15
**production** [2] - 338:23, 339:3
**productive** [1] - 279:24
**productivity** [1] - 339:7
**products** [1] - 401:7
**profession** [1] - 331:21
**professional** [1] - 349:4
**professionals** [1] - 349:10
**profit** [1] - 338:14
**program** [3] - 292:6, 310:15, 335:7
**programmer** [2] - 283:6, 373:19
**programs** [2] - 332:19, 334:20
**progressed** [1] - 284:22
**Progressive** [1] - 247:20
**prohibit** [2] - 339:20, 379:7
**project** [2] - 255:20, 255:24
**promise** [1] - 315:12
**proof** [1] - 427:1
**proper** [2] - 385:21, 431:18
**propose** [1] - 426:12
**proposed** [5] - 423:8, 424:21, 425:1, 425:9, 431:15
**protection** [1] - 314:17

**protective** [1] - 352:20
**proud** [1] - 289:9
**prove** [2] - 394:10, 394:11
**proven** [1] - 392:18
**provide** [8] - 352:13, 364:12, 394:10, 399:6, 400:4, 402:22, 419:2, 419:4
**provided** [9] - 237:17, 318:11, 328:24, 373:13, 374:21, 402:18, 402:24, 416:6, 416:7
**providing** [1] - 320:4
**psychology** [2] - 383:11, 383:12
**public** [3] - 314:18, 353:13, 354:4
**publicly** [2] - 314:19, 352:19
**publish** [12] - 248:17, 249:20, 250:18, 251:25, 252:19, 253:15, 258:4, 259:23, 265:22, 269:7, 272:1, 403:24
**published** [3] - 248:15, 351:17, 351:18
**pull** [3] - 339:8, 403:14, 403:19
**punting** [1] - 234:25
**purchased** [5] - 332:19, 363:8, 371:23, 371:24, 393:12
**purchases** [1] - 285:19
**purpose** [6] - 353:11, 356:8, 382:15, 408:1, 414:11
**purposes** [4] - 314:25, 394:18, 424:2, 424:8
**put** [12] - 307:11, 350:25, 357:9, 359:11, 363:16, 366:7, 366:22, 369:15, 384:10, 425:18, 428:25
**puts** [2] - 303:3, 303:5
**putting** [1] - 258:13

## Q

**qualified** [2] - 382:21, 383:5
**qualifier** [1] - 270:10
**qualify** [1] - 357:15
**quality** [1] - 398:17
**quantification** [1] - 384:9
**questions** [23] - 234:11, 274:4, 280:11, 281:5, 281:16, 301:17, 309:21, 311:22, 314:3, 314:4, 314:10, 330:8, 330:9, 330:11, 339:24, 340:3, 340:17, 344:21, 345:17, 356:14, 385:6, 393:20, 395:19
**quick** [6] - 233:18, 233:23, 236:22, 289:17, 304:16, 403:19
**quickly** [9] - 242:9, 242:17, 242:20, 243:1, 243:6, 277:24, 286:19, 290:14, 372:4
**quietly** [1] - 295:16
**quite** [1] - 310:20
**quota** [3] - 338:24, 339:3, 339:7

## R

**R-o-d-i-g-h-i-e-r-o** [1] - 282:15
**rabbits** [1] - 367:24
**radar** [1] - 350:9
**raise** [4] - 282:7, 337:3, 347:21, 348:15

**raised** [4] - 330:17, 427:6, 428:6, 428:7
**raising** [1] - 423:23
**range** [1] - 339:10
**rate** [2] - 369:15, 376:24
**rather** [2] - 266:5, 380:22
**re** [1] - 258:18
**reach** [3] - 395:3, 409:14, 431:12
**reached** [1] - 395:1
**reaching** [1] - 426:3
**read** [37] - 263:20, 263:25, 264:1, 264:5, 264:8, 277:14, 279:1, 291:2, 317:5, 317:6, 317:13, 324:15, 339:8, 339:13, 344:19, 348:8, 352:23, 361:8, 362:7, 362:15, 363:5, 363:14, 365:18, 407:11, 407:14, 411:19, 413:17, 415:5, 416:17, 416:24, 417:20, 419:15, 419:16, 421:6, 422:20, 423:20
**readily** [1] - 364:20
**Reading** [7] - 361:14, 362:18, 362:20, 363:7, 365:19, 411:25, 413:25
**reading** [8] - 300:9, 334:5, 423:13, 423:15, 423:17, 424:3, 426:16, 429:13
**reads** [1] - 418:7
**ready** [3] - 286:18, 303:5, 417:13
**real** [4] - 357:25, 381:11, 382:24, 428:21
**reality** [1] - 336:17
**Really** [1] - 351:20
**really** [27] - 255:17, 258:18, 258:19, 272:13, 278:5, 285:3, 288:5, 288:9, 290:14, 294:1, 295:16, 333:11, 335:21, 335:25, 336:21, 338:20, 342:22, 356:18, 358:1, 359:21, 359:25, 396:11, 423:24, 424:1, 424:2, 429:13, 430:23
**realm** [1] - 391:6
**reason** [23] - 238:9, 238:24, 239:11, 240:21, 241:24, 247:22, 249:15, 251:19, 252:14, 253:8, 258:23, 269:1, 272:23, 285:25, 297:23, 297:25, 332:14, 337:5, 338:13, 350:14, 364:11, 388:23, 420:4
**reasonable** [24] - 259:4, 342:20, 354:17, 356:17, 357:1, 357:15, 363:22, 369:23, 379:13, 379:18, 382:2, 382:13, 382:16, 382:18, 384:13, 384:18, 385:25, 386:1, 386:24, 389:19, 393:2, 393:5, 393:17, 396:10
**reasonably** [2] - 356:12, 425:22
**reasons** [2] - 289:15, 307:3
**rebuttal** [2] - 276:17, 430:12
**receipts** [1] - 254:7
**receive** [12] - 265:2, 265:6, 265:11, 369:2, 399:4, 400:17, 400:20, 400:21, 402:16, 403:9, 409:3, 424:24
**received** [47] - 240:6, 240:25, 241:12, 242:5, 244:4, 244:7, 248:9, 249:19, 250:17, 251:24, 252:18, 253:14, 256:13, 258:3, 259:22, 263:17, 263:19, 263:25, 265:8, 265:16, 265:17, 265:21, 269:6, 271:25,

314:12, 314:16, 329:22, 336:22, 343:8, 346:24, 359:6, 359:9, 359:18, 360:25, 366:9, 367:12, 376:11, 377:16, 389:1, 389:9, 394:23, 402:20, 404:8, 409:1, 410:9, 419:1, 425:16
**Received** [2] - 248:14, 365:19
**receives** [3] - 400:1, 406:21, 408:9
**receiving** [5] - 244:7, 244:20, 356:5, 374:12, 406:24
**recently** [1] - 277:12
**recess** [14] - 281:21, 281:25, 282:1, 313:17, 313:20, 313:24, 313:25, 315:22, 346:2, 347:24, 347:25, 422:1
**reckless** [1] - 423:15
**recognize** [9] - 237:15, 254:12, 265:13, 319:7, 360:22, 364:5, 366:5, 368:4, 405:13
**recognized** [4] - 349:22, 350:12, 350:18, 351:2
**recollection** [8] - 234:19, 255:16, 259:25, 260:9, 305:23, 388:15, 391:15, 419:8
**recommend** [3] - 343:13, 343:16, 355:15
**recommendations** [1] - 343:21
**reconvene** [5] - 233:3, 282:3, 315:24, 348:2, 422:2
**reconvened** [1] - 433:16
**record** [27] - 237:22, 274:18, 277:19, 277:20, 281:19, 302:3, 316:22, 317:4, 330:25, 334:9, 354:4, 359:4, 402:19, 402:22, 404:7, 406:1, 406:25, 410:23, 411:2, 411:15, 412:15, 413:6, 416:8, 422:7, 431:18, 432:25, 434:4
**records** [5] - 262:16, 278:9, 314:19, 353:13, 367:16
**recover** [4] - 424:15, 424:18, 425:6, 428:9
**recoverable** [1] - 427:17
**recovered** [1] - 285:8
**recovering** [2] - 285:6, 395:5
**Recovery** [1] - 249:10
**recovery** [3] - 284:24, 424:14, 425:21
**recross** [1] - 280:14
**RECROSS** [2] - 280:17, 396:1
**RECROSS-EXAMINATION** [2] - 280:17, 396:1
**red** [4] - 335:13, 337:3, 343:9, 391:7
**redacted** [8] - 314:14, 314:15, 314:17, 314:20, 314:23, 314:25, 315:2
**redirect** [7] - 274:6, 280:12, 301:18, 311:23, 311:24, 344:23, 393:23
**REDIRECT** [4] - 274:9, 281:9, 345:1, 394:1
**reel** [1] - 422:13
**refer** [3] - 236:2, 318:4, 388:12
**reference** [1] - 336:8
**referenced** [2] - 260:23, 367:13
**references** [2] - 272:6, 277:19
**referencing** [2] - 280:25, 371:15

**referring** [8] - 256:3, 256:6, 269:19, 299:13, 342:12, 359:13, 393:9, 393:10
**reflect** [3] - 256:23, 277:20, 328:20
**reflected** [1] - 395:5
**reflects** [1] - 353:5
**refresh** [1] - 252:12
**refusing** [1] - 378:24
**regarding** [13] - 238:1, 247:20, 249:13, 251:1, 251:10, 252:11, 253:7, 277:12, 277:19, 317:21, 318:8, 352:7, 431:21
**regards** [4] - 348:7, 348:9, 400:21, 408:19
**regime** [1] - 354:16
**regressed** [1] - 308:4
**regular** [1] - 293:17
**regularly** [2] - 268:1, 352:9
**rejected** [2] - 335:16, 382:7
**rejoin** [1] - 307:8
**relate** [2] - 340:22, 423:22
**related** [12] - 245:13, 245:14, 254:1, 255:19, 261:4, 265:24, 271:18, 278:10, 298:8, 299:12, 336:23, 390:16
**relating** [1] - 350:25
**relationship** [4] - 303:10, 307:1, 425:15, 428:11
**relative** [1] - 339:7
**release** [2] - 365:23, 372:6
**released** [1] - 363:11
**relevance** [9] - 275:1, 288:23, 293:15, 294:15, 303:18, 305:18, 357:2, 381:2, 381:8
**relevant** [22] - 270:21, 338:4, 351:18, 357:2, 359:16, 359:19, 363:14, 368:18, 371:1, 371:3, 371:13, 371:17, 371:20, 372:21, 373:14, 374:1, 374:16, 375:8, 375:14, 375:20, 389:14, 431:11
**relies** [1] - 318:24
**remainder** [1] - 405:7
**remaining** [2] - 315:18, 315:19
**remember** [47] - 234:18, 238:11, 238:14, 239:5, 240:20, 241:6, 242:13, 244:18, 246:4, 249:11, 250:10, 250:14, 251:14, 252:8, 252:13, 254:11, 255:20, 256:1, 257:15, 258:21, 260:8, 262:15, 268:12, 272:13, 278:2, 295:3, 296:7, 296:13, 298:4, 298:5, 298:11, 301:8, 341:11, 355:5, 360:8, 361:1, 376:3, 376:4, 376:7, 386:18, 386:21, 388:16, 388:18, 392:8, 416:25, 421:5
**remembering** [1] - 263:18
**remind** [1] - 411:11
**reminding** [1] - 360:9
**remote** [1] - 305:4
**removal** [1] - 277:21
**remove** [4] - 277:18, 318:21, 374:11, 426:10
**removed** [5] - 243:2, 243:7, 321:1, 326:18, 378:24

**rent** [4] - 275:14, 292:17, 292:19, 307:12
**rented** [2] - 305:7, 305:9
**repair** [2] - 343:12, 343:17
**reply** [1] - 400:7
**report** [98] - 236:19, 236:21, 238:22, 239:10, 243:2, 243:10, 243:11, 243:20, 246:25, 248:2, 248:12, 248:23, 248:25, 256:23, 257:1, 257:3, 258:13, 260:1, 268:14, 269:2, 270:9, 270:10, 274:12, 274:22, 275:6, 278:17, 279:6, 279:15, 289:3, 290:8, 291:25, 296:6, 297:14, 297:16, 298:8, 308:15, 319:13, 320:15, 320:17, 320:23, 321:2, 321:6, 323:13, 325:1, 325:2, 325:20, 326:20, 328:13, 328:14, 328:21, 328:23, 329:1, 336:8, 337:23, 342:13, 342:16, 345:4, 345:8, 349:14, 350:17, 351:1, 352:6, 353:3, 353:4, 353:16, 354:22, 354:24, 361:18, 367:24, 370:14, 372:7, 373:25, 374:10, 374:12, 375:13, 382:4, 383:13, 385:1, 390:2, 390:7, 390:10, 390:12, 390:16, 390:19, 391:6, 393:13, 394:23, 395:2, 395:8, 399:23, 418:7, 418:19, 419:1, 420:17, 425:4
**Reported** [2] - 268:17, 268:22
**reported** [8] - 278:25, 323:25, 327:10, 327:16, 328:6, 367:19, 370:16, 419:13
**Reporter** [1] - 434:13
**REPORTER** [3] - 232:19, 351:8, 392:25
**reporter** [5] - 281:19, 319:3, 348:5, 351:15, 421:5
**reporting** [62] - 257:13, 267:18, 268:1, 270:8, 299:24, 320:15, 321:5, 322:20, 323:13, 327:21, 328:8, 328:10, 330:21, 333:6, 349:5, 350:2, 350:4, 350:8, 350:9, 350:14, 350:15, 351:3, 352:4, 352:8, 352:16, 353:20, 353:22, 354:8, 355:3, 355:9, 355:11, 355:12, 355:24, 356:2, 356:6, 359:25, 360:1, 370:21, 378:2, 379:15, 381:12, 381:14, 383:3, 383:23, 393:12, 394:7, 395:7, 396:7, 399:7, 399:9, 399:10, 399:24, 400:5, 400:14, 402:18, 402:25, 403:6, 403:9, 408:14, 409:23, 416:6, 419:9
**Reporting** [3] - 349:11, 349:15, 350:21
**reports** [10] - 268:2, 298:2, 298:5, 354:6, 354:13, 358:16, 366:19, 367:9, 374:20, 396:8
**Reports** [2] - 349:10, 351:19
**represent** [1] - 388:23
**representation** [2] - 388:24, 388:25
**representing** [1] - 330:7
**reputation** [4] - 309:2, 424:25, 425:10, 425:13
**request** [12] - 262:15, 263:17, 263:21, 266:24, 272:7, 272:8, 314:20, 329:19, 380:4, 380:5, 387:23, 429:17

**requested** [1] - 328:21
**requesting** [3] - 262:21, 265:25, 386:11
**require** [2] - 420:17, 424:3
**requirement** [4] - 379:19, 379:25, 380:2, 418:24
**requirements** [1] - 394:13
**requires** [3] - 314:16, 344:4, 357:4
**rescheduled** [1] - 372:3
**research** [3] - 245:23, 294:14, 382:22
**researching** [1] - 295:4
**reserve** [2] - 346:22, 422:19
**Resolution** [1] - 412:12
**resolution** [1] - 344:8
**resolve** [3] - 307:13, 308:11, 427:24
**resolved** [5] - 242:9, 242:17, 242:20, 412:22, 412:24
**respect** [1] - 408:15
**respond** [20] - 262:13, 262:15, 266:21, 322:5, 322:6, 356:2, 400:6, 400:9, 400:11, 400:13, 401:4, 401:15, 408:6, 408:7, 408:14, 412:13, 417:13, 426:17, 427:3, 429:8
**responded** [15] - 277:24, 319:16, 323:21, 324:12, 325:9, 325:12, 326:3, 327:7, 328:3, 365:13, 387:3, 388:16, 390:5, 419:11, 419:12
**responder** [5] - 408:10, 414:4, 414:15, 415:17, 416:2
**responder's** [1] - 322:9
**responding** [7] - 266:24, 388:25, 389:3, 399:13, 401:2, 401:6, 410:11
**responds** [1] - 400:23
**response** [56] - 264:13, 267:13, 277:11, 318:20, 319:19, 319:22, 319:23, 320:3, 320:10, 320:14, 321:4, 322:7, 322:20, 323:3, 323:4, 323:8, 323:12, 323:22, 323:23, 324:22, 325:1, 325:9, 325:19, 326:4, 326:6, 326:10, 326:22, 327:7, 327:20, 328:3, 328:12, 336:25, 364:9, 365:3, 368:13, 368:14, 376:1, 377:9, 377:19, 380:4, 399:6, 400:4, 401:10, 402:23, 407:22, 412:3, 412:15, 413:2, 413:4, 413:7, 416:21, 417:12, 419:3, 420:5, 420:6
**responses** [8] - 280:9, 295:25, 389:14, 419:5, 425:19, 425:20, 425:24, 428:12
**responsibilities** [2] - 399:3, 399:4
**responsibility** [2] - 338:2, 356:17
**responsible** [4] - 277:17, 399:13, 416:5, 420:6
**rest** [3] - 352:18, 380:22, 401:23
**restore** [1] - 354:10
**rests** [1] - 396:22
**result** [9] - 286:15, 323:12, 327:20, 328:12, 334:20, 370:10, 384:3, 409:25, 425:22
**results** [1] - 319:13
**resume** [1] - 285:7
**retained** [4] - 332:24, 333:8, 340:4, 352:11

**retake** [1] - 233:6
**retakes** [1] - 233:8
**return** [4] - 274:23, 289:14, 289:20, 290:23
**returned** [7] - 290:24, 290:25, 291:11, 291:13, 291:23, 307:15, 307:18
**returning** [2] - 291:10, 293:10
**returns** [1] - 422:5
**revenue** [1] - 338:18
**review** [9] - 267:5, 352:20, 359:4, 372:20, 390:8, 403:12, 419:5, 419:19, 432:10
**Review** [1] - 407:12
**reviewed** [9] - 364:15, 372:16, 378:13, 386:3, 386:8, 387:16, 392:2, 407:22, 407:25
**reviewing** [4] - 251:18, 402:14, 405:19, 418:25
**revised** [1] - 254:23
**revision** [1] - 347:20
**rights** [1] - 355:1
**risk** [4] - 334:17, 334:21, 423:14
**risks** [1] - 379:10
**RMR** [2] - 232:19, 434:12
**road** [2] - 288:4, 290:18
**Robert** [3] - 232:11, 232:11, 232:15
**robust** [3] - 363:20, 366:18, 367:18
**rock** [1] - 336:21
**rocket** [1] - 337:20
**Rodighiero** [5] - 282:6, 282:14, 282:19, 296:19, 297:3
**RODIGHIERO** [1] - 282:9
**role** [5] - 340:14, 354:12, 354:14, 354:15, 398:16
**roles** [1] - 398:6
**room** [4] - 295:11, 295:15, 401:20, 401:21
**Room** [1] - 232:20
**roughly** [4] - 286:24, 290:23, 365:12, 402:3
**route** [3] - 373:19, 373:20, 375:18
**routes** [2] - 373:21, 384:16
**routine** [3] - 305:6, 305:7, 310:14
**rule** [1] - 314:15
**ruling** [1] - 422:19
**run** [1] - 292:15
**runs** [1] - 423:13

# S

**s-2(b** [1] - 422:24
**Sabido** [1] - 232:15
**sad** [3] - 308:22, 309:17
**sadly** [1] - 306:24
**safe** [2] - 286:20, 294:2
**sail** [2] - 290:19, 306:22
**sailboat** [2] - 255:7, 255:8
**sailed** [3] - 310:10, 310:11, 310:19
**sailing** [12] - 255:4, 284:10, 284:24,

285:7, 290:17, 292:20, 298:18, 307:20, 310:5, 310:8, 310:16, 334:10
**sailors** [2] - 284:12, 292:7
**sample** [1] - 373:1
**San** [2] - 233:24, 283:15
**sand** [1] - 232:2
**SAND** [57] - 282:6, 282:18, 285:15, 288:1, 288:18, 289:1, 290:15, 291:7, 292:22, 293:5, 293:22, 294:17, 296:20, 301:18, 301:21, 302:1, 302:16, 304:7, 305:20, 308:7, 309:13, 309:21, 311:24, 312:2, 315:15, 331:6, 331:20, 339:24, 344:24, 345:2, 345:17, 345:22, 346:14, 348:14, 349:2, 351:13, 357:19, 364:3, 364:4, 366:10, 366:21, 376:9, 376:10, 378:11, 381:5, 381:10, 383:14, 383:16, 385:6, 393:24, 394:2, 395:19, 396:14, 396:18, 422:3, 428:4, 433:7
**Sand** [1] - 232:2
**SAR** [1] - 372:7
**satisfaction** [1] - 394:21
**Satisfactory** [1] - 270:1
**satisfied** [1] - 394:13
**save** [1] - 426:19
**saving** [1] - 284:2
**saw** [18] - 299:16, 299:19, 299:20, 301:1, 305:25, 308:8, 308:12, 308:13, 311:9, 311:13, 311:16, 353:17, 365:4, 379:2, 398:10, 399:15, 420:16
**scan** [1] - 391:6
**scanning** [2] - 256:1, 256:5
**scarlet** [1] - 391:3
**schedule** [1] - 347:14
**scheduling** [1] - 429:14
**School** [1] - 293:18
**school** [12] - 283:7, 293:9, 293:11, 293:13, 293:17, 294:7, 303:5, 303:6, 310:15, 333:8, 333:10, 349:6
**science** [2] - 283:3, 337:20
**scoliosis** [1] - 284:21
**scope** [2] - 395:21, 423:22
**score** [3] - 352:5, 390:24, 391:8
**Scores** [1] - 351:19
**scores** [2] - 352:2, 352:3
**scoring** [7] - 352:1, 390:22, 391:3, 391:11, 391:14, 391:22
**screen** [10] - 233:19, 239:24, 240:15, 248:25, 312:21, 403:20, 403:21, 405:2, 412:11, 417:24
**screenshot** [5] - 248:12, 248:22, 250:5, 412:18
**SE** [1] - 232:3
**se** [1] - 350:17
**search** [1] - 343:19
**searching** [3] - 357:3, 358:12, 378:6
**season** [1] - 286:20
**seat** [6] - 302:10, 331:13, 348:21, 397:9, 421:10, 422:4
**seated** [3] - 233:5, 282:4, 315:25

**second** [24] - 233:19, 237:21, 238:4, 239:9, 239:16, 248:1, 248:11, 248:14, 248:21, 250:13, 251:18, 258:19, 272:6, 293:3, 314:11, 353:7, 364:19, 368:3, 373:22, 375:4, 403:19, 407:16, 428:2, 430:20

**seconds** [2] - 315:19, 315:20

**section** [3] - 264:16, 269:15, 354:5

**Security** [25] - 262:21, 263:18, 263:22, 266:24, 267:10, 268:20, 335:19, 335:23, 336:4, 349:25, 358:9, 358:25, 369:9, 370:1, 379:17, 379:25, 380:4, 380:5, 380:9, 380:11, 380:14, 386:10, 386:11, 386:15, 386:19

**see** [93] - 233:25, 236:11, 238:16, 238:22, 247:20, 248:13, 248:16, 248:23, 249:4, 250:13, 257:8, 258:16, 258:17, 259:7, 261:8, 261:16, 264:17, 266:6, 266:10, 266:14, 270:1, 271:19, 272:7, 278:18, 279:6, 279:10, 284:13, 295:21, 298:2, 299:11, 299:23, 300:14, 300:15, 300:16, 300:17, 307:23, 308:3, 308:16, 309:19, 311:4, 311:6, 315:5, 315:8, 319:19, 319:20, 319:23, 324:1, 328:17, 334:6, 352:23, 361:3, 362:11, 363:1, 363:3, 365:15, 368:12, 368:17, 369:6, 369:7, 369:8, 369:11, 369:15, 371:12, 371:17, 375:6, 376:22, 379:9, 387:7, 387:23, 391:7, 391:23, 403:11, 403:16, 403:21, 404:21, 406:3, 406:5, 408:4, 410:24, 411:4, 411:6, 412:22, 413:19, 416:18, 417:24, 418:7, 420:13, 421:7, 425:25, 426:3, 428:18, 429:22, 430:23

**seeing** [1] - 300:10

**seek** [6] - 274:11, 274:21, 275:4, 275:8, 275:21, 426:23

**seeking** [1] - 278:10

**seem** [2] - 256:24, 339:15

**sees** [1] - 408:10

**seizures** [1] - 310:13

**sell** [1] - 335:8

**Senate** [1] - 350:22

**send** [18] - 240:21, 244:15, 247:22, 251:20, 252:14, 253:8, 277:3, 296:6, 296:11, 299:24, 338:3, 338:4, 368:23, 371:7, 394:12, 399:6, 399:24, 432:19

**sending** [9] - 242:9, 247:8, 249:9, 272:11, 295:2, 297:22, 319:9, 366:16, 399:10

**sends** [1] - 368:20

**sense** [2] - 385:17, 422:19

**senseless** [1] - 382:4

**sent** [58] - 233:21, 237:9, 237:12, 238:20, 239:3, 243:8, 245:6, 246:8, 247:4, 248:25, 249:23, 250:25, 252:24, 252:25, 253:1, 257:12, 257:15, 259:14, 260:6, 260:7, 264:3, 267:4, 277:17, 296:9, 299:12, 299:22, 317:25, 318:7, 318:9, 321:15, 323:1,

323:3, 323:18, 324:9, 325:6, 325:25, 327:25, 364:9, 365:13, 366:24, 366:25, 372:8, 373:2, 373:10, 374:25, 377:6, 378:4, 390:1, 394:23, 407:21, 410:8, 414:1, 414:2, 414:4, 414:14, 414:18, 414:22, 415:1

**sentencing** [2] - 365:20, 372:3

**separate** [4] - 292:17, 401:6, 424:23, 425:11

**separately** [2] - 264:3, 425:9

**September** [1] - 349:9

**sequence** [1] - 334:7

**series** [1] - 319:2

**serious** [3] - 284:7, 384:2, 384:4

**served** [4] - 332:5, 349:24, 351:4, 351:5

**serves** [1] - 366:17

**Service** [1] - 271:19

**Services** [9] - 249:10, 265:25, 266:4, 317:12, 350:23, 366:17, 367:1, 372:8, 373:11

**SERVICES** [1] - 231:6

**services** [3] - 331:23, 331:24, 397:24

**serving** [2] - 352:7, 352:13

**set** [15] - 333:20, 335:13, 355:4, 388:12, 388:13, 389:1, 389:4, 389:6, 389:14, 390:5, 390:6, 414:22, 415:19, 421:19, 433:12

**sets** [1] - 303:3

**settlements** [1] - 338:20

**seven** [1] - 255:10

**seventeen** [1] - 295:20

**several** [11] - 245:10, 259:10, 261:10, 285:4, 300:4, 333:16, 351:18, 373:23, 374:25, 381:17, 422:11

**severe** [1] - 384:22

**severity** [3] - 383:2, 383:22, 384:5

**shadow** [1] - 402:1

**shadowing** [1] - 401:24

**shape** [1] - 266:16

**shares** [1] - 283:16

**sheriff's** [2] - 236:19, 236:21

**shock** [2] - 244:18, 244:21

**short** [6] - 288:4, 290:22, 306:24, 307:2, 307:3, 338:9

**shorter** [1] - 234:15

**shorthand** [3] - 413:12, 413:15, 414:15

**show** [17] - 268:3, 268:4, 268:7, 268:10, 271:4, 294:2, 360:21, 363:24, 365:9, 366:4, 371:10, 373:4, 374:23, 376:12, 388:20, 392:10, 395:11

**showed** [3] - 298:10, 376:19, 392:7

**showers** [1] - 303:2, 306:6

**showing** [14] - 239:18, 239:19, 256:23, 260:1, 269:22, 297:14, 350:9, 353:10, 360:12, 366:6, 367:8, 374:23, 376:17, 382:17

**shown** [10] - 256:18, 270:3, 320:1, 320:3, 322:12, 323:6, 369:12, 370:16, 384:1, 384:2

**shows** [12] - 246:20, 256:18, 264:19,

267:16, 270:11, 270:12, 270:18, 322:7, 353:6, 366:24, 375:14, 385:4

**side** [5] - 306:6, 315:10, 343:2, 401:24

**side-by-side** [1] - 401:24

**sign** [2] - 235:16, 352:19

**signature** [13] - 235:13, 236:9, 238:5, 246:20, 251:19, 256:18, 266:10, 266:13, 266:18, 434:6, 434:7

**signed** [2] - 266:15, 434:7

**significant** [2] - 384:4, 384:11

**signing** [1] - 434:3

**signs** [1] - 335:14

**similar** [3] - 248:25, 249:22, 343:13

**similarly** [1] - 314:23

**simple** [1] - 337:20

**simply** [3] - 329:6, 338:16, 427:20

**single** [3] - 244:15, 276:13, 416:9

**sit** [3] - 243:19, 258:23, 267:6

**sits** [1] - 303:2

**sitting** [3] - 281:24, 295:15, 360:16

**situation** [7] - 244:5, 338:21, 345:12, 379:21, 387:13, 408:24, 416:3

**situations** [1] - 352:25

**six** [8] - 237:10, 243:7, 247:8, 284:24, 287:1, 308:2, 313:12, 339:12

**six-day** [1] - 308:2

**Skype** [1] - 307:20

**sleeping** [8] - 273:23, 274:2, 295:13, 296:16, 305:24, 308:9, 309:16

**sleeplessness** [2] - 296:16, 382:11

**slippery** [1] - 340:17

**slope** [1] - 340:17

**slow** [2] - 351:8, 351:15

**slowed** [2] - 235:3, 235:6

**slowly** [1] - 346:7

**small** [4] - 286:14, 347:20, 413:21, 413:22

**Smith** [1] - 232:16, 422:8

**SMITH** [18] - 422:7, 422:10, 422:18, 426:4, 426:10, 426:15, 428:5, 428:17, 428:20, 429:3, 429:9, 429:11, 431:14, 431:24, 432:4, 432:9, 432:16, 433:1

**snowballing** [1] - 352:12

**Social** [25] - 262:21, 263:18, 263:22, 266:24, 267:10, 268:19, 335:19, 335:23, 336:4, 349:25, 358:8, 358:25, 369:9, 370:1, 379:17, 379:25, 380:4, 380:5, 380:9, 380:11, 380:14, 386:10, 386:11, 386:15, 386:19

**software** [1] - 283:9

**SOLA** [67] - 237:17, 241:11, 242:4, 242:10, 248:8, 249:18, 250:16, 251:23, 252:17, 253:13, 258:2, 259:21, 265:20, 269:5, 271:24, 274:7, 274:10, 274:19, 275:3, 276:17, 276:19, 279:10, 279:11, 280:7, 280:11, 281:7, 281:10, 281:16, 312:6, 312:11, 312:15, 312:20, 313:3, 313:7, 313:10, 313:12, 316:2, 316:12, 316:16, 316:20, 316:25, 317:5, 317:9,

317:17, 330:2, 330:24, 347:4, 347:10, 347:20, 396:22, 404:6, 410:15, 410:21, 411:1, 414:7, 426:19, 427:8, 427:15, 428:1, 428:21, 429:14, 430:13, 430:19, 431:2, 431:6, 432:17, 433:4
**Sola** [9] - 232:11, 243:23, 253:25, 255:1, 264:12, 330:9, 422:3, 422:5, 430:16
**sola** [1] - 232:11
**sold** [1] - 283:16
**solid** [1] - 336:21
**solution** [1] - 428:22
**solve** [1] - 279:24
**solved** [1] - 384:14
**solving** [1] - 373:19
**someone** [2] - 286:10, 360:24
**sometime** [1] - 429:22
**sometimes** [10] - 251:14, 268:5, 270:7, 280:1, 285:18, 295:14, 343:16, 343:18, 350:3, 380:5
**somewhere** [1] - 237:9
**son** [7] - 302:19, 303:13, 309:19, 311:4, 311:9, 311:13, 311:17
**soon** [1] - 298:18
**sorry** [40] - 234:14, 234:16, 235:2, 235:12, 236:10, 237:14, 241:21, 243:5, 255:12, 258:9, 260:20, 269:17, 270:10, 270:13, 270:14, 270:16, 271:3, 277:4, 280:14, 290:5, 297:6, 297:10, 301:13, 304:1, 304:24, 308:18, 309:12, 322:11, 333:25, 364:13, 366:11, 376:17, 383:6, 386:7, 387:18, 409:18, 413:23, 419:12, 428:5
**sort** [8] - 254:23, 255:5, 300:17, 382:20, 389:20, 422:13, 423:7, 423:21
**sorts** [1] - 336:16
**sounds** [4] - 329:15, 351:14, 392:1, 410:17
**source** [2] - 335:11, 363:17
**South** [7] - 235:4, 304:4, 304:11, 304:12, 304:20, 338:3, 375:15
**southern** [1] - 290:18
**Southern** [1] - 335:9
**space** [2] - 307:12, 315:14
**speaking** [8] - 242:23, 254:15, 277:4, 341:17, 388:12, 399:21, 404:13, 413:14
**speaks** [1] - 324:20
**special** [4] - 293:13, 293:14, 293:18, 383:10
**specialists** [1] - 349:18
**specialized** [4] - 349:9, 349:19, 352:14, 352:21
**specific** [5] - 250:5, 254:14, 266:5, 352:25, 357:13
**specifically** [5] - 246:4, 251:17, 298:6, 344:13, 402:11
**speculation** [1] - 290:10
**Speedy** [1] - 249:14
**spell** [5] - 282:13, 302:11, 331:14,

348:22, 397:10
**spelled** [1] - 331:16
**spend** [8] - 284:4, 287:15, 290:17, 294:4, 308:23, 309:9, 380:22, 384:7
**spending** [5] - 287:9, 292:16, 305:21, 305:23, 308:10
**spent** [7] - 284:12, 295:11, 373:5, 384:11, 388:9, 425:2, 425:3
**spinal** [1] - 284:22
**spoken** [5] - 335:9, 336:17, 337:19, 342:14, 414:9
**Sponer** [47] - 233:6, 233:17, 235:14, 237:24, 240:15, 241:2, 243:22, 248:11, 248:21, 270:21, 274:4, 274:11, 277:12, 280:19, 282:20, 297:12, 302:18, 314:13, 314:21, 321:20, 327:18, 335:18, 336:13, 343:24, 345:5, 356:20, 359:6, 360:5, 360:8, 363:23, 364:22, 370:13, 372:24, 373:13, 373:23, 374:25, 375:5, 377:6, 381:12, 384:10, 384:15, 389:25, 394:22, 394:23, 395:7, 396:22, 410:8
**SPONER** [2] - 231:3, 233:11
**Sponer's** [22] - 336:4, 336:23, 337:21, 357:22, 359:16, 361:5, 362:1, 363:14, 368:3, 371:8, 372:18, 374:12, 374:16, 374:24, 377:25, 379:17, 380:14, 385:1, 386:9, 390:10, 392:19, 393:12
**SSN** [1] - 361:19
**stairs** [1] - 331:7
**stamps** [1] - 375:17
**stand** [6] - 233:6, 233:8, 306:4, 421:13
**standard** [10] - 333:15, 333:22, 354:6, 354:8, 354:20, 392:22, 393:1, 393:3, 393:9, 396:10
**standards** [4] - 333:5, 333:11, 334:25, 336:11, 338:10, 354:7, 357:14, 366:15
**standing** [1] - 360:5
**start** [10] - 281:15, 287:8, 292:11, 310:15, 353:1, 371:18, 385:11, 396:25, 421:3, 421:21
**started** [11] - 254:20, 283:7, 283:11, 284:15, 332:4, 332:7, 333:12, 349:13, 352:9, 397:2, 410:12
**starting** [3] - 236:3, 246:7, 255:13, 256:12, 256:25, 289:21, 292:2, 428:23
**starts** [10] - 236:25, 239:8, 248:1, 256:9, 256:16, 257:7, 258:15, 361:10, 361:24, 401:12
**startup** [2] - 283:14, 283:16
**state** [8] - 282:13, 302:10, 317:18, 331:13, 348:21, 357:17, 397:9, 406:4
**statement** [2] - 243:4, 392:14
**statements** [1] - 239:7
**States** [4] - 232:20, 255:3, 297:4, 349:17
**STATES** [2] - 231:1, 231:17
**states** [1] - 365:20
**status** [6] - 377:4, 377:5, 391:19, 391:23, 407:3, 416:19

**statuses** [1] - 385:3
**statute** [1] - 423:15
**stay** [5] - 285:3, 285:5, 289:17, 289:18, 306:10
**stayed** [2] - 306:12, 308:1
**steal** [1] - 336:7
**steals** [1] - 350:16
**stemming** [1] - 382:23
**step** [18] - 234:21, 274:17, 281:17, 301:19, 311:25, 331:4, 337:12, 345:18, 345:25, 346:5, 388:6, 396:15, 409:16, 409:17, 409:19, 409:21, 421:11, 421:15
**steps** [4] - 234:22, 235:2, 356:15, 367:19
**stick** [2] - 288:17, 350:11
**still** [25] - 233:7, 250:9, 257:17, 257:19, 257:20, 259:1, 260:1, 269:22, 272:11, 290:21, 291:3, 294:18, 297:14, 298:21, 308:14, 308:19, 330:10, 347:14, 347:17, 352:10, 380:7, 408:7, 421:6, 421:20, 427:14
**stole** [2] - 363:9, 371:25
**stolen** [1] - 392:19
**stop** [9] - 279:10, 298:25, 299:3, 303:24, 330:21, 334:12, 376:7, 420:23, 421:1
**stopped** [2] - 234:2, 299:1
**store** [2] - 240:19, 251:12
**stories** [2] - 348:10, 382:10
**story** [1] - 348:7
**straps** [1] - 303:6
**streamline** [2] - 365:6, 374:4
**streamlined** [1] - 429:21
**Street** [2] - 232:6, 361:24
**strengthening** [1] - 350:20
**stress** [4] - 273:11, 296:14, 309:15, 425:19
**strictly** [1] - 391:22
**strike** [1] - 378:9
**stronger** [1] - 350:25
**strongest** [3] - 355:1, 355:2, 380:7
**student** [2] - 289:10, 397:24
**students** [1] - 333:10
**studies** [1] - 350:9
**stuff** [3] - 235:9, 256:1, 382:17
**stunning** [1] - 379:9
**submit** [4] - 335:18, 409:23, 431:17, 432:7
**submitted** [8] - 272:7, 321:4, 375:5, 410:6, 413:1, 431:1, 431:5, 432:6
**submitting** [1] - 431:22
**subscriber** [2] - 328:24, 329:5
**subscribers** [1] - 328:21
**subsection** [2] - 423:1, 428:6
**subsections** [2] - 422:24
**substance** [2] - 383:25, 384:24
**substandard** [1] - 380:25
**substantially** [1] - 423:14
**subsume** [1] - 288:20

**subsumed** [1] - 425:8
**suddenly** [3] - 283:16, 285:19, 286:21
**sufficient** [2] - 393:10, 427:1
**suggest** [1] - 416:15
**suggested** [1] - 347:21
**suggests** [1] - 409:2
**Suite** [4] - 232:3, 232:6, 232:9, 232:12
**summarize** [3] - 361:9, 406:20, 407:24
**summary** [7] - 401:9, 426:21, 427:4, 427:6, 427:9, 427:11, 427:13
**summer** [2] - 284:18, 293:8
**sums** [1] - 382:20
**super** [1] - 290:19
**superficial** [3] - 356:22, 359:2, 378:4
**supervisor** [2] - 339:9, 339:14
**supplemental** [3] - 404:2, 422:25, 423:18
**support** [2] - 345:15, 426:22
**supportable** [1] - 427:23
**supposed** [9] - 318:13, 319:13, 354:19, 356:7, 356:8, 356:9, 356:11, 361:2, 382:14
**Supreme** [2] - 424:8, 424:11
**surgery** [8] - 284:23, 285:6, 292:14, 306:21, 310:4, 310:7, 310:12, 310:17
**surprise** [1] - 257:11
**surprised** [1] - 308:3
**survey** [2] - 351:10, 351:12
**suspect** [5] - 361:16, 365:20, 365:21, 395:15, 395:16
**suspected** [2] - 360:23, 420:1
**suspicious** [1] - 372:7
**sustained** [13] - 280:6, 287:19, 287:21, 288:24, 291:6, 293:4, 294:16, 305:19, 308:6, 309:11, 381:3, 381:9, 425:21
**swear** [1] - 302:4
**swell** [1] - 316:8
**swimming** [1] - 426:11
**sworn** [6] - 233:13, 282:11, 302:8, 331:11, 348:19, 397:7
**symptoms** [3] - 296:13, 309:14, 382:11
**System** [2] - 351:20, 412:12
**system** [19] - 239:23, 352:1, 352:4, 355:14, 360:6, 360:25, 368:21, 391:23, 402:19, 402:22, 406:1, 406:25, 410:23, 410:24, 411:2, 411:15, 412:12, 416:8, 420:14
**systematic** [2] - 358:3, 381:15
**systems** [3] - 333:20, 334:2, 366:7

---

**T**

**T-a-r-t-e-r** [1] - 331:17
**table** [3] - 256:2, 303:2, 315:12
**tables** [2] - 256:1, 315:10
**tackle** [1] - 287:8
**tally** [1] - 315:15
**tape** [1] - 313:7
**Tarter** [10] - 331:6, 331:16, 331:21, 332:16, 340:3, 342:15, 342:25, 346:5,

358:20, 363:16
**TARTER** [1] - 331:9
**tax** [1] - 353:14
**teachers** [3] - 293:20, 294:2, 294:4
**team** [37] - 362:18, 399:12, 400:3, 400:23, 400:24, 401:10, 401:12, 401:23, 401:25, 402:13, 402:16, 403:7, 405:19, 406:2, 406:4, 406:21, 406:25, 407:2, 407:6, 407:25, 408:4, 408:20, 408:21, 409:6, 409:15, 409:22, 410:11, 411:4, 412:4, 412:13, 413:15, 416:4, 420:6, 420:7, 420:13, 420:21
**teams** [1] - 401:6
**telephone** [3] - 266:5, 279:19, 305:4
**template** [4] - 299:24, 300:20, 300:21
**ten** [1] - 234:17
**tension** [1] - 424:6
**term** [4] - 309:5, 333:13, 336:2, 355:20
**terminal** [1] - 328:17
**terminology** [1] - 353:2
**terms** [3] - 303:21, 367:17, 369:22, 384:4, 392:22
**testified** [41] - 235:23, 237:4, 243:24, 244:1, 244:10, 244:17, 245:18, 255:5, 262:12, 262:23, 263:15, 263:16, 263:24, 264:23, 272:15, 272:23, 273:14, 273:23, 280:19, 280:22, 297:3, 298:12, 298:14, 310:3, 311:8, 340:4, 340:10, 340:13, 340:25, 341:11, 341:14, 341:19, 342:3, 343:24, 344:7, 350:22, 388:13, 389:25, 393:7, 420:20
**testifies** [6] - 233:13, 282:11, 302:8, 331:11, 348:19, 397:7
**testify** [7] - 260:2, 317:20, 338:22, 338:23, 350:1, 378:12, 383:5
**testifying** [3] - 264:6, 340:12, 350:19
**testimony** [31] - 242:7, 244:11, 244:18, 254:6, 254:24, 300:23, 310:5, 317:13, 341:12, 341:16, 341:24, 343:10, 344:1, 344:9, 345:5, 348:6, 352:24, 359:5, 368:25, 372:17, 378:16, 378:19, 387:6, 388:9, 398:10, 398:19, 399:15, 400:16, 404:19, 416:11, 419:16
**testing** [2] - 289:21, 402:6
**text** [2] - 413:9, 417:20
**THE** [218] - 231:1, 231:2, 231:16, 232:2, 232:14, 233:4, 233:9, 237:19, 237:20, 239:16, 239:23, 240:3, 240:6, 240:10, 240:12, 240:25, 241:10, 241:12, 241:20, 242:3, 242:5, 242:12, 242:13, 247:15, 248:7, 248:9, 248:14, 249:19, 250:17, 251:24, 252:18, 253:14, 258:3, 259:22, 265:21, 269:6, 270:15, 271:25, 274:6, 274:17, 275:2, 280:6, 280:12, 280:14, 281:6, 281:17, 281:20, 282:4, 282:7, 282:13, 282:14, 285:14, 287:19, 287:20, 287:21,

287:23, 288:13, 288:15, 288:24, 290:11, 290:13, 291:5, 291:6, 292:4, 292:6, 293:3, 293:16, 293:17, 294:16, 296:21, 301:19, 301:22, 301:24, 302:2, 302:4, 302:10, 302:12, 303:19, 303:20, 303:24, 304:1, 304:2, 304:4, 305:19, 308:6, 309:11, 309:12, 309:22, 311:23, 311:25, 312:4, 312:18, 312:25, 313:9, 313:11, 313:13, 313:16, 315:8, 315:17, 315:19, 315:25, 316:5, 317:8, 330:25, 331:4, 331:7, 331:13, 331:15, 339:25, 342:25, 343:4, 343:5, 344:23, 345:18, 345:19, 345:20, 345:23, 345:25, 346:6, 346:8, 346:11, 346:18, 346:22, 347:1, 347:3, 347:6, 347:15, 347:17, 347:24, 348:3, 348:15, 348:21, 348:23, 351:8, 351:9, 357:8, 357:11, 357:18, 364:2, 366:9, 366:11, 366:12, 366:13, 376:8, 378:10, 381:3, 381:4, 381:9, 383:6, 383:9, 383:12, 383:15, 385:7, 392:25, 393:1, 393:22, 393:23, 395:23, 396:13, 396:15, 396:16, 396:17, 396:19, 396:21, 396:23, 397:2, 397:9, 397:11, 403:21, 403:22, 403:23, 404:1, 404:4, 404:8, 405:2, 405:4, 410:17, 410:23, 411:3, 411:7, 414:10, 420:23, 421:10, 421:12, 421:14, 422:4, 422:6, 422:9, 422:15, 425:25, 426:7, 426:13, 426:16, 427:5, 427:10, 427:18, 428:15, 428:19, 429:5, 429:10, 429:12, 429:18, 429:24, 430:12, 430:16, 430:25, 431:4, 431:8, 431:20, 432:1, 432:5, 432:11, 432:18, 432:21, 432:22, 433:3, 433:5, 433:9
**theft** [86] - 234:9, 234:13, 236:4, 238:21, 239:9, 244:5, 245:14, 246:16, 248:1, 256:17, 256:22, 275:25, 277:25, 286:8, 286:11, 286:13, 286:16, 287:8, 287:10, 289:5, 291:13, 295:3, 297:24, 298:9, 300:18, 303:14, 303:22, 305:10, 305:12, 332:22, 335:1, 335:22, 336:18, 336:23, 338:25, 339:20, 344:4, 350:6, 350:7, 350:8, 350:12, 350:22, 352:8, 356:20, 358:8, 359:7, 361:10, 361:14, 363:21, 364:23, 369:3, 369:24, 370:5, 370:7, 371:14, 371:21, 372:9, 372:11, 372:12, 373:24, 374:2, 374:8, 374:9, 375:12, 377:15, 378:25, 379:3, 379:8, 379:11, 379:21, 381:12, 381:13, 381:14, 385:21, 386:5, 393:19, 400:17, 402:12, 402:14, 405:20, 408:10, 408:25, 415:2, 420:1, 420:11
**therefore** [3] - 364:23, 386:24, 423:19
**they've** [5] - 314:25, 394:13, 407:25, 409:15, 415:24
**thief** [13] - 300:3, 335:22, 336:5, 336:9, 336:19, 337:19, 350:16, 358:8, 363:22, 369:25, 371:16, 380:15,

395:13
**thinking** [2] - 292:13, 292:16
**third** [8] - 258:14, 326:25, 334:18, 353:9, 367:20, 375:4, 428:1, 428:3
**Third** [1] - 232:20
**THOMAS** [1] - 331:9
**Thomas** [1] - 331:16
**thorough** [3] - 334:4, 373:17
**thoughts** [1] - 414:8
**threat** [3] - 350:15, 370:21, 381:16
**threatened** [1] - 299:3
**three** [16] - 250:23, 257:21, 268:4, 287:11, 311:6, 349:12, 351:22, 352:17, 353:5, 353:20, 365:3, 370:15, 384:21, 392:8, 401:13, 423:23
**three-week** [1] - 401:13
**throughout** [2] - 365:8, 382:9
**throw** [1] - 294:7
**Thursday** [1] - 429:16
**tickets** [1] - 304:16
**tied** [2] - 350:14, 425:23
**tighter** [1] - 314:7
**Tim** [1] - 330:6
**timeline** [3] - 243:5, 250:10, 258:21
**timely** [2] - 333:18, 333:21
**timing** [1] - 342:9
**Timothy** [1] - 232:15
**title** [2] - 318:3, 398:4
**titled** [1] - 434:5
**today** [13] - 243:19, 244:11, 258:24, 267:6, 280:20, 339:11, 347:13, 351:19, 357:20, 368:25, 378:12, 378:16, 398:13
**together** [5] - 282:23, 283:11, 290:1, 351:23, 366:22
**toilet** [1] - 306:7
**toileting** [1] - 303:7
**Tom** [1] - 331:6
**tomorrow** [8] - 348:10, 421:4, 421:7, 429:19, 430:10, 430:18, 432:12, 432:14
**ton** [1] - 412:9
**tonight** [1] - 422:14
**took** [19] - 234:12, 235:20, 243:9, 250:22, 255:18, 257:21, 259:10, 267:2, 267:6, 283:14, 286:24, 287:2, 288:4, 289:2, 307:11, 392:5, 392:7, 392:13, 432:1
**top** [5] - 258:18, 268:16, 278:3, 353:6, 369:6
**topics** [1] - 317:21
**total** [1] - 236:3
**totally** [5] - 296:8, 310:13, 378:2, 401:6
**touch** [4] - 307:17, 307:19, 405:2, 405:3
**towards** [4] - 268:16, 271:8, 278:11, 413:9
**track** [1] - 342:22
**trade** [4] - 353:9, 353:24, 400:14, 409:21
**trained** [2] - 306:19, 401:10

**training** [11] - 373:18, 383:11, 401:13, 401:16, 401:17, 401:19, 401:21, 402:1, 402:4, 402:5
**transactional** [1] - 375:22
**transactions** [1] - 360:12
**transcript** [2] - 434:4, 434:6
**TRANSCRIPT** [1] - 231:15
**transcripts** [1] - 378:13
**transferred** [1] - 349:7
**translating** [1] - 414:10
**transmission** [1] - 399:10
**transmit** [1] - 400:4
**transmits** [1] - 412:14
**TransUnion** [12] - 243:18, 267:22, 268:10, 271:18, 272:8, 350:9, 358:18, 366:15, 366:19, 366:23, 367:7, 367:11
**traveled** [1] - 285:17
**traveling** [6] - 274:24, 281:13, 281:14, 287:16, 289:23, 307:7
**trial** [10] - 314:2, 315:1, 333:14, 347:8, 365:22, 404:3, 426:8, 427:25, 428:25, 430:21
**TRIAL** [1] - 231:14
**trials** [1] - 340:7
**tried** [4] - 301:14, 365:6, 373:21, 424:20
**tries** [1] - 303:3
**triggered** [2] - 423:1, 423:3
**trip** [28] - 283:23, 283:25, 284:10, 285:7, 285:10, 285:24, 289:17, 290:1, 290:18, 292:20, 293:10, 304:18, 304:19, 304:21, 306:16, 306:24, 307:2, 307:3, 308:2, 310:5, 310:6, 310:9, 310:11, 310:21, 310:25, 311:1
**trips** [4] - 284:13, 288:4, 288:8, 290:22
**trouble** [4] - 250:9, 268:15, 273:23, 274:2
**troubled** [2] - 332:11, 332:13
**true** [16] - 237:8, 243:20, 245:19, 268:9, 321:23, 330:15, 343:12, 344:3, 364:11, 368:15, 370:6, 376:22, 385:15, 390:24, 391:2, 396:5
**truth** [2] - 340:18, 375:25
**try** [8] - 338:16, 338:20, 365:23, 373:20, 381:23, 382:4, 386:14, 413:23
**trying** [15] - 308:10, 308:14, 320:25, 342:21, 354:10, 361:1, 373:21, 374:4, 375:18, 375:19, 384:11, 384:15, 389:15, 407:8, 414:5
**Tuesday** [1] - 365:25
**Tugashov** [5] - 362:13, 362:20, 363:7, 365:19, 371:16
**turn** [18] - 235:11, 236:8, 254:12, 260:11, 260:22, 261:6, 265:13, 269:25, 321:8, 323:16, 325:4, 325:23, 327:3, 329:16, 357:4, 362:5, 407:18
**turned** [1] - 314:9
**turning** [4] - 261:14, 261:18, 402:11, 405:10
**two** [30] - 270:3, 283:19, 288:4, 289:15, 302:21, 306:13, 306:14, 314:1,

320:19, 321:11, 326:18, 332:11, 349:7, 351:4, 351:9, 351:22, 355:21, 362:12, 364:1, 366:5, 370:18, 374:9, 385:15, 392:9, 401:17, 417:4, 427:19, 427:23, 432:4, 432:5
**type** [8] - 239:22, 244:7, 260:24, 361:10, 369:15, 376:24, 400:16, 402:11
**types** [2] - 260:13, 400:19
**typically** [4] - 288:21, 353:5, 400:9, 402:8

## U

**U.S** [9] - 289:14, 290:23, 290:25, 291:10, 291:23, 292:10, 307:15, 307:18, 349:25
**ultimately** [1] - 273:2
**unacceptable** [2] - 356:23, 359:1
**under** [12] - 233:7, 308:9, 308:25, 309:17, 330:10, 379:2, 391:16, 393:3, 393:18, 407:17, 410:25, 413:9
**underfund** [1] - 344:8
**understandable** [5] - 243:24, 244:2, 244:8, 244:11, 244:15
**understood** [2] - 320:10, 396:3
**underway** [2] - 408:11, 417:13
**underwriters** [1] - 391:5
**underwriting** [2] - 337:17, 391:4
**unfortunately** [2] - 372:22, 411:18
**unfriendly** [1] - 316:4
**Union** [1] - 332:6
**unions** [1] - 341:7
**unit** [7] - 275:9, 292:17, 292:25, 362:21, 362:24, 363:8, 363:10
**United** [4] - 232:20, 255:3, 297:4, 349:17
**UNITED** [2] - 231:1, 231:17
**universe** [1] - 429:22
**University** [1] - 349:7
**University's** [2] - 333:8, 333:9
**unless** [1] - 346:12
**unpack** [1] - 380:3
**unreasonable** [4] - 369:25, 385:21, 388:6, 423:19
**unrelated** [3] - 324:16, 325:13, 326:7
**untrue** [1] - 258:24
**unusual** [5] - 295:21, 309:19, 339:11, 360:23, 361:8
**up** [52] - 233:19, 234:20, 239:18, 239:19, 240:3, 240:12, 262:8, 263:16, 266:1, 266:5, 269:22, 285:2, 285:5, 290:20, 292:11, 292:23, 292:24, 303:1, 303:3, 303:8, 305:24, 305:25, 306:2, 306:5, 306:6, 306:22, 307:22, 339:8, 346:18, 347:8, 350:11, 355:4, 357:4, 359:11, 362:21, 367:8, 378:7, 382:21, 385:4, 387:25, 391:7, 392:8, 395:22, 399:23, 402:6, 403:5, 403:14, 403:19, 404:18, 411:16, 420:24, 427:12

**upcoming** [1] - 363:14
**update** [1] - 256:22
**updated** [3] - 324:16, 325:13, 326:7
**upper** [1] - 292:19
**upset** [1] - 296:8
**uses** [2] - 356:1, 412:13
**usual** [1] - 425:1

## V

**vacation** [2] - 290:9, 306:15
**vacations** [1] - 290:22
**valuable** [1] - 339:10
**van** [3] - 288:5, 288:6
**various** [3] - 262:10, 270:8, 357:12
**vary** [1] - 245:16
**Vegas** [3] - 304:9, 304:10, 308:17
**vehicle** [3] - 334:19, 362:19, 372:6
**vendors** [1] - 354:3
**Vergeer** [1] - 232:17
**Verification** [1] - 317:25
**Verified** [1] - 413:25
**verified** [7] - 323:25, 327:10, 327:16, 328:6, 328:10, 370:16, 428:25
**verifies** [1] - 360:17
**verify** [7] - 354:19, 356:11, 360:18, 415:21, 416:9, 416:13, 417:2
**verifying** [3] - 380:8, 415:23, 416:2
**Verizon** [2] - 237:13, 238:1
**version** [1] - 368:11
**versus** [1] - 370:19
**via** [1] - 373:10
**victim** [22] - 238:21, 239:8, 247:25, 275:25, 286:7, 286:11, 286:13, 300:18, 303:13, 303:22, 342:22, 356:20, 358:9, 359:7, 361:14, 362:23, 363:22, 364:23, 381:12, 381:16, 393:19, 420:11
**victim's** [3] - 234:9, 246:16, 350:17
**victims** [9] - 336:10, 350:13, 350:22, 370:20, 374:8, 379:11, 379:15, 382:10, 383:22
**video** [2] - 312:20, 312:21
**videotape** [1] - 316:12
**videotaped** [11] - 312:6, 312:9, 312:13, 313:5, 313:14, 316:14, 316:16, 316:18, 316:23, 316:25, 317:2
**view** [1] - 335:25
**violation** [5] - 423:4, 423:7, 423:11, 423:19, 429:2
**virtually** [4] - 237:9, 238:19, 239:7, 240:18
**Visa** [1] - 274:24
**visit** [1] - 307:25
**visits** [1] - 306:19
**Vista** [2] - 335:10, 359:23
**voicemail** [2] - 286:9, 362:14
**volume** [1] - 312:11
**vs** [1] - 231:5

**vulnerable** [1] - 291:20

## W

**wait** [11] - 240:10, 248:14, 260:20, 293:3, 336:12, 346:6, 372:4, 410:3, 422:4, 422:15, 430:2
**waiting** [6] - 240:8, 276:20, 287:1, 336:13, 362:22, 379:16
**waits** [1] - 303:6
**waived** [1] - 427:7
**walk** [1] - 303:8
**Walker** [2] - 232:19, 434:11
**WALKER** [1] - 434:12
**walking** [1] - 316:6
**walks** [2] - 303:9, 334:22
**wall** [1] - 382:5
**wants** [1] - 347:7
**warning** [2] - 335:14, 406:6
**waste** [1] - 426:7
**watch** [1] - 401:25
**water** [1] - 307:11
**waterline** [1] - 255:9
**ways** [4] - 342:22, 344:10, 380:8, 431:19
**weather** [1] - 287:2
**web** [1] - 292:8
**website** [6] - 234:24, 237:6, 243:13, 243:17, 268:3, 374:7
**week** [1] - 287:12, 401:13
**weeks** [4] - 392:5, 392:8, 392:9, 401:17
**Weiner** [7] - 232:2, 247:14, 247:20, 249:6, 270:20, 278:20, 279:5
**welcome** [1] - 233:4
**Wells** [270] - 233:21, 235:20, 238:20, 242:8, 243:8, 244:8, 244:13, 245:4, 245:5, 246:11, 248:4, 248:5, 249:1, 249:24, 249:25, 250:2, 253:17, 254:1, 254:14, 256:9, 256:14, 257:14, 260:6, 260:7, 261:4, 262:10, 262:12, 262:24, 263:17, 264:23, 264:24, 265:1, 265:2, 265:16, 265:17, 266:3, 267:9, 268:10, 270:4, 271:1, 271:7, 272:6, 272:10, 273:15, 273:20, 274:11, 274:22, 276:2, 276:5, 278:10, 278:12, 279:13, 279:18, 285:10, 286:6, 289:2, 289:22, 290:2, 290:7, 291:1, 291:20, 291:24, 292:11, 294:19, 294:22, 295:25, 296:3, 297:12, 297:21, 298:13, 298:19, 298:23, 298:25, 299:1, 299:6, 299:11, 299:13, 299:22, 300:1, 300:7, 300:9, 300:10, 300:24, 301:14, 307:14, 308:15, 318:1, 319:9, 319:13, 319:16, 319:22, 319:25, 320:3, 320:11, 320:18, 321:4, 321:5, 321:15, 322:1, 322:5, 322:11, 322:17, 323:1, 323:3, 323:8, 323:12, 323:18, 323:21, 323:25, 324:3, 324:9, 324:12, 324:23, 325:6, 325:9, 325:16, 325:19, 325:25, 326:3, 326:11, 326:14, 327:1, 327:5, 327:7, 327:16, 327:20, 327:25, 328:3,

330:7, 334:11, 334:18, 334:24, 335:6, 335:18, 336:11, 336:22, 336:25, 337:13, 337:15, 337:22, 338:4, 338:5, 338:22, 341:15, 341:25, 342:3, 343:8, 344:13, 344:17, 344:20, 345:3, 345:7, 352:18, 354:12, 354:15, 356:4, 356:16, 356:21, 357:22, 358:1, 358:11, 358:12, 359:6, 359:17, 360:5, 360:6, 360:16, 360:24, 361:20, 364:14, 366:1, 366:17, 366:25, 367:10, 367:12, 368:5, 368:23, 368:25, 370:25, 371:13, 372:1, 372:8, 372:17, 372:20, 373:2, 373:11, 373:14, 374:11, 375:6, 375:21, 376:1, 376:11, 377:7, 377:9, 377:16, 377:19, 377:24, 378:13, 378:19, 379:10, 379:16, 380:13, 380:20, 380:25, 381:6, 384:25, 385:12, 386:4, 388:10, 388:16, 389:1, 389:18, 390:4, 390:9, 392:11, 393:7, 393:18, 394:12, 394:23, 395:1, 395:3, 395:8, 395:12, 397:18, 397:19, 397:22, 398:1, 398:2, 398:5, 398:6, 398:16, 399:1, 399:25, 400:1, 400:11, 401:3, 401:4, 401:5, 401:12, 406:3, 406:9, 407:2, 408:9, 410:7, 412:15, 413:2, 413:6, 416:7, 416:12, 417:6, 418:11, 418:18, 419:6, 419:11, 419:12, 419:20, 419:24, 420:1, 420:9, 422:8, 422:10, 425:3, 425:16, 425:20
**WELLS** [2] - 231:6, 232:15
**Wells'** [1] - 374:7
**WF** [2] - 361:18, 361:19
**Whangerei** [1] - 305:2
**whereabouts** [1] - 295:3
**whole** [10] - 277:14, 285:22, 291:12, 292:16, 298:16, 303:12, 361:20, 382:2, 382:15
**wholly** [2] - 356:23, 359:1
**wife** [4] - 272:19, 272:23, 273:2, 304:17
**willful** [2] - 423:11, 423:19
**willfulness** [1] - 423:12
**William** [6] - 316:16, 316:19, 316:24, 410:7, 411:22, 415:13
**window** [2] - 287:2, 400:10
**Winterville** [1] - 367:1
**wireless** [2] - 238:1, 278:5
**Wisconsin** [1] - 361:25
**wish** [2] - 312:6, 317:5
**withdrawal** [2] - 291:12, 423:24
**withdrawn** [1] - 295:10
**WITNESS** [33] - 242:13, 282:14, 287:20, 287:23, 288:15, 290:13, 291:5, 292:6, 293:17, 302:12, 303:20, 304:1, 304:4, 309:12, 331:15, 343:4, 345:19, 346:6, 348:23, 351:9, 357:11, 366:13, 381:4, 383:12, 393:1, 393:22, 396:16, 397:11, 403:22, 405:4, 410:23, 411:3, 421:12
**witness** [34] - 233:8, 233:12, 281:18,

282:5, 282:10, 296:20, 301:20, 301:25, 302:4, 302:7, 312:1, 312:5, 313:2, 313:3, 316:1, 330:24, 331:5, 331:10, 331:23, 331:24, 345:20, 348:13, 348:18, 352:9, 383:4, 396:17, 396:21, 397:6, 411:3, 420:24, 421:13, 430:12

**witnessed** [2] - 265:1, 301:4
**witnesses** [7] - 314:3, 314:4, 346:19, 396:24, 415:24, 416:12, 430:10
**WJB** [1] - 412:1
**woman** [1] - 317:6
**woods** [1] - 284:25
**word** [5] - 255:7, 309:5, 358:1, 432:21, 432:22
**Word** [1] - 432:20
**wording** [1] - 376:4
**words** [1] - 414:22
**Works** [1] - 351:20
**works** [6] - 239:23, 313:21, 347:2, 352:1, 352:4, 367:6
**world** [1] - 381:11
**worried** [3] - 284:6, 288:15, 298:23
**worry** [2] - 286:21, 297:25
**worse** [1] - 289:24
**wrapped** [1] - 392:8
**wrestling** [1] - 347:17
**write** [12] - 238:9, 238:24, 239:11, 241:24, 245:21, 245:23, 249:15, 262:1, 267:2, 267:7, 292:6, 295:9
**writing** [12] - 238:1, 239:14, 240:19, 241:3, 241:14, 245:22, 251:16, 263:3, 283:11, 349:9, 414:4, 429:6
**written** [2] - 245:25, 413:12
**wrote** [15] - 238:12, 238:14, 241:6, 242:22, 254:22, 258:22, 261:25, 262:8, 262:9, 276:25, 335:24, 351:20, 381:18, 385:5, 390:22

## X

**XB** [4] - 418:15, 418:16, 418:20, 419:2
**XC** [8] - 413:25, 417:25, 418:2, 418:3, 418:7, 418:20, 419:4, 419:9

## Y

**yacht** [2] - 255:4, 255:7
**Yakeeta** [1] - 266:14
**year** [19] - 284:12, 285:22, 292:14, 293:9, 293:19, 293:21, 296:10, 306:17, 310:9, 311:4, 311:6, 343:9, 350:13, 350:20, 350:24, 351:21, 370:20, 377:4, 402:9
**years** [22] - 282:21, 283:17, 284:2, 285:4, 295:20, 338:7, 339:18, 349:6, 349:7, 349:12, 349:20, 351:5, 351:9, 352:10, 355:6, 356:19, 356:25, 357:10, 382:9, 398:3, 398:9, 430:22
**yesterday** [22] - 234:9, 235:23, 237:5,

242:7, 243:23, 244:10, 244:17, 245:18, 253:25, 254:4, 255:2, 262:12, 262:22, 262:23, 263:15, 264:12, 271:7, 273:6, 273:14, 273:23, 278:2, 280:19
**Yochum** [6] - 363:9, 363:22, 371:16, 371:25, 372:1, 392:18
**young** [2] - 284:3, 317:6
**yourself** [1] - 340:16

## Z

**Zealand** [25] - 235:5, 255:5, 264:2, 286:19, 286:23, 286:25, 287:3, 287:5, 287:6, 287:17, 288:3, 288:7, 289:12, 289:21, 290:2, 290:7, 290:17, 305:2, 305:5, 305:8, 305:22, 306:10, 311:10, 311:13
**Zelda** [5] - 283:22, 293:24, 302:23, 305:15, 310:15
**zoom** [4] - 359:12, 362:6, 373:12, 412:17