1          IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF OREGON

3   MATTHEW SPONER,                    )
                                       )
4              Plaintiff,              ) No. 3:17-cv-02035-HZ
                                       )
5        vs.                           ) August 29, 2019
                                       )
6   EQUIFAX INFORMATION SERVICES,      ) Portland, Oregon
    LLC and WELLS FARGO BANK, N.A.,    )
7                                      )
               Defendants.             )
8   --------------------------------

9

10

11

12

13

14                     **TRIAL – DAY 3**

15              TRANSCRIPT OF PROCEEDINGS

16       BEFORE THE HONORABLE MARCO A. HERNANDEZ

17        UNITED STATES DISTRICT COURT JUDGE

18

19

20

21

22

23

24

25

1                        APPEARANCES

2   FOR THE PLAINTIFF:    Jeffrey B. Sand
                          Weiner & Sand LLC
3                         800 Battery Avenue SE
                          Suite 100
4                         Atlanta, GA  30339

5                         Kelly D. Jones
                          Kelly D. Jones, Attorney at Law
6                         819 S. E. Morrison Street
                          Suite 255
7                         Portland, OR  97214

8                         Michael R. Fuller
                          OlsenDaines
9                         111 S. W. Fifth Avenue
                          Suite 3150
10                        Portland, OR  97204

11                        Robert S. Sola
                          Robert S. Sola, P.C.
12                        1500 S. W. First Avenue
                          Suite 800
13                        Portland, OR  97201

14
    FOR THE DEFENDANT
15  WELLS FARGO BANK:     Robert E. Sabido
                          Timothy J. Fransen
16                        Daniel C. Peterson
                          Julie Annette Smith
17                        Cosgrave Vergeer Kester, LLP
                          900 S. W. Fifth Avenue
18                        24th Floor
                          Portland, OR  97204
19
    COURT REPORTER:       Nancy M. Walker, CSR, RMR, CRR
20                        United States District Courthouse
                          1000 S. W. Third Avenue, Room 301
21                        Portland, OR  97204
                          (503) 326-8186
22

23

24

25

Braxton - D

1                  P R O C E E D I N G S

2              (The Court, counsel, the parties, the witness, and

3      the jury reconvene.)

4              THE COURT:  Good morning.  Be seated.

5              You may proceed.

6              MR. FRANSEN:  Your Honor.

7

8                         MEGAN BRAXTON

9      called as a witness in behalf of the Defendant, having been

10     previously duly sworn, is examined and testifies as follows:

11

12                    DIRECT EXAMINATION

13     BY MR. FRANSEN:  (continuing)

14     Q.  Ms. Braxton, when we left off yesterday, we had just

15     started looking at some of the ACDV responses that Wells Fargo

16     had submitted.  Do you recall that?

17     A.  Yes.

18     Q.  And we were looking at the description of what the

19     processor performed in terms of that response, correct?

20     A.  Yes.

21              MR. FRANSEN:  Now, would you mind pulling up

22     Exhibit 33, please.  And can you highlight the bottom box

23     again.

24     BY MR. FRANSEN:  (continuing)

25     Q.  Now, we looked at this, and you described what some of

Braxton - D

1  these notations meant, correct?

2  A.  Yes.

3  Q.  And I believe that you testified that at least some of

4  these indicate the responder reviewed the notes and saw there

5  was a fraud investigation, something like that.  Is that what

6  you testified to?

7  A.  Yes.

8  Q.  Okay.  Now, have you reviewed all the ACDV responses in

9  this case?

10 A.  I have.

11 Q.  Do every one of those responses contain the same

12 notations?

13 A.  They do not.

14 Q.  Okay.  Well, let's look at them and we'll see what's

15 different.

16         MR. FRANSEN:  If you could pull up Exhibit 34,

17 please.  And can we zoom in on the bottom section.

18 BY MR. FRANSEN:  (continuing)

19 Q.  Okay.  Now, this is the next ACDV.  Are you able to

20 quickly kind of read what that box says?

21 A.  It "says verified updated ID account, 10-16," and

22 compliance condition code XC.

23 Q.  So this one doesn't include a notation that the responder

24 is talking about the fraud investigation?

25 A.  It does not.

Braxton - D

1    Q.   Does that happen sometimes?

2    A.   It does happen.

3    Q.   Okay.  Would the policy be that they should be notating

4    that they saw the fraud investigation?

5    A.   They should.

6    Q.   Okay.

7              MR. FRANSEN:  All right.  Can we look at the next

8    one, please, 35.  And can we zoom in on the same box on this

9    one.

10   BY MR. FRANSEN:  (continuing)

11   Q.   All right.  So, again, it's a little fuzzy, but do you

12   see -- go ahead and just summarize what the notes appear to

13   say.

14   A.   (Reading) Verified ID, verified account, 10-22-16,

15   compliance condition code XC.

16   Q.   And I know there are a lot of numbers on there.  But,

17   again, does it appear there is an actual indication in these

18   notes about the fraud investigation?

19   A.   There's not.

20             MR. FRANSEN:  All right.  Can we look at Exhibit 36,

21   and can we zoom in on the same box.

22   BY MR. FRANSEN:  (continuing)

23   Q.   All right.  Now, on this one, do you see any indication

24   that there is discussion of the fraud investigation?

25   A.   Yes.

Braxton - D

1  Q.  Okay.  And where is that, if you can just sort of draw

2  that out?

3  A.  Right after compliance condition code, it says "CCC," it

4  says "no fraud."

5  Q.  Okay.  And I think we talked yesterday, your understanding

6  of that notation is no fraud found yet?

7  A.  That's correct.

8          MR. FRANSEN:  So if you can zoom in on the "date

9  resolved" section -- it's a little bit above there.

10         Thank you.

11 BY MR. FRANSEN:  (continuing)

12 Q.  So what's the date this ACDV was completed?

13 A.  December 2nd, 2016.

14 Q.  Okay.  Now, so we've seen that these ACDVs, some of them

15 specifically notate that there was a fraud investigation; some

16 of them don't.

17         Would it be consistent with Wells Fargo's policies to

18 not look at iTop to see if a fraud investigation was going on?

19         MR. SOLA:  Objection, leading.

20         THE COURT:  Overruled.

21         You can answer that question.

22         THE WITNESS:  No.

23 BY MR. FRANSEN:  (continuing)

24 Q.  And we looked at the policy yesterday, didn't we?

25 A.  Yes.

Braxton - D

1  Q.  And did that policy -- how did that policy -- did that
2  policy say that in every instance you check iTop to see --
3  A.  Yes.
4  Q.  Okay.  So the fact that they didn't notate it, does that
5  mean you don't believe they didn't follow the policy?
6  A.  No.  I believe they did follow the policy.  Just because
7  they didn't notate doesn't mean that they didn't look at the
8  system of record.
9  Q.  But I think your testimony was they should have notated
10  that?
11  A.  Yes, correct.
12  Q.  Okay.  This is Exhibit 36, and we saw the date was
13  December 2nd, 2016.
14        MR. FRANSEN:  Can we look at Exhibit 37, please.  And
15  can you zoom in on the date resolved.
16  BY MR. FRANSEN:  (continuing)
17  Q.  And what's the date this ACDV was responded to?
18  A.  November 24th, 2017.
19  Q.  So this is almost a year later?
20  A.  Correct.
21        MR. FRANSEN:  And can we look at the box again.
22  BY MR. FRANSEN:  (continuing)
23  Q.  All right.  And this is a very brief one.  So can you
24  summarize what that description says?
25  A.  It says "verified ID," compliance condition code XC.

Braxton - D

1   Q.   And BF, whose initials are those?

2   A.   Brian Funsch.

3   Q.   Okay.  Now, the jury heard -- a tape was played of

4   Mr. Funsch testifying.  Do you recall that?

5   A.   I do.

6   Q.   And do you recall if he described that in his process he

7   did check iTop notes?

8   A.   He did.

9   Q.   Okay.  So it's not notated there, but you understand he's

10  following the process that would suggest that you look for

11  iTop notes?

12  A.   Yes.

13          MR. FRANSEN:  All right.  Can we look at the next

14  exhibit, please.

15          All right.  Let's look at the date first.

16  BY MR. FRANSEN:  (continuing)

17  Q.   This one is a little -- actually a little smaller than the

18  others.  That's very blurry.  Can you tell what that says?

19  A.   I believe it says November 26th, 2017.

20          MR. FRANSEN:  And then let's look at the description

21  box.

22  BY MR. FRANSEN:  (continuing)

23  Q.   Okay.  Can you read this one quickly and let us know what

24  you see.

25  A.   (Reading) Verified ID.  Sent to fraud.  Additional letter

1   sent.  No fraud found.

2   Q.   And we've already talked about the "no fraud found" or "no

3   fraud," what that means.

4          When it says "additional letter sent," do you know

5   what that is indicating?

6   A.   That the fraud investigation is still going on.

7          MR. FRANSEN:  If you can, can you pull out

8   Exhibit 32, please; and I'd like page 2, if you can.

9   BY MR. FRANSEN:  (continuing)

10  Q.   All right.  Now, we've looked at these a number of times.

11  Remind the jury what are these.

12  A.   These are the iTop AFS comments system of record notation.

13  Q.   And this is essentially what the ACDV responders -- is

14  this essentially what the ACDV responders look at?

15  A.   Yes.

16         MR. FRANSEN:  Can you zoom in.  There's a note on

17  November 1st, 2017.  Yes.  That one, thank you.

18  BY MR. FRANSEN:  (continuing)

19  Q.   Okay.  Can you read to the jury what that note says?

20  A.   (Reading) Suspected unusual activity.  A packet was sent

21  out to the customer in 2016.  We have received the documents

22  in the mail, too.  I have sent out an additional letter

23  requesting the copy of the Social Security card.

24  Q.   And then the initials of the person who entered that are?

25  A.   William Brady.

Braxton - D

1   Q.   But the initials are --

2   A.   -- WJB.

3   Q.   And the date on that was November 21st, 2017; is that

4   correct?

5   A.   That is correct.

6        MR. FRANSEN:  Okay.  Can we return to the exhibit,

7   the one we were just looking at, 38, I believe.  And can you

8   pull up the date resolved.

9   BY MR. FRANSEN:  (continuing)

10  Q.   Okay.  We looked at this a second ago.  But you said it

11  was November 26, 2017?

12  A.   Correct.

13  Q.   So that's a few days -- is that a few days after the

14  November 21st note was made?

15  A.   It is.

16       MR. FRANSEN:  All right.  And let's look at 39,

17  please.  And can we look at the description box.

18  BY MR. FRANSEN:  (continuing)

19  Q.   Okay.  Again, it's very blurry.  I apologize.  Can you

20  quickly read what you see there?

21  A.   (Reading) Verified ID, no fraud found.

22  Q.   And there is a compliance condition code there?

23  A.   There is:  XC.

24  Q.   All right.

25       MR. FRANSEN:  Let's look at No. 40.  And why don't we

Braxton - D

1  look at the date on this one.

2  BY MR. FRANSEN:  (continuing)

3  Q.  What date was this ACDV response?

4  A.  December 4th, 2017.

5       MR. FRANSEN:  And can we look at the description box.

6  BY MR. FRANSEN:  (continuing)

7  Q.  All right.  And then quickly, again, can you summarize

8  what you see there?

9  A.  (Reading) Verified ID.  Compliance condition code XC.

10 Additional info letter sent.  No fraud.

11 Q.  Okay.  And then, actually -- we haven't said this on every

12 one, but can you tell, really quickly, who filled out this

13 response?

14 A.  Colin Hollomon.

15 Q.  And did we just hear from Mr. Hollomon?

16 A.  You did.

17      MR. FRANSEN:  All right.  Exhibit 41, please.  How

18 about we look at the description box again.

19 BY MR. FRANSEN:  (continuing)

20 Q.  Okay.  And please read for the jury what this means.

21 A.  (Reading) Verified ID.  Compliance condition code XC.

22 Already reporting.  Additional info letter sent.  Images.

23 Q.  Okay.  And, again, who made this note?

24 A.  Colin Hollomon.

25 Q.  And I believe we have one more exhibit to look at,

Braxton - D

1  Exhibit 42.

2          MR. FRANSEN:  And can we look at the date on this

3  one, please.

4  BY MR. FRANSEN:  (continuing)

5  Q.  What's the date this was responded to?

6  A.  December 22nd, 2017.

7  Q.  All right.

8          MR. FRANSEN:  And then let's look at the description

9  box.

10 BY MR. FRANSEN:  (continuing)

11 Q.  All right.  Go ahead and read this one, too.

12 A.  (Reading) Verified ID.  Compliance condition code XC.

13 Already reporting.  Fraud investigation complete.  No fraud

14 found per fraud team research.

15 Q.  Okay.  So that's a little different than the ones we've

16 looked at before, isn't it?

17 A.  Yes.

18 Q.  Now, is it your understanding that the fraud investigation

19 was, in fact, complete on December 22nd?

20 A.  No.

21 Q.  Okay.  But does this indicate at least that he was aware

22 of a fraud investigation occurring?

23 A.  Yes.

24 Q.  Okay.  All right.

25          Now, we just looked at all 10 ACDV disputes that

447

Braxton - D

1  Wells Fargo responded to in this case, I believe.  Every -- is
2  every ACDV worked as a separate dispute?
3  A.   It is.
4  Q.   Okay.  In other words, when a responder is going to work
5  on an ACDV, do they necessarily look at or copy what a
6  previous ACDV had done?
7  A.   No, they do not.
8  Q.   Do they run through the procedures we looked at yesterday
9  for every dispute, or for every ACDV?
10  A.   Yes.
11  Q.   Okay.  And in every case, do they perform the verifying ID
12  process?
13  A.   They do.
14  Q.   Okay.  That's every type of ACDV?
15  A.   Yes.
16  Q.   All right.  So if a -- if somebody sends an ACDV that is
17  complaining that payments aren't late or maybe the account was
18  paid off, do they still -- do Wells Fargo's ACDV responders
19  still verify ID in that case?
20  A.   Yes, they do.
21  Q.   So when the witnesses that we saw the tapes of yesterday,
22  they were describing the verify ID process -- do you recall
23  that?
24  A.   I do.
25  Q.   Were they describing the entire verify ID process?

448

Braxton - D

1  A.   Not all of them.

2  Q.   Were they talking about a part of the process?

3  A.   Yes.

4  Q.   All right.  Now, you've heard that there's been evidence

5  that Mr. Sponer contacted Wells Fargo credit card, the credit

6  card division, to let them know he was going to be out of the

7  country.  Do you recall that?

8  A.   Yes.

9  Q.   Does Wells Fargo Auto have access to that information?

10  A.   We do not.

11  Q.   Okay.  Do you have -- does Wells Fargo Auto have access to

12  the list of charges Mr. Sponer is making on a credit card he

13  has at Wells Fargo?

14  A.   We do not.

15  Q.   Why is that?

16  A.   We work out of different systems of records.  So Wells

17  Fargo Auto will be working out of the iTop, also known as AFS

18  system.  Card services or home lending would be working out of

19  another system of record pertaining to their product.

20  Q.   There was some -- I believe that we listened to or we saw

21  the tape of Ms. Berg testifying at her deposition.  Do you

22  recall that?

23  A.   Yes.

24  Q.   And she gave an estimate, I believe, of about 25 to 30,000

25  ACDVs per month.  Do you remember that?

449

Braxton - D

1    A.   I do.

2    Q.   Okay.  Do you know if that number would reflect identity

3    theft disputes or does that reflect all ACDVs?

4    A.   That number would reflect all ACDVs.

5    Q.   Okay.  Is there anything unusual or suspicious about

6    receiving five or six similar ACDVs in a month or two time

7    frame?

8    A.   No.

9    Q.   And why is that?  Why is it that it's not suspicious?

10   A.   Because we treat every ACDV dispute as that single

11   dispute.  So a consumer or customer, it's their right to open

12   up multiple ACDVs to the credit reporting agency, and we would

13   receive them individually.

14   Q.   And is it the case that you can make a dispute with more

15   than one credit reporting agency?

16   A.   That is correct.

17   Q.   So if you made one dispute with Equifax, one dispute with

18   Experian, one dispute with TransUnion, how many disputes might

19   Wells Fargo Auto receive?

20   A.   We would receive three ACDVs.

21   Q.   And, as you just testified, would Wells Fargo Auto

22   investigate and respond to each of those ACDVs separately?

23   A.   Yes, we would.

24   Q.   Okay.  I'd like to ask you a little bit about some

25   correspondence in this case.

Braxton - D

1              MR. FRANSEN:  Can we get Exhibit 12 up, please.

2     BY MR. FRANSEN:  (continuing)

3     Q.   Okay.  This letter has been -- the jury has seen this

4     letter a number of times, I believe.  Can you just quickly

5     note, what unit within Wells Fargo Auto is sending this

6     letter?

7     A.   Credit bureau operations.

8     Q.   And is this an ACDV response?

9     A.   Yes.

10    Q.   Is it --

11    A.   It's a dispute response.

12    Q.   But is it a response by someone who would process an ACDV?

13    A.   Yes.

14    Q.   But the date on this is February 15th, 2017?

15    A.   Yes.

16    Q.   And that's not corresponding to one of the ACDVs that we

17    looked at previously?

18    A.   No.

19    Q.   Okay.  Now, do you know why -- so this was sent by

20    somebody in your department, essentially?

21    A.   Correct.

22    Q.   Do you know why they would be responding to this letter?

23    A.   Yes, because it was sent to us.

24    Q.   Okay.  Now, the address -- let's look at the -- I guess

25    it's the third paragraph.

Braxton - D

1          MR. FRANSEN:  Would you mind just zooming in on that,

2    please.

3    BY MR. FRANSEN:  (continuing)

4    Q.  All right.  So they're indicating in this, right, what

5    address you should send additional correspondence to for that

6    unit?

7    A.  Correct.

8    Q.  And what's the address?  Can you read it please?

9    A.  P.O. Box 1697, Winterville, North Carolina, 28590.

10   Q.  At the time, that was the P.O. Box for that unit of Wells

11   Fargo Auto?

12   A.  That is correct.

13   Q.  Was that the fraud -- excuse me, was that the fraud

14   department's address?

15   A.  No, it's not.

16          MR. FRANSEN:  Would you mind pulling up Exhibit 11,

17   please.

18   BY MR. FRANSEN:  (continuing)

19   Q.  Now, this, the jury has seen this as well.  It's obviously

20   a letter sent by the plaintiff to Wells Fargo, correct?

21   A.  Correct.

22   Q.  Can you tell what address it was sent to?

23   A.  It was sent to P. O. Box 1697, Winterville.

24   Q.  Now, it's addressed to the fraud department, right?

25   A.  That is correct.

Braxton - D

1  Q.  But the address is for --

2  A.  Credit bureau.

3  Q.  -- credit bureau.

4          Okay.  So credit bureau responded to the letter?

5  A.  Correct.

6  Q.  Should the fraud department also have gotten this letter?

7  A.  Yes.

8  Q.  Do you know if they did get the letter?

9  A.  I don't.

10  Q.  But it would be within policy that if a letter like this

11  was received by credit bureau, it would then also go to fraud

12  department?

13  A.  Correct.  We would respond to the letter and also forward

14  it on to the fraud department.

15  Q.  And the letter we saw on Exhibit 12 --

16          MR. FRANSEN:  You can go ahead and pull it up.

17  BY MR. FRANSEN:  (continuing)

18  Q.  This was a form letter that was in use at the time?

19  A.  That is correct.

20  Q.  Is this letter still used?

21  A.  It is not.

22  Q.  Okay.  Why isn't it used anymore?

23  A.  Because it could be very confusing to a customer or

24  consumer in regards to where we're at in the investigation.

25  So it's not telling them everything.

Braxton - D

1  Q.  All right.  I just want to run through a couple more

2  pieces of correspondence with you.

3          MR. FRANSEN:  Exhibit 22, please -- I'm sorry, 23.

4  BY MR. FRANSEN:  (continuing)

5  Q.  Okay.  Can you -- can you quickly tell the jury where this

6  letter came from, what department it came from?

7  A.  It came from Office of the President.

8  Q.  And can you explain what the Office of the President is?

9  A.  Office of the President is a customer service group that

10  handles escalated complaints from a consumer or customer.

11  Q.  What's the main focus of the Office of the President, as

12  you understand it?

13  A.  To speak to the party that is contacting Wells Fargo and

14  to resolve their matters in regards to their complaint.

15  Q.  Do they primarily try to reach people by phone?

16  A.  Yes.

17          MR. FRANSEN:  Exhibit 26, please.

18  BY MR. FRANSEN:  (continuing)

19  Q.  Okay.  Can you explain what department this came from?

20  A.  Identity theft operations.

21  Q.  Okay.  Now, is identity theft operations, is that part of

22  the credit bureau team?

23  A.  It is not.

24  Q.  Do you know if it's part of the fraud team?

25  A.  It is not.

Braxton - X

1  Q.   Okay.  It's a separate -- it's a separate entity?

2  A.   It is.

3  Q.   Okay.

4          MR. FRANSEN:  No further questions.

5          THE COURT:  Cross-exam.

6

7                    CROSS-EXAMINATION

8  BY MR. SOLA:

9  Q.   Ms. Braxton, we've been looking at disputes and responses,

10  and you agree that the FCRA gives all consumers the right to

11  dispute inaccurate information on their credit reports,

12  correct?

13  A.   Yes.

14  Q.   And the purpose of that right to dispute inaccurate

15  information is to get the inaccurate information corrected,

16  right?

17  A.   That's correct.

18  Q.   All right.  And then we saw the Fair Credit Reporting Act

19  in the opening statement, and you understand that to get

20  accuracy, the Act requires that furnishers like Wells Fargo

21  perform a reasonable investigation to determine if the

22  disputed information is accurate?

23  A.   Correct.

24  Q.   And, again, the purpose is to get the inaccurate

25  information corrected, so it's not on the consumer's report?

Braxton - X

1    A.   Correct.

2    Q.   All right.  And, as Mr. Hendricks said, so there's a

3    procedure there with a purpose.

4            Now, plaintiff made disputes to a credit reporting

5    agency that were forwarded to Wells Fargo, correct?

6    A.   Correct.

7    Q.   He said the account was identity theft, correct?

8    A.   Correct.

9    Q.   And Wells Fargo got those disputes through the ACDV

10   process, right?

11   A.   Correct.

12   Q.   And we all agree and know that the account was identity

13   theft, right?

14   A.   Based off of what we heard today, yes.

15   Q.   Well, Wells Fargo knew it was identity theft earlier than

16   today, right?

17           I may have misunderstood you.  Okay.

18           So, in other words, the information that Mr. Sponer

19   was disputing was inaccurate, wasn't it?

20   A.   Based off of today, yes.

21   Q.   What do you mean, "based off of today"?

22   A.   So where we are today and based off of the information we

23   received, yes, it was identity theft.  But going through and

24   responding to the ACDVs, it was under fraud investigation, so

25   we did not know that at that time.

Braxton - X

1  Q.  Well, you were not -- the ACDV people were not doing any

2  fraud investigation, right?

3  A.  No.  The fraud team was.

4  Q.  Okay.  But you agree that the account, at the time that he

5  disputed it, was not his?

6  A.  I can't say I agree to that.

7  Q.  Really?  Today, here in court, as Wells Fargo's

8  representative, you are not saying that when he disputed in

9  October 2016, that account was inaccurate?

10          MR. FRANSEN:  Objection, misstates testimony.

11          THE COURT:  Overruled.

12          You can answer the question.

13          THE WITNESS:  Can you re-ask the question?

14  BY MR. SOLA:  (continuing)

15  Q.  My question is:  Do you agree that when he disputed the

16  account in October 2016, it was inaccurate?

17  A.  Based off of the information today, yes, it was

18  inaccurate, because here, today -- so if you're asking me

19  today, yes.  At that time, the team members, the ACDV team

20  members, were looking at the account and did not have that

21  information to determine that it was fraud at that time.

22  Q.  Okay.  Ma'am, my question is:  Do you agree that when he

23  disputed the account as fraudulent, that was true that it was

24  fraudulent?

25          MR. FRANSEN:  Objection, asked and answered.

1          THE COURT:  Sustained.

2     BY MR. SOLA:  (continuing)

3     Q.   Now, Wells Fargo followed its procedures in processing his

4     dispute, right?

5     A.   That is correct.

6     Q.   And those procedures require that they investigate whether

7     the disputed information was accurate, right?

8     A.   That is correct.

9     Q.   But the inaccurate information on Mr. Sponer's report was

10    not corrected through your procedure process, was it?

11    A.   That is correct.

12    Q.   So under Wells Fargo's procedures, the purpose of the

13    FCRA, to get inaccurate information corrected, was not

14    fulfilled, correct?

15    A.   That is incorrect.  We followed the policy and procedures

16    at that time and investigated the dispute.  At that time we

17    were also made aware, by looking at the system of record, that

18    the account was in active fraud investigation.  And we did not

19    have a response in regards to that fraud investigation yet.

20          So the team member followed the policy and procedure

21    by utilizing those procedures, investigating what was

22    available to us, and providing a response back to the credit

23    reporting agency.

24          MR. SOLA:  Your Honor, I'll move to strike.

25          THE COURT:  Your objection is overruled.

Braxton - X

1    BY MR. SOLA:  (continuing)

2    Q.  But would you agree that the inaccurate information on

3    Mr. Sponer's credit report was not corrected as a result of

4    the procedures that Wells Fargo followed?

5              MR. FRANSEN:  Objection, asked and answered.

6              THE COURT:  Overruled.

7              THE WITNESS:  I disagree.  The team members followed

8    the policy and procedures.

9    BY MR. SOLA:  (continuing)

10   Q.  Okay.  Maybe I'm not being clear.  My question is about

11   what happened as to the inaccurate information.

12             So would you agree that the inaccurate information

13   was not corrected after Wells Fargo followed its policies and

14   procedures in processing the ACDV?

15   A.  At that time, the information that was available with the

16   account was still in fraud investigation.  So at that time,

17   the information to the ACDV team member was not inaccurate,

18   because the fraud investigation was still going on.

19   Q.  But you agree the inaccurate information was not

20   corrected?

21   A.  I do not agree, because at that time it was in fraud

22   investigation.

23   Q.  I understand.  So fraud had not done an investigation at

24   that time, had it?

25   A.  Fraud was in the investigation at that time.

Braxton - X

1   Q.  All right.  Do you know what -- well, let me move on.

2            Now, you testified that you agreed with the testimony

3   of Ashley Grier and the other employees as shown on those

4   videotapes, correct?

5   A.  Yes.

6   Q.  So you agree with Ashley Grier when she said all she did

7   to investigate plaintiff's fraud dispute was verify the ID?

8   A.  I agree that's what she stated.

9   Q.  Yes.  That's all she did to investigate his dispute was

10  verify ID.  That was her testimony, and you agree with that?

11  A.  I agree that she verified the ID, and that's what she

12  stated in her testimony.  But I also believe she followed the

13  policy and procedure.  She may not have stated that when asked

14  the question.

15  Q.  Okay.  But she said that was all she did.  Are you saying

16  you think she's not being truthful?

17  A.  I stated that I believe my team member followed the policy

18  and procedures at that time.

19  Q.  All right.  And you agree with Montressa Ebron when she

20  said that all she did to investigate the dispute of identity

21  theft was to verify ID, correct?

22  A.  She did verify ID.  Also, again, I believe the team member

23  followed the policy and procedures.

24  Q.  All right.  And you agree with Brian Funsch when he said

25  he had no communication with the fraud department in

Braxton - X

1   conducting his investigation, correct?

2   A.   He stated that he had no communication with the fraud

3   department.  But his notes state that he reviewed and it was

4   in fraud investigation, in the ACDV notation.

5   Q.   Okay.  But he did not communicate with the fraud

6   department, correct?

7   A.   He did not personally communicate with the fraud

8   department.

9   Q.   And you agree with Brian Funsch when he said his

10  investigation only took a few minutes?

11  A.   I don't know.  I didn't witness him complete the -- the

12  review.

13  Q.   You've indicated many times that Wells Fargo followed its

14  procedures, correct?

15  A.   Correct.

16  Q.   And you believe, I think, that the Wells Fargo system

17  worked as it was designed; is that right?

18  A.   In regards to the ACDVs, yes.

19  Q.   All right.  And so here, when Wells Fargo's system works

20  as it's designed, it results in a fraudulent account being

21  verified as accurate 10 times, right?

22  A.   I believe that when we received the ACDV disputes, we

23  performed the job and policy and procedures at that time, and

24  we allowed for the fraud investigation to complete their part.

25  Q.   I understand.  But under your policies and procedures, the

1  fraudulent account was verified as accurate 10 times, right?

2  A.   It was verified as accurate because the fraud

3  investigation was still being completed.

4  Q.   You were relying on the fraud department, right?

5  A.   That is correct.

6  Q.   Because the ACDV operators are not allowed to investigate

7  identity theft, are they?

8  A.   It is not within their role and responsibilities to

9  investigate fraud.  We send that over to the fraud team to

10  handle.

11  Q.   But you agree that when Wells Fargo gets an ACDV with an

12  identity theft dispute, it must investigate to determine if

13  the account is the result of identity theft?

14  A.   I agree that we will partner with our fraud team, to send

15  them the information they need to start their investigation.

16  Q.   Okay, ma'am.  But in your deposition you stated you agree

17  that when Wells Fargo gets an ACDV with a dispute of identity

18  theft, Wells Fargo must investigate to determine if the

19  account is the result of identity theft, isn't that so?

20  A.   That's correct.  And so when we receive the ACDV and we

21  have that information, we would send it and forward it on to

22  fraud, so they can start their investigation.

23  Q.   And you agree with Bets Berg and I think your own

24  testimony that none of the Wells Fargo employees who handle

25  ACDVs did that investigation to determine if the account was

1  identity theft, right?

2  A.   It is not their -- in their role or responsibilities nor

3  policy and procedures to investigate for fraud.

4  Q.   That's right.

5       And Mr. Sponer's ACDVs, they were handled solely by

6  the credit bureau operations department, right?

7  A.   That is correct.

8  Q.   No other department in Wells Fargo handled those ACDVs,

9  right?

10 A.   That is correct.

11 Q.   Now, you talked about referring -- well, that referral to

12 the fraud -- I want to start again.

13      The fraud department was already investigating -- the

14 fraud department had been notified that this account was

15 identity theft before the first ACDV, correct?

16 A.   Correct.

17 Q.   And they had opened an investigation before the first

18 ACDV, right?

19 A.   Correct.

20 Q.   And that investigation was pending in November 2016 when

21 Wells Fargo got an ACDV?

22 A.   Correct.

23 Q.   And that investigation was pending in December 2016 when

24 Wells Fargo got more ACDVs, right?

25 A.   Correct.

1  Q.  And that investigation was pending in January 2017 when

2  Mr. Sponer sent a direct dispute, right?

3  A.  Correct.

4  Q.  And that fraud investigation was still pending in

5  February, March, April, May, June, and July and August of

6  2017, wasn't it?

7  A.  Correct.

8  Q.  And that fraud investigation was still pending in

9  September, October, and November 2017, wasn't it?

10  A.  Correct.

11  Q.  And then you -- Wells Fargo got more ACDVs in November

12  2017, right?

13  A.  Correct.

14  Q.  And you indicate because that fraud investigation was

15  still pending, the procedure required that Wells Fargo verify

16  the account as accurate?

17  A.  That is correct.

18  Q.  And there were more ACDVs in December 2017, right?

19  A.  Correct.

20  Q.  And the fraud investigation was still pending in December

21  2017, approximately 14 months after it had been open; is that

22  right?

23  A.  Correct.

24  Q.  The fact is that the fraud investigation was always

25  pending, but it was never done, right?

Braxton - X

1   A.   I can't say that that's correct.   It was an investigation.

2   I don't know the details of the investigation.

3   Q.   Well, you just pointed out, on one of the ACDV responses

4   where somebody entered that the fraud investigation was

5   completed, that was wrong?

6   A.   It's not that they're saying it was completed.   They were

7   stating that no fraud because it was still active in

8   investigation.   They had no additional notes to provide at

9   that time.

10  Q.   Okay.   Have you seen any record -- well, you agree the

11  fraud investigation was still pending in November 2017, right?

12  A.   Yes.

13  Q.   Can you explain why the fraud investigation never got

14  completed over 14 months?

15  A.   I cannot.   I'm not part of the fraud department and I

16  don't know their policy or procedures or information as to why

17  they still had it open as an investigation.

18  Q.   Now, you've indicated that the people in the ACDV

19  department may have looked at some of the iTop notes, right?

20  A.   They look at the iTop notes every time they work an ACDV

21  dispute.

22  Q.   Okay.   But you agree that Ms. Grier and Ms. Ebron did not

23  indicate that they looked at the iTop notes, right?

24  A.   They did not state that in their testimony.

25  Q.   And they did not make a notation that they looked in the

1    iTop notes?

2    A.   They did not.

3    Q.   But let's say a person looked at the iTop notes, okay.

4    Then they would see that the police had told Wells Fargo on

5    October 26th that Jason Yochum had purchased the car using the

6    customer's identity, right?

7    A.   That's correct.

8    Q.   And since all the ACDV investigations were completed on or

9    after November 3rd, they would also see the entry from

10   November 3rd where the police told Wells Fargo that the

11   suspect had pled guilty, correct?

12   A.   Right.

13   Q.   And they would also see from the iTop notes that the car

14   that was part of the crime was being held as evidence in the

15   prosecution of the criminal, right?

16   A.   Correct.

17   Q.   But those people in the ACDV department, even if they

18   looked at the iTop notes and saw that the account was opened

19   fraudulently by Jason Yochum, they couldn't do anything to

20   determine it was identity theft, they couldn't use that

21   information, because they're prohibited from making a

22   determination of identity theft, correct?

23   A.   They're not prohibited, but their policy and procedure

24   states to allow fraud to complete the investigation.  So they

25   would have seen the notes, but they would have then looked to

Braxton - X

1  see where fraud was at and if it was determined that it was

2  fraud, because if it wasn't at that time, they would continue

3  to work through the procedure to respond to the ACDV.

4  Q.  All right.  So if they wanted to follow Wells Fargo's

5  policy, then they could not use that information and make a

6  determination that it was identity theft?

7  A.  They cannot.

8  Q.  That's right.

9         Now, you indicated that it's not unusual for Wells

10 Fargo to get five or six disputes in a short period of time

11 from one consumer; is that right?

12 A.  That's correct.

13 Q.  Would you say it's common?

14 A.  Yes.

15 Q.  All right.  So Mr. Sponer was not the only consumer who

16 had to dispute multiple times to Wells Fargo to get inaccurate

17 information corrected, right?

18 A.  Well, I guess that question -- so it is the consumer's

19 right to submit multiple disputes, but it's not always because

20 they're disputing inaccurate information.

21 Q.  Well, that's typically why they're -- isn't that the

22 purpose of the dispute, to get inaccurate information

23 corrected?

24 A.  We do see, at times, that consumers flood us with disputes

25 so we could miss one, so the trade line account can be

Braxton - X

1    deleted.

2    Q.  But you agree with my question that Mr. Sponer was not the

3    only consumer who had to dispute multiple times with Wells

4    Fargo to get inaccurate information corrected?

5              MR. FRANSEN:  Objection, relevance.

6              THE COURT:  Overruled.

7              THE WITNESS:  I don't think that -- in your question

8    you're saying they're disputing multiple times because they're

9    trying to have inaccurate information removed.  Yes, there are

10   customers that do submit in that way.  And there are other

11   customers that do it to have the trade line deleted because we

12   did not respond to the ACDV within the 30 days.

13             So there are multiple scenarios when a customer sends

14   multiple disputes.  Some of them are looking for inaccurate

15   information.  Some of them are looking just to give us

16   multiple disputes to see if we miss one.

17   BY MR. SOLA:  (continuing)

18   Q.  All right.

19             MR. SOLA:  Now, Exhibit 12, can we put that back up

20   on the board.

21             Wait a minute.  Let me finish the ones that don't

22   have exhibits.  Then we can go.

23             MR. PETERSON:  We're happy to put up exhibits for

24   you.

25             MR. SOLA:  Okay.

1   BY MR. SOLA:  (continuing)

2   Q.  Now, you indicated the credit bureau operations gets

3   31,000 disputes a month; is that right?

4          MR. SOLA:  You can take it down.  Thank you.

5          THE WITNESS:  Roughly.

6   BY MR. SOLA:  (continuing)

7   Q.  Roughly.  All right.

8          So in 12 months, that's about 372,000 disputes a

9   year, right?

10  A.  Roughly.

11  Q.  Okay.  And that's just the credit bureau operations in

12  Wells Fargo Auto.

13  A.  That is correct.

14  Q.  Okay.  And Wells Fargo has many other lending divisions,

15  including credit cards, right?

16  A.  That's correct.

17  Q.  Mortgages, right?

18  A.  Correct.

19  Q.  Home equity?

20  A.  Correct.

21  Q.  Small business?

22  A.  Correct.

23  Q.  I'm probably missing some.

24          So the credit bureau operations is a small portion of

25  all the Wells Fargo lending operations, right?

Braxton - X

1  A.   Credit bureau Wells Fargo Auto operations is a small --

2  Q.   Thank you for correcting.  So the auto division --

3  A.   Correct.

4  Q.   And you, just in the small division, get 372,000 disputes

5  a year, right?

6  A.   Roughly.

7  Q.   And you indicated previously that -- in deposition, that

8  identity theft is a common dispute?

9  A.   It's common, yes.

10  Q.   So what would you say common for Wells Fargo Auto -- how

11  would you define it?  Would it be 20 percent, 50 percent, some

12  other percent?

13  A.   I couldn't put a number on it.

14  Q.   Couldn't put a number on it.  All right.

15         But you'd agree there are tens of thousands if not

16  hundreds of thousands of disputes of identity theft, at least

17  tens of thousands coming into Wells Fargo Auto every year?

18  A.   I can't agree to that.

19  Q.   You don't know how many?

20  A.   I don't know how many.

21  Q.   But all the identity theft disputes that Wells Fargo Auto

22  receives are handled just the way Mr. Sponer's disputes are

23  handled, right?

24  A.   I disagree.

25  Q.   Well, you've been real strict on how everybody follows

1   procedures.  Are you saying that when someone else disputes

2   identity theft, Wells Fargo was not following procedures?

3   A.  We always follow the policy and procedures.  But you

4   stated Mr. Sponer specifically, so that's where I would

5   disagree.

6   Q.  Well, my question is:  If you -- you follow the same

7   policies and procedures for all the identity theft disputes?

8   A.  Correct.  We would verify the ID and system of record

9   notations and provide a response back.

10   Q.  All right.  So you would follow the same procedure for

11   Mr. Sponer as you do for other people?

12   A.  Correct.

13   Q.  And that procedure that you followed for Mr. Sponer back

14   in 2016 and 2017, that's the same procedure you're still using

15   today, right?

16   A.  That's correct.  There may be small updates year to year

17   in regards to our procedures, but yes.

18   Q.  All right.  Now, the procedures require that they verify

19   ID, right?

20   A.  Yes.

21   Q.  But you're not aware of the procedures requiring anything

22   beyond verifying ID, are you?

23   A.  Yes.

24   Q.  Ma'am, in your deposition you testified differently,

25   didn't you?

Braxton - X

1    A.   In my deposition I didn't understand the question.   And

2    when you asked if I -- if I agreed if they verified, I just

3    truly didn't understand the question.

4    Q.   No, ma'am.   I'm talking about in your deposition, you said

5    you were not aware of the procedures requiring anything beyond

6    verifying ID.   Wasn't that your testimony?

7    A.   That was my testimony.   But I did not understand the

8    question.   And I'm stating here today that the team members do

9    verify ID, but they also follow additional instructions within

10   the policy and procedures.

11   Q.   Okay.   But when I asked, "You're not aware of the

12   procedures requiring anything beyond verify ID?," you said,

13   "That is correct."

14   A.   And I'm saying that I answered that incorrectly.   I did

15   not understand the question in its entirety.   And, yes, I

16   stated that.   But our policy and procedures tell the team

17   member to do more than just verify ID.

18   Q.   All right.   And that is that they should look at the iTop

19   notes?

20   A.   That is that they're looking at the system of record.

21   Q.   All right.   But would you agree that no matter what they

22   see in the iTop notes, they cannot make a determination that

23   the account results from identity theft?

24   A.   They cannot rule and state that it is identity theft.

25   Q.   So they're always going to identify an identity theft

1    dispute as accurate, right?

2    A.   I don't -- can you ask that question again?

3    Q.   Because the ACDV operators cannot make a determination as

4    to whether an account is the result of identity theft, in

5    responding to the ACDV, they're going to always verify that

6    the account is accurate, because they cannot make a

7    determination that it's not accurate?

8    A.   They're going to respond to the ACDV based off of the

9    system of record notes.  So if it is the case that it hasn't

10   been determined fraud yet, they're going to respond back as

11   the information is accurate.  If the fraud investigation was

12   completed, then they would go ahead and move forward and

13   follow that policy and change the information.

14   Q.   So is it fair to say the only way that the ACDV operator

15   could respond to an identity theft dispute other than

16   verifying it as accurate is if the fraud department has

17   already done an investigation, concluded the account is fraud,

18   made a notation in the system of record, and the ACDV looked

19   and saw that notation?

20   A.   That is correct.

21   Q.   All right.  And here there was never a notation in the

22   system of record by the fraud department that this account was

23   verified -- was fraud, except possibly after Mr. Sponer sued

24   Wells Fargo, correct?

25   A.   That is correct.

1  Q.  Now, is it your view, Wells Fargo's view, that if it

2  follows its policies and procedures, then it complies with the

3  FCRA?

4          MR. FRANSEN:  Objection, relevance.

5          THE COURT:  Overruled.

6          THE WITNESS:  If we're following our policy and

7  procedures, yes.

8  BY MR. SOLA:  (continuing)

9  Q.  All right.  So your view is -- well, so Wells Fargo's

10  position is that as long as it followed its policies and

11  procedures, it complied with the FCRA, even if information

12  that is inaccurate is not corrected?

13  A.  Our policy and procedures are written in correspondence to

14  the FCRA.  So at that time we are following the policy and

15  procedures based off of the system of record information and

16  what has been made available to us.  So yes.

17  Q.  All right.  And you agree that if Wells Fargo followed its

18  policies and procedures, then it complies with the FCRA, even

19  if it responds to an ACDV and says information that is

20  inaccurate is accurate?

21  A.  At the time of review, if the information is there, not

22  supporting that the information is not accurate, yes, they're

23  responding truthfully, because there is an investigation going

24  on.  They don't know and cannot determine what -- what's going

25  to happen after the end of the fraud investigation.  So the

Braxton - X

1    team member is following policies and procedures and

2    responding in regards to what the FCRA is asking us to do.

3    Q.   So fair to say, Wells Fargo's position is no matter what

4    the response is to the CRA and whether they continue to report

5    inaccurate information, as long as they follow procedures, you

6    believe they complied with the Fair Credit Reporting Act?

7    A.   The team members did not know that the information was

8    inaccurate, so yes.

9    Q.   You mean the ACDV operators did not have information that

10   they could use to determine that it was -- well, they couldn't

11   determine it was inaccurate, could they?

12   A.   They could not.

13   Q.   But you agree that when Wells Fargo gets a notice of

14   dispute from a CRA, it must make a determination as to whether

15   the disputed information is inaccurate?

16   A.   They are to review the account to see if there's any

17   inaccurate information and provide a response.

18          MR. SOLA:  All right.  Could we look at Exhibit 12.

19   Do you mind?

20          Thank you.

21          And, actually, the January letter, can you pull that

22   up?

23          MR. FRANSEN:  It's 11.

24          MR. SOLA:  Okay.  Great.

25

Braxton - X

1    BY MR. SOLA:   (continuing)
2    Q.   So this is a January 19, 2017 letter that plaintiff sent
3    to Wells Fargo, right?
4    A.   Yes.
5    Q.   And in it he says, in the very first sentence, "I am the
6    victim of identity theft and I am writing to dispute certain
7    information you have reported about me to the credit reporting
8    agencies," right?
9    A.   Yes.
10   Q.   Now, actually, you agree that the credit bureau operations
11   department, which you're head of, that's the department
12   responsible for making sure that information reported to the
13   CRAs is accurate, right?
14   A.   Correct.
15   Q.   So if a consumer has a dispute about accuracy of
16   information, it would be very appropriate for that letter to
17   go to the credit bureau operations department, right?
18   A.   It would be in regards to the credit, but we would still
19   have to work with the fraud department, because he's stating
20   he's the victim of identity theft.  We can't determine that in
21   credit bureau operations, so we would forward that on to the
22   fraud department, and that would start the investigation.
23   Q.   But you didn't forward this letter on to the fraud
24   department, did you?
25   A.   Um, I can't -- I can't state that we didn't forward it on

Braxton - X

1    to the fraud team.  I believe that there were documents that

2    said it was forwarded on to fraud.  I can't -- I can't state

3    that it made it to fraud.

4    Q.  Well, the fraud department never responded to this letter,

5    did it?

6    A.  Not to my knowledge.

7    Q.  All right.  So are you saying you think they got it and

8    just failed to respond?

9    A.  I cannot state that they received it forwarded from my

10   team.

11   Q.  And do you have any record that it was forwarded to the

12   fraud department?

13   A.  We don't have, like, any tracing record.  But there was

14   documentation on one of the letters stating that it was

15   forwarded over.

16   Q.  There was documentation on what?

17   A.  I believe in one of the exhibits, I saw there was a

18   handwritten note on the letter from my team stating that it

19   was forwarded to fraud.

20   Q.  All right.  We'll move on.

21          The credit bureau operations got this.

22   A.  Yes.

23   Q.  They clearly saw that his dispute was that he was the

24   victim of identity theft, correct?

25   A.  Correct.

Braxton - X

1              MR. SOLA:  Let's look at Exhibit 12.

2    BY MR. SOLA:  (continuing)

3    Q.  And then the credit bureau operations sent this response

4    February 15, right?

5    A.  Correct.

6    Q.  And it doesn't make any mention of identity theft, does

7    it?

8    A.  It does not.

9    Q.  Okay.  From this letter, your response -- you actually

10   only refer to him providing documents such as cancelled checks

11   or receipts; is that right?

12   A.  That's correct.

13   Q.  So this letter is not responsive to a dispute of identity

14   theft, is it?

15   A.  It doesn't state "identity theft."  But at that time, this

16   is the letter that they used for identity theft.

17   Q.  This is the form letter they used for identity theft?

18   A.  This is the letter that we used at that time.

19   Q.  This letter that doesn't mention identity theft --

20              MR. FRANSEN:  Objection, asked and answered.

21              THE COURT:  Overruled.

22   BY MR. SOLA:  (continuing)

23   Q.  This letter that doesn't mention identity theft, that asks

24   the consumer for copies of cancelled checks or

25   receipts -- well, first, do you agree that cancelled checks or

1   receipts would not be relevant to an identity theft dispute?

2   A.  Yes.  Today I do.

3   Q.  So this letter that does not mention identity theft, that

4   asked for information that's not relevant to identity theft,

5   is the form letter that Wells Fargo uses to respond to

6   disputes of identity theft?  Is that your testimony?

7   A.  It is.  At that time this is what they put in place.  I

8   wasn't there, so I can't state why they asked for cancelled

9   checks or receipts.  Maybe it made sense at that time in that

10  era.  Today it doesn't, and that's why I testified that that

11  letter is not in practice anymore.

12  Q.  All right.  But Mr. Sponer would not be the only person

13  who received this form letter in response to a dispute of

14  identity theft, right?

15  A.  Agree.

16  Q.  And this letter doesn't ask for any identifying -- any

17  identification documents, does it?

18  A.  I believe them asking for the cancelled checks and

19  receipts was some of their identifiers that they were asking

20  for at that time.

21  Q.  It doesn't ask for a Social Security card, does it?

22  A.  It does not.

23  Q.  It doesn't ask for a driver's license, does it?

24  A.  It does not.

25  Q.  Now, at the time Mr. Sponer made his January 2017 dispute,

Braxton - X

1  Wells Fargo had gotten the car back, right?

2  A.   January 2017?

3  Q.   January 2017.

4  A.   2017.

5  Q.   Yes.

6  A.   Yes.

7  Q.   All right.  And they got the car back because the criminal

8  case had been completed, right?

9  A.   Correct.

10  Q.   In other words, the thief had been convicted?

11  A.   Correct.

12  Q.   And so then there's no question that it's identity theft

13  in Wells Fargo's eyes, correct?

14  A.   Correct.

15  Q.   All right.

16          MR. SOLA:  Can you put that back up?

17  BY MR. SOLA:  (continuing)

18  Q.   But this letter, if you look at this second -- the second

19  paragraph, after "Thank you," it says, "Wells Fargo Dealer

20  Services has verified that the information being sent to the

21  consumer credit reporting agencies on this account is

22  accurate."

23          But you --

24  A.   Go ahead.

25  Q.   But you agree that the information was not accurate,

1  right?

2  A.   The information based off of that time, it was still in

3  investigation.  So we did not have the information to state

4  that the information was inaccurate.

5  Q.   We just established by this time the criminal had been

6  convicted, you got the car back.  There was no question, even

7  if there had been previously, that the account was identity

8  theft, right?

9  A.   Based off the information in the system of record, we did

10  receive the car back, somebody was convicted, but the fraud

11  investigation was still going on.  So at that time the team

12  member still cannot, even if the notes are saying that

13  somebody has been convicted, state that that's truly identity

14  theft until fraud is done with their investigation.

15  Q.   All right.  So even though the criminal had been

16  convicted, Wells Fargo had gotten the car back, the fraud

17  department still hadn't completed its investigation, right?

18  A.   It was still going on, correct.

19  Q.   Yeah.  You don't know what they're doing to investigate,

20  do you?

21  A.   I do not know the fraud process or procedures.

22  Q.   And because they had not completed their investigation,

23  the credit bureau operations department was required to say

24  this information was accurate, right?

25  A.   We are going off of what is available at that time, so

1    yes.

2    Q.   Okay.  But you'd agree that Wells Fargo did not verify

3    that the information being sent to the CRAs was accurate, did

4    it?

5    A.   It did verify, based off of the system of record at that

6    time.  We didn't have anything telling us that it was

7    inaccurate information.  We did understand that it was fraud,

8    in a fraud investigation, but that was all that was given to

9    the team members at that time.  So they didn't have anything

10   to go back and say, "This is inaccurate information," in

11   response to the ACDV.

12   Q.   Okay.  But by "verify," what I mean is looking into a

13   circumstance and trying to make a determination, like verify

14   accuracy.  That would be looking at information and doing an

15   investigation to determine if it's accurate.  Does that

16   comport with your meaning of "verify"?

17   A.   So they would be looking at the information, such as the

18   customer demographics.  They would be looking at the system of

19   record.  But their policy and procedure does not call out for

20   exceptions based on an officer calling in or other leading

21   information that would determine that this is potentially

22   identity theft.  They are going to look at the demographics,

23   the system notations, to see where the fraud investigation is,

24   and then respond, based off of that information, to the ACDV.

25   Q.   Well, maybe this situation is comparable to the ACDV.  In

1    other words, the credit bureau operations department will look

2    at the system of record, and no matter what else is in

3    there -- and at this time a convicted thief would be noted in

4    there and the car being returned would be noted in there.

5    They cannot do anything other than verify, unless the fraud

6    department has completed its investigation, which has now been

7    pending for about four months, and determine that it's fraud,

8    correct?

9    A.    Correct.

10   Q.    Would you look at Exhibit 33.

11           Now, you talked about Exhibit 33.  This is an ACDV

12   that Wells Fargo received, right?

13   A.    Correct.

14   Q.    And this is Wells Fargo's version of it; is that right?

15   A.    Yes.

16   Q.    And we've seen the Equifax version of these ACDVs.

17   They're a little bit different.  They're landscape in format,

18   right?

19   A.    Correct.

20   Q.    But the essence of these ACDVs are the same; in other

21   words, the dispute that's made and conveyed, the dispute

22   that's conveyed from the CRA to Wells Fargo and Wells Fargo's

23   response?

24   A.    Yes.

25   Q.    Okay.  And so with this ACDV you responded on

1    November 3rd, right?

2    A.    I think so.  I can't see the date.  Sorry.

3              Yes.

4    Q.    And these are chronological, right, starting with 33?

5    A.    Yeah.

6    Q.    Okay.  So -- and Wells Fargo followed its procedures,

7    right?

8    A.    Yes.

9    Q.    And you talked about how you interpreted the box at the

10   bottom as indicating what the ACDV operators did, right?

11   A.    Correct.

12   Q.    But you concede that they never investigated whether it

13   was identity theft, right?

14   A.    They didn't investigate that -- the fraud investigation,

15   but they did mention, as in this ACDV, that per their review,

16   it was sent to fraud.

17   Q.    That's right.  But they knew that the dispute was identity

18   theft because it's on the ACDV, right?

19   A.    That's correct.

20   Q.    But they did not investigate whether it was identity

21   theft, right?

22   A.    They do not do that.

23   Q.    All right.  And under those procedures that Wells Fargo

24   followed for this ACDV, it verified that the fraudulent

25   account belonged to plaintiff, right?

Braxton - X

1   A.   Based off of the information they had at that time, yes.

2   Q.   All right.

3             MR. SOLA:  Can we look at Exhibit 34.

4   BY MR. SOLA:  (continuing)

5   Q.   And this is another ACDV, we'll just say in the fall of

6   2016; is that right?

7   A.   Yes.

8   Q.   And, again, the dispute is that the account is identity

9   theft, right?

10  A.   Correct.

11  Q.   And, again, the ACDV operators cannot investigate that

12  dispute, right?

13  A.   They can't determine the status of the fraud case pending.

14  Q.   And so under Wells Fargo's procedures, it verified that

15  the fraudulent account belonged to plaintiff, in its response?

16  A.   It verified the customer demographics.  It looked at the

17  system of record and saw the status of the fraud

18  investigation.

19  Q.   Yeah.  But I'm trying to get the result here, because

20  that's really all that matters for Mr. Sponer and other

21  consumers, right, is what's the result of the investigation

22  and is the item going to stay on my credit report or is it

23  going to come off, right?

24  A.   Correct.

25  Q.   And the result, following Wells Fargo's procedures here,

1   was that the fraudulent account would remain on its credit

2   report, right?

3   A.   Until we got information of the fraud investigation

4   completion.

5   Q.   All right.  Would you look at Exhibit 35.  This is another

6   ACDV from 2016, correct?

7   A.   Correct.

8   Q.   And, again, it indicates that the dispute is identity

9   theft, right?

10  A.   Correct.

11  Q.   And, again, pursuant to Wells Fargo's procedures, it

12  verified that the fraudulent account belonged to plaintiff.

13  A.   Again, my answer is the same.  They verified, based off of

14  what was in the system of record at that time, that it was

15  still in open fraud investigation and responded to the ACDV.

16  Q.   Okay.  And their response was that the fraudulent account

17  belonged to plaintiff; is that right?

18  A.   Based off of the information in the system, the only

19  option they had to respond to the ACDV is that it's still in

20  investigation, and they cannot change any of the information

21  on the ACDV at that time.

22  Q.   Well, but they didn't respond saying it was still in

23  investigation.  They responded by verifying to Equifax that it

24  was not fraud, right?

25  A.   There's not an option, when responding to the credit

1    reporting agency, to tell them that your case is active in

2    fraud.  So the only option that we have, given by the CRA, is

3    just to respond based off of the letter -- like the XC, the

4    compliance condition code, that we've investigated the ACDV

5    and we disagree with the consumer at that time.

6    Q.   Now, you saw or heard Celestina Gobin, the Equifax

7    representative, right?

8    A.   Yes.

9    Q.   And she indicated that when they sent -- well, most of

10   these ACDVs were through Equifax.  She indicated when they

11   sent those ACDVs, they expected Wells Fargo to do an

12   investigation as to whether the account was identity theft,

13   right?

14   A.   Correct.

15   Q.   But you agree the credit bureau department did not do such

16   an investigation, right?

17   A.   We did do an investigation.  We reviewed the account and

18   we saw that the account was in a fraud investigation status.

19   And at that time there wasn't a response we could provide back

20   to Equifax of the result of the fraud investigation.

21   Q.   But my question was:  You agree that the credit bureau

22   department did not do an investigation as to whether it was an

23   identity theft?

24           MR. FRANSEN:  Objection, asked and answered.

25           THE COURT:  Sustained.

Braxton - X

1    BY MR. SOLA:   (continuing)

2    Q.   And you also heard her testimony that when Equifax got the

3    responses from Wells Fargo, it understood that Wells Fargo had

4    determined that the account belonged to plaintiff?

5    A.   At that time of the ACDV review, that's the information

6    that we had to provide back to Equifax, yes.

7    Q.   All right.   And this procedure, in verifying, that is what

8    you intended to respond to Equifax, right?

9    A.   It's a requirement that we verified the customer

10   demographics and continue to follow the policy and procedure

11   and provide a response back to the CRA.

12   Q.   But my point is, there was no mistake made here by Wells

13   Fargo in its processing of these ACDVs, was there?

14   A.   In regards to the ACDVs, the team members responded based

15   off of the information in the system of record at that time.

16   So they would have been responding accurately until the fraud

17   investigation changed something.

18   Q.   My question was:   There was no mistake made by the ACDV

19   operators and how they processed these disputes, right?

20   A.   They followed policies and procedures, yes.

21   Q.   In other words, Wells Fargo intended that Equifax keep

22   reporting this fraudulent account on Mr. Sponer's credit

23   report, right?

24   A.   We intended to provide the information that we had within

25   our system of record until the investigation was completed by

1   fraud.

2   Q.   Okay.  Ma'am, you understood that when you verified, the

3   information would continue to be reported on Mr. Sponer's

4   report, right?

5   A.   It was -- yes.  It's an open trade line, and we responded

6   to the ACDV.  That would not change the trade line from being

7   reported.

8   Q.   All right.  And your response that you knew would result

9   in this account remaining on Mr. Sponer's credit report was

10  what you intended to respond?

11  A.   We had to continue to report and respond to the ACDVs

12  based off of the information in the system of record at that

13  time.

14  Q.   Okay.  But my question was:  The response that you sent,

15  that you knew would keep this account on Mr. Sponer's report,

16  was what Wells Fargo intended to respond?

17  A.   It is -- it is our job to respond to the ACDVs and to

18  report the information that's available in the system at that

19  time.

20  Q.   Okay.  What I'm trying to determine is between --

21  sometimes we do things we intend to do, and sometimes we do

22  things that we don't intend to do, we make a mistake.

23          Would you agree with me here that Wells Fargo

24  intended to make the response to Equifax that this was

25  verified, knowing it would stay on Mr. Sponer's credit report?

Braxton - X

1  A.   At the time we responded to the ACDV, there was nothing in

2  the system for us to not report the information on the

3  customer's credit report.

4  Q.   I'd really like an answer.   I really don't like asking the

5  question multiple times.

6  A.   I guess I feel like I'm answering the question.   I can't

7  say that it was our intention.   We were following the policies

8  and procedures to report the information that was available.

9  At that time we were reporting what was in the system of

10 record, and we knew that a fraud investigation was pending,

11 but there was nothing that allowed us to move forward and

12 change that response which would have changed the reporting of

13 Mr. Sponer's account.

14 Q.   Maybe I can phrase it this way.   It was intentional, in

15 the sense that that was the response that was required to be

16 sent under Wells Fargo's policies and procedures.   Would you

17 agree with that?

18 A.   I guess not intentional.   We were providing the

19 information in the system of record at that time.   So, yes,

20 we're responding based off of that time of that ACDV.

21 Q.   Let's move on.

22       MR. SOLA:   Exhibit 36, if you will.

23 BY MR. SOLA:   (continuing)

24 Q.   All right.   And this is another ACDV.   We're still in

25 2016.   And, again, the dispute is identity theft.   And Wells

1  Fargo, pursuant to its procedures, again verified the account

2  as belonging to plaintiff in its response, correct?

3  A.   Yes.

4          MR. SOLA:  Could we look at Exhibit 37.

5  BY MR. SOLA:  (continuing)

6  Q.   Okay.  In Exhibit 37, I think I can read the initials down

7  there, BF.  Is that right?

8  A.   Correct.

9  Q.   So this is Brian Funsch who we heard from?

10  A.   Correct.

11  Q.   This is the investigation he testified only took a few

12  minutes, right?

13  A.   Per his testimony, right.

14  Q.   And you have no reason to disbelieve that testimony, do

15  you?

16  A.   No.

17  Q.   And because he followed Wells Fargo's procedures, he sent

18  back a response verifying the fraudulent -- verifying the

19  fraudulent account as belonging to Mr. Sponer, correct?

20  A.   Yes.

21  Q.   All right.

22          MR. SOLA:  Let's look at Exhibit 38.

23  BY MR. SOLA:  (continuing)

24  Q.   This is another ACDV, and now we've moved into November

25  2017; is that right?

Braxton - X

1    A.   Yes.

2    Q.   Okay.  Wells Fargo has more information in November 2017

3    than it had back in November 2016.  Would you agree?

4    A.   Yes.

5    Q.   Okay.  In addition to all the information it had from the

6    police about the suspect pleading guilty -- that was around

7    November 3rd, as I recall.  As you and I have established, by

8    January the suspect is convicted, the car is returned to Wells

9    Fargo.  And, as I think you said, that confirms that the

10   account is identity theft, right?

11   A.   Based off of the information that I know today, that

12   information is -- was relevant.  But at that time, the fraud

13   investigation was still going on.

14          I can't, you know, answer to the fact of

15   that -- where I'm sitting at today and understanding all the

16   information, that that information is not accurate.

17          However, it's not our policy and procedure to use

18   that information to determine how we respond back to an ACDV.

19   Q.   That's right.  But the fraud department, they've got all

20   the information about the criminal case, right?

21   A.   From my understanding, they do.

22   Q.   In fact -- I mean, I would presume that since it's called

23   the fraud department, it knows how to investigate a claim of

24   fraud, right?

25   A.   Yes.

Braxton - X

1   Q.  And so the fraud department in January of 2017 knows that

2   the person is convicted, right?

3   A.  I would assume so.  I wouldn't know.

4   Q.  All right.  Well, let's just say this.  It's in Wells

5   Fargo's records, right?

6   A.  Yes.

7   Q.  And the ACDV people have access to those records, right?

8   A.  Yes.

9   Q.  And the fraud department would have access to those

10  records, right?

11  A.  Yes.

12  Q.  In addition to that conviction of the thief, Mr. Sponer

13  has sent in an FTC fraud affidavit and a police report.  That

14  was what accompanied his January letter that we looked at

15  earlier.

16  A.  Yes.

17  Q.  So Wells Fargo has all that additional information when it

18  gets this ACDV in November.  Yet, pursuant to its procedures,

19  it verifies this fraudulent account as belonging to

20  Mr. Sponer, correct?

21  A.  At that time, yes.

22          MR. SOLA:  Let's look at Exhibit 39.

23  BY MR. SOLA:  (continuing)

24  Q.  And this is another ACDV.  We'll say November.  I have a

25  note that it's November 30th, but it's so hard to read.  You'd

Braxton - X

1    agree it's another ACDV in the fall of 2017?

2    A.   Yes.

3    Q.   And, again, pursuant to Wells Fargo's procedures, this

4    fraudulent account is verified as belonging to Mr. Sponer?

5    A.   Yes.

6         MR. SOLA:  Let's look at Exhibit 40.

7    BY MR. SOLA:  (continuing)

8    Q.   This is another ACDV in late 2017.  And, again, despite

9    all the information that Wells Fargo has that this account is

10   fraudulent, pursuant to its procedures, it verifies to Wells

11   Fargo -- I mean, to Equifax that it belongs to Mr. Sponer,

12   correct?

13   A.   That the account was still in fraud investigation, so we

14   responded to the ACDV.

15   Q.   I think we established that earlier, that even in November

16   of 2017, which is 13 months after the fraud department

17   allegedly opened an investigation, they still haven't finished

18   that investigation, right?

19   A.   That's correct.

20   Q.   Would you look at Exhibit 41.  This is an ACDV also from

21   December 2017, right?

22   A.   Yes.

23   Q.   All right.  And, again, Wells Fargo, pursuant to its

24   policies and procedures, verified the fraudulent account

25   belonged to Mr. Sponer?

1  A.   It was still in open investigation, fraud investigation,
2  yes.
3  Q.   The fraud investigation that's always ongoing until
4  Mr. Sponer sues Wells Fargo, and then about five weeks after
5  that, then they indicate they've completed, right?
6  A.   Yes.
7  Q.   Now, look at Exhibit 42.  And this is another ACDV from
8  December 22, 2017.  And, again, through Wells Fargo's policies
9  and procedures, it verifies that this fraudulent account
10 belongs to Mr. Sponer, knowing that that response means it
11 will continue to be reported on his credit report, correct?
12 A.   We still didn't have information at that time to report
13 anything differently, yes.
14 Q.   All right.  Now, the fraud department, as we indicated,
15 you know, they got Mr. Charne's letter October 19, 2016, and
16 shortly thereafter opened an investigation, right?
17 A.   I'm sorry.  Who opened the investigation?  I'm sorry.  I
18 missed that.
19 Q.   Okay.  Well --
20 A.   So we received his letter, yes.  And then a few days we
21 responded back to that letter, asking for information from
22 Mr. Sponer.
23 Q.   I understand.  But the fraud department, they're not under
24 any time restriction in terms of determining whether it's
25 fraud or not, right?

Braxton - X

1    A.   I don't know their policies and procedures or their times.

2    Q.   I mean, if there is a time restriction, it must be a very

3    flexible one, because we've seen that for 14 months they never

4    complete their investigation, right?

5            MR. FRANSEN:   Objection, lacks foundation.

6            THE COURT:   Sustained.

7    BY MR. SOLA:   (continuing)

8    Q.   Now, you heard Mr. Thomas Tarter, the expert in banking,

9    state that when there's multiple disputes by a single consumer

10   stating, you know, that they're claiming inaccurate

11   information is not getting corrected, that should raise a red

12   flag and someone should go to management to alert them of that

13   situation.   Did you hear that testimony?

14   A.   I did.

15   Q.   And you agree here that despite Mr. Sponer's multiple

16   disputes, no one at Wells Fargo in the credit bureau

17   operations department, none of the ACDV operators, no one ever

18   took this issue up to management to see if there was some

19   problem here?

20   A.   They did not, because it's not uncommon for a consumer to

21   submit multiple disputes.

22           As stated earlier, we receive, and you mentioned, up

23   to 31,000 disputes a month.   We have customers and consumers

24   that try to trick the system, and that's why we get multiple

25   disputes.   So it's not uncommon to receive multiple disputes

Braxton - X

1    from one individual, and we respond to every dispute on its

2    own.  So every ACDV is treated the same.  We review and we

3    investigate per our policies and procedures.

4            So the testimony that Mr. Tarter gave, it's one-sided

5    and making it seem that we -- it's not common to receive

6    multiple disputes.  It is very common that we receive multiple

7    disputes from one person, so it wouldn't raise red flags.

8    Q.  Well, first off, you said you treat each dispute

9    individually, right?

10   A.  We investigate each dispute.

11   Q.  And there was no suspicion at all that Mr. Sponer's

12   disputes, you know, were somehow invalid, right?  He wasn't

13   trying to trick Wells Fargo, was he?

14   A.  I can't answer that.  We received the dispute and we

15   responded based off of the system of record, and that's why we

16   allow fraud to complete the investigation.  We have to allow

17   them to follow their policies and procedures and provide us

18   the information and let us know if the identity theft is truly

19   an identity theft.

20   Q.  Okay.  But I asked you about not raising Mr. Sponer's

21   multiple disputes to management, and I think your answer was

22   "Well, we don't raise to management because we get so many

23   disputes."  Is that --

24   A.  That's not accurate.

25   Q.  I don't want to misstate.

Braxton - X

1  A.   Okay.

2  Q.   Well, what is the reason again -- well, let's talk about

3  Mr. Sponer, because you said you treated him as an individual.

4  A.   Correct.

5  Q.   All right.  So you agree that even though Mr. Sponer had

6  made multiple disputes, you didn't -- nobody raised that to

7  management, right?

8  A.   We didn't receive multiple disputes at the same exact

9  time.  We received them over a period of time.  So it wasn't

10  three the same day.

11          And, also, we reviewed the ACDV based off of our

12  policies and procedures and provided a response in regards to

13  that dispute.

14  Q.   And you said you get multiple disputes, sometimes from the

15  same consumer; is that right?

16  A.   Correct.

17  Q.   All right.  And isn't it possible the reason you get

18  multiple disputes from the same consumer is because under your

19  policies and procedures, the ACDV department cannot

20  investigate disputes of identity theft, and basically the

21  default there is to always verify that identity theft disputes

22  are not valid?

23  A.   That's not true.  So we receive more than identity theft

24  disputes.  And we respond to each dispute.  We just have some

25  consumers that are trying to cheat the system.

Braxton - X

1  Q.  Well, what is your basis for saying -- well, let me ask

2  this.  Is Wells Fargo then treating the disputes from

3  consumers as if they're trying to cheat the system?

4  A.  No.  So we don't -- Wells Fargo does not adopt a frivolous

5  policy.  That's why we treat every single ACDV dispute -- we

6  follow policy and procedure as if it's the first time they've

7  ever contacted the company in regards to a dispute.  We don't

8  look at other disputes that they may have filed with our

9  company and answer based off of the previous dispute.  We do a

10  new investigation every single time.

11  Q.  Well, you're required to do a new investigation every

12  single time, aren't you?

13  A.  We do.  But there is -- in the FCRA, there is a frivolous

14  policy.

15  Q.  All right.  That does not apply to disputes you get

16  through ACDVs, does it?

17  A.  I can't answer that.

18  Q.  Well, let's talk about this mechanism.  The jury will

19  remember in my opening, I showed a chart of the dispute

20  through the CRA.

21  A.  Uh-huh.

22  Q.  And you agree that when a consumer disputes to the CRA,

23  the CRA, they have an option, when they get that dispute, to

24  go back to the consumer, if there's any kind of suspicion or

25  any kind of concern by the CRA that maybe this isn't the

1   consumer disputing or any reason they feel -- they have to

2   have a reason for it, but anything they have a good reason

3   for, they go back to the consumer and can ask for more

4   information, right?

5   A.   They have that option to do so.

6   Q.   And, actually, that's called a determination that the

7   dispute is frivolous or irrelevant, right?

8   A.   Correct.

9   Q.   And so any dispute that goes to a furnisher, such as

10  these, they've already been filtered by the CRA, and the CRA

11  has said, "We believe this is a valid dispute."  I don't mean

12  that the information is inaccurate, but "We believe this is a

13  bona fide consumer making this dispute," right?

14  A.   I can't say what their policy and procedure is.  But we

15  know that not all CRAs have adopted that policy today.  So we

16  may get an ACDV sent from the CRA that would have -- could

17  have been one that they blocked prior to.  So the practice

18  isn't consistent as you're laying it out to be by the CRA.

19  Q.   Well, the CRAs, they have that ability to reject disputes,

20  right?

21  A.   They do have that ability.

22  Q.   And, you know, the CRAs -- well, and so anything you got

23  was not rejected by the CRA, anything Wells Fargo gets, right?

24  A.   It was not, no, because we received the ACDV.

25  Q.   And you agree that as far as Mr. Sponer's disputes, there

1  was never any doubt that he was the one making the dispute,

2  right?

3  A.   Correct.

4  Q.   All right.  You never needed any identification from

5  Mr. Sponer to investigate his disputes, did you?

6  A.   We do not ask for identification.

7  Q.   That's because you didn't need any identification, did

8  you?

9  A.   Correct.

10 Q.   You didn't need his Social Security card, did you?

11 A.   The ACDV department, we do not ask for a Social Security

12 card.

13 Q.   Let's look at the --

14        THE COURT:  Why don't we go ahead and take our mid

15 morning recess at this time.  We'll be in recess for 15

16 minutes.

17        Jennifer will escort you out.  Thank you.

18        (A recess is then taken.)

19        (The Court, counsel, the parties, the witness, and

20 the jury reconvene.)

21        THE COURT:  Be seated.

22        You may proceed.

23        MR. SOLA:  Can we look at Exhibit 560.

24 BY MR. SOLA:  (continuing)

25 Q.   And these are procedures for your department; is that

1    right?

2    A.   That is correct.

3    Q.   Okay.  And you said you read Bets Berg's deposition; is

4    that right?

5    A.   That's correct.

6    Q.   And do you remember her testifying that she was not aware

7    of any other procedures that would have been related to

8    identity theft?  In other words, she was not aware of these

9    procedures?

10   A.   I believe so, yes.

11   Q.   Okay.  So you're offering these procedures today, but the

12   head of the dispute department at the time that Mr. Sponer

13   made -- I mean, the head of the credit bureau operations

14   department at the time Mr. Sponer made his disputes was not

15   even aware these procedures even existed, correct?

16            MR. FRANSEN:  Objection, assumes facts not in

17   evidence.

18            THE COURT:  Overruled.

19            You can answer that question.

20            THE WITNESS:  Can you ask it again?

21   BY MR. SOLA:  (continuing)

22   Q.   You just testified that Bets Berg testified she was not

23   aware of these procedures.

24   A.   That's correct.

25   Q.   And my point is, Bets Berg was the head of the credit

1  bureau operations at the time of Mr. Sponer's dispute.

2  A.   Correct.

3  Q.   So the head of the credit bureau operations at the time of

4  Mr. Sponer's disputes was not even aware that these procedures

5  existed, correct?

6  A.   Correct.

7  Q.   Now, they're in two parts -- well, a few parts.  But

8  there's 508.  Then if we could look at the next page, 509, and

9  then if we look at the next page, accounts easily identified

10 as fraud -- do you see that?

11 A.   Yes.

12 Q.   And you agree, you don't know if Mr. Sponer's disputes

13 were put into this category, right?

14 A.   Put into this category?

15 Q.   Of accounts easily identified as fraud.

16 A.   Using these procedures, I don't know, correct.

17 Q.   And if we flip to the next page, accounts not easily

18 identified as fraud, you don't know if Mr. Sponer's disputes

19 were put in this category, right?

20 A.   Correct.

21 Q.   In fact, you'd agree that you don't know if these

22 procedures are relevant -- yeah, you don't know if these

23 procedures are even relevant to Mr. Sponer's dispute, right?

24 A.   I disagree.  These are the policies and procedures that a

25 team member would follow if there's mention of identity theft.

Braxton - X

1  Q.  But, ma'am, in your deposition --

2          MR. SOLA:  Counsel, page 96, line 18.

3  BY MR. SOLA:  (continuing)

4  Q.  Do you remember your deposition was taken?

5  A.  I do.

6  Q.  Okay.  And do you remember, the question was "You don't

7  know if these are relevant to these disputes?"  And you said,

8  "Correct."

9  A.  I did not understand the question.  And so I may have made

10  a mistake in my response to you in my deposition.

11  Q.  All right.  You'd agree you cannot confirm that these

12  procedures -- let's start on page 508, so the whole five or

13  six pages.  You cannot confirm that these procedures were

14  followed in regard to Mr. Sponer's disputes, can you?

15  A.  I believe that the procedures were followed.  I

16  cannot -- I can state that I did not witness the team members

17  utilizing the procedures in their review.

18  Q.  Well, ma'am, again, in your deposition, page 98, line 24,

19  "Question:  And you don't know if these procedures were

20  followed in regard to Mr. Sponer's disputes, any of these on

21  page 508 through 513, right?

22          "Answer:  I can't confirm that these policies and

23  procedures were used."

24  A.  I also stated in my deposition that -- I corrected myself,

25  because I did not understand the question you were asking, and

Braxton - X

1    I did state in my deposition that I do believe that the

2    procedures from 508 to 513, I believe -- I stated that they

3    were followed, but I did not witness the team member utilizing

4    the procedure is what my correction was in my deposition.

5    Q.   Okay.  Well, just to clarify, so you're saying -- and I

6    think you say that you think all the procedures that apply to

7    Mr. Sponer's disputes were followed, right?

8    A.   I believe our policies and procedures were followed, yes.

9    Q.   But you have no personal knowledge as to whether they were

10   followed?

11   A.   I did not witness the team members utilizing the policies

12   and procedures at that time.

13   Q.   And, actually, there's no records in all of Wells Fargo's

14   documents indicating these policies and procedures in

15   Exhibit 560 were followed in regards to Mr. Sponer's disputes,

16   is there?

17   A.   Based off of the account notation within the ACDV

18   response, that would be my belief, that the policies and

19   procedures were followed.

20   Q.   I understand.  But there's no evidence in the records of

21   Wells Fargo that these policies and procedures were followed

22   in regard to Mr. Sponer's disputes, is there?

23   A.   I guess I would need you to re-ask the question in regards

24   to records, because the record would be the notation that the

25   team member placed in the ACDV response.  That is them stating

Braxton - ReD

1    the steps they took to verify the account and their

2    documentation.

3    Q.  All right.  But we didn't see any notations that indicated

4    there was any determination as to whether these accounts were

5    in the category of easily identified as fraud or not easily

6    identified as fraud?

7    A.  It is not a requirement nor in the policy and procedure

8    for them to document the policy and procedure they are using

9    to complete their investigation.

10   Q.  Okay.  Well, then we can leave it at this.  You believe

11   the policies and procedures were followed because that's what

12   you expect of the employees, right?

13   A.  That is correct.

14   Q.  But you don't know if they were?

15   A.  I did not witness.

16          MR. SOLA:  That's all the questions I have.

17          THE COURT:  Redirect.

18          MR. FRANSEN:  Thank you.

19

20                    REDIRECT EXAMINATION

21   BY MR. FRANSEN:

22   Q.  Ms. Braxton, you were asked a little bit about the CRA

23   process of filtering disputes.  Do you recall that?

24   A.  Yes.

25   Q.  Does a CRA have any obligation to filter out disputes that

Braxton - ReD

1    it receives?

2    A.    No.

3    Q.    They just have the option?

4    A.    Correct.

5    Q.    Now, you also were -- just a minute ago you were asked

6    about Bets Berg's testimony.  Now, you've heard Bets'

7    testimony?

8    A.    Yes.

9    Q.    And you've read her transcript?

10   A.    Yes.

11   Q.    Did she describe the content of the policies that we were

12   just looking at in Exhibit 560?

13         MR. SOLA:  Objection, leading.

14         THE COURT:  You can rephrase your question.

15   BY MR. FRANSEN:  (continuing)

16   Q.    Bets' testimony, did it -- can you describe, Bets

17   generally outlined the policy -- the procedure for responding

18   to identity theft disputes?

19   A.    Yes.

20   Q.    So she did?

21   A.    Yes.

22   Q.    Was that consistent with what's in Exhibit 560?

23   A.    It is.

24   Q.    And you said you don't know -- you said that you didn't

25   think or maybe the question was that Bets Berg wasn't aware of

1    that policy.  Do you recall that question?

2    A.   Yes.

3    Q.   All right.  Now, you don't know that Bets Berg was or

4    wasn't aware of a written document?

5    A.   That's correct.

6    Q.   Okay.  But you would -- would you expect, because she was

7    the head of credit bureau operations before you, that she's

8    aware of the content of the policy --

9    A.   Yes.

10   Q.   -- whether or not she specifically described that it was

11   in writing?

12   A.   Correct.

13   Q.   Okay.  Now, pursuant to that Exhibit 560 that we just

14   looked at, if a team member -- I think we already talked about

15   this, but the first thing the team member does is what when

16   they get a dispute?

17   A.   Verify the identifying factors.

18   Q.   And on the screen you're looking at right there, what's

19   number 1 under "procedure"?

20   A.   To access the account in iTop.

21   Q.   Okay.  So in every case, is your testimony that they will

22   look at iTop?

23   A.   Yes.

24          And so to elaborate on that, iTop is our system of

25   record.  And the team member, in order to see the credit

508

Braxton - ReD

1    reporting fields, you can only see that within iTop, so they

2    have to access iTop.

3    Q.   All right.   Based on this policy that we looked at

4    yesterday, what do they do if they look at the account and

5    they see that it's been flagged as fraud by somebody else in

6    Wells Fargo?

7    A.   Can you ask that question again?   I'm sorry.

8    Q.   Sure.

9             Based on the policy -- based on these policies that

10   are in Exhibit 560, what does the ACDV responder do if they

11   pull up iTop and see that a fraud flag has been placed on the

12   account?

13   A.   So they would continue to let fraud complete their

14   investigation, unless there was something there stating that

15   the investigation was completed.

16   Q.   And if the investigation was completed with a finding of

17   fraud, then what?

18   A.   They would move forward and change the account information

19   on the ACDV to report that back out to the CRAs.

20   Q.   And by that, do you mean they would delete the account for

21   fraud?

22   A.   They would delete the account for fraud.

23   Q.   And we also discussed that if fraud -- if the fraud

24   department -- based on these policies, if the fraud department

25   determines there's fraud, are they able to reach out directly

Braxton - ReD

1  to the credit bureau and delete the account?

2  A.   Yes.

3  Q.   They don't have to wait for a new ACDV to come in?

4  A.   They would not wait for a new ACDV.  They would send us a

5  response, just like we send them information, and they would

6  let us know that they found fraud; and we would go ahead and

7  submit an AUD to have the account updated right then and

8  there.

9  Q.   Now, all these ACDVs that we've looked at -- and you've

10  looked at them a couple times -- they all -- did they all

11  follow some indication that the fraud investigation was

12  active?

13  A.   Yes.

14  Q.   Okay.  All right.  Now, you were also asked if the ACDV

15  department -- ACDV response team, if they solely handle the

16  ACDV investigation of an identity theft dispute.  And I wanted

17  to ask you if you could clarify, what part of the dispute does

18  the ACDV team handle?

19  A.   So they would handle the investigation of the dispute of

20  the ACDV.

21  Q.   And then are they responsible specifically for completing

22  the response?

23  A.   For the response back on the ACDV, yes.

24  Q.   All right.  So no other department inputs information into

25  the ACDV response forms?

Braxton - ReD

1    A.   No other department has access to our ACDV form that we

2    would submit back out.

3    Q.   But does the fraud department have a role to play in

4    determining if fraud occurred?

5    A.   Yes.

6    Q.   And you've talked a little bit about the fact that there

7    are times where multiple ACDVs come in from the same consumer

8    in a short period of time.

9    A.   Yes.

10   Q.   And is there anything suspicious about one dispute coming

11   in and then several more coming in in the next few days?

12   A.   No.

13   Q.   And you said -- was there anything suspicious about three

14   or four or five ACDVs coming in in a day or two?

15   A.   No.

16   Q.   You don't presume that multiple disputes means somebody is

17   trying to -- I think you said catch you guys or trick you or

18   something like that.  You don't presume that's the case?

19   A.   No.

20   Q.   So that's why you respond to every ACDV?

21   A.   Correct.

22   Q.   And there's been testimony, and I think you were asked

23   about whether the ACDV responders can investigate fraud.  Do

24   you recall that --

25   A.   Yes.

Braxton - ReD

1  Q.  -- that testimony?

2          All right.  The policy we're looking at, 560, do you

3  recall if this policy contains the instructions for what an

4  ACDV responder is supposed to do to investigate?

5  A.  Yes.

6  Q.  Okay.  Do they perform an investigation?

7  A.  Yes.

8  Q.  Okay.  But part of that investigation might -- or would

9  part of that investigation potentially be to refer something

10  to the fraud department?

11  A.  Yes.

12  Q.  And if the fraud department is looking at something, would

13  it be consistent with the policy to allow the fraud department

14  to continue looking at it?

15  A.  That is correct.

16  Q.  You've also testified a little bit about the fact that

17  your department is responsible for reporting accurate

18  information.  Do you recall that?

19  A.  Yes.

20  Q.  What is the accuracy of the information based off of?

21  A.  Based off of what we have available -- been made available

22  to us from the CRA and within our system of record.

23  Q.  So is the idea that you want to make sure that you're

24  reporting what you intend to report?

25  A.  Correct.

Brady - D

1   Q.  And the policy we've looked at, if the fraud investigation

2   is still ongoing, the ACDV responders are not going to

3   indicate to delete the account?

4   A.  That is correct.

5   Q.  They're relying on the fraud investigation to run its

6   course or be completed?

7   A.  That is correct.

8           MR. FRANSEN:  All right.  No further questions.

9           THE COURT:  You may step down.

10           THE WITNESS:  Thank you.

11           THE COURT:  Call your next witness.

12           MR. PETERSON:  Defendant calls William Brady.

13           THE CLERK:  There are steps up there.

14           Please raise your right hand.

15

16                     WILLIAM BRADY

17   called as a witness in behalf of the Defendant, having been

18   first duly sworn, is examined and testifies as follows:

19

20           THE CLERK:  Please have a seat and state your name

21   and spell it.

22           THE WITNESS:  William Brady, W-i-l-l-i-a-m B-r-a-d-y.

23

24

25

513

Brady - D

DIRECT EXAMINATION

1

2   BY MR. PETERSON:

3   Q.   Good morning, Mr. Brady.

4           You were here in the courtroom yesterday, but you

5   were on video, so we're happy to have you here in person

6   today.

7           Can you -- who is your present employer?

8   A.   Wells Fargo.

9   Q.   And where do you presently work within Wells Fargo?

10  A.   For Wells Fargo wholesale day loss prevention and

11  compromised data.

12  Q.   And is that a relatively new position for you?

13  A.   Yes.  I started that in December of 2018.

14  Q.   And I'd like to go back.  When did you first start working

15  for Wells Fargo?

16  A.   May of 2009.

17  Q.   And what position did you begin with at Wells Fargo?

18  A.   I was a front -- a front end collections.

19  Q.   And was that within the auto or Dealer Services Division?

20  A.   Yes.  That was part of Dealer Services at the time.

21  Q.   Which is now known as Wells Fargo Auto?

22  A.   Yes, sir.

23  Q.   And how long were you with Wells Fargo Auto in the

24  collections division?

25  A.   For roughly four or five years, until 2014.

Brady - D

1    Q.   And what did you do in 2014?

2    A.   I started with the fraud department in 2014.

3    Q.   And what was your position within the fraud department?

4    A.   Operational risk consultant.

5    Q.   And what was your reason for leaving the fraud department

6    this past December?

7    A.   The team was displaced and the jobs were moved to

8    Minnesota, and I wasn't willing to relocate, so I decided to

9    apply for other jobs within Wells Fargo.

10   Q.   Okay.  When you were with the fraud team, what were your

11   responsibilities on a day-to-day basis?

12   A.   Working a shared e-mail box, receiving disputes from

13   customers regarding identity theft, reviewing applications for

14   potential identity theft or fraud, and working blocked

15   notifications and credit bureau disputes and stuff like that.

16   Q.   And you said you joined the fraud department in about

17   2014.  What sort of training did you have when you joined the

18   fraud department?

19   A.   We did a lot of side-by-side training with the employees

20   that were currently on the team, of just sitting with them,

21   them showing us the day-to-day processes of what we do as far

22   as working each -- each procedure.  And that lasted probably

23   about six months.  And then it was kind of continuously, you

24   know, learning, on-the-job training.

25   Q.   And then any other presentations or training that were

Brady - D

1  ongoing when you were with the fraud team?

2  A.   Yeah.  We would go to, like, different conferences, and

3  we'd give training classes to different groups within Wells

4  Fargo.

5  Q.   And when you were with the fraud team, where were you

6  based?

7  A.   In Greenville, North Carolina.

8  Q.   In your position with the fraud team, did you have some

9  involvement in Mr. Sponer's dispute of the account at issue in

10  this case?

11  A.   Yes.

12  Q.   I'm going to have some documents flash up on the screen

13  for you.  I'd like to start with Exhibit No. 2.  And this is

14  an exhibit that the jury and the Court, we've looked at a few

15  times.  This is a letter from an attorney named James Charne

16  to Wells Fargo Dealer Services; attention:  Fraud department.

17          Do you -- do you recall receiving this letter?

18  A.   I do recall receiving it.  I don't remember the exact

19  specifics of when I received it, but I do vaguely recall

20  receiving it, to start off the investigation.

21  Q.   And in your position, you deal with many disputes,

22  correct?

23  A.   Yes, sir.

24  Q.   And I'm going to have you look at Exhibit No. 3.

25          I'm sorry.  I'm actually going to have you look at

Brady - D

1   Exhibit 501.  Is Exhibit 501 -- do you recognize this
2   document?
3   A.   Yes.  This is a form letter that we would send out to
4   potential victims of identity theft.
5   Q.   And are you the author of this letter?
6   A.   Yes, sir.
7   Q.   And I want to look at a couple pieces of this.
8           Well, first let's go back to Exhibit 2.  Is it your
9   understanding, as you sit here today, that Exhibit 501, your
10  letter, that was in response to this Exhibit 2, Mr. Charne's
11  letter?
12  A.   Yes, as far as I can tell.
13  Q.   Okay.  And in Mr. Charne's letter, is it accurate that
14  he's providing some information about a dispute on behalf of
15  Mr. Sponer?
16  A.   Yes.
17  Q.   And when you received this letter, what steps did you
18  take?  What's the process you would go through from that
19  point, from receipt of the letter?
20  A.   As far as specifics to this particular case, I can't
21  recall exactly, but normal standard procedure was once we
22  received a complaint, we would send out the identity theft
23  packet, which included the affidavit request and the letter
24  that was shown and requesting driver's license, Social
25  Security card, and police report.

Brady - D

1   Q.  And did the letter from Mr. Charne contain, to your

2   recollection, or after your review, did it contain any of

3   Mr. Sponer's identifying information?

4   A.  Not that I can recall.  And it would appear not.

5   Q.  And it doesn't appear that it contained like the fraud

6   affidavit or any formal police report?

7   A.  No, it doesn't.

8   Q.  It does -- it does mention that there's a police

9   investigation ongoing, kind of in the middle of the page

10  there.  Do you see that?

11  A.  Yes, sir.

12  Q.  And despite receiving that information, was it still

13  policy and procedure that based on this limited information,

14  you would request the standard fraud packet information?

15  A.  Yes, sir, we would.

16  Q.  And let's go back to Exhibit 501.  And you state that this

17  is a response to Mr. Charne's letter?

18  A.  Yes, it would appear so.

19  Q.  In kind of the top third of the page there's a bold part

20  that says "What you need to do."  And that lists some

21  information you're requesting.  Is that what you're referring

22  to with information request?

23  A.  Yes, sir, that is.

24  Q.  And what items are those that are requested?

25  A.  The identity theft affidavit, the copy of the Social

518

Brady - D

1    Security card, driver's license or some form of identification

2    card, and the police report.

3    Q.  And those are the standard items that are requested under

4    Wells Fargo's policies and procedures?

5    A.  Yes.  At the time, from what I can recall, those were

6    standard, standard policy.

7    Q.  And those are the policies and procedures for the fraud

8    department?

9    A.  Yes, sir.

10   Q.  Under subsection 3 there, it says, "Mail your documents

11   to," and then it lists an address on Thomas Langston Road.  To

12   your recollection, is that the mailing address for the fraud

13   department?

14   A.  Yes.  That's the building I worked in.

15   Q.  For the jury's benefit, you said Greenville, and this is

16   Winterville?

17   A.  Yes.  They're basically the same city.

18   Q.  So the actual office was in Winterville?

19   A.  Yes.

20   Q.  But that's right next door to Greenville?

21   A.  Yes.

22   Q.  And then towards the bottom of the page, it says, "If you

23   have questions, please call me."  Do you see that?

24   A.  Yes.

25   Q.  And then it lists a phone number and an extension.  When

Brady - D

1   you were with the fraud department, was that your telephone

2   extension?

3   A.   Yes.  That was my direct line.

4   Q.   And that would ring directly to your desk?

5   A.   Yes, sir.

6   Q.   Do you recall whether or not you spoke to Mr. Charne on

7   the telephone?

8   A.   I don't recall the specifics of it, but in review of some

9   of the documents and stuff, it would appear that I did speak

10  with him, I think.

11  Q.   So let's take a look at Exhibit 32.  And it's page 20 of

12  this exhibit.

13          And, first, what are these that we're looking at?

14  A.   These are system notes in the system iTop.  These are

15  where we notate actions taken on the account and other

16  departments notate actions done on the account.

17  Q.   So this would notate anything that happens within auto

18  related to this account?

19  A.   Yes.

20  Q.   And on page 20, at actually the bottom of the page --

21          MR. PETERSON:  If you can blow it up a little bit.

22  BY MR. PETERSON:  (continuing)

23  Q.   -- there's a notation.  It says, "William Brady spoke with

24  Matthew's attorney and faxed a packet to him to have Matthew

25  fill out."  Do you see that?

Brady - D

1  A.   Yes.

2  Q.   And WJB, are those your initials?

3  A.   Yes, sir.

4  Q.   And does this indicate that you made that notation?

5  A.   Yes, sir.

6  Q.   And I know you testified you don't remember the specifics

7  of the phone call from three years ago, but this would

8  indicate that you spoke with the attorney?

9  A.   Yes, sir.

10  Q.   And do you -- as you sit here today, do you believe it's

11  likely that the October 26th letter was sent either just

12  before or just after this phone call?

13  A.   It would appear so.

14  Q.   One other question before we move off this, going to page

15  21, briefly.  And right under the entry that starts with, "Got

16  a note," it says, "Got a note from Will here on John Miller's

17  team that this was impounded."

18          Did you ever work on John Miller's team?

19  A.   No, sir.

20  Q.   Did you -- is there any indication here that this was an

21  entry that you made?

22  A.   No, it's not.  There over on the right-hand side, where it

23  says 6749, that's the teller number; and that was not my

24  teller number.

25  Q.   And is it your belief that this notation is speaking of a

Brady - D

1  different Will?

2  A.   Yes.  It's possible.  I'm not sure.

3  Q.   But you were never on John Miller's team?

4  A.   No, sir.

5  Q.   Going back to Exhibit 2, under -- as we talked about, this

6  lists some information about an ongoing police investigation.

7  In the policies and procedures from Wells Fargo, was there any

8  exception, for example, if you had a scenario where there was

9  police involvement?

10  A.   Yes, there were -- there were plenty of cases where police

11  would be involved, and occasionally we would talk to the

12  police officers.

13  Q.   But within the policies, despite the involvement of a

14  police officer, you still had to follow the policies and

15  procedures?

16  A.   Yes.  We would still have to go through the policies and

17  send out the information and request the information back from

18  the potential victim.

19  Q.   And looking at Exhibit 501, do you know why that

20  information is routinely requested?

21  A.   Not entirely sure on the specifics of it, but to my

22  knowledge, just basically for the potential victim to provide

23  proof that they are the owner of the Social Security number

24  and provide that information to prove that the fraud is legit.

25  Q.   And that information, does that provide you the

Brady - D

1    opportunity to do additional investigation?

2    A.   Yes, sir.

3    Q.   When you were with the fraud department sending out these

4    letters, would it happen from time to time you would receive

5    no response from the consumer?

6    A.   Yes, it would happen from time to time that we would

7    receive no response from a customer.

8    Q.   And if there was no response from a customer, what would

9    happen to the complaint, to the dispute?

10   A.   After 30 days we would close it out on our end.  And after

11   that, if we did still receive additional information from the

12   potential victim, we would reopen the case and look at it.

13   But the closing was just more for our internal recordkeeping.

14   Q.   So that didn't mean that any new information would be

15   ignored?

16   A.   No.

17   Q.   And any new information that you received, even if the

18   investigation was formally closed for your internal records,

19   that old information would still exist in the system?

20   A.   Yes.

21   Q.   And the new information would be added to it?

22   A.   Yes.

23   Q.   Do you recall kind of in this initial time frame, late

24   fall, early winter of 2016 -- I guess late fall -- receiving

25   any information from either Mr. Charne or Mr. Sponer following

Brady - D

1   the initial letter?

2   A.   I don't recall receiving anything, but I don't recall the

3   specifics of it.

4   Q.   And if I could have you look at what has been marked

5   Exhibit No. 11 -- and this is a letter dated January 19th,

6   2017, from Mr. Sponer.  And you see it's addressed to the

7   Wells Fargo Dealer Services fraud department.  The address

8   listed there with the P. O. Box, is that the address for the

9   fraud department?

10  A.   Not that I'm aware of.

11  Q.   And it's different from the address that was on the letter

12  that you sent?

13  A.   Yes.

14  Q.   Do you -- generally speaking, within the fraud department,

15  the standard policy was that if one fraud team member or

16  investigator was working a file, would additional information

17  go to that same team member?

18  A.   Yes, yes.  Usually that was our practice within our team,

19  that if one person was working it, then any information

20  received by another individual would have handed it over to me

21  in this situation.

22  Q.   Do you know why that was important to Wells Fargo, to do

23  it that way?

24  A.   Just to stay with the consistency of it, that we didn't

25  have multiple people working the same case, just have one

Brady - D

1  person.

2  Q.  A point of contact?

3  A.  Yeah.

4  Q.  Do you recall having this letter forwarded to you?

5  A.  I don't recall, due to the time of -- I don't recall

6  seeing this letter at all.

7  Q.  If it were forwarded to you, is it something you would

8  have responded to under the policies and procedures?

9  A.  Yes, sir.

10  Q.  But you don't -- you don't recall receiving it and don't

11  believe it was received?

12  A.  Not that I can recall.

13  Q.  Let's look at page 2, though.  And I know you testified

14  that you didn't receive this or it didn't get forwarded to

15  you.  But do you see the attachments there?

16  A.  Yes, sir.

17  Q.  What information does it show was attached to this letter?

18  A.  It shows the identity theft affidavit, the police report,

19  and notice to furnishers of information.

20  Q.  So the first two bullet points there, is that some of the

21  information that your October 26th letter had requested?

22  A.  Yes.  Yes, sir.

23  Q.  But this didn't contain all of the information, did it?

24  A.  No.  It appears it didn't have the driver's license or

25  identification card or the Social Security card.

Brady - D

1  Q.  And so based on your practice within the fraud department,
2  how you would handle these type of disputes under the
3  policies, if you had received this letter, what would have
4  been your next steps?
5  A.  We would have sent out an additional letter requesting
6  additional information.
7  Q.  And that would have been a follow-up letter asking for the
8  previous information that was previously requested but not
9  provided?
10  A.  Correct.
11  Q.  So in this case that would have been --
12  A.  -- the driver's license and Social Security card.
13  Q.  Do you have any understanding as to why the Social
14  Security card was important to the Wells Fargo fraud
15  department?
16  A.  As far as -- as far as I know, it was to provide proof
17  that they, the potential victim, was indeed the owner of the
18  Social Security number.
19  Q.  I'd like to look briefly at Exhibit 15.  And this is
20  another letter from Mr. Sponer dated November 3rd.  And this
21  one is also addressed to that P. O. Box, and this time it
22  shows that it's to the credit bureau dispute resolution unit.
23  But is it your recollection, and after review of documents,
24  that this letter was actually forwarded to you?
25  A.  I can't recall exactly.  But after review, I believe -- I

Brady - D

1   believe this one was.

2   Q.   Okay.  And if I could have you look at the third page of

3   this -- and, again, there are some attachments to this letter

4   that were sent and forwarded to you in the fraud department.

5   What are the items that were included here?

6   A.   They included a passport, the letter from Mr. Charne,

7   responses from Wells Fargo Dealer Services, identity theft

8   affidavit, the police report, and the furnishers of

9   information.

10  Q.   And so in -- at this point now, does this letter contain

11  all of the items you requested in your October 26th of 2016

12  letter?

13  A.   No.  It would still be missing the Social Security card.

14  Q.   But this added the identification card?

15  A.   Yes.

16  Q.   And is that important -- is the identification card

17  important as well?

18  A.   Yes, sir.

19  Q.   Did you have an understanding of why the fraud department

20  requested two forms of identifying --

21  A.   To my knowledge, it was to show, once again, proof of the

22  person, and also to provide a copy of signature, so we can

23  compare it to the documents that are on the purchase of the

24  vehicle.

25  Q.   So having multiple data points to compare?

Brady - D

1    A.   Yes.

2    Q.   And I'd like to have you look at Exhibit 18.  What is this

3    letter, Mr. Brady?

4    A.   This would be the additional letter that I would send out,

5    if any missing information or information wasn't provided, we

6    would send this out requesting.  In this instance, it was a

7    copy of the Social Security card.

8    Q.   So this was after -- was this after you had reviewed the

9    November 3rd letter and the information provided?

10   A.   Yes.  It would appear so.

11   Q.   And at that point, of the four items that you requested a

12   year earlier, three of the four had been returned, and now

13   you're asking for the fourth; is that correct?

14   A.   Correct.

15   Q.   And, Mr. Brady, does this November 21st, 2017 letter, does

16   it have your name and address as the contact person?

17   A.   Yes, sir, it does.

18   Q.   And in the final paragraph of the body of the letter, is

19   that your telephone number and your direct extension again?

20   A.   Yes, sir.

21   Q.   Do you recall whether you ever received a phone call from

22   Mr. Sponer?

23   A.   I can't recall if I ever did or not.

24   Q.   And if I could have you look again at Exhibit 32, and if I

25   could have you look on page 2 of that exhibit, and there are

Brady - D

1    several on page 2 -- there are several notations dated

2    11-21-2017.  And there's one kind of right in the middle of

3    the page there that starts with "suspected unusual activity."

4    A.   Yes.

5    Q.   And it states that "A packet was sent out to customer.  I

6    have sent an additional letter requesting a copy of the Social

7    Security card."  And then it has the initials, WJB.  Does that

8    indicate that was a notation you made?

9    A.   Yes.  That would appear to be a notation I made.

10   Q.   And does that indicate, for anyone else who looks at iTop,

11   that the fraud investigation is ongoing?

12   A.   Yes.

13   Q.   Mr. Brady, do you know if this account was ultimately

14   verified as fraud?  Well, actually, let me -- I'm sorry.  Let

15   me back up.  Let me back up.

16            Let's look at Exhibit 22.  Do you recognize this

17   letter?

18   A.   Yes.  After reviewing for the case, yes, I do recognize

19   this letter.

20   Q.   And this was sent directly to your attention; is that

21   right?

22   A.   Yes.  It would appear so from the address on it.

23   Q.   And based on your understanding of the system and the way

24   things work, would this have actually been delivered directly

25   to you?

Brady - D

1    A.   Yes, I would assume so.

2    Q.   And in the first part of this letter it says,

3    "Unfortunately, I do not currently have a copy of my Social

4    Security card available."  Do you see that?

5    A.   Yes, sir.

6    Q.   To your knowledge, was that the first time Mr. Sponer told

7    Wells Fargo Auto that he didn't have a copy of his Social

8    Security card?

9    A.   From what I can recall, yes.

10   Q.   Did you review the other information in this document?

11   A.   I can't remember the specifics, but I would assume so.

12   Q.   It would have been within your practice, under the

13   policies and procedures, that you would have reviewed the

14   information?

15   A.   Yeah.  Within the procedures, yeah, I would have reviewed

16   the information.

17   Q.   And in your normal practice, after receiving something

18   like this from a customer that says, "Hey, I don't have one of

19   the things you're asking for," what would your next steps be?

20   A.   I don't recall the specifics of this account, but

21   like -- usually standard practice, I would have either spoke

22   with the customer and encouraged them to get a copy of the

23   Social Security card or I would have brought this information

24   to my management to see if we could move forward with

25   validation if we had enough evidence and went forward with the

Brady - D

 1    validation.

 2    Q.   Do you recall if in this case -- I know it was three years

 3    ago -- if you ever made an effort to call Mr. Sponer?

 4    A.   I don't recall offhand if I did or not.

 5    Q.   Do you know if this account was ultimately resolved and

 6    validated as fraud?

 7    A.   Yes.  As far as I can remember, yes, it was validated as

 8    fraud.

 9    Q.   And were you involved in that process?

10    A.   Yes, sir.

11    Q.   And as the person who was handling this for the fraud

12    department, it would have been part of your responsibility --

13    A.   Yes.

14    Q.   -- to escalate or to discuss with others?

15    A.   Yes.

16    Q.   And based on the information, because it was incomplete,

17    under the policies and procedures, did you have the ability to

18    make a decision on your own?

19    A.   No.  Usually standard practice was to take it to

20    management and review anything, in case we missed something or

21    just have a second set of eyes on it, to make sure that we can

22    go through with the validation.

23    Q.   And in this circumstance, do you recall the circumstances

24    around this being validated in January?

25    A.   I do remember my boss had come to me and he stated that

Brady - X

1    legal did get involved with this case and that we reviewed it

2    at that time.

3    Q.   And based on the information that you've reviewed and your

4    practice within the fraud department, is it likely that based

5    on what was provided in this December 1st letter and the

6    November 3rd letter, that this would have been validated as

7    fraud, even without the lawsuit?

8    A.   Yes.  To my knowledge, yes, it would have been.

9    Q.   The steps you took after receiving this December 1st

10   letter that said there was no Social Security card, are those

11   the same steps you believe you would have taken if you would

12   have received this information?  "I don't have the card," if

13   you had received that earlier, would you have taken the same

14   steps?

15   A.   Yes, sir.

16   Q.   Thank you, Mr. Brady.

17            MR. PETERSON:  I don't have any further questions.

18            THE COURT:  Cross-exam.

19

20                      CROSS-EXAMINATION

21   BY MR. SOLA:

22   Q.   Good day, Mr. Brady.

23   A.   Hello.

24   Q.   Now, when the fraud department, just in general -- you're

25   in the fraud department, right?

Brady - X

1    A.   I was in the fraud department.

2    Q.   You were?

3    A.   I'm no longer there.

4    Q.   And the fraud department, they investigate fraud, right?

5    A.   Yes, sir.

6    Q.   Okay.  Has it got several highly trained fraud

7    investigators that work there?

8    A.   Yes, sir.

9    Q.   And you're one of them?

10   A.   Yes, sir, I was.

11   Q.   And so when someone makes a dispute that ends up at the

12   fraud department that an account is identity theft, the fraud

13   department should do a thorough investigation of whether it's

14   identity theft, right?

15   A.   Yes, sir.  That was usually standard practice.

16   Q.   All right.  And Mr. Charne sent a letter on October 19

17   that alerted Wells Fargo that Mr. Sponer was disputing as

18   fraud, right?

19   A.   Correct.

20   Q.   And then you were going to -- as the fraud department, you

21   were going to do a thorough investigation as to whether that

22   account resulted from fraud, right?

23   A.   Correct.

24   Q.   Okay.  What's the first thing you did to investigate?

25   A.   I don't remember specifics, but usually first step was to

Brady - X

1    reach out and send an identity theft packet to the customer.

2    Q.   Okay.  So your first step would be to not go to

3    anybody -- well, his letter mentioned the police, right?

4    A.   Right.

5    Q.   So your first step wasn't to contact the police, was it?

6    A.   I don't remember the specifics of it, if I did contact the

7    police or not, but I'm not positive.

8    Q.   All right.  So your first step was actually go back to the

9    victim and ask them to provide you information, right?

10   A.   Yes, sir.

11   Q.   And Mr. Charne's letter had indicated that Mr. Sponer was

12   out of the country, probably would be away for a year.  Do you

13   remember that?

14   A.   Vaguely, I remember that.

15   Q.   So you understood that you probably wouldn't get a

16   response to your October 26th letter, right?

17   A.   It's possible.

18   Q.   All right.  What was your next step, after you sent that

19   October 26th letter, to do a thorough investigation of

20   Mr. Sponer's dispute?

21   A.   Which letter were you speaking of?

22   Q.   Oh, after you sent the October 26th letter.

23   A.   After I sent out the identity theft packet?

24   Q.   Did you do anything next to do a thorough investigation of

25   Mr. Sponer's dispute?

Brady - X

1   A.   I don't recall the specifics of what my next steps were,

2   if I contacted the police or not.  I'm not positive.  Usually

3   standard practice was to wait until we received the identity

4   theft packet back from the customer that provided us more

5   information.

6   Q.   Okay.  So actually the standard practice was not to do any

7   thorough investigation, but to wait and see if you got a

8   response to the request to the victim for information; is that

9   right?

10  A.   We would wait for the information.  Then once we got the

11  further information, we would do our investigation at that

12  point, with the information provided from the potential

13  victim.

14  Q.   Okay.  So you didn't do anything?

15          MR. PETERSON:  Objection, misstates the testimony.

16          THE COURT:  The objection is overruled.

17          You can answer the question.

18          THE WITNESS:  At that point in time, I can't recall

19  the specifics of what I did next, but standard practice was

20  usually to wait for the information.  It's possible that I did

21  contact the police officer.

22  BY MR. SOLA:  (continuing)

23  Q.   All right.  You could have contacted the police, right?

24  A.   It's possible, yes.

25  Q.   Okay.  And you could have asked the police for any

Brady - X

1    information you wanted about the identity theft, right?

2    A.   Yes.  But still, it was standard practice to receive the

3    information, that we wouldn't be able to go forward with the

4    fraud allegation until we received the information from the

5    victim.

6    Q.   I understand.  Your procedure was to wait until you get a

7    response?

8    A.   Yes, sir.

9    Q.   And I think, as you indicated, your procedure is really

10   not to do anything while you're waiting; is that right?

11   A.   Potentially, yes.

12   Q.   In other words, so you're not contacting the police,

13   right?

14   A.   It's possible that we could have potentially called the

15   police, but I'm not positive.

16   Q.   You didn't ask the police for the police report, did you?

17   A.   I can't recall the specifics of it, if I did ask them for

18   it or not or if I called them or not.

19   Q.   You actually had a police report number and a detective's

20   name and phone number, but you never even asked for the police

21   report that you could have gotten from the police, right?

22   A.   It's possible.  I don't remember --

23   Q.   You --

24   A.   -- the specifics of it.

25   Q.   I'm sorry.  I don't mean to cut you off.  I'm a little

 1  eager.

 2          Instead you asked Mr. Sponer for the police report,

 3  right?

 4  A.   Yes, sir.

 5  Q.   But you could have gotten it from the police, right?

 6  A.   It's possible I could have gotten it from the police

 7  officer as well, yes.

 8  Q.   And this was a car loan, right?

 9  A.   Yes, sir.

10  Q.   So there is a car dealer involved in the sale, right?

11  A.   Yes, sir.

12  Q.   And when a person buys a car, they have to provide

13  information to the car dealer, right?

14  A.   Yes, sir.

15  Q.   And typically a driver's license, right?

16  A.   Typically, yes.

17  Q.   And a driver's license has a photo, right?

18  A.   Yes, sir.

19  Q.   And it has -- if I remember, it certainly has height and

20  weight, right?

21  A.   Yes, sir.

22  Q.   And it has hair color and eye color, right?

23  A.   Yes, sir.

24  Q.   And so you could have gone to the car dealer, if you were

25  doing a thorough investigation of this fraud claim, and asked

Brady - X

1    to see the driver's license of the person who made the

2    purchase, couldn't you?

3    A.   Yes, sir.

4    Q.   Okay.  And then you could have compared the identifying

5    information on the driver's license with information of

6    Mr. Sponer and seen it was a different person, right?

7    A.   Yes, sir, potentially I could have.

8    Q.   But you didn't do that, did you?

9    A.   I can't recall the specifics, if I did request a driver's

10   license from the dealership or not.

11   Q.   And then you had the loan origination documents, right?

12   A.   Yes, sir.

13   Q.   In other words, the application for the loan, the

14   application -- the car purchase documents, right?

15   A.   Yes, sir.

16   Q.   And you could have looked at those and seen if there was a

17   signature that did not match Mr. Sponer's, right?

18   A.   Correct.

19   Q.   But you didn't do that either, did you?

20   A.   At the time, without the copy of the potential victim's

21   information, I didn't have a copy of the signature, as far as

22   I knew at that point, but I can't -- I don't know the

23   specifics, if I had that information at that point in time or

24   not.

25   Q.   Well, actually, Mr. Charne informed you that Mr. Sponer

1   was a customer of Wells Fargo, right?

2   A.   Correct.

3   Q.   So you could have gone to the other branches of Wells

4   Fargo and seen if they had a signature from Mr. Sponer, right?

5   A.   Possible, potentially.

6   Q.   He had a checking account, didn't he?

7   A.   I can't recall exactly if he did or not.

8   Q.   That's fair.

9          But if you write checks, then you sign them, right?

10  A.   Yes, sir.

11  Q.   So if he had a checking account, Wells Fargo could have

12  signed checks for him in their records, right?

13  A.   I would assume so, yes.

14  Q.   But you didn't look at the loan origination documents or

15  request from the other divisions of Wells Fargo his signature

16  for you to compare, did you?

17  A.   I can't recall the specifics, if I did or not.

18  Q.   No.  Because the procedure is to do nothing and just wait

19  for the victim to send you documents, right?

20  A.   Potentially, yes, if we have no other evidence to go off

21  of at the time.

22  Q.   You could have also looked at the account notes for

23  suspicious activity, right?

24  A.   Yes.  Yes, sir, potentially.

25  Q.   In fact, there was already in the file, as of October 19,

Brady - X

1  2016, a suspected unusual activity form, wasn't there?

2  A.   I don't recall if there was or not.

3  Q.   You don't recall, so you obviously didn't see that in your

4  investigation?

5  A.   I don't recall from back in 2016 if there was or not.

6  Q.   But also in the account -- I call them the account notes;

7  you call them the iTop notes.  But in those notes, there was

8  also an indication there was a missed -- actually, there was

9  an indication that the payment that was made was taken out of

10  an account.  Do you recall that?

11  A.   I don't recall that.

12  Q.   And that the accountholder -- well, let's -- the

13  accountholder then contacted Wells Fargo and said, "This

14  shouldn't be coming out of my account," and Wells Fargo had to

15  refund the money.  Do you know about that?

16  A.   I don't remember the specifics of that, no.

17  Q.   Okay.  And that would be a suspicious thing, too, right,

18  if the person who bought the car gave an account of someone

19  who then said, "This isn't my debt"?

20  A.   Yes.

21  Q.   All right.  But you didn't look at that and consider that

22  in the investigation, did you?

23  A.   I'm not sure if I did or not.  I don't remember the

24  specifics of that instance, no.

25  Q.   All right.  And so as it turned out, since that first auto

Brady - X

1  withdrawal payment had to be returned to the accountholder,

2  there was never a payment made on the account, was there?

3  A.  I don't recall if there was or not at that point in time.

4  Q.  Now, we heard Mr. Tarter talk.  He's a banking expert.  He

5  called it "the missed first payment."  So in this case, there

6  was a missed first payment, right?

7  A.  As far as I know.

8  Q.  And that's suspicious, too.  Somebody bought a car and

9  didn't make a single payment, right?

10  A.  Yes, sir.

11  Q.  But that wasn't any information you were looking at to

12  consider in the investigation?

13  A.  It's possible.  I don't recall the specifics of whether I

14  looked at that or not.

15  Q.  You were essentially doing nothing, waiting to get some

16  information back from Mr. Sponer, right?

17  A.  As far as I can recall.  I don't remember the specifics of

18  it.

19  Q.  It's fair to say, really, the fraud department did not do

20  any investigation of this dispute, did it?

21  A.  Eventually, once we received all documents and we had

22  enough evidence and proof, we did do a thorough investigation,

23  as far as I can recall.

24  Q.  Okay.  You didn't do any investigation until, well, you

25  received enough documents you thought were adequate?

Brady - X

1   A.   Yes, sir, as far as I can recall.

2   Q.   Okay.  You didn't do any investigation while Mr. Sponer

3   was sending his disputes, did you?

4   A.   As far as I can recall.  I'm not sure of the specifics on

5   what investigation I was doing prior to him sending the

6   information back to us.

7   Q.   The procedure was to wait and hear back from the consumer,

8   right?

9   A.   Yes, sir.  Usually that was procedure.

10  Q.   And if that consumer doesn't send you all four of the

11  documents you request, you cannot validate their claim as

12  fraud, right?

13            MR. PETERSON:  Objection, misstates testimony.

14            THE COURT:  Overruled.

15            You can answer the question.

16            THE WITNESS:  No.  We can validate if we don't have

17  all the information.  We have validated without having all the

18  information.  It just depends on whether it's enough

19  information to move forward with the validation of fraud.

20  BY MR. SOLA:  (continuing)

21  Q.   Well, let me first point out, by the time of your

22  November 21 letter, November 21, 2017, I think you just

23  testified you had three of the four, right?

24  A.   I believe so, yes.

25  Q.   And you sent that letter of November 21 requesting his

1    Social Security card?

2    A.   I believe so, yes.

3    Q.   All right.  And that was pursuant to the policy?

4    A.   Yes, sir.

5    Q.   So you weren't going to validate that account without the

6    Social Security card?

7    A.   Usually that was standard practice, to get -- to make an

8    attempt to get all -- as much of the information as possible.

9    Q.   Well, to be clear, not as much of the information as

10   possible.  You were telling Mr. Sponer, and I think the words

11   were, "Before we can proceed with an investigation, you need

12   to send us a copy of your Social Security card," right?

13   A.   Yes, that's what I stated in the letter.

14   Q.   Okay.  In other words, you weren't going to do anything,

15   you weren't going to proceed with any investigation unless you

16   got that Social Security card.  That's what your letter says,

17   right?

18   A.   At that point in time, I don't recall the specifics of

19   what I was doing as far as the investigation side of it, as

20   far as reviewing the other documents, bringing it to

21   management.  I can't recall the specifics of what I was

22   actually doing with the investigation, but standard practice

23   was to obtain a copy of the Social Security card.

24   Q.   Now, I asked you earlier if you needed all four items

25   before you would validate an account as fraud, and you said

Brady - X

1   you didn't think you needed all four; is that right?

2   A.   It was potential -- usually we needed all four documents

3   in order to validate as fraud.

4   Q.   Well, let me remind you of your deposition testimony,

5   okay.

6           MR. SOLA:   Page 40, line 1, Counsel.

7   BY MR. SOLA:   (continuing)

8   Q.   "So you're saying even if the identity theft claim

9   appeared to be valid at that time, you still would require the

10  information that you're asking for in the letter?

11          "Answer:   To my knowledge, it was our policy that

12  we're required to have this documentation before we validated

13  any accounts as fraud."

14  A.   Yes, sir.

15  Q.   That's the policy, right?

16  A.   Yes, sir.

17  Q.   And that policy applied, as my question stated, even where

18  the identity theft claim appears to be valid, right?

19  A.   I'm sorry.  Repeat that.

20  Q.   My question was "So you're saying even if the identity

21  theft claim appeared to be valid at the time, you would still

22  require the information you're asking for in this letter?"

23  And you said, "Yes," right?

24  A.   Well, it would be if we had enough evidence to verify that

25  it is fraud, then we could potentially move forward with it,

Brady - X

1  if he wasn't able to obtain and provide a copy of his Social

2  Security card.  It was --

3  Q.  But the policy -- I'm sorry.

4  A.  It's fine.

5       But the standard policy was to try to obtain the

6  Social Security card.

7  Q.  Okay.  Even when the identity theft claim appears to be

8  valid, you're still going to demand the Social Security card,

9  right?

10  A.  Potentially.  It all depends on the specifics of the case.

11  Q.  But that's what you did with Mr. Sponer.  You demanded the

12  Social Security card, didn't you?

13  A.  Yes, sir.

14  Q.  And that was pursuant to Wells Fargo's policy?

15  A.  Yes, sir.

16  Q.  Okay.  So is it fair to say that between you sending the

17  October 26th, 2016 letter to Mr. Sponer requesting documents

18  and you sending that -- and you reviewing his letter of

19  November 3rd, 2017, you didn't do anything to investigate his

20  dispute?

21  A.  It's possible.  I don't recall the specifics on what I was

22  doing at that certain time, no.

23  Q.  And you'd agree that not doing anything and simply waiting

24  for his response to your request for documents in October,

25  that would be the policy of Wells Fargo?

Brady - X

1   A.   Possibly, potentially, just to wait and get more
2   information.
3   Q.   All right.  And then you talked to Mr. Charne, right?
4   A.   Vaguely, I believe so, yes.
5   Q.   And I know you can't remember, but I think you just
6   testified there's an entry --
7   A.   Yeah.  There were notes in the iTop notes that I did speak
8   with him.
9   Q.   And after you spoke with him, you didn't take any further
10  steps to investigate the fraud dispute, did you?
11  A.   I'm not sure at that specific time what steps were taken
12  or what I was doing.
13  Q.   Now, here -- well, maybe you weren't here for
14  Ms. Braxton's testimony.  Is that right?  You weren't here for
15  hers?
16  A.   I was not.
17  Q.   All right.  Because she indicated that when the credit
18  bureau operations department got ACDVs, it would check and see
19  that the fraud department investigation was still pending,
20  okay.  And you agree that investigation was pending at least
21  through November 21, 2017, when you sent your letter, right?
22  A.   I don't recall the specifics of it, but I would assume so,
23  that it would still be showing pending on the account.
24  Q.   I mean, we know it was not completed by November of 2017,
25  was it?

Brady - X

1    A.   Correct.

2    Q.   And it was not completed by December of 2017, was it?

3    A.   I don't recall the specific date of validation, but I

4    would assume not.

5    Q.   Okay.  Well, it was not completed until after he filed a

6    lawsuit, was it?

7    A.   I believe that's correct.

8    Q.   I mean, maybe you remember your testimony in deposition,

9    and it was just brought up again, that after he filed his

10   lawsuit, you told me that legal got involved.  Is that right?

11   A.   Yeah.  As far as I can recall, yes, sir.

12   Q.   And your manager -- after legal got involved, your manager

13   came to you and said, "Let's validate this dispute as fraud"?

14   A.   We were -- I don't recall the specifics, but we reviewed

15   the information we did have.  And as far as I can recall, we

16   validated the account as fraud.

17   Q.   You testified you validated it as fraud because your

18   manager told you to, right?

19   A.   I believe so, yes, sir.

20   Q.   And I asked you if you had done any more research to

21   determine it was fraud, and you said you couldn't recall doing

22   any.  Do you remember that?

23   A.   I don't remember the specifics -- the specifics of the

24   investigation at that point in time.

25   Q.   Okay.  But that's still true today.  You can't recall

1   doing any further research that resulted in this being
2   validated as fraud, right?
3   A.   From what I can remember -- I can't remember exactly
4   what -- the specifics of the investigation at that point in
5   time, no, sir.
6   Q.   I actually remember, you said something like that you
7   couldn't remember exactly what happened, so I said, "Just give
8   us whatever you remember."  And you said what you remember is
9   that after legal got involved, your manager came to you and
10  told you to validate it as fraud.
11  A.   After -- from what I can remember, yes, sir.
12  Q.   Now, the letter you sent on October 26th, 2016,
13  Exhibit 501, asking for those four items, that's a form
14  letter, right?
15  A.   Yes, sir.
16  Q.   And that's sent to every consumer who makes a dispute with
17  Wells Fargo directly about identity theft or fraud, right?
18  A.   Yes, sir.
19  Q.   And that letter is sent regardless of the circumstances of
20  the case, individual fraud case, right?
21  A.   Yes, sir.
22  Q.   And that letter is sent regardless of what information
23  Wells Fargo knows about the identity theft, right?
24  A.   Usually, standard practice was if we received a dispute,
25  to send out that letter.

Brady - ReD

1   Q.  And that letter requesting those four documents, that's

2   going to be sent even if Wells Fargo knows the account is

3   identity theft, correct?

4   A.  Usually, I believe, it was, just because it was standard

5   practice to require the information from the potential victim.

6   Q.  Yeah.  That's exactly it.  You had this practice where you

7   had to get those four documents, no matter what you knew, and

8   even if you knew the account was identity theft, correct?

9   A.  Yes, sir.

10          MR. SOLA:  That's all the questions I have.

11          THE COURT:  Redirect.

12          MR. PETERSON:  Very briefly, Your Honor.

13

14                    REDIRECT EXAMINATION

15  BY MR. PETERSON:

16  Q.  Mr. Brady, you -- you'd agree that the obligation is to do

17  a thorough investigation?  That's Wells Fargo's policy and

18  procedure?

19  A.  Yes, sir.

20  Q.  And is part of that thorough investigation requesting

21  information from the consumer?

22  A.  Yes, sir.

23  Q.  So part of your investigation is to ask the consumer,

24  "What can you provide us?"

25  A.  Yes, sir.

Brady - ReD

1   Q.   And you considered that investigation?

2   A.   Yes, sir.

3   Q.   If I could have you look again at Exhibit 32, you recall

4   your October 26 letter -- we'll go to page 20 of Exhibit 32.

5   You recall your October 26th letter, correct?  That was the

6   one you sent to Mr. Sponer after talking to Mr. Charne.

7   A.   Requesting the information?  Yes, sir.

8   Q.   And I think Mr. Sola asked you or told you that you sent

9   that letter without any expectation that you'd receive a

10  response, because you knew Mr. Sponer was sailing.  Do you

11  remember that question?

12  A.   Yes, sir.

13  Q.   But you actually sent the letter -- even though it had

14  Mr. Sponer's name on it, you sent that to Mr. Charne, didn't

15  you?

16  A.   Yes, I believe so.

17  Q.   After speaking with him on the phone?

18  A.   Yes.

19  Q.   And I think your entry here says, "I spoke with Matthew's

20  attorney and faxed a packet to him to have Matthew fill out."

21  That would imply you sent that to Mr. Charne?

22  A.   Yes, sir.

23  Q.   Do you recall if that was because Mr. Charne told you that

24  he would be in contact with Mr. Sponer?

25  A.   Yes, I believe so.  I don't recall the specifics, but I

Brady - ReD

1  believe so.

2  Q.  So at that point, with that conversation with Mr. Charne,

3  you would have expected a response to your letter; is that

4  right?

5  A.  Yes, sir.

6  Q.  Mr. Sola asked you some questions about requesting a

7  driver's license from the car dealership where the fraudster

8  purchased the car.  Do you recall that?

9  A.  Yes, sir.

10  Q.  So if that car dealership had a driver's license, it would

11  be the fraudster's driver's license, correct?

12  A.  Correct.

13  Q.  And at that point you hadn't received any picture ID or

14  passport from Mr. Sponer, correct?

15  A.  I don't recall the specifics of it, but I would assume.

16  I'm not sure.

17  Q.  So in that October time frame or November, even if you

18  would have gotten a picture ID from the car dealership, you

19  would have had nothing to compare it to?

20  A.  Correct.

21  Q.  So in that circumstance, it might have actually prevented

22  Wells Fargo from determining this was fraud, because there

23  would have been a valid picture ID --

24  A.  Potentially, yes.

25  Q.  -- with the fraudster's picture?

Brady - ReD

1    A.    Correct.

2    Q.    You said you worked in the fraud department for three

3    years, four years?

4    A.    About five years.

5    Q.    Did you ever have circumstances where you were involved in

6    the decision to validate a claim as fraud without all four

7    pieces of information?

8    A.    Yes, sir.

9    Q.    So it did happen?

10   A.    Yes, sir.

11   Q.    And even in a circumstance where you had information, some

12   information, was it still the policy to ask for all the

13   information?

14   A.    Yes, sir.

15   Q.    Did that mean that necessarily you couldn't validate if

16   you didn't get those extra pieces back?

17   A.    No, sir.  It just depended on -- from a case-to-case

18   basis.

19   Q.    And I just want to make -- for clarification, you talked

20   about the timing of when the account was validated as fraud,

21   and that was after receiving the identifying information from

22   Mr. Sponer and after receiving the statement that he didn't

23   have a Social Security card.  Is that consistent with your

24   testimony?

25   A.    Yes, I believe so.

Brady - ReD

1    Q.   And then I think you stated that your manager told you to

2    validate it as fraud.  Was that your testimony?

3    A.   I believe so, yes.

4    Q.   Was that a decision that you and the manager made together

5    after reviewing the documentation?

6    A.   From what I can recall, from the specifics, I believe,

7    yeah, that would have been the process.

8    Q.   So that was -- that was a review of the documents.

9    Someone didn't just walk down the hallway and say, "Validate

10   this"?

11   A.   Correct.

12   Q.   Okay.  I have one question, if we can go back to

13   Exhibit 501, I think Mr. Sola asked you if this was a letter

14   that goes to all Wells Fargo customers that have a fraud

15   complaint.  Do you recall that question?

16   A.   Yes, sir.

17   Q.   Now, this letter, this is just specific to Wells Fargo

18   Auto, isn't it?

19   A.   I believe so.

20   Q.   You don't know what letters other fraud

21   departments -- well, let me ask a question.  Do other

22   divisions or sections of Wells Fargo have their own fraud

23   departments?

24   A.   I believe so.

25   Q.   The fraud department you were part of just dealt with

Brady - ReD

1  auto?

2  A.  Yes, sir.

3  Q.  And, as far as you know, this letter was just directed to

4  auto customers with a fraud dispute?

5  A.  Yes, sir, I believe so.

6  Q.  Thank you, Mr. Brady.

7          MR. PETERSON:  I don't have anything else.

8          MR. SOLA:  Your Honor, if I may.

9          THE COURT:  What area did he cover that was outside

10  the scope of your examination?

11         MR. SOLA:  I just wanted to do a short

12  recross-examination, one or two questions.

13         THE COURT:  On what area?

14         MR. SOLA:  It's on the circumstances of the

15  validation of the account as fraud.

16         THE COURT:  You can do that -- you can take it up in

17  rebuttal if you believe it's important to your case.  He will

18  remain available.

19         That's the answer to that question.  He's not

20  excused.  Please step off.

21         Members of the jury, it's just about the noon hour.

22  We'll take our midday recess at this time.  We'll be in recess

23  for one hour.

24         Remember the precautionary instruction.

25         (The jury leaves the courtroom.)

1          THE COURT:  How many other witnesses do you have?

2          MR. PETERSON:  We're going to call Mr. Cooper, John

3    Cooper.  I expect my direct of him will be 45 minutes.

4    Obviously my timing has been a little off.  I can't account

5    for cross.  Then Mr. Dean Binder, one of our experts, before

6    Brian Kelley.  I think our total direct remaining is probably

7    two hours, two and a half hours of direct.

8          THE COURT:  All right.

9          MR. PETERSON:  Could I have direction?  Mr. Brady,

10   since he's not been released and may be called in rebuttal,

11   should stay outside, or may he remain?

12         THE COURT:  He should be outside.

13         Anything else?

14         You might want to confer with each other if you want

15   Mr. Brady on his way, and maybe we can take up that issue

16   sooner as opposed to later.

17         MR. PETERSON:  Thank you, Your Honor.

18         THE COURT:  All right.  We're in recess.

19         (A lunch recess is then taken.)

20         (The Court, counsel, and the parties reconvene.)

21         MR. PETERSON:  Your Honor, just very briefly, I've

22   just consulted with Mr. Sola.  They're going to let Brady go.

23         (The jury enters the courtroom.)

24         THE COURT:  Good afternoon.  Be seated.

25         Call your next witness.

555

Cooper - D

1          MR. PETERSON:  Your Honor, Defendant calls John

2     Cooper.

3          THE CLERK:  Raise your right hand.

4

5                         JOHN COOPER

6     called as a witness in behalf of the Defendant, having been

7     first duly sworn, is examined and testifies as follows:

8

9          THE CLERK:  Please have a seat.  State your name and

10    spell it.

11         THE WITNESS:  Thank you.  My name is John, J-o-h-n,

12    Cooper, C-o-o-p-e-r.

13

14                     DIRECT EXAMINATION

15    BY MR. PETERSON:

16    Q.  Good afternoon, Mr. Cooper.  Can you -- well, who is your

17    present employer?

18    A.  Wells Fargo Auto.

19    Q.  And what is your job title?

20    A.  My job title is operational risk manager.

21    Q.  And what department do you work in for Wells Fargo?

22    A.  So I manage the Wells Fargo Auto fraud team.

23    Q.  And how long have you been in that position as the manager

24    of the auto fraud team?

25    A.  A little over a year.

Cooper - D

1   Q.   Can you give the jury a brief description of your

2   professional background?

3   A.   Sure.

4          So I've been with Wells Fargo Auto for just over a

5   year.  Prior to that I was with Wells Fargo Mortgage for 10

6   years.  Last position I held there, I managed a fraud

7   investigation team for the mortgage side.  Prior to that I was

8   the supervisor of that team and team lead and then previously

9   an underwriter for that team as well.

10  Q.   And what does the auto fraud department do?

11  A.   So the auto fraud department, the first thing that we're

12  trying to do is look for a potential unknown risk or unusual

13  activity that may be going on with things like applications at

14  origination, funded loans, and other situations like that,

15  that we may come across.

16  Q.   What are some common examples, types of fraud that the

17  fraud department for Wells Fargo Auto sees?

18  A.   The major one is misrepresentation around identity, so

19  identity theft in different forms, as well as things like

20  dealer fraud, things like that, that may occur.

21  Q.   From what sources does the fraud department receive

22  disputes or complaints?

23  A.   Sure.

24          Complaints are received from multiple different

25  sources within our line of business.  So we may receive them

1    from our origination partners or underwriters or funders in

2    the origination side that are actually looking at the initial

3    application.  We may get it from our customer service side or

4    our Office of the President and other partners that we work

5    with on the front end and back end.

6    Q.  And -- I'm sorry -- did you say, does that include

7    consumers?

8    A.  Yes.  Yeah, it would include consumers.

9    Q.  Is there -- well, does the fraud department get involved

10   in credit bureau disputes?

11   A.  Yes, we get involved with credit bureau disputes.

12   Q.  And what is the interplay or relationship between the auto

13   fraud department and the auto credit bureau dispute

14   department?

15   A.  So the credit bureau operations team, they're kind of that

16   initial filter for Wells Fargo when disputes are made with

17   respect to their credit.  So there's a couple different types

18   that we would receive.  We would receive some automated from

19   the credit reporting agencies or we could receive them direct

20   to Wells Fargo from our customer.

21           And so the CBO team will look at those, perform an

22   initial review of those cases, and try to identify at that

23   time if there are any identifying pieces that may indicate

24   fraud or identity theft or something like that.  And then they

25   would then route those to our team.

Cooper - D

1    Q.   And so anything that they review that has an indication

2    that the complaint is about fraud, those go to you?

3    A.   That's how I understand it, yes.

4    Q.   Is it important for -- or why is it important to have a

5    separate fraud department?

6    A.   So, in my opinion, it's important to have a separate fraud

7    department because you're focusing on different experience and

8    knowledge.  When we have a fraud department, we're singularly

9    focused on trying to identify different aspects of risk or

10   potential pieces of risk that could associate itself with

11   fraud, red flags and such.  And so you gain that with

12   experience in doing those consistently.

13   Q.   What sort of training does the fraud department undertake

14   with its employees, its team members?

15   A.   So there's a few different types of trainings.  We have

16   our yearly annual training that we have that's required by

17   Wells Fargo.  We also do -- talk to industry experts, FBI.

18   Some of our team members are members of, like, different fraud

19   groups, organizations.  They will go to the meetings and bring

20   topics back to our team.

21           And Wells Fargo also has a monthly call with all of

22   our different fraud teams to talk about different schemes that

23   may have been caught or pieces of information that they're

24   seeing and what's occurring on their side of business, so that

25   we can all kind of learn from each other.

Cooper - D

1    Q.   And what about during the on-boarding part of -- when an
2    employee first starts with the fraud department?
3    A.   Uh-huh.  So the initial steps, when we on-board a team
4    member, the first thing they're going to do is read through
5    our procedures.  They're going to look at what types of work,
6    what types of different work we do.  Then they'll sit down and
7    job shadow with somebody or do what we call a side-by-side.
8    They'll sit with that person we call a SME, subject matter
9    expert, on that process.  They'll learn what they do, learn
10   the different types of piece of information they're reviewing
11   for.

12            And then little by little we'll start to let them
13   kind of work that process with that person next to them,
14   watching and transferring that education, letting them ask
15   questions, just really having an open slate and letting them
16   learn.  And then little by little, we'll let them take over
17   and let them run some of that on their own.  But that process
18   can take some time, sometimes six months to a year, somewhere
19   in there.

20            And then if -- once they're proficient at a
21   particular task, then we'll look at moving on them to higher
22   level tasks and things like that.
23   Q.   Mr. Cooper, you're presently the manager of the auto fraud
24   department, but you testified that you started relatively
25   recently.  When you came on board, what did you do to

Cooper - D

1   familiarize yourself with the operations of the fraud

2   department?

3   A.   So the first thing you have to do, obviously, is you have

4   to understand what you're working with, where are we at,

5   square one.  So we have to go through and perform review of

6   our current procedures, because when I was coming in, that was

7   one of the things that we really needed to look at:  How do we

8   become more efficient, how do we become more effective at what

9   we do.  So that was my task as I came in, trying to figure

10  out, how do I help make this team better.

11  Q.   And in addition to reviewing the current policies and

12  procedures, did you review historical policies and procedures

13  and documents?

14  A.   I would say that's part of -- part of getting familiar

15  with those procedures, yeah.

16  Q.   I'd like to have you look at a document that's marked

17  Exhibit 509.  It should come up on your screen here in a

18  minute.

19          Do you recognize this document, Mr. Cooper?

20  A.   Yes, sir.

21  Q.   And I'm going -- I'm going to have -- we'll scroll through

22  the three pages, just so you can take a look.

23          And is this -- is this one of the documents that you

24  reviewed when you came on board with the fraud department?

25  A.   It would have been one that I looked at, yeah.

Cooper - D

1          MR. PETERSON:  And go back to the first page, please.

2     BY MR. PETERSON:  (continuing)

3     Q.   What is this document?

4     A.   It's one of our procedures that we use within the fraud

5     team, specifically for unusual activity.

6     Q.   And do you know what dates this policy was effective for?

7     A.   It looks like it started in March of 2017.

8     Q.   And that's on the final page?

9     A.   On the third page, yeah.

10    Q.   And is that March of 20 --

11    A.   Oh, I'm sorry, March of 2016.  Thank you.

12    Q.   Thank you.

13          MR. PETERSON:  I'll offer Exhibit 509.

14          THE COURT:  Any objection?

15          MR. SOLA:  No objection.

16          THE COURT:  It's received.

17          MR. PETERSON:  Please publish.

18    BY MR. PETERSON:  (continuing)

19    Q.   Okay.  You testified that this was a policy and procedure.

20    And you've become aware of this disputed issue in this

21    lawsuit; is that right?

22    A.   Yes.

23    Q.   And you have an understanding of the time -- the relevant

24    time frame?

25    A.   Yes.

1   Q.   And so this Exhibit 509 that we're looking at, is this the

2   relevant policies and procedures during October of 2016?

3   A.   Yes, sir.

4   Q.   And is this the policies and procedures that would be

5   implicated upon receipt of a customer dispute of identity

6   theft?

7   A.   Yeah.  This is one of the kind of procedures that kind of

8   begins most of our research.

9   Q.   Talk more about that.  Most of your research?

10  A.   Yeah.  So if we think about fraud in general, and

11  regardless of what type of fraud it is or what type of case it

12  is, whether it comes from our origination or funded section,

13  we're trying to look and determine if fraud occurred.  So the

14  steps we use to do that are pretty much -- are very similar.

15  The differences are what documentation we have to facilitate

16  that kind of research.

17  Q.   And looking in the -- sort of the middle of the page here,

18  there's some red writing, your initial review.  Do you see

19  that section?

20  A.   Yes, sir.

21  Q.   And is this the process that would start upon receipt of a

22  dispute?

23  A.   Yes.

24  Q.   And can you walk us through the steps here, in that next

25  paragraph, and describe what's actually happening during those

Cooper - D

1    steps?

2    A.   Sure.

3              So as you can see by the document itself, the first

4    step that we're going to do is we're going to look at that

5    request or that case, if you will.  We're going to try to

6    understand what's going on with that specific situation.  And

7    then we're going to utilize whatever tools we can to try to

8    complete that research.  Now, whether that be vendor tools,

9    internal notes, internal documentation, depending on what case

10   that is and what, you know, type of documentation we have will

11   determine kind of where we go.

12   Q.   And sometimes is a consumer, a victim -- do they provide

13   all the information that you need?

14   A.   No.  Many times we're going to have to request that.  That

15   happens quite frequently.

16   Q.   And so what are the -- what are the next steps here, after

17   you review the initial --

18   A.   Yeah.  So we're going to look at that documentation.

19   We're going to use, again, the available tools.  And then

20   we're going to complete -- well, it ends up that we will be

21   sending out a request letter to the customer for any

22   documentation that may be missing or that we may not have in

23   that specific thing.  There's a form letter we send out.

24             But the rest of that process, we would go back, send

25   off what's called a CBDR 01 form, which is a Credit Bureau

Cooper - D

 1    Resolution Dispute 01 form.  That goes to the credit bureau

 2    operations team.  They intake it.  And, according to this,

 3    they're going to go ahead and they'll place it in XB status.

 4    That's notifying the credit report that it's in a dispute

 5    status, if you will.

 6    Q.  And that XB status, that's something -- well, are you

 7    familiar with the ACDV process?

 8    A.  Yeah.

 9    Q.  And is that something that shows up on the ACDVs?

10    A.  It would be something that that team sets, so they set the

11    code or whatever for the credit report.

12    Q.  There is another subheading here.  It's under 2, and it

13    says, "Set warning flag 3."  What does that refer to?

14    A.  So warning flag 3, it's a specific flag within our system

15    of record.  So our servcing system for auto is called iTop.

16    There's a section you can input warning flags.  So warning

17    flag 3 identifies or tells people that that account is under

18    investigation.

19    Q.  And then you -- and so that's something that shows up and

20    stays in the iTop system?

21    A.  Correct, until it's removed, yeah.

22    Q.  And then you talked about the ID theft package that you

23    sent to the consumer or the person that's complaining about

24    the account.

25            If you could turn to the second page of this exhibit,

Cooper - D

1    in that initial correspondence to the consumer, are there some

2    items that are requested from the consumer?

3    A.   Yeah, absolutely.

4         So many times when we would receive a request, we

5    won't have additional information or maybe enough information

6    for us to move forward and complete a thorough investigation

7    or complete our research.  And so that letter that we send

8    out, it's a form letter that requests four pieces of

9    information from a consumer.

10        One would be the identity theft affidavit package or

11   the identity theft affidavit.  Then you would also have a

12   request for a police report, a copy of a police report; copy

13   of a government photo ID, driver's license, something of that;

14   and then a copy of your Social Security card.

15   Q.   And just backing up real quick, you testified that

16   these -- these policies and procedures, this version is not

17   what's in effect right now; is that right?

18   A.   No, that's true.

19   Q.   But those pieces of information, those carry through the

20   revisions, don't they?  Those are still the pieces of

21   information that the fraud department requests?

22   A.   Still requests the same ones today, yes, sir.

23   Q.   And I want to talk about a couple of these.  The ID theft

24   affidavit, what's the purpose of requesting that from the

25   consumer?

566

Cooper - D

A.   So there's a couple different things that we know as we're
building this case.  What we're -- what we're working towards
is potentially validating this account as fraud.  And part of
that, Wells Fargo also has collateral out there, so there may
be legal action that needs to be taken with respect to
repossession and things like that.  So because of those types
of things, we request documentation.

The affidavit is an admission from the customer that
states, "Here's what has occurred."  It gives them an
opportunity to really outline all the issues that have
happened.  Maybe they know the person that they suspect is
involved in this.  And then they provide that information.
There's a spot for them to provide, like, a police report
number and things like that.  But it also has them get -- have
the affidavit notarized as well.

Q.   And what about government-issued ID?  Why is that
important?

A.   So, again, when we're looking for a government-issued ID
or photo ID, we're trying to determine how this account was
originated.  So one of the things that we're requesting with
that ID or one of the things that we do with that ID is we'll
look at the photo on the ID when we get it.  We're going to
compare that to a driver's license or photo that we receive
from the dealership, right.

We're trying to ascertain, is it the same person,

Cooper - D

right.  So it's one of those ways that we're looking, just

seeing -- it's another piece of the story, another piece of

our research that we're trying to complete to put that whole

picture together.

Q.   So it's -- having multiple data points to compare is

really important to the job that you do; is that right?

A.   That's true.

Q.   And then the Social Security card specifically, what's the

purpose for requesting the Social Security card?

A.   Yeah.  The reason why we request a Social Security card

stems from the fact that we deal with a lot of these cases.

And one of the things that fraudsters -- I'm sorry.  That's

what we call them, fraudsters -- may not actually have is a

copy of the Social Security card because they don't have to

fake one.  They go in to get a car, they need an ID, they need

maybe fake pay stubs, insurance card, things like that, but

they don't need a Social Security card, and so they don't

bother to fake it.

So we're requesting that because many times that is

going to be owned by the person that owns it, and they're

going to be able to provide that to us.

Q.   And what about the police report?  What's the purpose of

the police report?

A.   Again, it just goes back to the documentation, right.

We're getting that assertion from the customer that "Not only

Cooper - D

1   am I a victim of identity theft, I have gone to the police and

2   I have actually filed that report with them."

3           And so, again, when we're talking about repossession,

4   it helps build us our case and really gets us that

5   documentation and try to make that robust case that we need.

6   Q.   And within Wells Fargo Auto, the accounts you're generally

7   dealing with are relatively substantial accounts; is that

8   accurate?

9   A.   They can be.

10  Q.   People are buying cars, 10 to $40,000, kind of that range?

11  A.   Some over a hundred, yeah.

12  Q.   And so it's important that you verify with what's at

13  stake?

14  A.   That's true.

15  Q.   And I'd like to have a look at a document that is marked

16  as Exhibit No. 2.  Well, actually -- I'm sorry.  Let's go

17  back.

18          We talked about the documentation that the person is

19  to provide under these policies, 509.  What happens next,

20  after that letter requesting the policies -- or the

21  information goes out?

22  A.   So the letter -- basically we're trying to wait to obtain

23  that information from the consumer, from the potential victim.

24  Q.   And -- and then the -- I'm sorry.  Back to the second page

25  of that exhibit, Exhibit 509.  And what happens if the

Cooper - D

1    potential victim or the consumer doesn't return anything,

2    doesn't respond?

3    A.   Yeah.  So if we receive nothing from the consumer, again,

4    we're looking at that -- the case.  And many times there's not

5    much we can do.  We have an allegation, but there's no

6    information for us to move forward on that case with.

7            And so systemically, within our system -- and Work

8    Flow is a system that we use -- in our Work Flow system that

9    case would be closed out.  And, again, it's a systemic

10   closure.

11   Q.   And when you say "systemic closure," what does that mean

12   from a practical matter?  What happens if the consumer sends

13   something in 60 days late?

14   A.   Sure.

15           Yeah, if the consumer sends something in, regardless

16   of what the date is, whether it's three days or 30 or 90,

17   whatever, we would retain that documentation, we would reopen

18   the case.  We would have to reopen it under a different

19   number, but we reference the old case and the information in

20   there.  And we also forward that information to our team

21   member that worked it previously so that we can have

22   that -- they probably have knowledge about the case more than

23   a new person.  It just helps us with more efficiencies.

24   Q.   And potentially helps the consumer as well?

25   A.   Sure.

Cooper - D

1          It's possible, if we've -- in a lot of instances,

2     when we're contacting or trying to contact a victim and we've

3     contacted them, again, we have that -- we've already had that

4     interaction with them, and so you hate to, you know, put them

5     in with somebody else that they don't know.  This is very

6     sensitive information.  We're talking about Social Security

7     numbers and identity.  So we try to make sure that, from our

8     perspective, when we're talking about the cases, we're trying

9     to keep that cohesion.

10    Q.  So what happens in the other scenario, where the consumer

11    does send back information as requested?  What's the next step

12    then?

13    A.  Yeah.

14         So if we receive it within that 30 days, I believe

15    the policy is written -- and it is today, still -- we have 48

16    hours with which to look over the documentation that we

17    receive from the customer to try to determine what's our next

18    steps, right?  What kind of documentation have we received?

19    Did we receive it all?  Did we not receive it all?

20         If we didn't receive it all, many times we're going

21    to send out that request.  If we've been in contact with them

22    consistently, we've been able to talk with them, we may call

23    them, again, because we want to facilitate that as quickly as

24    we can.  So we would potentially want them to e-mail it to us

25    or fax it to us, something like that.

Cooper - D

1  Q.  And sometimes that direct communication can have the

2  effect of speeding along the process?

3  A.  Yes, it can, for sure.

4  Q.  Mr. Cooper, now let's take a look at that Exhibit 2.  And

5  you said you reviewed -- again, I recognize you weren't with

6  the fraud department back in 2016, but you said you reviewed

7  the materials, and you have a basic understanding of this

8  case, don't you?

9  A.  Yes, sir.

10 Q.  And this was a document that a lawyer named James Charne

11 sent to Wells Fargo.  Have you reviewed this document?

12 A.  Yes, I've reviewed this.

13 Q.  And what -- how would you describe the information

14 provided here?

15 A.  So, to me, this is an assertion from James Charne that

16 he's been hired by Mr. Sponer to work with -- work with Wells

17 Fargo to assert his claim of identity theft.

18 Q.  And you also reviewed the specific information that he set

19 forth here.  There's reference to a police investigation.  And

20 is -- is that information, in and of itself, enough for the

21 fraud department to make a fraud decision?

22 A.  Just the case would not be sufficient evidence for us to

23 validate a claim.

24 Q.  Upon receipt of a letter like this, what would be the next

25 step under the policies and procedures?

Cooper - D

1    A.    Yeah.

2           Again, we would review this and we would start a case

3    or open a case on it, open an investigation.

4    Q.    And would that include sending a request for information,

5    like we talked about?

6    A.    Yes.

7           Again, just like in the procedures, we would be

8    looking at this letter and their assertions here.  And then if

9    it didn't include the information that we need, we would be

10   sending out that additional information request letter.

11   Q.    And that -- in and of itself, that seeking information,

12   that's an investigation, isn't it?

13   A.    Yes, sir, helping us provide clarity, uh-huh.

14   Q.    Taking steps to gather information?

15   A.    That's correct.

16   Q.    When you're dealing with an identity theft complaint from

17   a consumer, what is, generally speaking, your best source of

18   information about information that will help you solve this?

19   A.    It comes from a number of sources, but it's imperative

20   that the customer is engaged with us and helping us through

21   that documentation and providing that to us.

22   Q.    I'd like you to turn to an exhibit that's been marked 501.

23   And Mr. Will Brady testified about this document earlier.  We

24   know this is a letter that he sent.  And he used to be in the

25   fraud department; is that right?

573

Cooper - D

1   A.   Yes, that's true.

2   Q.   And is this kind of the form letter you were referring to,

3   the request for additional information?

4   A.   Yes, sir.

5   Q.   And so this -- this letter to -- it's addressed to

6   Mr. Sponer.  That letter is -- follows the policies and

7   procedures?

8   A.   Yes, sir.

9   Q.   And is it your understanding that this was in response to

10  Mr. Charne's letter?

11  A.   That's how I understand it, yes.

12  Q.   And Mr. Brady testified and the iTop notes show that this

13  was actually sent to Mr. Charne, even though it's addressed to

14  Mr. Sponer.

15          Is it common in -- is it common in what you do that

16  sometimes you'll deal with a representative for a consumer or

17  victim?

18  A.   Yeah.  I mean, I wouldn't say it's super common.  I mean,

19  most of the time we're dealing directly with the consumer.

20  But on occasion, yeah, we can deal with representatives.

21  Q.   And so flipping back quickly to 509, is it your testimony

22  that Mr. Brady's October 26th letter is consistent with the

23  policies and procedures that were in effect at the time?

24  A.   Yes, it would seem to follow that.

25  Q.   And at that point, under the policies and procedures, the

Cooper - D

1   next step in the investigation is to wait to review what the

2   consumer sends; is that right?

3   A.   That's correct.

4   Q.   I'd like to have you look, Mr. Cooper, at an exhibit

5   that's been marked No. 11.  And this is a letter dated

6   January 19th from Mr. Sponer to Wells Fargo Dealer Services.

7          And, again, you testified that you reviewed the

8   documents related to this matter.  Do you know if this letter

9   ever showed up in the files of the fraud department, or have

10  you seen this within the fraud department and do you know

11  whether this was received?

12  A.   I do not know if the fraud team received it.

13  Q.   But now, as you sit here today, you've ultimately reviewed

14  this -- reviewed this letter and its attachments; is that

15  correct?

16  A.   Yes, that's correct.

17  Q.   Let's turn to the second page.  And just backing up real

18  quick, you testified that if there's no response from the

19  consumer within 30 days, internally your system closes the

20  case.

21          If this letter would have gone to the fraud

22  department or if it did, if it would have, would this

23  information have been added into what you already had?  Is

24  that the matching up you had talked about before?

25  A.   Right.

Cooper - D

1          So in a situation where we received information from

2    a customer, we're going to go ahead and we would reopen that

3    case -- I shouldn't say reopen -- a new case for that

4    particular individual at that time.

5    Q.   And -- and it would include all the stuff that came in in

6    the old case?

7    A.   The notes and things like that would be added, sure.

8    Q.   The letters?

9    A.   Well, they wouldn't be added to that system, but we would

10   have them available, yeah.

11   Q.   And it would go back to the same operator?

12   A.   Yes, yes.

13   Q.   The same investigator?

14   A.   That's true.

15   Q.   And turning to the second page of this Exhibit 11, the

16   bullet points there are the attachments that were included

17   with this letter.  Do you see that information?

18   A.   Yes.

19   Q.   And what is it that Mr. Sponer provided at this time, in

20   January?

21   A.   FTC identity theft affidavit, nine pages; police report,

22   20 pages; and notice to furnisher of information, two pages.

23   Q.   And did that constitute all of the documents that were

24   requested in Mr. Brady's letter?

25   A.   No, sir.

Cooper - D

1   Q.   What is it that wasn't included here?

2   A.   So we don't have either a government-issued picture ID nor

3   the Social Security number -- card, I mean.

4   Q.   And if this letter made it to the fraud department, under

5   the policies and procedures that were in effect at the time,

6   what would have been the next step?

7   A.   So we -- again, we would have reviewed the information

8   that was sent in.  We would determine that -- did we receive

9   all the required information?  If not, then, again, we're

10  going to go ahead and we're going to contact that customer and

11  see if we can get the remaining information available.

12  Q.   There was testimony earlier -- if we go back to the first

13  page of this, there was testimony earlier that the address

14  here with the P. O. Box 1697, that that possibly was the

15  credit bureau dispute team's address.

16       I understand you haven't -- you can't confirm whether

17  this made it to fraud.  But my question is:  Should this have

18  gone to the fraud department?

19  A.   I agree, if it came from Mr. Sponer, it should have been

20  sent to our team, absolutely.

21  Q.   I'd like to have you look at what's been marked as Exhibit

22  510.

23       And, Mr. Cooper, if I could have you look at just a

24  couple of pages here, we'll just scroll through it briefly.

25  And what is -- generally speaking, what is this document, 510

577

Cooper - D

1    that I've shown you here?

2    A.   So this is the identity theft process for indirect, and

3    it's specific to our Work Flow process.

4    Q.   And these are policies and procedures related to identity

5    theft?

6    A.   That's correct.

7    Q.   And what was the effective date of these policies and

8    procedures?

9    A.   September of 2017.

10   Q.   And, again, that was before you started with fraud?

11   A.   That's true.

12   Q.   Are these documents that you would have reviewed in

13   learning and understanding the policies and procedures?

14   A.   Right, along with this case, yes.

15            MR. PETERSON:  Offer Exhibit 510.

16            MR. SOLA:  No objection.

17            THE COURT:  Received.

18            MR. PETERSON:  Please publish.

19   BY MR. PETERSON:  (continuing)

20   Q.   And you said you had a chance to review these documents,

21   or this document?

22   A.   Yes.

23   Q.   And walk us through the steps here.  This is a similar

24   type of process as Exhibit 509; is that right?

25   A.   Correct, yes.

Cooper - D

1  Q.   Walk us through the steps that would -- starting with a

2  complaint or a dispute.

3  A.   Yeah.

4         So we would receive that request, dispute, referral.

5  Again, we're going to review that claim, the information

6  associated with that claim, to determine if there's enough

7  evidence that has been supplied for us to then take those next

8  steps to potential validation.

9         And if we have sufficient evidence, then we move

10  toward validation.  If we don't have sufficient evidence, then

11  we're going to look toward, again, requesting that information

12  from the consumer.

13  Q.   And under the summary, on the top page, it says that these

14  are the procedures when a referral has been routed to the ID

15  theft queue.  What is that referring to?

16  A.   So the ID theft queue is actually a queue within our Work

17  Flow system that is utilized by our partners that refer us

18  business.  They send it to us in the Work Flow system and put

19  it in that queue.

20  Q.   So you testified in the beginning about different types of

21  fraud that you see.

22  A.   Uh-huh.

23  Q.   So these policies here would just be specific to ID theft?

24  A.   Yes, that's correct, specific -- again, when you look at

25  Work Flow, specific to that process, yeah.

Cooper - D

1    Q.  And I'd like to have you look at what has been marked as

2    Exhibit 15.

3            Mr. Cooper, have you reviewed this letter that's

4    Exhibit 15?

5    A.  Yes, I've seen this.

6    Q.  And this is a letter dated November 3rd from Mr. Sponer.

7    And this one is also to the credit bureau dispute resolution

8    unit, but as we sit here today, are you aware whether or not

9    this was forwarded to the fraud team?

10   A.  I believe -- I believe this one did get to the fraud team.

11           MR. SOLA:  Your Honor, question in aid of objection?

12           THE COURT:  Sure.

13           MR. SOLA:  What's the basis for your knowledge that

14   this was forwarded to the fraud team?

15           THE WITNESS:  Notations made within the iTop system,

16   from the original person that had this case on our team.

17           MR. SOLA:  Okay.

18           THE COURT:  You may proceed.

19           MR. PETERSON:  Thank you.

20   BY MR. PETERSON:  (continuing)

21   Q.  And let's just do one thing real quick.  Can I have you

22   look at Exhibit 18.  And this is a letter of November 21st

23   from Mr. Brady to Mr. Sponer.

24   A.  That's correct.

25   Q.  And that's a couple weeks after Mr. Sponer's November 3rd

Cooper - D

1  letter?

2  A.   Correct.

3  Q.   Would that imply to you that at some point Mr. Brady

4  received new information from Mr. Sponer, sometime relatively

5  contemporaneous with his response letter?

6  A.   I would agree with that.

7  Q.   Back to Exhibit 15, and this letter has -- has quite a bit

8  of information.  It has information about the background of

9  the case and Mr. Sponer's correspondence with Wells Fargo.

10  And it also -- if you turn to the third page of this exhibit,

11  it also lists the information that's included.  Do you see

12  that?

13  A.   Yes, sir.

14  Q.   And what do you see as far as what's been included?

15  What's listed there?

16  A.   So relevant passport pages, four pages; law offices of

17  James I. Charne letter, five pages; response from Wells Fargo

18  Dealer Services, one page; FTC identity theft affidavit, nine

19  pages; police report, 24 pages; notice to furnishers of

20  information, two pages.

21  Q.   And out of the four items that you, as the fraud

22  department, request as part of your investigation, how many of

23  those items are included here?

24  A.   Three of those items are included here.

25  Q.   And what's new this time that Wells Fargo didn't have

Cooper - D

1    before?

2    A.   The relevant passport pages.

3    Q.   And if I could have you turn to page 5 of this document --

4    and that included the picture page of the passport?

5    A.   That is true.

6    Q.   And is that the sort of photo identification, government

7    ID, that you were referring to --

8    A.   Yes, sir.

9    Q.   -- that helps you have something to compare?

10   A.   Correct.

11   Q.   And out of the items that were requested, what's missing?

12   A.   We still do not have a copy of his -- Mr. Sponer's Social

13   Security card.

14   Q.   And if I could have you turn back again, now, to

15   Exhibit 18 -- and this is Mr. Brady's letter.  And what is

16   Mr. Brady requesting here?

17   A.   He's requesting "a copy of your Social Security card."

18   Q.   And is that consistent with the policies and procedures of

19   Wells Fargo?

20   A.   Yes, that was.

21   Q.   And a couple other notes on this.  I notice, and Mr. Brady

22   testified that there's his phone number and extension on here.

23   Is it important to the fraud department that consumers have

24   someone they can get in touch with?

25   A.   Yes.

Cooper - D

1   Q.   And is that for the reasons you've talked about before,
2   consistency and --
3   A.   Yeah.
4         I mean, we're trying to help people through this
5   process.  It's not fun for anybody.  And so we're trying to
6   get ahold of people, give them an opportunity to get directly
7   in touch with our team members so that we can resolve these as
8   quickly as possible.
9   Q.   I'll have you look at Exhibit 22, please.
10        Now, Exhibit 22 is a letter from Mr. Sponer directly
11   to Mr. Brady.  And if you see in the first paragraph,
12   Mr. Sponer explains that he doesn't have a copy of his Social
13   Security card.  Do you see that?
14   A.   Yes.
15   Q.   And under the policies and procedures, his statement that
16   "I don't have the card," what would happen next?
17   A.   So that statement, there's no way for us to get that last
18   piece of the puzzle for us.  So we would review the
19   information that we received.  We would try to make a
20   determination there.  It would go to -- many times escalate to
21   a second-level review with a manager.  And then a final
22   decision would be made at that point in time.
23   Q.   So not having the Social Security card, does that
24   necessarily foreclose the ability to get something validated
25   as fraud?

Cooper - D

1    A.   No, sir.

2    Q.   Mr. Cooper, we reviewed a lot of documents.  And let's

3    look back at Exhibit 15.  There's a lot of information here in

4    Exhibit 15, the November 3rd, 2017 letter, a fairly thick

5    packet, the identification card, et cetera.

6            As you sit here today, with the benefit of being able

7    to look back at this document, do you think as of November

8    2017 there was sufficient information for Wells Fargo to

9    verify this as fraud?

10   A.   I definitely think that we had that opportunity, yes.

11   Q.   In November of 2017?

12   A.   That's correct.

13   Q.   Mr. Cooper, have there been changes to the auto fraud

14   department's policies and procedures?

15   A.   Yeah.

16            I mean, just as a part of normal business, we review

17   our procedures every six months or so to look for updates and

18   improvements.  So the procedures that were in place at that

19   time have changed.

20   Q.   And what sort of -- what sort of changes have taken place?

21   A.   Many times what we're looking to do is provide clarity to

22   our team members, right.  They're referring to these

23   procedures as they move along, and so for us to provide

24   clarity as to what that next step is when -- you know, when we

25   obtain information or whatever those situations are.  The more

Cooper - X

1  clarity we can provide, obviously the better it is for our

2  team members as well as our consumers, customers.

3  Q.   Thank you, Mr. Cooper.

4        MR. PETERSON:  I don't have any further questions.

5        THE COURT:  Cross-exam.

6

7                       CROSS-EXAMINATION

8  BY MR. SOLA:

9  Q.   Good day, Mr. Cooper.

10  A.   Good day.

11  Q.   Well, that last question, you're saying now you do have

12  different procedures; is that right?

13  A.   We do -- we do have some different procedures, yes, sir.

14  Q.   All right.  But you'd agree that Wells Fargo's

15  investigation of the identity theft dispute that Mr. Sponer

16  made would be handled the same way if it was sent now,

17  correct?

18  A.   Explain what you mean by "same way."

19  Q.   It would be handled in the same ways as his was.  You

20  would follow the same procedures?

21  A.   I would say that the outcome may be different with respect

22  to, again, thinking about the documentation that we received

23  and the requirements.  But yes, we still require the same

24  documentation.  We still have a similar form letter.  So

25  similarly, yes.

Cooper - X

1  Q.   Okay.  So the same procedure that you imposed on

2  Mr. Sponer, you'd impose on consumers today?

3  A.   So the fraud team does work under procedures that are

4  similar to then, to those procedures.  They are not the same.

5  Q.   Well, you're still going to ask for all four pieces of

6  identification, right?

7  A.   That is correct.  We still request those four pieces of

8  information, that's accurate.

9  Q.   And as shown by Mr. Sponer's information, when he sent

10  three, that wasn't enough, was it?

11  A.   According to our procedures at the time, we request that

12  fourth piece of information.

13  Q.   Now, in October of 2016 Mr. Charne wrote to Wells Fargo.

14  He indicated Mr. Sponer was the victim of identity theft,

15  correct?

16  A.   That is accurate, yes.

17  Q.   We've reviewed the letter.  And Mr. Charne informed Wells

18  Fargo about the pending criminal case, gave the criminal case

19  number and the police report number and the name of the

20  detective and the phone number, right?

21  A.   I believe that's true, yes.

22  Q.   Okay.  So that put you on notice that there was a criminal

23  case against the thief, right?

24  A.   That gave us notice that a police report had been filed

25  around a potential case, yes.

Cooper - X

1   Q.   Okay.  Well, not just a police report had been filed.

2   Didn't he indicate that they had apprehended the suspect and

3   the car had been recovered by the police and the car would be

4   returned to Wells Fargo?

5   A.   That was communicated to us at some time.  I can't

6   remember if it was right in the very beginning.

7   Q.   Okay.  And you'd agree, based on that information, this

8   looked like identity theft, right?

9   A.   I would say that at that point in time, that was what we

10  opened the case for, was the assertion of an identity theft

11  claim.

12  Q.   Okay.  But a fraud affidavit, that's just a consumer

13  saying they're the victim of identity theft under oath, right?

14  A.   That is what that is, yes.

15  Q.   Okay.  But you had something much better.  You had the

16  police telling you that the consumer was the victim of

17  identity theft, right?

18  A.   I would say that was part of the assertion, yes.

19  Q.   No.  But you had something better than a fraud affidavit,

20  didn't you?  You had the police telling you the consumer was

21  the victim of identity theft?

22  A.   So the police report opens a potential case.  But the case

23  at that time was not completed nor closed.  So at that -- at

24  that point in time, again, it's an assertion that he was a

25  victim of identity theft.

Cooper - X

1    Q.   Well, what I'm trying to draw a distinction -- a fraud

2    affidavit is a consumer's assertion they're the victim of

3    identity theft, right?

4    A.   That's correct.

5    Q.   You had the police asserting that Mr. Sponer was the

6    victim of identity theft, right?

7    A.   That is correct, yes.

8    Q.   Okay.  And you believed the police on that, didn't you?

9    A.   We did not doubt the police at that point in time.

10   Q.   Okay.  Now, you also -- so that was better than a fraud

11   affidavit, right?

12   A.   Again, I would say that's part of the investigation, a

13   piece of the documents that we use in our investigation to

14   come up with a final decision.

15   Q.   Okay.  Another thing you asked Mr. Sponer for was the

16   police report, right?

17   A.   That is -- that is accurate.

18   Q.   All right.  But you had the police report number.  And, as

19   we know, you were speaking with the police, but you didn't

20   even bother to ask the police for the police report, did you?

21   A.   That's not part of the procedure, but I don't -- yeah, I

22   don't know if they did or not.  It's not in the notes that I

23   read, so I would assume at the time they did not ask for a

24   copy of the police report.

25   Q.   Okay.  So it's not part of the procedure, when you know

Cooper - X

1    there's a police report, to ask for it from the police?

2    A.   Well, so when we're talking about procedure, we can't

3    write the procedure for every eventuality.  That's why we

4    include that in the letter.  We're trying to make sure we have

5    that information communicated to the consumer.

6    Q.   Well, the consumer might not have a police report, right?

7    A.   It's possible that they don't, sure.

8    Q.   Sure.

9         So, actually, the police are the only people that you

10   know will have a police report when you get a police report

11   number, right?

12   A.   True.  And in many instances that we've come across, it's

13   difficult to get that report from the police.

14   Q.   Really.  But you didn't even try here, did you?

15   A.   Like I said, I can't say that we did or we didn't.  There

16   isn't a note, so I can't say that we did.

17   Q.   I think you said the policy is not to request it from the

18   police.

19   A.   No.  I said the policy doesn't state that we do that.

20   There isn't that in the policy.

21   Q.   All right.  And then we know on October 26 Wells Fargo

22   spoke with police.  Detective Tugashov said words to the

23   effect, "We're investigating.  This is fraud.  Jason Yochum

24   purchased a car using your customer's identity, and the car is

25   now being held"; is that right?

589

Cooper - X

1   A.   Yes.  Somebody, it appears, talked to him, yes.

2   Q.   All right.  And then on November 3rd Wells Fargo talked

3   again with Detective Tugashov, and he said, "Suspect pled

4   guilty, and the car is going to be held as evidence," right?

5   A.   That was another note, yes, sir.

6   Q.   Okay.  But at that point, that wasn't enough for Wells

7   Fargo to drop this from Mr. Sponer's credit report, was it?

8   A.   No.  It's not enough for our investigation to be completed

9   at that point in time, because if you also read through the

10  rest of that note, it also states that the police did say that

11  he pled guilty; however, he could change his plea prior to the

12  end of the case.

13       So, again, it asserts the reason why we have to

14  complete our investigation really is because we don't know

15  what the outcome of that case is going to be.  So for us, we

16  have to follow through with those pieces of information so

17  that, again, we're making that case for Wells Fargo as robust

18  with what we have as we can.

19  Q.   All right.  Well, let's say the consumer sends you the

20  information you want.

21  A.   Sure.

22  Q.   You still don't know what the outcome -- before the

23  criminal case is completed, you don't know what the criminal

24  case will be, right?

25  A.   That's very possible, sure.

1   Q.   But let's move on.   Then in January 2017 Mr. Sponer sends

2   another dispute letter, with the police report and with the

3   fraud affidavit, right?

4   A.   What time frame?

5   Q.   January 2017.

6   A.   I'm assuming so, yes.   Fraud team did not receive it, but

7   I'm assuming that's the case, because we have it in the --

8   Q.   Okay.   But still, that wasn't enough for Wells Fargo to

9   take this off his credit report, right?

10  A.   We would have still requested the copy of his photo ID, as

11  well as the Social Security card, yes.

12  Q.   All right.   Then in January 2017 the criminal actually is

13  convicted and Wells Fargo gets its car back, right?

14  A.   According -- according to the notes, that does appear

15  that's true, yes, sir.

16  Q.   Okay.   So now -- you had referred to that possibility that

17  the thief could change his plea.   That's not possible anymore.

18  Now there's been a conviction of the thief who stole

19  Mr. Sponer's identity.   And Wells Fargo knows it, because

20  that's why they got the car back.   It's not needed for the

21  criminal case.

22          But that's still not enough for Wells Fargo to admit

23  this is identity theft, is it?

24  A.   So at the time that we -- that was occurring, we didn't

25  have an open case in the fraud department.   And so not -- not

Cooper - X

1    knowing there's an open case, we didn't receive any

2    documentation around that, so we weren't investigating it at

3    that time.

4    Q.   You shut down his case when you were waiting to find out

5    if the criminal was convicted?

6    A.   It wasn't open at that point in time.

7    Q.   So you shut it down while you were waiting to learn if the

8    criminal was convicted?

9    A.   Systemically, after 30 days, the account was closed in our

10   Work Flow system, yes, sir.

11   Q.   All right.  Then Mr. Sponer sent a letter in August of

12   2017 again disputing and enclosing more information.  And,

13   again, that still wasn't enough for Wells Fargo to admit this

14   was identity theft, was it?

15   A.   Wells Fargo, to my knowledge, doesn't even acknowledge

16   that that letter was received.

17   Q.   All right.  Well, let's go to November.

18   A.   Yes, sir.

19   Q.   Because we have a letter in November.  Wells Fargo

20   acknowledges that was received.

21   A.   That is true, ser.

22   Q.   And that had a passport?

23   A.   Yes, sir.

24   Q.   But that still wasn't enough for Wells Fargo to agree this

25   was identity theft, was it?

Cooper - X

1   A.   We were still looking for that copy of the Social Security

2   card, sir, per procedure, yes, sir.

3   Q.   Okay.  And around that time, plaintiff disputed to

4   Equifax; and Equifax forwarded Wells Fargo a driver's license

5   and passport through one of the ACDVs.  Are you aware of that?

6   A.   I was not aware of that, sir.

7   Q.   Actually, I want to retract that.  I don't want to state

8   something that you're not aware of.

9        December 1st, 2017 -- well, actually after the

10  November letter, that's when you folks wrote the letter that

11  said, "Before we can proceed with the investigation, you need

12  to send your Social Security card," right?

13  A.   That's correct.

14  Q.   That is your answer, "That's correct"?

15  A.   I don't remember what the question was now.

16  Q.   On December 1st Mr. Sponer sent another letter to Wells

17  Fargo, correct?

18  A.   That is correct, yes.

19  Q.   But still Wells Fargo didn't take it off his credit

20  report, did it?

21  A.   That was the first time that we were notified that

22  Mr. Sponer did not have a copy of his Social Security card.

23  Q.   I understand.  And, you know, a month went by, all of

24  December.  You still didn't take it off his credit report, did

25  you?

Cooper - X

1    A.   I do not believe that that was taken off, no.

2    Q.   No.  Okay.

3         In fact, he got a letter dated December 5th that

4    said, "Your dispute is being forwarded to the fraud

5    department," didn't he?

6    A.   Through a different area.

7    Q.   Through the Office of the President, right?

8    A.   I believe that's true, yes.

9    Q.   Yeah.  Mr. Sponer's letter got forwarded to the Office of

10   the President; and they didn't do anything, did they?

11   A.   Well, the Office of the President, what they do is they'll

12   open a case, right, and they try to work with our different

13   teams to figure out what's going on with that.

14        So, again, in that request, that, then, would go to

15   the fraud team, just as ACDV or whatever we would have in this

16   case, they would come to our team to determine -- make that

17   determination of fraud.

18   Q.   So, in other words, the Office of the President didn't do

19   anything but send it back to the fraud department, correct?

20   A.   They sent it to us and talked with us at that time, I

21   would assume.

22   Q.   But still, after you got that December 5th letter, all

23   through December you didn't take it off, did you?  I mean --

24   sorry, not that December 5th letter, but assuming it was

25   forwarded from the Office of the President to the fraud

Cooper - X

1    department, you still didn't act on it, did you?

2    A.   We would go through that review process.

3    Q.   Okay.  And then Mr. Sponer sues Wells Fargo, and almost

4    the whole month of January goes by, until he gets a letter

5    January 30 saying Wells Fargo is finally going to fix it?

6    A.   I believe that's true.

7    Q.   So you didn't fix it in response to the December 1st

8    letter, did you?

9    A.   Again, without knowing the notes in there, I'm not sure

10   what was going on behind the scenes there.

11   Q.   I mean, it wouldn't have taken almost two months if that

12   was your intention, would it?

13   A.   Again, some cases take longer.  I don't know.  I don't

14   know what to tell you.  The notes aren't in the system, so I'm

15   not sure.

16   Q.   Now, when you have an investigation -- well, actually,

17   you're in the fraud department, right?

18   A.   That is true, yeah.

19   Q.   And when you get a dispute of fraud, you should do a

20   thorough investigation, shouldn't you?

21   A.   That's -- that's our goal, yes, sir.

22   Q.   Do you have people that are trained to do fraud

23   investigations?

24   A.   That's what we do, yes, sir.

25   Q.   Okay.  That's what you do.

Cooper - X

1          And after you got Mr. Charne's letter, you agree,
2    that's what you should have done, a thorough investigation of
3    Mr. Sponer's dispute?
4    A.   Unfortunately, we couldn't.  We didn't have enough
5    information to complete that research according to our
6    procedures.
7    Q.   Okay.  But what I'd like to know is:  What were
8    you -- what are the procedures going to require you do to make
9    that a thorough investigation?
10   A.   Again, the research that we're taking on at the time is to
11   review the information that we have, the documentation that we
12   have, looking for additional documentation from the customer,
13   the consumer, and continuing on with our investigation.
14   Q.   Now, I don't think you were here for Mr. Brady.  He said
15   the procedure after the Charne letter was to send the
16   October 26th letter requesting documents.  Do you agree with
17   that?
18   A.   That's part of that procedure, yes, sir.
19   Q.   He did not recall anything that was done other than
20   sending that letter.
21          Do you know of anything that was done to investigate
22   this dispute that you said deserved a thorough investigation,
23   other than sending the October 26th letter?
24   A.   So if Mr. Brady was following the procedures, he should
25   have done a -- again, a review of the documentation that was

Cooper - X

1   there, potentially looking at some third-party vendors to

2   determine what we have.  And then after that, then we would go

3   ahead and we would send that letter.

4   Q.   My question, sir, was whether you were aware anything was

5   done other than Mr. Brady sending the October 26th letter.

6   A.   And I was not with the team at that time.  The notes don't

7   state what was completed.  So there's no way for me to

8   determine or tell you what was done at that time.

9   Q.   All right.  Well, if there was some -- you saw nothing in

10  Wells Fargo's records to indicate anything was done other than

11  sending the October 26th letter, correct?

12  A.   I would say generally, through our review in certain

13  cases, it's not held -- the notes aren't held in the iTop

14  system, so it's difficult for me to say again what would have

15  been done or what wasn't done by Mr. Brady at the time.

16       Procedures are very clear.  They state we should be

17  looking at documentation and notes and third-party vendors'

18  information; then after we've done that, then sending that

19  letter out.

20  Q.   Well, actually Mr. Brady did not indicate any of that.  He

21  indicated the procedures are you wait to get the documents

22  from the consumer before you do anything else.

23  A.   Okay.

24  Q.   Do you agree with that?

25  A.   No, I do not agree with that.

Cooper - X

1    Q.   Okay.  But you agree -- you have no evidence that Wells
2    Fargo took any steps to investigate the fraud dispute other
3    than send the October 26th letter, right?
4    A.   I would say any -- any statement by me at that point would
5    be speculative in nature.  There's no way for me to know if
6    there's no note in the system.  I would have to fall back to
7    Mr. Brady.
8    Q.   All right.  In fact, you've only been with the fraud
9    department for about one year, right?
10   A.   That is accurate.
11   Q.   And you were not in the fraud department at the time these
12   events happened, were you?
13   A.   That is true.
14   Q.   But Mr. Brady, he was there, wasn't?
15   A.   He was there.
16   Q.   Right.  So he would have more knowledge about what
17   happened than you would, right?
18   A.   With this specific case, are you saying?
19   Q.   Yes, with Mr. Sponer's case.
20   A.   So, yes, Mr. Brady would have more knowledge in this
21   specific case than I because he was the one that worked the
22   case.
23   Q.   In fact, you have no personal knowledge of any of the
24   events related to this case, do you?
25   A.   That's accurate.

Cooper - X

1    Q.   The only knowledge you have is knowledge you obtained in

2    the last few weeks, getting ready for the trial, right?

3    A.   With respect to this case, that's true.

4    Q.   And all the knowledge you have about this case is just

5    based on documents you reviewed, right?

6    A.   Yes, that's accurate.

7    Q.   And you were referring to some procedures in Exhibit 509.

8    Do you remember that?

9    A.   Yes, sir.

10   Q.   And you don't know if any of those procedures were

11   followed in regard to Mr. Sponer's disputes, do you?

12   A.   Again, I would assume that they would be followed, because

13   that was the procedure that was in play at the time.

14   Q.   I understand.  But my question is:  You don't know if any

15   of those procedures were followed in regard to Mr. Sponer, do

16   you?

17   A.   You would have to talk to Mr. Brady.

18   Q.   I'm sorry.  I couldn't hear you.

19   A.   You would have to talk to Mr. Brady about that.  I wasn't

20   there for the activities that took place, that's true.

21   Q.   You mentioned that the dealer who sold the car would have

22   a driver's license of the purchaser, right?

23   A.   Yeah.  I would say the majority of the time that they do,

24   yes, sir.

25   Q.   Okay.  But you never asked the dealer for the driver's

Cooper - X

1  license as part of an investigation, did you?

2  A.  Again, I wasn't there at the time.  I'm not sure what was

3  done because it wasn't in the notes.  It would be part of what

4  we would request today.  And, again, reviewing documentation

5  that's available would be part of that procedure.  But I don't

6  see that in the notes, so I can't say for sure they did or

7  they did not.

8  Q.  And did you ever go to the district attorney and ask for

9  information about the criminal case?

10  A.  Again, I don't believe so.  I don't see it in the notes.

11  Q.  Did you ever go back to the police, other than to try to

12  get the car back, and ask for more information about the

13  criminal case?

14  A.  I don't believe that I saw that in the notes either, no,

15  sir.

16  Q.  Okay.  And you never asked for the police report, right?

17  A.  Again, it's not in the procedure.  It wasn't in the notes.

18  So I'm assuming that -- I can't answer yes or no.

19  Q.  All right.  There was a suspected unusual activity form.

20  Did your office review that?

21  A.  Yes.  I believe that was -- that was sent, I believe,

22  in -- was that October, I believe?  I can't remember.  I

23  believe that it came to our department.  I can't remember what

24  the exact date was.

25  Q.  All right.  It came to your department.  But there's no

1   record that any action was taken as a result of getting that
2   suspected unusual activity report, was there?
3   A.   What date are you referring to?
4   Q.   October 19, 2016.
5   A.   October 19?  So that could have been what sparked the
6   initial case.  Again, because the information that was sent
7   from Mr. Charne was sent, I believe, to the credit bureau
8   operations team, which then would have filed that suspected
9   unusual activity form, that would have come to our team, and
10  that would have kicked off the case.  That's my assumption
11  there.
12  Q.   But if Mr. Brady testified that the only thing that was
13  done to investigate in the fall of 2016 was sending the
14  October 26 letter to Mr. Sponer, you'd have no basis for
15  disagreeing with that?
16  A.   I would have to defer to Mr. Brady as far as what he did
17  or did not do.
18  Q.   And did you understand that there were 10 ACDVs that went
19  to the credit bureau operations department because Mr. Sponer
20  kept trying to get this account off his credit report?
21  A.   I saw that in the review.  We weren't notified of those,
22  but I saw that in the case, yeah.
23  Q.   Yeah.  The fraud department wasn't notified of any of
24  those, was it?
25  A.   No.  Many of them, no.  They were handled through the CBO,

1    it looks like.

2    Q.   So they were never forwarded to the fraud department, were

3    they?

4    A.   I don't believe so.

5    Q.   So much of those procedures you talked about, where the

6    credit bureau dispute department contacts the fraud department

7    about an ACDV, they don't apply in this case, do they?

8    A.   Again, it goes back to what was stated in the ACDV.  I

9    don't know.  We weren't notified of those.  So that would have

10   to go back to their procedures and their review process.

11   Q.   And it's the credit bureau operations department that's

12   responsible for ensuring that Wells Fargo reports accurate

13   information to the CRAs, right?

14   A.   I believe that's in their purview, yes.

15   Q.   Okay.  And it's the credit bureau operations department

16   that's responsible for responding to the ACDVs and telling the

17   CRAs whether they should delete or modify disputed

18   information, right?

19   A.   Yes, sir, I believe that's true.

20   Q.   That's not the responsibility of the fraud department,

21   right?

22   A.   We do -- again, we do the research and determine if a case

23   happens to be fraud.

24   Q.   Okay.  But, I mean, the fraud department is not

25   communicating with the credit reporting agencies, is it?

602

Cooper - X

1   A.   No, sir.

2   Q.   Now, when Mr. Charne sent his letter, he sent the power of

3   attorney as well, right?

4   A.   Yes, sir, he did.

5        You're talking about the letter of October 19th?

6   Q.   Yes.

7   A.   Yes, sir.

8   Q.   There's only one letter from Mr. Charne.

9   A.   Oh.

10  Q.   And you'd agree, when Wells Fargo got that letter from

11  Mr. Charne with the power of attorney, there was no question

12  that it was a dispute being made on behalf of Mr. Sponer,

13  right?

14  A.   I believe that's accurate, yes.

15  Q.   So you had no need to try to verify who Mr. Sponer was,

16  did you?

17  A.   We always have to verify who we're dealing with.

18  Q.   Well, but you just said there was no question that it was

19  Mr. Sponer making the dispute, so why would you verify?

20  A.   I'm saying there's no dispute that there was a dispute by

21  Mr. Sponer and that Mr. Charne was representing him, so,

22  therefore, we opened the case to try to work through our

23  investigation.  And that identity piece is part of our

24  investigation, determining their identity.

25  Q.   Now, when you did get a dispute of identity theft, then

1   what you need to investigate is whether the account resulted

2   from identity theft, correct?

3   A.   Yeah.  We're trying to determine who may have opened the

4   account, yes.

5   Q.   I mean, isn't that the only question:  Was it a thief who

6   opened the account?

7   A.   I would say it's trying to determine who opened the

8   account, yeah.

9   Q.   Trying to determine who opened the account.

10           And so let's say a consumer makes that dispute.  You

11   request they give you their Social Security card, right?

12   A.   That's one of the things, yes, sir.

13   Q.   All right.  Let's just take the Social Security card.

14   Okay.  Let's say one consumer has their Social Security card.

15   They send it in.

16   A.   Yes, sir.

17   Q.   Another consumer doesn't have their Social Security card.

18   They don't send it in.

19   A.   Yes, sir.

20   Q.   In either of those cases, does it matter in terms of

21   whether an identity thief opened the account?

22   A.   There is -- in no case that I -- that I've reviewed or

23   have experience with that we would accept only a Social

24   Security card to validate an account.

25   Q.   No, no.  But what I'm saying is I don't see how the fact

Cooper - X

1  as to whether a consumer has their Social Security card or not

2  bears on the question of whether a thief opened the account.

3  Can you explain if there is any relationship?

4  A.   Yeah.  We explained it a little bit earlier.  But when

5  you're talking about an identity thief, as you call them, one

6  of the things that they don't think about, they don't have to

7  falsify, is a Social Security card.  Why would they?  They're

8  going to get a car.  They're going to get a credit card.  They

9  don't need a Social Security card in any of those cases.

10         So many times when we're trying to build that case,

11  that's what we're kind of -- one of the pieces that we're

12  asking for because of that, right.  So for us, it's that next

13  piece that, yeah, we're dealing with that particular

14  individual.  That's helping us to understand that they have

15  that documentation.

16  Q.   You're not asking -- I'm sorry.  I guess I don't

17  understand.  How does the fact that the consumer has their

18  Social Security card prove that it's identity theft?

19  A.   So, again, it's part of a case.  It's not the one piece.

20  So the -- if somebody provided me just a Social Security card,

21  yeah, you're right.  There's nothing I can do on just a Social

22  Security card.

23  Q.   What I'm saying is the fact that the consumer has or

24  doesn't have their Social Security card has no bearing on to

25  whether a thief impersonated them when they made the loan,

Cooper - X

1  right?

2  A.   It can help us to determine if that truly is the

3  individual or not, the person that's making that assertion,

4  sure.

5  Q.   Okay.  Well, no.  What you're saying is the Social

6  Security card will help you determine who is making the

7  dispute; is that right?

8  A.   It's one of the pieces that we're talking -- yeah, that we

9  utilize, yes.

10  Q.   Okay.  So when you're supposed to be investigating whether

11  there was identity theft, actually you're investigating who is

12  making the dispute, right?

13  A.   We are not investigating who is making the dispute.  We're

14  trying to ascertain the identity of the person that's making

15  the dispute and comparing it to the documentation that we have

16  on the loan.  And if we don't have one or the other, we don't

17  have a way to finalize our case.

18  Q.   All right.  So those people that don't keep their Social

19  Security card, they're not going to get their fraud dispute

20  validated, right?

21  A.   No, that's not true, sir.

22  Q.   Well, that's what happened to Mr. Sponer, right?

23  A.   Mr. Sponer's case was validated in January.

24  Q.   Well, after he sued.

25  A.   That may be the case.

Cooper - X

1   Q.   Now, you -- you wanted Mr. Sponer's Social Security card,
2   right?
3   A.   That is what we requested, yes.
4   Q.   And this loan with the car dealer, you had a relationship
5   with that car dealer, right?
6   A.   We have relationships with thousands of car dealers.
7   Q.   I understand.  But the only reason the loan was through
8   Wells Fargo was because of your relationship with the car
9   dealer?
10  A.   Thousands of them, yes.
11  Q.   But you never told the car dealer, "Before you make that
12  loan, get the Social Security card"?  You didn't do that, did
13  you?
14  A.   So the CIP program does not depend -- Wells Fargo does not
15  require that, because we don't complete CIP for the loan.
16  Q.   Okay.  But you demand the Social Security card of the
17  consumer that's disputing, but you don't demand it to prove
18  the identity of the person that's opening the loan to avoid
19  identity theft, do you?
20  A.   That wouldn't be consistent documentation that's required
21  that -- I believe it's really the requirement of the dealers
22  themselves.  It's not Wells Fargo that determines what they
23  accept or don't accept.
24  Q.   Now, Mr. Sponer disputed to the CRAs 10 times, and those
25  disputes were forwarded to Wells Fargo, right?

Cooper - X

1   A.   I assume, by looking at the notes, that that was the case.

2   Q.   And Wells Fargo -- you've talked about various procedures.

3   And Wells Fargo and the fraud department followed their

4   procedures in handling his direct disputes that he wrote and

5   in handling the ACDV disputes, correct?

6   A.   To the best of my knowledge, that's accurate.

7   Q.   And as a result of Wells Fargo following its procedures,

8   it kept verifying that the fraudulent account was his and

9   never told him, until after he sued, that the account was not

10  his, correct?

11  A.   I would say, again, we were going through the process.  We

12  finalized our case after we received that information from

13  Mr. Sponer about not having a copy of his Social Security card

14  and that was escalated.  After that I couldn't tell you

15  because, again, it was not included in the notes.

16  Q.   But what you're saying is until he sued, you verified the

17  account was his every time he disputed it, correct?

18  A.   Again, you would have to ask somebody else, because I'm

19  not involved in the ACDVs.  Per the notes, that's what it

20  shows.  So I'm assuming that's accurate.

21           MR. SOLA:  No more questions.

22           THE COURT:  Redirect.

23           MR. PETERSON:  Very briefly.

24

25

Cooper - ReD

1                    <u>REDIRECT EXAMINATION</u>

2    BY MR. PETERSON:

3    Q.   Mr. Cooper, there was a question about whether or not all

4    10 of the ACDVs were forwarded to the fraud department.   Do

5    you recall that question?

6    A.   Yes, I do.

7    Q.   When the fraud department opens a fraud investigation,

8    does that show up in the system of record, in iTop?

9    A.   Yes, sir, it does.

10   Q.   And that would remain showing that there was an open fraud

11   investigation?

12   A.   Correct.

13           MR. PETERSON:  I don't have any further questions.

14           THE COURT:  You may step down.

15           Do you want this witness excused?

16           MR. PETERSON:  That's fine with us, Your Honor.

17           THE COURT:  Any objection?

18           MR. SOLA:  No objection.

19           THE COURT:  You are excused.

20           THE WITNESS:  Thank you.

21           THE COURT:  Call your next witness.

22           MR. PETERSON:  The defendant calls Dean Binder.

23           THE CLERK:  Please raise your hand.

24

25

609

Binder - D

1                    DEAN BINDER

2    called as a witness in behalf of the Defendant, having been

3    first duly sworn, is examined and testifies as follows:

4

5              THE CLERK:  Please have a seat.  State your name and

6    spell it.

7              THE WITNESS:  My name is Dean Binder, D-e-a-n

8    B-i-n-d-e-r.

9                    DIRECT EXAMINATION

10   BY MR. FRANSEN:

11   Q.  Good afternoon, Mr. Binder.

12             Can you please let the jury know a little bit about

13   your background.

14   A.  Certainly.

15             So I have 13 years of credit industry experience.  I

16   worked for Equifax, a credit bureau.  I also worked for a

17   company called Fair Isaac, which is now known as FICO, a

18   credit scoring company.

19             I also worked as a finance insurance manager.

20   Finance insurance manager is if you buy a car, they send you

21   to the F and I guy who pulls credit reports and approves you

22   for a loan.  So I did that for an RV dealership.

23   Q.  All right.  Now, what time were you at Equifax?

24   A.  From late '91 for five years, until '96.

25   Q.  What sort of roles did you have when you worked at

Binder - D

1  Equifax?

2  A.   So I was hired bottom level as a dispute analyst in their

3  disputes department and worked my way laterally and up through

4  all the different divisions in the credit bureau dispute

5  investigations departments, from maintenance, back end, making

6  changes, taking phone calls from consumers, worked my way up

7  to quality assurance.  And then I did management for dispute

8  investigation teams and ultimately the fraud investigations

9  team.

10 Q.   All right.  How about at Fair Isaac?  What did you do when

11 you worked there?

12 A.   I worked there for seven years and mostly did sales for

13 mid-sized banks.  So I was selling Fair Isaac products and

14 scores, a product called Liquid Credit, which was a loan

15 originations product.  So that's basically what I did for

16 them.

17 Q.   All right.  And now following your time in the consumer

18 credit industry, what have you been doing for the last 10

19 years or so?

20 A.   I have been doing expert witness work since my time with

21 Fair Isaac.

22 Q.   And about how many cases do you think you've been hired as

23 an expert?

24 A.   Hired around 60.

25 Q.   And have you reviewed records in more cases than that?

Binder - D

1    A.   Certainly.  I've also done consultant work additionally

2    from my expert witness work.

3    Q.   Now, in your 10 years working as an expert witness, are

4    you primarily hired by creditors like Wells Fargo?

5    A.   I would say no.

6    Q.   Who are you primarily hired by?

7    A.   I would say primarily plaintiffs.  So I'm more on the

8    consumer side.  But I do occasionally get hired on the

9    defendant's side, for banks, collection agencies.

10   Q.   Okay.  Now, as part of your work in this case, did you

11   review any procedures for Wells Fargo Auto?

12   A.   I did, yes, their fraud, fraud procedures.

13   Q.   Is there anything in particular that you focused on in

14   that review?

15   A.   Particularly the identity theft request and the

16   information, the four points -- the four pieces of information

17   requested from -- from Wells.

18   Q.   All right.

19        MR. FRANSEN:  Can we pull up Exhibit 501.

20   BY MR. FRANSEN:  (continuing)

21   Q.   Now, you were here for Mr. Cooper's testimony, and he

22   described -- did he describe the policies and discuss the

23   policies that you reviewed?

24   A.   Yes.

25   Q.   Now, have you seen this letter before?

612

Binder - D

1    A.   I have.

2    Q.   All right.  This is the October 26 letter we've been

3    talking a lot about; is that right?

4    A.   That's correct.

5    Q.   Okay.  Does this letter contain the request for those four

6    pieces of information?

7    A.   Yes, it does.

8             MR. FRANSEN:  All right.  Would you mind, just help

9    us out, just zoom in on those four pieces.

10            Good enough.

11   BY MR. FRANSEN:  (continuing)

12   Q.   So these are the four items that you were talking about?

13   A.   That's right.

14   Q.   Okay.  So can you discuss -- or as part of the work, have

15   you developed an opinion about whether it's reasonable to

16   request these four items?

17   A.   Absolutely.

18            And my opinion is that it is reasonable to ask for

19   these items.  Most of these are industry-wide items that are

20   asked for in fraud investigations.

21   Q.   And can you just go through them one by one and explain

22   what you mean by why they're reasonable?

23   A.   All right.  So an identity theft affidavit is a document

24   that can be filled out once.  You can get it from the FTC or

25   through a creditor, and you can send it to all of your

Binder - D

1  creditors that you believe you've been a victim of fraud with.

2  It's also notarized, so it's signed under oath.  And it's more

3  of a convenience document that you can send to everyone.

4  Q.  How about the next item?  Let me ask you about the police

5  report.

6  A.  Certainly.

7           That shows you've been in contact with the police,

8  that there's been official -- official contact with the

9  police.

10  Q.  And the last two items, Social Security card and an

11  identification card, can you explain your opinion based on

12  both of those?

13  A.  Right.

14           So these are identification documents.  Obviously the

15  driver's license or passport, government ID shows who you are;

16  and, additionally, the Social Security card is another helpful

17  piece that is routinely asked for.

18  Q.  All right.  Now, is it important -- in an identity theft

19  investigation, is it important to confirm the identity of the

20  person who is making the claim?

21  A.  Absolutely.

22  Q.  Okay.  And why is -- why is it important?

23  A.  Well, first, you want to make sure who is submitting the

24  claim, making sure you're speaking with the right person.  But

25  additionally, there are, unfortunately, unscrupulous people

Binder - D

1  and companies that are submitting bogus fraud disputes in an

2  effort to remove valid debts from credit reports or inflate

3  credit scores.

4  Q.  All right.  Now, have you seen anything in this case to

5  suggest that Mr. Sponer is involved in any of those

6  unscrupulous or bogus activities?

7  A.  Absolutely not.

8       But the reason I'm saying that is because of the

9  policy or procedure to ask for the identifying information,

10 the driver's license and the Social Security card, would help

11 with that.

12 Q.  So it's reasonable to ask for these items every time?

13 A.  It's reasonable to ask for these items, certainly.

14 Q.  And I should have specifically asked you before, we're

15 talking about policies for Wells Fargo Auto, correct?

16 A.  Yes.

17 Q.  Okay.  If we were talking about policies for some

18 different product, might it be -- might something less

19 substantial, a credit card, something like that, might it be

20 reasonable to not ask for as much information?

21 A.  Certainly.

22      And sometimes there are variances.  Some companies

23 may not ask the for Social.  Some companies may not ask for

24 certain items.  But overall, these are -- these are standard

25 documents that can and could be asked for.

Binder - D

1    Q.   All right.  Would it be reasonable to have an exception to

2    this policy for a situation where, for an example, like this

3    case, you got a call from the police saying there's an -- that

4    an identity thief has been arrested and/or has pled guilty.

5    A.   Right.  So not an exception for that.  That would be

6    valuable information for a fraud department to have, but

7    clearly the first steps in a fraud investigation is to get

8    these types of documents and identifying information to make

9    sure you're dealing with the right person.

10   Q.   And it's reasonable to get those from the person him or

11   herself?

12   A.   Say that again, please.

13   Q.   And it's reasonable to get that from the person making the

14   claim him or herself?

15   A.   Certainly.

16   Q.   And now we've heard -- for example, in this case -- there

17   could be a situation where someone doesn't have a Social

18   Security card.  What can they do if they need to get a Social

19   Security card?

20   A.   So I'm fairly confident that you can go to the Social

21   Security Administration and get a Social Security card.  Many

22   states -- and I believe Oregon included -- you can do it

23   online.

24   Q.   All right.  But it may require some work?

25   A.   Certainly.  It takes work.  Unfortunately, identity theft

1   does require some work for the victim.

2   Q.   All right.  And we actually heard quite a bit of testimony

3   that Mr. Sponer here did -- he did engage in quite a bit of

4   work, didn't he?

5   A.   He absolutely did.

6   Q.   Not just with Wells Fargo Auto?

7   A.   Many other creditors that he was sending letters to in

8   2016 and 2017, additionally.

9   Q.   All right.  Now, you heard plaintiff's experts when they

10  discussed their view of the industry standard; is that

11  correct?

12  A.   Yes.

13  Q.   All right.  Do you recall plaintiff's experts discussing

14  that receiving 10 disputes would be some sort of a red flag?

15  A.   I do.

16  Q.   Do you agree with that?

17  A.   Not necessarily 10 disputes.  I'm unaware of an industry

18  standard that says if you receive 10 disputes, we should flag

19  your account.

20  Q.   Okay.  What about just if you receive multiple disputes in

21  a short amount of time?

22  A.   No.  Many creditors are receiving millions and thousands

23  of dispute, so I don't think that's a red flag situation.

24  Q.   Do you also recall plaintiff's experts claiming

25  that -- just the fact that the police reached out and said,

1    "We've got a guy.  He's pled guilty for stealing identity,"

2    that should have been enough to delete the account right away?

3    Do you recall that?

4    A.   That is definitely not an industry standard, to receive a

5    police call and immediately take an item off a credit report.

6    I'm unaware of any creditor that has that policy.

7    Q.   Is it reasonable for that to be information that's part of

8    the fraud investigation?

9    A.   Sure.

10   Q.   So, in other words, it's reasonable to make the request

11   for four items, even though you have that in your files?

12   A.   It's a piece of the information.  Again, one of the pieces

13   is the police report.  So, you know, I would lump this in with

14   police contact.

15   Q.   All right.  Now, as part of your work on this case, did

16   you review any of plaintiff's credit reports?

17   A.   I did.

18   Q.   Okay.  And did you review, in fact, multiple reports

19   between October 2016 and November 2017?

20   A.   I saw several of them from that time period.

21   Q.   Do you recall reviewing any credit reports in that time

22   period that did not have more than one negative or derogatory

23   account on them?

24   A.   I do not.

25   Q.   Okay.  And do you recall the evidence that came in that

Binder - D

1   Mr. Sponer was disputing multiple accounts all throughout
2   2017?
3   A.  Yes.
4   Q.  All right.  Would those negative accounts, would those
5   have impacted his ability to obtain credit?
6   A.  Certainly.
7            And he mentioned that he had many collection accounts
8   that he was dealing with specifically around November of 2017,
9   August 2017.  So those would certainly have an impact on his
10  credit.
11  Q.  So collections accounts in particular are negative marks
12  on a credit report?
13  A.  Yes.
14  Q.  Can you describe a little bit about why that is?
15  A.  Right.
16           So like a charge-off, a collection account is a major
17  derogatory -- specifically a third party, that's been sold to
18  a third party, it's a major derogatory.  It will affect
19  someone's credit seriously.
20  Q.  So if there are collection accounts on his report, even if
21  the Wells Fargo trade line is not on there, is it still going
22  to impact his ability to get credit?
23  A.  Absolutely.
24           MR. FRANSEN:  All right.  No further questions.
25           THE COURT:  Cross-exam.

Binder - X

CROSS-EXAMINATION

1

BY MR. SOLA:

2

3   Q.   Now, Mr. Binder, you agree that the Fair Credit Reporting

4   Act gives all consumers the right to dispute information on

5   their credit reports, correct?

6   A.   Yes, sir.

7   Q.   And there's a section you're probably familiar with, we

8   call s-2(b), that states the duties on furnishers, when they

9   receive a notice of a dispute from a CRA, which is normally

10  through an ACDV.  Are you familiar with that?

11  A.   623?

12          MR. FRANSEN:  Objection, outside the scope of the

13  direct.

14          THE COURT:  I'm sorry.  I didn't even hear the

15  question.

16          MR. SOLA:  I asked him about the FCRA section

17  imposing duties on furnishers.

18  BY MR. SOLA:  (continuing)

19  Q.   Let me ask this question.  It will be different.

20          Okay.  What you've been talking about has nothing to

21  do with the ACDV dispute process, does it?

22  A.   What I've been talking about?

23  Q.   Yes.  In your testimony here, you have not been talking

24  about Wells Fargo's duties in regard to responding to an ACDV,

25  have you?

Kelley - D

1   A.   That's correct.   The questions that were asked of me were

2   primarily regarding the identity theft package and the

3   reasonableness of asking for that information.

4           MR. SOLA:   I have no more questions.

5           THE COURT:   Redirect?

6           MR. FRANSEN:   No questions.

7           THE COURT:   You may step down.

8           Do you want this witness excused?

9           MR. FRANSEN:   Yes.

10           THE COURT:   Any objection?   Do you have any

11   objection?

12           MR. SOLA:   No objection.

13           THE COURT:   You are excused.

14           Call your next witness.

15           MR. PETERSON:   Defendant called Brian Kelley, who

16   will be here momentarily.

17           THE CLERK:   Please raise your hand.

18

19                         BRIAN KELLEY

20   called as a witness in behalf of the Defendant, having been

21   first duly sworn, is examined and testifies as follows:

22

23           THE CLERK:   Please have a seat.   State your name and

24   spell it.

25           THE WITNESS:   My name is Brian Kelley.   Brian is

Kelley - D

 1   B-r-i-a-n, Kelley, K-e-l-l-e-y.

 2

 3                          DIRECT EXAMINATION

 4   BY MR. PETERSON:

 5   Q.   Good afternoon, Mr. Kelley.

 6          You've had an extensive history in the banking

 7   industry.  Can you describe it for the Court and jury?

 8   A.   Yes.

 9          After I graduated from law school in 1977, started

10   with First Security Bank in Salt Lake City, first in their

11   legal department; and then after about a year, moved over to

12   the lending credit side, and I've been over in that area

13   pretty much throughout my career.

14          I've worked for two large national banks, for a large

15   mortgage company.  The last 12 years of my banking career I

16   was president of three banks, all in California.

17          I've also served as director for the Western

18   Independent Bankers, which is a West Coast organization of

19   banks.  The FDIC, Federal Deposit Insurance Corporation,

20   appointed me to serve on the Council of Minority-Owned Banks.

21   And then I also, my last few years with my last bank,

22   volunteered with a credit counseling charity that operated in

23   Los Angeles.

24   Q.   And in your long experience in the banking industry, what

25   type of work -- what type of responsibilities have you had

Kelley - D

1    throughout your career?

2    A.    You know, it's pretty much been -- in the early phases of

3    my career I was a loan officer, worked in mortgage finance, in

4    business lending, in consumer finance, so pretty much the

5    whole gamut of credit.

6        Later on with the national banks, I headed up a large

7    credit group in Los Angeles where I had responsibility for the

8    lending function there as well as the policies and procedures

9    of the bank, which included the servicing of loans, responding

10   to credit inquiries, to ACDVs, the furnishing of information.

11       And then at the three banks that I was involved in,

12   one was a de novo, that means a bank that we founded and

13   started up from ground zero.  The other two banks that I was

14   president of were existing banks in Los Angeles when I joined

15   them.  And they were all three fairly small community,

16   regional-type banks.

17       And, again, in that position I was head of the bank,

18   but also a member of the bank's credit committee, oversaw a

19   lot of the business development within the bank and I think

20   really, in part because my legal background was involved in a

21   lot of the implementation of policies and procedures for the

22   bank, particularly in the area of credit, credit reporting,

23   the furnishing of credit information, and so forth.

24   Q.    And you said -- you referred to your banking career.  Do

25   you have a different career now?

Kelley - D

1   A.   Yeah.

2           In 2011 I left my last bank, which was Pacific

3   Commerce Bank in Los Angeles.  I became a consultant with the

4   Federal Deposit Insurance Corporation -- again, the FDIC.  I

5   did some consulting with them, did some expert witness work,

6   legal support work for them back -- back during some of the

7   suits they brought against failed banks back in those days.

8           And after a year and a half or so doing that, I

9   decided to get into consulting and expert witness full time,

10  so I've pretty much been doing that since -- since then, so

11  roughly the last eight years.

12  Q.   And do you have experience with issues related to credit

13  reporting?

14  A.   I do.  I've had a number of cases on behalf of credit

15  providers like CoreLogic, Credco, DataQuick, companies that

16  I've testified on behalf of.

17          I've also testified on behalf of banks that have

18  been -- that have furnished credit information and have been

19  at times accused of violating the Fair Credit Reporting Act.

20  So I'm certainly familiar with and comfortable with the

21  requirements under the Fair Credit Reporting Act.

22  Q.   So you have experience with the FCRA and its regulations,

23  compliance with it.

24          What about experience with correction of records?

25  A.   Yes, very much, both really.  I think -- I should say

Kelley - D

1   actually three roles.  Certainly as a banker we oversaw that

2   process in terms of our responsibilities to -- to provide

3   accurate information and to correct information when it was

4   not.

5           When I was volunteering in the credit counseling

6   area, that was fun.  It actually gave me sort of a ground view

7   of the credit process that you wouldn't get in an executive

8   office of a bank.  And I worked with consumers, helped them,

9   advised them, in terms of navigating the world of credit and,

10  you know, trying to correct or upgrade their credit reports.

11          And then, lastly, again on behalf of the credit

12  reporting agencies and other banks that I've worked with as an

13  expert and a testifying expert, I've certainly done -- worked

14  with them closely and been familiar with the issues and

15  concerns that they have as well.

16  Q.  And you mentioned a number of industry clients that you've

17  worked with at a number of banks.  You also served as a

18  witness, expert witness, for individuals and consumers?

19  A.  I have, yes.  I would guess, Counselor, that roughly 40

20  percent of my clients have been plaintiffs.  The other 60

21  percent have been defendants.

22  Q.  And, Mr. Kelley, in your experience both in the banking

23  industry and since you've gone out on your own, you have

24  experience dealing with issues relating to identity theft?

25  A.  I have, yes.

Kelley - D

1  Q.   And could you describe those?

2  A.   Sure.

3          It has become a -- in my estimation, an increasingly

4  challenging problem for a lot of the financial institutions.

5  And certainly for the victims of identity theft, I have great

6  feelings for in terms of what the process forces them to go

7  through as well.  It has been an issue, I think, that has

8  been -- been challenging, really, to both the consumers that

9  are affected by it and the banks and credit agencies that

10  increasingly have to respond to it.

11          And I think it's also -- I think, as we've discussed

12  in the trial this past week, I think there are issues related

13  to identity theft that are different than the typical issues

14  that might be related to, you know, just simply repairing

15  incorrect credit information.  There are unique challenges.

16  Q.   What sort of unique problems or challenges are there?

17  What is unique about identity theft?

18  A.   Well, it's --

19  Q.   And let me back up.  Really, from your perspective, from

20  your long years in banking -- when you were in banking, I

21  assume you dealt with identity theft issues?

22  A.   Yes.

23  Q.   And is that -- and then you continued to deal with those

24  issues over your expert career?

25  A.   I have.

Kelley - D

1  Q.   So what have you seen?  What makes the problems unique?

2  A.   Well, I think one way to appreciate the problem -- the

3  problems unique to identity theft is maybe to discuss a little

4  bit sort of the typical credit discrepancies that lenders and

5  credit reporting agencies deal with.

6        Historically those issues used to be a furnisher of

7  credit, such as a bank or a finance company, reporting that

8  the consumer was -- had missed three payments during the last

9  year or was 60 days late on one payment.  And the consumer

10 looks at their financial records and says, "No, I actually

11 just missed one payment."  And those are fairly easy to

12 correct.

13       You know, misstated maturity dates, loan amounts that

14 are incorrect -- you know, sometimes errors occur on people's

15 credit reports because somebody has inverted a couple of

16 numbers in their Social Security number and you end up with

17 the wrong information on a credit report.

18       And those are all fairly easily addressed.  You can

19 initiate an ACDV, which we've talked about, through the credit

20 bureaus.  They come to the furnisher.  The furnisher has an

21 operator, which we've heard plenty of testimony from the last

22 day or so, that can pull up the information on the consumer on

23 a screen and look and see if the reported information, you

24 know, is consistent with what the system reflects, in terms of

25 the loan relationship, the delinquencies, the payment dates

Kelley - D

1    and so forth.  That part is easy.

2            The challenge with identity theft is that -- is that

3    you often have information that agrees perfectly with what is

4    set forth in the bank's online files.  You're not looking at

5    somebody that's using a different Social Security number.

6    You're looking at the same Social Security number that the

7    consumer has.  It's the same birth date they have.  It's the

8    same driver's license number that they have.

9            So just simply pulling up the in-house information

10   that the -- that the credit furnisher might be maintaining and

11   comparing it to what's being reported doesn't necessarily get

12   you anywhere in identity theft, because the very nature of

13   identity theft is that somebody is using your correct

14   information to impersonate you and obtain credit.

15   Q.  Now, you've seen in the testimony in this case, and you're

16   well aware from your review of the records, that Wells Fargo

17   has a designated fraud unit to deal with fraud, with identity

18   theft and other forms of fraud, but with identity theft.

19           Is it important -- or what is the importance of

20   having a designated or a dedicated fraud unit?

21   A.  Well, as I said, it's really a specialized problem, I

22   think, for the banks.  And certainly every major bank that I'm

23   aware of or I've worked with has a dedicated fraud unit within

24   that bank or within that lending group that, again, focuses on

25   those issues.

Kelley - D

1          Because I think the challenge for the furnisher of
2   credit is that they really need to step outside of the account
3   information they maintain within the bank and investigate what
4   the circumstances are of the -- of the identity theft.  And
5   that's difficult for an ACDV operator to do who is just simply
6   looking at on screen information that the bank might have.  It
7   really calls, I think, often for a specialized fraud unit
8   within the bank.
9   Q.   You heard testimony -- and I think we all agree -- that
10  when it comes to credit reporting, accuracy is important.
11  Would you agree with that statement?
12  A.   I would.
13  Q.   And in the nature of identity theft, is it due to those
14  accuracy concerns that makes it difficult for a furnisher to
15  just take the consumer's word for it?
16  A.   Well, sure, particularly I think in this day and age where
17  so many of the lenders are just besieged by fraud and bogus
18  credit repair services that literally blanket them with bogus
19  claims of identity theft.
20          I suppose there are some consumers that if they look
21  at debt that they would prefer not to have reported, a pretty
22  easy way to get rid of it is to say, "It's not mine.  Somebody
23  impersonated me."  So I think it makes it incumbent on the
24  part of the lenders to investigate that and, again, the reason
25  for the specialized groups.  It's a much higher level

1  investigation that needs to occur.

2  Q.   And accuracy is important on both sides.  It's obviously

3  important to the consumers, and it's also important to the

4  lenders and furnishers?

5  A.   Yeah, critical, I think, really for both.

6  Q.   And, Mr. Kelley, you kind of touched a little bit on the

7  ACDV process, and all of us have heard a lot about the ACDV

8  process.  You're familiar with it?

9  A.   I am.

10  Q.   And you described that, just for clarification, the ACDV

11  process deals with far more than fraud and identity theft?

12  A.   That's true.  The majority of the activities would not be

13  fraud and identity theft, in my experience.

14  Q.   And I know you kind of touched on this, but in your

15  opinion, is the ACDV process well suited to deal with these

16  unique issues that you've been talking about?

17  A.   It really isn't.  I think that's, again, the reason for

18  the need for a dedicated fraud unit, particularly in the

19  larger banks, because in my experience, the typical ACDV

20  operator is really not equipped to -- in terms of often

21  training or time to -- to investigate an identity fraud

22  situation, particularly, I think, because so much of the

23  investigation occurs outside of the internal systems that the

24  bank is maintaining in terms of the information that the bank

25  retains.

Kelley - D

1    Q.   I'd like to have you look at a couple of documents here.

2    The first one I'd like to have you take a look at is Exhibit

3    560.

4              In preparation for this case, did you have an

5    opportunity to review this document?

6    A.   I did.

7    Q.   And what is your understanding of what this document is?

8    A.   Well, this is a -- it's a policy or procedure that, as

9    it's titled here, deals with fraud procedures, fraud disputes,

10   ACDVs.  It's a policy that I think periodically is updated

11   by -- by Wells Fargo, that provides, again, guidance and

12   procedures for responding to these kind of issues.

13   Q.   And if you look -- if you look through there, it sort of

14   walks through the process of what the ACDV operator is

15   supposed to do.  Is that accurate?

16   A.   Yeah, I believe so, yes.

17   Q.   And in your review of this document and based on your

18   experience in the banking industry, did you see anything in

19   this document that was unreasonable in light of the

20   requirements and goals of the FCRA?

21   A.   No, nor do I see anything that was inconsistent or, you

22   know, markedly different from other policies that I've seen at

23   other banks.

24   Q.   Some of the issues that have been raised in this case have

25   related to the fact that under Wells Fargo's system, if an

Kelley - D

1    ACDV operator -- and this is in the policies -- gets an

2    identity theft dispute that's not easily resolvable, they

3    forward it to the fraud department.

4            Is that -- is there anything inherently unreasonable

5    about that process, about the way those two entities relate?

6    A.    No.  In my experience, it's fairly typical, again, in

7    large banks, lenders, that they would have that kind of

8    structure, with an ACDV unit and then a separate fraud

9    department.

10   Q.    And there's also been testimony about when the ACDV

11   operator, the member of CBD department, when they receive an

12   ACDV and they look in the iTop notes, the system of record,

13   and they see there is an open fraud investigation, they then

14   can't verify the ACDV as fraud.  Do you see anything

15   inherently incompatible with the FCRA with that process?

16   A.    No.  They really can't.  And I don't know, you know, how

17   they could even if they wanted to, because it would basically

18   potentially set up a competing process within the bank.

19           I mean, you would not want to have a fraud department

20   charged with investigating identity theft fraud and then

21   empower an ACDV operator to run a tandem or disparate, you

22   know, investigation.  It wouldn't make sense.

23   Q.    And the timeline for an ACDV is fairly short; is that

24   right?

25   A.    Yes.  It's 30 days.  And I think the testimony we heard

Kelley - D

1   yesterday was that internally the ACDV operators, I think,

2   were looking at a 15-day turnaround.

3   Q.   And in your experience, is an adequate fraud

4   investigation -- generally, does it take longer than that

5   turnaround time?

6   A.   It does, primarily because you're often waiting for

7   information as part of that investigation.

8   Q.   You heard testimony that Wells Fargo, because of these

9   policies and procedures, doesn't conduct an investigation when

10  it receives a fraud ACDV.  Do you agree with that position?

11  A.   I don't.  Certainly I wouldn't agree with it, certainly in

12  the context of this -- this case.

13  Q.   And where does your disagreement lie?  Can you describe

14  that a little more?

15  A.   Well, to me, if you look at really the inception of when

16  the bank was advised of the original identity theft issue that

17  goes back to Mr. Charne's letter that was received by the bank

18  in mid October of 2016, within a week of receiving that letter

19  the bank launches a -- an investigation by the fraud

20  department.

21          You know, the letter that we've been looking at, the

22  October 26th letter, goes out from Mr. Brady.  It's sent

23  directly to -- to Mr. Sponer.  A copy of it is sent to his

24  attorney, Mr. Charne.  I think that was all very much textbook

25  and reflective of an investigation -- fraud investigation

Kelley - D

1    being opened.

2              So, you know, as I look at the series of ACDVs that

3    then -- that then come in -- and I think we need to be careful

4    not to overstate -- you know, you talk about 10 ACDVs coming

5    in.  It sounds like a ton of ACDVs.  In my experience, it is

6    not.  Because, you know, when you're dealing with a credit

7    theft situation, your initial step is to go to the credit

8    reporting agencies and initiate that consumer dispute.  When

9    you do that, each of those agencies -- there's three of

10   them -- all generate their own ACDVs.  So basically one

11   contact with those agencies initially triggers three ACDVs

12   that then would hit the bank.

13   Q.  So that's the policies with the ACDV department deals,

14   with the credit bureau department.  I'd like to have you look

15   briefly at Exhibit 509.

16             THE COURT:  Before we get to the new exhibit, why

17   don't we go ahead and take our mid afternoon recess.

18             We'll be in recess for about 15 minutes.

19             (A recess is then taken.)

20             (The Court, counsel, the parties, the witness, and

21   the jury reconvene.)

22             THE COURT:  Be seated.

23             Proceed.

24   BY MR. PETERSON:  (continuing)

25   Q.  Mr. Kelley, right before the break we were finishing up

Kelley - D

1   talking about Exhibit 509, which was the ACDV-related

2   policies.  Do you recall that?

3   A.   Right.

4   Q.   And, obviously, ACDVs are a key issue in the case.  And

5   we've talked about how when the ACDV operators, when they

6   review the system of record -- and, first, can you talk a

7   little bit about what is the system of record?  What does that

8   entail?

9   A.   The system of record would really be the on-file

10  information that the bank maintains on the accounts and on the

11  account relationships with -- with the consumer.

12  Q.   And we've talked about in the Wells Fargo system, when the

13  ACDV operator reviews the system of record, they will see

14  whether or not there is an open fraud investigation?

15  A.   That's correct.

16  Q.   And we talked about how we don't want to have competing

17  fraud investigations, right?

18  A.   Right.

19  Q.   So under that circumstance, when the ACDV operator looks

20  and sees there is an open fraud complaint, what are they

21  supposed to do at that point?

22  A.   Really about the only thing they can do is when they see

23  that that fraud complaint or investigation is ongoing, they

24  just simply do an identity confirmation within the system to

25  make sure, again, that the -- that the ACDV coming in agrees

Kelley - D

1    with the information that they have.  And it's a little bit

2    more than just simply comparing Social Security numbers.  It's

3    other identifying factors.

4            But once they're reasonably certain that they're

5    talking about the same person, yeah, then I think they very

6    much defer to the fraud group to continue their investigation.

7    Q.  And turning to Exhibit 510 -- I'm sorry.  Before the

8    break, we were talking about Exhibit 560; is that right?

9            MR. FRANSEN:  You had just pulled out --

10   BY MR. PETERSON:  (continuing)

11   Q.  Well, let's look at Exhibit 510.  And I think I misspoke

12   with 509.  509 is the fraud department, not the ACDV

13   department; is that right?

14   A.  I think so, yes.

15   Q.  And same with -- same with 510.  I think the testimony was

16   that that's the updated fraud department.  Do you see that?

17   A.  Yes.

18   Q.  And there was nothing between the -- the interplay between

19   these fraud department policies and procedures and the ACDV

20   department policies and procedures, there's nothing

21   inconsistent about the way those work together, in your

22   review, was there?

23   A.  No, I don't think so.

24   Q.  I'd like to look at Exhibit 2.  We've talked a lot about

25   this correspondence.  And it was shortly followed by

Kelley - D

1    Exhibit 501.  And this was Mr. Brady's October 26 of 2016

2    letter.

3    A.   Right.

4    Q.   And in your review of the applicable fraud department

5    policies and procedures, is this letter consistent with those

6    policies and procedures?

7    A.   It is.

8            This, to me, is really the opening of the fraud

9    investigation.  They're asking for information that is

10   obviously reasonable.  I think that they consider it to be

11   necessary and useful to conducting their investigation.

12   Q.   And with the -- now, Exhibit 2, Mr. Charne's letter,

13   that's referred to as a direct dispute; is that right?

14   A.   Right.

15   Q.   And that is what caused Mr. Brady to draft and send this

16   letter?

17   A.   That's right.

18   Q.   But your understanding of the Wells Fargo system, this

19   information, such as the fraud investigation being open, would

20   that be available to the ACDV operators?

21   A.   Yeah.  My understanding is once it was opened, it would be

22   visible to them, in terms of seeing that fraud was involved.

23   Q.   So nothing about the fact that it was opened by a direct

24   dispute changes the fact that it was something that was part

25   of the system that the ACDV team reviewed?

Kelley - D

1   A.   No.

2   Q.   Looking at this Exhibit 501, you've seen the information

3   that's requested there as part of the fraud investigation.   In

4   your experience in the industry, is that a fairly common type

5   of information request, especially when we're looking at this

6   category of loan?

7   A.   Oh, absolutely.   I think this is -- again, we're talking

8   about a $30,000 loan here, not, you know, a small $200

9   consumer-type credit.   So it's certainly a significant loan.

10  I think the information being requested is certainly

11  reasonable.   The first two items I think would be universal to

12  any bank department conducting a fraud investigation, to get a

13  police report, if there's one, to get the affidavit from

14  the -- from the consumer.

15          I think the next two items are really part and parcel

16  of, again, the fraud department's need to verify

17  identification.   Obviously if you're talking about a fraud

18  that involves identification, fraud, I mean, what could be

19  more central in investigating that than making sure you're

20  dealing with somebody that is properly identified?   I really

21  have no problem with the reasonableness of the three different

22  forms of identity that they've asked for here.   Again, it

23  could be other things as well, but these certainly strike me

24  as reasonable.

25  Q.   And why is it important to have multiple data points?

Kelley - D

1   A.   Well, there's an expression in the Bible, you know, "In
2   the words of two witnesses shall all things be established."
3   You want more than one.  Two or three points of confirmation
4   certainly is -- is useful.  It certainly is harder for an
5   identify thief to cover himself if you're looking at multiple
6   points of verification.
7   Q.   So that would be more sources to show, you know,
8   photographs?  Like there was testimony about getting the
9   picture ID from the auto dealership.  For that to be
10  effective --
11  A.   Well, it's not terribly effective if you don't have a
12  picture ID on the real Mr. Sponer.  So you've got to have
13  both.
14  Q.   And in the -- it's unquestionable that identity theft is a
15  problem and identity theft is very difficult.  I think you
16  said it's difficult on everybody involved, especially the
17  victims.
18  A.   It is.
19  Q.   And despite that, is it reasonable within the industry
20  that it requires or the industry anticipates a degree of
21  cooperation from the consumer, from the identity theft victim,
22  in order to clear their name?
23  A.   Sure.  That's certainly -- again, when I was doing
24  consumer counseling, that was one of our central points that
25  we would make, which is just be very proactive, provide the

Kelley - D

1    creditors with whatever they request, when they request it,

2    where they want it.  Call them and confirm it.

3            I've got a family member right now that's going

4    through identity theft, and it's really painful.  And, you

5    know, you have to be responsive.  And it requires a

6    cooperation with the -- with the furnisher of credit.

7            But, again, I would also say I find it hardly

8    surprising that at the launch of an investigation, that the

9    fraud department would ask for information.  That's what

10   investigators do.  I don't care whether it's a bank's fraud

11   department or a detective for the city police department.  If

12   they're investigating something, they ask for information.

13   It's part and parcel of their function.

14   Q.  I'd like to have you look at what's been marked as Exhibit

15   11.  And you heard testimony about this and reviewed this

16   letter.  And you understand this to be the first letter that

17   Mr. Sponer, rather than his attorney, Mr. Charne, wrote to

18   Wells Fargo?

19   A.  Yes.

20   Q.  And you also heard the testimony about these -- this being

21   a form letter.  In your experience, can there be any problems

22   with form letters that a consumer finds on the Internet to

23   dispute these claims?

24   A.  Yeah.  I mean, this was frustrating to me to read it,

25   because this, in my mind, is really where things start to

Kelley - D

1  unravel for him.  I think Mr. Charne had done a fairly good

2  job at that point contacting the bank.  He had directly

3  contacted the -- you know, the auto fraud department, had sent

4  the letter, had spoken with Mr. Brady, so he'd got that

5  personal contact, he'd got the written contact.  And then

6  Brady immediately sends out a letter launching the -- the

7  investigation.

8          And then in the seven weeks that intervened between

9  that October 26th letter and this January 19th letter,

10 apparently Mr. Sponer decides not to further -- or to retain

11 Mr. Charne any longer, goes on the Internet, pulls up a form

12 himself, and says, "Well, I think I'll just take over this

13 response myself," sends this, you know, to the different

14 creditors; in the case of Wells Fargo, sends it to a

15 department of the bank other than what the October 26th letter

16 directed him to send it to.  Again, there's no personal

17 contact like Mr. Charne had with Mr. Brady, ignores really the

18 requirements of the October 26th letter in terms of what they

19 were looking for, sends two pieces of information out of the

20 four that were requested.

21         I'm not criticizing him.  I guess I'm frustrated,

22 that I can sort of see this happening, and it's like a train

23 wreck that you sort of say, "Stop, stop.  Please don't do

24 this."

25 Q.  And the attachments to that you've talked about, the

Kelley - D

1    identity theft affidavit and the police report.  Now you've

2    heard testimony that for at least a couple of the creditors,

3    the similar version of this letter that he sent, such as a

4    couple of the smaller store cards and that sort of thing, this

5    was able to resolve that dispute, does that surprise you?

6    A.   No.  I think for smaller credits they have, again, as I

7    mentioned earlier, a lower threshold in terms of what they

8    need to look at.

9         MR. PETERSON:  If we could move forward to

10   Exhibit 15.

11   BY MR. PETERSON:  (continuing)

12   Q.   And this is the November 3rd, 2017 letter from Mr. Sponer.

13   And if you look at the third page of this, there's quite a bit

14   more information.  Also, the body of the letter shares more

15   information.

16        Did you review this letter?

17   A.   I did, yes.

18   Q.   What was your opinion of the information that was provided

19   here?

20   A.   Well, first off, this is the letter I wish would have been

21   sent in January of 2017.  It at least has some identification

22   information.  Again, apparently still sent to the wrong

23   department within the bank, but at least this one got

24   forwarded to where it needed to be, to be sent.  So at this

25   point I think the bank has better information.

Kelley - D

1          Again, I think the nature of large institutions are

2     that they're still looking for all the information that they

3     had requested.  The one thing certainly I would have suggested

4     to Mr. Sponer, if he were writing this letter and I were

5     advising him, I would have said, "Send this letter and tell

6     them you don't have your Social Security number and see if

7     something else will work," a baptismal certificate, you know,

8     whatever form of identification, ideally one with a photo.

9     The passport I think was great.

10          But, you know, the nature again -- and banks, they're

11    trying to complete their due diligence, request things

12    that -- or confirm things that they earlier requested.  And I

13    think you take the opportunity to tell them what you have,

14    what you don't have, and what you might have available in lieu

15    of that.  I would have liked to have seen that.

16    Q.   There was some testimony earlier -- you heard testimony

17    from Mr. Sponer and others about obviously a customer of Wells

18    Fargo and the idea that the auto division should have been

19    able to review his credit card records.  And I believe the

20    testimony was that the auto people can't see the credit card

21    people's records.

22          Do you have an opinion on that division?

23    A.   Yeah.  I think it would be naive to think in an

24    organization the size of Wells Fargo that you'd have

25    the -- that exchange of information.  And, actually, I think

Kelley - X

1    in this case it could have really been a hindrance to

2    Mr. Sponer if you had that kind of cross information access.

3            For example, if -- you know, if the auto group were

4    to contact the credit card group and say, "Hey, we've got a

5    fraud alert and all these things are going on and all these

6    things are hitting his credit," you know, all of a sudden his

7    credit card gets shut down.  So there's actually a benefit in

8    having those firewalls between the groups.

9            I think there's also some -- frankly, as bankers,

10   there's some lender liability issues as well, in terms of, you

11   know, requiring customer consent to share information from one

12   side of the bank with the other side of the bank.

13   Q.  I don't have any further questions, Mr. Kelley.  Thank

14   you.

15           THE COURT:  Cross-exam.

16

17                       CROSS-EXAMINATION

18   BY MR. SOLA:

19   Q.  Mr. Kelley, you agree the FCRA gives all consumers the

20   right to dispute inaccurate information on their credit

21   reports?

22   A.  It does.

23   Q.  It does.

24           And the purpose of that section is to get inaccurate

25   information corrected, right?

Kelley - X

1  A.  Right.

2  Q.  And there's nothing really more important in terms of a

3  consumer's rights than getting inaccurate information

4  corrected, right?

5  A.  Nothing in my experience.  It's central to their benefit,

6  yeah.

7  Q.  And to get that inaccurate information corrected, the FCRA

8  requires that furnishers do a reasonable investigation of the

9  disputed information to determine if it's accurate, right?

10  A.  Right.

11  Q.  All right.  So as Mr. Hendricks said, it's a procedure

12  with a purpose.  Do you agree with that?  The purpose is

13  accuracy, right?

14  A.  Yes.

15  Q.  All right.  And here Mr. Sponer contacted the CRAs, and

16  they notified Wells Fargo of his disputes, all right.

17  A.  That's true.

18  Q.  And then Wells Fargo had a duty to do a reasonable

19  investigation of his disputes to determine if the disputed

20  information was accurate, right?

21  A.  Well, the only clarification I would make is I consider

22  that investigation to have been launched back on October 26th,

23  so -- which I think predates most of the, if not all of the

24  ACDVs that you're talking about.

25  Q.  Well, but that's not an ACDV dispute under the FCRA.

1    That's a separate dispute he made directly, right?

2    A.    It is.  But it's part of the -- it's part of the same

3    overall investigation.  I don't think you look at those as two

4    separate procedures or processes in terms of addressing the

5    need to correct and investigate the inaccuracy in the credit

6    alleged.

7    Q.    Well, as Mr. Cooper said, the fraud department is not

8    communicating with the credit reporting agencies, right?

9    A.    Right.

10   Q.    And under the law, the dispute at the credit reporting

11   agencies is what invokes Wells Fargo's duty to do a reasonable

12   investigation, correct?

13   A.    Correct.

14   Q.    And maybe you're not aware that's our claim in this case,

15   that when Wells Fargo got the ACDVs from the credit reporting

16   agencies, it failed to do a reasonable investigation.

17   A.    I understand that's what you're claiming, yeah.

18   Q.    We're not claiming the fraud department messed up.  That's

19   not what our claim is.  Do you understand the law separates

20   those two?

21   A.    I understand again what your claim is.  My point is,

22   though, the ACDV may initiate some of those duties or

23   responsibilities, but you certainly can't divorce the -- the

24   activities of the fraud department from -- from the ACDV

25   operators.  They're both connected to each other.

Kelley - X

1   Q.  Well, actually, Megan Braxton said that the

2   reinvestigations of the ACDVs, or investigations, was done

3   solely by the credit bureau operations department.  Are you

4   aware of that?

5   A.  I understand that.

6   Q.  And she said --

7   A.  But she also testified that they were referring to the

8   notes to the file that were indicating that a fraud

9   investigation had been opened as well by the fraud department.

10  So, again, I don't think you can divorce those two activities.

11  Q.  But the fraud department had no duty at all under the FCRA

12  in Mr. Sponer's claim, right?

13  A.  I don't think I would agree with that.

14  Q.  At any rate, let's continue.

15          So he made 10 disputes through ACDVs?

16  A.  Right.

17  Q.  And we all agree it was a fraudulent account, right?

18  A.  As we sit here today, yes.

19  Q.  Well, actually once they heard from the police, that's

20  pretty strong proof that it's a fraudulent account, right?

21  A.  Sure, that's a strong indication that there's been a fraud

22  committed, no question.

23  Q.  I mean, you'd agree when a furnisher actually talks to the

24  police and the police confirm that it's truly an identity

25  theft situation, that's about as strong a confirmation of

Kelley - X

1    identity theft as a furnisher can get, right?

2    A.   I would agree that that is a strong indication.   That is

3    not, again, the end of the -- of the bank's investigation, by

4    any stretch.   But it's certainly a strong indicator of fraud,

5    I would agree.

6    Q.   Isn't it a confirmation of identity theft that the police

7    are telling Wells Fargo not only that they suspect somebody,

8    but that they caught him, that he pled guilty, and that the

9    car that was purchased is evidence in the case?   You can't get

10   much better than that, can you?

11   A.   Well, again, that's a strong indication, but, you know, if

12   you'll allow me an anecdote, I was involved --

13   Q.   No.   I'd ask you just answer the question.

14   A.   Well, my answer is it depends.   And I'll give you an

15   example of why it depends if you'll let me.

16   Q.   The police would not have the car if it had not been

17   purchased by a thief, right?

18   A.   Yeah.   One would presume, yes.

19   Q.   All right.   So anyway, when Wells Fargo gets these ACDVs

20   related to this account that's identity theft, they verify

21   that the information is accurate, right?

22   A.   Right.

23   Q.   And they do that every time Mr. Sponer disputes, right?

24   A.   Well, yeah.   They're doing an in-file verification, which,

25   again, as I was talking about earlier, the very nature of that

1    process is that identification theft, because it's

2    identification theft, obviously has information in the file

3    that agrees with the true identity of the person or the victim

4    of that theft, so, again, the whole need for a separate fraud

5    department that we've been talking about.

6    Q.   But under Wells Fargo's procedures that it followed in

7    this case, the inaccurate information was not corrected,

8    right?

9    A.   Was not corrected?

10   Q.   Yes.  It was not corrected.  That account stayed on

11   Mr. Sponer's report?

12   A.   Well, stayed on his report until January of 2018, yes.

13   Q.   Yeah.  I mean, 15 months after -- or 14 months after the

14   first ACDV, right?

15   A.   Yeah.  I would readily concede, I don't think 14 months is

16   acceptable to anybody.  It should have been corrected before

17   that.

18            But, again, I disagree with, you know, some of your

19   positions that -- you know, that there were not contributing

20   factors to that delay.  That's what I find frustrating.

21   Q.   Well, because it was not corrected, then you'd agree that

22   the purposes of the furnisher investigation duties to assure

23   that inaccurate information is corrected were not fulfilled?

24   A.   No.  There were reasons, I think, that it was not

25   fulfilled in terms of timeliness of response.  There were

1  delays, and that's what we've been talking about.

2  Q.  Now, you'd agree that even if Wells Fargo has requested

3  information from a consumer, when it gets the ACDV, it must do

4  a reasonable investigation to determine if the information is

5  accurate?

6  A.  Yeah.  I think all those ACDVs again note that the

7  investigation had not been concluded.  It was still pending.

8  It was awaiting information.

9  Q.  Okay.  That wasn't my question.  My question is:  Under

10  the Fair Credit Reporting Act, it says when a company like

11  Wells Fargo, a furnisher, gets a notice from a CRA, it shall

12  conduct an investigation of the disputed information.  Are you

13  aware of that?

14  A.  I'm aware of that.

15  Q.  Okay.  And so my point is -- and we all agree it has to be

16  a reasonable investigation?

17  A.  Yes.

18  Q.  Okay.  My point is that even if Wells Fargo has

19  separately, because of the fraud department, requested

20  information from the consumer, it still must conduct a

21  reasonable investigation to determine if this account is

22  accurate, right?

23  A.  I agree with that, yes.

24  Q.  Now, you mentioned that in an identity theft situation,

25  the identifying information that is on the ACDV -- well, let's

Kelley - X

1  just start over.

2           As you know, the ACDV will have two sections of

3  identifying information.  The credit reporting agency will

4  provide to Wells Fargo the identifying information of the

5  person disputing, right?

6  A.   Right.

7  Q.   And then Wells Fargo, in their procedure here, will

8  compare the identifying information it has for its

9  accountholder with the identifying information of the consumer

10 who is disputing, right?

11 A.   Which is the matching identity we've talked about, yes.

12 Q.   And I agree because in identity theft the thief is using

13 the consumer's identifying information, it's going to match,

14 right?

15 A.   It will, yes.

16 Q.   And so simply comparing -- I think these are your

17 words -- simply comparing the identifying information -- well,

18 let me step back.  These aren't your words.  But you agree

19 that simply comparing the identifying information is not a

20 reasonable procedure to investigate identity theft?

21 A.   No.  Hence the need for the services that the fraud

22 department provides.

23 Q.   But as you've heard in this trial, that's the procedure

24 that Wells Fargo requires its ACDV operators to use, right?

25 A.   What procedure?

Kelley - X

1  Q.   The procedure, as Ashley Grier and Montressa Ebron stated,

2  when they investigate a dispute of identity theft, they

3  compare the identifying information on the ACDV with the

4  identifying information in their system of record.

5  A.   Although I think they said that was in the context

6  of -- again, a matter where the fraud department was already

7  engaged in the investigation.  In other words, they could see

8  that on the headnotes that the fraud department was already

9  involved.

10  Q.   Well, Ms. Grier, I questioned her.  I asked her -- they

11  call it "verify ID."  And I said, "Was that all you did to

12  investigate this dispute?"  She said, "Yes."  And you heard

13  her videotape, didn't you?

14  A.   I did.

15  Q.   And Montressa Ebron, she said that's all she did to

16  verify, was compare the identifying information, correct?

17  A.   Yep.

18  Q.   And you agree, that's not adequate?

19  A.   No.

20       Again, that's why -- that's why the fraud department

21  sent their letter out and initiated their -- their

22  investigation.  I mean, we can -- you know, we can watch five

23  more videos on ACDV operators, and they'll say the same thing,

24  which is that, you know, their role is much more limited than

25  what the fraud department was tasked to do.

Kelley - X

1   Q.   That's right.  But their role is limited because of Wells
2   Fargo's procedures, right?
3   A.   Yeah.  I think it's limited by the procedures, by the
4   policies and scope of their duties as Wells Fargo outlines.
5   Q.   Yeah.  Because Wells Fargo, when they get that ACDV, as
6   you agree, they have a duty to do a reasonable investigation
7   of the dispute, right?
8   A.   They do.
9   Q.   And in this case -- well, not this case, but all the
10  identity theft disputes, Wells Fargo prohibits its
11  investigators from doing an investigation to determine if
12  there's identity theft, right?
13  A.   No.  I think the problem that we're having is that
14  you -- you're limiting the definition of its investigators to
15  the ACDV operators.  And I keep on pointing out that the fraud
16  department, once they launch that investigation, is part of
17  that due diligence and response.  You can ask me that question
18  five more times, but it will be the same answer each time.
19  Q.   But Ms. Braxton, the head of the credit bureau operations
20  department, said it was solely her department that was
21  responsible for doing the investigation of the ACDVs.
22  A.   Well, I think you're arguing over semantics.  The fraud
23  department clearly has an involvement in responding to
24  identity theft issues, whether they're brought directly or
25  raised under an ACDV.  I think she -- she consistently

1    testified that they acknowledge the fact that the fraud

2    department was involved in that effort.  So I think you can

3    divorce the two.

4    Q.   Okay.  She indicated that some of the ACDV operators might

5    have looked at the account notes to see if the fraud

6    department had made a determination of fraud.

7    A.   I think she testified that all of them should have.  She

8    obviously wasn't looking over their shoulders.  But that would

9    have been her expectation.

10   Q.   And those ACDV operators, even if they saw in the iTop

11   notes that the police had caught the criminal and he had pled

12   guilty, they still couldn't determine that it was fraudulent,

13   right?

14   A.   Until the -- until the investigation was closed, no.

15   Q.   Okay.  And, again -- well, you saw Mr. Brady.  The fraud

16   department didn't do anything except send a letter to

17   Mr. Sponer asking for information, correct?

18   A.   That's what investigators do.  They ask for information.

19   Q.   Okay.  But, I mean, the only place they asked for

20   information was Mr. Sponer, right?

21   A.   That was certainly the start of it.

22          But, again, my focus is:  Was the information

23   reasonable?  Should he have provided it?  Did it make sense to

24   provide it?  I think the answer would be yes.

25   Q.   But they didn't do any investigation with the police, with

Kelley - X

1    the dealer who sold the car, looking at the loan origination
2    documents.  They didn't do any of that, right?
3    A.   Again, I think if you look at the October 26th letter,
4    it's pretty clear:  "In order for us to start our
5    investigation, we would like to obtain the following
6    information."
7    Q.   I know.  But why couldn't they just start themselves?
8    They could have gotten a police report the next day by just
9    contacting the police.  But they didn't do that, did they?
10   A.   I don't know.  I don't think so.
11   Q.   They could have got a lot of information related to the
12   identity theft if they had chosen to really do a fraud
13   investigation, couldn't they?
14   A.   Well, again, you're assuming that the bank has the ability
15   to have a specialized policy tailored for each unique
16   individual circumstance.  And the nature of the business is
17   that you have -- I presume thousands of identity theft
18   allegations that are coming into the bank.  The bank has to
19   adopt reasonable standards in terms of how they process them.
20         Again, in hindsight, it's easy to sit here and say,
21   "Gee, they could have done this, this, and that if they wanted
22   to."  It's certainly reasonable to me that the bank followed
23   the procedures that they had in place.  I think the
24   information that they requested was very consistent with what
25   my experience is in terms of fraud units and what they're

Kelley - X

1    looking for.

2    Q.   Well, Mr. Kelley, I think you made a very good point here.

3    You believe that because Wells Fargo has thousands of fraud

4    disputes it must investigate, it's going to adopt a procedure

5    here that basically shifts that burden of investigation to the

6    consumer, because Wells Fargo doesn't have enough employees

7    and hasn't invested enough in the fraud department to do a

8    real investigation of all the disputes they receive?  Isn't

9    that true?

10   A.   That's nonsense.

11   Q.   Well --

12   A.   Absolutely nonsense.

13   Q.   You heard Mr. Cooper say his department had trained fraud

14   investigators, right?

15   A.   Right.

16   Q.   But in this case, those trained fraud investigators did

17   not do anything to investigate, other than ask Mr. Sponer for

18   information, correct?

19   A.   Correct.

20            As I said earlier, I think that is a very appropriate

21   initial step to take.  And, you know, I think any

22   investigator, again, whether it's in connection with the Fair

23   Credit Reporting Act or, as I said earlier, any other type of

24   investigator, with the police department or the IRS, is going

25   to reasonably request information at the start of the

1    investigation.  And I think a consumer, if he wants to support

2    that investigation, has to have a modicum of cooperation in

3    helping that investigation move forward.

4    Q.  Well, actually, cooperation is interesting, because it was

5    Mr. Charne's letter to Wells Fargo that alerted them to how

6    they could get their vehicle back, wasn't it?

7    A.  Yeah.  I think he -- I think he mentioned at least the

8    police department and the number that was involved.

9    Q.  So actually Mr. Sponer, through his lawyer to Wells Fargo,

10   was helping them recover their assets, wasn't he?

11   A.  Again, I have absolutely no idea to what extent they did

12   or not.  I presume there were collection people that were

13   involved in that effort as well.  But, again, it doesn't

14   change the import, I think, of my earlier comment, that I

15   think that the bank, as part of launching an investigation,

16   has some expectation that they can ask and receive reasonable

17   information.

18   Q.  Yes.  But as you said, when they get that ACDV, they have

19   to do a reasonable investigation, even if they're still

20   waiting on information they requested, right?

21   A.  Yes.  I think based on what they have right then and

22   there, yes, they do, yes.

23   Q.  And you'd agree that the ACDV operators did not conduct a

24   reasonable investigation as to whether the account was

25   identity theft, correct?

Kelley - X

1  A.  No, not correct.  I would -- I think their investigation

2  was very much pursuant to policy and, again, in recognition

3  that an investigation had already been launched within

4  the -- within the fraud department.

5  Q.  Well, is your testimony now you do not agree that the ACDV

6  operators did not conduct a reasonable investigation as to

7  whether the account was identity theft?

8  A.  I think there were a couple of double negatives there.

9  Try that again.

10        MR. SOLA:  Counsel, deposition page 18, line 20.

11  BY MR. SOLA:  (continuing)

12  Q.  My question:  "So you agree that the ACDV operators did

13  not conduct a reasonable investigation as to whether the

14  account was identity theft?

15        "Answer:  Again, I would agree.  As far as I know, I

16  don't think they really conducted any investigation, other

17  than turning to the fraud unit that was supposedly doing that

18  investigation."

19        That was your testimony, wasn't it?

20  A.  I'd have to have the transcript in front of me, but I'm

21  sure you wouldn't mislead me.

22        What I'm telling you today, you know, I don't think

23  directly conflicts with that.  Again, the role of the ACDV

24  operators was limited since the bank had already launched its

25  own fraud investigation within the fraud unit.

1   Q.   It was limited by Wells Fargo's policies and procedures,

2   right?

3   A.   Yeah, limited, and understandably so.

4   Q.   But that limitation resulted in the ACDV operators not

5   investigating the dispute of identity theft that the FCRA

6   requires they investigate, right?

7   A.   I am not aware of language in the Fair Credit Reporting

8   Act that specifically refers to investigations being limited

9   to ACDV operators.   So I think you've misstated the

10  requirements.

11  Q.   Well, the fraud department never sees the ACDV, right?

12  A.   They don't.   But they're certainly -- they're certainly

13  communicating with them, and they provide a service to the

14  bank.   Again, I don't think you can just simply divorce

15  that -- that service or activity that they're involved in.

16  Q.   Now, you indicated identity theft is a common problem,

17  right?

18  A.   Right.

19  Q.   I think Mr. Hendricks said 9 million victims a year.   Do

20  you have any knowledge if it's bigger now?

21  A.   It probably is, but I don't have any knowledge that's

22  better than that.

23  Q.   And because there are so many victims of identity theft

24  and, as Mr. Hendricks explained, that then leads to fraudulent

25  accounts on consumer credit reports, you agree there are many

Kelley - X

1   disputes coming into banks like Wells Fargo of identity theft?
2   A.   True, sure, both valid and bogus.
3   Q.   Okay.  And so those disputes are often on ACDVs from
4   credit reporting agencies, right?
5   A.   Right.
6   Q.   And so you agree Wells Fargo must have procedures to
7   assure that all those disputes of fraudulent information
8   result in that fraudulent information being corrected?
9   A.   That would certainly be the goal, yes.
10  Q.   But here we saw that Mr. Sponer sent 10 disputes; and
11  under Wells Fargo's procedures, the fraudulent information was
12  never corrected, right?
13  A.   Sent 10 disputes and didn't respond, to me, was the most
14  primary and critical piece of information which was provided
15  to him, which was the October 26 letter asking for information
16  so the bank could proceed with their investigation.
17  Q.   But, sir, you just said -- and I think said it twice
18  now -- that that duty to do an investigation applies even if
19  the furnisher is awaiting to get documents from the consumer?
20  A.   It does, but it's still limited by that lack of -- of
21  information and by the pendency of the investigation.
22  Q.   Okay.  What did -- Wells Fargo knew on October 26, 2016,
23  that Jason Yochum had opened -- or had purchased a car using
24  Mr. Sponer's identity, right?
25  A.   Right.

Kelley - X

1   Q.   And that the car was being held as evidence, right?

2   A.   Yeah.

3   Q.   Then it knew on November 3rd, 2016, that Mr. Yochum had

4   pleaded guilty and he was going to be sentenced, right?

5   A.   Yeah.  I believe at that point he was -- they were

6   anticipating that plea.  Again, I think there was some

7   testimony that it was not finalized until January.

8   Q.   Okay.  That's one of the next items.

9        Okay.  Then in January the conviction happens and

10  Wells Fargo gets its car back.  And you agree at that point

11  there's no dispute that this account resulted from identity

12  theft, right?

13  A.   You know, I think that, again, is a strong indication that

14  it did.  But it is not the sole point of the investigation.  I

15  think the investigation -- the reason they're looking for

16  identity is because of other concerns.

17       I mean, for example, you could have collusion

18  between -- between Mr. Sponer and Mr. Yochum.  I'm not

19  suggesting that there was or that, in hindsight, it would be

20  highly unlikely.  But you don't know, as you're sitting there

21  as a bank, initially what the circumstances of that sale and

22  loan are.  I mean, that's why you launch an investigation.

23  Q.   Okay.  There's no evidence Wells Fargo even considered

24  that there was any collusion, right?

25  A.   No, I don't -- I don't believe they did at all.

Kelley - X

1    Q.   And let's say that Mr. Sponer sent in a Social Security

2    card.   That doesn't negate the possibility of collusion, does

3    it?

4    A.   Certainly -- it certainly establishes more firmly that

5    they're talking to who they think they should be talking to,

6    that, in fact, they're directing themselves to the right

7    consumer.

8              Again, in my expert report, I indicated a case

9    where --

10   Q.   Sir, that's beyond my question.

11   A.   Okay.

12   Q.   My question was:  The fact that Mr. Sponer sends in his

13   Social Security card does not disprove that he's colluding

14   with the thief, does it?

15   A.   No.   But it certainly helps establish that he is who he

16   says he is.

17   Q.   I know.   But if you're thinking this guy is colluding,

18   getting proof that he is who he is doesn't answer that

19   question, does it?

20   A.   Yeah.   But your original question was why couldn't they

21   just simply accept the repossession of the vehicle as the end

22   of the matter and close the investigation, and I was just

23   providing you an example of things that would be appropriate

24   to investigate if there were other issues.

25              Again, that's why you are looking for information.

1   And, you know, as a bank, I think a bank is entitled to ask

2   for some reasonable information at the inception of their

3   investigation.

4   Q.   But the ACDV people, they're not asking for any

5   information from Mr. Sponer, are they?

6   A.   No, because, again, they're acknowledging that the fraud

7   investigation has been launched.

8   Q.   Well, actually isn't it because the dispute they're

9   getting, the ACDV dispute, has already gone through a

10   filtering process by the CRA, and the CRA has chosen not to

11   reject it, as it can, and ask the consumer for more

12   information, but has determined at least it looks like a bona

13   fide dispute and is going to send it on to Wells Fargo,

14   correct?

15   A.   Yeah, but you're still talking apples and oranges,

16   different -- a different goal on the part of the credit

17   reporting agencies in terms of their filter than what the bank

18   has.

19   Q.   Now, what it sounds like you're saying is Wells Fargo

20   wants to get the Social Security card or other identification

21   to assure that the person disputing is who they say they are,

22   right?

23   A.   Sure.   That's one of the reasons to request that.

24   Q.   Okay.   But if the consumer has disputed through an ACDV

25   and says his account is identity theft, Wells Fargo has to

1  remove it if it's identity theft, right?

2  A.   If they can confirm that it's -- yeah, that it's identity

3  theft, they should remove it.

4  Q.   And let's say that Mr. Sponer's wife was disputing for

5  them, okay.  If Wells Fargo determined the account was

6  identity theft, they have to remove it, even though the person

7  disputing is actually not the consumer, right?

8  A.   Yeah.  I think you'd have to probably talk about her

9  authority to do so and represent him, and, you know, whether

10  there is a properly executed power of attorney.  I think

11  that's possible.

12  Q.   Well, no.  If the information is inaccurate, it has to be

13  corrected, regardless of the source of the dispute.

14  A.   The source of the dispute or the source of the --

15  Q.   The source of the dispute, whether it's a cousin, whether

16  it's a lawyer, whether it's a wife, regardless, if the

17  information is inaccurate, Wells Fargo has to delete it under

18  s-2(b), the claim we make in this case?

19  A.   Yeah.  They should, again, once they're satisfied that a

20  reasonable investigation has been conducted.

21  Q.   And I think we've already established, you agree that the

22  ACDV operators did not conduct a reasonable investigation?

23  A.   No, I have not agreed with that.  I stated that I think

24  within the -- within the policies and procedures, they acted

25  appropriately in recognizing that the fraud department was

1    conducting its own investigation.

2    Q.   Well, I guess is your testimony, then, that as long as

3    Wells Fargo complied with its policies and procedures, that it

4    did a reasonable investigation?

5    A.   Let me think about that.

6            You know, certainly a reasonable investigation, I

7    suppose, with what they had.  But, again, you've got

8    to -- you've got to look at the overall situation in terms of

9    what they were provided, what delays were there in providing

10   them information.  I think it's understandable.

11   Q.   Well, I was giving a chronology, and I got sidetracked.

12   And I think we were up to the conviction of the thief, okay,

13   in January.

14           THE COURT:  Can I interrupt you for just a moment?

15           MR. SOLA:  Sure.

16           THE COURT:  Can I see counsel up here, please.

17           (The Court and counsel confer off the record.)

18           THE COURT:  If you want the court reporter to read

19   back where you stopped --

20           MR. SOLA:  Thank you.

21           (The record is read, as requested.)

22           MR. SOLA:  All right.

23   BY MR. SOLA:  (continuing)

24   Q.   All right.  Now we have the thief convicted, the car

25   returned to Wells Fargo, but I think it's your opinion that's

Kelley - X

1    still not enough for Wells Fargo to say, "Yes, this is

2    identity theft," right?

3    A.   Well, at that point they haven't seen the police report.

4    They haven't received the affidavit from the consumer.  Yeah,

5    I think they need to complete their file at that point.

6    Q.   Okay.  Let's move later into January because, as you saw,

7    in January Mr. Sponer sends the police report and sends the

8    fraud affidavit.

9         But I think it's your opinion that despite all the

10   information they have up to that time, including the

11   conviction of the thief, return of the car, and now what you

12   just mentioned they didn't have, the fraud affidavit and the

13   police report, in your opinion, that's still not enough for

14   Wells Fargo to determine this is identity theft, right?

15   A.   Well, the problem, as I testified earlier, was he sent

16   that information to the wrong department within the bank.

17   I've seen no indication that the fraud department that was

18   conducting the investigation received the information.  I

19   think that's, again, unfortunate.  But it is an issue that

20   delayed the resolution of this and completion of the

21   investigation.

22   Q.   It looks -- was it sent to the wrong department by

23   Mr. Sponer or was it sent to the wrong department by Wells

24   Fargo?

25   A.   Well, it was clearly sent to an address other than the

1  address that Mr. Brady had directed in the October 26th letter

2  to send that information to.

3  Q.   Okay.   That actually -- he got a response from the credit

4  bureau dispute resolution department.   Did you see that?   I

5  believe it's February 15th.

6  A.   Yes.

7  Q.   So obviously that letter was received -- we'll call it the

8  credit bureau operations department.   It was received by them,

9  right?

10  A.   Right.

11  Q.   You've talked a lot about the credit bureau operations

12  department is working with the fraud department, right?

13  A.   Right.

14  Q.   So are you saying when the credit bureau operations

15  department got a letter from Mr. Sponer indicating he was

16  disputing identity theft, which he had already disputed once

17  through Mr. Charne and four times through the CRAs, and the

18  credit bureau operations is supposedly working with the fraud

19  department, that it did not even notify the fraud department

20  that it had received the police report and the fraud affidavit

21  that had been requested from Mr. Sponer?

22  A.   I think I lost the structure of that sentence about three

23  sentences back.

24  Q.   I'm sorry.   It was very long.

25          My point is:   If the credit bureau operations

Kelley - X

1   department got that, they should have given it to the fraud

2   department, right?

3   A.   They should have.  They should have.  And I would readily

4   concede that.  But it should not have been sent to the wrong

5   department in the first place; and there should have been some

6   kind of outreach, phone calls, communications returned.

7   That's what frustrates me is that it was so foreseeable that

8   this would be a problem.

9   Q.   You understand that Mr. Sponer sent that letter because he

10  wanted his credit report corrected.  Do you understand that?

11  A.   I do.  I'm sympathetic with his efforts to get that done.

12  Q.   Okay.  And the credit bureau operations department, those

13  are the people that fix the credit reporting, so it was

14  exactly the right place to send his letter, wasn't it?

15  A.   No, it was not.

16  Q.   To accomplish a correction of his credit report, wasn't

17  that the right place?

18  A.   No, no, no.  And to conclude that is to ignore the whole

19  purpose of the October 26th letter.

20  Q.   My question wasn't the purpose of the October 26th letter.

21  My question was about the purpose Mr. Sponer sent his letter.

22  A.   Yeah.  It would be like me sending my -- my tax payment

23  to -- directly to Washington, D.C. rather than Ogden, Utah,

24  because I concluded that that's actually where the money is

25  ultimately going.

Kelley - X

         Mr. Sponer was directed on October 26th to send the

1  bank four pieces of information, to send them to a specific

2  unit and address within the bank.  It doesn't require a rocket

3  scientist to figure out what the bank was asking for and where

4  it was to be sent.  As I said, I'm frustrated that he didn't

5  follow those -- those instructions.  And I think it was

6  unfortunate for him, and it's resulted in, I suspect, all of

7  us being here today.

8  Q.  Well, he didn't have to send anything to get his credit

9  report corrected, other than a dispute to a CRA, did he?

10  A.  Well, and, again, I'm suggesting I don't agree with that.

11  But I think the bank, if it's required to conduct an

12  investigation into identity fraud, is entitled to -- to ask

13  for information and expect some level of cooperation

14  from -- from the consumer.

15  Q.  Well, my question, though:  To get his credit report

16  corrected, he has rights to send his dispute to the CRA,

17  right?

18  A.  Right.

19  Q.  In fact, that's the strongest and best means, according to

20  Evan Hendricks, for a consumer to get their credit report

21  corrected, is to send the dispute to the CRA?

22  A.  Not when your attorney has already contacted the bank and

23  you've received a letter of instruction and direction from the

24  bank confirming that a fraud investigation has been opened.

1   It's like taking your car to a transmission shop to have the

2   wheels realigned.  You know, what he needed to do was respond

3   to the October 26th letter.

4   Q.  Sir -- okay.  He wrote to the CRAs to get his credit

5   report corrected.  That was forwarded to Wells Fargo, who had

6   a duty to investigate what they were reporting to the credit

7   reporting agencies.  So it was exactly the right place to send

8   a dispute if he wanted his credit report corrected under the

9   law that he is suing under today, correct?

10  A.  So if that were the case, why wouldn't Mr. Charne

11  have -- have advised him to do that?  Why reach out, as Charne

12  did, directly to the fraud department within the bank?  Why

13  didn't Charne simply send out an ACDV through the -- through

14  the credit reporting agencies?

15  Q.  Because Mr. Charne's letter was actually for a different

16  purpose.

17          THE COURT:  Hang on just a second.  Right now he's

18  asking questions and you're answering them.  That's not really

19  the way it should be working.

20          THE WITNESS:  Sorry about that.

21          THE COURT:  Let's do it the right way.

22          You get to ask questions, and he gets to answer.

23  BY MR. SOLA:  (continuing)

24  Q.  Well, I will answer your question.

25          Mr. Charne's letter was primarily to make sure that

Kelley - X

1    Wells Fargo did not cut off Mr. Sponer's credit card.  If we
2    remember that letter --
3              THE COURT:  Again, you're doing the wrong thing here.
4    You're making an argument.  You should be asking questions.
5    Please get back on point.
6              MR. SOLA:  All right.
7    BY MR. SOLA:  (continuing)
8    Q.  Now, the fraud department, they didn't do an
9    investigation, did they?
10   A.  They did.  I mean, I would consider the request for
11   information to be the first step in -- in that investigation,
12   asking for information.  That's what investigators do.
13   Q.  Okay.  You call that the first step.  There was no second
14   step, was there?
15   A.  Not for -- not for an extended period of time.  Again, I
16   think as has been indicated earlier, it was 13 months until
17   they received any identification information from -- from
18   Mr. Sponer.
19   Q.  If the identifying information was so important to Wells
20   Fargo, after not getting it in October, why didn't it ask for
21   it in November?
22   A.  You know, again, they sent Mr. Sponer a letter.  They gave
23   him a contact, a person to call, an extension number for that
24   person.  I think they reached out a couple of times, didn't
25   have their calls answered.

Kelley - X

1        You know, sure, I can imagine that they should

2   have -- should have, could have sent out another letter, but I

3   think they were making an effort to reach out to Mr. Sponer.

4   And, again, it's frustrating to me that in looking at the

5   file, that the connection was just not there.

6   Q.  Sir, they made no effort.  They made no contact with him

7   until November 21, and that was only in response to his

8   November 3rd letter.  Aren't those the facts?

9   A.  No, I don't think so.  I think, again, you know, you're

10  ignoring the October 26th letter.  You're ignoring the

11  February 15th letter which, again, had an invitation to call

12  the bank if he had concerns.  He could have called the bank.

13        Surely if he had called the bank, he would have been

14  referred to Mr. Brady in the fraud department, who would have

15  said, "Gee, we're still waiting for this identification

16  information.  Can you please send it?"

17  Q.  The February 15th letter does not ask for any of the

18  documents that are in the October 26th letter, correct?

19  A.  No, it doesn't.  It's -- it's sent by a different part of

20  the bank.

21        But I guess what I'm suggesting is that based on his

22  testimony, it caused him great concern and anxiety when he

23  received that letter.  But, again, no phone call, no contact

24  to the bank, no question to the bank on, you know, "What else

25  do you need?"

Kelley - X

1    Q.  Well, you heard his testimony.  He didn't want to call

2    because he didn't want them to ask him to pay the money that

3    they were insisting he owed, because he had been through many

4    collection calls, and it wasn't pleasant.

5    A.  He didn't want to call because he felt that it was not

6    productive in a large organization, and that is the opposite

7    of what I'd certainly advise anybody that he was talking to

8    about -- about credit disputes.  You've got to be proactive.

9    You've got to make the calls.

10   Q.  You know, it's interesting you say he should call, because

11   Wells Fargo wants documents.  He can't give them documents in

12   a phone call, can he?

13   A.  No.  But you can certainly find out why the bank still has

14   not responded in terms of removing the credit.

15              As I said --

16   Q.  So a call wouldn't have got the documents that Wells Fargo

17   wanted.

18   A.  A call would have reminded Mr. Sponer what the bank was

19   still waiting for.  And, instead, after the January letter you

20   find just a complete silence for, you know, seven months,

21   until you get out to August.

22   Q.  So the fact that Mr. Sponer sent 10 disputes with ACDVs,

23   made, with his lawyer, five direct disputes, that wasn't

24   enough.  You're saying he had to do something more?

25   A.  Well, clearly what he was doing was not what the bank was

Kelley - X

1    looking for.  And I think there was a fairly clear indication
2    from the bank that they had requested information.  You can't
3    ignore it.  You can't say, "Well, I'd prefer to send you ACDVs
4    instead of sending you the information that you requested."
5    It's not reasonable.
6    Q.  And you think it's reasonable for the bank to report an
7    account they know is an identity theft because he hasn't
8    provided his Social Security card?
9    A.  No, I don't think -- I don't think anybody was sitting at
10   the bank saying, "Let's punish him because he hasn't sent his
11   Social Security card."
12           Again, you talk as though the Social Security card
13   was the only thing that was outstanding.  There was no
14   personal identification sent to them for 13 months after this
15   fraud investigation was launched.  And we're not talking a
16   Social Security card.  We're talking a driver's license, a
17   passport, any identification.
18   Q.  But, sir, that wasn't necessary to determine if the
19   account was identity theft, was it?
20   A.  Well, according to you.
21   Q.  Well, again, how does the fact that he has a Social
22   Security card or driver's license have any bearing on whether
23   it was a thief that opened the account?
24           MR. PETERSON:  Objection, asked and answered.
25           THE COURT:  Sustained.

Kelley - X

1   BY MR. SOLA:  (continuing)

2   Q.  Now, getting back, you agree that the only thing that the

3   Wells Fargo fraud department did in terms of investigating his

4   dispute was to ask him on October 26th for that information

5   and then on November 21 for information?

6   A.  Yeah, that's right.  Well, I mean, there was some, I

7   think, additional communication in December, but yeah.

8   Q.  December 2017?

9   A.  Right.

10  Q.  And you agree that if Wells Fargo knows it's reporting

11  inaccurate information, it should remove it from the

12  consumer's credit report?

13  A.  Yes.

14  Q.  Even without a dispute, right?

15  A.  Yeah.  If it independently had concluded that it was, then

16  it should have, yes.

17  Q.  In other words, if he never disputed, but the police had

18  notified Wells Fargo about this identity theft, they should

19  have removed it, right?

20  A.  Yeah, at some point, again, when they concluded

21  their -- their investigation into it.

22  Q.  So by January 2017, when the thief was convicted and Wells

23  Fargo knew it, you agree that Wells Fargo should have removed

24  this?

25  A.  No, I don't think I've stated that.

Kelley - X

1   Q.   Okay.  So you think it was reasonable for Wells Fargo to
2   report this account until he sued them?  Is that what you're
3   saying?
4   A.   No, no.  And I wouldn't agree with that characterization
5   either.
6           Again, the bank had asked for information that I
7   think was reasonable.  They didn't receive any identification
8   information until 13 months after the investigation was
9   launched.  They didn't receive an explanation regarding the
10  unavailability of the -- of the Social Security card until
11  December 1st.
12          And, you know, at that point it appears to me the
13  bank was making a determination, "Well, fine.  We've got what
14  we've got, and let's move ahead."  And, you know, before they
15  could complete their process, the suit is initiated.  I think
16  it was two weeks after that December 1st explanation on the
17  Social Security card.
18  Q.   Well, but in December they never removed it.
19  A.   No, it wasn't removed in December.  But they, at that
20  point, seemed to be moving forward.
21          It certainly would have solicited, in my mind, a
22  phone call to Mr. Brady to say, "You got my letter on the
23  Social Security card.  Do you need anything else or are we
24  done?"  But instead, you know, it's the filing of a lawsuit,
25  and here we are.

1   Q.  Well, I think you're omitting he got a letter on

2   December 5th that said it was just going back to the fraud

3   department.  Are you aware of that?

4   A.  Yeah, it was a letter, again, the letter from the Office

5   of the President.

6   Q.  And then he got a letter on December 14th that said, "We

7   want to inform you you may the victim of identity theft."

8   That would definitely cause him to think that nothing was

9   happening.

10  A.  It would cause me, again, to pick up the phone, call

11  Mr. Brady and say, you know, "Explain this letter to me.  Does

12  this mean that you're finally in agreement that there's been

13  an identity theft or do you need something else?"

14  Q.  That letter wasn't from Mr. Brady.

15  A.  It doesn't matter.  He had the contact information from

16  Mr. Brady, who was the person responsible at the bank for him

17  to talk to in the investigation.

18  Q.  So his rights under the Fair Credit Reporting Act, in your

19  view, are really subservient to Wells Fargo's demands for

20  documents?

21  A.  I don't think I've said that.

22  Q.  But you're saying they shouldn't have removed it from his

23  credit report, despite the 10 ACDV disputes, because he hadn't

24  sent them every piece of information they requested.

25  A.  What I'm testifying is I think it's understandable that

1    there were delays in doing so.  And it's, again, frustrating

2    to me and saddens me that those delays occurred, but it's

3    understandable.

4    Q.  But you agree that when the ACDV operators got his

5    disputes, they did not conduct a reasonable investigation to

6    determine if the information was accurate?

7    A.  Well, I think I've answered that one, three, or four times

8    now.  But, no, I don't agree with that.

9    Q.  So you're changing your testimony from what I read in your

10   deposition; is that right?

11   A.  No.  I think the context of what you were asking me in

12   my -- in my deposition was whether they were the ones that

13   were responsible for conducting the investigation.  And my

14   response, I think, was that as the ACDV operators, with the

15   fraud department having been charged with that investigation,

16   their role was fairly limited until that investigation was

17   complete.

18   Q.  All right.  Well, I don't want to misrepresent what you

19   said or what I asked, so I'm just going to ask you again, so

20   we can know what your testimony is.

21        My question, I said, "Let me just clarify.  So you

22   agree" --

23        MR. PETERSON:  Objection, argumentative.

24        THE COURT:  The question has been asked and the

25   question has been answered.

Kelley - ReD

1          MR. SOLA:  I asked if he changed his testimony, and

2     he indicated he thought I was misstating what he said.

3          THE COURT:  Go ahead and ask your question again.

4     BY MR. SOLA:  (continuing)

5     Q.  Sir, my question was, page 18, line 20:  "So you agree

6     that the ACDV operators did not conduct a reasonable

7     investigation as to whether the account was identity theft?

8          "Answer:  Again, I would agree.  As far as I know, I

9     don't think they really conducted any investigation other than

10    turning to the fraud unit that was supposedly doing that

11    investigation."

12         Are you changing that testimony?

13    A.  No.

14         MR. SOLA:  That's all the questions I have.

15         THE COURT:  Redirect?

16

17                     REDIRECT EXAMINATION

18    BY MR. PETERSON:

19    Q.  Mr. Kelley, do you recall the question just prior to that

20    one that Mr. Sola asked you at your deposition?

21    A.  No.

22         MR. PETERSON:  Counsel, page 18, line 8.

23    BY MR. PETERSON:  (continuing)

24    Q.  "So because they didn't have" -- "Question:  So because

25    they didn't have the function of investigating whether it's

Kelley - ReD

1  identity theft, they could not have done a reasonable

2  investigation as to whether it was identity theft, right?

3          "Answer:  Again, I don't know whether 'can' implies

4  that they have the ability or the capacity to.  Again, as I

5  said, I don't think it was their job function.  I think it was

6  being handled by the fraud department.  And I think they -- at

7  least the testimony of the ACDV operators that I reviewed

8  seemed to confirm that they were looking for the fraud

9  department for their direction."

10         Do you recall that testimony?

11  A.  I do.  That would seem to be consistent with what I'm

12  saying today.

13  Q.  Mr. Kelley, does the FCRA -- is there any requirement for

14  a furnisher to look outside the information that it has,

15  including what's provided with the ACDV, when it does an

16  investigation?

17  A.  No.

18  Q.  Are the policies and procedures of the ACDV department and

19  the fraud department at Wells Fargo reasonable under the FCRA?

20  A.  In my opinion, they are, yes.

21  Q.  And were the ACDV responses done by Wells Fargo in this

22  case reasonable under the FCRA?

23  A.  I believe they were.

24         MR. PETERSON:  I have no further questions.

25         THE COURT:  Thank you.  You may step down.

1          Do you want this witness excused?

2          MR. PETERSON:  I do, Your Honor.

3          THE COURT:  Any objection?

4          MR. SOLA:  No.

5          THE COURT:  You are excused.

6          Call your next witness.

7          MR. PETERSON:  The defense rests, Your Honor.

8          THE COURT:  Do you have any rebuttal?

9          MR. SOLA:  No, Your Honor.

10         THE COURT:  Members of the jury, you've heard all the

11  evidence you're going to hear in this case.  It's 4:30.  The

12  lawyers and I have some work to do to get the jury

13  instructions ready for you.

14         And so I'm going to let you go, and we will get

15  started tomorrow -- let's say at 9:30 tomorrow morning, we'll

16  get started.  And you can expect at that point that you'll

17  hear the closing arguments.  After the closing arguments, I

18  will instruct you.  And then after that, you'll begin your

19  deliberations.

20         Remember the precautionary instruction telling you

21  not to discuss the case with anybody.

22         I will see you tomorrow at 9:30.

23         Thank you.  Have a good evening.

24         (The jury leaves the courtroom.)

25         THE COURT:  Please be seated.

1          Did the plaintiffs file any written response to the

2    motion for judgment as a matter of law?

3          MR. SOLA:  Yes.

4          Let me check.

5          THE COURT:  If you did, I haven't seen it or read it.

6          (Plaintiff's counsel confer off the record.)

7          THE COURT:  So the answer is?

8          MR. SOLA:  In five minutes.

9          THE COURT:  So let's go through some of those

10   motions.  I don't know that I need to read them.  The ones I'm

11   unsure of, I'll wait until you have an opportunity to respond

12   to the filings.

13         MS. SMITH:  Sorry, Your Honor.  I'm trying to get set

14   up here.

15         THE COURT:  No worries.

16         MR. SOLA:  Just to save time, Your Honor, we are not

17   going to make a claim under subsection (e), so you don't need

18   to decide that.

19         THE COURT:  Okay.

20         MS. SMITH:  So just a point of clarification,

21   Counsel, does that mean we can pull it from the jury

22   instructions as well?

23         MR. SOLA:  Yes, we can pull it from the jury

24   instructions.

25         MS. SMITH:  For the record, Julie Smith on behalf of

1   Wells Fargo Bank.

2        At this time Wells Fargo moves for judgment as a

3   matter of law.  In addition to the issues that are raised in

4   the memorandum and that were discussed yesterday, Wells Fargo

5   moves for judgment as a matter of law on the willfulness

6   claim, the claim for a willful violation.

7        We heard testimony from four different experts, and

8   they talked about what was reasonable and unreasonable, but

9   the willfulness component of the FCRA has a much higher

10  standard than reasonableness.  It has to be -- and I'll quote

11  from the relevant case on that point, which is *Safeco v. Burr*,

12  and it talks about willfulness either being a knowing

13  violation or acting in reckless disregard.  And the reckless

14  disregard part has to be that the company ran a risk of

15  violating the law substantially greater than the risk

16  associated with a reading that was merely careless.

17        Unless the Court has questions, I don't have anything

18  else to add on that particular motion.  I'm just going to go

19  through the memorandum that I submitted.

20        Since plaintiff has withdrawn any claim under

21  subsection (e), I'll skip the first two sections of the

22  memorandum and talk a little bit about the argument that

23  actual damages under the FCRA include only pecuniary losses.

24        When I talked about this yesterday, I think I

25  downplayed this argument a little bit too much.  When I went

1   back and read the cases that include the Supreme Court's case

2   in *FAA v. Cooper*, the Ninth Circuit's case in *Ryan v. Foster*,

3   and in particular the Ninth Circuit's opinion, because it was

4   the lower court in the *FAA v. Cooper* case, I realized that in

5   the Ninth Circuit's opinion in *FAA v. Cooper*, it compared the

6   Privacy Act to the FCRA and said basically they have very

7   similar purposes, so the term "actual damages" should be

8   construed consistently in both statutes.

9        And then, as it turns out, when it went up to the

10  Supreme Court in *FAA v. Cooper*, the Supreme Court concluded

11  that actual damages for purposes of the Privacy Act include

12  only pecuniary losses, not non-economic damages, such as

13  emotional distress.

14       But even if plaintiff can recover for emotional

15  distress damages, he can only recover for emotional distress

16  damages, not for any of the other items that he has listed

17  both in the Complaint and in the -- that are in the currently

18  proposed jury instructions, including loss of reputation,

19  which there is no evidence to support.

20       And then the next argument that we raise in the memo

21  that I filed is based on this case called *Casella v. Equifax*.

22  In that case -- it's a Second Circuit case -- the Court

23  severely limited the scope of economic damages that are

24  available in an FCRA case and limited it not just to

25  damages -- the Court held that the plaintiff cannot recover

Motions for Judgment as a Matter of Law

1    damages for pain and suffering simply because he knew of

2    inaccurate and potentially damaging items in his credit

3    report.  In that case the Court said there was no evidence

4    that a potential creditor or other person in appellant's

5    community learned of any harmful information from the

6    inaccurate report.

7            In this case there is some evidence that an insurer

8    did learn about the information on the credit report, but if

9    plaintiff is entitled to recover emotional distress damages,

10   they should be limited to the distress related to the insurer,

11   to the extent there was any distress related to the insurer

12   having seen the item on the credit report.

13           THE COURT:  Do you think *Casella* is consistent with

14   *Drew*?

15           MS. SMITH:  I don't think it's inconsistent with

16   *Drew*.  There are no Ninth Circuit cases that discuss *Casella*

17   except for -- the only case I could find in the Ninth Circuit

18   that discusses *Casella* is the *CAA* opinion that the Ninth

19   Circuit issued, but it didn't discuss that part of *Casella*.

20   So I think it's an open question in the Ninth Circuit because

21   it isn't inconsistent with *Drew*.

22           THE COURT:  As I read it, it seemed to me that in the

23   Second Circuit they very much limited the consideration

24   regarding emotional distress damages, but -- and, again, I

25   didn't go back and look at *Drew*.  Based on your earlier

Motions for Judgment as a Matter of Law

1   representations about what *Drew* did, I thought I should focus
2   my attention in other places.  But just in kind of listening
3   to your description of what *Drew* does and what *Casella* does, I
4   did read *Casella*.  It did seem to me that there is some
5   inconsistency regarding the limitations regarding emotional
6   distress damages out of the Second Circuit.

7          MS. SMITH:  Well, I don't think the issue of
8   emotional distress damages was before the Court in *Drew*, so I
9   think it's inconsistent with *Drew* for that reason.  It just
10  simply wasn't presented in that case.

11         THE COURT:  And I don't know if the facts in *Casella*
12  kind of match the facts here, where you have a lot of evidence
13  around somebody who has at least spent some great -- a great
14  deal of effort, arguably a great deal of effort trying to fix
15  a problem and was frustrated in the lack of a response or
16  ability to get that resolved.  That's not the facts in
17  *Casella*.

18         MS. SMITH:  I don't think so.  But I think *Casella*
19  does raise the issue of is it really open to every bit of
20  common law emotional distress that might be available for some
21  sort of common law tort?  And I think the answer to that
22  question -- and it's consistent even with what the Ninth
23  Circuit has said in a different case -- I'm trying to find the
24  name of that case --

25         THE COURT:  The part of *Casella* that you quote, it

Motions for Judgment as a Matter of Law

1    talks about simply because there was an inaccurate and

2    potentially damaging item in his credit report.  I understand

3    that.  But this -- in this case there's more than that.  It's

4    not simply because there was an inaccurate and potentially

5    damaging item in a credit report.

6            MS. SMITH:  Right.  It was his emotional distress in

7    having to repeatedly -- I understand that.  But I do think

8    that -- I mean, this kind of gets to the larger point I'm

9    raising, which is you don't get everything under the sun under

10   the FCRA when it comes to non-economic damages.  It has to be

11   limited quite a bit, and that's sort of the points I'm making.

12           And I realize I'm making a lot of alternative

13   arguments, but that's because this is really unsettled right

14   now, so --

15           THE COURT:  Nothing like unsettled law.

16           MS. SMITH:  Right.  Right.

17           And then the last point we talked about yesterday, I

18   think it's largely going to be covered by jury instructions

19   that I've offered, but I will say that -- I want to talk a

20   little bit about the two components of causation being both

21   "but for" causation and proximate cause.  And some -- some of

22   these -- proximate cause includes two components itself:  a

23   foreseeability requirement and also a direct relationship

24   requirement.

25           And in this case -- I've already listed it in the

Motions for Judgment as a Matter of Law

1  memorandum, but there are several areas of damages that have

2  come up during the trial that aren't -- were not the -- that

3  the alleged violations were not the "but for" cause or the

4  proximate cause of.

5            THE COURT:  Okay.

6            MS. SMITH:  Thank you.

7            THE COURT:  Thank you.

8            MR. SOLA:  Thank you, Your Honor.

9            So I'm a little handicapped since I was in trial all

10  day.

11            On willfulness, their memo actually only attacks

12  willfulness in regard to the (e) claim.

13            THE COURT:  Right.  They made a different additional

14  argument this afternoon as regards all of the claims.

15            MR. SOLA:  Well, Your Honor, in that regard we

16  presented more than enough evidence to satisfy the standard of

17  reckless disregard.  As we put in our summary judgment motion,

18  the question of whether there was willfulness is typically a

19  fact question.  And you found that it was a fact question in

20  regard to your summary judgment ruling.

21            And we presented, I think, even more evidence in this

22  trial than we presented in the summary judgment motion.  And

23  so it's a fact question for the jury.  Reckless disregard,

24  that's the standard.

25            As far as only pecuniary loss, this is contrary to

Motions for Judgment as a Matter of Law

1    all the FCRA law that I've ever seen, but including binding

2    Ninth Circuit law.  The *Guimond* case -- I may not be

3    pronouncing that correctly, G-u-i-m-o-n-d -- which I think

4    came down around 1995, you know, established that you could

5    get non-pecuniary damages.

6           That opinion has been cited over and over by District

7    Courts across the country and, of course, the Ninth Circuit

8    itself, the District of Oregon.  We have cases in our brief on

9    this.  I believe there's also *Drew*.

10          He's showing me stuff.  But, I mean, that's contrary

11   to well-established Ninth Circuit law.

12          The recoverable emotional distress damages, the

13   *Casella* opinion, that opinion is sort of the bane of FCRA

14   lawyers who practice in the Second Circuit because it does

15   take a very narrow, totally different view than the rest of

16   the circuits.

17          Again, the Ninth Circuit in *Guimond* expressly said

18   that there's no requirement that you even have to show the

19   report went to a third party.  I believe it's a footnote.  So

20   *Casella* is, you know, not followed except in the Second

21   Circuit.  And, as you pointed out, the facts here are very

22   different.

23          Then on causal relationship, as we put in our jury

24   instruction, the standard for causation in FCRA cases -- and

25   this goes back to, you know, cases in the eighties.  It's

Motions for Judgment as a Matter of Law

1  substantial factor.  It's not "but for."  It's substantial

2  factor.  That's well settled.

3        And, you know, as Wells Fargo's counsel admitted when

4  she first brought up yesterday, you know, she's taking some

5  positions that are contrary to Ninth Circuit law that's

6  binding on this Court.  And, you know, there's -- *Rothery* (ph)

7  was a case in this court.  There's *Philbin v. TransUnion*.  All

8  the cases that I'm aware of that have gone to trial in

9  FCRA -- and you can look, and we can give you more -- it's the

10  substantial factor test.

11        As far as the jury instruction, we agree the jury

12  should be instructed that plaintiff can only recover damages

13  occurring after November 3rd, 2016.  That's the date of the

14  first ACDV response.

15        And I don't know that you need a jury instruction for

16  damages caused by Wells Fargo because that's in the verdict

17  form, you know.  We ask the jury -- of course, I haven't seen

18  your final verdict form, but we ask the jury to determine

19  damages caused by violations of Wells Fargo, you know.  So

20  that's all they're going to do is they're going to look:  Were

21  their violations by Wells Fargo?  What damages were caused by

22  those violations?  So there's been no request for any damages

23  related to any other party.

24        THE COURT:  Talk to me about emotional distress.  Are

25  you seeking damages for anything other than emotional

Motions for Judgment as a Matter of Law

1    distress?

2         MR. SOLA:  Yes, Your Honor.  She didn't raise that.

3    Yes, we are, as we put in the Complaint.  We have -- we have

4    damage to reputation.

5         THE COURT:  Let's stop there.

6         MR. SOLA:  Okay.

7         THE COURT:  What evidence do you have of a value that

8    the jury can attach to damages for loss of reputation, without

9    simply speculating?

10        MR. SOLA:  Well, I don't think it's speculation.  We

11   know that his report was viewed at least twice when it had

12   this derogatory item on it.

13        THE COURT:  So what's the damage?  How does the jury

14   calculate what that is?

15        MR. SOLA:  What they calculate, I think, is they look

16   at how many times was his report seen; in other words, two

17   versus 20.  How derogatory was the information on it?  Was it,

18   you know, one 30-day late, or it was was it a $29,000

19   charge-off?  Because one is more derogatory, just like a

20   defamation case.

21        THE COURT:  No, it's not just like a defamation

22   case.

23        MR. SOLA:  Well, the Fair Credit Reporting Act, you

24   know, is really --

25        THE COURT:  In a defamation case somebody would say

1    that they suffered this kind of damage, and there's a monetary

2    value that we can attach to what happened; and you're not

3    asking the jury simply to speculate, unless there is a

4    statement that is so bad that they don't have to go through

5    that exercise of putting on an expert in order to calculate

6    it.

7            And this is different.  You're just saying, well,

8    somebody looked at a credit report a couple of times or one

9    time.  In fact, he said -- your client said, "The only person

10   that looked at it was my insurance carrier.  They looked at it

11   one time."

12           Tell me how it is a jury is supposed to calculate

13   the value of that without simply drawing numbers out of the

14   sky.

15           What I think you can do is say that "My client

16   learned about that and it caused him emotional distress, and

17   he's entitled to recover for the emotional distress as a

18   result of that."  That actually feels okay to me.  But to

19   simply say he's entitled to a separate claim and a separate

20   monetary award for a loss of reputation based on the evidence

21   I have here and I have heard so far in court, I don't get it.

22           MR. SOLA:  That's the nature of credit reports; they

23   go to third parties.  And it's Equifax, too.  It's not just

24   his insurance company.

25           THE COURT:  I get that.  But what are the damages?

Motions for Judgment as a Matter of Law

1   What attachment do we put to that?

2          MR. SOLA:  I haven't tried a defamation case, but if

3   someone comes in and says, "They say I robbed a store, and

4   that's not true," plaintiff doesn't put a number on it.  They

5   ask the jury, "What are my damages because that person said I

6   robbed a store and three people heard it?"

7          THE COURT:  In a loss of reputation, typically

8   there's something that says, "Here's how it affected me," and

9   I haven't heard that, other than "I just learned somebody else

10  looked at my report."  That's it.

11         MR. SOLA:  Well, he did say how it affected him, and

12  I think you recognize that's a damage in itself.

13         So it's two damages.  One, his insurance company and

14  Equifax have a lesser opinion of him because they see negative

15  information.  I mean, this is serious.  This is a $29,000

16  unpaid debt.  As he said, he feels it's like he stole a car.

17  That's what these companies are seeing.  That damages his

18  reputation.

19         They used to think Mr. Sponer was an honest,

20  bill-paying, creditworthy man.  And now they don't think that

21  because they see he hasn't paid -- they think he hasn't paid a

22  $29,000 bill.  That's totally his reputation.  That's at issue

23  there.  They're getting a false image of him.

24         And that's a separate damage than his concern about

25  what people are saying.  They have the wrong impression.  He

Motions for Judgment as a Matter of Law

1    looks like a bad guy.  His reputation that used to be sterling

2    is now, as he called it, an F minus.  It's a black mark.  And

3    that's, you know, a separate category.  And we have case law

4    on that which we'll provide you.

5           THE COURT:  You need to, because you haven't

6    convinced me.

7           MR. SOLA:  And in this court, that's been a separate

8    damage.

9           THE COURT:  Which court?

10          MR. SOLA:  In the District of Oregon in other FCRA

11   cases.  We have two cases, Valentine and Kirkpatrick.

12          Well, in this one, Judge Mosman, the element of

13   damages which you may consider:  denial of credit, loss of

14   opportunity to obtain credit, damage to reputation, invasion

15   of privacy, mental anguish, distress and anxiety.  And those

16   are almost identical to the categories we claim here.

17          THE COURT:  Do you know whether there was any

18   evidence of those losses, other than the same kind of evidence

19   that you presented here?

20          MR. SOLA:  Well, it was my case, Your Honor, but I

21   can't remember.  You know, we did get damages for

22   all -- again, I can't know what the jury decided, right.  They

23   might have said --

24          THE COURT:  That's not the question.  The question

25   is:  Was there evidence from which a jury could reasonably

Motions for Judgment as a Matter of Law

1    conclude a measure of damages based on those things that was

2    before the jury, more than what or at the same level as what

3    you've given here?

4           MR. SOLA:  All I know is that I will not claim damage

5    to reputation unless some third party sees the report,

6    because, you know, otherwise no one judged you.

7           And so in Kirkpatrick, his report went out to third

8    parties, and that was his evidence of damage to reputation.

9    He was an identity theft victim, too.  It was a very similar

10   case, where he could not get the fraudulent information off

11   his credit report.

12          And, also, in the Valentine case -- oh, this is Judge

13   Jones.  Is that the one I just read?

14          Same thing, really.  It's exactly the same.

15          MR. JONES:  Almost exactly.

16          MR. SOLA:  Damage to reputation, invasion of privacy,

17   loss of opportunity to obtain credit, mental anguish,

18   distress -- wait a minute.

19          Yeah, they're actually identical.

20          THE COURT:  Is this out of a jury instruction?

21          MR. SOLA:  This is out of a jury instruction, yeah.

22          MS. SMITH:  Your Honor, may I have an opportunity to

23   respond?  Because I don't know if I'm going to have a chance

24   to file anything in response.

25          THE COURT:  Not yet.  Don't interrupt him.

Motions for Judgment as a Matter of Law

1          MS. SMITH:  I'm sorry, Your Honor.

2          MR. SOLA:  And I tried a case, I already mentioned,

3     with Judge Jelderks; and we had four or five separate

4     categories of damages.  And I will tell you when we got to

5     trial in one of the cases, I had those categories -- well,

6     anyway, I won't digress.

7          But this has been established here.  I mean, I

8     appreciate we do need evidence to support each claim.  And if

9     we did not have Equifax, TransUnion and Experian and Foremost

10    Insurance having seen this derogatory information, we would

11    not be making a claim for damage to reputation, but they did.

12    And we have Equifax stating that a bank saw his report.

13         So we have five companies that saw his report, that

14    saw the derogatory information that Wells Fargo reported.  So

15    that's fairly substantial, Your Honor, in terms of damage to

16    reputation, five different companies.

17         And it's particularly bad with Equifax because, you

18    know, he keeps telling Equifax this isn't his, but Wells Fargo

19    keeps telling Equifax it is.

20         So think of the person that's got defamation, and

21    they say, "Don't believe that lie about me, that I robbed a

22    store," and the person says, "I believe it.  I think you

23    robbed that store."  That's where the damage gets really bad.

24         If the person, the third party that heard it, said,

25    "I know you're honest.  I don't believe you robbed that

1    store," you really don't have too much damage to your

2    reputation.  He's got considerable damage, over and over and

3    over again for 14 months.

4                THE COURT:  Okay.  Anything else you want to tell me

5    on that issue?

6                MR. SOLA:  Well, do you need any -- do you have any

7    questions about the other categories and whether we have

8    evidence?  Our categories, they're in our jury instructions.

9                THE COURT:  So you're talking about privacy and

10   denial of credit as categories where you can claim damages?

11               MR. SOLA:  Give me a moment.

12               Well, we're not claiming denial of credit, because we

13   don't -- we don't have a denial of credit.  I'm trying to look

14   for the -- here they are.  It's No. 21.

15               So do you want me to go through them, after damage to

16   reputation?

17               THE COURT:  What were the other categories?

18               MR. SOLA:  Okay.  The other categories -- this is

19   based on your jury instruction, which I hope followed ours:

20   damage to reputation, emotional distress and discomfort,

21   interference with normal and usual activities, inconvenience,

22   lost opportunity to receive credit and not seeking credit and

23   invasion of privacy.

24               Yeah, those are the ones.

25               THE COURT:  What were the last two?  Opportunity to

1   seek credit?

2           MR. SOLA:  It's lost opportunity to receive credit

3   and not seeking credit.

4           THE COURT:  What's the difference between those two?

5           MR. SOLA:  Well, the difference is lost opportunity

6   to receive credit would be unsolicited offers of credit, you

7   know, like we all get in the mail, but I don't think I have

8   evidence of that.  So if there was some way we could phrase

9   that differently -- "chilling effect" is what some courts talk

10  about.

11          THE COURT:  That would go to the not seeking credit.

12          MR. SOLA:  Yeah, that would go to the not seeking

13  credit.

14          THE COURT:  And then the last one was invasion of

15  privacy?

16          MR. SOLA:  The last one was invasion of privacy.

17          THE COURT:  All right.  Thank you.

18          You wanted an opportunity to respond.

19          MS. SMITH:  Thank you.

20          On the reputation issue, it is -- damage to

21  reputation is often pled as an economic loss, and I just

22  wanted to remind the Court that plaintiff has disavowed any

23  claims for economic losses.

24          And the other point I want to make on the reputation

25  issue is that there's just no evidence that there was an

Motions for Judgment as a Matter of Law

1   actual loss of reputation here.  The insurance carrier, for

2   example, did not testify that the carrier saw him, plaintiff,

3   in a different light as a result of having -- we don't even

4   actually know who in the insurance company saw the credit

5   report.  So -- so it is speculative, as you pointed out,

6   entirely speculative.

7           As to the jury instructions that may have been given

8   in other cases that list off different items of damages other

9   than emotional distress, obviously we don't know if there was

10  anyone in my position making the argument that I'm making,

11  which is that, at most, the Ninth Circuit recognizes emotional

12  distress and reputation, at most, as available.

13          And the larger point is what plaintiff is trying to

14  do here is just itemize all these different things to try to

15  stack up the potential damages that all really fall under

16  emotional distress.  It's all characterized by emotional

17  distress.  We don't need to assign a category of damages to

18  all these other things that just fall within generalized

19  emotional distress.  And the Ninth Circuit certainly has not

20  gone that far.

21          And, as we've talked about earlier, there are cases

22  that limit FCRA damages, like the Second Circuit being the

23  example that we talked about earlier.  It just goes too far.

24          THE COURT:  Okay.  Thank you.

25          MR. SOLA:  Your Honor, if I might, you also noted in

Motions for Judgment as a Matter of Law

1    the ruling on the protective order that some damages fell into

2    what we call interference with normal and usual activities.

3    So you recognized there -- you know, it was a question

4    of -- some of it, was it garden variety emotional distress?

5                THE COURT:  Yeah, that word, "garden variety" -- two

6    words, right?

7                MR. SOLA:  And they claimed it wasn't garden variety

8    because of some damage Mr. Sponer was making.  And if my

9    memory is correct, you said, "They're not making that claim as

10   part of their emotional distress.  They're making that claim

11   with reference to interference with his normal and usual

12   activities."

13               Anyway, in our brief we have many more cases.  I did

14   not make any claim that there is no case law saying that's a

15   separate category of damage.  And, again, most of the case

16   law -- well, a lot of it is district.

17               THE COURT:  Thank you.

18               MS. SMITH:  Thank you.

19               I'm sorry.  Since it was my motion, can I just have

20   one last word on this.

21               THE COURT:  Why not.

22               MS. SMITH:  I just want to point out that the Ninth

23   Circuit recognized in the *Cooper* case -- and this is discussed

24   in the memorandum -- I'm quoting:  "Simply because a statute

25   authorizes the recovery of damages to compensate for injuries

Motions for Judgment as a Matter of Law

1    does not mean that the statute authorizes the recovery of

2    damages for any type of loss."

3            THE COURT:  Okay.

4            MS. SMITH:  Thank you.

5            THE COURT:  Thank you.

6            So the first issue regarding willfulness, I must

7    look at the evidence in the light most favorable to the

8    nonmoving party.  And in that light, I find there is

9    sufficient evidence from which a reasonable trier of fact

10   could conclude the behavior of the defendants was willful.

11   The motion for judgment as a matter of law on that issue is

12   denied.

13           As regards the pecuniary damages question, I was

14   ready to rule on that case until this afternoon when defense

15   counsel suggested to me that she may have overstated the

16   importance of *Drew* and *Equifax*.

17           So now I actually have to go read the cases, where

18   before, because of the representation that I would be ruling

19   contrary to Ninth Circuit law, I took it that I didn't need to

20   do any further work.  As soon as you say those words, my work

21   is done, my brain turned off, and --

22           MS. SMITH:  Sorry.

23           THE COURT:  That's okay.

24           Because you are representing that it might represent

25   something different, I need to look at a couple cases.  I will

Motions for Judgment as a Matter of Law

1   reserve ruling on that.  I would operate under the assumption

2   that that motion will be denied as well, but I want to at

3   least read the cases that are relevant to that issue.

4           As regards the motion regarding that the plaintiff

5   can only recover emotional distress damages, I'm not -- again,

6   as a matter of law this is really kind of a -- I suppose both

7   a fact and a law question.  I want to take a look again at the

8   requirements for reputation damages and the other kind of

9   categories of damages that the plaintiff is seeking in this

10  particular case and analyze for myself, one, is there

11  sufficient evidence from which a reasonable trier of fact

12  could award damages for things like reputation and

13  interference with normal and usual activities, inconvenience,

14  and not seeking credit, as well as invasion of privacy.

15          At a minimum, these categories are still going to be

16  relevant because I think they're relevant to emotional

17  distress damages.  In other words, you can say that emotional

18  distress came from all of these different categories.  The

19  question is whether or not you get an instruction that says

20  that the jury must -- in addition to that, those emotional

21  distress damages that arise from those categories, that the

22  jury is to consider whether or not they should award damages

23  for those things separate from emotional distress.

24          I need to look at that question a little bit more

25  carefully.  I don't think it will change your -- well, it may

1    change your closing argument a little bit.  I'm just not

2    prepared to give you the answer to that question as we're

3    looking at each other this afternoon.

4              I was prepared to grant the motion, but Mr. Sola has

5    given me pause, and I want to take another look at it.

6              MR. SOLA:  And I would just ask, also -- I'd welcome

7    to know, which do you think is the least separate kind?  Like

8    it seems like you have a problem with damage to reputation.

9    And I think I told you why, but, you know, they seem very

10   separate to me.

11             But is there another one that you think, "Well, this

12   is really emotional distress"?  And if not, great.

13             THE COURT:  I have to kind of go through them in my

14   head and step back a little bit and take a look at this.

15             MR. SOLA:  Like interference with normal and usual

16   activities, that's something that you did not do.  It's not

17   emotion.  It's participation.  It's something else.  It's very

18   different.

19             And invasion of privacy is very different here.

20   Damage to reputation is what a third party thinks of you, but

21   invasion of privacy is your information being disclosed when

22   it shouldn't or you having to disclose your private

23   information to Wells Fargo over and over again, which puts you

24   at risk of identity theft.  So that's very different.

25             And then the lost opportunity to seek credit, I can

Motions for Judgment as a Matter of Law

1   see how Your Honor might think that is really emotional

2   distress, you know.  But, again, it's an act or an act you

3   don't take.  So that's different.  We're not going to try to

4   get another credit card.  You know, they can argue, "You

5   wouldn't have got it anyway."  That's causation.  But that's

6   not -- it's a different -- they didn't seek it, so it's not

7   emotional distress.

8           THE COURT:  It's a little bit fuzzy to me, however,

9   because the question of how you measure damages from making a

10  decision not to obtain credit, a credit card and other credit

11  in order to build the additional housing unit, I have to say

12  that you start to crawl into this area of -- because he never

13  applied.  If he had applied and was denied, it would be easier

14  for me.  But in this case there was no application for that;

15  and it's hard to measure or ask a jury, "You need to measure

16  what that damage might be for not doing something."

17          MR. SOLA:  Well, you know, these kinds of questions

18  of "What's the amount of damage?" are all difficult.  I mean,

19  think of pain and suffering.

20          THE COURT:  They're not.  They're not.  They're not

21  if you are not asking the jury to speculate.

22          And at a certain place -- I agree with you that

23  there's a meter; and at a certain place it becomes

24  speculation, and the jury can't go there.  They cannot

25  speculate.

Motions for Judgment as a Matter of Law

1        So maybe the instruction that tells the jury, "Don't

2   speculate," is enough to cover that issue.  I don't know.  But

3   the if the sense is we're asking them to speculate as a matter

4   of law, I've got to grant their motion on that issue.

5        MR. SOLA:  We don't oppose a motion -- I mean an

6   instruction about not speculating.  But here it's tied to

7   specific events.  There were two things he was chilled from.

8   So I think that gives the jury a basis.  It's not 20.  It's

9   not one.  It's two.

10        And the only argument we're going to make for lost

11   opportunity to receive credit or not seeking credit are those

12   two he testified to, and his wife testified to them as well.

13   So that's a quantifiable event or two events that they can

14   address.

15        Again, if it was 20, that would be a much bigger

16   number, but it's two.  So that's why it's not speculation.

17   They can say, "Okay.  It's two."  They could say it's not a

18   big thing, but it's something.

19        But, again, it's way different than emotional

20   distress to me because they're being prevented from taking

21   part in our credit-based economy, achieving a rental unit.

22   We're not asking for damages for income they would have got

23   for the rental unit.  I think that would be speculative.  But

24   just not seeking the credit is not speculative.  And he

25   testified about it, as well as his wife, in very concrete

Motions for Judgment as a Matter of Law

1   testimony, directly related to what they were going to use it

2   for and when.

3          THE COURT:  What's that worth?  How do you ask a jury

4   to determine what not doing that is worth, without

5   speculating?  We don't know anything about the unit.  We don't

6   know how big it was going to be.  We don't know how big the

7   loan was going to be.  We know nothing.

8          MR. SOLA:  Well, we know that it was going to be for

9   an ADU.  I think that's sufficient enough.  It's an ADU.  It's

10  not a car.  It's not a house.  It's a renovation of their

11  house.

12         Same with the credit card.  He said a mileage credit

13  card.  That's a pretty quantifiable thing you would get, and

14  it's a benefit if you get it.  I mean, this Court has had

15  juries decide this question over and over again.

16         THE COURT:  Not this Court.  We're in my court.

17         MR. SOLA:  I know.  I appreciate that, Your Honor.

18  You've said that before.

19         You're right.  It's your call.  But it's not

20  something that other judges have found isn't worthy of a jury

21  deciding or that it's something that a jury cannot decide.

22         You know, Judge Jones, Judge Mosman, these other

23  judges --

24         THE COURT:  You say that, but, first of all, I don't

25  know if there was any objection to the instruction or not.  We

1    have no idea about that.

2           Secondly, I know nothing about the facts of those

3    other particular cases.  They are not before this Court and

4    they don't give me anything to anchor my reasoning to.

5    They're simply not before this Court.  So I don't know if they

6    were looking at a case that is exactly like this one or not

7    like this one.  I don't know if any of those cases included

8    things like not seeking credit.  I don't remember whether or

9    not --

10          MR. SOLA:  He gave the instruction.  Again, I was the

11   trial lawyer in Kirkpatrick.  And I wouldn't have made a claim

12   for not seeking credit if the client didn't testify that they

13   did not seek credit.  I mean, you don't do that.  You're a

14   lawyer.  You've got to have evidence of your claim.

15          So I can't remember the particulars.  Again, most of

16   these cases are very similar.  People know their credit report

17   is bad.

18          Actually, I do remember Mr. Kirkpatrick.  He wanted

19   to do an addition to his house, and he didn't seek the credit

20   because his credit report was wrong, and so he took the money

21   out of his retirement account.  So that was, you know, the

22   chilling.  He didn't seek the loan because his credit report

23   was bad.  It's almost the same situation.  You don't seek

24   credit because you know you won't get it or you know you'll

25   get it on terms that aren't reasonable.

Motions for Judgment as a Matter of Law

1          THE COURT:  But taking money out of a retirement

2     account, now, that makes a lot more sense to me.  He actually

3     did something that gives me -- gives the jury something to tie

4     the denial of credit to.  I don't have that here.

5          MR. SOLA:  Well, they --

6          THE COURT:  That's a significant fact.

7          MR. SOLA:  We didn't claim the penalty for the

8     requirement account, but --

9          THE COURT:  But nonetheless, there's something you

10    can tie to an act, an amount of money that gets tied to what

11    you did instead of seeking the credit.  To me that's a

12    significant factual difference, much stronger in that case

13    than this one.

14         MR. SOLA:  Well, again, we have two concrete

15    instances where he did not seek credit.

16         THE COURT:  Yes.  We're just saying the same thing

17    over and over again.

18         MR. SOLA:  Okay.  I know.

19         THE COURT:  We have other things we need to talk

20    about, so I need you to sit down.

21         Anything else?

22         MS. SMITH:  Your Honor, obviously he was upset about

23    the inability to seek credit, and that's emotional distress

24    damages.

25         That's the last I have to say on my motions.

1              THE COURT:  Thank you.

2              On the causal relationship, you saw the instruction,

3    the proposed instruction, and that's a substantial factor.

4    That's what I think the correct standard is.  The motion for

5    judgment as a matter of law for the causal relationship issue

6    is denied.

7              MS. SMITH:  I'm sorry, Your Honor.  In your draft

8    instructions, I did not see a causation instruction at all.

9              THE COURT:  Oh, we didn't give that one?

10             MS. SMITH:  No.

11             THE COURT:  Sorry.  That's what it says.  I haven't

12   given it to you yet.

13             MS. SMITH:  Okay.  Then I will argue that issue

14   later, then, when we talk about instructions.

15             THE COURT:  When will happen is you'll object, I'll

16   overrule, and then at the end you can except.

17             So let's talk about instructions.  So you now know

18   I'm going to give the substantial factor test instead of the

19   "but for" test as regards the instructions.

20             (The Court and the law clerk confer off the record.)

21             MS. SMITH:  Should I go ahead and raise my objection

22   to the substantial factor instruction now?

23             THE COURT:  Maybe you want to look at it first.

24             MS. SMITH:  The only point I want to raise now, I

25   read the cases the plaintiff cited, and they did not stand for

1    the proposition that FCRA cases are subject to a substantial

2    factor test.  And by the plain terms of the FCRA, the language

3    "as a result of" means "but for" causation under -- under the

4    cases I've cited, actually, in the motion for judgment as a

5    matter of law.

6              THE COURT:  Thank you.

7              All right.  Getting to the proposed instructions I

8    gave you, are there any other objections on the part of the

9    plaintiff?

10             MR. SOLA:  I'm sorry.  I didn't read them all.

11             THE COURT:  I'm sorry?  You didn't do your homework?

12             MR. SOLA:  I did not, Your Honor.

13             THE COURT:  That's okay.  A lot of times people don't

14   do their homework.

15             Have a seat for a minute.  Let me just hear from the

16   other side.

17             MS. SMITH:  I've got lots to talk about.  I'm sorry.

18             THE COURT:  That's okay.

19             MS. SMITH:  So some of them are minor; some of them

20   are major.  I'm going to cover them in order.

21             The deposition instruction, I assume that --

22   plaintiff is the only one who offered depositions -- that

23   plaintiff will be supplying the names, because right now it's

24   blank.

25             THE COURT:  I won't use that last paragraph.

 1           MS. SMITH:  Okay.

 2           THE COURT:  Actually, I won't use the first sentence

 3   of the last paragraph.

 4           MR. SOLA:  Your Honor, which instruction are we on?

 5           THE COURT:  Page 6, Instruction No. 4.

 6           So the first sentence of the last paragraph is going

 7   to be struck so I don't have to add the names of -- I don't

 8   know how many depositions you used.

 9           MS. SMITH:  May I proceed?

10           THE COURT:  You may.

11           MS. SMITH:  Instruction No. 5 on page 7, I'm not

12   aware of any stipulated testimony, so I think this one should

13   be pulled.

14           THE COURT:  Struck.

15           Are there facts that you agree to, in the next one?

16           MS. SMITH:  I don't think that there are at this

17   point.  I think that we circulated drafts.

18           MR. SOLA:  There is one fact, Your Honor.

19           THE COURT:  There is one fact you agree to?

20           MR. SOLA:  Yeah, the net worth.

21           THE COURT:  I'm sorry?

22           MR. SOLA:  Their current net worth.

23           THE COURT:  Oh, okay.

24           MS. SMITH:  So on that point, Your Honor, we raised a

25   motion in limine on that issue, which you denied, but I want

1      to raise that issue again.

2             Net worth is not admissible or relevant in this case.

3      The sole -- the net worth is $165 billion.  The sole purpose

4      of asking the jury to consider that in awarding punitive

5      damages is to incite the jury to reach an unconstitutional

6      verdict.  This is just not a case where -- where that could

7      possibly do anything else, really.

8             And there are other arguments that we raised in the

9      motions in limine with respect to net worth that I'm just

10     going to -- I'm just re-raising them by reference at this

11     point, but I just wanted to point out that one additional

12     factor.

13            In a case like that, you're talking about

14     $165 billion.  This is not -- this is not a case where

15     somebody was physically injured, received a devastating

16     physical injury, and is going to be entitled to a significant

17     amount of economic damages in addition to non-economic

18     damages.  This is, at most, an emotional distress case.  And

19     hearing that number is going to do nothing but incite the jury

20     to reach an unconstitutional verdict.

21            THE COURT:  Thank you.

22            Is there anything you want to tell me on that one?

23            MR. SOLA:  Well, actually, we made another

24     stipulation.  So after the pretrial conference, we made a

25     stipulation that we would only offer the current net worth,

1   not income, and then they would not call Ms. Santana.  So we

2   stipulated to that.

3              THE COURT:  And as I recall --

4              MR. PETERSON:  They're talking about my e-mail.

5              THE COURT:  I remember this conversation.  And the

6   way it went was "Yes, we stipulated to amounts.  We did not

7   stipulate to admissibility."

8              MS. SMITH:  Correct.

9              MR. PETERSON:  And the only thing I would add, Your

10  Honor, in that follow-up stipulation we made that perfectly

11  clear this time:  We'd stipulate to the number, not to its

12  admissibility.

13             MR. SOLA:  Our view is it was always a

14  stipulation -- it was a stipulation of fact.  We don't need to

15  argue this now.  But that was a stipulation of fact for trial.

16  That's what my e-mail said.

17             I don't know that the Court has to decide it, because

18  you already decided, I believe, that net worth and income was

19  admissible.  You denied their motion in limine.  What we did

20  was, to try to shorten the trial and eliminate Mr. Santana, we

21  agreed to a stipulation of net worth and, again, that it would

22  be admissible.  So that's our stipulation of fact.

23             THE COURT:  Thank you.

24             MS. SMITH:  Page 9 --

25             THE COURT:  By the way, your objection is overruled.

1                MS. SMITH:  Okay.  I understand, Your Honor.

2                THE COURT:  March on.

3                MR. SOLA:  Well, is it going to be a stipulation,

4     then, or is it just going to be in a jury instruction?

5                THE COURT:  I will read, "The parties agreed to

6     certain facts" or "a certain fact."  And then I will get

7     better language, but it will say, "The net worth of Wells

8     Fargo is $165 billion.  You should treat this fact as having

9     been proved."

10               MS. SMITH:  Did I get that number right?

11               MR. SOLA:  Yes, the current net worth of Wells Fargo

12    Bank.

13               THE COURT:  Proceed.

14               MS. SMITH:  Thank you, Your Honor.

15               No. 7 on page 9, in the motions in limine, my

16    understanding is that you excluded the RFA exhibit that

17    plaintiff had listed.

18               THE COURT:  My thought was to strike this

19    instruction.

20               Do you need this Instruction No. 7?

21               MR. SOLA:  No, we don't.

22               THE COURT:  It's out.

23               Let me look at No. 8.  Do you have any objection to

24    8?

25               MS. SMITH:  I don't know that there were any that fit

1    in there, but I don't have a --

2            THE COURT:  I think it refers to things that might

3    have been presented to the jury during opening statement, for

4    example.  And I don't know whether you plan on using charts or

5    exhibits during your closing argument, but those are the kinds

6    of things it addresses.

7            MS. SMITH:  Okay.  No objection.

8            THE COURT:  Keep going.

9            MS. SMITH:  Skipping 9 on page 11, on 10, on No. 10,

10   page 12, just a really minor point:  There's a sentence that's

11   repeated.  And the sentence is the one that's right after

12   the -- you have the list 1 through 7.  "The weight of the

13   evidence as to a fact," that sentence appears in the last

14   paragraph.

15           Minor, I know, but I'm sure you don't want to read it

16   twice.

17           THE COURT:  Thank you.

18           MS. SMITH:  I'm skipping ahead now several

19   instructions.

20           THE COURT:  Well, let's slow down, let the

21   plaintiff catch up.

22           MR. SOLA:  No. 10, is that the model?  If that's the

23   model, we won't object.

24           THE COURT:  The problem is -- it is the model, but

25   apparently that sentence is just repeated twice, and I don't

1    want to repeat myself within the same instruction.

2            MR. SOLA:  Oh, which --

3            THE COURT:  If you look, right after No. 7 appears in

4    the first part of that instruction, "The weight of the

5    evidence," if you look at the last paragraph, "The weight of

6    the evidence," those two sentences are exactly the same.  And

7    I'm going to take one of them out.

8            MS. SMITH:  And the first one wasn't in the model.

9            THE COURT:  Somebody did some bad cutting and

10   pasting.  I'm not going to look at anybody to figure out who

11   did that, but that's what happened.

12           MS. SMITH:  So if plaintiff's counsel doesn't have

13   anything on the intervening ones, I'm jumping ahead to No. 16

14   on page 19.  And based on what plaintiff's counsel said a few

15   minutes ago, everything from 4 down should be stricken.

16           THE COURT:  I think that's correct.

17           Does that sound right to you, Mr. Sola?  We're on

18   No. 16, page 19.

19           MR. SOLA:  Here we go.

20           What we would like is the statutory language for 1,

21   2, 3.  I'm not sure that's it.

22           (The Court and the law clerk confer off the record.)

23           THE COURT:  That was our intent, was to follow the

24   statutory language.  We'll double-check.

25           And then after the word "and" on line 3, everything

1    below that will be deleted.

2            Next?

3            MS. SMITH:  No. 17 on page 20.  And I say "page 20"

4    because there are two No. 17s.  This is the reasonable

5    investigation instruction.

6            THE COURT:  Yes.

7            MS. SMITH:  I would ask the Court to make a couple

8    changes to this one.

9            THE COURT:  Okay.

10           MS. SMITH:  At the end of the first sentence, I would

11   like to add this language -- and I'll try to go slowly -- "in

12   light of the nature of the dispute."

13           And that is supported by the *Gorman* case, and I can

14   give you a jump cite if you would like it.  It's 584 F.3d at

15   1157.

16           So that's the first thing I'd like to change to that

17   one.  I have a couple more.

18           THE COURT:  Hang on a second.

19           Go ahead.

20           MS. SMITH:  The second change I'd like to make is to

21   the first part of the second sentence.  I'd like to delete "a

22   superficial or" and just start it with "an unreasonable

23   investigation."

24           And the reason for that is, if you read the *Gorman*

25   case, in some circumstances it might be reasonable to do what

someone might characterize as a superficial investigation; it really depends on the circumstances of the case.  And that's really the proposition that *Gorman* stands for, that reasonableness really is situation-dependent.  It depends on the circumstances.  It depends on the type of dispute.

And in *Gorman* itself, the case involved a decision not to repeat an earlier investigation that had been done because the information hadn't changed.  And the Court said that that wasn't unreasonable.  So I think that that could be characterized as superficial, yet *Gorman* says as a matter of law that was not unreasonable.

And, really, reasonableness is the quintessential jury question.  So I think all the jury needs to know is that the investigation needs to be reasonable under the circumstances.  And if it's unreasonable, then it violates the FCRA.

And the last point I want to make is -- and this came up especially this afternoon.  *Gorman* also states that an investigation can be reasonable even if the conclusion turns out to be inaccurate.

So investigation -- it's not a strict liability.  You can conduct a reasonable investigation even if, in the end, with the benefit of hindsight, it turns out to be wrong.  So the language I would like to add to this instruction is -- and I'll try to say it slowly -- "An investigation can be

1    reasonable even if the conclusion reached turns out to be

2    inaccurate."

3              THE COURT:  Thank you.

4              Do you have any response to their suggestions?

5              MR. SOLA:  Yes, yes.  We would go with pretty much

6    yours.

7              I think the second sentence in our proposal, "A

8    reasonable investigation requires an inquiry likely to turn up

9    information about the underlying facts and positions of the

10   parties," and the rest of that, you know, that's pretty much

11   accepted as the Ninth Circuit standard.  And we would like

12   that, and we actually would like at least something about what

13   they have to review.  That's our second paragraph.

14             THE COURT:  Yeah.  I don't want to do that.  The

15   instruction should be general and not specific as to what

16   happened in a particular case.

17             I mean, to me, it just should be that "In order to

18   satisfy the requirements of the Fair Credit Reporting Act, a

19   furnisher's investigation of disputed information must be a

20   reasonable investigation, considering the totality of the

21   circumstances," period.  And then they have all the

22   circumstances, and the jury has to figure out whether it's

23   reasonable or not.

24             MR. SOLA:  Your Honor, I don't think that's in

25   *Gorman*, the circumstances.

```
 1                THE COURT:  It isn't, but that's what the law is.
 2                MR. SOLA:  Well, I think "reasonable" implies that.
 3                THE COURT:  What the defense is asking is similar.
 4     They said, "In light of the nature of the dispute, an
 5     unreasonable investigation does not satisfy the Fair Credit
 6     Reporting Act," and that's true, too.
 7                MR. SOLA:  I guess I would go back to your first one.
 8     I don't think we should add "in light of the circumstances,"
 9     and take out "superficial" and "unreasonable," or at least
10     "superficial or cursory."  I mean, that gives them some
11     guidance.
12                I agree with you it should be not tied to the facts
13     of this case.  So that's what I would say is that "A
14     superficial, cursory, or unreasonable investigation does not
15     satisfy the requirements of the Fair Credit Reporting Act."
16                THE COURT:  Their point is sometimes it might.
17                Let me give you an example.  If Wells Fargo, upon
18     receiving the letter from your client, had then responded to
19     that letter by notifying all of the credit agencies, "Take
20     this off.  It's a fraud," that may have been considered a
21     cursory investigation.  It may well have satisfied the Fair
22     Credit Reporting Act.
23                And their point is sometimes even a cursory
24     investigation might be enough.  If they did nothing else but
25     told them, "Take this off.  It's a fraud," some people might
```

1   think it was a cursory investigation.  Yeah, it was.

2            That's the problem with words like "cursory."  That's

3   why I like, "Just look at all the circumstances and decide,

4   was it reasonable."

5            MR. SOLA:  Well, there, though, I think they're

6   reading the letter and they're convinced -- I mean, a letter

7   might be enough to establish.  So I don't think it is cursory

8   in that situation.

9            THE COURT:  Well, it's not in your mind, necessarily.

10  But in a reasonable juror's mind, that could be a cursory

11  investigation.  Is it enough?

12           MR. SOLA:  Well, again, I hear you about the cursory.

13           Why don't we stick with the first sentence.  That

14  can't be error, that first sentence.  And none of us want

15  error.  But to add "under the circumstances," to throw

16  something in that's not even in the Ninth Circuit law, I think

17  that's risky.

18           MS. SMITH:  Your Honor, if plaintiff's counsel is

19  suggesting that we cut the second sentence entirely, I have no

20  objection to that.  I do think that it should say "in light of

21  the circumstances" or something similar to that.  *Gorman*

22  supports that.

23           And I also would like to add the sentence that I

24  talked about, about what *Gorman* says about an investigation

25  can still be reasonable even if it turns out to be inaccurate.

1         Did I say that wrong?

2         THE COURT:  Yeah, you said it correctly, but I don't

3    know that it's relevant to this particular case.  I don't know

4    that any investigation in this case was shown to be

5    inaccurate.

6         MS. SMITH:  The information -- if the information

7    turns out to be -- it's the hindsight point I was making

8    earlier.  Just because ultimately they determined that it was

9    identity theft all along doesn't mean that the investigations

10   were unreasonable.

11        I don't want to belabor the point, but it is

12   supported by *Gorman* on page 1161.

13        THE COURT:  Okay.

14        MR. SOLA:  As a compromise, I would propose either

15   putting in "under the circumstances" and keeping the second

16   sentence or just having the first sentence.  But if you add

17   "under the circumstances," I think we need something that

18   gives them some guidance, which you have, that superficial or

19   unreasonable does not satisfy the requirement.

20        We oppose that sentence she wants from *Gorman*, but it

21   looks like the Court is not considering that.

22        THE COURT:  Right.  I'm not adding that additional

23   sentence at the end of the instruction.

24        So the first sentence would read, "To satisfy the

25   requirements of the Fair Credit Reporting Act, the furnisher's

1    investigation of the disputed information must be a reasonable

2    investigation under all of the circumstances."

3              Is that what you all are looking for, "in light of

4    all the circumstances"?

5              MR. SOLA:  You know, let me raise a big problem with

6    that.

7              THE COURT:  That's okay.  My question is:  Is that

8    what you're asking for?  If the answer is no, just say, "No."

9              MR. SOLA:  It's not.  I think it brings in the whole

10   s-2(a), s-2(b) problem.

11             THE COURT:  Wait, wait, wait.  That was a yes or no

12   question.

13             Then as the second sentence, "An unreasonable

14   investigation does not satisfy the Fair Credit Reporting Act,"

15   and just leave it at that time?

16             MS. SMITH:  Yeah, that's fine, without waiving the

17   arguments I've made before.

18             So, I'm sorry.  I'm not sure if I'm tracking what the

19   Court's decision was on that.  Are you going to say anything

20   about "under the circumstances" or "in light of the nature of

21   the dispute" or are you just going to leave it?

22             THE COURT:  I'm still thinking about it.

23             Let's move on.  I'll go back to that one.

24             MR. SOLA:  Wait, Your Honor.

25             The reason I don't like "under the circumstances" is

it gets into the direct disputes and the s-2(a), which we've

all agreed isn't part of the case.  And they want to bring up

these circumstances, which I think includes circumstances

related to direct disputes.

You know, "reasonable investigation" by itself is

going to be -- it's not going to be error.  And so I don't

think we should add any words, especially in the context of

them throwing out all these other explanations for why they

didn't investigate.

THE COURT:  It's not error either way.  Any time you

have an instruction like this, which says you have to figure

out whether the investigation was reasonable, the notion that

you add "under all the circumstances" is not error.  It can't

be because that's exactly what they're supposed to do is

consider all the evidence.

MR. SOLA:  Well, but I still think in this context,

in this case, it's unnecessary.  It could implicate s-2(a),

which we don't want to implicate s-2(a) because that whole

request for documents, that was s-2(a).

And I have another instruction -- I'm not sure what

the Court is going to do on it -- that talks about that they

can't not do an investigation or avoid it because they

requested information, you know.

I think that is not -- we'd strongly oppose "under

the circumstances."  You didn't have it in there originally.

1            And then we would live with the second sentence.  You
2    want to take out "superficial," and I would oppose that, too.
3    But, you know, if you decide just the first sentence as it is
4    and the second sentence, just talking about "unreasonable," we
5    won't take an exception.
6            THE COURT:  Thank you.
7            Let's move on.
8            MS. SMITH:  Okay.  Page 21, there's some language I
9    would like to add just to clarify.  And the language I would
10   like to add would be in the middle of the second sentence,
11   after the word "act," and I would say "in the way it
12   investigated the notices it received from Equifax."
13           THE COURT:  No.
14           Anything else?
15           MS. SMITH:  Yes.  The last sentence, I would like to
16   add to that, the end of that sentence, "as a result," because
17   it captures that we're denying causation.
18           THE COURT:  So how would the sentence read?  I'm
19   sorry.
20           MS. SMITH:  It would read, "The defendant denies that
21   it willfully violated the Fair Credit Reporting Act and denies
22   that plaintiff suffered any damages" --
23           THE COURT:  I'm sorry.  What instruction are you on?
24           MS. SMITH:  There's two 17s, or there's two page 21s.
25   I'm sorry.  I'm on the one, Description of Claims and

1   Defenses.  I guess I started referring to page numbers, but

2   there's two 21s and two 17s, at least on my version.

3            MR. SOLA:  I was on No. 18, the next one.

4            MS. SMITH:  Sorry.  I'm on Description of Claims and

5   Defenses, which precedes No. 18.

6            MR. SOLA:  There's two 17s.

7            MS. SMITH:  How about I refer to them by the title

8   instead of the numbers?

9            THE COURT:  All right.

10            I'm sorry.  Go ahead again.

11            MS. SMITH:  All right.  So I think I should start

12   over with my first request, because I think we might have been

13   talking about different instructions when I made it.

14            The first request I had on the instruction entitled

15   "Description of Claims and Defenses" was to add the following

16   language to the second sentence of the instruction, after the

17   word "act," and it would say "in the way it investigated the

18   notices it received from Equifax."

19            That's number one.  And I think that fairly

20   characterizes where we are, after the stipulation that we

21   reached.

22            THE COURT:  "In the way that defendant" --

23            MS. SMITH:  -- "investigated the notices it received

24   from Equifax."

25            MR. SOLA:  Your Honor, that doesn't cover our claims.

1    There are three subsections that you have in No. 16.  And so I

2    think the better is the language you have.

3             And then we get to subsection -- or what's now called

4    No. 16, Fair Credit Reporting Act, and you instruct the jury

5    on those three duties, because we claim they didn't review all

6    relevant information provided by the consumer reporting

7    agency.

8             And there's not just Equifax ACDVs.  There's an

9    Experian ACDV.  So, you know, it just really complicates that

10   one and actually just doesn't represent our case.

11        MS. SMITH:  Your Honor, can I speak to that a little

12   bit?

13        MR. SOLA:  We -- let me just -- we get to define our

14   claim, you know; and our claim is bigger than what counsel is

15   saying our claim is.

16        MS. SMITH:  The jury has heard throughout this case

17   that this is about the 10 ACDVs that were sent by Equifax.

18   Experian has never been a part of this case.  That is not

19   within the scope of the Complaint.  It's not how this case has

20   been tried.  The jury should not be considering whether there

21   was an additional violation because of the Experian notice.

22        MR. SOLA:  We have an Experian ACDV.  I don't think

23   they objected to it.  I mean, it's No. 10 -- or No. 1.  So the

24   Experian ACDV is the first one.  So we have tried the whole

25   case.  So --

1          THE COURT:  So in that list of 10 that everybody has
2   been referring to, one was an Experian?
3          MR. SOLA:  Yeah, the first one.
4          MS. SMITH:  I'm sorry, Your Honor.  I think I
5   misunderstood the point he was trying to make.  So let me
6   propose, then --
7          THE COURT:  I'm going to leave it the way it is.
8          MS. SMITH:  Okay.  All right.  So I'll move on, then.
9          The second change I'd like to make to that
10  instruction is the last sentence.  I would just like to add
11  the words "as a result," which captures the causation issue.
12         THE COURT:  I'm sorry.  Read the sentence to me.
13         MS. SMITH:  I would like the sentence to say, "The
14  defendant denies that it willfully violated the Fair Credit
15  Reporting Act and denies that plaintiff suffered any actual
16  damages as a result."
17         That's language from the statute and captures our
18  denial of causation.
19         THE COURT:  So right now the sentence says, "The
20  defendant denies it willfully violated the Fair Credit
21  Reporting Act and denies that the plaintiff suffered any
22  actual damages."
23         What do you want to add?
24         MS. SMITH:  "As a result."
25         THE COURT:  No.

1              Let's move on.

2              MR. SOLA:  Your Honor, just out of fairness -- I feel

3    like that makes it looks like you're conceding negligence.

4    I'd like that, but I don't want an error, if that's not your

5    intention.

6              MS. SMITH:  Your Honor, may I have a moment to confer

7    with my co-counsel on that?  I mean, it doesn't say it either

8    way, but --

9              THE COURT:  Whatever you think.  It doesn't matter to

10   me.

11             Oh, because it says "willfully."

12             MR. SOLA:  Yes.

13             THE COURT:  Oh, we can just take out the word

14   "willfully."

15             MR. SOLA:  And I know she used "violated."  The words

16   I was using was "failed to comply."  I don't know if that

17   makes a difference to you.

18             (Defense counsel confer off the record.)

19             MR. JONES:  Your Honor, if I may, a separate issue

20   altogether --

21             THE COURT:  There has to be two sides.

22             (Defense counsel confer off the record.)

23             THE COURT:  I know what this all was about.

24             MS. SMITH:  Thank you for indulging this.  I

25   appreciate counsel pointing this out.

1          I think what we would propose is "The defendant

2     admits some negligence, but denies" -- so I guess those would

3     be the only words we need to add there, so four words:

4     "admits some negligence, but" --

5          THE COURT:  So originally what you had proposed was

6     "The defendant admits it negligently violated the Fair Credit

7     Reporting Act in some but not all of the ways alleged by

8     plaintiff.  The defendant denies it willfully violated the

9     Fair Credit Reporting Act and denies the plaintiff suffered

10    any damages."

11         That was your original proposal.

12         MS. SMITH:  Right.  And what I'm proposing now I

13    think is very similar.

14         THE COURT:  I'm okay with the original if that works

15    for you.  I had taken that first part out because, based on

16    the opening statements, I didn't hear it.

17         MS. SMITH:  Okay.  That makes sense.  The original,

18    I think, reads fine.

19         MR. SOLA:  Your Honor, we would oppose that, the

20    "some" part.  I mean, there's one claim, negligent failure to

21    comply, and a second claim, willful failure to comply.  And

22    they can, I guess, explain it to the jury.  But if they admit

23    some negligence, then they admit our first claim for relief.

24         THE COURT:  You can make that argument to the jury.

25         MR. SOLA:  What about the verdict form, too, then?

1      There's only one question for negligent violation, I believe.

2                THE COURT:  I think what will happen is it will

3      pivot -- the pivot will be as to damages.  It won't be as to

4      whether the jury will find the defendants negligent or not.

5                MR. SOLA:  So it's going to say, "Defendant admits

6      some negligence"?

7                THE COURT:  "The defendant admits it negligently

8      violated the Fair Credit Reporting Act in some but not all of

9      the ways alleged by the plaintiff.  The defendant denies it

10     willfully violated the Fair Credit Reporting Act and denies

11     plaintiff suffered any damages."

12               All right.  Let's move on.

13               MS. SMITH:  Okay.  The next one is titled "Elements."

14     I have a few proposed changes to it.

15               THE COURT:  Do you have a page for that one?

16               MS. SMITH:  No. 18, page 21.

17               THE COURT:  Oh, okay.

18               MS. SMITH:  Okay.  The changes I am proposing are to

19     the first and second paragraphs, the numbered paragraphs.

20     Paragraph 1, the numbered 1, I would propose that it be

21     changed to read as follows:  "that defendant received notice

22     of a dispute regarding the accuracy of information from a

23     consumer reporting agency."

24               I had "Equifax" down here, but I now realize it was

25     Equifax and Experian, so I think it should just say -- I think

1  that tracks the statutory language a little better.  I'm

2  trying to remember why I was doing this, but I think that

3  might have been why.

4         MR. SOLA:  May I make a point on that one, Your

5  Honor?

6         It's not contested.  I don't think I need to prove

7  that.  We're okay if she puts in -- or we agree on any, you

8  know, language.  But that fact is not contested.  We have all

9  the ACDVs.  So, you know, we don't need the jury to decide

10  something they don't need to decide.

11         THE COURT:  I don't see what harm the requested

12  change does.

13         MR. SOLA:  No, no.  But you're saying I must prove

14  that, but I already have.

15         So I just want something to say that that fact is not

16  contested or that fact has been proven, because I don't want

17  the jury to -- you know, this ACDV stuff, you know, we've been

18  talking about it, but it could be confusing.  And, again, it's

19  not contested, so -- well, anyway.

20         MS. SMITH:  I think that's certainly something you

21  can say in argument, that it's not been contested.  I think

22  that's fair game for argument.

23         The point of this is to give the jury some context in

24  which to decide whether a violation occurred.

25         THE COURT:  Go ahead.

1          MS. SMITH:  I guess I have --

2          MR. SOLA:  Can you give me your language again?

3     "Defendant received" --

4          MS. SMITH:  -- "notice of a dispute regarding the

5     accuracy of information from a consumer reporting agency."

6          And then, similarly, on No. 2, I propose that it be

7     revised to say that "Defendant violated" -- I would delete

8     "one or more of the requirements," just "violated the Fair

9     Credit Reporting Act in the way it investigated the notices it

10    received."

11         THE COURT:  As to your second request, that's denied.

12         As to your first request, I don't have any trouble

13    giving the requested instruction as you have suggested, as to

14    No. 1.

15         MS. SMITH:  All right.  I'll move on.

16         I'm on page 22, Instruction No. 19.  I'll start with

17    the easy one.  There's a typo in the last sentence.  "Ham"

18    should be "harm."

19         Similar to the previous question, I would add to the

20    first sentence the following phrase, or I request that the

21    following phrase be added:  "in the way it investigated the

22    notice it received from the consumer reporting agencies."

23         And then I understand the second paragraph is meant

24    to talk about what negligence means, but I'm a little -- I am

25    concerned that it's just too broad, because it's really not

1    tied to what the statute actually requires, which is a

2    reasonable investigation.  So I ask that that second paragraph

3    be deleted.

4              THE COURT:  Do you have any problem with that?

5              MR. SOLA:  The second paragraph?

6              THE COURT:  Yeah.

7              MR. SOLA:  Yes, I do.  This is the textbook

8    definition of negligence, and it's been followed.  We need to

9    define negligence.  And this is -- you know, this is the

10   definition.

11             MS. SMITH:  My last objection to this instruction, as

12   it's drafted, is that the definition of reckless disregard is

13   discussed at length in *Safeco v. Burr*.  And in this last

14   sentence, where it says, "Reckless disregard means an action

15   entailing an unjustifiable high risk of harm that is either

16   known or so obvious that it should be known," that language

17   comes out of an earlier discussion in *Safeco v. Burr* where the

18   Court is characterizing the common law cases on reckless

19   disregard.

20             Later in the opinion, however, the Court ties this

21   reckless disregard concept to the FCRA and it says -- later in

22   the opinion it says that "A defendant acts in reckless

23   disregard of the FCRA if the action is not only a violation

24   under a reasonable reading of the statute's terms but shows

25   that the company ran a risk of violating the law substantially

 1    greater than the risk associated with a reading that was

 2    merely careless."

 3              I'm sorry.  I didn't write down a jump cite to that,

 4    but I can pull it up really quickly if you'd like to have one.

 5              So my request is that that language from *Safeco v.*

 6    *Burr* be either added to the "reckless disregard" language

 7    that's actually in there or replacing it, because I think

 8    it's -- it's a better characterization of the actual holding

 9    in that case of what reckless disregard means.

10              MR. SOLA:  May I be heard?

11              THE COURT:  Sure.

12              MR. SOLA:  There's no issue of the reading in this

13    case.  That -- that's only in situations where the statute is

14    unclear.

15              Here it's just a question of whether their violation

16    was, you know, reckless or knowing.  What we have given is the

17    Ninth Circuit instruction verbatim from *Reynolds* -- well, the

18    Ninth Circuit -- yeah, the standard in *Reynolds* that it's

19    willful if it's done knowing it will violate the Fair Credit

20    Reporting Act or with reckless disregard.

21              And then you define reckless disregard, just as the

22    Supreme Court and the Ninth Circuit have.  You know, there

23    shouldn't be anything about how they read the statute.  That's

24    not part of the test.  And there's no evidence that they read

25    the statute in a different way than, you know, its common

1    meaning or that there is any ambiguity as to what they needed

2    to do.

3         MS. SMITH:  Your Honor, there was testimony that the

4    policies and procedures were designed to comply with the FCRA.

5         And then the last point I would make, the *Reynolds v.*

6    *Hartford Financial Services Group* case, the Ninth Circuit case

7    that plaintiff is relying on, that's actually the Ninth

8    Circuit's opinion that was altered by the Supreme Court in

9    *Safeco v. Burr*.  It has a different title.  But if you -- I

10   mean, the "key cite" used to be the old term under Westlaw,

11   but if you check the case history of *Reynolds*, it says it was

12   reversed by *Safeco v. Burr*.  So *Safeco* is the controlling

13   authority.

14        MR. SOLA:  It wasn't reversed on the standard of

15   recklessness, Your Honor.

16        This was like the biggest case in FCRA.  The whole

17   issue was:  How do you define willful?  And the U.S. Supreme

18   Court agreed with the Ninth Circuit that willful includes

19   reckless, and that was many precedents, because it's a civil

20   statute.

21        What the Supreme Court did was reversed the liability

22   aspect of the case.  At the lower court there was a judgment

23   in favor of plaintiff.  The Supreme Court said, "We adopt the

24   reckless standard, but we find that this defendant was not

25   reckless."  That's the only thing that got reversed was the

736

1    liability, not the standard as to willful.

2              MS. SMITH:  Your Honor, the last thing I want to say

3    is the jump cite for that quote I gave you from *Safeco v.*

4    *Burr*, it's 551 U.S. at page 69.

5              THE COURT:  Okay.  Thank you.

6              MR. SOLA:  And we would add back our sentence:  "You

7    need not find that Wells Fargo acted with malice or an evil

8    motive in order to find that Wells Fargo acted willfully under

9    the law."

10             This is especially important because in opening

11   statement Mr. Peterson said willful required malice or

12   oppressive conduct.  And it doesn't, and the jury needs to

13   know that.

14             This is something that's typically given, this last

15   sentence, because people tend to think willful means malice or

16   evil motive, and it doesn't.  But now the jury may think it

17   does, because Mr. Peterson said so in his opening statement.

18             THE COURT:  Wouldn't you point them to the jury

19   instruction they're about to get and say, "Do you see anything

20   in there that says malice or anything like that?"

21             MR. SOLA:  I guess I could, Your Honor, but we --

22             THE COURT:  And you're going to then tell them that

23   "You're required to apply the instructions that the Court

24   gives you, because that's the law"?  Wouldn't you tell them

25   that?

1           MR. SOLA:  Yes.

2           THE COURT:  Thank you.

3           Anything else?

4           MS. SMITH:  No, not on that one.

5           THE COURT:  As far as your first request, to add the

6    language "in the way it investigated the notice it received

7    from the credit reporting," I don't have trouble adding that

8    particular language.

9           As regards your second point, the request to strike

10   the definition of negligence, the motion is denied.

11          As regards the third point, to adjust the language of

12   willfulness to comport with the -- I think you said the *Safeco*

13   case --

14          MS. SMITH:  *Safeco v. Burr*.

15          THE COURT:  -- right now my plan is not to do that.

16   I'm going to leave the language the way it is.  I'll take a

17   look at *Safeco*; and if I change my mind, I'll let you know.

18          MR. SOLA:  Your Honor, our claim is more than just

19   how they reinvestigated.  If you look at page 19, those are

20   the three parts of the Fair Credit Reporting Act that we're

21   claiming.  So there's three subsections, Instruction 16 on

22   page 19.  And we've all agreed we're going to have subparts 1,

23   2, and 3.

24          It will make it very easy, whenever we refer to

25   failure to comply, we just say, you know, one or more

1    provisions of the Fair Credit Reporting Act or -- the Fair

2    Credit Reporting Act.

3            The jury is going to know -- all they're going to

4    know about the Fair Credit Reporting Act is those

5    three -- well, that's all you're going to instruct them on.

6    But if she wants to add in how they investigated the dispute,

7    then she's leaving out whether they considered all the

8    relevant information.

9            MS. SMITH:  Your Honor, this is something that --

10           MR. SOLA:  Simplicity is what we really strive for in

11    jury instructions, so -- or you could add "in one of the

12    manners alleged," "one of the particulars alleged above."  I

13    think we said that somewhere else.

14           THE COURT:  We did.

15           MS. SMITH:  Your Honor, if I could make one more

16    point about that initial instruction about the FCRA, before

17    the pretrial hearing we filed a memorandum on this issue.

18    And, yes, the FCRA does have those three subparts, but they're

19    all going to the same concept, which is the investigation.

20    They all relate to the investigation.  So really, it's

21    appropriate to characterize it as "in the way it

22    investigated."

23           That's the last point I'll make on that point, and

24    then I'll move on.

25           MR. SOLA:  That's reading the second subpart out of

1    the statute.

2            THE COURT:  I don't think it reads the second subpart

3    out.  It might read the third subpart out.

4            But in any event, I understand your point, because

5    the second subpart, as I read it, sounds like investigation.

6    It was the third one where I wasn't so sure about it.

7            MR. SOLA:  Well, Your Honor, Congress specifically

8    made that a second duty.

9            THE COURT:  Stop for just a second.

10           I'm not going to give that part of the instruction,

11   which is why I'm stopping you.

12           MR. SOLA:  Okay.  Thank you.

13           THE COURT:  All right.  So I'm going to deny your

14   request for that additional language.  We'll just leave it

15   like it was.

16           MS. SMITH:  Okay.  Moving on to No. 20 on page 23, I

17   notice that the title still says "Defendant's Second Requested

18   Instruction," so I would retitle it "Investigation Deadline"

19   or something like that.

20           And then also it needs to be edited, the first

21   sentence, because there's no previous instruction that fits

22   with it anymore.  So I would propose that the first sentence

23   be changed to read as follows:  "The defendant had 30 days

24   within which to conduct and complete the investigation of the

25   notices it received from the consumer reporting agencies."

1        THE COURT:  Why don't I just end after

2  "investigation"?

3           MS. SMITH:  "To complete" --

4           THE COURT:  "To complete the investigation."

5           MS. SMITH:  That's fine.

6        I think that the next sentences will need to be

7  changed, because I think -- only because in other

8  instructions, instead of saying "CRA," we say "consumer

9  reporting agencies."  So I would change "CRA" to "consumer

10  reporting agencies" both times "CRA" appears in the sentence,

11  only to make it consistent with the rest of the instruction.

12          THE COURT:  That makes sense.

13          Mr. Sola, you got anything on that one?

14          MR. SOLA:  Okay.  I'm happy that "The defendant has

15  30 days within which to complete the investigation."  Is that

16  what you're going to do?

17          THE COURT:  Yes.

18          MR. SOLA:  And then do we even need the second

19  sentence?

20          But I'm okay -- let me see.

21          Are we keeping that whole sentence or did we amend

22  that?

23          THE COURT:  I'm sorry.  Which sentence are you --

24          MR. SOLA:  The second sentence.

25          THE COURT:  Only to say "consumer reporting agency"

1    as opposed to "CRA."

2             MR. SOLA:  Oh, okay.  We're just changing from "CRA"

3    to "credit reporting agency"?

4             THE COURT:  Is it "credit reporting agency" or

5    "consumer reporting agency"?

6             MR. SOLA:  The statute uses the word "consumer," but

7    I usually just use "credit."  I don't care.

8             MS. SMITH:  "Consumer reporting" is what we said in

9    the other instructions, Your Honor.

10            THE COURT:  Okay.  I'm going to use the language of

11   the statute.

12            MR. SOLA:  I'm fine with the second.

13            THE COURT:  Next.

14            MS. SMITH:  No. 21 on page 24, I'm proposing changes

15   that are consistent with the arguments I've made earlier.

16            I would -- let's see.  Third sentence of the second

17   paragraph, I --

18            THE COURT:  Where it says, "You should consider" --

19            MS. SMITH:  No, the sentence that starts with

20   "Damages mean," I propose or ask the Court -- I should use

21   more precise language -- to change the word "injury" to

22   "emotional distress."

23            Then I ask the Court to strike the sentence starting

24   with "You should consider the following."

25            THE COURT:  Okay.  That's the same thing that I'm

1    still thinking about anyway.

2              MS. SMITH:  I understand.

3              THE COURT:  I'm not changing it at this juncture.

4    And if I change my mind, I'll let you know.

5              MR. SOLA:  Well, you would still put in the word

6    "injury," but then if you change on the category of

7    damages -- I think that's the model.  Isn't that the word

8    "injury"?

9              THE COURT:  I think that's correct.

10             If it's only emotional distress, then I'm going to

11   make it only emotional distress.  If it is more than that, it

12   will look something like this, with perhaps reputation or some

13   of the others that I don't think belong taken out.

14             MS. SMITH:  I understand.

15             I think Mr. Sabido wanted to say something.

16             MR. SABIDO:  For the record, Robert Sabido for

17   Defendant Wells Fargo, Your Honor.

18             If I may go back to No. 20 real briefly, please, the

19   concern I have with not including the language proposed by

20   Ms. Smith is that there may be confusion by the jury as to

21   what triggers the 30-day period.  They've heard disputes being

22   received, both direct disputes and ACDVs.  And there may be

23   some confusion about the 30-day period beginning to run when a

24   direct dispute is received, when we all know it's s-2(b) case

25   and the time is triggered from ACDVs, not from the direct

1    disputes.

2            THE COURT:  I don't even remember what her language

3    was at this point.

4            MR. SABIDO:  It was to add at the end of the first

5    sentence, instead of "described in the previous instruction,"

6    she was proposing "complete the investigation of the notices

7    it received from the consumer reporting agencies," which ties

8    it nicely to s-2(b) and makes it clear to the jury it's not

9    direct disputes that triggers the 30-day period.

10           THE COURT:  "Complete the investigation" what?

11           MR. SABIDO:  -- "of the notices it received from the

12    consumer reporting agencies."

13           MR. SOLA:  Well, it's not investigation of notices.

14    If we could change some word there.

15           What's wrong with what's described -- I'm sorry.  I

16    know we're not supposed to address counsel.

17           THE COURT:  I think what they're saying is without

18    the language that's added, they won't know when the 30 days

19    gets triggered, whether it gets triggered by a direct

20    complaint or whether it got triggered by a report from a

21    credit reporting or a consumer reporting agency.

22           And they wanted to make sure that there was language

23    that pointed out that the 30 days gets triggered when you

24    receive a report -- Wells Fargo received a report from the

25    credit reporting agency, that that's what triggered the 30

1    days running.

2            MR. SOLA:  I think we're fine.  I thought he said

3    "complete the investigation of the notice," and I think it

4    would be better if it said "complete the investigation of the

5    disputed information in the notice."  It's not an

6    investigation of a notice.

7            THE COURT:  Yeah.  Their point is that it was

8    received from the credit reporting agency.  I don't think

9    they're going to bicker about the way you want to frame that

10   language.

11           MR. SOLA:  Okay.  Maybe I could just hear again, is

12   the first sentence changed?

13           THE COURT:  They wanted to add information after the

14   first sentence, after the word "investigation," to include "of

15   notices it received from the credit or consumer reporting

16   agency."

17           MR. SOLA:  And I would just throw the word

18   "information" in there, just so they know -- "to complete the

19   investigation of information disputed in the notices they

20   received."

21           THE COURT:  You all confer afterwards and draft

22   language.  I don't think you're far apart on this.

23           MS. SMITH:  Yeah.

24           MR. SOLA:  Do you have a problem with that?  I

25   think --

1          MR. SABIDO:  We can talk about --

2          MR. SOLA:  I think your point --

3          THE COURT:  Wait.  Wait.  There's a court reporter

4     here.

5          MR. SOLA:  I'm sorry.

6          (The Court and court reporter confer off the record.

7     The remainder of the proceedings are off the record and not

8     reported.)

9          (The proceedings are adjourned on August 29, 2019 and

10    reconvened on August 30, 2019.)

1                              --oOo--

2

3          I certify, by signing below, that the

4      foregoing is a correct transcript of the record

5      of proceedings in the above-titled cause.  A

6      transcript without an original signature,

7      conformed signature or digitally signed signature

8      is not certified.

9

10

11
       */s/ Nancy M. Walker*                    *10-16-19*
12     _____      _____
       NANCY M. WALKER, CSR, RMR, CRR          DATE
13     Official Court Reporter
       Oregon CSR No. 90-0091
14

15

16

17

18

19

20

21

22

23

24

25

## $

**$165** [3] - 711:3, 711:14, 713:8
**$200** [1] - 637:8
**$29,000** [3] - 690:18, 692:15, 692:22
**$30,000** [1] - 637:8
**$40,000** [1] - 568:10

## '

**'91** [1] - 609:24
**'96** [1] - 609:24
**'can'** [1] - 679:3

## /

**/s** [1] - 746:11

## 0

**01** [2] - 563:25, 564:1

## 1

**1** [9] - 507:19, 543:6, 714:12, 715:20, 726:23, 730:20, 732:14, 737:22
**10** [25] - 446:25, 460:21, 461:1, 556:5, 568:10, 600:18, 606:24, 608:4, 610:18, 611:3, 616:14, 616:17, 616:18, 633:4, 646:15, 659:10, 659:13, 672:22, 676:23, 714:9, 714:22, 726:17, 726:23, 727:1
**10-16** [1] - 438:21
**10-16-19** [1] - 746:11
**10-22-16** [1] - 439:14
**100** [1] - 436:3
**1000** [1] - 436:20
**11** [7] - 451:16, 474:23, 523:5, 574:5, 575:15, 639:15, 714:9
**11-21-2017** [1] - 528:2
**111** [1] - 436:9
**1157** [1] - 716:15
**1161** [1] - 721:12
**12** [8] - 450:1, 452:15, 467:19, 468:8, 474:18, 477:1, 621:15, 714:10
**13** [5] - 493:16, 609:15, 670:16, 673:14, 675:8
**14** [6] - 463:21, 464:14, 495:3, 648:13, 648:15, 696:3
**14th** [1] - 676:6
**15** [11] - 477:4, 500:15, 525:19, 579:2, 579:4, 580:7, 583:3, 583:4, 633:18, 641:10, 648:13
**15-day** [1] - 632:2
**1500** [1] - 436:12
**15th** [4] - 450:14, 666:5, 671:11, 671:17
**16** [5] - 715:13, 715:18, 726:1, 726:4, 737:21
**1697** [3] - 451:9, 451:23, 576:14
**17** [1] - 716:3

**17s** [4] - 716:4, 724:24, 725:2, 725:6
**18** [10] - 503:2, 527:2, 579:22, 581:15, 657:10, 678:5, 678:22, 725:3, 725:5, 730:16
**19** [11] - 475:2, 494:15, 532:16, 538:25, 600:4, 600:5, 715:14, 715:18, 732:16, 737:19, 737:22
**1977** [1] - 621:9
**1995** [1] - 688:4
**19th** [4] - 523:5, 574:6, 602:5, 640:9
**1st** [8] - 443:17, 531:5, 531:9, 592:9, 592:16, 594:7, 675:11, 675:16

## 2

**2** [16] - 443:8, 515:13, 516:8, 516:10, 521:5, 524:13, 527:25, 528:1, 564:12, 568:16, 571:4, 635:24, 636:12, 715:21, 732:6, 737:23
**20** [15] - 469:11, 519:11, 519:20, 549:4, 561:10, 575:22, 657:10, 678:5, 690:17, 704:8, 704:15, 716:3, 739:16, 742:18
**2009** [1] - 513:16
**2011** [1] - 623:2
**2014** [4] - 513:25, 514:1, 514:2, 514:17
**2016** [32] - 440:13, 441:13, 443:21, 456:9, 456:16, 462:20, 462:23, 470:14, 484:6, 485:6, 489:25, 491:3, 494:15, 522:24, 526:11, 539:1, 539:5, 544:17, 547:12, 561:11, 562:2, 571:6, 585:13, 600:4, 600:13, 616:8, 617:19, 632:18, 636:1, 659:22, 660:3, 689:13
**2017** [55] - 441:18, 442:19, 443:17, 444:3, 444:11, 445:4, 446:6, 450:14, 463:1, 463:6, 463:9, 463:12, 463:18, 463:21, 464:11, 470:14, 475:2, 478:25, 479:2, 479:3, 479:4, 490:25, 491:2, 492:1, 493:1, 493:8, 493:16, 493:21, 494:8, 523:6, 527:15, 541:22, 544:19, 545:21, 545:24, 546:2, 561:7, 577:9, 583:4, 583:8, 583:11, 590:1, 590:5, 590:12, 591:12, 592:9, 616:8, 617:19, 618:2, 618:8, 618:9, 641:12, 641:21, 674:8, 674:22
**2018** [2] - 513:13, 648:12
**2019** [3] - 435:5, 745:9, 745:10
**21** [11] - 520:15, 541:22, 541:25, 545:21, 671:7, 674:5, 696:14, 724:8, 730:16, 741:14
**21s** [2] - 724:24, 725:2
**21st** [4] - 444:3, 444:14, 527:15, 579:22
**22** [6] - 453:3, 494:8, 528:16, 582:9, 582:10, 732:16
**22nd** [2] - 446:6, 446:19
**23** [2] - 453:3, 739:16
**24** [3] - 503:18, 580:19, 741:14
**24th** [2] - 436:18, 441:18
**25** [1] - 448:24
**255** [1] - 436:6

**26** [9] - 444:11, 453:17, 549:4, 588:21, 600:14, 612:2, 636:1, 659:15, 659:22
**26th** [31] - 442:19, 465:5, 520:11, 524:21, 526:11, 533:16, 533:19, 533:22, 544:17, 547:12, 549:5, 573:22, 595:16, 595:23, 596:5, 596:11, 597:3, 632:22, 640:9, 640:15, 640:18, 644:22, 654:3, 666:1, 667:19, 667:20, 668:1, 669:3, 671:10, 671:18, 674:4
**28590** [1] - 451:9
**29** [1] - 435:5, 745:9
**2nd** [2] - 440:13, 441:13

## 3

**3** [9] - 435:14, 515:24, 518:10, 564:13, 564:14, 564:17, 715:21, 715:25, 737:23
**30** [14] - 467:12, 522:10, 569:16, 570:14, 574:19, 591:9, 594:5, 631:25, 739:23, 740:15, 743:18, 743:23, 743:25, 745:10
**30,000** [1] - 448:24
**30-day** [4] - 690:18, 742:21, 742:23, 743:9
**301** [1] - 436:20
**30339** [1] - 436:4
**30th** [1] - 492:25
**31,000** [2] - 468:3, 495:23
**3150** [1] - 436:9
**32** [5] - 443:8, 519:11, 527:24, 549:3, 549:4
**326-8186** [1] - 436:21
**33** [4] - 437:22, 482:10, 482:11, 483:4
**34** [2] - 438:16, 484:3
**35** [2] - 439:8, 485:5
**36** [3] - 439:20, 441:12, 489:22
**37** [3] - 441:14, 490:4, 490:6
**372,000** [2] - 468:8, 469:4
**38** [2] - 444:7, 490:22
**39** [2] - 444:16, 492:22
**3:17-cv-02035-HZ** [1] - 435:4
**3rd** [16] - 465:9, 465:10, 483:1, 491:7, 525:20, 527:9, 531:6, 544:19, 579:6, 579:25, 583:4, 589:2, 641:12, 660:3, 671:8, 689:13

## 4

**4** [2] - 710:5, 715:15
**40** [4] - 444:25, 493:6, 543:6, 624:19
**41** [2] - 444:17, 493:20
**42** [2] - 446:1, 494:7
**45** [1] - 554:3
**48** [1] - 570:15
**4:30** [1] - 680:11
**4th** [1] - 445:4

## 5

**5** [2] - 581:3, 710:11
**50** [1] - 469:11
**501** [11] - 516:1, 516:9, 517:16, 521:19, 547:13, 552:13, 572:22, 611:19, 636:1, 637:2
**503** [1] - 436:21
**508** [4] - 502:8, 503:12, 503:21, 504:2
**509** [13] - 502:8, 560:17, 561:13, 562:1, 568:19, 568:25, 573:21, 577:24, 598:7, 633:15, 634:1, 635:12
**510** [6] - 576:22, 576:25, 577:15, 635:7, 635:11, 635:15
**513** [2] - 503:21, 504:2
**551** [1] - 736:4
**560** [9] - 500:23, 504:15, 506:12, 506:22, 507:13, 508:10, 511:2, 630:3, 635:8
**584** [1] - 716:14
**5th** [4] - 593:3, 593:22, 593:24, 676:2

## 6

**6** [1] - 710:5
**60** [4] - 569:13, 610:24, 624:20, 626:9
**623** [1] - 619:11
**6749** [1] - 520:23
**69** [1] - 736:4

## 7

**7** [5] - 710:11, 713:15, 713:20, 714:12, 715:3

## 8

**8** [3] - 678:22, 713:23, 713:24
**800** [2] - 436:3, 436:12
**819** [1] - 436:6

## 9

**9** [4] - 658:19, 712:24, 713:15, 714:9
**90** [1] - 569:16
**90-0091** [1] - 746:13
**900** [1] - 436:17
**96** [1] - 503:2
**97201** [1] - 436:13
**97204** [3] - 436:10, 436:18, 436:21
**97214** [1] - 436:7
**98** [1] - 503:18
**9:30** [2] - 680:15, 680:22

## A

**ability** [9] - 499:19, 499:21, 530:17, 582:24, 618:5, 618:22, 654:14, 679:4, 685:16
**able** [9] - 438:19, 508:25, 535:3, 544:1,

567:21, 570:22, 583:6, 641:5, 642:19
**above-titled** [1] - 746:5
**absolutely** [10] - 565:3, 576:20, 612:17, 613:21, 614:7, 616:5, 618:23, 637:7, 655:12, 656:11
**accept** [4] - 603:23, 606:23, 661:21
**acceptable** [1] - 648:16
**accepted** [1] - 718:11
**access** [8] - 448:9, 448:11, 492:7, 492:9, 507:20, 508:2, 510:1, 643:2
**accompanied** [1] - 492:14
**accomplish** [1] - 667:16
**according** [7] - 564:2, 585:11, 590:14, 595:5, 668:20, 673:20
**account** [133] - 438:21, 439:14, 447:17, 455:7, 455:12, 456:4, 456:9, 456:16, 456:20, 456:23, 457:18, 458:16, 460:20, 461:1, 461:13, 461:19, 461:25, 462:14, 463:16, 465:18, 466:25, 471:23, 472:4, 472:6, 472:17, 472:22, 474:16, 479:21, 480:7, 483:25, 484:8, 484:15, 485:1, 485:12, 485:16, 486:12, 486:17, 486:18, 487:4, 487:22, 488:9, 488:15, 489:13, 490:1, 490:19, 491:10, 492:19, 493:4, 493:9, 493:13, 493:24, 494:9, 504:17, 505:1, 507:20, 508:4, 508:12, 508:18, 508:20, 508:22, 509:1, 509:7, 512:3, 515:9, 519:15, 519:16, 519:18, 528:13, 529:20, 530:5, 532:12, 532:22, 538:6, 538:11, 538:22, 539:6, 539:10, 539:14, 539:18, 540:2, 542:5, 542:25, 545:23, 546:16, 548:2, 548:8, 551:20, 553:15, 554:4, 564:17, 564:24, 566:3, 566:19, 591:9, 600:20, 603:1, 603:4, 603:6, 603:8, 603:9, 603:21, 603:24, 604:2, 607:8, 607:9, 607:17, 616:19, 617:2, 617:23, 618:16, 628:2, 634:11, 646:17, 646:20, 647:20, 648:10, 649:21, 653:5, 656:24, 657:7, 657:14, 660:11, 662:25, 663:5, 673:7, 673:19, 673:23, 675:2, 678:7, 706:21, 707:2, 707:8
**accountholder** [4] - 539:12, 539:13, 540:1, 650:9
**accounts** [14] - 502:9, 502:15, 502:17, 505:4, 543:13, 568:6, 568:7, 618:1, 618:4, 618:7, 618:11, 618:20, 634:10, 658:25
**accuracy** [10] - 454:20, 475:15, 481:14, 511:20, 628:10, 628:14, 629:2, 644:13, 730:22, 732:5
**accurate** [42] - 454:22, 457:7, 460:21, 461:1, 461:2, 463:16, 472:1, 472:6, 472:7, 472:11, 472:16, 473:20, 473:22, 475:13, 479:22, 479:25, 480:24, 481:3, 481:15, 491:16, 496:24, 511:17, 516:13, 568:8, 585:8, 585:16, 587:17, 597:10, 597:25, 598:6, 601:12, 602:14, 607:6, 607:20,

624:3, 630:15, 644:9, 644:20, 647:21, 649:5, 649:22, 677:6
**accurately** [1] - 487:16
**accused** [1] - 623:19
**ACDV** [181] - 437:15, 438:8, 438:19, 440:12, 441:17, 443:13, 443:14, 445:3, 446:25, 447:2, 447:5, 447:6, 447:9, 447:14, 447:16, 447:18, 449:10, 450:8, 450:12, 455:9, 456:1, 456:19, 458:14, 458:17, 460:4, 460:22, 461:6, 461:11, 461:17, 461:20, 462:15, 462:18, 462:21, 464:3, 464:18, 464:20, 465:8, 465:17, 466:3, 467:12, 472:3, 472:5, 472:8, 472:14, 472:18, 473:19, 474:9, 481:11, 481:24, 481:25, 482:11, 482:25, 483:10, 483:15, 483:18, 483:24, 484:5, 484:11, 485:6, 485:15, 485:19, 485:21, 486:4, 487:5, 487:18, 488:6, 489:1, 489:20, 489:24, 490:24, 491:18, 492:7, 492:18, 492:24, 493:1, 493:8, 493:14, 493:20, 494:7, 495:17, 496:2, 497:11, 497:19, 498:5, 499:16, 499:24, 500:11, 504:17, 504:25, 508:10, 508:19, 509:3, 509:4, 509:14, 509:15, 509:16, 509:18, 509:20, 509:23, 509:25, 510:1, 510:20, 510:23, 511:4, 512:2, 564:7, 593:15, 601:7, 601:8, 607:5, 619:10, 619:21, 619:24, 626:19, 628:5, 629:7, 629:10, 629:15, 629:19, 630:14, 631:1, 631:8, 631:10, 631:12, 631:14, 631:21, 631:23, 632:1, 632:10, 633:13, 634:1, 634:5, 634:13, 634:19, 634:25, 635:12, 635:19, 636:20, 636:25, 644:25, 645:22, 645:24, 648:14, 649:3, 649:25, 650:2, 650:24, 651:3, 651:23, 652:5, 652:15, 652:25, 653:4, 653:10, 656:18, 656:23, 657:5, 657:12, 657:23, 658:4, 658:9, 658:11, 662:4, 662:9, 662:24, 663:22, 669:13, 676:23, 677:4, 677:14, 678:6, 679:7, 679:15, 679:18, 679:21, 689:14, 726:9, 726:22, 726:24, 731:17
**ACDV-related** [1] - 634:1
**ACDVs** [59] - 440:14, 448:25, 449:3, 449:4, 449:6, 449:12, 449:20, 449:22, 450:16, 455:24, 460:18, 461:25, 462:5, 462:8, 462:24, 463:11, 463:18, 482:16, 482:20, 486:10, 486:11, 487:13, 487:14, 488:11, 488:17, 498:16, 509:9, 510:7, 510:14, 545:18, 564:9, 592:5, 600:18, 601:16, 607:19, 608:4, 622:10, 630:10, 633:2, 633:4, 633:5, 633:10, 633:11, 634:4, 644:24, 645:15, 646:2, 646:15, 647:19, 649:6, 652:21, 659:3, 672:22, 673:3, 726:8, 726:17, 731:9, 742:22, 742:25
**achieving** [1] - 704:21
**acknowledge** [2] - 591:15, 653:1

**acknowledges** [1] - 591:20
**acknowledging** [1] - 662:6
**Act** [33] - 454:18, 454:20, 474:6, 619:4, 623:19, 623:21, 649:10, 655:23, 658:8, 676:18, 683:6, 683:11, 690:23, 718:18, 719:6, 719:15, 719:22, 721:25, 722:14, 724:21, 726:4, 727:15, 727:21, 729:7, 729:9, 730:8, 730:10, 732:9, 734:20, 737:20, 738:1, 738:2, 738:4
**act** [6] - 594:1, 703:2, 707:10, 724:11, 725:17
**acted** [3] - 663:24, 736:7, 736:8
**acting** [1] - 682:13
**action** [4] - 566:5, 600:1, 733:14, 733:23
**actions** [2] - 519:15, 519:16
**active** [4] - 457:18, 464:7, 486:1, 509:12
**activities** [10] - 598:20, 614:6, 629:12, 645:24, 646:10, 696:21, 699:2, 699:12, 701:13, 702:16
**activity** [10] - 443:20, 528:3, 538:23, 539:1, 556:13, 561:5, 599:19, 600:2, 600:9, 658:15
**acts** [1] - 733:22
**actual** [9] - 439:17, 518:18, 682:23, 683:7, 683:11, 698:1, 727:15, 727:22, 734:8
**add** [25] - 682:18, 710:7, 712:9, 716:11, 717:24, 719:8, 720:15, 720:23, 721:16, 723:7, 723:13, 724:9, 724:10, 724:16, 725:15, 727:10, 727:23, 729:3, 732:19, 736:6, 737:5, 738:6, 738:11, 743:4, 744:13
**added** [8] - 522:21, 526:14, 574:23, 575:7, 575:9, 732:21, 734:6, 743:18
**adding** [2] - 721:22, 737:7
**addition** [7] - 491:5, 492:12, 560:11, 682:3, 701:20, 706:19, 711:17
**additional** [27] - 442:25, 443:4, 443:22, 445:10, 445:22, 451:5, 464:8, 471:9, 492:17, 522:1, 522:11, 523:16, 525:5, 525:6, 527:4, 528:6, 565:5, 572:10, 573:3, 595:12, 674:7, 687:13, 703:11, 711:11, 721:22, 726:21, 739:14
**additionally** [4] - 611:1, 613:16, 613:25, 616:8
**address** [20] - 450:24, 451:5, 451:8, 451:14, 451:22, 452:1, 518:11, 518:12, 523:7, 523:8, 523:11, 527:16, 528:22, 576:13, 576:15, 665:25, 666:1, 668:3, 704:14, 743:16
**addressed** [6] - 451:24, 523:6, 525:21, 573:5, 573:13, 626:18
**addresses** [1] - 714:6
**addressing** [1] - 645:4
**adequate** [3] - 540:25, 632:3, 651:18
**adjourned** [1] - 745:9
**adjust** [1] - 737:11
**Administration** [1] - 615:21
**admissibility** [2] - 712:7, 712:12

**admissible** [3] - 711:2, 712:19, 712:22
**admission** [1] - 566:8
**admit** [4] - 590:22, 591:13, 729:22, 729:23
**admits** [5] - 729:2, 729:4, 729:6, 730:5, 730:7
**admitted** [1] - 689:3
**adopt** [4] - 498:4, 654:19, 655:4, 735:23
**adopted** [1] - 499:15
**ADU** [2] - 705:9
**advise** [1] - 672:7
**advised** [3] - 624:9, 632:16, 669:11
**advising** [1] - 642:5
**affect** [1] - 618:18
**affected** [3] - 625:9, 692:8, 692:11
**affidavit** [25] - 492:13, 516:23, 517:6, 517:25, 524:18, 526:8, 565:10, 565:11, 565:24, 566:8, 566:15, 575:21, 580:18, 586:12, 586:19, 587:2, 587:11, 590:3, 612:23, 637:13, 641:1, 665:4, 665:8, 665:12, 666:20
**AFS** [2] - 443:12, 448:17
**afternoon** [9] - 554:24, 555:16, 609:11, 621:5, 633:17, 687:14, 700:14, 702:3, 717:18
**afterwards** [1] - 744:21
**age** [1] - 628:16
**agencies** [25] - 475:8, 479:21, 557:19, 601:25, 611:9, 624:12, 625:9, 626:5, 633:8, 633:9, 633:11, 645:8, 645:11, 645:16, 659:4, 662:17, 669:7, 669:14, 719:19, 732:22, 739:25, 740:9, 740:10, 743:7, 743:12
**agency** [17] - 449:12, 449:15, 455:5, 457:23, 486:1, 650:3, 726:7, 730:23, 732:5, 740:25, 741:3, 741:4, 741:5, 743:21, 743:25, 744:8, 744:16
**ago** [5] - 444:10, 506:5, 520:7, 530:3, 715:15
**agree** [106] - 454:10, 455:12, 456:4, 456:6, 456:15, 456:22, 458:2, 458:12, 458:19, 458:21, 459:6, 459:8, 459:10, 459:11, 459:19, 459:24, 460:9, 461:11, 461:14, 461:16, 461:23, 464:10, 464:22, 467:2, 469:15, 469:18, 471:21, 473:17, 474:13, 475:10, 477:25, 478:15, 479:25, 481:2, 486:15, 486:21, 488:23, 489:17, 491:3, 493:1, 495:15, 497:5, 498:22, 499:25, 502:12, 502:21, 503:11, 544:23, 545:20, 548:16, 576:19, 580:6, 584:14, 586:7, 591:24, 595:1, 595:16, 596:24, 596:25, 597:1, 602:10, 616:16, 619:3, 628:9, 628:11, 632:10, 632:11, 643:19, 644:12, 646:13, 646:17, 646:23, 647:2, 647:5, 648:21, 649:2, 649:15, 649:23, 650:12, 650:18, 651:18, 652:6, 656:23, 657:5, 657:12, 657:15, 658:25, 659:6, 660:10, 663:21,

**admissible** column continues...
668:11, 674:2, 674:10, 674:23, 675:4, 677:4, 677:8, 677:22, 678:5, 678:8, 689:11, 703:22, 710:15, 710:19, 719:12, 731:7
**agreed** [8] - 459:2, 471:2, 663:23, 712:21, 713:5, 723:2, 735:18, 737:22
**agreement** [1] - 676:12
**agrees** [3] - 627:3, 634:25, 648:3
**ahead** [20] - 439:12, 446:11, 452:16, 472:12, 479:24, 500:14, 509:6, 564:3, 575:2, 576:10, 596:3, 633:17, 675:14, 678:3, 708:21, 714:18, 715:13, 716:19, 725:10, 731:25
**ahold** [1] - 582:6
**aid** [1] - 579:11
**alert** [2] - 495:12, 643:5
**alerted** [2] - 532:17, 656:5
**allegation** [2] - 535:4, 569:5
**allegation** [1] - 654:18
**alleged** [6] - 645:6, 687:3, 729:7, 730:9, 738:12
**allegedly** [1] - 493:17
**allow** [5] - 465:24, 496:16, 511:13, 647:12
**allowed** [3] - 460:24, 461:6, 489:11
**almost** [6] - 441:19, 594:3, 594:11, 693:16, 694:15, 706:23
**altered** [1] - 735:8
**alternative** [1] - 686:12
**altogether** [1] - 728:20
**ambiguity** [1] - 735:1
**amend** [1] - 740:21
**amount** [4] - 616:21, 703:18, 707:10, 711:17
**amounts** [2] - 626:13, 712:6
**analyst** [1] - 610:2
**analyze** [1] - 701:10
**anchor** [1] - 706:4
**anecdote** [1] - 647:12
**Angeles** [4] - 621:23, 622:7, 622:14, 623:3
**anguish** [2] - 693:15, 694:17
**Annette** [1] - 436:16
**annual** [1] - 558:16
**answer** [31] - 440:21, 456:12, 485:13, 489:4, 491:14, 496:14, 496:21, 498:9, 498:17, 501:19, 503:22, 534:17, 541:15, 543:11, 553:19, 592:14, 599:18, 647:13, 647:14, 652:18, 653:24, 657:15, 661:18, 669:22, 669:24, 678:8, 679:3, 681:7, 685:21, 702:2, 722:8
**answered** [9] - 456:25, 458:5, 471:14, 477:20, 486:24, 670:25, 673:24, 677:7, 677:25
**answering** [2] - 489:6, 669:18
**anticipates** [1] - 638:20
**anticipating** [1] - 660:6
**anxiety** [2] - 671:22, 693:15
**anyway** [6] - 647:19, 695:6, 699:13,

703:5, 731:19, 742:1
**apart** [1] - 744:22
**apologize** [1] - 444:19
**appear** [11] - 439:12, 439:17, 517:4, 517:5, 517:18, 519:9, 520:13, 527:10, 528:9, 528:22, 590:14
**APPEARANCES** [1] - 436:1
**appeared** [2] - 543:9, 543:21
**appellant's** [1] - 684:4
**apples** [1] - 662:15
**applicable** [1] - 636:4
**application** [4] - 537:13, 537:14, 557:3, 703:14
**applications** [2] - 514:13, 556:13
**applied** [3] - 543:17, 703:13
**applies** [1] - 659:18
**apply** [5] - 498:15, 504:6, 514:9, 601:7, 736:23
**appointed** [1] - 621:20
**appreciate** [4] - 626:2, 695:8, 705:17, 728:25
**apprehended** [1] - 586:2
**appropriate** [4] - 475:16, 655:20, 661:23, 738:21
**appropriately** [1] - 663:25
**approves** [1] - 609:21
**April** [1] - 463:5
**area** [7] - 553:9, 553:13, 593:6, 621:12, 622:22, 624:6, 703:12
**areas** [1] - 687:1
**arguably** [1] - 685:14
**argue** [3] - 703:4, 708:13, 712:15
**arguing** [1] - 652:22
**argument** [12] - 670:4, 682:22, 682:25, 683:20, 687:14, 698:10, 702:1, 704:10, 714:5, 729:24, 731:21, 731:22
**argumentative** [1] - 677:23
**arguments** [6] - 680:17, 686:13, 711:8, 722:17, 741:15
**arise** [1] - 701:21
**arrested** [1] - 615:4
**ascertain** [2] - 566:25, 605:14
**Ashley** [3] - 459:3, 459:6, 651:1
**aspect** [1] - 735:22
**aspects** [1] - 558:9
**assert** [1] - 571:17
**asserting** [1] - 587:5
**assertion** [7] - 567:25, 571:15, 586:10, 586:18, 586:24, 587:2, 605:3
**assertions** [1] - 572:8
**asserts** [1] - 589:13
**assets** [1] - 656:10
**assign** [1] - 698:17
**associate** [1] - 558:10
**associated** [3] - 578:6, 682:16, 734:1
**assume** [13] - 492:3, 529:1, 529:11, 538:13, 545:22, 546:4, 550:15, 587:23, 593:21, 598:12, 607:1, 625:21, 709:21

**assumes** [1] - 501:16
**assuming** [6] - 590:6, 590:7, 593:24, 599:18, 607:20, 654:14
**assumption** [2] - 600:10, 701:1
**assurance** [1] - 610:7
**assure** [3] - 648:22, 659:7, 662:21
**Atlanta** [1] - 436:4
**attach** [2] - 690:8, 691:2
**attached** [1] - 524:17
**attachment** [1] - 692:1
**attachments** [5] - 524:15, 526:3, 574:14, 575:16, 640:25
**attacks** [1] - 687:11
**attempt** [1] - 542:8
**attention** [3] - 515:16, 528:20, 685:2
**Attorney** [1] - 436:5
**attorney** [11] - 515:15, 519:24, 520:8, 549:20, 599:8, 602:3, 602:11, 632:24, 639:17, 663:10, 668:23
**AUD** [1] - 509:7
**August** [7] - 435:5, 463:5, 591:11, 618:9, 672:21, 745:9, 745:10
**author** [1] - 516:5
**authority** [2] - 663:9, 735:13
**authorizes** [2] - 699:25, 700:1
**Auto** [24] - 448:9, 448:11, 448:17, 449:19, 449:21, 450:5, 451:11, 468:12, 469:1, 469:10, 469:17, 469:21, 513:21, 513:23, 529:7, 552:18, 555:18, 555:22, 556:4, 556:17, 568:6, 611:11, 614:15, 616:6
**auto** [19] - 469:2, 513:19, 519:17, 539:25, 553:1, 553:4, 555:24, 556:10, 556:11, 557:12, 557:13, 559:23, 564:15, 583:13, 638:9, 640:3, 642:18, 642:20, 643:3
**automated** [1] - 557:18
**available** [19] - 457:22, 458:15, 473:16, 480:25, 488:18, 489:8, 511:21, 529:4, 553:18, 563:19, 575:10, 576:11, 599:5, 636:20, 642:14, 683:24, 685:20, 698:12
**Avenue** [5] - 436:3, 436:9, 436:12, 436:17, 436:20
**avoid** [2] - 606:18, 723:22
**awaiting** [2] - 649:8, 659:19
**award** [3] - 691:20, 701:12, 701:22
**awarding** [1] - 711:4
**aware** [30] - 446:21, 457:17, 470:21, 471:5, 471:11, 501:6, 501:8, 501:15, 501:23, 502:4, 506:25, 507:4, 507:8, 523:10, 561:20, 579:8, 592:5, 592:6, 592:8, 596:4, 627:16, 627:23, 645:14, 646:4, 649:13, 649:14, 658:7, 676:3, 689:8, 710:12

---

**B**

---

**B-i-n-d-e-r** [1] - 609:8
**B-r-a-d-y** [1] - 512:22

**background** [4] - 556:2, 580:8, 609:13, 622:20
**backing** [2] - 565:15, 574:17
**bad** [7] - 691:4, 693:1, 695:17, 695:23, 706:17, 706:23, 715:9
**bane** [1] - 688:13
**BANK** [2] - 435:6, 436:15
**Bank** [4] - 621:10, 623:3, 682:1, 713:12
**bank** [65] - 621:21, 622:9, 622:12, 622:17, 622:19, 622:22, 623:2, 624:8, 626:7, 627:22, 627:24, 628:3, 628:6, 628:8, 629:24, 631:18, 632:16, 632:17, 632:19, 633:12, 634:10, 637:12, 640:2, 640:15, 641:23, 641:25, 643:12, 654:14, 654:18, 654:22, 656:15, 657:24, 658:14, 659:16, 660:21, 662:1, 662:17, 665:16, 668:2, 668:3, 668:4, 668:12, 668:23, 668:25, 669:12, 671:12, 671:13, 671:20, 671:24, 672:13, 672:18, 672:25, 673:2, 673:6, 673:10, 675:6, 675:13, 676:16, 695:12
**bank's** [4] - 622:18, 627:4, 639:10, 647:3
**banker** [1] - 624:1
**Bankers** [1] - 621:18
**bankers** [1] - 643:9
**banking** [10] - 495:8, 540:4, 621:6, 621:15, 621:24, 622:24, 624:22, 625:20, 630:18
**banks** [21] - 610:13, 611:9, 621:14, 621:16, 621:19, 622:6, 622:11, 622:13, 622:14, 622:16, 623:7, 623:17, 624:12, 624:17, 625:9, 627:22, 629:19, 630:23, 631:7, 642:10, 659:1
**Banks** [1] - 621:20
**baptismal** [1] - 642:7
**based** [51] - 455:14, 455:20, 455:21, 455:22, 456:17, 472:8, 473:15, 480:2, 480:9, 481:5, 481:20, 481:24, 484:1, 485:13, 485:18, 486:3, 487:14, 488:12, 489:20, 491:11, 496:15, 497:11, 498:9, 504:17, 508:3, 508:9, 508:24, 511:20, 511:21, 515:6, 517:13, 525:1, 528:23, 530:16, 531:3, 531:4, 586:7, 598:5, 613:11, 630:17, 656:21, 671:21, 683:21, 684:25, 691:20, 694:1, 696:19, 704:21, 715:14, 729:15
**basic** [1] - 571:7
**basis** [6] - 498:1, 514:11, 551:18, 579:13, 600:14, 704:8
**Battery** [1] - 436:3
**bearing** [2] - 604:24, 673:22
**bears** [1] - 604:2
**became** [1] - 623:3
**become** [4] - 560:8, 561:20, 625:3
**becomes** [1] - 703:23
**BEFORE** [1] - 435:16

**begin** [2] - 513:17, 680:18
**beginning** [3] - 578:20, 586:6, 742:23
**begins** [1] - 562:8
**behalf** [12] - 437:9, 512:17, 516:14, 555:6, 602:12, 609:2, 620:20, 623:14, 623:16, 623:17, 624:11, 681:25
**behavior** [1] - 700:10
**behind** [1] - 594:10
**belabor** [1] - 721:11
**belief** [2] - 504:18, 520:25
**belong** [1] - 742:13
**belonged** [6] - 483:25, 484:15, 485:12, 485:17, 487:4, 493:25
**belonging** [4] - 490:2, 490:19, 492:19, 493:4
**belongs** [2] - 493:11, 494:10
**below** [2] - 716:1, 746:3
**benefit** [6] - 518:15, 583:6, 643:7, 644:5, 705:14, 717:23
**Berg** [6] - 448:21, 461:23, 501:22, 501:25, 506:25, 507:3
**Berg's** [2] - 501:3, 506:6
**besieged** [1] - 628:17
**best** [3] - 572:17, 607:6, 668:20
**Bets** [8] - 461:23, 501:3, 501:22, 501:25, 506:6, 506:16, 506:25, 507:3
**Bets'** [2] - 506:6, 506:16
**better** [13] - 560:10, 584:1, 586:15, 586:19, 587:10, 641:25, 647:10, 658:22, 713:7, 726:2, 731:1, 734:8, 744:4
**between** [11] - 488:20, 544:16, 557:12, 617:19, 635:18, 640:8, 643:8, 660:18, 697:4
**beyond** [4] - 470:22, 471:5, 471:12, 661:10
**BF** [2] - 442:1, 490:7
**Bible** [1] - 638:1
**bicker** [1] - 744:9
**big** [4] - 704:18, 705:6, 722:5
**bigger** [3] - 658:20, 704:15, 726:14
**biggest** [1] - 735:16
**bill** [2] - 692:20, 692:22
**bill-paying** [1] - 692:20
**billion** [3] - 711:3, 711:14, 713:8
**Binder** [4] - 554:5, 608:22, 609:7, 619:3
**BINDER** [1] - 609:1
**binder** [1] - 609:11
**binding** [2] - 688:1, 689:6
**birth** [1] - 627:7
**bit** [28] - 440:9, 449:24, 482:17, 505:22, 510:6, 511:16, 519:21, 580:7, 604:4, 609:12, 616:2, 616:3, 618:14, 626:4, 629:6, 634:7, 635:1, 641:13, 682:22, 682:25, 685:19, 686:11, 686:20, 701:24, 702:1, 702:14, 703:8, 726:12
**black** [1] - 693:2
**blank** [1] - 709:24
**blanket** [1] - 628:18

**blocked** [2] - 499:17, 514:14
**blow** [1] - 519:21
**blurry** [2] - 442:18, 444:19
**board** [4] - 467:20, 559:3, 559:25, 560:24
**boarding** [1] - 559:1
**body** [2] - 527:18, 641:14
**bogus** [5] - 614:1, 614:6, 628:17, 628:18, 659:2
**bold** [1] - 517:19
**bona** [2] - 499:13, 662:12
**boss** [1] - 530:25
**bother** [2] - 567:18, 587:20
**bottom** [6] - 437:22, 438:17, 483:10, 518:22, 519:20, 610:2
**bought** [2] - 539:18, 540:8
**box** [13] - 437:22, 438:20, 439:8, 439:21, 441:21, 442:21, 444:17, 445:5, 445:18, 446:9, 483:9, 514:12, 576:14
**Box** [5] - 451:9, 451:10, 451:23, 523:8, 525:21
**Brady** [45] - 443:25, 512:12, 512:22, 513:3, 519:23, 527:3, 527:15, 528:13, 531:16, 531:22, 548:16, 553:6, 554:9, 554:15, 554:22, 572:23, 573:12, 579:23, 580:3, 581:16, 581:21, 582:11, 595:14, 595:24, 596:5, 596:15, 596:20, 597:7, 597:14, 597:20, 598:17, 598:19, 600:12, 600:16, 632:22, 636:15, 640:4, 640:6, 640:17, 653:15, 666:1, 675:22, 676:11, 676:14, 676:16
**brady** [1] - 671:14
**BRADY** [1] - 512:16
**Brady's** [4] - 573:22, 575:24, 581:15, 636:1
**brain** [1] - 700:21
**branches** [1] - 538:3
**BRAXTON** [1] - 437:8
**Braxton** [3] - 437:14, 454:9, 505:22, 646:1, 652:19
**Braxton's** [1] - 545:14
**break** [2] - 633:25, 635:8
**BRIAN** [2] - 620:19, 621:1
**Brian** [8] - 442:2, 459:24, 460:9, 490:9, 554:6, 620:15, 620:25
**brief** [4] - 441:23, 556:1, 688:8, 699:13
**briefly** [8] - 520:15, 525:19, 548:12, 554:21, 576:24, 607:23, 633:15, 742:18
**bring** [2] - 558:19, 723:2
**bringing** [1] - 542:20
**brings** [1] - 722:9
**broad** [1] - 732:25
**brought** [5] - 529:23, 546:9, 623:7, 652:24, 689:4
**build** [3] - 568:4, 604:10, 703:11
**building** [2] - 518:14, 566:2
**bullet** [2] - 524:20, 575:16

**burden** [1] - 655:5
**bureau** [53] - 450:7, 452:2, 452:3, 452:4, 452:11, 453:22, 462:6, 468:2, 468:11, 468:24, 469:1, 475:10, 475:17, 475:21, 476:21, 477:3, 480:23, 482:1, 486:15, 486:21, 495:16, 501:13, 502:1, 502:3, 507:7, 509:1, 514:15, 525:22, 545:18, 557:10, 557:11, 557:13, 557:15, 564:1, 576:15, 579:7, 600:7, 600:19, 601:6, 601:11, 601:15, 609:16, 610:4, 633:14, 646:3, 652:19, 666:4, 666:8, 666:11, 666:14, 666:18, 666:25, 667:12
**Bureau** [1] - 563:25
**bureaus** [1] - 626:20
**Burr** [8] - 682:11, 733:13, 733:17, 734:6, 735:9, 735:12, 736:4, 737:14
**business** [4] - 468:21, 556:25, 558:24, 578:18, 583:16, 622:4, 622:19, 654:16
**buy** [1] - 609:20
**buying** [1] - 568:10
**buys** [1] - 536:12
**BY** [84] - 437:13, 437:24, 438:18, 439:10, 439:22, 440:11, 440:23, 441:16, 441:22, 442:16, 442:22, 443:9, 443:18, 444:9, 444:18, 445:2, 445:6, 445:19, 446:4, 446:10, 450:2, 451:3, 451:18, 452:17, 453:4, 453:18, 454:8, 456:14, 457:2, 458:1, 458:9, 467:17, 468:1, 468:6, 473:8, 475:1, 477:2, 477:22, 479:17, 484:4, 487:1, 489:23, 490:5, 490:23, 492:23, 493:7, 495:7, 500:24, 501:21, 503:3, 505:21, 506:15, 513:2, 519:22, 531:21, 534:22, 541:20, 543:7, 548:15, 555:15, 561:2, 561:18, 577:19, 579:20, 584:8, 608:2, 609:10, 611:20, 612:11, 619:2, 619:18, 621:4, 633:24, 635:10, 641:11, 643:18, 657:11, 664:23, 669:23, 670:7, 674:1, 678:4, 678:18, 678:23

### C

**C-o-o-p-e-r** [1] - 555:12
**CAA** [1] - 684:18
**calculate** [4] - 690:14, 690:15, 691:5, 691:12
**California** [1] - 621:16
**cancelled** [5] - 477:10, 477:24, 477:25, 478:8, 478:18
**cannot** [20] - 464:15, 466:7, 471:22, 471:24, 472:3, 472:6, 473:24, 476:9, 480:12, 482:5, 484:11, 485:20, 497:19, 503:11, 503:13, 503:16, 541:11, 683:25, 703:24, 705:21
**capacity** [1] - 679:4
**captures** [3] - 724:17, 727:11, 727:17
**car** [49] - 465:5, 465:13, 479:1, 479:7, 480:6, 480:10, 480:16, 482:4, 491:8,

536:8, 536:10, 536:12, 536:13,
536:24, 537:14, 539:18, 540:8, 550:7,
550:8, 550:10, 550:18, 567:15, 586:3,
588:24, 589:4, 590:13, 590:20,
598:21, 599:12, 604:8, 606:4, 606:5,
606:6, 606:8, 606:11, 609:20, 647:9,
647:16, 654:1, 659:23, 660:1, 660:10,
664:24, 665:11, 669:1, 692:16, 705:10
**card** [100] – 443:23, 448:5, 448:6,
448:12, 448:18, 478:21, 500:10,
500:12, 516:25, 518:1, 518:2, 524:25,
525:12, 525:14, 526:13, 526:14,
526:16, 527:7, 528:7, 529:4, 529:8,
529:23, 531:10, 531:12, 542:1, 542:6,
542:12, 542:16, 542:23, 544:2, 544:6,
544:8, 544:12, 551:23, 565:14, 567:8,
567:9, 567:10, 567:14, 567:16,
567:17, 576:3, 581:13, 581:17,
582:13, 582:16, 582:23, 583:5,
590:11, 592:2, 592:12, 592:22,
603:11, 603:13, 603:14, 603:17,
603:24, 604:1, 604:7, 604:8, 604:9,
604:18, 604:20, 604:22, 604:24,
605:6, 605:19, 606:1, 606:12, 606:16,
607:13, 613:10, 613:11, 613:16,
614:10, 614:19, 615:18, 615:19,
615:21, 642:19, 642:20, 643:4, 643:7,
661:2, 661:13, 662:20, 670:1, 673:8,
673:11, 673:12, 673:16, 673:22,
675:10, 675:17, 675:23, 703:4,
703:10, 705:12, 705:13
**cards** [2] – 468:15, 641:4
**care** [2] – 639:10, 741:7
**career** [7] – 621:13, 621:15, 622:1,
622:3, 622:24, 622:25, 625:24
**careful** [1] – 633:3
**carefully** [1] – 701:25
**careless** [2] – 682:16, 734:2
**Carolina** [2] – 451:9, 515:7
**carrier** [3] – 691:10, 698:1, 698:2
**carry** [1] – 565:19
**cars** [1] – 568:10
**case** [182] – 438:9, 447:1, 447:11,
447:19, 449:14, 449:25, 472:9, 479:8,
484:13, 486:1, 491:20, 507:21,
510:18, 515:10, 516:20, 522:12,
523:25, 525:11, 528:18, 530:2,
530:20, 531:1, 540:5, 544:10, 547:20,
551:17, 553:17, 562:11, 563:5, 563:9,
566:2, 568:4, 568:5, 569:4, 569:6,
569:9, 569:18, 569:19, 569:22, 571:8,
571:22, 572:2, 572:3, 574:20, 575:3,
575:6, 577:14, 579:16, 580:9, 585:18,
585:23, 585:25, 586:10, 586:22,
589:12, 589:15, 589:17, 589:23,
589:24, 590:7, 590:21, 590:25, 591:1,
591:4, 593:12, 593:16, 597:18,
597:19, 597:21, 597:22, 597:24,
598:3, 598:4, 599:9, 599:13, 600:6,
600:10, 600:22, 601:7, 601:22,

602:22, 603:22, 604:10, 604:19,
605:17, 605:23, 605:25, 607:1,
607:12, 611:10, 614:4, 615:3, 615:16,
617:15, 627:15, 630:4, 630:24,
632:12, 634:4, 640:14, 643:1, 645:14,
647:9, 648:7, 652:9, 655:16, 661:8,
663:18, 669:10, 679:22, 680:11,
680:21, 682:11, 683:1, 683:2, 683:4,
683:21, 683:22, 683:24, 684:3, 684:7,
684:17, 685:10, 685:23, 685:24,
686:3, 686:25, 688:2, 689:7, 690:20,
690:22, 690:25, 692:2, 693:3, 693:20,
694:10, 694:12, 695:2, 699:14,
699:15, 699:23, 700:14, 701:10,
703:14, 706:6, 707:12, 711:2, 711:6,
711:13, 711:14, 711:18, 716:13,
716:25, 717:2, 717:6, 718:16, 719:13,
721:3, 721:4, 723:2, 723:17, 726:10,
726:16, 726:18, 726:19, 726:25,
734:9, 734:13, 735:6, 735:11, 735:16,
735:22, 737:13, 742:24
**case-to-case** [1] – 551:17
**Casella** [13] – 683:21, 684:13, 684:16,
684:18, 684:19, 685:3, 685:4, 685:11,
685:17, 685:18, 685:25, 688:13,
688:20
**cases** [33] – 521:10, 557:22, 567:11,
570:8, 594:13, 596:13, 603:20, 604:9,
610:22, 610:25, 623:14, 683:1,
684:16, 688:8, 688:24, 688:25, 689:8,
693:11, 695:5, 698:8, 698:21, 699:13,
700:17, 700:25, 701:3, 706:3, 706:7,
706:16, 708:25, 709:1, 709:4, 733:18
**catch** [2] – 510:17, 714:21
**categories** [12] – 693:16, 695:4, 695:5,
696:7, 696:8, 696:10, 696:17, 696:18,
701:9, 701:15, 701:18, 701:21
**category** [9] – 502:13, 502:14, 502:19,
505:5, 637:6, 693:3, 698:17, 699:15,
742:6
**caught** [3] – 558:23, 647:8, 653:11
**causal** [3] – 688:23, 708:2, 708:5
**causation** [9] – 686:20, 686:21, 688:24,
703:5, 708:8, 709:3, 724:17, 727:11,
727:18
**caused** [6] – 636:15, 671:22, 689:16,
689:19, 689:21, 691:16
**CBD** [1] – 631:11
**CBDR** [1] – 563:25
**CBO** [2] – 557:21, 600:25
**CCC** [1] – 440:3
**Celestina** [1] – 486:6
**central** [3] – 637:19, 638:24, 644:5
**certain** [9] – 475:6, 544:22, 596:12,
614:24, 635:4, 703:22, 703:23, 713:6
**certainly** [40] – 536:19, 609:14, 611:1,
613:6, 614:13, 614:21, 615:15,
615:25, 618:6, 618:9, 623:20, 624:1,
624:13, 625:5, 627:22, 632:11, 637:9,
637:10, 637:23, 638:4, 638:23, 642:3,

645:23, 647:4, 653:21, 654:22,
658:12, 659:9, 661:4, 661:15, 664:6,
672:7, 672:13, 675:21, 698:19, 731:20
**certificate** [1] – 642:7
**certified** [1] – 746:8
**certify** [1] – 746:3
**cetera** [1] – 583:5
**challenge** [2] – 627:2, 628:1
**challenges** [2] – 625:15, 625:16
**challenging** [2] – 625:4, 625:8
**chance** [2] – 577:20, 694:23
**change** [20] – 472:13, 485:20, 488:6,
489:12, 508:18, 589:11, 590:17,
656:14, 701:25, 702:1, 716:16,
716:20, 727:9, 731:12, 737:17, 740:9,
741:21, 742:4, 742:6, 743:14
**changed** [9] – 487:17, 489:12, 583:19,
678:1, 717:8, 730:21, 739:23, 740:7,
744:12
**changes** [8] – 583:13, 583:20, 610:6,
636:24, 716:8, 730:14, 730:18, 741:14
**changing** [4] – 477:9, 678:12, 741:2,
742:3
**characterization** [2] – 675:4, 734:8
**characterize** [2] – 717:1, 738:21
**characterized** [2] – 698:16, 717:10
**characterizes** [1] – 725:20
**characterizing** [1] – 733:18
**charge** [2] – 618:16, 690:19
**charge-off** [2] – 618:16, 690:19
**charged** [2] – 631:20, 677:15
**charges** [1] – 448:12
**charity** [1] – 621:22
**Charne** [34] – 515:15, 517:1, 519:6,
522:25, 526:6, 532:16, 537:25, 545:3,
549:6, 549:14, 549:21, 549:23, 550:2,
571:10, 571:15, 573:13, 580:17,
585:13, 585:17, 595:15, 600:7, 602:2,
602:8, 602:11, 602:21, 632:24,
639:17, 640:1, 640:11, 640:17,
666:17, 669:10, 669:11, 669:13
**Charne's** [12] – 494:15, 516:10, 516:13,
517:17, 533:11, 573:10, 595:1,
632:17, 636:12, 636:5, 669:15, 669:25
**chart** [1] – 498:19
**charts** [1] – 714:4
**cheat** [2] – 497:25, 498:3
**check** [6] – 441:2, 442:7, 545:18, 681:4,
715:24, 735:11
**checking** [2] – 538:6, 538:11
**checks** [7] – 477:10, 477:24, 477:25,
478:9, 478:18, 538:9, 538:12
**chilled** [1] – 704:7
**chilling** [2] – 697:9, 706:22
**chosen** [2] – 654:12, 662:10
**chronological** [1] – 483:4
**chronology** [1] – 664:11
**CIP** [2] – 606:14, 606:15
**Circuit** [27] – 683:22, 684:16, 684:17,
684:19, 684:20, 684:23, 685:6,

685:23, 688:2, 688:7, 688:11, 688:14, 688:17, 688:21, 689:5, 698:11, 698:19, 698:22, 699:23, 700:19, 718:11, 720:16, 734:17, 734:18, 734:22, 735:6, 735:18
**Circuit's** [4] - 683:2, 683:3, 683:5, 735:8
**circuits** [1] - 688:16
**circulated** [1] - 710:17
**circumstance** [6] - 481:13, 530:23, 550:21, 551:11, 634:19, 654:16
**circumstances** [27] - 530:23, 547:19, 551:5, 553:14, 628:4, 660:21, 716:25, 717:2, 717:5, 717:15, 718:21, 718:22, 718:25, 719:8, 720:3, 720:15, 720:21, 721:15, 721:17, 722:2, 722:4, 722:20, 722:25, 723:3, 723:13, 723:25
**cite** [4] - 716:14, 734:3, 735:10, 736:3
**cited** [3] - 688:6, 708:25, 709:4
**city** [2] - 518:17, 639:11
**City** [1] - 621:10
**civil** [1] - 735:19
**claim** [46] - 491:23, 536:25, 541:11, 543:8, 543:18, 543:21, 544:7, 551:6, 571:17, 571:23, 578:5, 578:6, 586:11, 613:20, 613:24, 615:14, 645:14, 645:19, 645:21, 646:12, 663:18, 681:17, 682:6, 682:20, 687:12, 691:19, 693:16, 694:4, 695:8, 695:11, 696:10, 699:9, 699:10, 699:14, 706:11, 706:14, 707:7, 726:5, 726:14, 726:15, 729:20, 729:21, 729:23, 737:18
**claimed** [1] - 699:7
**claiming** [6] - 495:10, 616:24, 645:17, 645:18, 696:12, 737:21
**Claims** [3] - 724:25, 725:4, 725:15
**claims** [5] - 628:19, 639:23, 687:14, 697:23, 725:25
**clarification** [4] - 551:19, 629:10, 644:21, 681:20
**clarify** [4] - 504:5, 509:17, 677:21, 724:9
**clarity** [4] - 572:13, 583:21, 583:24, 584:1
**classes** [1] - 515:3
**clear** [8] - 458:10, 542:9, 596:16, 638:22, 654:4, 673:1, 712:11, 743:8
**clearly** [5] - 476:23, 615:7, 652:23, 665:25, 672:25
**CLERK** [8] - 512:13, 512:20, 555:3, 555:9, 608:23, 609:5, 620:17, 620:23
**clerk** [2] - 708:20, 715:22
**client** [4] - 691:9, 691:15, 706:12, 719:18
**clients** [2] - 624:16, 624:20
**close** [2] - 522:10, 661:22
**closed** [5] - 522:18, 569:9, 586:23, 591:9, 653:14
**closely** [1] - 624:14
**closes** [1] - 574:19
**closing** [5] - 522:13, 680:17, 702:1,

714:5
**closure** [2] - 569:10, 569:11
**co** [1] - 728:7
**co-counsel** [1] - 728:7
**Coast** [1] - 621:18
**code** [10] - 438:22, 439:15, 440:3, 441:25, 444:22, 445:9, 445:21, 446:12, 486:4, 564:11
**cohesion** [1] - 570:9
**Colin** [2] - 445:14, 445:24
**collateral** [1] - 566:4
**collection** [6] - 611:9, 618:7, 618:16, 618:20, 656:12, 672:4
**collections** [3] - 513:18, 513:24, 618:11
**colluding** [2] - 661:13, 661:17
**collusion** [3] - 660:17, 660:24, 661:2
**color** [2] - 536:22
**comfortable** [1] - 623:20
**coming** [10] - 469:17, 510:10, 510:11, 510:14, 539:14, 560:6, 633:4, 634:25, 654:18, 659:1
**comment** [1] - 656:14
**comments** [1] - 443:12
**Commerce** [1] - 623:3
**committed** [1] - 646:22
**committee** [1] - 622:18
**common** [16] - 466:13, 469:8, 469:9, 469:10, 496:5, 496:6, 556:16, 573:15, 573:18, 637:4, 658:16, 685:20, 685:21, 733:18, 734:25
**communicate** [2] - 460:5, 460:7
**communicated** [2] - 586:5, 588:5
**communicating** [3] - 601:25, 645:8, 658:13
**communication** [4] - 459:25, 460:2, 571:1, 674:7
**communications** [1] - 667:6
**community** [2] - 622:15, 684:5
**companies** [7] - 614:1, 614:22, 614:23, 623:15, 692:17, 695:13, 695:16
**company** [12] - 498:7, 498:9, 609:17, 609:18, 621:15, 626:7, 649:10, 682:14, 691:24, 692:13, 698:4, 733:25
**comparable** [1] - 481:25
**compare** [10] - 526:23, 526:25, 538:16, 550:19, 566:23, 567:5, 581:9, 650:8, 651:3, 651:16
**compared** [2] - 537:4, 683:5
**comparing** [6] - 605:15, 627:11, 635:2, 650:16, 650:17, 650:19
**compensate** [1] - 699:25
**competing** [2] - 631:18, 634:16
**complaining** [2] - 447:17, 564:23
**complaint** [10] - 453:14, 516:22, 522:9, 552:15, 558:2, 572:16, 578:2, 634:20, 634:23, 743:20
**Complaint** [2] - 683:17, 690:3, 726:19
**complaints** [3] - 453:10, 556:22, 556:24
**complete** [31] - 446:13, 446:19, 460:11, 460:24, 465:24, 495:4, 496:16, 505:9,

508:13, 563:8, 563:20, 565:6, 565:7, 567:3, 589:14, 595:5, 606:15, 642:11, 665:5, 672:20, 675:15, 677:17, 739:24, 740:3, 740:4, 740:15, 743:6, 743:10, 744:3, 744:4, 744:18
**completed** [23] - 440:12, 461:3, 464:5, 464:6, 464:14, 465:8, 472:12, 479:8, 480:17, 480:22, 482:6, 487:25, 494:5, 508:15, 508:16, 512:6, 545:24, 546:2, 546:5, 586:23, 589:8, 589:23, 596:7
**completing** [1] - 509:21
**completion** [2] - 485:4, 665:20
**compliance** [10] - 438:22, 439:15, 440:3, 441:25, 444:22, 445:9, 445:21, 446:12, 486:4, 623:23
**complicates** [1] - 726:9
**complied** [3] - 473:11, 474:6, 664:3
**complies** [2] - 473:2, 473:18
**comply** [5] - 728:16, 729:21, 735:4, 737:25
**component** [1] - 682:9
**components** [2] - 686:20, 686:22
**comport** [2] - 481:16, 737:12
**compromise** [1] - 721:14
**compromised** [1] - 513:11
**concede** [3] - 483:12, 648:15, 667:4
**conceding** [1] - 728:3
**concept** [2] - 733:21, 738:19
**concern** [4] - 498:25, 671:22, 692:24, 742:19
**concerned** [1] - 732:25
**concerns** [4] - 624:15, 628:14, 660:16, 671:12
**conclude** [3] - 667:18, 694:1, 700:10
**concluded** [6] - 472:17, 649:7, 667:24, 674:15, 674:20, 683:10
**conclusion** [2] - 717:19, 718:1
**concrete** [2] - 704:25, 707:14
**condition** [9] - 438:22, 439:15, 440:3, 441:25, 444:22, 445:9, 445:21, 446:12, 486:4
**conduct** [13] - 632:9, 649:12, 649:20, 656:23, 657:6, 657:13, 663:22, 668:12, 677:5, 678:6, 717:22, 736:12, 739:24
**conducted** [3] - 657:16, 663:20, 678:9
**conducting** [6] - 460:1, 636:11, 637:12, 664:1, 665:18, 677:13
**confer** [10] - 554:14, 664:17, 681:6, 708:20, 715:22, 728:6, 728:18, 728:22, 744:21, 745:6
**conference** [1] - 711:24
**conferences** [1] - 515:2
**confident** [1] - 615:20
**confirm** [10] - 503:11, 503:13, 503:22, 576:16, 613:19, 639:2, 642:12, 646:24, 663:2, 679:8
**confirmation** [4] - 634:24, 638:3, 646:25, 647:6
**confirming** [1] - 668:25

confirms [1] - 491:9
conflicts [1] - 657:23
conformed [1] - 746:7
confusing [2] - 452:23, 731:18
confusion [2] - 742:20, 742:23
Congress [1] - 739:7
connected [1] - 645:25
connection [2] - 655:22, 671:5
consent [1] - 643:11
consider [11] - 539:21, 540:12, 636:10, 644:21, 670:10, 693:13, 701:22, 711:4, 723:15, 741:18, 741:24
considerable [1] - 696:2
consideration [1] - 684:23
considered [4] - 549:1, 660:23, 719:20, 738:7
considering [3] - 718:20, 721:21, 726:20
consistency [2] - 523:24, 582:2
consistent [16] - 440:17, 499:18, 506:22, 511:13, 551:23, 573:22, 581:18, 606:20, 626:24, 636:5, 654:24, 679:11, 684:13, 685:22, 740:11, 741:15
consistently [4] - 558:12, 570:22, 652:25, 683:8
constitute [1] - 575:23
construed [1] - 683:8
consultant [3] - 514:4, 611:1, 623:3
consulted [1] - 554:22
consulting [2] - 623:5, 623:9
consumer [103] - 449:11, 452:24, 453:10, 466:11, 466:15, 467:3, 475:15, 477:24, 479:21, 486:5, 495:9, 495:20, 497:15, 497:18, 498:22, 498:24, 499:1, 499:3, 499:13, 510:7, 522:5, 541:7, 541:10, 547:16, 548:21, 548:23, 563:12, 564:23, 565:1, 565:2, 565:9, 565:25, 568:23, 569:1, 569:3, 569:12, 569:15, 569:24, 570:10, 572:17, 573:16, 573:19, 574:2, 574:19, 578:12, 586:12, 586:16, 586:20, 588:5, 588:6, 589:19, 595:13, 596:22, 603:10, 603:14, 603:17, 604:1, 604:17, 604:23, 606:17, 610:17, 611:8, 622:4, 626:8, 626:9, 626:22, 627:7, 633:8, 634:11, 637:9, 637:14, 638:21, 638:24, 639:22, 649:3, 649:20, 650:9, 655:6, 656:1, 658:25, 659:19, 661:7, 662:11, 662:24, 663:7, 665:4, 668:15, 668:21, 726:6, 730:23, 732:5, 732:22, 739:25, 740:8, 740:9, 740:25, 741:5, 741:6, 741:8, 743:7, 743:12, 743:21, 744:15
consumer's [7] - 454:25, 466:18, 587:2, 628:15, 644:3, 650:13, 674:12
consumer-type [1] - 637:9
consumers [19] - 454:10, 466:24, 484:21, 495:23, 497:25, 498:3, 557:7, 557:8, 581:23, 584:2, 585:2, 610:6,

619:4, 624:8, 624:18, 625:8, 628:20, 629:3, 643:19
contact [21] - 524:2, 527:16, 533:5, 533:6, 534:21, 549:24, 570:2, 570:21, 576:10, 613:7, 613:8, 617:14, 633:11, 640:5, 640:17, 643:4, 670:23, 671:6, 671:23, 676:15
contacted [9] - 448:5, 498:7, 534:2, 534:23, 539:13, 570:3, 640:3, 644:15, 668:23
contacting [5] - 453:13, 535:12, 570:2, 640:2, 654:9
contacts [1] - 601:6
contain [6] - 438:11, 517:1, 517:2, 524:23, 526:10, 612:5
contained [1] - 517:5
contains [1] - 511:3
contemporaneous [1] - 580:5
content [2] - 506:11, 507:8
contested [5] - 731:6, 731:8, 731:16, 731:19, 731:21
context [6] - 632:12, 651:5, 677:11, 723:7, 723:16, 731:23
continue [10] - 466:2, 474:4, 487:10, 488:3, 488:11, 494:11, 508:13, 511:14, 635:6, 646:14
continued [1] - 625:23
continuing [72] - 437:13, 437:24, 438:18, 439:10, 439:22, 440:11, 440:23, 441:16, 441:22, 442:16, 442:22, 443:9, 443:18, 444:9, 444:18, 445:2, 445:6, 445:19, 446:4, 446:10, 450:2, 451:3, 451:18, 452:17, 453:4, 453:18, 456:14, 457:2, 458:1, 458:9, 467:17, 468:1, 468:6, 473:8, 475:1, 477:2, 477:22, 479:17, 484:4, 487:1, 489:23, 490:5, 490:23, 492:23, 493:7, 495:7, 500:24, 501:21, 503:3, 506:15, 519:22, 534:22, 541:20, 543:7, 561:2, 561:18, 577:19, 579:20, 595:13, 611:20, 612:11, 619:18, 633:24, 635:10, 641:11, 657:11, 664:23, 669:23, 670:7, 674:1, 678:4, 678:23
continuously [1] - 514:23
contrary [4] - 687:25, 688:10, 689:5, 700:19
contributing [1] - 648:19
controlling [1] - 735:12
convenience [1] - 613:3
conversation [2] - 550:2, 712:5
conveyed [2] - 482:21, 482:22
convicted [13] - 479:10, 480:6, 480:10, 480:13, 480:16, 482:3, 491:8, 492:2, 590:13, 591:5, 591:8, 664:24, 674:22
conviction [5] - 492:12, 590:18, 660:9, 664:12, 665:11
convinced [2] - 693:6, 720:6
Cooper [23] - 554:2, 554:3, 555:2, 555:12, 555:16, 559:23, 560:19, 571:4, 574:4, 576:23, 579:3, 583:2,

583:13, 584:3, 584:9, 608:3, 645:7, 655:13, 683:2, 683:4, 683:5, 683:10, 699:23
COOPER [1] - 555:5
Cooper's [1] - 611:21
cooperation [5] - 638:21, 639:6, 656:2, 656:4, 668:14
copies [1] - 477:24
copy [27] - 443:23, 447:5, 517:25, 526:22, 527:7, 528:6, 529:3, 529:7, 529:22, 537:20, 537:21, 542:12, 542:23, 544:1, 565:12, 565:14, 567:14, 581:12, 581:17, 582:12, 587:24, 590:10, 592:1, 592:22, 607:13, 632:23
CoreLogic [1] - 623:15
Corporation [2] - 621:19, 623:4
correct [200] - 437:19, 438:1, 440:7, 441:11, 441:20, 444:4, 444:5, 444:12, 449:16, 450:21, 451:7, 451:12, 451:20, 451:21, 451:25, 452:5, 452:13, 452:19, 454:12, 454:17, 454:23, 455:1, 455:5, 455:6, 455:7, 455:8, 455:11, 457:5, 457:8, 457:11, 457:14, 459:4, 459:21, 460:1, 460:6, 460:14, 460:15, 461:5, 461:20, 462:7, 462:10, 462:15, 462:16, 462:19, 462:22, 462:25, 463:3, 463:7, 463:10, 463:13, 463:17, 463:19, 463:23, 464:1, 465:7, 465:11, 465:16, 465:22, 466:12, 468:13, 468:16, 468:18, 468:20, 468:22, 469:3, 470:8, 470:12, 470:16, 471:13, 472:20, 472:24, 472:25, 475:14, 476:24, 476:25, 477:5, 477:12, 479:9, 479:11, 479:13, 479:14, 480:18, 482:8, 482:9, 482:13, 482:19, 483:11, 483:19, 484:10, 484:24, 485:6, 485:7, 485:10, 486:14, 490:2, 490:8, 490:10, 490:19, 492:20, 493:12, 493:19, 494:11, 497:4, 497:16, 499:8, 500:3, 500:9, 501:2, 501:5, 501:15, 501:24, 502:2, 502:5, 502:6, 502:16, 502:20, 505:13, 506:4, 507:5, 507:12, 510:21, 511:15, 511:25, 512:4, 512:7, 515:22, 525:10, 527:13, 527:14, 532:19, 532:23, 537:18, 538:2, 546:1, 546:7, 548:3, 548:8, 549:5, 550:11, 550:12, 550:14, 550:20, 551:1, 552:11, 564:21, 572:15, 574:3, 574:15, 574:16, 577:6, 577:25, 578:24, 579:24, 580:2, 581:10, 583:12, 584:17, 585:7, 585:15, 587:4, 587:7, 592:13, 592:14, 592:17, 592:18, 593:19, 596:11, 603:2, 607:5, 607:10, 607:17, 608:12, 612:4, 614:15, 616:11, 619:5, 620:1, 624:3, 624:10, 626:12, 627:13, 634:15, 645:5, 645:12, 645:13, 651:16, 653:17, 655:18, 655:19, 656:25, 657:1, 662:14, 669:9, 671:18,

699:9, 708:4, 712:8, 715:16, 742:9,
746:4
**Correct** [1] - 503:8
**corrected** [31] - 454:15, 454:25, 457:10,
457:13, 458:3, 458:13, 458:20,
466:17, 466:23, 467:4, 473:12,
495:11, 503:24, 643:25, 644:4, 644:7,
648:7, 648:9, 648:10, 648:16, 648:21,
648:23, 659:8, 659:12, 663:13,
667:10, 668:10, 668:17, 668:22,
669:5, 669:8
**correcting** [1] - 469:2
**correction** [3] - 504:4, 623:24, 667:16
**correctly** [2] - 688:3, 721:2
**correspondence** [7] - 449:25, 451:5,
453:2, 473:13, 565:1, 580:9, 635:25
**corresponding** [1] - 450:16
**Cosgrave** [1] - 436:17
**Council** [1] - 621:20
**counsel** [21] - 437:2, 500:19, 503:2,
554:20, 633:20, 657:10, 664:16,
664:17, 678:22, 681:6, 689:3, 700:15,
715:12, 715:14, 720:18, 726:14,
728:7, 728:18, 728:22, 728:25, 743:16
**Counsel** [2] - 543:6, 681:21
**counseling** [3] - 621:22, 624:5, 638:24
**Counselor** [1] - 624:19
**country** [3] - 448:7, 533:12, 688:7
**couple** [19] - 453:1, 509:10, 516:7,
557:17, 565:23, 566:1, 576:24,
579:25, 581:21, 626:15, 630:1, 641:2,
641:4, 657:8, 670:24, 691:8, 700:25,
716:7, 716:17
**course** [3] - 512:6, 688:7, 689:17
**COURT** [233] - 435:1, 435:17, 436:19,
437:4, 440:20, 454:5, 456:11, 457:1,
457:25, 458:6, 467:6, 473:5, 477:21,
486:25, 495:6, 500:14, 500:21,
501:18, 505:17, 506:14, 512:9,
512:11, 531:18, 534:16, 541:14,
548:11, 553:9, 553:13, 553:16, 554:1,
554:8, 554:12, 554:18, 554:24,
561:14, 561:16, 577:17, 579:12,
579:18, 584:5, 607:22, 608:14,
608:17, 608:19, 608:21, 618:25,
619:14, 620:5, 620:7, 620:10, 620:13,
633:16, 633:22, 643:15, 664:14,
664:16, 664:18, 669:17, 669:21,
670:3, 673:25, 677:24, 678:3, 678:15,
679:25, 680:3, 680:5, 680:8, 680:10,
680:25, 681:5, 681:7, 681:9, 681:15,
681:19, 684:13, 684:22, 685:11,
685:25, 686:15, 687:5, 687:7, 687:13,
689:24, 690:5, 690:7, 690:13, 690:21,
690:25, 691:25, 692:7, 693:5, 693:9,
693:17, 693:24, 694:20, 694:25,
696:4, 696:9, 696:17, 696:25, 697:4,
697:11, 697:14, 697:17, 697:24,
699:5, 699:17, 699:21, 700:3, 700:5,
700:23, 702:13, 703:8, 703:20, 705:3,

705:16, 705:24, 707:1, 707:6, 707:9,
707:16, 707:19, 708:1, 708:9, 708:11,
708:15, 708:23, 709:6, 709:11,
709:13, 709:18, 709:25, 710:2, 710:5,
710:10, 710:14, 710:19, 710:21,
710:23, 711:21, 712:3, 712:5, 712:23,
712:25, 713:2, 713:5, 713:13, 713:18,
713:22, 714:2, 714:8, 714:17, 714:20,
714:24, 715:3, 715:9, 715:16, 715:23,
716:6, 716:9, 716:18, 718:3, 718:14,
719:1, 719:3, 719:16, 720:9, 721:2,
721:13, 721:22, 722:7, 722:11,
722:22, 723:10, 724:6, 724:13,
724:18, 724:23, 725:9, 725:22, 727:1,
727:7, 727:12, 727:19, 727:25, 728:9,
728:13, 728:21, 728:23, 729:5,
729:14, 729:24, 730:2, 730:7, 730:15,
730:17, 731:11, 731:25, 732:11,
733:4, 733:6, 734:11, 736:5, 736:18,
736:22, 737:2, 737:5, 737:15, 738:14,
739:2, 739:9, 739:13, 740:1, 740:4,
740:12, 740:17, 740:23, 740:25,
741:4, 741:10, 741:13, 741:18,
741:25, 742:3, 742:9, 743:2, 743:10,
743:17, 744:7, 744:13, 744:21, 745:3
**court** [11] - 456:7, 664:18, 683:4, 689:7,
691:21, 693:7, 693:9, 705:16, 735:22,
745:3, 745:6
**Court** [39] - 437:2, 500:19, 515:14,
554:20, 621:7, 633:20, 664:17,
682:17, 683:10, 683:22, 683:25,
684:3, 685:8, 689:6, 697:22, 705:14,
705:16, 706:3, 706:5, 708:20, 712:17,
715:22, 716:7, 717:8, 721:21, 723:21,
733:18, 733:20, 734:22, 735:8,
735:18, 735:21, 735:23, 736:23,
741:20, 741:23, 745:6, 746:13
**Court's** [2] - 683:1, 722:19
**Courthouse** [1] - 436:20
**courtroom** [4] - 513:4, 553:25, 554:23,
680:24
**courts** [1] - 697:9
**Courts** [1] - 688:7
**cousin** [1] - 663:15
**cover** [5] - 553:9, 638:5, 704:2, 709:20,
725:25
**covered** [1] - 686:18
**CRA** [29] - 474:4, 474:14, 482:22, 486:2,
487:11, 498:20, 498:22, 498:23,
498:25, 499:10, 499:16, 499:18,
499:23, 505:22, 505:25, 511:22,
619:9, 649:11, 662:10, 668:10,
668:17, 668:22, 740:8, 740:9, 740:10,
741:1, 741:2
**CRAs** [12] - 475:13, 481:3, 499:15,
499:19, 499:22, 508:19, 601:13,
601:17, 606:24, 644:15, 666:17, 669:4
**crawl** [1] - 703:12
**Credco** [1] - 623:15
**credit** [222] - 448:5, 448:12, 449:12,

449:15, 450:7, 452:2, 452:3, 452:4,
452:11, 453:22, 454:11, 455:4,
457:22, 458:3, 462:6, 468:2, 468:11,
468:15, 468:24, 469:1, 475:7, 475:10,
475:17, 475:18, 475:21, 476:21,
477:3, 479:21, 480:23, 482:1, 484:22,
485:1, 485:25, 486:15, 486:21,
487:22, 488:9, 488:25, 489:3, 494:11,
495:16, 501:13, 501:25, 502:3, 507:7,
507:25, 509:1, 514:15, 525:22,
545:17, 557:10, 557:11, 557:13,
557:15, 557:17, 557:19, 564:1, 564:4,
564:11, 576:15, 579:7, 589:7, 590:9,
592:19, 592:24, 600:7, 600:19,
600:20, 601:6, 601:11, 601:15,
601:25, 604:8, 609:15, 609:16,
609:18, 609:21, 610:4, 610:18, 614:2,
614:3, 614:19, 617:5, 617:16, 617:21,
618:5, 618:10, 618:12, 618:19,
618:22, 619:5, 621:12, 621:22, 622:5,
622:7, 622:10, 622:18, 622:22,
622:23, 623:12, 623:14, 623:18,
624:5, 624:7, 624:9, 624:10, 624:11,
625:9, 625:15, 626:4, 626:5, 626:7,
626:15, 626:17, 626:19, 627:10,
627:14, 628:2, 628:10, 628:18, 633:6,
633:7, 633:14, 637:9, 639:6, 642:19,
642:20, 643:4, 643:6, 643:7, 643:20,
645:5, 645:8, 645:10, 645:15, 646:3,
650:3, 652:19, 658:25, 659:4, 662:16,
666:3, 666:8, 666:11, 666:14, 666:18,
666:25, 667:10, 667:12, 667:13,
667:16, 668:9, 668:16, 668:21, 669:4,
669:6, 669:8, 669:14, 670:1, 672:8,
672:14, 674:12, 676:23, 684:2, 684:8,
684:12, 686:2, 686:5, 691:8, 691:22,
693:13, 693:14, 694:11, 694:17,
696:10, 696:12, 696:13, 696:22,
697:1, 697:2, 697:3, 697:6, 697:11,
697:13, 698:4, 701:14, 702:25, 703:4,
703:10, 704:11, 704:21, 704:24,
705:12, 706:8, 706:12, 706:13,
706:16, 706:19, 706:20, 706:22,
706:24, 707:4, 707:11, 707:15,
707:23, 719:19, 737:7, 741:3, 741:4,
741:7, 743:21, 743:25, 744:8, 744:15
**Credit** [32] - 454:18, 474:6, 563:25,
610:14, 619:3, 623:19, 623:21,
649:10, 655:23, 658:7, 676:18,
690:23, 718:18, 719:5, 719:15,
719:22, 721:25, 722:14, 724:21,
726:4, 727:14, 727:20, 729:6, 729:9,
730:8, 730:10, 732:9, 734:19, 737:20,
738:1, 738:2, 738:4
**credit-based** [1] - 704:21
**creditor** [3] - 612:25, 617:6, 684:4
**creditors** [7] - 611:4, 613:1, 616:7,
616:22, 639:1, 640:14, 641:2
**credits** [1] - 641:6
**creditworthy** [1] - 692:20

**crime** [1] - 465:14
**criminal** [17] - 465:15, 479:7, 480:5, 480:15, 491:20, 585:18, 585:22, 589:23, 590:12, 590:21, 591:5, 591:8, 599:9, 599:13, 653:11
**critical** [2] - 629:5, 659:14
**criticizing** [1] - 640:21
**cross** [7] - 454:5, 531:18, 554:5, 584:5, 618:25, 643:2, 643:15
**CROSS** [5] - 454:7, 531:20, 584:7, 619:1, 643:17
**cross-exam** [5] - 454:5, 531:18, 584:5, 618:25, 643:15
**CROSS-EXAMINATION** [5] - 454:7, 531:20, 584:7, 619:1, 643:17
**CRR** [2] - 436:19, 746:12
**CSR** [3] - 436:19, 746:12, 746:13
**current** [5] - 560:6, 560:11, 710:22, 711:25, 713:11
**cursory** [9] - 719:10, 719:14, 719:21, 719:23, 720:1, 720:2, 720:7, 720:10, 720:12
**customer** [30] - 443:21, 449:11, 452:23, 453:9, 453:10, 467:13, 481:18, 484:16, 487:9, 522:7, 522:8, 528:5, 529:18, 529:22, 533:1, 534:4, 538:1, 557:3, 557:20, 562:5, 563:21, 566:8, 567:25, 570:17, 572:20, 575:2, 576:10, 595:12, 642:17, 643:11
**customer's** [3] - 465:6, 489:3, 588:24
**customers** [7] - 467:10, 467:11, 495:23, 514:13, 552:14, 553:4, 584:2
**cut** [3] - 535:25, 670:1, 720:19
**cutting** [1] - 715:9

**D**

**D.C** [1] - 667:23
**damage** [24] - 690:4, 690:13, 691:1, 692:12, 692:24, 693:8, 693:14, 694:4, 694:8, 694:16, 695:11, 695:15, 695:23, 696:1, 696:2, 696:15, 696:20, 697:20, 699:8, 699:15, 702:8, 702:20, 703:16, 703:18
**Damages** [1] - 741:20
**damages** [61] - 682:23, 683:7, 683:11, 683:12, 683:15, 683:16, 683:23, 683:25, 684:1, 684:9, 684:24, 685:6, 685:8, 686:10, 687:1, 688:5, 688:12, 689:12, 689:16, 689:19, 689:21, 689:22, 689:25, 690:8, 691:25, 692:5, 692:13, 692:17, 693:13, 693:21, 694:1, 695:4, 696:10, 698:8, 698:15, 698:17, 698:22, 699:1, 699:25, 700:2, 700:13, 701:5, 701:8, 701:9, 701:12, 701:17, 701:21, 701:22, 703:9, 704:22, 707:24, 711:5, 711:17, 711:18, 724:22, 727:16, 727:22, 729:10, 730:3, 730:11, 742:7
**damaging** [3] - 684:2, 686:2, 686:5

**Daniel** [1] - 436:16
**data** [4] - 513:11, 526:25, 567:5, 637:25
**DataQuick** [1] - 623:15
**date** [21] - 440:8, 440:12, 441:12, 441:15, 441:17, 442:15, 444:3, 444:8, 445:1, 445:3, 446:2, 446:5, 450:14, 483:2, 546:3, 569:16, 577:7, 599:24, 600:3, 627:7, 689:13
**DATE** [1] - 746:12
**dated** [6] - 523:5, 525:20, 528:1, 574:5, 579:6, 593:3
**dates** [3] - 561:6, 626:13, 626:25
**DAY** [1] - 435:14
**day-to-day** [2] - 514:11, 514:21
**days** [19] - 444:13, 467:12, 494:20, 510:11, 522:10, 569:13, 569:16, 570:14, 574:19, 591:9, 623:7, 626:9, 631:25, 739:23, 740:15, 743:18, 743:23, 744:1
**de** [1] - 622:12
**Deadline** [1] - 739:18
**deal** [10] - 515:21, 567:11, 573:16, 573:20, 625:23, 626:5, 627:17, 629:15, 685:14
**Dealer** [8] - 479:19, 513:19, 513:20, 515:16, 523:7, 526:7, 574:6, 580:18
**dealer** [11] - 536:10, 536:13, 536:24, 556:20, 598:21, 598:25, 606:4, 606:5, 606:9, 606:11, 654:1
**dealers** [2] - 606:6, 606:21
**dealership** [7] - 537:10, 550:7, 550:10, 550:18, 566:24, 609:22, 638:9
**dealing** [10] - 568:7, 572:16, 573:19, 602:17, 604:13, 615:9, 618:8, 624:24, 633:6, 637:20
**deals** [3] - 629:11, 630:9, 633:13
**dealt** [2] - 552:25, 625:21
**DEAN** [2] - 609:1, 609:7
**Dean** [3] - 554:5, 608:22, 609:7
**debt** [3] - 539:19, 628:21, 692:16
**debts** [1] - 614:2
**December** [31] - 440:13, 441:13, 445:4, 446:6, 446:19, 462:23, 463:18, 463:20, 493:21, 494:8, 513:13, 514:6, 531:5, 531:9, 546:2, 592:9, 592:16, 592:24, 593:3, 593:22, 593:23, 593:24, 594:7, 674:7, 674:8, 675:11, 675:16, 675:18, 675:19, 676:2, 676:6
**decide** [9] - 681:18, 705:15, 705:21, 712:17, 720:3, 724:3, 731:9, 731:10, 731:24
**decided** [4] - 514:8, 623:9, 693:22, 712:18
**decides** [1] - 640:10
**deciding** [1] - 705:21
**decision** [9] - 530:18, 551:6, 552:4, 571:21, 582:22, 587:14, 703:10, 717:6, 722:19
**dedicated** [3] - 627:20, 627:23, 629:18
**defamation** [5] - 690:20, 690:21,

690:25, 692:2, 695:20
**default** [1] - 497:21
**DEFENDANT** [1] - 436:14
**defendant** [18] - 512:12, 608:22, 620:15, 724:20, 725:22, 727:14, 727:20, 729:1, 729:6, 729:8, 730:7, 730:9, 730:21, 732:3, 733:22, 735:24, 739:23, 740:14
**Defendant** [9] - 437:9, 512:17, 555:1, 555:6, 609:2, 620:20, 730:5, 732:7, 742:17
**Defendant's** [1] - 739:17
**defendant's** [1] - 611:9
**defendants** [3] - 624:21, 700:10, 730:4
**Defendants** [1] - 435:7
**Defense** [2] - 728:18, 728:22
**defense** [3] - 680:7, 700:14, 719:3
**Defenses** [3] - 725:1, 725:5, 725:15
**defer** [2] - 600:16, 635:6
**define** [5] - 469:11, 726:13, 733:9, 734:21, 735:17
**definitely** [3] - 583:10, 617:4, 676:8
**definition** [5] - 652:14, 733:8, 733:10, 733:12, 737:10
**degree** [1] - 638:20
**delay** [1] - 648:20
**delayed** [1] - 665:20
**delays** [4] - 649:1, 664:9, 677:1, 677:2
**delete** [9] - 508:20, 508:22, 509:1, 512:3, 601:17, 617:2, 663:17, 716:21, 732:7
**deleted** [4] - 467:1, 467:11, 716:1, 733:3
**deliberations** [1] - 680:19
**delinquencies** [1] - 626:25
**delivered** [1] - 528:24
**demand** [3] - 544:8, 606:16, 606:17
**demanded** [1] - 544:11
**demands** [1] - 676:19
**demographics** [4] - 481:18, 481:22, 484:16, 487:10
**denial** [6] - 693:13, 696:10, 696:12, 696:13, 707:4, 727:18
**denied** [8] - 700:12, 701:2, 703:13, 708:6, 710:25, 712:19, 732:11, 737:10
**denies** [1] - 724:20, 724:21, 727:14, 727:15, 727:20, 727:21, 729:2, 729:8, 729:9, 730:9, 730:10
**deny** [1] - 739:13
**denying** [1] - 724:17
**department** [212] - 450:20, 451:24, 452:6, 452:12, 452:14, 453:6, 453:19, 459:25, 460:3, 460:6, 460:8, 461:4, 462:6, 462:8, 462:13, 462:14, 464:15, 464:19, 465:17, 472:16, 472:22, 475:11, 475:17, 475:19, 475:22, 475:24, 476:4, 476:12, 480:17, 480:23, 482:1, 482:6, 486:15, 486:22, 491:19, 491:23, 492:1, 492:9, 493:16, 494:14, 494:23, 495:17, 497:19, 500:11, 500:25, 501:12, 501:14,

508:24, 509:15, 509:24, 510:1, 510:3, 511:10, 511:12, 511:13, 511:17, 514:2, 514:3, 514:5, 514:16, 514:18, 515:16, 518:8, 518:13, 519:1, 522:3, 523:7, 523:9, 523:14, 525:1, 525:15, 526:4, 526:19, 530:12, 531:4, 531:24, 531:25, 532:1, 532:4, 532:12, 532:13, 532:20, 540:19, 545:18, 545:19, 551:2, 552:25, 555:21, 556:10, 556:11, 556:17, 556:21, 557:9, 557:13, 557:14, 558:5, 558:7, 558:8, 558:13, 559:2, 559:24, 560:2, 560:24, 565:21, 571:6, 571:21, 572:25, 574:9, 574:10, 574:22, 576:4, 576:18, 580:22, 581:23, 590:25, 593:5, 593:19, 594:1, 594:17, 597:9, 597:11, 599:23, 599:25, 600:19, 600:23, 601:2, 601:6, 601:11, 601:15, 601:20, 601:24, 607:3, 608:4, 608:7, 610:3, 615:6, 621:11, 631:3, 631:9, 631:11, 631:19, 632:20, 633:13, 633:14, 635:12, 635:13, 635:16, 635:19, 635:20, 636:4, 637:12, 639:9, 639:11, 640:3, 640:15, 641:23, 645:7, 645:18, 645:24, 646:3, 646:9, 646:11, 648:5, 649:19, 650:22, 651:6, 651:8, 651:20, 651:25, 652:16, 652:20, 652:23, 653:2, 653:6, 653:16, 655:7, 655:13, 655:24, 656:8, 657:4, 658:11, 663:25, 665:16, 665:17, 665:22, 665:23, 666:4, 666:8, 666:12, 666:15, 666:19, 667:1, 667:2, 667:5, 667:12, 669:12, 670:8, 671:14, 674:3, 676:3, 677:15, 679:6, 679:9, 679:18, 679:19

**department's** [3] - 451:14, 583:14, 637:16
**departments** [4] - 519:16, 552:21, 552:23, 610:5
**depended** [1] - 551:17
**dependent** [1] - 717:4
**Deposit** [2] - 621:19, 623:4
**deposition** [21] - 448:21, 461:16, 469:7, 470:24, 471:1, 471:4, 501:3, 503:1, 503:4, 503:10, 503:18, 503:24, 504:1, 504:4, 543:4, 546:8, 657:10, 677:10, 677:12, 678:20, 709:21
**depositions** [2] - 709:22, 710:8
**derogatory** [8] - 617:22, 618:17, 618:18, 690:12, 690:17, 690:19, 695:10, 695:14
**describe** [9] - 506:11, 506:16, 562:25, 571:13, 611:22, 618:14, 621:7, 625:1, 632:13
**described** [7] - 437:25, 442:6, 507:10, 611:22, 629:10, 743:5, 743:15
**describing** [2] - 447:22, 447:25
**description** [9] - 437:18, 441:24, 442:20, 444:17, 445:5, 445:18, 446:8, 556:1, 685:3
**Description** [3] - 724:25, 725:4, 725:15

**deserved** [1] - 595:22
**designated** [2] - 627:17, 627:20
**designed** [3] - 460:17, 460:20, 735:4
**desk** [1] - 519:4
**despite** [7] - 493:8, 495:15, 517:12, 521:13, 638:19, 665:9, 676:23
**details** [1] - 464:2
**detective** [2] - 585:20, 639:11
**Detective** [2] - 588:22, 589:3
**detective's** [1] - 535:19
**determination** [13] - 465:22, 466:6, 471:22, 472:3, 472:7, 474:14, 481:13, 499:6, 505:4, 582:20, 593:17, 653:6, 675:13
**determine** [43] - 454:21, 456:21, 461:12, 461:18, 461:25, 465:20, 473:24, 474:10, 474:11, 475:20, 481:15, 481:21, 482:7, 484:13, 488:20, 491:18, 546:21, 562:13, 563:11, 566:19, 570:17, 576:8, 578:6, 593:16, 596:2, 596:8, 601:22, 603:3, 603:7, 603:9, 605:2, 605:6, 644:9, 644:19, 649:4, 649:21, 652:11, 653:12, 665:14, 673:18, 677:6, 689:18, 705:4
**determined** [6] - 466:1, 472:10, 487:4, 662:12, 663:5, 721:8
**determines** [2] - 508:25, 606:22
**determining** [4] - 494:24, 510:4, 550:22, 602:24
**devastating** [1] - 711:15
**developed** [1] - 612:15
**development** [1] - 622:19
**difference** [4] - 697:4, 697:5, 707:12, 728:17
**differences** [1] - 562:15
**different** [62] - 438:15, 446:15, 448:16, 482:17, 515:2, 515:3, 521:1, 523:11, 537:6, 556:19, 556:24, 557:17, 558:7, 558:9, 558:15, 558:18, 558:22, 559:6, 559:10, 566:1, 569:18, 578:20, 584:12, 584:13, 584:21, 593:6, 593:12, 610:4, 614:18, 619:19, 622:25, 625:13, 627:5, 630:22, 637:21, 640:13, 662:16, 669:15, 671:19, 682:7, 685:23, 687:13, 688:15, 688:22, 691:7, 695:16, 698:3, 698:8, 698:14, 700:25, 701:18, 702:18, 702:19, 702:24, 703:3, 703:6, 704:19, 725:13, 734:25, 735:9
**differently** [3] - 470:24, 494:13, 697:9
**difficult** [7] - 588:13, 596:14, 628:5, 628:14, 638:15, 638:16, 703:18
**digitally** [1] - 746:7
**digress** [1] - 695:6
**diligence** [2] - 642:11, 652:17
**DIRECT** [5] - 437:12, 513:1, 555:14, 609:9, 621:3
**direct** [21] - 463:2, 519:3, 527:19, 554:3, 554:6, 554:7, 557:19, 571:1, 607:4, 619:13, 636:13, 636:23, 672:23,

686:23, 723:1, 723:4, 742:22, 742:24, 742:25, 743:9, 743:19
**directed** [4] - 553:3, 640:16, 666:1, 668:1
**directing** [1] - 661:6
**direction** [3] - 554:9, 668:24, 679:9
**directly** [16] - 508:25, 519:4, 528:20, 528:24, 547:17, 573:19, 582:6, 582:10, 632:23, 640:2, 645:1, 652:24, 657:23, 667:23, 669:12, 705:1
**director** [1] - 621:17
**disagree** [6] - 458:7, 469:24, 470:5, 486:5, 502:24, 648:18
**disagreeing** [1] - 600:15
**disagreement** [1] - 632:13
**disavowed** [1] - 697:22
**disbelieve** [1] - 490:14
**disclose** [1] - 702:22
**disclosed** [1] - 702:21
**discomfort** [1] - 696:20
**discrepancies** [1] - 626:4
**discuss** [7] - 530:14, 611:22, 612:14, 626:3, 680:21, 684:16, 684:19
**discussed** [6] - 508:23, 616:10, 625:11, 682:4, 699:23, 733:13
**discusses** [1] - 684:18
**discussing** [1] - 616:13
**discussion** [2] - 439:24, 733:17
**disparate** [1] - 631:21
**displaced** [1] - 514:7
**disprove** [1] - 661:13
**dispute** [149] - 447:2, 447:9, 449:10, 449:11, 449:14, 449:17, 449:18, 450:11, 454:11, 454:14, 457:4, 457:16, 459:7, 459:9, 459:20, 461:12, 461:17, 463:2, 464:21, 466:16, 466:22, 467:3, 469:8, 472:1, 472:15, 474:14, 475:6, 475:15, 476:23, 477:13, 478:1, 478:13, 478:25, 482:21, 483:17, 484:8, 484:12, 485:8, 489:25, 496:1, 496:8, 496:10, 496:14, 497:13, 497:24, 498:5, 498:7, 498:9, 498:19, 498:23, 499:7, 499:9, 499:11, 499:13, 500:1, 501:12, 502:1, 502:23, 507:16, 509:16, 509:17, 509:19, 510:10, 515:9, 516:14, 522:9, 525:22, 532:11, 533:20, 533:25, 540:20, 544:20, 545:10, 546:13, 547:16, 547:24, 553:4, 557:13, 562:5, 562:22, 564:4, 576:15, 578:2, 578:4, 579:7, 584:15, 590:2, 593:4, 594:19, 595:3, 595:22, 597:2, 601:6, 602:12, 602:19, 602:20, 602:25, 603:10, 605:7, 605:12, 605:13, 605:15, 605:19, 610:2, 610:4, 610:7, 616:23, 619:4, 619:9, 619:21, 631:2, 633:8, 636:13, 636:24, 639:23, 641:5, 643:20, 644:25, 645:1, 645:10, 651:2, 651:12, 652:7, 658:5, 660:11, 662:8, 662:9, 662:13, 663:13, 663:14, 663:15,

666:4, 668:10, 668:17, 668:22, 669:8, 674:4, 674:14, 716:12, 717:5, 719:4, 722:21, 730:22, 732:4, 738:6, 742:24

**Dispute** [1] - 564:1

**disputed** [22] - 454:22, 456:5, 456:8, 456:15, 456:23, 457:7, 474:15, 561:20, 592:3, 601:17, 606:24, 607:17, 644:9, 644:19, 649:12, 662:24, 666:16, 674:17, 718:19, 722:1, 744:5, 744:19

**disputes** [104] - 446:25, 449:3, 449:18, 454:9, 455:4, 455:9, 460:22, 466:10, 466:19, 466:24, 467:14, 467:16, 468:3, 468:8, 469:4, 469:16, 469:21, 469:22, 470:1, 470:7, 478:6, 487:19, 495:9, 495:16, 495:21, 495:23, 495:25, 496:6, 496:7, 496:12, 496:21, 496:23, 497:6, 497:8, 497:14, 497:18, 497:20, 497:21, 497:24, 498:2, 498:8, 498:15, 498:22, 499:19, 499:25, 500:5, 501:14, 502:4, 502:12, 502:18, 503:7, 503:14, 503:20, 504:7, 504:15, 504:22, 505:23, 505:25, 506:18, 510:16, 514:12, 514:15, 515:21, 525:2, 541:3, 556:22, 557:10, 557:11, 557:16, 598:11, 606:25, 607:4, 607:5, 610:3, 614:1, 616:14, 616:17, 616:18, 616:20, 630:9, 644:16, 644:19, 646:15, 647:23, 652:10, 655:4, 655:8, 659:1, 659:3, 659:7, 659:10, 659:13, 672:8, 672:22, 672:23, 676:23, 677:5, 723:1, 723:4, 742:21, 742:22, 743:1, 743:9

**disputing** [14] - 455:19, 466:20, 467:8, 499:1, 532:17, 591:12, 606:17, 618:1, 650:5, 650:10, 662:21, 663:4, 663:7, 666:16

**disregard** [13] - 682:13, 682:14, 687:17, 687:23, 733:12, 733:14, 733:19, 733:21, 733:23, 734:6, 734:9, 734:20, 734:21

**distinction** [1] - 587:1

**distress** [40] - 683:13, 683:15, 684:9, 684:10, 684:11, 684:24, 685:6, 685:8, 685:20, 686:6, 688:12, 689:24, 690:1, 691:16, 691:17, 693:15, 694:18, 696:20, 698:9, 698:12, 698:16, 698:17, 698:19, 699:4, 699:10, 701:5, 701:17, 701:18, 701:21, 701:23, 702:12, 703:2, 703:7, 704:20, 707:23, 711:18, 741:22, 742:10, 742:11

**District** [4] - 436:20, 688:6, 688:8, 693:10

**DISTRICT** [3] - 435:1, 435:2, 435:17

**district** [2] - 599:8, 699:16

**Division** [1] - 513:19

**division** [6] - 448:6, 469:2, 469:4, 513:24, 642:18, 642:22

**divisions** [4] - 468:14, 538:15, 552:22, 610:4

**divorce** [4] - 645:23, 646:10, 653:3, 658:14

**document** [22] - 505:8, 507:4, 516:2, 529:10, 560:16, 560:19, 561:3, 563:3, 568:15, 571:10, 571:11, 572:23, 576:25, 577:21, 581:3, 583:7, 612:23, 613:3, 630:5, 630:7, 630:17, 630:19

**documentation** [29] - 476:14, 476:16, 505:2, 543:12, 552:5, 562:15, 563:9, 563:10, 563:18, 563:22, 566:7, 567:24, 568:5, 568:18, 569:17, 570:16, 570:18, 572:21, 584:22, 584:24, 591:2, 595:11, 595:12, 595:25, 596:17, 599:4, 604:15, 605:15, 606:20

**documents** [47] - 443:21, 476:1, 477:10, 478:17, 514:14, 515:12, 518:10, 519:9, 525:23, 526:23, 537:11, 537:14, 538:14, 538:19, 540:21, 540:25, 541:11, 542:20, 543:2, 544:17, 544:24, 548:1, 548:7, 552:8, 560:13, 560:23, 574:8, 575:23, 577:12, 577:20, 583:2, 587:13, 595:16, 596:21, 598:5, 613:14, 614:25, 615:8, 630:1, 654:2, 659:19, 671:18, 672:11, 672:16, 676:20, 723:19

**done** [31] - 447:6, 458:23, 463:25, 472:17, 480:14, 519:16, 546:20, 595:2, 595:19, 595:21, 595:25, 596:5, 596:8, 596:10, 596:15, 596:18, 599:3, 600:13, 611:1, 624:13, 640:1, 646:2, 654:21, 667:11, 675:24, 679:1, 679:21, 700:21, 717:7, 734:19

**door** [1] - 518:20

**double** [2] - 657:8, 715:24

**double-check** [1] - 715:24

**doubt** [2] - 500:1, 587:9

**down** [17] - 468:4, 490:6, 512:9, 552:9, 559:6, 591:4, 591:7, 608:14, 620:7, 643:7, 679:25, 688:4, 707:20, 714:20, 715:15, 730:24, 734:3

**downplayed** [1] - 682:25

**draft** [3] - 636:15, 708:7, 744:21

**drafted** [1] - 733:12

**drafts** [1] - 710:17

**draw** [2] - 440:1, 587:1

**drawing** [1] - 691:13

**Drew** [10] - 684:14, 684:16, 684:21, 684:25, 685:1, 685:3, 685:8, 685:9, 688:9, 700:16

**driver's** [23] - 478:23, 516:24, 518:1, 524:24, 525:12, 536:15, 536:17, 537:1, 537:5, 537:9, 550:7, 550:10, 550:11, 565:13, 566:23, 592:4, 598:22, 598:25, 613:15, 614:10, 627:8, 673:16, 673:22

**drop** [1] - 589:7

**due** [4] - 524:5, 628:13, 642:11, 652:17

**duly** [5] - 437:10, 512:18, 555:7, 609:3,

620:21

**during** [8] - 559:1, 562:2, 562:25, 623:6, 626:8, 687:2, 714:3, 714:5

**duties** [7] - 619:8, 619:17, 619:24, 645:22, 648:22, 652:4, 726:5

**duty** [7] - 644:18, 645:11, 646:11, 652:6, 659:18, 669:6, 739:8

# E

**e-mail** [4] - 514:12, 570:24, 712:4, 712:16

**eager** [1] - 536:1

**early** [2] - 522:24, 622:2

**easier** [1] - 703:13

**easily** [7] - 502:9, 502:15, 502:17, 505:5, 626:18, 631:2

**easy** [6] - 626:11, 627:1, 628:22, 654:20, 732:17, 737:24

**Ebron** [4] - 459:19, 464:22, 651:1, 651:15

**economic** [7] - 683:12, 683:23, 686:10, 697:21, 697:23, 711:17

**economy** [1] - 704:21

**edited** [1] - 739:20

**education** [1] - 559:14

**effect** [6] - 565:17, 571:2, 573:23, 576:5, 588:23, 697:9

**effective** [5] - 560:8, 561:6, 577:7, 638:10, 638:11

**efficiencies** [1] - 569:23

**efficient** [1] - 560:8

**effort** [8] - 530:3, 614:2, 653:2, 656:13, 671:3, 671:6, 685:14

**efforts** [1] - 667:11

**eight** [1] - 623:11

**eighties** [1] - 688:25

**either** [14] - 520:11, 522:25, 529:21, 537:19, 576:2, 599:14, 603:20, 675:5, 682:12, 721:14, 723:10, 728:7, 733:15, 734:6

**elaborate** [1] - 507:24

**element** [1] - 693:12

**Elements** [1] - 730:13

**eliminate** [1] - 712:20

**emotion** [1] - 702:17

**emotional** [36] - 683:13, 683:14, 683:15, 684:9, 684:24, 685:5, 685:8, 685:20, 686:6, 688:12, 689:24, 689:25, 691:16, 691:17, 696:20, 698:9, 698:11, 698:16, 698:19, 699:4, 699:10, 701:5, 701:16, 701:17, 701:20, 701:23, 702:12, 703:1, 703:7, 704:19, 707:23, 711:18, 741:22, 742:10, 742:11

**employee** [1] - 559:2

**employees** [6] - 459:3, 461:24, 505:12, 514:19, 558:14, 655:6

**employer** [2] - 513:7, 555:17

**empower** [1] - 631:21

enclosing [1] - 591:12
encouraged [1] - 529:22
end [17] - 473:25, 513:18, 522:10,
  557:5, 589:12, 610:5, 626:16, 647:3,
  661:21, 708:16, 716:10, 717:22,
  721:23, 724:16, 740:1, 743:4
ends [2] - 532:11, 563:20
engage [1] - 616:3
engaged [2] - 572:20, 651:7
ensuring [1] - 601:12
entail [1] - 634:8
entailing [1] - 733:15
entered [2] - 443:24, 464:4
enters [1] - 554:23
entire [1] - 447:25
entirely [3] - 521:21, 698:6, 720:19
entirety [1] - 471:15
entities [1] - 631:5
entitled [7] - 662:1, 668:13, 684:9,
  691:17, 691:19, 711:16, 725:14
entity [1] - 454:1
entry [5] - 465:9, 520:15, 520:21, 545:6,
  549:19
Equifax [33] - 449:17, 482:16, 485:23,
  486:6, 486:10, 486:20, 487:2, 487:6,
  487:8, 487:21, 488:24, 493:11, 592:4,
  609:16, 609:23, 610:1, 683:21,
  691:23, 692:14, 695:9, 695:12,
  695:17, 695:18, 695:19, 700:16,
  724:12, 725:18, 725:24, 726:8,
  726:17, 730:24, 730:25
EQUIFAX [1] - 435:6
equipped [1] - 629:20
equity [1] - 468:19
era [1] - 478:10
error [6] - 720:14, 720:15, 723:6,
  723:10, 723:13, 728:4
errors [1] - 626:14
escalate [2] - 530:14, 582:20
escalated [2] - 453:10, 607:14
escort [1] - 500:17
especially [5] - 637:5, 638:16, 717:18,
  723:7, 736:10
essence [1] - 482:20
essentially [4] - 443:13, 443:14, 450:20,
  540:15
establish [2] - 661:15, 720:7
established [8] - 480:5, 491:7, 493:15,
  638:2, 663:21, 688:4, 688:11, 695:7
establishes [1] - 661:4
estimate [1] - 448:24
estimation [1] - 625:3
et [1] - 583:5
Evan [1] - 668:21
evening [1] - 680:23
event [2] - 704:13, 739:4
events [4] - 597:12, 597:24, 704:7,
  704:13
eventuality [1] - 588:3

eventually [1] - 540:21
evidence [44] - 448:4, 465:14, 501:17,
  504:20, 529:25, 538:20, 540:22,
  543:24, 571:22, 578:7, 578:9, 578:10,
  589:4, 597:1, 617:25, 647:9, 660:1,
  660:23, 680:11, 683:19, 684:3, 684:7,
  685:12, 687:16, 687:21, 690:7,
  691:20, 693:18, 693:25, 694:8, 695:8,
  696:8, 697:8, 697:25, 700:7, 700:9,
  701:11, 706:14, 714:13, 715:5, 715:6,
  723:15, 734:24
evil [2] - 736:7, 736:16
exact [3] - 497:8, 515:18, 599:24
exactly [13] - 516:21, 525:25, 538:7,
  547:3, 547:7, 548:6, 667:14, 669:7,
  694:14, 694:15, 706:6, 715:6, 723:14
exam [5] - 454:5, 531:18, 584:5, 618:25,
  643:15
examination [2] - 553:10, 553:12
EXAMINATION [14] - 437:12, 454:7,
  505:20, 513:1, 531:20, 548:14,
  555:14, 584:7, 608:1, 609:9, 619:1,
  621:3, 643:17, 678:17
examined [5] - 437:10, 512:18, 555:7,
  609:3, 620:21
example [5] - 521:8, 615:2, 615:16,
  643:3, 647:15, 660:17, 661:23, 698:2,
  698:23, 714:4, 719:17
examples [1] - 556:16
except [5] - 472:23, 653:16, 684:17,
  688:20, 708:16
exception [4] - 521:8, 615:1, 615:5,
  724:5
exceptions [1] - 481:20
exchange [1] - 642:25
excluded [1] - 713:16
excuse [1] - 451:13
excused [7] - 553:20, 608:15, 608:19,
  620:8, 620:13, 680:1, 680:5
executed [1] - 663:10
executive [1] - 624:7
exercise [1] - 691:5
exhibit [13] - 442:14, 444:6, 445:25,
  515:14, 519:12, 527:25, 564:25,
  568:25, 572:22, 574:4, 580:10,
  633:16, 713:16
Exhibit [87] - 437:22, 438:16, 439:20,
  441:12, 441:14, 443:8, 445:17, 446:1,
  450:1, 451:16, 452:15, 453:3, 453:17,
  467:19, 474:18, 477:1, 482:10,
  482:11, 484:3, 485:5, 489:22, 490:4,
  490:6, 490:22, 492:22, 493:6, 493:20,
  494:7, 500:23, 504:15, 506:12,
  506:22, 507:13, 508:10, 515:13,
  515:24, 516:1, 516:8, 516:9, 516:10,
  517:16, 519:11, 521:5, 521:19, 523:5,
  525:19, 527:2, 527:24, 528:16,
  547:13, 549:3, 549:4, 552:13, 560:17,
  561:13, 562:1, 568:16, 568:25, 571:4,
  575:15, 576:21, 577:15, 577:24,

579:2, 579:4, 579:22, 580:7, 581:15,
  582:9, 582:10, 583:3, 583:4, 598:7,
  611:19, 630:2, 633:15, 634:1, 635:7,
  635:8, 635:11, 635:24, 636:1, 636:12,
  637:2, 639:14, 641:10
exhibits [4] - 467:22, 467:23, 476:17,
  714:5
exist [1] - 522:19
existed [2] - 501:15, 502:5
existing [1] - 622:14
expect [5] - 505:12, 507:6, 554:3,
  668:14, 680:16
expectation [3] - 549:9, 653:9, 656:16
expected [2] - 486:11, 550:3
Experian [9] - 449:18, 695:9, 726:9,
  726:18, 726:21, 726:22, 726:24,
  727:2, 730:25
experience [20] - 558:7, 558:12, 603:23,
  609:15, 621:24, 623:12, 623:22,
  623:24, 624:22, 624:24, 629:13,
  629:19, 630:18, 631:6, 632:3, 633:5,
  637:4, 639:21, 644:5, 654:25
expert [15] - 495:8, 540:4, 559:9,
  610:20, 610:23, 611:2, 611:3, 623:5,
  623:9, 624:13, 624:18, 625:24, 661:8,
  691:5
experts [6] - 554:5, 558:17, 616:9,
  616:13, 616:24, 682:7
explain [8] - 453:8, 453:19, 464:13,
  584:18, 604:3, 612:21, 613:11, 729:22
Explain [1] - 676:11
explained [2] - 604:4, 658:24
explains [1] - 582:12
explanation [2] - 675:9, 675:16
explanations [1] - 723:8
expression [1] - 638:1
expressly [1] - 688:17
extended [1] - 670:15
extension [5] - 518:25, 519:2, 527:19,
  581:22, 670:23
extensive [1] - 621:6
extent [2] - 656:11, 684:11
extra [1] - 551:16
eye [1] - 536:22
eyes [2] - 479:13, 530:21

F

F.3d [1] - 716:14
FAA [4] - 683:2, 683:4, 683:5, 683:10
facilitate [2] - 562:15, 570:23
fact [46] - 441:4, 446:19, 463:24,
  491:14, 491:22, 502:21, 510:6,
  511:16, 538:25, 567:11, 593:3, 597:8,
  597:23, 603:25, 604:17, 604:23,
  616:25, 617:18, 630:25, 636:23,
  636:24, 653:1, 661:6, 661:12, 668:20,
  672:22, 673:21, 687:19, 687:23,
  691:9, 700:9, 701:7, 701:11, 707:6,
  710:18, 710:19, 712:14, 712:15,

712:22, 713:6, 713:8, 714:13, 731:8, 731:15, 731:16

**factor** [8] - 689:1, 689:2, 689:10, 708:3, 708:18, 708:22, 709:2, 711:12

**factors** [3] - 507:17, 635:3, 648:20

**facts** [11] - 501:16, 671:8, 685:11, 685:12, 685:16, 688:21, 706:2, 710:15, 713:6, 718:9, 719:12

**factual** [1] - 707:12

**failed** [4] - 476:8, 623:7, 645:16, 728:16

**failure** [3] - 729:20, 729:21, 737:25

**fair** [6] - 472:14, 474:3, 538:8, 540:19, 544:16, 731:22

**Fair** [34] - 454:18, 474:6, 609:17, 610:10, 610:13, 610:21, 619:3, 623:19, 623:21, 649:10, 655:22, 658:7, 676:18, 690:23, 718:18, 719:5, 719:15, 719:21, 721:25, 722:14, 724:21, 726:4, 727:14, 727:20, 729:6, 729:9, 730:8, 730:10, 732:8, 734:19, 737:20, 738:1, 738:4

**fairly** [13] - 583:4, 615:20, 622:15, 626:11, 626:18, 631:6, 631:23, 637:4, 640:1, 673:1, 677:16, 695:15, 725:19

**fairness** [1] - 728:2

**fake** [3] - 567:15, 567:16, 567:18

**fall** [8] - 484:5, 493:1, 522:24, 597:6, 600:13, 698:15, 698:18

**false** [1] - 692:23

**falsify** [1] - 604:7

**familiar** [7] - 560:14, 564:7, 619:7, 619:10, 623:20, 624:14, 629:8

**familiarize** [1] - 560:1

**family** [1] - 639:3

**far** [30] - 499:25, 514:21, 516:12, 516:20, 525:16, 530:7, 537:21, 540:7, 540:17, 540:23, 541:1, 541:4, 542:19, 542:20, 546:11, 546:15, 553:3, 580:14, 600:16, 629:11, 657:15, 678:8, 687:25, 689:11, 691:21, 698:20, 698:23, 737:5, 744:22

**FARGO** [2] - 435:6, 436:15

**Fargo** [236] - 437:15, 447:1, 448:5, 448:9, 448:11, 448:13, 448:17, 449:19, 449:21, 450:5, 451:11, 451:20, 453:13, 454:20, 455:5, 455:9, 455:15, 457:3, 458:4, 458:13, 460:13, 460:16, 461:11, 461:17, 461:18, 461:24, 462:8, 462:21, 462:24, 463:11, 463:15, 465:4, 465:10, 466:10, 466:16, 467:4, 468:12, 468:14, 468:25, 469:1, 469:10, 469:17, 469:21, 470:2, 472:24, 473:17, 474:13, 475:3, 478:5, 479:1, 479:19, 480:16, 481:2, 482:12, 482:22, 483:6, 483:23, 486:11, 487:3, 487:13, 487:21, 488:16, 488:23, 490:1, 491:2, 491:9, 492:17, 493:9, 493:11, 493:23, 494:4, 495:16, 496:13, 498:2, 498:4, 499:23, 504:21,

508:6, 513:8, 513:9, 513:10, 513:15, 513:17, 513:21, 513:23, 514:9, 515:4, 515:16, 521:7, 523:7, 523:22, 525:14, 526:7, 529:7, 532:17, 538:1, 538:4, 538:11, 538:15, 539:13, 539:14, 544:25, 547:17, 547:23, 548:2, 550:22, 552:14, 552:17, 552:22, 555:18, 555:21, 555:22, 556:4, 556:5, 556:17, 557:16, 557:20, 558:17, 558:21, 566:4, 568:6, 571:11, 571:17, 574:6, 580:9, 580:17, 580:25, 581:19, 583:8, 585:13, 585:18, 586:4, 588:21, 589:2, 589:7, 589:17, 590:8, 590:13, 590:19, 590:22, 591:13, 591:15, 591:19, 591:24, 592:4, 592:17, 592:19, 594:3, 594:5, 597:2, 601:12, 602:10, 606:8, 606:14, 606:22, 606:25, 607:2, 607:3, 607:7, 611:4, 611:11, 614:15, 616:6, 618:21, 627:16, 630:11, 632:8, 634:12, 636:18, 639:18, 640:14, 642:18, 642:24, 644:16, 644:18, 645:15, 647:7, 647:19, 649:2, 649:11, 649:18, 650:4, 650:7, 650:24, 652:4, 652:5, 652:10, 655:3, 655:6, 656:5, 656:9, 659:1, 659:6, 659:22, 660:10, 660:23, 662:13, 662:19, 662:25, 663:5, 663:17, 664:3, 664:25, 665:1, 665:14, 665:24, 669:5, 670:1, 670:20, 672:11, 672:16, 674:3, 674:10, 674:18, 674:23, 675:1, 679:19, 679:21, 682:1, 682:2, 682:4, 689:16, 689:19, 689:21, 695:14, 695:18, 702:23, 713:8, 713:11, 719:17, 736:7, 736:8, 742:17, 743:24

**Fargo's** [35] - 440:17, 447:18, 456:7, 457:12, 460:19, 466:4, 473:1, 473:9, 474:3, 479:13, 482:14, 482:22, 484:14, 484:25, 485:11, 489:16, 490:17, 492:5, 493:3, 494:8, 504:13, 518:4, 544:14, 548:17, 584:14, 596:10, 619:24, 630:25, 645:11, 648:6, 652:2, 658:1, 659:11, 676:19, 689:3

**favor** [1] - 735:23

**favorable** [1] - 700:7

**fax** [1] - 570:25

**faxed** [2] - 519:24, 549:20

**FBI** [1] - 558:17

**FCRA** [40] - 454:10, 457:13, 473:3, 473:11, 473:14, 473:18, 474:2, 498:13, 619:16, 623:22, 630:20, 631:15, 643:19, 644:7, 644:25, 646:11, 658:5, 679:13, 679:19, 679:22, 682:9, 682:23, 683:6, 683:24, 686:10, 688:1, 688:13, 688:24, 689:9, 693:10, 698:22, 709:1, 709:2, 717:16, 733:21, 733:23, 735:4, 735:16, 738:16, 738:18

**FDIC** [2] - 621:19, 623:4

**February** [6] - 450:14, 463:5, 477:4, 666:5, 671:11, 671:17

**Federal** [2] - 621:19, 623:4

**feelings** [1] - 625:6

**fell** [1] - 699:1

**felt** [1] - 672:5

**few** [13] - 444:13, 460:10, 490:11, 494:20, 502:7, 510:11, 515:14, 558:15, 598:2, 621:21, 715:14, 730:14

**FICO** [1] - 609:17

**fide** [2] - 499:13, 662:13

**fields** [1] - 508:1

**Fifth** [2] - 436:9, 436:17

**figure** [6] - 560:9, 593:13, 668:4, 715:10, 718:22, 723:11

**file** [10] - 523:16, 538:25, 634:9, 646:8, 647:24, 648:2, 665:5, 671:5, 681:1, 694:24

**filed** [9] - 498:8, 546:5, 546:9, 568:2, 585:24, 586:1, 600:8, 683:21, 738:17

**files** [3] - 574:9, 617:11, 627:4

**filing** [1] - 675:24

**filings** [1] - 681:12

**fill** [2] - 519:25, 549:20

**filled** [2] - 445:12, 612:24

**filter** [3] - 505:25, 557:16, 662:17

**filtered** [1] - 499:10

**filtering** [2] - 505:23, 662:10

**final** [5] - 527:18, 561:8, 582:21, 587:14, 689:18

**finalize** [1] - 605:17

**finalized** [2] - 607:12, 660:7

**finally** [2] - 594:5, 676:12

**finance** [5] - 609:19, 609:20, 622:3, 622:4, 626:7

**financial** [2] - 625:4, 626:10

**Financial** [1] - 735:6

**fine** [8] - 544:4, 608:16, 675:13, 722:16, 729:18, 740:5, 741:12, 744:2

**finish** [1] - 467:21

**finished** [1] - 493:17

**finishing** [1] - 633:25

**firewalls** [1] - 643:8

**firmly** [1] - 661:4

**First** [2] - 436:12, 621:10

**first** [82] - 442:15, 462:15, 462:17, 475:5, 477:25, 496:8, 498:6, 507:15, 512:18, 513:14, 516:8, 519:13, 524:20, 529:2, 529:6, 532:24, 532:25, 533:2, 533:5, 533:8, 539:25, 540:5, 540:6, 541:21, 555:7, 556:11, 559:2, 559:4, 560:3, 561:1, 563:3, 576:12, 582:11, 592:21, 609:3, 613:23, 615:7, 620:21, 621:10, 630:2, 634:6, 637:11, 639:16, 641:20, 648:14, 667:5, 670:11, 670:13, 682:21, 689:4, 689:14, 700:6, 705:24, 708:23, 710:2, 710:6, 715:4, 715:8, 716:10, 716:16, 716:21, 719:7, 720:13, 720:14, 721:16, 721:24, 724:3, 725:12,

725:14, 726:24, 727:3, 729:15, 729:23, 730:19, 732:12, 732:20, 737:5, 739:20, 739:22, 743:4, 744:12, 744:14

**fit** [1] - 713:25

**fits** [1] - 739:21

**five** [16] - 449:6, 466:10, 494:4, 503:12, 510:14, 513:25, 551:4, 580:17, 609:24, 651:22, 652:18, 672:23, 681:8, 695:3, 695:13, 695:16

**fix** [4] - 594:5, 594:7, 667:13, 685:14

**flag** [9] - 495:12, 508:11, 564:13, 564:14, 564:17, 616:14, 616:18, 616:23

**flagged** [1] - 508:5

**flags** [3] - 496:7, 558:11, 564:16

**flash** [1] - 515:12

**flexible** [1] - 495:3

**flip** [1] - 502:17

**flipping** [1] - 573:21

**flood** [1] - 466:24

**Floor** [1] - 436:18

**Flow** [7] - 569:8, 577:3, 578:17, 578:18, 578:25, 591:10

**focus** [3] - 453:11, 653:22, 685:1

**focused** [2] - 558:9, 611:13

**focuses** [1] - 627:24

**focusing** [1] - 558:7

**folks** [1] - 592:10

**follow** [22] - 441:5, 441:6, 466:4, 470:3, 470:6, 470:10, 471:9, 472:13, 474:5, 487:10, 496:17, 498:6, 502:25, 509:11, 521:14, 525:7, 573:24, 584:20, 589:16, 668:6, 712:10, 715:23

**follow-up** [2] - 525:7, 712:10

**followed** [38] - 457:3, 457:15, 457:20, 458:4, 458:7, 458:13, 459:12, 459:17, 459:23, 460:13, 470:13, 473:10, 473:17, 483:6, 483:24, 487:20, 490:17, 503:14, 503:15, 503:20, 504:3, 504:7, 504:8, 504:10, 504:15, 504:19, 504:21, 505:11, 598:11, 598:12, 598:15, 607:3, 635:25, 648:6, 654:22, 688:20, 696:19, 733:8

**following** [16] - 442:10, 470:2, 473:6, 473:14, 474:1, 484:25, 489:7, 522:25, 595:24, 607:7, 610:17, 654:5, 725:15, 732:20, 732:21, 741:24

**follows** [10] - 437:10, 469:25, 473:2, 512:18, 555:7, 573:6, 609:3, 620:21, 730:21, 739:23

**footnote** [1] - 688:19

**FOR** [3] - 435:2, 436:2, 436:14

**forces** [1] - 625:6

**foreclose** [1] - 582:24

**foregoing** [1] - 746:4

**Foremost** [1] - 695:9

**foreseeability** [1] - 686:23

**foreseeable** [1] - 667:7

**form** [24] - 452:18, 477:17, 478:5,

478:13, 510:1, 516:3, 518:1, 539:1, 547:13, 563:23, 563:25, 564:1, 565:8, 573:2, 584:24, 599:19, 600:9, 639:21, 639:22, 640:11, 642:8, 689:17, 689:18, 729:25

**formal** [1] - 517:6

**formally** [1] - 522:18

**format** [1] - 482:17

**forms** [5] - 509:25, 526:20, 556:19, 627:18, 637:22

**forth** [4] - 571:19, 622:23, 627:1, 627:4

**forward** [20] - 452:13, 461:21, 472:12, 475:21, 475:23, 475:25, 489:11, 508:18, 529:24, 529:25, 535:3, 541:19, 543:25, 565:6, 569:6, 569:20, 631:3, 641:9, 656:3, 675:20

**forwarded** [22] - 455:5, 476:2, 476:9, 476:11, 476:15, 476:19, 524:4, 524:7, 524:14, 525:24, 526:4, 579:9, 579:14, 592:4, 593:4, 593:9, 593:25, 601:2, 606:25, 608:4, 641:24, 669:5

**Foster** [1] - 683:2

**foundation** [1] - 495:5

**founded** [1] - 622:12

**four** [34] - 482:7, 510:14, 513:25, 527:11, 527:12, 541:10, 541:23, 542:24, 543:1, 543:2, 547:13, 548:1, 548:7, 551:3, 551:6, 565:8, 580:16, 580:21, 585:5, 585:7, 611:16, 612:5, 612:9, 612:12, 612:16, 617:11, 640:20, 666:17, 668:2, 677:7, 682:7, 695:3, 729:3

**fourth** [2] - 527:13, 585:12

**frame** [6] - 449:7, 522:23, 550:17, 561:24, 590:4, 744:9

**frankly** [1] - 643:9

**Fransen** [1] - 436:15

**FRANSEN** [76] - 437:6, 437:13, 437:21, 437:24, 438:16, 438:18, 439:7, 439:10, 439:20, 439:22, 440:8, 440:11, 440:23, 441:14, 441:16, 441:21, 441:22, 442:13, 442:16, 442:20, 442:22, 443:7, 443:9, 443:16, 443:18, 444:6, 444:9, 444:16, 444:18, 444:25, 445:2, 445:5, 445:6, 445:17, 445:19, 446:2, 446:4, 446:8, 446:10, 450:1, 450:2, 451:1, 451:3, 451:16, 451:18, 452:16, 452:17, 453:3, 453:4, 453:17, 453:18, 454:4, 456:10, 456:25, 458:5, 467:5, 473:4, 474:23, 477:20, 486:24, 495:5, 501:16, 505:18, 505:21, 506:15, 512:8, 609:10, 611:19, 611:20, 612:8, 612:11, 618:24, 619:12, 620:6, 620:9, 635:9

**fraud** [414] - 438:5, 438:24, 439:4, 439:18, 439:24, 440:4, 440:6, 440:15, 440:18, 442:25, 443:1, 443:2, 443:3, 443:6, 444:21, 445:10, 446:13, 446:14, 446:18, 446:22, 451:13,

451:24, 452:6, 452:11, 452:14, 453:24, 455:24, 456:2, 456:3, 456:21, 457:18, 457:19, 458:16, 458:18, 458:21, 458:23, 458:25, 459:7, 459:25, 460:2, 460:4, 460:5, 460:7, 460:24, 461:2, 461:4, 461:9, 461:14, 461:22, 462:3, 462:12, 462:13, 462:14, 463:4, 463:8, 463:14, 463:20, 463:24, 464:4, 464:7, 464:11, 464:13, 464:15, 465:24, 466:1, 466:2, 472:10, 472:11, 472:16, 472:17, 472:22, 472:23, 473:25, 475:19, 475:22, 475:23, 476:1, 476:2, 476:3, 476:4, 476:12, 476:19, 480:10, 480:14, 480:16, 480:21, 481:7, 481:8, 481:23, 482:5, 482:7, 483:14, 483:16, 484:13, 484:17, 485:3, 485:15, 485:24, 486:2, 486:18, 486:20, 487:16, 488:1, 489:10, 491:12, 491:19, 491:23, 491:24, 492:1, 492:9, 492:13, 493:13, 493:16, 494:1, 494:3, 494:14, 494:23, 494:25, 496:16, 502:10, 502:15, 502:18, 505:5, 505:6, 508:5, 508:11, 508:13, 508:17, 508:21, 508:22, 508:23, 508:24, 508:25, 509:6, 509:11, 510:3, 510:4, 510:23, 511:10, 511:12, 511:13, 512:1, 512:5, 514:2, 514:3, 514:5, 514:10, 514:14, 514:16, 514:18, 515:1, 515:5, 515:8, 515:16, 517:5, 517:14, 518:7, 518:12, 519:1, 521:24, 522:3, 523:7, 523:9, 523:14, 523:15, 525:1, 525:14, 526:4, 526:19, 528:11, 528:14, 530:6, 530:8, 530:11, 531:4, 531:7, 531:24, 531:25, 532:1, 532:4, 532:6, 532:12, 532:18, 532:20, 532:22, 535:4, 536:25, 540:19, 541:12, 541:19, 542:25, 543:3, 543:13, 543:25, 545:10, 545:19, 546:13, 546:16, 546:17, 546:21, 547:2, 547:10, 547:17, 547:20, 550:22, 551:2, 551:6, 551:20, 552:2, 552:14, 552:20, 552:22, 552:25, 553:4, 553:15, 555:22, 555:24, 556:6, 556:10, 556:11, 556:16, 556:17, 556:20, 556:21, 557:9, 557:13, 557:24, 558:2, 558:5, 558:6, 558:8, 558:11, 558:13, 558:18, 558:22, 559:2, 559:23, 560:1, 560:24, 561:4, 562:10, 562:11, 562:13, 565:21, 566:3, 571:6, 571:21, 572:25, 574:9, 574:10, 574:12, 574:21, 576:4, 576:17, 576:18, 577:10, 578:21, 579:9, 579:10, 579:14, 580:21, 581:23, 582:25, 583:9, 583:13, 585:3, 586:12, 586:19, 587:1, 587:10, 588:23, 590:3, 590:6, 590:25, 593:4, 593:15, 593:17, 593:19, 593:25, 594:17, 594:19, 594:22, 597:2, 597:8, 597:11, 600:23, 601:2, 601:6, 601:20, 601:23, 601:24, 605:19, 607:3, 608:4, 608:7, 608:10, 610:8, 611:12, 612:20,

613:1, 614:1, 615:6, 615:7, 617:8,
627:17, 627:18, 627:20, 627:23,
628:7, 628:17, 629:11, 629:13,
629:18, 629:21, 630:9, 631:3, 631:8,
631:13, 631:14, 631:19, 631:20,
632:3, 632:10, 632:19, 632:25,
634:14, 634:17, 634:20, 634:23,
635:6, 635:12, 635:16, 635:19, 636:4,
636:8, 636:19, 636:22, 637:3, 637:12,
637:16, 637:17, 637:18, 639:9,
639:10, 640:3, 643:5, 645:7, 645:18,
645:24, 646:8, 646:9, 646:11, 646:21,
647:4, 648:4, 649:19, 650:21, 651:6,
651:8, 651:20, 651:25, 652:15,
652:22, 653:1, 653:5, 653:6, 653:15,
654:12, 654:25, 655:3, 655:7, 655:13,
655:16, 657:4, 657:17, 657:25,
658:11, 662:6, 663:25, 665:8, 665:12,
665:17, 666:12, 666:18, 666:19,
666:20, 667:1, 668:13, 668:25,
669:12, 670:8, 671:14, 673:15, 674:3,
676:2, 677:15, 678:10, 679:6, 679:8,
679:19, 719:20, 719:25
**fraudster** [1] - 550:7
**fraudster's** [2] - 550:11, 550:25
**fraudsters** [2] - 567:12, 567:13
**fraudulent** [26] - 456:23, 456:24,
460:20, 461:1, 483:24, 484:15, 485:1,
485:12, 485:16, 487:22, 490:18,
490:19, 492:19, 493:4, 493:10,
493:24, 494:9, 607:8, 646:17, 646:20,
653:12, 658:24, 659:7, 659:8, 659:11,
694:10
**fraudulently** [1] - 465:19
**frequently** [1] - 563:15
**frivolous** [3] - 498:4, 498:13, 499:7
**front** [4] - 513:18, 557:5, 657:20
**frustrated** [3] - 640:21, 668:5, 685:15
**frustrates** [1] - 667:7
**frustrating** [4] - 639:24, 648:20, 671:4,
677:1
**FTC** [4] - 492:13, 575:21, 580:18,
612:24
**fulfilled** [3] - 457:14, 648:23, 648:25
**full** [1] - 623:9
**fuller** [1] - 436:8
**fun** [2] - 582:5, 624:6
**function** [4] - 622:8, 639:13, 678:25,
679:5
**funded** [2] - 556:14, 562:12
**funders** [1] - 557:1
**Funsch** [5] - 442:2, 442:4, 459:24,
460:9, 490:9
**furnished** [1] - 623:18
**furnisher** [15] - 499:9, 575:22, 626:6,
626:20, 627:10, 628:1, 628:14, 639:6,
646:23, 647:1, 648:22, 649:11,
659:19, 679:14
**furnisher's** [2] - 718:19, 721:25
**furnishers** [8] - 454:20, 524:19, 526:8,

580:19, 619:8, 619:17, 629:4, 644:8
**furnishing** [2] - 622:10, 622:23
**fuzzy** [2] - 439:11, 703:8

## G

**GA** [1] - 436:4
**gain** [1] - 558:11
**game** [1] - 731:22
**gamut** [1] - 622:5
**garden** [3] - 699:4, 699:5, 699:7
**gather** [1] - 572:14
**Gee** [2] - 654:21, 671:15
**general** [3] - 531:24, 562:10, 718:15
**generalized** [1] - 698:18
**generally** [7] - 506:17, 523:14, 568:6,
572:17, 576:25, 596:12, 632:4
**generate** [1] - 633:10
**given** [9] - 481:8, 486:2, 667:1, 694:3,
698:7, 702:5, 708:12, 734:16, 736:14
**goal** [3] - 594:21, 659:9, 662:16
**goals** [1] - 630:20
**Gobin** [1] - 486:6
**Gorman** [11] - 716:13, 716:24, 717:3,
717:6, 717:10, 717:18, 718:25,
720:21, 720:24, 721:12, 721:20
**government** [6] - 565:13, 566:16,
566:18, 576:2, 581:6, 613:15
**government-issued** [3] - 566:16,
566:18, 576:2
**graduated** [1] - 621:9
**grant** [2] - 702:4, 704:4
**great** [8] - 474:24, 625:5, 642:9, 671:22,
685:13, 685:14, 702:12
**greater** [2] - 682:15, 734:1
**Greenville** [3] - 515:7, 518:15, 518:20
**Grier** [5] - 459:3, 459:6, 464:22, 651:1,
651:10
**ground** [2] - 622:13, 624:6
**Group** [1] - 735:6
**group** [6] - 453:9, 622:7, 627:24, 635:6,
643:3, 643:4
**groups** [4] - 515:3, 558:19, 628:25,
643:8
**guess** [17] - 450:24, 466:18, 489:6,
489:18, 504:23, 522:24, 604:16,
624:19, 640:21, 664:2, 671:21, 719:7,
725:1, 729:2, 729:22, 732:1, 736:21
**guidance** [3] - 630:11, 719:11, 721:18
**guilty** [9] - 465:11, 491:6, 589:4, 589:11,
615:4, 617:1, 647:8, 653:12, 660:4
**Guimond** [2] - 688:2, 688:17
**GUIMOND** [1] - 688:3
**guy** [4] - 609:21, 617:1, 661:17, 693:1
**guys** [1] - 510:17

## H

**hair** [1] - 536:22
**half** [2] - 554:7, 623:8

**hallway** [1] - 552:9
**ham** [1] - 732:17
**hand** [5] - 512:14, 520:22, 555:3,
608:23, 620:17
**handed** [1] - 523:20
**handicapped** [1] - 687:9
**handle** [6] - 461:10, 461:24, 509:15,
509:18, 509:19, 525:2
**handled** [8] - 462:5, 462:8, 469:22,
469:23, 584:16, 584:19, 600:25, 679:6
**handles** [1] - 453:10
**handling** [3] - 530:11, 607:4, 607:5
**handwritten** [1] - 476:18
**hang** [2] - 669:17, 716:18
**happy** [3] - 467:23, 513:5, 740:14
**hard** [2] - 492:25, 703:15
**harder** [1] - 638:4
**hardly** [1] - 639:7
**harm** [3] - 731:11, 732:18, 733:15
**harmful** [1] - 684:5
**Hartford** [1] - 735:6
**hate** [1] - 570:4
**head** [9] - 475:11, 501:12, 501:13,
501:25, 502:3, 507:7, 622:17, 652:19,
702:14
**headed** [1] - 622:6
**headnotes** [1] - 651:8
**hear** [11] - 445:15, 495:13, 541:7,
598:18, 619:14, 680:11, 680:17,
709:15, 720:12, 729:16, 744:11
**heard** [35] - 442:3, 448:4, 455:14, 486:6,
487:2, 490:9, 495:8, 506:6, 540:4,
615:16, 616:2, 616:9, 626:21, 628:9,
629:7, 631:25, 632:8, 639:15, 639:20,
641:2, 642:16, 646:19, 650:23,
651:12, 655:13, 672:1, 680:10, 682:7,
691:21, 692:6, 692:9, 695:24, 726:16,
734:10, 742:21
**hearing** [2] - 711:19, 738:17
**height** [1] - 536:19
**held** [8] - 465:14, 556:6, 588:25, 589:4,
596:13, 660:1, 683:25
**hello** [1] - 531:23
**help** [7] - 560:10, 572:18, 582:4, 605:2,
605:6, 612:8, 614:10
**helped** [1] - 624:8
**helpful** [1] - 613:16
**helping** [5] - 572:13, 572:20, 604:14,
656:3, 656:10
**helps** [5] - 568:4, 569:23, 569:24, 581:9,
661:15
**hence** [1] - 650:21
**Hendricks** [5] - 455:2, 644:11, 658:19,
658:24, 668:21
**HERNANDEZ** [1] - 435:16
**herself** [2] - 615:11, 615:14
**high** [1] - 733:15
**higher** [3] - 559:21, 628:25, 682:9
**highlight** [1] - 437:22

**highly** [2] - 532:6, 660:20
**himself** [2] - 638:5, 640:12
**hindrance** [1] - 643:1
**hindsight** [4] - 654:20, 660:19, 717:23, 721:7
**hired** [7] - 571:16, 610:2, 610:22, 610:24, 611:4, 611:6, 611:8
**historical** [1] - 560:12
**historically** [1] - 626:6
**history** [2] - 621:6, 735:11
**hit** [1] - 633:12
**hitting** [1] - 643:6
**holding** [1] - 734:8
**Hollomon** [3] - 445:14, 445:15, 445:24
**home** [2] - 448:18, 468:19
**homework** [2] - 709:11, 709:14
**honest** [2] - 692:19, 695:25
**Honor** [54] - 437:6, 457:24, 548:12, 553:8, 554:17, 554:21, 555:1, 579:11, 608:16, 680:2, 680:7, 680:9, 681:13, 681:16, 687:8, 687:15, 690:2, 693:20, 694:22, 695:1, 695:15, 698:25, 703:1, 705:17, 707:22, 708:7, 709:12, 710:4, 710:18, 710:24, 712:10, 713:1, 713:14, 718:24, 720:18, 722:24, 725:25, 726:11, 727:4, 728:2, 728:6, 728:19, 729:19, 731:5, 735:3, 735:15, 736:2, 736:21, 737:18, 738:9, 738:15, 739:7, 741:9, 742:17
**HONORABLE** [1] - 435:16
**hope** [1] - 696:19
**hour** [2] - 553:21, 553:23
**hours** [3] - 554:7, 570:16
**house** [4] - 627:9, 705:10, 705:11, 706:19
**housing** [1] - 703:11
**hundred** [1] - 568:11
**hundreds** [1] - 469:16

---

**I**

**ID** [47] - 438:21, 439:14, 441:25, 442:25, 444:21, 445:9, 445:21, 446:12, 447:11, 447:19, 447:22, 447:25, 459:7, 459:10, 459:11, 459:21, 459:22, 470:8, 470:19, 470:22, 471:6, 471:9, 471:12, 471:17, 550:13, 550:18, 550:23, 564:22, 565:13, 565:23, 566:16, 566:18, 566:19, 566:21, 566:22, 567:15, 576:2, 578:14, 578:16, 578:23, 581:7, 590:10, 613:15, 638:9, 638:12, 651:11
**idea** [4] - 511:23, 642:18, 656:11, 706:1
**ideally** [1] - 642:8
**identical** [2] - 693:16, 694:19
**identification** [25] - 478:17, 500:4, 500:6, 500:7, 518:1, 524:25, 526:14, 526:16, 581:6, 583:5, 585:6, 613:11, 613:14, 637:17, 637:18, 641:21, 642:8, 648:1, 648:2, 662:20, 670:17,

671:15, 673:14, 673:17, 675:7
**identified** [6] - 502:9, 502:15, 502:18, 505:5, 505:6, 637:20
**identifiers** [1] - 478:19
**identifies** [1] - 564:17
**identify** [4] - 471:25, 557:22, 558:9, 638:5
**identifying** [22] - 478:16, 507:17, 517:3, 526:20, 537:4, 551:21, 557:23, 614:9, 615:8, 635:3, 649:25, 650:3, 650:4, 650:8, 650:9, 650:13, 650:17, 650:19, 651:3, 651:4, 651:16, 670:19
**identity** [206] - 449:2, 453:20, 453:21, 455:7, 455:12, 455:15, 455:23, 459:20, 461:7, 461:12, 461:13, 461:17, 461:19, 462:1, 462:15, 465:6, 465:20, 465:22, 466:6, 469:8, 469:16, 469:21, 470:2, 470:7, 471:23, 471:24, 471:25, 472:4, 472:15, 475:6, 475:20, 476:24, 477:6, 477:13, 477:15, 477:16, 477:17, 477:19, 477:23, 478:1, 478:3, 478:4, 478:6, 478:14, 479:12, 480:7, 480:13, 481:22, 483:13, 483:17, 483:20, 484:8, 485:8, 486:12, 486:23, 489:25, 491:10, 496:18, 496:19, 497:20, 497:21, 497:23, 501:8, 502:25, 506:18, 509:16, 514:13, 514:14, 516:4, 516:22, 517:25, 524:18, 526:7, 532:12, 532:14, 533:1, 533:23, 534:3, 535:1, 543:8, 543:18, 543:20, 544:7, 547:17, 547:23, 548:3, 548:8, 556:18, 556:19, 557:24, 562:5, 565:10, 565:11, 568:1, 570:7, 571:17, 572:16, 575:21, 577:2, 577:4, 580:18, 584:15, 585:14, 586:8, 586:10, 586:13, 586:17, 586:21, 586:25, 587:3, 587:6, 588:24, 590:19, 590:23, 591:14, 591:25, 602:23, 602:24, 602:25, 603:2, 603:21, 604:5, 604:18, 605:11, 605:14, 606:18, 606:19, 611:15, 612:23, 613:18, 613:19, 615:4, 615:25, 617:1, 620:2, 624:24, 625:5, 625:13, 625:17, 625:21, 626:3, 627:2, 627:12, 627:13, 627:17, 627:18, 628:4, 628:13, 628:19, 629:11, 629:13, 629:21, 631:2, 631:20, 632:16, 634:24, 637:22, 638:14, 638:15, 638:21, 639:4, 641:1, 646:24, 647:1, 647:6, 647:20, 648:3, 649:24, 650:11, 650:12, 650:20, 651:2, 652:10, 652:12, 652:24, 654:12, 654:17, 656:25, 657:7, 657:14, 658:5, 658:16, 658:23, 659:1, 659:24, 660:11, 660:16, 662:25, 663:1, 663:2, 663:6, 665:2, 665:14, 666:16, 668:13, 673:7, 673:19, 674:18, 676:7, 676:13, 678:7, 679:1, 679:2, 694:9, 702:24, 721:9
**ignore** [2] - 667:18, 673:3

**ignored** [1] - 522:15
**ignores** [1] - 640:17
**ignoring** [2] - 671:10
**image** [1] - 692:23
**images** [1] - 445:22
**imagine** [1] - 671:1
**immediately** [2] - 617:5, 640:6
**impact** [2] - 618:9, 618:22
**impacted** [1] - 618:5
**imperative** [1] - 572:19
**impersonate** [1] - 627:14
**impersonated** [2] - 604:25, 628:23
**implementation** [1] - 622:21
**implicate** [2] - 723:17, 723:18
**implicated** [1] - 562:5
**implies** [2] - 679:3, 719:2
**imply** [2] - 549:21, 580:3
**import** [1] - 656:14
**importance** [2] - 627:19, 700:16
**important** [24] - 523:22, 525:14, 526:16, 526:17, 553:17, 558:4, 558:6, 566:17, 567:6, 568:12, 581:23, 613:18, 613:19, 613:22, 627:19, 628:10, 629:2, 629:3, 637:25, 644:2, 670:19, 736:10
**impose** [1] - 585:2
**imposed** [1] - 585:1
**imposing** [1] - 619:17
**impounded** [1] - 520:17
**impression** [1] - 692:25
**improvements** [1] - 583:18
**IN** [1] - 435:1
**in-file** [1] - 647:24
**in-house** [1] - 627:9
**inability** [1] - 707:23
**inaccuracy** [1] - 645:5
**inaccurate** [50] - 454:11, 454:14, 454:15, 454:24, 455:19, 456:9, 456:16, 456:18, 457:9, 457:13, 458:2, 458:11, 458:12, 458:17, 458:19, 466:16, 466:20, 466:22, 467:4, 467:9, 467:14, 473:12, 473:20, 474:5, 474:8, 474:11, 474:15, 474:17, 480:4, 481:7, 481:10, 495:10, 499:12, 643:20, 643:24, 644:3, 644:7, 648:7, 648:23, 663:12, 663:17, 674:11, 684:2, 684:6, 686:1, 686:4, 717:20, 718:2, 720:25, 721:5
**inception** [2] - 632:15, 662:2
**incite** [2] - 711:5, 711:19
**include** [11] - 438:23, 557:6, 557:8, 572:4, 572:9, 575:5, 588:4, 682:23, 683:1, 683:11, 744:14
**included** [14] - 516:23, 526:5, 526:6, 575:16, 576:1, 580:11, 580:14, 580:23, 580:24, 581:4, 607:15, 615:22, 622:9, 706:7
**includes** [3] - 686:22, 723:3, 735:18
**including** [6] - 468:15, 665:10, 679:15, 683:18, 688:1, 742:19

**income** [3] - 704:22, 712:1, 712:18
**incompatible** [1] - 631:15
**incomplete** [1] - 530:16
**inconsistency** [1] - 685:5
**inconsistent** [5] - 630:21, 635:21, 684:15, 684:21, 685:9
**inconvenience** [2] - 696:21, 701:13
**incorrect** [3] - 457:15, 625:15, 626:14
**incorrectly** [1] - 471:14
**increasingly** [2] - 625:3, 625:10
**incumbent** [1] - 628:23
**indeed** [1] - 525:17
**Independent** [1] - 621:18
**independently** [1] - 674:15
**indicate** [14] - 438:4, 446:21, 463:14, 464:23, 494:5, 512:3, 520:4, 520:8, 528:8, 528:10, 557:23, 586:2, 596:10, 596:20
**indicated** [19] - 460:13, 464:18, 466:9, 468:2, 469:7, 486:9, 486:10, 494:14, 505:3, 533:11, 535:9, 545:17, 585:14, 596:21, 653:4, 658:16, 661:8, 670:16, 678:2
**indicates** [1] - 485:8
**indicating** [6] - 443:5, 451:4, 483:10, 504:14, 646:8, 666:15
**indication** [13] - 439:17, 439:23, 509:11, 520:20, 539:8, 539:9, 558:1, 646:21, 647:2, 647:11, 660:13, 665:17, 673:1
**indicator** [1] - 647:4
**indirect** [1] - 577:2
**individual** [8] - 496:1, 497:3, 523:20, 547:20, 575:4, 604:14, 605:3, 654:16
**individually** [2] - 449:13, 496:9
**individuals** [1] - 624:18
**indulging** [1] - 728:24
**industry** [15] - 558:17, 609:15, 610:18, 612:19, 616:10, 616:17, 617:4, 621:7, 621:24, 624:16, 624:23, 630:18, 637:4, 638:19, 638:20
**industry-wide** [1] - 612:19
**inflate** [1] - 614:2
**info** [2] - 445:10, 445:22
**inform** [1] - 676:7
**INFORMATION** [1] - 435:6
**information** [372] - 448:9, 454:11, 454:15, 454:22, 454:25, 455:18, 455:22, 456:17, 456:21, 457:7, 457:9, 457:13, 458:2, 458:11, 458:12, 458:15, 458:17, 458:19, 461:15, 461:21, 464:16, 465:21, 466:5, 466:17, 466:20, 466:22, 467:4, 467:9, 467:15, 472:11, 472:13, 473:11, 473:15, 473:19, 473:21, 473:22, 474:5, 474:7, 474:9, 474:15, 474:17, 475:7, 475:12, 475:16, 478:4, 479:20, 479:25, 480:2, 480:3, 480:4, 480:9, 480:24, 481:3, 481:7, 481:10, 481:14, 481:17, 481:21, 481:24, 484:1, 485:3, 485:18, 485:20, 487:5, 487:15,

487:24, 488:3, 488:12, 488:18, 489:2, 489:8, 489:19, 491:2, 491:5, 491:11, 491:12, 491:16, 491:18, 491:20, 492:17, 493:9, 494:12, 494:21, 495:11, 496:18, 499:4, 499:12, 508:18, 509:5, 509:24, 511:18, 511:20, 516:14, 517:3, 517:12, 517:13, 517:14, 517:21, 517:22, 521:6, 521:17, 521:20, 521:24, 521:25, 522:11, 522:14, 522:17, 522:19, 522:21, 522:25, 523:16, 523:19, 524:17, 524:19, 524:21, 524:23, 525:6, 525:8, 526:9, 527:5, 527:9, 529:10, 529:14, 529:16, 529:23, 530:16, 531:3, 531:12, 533:9, 534:5, 534:8, 534:10, 534:11, 534:12, 534:20, 535:1, 535:3, 535:4, 536:13, 537:5, 537:21, 537:23, 540:11, 540:16, 541:6, 541:17, 541:18, 541:19, 542:8, 542:9, 543:10, 543:22, 545:2, 546:15, 547:22, 548:5, 548:21, 549:7, 551:7, 551:11, 551:12, 551:13, 551:21, 558:23, 559:10, 563:13, 565:5, 565:9, 565:19, 565:21, 566:12, 568:21, 568:23, 569:6, 569:19, 569:20, 570:6, 570:11, 571:13, 571:18, 571:20, 572:4, 572:9, 572:10, 572:11, 572:14, 572:18, 573:3, 574:23, 575:1, 575:17, 575:22, 576:7, 576:9, 576:11, 578:5, 578:11, 580:4, 580:8, 580:11, 580:20, 582:19, 583:3, 583:8, 583:25, 585:8, 585:9, 585:12, 586:7, 588:5, 589:16, 589:20, 591:12, 595:5, 595:11, 596:18, 599:9, 599:12, 600:6, 601:13, 601:18, 607:12, 611:16, 612:6, 614:9, 614:20, 615:6, 615:8, 617:7, 617:12, 619:4, 620:3, 622:10, 622:23, 623:18, 624:3, 625:15, 626:17, 626:22, 626:23, 627:3, 627:9, 627:14, 628:3, 628:6, 629:24, 632:7, 634:10, 635:1, 636:9, 636:19, 637:2, 637:5, 637:10, 639:9, 639:12, 640:19, 641:14, 641:15, 641:18, 641:22, 641:25, 642:2, 642:25, 643:2, 643:11, 643:20, 643:25, 644:3, 644:7, 644:9, 644:20, 647:21, 648:2, 648:7, 648:23, 649:3, 649:4, 649:8, 649:12, 649:20, 649:25, 650:3, 650:4, 650:8, 650:9, 650:13, 650:17, 650:19, 651:3, 651:4, 651:16, 653:17, 653:18, 653:20, 653:22, 654:6, 654:11, 654:24, 655:18, 655:25, 656:17, 656:20, 659:7, 659:8, 659:11, 659:14, 659:15, 659:21, 661:25, 662:2, 662:5, 662:12, 663:12, 663:17, 664:10, 665:10, 665:16, 665:18, 666:2, 668:2, 668:14, 670:11, 670:12, 670:17, 670:19, 671:16, 673:2, 673:4, 674:4, 674:5, 674:11, 675:6, 675:8, 676:15, 676:24, 677:6, 679:14, 684:5, 684:8, 690:17, 692:15,

694:10, 695:10, 695:14, 702:21, 702:23, 717:8, 718:9, 718:19, 721:6, 722:1, 723:23, 726:6, 730:22, 732:5, 738:8, 744:5, 744:13, 744:18, 744:19
**informed** [2] - 537:25, 585:17
**inherently** [2] - 631:4, 631:15
**initial** [13] - 522:23, 523:1, 557:2, 557:16, 557:22, 559:3, 562:18, 563:17, 565:1, 600:6, 633:7, 655:21, 738:16
**initials** [6] - 442:1, 443:24, 444:1, 490:6, 520:2, 528:7
**initiate** [3] - 626:19, 633:8, 645:22
**initiated** [2] - 651:21, 675:15
**injured** [1] - 711:15
**injuries** [1] - 699:25
**injury** [4] - 711:16, 741:21, 742:6, 742:8
**input** [1] - 564:16
**inputs** [1] - 509:24
**inquiries** [1] - 622:10
**inquiry** [1] - 718:8
**insisting** [1] - 672:3
**instance** [3] - 441:2, 527:6, 539:24
**instances** [3] - 570:1, 588:12, 707:15
**instead** [9] - 536:2, 672:19, 673:4, 675:24, 707:11, 708:18, 725:8, 740:8, 743:5
**institutions** [2] - 625:4, 642:1
**instruct** [3] - 680:18, 726:4, 738:5
**instructed** [1] - 689:12
**instruction** [43] - 553:24, 668:24, 680:20, 688:24, 689:11, 689:15, 694:20, 694:21, 696:19, 701:19, 704:1, 704:6, 705:25, 706:10, 708:2, 708:3, 708:8, 708:22, 709:21, 710:4, 713:4, 713:19, 715:1, 715:4, 716:5, 717:24, 718:15, 721:23, 723:11, 723:20, 724:23, 725:14, 725:16, 727:10, 732:13, 733:11, 734:17, 736:19, 738:16, 739:10, 739:21, 740:11, 743:5
**Instruction** [6] - 710:5, 710:11, 713:20, 732:16, 737:21, 739:18
**instructions** [21] - 471:9, 511:3, 668:6, 680:13, 681:22, 681:24, 683:18, 686:18, 696:8, 698:7, 708:8, 708:14, 708:17, 708:19, 709:7, 714:19, 725:13, 736:23, 738:11, 740:8, 741:9
**insurance** [8] - 567:16, 609:19, 609:20, 691:10, 691:24, 692:13, 698:1, 698:4
**Insurance** [3] - 621:19, 623:4, 695:10
**insurer** [3] - 684:7, 684:10, 684:11
**intake** [1] - 564:2
**intend** [3] - 488:21, 488:22, 511:24
**intended** [6] - 487:8, 487:21, 487:24, 488:10, 488:16, 488:24
**intent** [1] - 715:23
**intention** [3] - 489:7, 594:12, 728:5
**intentional** [2] - 489:14, 489:18
**interaction** [1] - 570:4

**interesting** [2] - 656:4, 672:10
**interference** [5] - 696:21, 699:2, 699:11, 701:13, 702:15
**internal** [5] - 522:13, 522:18, 563:9, 629:23
**internally** [2] - 574:19, 632:1
**Internet** [2] - 639:22, 640:11
**interplay** [2] - 557:12, 635:18
**interpreted** [1] - 483:9
**interrupt** [2] - 664:14, 694:25
**intervened** [1] - 640:8
**intervening** [1] - 715:13
**invalid** [1] - 496:12
**invasion** [8] - 693:14, 694:16, 696:23, 697:14, 697:16, 701:14, 702:19, 702:21
**inverted** [1] - 626:15
**invested** [1] - 655:7
**investigate** [42] - 449:22, 457:6, 459:7, 459:9, 459:20, 461:6, 461:9, 461:12, 461:18, 462:3, 480:19, 483:14, 483:20, 484:11, 491:23, 496:3, 496:10, 497:20, 500:5, 510:23, 511:4, 532:4, 532:24, 544:19, 545:10, 595:21, 597:2, 600:13, 603:1, 628:3, 628:24, 629:21, 645:5, 650:20, 651:2, 651:12, 655:4, 655:17, 658:6, 661:24, 669:6, 723:9
**investigated** [11] - 457:16, 483:12, 486:4, 724:12, 725:17, 725:23, 732:9, 732:21, 737:6, 738:6, 738:22
**investigating** [13] - 457:21, 462:13, 588:23, 591:2, 605:10, 605:11, 605:13, 631:20, 637:19, 639:12, 658:5, 674:3, 678:25
**Investigation** [1] - 739:18
**investigation** [299] - 438:5, 438:24, 439:4, 439:18, 439:24, 440:15, 440:18, 443:6, 446:13, 446:18, 446:22, 452:24, 454:21, 455:24, 456:2, 457:18, 457:19, 458:16, 458:18, 458:22, 458:23, 458:25, 460:1, 460:4, 460:10, 460:24, 461:3, 461:15, 461:22, 461:25, 462:17, 462:20, 462:23, 463:1, 463:4, 463:8, 463:14, 463:20, 463:24, 464:1, 464:2, 464:4, 464:8, 464:11, 464:13, 464:17, 465:24, 472:11, 472:17, 473:23, 473:25, 475:22, 480:3, 480:11, 480:14, 480:17, 480:22, 481:8, 481:15, 481:23, 482:6, 483:14, 484:18, 484:21, 485:3, 485:15, 485:20, 485:23, 486:12, 486:16, 486:17, 486:18, 486:20, 486:22, 487:17, 487:25, 489:10, 490:11, 491:13, 493:13, 493:17, 493:18, 494:1, 494:3, 494:16, 494:17, 495:4, 496:16, 498:10, 498:11, 505:9, 508:14, 508:15, 508:16, 509:11, 509:16, 509:19, 511:6, 511:8, 511:9,

512:1, 512:5, 515:20, 517:9, 521:6, 522:1, 522:18, 528:11, 532:13, 532:21, 533:19, 533:24, 534:7, 534:11, 536:25, 539:4, 539:22, 540:12, 540:20, 540:22, 540:24, 541:2, 541:5, 542:11, 542:15, 542:19, 542:22, 545:19, 545:20, 546:24, 547:4, 548:17, 548:20, 548:23, 549:1, 556:7, 564:18, 565:6, 571:19, 572:3, 572:12, 574:1, 580:22, 584:15, 587:12, 587:13, 589:8, 589:14, 592:11, 594:16, 594:20, 595:2, 595:9, 595:13, 595:22, 599:1, 602:23, 602:24, 608:7, 608:11, 610:8, 613:19, 615:7, 617:8, 629:1, 629:23, 631:13, 631:22, 632:4, 632:7, 632:9, 632:19, 632:25, 634:14, 634:23, 635:6, 636:9, 636:11, 636:19, 637:3, 637:12, 639:8, 640:7, 644:8, 644:19, 644:22, 645:3, 645:12, 645:16, 646:9, 647:3, 648:22, 649:4, 649:7, 649:12, 649:16, 649:21, 651:7, 651:22, 652:6, 652:11, 652:16, 652:21, 653:14, 653:25, 654:5, 654:13, 655:5, 655:8, 656:1, 656:2, 656:3, 656:15, 656:19, 656:24, 657:1, 657:3, 657:6, 657:13, 657:16, 657:18, 657:25, 659:16, 659:18, 659:21, 660:14, 660:15, 660:22, 661:22, 662:3, 662:7, 663:20, 663:22, 664:1, 664:4, 664:6, 665:18, 665:21, 668:13, 668:25, 670:9, 670:11, 673:15, 674:21, 675:8, 676:17, 677:5, 677:13, 677:15, 677:16, 678:7, 678:9, 678:11, 679:2, 679:16, 716:5, 716:23, 717:1, 717:7, 717:14, 717:19, 717:21, 717:22, 717:25, 718:8, 718:19, 718:20, 719:5, 719:14, 719:21, 719:24, 720:1, 720:11, 720:24, 721:4, 722:1, 722:2, 722:14, 723:5, 723:12, 723:22, 733:2, 738:19, 738:20, 739:5, 739:24, 740:2, 740:4, 740:15, 743:6, 743:10, 743:13, 744:3, 744:4, 744:6, 744:14, 744:19
**investigations** [9] - 465:8, 594:23, 610:5, 610:8, 612:20, 634:17, 646:2, 658:8, 721:9
**investigator** [4] - 523:16, 575:13, 655:22, 655:24
**investigators** [8] - 532:7, 639:10, 652:11, 652:14, 653:18, 655:14, 655:16, 670:12
**invitation** [1] - 671:11
**invokes** [1] - 645:11
**involved** [24] - 521:11, 530:9, 531:1, 536:10, 546:10, 546:12, 547:9, 551:5, 557:9, 557:11, 566:12, 607:19, 614:5, 622:11, 622:20, 636:22, 638:16, 647:12, 651:9, 653:2, 656:8, 656:13, 658:15, 717:6
**involvement** [4] - 515:9, 521:9, 521:13,

652:23
**involves** [1] - 637:18
**irrelevant** [1] - 499:7
**IRS** [1] - 655:24
**Isaac** [4] - 609:17, 610:10, 610:13, 610:21
**issue** [28] - 495:18, 515:9, 554:15, 561:20, 625:7, 632:16, 634:4, 665:19, 685:7, 685:19, 692:22, 696:5, 697:20, 697:25, 700:6, 700:11, 701:3, 704:2, 704:4, 708:5, 708:13, 710:25, 711:1, 727:11, 728:19, 734:12, 735:17, 738:17
**issued** [4] - 566:16, 566:18, 576:2, 684:19
**issues** [17] - 566:10, 623:12, 624:14, 624:24, 625:12, 625:13, 625:21, 625:24, 626:6, 627:25, 629:16, 630:12, 630:24, 643:10, 652:24, 661:24, 682:3
**item** [7] - 484:22, 613:4, 617:5, 684:12, 686:2, 686:5, 690:12
**itemize** [1] - 698:14
**items** [27] - 517:24, 518:3, 526:5, 526:11, 527:11, 542:24, 547:13, 565:2, 580:21, 580:23, 580:24, 581:11, 612:12, 612:16, 612:19, 613:10, 614:12, 614:13, 614:24, 617:11, 637:11, 637:15, 660:8, 683:16, 684:2, 698:8
**iTop** [33] - 440:18, 441:2, 442:7, 442:11, 443:12, 448:17, 464:19, 464:20, 464:23, 465:1, 465:3, 465:13, 465:18, 471:18, 471:22, 507:20, 507:22, 507:24, 508:1, 508:2, 508:11, 519:14, 528:10, 539:7, 545:7, 564:15, 564:20, 573:12, 579:15, 596:13, 608:8, 612:13, 653:10
**itself** [9] - 558:10, 563:3, 571:20, 572:11, 686:22, 688:8, 692:12, 717:6, 723:5

## J

**James** [4] - 515:15, 571:10, 571:15, 580:17
**January** [29] - 463:1, 474:21, 475:2, 478:25, 479:2, 479:3, 491:8, 492:1, 492:14, 523:5, 530:24, 574:6, 575:20, 590:1, 590:5, 590:12, 594:4, 594:5, 605:23, 640:9, 641:21, 648:12, 660:7, 660:9, 664:13, 665:6, 665:7, 672:19, 674:22
**Jason** [4] - 465:5, 465:19, 588:23, 659:23
**Jeffrey** [1] - 436:2
**Jelderks** [1] - 695:3
**Jennifer** [1] - 500:17
**job** [9] - 460:23, 488:17, 514:24, 555:19, 555:20, 559:7, 567:6, 640:2, 679:5

**jobs** [2] - 514:7, 514:9
**John** [6] - 520:16, 520:18, 521:3, 554:2, 555:1, 555:11
**JOHN** [2] - 555:5, 555:11
**joined** [3] - 514:16, 514:17, 622:14
**Jones** [4] - 436:5, 436:5, 694:13, 705:22
**JONES** [2] - 694:15, 728:19
**JUDGE** [1] - 435:17
**Judge** [5] - 693:12, 694:12, 695:3, 705:22
**judged** [1] - 694:6
**judges** [2] - 705:20, 705:23
**judgment** [10] - 681:2, 682:2, 682:5, 687:17, 687:20, 687:22, 700:11, 708:5, 709:4, 735:22
**Julie** [2] - 436:16, 681:25
**July** [1] - 463:5
**jump** [3] - 716:14, 734:3, 736:3
**jumping** [1] - 715:13
**juncture** [1] - 742:3
**June** [1] - 463:5
**juries** [1] - 705:15
**juror's** [1] - 720:10
**jury** [80] - 437:3, 442:3, 443:11, 443:19, 445:20, 450:3, 451:19, 453:5, 498:18, 500:20, 515:14, 553:21, 553:25, 554:23, 556:1, 609:12, 621:7, 633:21, 680:10, 680:12, 680:24, 681:21, 681:23, 683:18, 686:18, 687:23, 688:23, 689:11, 689:15, 689:17, 689:18, 690:8, 690:13, 691:3, 691:12, 692:5, 693:22, 693:25, 694:2, 694:20, 694:21, 696:8, 696:19, 698:7, 701:20, 701:22, 703:15, 703:21, 703:24, 704:1, 704:8, 705:3, 705:20, 705:21, 707:3, 711:4, 711:5, 711:19, 713:4, 714:3, 717:13, 718:22, 726:4, 726:16, 726:20, 729:22, 729:24, 730:4, 731:9, 731:17, 731:23, 736:12, 736:16, 736:18, 738:3, 738:11, 742:20, 743:8
**jury's** [1] - 518:15

## K

**K-e-l-l-e-y** [1] - 621:1
**keep** [6] - 487:21, 488:15, 570:9, 605:18, 652:15, 714:8
**keeping** [2] - 721:15, 740:21
**keeps** [2] - 695:18, 695:19
**Kelley** [13] - 554:6, 620:15, 620:25, 621:1, 621:5, 624:22, 629:6, 633:25, 643:13, 643:19, 655:2, 678:19, 679:13
**KELLEY** [1] - 620:19
**Kelly** [2] - 436:5, 436:5
**kept** [2] - 600:20, 607:8
**Kester** [1] - 436:17
**key** [2] - 634:4, 735:10
**kicked** [1] - 600:10
**kind** [34] - 438:20, 498:24, 498:25, 514:23, 517:9, 517:19, 522:23, 528:2,

557:15, 558:25, 559:13, 562:7, 562:16, 563:11, 568:10, 570:18, 573:2, 604:11, 629:6, 629:14, 630:12, 631:7, 643:2, 667:6, 685:2, 685:12, 686:8, 691:1, 693:18, 701:6, 701:8, 702:7, 702:13
**kinds** [2] - 703:17, 714:5
**Kirkpatrick** [4] - 693:11, 694:7, 706:11, 706:18
**knowing** [7] - 488:25, 494:10, 591:1, 594:9, 682:12, 734:16, 734:19
**knowledge** [20] - 476:6, 504:9, 521:22, 526:21, 529:6, 531:8, 543:11, 558:8, 569:22, 579:13, 591:15, 597:16, 597:20, 597:23, 598:1, 598:4, 607:6, 658:20, 658:21
**known** [5] - 448:17, 513:21, 609:17, 733:16
**knows** [6] - 491:23, 492:1, 547:23, 548:2, 590:19, 674:10

## L

**lack** [2] - 659:20, 685:15
**lacks** [1] - 495:5
**Lake** [1] - 621:10
**landscape** [1] - 482:17
**Langston** [1] - 518:11
**language** [31] - 658:7, 709:2, 713:7, 715:20, 715:24, 716:11, 717:24, 724:8, 724:9, 725:16, 726:2, 727:17, 731:1, 731:8, 732:2, 733:16, 734:5, 734:6, 737:6, 737:8, 737:11, 737:16, 739:14, 741:10, 741:21, 742:19, 743:2, 743:18, 743:22, 744:10, 744:22
**large** [6] - 621:14, 622:6, 631:7, 642:1, 672:6
**largely** [1] - 686:18
**larger** [3] - 629:19, 686:8, 698:13
**last** [34] - 556:6, 582:17, 584:11, 598:2, 610:18, 613:10, 621:15, 621:21, 623:2, 623:11, 626:8, 626:21, 686:17, 696:25, 697:14, 697:16, 699:20, 707:25, 709:25, 710:3, 710:6, 714:13, 715:5, 717:17, 724:15, 727:10, 732:17, 733:11, 733:13, 735:5, 736:2, 736:14, 738:23
**lasted** [1] - 514:22
**lastly** [1] - 624:11
**late** [8] - 447:17, 493:8, 522:23, 522:24, 569:13, 609:24, 626:9, 690:18
**laterally** [1] - 610:3
**launch** [3] - 639:8, 652:16, 660:22
**launched** [6] - 644:22, 657:3, 657:24, 662:7, 673:15, 675:9
**launches** [1] - 632:19
**launching** [2] - 640:6, 656:15
**law** [35] - 580:16, 621:9, 645:10, 645:19, 669:9, 681:2, 682:3, 682:5, 682:15, 685:20, 685:21, 686:15, 688:1, 688:2,

688:11, 689:5, 693:3, 699:14, 699:16, 700:11, 700:19, 701:6, 701:7, 704:4, 708:5, 708:20, 709:5, 715:22, 717:11, 719:1, 720:16, 733:18, 733:25, 736:9, 736:24
**Law** [1] - 436:5
**lawsuit** [5] - 531:7, 546:6, 546:10, 561:21, 675:24
**lawyer** [6] - 571:10, 656:9, 663:16, 672:23, 706:11, 706:14
**lawyers** [2] - 680:12, 688:14
**laying** [1] - 499:18
**lead** [1] - 556:8
**leading** [3] - 440:19, 481:20, 506:13
**leads** [1] - 658:24
**learn** [6] - 558:25, 559:9, 559:16, 591:7, 684:8
**learned** [3] - 684:5, 691:16, 692:9
**learning** [2] - 514:24, 577:13
**least** [17] - 438:3, 446:21, 469:16, 545:20, 641:2, 641:21, 641:23, 656:7, 662:12, 679:7, 685:13, 690:11, 701:3, 702:7, 718:12, 719:9, 725:2
**leave** [6] - 505:10, 722:15, 722:21, 727:7, 737:16, 739:14
**leaves** [2] - 553:25, 680:24
**leaving** [2] - 514:5, 738:7
**left** [2] - 437:14, 623:2
**legal** [8] - 531:1, 546:10, 546:12, 547:9, 566:5, 621:11, 622:20, 623:6
**legit** [1] - 521:24
**lender** [1] - 643:10
**lenders** [5] - 626:4, 628:17, 628:24, 629:4, 631:7
**lending** [7] - 448:18, 468:14, 468:25, 621:12, 622:4, 622:8, 627:24
**length** [1] - 733:13
**less** [1] - 614:18
**lesser** [1] - 692:14
**letter** [242] - 442:25, 443:4, 443:22, 445:10, 445:22, 450:3, 450:4, 450:6, 450:22, 451:20, 452:4, 452:6, 452:8, 452:10, 452:13, 452:15, 452:18, 452:20, 453:6, 474:21, 475:2, 475:16, 475:23, 476:4, 476:18, 477:9, 477:13, 477:16, 477:17, 477:18, 477:19, 477:23, 478:3, 478:5, 478:11, 478:13, 478:16, 479:18, 486:3, 492:14, 494:15, 494:20, 494:21, 515:15, 515:17, 516:3, 516:5, 516:10, 516:11, 516:13, 516:17, 516:19, 516:23, 517:1, 517:17, 520:11, 523:1, 523:5, 523:11, 524:4, 524:6, 524:17, 524:21, 525:3, 525:5, 525:7, 525:20, 525:24, 526:3, 526:6, 526:10, 526:12, 527:3, 527:4, 527:9, 527:15, 527:18, 528:6, 528:17, 528:19, 529:2, 531:5, 531:6, 531:10, 532:16, 533:3, 533:11, 533:16, 533:19, 533:21, 533:22, 541:22, 541:25, 542:13, 542:16,

543:10, 543:22, 544:17, 544:18, 545:21, 547:12, 547:14, 547:19, 547:22, 547:25, 548:1, 549:4, 549:5, 549:9, 549:13, 550:3, 552:13, 552:17, 553:3, 563:21, 563:23, 565:7, 565:8, 568:20, 568:22, 571:24, 572:8, 572:10, 572:24, 573:2, 573:5, 573:6, 573:10, 573:22, 574:5, 574:8, 574:14, 574:21, 575:17, 575:24, 576:4, 579:3, 579:6, 579:22, 580:1, 580:5, 580:7, 580:17, 581:15, 582:10, 583:4, 584:24, 585:17, 588:4, 590:2, 591:11, 591:16, 591:19, 592:10, 592:16, 593:3, 593:9, 593:22, 593:24, 594:4, 594:8, 595:1, 595:15, 595:16, 595:20, 595:23, 596:3, 596:5, 596:11, 596:19, 597:3, 600:14, 602:2, 602:5, 602:8, 602:10, 611:25, 612:2, 612:5, 632:17, 632:18, 632:21, 632:22, 636:2, 636:5, 636:12, 636:16, 639:16, 639:21, 640:4, 640:6, 640:9, 640:15, 640:18, 641:3, 641:12, 641:14, 641:16, 641:20, 642:4, 642:5, 651:21, 653:16, 654:3, 656:5, 659:15, 666:1, 666:7, 666:15, 667:9, 667:14, 667:19, 667:20, 667:21, 668:24, 669:3, 669:15, 669:25, 670:2, 670:22, 671:2, 671:8, 671:10, 671:11, 671:17, 671:18, 671:23, 672:19, 675:22, 676:1, 676:4, 676:6, 676:11, 676:14, 719:18, 719:19, 720:6
**letters** [6] - 476:14, 522:4, 552:20, 575:8, 616:7, 639:22
**letting** [2] - 559:14, 559:15
**level** [6] - 559:22, 582:21, 610:2, 628:25, 668:14, 694:2
**liability** [4] - 643:10, 717:21, 735:21, 736:1
**license** [23] - 478:23, 516:24, 518:1, 524:24, 525:12, 536:15, 536:17, 537:1, 537:5, 537:10, 550:7, 550:10, 550:11, 565:13, 566:23, 592:4, 598:22, 599:1, 613:15, 614:10, 627:8, 673:16, 673:22
**lie** [2] - 632:13, 695:21
**lieu** [1] - 642:14
**light** [10] - 630:19, 698:3, 700:7, 700:8, 716:12, 719:4, 719:8, 720:20, 722:3, 722:20
**likely** [3] - 520:11, 531:4, 718:8
**limine** [4] - 710:25, 711:9, 712:19, 713:15
**limit** [1] - 698:22
**limitation** [1] - 658:4
**limitations** [1] - 685:5
**limited** [15] - 517:13, 651:24, 652:1, 652:3, 657:24, 658:1, 658:3, 658:8, 659:20, 677:16, 683:23, 683:24, 684:10, 684:23, 686:11
**limiting** [1] - 652:14

**line** [14] - 466:25, 467:11, 488:5, 488:6, 503:2, 503:18, 519:3, 543:6, 556:25, 618:21, 657:10, 678:5, 678:22, 715:25
**Liquid** [1] - 610:14
**list** [4] - 448:12, 698:8, 714:12, 727:1
**listed** [5] - 523:8, 580:15, 683:16, 686:25, 713:17
**listened** [1] - 448:20
**listening** [1] - 685:2
**lists** [5] - 517:20, 518:11, 518:25, 521:6, 580:11
**literally** [1] - 628:18
**live** [1] - 724:1
**LLC** [2] - 435:6, 436:2
**LLP** [1] - 436:17
**loan** [23] - 536:8, 537:11, 537:13, 538:14, 604:25, 605:16, 606:4, 606:7, 606:12, 606:15, 606:18, 609:22, 610:14, 622:3, 626:13, 626:25, 637:6, 637:8, 637:9, 654:1, 660:22, 705:7, 706:22
**loans** [2] - 556:14, 622:9
**look** [126] - 438:14, 439:7, 439:20, 440:18, 441:7, 441:14, 441:21, 442:10, 442:13, 442:15, 442:20, 443:14, 444:16, 444:17, 444:25, 445:1, 445:5, 445:18, 445:25, 446:2, 446:8, 447:5, 450:24, 464:20, 471:18, 474:18, 477:1, 479:18, 481:22, 482:1, 482:10, 484:3, 485:5, 490:4, 490:22, 492:22, 493:6, 493:20, 494:7, 498:8, 500:13, 500:23, 502:8, 502:9, 507:22, 508:4, 515:24, 515:25, 516:7, 519:11, 522:12, 523:4, 524:13, 525:19, 526:2, 527:2, 527:24, 527:25, 528:16, 538:14, 539:21, 549:3, 556:12, 557:21, 559:5, 559:21, 560:7, 560:16, 560:22, 562:13, 563:4, 563:18, 566:22, 568:15, 570:16, 571:4, 574:4, 576:21, 576:23, 578:11, 578:24, 579:1, 579:22, 582:9, 583:3, 583:7, 583:17, 626:23, 628:20, 630:1, 630:2, 630:13, 631:12, 632:15, 633:2, 633:14, 635:11, 635:24, 639:14, 641:8, 641:13, 645:3, 654:3, 664:8, 679:14, 684:25, 689:9, 689:20, 690:15, 696:13, 700:7, 700:25, 701:7, 701:24, 702:5, 702:14, 708:23, 713:23, 715:3, 715:5, 715:10, 720:3, 737:17, 737:19, 742:12
**looked** [33] - 437:25, 440:24, 443:10, 444:10, 446:16, 446:25, 447:8, 450:17, 464:19, 464:23, 464:25, 465:3, 465:18, 465:25, 472:18, 484:16, 492:14, 507:14, 508:3, 509:9, 509:10, 512:1, 515:14, 537:16, 538:22, 540:14, 560:25, 586:8, 653:5, 691:8, 691:10, 692:10
**looking** [55] - 437:15, 437:18, 444:7, 454:9, 456:20, 457:17, 467:14,

467:15, 471:20, 481:12, 481:14, 481:17, 481:18, 506:12, 507:18, 511:2, 511:12, 511:14, 519:13, 521:19, 540:11, 557:2, 562:1, 562:17, 566:18, 567:1, 569:4, 572:8, 583:21, 592:1, 595:12, 596:1, 596:17, 607:1, 627:4, 627:6, 628:6, 632:2, 632:21, 637:2, 637:5, 638:5, 640:19, 642:2, 653:8, 654:1, 655:1, 660:15, 661:25, 671:4, 673:1, 679:8, 702:3, 706:6, 722:3
**looks** [10] - 528:10, 561:7, 601:1, 626:10, 634:19, 662:12, 665:22, 693:1, 721:21, 728:3
**Los** [4] - 621:23, 622:7, 622:14, 623:3
**loss** [11] - 513:10, 683:18, 687:25, 690:8, 691:20, 692:7, 693:13, 694:17, 697:21, 698:1, 700:2
**losses** [4] - 682:23, 683:12, 693:18, 697:23
**lost** [6] - 666:22, 696:22, 697:2, 697:5, 702:25, 704:10
**lower** [3] - 641:7, 683:4, 735:22
**lump** [1] - 617:13
**lunch** [1] - 554:19

**M**

**ma'am** [7] - 456:22, 461:16, 470:24, 471:4, 488:2, 503:1, 503:18
**mail** [6] - 443:22, 514:12, 570:24, 697:7, 712:4, 712:16
**Mail** [1] - 518:10
**mailing** [1] - 518:12
**main** [1] - 453:11
**maintain** [1] - 628:3
**maintaining** [2] - 627:10, 629:24
**maintains** [1] - 634:10
**maintenance** [1] - 610:5
**major** [5] - 556:18, 618:16, 618:18, 627:22, 709:20
**majority** [2] - 598:23, 629:12
**malice** [4] - 736:7, 736:11, 736:15, 736:20
**man** [1] - 692:20
**manage** [1] - 555:22
**managed** [1] - 556:6
**management** [9] - 495:12, 495:18, 496:21, 496:22, 497:7, 529:24, 530:20, 542:21, 610:7
**manager** [12] - 546:12, 546:18, 547:9, 552:1, 552:4, 555:20, 555:23, 559:23, 582:21, 609:19, 609:20
**manners** [1] - 738:12
**March** [5] - 463:5, 561:7, 561:10, 561:11, 713:2
**MARCO** [1] - 435:16
**mark** [1] - 693:2
**marked** [8] - 523:4, 560:16, 568:15, 572:22, 574:5, 576:21, 579:1, 639:14

**markedly** [1] - 630:22
**marks** [1] - 618:11
**match** [3] - 537:17, 650:13, 685:12
**matching** [2] - 574:24, 650:11
**materials** [1] - 571:7
**matter** [21] - 471:21, 474:3, 482:2, 548:7, 559:8, 569:12, 574:8, 603:20, 651:6, 661:22, 676:15, 681:2, 682:3, 682:5, 700:11, 701:6, 704:3, 708:5, 709:5, 717:10, 728:9
**matters** [2] - 453:14, 484:20
**Matthew** [2] - 519:24, 549:20
**MATTHEW** [1] - 435:3
**Matthew's** [2] - 519:24, 549:19
**maturity** [1] - 626:13
**mean** [59] - 441:5, 441:7, 455:21, 474:9, 481:12, 491:22, 493:11, 495:2, 499:11, 501:13, 508:20, 522:14, 535:25, 545:24, 546:8, 551:15, 569:11, 573:18, 576:3, 582:4, 583:16, 584:18, 593:23, 594:11, 601:24, 603:5, 612:22, 631:19, 637:18, 639:24, 646:23, 648:13, 651:22, 653:19, 660:17, 660:22, 670:10, 692:15, 695:7, 700:1, 703:18, 704:5, 705:14, 706:13, 718:17, 719:10, 720:6, 721:9, 726:23, 728:7, 729:20, 735:10, 741:20
**meaning** [2] - 481:16, 735:1
**means** [11] - 443:3, 445:20, 494:10, 510:16, 622:12, 668:20, 709:3, 732:24, 733:14, 734:9, 736:15
**meant** [2] - 438:1, 732:23
**measure** [4] - 694:1, 703:9, 703:15
**mechanism** [1] - 498:18
**meetings** [1] - 558:19
**MEGAN** [1] - 437:8
**Megan** [1] - 646:1
**member** [20] - 457:20, 458:17, 459:17, 459:22, 471:17, 474:1, 480:12, 502:25, 504:3, 504:25, 507:14, 507:15, 507:25, 523:15, 523:17, 559:4, 569:21, 622:18, 631:11, 639:3
**members** [17] - 456:19, 456:20, 458:7, 471:8, 474:7, 481:9, 487:14, 503:16, 504:11, 553:21, 558:14, 558:18, 582:7, 583:22, 584:2, 680:10
**memo** [2] - 683:20, 687:11
**memorandum** [6] - 682:4, 682:19, 682:22, 687:1, 699:24, 738:17
**memory** [1] - 699:9
**mental** [2] - 693:15, 694:17
**mention** [7] - 477:6, 477:19, 477:23, 478:3, 483:15, 502:25, 517:8
**mentioned** [10] - 495:22, 533:3, 598:21, 618:7, 624:16, 641:7, 649:24, 656:7, 665:12, 695:2
**merely** [2] - 682:16, 734:2
**messed** [1] - 645:18

**meter** [1] - 703:23
**Michael** [1] - 436:8
**mid** [4] - 500:14, 610:13, 632:18, 633:17
**mid-sized** [1] - 610:13
**midday** [1] - 553:22
**middle** [4] - 517:9, 528:2, 562:17, 724:10
**might** [29] - 449:18, 511:8, 550:21, 554:14, 588:6, 614:18, 614:19, 625:14, 627:10, 628:6, 642:14, 653:4, 685:20, 693:23, 698:25, 700:24, 703:1, 703:16, 714:2, 716:25, 717:1, 719:16, 719:24, 719:25, 720:7, 725:12, 731:3, 739:3
**mileage** [1] - 705:12
**Miller's** [3] - 520:16, 520:18, 521:3
**million** [1] - 658:19
**millions** [1] - 616:22
**mind** [11] - 437:21, 451:1, 451:16, 474:19, 612:8, 639:25, 675:21, 720:9, 720:10, 737:17, 742:4
**mine** [1] - 628:22
**minimum** [1] - 701:15
**Minnesota** [1] - 514:8
**minor** [3] - 709:19, 714:10, 714:15
**Minority** [1] - 621:20
**Minority-Owned** [1] - 621:20
**minus** [1] - 693:2
**minute** [5] - 467:21, 506:5, 560:18, 694:18, 709:15
**minutes** [7] - 460:10, 490:12, 500:16, 554:3, 633:18, 681:8, 715:15
**mislead** [1] - 657:21
**misrepresent** [1] - 677:18
**misrepresentation** [1] - 556:18
**miss** [2] - 466:25, 467:16
**missed** [7] - 494:18, 530:20, 539:8, 540:5, 540:6, 626:8, 626:11
**missing** [5] - 468:23, 526:13, 527:5, 563:22, 581:11
**misspoke** [1] - 635:11
**misstate** [1] - 496:25
**misstated** [2] - 626:13, 658:9
**misstates** [3] - 456:10, 534:15, 541:13
**misstating** [1] - 678:2
**mistake** [4] - 487:12, 487:18, 488:22, 503:10
**misunderstood** [2] - 455:17, 727:5
**model** [5] - 714:22, 714:23, 714:24, 715:8, 742:7
**modicum** [1] - 656:2
**modify** [1] - 601:17
**moment** [3] - 664:14, 696:11, 728:6
**momentarily** [1] - 620:16
**monetary** [2] - 691:1, 691:20
**money** [6] - 539:15, 667:24, 672:2, 706:20, 707:1, 707:10
**month** [6] - 448:25, 449:6, 468:3, 495:23, 592:23, 594:4

**monthly** [1] - 558:21
**months** [18] - 463:21, 464:14, 468:8, 482:7, 493:16, 495:3, 514:23, 559:18, 583:17, 594:11, 648:13, 648:15, 670:16, 672:20, 673:14, 675:8, 696:3
**Montressa** [3] - 459:19, 651:1, 651:15
**morning** [4] - 437:4, 500:15, 513:3, 680:15
**Morrison** [1] - 436:6
**Mortgage** [1] - 556:5
**mortgage** [3] - 556:7, 621:15, 622:3
**mortgages** [1] - 468:17
**Mosman** [2] - 693:12, 705:22
**most** [13] - 486:9, 562:8, 562:9, 573:19, 612:19, 644:23, 659:13, 698:11, 698:12, 699:15, 700:7, 706:15, 711:18
**mostly** [1] - 610:12
**motion** [16] - 681:2, 682:18, 687:17, 687:22, 699:19, 700:11, 701:2, 701:4, 702:4, 704:4, 704:5, 708:4, 709:4, 710:25, 712:19, 737:10
**motions** [4] - 681:10, 707:25, 711:9, 713:15
**motive** [2] - 736:8, 736:16
**move** [27] - 457:24, 459:1, 472:12, 476:20, 489:11, 489:21, 508:18, 520:14, 529:24, 541:19, 543:25, 565:6, 566:9, 578:9, 583:23, 590:1, 641:9, 656:3, 665:6, 675:14, 722:23, 724:7, 727:8, 728:1, 730:12, 732:15, 738:24
**moved** [3] - 490:24, 514:7, 621:11
**moves** [2] - 682:2, 682:5
**moving** [3] - 559:21, 675:20, 739:16
**MR** [320] - 437:6, 437:13, 437:21, 437:24, 438:16, 438:18, 439:7, 439:10, 439:20, 439:22, 440:8, 440:11, 440:19, 440:23, 441:14, 441:16, 441:21, 441:22, 442:13, 442:16, 442:20, 442:22, 443:7, 443:9, 443:16, 443:18, 444:6, 444:9, 444:16, 444:18, 444:25, 445:2, 445:5, 445:6, 445:17, 445:19, 446:2, 446:4, 446:8, 446:10, 450:1, 450:2, 451:1, 451:3, 451:18, 451:18, 452:16, 452:17, 453:3, 453:4, 453:17, 453:18, 454:4, 454:8, 456:10, 456:14, 456:25, 457:2, 457:24, 458:1, 458:5, 458:9, 467:5, 467:17, 467:19, 467:23, 467:25, 468:1, 468:4, 468:6, 473:4, 473:8, 474:18, 474:23, 474:24, 475:1, 477:1, 477:2, 477:20, 477:22, 479:16, 479:17, 484:3, 484:4, 486:24, 487:1, 489:22, 489:23, 490:4, 490:5, 490:22, 490:23, 492:22, 492:23, 493:6, 493:7, 495:5, 495:7, 500:23, 500:24, 501:16, 501:21, 503:2, 503:3, 505:16, 505:18, 505:21, 506:13, 506:15, 512:8, 512:12, 513:2, 519:21, 519:22, 531:17, 531:21, 534:15, 534:22,

541:13, 541:20, 543:6, 543:7, 548:10, 548:12, 548:15, 553:7, 553:8, 553:11, 553:14, 554:2, 554:9, 554:17, 554:21, 555:1, 555:15, 561:1, 561:2, 561:13, 561:15, 561:17, 561:18, 577:15, 577:16, 577:18, 577:19, 579:11, 579:13, 579:17, 579:19, 579:20, 584:4, 584:8, 607:21, 607:23, 608:2, 608:13, 608:16, 608:18, 608:22, 609:10, 611:19, 611:20, 612:8, 612:11, 618:24, 619:2, 619:12, 619:16, 619:18, 620:4, 620:6, 620:9, 620:12, 620:15, 621:4, 633:24, 635:9, 635:10, 641:9, 641:11, 643:18, 657:10, 657:11, 664:15, 664:20, 664:22, 664:23, 669:23, 670:6, 670:7, 673:24, 674:1, 677:23, 678:1, 678:4, 678:14, 678:18, 678:22, 678:23, 679:24, 680:2, 680:4, 680:7, 680:9, 681:3, 681:8, 681:16, 681:23, 687:8, 687:15, 690:2, 690:6, 690:10, 690:15, 690:23, 691:22, 692:2, 692:11, 693:7, 693:10, 693:20, 694:4, 694:15, 694:16, 694:21, 695:2, 696:6, 696:11, 696:18, 697:2, 697:5, 697:12, 697:16, 698:25, 699:7, 702:6, 702:15, 703:17, 704:5, 705:8, 705:17, 706:10, 707:5, 707:7, 707:14, 707:18, 709:10, 709:12, 710:4, 710:18, 710:20, 710:22, 711:23, 712:4, 712:9, 712:13, 713:3, 713:11, 713:21, 714:22, 715:2, 715:19, 718:5, 718:24, 719:2, 719:7, 720:5, 720:12, 721:14, 722:5, 722:9, 722:24, 723:16, 725:3, 725:6, 725:25, 726:13, 726:22, 727:3, 728:2, 728:12, 728:15, 728:19, 729:19, 729:25, 730:5, 731:4, 731:13, 732:2, 733:5, 733:7, 734:10, 734:12, 735:14, 736:6, 736:21, 737:1, 737:18, 738:10, 738:25, 739:7, 739:12, 740:14, 740:18, 740:24, 741:2, 741:6, 741:12, 742:5, 742:16, 743:4, 743:11, 743:13, 744:2, 744:11, 744:17, 744:24, 745:1, 745:2, 745:5

**MS** [88] - 681:13, 681:20, 681:25, 684:15, 685:7, 685:18, 686:6, 686:16, 687:6, 694:22, 695:1, 697:19, 699:18, 699:22, 700:4, 700:22, 707:22, 708:7, 708:10, 708:13, 708:21, 708:24, 709:17, 709:19, 710:1, 710:9, 710:11, 710:16, 710:24, 712:8, 712:24, 713:1, 713:10, 713:14, 713:25, 714:7, 714:9, 714:18, 715:8, 715:12, 716:3, 716:7, 716:10, 716:20, 720:18, 721:6, 722:16, 724:8, 724:15, 724:20, 724:24, 725:4, 725:7, 725:11, 725:23, 726:11, 726:16, 727:4, 727:8, 727:13, 727:24, 728:6, 728:24, 729:12, 729:17, 730:13, 730:16, 730:18, 731:20, 732:1, 732:4, 732:15, 733:11, 735:3, 736:2, 737:4, 737:14, 738:9,

738:15, 739:16, 740:3, 740:5, 741:8, 741:14, 741:19, 742:2, 742:14, 744:23
**multiple** [32] - 449:12, 466:16, 466:19, 467:3, 467:8, 467:13, 467:14, 467:16, 489:5, 495:9, 495:15, 495:21, 495:24, 495:25, 496:6, 496:21, 497:6, 497:8, 497:14, 497:18, 510:7, 510:16, 523:25, 526:25, 556:24, 567:5, 616:20, 617:18, 618:1, 637:25, 638:5
**must** [13] - 461:12, 461:18, 474:14, 495:2, 649:3, 649:20, 655:4, 659:6, 700:6, 701:20, 718:19, 722:1, 731:13

# N

**N.A** [1] - 435:6
**naive** [1] - 642:23
**name** [13] - 512:20, 527:16, 535:20, 549:14, 555:9, 555:11, 585:19, 609:5, 609:7, 620:23, 620:25, 638:22, 685:24
**named** [2] - 515:15, 571:10
**names** [2] - 709:23, 710:7
**Nancy** [1] - 746:11
**nancy** [1] - 436:19
**NANCY** [1] - 746:12
**narrow** [1] - 688:15
**national** [2] - 621:14, 622:6
**nature** [11] - 597:5, 627:12, 628:13, 642:1, 642:10, 647:25, 654:16, 691:22, 716:12, 719:4, 722:20
**navigating** [1] - 624:9
**necessarily** [6] - 447:5, 551:15, 582:24, 616:17, 627:11, 720:9
**necessary** [2] - 636:11, 673:18
**need** [53] - 461:15, 500:7, 500:10, 504:23, 517:20, 542:11, 563:13, 567:15, 567:17, 568:5, 572:9, 592:11, 602:15, 603:1, 604:9, 615:18, 628:2, 629:18, 633:3, 637:16, 641:8, 645:5, 648:4, 650:21, 665:5, 671:25, 675:23, 676:13, 681:10, 681:17, 689:15, 693:5, 695:8, 696:6, 698:17, 700:19, 700:25, 701:24, 703:15, 707:19, 707:20, 712:14, 713:20, 721:17, 729:3, 731:6, 731:9, 731:10, 733:8, 736:7, 740:6, 740:18
**needed** [9] - 500:4, 542:24, 543:1, 543:2, 560:7, 590:20, 641:24, 669:2, 735:1
**needs** [6] - 566:5, 629:1, 717:13, 717:14, 736:12, 739:20
**negate** [1] - 661:2
**negative** [4] - 617:22, 618:4, 618:11, 692:14
**negatives** [1] - 657:8
**negligence** [9] - 728:3, 729:2, 729:4, 729:23, 730:6, 732:24, 733:8, 733:9, 737:10
**negligent** [3] - 729:20, 730:1, 730:4
**negligently** [2] - 729:6, 730:7

**net** [10] - 710:20, 710:22, 711:2, 711:3, 711:9, 711:25, 712:18, 712:21, 713:7, 713:11
**never** [22] - 463:25, 464:13, 472:21, 476:4, 483:12, 495:3, 500:1, 500:4, 521:3, 535:20, 540:2, 598:25, 599:16, 601:2, 606:11, 607:9, 658:11, 659:12, 674:17, 675:18, 703:12, 726:18
**new** [13] - 498:10, 498:11, 509:3, 509:4, 513:12, 522:14, 522:17, 522:21, 569:23, 575:3, 580:4, 580:25, 633:16
**next** [43] - 438:19, 439:7, 442:13, 502:8, 502:9, 502:17, 510:11, 512:11, 518:20, 525:4, 529:19, 533:18, 533:24, 534:1, 534:19, 554:25, 559:13, 562:24, 563:16, 568:19, 570:11, 570:17, 571:24, 574:1, 576:6, 578:7, 582:16, 583:24, 604:12, 608:21, 613:4, 620:14, 637:15, 654:8, 660:8, 680:6, 683:20, 710:15, 716:2, 725:3, 730:13, 740:6, 741:13
**nicely** [1] - 743:8
**nine** [2] - 575:21, 580:18
**Ninth** [25] - 683:2, 683:3, 683:5, 684:16, 684:17, 684:18, 684:20, 685:22, 688:2, 688:7, 688:11, 688:17, 689:5, 698:11, 698:19, 699:22, 700:19, 718:11, 720:16, 734:17, 734:18, 734:22, 735:6, 735:7, 735:18
**nobody** [1] - 497:6
**non** [4] - 683:12, 686:10, 688:5, 711:17
**non-economic** [3] - 683:12, 686:10, 711:17
**non-pecuniary** [1] - 688:5
**none** [3] - 461:24, 495:17, 720:14
**nonetheless** [1] - 707:9
**nonmoving** [1] - 700:8
**nonsense** [2] - 655:10, 655:12
**noon** [1] - 553:21
**normal** [8] - 516:21, 529:17, 583:16, 696:21, 699:2, 699:11, 701:13, 702:15
**normally** [1] - 619:9
**North** [2] - 451:9, 515:7
**notarized** [2] - 566:15, 613:2
**notate** [6] - 440:15, 441:4, 441:7, 519:15, 519:16, 519:17
**notated** [2] - 441:9, 442:9
**notating** [1] - 439:3
**notation** [15] - 438:23, 440:6, 443:12, 460:4, 464:25, 472:18, 472:19, 472:21, 504:17, 504:24, 519:23, 520:4, 520:25, 528:8, 528:9
**notations** [7] - 438:1, 438:12, 470:9, 481:23, 505:3, 528:1, 579:15
**note** [14] - 443:16, 443:19, 444:14, 445:23, 450:5, 476:18, 492:25, 520:16, 588:16, 589:5, 589:10, 597:6, 649:6
**noted** [3] - 482:3, 482:4, 698:25
**notes** [49] - 438:4, 439:12, 439:18,

442:7, 442:11, 460:3, 464:8, 464:19, 464:20, 464:23, 465:1, 465:3, 465:13, 465:18, 465:25, 471:19, 471:22, 472:9, 480:12, 519:14, 538:22, 539:6, 539:7, 545:7, 563:9, 573:12, 575:7, 581:21, 587:22, 590:14, 594:9, 594:14, 596:6, 596:13, 596:17, 599:3, 599:6, 599:10, 599:14, 599:17, 607:1, 607:15, 607:19, 631:12, 646:8, 653:5, 653:11

**nothing** [20] - 489:1, 489:11, 538:18, 540:15, 550:19, 569:3, 596:9, 604:21, 619:20, 635:18, 635:20, 636:23, 644:2, 644:5, 676:8, 686:15, 705:7, 706:2, 711:19, 719:24

**notice** [18] - 474:13, 524:19, 575:22, 580:19, 581:21, 585:22, 585:24, 619:9, 649:11, 726:21, 730:21, 732:4, 732:22, 737:6, 739:17, 744:3, 744:5, 744:6

**notices** [10] - 724:12, 725:18, 725:23, 732:9, 739:25, 743:6, 743:11, 743:13, 744:15, 744:19

**notifications** [1] - 514:15

**notified** [7] - 462:14, 592:21, 600:21, 600:23, 601:9, 644:16, 674:18

**notify** [1] - 666:19

**notifying** [2] - 564:4, 719:19

**notion** [1] - 723:12

**November** [51] - 441:18, 442:19, 443:17, 444:3, 444:11, 444:14, 462:20, 463:9, 463:11, 464:11, 465:9, 465:10, 483:1, 490:24, 491:2, 491:3, 491:7, 492:18, 492:24, 492:25, 493:15, 525:20, 527:9, 527:15, 531:6, 541:22, 541:25, 544:19, 545:21, 545:24, 550:17, 579:6, 579:22, 579:25, 583:4, 583:7, 583:11, 589:2, 591:17, 591:19, 592:10, 617:19, 618:8, 641:12, 660:3, 670:21, 671:7, 671:8, 674:5, 689:13

**novo** [1] - 622:12

**number** [41] - 443:10, 449:2, 449:4, 450:4, 469:13, 469:14, 507:19, 518:25, 520:23, 520:24, 521:23, 525:18, 527:19, 535:19, 535:20, 566:14, 569:19, 572:19, 576:3, 581:22, 585:19, 585:20, 587:18, 588:11, 623:14, 624:16, 624:17, 626:16, 627:5, 627:6, 627:8, 642:6, 656:8, 670:23, 692:4, 704:16, 711:19, 712:11, 713:10, 725:19

**numbered** [2] - 730:19, 730:20

**numbers** [7] - 439:16, 570:7, 626:16, 635:2, 691:13, 725:1, 725:8

# O

**oath** [2] - 586:13, 613:2

**object** [2] - 708:15, 714:23

**objected** [1] - 726:23

**objection** [35] - 440:19, 456:10, 456:25, 457:25, 458:5, 467:5, 473:4, 477:20, 486:24, 495:5, 501:16, 506:13, 534:15, 534:16, 541:13, 561:14, 561:15, 577:16, 579:11, 608:17, 608:18, 619:12, 620:10, 620:11, 620:12, 673:24, 677:23, 680:3, 705:25, 708:21, 712:25, 713:23, 714:7, 720:20, 733:11

**objections** [1] - 709:8

**obligation** [2] - 505:25, 548:16

**obtain** [11] - 542:23, 544:1, 544:5, 568:22, 583:25, 618:5, 627:14, 654:5, 693:14, 694:17, 703:10

**obtained** [1] - 598:1

**obvious** [1] - 733:16

**obviously** [16] - 451:19, 539:3, 554:4, 560:3, 584:1, 613:14, 629:2, 634:4, 636:10, 637:17, 642:17, 648:2, 653:8, 666:7, 698:9, 707:22

**occasion** [1] - 573:20

**occasionally** [2] - 521:11, 611:8

**occur** [3] - 556:20, 626:14, 629:1

**occurred** [5] - 510:4, 562:13, 566:9, 677:2, 731:24

**occurring** [4] - 446:22, 558:24, 590:24, 689:13

**occurs** [1] - 629:23

**October** [54] - 456:9, 456:16, 463:9, 465:5, 494:15, 520:11, 524:21, 526:11, 532:16, 533:16, 533:19, 533:22, 538:25, 544:17, 544:24, 547:12, 549:4, 549:5, 550:17, 562:2, 573:22, 585:13, 588:21, 595:16, 595:23, 596:5, 596:11, 597:3, 599:22, 600:4, 600:5, 600:14, 602:5, 612:2, 617:19, 632:18, 632:22, 636:1, 640:9, 640:15, 640:18, 644:22, 654:3, 659:15, 659:22, 666:1, 667:19, 667:20, 668:1, 669:3, 670:20, 671:10, 671:18, 674:4

**OF** [2] - 435:2, 435:15

**offer** [3] - 561:13, 577:15, 711:25

**offered** [2] - 686:19, 709:22

**offering** [1] - 501:11

**offers** [1] - 697:6

**offhand** [1] - 530:4

**office** [3] - 518:18, 599:20, 624:8

**Office** [11] - 453:7, 453:8, 453:9, 453:11, 557:4, 593:7, 593:9, 593:11, 593:18, 593:25, 676:4

**officer** [5] - 481:20, 521:14, 534:21, 536:7, 622:3

**officers** [1] - 521:12

**offices** [1] - 580:16

**Official** [1] - 746:13

**official** [2] - 613:8

**often** [6] - 627:3, 628:7, 629:20, 632:6, 659:3, 697:21

**Ogden** [1] - 667:23

**old** [4] - 522:19, 569:19, 575:6, 735:10

**OlsenDaines** [1] - 436:8

**omitting** [1] - 676:1

**on-board** [2] - 559:3

**on-boarding** [1] - 559:1

**on-file** [1] - 634:9

**on-the-job** [1] - 514:24

**once** [12] - 516:21, 526:21, 534:10, 540:21, 559:20, 612:24, 635:4, 636:21, 646:19, 652:16, 663:19, 666:16

**one** [154] - 438:11, 438:23, 439:8, 439:9, 439:23, 441:23, 442:17, 442:23, 443:17, 444:7, 445:1, 445:12, 445:25, 446:3, 446:11, 449:15, 449:17, 449:18, 450:16, 464:3, 466:11, 466:25, 467:16, 476:14, 476:17, 495:3, 495:16, 495:17, 496:1, 496:4, 496:7, 499:17, 500:1, 510:10, 520:14, 523:15, 523:19, 523:25, 525:21, 526:1, 528:2, 529:18, 532:9, 549:6, 552:12, 553:12, 553:23, 554:5, 556:18, 560:5, 560:7, 560:23, 560:25, 561:4, 562:7, 565:10, 566:20, 566:21, 567:1, 567:12, 567:15, 579:7, 579:10, 579:21, 580:18, 592:5, 597:9, 597:21, 602:8, 603:12, 603:14, 604:5, 604:11, 604:19, 605:8, 605:16, 612:21, 617:12, 617:22, 622:12, 626:2, 626:9, 626:11, 630:2, 633:10, 637:13, 638:3, 638:24, 641:23, 642:3, 642:8, 643:11, 647:18, 660:8, 662:23, 677:7, 678:20, 690:18, 690:19, 691:8, 691:11, 692:13, 693:12, 694:6, 694:13, 695:5, 697:14, 697:16, 699:20, 701:10, 702:11, 704:9, 706:6, 706:7, 707:13, 708:9, 709:22, 710:12, 710:15, 710:18, 710:19, 711:11, 711:22, 714:11, 715:7, 715:8, 716:8, 716:17, 719:7, 722:23, 724:25, 725:3, 725:19, 726:10, 726:24, 727:2, 727:3, 729:20, 730:1, 730:13, 730:15, 731:4, 732:8, 732:17, 734:4, 737:4, 737:25, 738:11, 738:12, 738:15, 739:6, 740:13

**one-sided** [1] - 496:4

**ones** [7] - 446:15, 467:21, 565:22, 677:12, 681:10, 696:24, 715:13

**ongoing** [7] - 494:3, 512:2, 515:1, 517:9, 521:6, 528:11, 634:23

**online** [2] - 615:23, 627:4

**oOo** [1] - 746:1

**open** [10] - 449:11, 463:21, 464:17, 485:15, 488:5, 494:1, 559:15, 572:3, 590:25, 591:1, 591:6, 593:12, 608:10, 631:13, 634:14, 634:20, 636:19, 684:20, 685:19

**opened** [20] - 462:17, 465:18, 493:17, 494:16, 494:17, 586:10, 602:22, 603:3, 603:6, 603:7, 603:9, 603:21,

604:2, 633:1, 636:21, 636:23, 646:9, 659:23, 668:25, 673:23
**opening** [8] - 454:19, 498:19, 606:18, 636:8, 714:3, 729:16, 736:10, 736:17
**opens** [2] - 586:22, 608:7
**operate** [1] - 701:1
**operated** [1] - 621:22
**operational** [2] - 514:4, 555:20
**operations** [37] - 450:7, 453:20, 453:21, 462:6, 468:2, 468:11, 468:24, 468:25, 469:1, 475:10, 475:17, 475:21, 476:21, 477:3, 480:23, 482:1, 495:17, 501:13, 502:1, 502:3, 507:7, 545:18, 557:15, 560:1, 564:2, 600:8, 600:19, 601:11, 601:15, 646:3, 652:19, 666:8, 666:11, 666:14, 666:18, 666:25, 667:12
**operator** [11] - 472:14, 575:11, 626:21, 628:5, 629:20, 630:14, 631:1, 631:11, 631:21, 634:13, 634:19
**operators** [27] - 461:6, 472:3, 474:9, 483:10, 484:11, 487:19, 495:17, 632:1, 634:5, 636:20, 645:25, 650:24, 651:23, 652:15, 653:4, 653:10, 656:23, 657:6, 657:12, 657:24, 658:4, 658:9, 663:22, 677:4, 677:14, 678:6, 679:7
**opinion** [21] - 558:6, 612:15, 612:18, 613:11, 629:15, 641:18, 642:22, 664:25, 665:9, 665:13, 679:20, 683:3, 683:5, 684:18, 688:6, 688:13, 692:14, 733:20, 733:22, 735:8
**opportunity** [17] - 522:1, 566:10, 582:6, 583:10, 630:5, 642:13, 681:11, 693:14, 694:17, 694:22, 696:22, 696:25, 697:2, 697:5, 697:18, 702:25, 704:11
**oppose** [5] - 704:5, 721:20, 723:24, 724:2, 729:19
**opposed** [2] - 554:16, 741:1
**opposite** [1] - 672:6
**oppressive** [1] - 736:12
**option** [6] - 485:19, 485:25, 486:2, 498:23, 499:5, 506:3
**OR** [5] - 436:7, 436:10, 436:13, 436:18, 436:21
**oranges** [1] - 662:15
**order** [10] - 507:25, 543:3, 638:22, 654:4, 691:5, 699:1, 703:11, 709:20, 718:17, 736:8
**OREGON** [1] - 435:2
**Oregon** [5] - 435:6, 615:22, 688:8, 693:10, 746:13
**organization** [3] - 621:18, 642:24, 672:6
**organizations** [1] - 558:19
**original** [7] - 579:16, 632:16, 661:20, 729:11, 729:14, 729:17, 746:6
**originally** [2] - 723:25, 729:5
**originated** [1] - 566:20
**origination** [7] - 537:11, 538:14, 556:14,

557:1, 557:2, 562:12, 654:1
**originations** [1] - 610:15
**otherwise** [1] - 694:6
**outcome** [3] - 584:21, 589:15, 589:22
**outline** [1] - 566:10
**outlined** [1] - 506:17
**outlines** [1] - 652:4
**outreach** [1] - 667:6
**outside** [7] - 553:9, 554:11, 554:12, 619:12, 628:2, 629:23, 679:14
**outstanding** [1] - 673:13
**overall** [3] - 614:24, 645:3, 664:8
**overrule** [1] - 708:16
**overruled** [11] - 440:20, 456:11, 457:25, 458:6, 467:6, 473:5, 477:21, 501:18, 534:16, 541:14, 712:25
**oversaw** [2] - 622:18, 624:1
**overstate** [1] - 633:4
**overstated** [1] - 700:15
**owed** [1] - 672:3
**own** [9] - 461:23, 496:2, 530:18, 552:22, 559:17, 624:23, 633:10, 657:25, 664:1
**owned** [1] - 567:20
**Owned** [1] - 621:20
**owner** [2] - 521:23, 525:17
**owns** [1] - 567:20

---

# P

**P.C** [1] - 436:11
**P.O** [2] - 451:9, 451:10
**Pacific** [1] - 623:2
**package** [3] - 564:22, 565:10, 620:2
**packet** [10] - 443:20, 516:23, 517:14, 519:24, 528:5, 533:1, 533:23, 534:4, 549:20, 583:5
**page** [62] - 443:8, 502:8, 502:9, 502:17, 503:2, 503:12, 503:18, 503:21, 517:9, 517:19, 518:22, 519:11, 519:20, 520:14, 524:13, 526:2, 527:25, 528:1, 528:3, 543:6, 549:4, 561:1, 561:8, 561:9, 562:17, 564:25, 568:24, 574:17, 575:15, 576:13, 578:13, 580:10, 580:18, 581:3, 581:4, 641:13, 657:10, 678:5, 678:22, 710:5, 710:11, 712:24, 713:15, 714:9, 714:10, 715:14, 715:18, 716:3, 721:12, 724:8, 724:24, 725:1, 730:15, 730:16, 732:16, 736:4, 737:19, 737:22, 739:16, 741:14
**pages** [13] - 503:13, 560:22, 575:21, 575:22, 576:24, 580:16, 580:17, 580:19, 580:20, 581:2
**paid** [3] - 447:18, 692:21
**pain** [2] - 684:1, 703:19
**painful** [1] - 639:4
**paragraph** [16] - 450:25, 479:19, 527:18, 562:25, 582:11, 709:25, 710:3, 710:6, 714:14, 715:5, 718:13, 730:20, 732:23, 733:2, 733:5, 741:17

**paragraphs** [2] - 730:19
**parcel** [2] - 637:15, 639:13
**part** [64] - 448:2, 453:21, 453:24, 460:24, 464:15, 465:14, 509:17, 511:8, 511:9, 513:20, 517:19, 529:2, 530:12, 548:20, 548:23, 552:25, 559:1, 560:14, 566:3, 580:22, 583:16, 586:18, 587:12, 587:21, 587:25, 595:18, 599:1, 599:3, 599:5, 602:23, 604:19, 611:10, 612:14, 617:7, 617:15, 622:20, 627:1, 628:24, 632:7, 636:24, 637:3, 637:15, 639:13, 645:2, 652:16, 656:15, 662:16, 671:19, 682:14, 684:19, 685:25, 699:10, 704:21, 709:8, 715:4, 716:21, 723:2, 726:18, 729:15, 729:20, 734:24, 739:10
**participation** [1] - 702:17
**particular** [13] - 516:20, 559:21, 575:4, 604:13, 611:13, 618:11, 682:18, 683:3, 701:10, 706:3, 718:16, 721:3, 737:8
**particularly** [6] - 611:15, 622:22, 628:16, 629:18, 629:22, 695:17
**particulars** [2] - 706:15, 738:12
**parties** [8] - 437:2, 500:19, 554:20, 633:20, 691:23, 694:8, 713:5, 718:10
**partner** [1] - 461:14
**partners** [3] - 557:1, 557:4, 578:17
**parts** [3] - 502:7, 737:20
**party** [11] - 453:13, 596:1, 596:17, 618:17, 618:18, 688:19, 689:23, 694:5, 695:24, 700:8, 702:20
**passport** [5] - 526:6, 550:14, 580:16, 581:2, 581:4, 591:22, 592:5, 613:15, 642:9, 673:17
**past** [2] - 514:6, 625:12
**pasting** [1] - 715:10
**pause** [1] - 702:5
**pay** [2] - 567:16, 672:2
**paying** [1] - 692:20
**payment** [10] - 539:9, 540:1, 540:2, 540:5, 540:6, 540:9, 626:9, 626:11, 626:25, 667:22
**payments** [2] - 447:17, 626:8
**pecuniary** [5] - 682:23, 683:12, 687:25, 688:5, 700:13
**penalty** [1] - 707:7
**pendency** [1] - 659:21
**pending** [17] - 462:20, 462:23, 463:1, 463:4, 463:8, 463:15, 463:20, 463:25, 464:11, 482:7, 484:13, 489:10, 545:19, 545:20, 545:23, 585:18, 649:7
**people** [25] - 453:15, 456:1, 464:18, 465:17, 470:11, 492:7, 523:25, 564:17, 568:10, 582:4, 582:6, 588:9, 594:22, 605:18, 613:25, 642:20, 656:12, 662:4, 667:13, 692:6, 692:25, 706:16, 709:13, 719:25, 736:15
**people's** [2] - 626:14, 642:21

**per** [7] - 446:14, 448:25, 483:15, 490:13, 496:3, 592:2, 607:19

**percent** [5] - 469:11, 469:12, 624:20, 624:21

**perfectly** [2] - 627:3, 712:10

**perform** [5] - 447:11, 454:21, 511:6, 557:21, 560:5

**performed** [2] - 437:19, 460:23

**perhaps** [1] - 742:12

**period** [10] - 466:10, 497:9, 510:8, 617:20, 617:22, 670:15, 718:21, 742:21, 742:23, 743:9

**periodically** [1] - 630:10

**person** [46] - 443:24, 465:3, 478:12, 492:2, 496:7, 513:5, 523:19, 524:1, 526:22, 527:16, 530:11, 536:12, 537:1, 537:6, 539:18, 559:8, 559:13, 564:23, 566:11, 566:25, 567:20, 568:18, 569:23, 579:16, 605:3, 605:14, 606:18, 613:20, 613:24, 615:9, 615:10, 615:13, 635:5, 648:3, 650:5, 662:21, 663:6, 670:23, 670:24, 676:16, 684:4, 691:9, 692:5, 695:20, 695:22, 695:24

**personal** [5] - 504:9, 597:23, 640:5, 640:16, 673:14

**personally** [1] - 460:7

**perspective** [2] - 570:8, 625:19

**pertaining** [1] - 448:19

**PETERSON** [49] - 467:23, 512:12, 513:2, 519:21, 519:22, 531:17, 534:15, 541:13, 548:12, 548:15, 553:7, 554:2, 554:9, 554:17, 554:21, 555:1, 555:15, 561:1, 561:2, 561:13, 561:17, 561:18, 577:15, 577:18, 577:19, 579:19, 579:20, 584:4, 607:23, 608:2, 608:13, 608:16, 608:22, 620:15, 621:4, 633:24, 635:10, 641:9, 641:11, 673:24, 677:23, 678:18, 678:22, 678:23, 679:24, 680:2, 680:7, 712:4, 712:9

**peterson** [1] - 436:16

**Peterson** [2] - 736:11, 736:17

**ph** [1] - 689:6

**phases** [1] - 622:2

**Philbin** [1] - 689:7

**phone** [15] - 453:15, 518:25, 520:7, 520:12, 527:21, 535:20, 549:17, 581:22, 585:20, 610:6, 667:6, 671:23, 672:12, 675:22, 676:10

**photo** [8] - 536:17, 565:13, 566:19, 566:22, 566:23, 581:6, 590:10, 642:8

**photographs** [1] - 638:8

**phrase** [4] - 489:14, 697:8, 732:20, 732:21

**physical** [1] - 711:16

**physically** [1] - 711:15

**pick** [1] - 676:10

**picture** [9] - 550:13, 550:18, 550:23, 550:25, 567:4, 576:2, 581:4, 638:9,
638:12

**piece** [13] - 559:10, 567:2, 582:18, 585:12, 587:13, 602:23, 604:13, 604:19, 613:17, 617:12, 659:14, 676:24

**pieces** [21] - 453:2, 516:7, 551:7, 551:16, 557:23, 558:10, 558:23, 565:8, 565:19, 565:20, 585:5, 585:7, 589:16, 604:11, 605:8, 611:16, 612:6, 612:9, 617:12, 640:19, 668:2

**pivot** [2] - 730:3

**place** [13] - 478:7, 564:3, 583:18, 583:20, 598:20, 653:19, 654:23, 667:5, 667:14, 667:17, 669:7, 703:22, 703:23

**placed** [2] - 504:25, 508:11

**places** [1] - 685:2

**plain** [1] - 709:2

**plaintiff** [36] - 451:20, 455:4, 475:2, 483:25, 484:15, 485:12, 485:17, 487:4, 490:2, 592:3, 682:20, 683:14, 683:25, 684:9, 689:12, 692:4, 697:22, 698:2, 698:13, 701:4, 701:9, 708:25, 709:9, 709:22, 709:23, 713:17, 714:21, 724:22, 727:15, 727:21, 729:8, 729:9, 730:9, 730:11, 735:7, 735:23

**Plaintiff** [1] - 435:4

**PLAINTIFF** [1] - 436:2

**plaintiff's** [8] - 459:7, 616:9, 616:13, 616:24, 617:16, 715:12, 715:14, 720:18

**Plaintiff's** [1] - 681:6

**plaintiffs** [3] - 611:7, 624:20, 681:1

**plan** [2] - 714:4, 737:15

**play** [2] - 510:3, 598:13

**played** [1] - 442:3

**plea** [3] - 589:11, 590:17, 660:6

**pleaded** [1] - 660:4

**pleading** [1] - 491:6

**pleasant** [1] - 672:4

**pled** [8] - 465:11, 589:3, 589:11, 615:4, 617:1, 647:8, 653:11, 697:21

**plenty** [2] - 521:10, 626:21

**point** [77] - 487:12, 501:25, 516:19, 524:2, 526:10, 527:11, 534:12, 534:18, 537:22, 537:23, 540:3, 541:21, 542:18, 546:24, 547:4, 550:2, 550:13, 573:25, 580:3, 582:22, 586:9, 586:24, 587:9, 589:6, 589:9, 591:6, 597:4, 634:21, 640:2, 641:25, 645:21, 649:15, 649:18, 655:2, 660:5, 660:10, 660:14, 665:3, 665:5, 666:25, 670:5, 674:20, 675:12, 675:20, 680:16, 681:20, 682:11, 686:8, 686:17, 697:24, 698:13, 699:22, 708:24, 710:17, 710:24, 711:11, 714:10, 717:17, 719:16, 719:23, 721:7, 721:11, 727:5, 731:4, 731:23, 735:5, 736:18, 737:9, 737:11, 738:16,
738:23, 739:4, 743:3, 744:7, 745:2

**pointed** [4] - 464:3, 688:21, 698:5, 743:23

**pointing** [2] - 652:15, 728:25

**points** [10] - 524:20, 526:25, 567:5, 575:16, 611:16, 637:25, 638:3, 638:6, 638:24, 686:11

**police** [97] - 465:4, 465:10, 491:6, 492:13, 516:25, 517:6, 517:8, 518:2, 521:6, 521:9, 521:10, 521:12, 521:14, 524:18, 526:8, 533:3, 533:5, 533:7, 534:2, 534:21, 534:23, 534:25, 535:12, 535:15, 535:16, 535:19, 535:20, 535:21, 536:2, 536:5, 536:6, 565:12, 566:13, 567:22, 567:23, 568:1, 571:19, 575:21, 580:19, 585:19, 585:24, 586:1, 586:3, 586:16, 586:20, 586:22, 587:5, 587:8, 587:9, 587:16, 587:18, 587:19, 587:20, 587:24, 588:1, 588:6, 588:9, 588:10, 588:13, 588:18, 588:22, 589:10, 590:2, 599:11, 599:16, 613:4, 613:7, 613:9, 615:3, 616:25, 617:5, 617:13, 617:14, 637:13, 639:11, 641:1, 646:19, 646:24, 647:6, 647:16, 653:11, 653:25, 654:8, 654:9, 655:24, 656:8, 665:3, 665:7, 665:13, 666:20, 674:17

**policies** [79] - 440:17, 458:13, 460:25, 470:7, 473:2, 473:10, 473:18, 474:1, 487:20, 489:7, 489:16, 493:24, 494:8, 495:1, 496:3, 496:17, 497:12, 497:19, 502:24, 503:22, 504:8, 504:11, 504:14, 504:18, 504:21, 505:11, 506:11, 508:9, 508:24, 518:4, 518:7, 521:7, 521:13, 521:14, 521:16, 524:8, 525:3, 529:13, 530:17, 560:11, 560:12, 562:2, 562:4, 565:16, 568:19, 568:20, 571:25, 573:6, 573:23, 573:25, 576:5, 577:4, 577:7, 577:13, 578:23, 581:18, 582:15, 583:14, 611:22, 611:23, 614:15, 614:17, 622:8, 622:21, 630:22, 631:1, 632:9, 633:13, 634:2, 635:19, 635:20, 636:5, 636:6, 652:4, 658:1, 663:24, 664:3, 679:18, 735:4

**policy** [71] - 439:3, 440:24, 441:1, 441:2, 441:5, 441:6, 452:10, 457:15, 457:20, 458:8, 459:13, 459:17, 459:23, 460:23, 462:3, 464:16, 465:23, 466:5, 470:3, 471:10, 471:16, 472:13, 473:6, 473:13, 473:14, 481:19, 487:10, 491:17, 498:5, 498:6, 498:14, 499:14, 499:15, 505:7, 505:8, 506:17, 507:1, 507:8, 508:3, 508:9, 511:2, 511:3, 511:13, 512:1, 517:13, 518:6, 523:15, 542:3, 543:11, 543:15, 543:17, 544:3, 544:5, 544:14, 544:25, 548:17, 551:12, 561:6, 561:19, 570:15, 588:17, 588:19, 588:20,

614:9, 615:2, 617:6, 630:8, 630:10, 654:15, 657:2
**portion** [1] - 468:24
**Portland** [6] - 435:6, 436:7, 436:10, 436:13, 436:18, 436:21
**position** [12] - 473:10, 474:3, 513:12, 513:17, 514:3, 515:8, 515:21, 555:23, 556:6, 622:17, 632:10, 698:10
**positions** [3] - 648:19, 689:5, 718:9
**positive** [3] - 533:7, 534:2, 535:15
**possibility** [2] - 590:16, 661:2
**possible** [19] - 497:17, 521:2, 533:17, 534:20, 534:24, 535:14, 535:22, 536:6, 538:5, 540:13, 542:8, 542:10, 544:21, 570:1, 582:8, 588:7, 589:25, 590:17, 663:11
**possibly** [4] - 472:23, 545:1, 576:14, 711:7
**potential** [19] - 514:14, 516:4, 521:18, 521:22, 522:12, 525:17, 534:12, 537:20, 543:2, 548:5, 556:12, 558:10, 568:23, 569:1, 578:8, 585:25, 586:22, 684:4, 698:15
**potentially** [20] - 481:21, 511:9, 535:11, 535:14, 537:7, 538:5, 538:20, 538:24, 543:25, 544:10, 545:1, 550:24, 566:3, 569:24, 570:24, 596:1, 631:18, 684:2, 686:2, 686:4
**power** [3] - 602:2, 602:11, 663:10
**practical** [1] - 569:12
**practice** [20] - 478:11, 499:17, 523:18, 525:1, 529:12, 529:17, 529:21, 530:19, 531:4, 532:15, 534:3, 534:6, 534:19, 535:2, 542:7, 542:22, 547:24, 548:5, 548:6, 688:14
**precautionary** [2] - 553:24, 680:20
**precedents** [1] - 735:19
**precedes** [1] - 725:5
**precise** [1] - 741:21
**predates** [1] - 644:23
**prefer** [2] - 628:21, 673:3
**preparation** [1] - 630:4
**prepared** [2] - 702:2, 702:4
**present** [2] - 513:7, 555:17
**presentations** [1] - 514:25
**presented** [6] - 685:10, 687:16, 687:21, 687:22, 693:19, 714:3
**presently** [2] - 513:9, 559:23
**president** [2] - 621:16, 622:14
**President** [11] - 453:7, 453:8, 453:9, 453:11, 557:4, 593:7, 593:10, 593:11, 593:18, 593:25, 676:5
**presume** [6] - 491:22, 510:16, 510:18, 647:18, 654:17, 656:12
**pretrial** [2] - 711:24, 738:17
**pretty** [11] - 562:14, 621:13, 622:2, 622:4, 623:10, 628:21, 646:20, 654:4, 705:13, 718:5, 718:10
**prevented** [2] - 550:21, 704:20
**prevention** [1] - 513:10

**previous** [6] - 447:6, 498:9, 525:8, 732:19, 739:21, 743:5
**previously** [7] - 437:10, 450:17, 469:7, 480:7, 525:8, 556:8, 569:21
**primarily** [7] - 453:15, 611:4, 611:6, 611:7, 620:2, 632:6, 669:25
**primary** [1] - 659:14
**privacy** [9] - 693:15, 694:16, 696:9, 696:23, 697:15, 697:16, 701:14, 702:19, 702:21
**Privacy** [2] - 683:6, 683:11
**private** [1] - 702:22
**proactive** [2] - 638:25, 672:8
**problem** [18] - 495:19, 625:4, 626:2, 627:21, 637:21, 638:15, 652:13, 658:16, 665:15, 667:8, 685:15, 702:8, 714:24, 720:2, 722:5, 722:10, 733:4, 744:24
**problems** [4] - 625:16, 626:1, 626:3, 639:21
**procedure** [51] - 455:3, 457:10, 457:20, 459:13, 463:15, 465:23, 466:3, 470:10, 470:13, 470:14, 481:19, 487:7, 487:10, 491:17, 498:6, 499:14, 504:4, 505:7, 505:8, 506:17, 507:19, 514:22, 516:21, 517:13, 535:6, 535:9, 538:18, 541:7, 541:9, 548:18, 561:19, 585:1, 587:21, 587:25, 588:2, 588:3, 592:2, 595:15, 595:18, 598:13, 599:5, 599:17, 614:9, 630:8, 644:11, 650:7, 650:20, 650:23, 650:25, 651:1, 655:4
**procedures** [157] - 447:8, 457:3, 457:6, 457:12, 457:15, 457:21, 458:4, 458:8, 458:14, 459:18, 459:23, 460:14, 460:23, 460:25, 462:3, 464:16, 470:1, 470:2, 470:3, 470:7, 470:17, 470:18, 470:21, 471:5, 471:10, 471:12, 471:16, 473:2, 473:7, 473:11, 473:13, 473:15, 473:18, 474:1, 474:5, 480:21, 483:6, 483:23, 484:14, 484:25, 485:11, 487:20, 489:8, 489:16, 490:1, 490:17, 492:18, 493:3, 493:10, 493:24, 494:9, 495:1, 496:3, 496:17, 497:12, 497:19, 500:25, 501:7, 501:9, 501:11, 501:15, 501:23, 502:4, 502:16, 502:22, 502:23, 502:24, 503:12, 503:13, 503:15, 503:17, 503:19, 503:23, 504:2, 504:6, 504:8, 504:12, 504:14, 504:19, 504:21, 505:11, 518:4, 518:7, 521:7, 521:15, 524:8, 529:13, 529:15, 530:17, 559:5, 560:6, 560:12, 560:15, 561:4, 562:2, 562:4, 562:7, 565:16, 571:25, 572:7, 573:7, 573:23, 573:25, 576:5, 577:4, 577:8, 577:13, 578:14, 581:18, 582:15, 583:14, 583:17, 583:18, 583:23, 584:12, 584:13, 584:20, 585:3, 585:4, 585:11, 595:6, 595:8, 595:24, 596:16, 596:21, 598:7, 598:10, 598:15, 601:5, 601:10, 607:2,

607:4, 607:7, 611:11, 611:12, 622:8, 622:21, 630:9, 630:12, 632:9, 635:19, 635:20, 636:5, 636:6, 645:4, 648:6, 652:2, 652:3, 654:23, 658:1, 659:6, 659:11, 663:24, 664:3, 679:18, 735:4
**proceed** [10] - 437:5, 500:22, 542:11, 542:15, 579:18, 592:11, 633:23, 659:16, 710:9, 713:13
**PROCEEDINGS** [1] - 435:15
**proceedings** [3] - 745:7, 745:9, 746:5
**process** [45] - 442:6, 442:10, 447:12, 447:22, 447:25, 448:2, 450:12, 455:10, 457:10, 480:21, 505:23, 516:18, 530:9, 552:7, 559:9, 559:13, 559:17, 562:21, 563:24, 564:7, 571:2, 577:2, 577:3, 577:24, 578:25, 582:5, 594:2, 601:10, 607:11, 619:21, 624:2, 624:7, 625:6, 629:7, 629:8, 629:11, 629:15, 630:14, 631:5, 631:15, 631:18, 648:1, 654:19, 662:10, 675:15
**processed** [1] - 487:19
**processes** [2] - 514:21, 645:4
**processing** [3] - 457:3, 458:14, 487:13
**processor** [1] - 437:19
**product** [4] - 448:19, 610:14, 610:15, 614:18
**productive** [1] - 672:6
**products** [1] - 610:13
**professional** [1] - 556:2
**proficient** [1] - 559:20
**program** [1] - 606:14
**prohibited** [2] - 465:21, 465:23
**prohibits** [1] - 652:10
**pronouncing** [1] - 688:3
**proof** [6] - 521:23, 525:16, 526:21, 540:22, 646:20, 661:18
**properly** [2] - 637:20, 663:10
**proposal** [2] - 718:7, 729:11
**propose** [7] - 721:14, 727:6, 729:1, 730:20, 732:6, 739:22, 741:20
**proposed** [6] - 683:18, 708:3, 709:7, 729:5, 730:14, 742:19
**proposing** [4] - 729:12, 730:18, 741:14, 743:6
**proposition** [2] - 709:1, 717:3
**prosecution** [1] - 465:15
**protective** [1] - 699:1
**prove** [5] - 521:24, 604:18, 606:17, 731:6, 731:13
**proved** [1] - 713:9
**proven** [1] - 731:16
**provide** [32] - 464:8, 470:9, 474:17, 486:19, 487:6, 487:11, 487:24, 496:17, 521:22, 521:24, 521:25, 525:16, 526:22, 533:9, 536:12, 544:1, 548:24, 563:12, 566:12, 566:13, 567:21, 568:19, 572:13, 583:21, 583:23, 584:1, 624:2, 638:25, 650:4, 653:24, 658:13, 693:4
**provided** [17] - 497:12, 525:9, 527:5,

527:9, 531:5, 534:4, 534:12, 571:14, 575:19, 604:20, 641:18, 653:23, 659:14, 664:9, 673:8, 679:15, 726:6
**providers** [1] - 623:15
**provides** [2] - 630:11, 650:22
**providing** [7] - 457:22, 477:10, 489:18, 516:14, 572:21, 661:23, 664:9
**provisions** [1] - 738:1
**proximate** [3] - 686:21, 686:22, 687:4
**publish** [2] - 561:17, 577:18
**pull** [11] - 438:16, 443:7, 444:8, 452:16, 474:21, 508:11, 611:19, 626:22, 681:21, 681:23, 734:4
**pulled** [2] - 635:9, 710:13
**pulling** [3] - 437:21, 451:16, 627:9
**pulls** [2] - 609:21, 640:11
**punish** [1] - 673:10
**punitive** [1] - 711:4
**purchase** [3] - 526:23, 537:2, 537:14
**purchased** [6] - 465:5, 550:8, 588:24, 647:9, 647:17, 659:23
**purchaser** [1] - 598:22
**purpose** [16] - 454:14, 454:24, 455:3, 457:12, 466:22, 565:24, 567:9, 567:22, 643:24, 644:12, 667:19, 667:20, 667:21, 669:16, 711:3
**purposes** [3] - 648:22, 683:7, 683:11
**pursuant** [10] - 485:11, 490:1, 492:18, 493:3, 493:10, 493:23, 507:13, 542:3, 544:14, 657:2
**purview** [1] - 601:14
**put** [19] - 467:19, 467:23, 469:13, 469:14, 478:7, 479:16, 502:13, 502:14, 502:19, 567:3, 570:4, 578:18, 585:22, 687:17, 688:23, 690:3, 692:1, 692:4, 742:5
**puts** [2] - 702:23, 731:7
**putting** [2] - 691:5, 721:15
**puzzle** [1] - 582:18

## Q

**quality** [1] - 610:7
**quantifiable** [2] - 704:13, 705:13
**questioned** [1] - 651:10
**questions** [25] - 454:4, 505:16, 512:8, 518:23, 531:17, 548:10, 550:6, 553:12, 559:15, 584:4, 607:21, 608:13, 618:24, 620:1, 620:4, 620:6, 643:13, 669:18, 669:22, 670:4, 678:14, 679:24, 682:17, 696:7, 703:17
**queue** [4] - 578:15, 578:16, 578:19
**quick** [3] - 565:15, 574:18, 579:21
**quickly** [11] - 438:20, 442:23, 444:20, 445:7, 445:12, 450:4, 453:5, 570:23, 573:21, 582:8, 734:4
**quintessential** [1] - 717:12
**quite** [6] - 563:15, 580:7, 616:2, 616:3, 641:13, 686:11
**quote** [3] - 682:10, 685:25, 736:3

**quoting** [1] - 699:24

## R

**raise** [14] - 495:11, 496:7, 496:22, 512:14, 555:3, 608:23, 620:17, 683:20, 685:19, 690:2, 708:21, 708:24, 711:1, 722:5
**raised** [6] - 497:6, 630:24, 652:25, 682:3, 710:24, 711:8
**raising** [3] - 496:20, 686:9, 711:10
**ran** [2] - 682:14, 733:25
**range** [1] - 568:10
**rate** [1] - 646:14
**rather** [2] - 639:17, 667:23
**re** [3] - 456:13, 504:23, 711:10
**re-ask** [2] - 456:13, 504:23
**re-raising** [1] - 711:10
**reach** [7] - 453:15, 508:25, 533:1, 669:11, 671:3, 711:5, 711:20
**reached** [4] - 616:25, 670:24, 718:1, 725:21
**read** [41] - 438:20, 442:23, 443:19, 444:20, 445:20, 446:11, 451:8, 490:6, 492:25, 501:3, 506:9, 559:4, 587:23, 589:9, 639:24, 664:18, 664:21, 677:9, 681:5, 681:10, 683:1, 684:22, 685:4, 694:13, 700:17, 701:3, 708:25, 709:10, 713:5, 714:15, 716:24, 721:24, 724:18, 724:20, 727:12, 730:21, 734:23, 734:24, 739:3, 739:5, 739:23
**readily** [2] - 648:15, 667:3
**Reading** [2] - 439:14, 442:25
**reading** [11] - 443:20, 444:21, 445:9, 445:21, 446:12, 682:16, 720:6, 733:24, 734:1, 734:12, 738:25
**reads** [2] - 729:18, 739:2
**ready** [3] - 598:2, 680:13, 700:14
**real** [7] - 469:25, 565:15, 574:17, 579:21, 638:12, 655:8, 742:18
**realigned** [1] - 669:2
**realize** [2] - 686:12, 730:24
**realized** [1] - 683:4
**really** [63] - 445:12, 456:7, 484:20, 489:4, 535:9, 540:19, 559:15, 560:7, 566:10, 567:6, 568:4, 588:14, 589:14, 606:21, 622:20, 623:25, 625:8, 625:19, 627:21, 628:2, 628:7, 629:5, 629:17, 629:20, 631:16, 632:15, 634:9, 634:22, 636:8, 637:15, 637:20, 639:4, 639:25, 640:17, 643:1, 644:2, 654:12, 657:16, 669:18, 676:19, 678:9, 685:19, 686:13, 690:24, 694:14, 695:23, 696:1, 698:15, 701:6, 702:12, 703:1, 711:7, 714:10, 717:2, 717:3, 717:4, 717:12, 726:9, 732:25, 734:4, 738:10, 738:20
**reason** [17] - 490:14, 497:2, 497:17, 499:1, 499:2, 514:5, 567:10, 589:13,

606:7, 614:8, 628:24, 629:17, 660:15, 685:9, 716:24, 722:25
**reasonable** [69] - 454:21, 612:15, 612:18, 612:22, 614:12, 614:13, 614:20, 615:1, 615:10, 615:13, 617:7, 617:10, 636:10, 637:11, 637:24, 638:19, 644:8, 644:18, 645:11, 645:16, 649:4, 649:16, 649:21, 650:20, 652:6, 653:23, 654:19, 654:22, 656:16, 656:19, 656:24, 657:6, 657:13, 662:2, 663:20, 663:22, 664:4, 664:6, 673:5, 673:6, 675:1, 675:7, 677:5, 678:6, 679:1, 679:19, 679:22, 682:8, 700:9, 701:11, 706:25, 716:4, 716:25, 717:14, 717:19, 717:22, 718:1, 718:8, 718:20, 718:23, 719:2, 720:4, 720:10, 720:25, 722:1, 723:5, 723:12, 733:2, 733:24
**reasonableness** [5] - 620:3, 637:21, 682:10, 717:4, 717:12
**reasonably** [3] - 635:4, 655:25, 693:25
**reasoning** [1] - 706:4
**reasons** [3] - 582:1, 648:24, 662:23
**rebuttal** [3] - 553:17, 554:10, 680:8
**receipt** [4] - 516:19, 562:5, 562:21, 571:24
**receipts** [5] - 477:11, 477:25, 478:1, 478:9, 478:19
**receive** [48] - 449:13, 449:19, 449:20, 461:20, 480:10, 495:22, 495:25, 496:5, 496:6, 497:8, 497:23, 522:4, 522:7, 522:11, 524:14, 535:2, 549:9, 556:21, 556:25, 557:18, 557:19, 565:4, 566:23, 569:3, 570:14, 570:17, 570:19, 570:20, 576:8, 578:4, 590:6, 591:1, 616:18, 616:20, 617:4, 619:9, 631:11, 655:8, 656:16, 675:7, 675:9, 696:22, 697:2, 697:6, 704:11, 743:24
**received** [67] - 443:21, 452:11, 455:23, 460:22, 476:9, 478:13, 482:12, 494:20, 496:14, 497:9, 499:24, 515:19, 516:17, 516:22, 522:17, 523:20, 524:11, 525:3, 527:21, 531:12, 531:13, 534:3, 535:4, 540:21, 540:25, 547:24, 550:13, 556:24, 561:16, 570:18, 574:11, 574:12, 575:1, 577:17, 580:4, 582:19, 584:22, 591:16, 591:20, 607:12, 632:17, 665:4, 665:18, 666:7, 666:8, 666:20, 668:24, 670:17, 671:23, 711:15, 724:12, 725:18, 725:23, 730:21, 732:3, 732:10, 732:22, 737:6, 739:25, 742:22, 742:24, 743:7, 743:11, 743:24, 744:8, 744:15, 744:20
**receives** [3] - 469:22, 506:1, 632:10
**receiving** [17] - 449:6, 514:12, 515:17, 515:18, 515:20, 517:12, 522:24, 523:2, 524:10, 529:17, 531:9, 551:21, 551:22, 616:14, 616:22, 632:18, 719:18

**recently** [1] - 559:25
**recess** [10] - 500:15, 500:18, 553:22, 554:18, 554:19, 633:17, 633:18, 633:19
**reckless** [16] - 682:13, 687:17, 687:23, 733:12, 733:18, 733:21, 733:22, 734:6, 734:9, 734:16, 734:20, 734:21, 735:19, 735:24, 735:25
**Reckless** [1] - 733:14
**recklessness** [1] - 735:15
**recognition** [1] - 657:2
**recognize** [6] - 516:1, 528:16, 528:18, 560:19, 571:5, 692:12
**recognized** [2] - 699:3, 699:23
**recognizes** [1] - 698:11
**recognizing** [1] - 663:25
**recollection** - 517:2, 518:12, 525:23
**reconvene** [4] - 437:3, 500:20, 554:20, 633:21
**reconvened** [1] - 745:10
**record** [49] - 441:8, 443:12, 448:19, 457:17, 464:10, 470:8, 471:20, 472:9, 472:18, 472:22, 473:15, 476:11, 476:13, 480:9, 481:5, 481:19, 482:2, 484:17, 485:14, 487:15, 487:25, 488:12, 489:10, 489:19, 496:15, 504:24, 507:25, 511:22, 564:15, 600:1, 608:8, 631:12, 634:6, 634:7, 634:9, 634:13, 651:4, 664:17, 664:21, 681:6, 681:25, 708:20, 715:22, 728:18, 728:22, 742:16, 745:6, 745:7, 746:4
**recordkeeping** [1] - 522:13
**records** [16] - 448:16, 492:5, 492:7, 492:10, 504:13, 504:20, 504:24, 522:18, 538:12, 596:10, 610:25, 623:24, 626:10, 627:16, 642:19, 642:21
**recover** [8] - 656:10, 683:14, 683:15, 683:25, 684:9, 689:12, 691:17, 701:5
**recoverable** [1] - 688:12
**recovered** [1] - 586:3
**recovery** [2] - 699:25, 700:1
**recross** [1] - 553:12
**recross-examination** [1] - 553:12
**red** [6] - 495:11, 496:7, 558:11, 562:18, 616:14, 616:23
**redirect** [5] - 505:17, 548:11, 607:22, 620:5, 678:15
**REDIRECT** [4] - 505:20, 548:14, 608:1, 678:17
**refer** [6] - 477:10, 511:9, 564:13, 578:17, 725:7, 737:24
**reference** [4] - 569:19, 571:19, 699:11, 711:10
**referral** [3] - 462:11, 578:4, 578:14
**referred** [4] - 590:16, 622:24, 636:13, 671:14
**referring** [11] - 462:11, 517:21, 573:2, 578:15, 581:7, 583:22, 598:7, 600:3,

646:7, 725:1, 727:2
**refers** [2] - 658:8, 714:2
**reflect** [3] - 449:2, 449:3, 449:4
**reflective** [1] - 632:25
**reflects** [1] - 626:24
**refund** [1] - 539:15
**regard** [9] - 503:14, 503:20, 504:22, 598:11, 598:15, 619:24, 687:12, 687:15, 687:20
**regarding** [10] - 514:13, 620:2, 675:9, 684:24, 685:5, 700:6, 701:4, 730:22, 732:4
**regardless** [6] - 547:19, 547:22, 562:11, 569:15, 663:13, 663:16
**regards** [18] - 452:24, 453:14, 457:19, 460:18, 470:17, 474:2, 475:18, 487:14, 497:12, 498:7, 504:15, 504:23, 687:14, 700:13, 701:4, 708:19, 737:9, 737:11
**regional** [1] - 622:16
**regional-type** [1] - 622:16
**regulations** [1] - 623:22
**reinvestigated** [1] - 737:19
**reinvestigations** [1] - 646:2
**reject** [2] - 499:19, 662:11
**rejected** [1] - 499:23
**relate** [2] - 631:5, 738:20
**related** [17] - 501:7, 519:18, 574:8, 577:4, 597:24, 623:12, 625:12, 625:14, 630:25, 634:1, 647:20, 654:11, 684:10, 684:11, 689:23, 705:1, 723:4
**relating** [1] - 624:24
**relationship** [9] - 557:12, 604:3, 606:4, 606:8, 626:25, 686:23, 688:23, 708:2, 708:5
**relationships** [2] - 606:6, 634:11
**relatively** [4] - 513:12, 559:24, 568:7, 580:4
**released** [1] - 554:10
**relevance** [2] - 467:5, 473:4
**relevant** [18] - 478:1, 478:4, 491:12, 502:22, 502:23, 503:7, 561:23, 562:2, 580:16, 581:2, 682:11, 701:3, 701:16, 711:2, 721:3, 726:6, 738:8
**relief** [1] - 729:23
**relocate** [1] - 514:8
**relying** [3] - 461:4, 512:5, 735:7
**remain** [4] - 485:1, 553:18, 554:11, 608:10
**remainder** [1] - 745:7
**remaining** [3] - 488:9, 554:6, 576:11
**remember** [48] - 448:25, 498:19, 501:6, 503:4, 503:6, 515:18, 520:6, 529:11, 530:7, 530:25, 532:25, 533:6, 533:13, 533:14, 535:22, 536:19, 539:16, 539:23, 540:17, 545:5, 546:8, 546:22, 546:23, 547:3, 547:6, 547:7, 547:8, 547:11, 549:11, 553:24, 586:6, 592:15, 598:8, 599:22, 599:23, 670:2,

680:20, 693:21, 706:8, 706:15, 706:18, 712:5, 731:2, 743:2
**remind** [2] - 443:11, 543:4, 697:22
**reminded** [1] - 672:18
**remove** [5] - 614:2, 663:1, 663:3, 663:6, 674:11
**removed** [7] - 467:9, 564:21, 674:19, 674:23, 675:18, 675:19, 676:22
**removing** [1] - 672:14
**renovation** [1] - 705:10
**rental** [2] - 704:21, 704:23
**reopen** [5] - 522:12, 569:17, 569:18, 575:2, 575:3
**repair** [1] - 628:18
**repairing** [1] - 625:14
**repeat** [3] - 543:19, 715:1, 717:7
**repeated** [2] - 714:11, 714:25
**repeatedly** [1] - 686:7
**rephrase** [1] - 506:14
**replacing** [1] - 734:7
**report** [51] - 454:25, 457:9, 458:3, 474:4, 484:22, 485:2, 487:23, 488:4, 488:9, 488:11, 488:15, 488:18, 488:25, 489:2, 489:3, 489:8, 492:13, 494:11, 494:12, 508:19, 511:24, 516:25, 517:6, 518:2, 524:18, 526:8, 535:16, 535:19, 535:21, 536:2, 564:4, 564:11, 565:12, 566:13, 567:22, 567:23, 568:2, 575:21, 580:19, 585:19, 585:24, 586:1, 586:22, 587:16, 587:18, 587:20, 587:24, 588:1, 588:6, 588:10, 588:13, 589:7, 590:2, 590:9, 592:20, 592:24, 599:16, 600:2, 600:20, 613:5, 617:5, 617:13, 618:12, 618:20, 626:17, 637:13, 641:1, 648:11, 648:12, 654:8, 661:8, 665:3, 665:7, 665:13, 666:20, 667:10, 667:16, 668:10, 668:16, 668:21, 669:5, 669:8, 673:6, 674:12, 675:2, 676:23, 684:3, 684:6, 684:8, 684:12, 686:2, 686:5, 688:19, 690:11, 690:16, 691:8, 692:10, 694:5, 694:7, 694:11, 695:12, 695:13, 698:5, 706:16, 706:20, 706:22, 743:20, 743:24
**reported** [10] - 475:7, 475:12, 488:3, 488:7, 494:11, 626:23, 627:11, 628:21, 695:14, 745:8
**REPORTER** [1] - 436:19
**reporter** [3] - 664:18, 745:3, 745:6
**Reporter** [1] - 746:13
**Reporting** [30] - 454:18, 474:6, 619:3, 623:19, 623:21, 649:10, 655:23, 658:7, 676:18, 690:23, 718:18, 719:6, 719:15, 719:22, 721:25, 722:14, 724:21, 726:4, 727:15, 727:21, 729:7, 729:9, 730:8, 730:10, 732:9, 734:20, 737:20, 738:1, 738:2, 738:4
**reporting** [55] - 445:22, 446:13, 449:12, 449:15, 455:4, 457:23, 475:7, 479:21, 486:1, 487:22, 489:9, 489:12, 508:1,

511:17, 511:24, 557:19, 601:25, 622:22, 623:13, 624:12, 626:5, 626:7, 628:10, 633:8, 645:8, 645:10, 645:15, 650:3, 659:4, 662:17, 667:13, 669:6, 669:7, 669:14, 674:10, 726:6, 730:23, 732:5, 732:22, 737:7, 739:25, 740:9, 740:10, 740:25, 741:3, 741:4, 741:5, 741:8, 743:7, 743:12, 743:21, 743:25, 744:8, 744:15

**reports** [13] - 454:11, 601:12, 609:21, 614:2, 617:16, 617:18, 617:21, 619:5, 624:10, 626:15, 643:21, 658:25, 691:22

**repossession** [3] - 566:6, 568:3, 661:21

**represent** [3] - 663:9, 700:24, 726:10

**representation** [1] - 700:18

**representations** [1] - 685:1

**representative** [3] - 456:8, 486:7, 573:16

**representatives** [1] - 573:20

**representing** [2] - 602:21, 700:24

**reputation** [27] - 683:18, 690:4, 690:8, 691:20, 692:7, 692:18, 692:22, 693:1, 693:14, 694:5, 694:8, 694:16, 695:11, 695:16, 696:2, 696:16, 696:20, 697:20, 697:21, 697:24, 698:1, 698:12, 701:8, 701:12, 702:8, 702:20, 742:12

**request** [50] - 516:23, 517:14, 517:22, 521:17, 534:8, 537:9, 538:15, 541:11, 544:24, 563:5, 563:14, 563:21, 565:4, 565:12, 566:7, 567:10, 570:21, 572:4, 572:10, 573:3, 578:4, 580:22, 585:7, 585:11, 588:17, 593:14, 599:4, 603:11, 611:15, 612:5, 612:16, 617:10, 637:5, 639:1, 642:11, 655:25, 662:23, 670:10, 689:22, 723:19, 725:12, 725:14, 732:11, 732:12, 732:20, 734:5, 737:5, 737:9, 739:14

**Requested** [1] - 739:17

**requested** [32] - 517:24, 518:3, 521:20, 524:21, 525:8, 526:11, 526:20, 527:11, 565:2, 570:11, 575:24, 581:11, 590:10, 606:3, 611:17, 637:3, 637:10, 640:20, 642:3, 642:12, 649:2, 649:19, 654:24, 656:20, 664:21, 666:21, 673:2, 673:4, 676:24, 723:23, 731:11, 732:13

**requesting** [21] - 443:23, 516:24, 517:21, 525:5, 527:6, 528:6, 541:25, 544:17, 548:1, 548:20, 549:7, 550:6, 565:24, 566:20, 567:9, 567:19, 568:20, 578:11, 581:16, 581:17, 595:16

**requests** [3] - 565:8, 565:21, 565:22

**require** [11] - 457:6, 470:18, 543:9, 543:22, 548:5, 584:23, 595:8, 606:15, 615:24, 616:1, 668:3

**required** [11] - 463:15, 480:23, 489:15, 498:11, 543:12, 558:16, 576:9,

606:20, 668:12, 736:11, 736:23

**requirement** [9] - 487:9, 505:7, 606:21, 679:13, 686:23, 686:24, 688:18, 707:8, 721:19

**requirements** [10] - 584:23, 623:21, 630:20, 640:18, 658:10, 701:8, 718:18, 719:15, 721:25, 732:8

**requires** [8] - 454:20, 638:20, 639:5, 644:8, 650:24, 658:6, 718:8, 733:1

**requiring** [4] - 470:21, 471:5, 471:12, 643:11

**research** [12] - 446:14, 546:20, 547:1, 562:8, 562:9, 562:16, 563:8, 565:7, 567:3, 595:5, 595:10, 601:22

**reserve** [1] - 701:1

**resolution** [4] - 525:22, 579:7, 665:20, 666:4

**Resolution** [1] - 564:1

**resolvable** [1] - 631:2

**resolve** [3] - 453:14, 582:7, 641:5

**resolved** [5] - 440:9, 441:15, 444:8, 530:5, 685:16

**respect** [5] - 557:17, 566:5, 584:21, 598:3, 711:9

**respond** [29] - 449:22, 452:13, 466:3, 467:12, 472:8, 472:10, 472:15, 476:8, 478:5, 481:24, 485:19, 485:22, 486:3, 487:8, 488:10, 488:11, 488:16, 488:17, 491:18, 496:1, 497:24, 510:20, 569:2, 625:10, 659:13, 669:2, 681:11, 694:23, 697:18

**responded** [17] - 441:17, 446:5, 447:1, 452:4, 476:4, 482:25, 485:15, 485:23, 487:14, 488:5, 489:1, 493:14, 494:21, 496:15, 524:8, 672:14, 719:18

**responder** [5] - 438:4, 438:23, 447:4, 508:10, 511:4

**responders** [5] - 443:13, 443:14, 447:18, 510:23, 512:2

**responding** [14] - 450:22, 455:24, 472:5, 473:23, 474:2, 485:25, 487:16, 489:20, 506:17, 601:16, 619:24, 622:9, 630:12, 652:23

**responds** [1] - 473:19

**response** [64] - 437:19, 445:3, 445:13, 450:8, 450:11, 450:12, 457:19, 457:22, 470:9, 474:4, 474:17, 477:3, 477:9, 478:13, 481:11, 482:23, 484:15, 485:16, 486:19, 487:11, 488:8, 488:14, 488:24, 489:12, 489:15, 490:2, 490:18, 494:10, 497:12, 503:10, 504:18, 504:25, 509:5, 509:15, 509:22, 509:23, 509:25, 516:10, 517:17, 522:5, 522:7, 522:8, 533:16, 534:8, 535:7, 544:24, 549:10, 550:3, 573:9, 574:18, 580:5, 580:17, 594:7, 640:13, 648:25, 652:17, 666:3, 671:7, 677:14, 681:1, 685:15, 689:14, 694:24, 718:4

**responses** [8] - 437:15, 438:8, 438:11,

454:9, 464:3, 487:3, 526:7, 679:21

**responsibilities** [6] - 461:8, 462:2, 514:11, 621:25, 624:2, 645:23

**responsibility** [3] - 530:12, 601:20, 622:7

**responsible** [8] - 475:12, 509:21, 511:17, 601:12, 601:16, 652:21, 676:16, 677:13

**responsive** [2] - 477:13, 639:5

**rest** [5] - 563:24, 589:10, 688:15, 718:10, 740:11

**restriction** [2] - 494:24, 495:2

**rests** [1] - 680:7

**result** [19] - 458:3, 461:13, 461:19, 472:4, 484:19, 484:21, 484:25, 486:20, 488:8, 600:1, 607:7, 659:8, 691:18, 698:3, 709:3, 724:16, 727:11, 727:16, 727:24

**resulted** [6] - 532:22, 547:1, 603:1, 658:4, 660:11, 668:7

**results** [2] - 460:20, 471:23

**retain** [2] - 569:17, 640:10

**retains** [1] - 629:25

**retirement** [2] - 706:21, 707:1

**retitle** [1] - 739:18

**retract** [1] - 592:7

**return** [3] - 444:6, 569:1, 665:11

**returned** [7] - 482:4, 491:8, 527:12, 540:1, 586:4, 664:25, 667:6

**reversed** [4] - 735:12, 735:14, 735:21, 735:25

**review** [48] - 460:12, 473:21, 474:16, 483:15, 487:5, 496:2, 503:17, 517:2, 519:8, 525:23, 525:25, 529:10, 530:20, 552:8, 557:22, 558:1, 560:5, 560:12, 562:18, 563:17, 572:2, 574:1, 577:20, 578:5, 582:18, 582:21, 583:16, 594:2, 595:11, 595:25, 596:12, 599:20, 600:21, 601:10, 611:11, 611:14, 617:16, 617:18, 627:16, 630:5, 630:17, 634:6, 635:22, 636:4, 641:16, 642:19, 718:13, 726:5

**reviewed** [32] - 438:4, 438:8, 460:3, 486:17, 497:11, 527:8, 529:13, 529:15, 531:1, 531:3, 546:14, 560:24, 571:5, 571:6, 571:11, 571:12, 571:18, 574:7, 574:13, 574:14, 576:7, 577:12, 579:3, 583:2, 585:17, 598:5, 603:22, 610:25, 611:23, 636:25, 639:15, 679:7

**reviewing** [9] - 514:13, 528:18, 542:20, 544:18, 552:5, 559:10, 560:11, 599:4, 617:21

**reviews** [1] - 634:13

**revised** [1] - 732:7

**revisions** [1] - 565:20

**Reynolds** [4] - 734:17, 734:18, 735:5, 735:11

**RFA** [1] - 713:16

**rid** [1] - 628:22

**right-hand** [1] - 520:22

**rights** [3] - 644:3, 668:17, 676:18
**ring** [1] - 519:4
**risk** [11] - 514:4, 555:20, 556:12, 558:9, 558:10, 682:14, 682:15, 702:24, 733:15, 733:25, 734:1
**risky** [1] - 720:17
**RMR** [2] - 436:19, 746:12
**Road** [1] - 518:11
**robbed** [5] - 692:3, 692:6, 695:21, 695:23, 695:25
**Robert** [4] - 436:11, 436:11, 436:15, 742:16
**robust** [2] - 568:5, 589:17
**rocket** [1] - 668:3
**role** [7] - 461:8, 462:2, 510:3, 651:24, 652:1, 657:23, 677:16
**roles** [2] - 609:25, 624:1
**Room** [1] - 436:20
**Rothery** [1] - 689:6
**roughly** [7] - 468:5, 468:7, 468:10, 469:6, 513:25, 623:11, 624:19
**route** [1] - 557:25
**routed** [1] - 578:14
**routinely** [2] - 521:20, 613:17
**rule** [2] - 471:24, 700:14
**ruling** [4] - 687:20, 699:1, 700:18, 701:1
**run** [6] - 447:8, 453:1, 512:5, 559:17, 631:21, 742:23
**running** [1] - 744:1
**RV** [1] - 609:22
**Ryan** [1] - 683:2

**S**

**s-2(a** [4] - 722:10, 723:1, 723:17, 723:18
**s-2(a)** [1] - 723:19
**s-2(b** [5] - 619:8, 663:18, 722:10, 742:24, 743:8
**SABIDO** [4] - 742:16, 743:4, 743:11, 745:1
**Sabido** [3] - 436:15, 742:15, 742:16
**saddens** [1] - 677:2
**Safeco** [14] - 682:11, 733:13, 733:17, 734:5, 735:9, 735:12, 736:3, 737:12, 737:14, 737:17
**sailing** [1] - 549:10
**sale** [2] - 536:10, 660:21
**sales** [1] - 610:12
**Salt** [1] - 621:10
**sand** [1] - 436:2
**Sand** [1] - 436:2
**Santana** [2] - 712:1, 712:20
**satisfied** [2] - 663:19, 719:21
**satisfy** [7] - 687:16, 718:18, 719:5, 719:15, 721:19, 721:24, 722:14
**save** [1] - 681:16
**saw** [29] - 438:4, 439:4, 441:12, 447:21, 448:20, 452:15, 454:18, 465:18, 472:19, 476:17, 476:23, 484:17, 486:6, 486:18, 596:9, 599:14, 600:21,

600:22, 617:20, 653:10, 653:15, 659:10, 665:6, 695:12, 695:13, 695:14, 698:2, 698:4, 708:2
**scenario** [2] - 521:8, 570:10
**scenarios** [1] - 467:13
**scenes** [1] - 594:10
**schemes** [1] - 558:22
**school** [1] - 621:9
**scientist** [1] - 668:4
**scope** [5] - 553:10, 619:12, 652:4, 683:23, 726:19
**scores** [2] - 610:14, 614:3
**scoring** [1] - 609:18
**screen** [5] - 507:18, 515:12, 560:17, 626:23, 628:6
**scroll** [2] - 560:21, 576:24
**SE** [1] - 436:3
**seat** [5] - 512:20, 555:9, 609:5, 620:23, 709:15
**seated** [5] - 437:4, 500:21, 554:24, 633:22, 680:25
**Second** [7] - 683:22, 684:23, 685:6, 688:14, 688:20, 698:22, 739:17
**second** [40] - 444:10, 479:18, 530:21, 564:25, 568:24, 574:17, 575:15, 582:21, 669:17, 670:13, 716:18, 716:20, 716:21, 718:7, 718:13, 720:19, 721:15, 722:13, 724:1, 724:4, 724:10, 725:16, 727:9, 729:21, 730:19, 732:11, 732:23, 733:2, 733:5, 737:9, 738:25, 739:2, 739:5, 739:8, 739:9, 740:18, 740:24, 741:12, 741:16
**second-level** [1] - 582:21
**secondly** [1] - 706:2
**section** [8] - 438:17, 440:9, 562:12, 562:19, 564:16, 619:7, 619:16, 643:24
**sections** [3] - 552:22, 650:2, 682:21
**Security** [86] - 443:23, 478:21, 500:10, 500:11, 516:25, 518:1, 521:23, 524:25, 525:12, 525:14, 525:18, 526:13, 527:7, 528:7, 529:4, 529:8, 529:23, 531:10, 542:1, 542:6, 542:12, 542:16, 542:23, 544:2, 544:6, 544:8, 544:12, 551:23, 565:14, 567:8, 567:9, 567:10, 567:14, 567:17, 570:6, 576:3, 581:13, 581:17, 582:13, 582:23, 590:11, 592:1, 592:12, 592:22, 603:11, 603:13, 603:14, 603:17, 603:24, 604:1, 604:7, 604:9, 604:18, 604:20, 604:22, 604:24, 605:6, 605:19, 606:1, 606:12, 606:16, 607:13, 613:10, 613:16, 614:10, 615:18, 615:19, 615:21, 621:10, 626:16, 627:5, 627:6, 635:2, 642:6, 661:1, 661:13, 662:20, 673:8, 673:11, 673:12, 673:16, 673:22, 675:10, 675:17, 675:23
**see** [72] - 438:14, 439:12, 439:23, 440:18, 441:2, 442:24, 444:20, 445:8, 465:4, 465:9, 465:13, 466:1, 466:24,

467:16, 471:22, 474:16, 481:23, 483:2, 495:18, 502:10, 505:3, 507:25, 508:1, 508:5, 508:11, 517:10, 518:23, 519:25, 523:6, 524:15, 529:4, 529:24, 534:7, 537:1, 539:3, 545:18, 562:18, 563:3, 575:17, 576:11, 578:21, 580:11, 580:14, 582:11, 582:13, 599:6, 599:10, 603:25, 626:23, 630:18, 630:21, 631:13, 631:14, 634:13, 634:22, 635:16, 640:22, 642:6, 642:20, 651:7, 653:5, 664:16, 666:4, 680:22, 692:14, 692:21, 703:1, 708:8, 731:11, 736:19, 740:20, 741:16
**seeing** [5] - 524:6, 558:24, 567:2, 636:22, 692:17
**seek** [9] - 697:1, 702:25, 703:6, 706:13, 706:19, 706:22, 706:23, 707:15, 707:23
**seeking** [13] - 572:11, 689:25, 696:22, 697:3, 697:11, 697:12, 701:9, 701:14, 704:11, 704:24, 706:8, 706:12, 707:11
**seem** [6] - 496:5, 573:24, 679:11, 685:4, 702:9
**sees** [4] - 556:17, 634:20, 658:11, 694:5
**selling** [1] - 610:13
**semantics** [1] - 652:22
**send** [47] - 451:5, 461:9, 461:14, 461:21, 509:4, 509:5, 516:3, 516:22, 521:17, 527:4, 527:6, 533:1, 538:19, 541:10, 542:12, 547:25, 563:23, 563:24, 565:7, 570:11, 570:21, 578:18, 592:12, 593:19, 595:15, 596:3, 597:3, 603:15, 603:18, 609:20, 612:25, 613:3, 636:15, 640:16, 653:16, 662:13, 666:2, 667:14, 668:1, 668:2, 668:9, 668:17, 668:22, 669:7, 669:13, 671:16, 673:3
**Send** [1] - 642:5
**sending** [18] - 450:5, 522:3, 541:3, 541:5, 544:16, 544:18, 563:21, 572:4, 572:10, 595:20, 595:23, 596:5, 596:11, 596:18, 600:13, 616:7, 667:22, 673:4
**sends** [14] - 447:16, 467:13, 569:12, 569:15, 574:2, 589:19, 590:1, 640:6, 640:13, 640:14, 640:19, 661:12, 665:7
**sense** [8] - 478:9, 489:15, 631:22, 653:23, 704:3, 707:2, 729:17, 740:12
**sensitive** [1] - 570:6
**sent** [91] - 442:25, 443:1, 443:4, 443:20, 443:22, 445:10, 445:22, 450:19, 450:23, 451:20, 451:22, 451:23, 463:2, 475:2, 477:3, 479:20, 481:3, 483:16, 486:9, 486:11, 488:14, 489:16, 490:17, 492:13, 499:16, 520:11, 523:12, 525:5, 526:4, 528:5, 528:6, 528:20, 532:16, 533:18, 533:22, 533:23, 541:25, 545:21, 547:12, 547:16, 547:19, 547:22, 548:2, 549:6, 549:8, 549:13, 549:14,

549:21, 564:23, 571:11, 572:24, 573:13, 576:8, 576:20, 584:16, 585:9, 591:11, 592:16, 593:20, 599:21, 600:6, 600:7, 602:2, 632:22, 632:23, 640:3, 641:3, 641:21, 641:22, 641:24, 651:21, 659:10, 659:13, 661:1, 665:15, 665:22, 665:23, 665:25, 667:4, 667:9, 667:21, 668:5, 670:22, 671:2, 671:19, 672:22, 673:10, 673:14, 676:24, 726:17

**sentence** [51] - 475:5, 666:22, 710:2, 710:6, 714:10, 714:11, 714:13, 714:25, 716:10, 716:21, 718:7, 720:13, 720:14, 720:19, 720:23, 721:16, 721:20, 721:23, 721:24, 722:13, 724:1, 724:3, 724:4, 724:10, 724:15, 724:16, 724:18, 725:16, 727:10, 727:12, 727:13, 727:19, 732:17, 732:20, 733:14, 736:6, 736:15, 739:21, 739:22, 740:10, 740:19, 740:21, 740:23, 740:24, 741:16, 741:19, 741:23, 743:5, 744:12, 744:14

**sentenced** [1] - 660:4

**sentences** [3] - 666:23, 715:6, 740:6

**separate** [20] - 447:2, 454:1, 558:5, 558:6, 631:8, 645:1, 645:4, 648:4, 691:19, 692:24, 693:3, 693:7, 695:3, 699:15, 701:23, 702:7, 702:10, 728:19

**separately** [2] - 449:22, 649:19

**separates** [1] - 645:19

**September** [2] - 463:9, 577:9

**ser** [1] - 591:21

**series** [1] - 633:2

**serious** [1] - 692:15

**seriously** [1] - 618:19

**servcing** [1] - 564:15

**serve** [1] - 621:20

**served** [2] - 621:17, 624:17

**service** [4] - 453:9, 557:3, 658:13, 658:15

**SERVICES** [1] - 435:6

**Services** [9] - 479:20, 513:19, 513:20, 515:16, 523:7, 526:7, 574:6, 580:18, 735:6

**services** [3] - 448:18, 628:18, 650:21

**servicing** [1] - 622:9

**set** [6] - 530:21, 564:10, 571:18, 627:4, 631:18, 681:13

**Set** [1] - 564:13

**sets** [1] - 564:10

**settled** [1] - 689:2

**seven** [1] - 610:12, 640:8, 672:20

**several** [7] - 510:11, 528:1, 532:6, 617:20, 687:1, 714:18

**severely** [1] - 683:23

**shadow** [1] - 559:7

**shall** [2] - 638:2, 649:11

**share** [1] - 643:11

**shared** [1] - 514:12

**shares** [1] - 641:14

**shifts** [1] - 655:5

**shop** [1] - 669:1

**short** [5] - 466:10, 510:8, 553:11, 616:21, 631:23

**shorten** [1] - 712:20

**shortly** [2] - 494:16, 635:25

**shoulders** [1] - 653:8

**show** [6] - 524:17, 526:21, 573:12, 608:8, 638:7, 688:18

**showed** [2] - 498:19, 574:9

**showing** [4] - 514:21, 545:23, 608:10, 688:10

**shown** [5] - 459:3, 516:24, 577:1, 585:9, 721:4

**shows** [8] - 524:18, 525:22, 564:9, 564:19, 607:20, 613:7, 613:15, 733:24

**shut** [3] - 591:4, 591:7, 643:7

**side** [16] - 514:19, 520:22, 542:19, 556:7, 557:2, 557:3, 558:24, 559:7, 611:8, 611:9, 621:12, 643:12, 709:16

**side-by-side** [2] - 514:19, 559:7

**sided** [1] - 496:4

**sides** [2] - 629:2, 728:21

**sidetracked** [1] - 664:11

**sign** [1] - 538:9

**signature** [8] - 526:22, 537:17, 537:21, 538:4, 538:15, 746:6, 746:7

**signed** [3] - 538:12, 613:2, 746:7

**significant** [4] - 637:9, 707:6, 707:12, 711:16

**signing** [1] - 746:3

**silence** [1] - 672:20

**similar** [13] - 449:6, 562:14, 577:23, 584:24, 585:4, 641:3, 683:7, 694:9, 706:16, 719:3, 720:21, 729:13, 732:19

**similarly** [2] - 584:25, 732:6

**simplicity** [1] - 738:10

**simply** [22] - 544:23, 625:14, 627:9, 628:5, 634:24, 635:2, 650:16, 650:17, 650:19, 658:14, 661:21, 669:13, 684:1, 685:10, 686:1, 686:4, 690:9, 691:3, 691:13, 691:19, 699:24, 706:5

**single** [6] - 449:10, 495:9, 498:5, 498:10, 498:12, 540:9

**singularly** [1] - 558:8

**sit** [10] - 516:9, 520:10, 559:6, 559:8, 574:13, 579:8, 583:6, 646:18, 654:20, 707:20

**sitting** [4] - 491:15, 514:20, 660:20, 673:9

**situation** [16] - 481:25, 495:13, 523:21, 563:6, 575:1, 615:2, 615:17, 616:23, 629:22, 633:7, 646:25, 649:24, 664:8, 706:23, 717:4, 720:8

**situation-dependent** [1] - 717:4

**situations** [3] - 556:14, 583:25, 734:13

**six** [6] - 449:6, 466:10, 503:13, 514:23, 559:18, 583:17

**size** [1] - 642:24

**sized** [1] - 610:13

**skip** [1] - 682:21

**skipping** [2] - 714:9, 714:18

**sky** [1] - 691:14

**slate** [1] - 559:15

**slow** [1] - 714:20

**slowly** [2] - 716:11, 717:25

**small** [7] - 468:21, 468:24, 469:1, 469:4, 470:16, 622:15, 637:8

**smaller** [3] - 442:17, 641:4, 641:6

**SME** [1] - 559:8

**Smith** [3] - 436:16, 681:25, 742:20

**SMITH** [88] - 681:13, 681:20, 681:25, 684:15, 685:7, 685:18, 686:6, 686:16, 687:6, 694:22, 695:1, 697:19, 699:18, 699:22, 700:4, 700:22, 707:22, 708:7, 708:10, 708:13, 708:21, 708:24, 709:17, 709:19, 710:1, 710:9, 710:11, 710:16, 710:24, 712:8, 712:24, 713:1, 713:10, 713:14, 713:25, 714:7, 714:9, 714:18, 715:8, 715:12, 716:3, 716:7, 716:10, 716:20, 720:18, 721:6, 722:16, 724:8, 724:15, 724:20, 724:24, 725:4, 725:7, 725:11, 725:23, 726:11, 726:16, 727:4, 727:8, 727:13, 727:24, 728:6, 728:24, 729:12, 729:17, 730:13, 730:16, 730:18, 731:20, 732:1, 732:4, 732:15, 733:11, 735:3, 736:2, 737:4, 737:14, 738:9, 738:15, 739:16, 740:3, 740:5, 741:8, 741:14, 741:19, 742:2, 742:14, 744:23

**Social** [86] - 443:23, 478:21, 500:10, 500:11, 516:24, 517:25, 521:23, 524:25, 525:12, 525:13, 525:18, 526:13, 527:7, 528:6, 529:3, 529:7, 529:23, 531:10, 542:1, 542:6, 542:12, 542:16, 542:23, 544:1, 544:6, 544:8, 544:12, 551:23, 565:14, 567:8, 567:9, 567:10, 567:14, 567:17, 570:6, 576:3, 581:12, 581:17, 582:12, 582:23, 590:11, 592:1, 592:12, 592:22, 603:11, 603:13, 603:14, 603:17, 603:23, 604:1, 604:7, 604:9, 604:18, 604:20, 604:21, 604:24, 605:5, 605:18, 606:1, 606:12, 606:16, 607:13, 613:10, 613:16, 614:10, 614:23, 615:17, 615:18, 615:20, 615:21, 626:16, 627:5, 627:6, 635:2, 642:6, 661:1, 661:13, 662:20, 673:8, 673:11, 673:12, 673:16, 673:21, 675:10, 675:17, 675:23

**SOLA** [189] - 440:19, 454:8, 456:14, 457:2, 457:24, 458:1, 458:9, 467:17, 467:19, 467:25, 468:1, 468:4, 468:6, 473:8, 474:18, 474:24, 475:1, 477:1, 477:2, 477:22, 479:16, 479:17, 484:3, 484:4, 487:1, 489:22, 489:23, 490:4, 490:5, 490:22, 490:23, 492:22, 492:23, 493:6, 493:7, 495:7, 500:23, 500:24, 501:21, 503:2, 503:3, 505:16,

506:13, 531:21, 534:22, 541:20, 543:6, 543:7, 548:10, 553:8, 553:11, 553:14, 561:15, 577:16, 579:11, 579:13, 579:17, 584:8, 607:21, 608:18, 619:2, 619:16, 619:18, 620:4, 620:12, 643:18, 657:10, 657:11, 664:15, 664:20, 664:22, 664:23, 669:23, 670:6, 670:7, 674:1, 678:1, 678:4, 678:14, 680:4, 680:9, 681:3, 681:8, 681:16, 681:23, 687:8, 687:15, 690:2, 690:6, 690:10, 690:15, 690:23, 691:22, 692:2, 692:11, 693:7, 693:10, 693:20, 694:4, 694:16, 694:21, 695:2, 696:6, 696:11, 696:18, 697:2, 697:5, 697:12, 697:16, 698:25, 699:7, 702:6, 702:15, 703:17, 704:5, 705:8, 705:17, 706:10, 707:5, 707:7, 707:14, 707:18, 709:10, 709:12, 710:4, 710:18, 710:20, 710:22, 711:23, 712:13, 713:3, 713:11, 713:21, 714:22, 715:2, 715:19, 718:5, 718:24, 719:2, 719:7, 720:5, 720:12, 721:14, 722:5, 722:9, 722:24, 723:16, 725:3, 725:6, 725:25, 726:13, 726:22, 727:3, 728:2, 728:12, 728:15, 729:19, 729:25, 730:5, 731:4, 731:13, 732:2, 733:5, 733:7, 734:10, 734:12, 735:14, 736:6, 736:21, 737:1, 737:18, 738:10, 738:25, 739:7, 739:12, 740:14, 740:18, 740:24, 741:2, 741:6, 741:12, 742:5, 743:13, 744:2, 744:11, 744:17, 744:24, 745:2, 745:5

**Sola** [9] - 436:11, 549:8, 550:6, 552:13, 554:22, 678:20, 702:4, 715:17, 740:13

**sola** [1] - 436:11

**sold** [3] - 598:21, 618:17, 654:1

**sole** [2] - 660:14, 711:3

**solely** [4] - 462:5, 509:15, 646:3, 652:20

**solicited** [1] - 675:21

**solve** [1] - 572:18

**someone** [10] - 450:12, 470:1, 495:12, 532:11, 539:18, 552:9, 581:24, 615:17, 692:3, 717:1

**sometime** [1] - 580:4

**sometimes** [12] - 439:1, 488:21, 497:14, 559:18, 563:12, 571:1, 573:16, 614:22, 626:14, 719:16, 719:23

**somewhere** [2] - 559:18, 738:13

**soon** [1] - 700:20

**sooner** [1] - 554:16

**sorry** [44] - 453:3, 483:2, 494:17, 508:7, 515:25, 528:14, 535:25, 543:19, 544:3, 557:6, 561:11, 567:12, 568:16, 568:24, 593:24, 598:18, 604:16, 619:14, 635:7, 666:24, 669:20, 681:13, 695:1, 699:19, 700:22, 708:7, 708:11, 709:10, 709:11, 709:17, 710:21, 722:18, 724:19, 724:23, 724:25, 725:4, 725:10, 727:4, 727:12, 734:3, 740:23, 743:15, 745:5

**sort** [19] - 440:1, 514:17, 558:13, 562:17, 581:6, 583:20, 609:25, 616:14, 624:6, 625:16, 626:4, 630:13, 640:22, 640:23, 641:4, 685:21, 686:11, 688:13

**sound** [1] - 715:17

**sounds** [3] - 633:5, 662:19, 739:5

**source** [5] - 572:17, 663:13, 663:14, 663:15

**sources** [4] - 556:21, 556:25, 572:12, 638:7

**sparked** [1] - 600:5

**speaking** [8] - 520:25, 523:14, 533:21, 549:17, 572:17, 576:25, 587:19, 613:24

**specialized** [4] - 627:21, 628:7, 628:25, 654:15

**specific** [16] - 545:11, 546:3, 552:17, 563:6, 563:23, 564:14, 571:18, 577:3, 578:23, 578:24, 578:25, 597:18, 597:21, 668:2, 704:7, 718:15

**specifically** [11] - 440:15, 470:4, 507:10, 509:21, 561:5, 567:8, 614:14, 618:8, 618:17, 658:8, 739:7

**specifics** [34] - 515:19, 516:20, 519:8, 520:6, 521:21, 523:3, 529:11, 529:20, 532:25, 533:6, 534:1, 534:19, 535:17, 535:24, 537:9, 537:23, 538:17, 539:16, 539:24, 540:13, 540:17, 541:4, 542:18, 542:21, 544:10, 544:21, 545:22, 546:14, 546:23, 547:4, 549:25, 550:15, 552:6

**speculate** [5] - 691:3, 703:21, 703:25, 704:2, 704:3

**speculating** [3] - 690:9, 704:6, 705:5

**speculation** [2] - 690:10, 703:24, 704:16

**speculative** [5] - 597:5, 698:5, 698:6, 704:23, 704:24

**speeding** [1] - 571:2

**spell** [4] - 512:21, 555:10, 609:6, 620:24

**spent** [1] - 685:13

**spoken** [1] - 640:4

**Sponer** [117] - 448:5, 448:12, 455:18, 463:2, 466:15, 467:2, 470:4, 470:11, 470:13, 472:23, 478:12, 478:25, 484:20, 490:19, 492:12, 492:20, 493:4, 493:11, 493:25, 494:4, 494:10, 494:22, 497:3, 497:5, 500:5, 501:12, 501:14, 516:15, 522:25, 523:6, 525:20, 527:22, 529:6, 530:3, 532:17, 533:11, 536:2, 537:6, 537:25, 538:4, 540:16, 541:2, 542:10, 544:11, 544:17, 549:6, 549:10, 549:24, 550:14, 551:22, 571:16, 573:6, 573:14, 574:6, 575:19, 576:19, 579:6, 579:23, 580:4, 582:10, 582:12, 584:15, 585:2, 585:14, 587:5, 587:15, 590:1, 591:11, 592:16, 592:22, 594:3, 598:15, 600:14, 600:19, 602:12,

602:15, 602:19, 602:21, 605:22, 606:24, 607:13, 614:5, 616:3, 618:1, 632:23, 638:12, 639:17, 640:10, 641:12, 642:4, 642:17, 643:2, 644:15, 647:23, 653:17, 653:20, 655:17, 656:9, 659:10, 660:18, 661:1, 661:12, 662:5, 665:7, 665:23, 666:15, 666:21, 667:9, 667:21, 668:1, 670:18, 670:22, 671:3, 672:18, 672:22, 692:19, 699:8

**SPONER** [1] - 435:3

**Sponer's** [47] - 457:9, 458:3, 462:5, 469:22, 487:22, 488:3, 488:9, 488:15, 488:25, 489:13, 495:15, 496:11, 496:20, 499:25, 502:1, 502:4, 502:12, 502:18, 502:23, 503:14, 503:20, 504:7, 504:15, 504:22, 515:9, 517:3, 533:20, 533:25, 537:17, 549:14, 579:25, 580:9, 581:12, 585:9, 589:7, 590:19, 593:9, 595:3, 597:19, 598:11, 605:23, 606:1, 646:12, 648:11, 659:24, 663:4, 670:1

**spot** [1] - 566:13

**square** [1] - 560:5

**stack** [1] - 698:15

**stake** [1] - 568:13

**stand** [1] - 708:25

**standard** [32] - 516:21, 517:14, 518:3, 518:6, 523:15, 529:21, 530:19, 532:15, 534:3, 534:6, 534:19, 535:2, 542:7, 542:22, 544:5, 547:24, 548:4, 614:24, 616:10, 616:18, 617:4, 682:10, 687:16, 687:24, 688:24, 708:4, 718:11, 734:18, 735:14, 735:24, 736:1

**standards** [1] - 654:19

**stands** [1] - 717:3

**start** [21] - 461:15, 461:22, 462:12, 475:22, 503:12, 513:14, 515:13, 515:20, 559:12, 562:21, 572:2, 639:25, 650:1, 653:21, 654:4, 654:7, 655:25, 703:12, 716:22, 725:11, 732:16

**started** [11] - 437:15, 513:13, 514:2, 559:24, 561:7, 577:10, 621:9, 622:13, 680:15, 680:16, 725:1

**starting** [3] - 483:4, 578:1, 741:23

**starts** [4] - 520:15, 528:3, 559:2, 741:19

**state** [22] - 460:3, 464:24, 471:24, 475:25, 476:2, 476:9, 477:15, 478:8, 480:3, 480:13, 495:9, 503:16, 504:1, 512:20, 517:16, 555:9, 588:19, 592:7, 596:7, 596:16, 609:5, 620:23

**statement** [10] - 454:19, 551:22, 582:15, 582:17, 597:4, 628:11, 691:4, 714:3, 736:11, 736:17

**statements** [1] - 729:16

**STATES** [2] - 435:1, 435:17

**States** [1] - 436:20

**states** [7] - 465:24, 528:5, 566:9, 589:10, 615:22, 619:8, 717:18

**stating** [9] - 464:7, 471:8, 475:19, 476:14, 476:18, 495:10, 504:25, 508:14, 695:12
**status** [6] - 484:13, 484:17, 486:18, 564:3, 564:5, 564:6
**statute** [11] - 699:24, 700:1, 727:17, 733:1, 734:13, 734:23, 734:25, 735:20, 739:1, 741:6, 741:11
**statute's** [1] - 733:24
**statutes** [1] - 683:8
**statutory** [3] - 715:20, 715:24, 731:1
**stay** [4] - 484:22, 488:25, 523:24, 554:11
**stayed** [2] - 648:10, 648:12
**stays** [1] - 564:20
**stealing** [1] - 617:1
**stems** [1] - 567:11
**step** [24] - 512:9, 532:25, 533:2, 533:5, 533:8, 533:18, 553:20, 563:4, 570:11, 571:25, 574:1, 576:6, 583:24, 608:14, 620:7, 628:2, 633:7, 650:18, 655:21, 670:11, 670:13, 670:14, 679:25, 702:14
**steps** [23] - 505:1, 512:13, 516:17, 525:4, 529:19, 531:9, 531:11, 531:14, 534:1, 545:10, 545:11, 559:3, 562:14, 562:24, 563:1, 563:16, 570:18, 572:14, 577:23, 578:1, 578:8, 597:2, 615:7
**sterling** [1] - 693:1
**stick** [1] - 720:13
**still** [85] - 443:6, 447:18, 447:19, 452:20, 458:16, 458:18, 461:3, 463:4, 463:8, 463:15, 463:20, 464:7, 464:11, 464:17, 470:14, 475:18, 480:2, 480:11, 480:12, 480:17, 480:18, 485:15, 485:19, 485:22, 489:24, 491:13, 493:13, 493:17, 494:1, 494:12, 512:2, 517:12, 521:14, 521:16, 522:11, 522:19, 526:13, 535:2, 543:9, 543:21, 544:8, 545:19, 545:23, 546:25, 551:12, 565:20, 565:22, 570:15, 581:12, 584:23, 584:24, 585:5, 587:5, 589:22, 590:8, 590:10, 590:22, 591:13, 591:24, 592:1, 592:19, 592:24, 593:22, 594:1, 618:21, 641:22, 642:2, 649:7, 649:20, 653:12, 656:19, 659:20, 662:15, 665:1, 665:13, 671:15, 672:13, 672:19, 701:15, 720:25, 722:22, 723:16, 739:17, 742:1, 742:5
**stipulate** [2] - 712:7, 712:11
**stipulated** [3] - 710:12, 712:2, 712:6
**stipulation** [10] - 711:24, 711:25, 712:10, 712:14, 712:15, 712:21, 712:22, 713:3, 725:20
**stole** [2] - 590:18, 692:16
**Stop** [1] - 640:23
**stop** [3] - 640:23, 690:5, 739:9
**stopped** [1] - 664:19

**stopping** [1] - 739:11
**store** [6] - 641:4, 692:3, 692:6, 695:22, 695:23, 696:1
**story** [1] - 567:2
**Street** [1] - 436:6
**stretch** [1] - 647:4
**stricken** [1] - 715:15
**strict** [2] - 469:25, 717:21
**strike** [5] - 457:24, 637:23, 713:18, 737:9, 741:23
**strive** [1] - 738:10
**strong** [7] - 646:20, 646:21, 646:25, 647:2, 647:4, 647:11, 660:13
**stronger** [1] - 707:12
**strongest** [1] - 668:20
**strongly** [1] - 723:24
**struck** [2] - 710:7, 710:14
**structure** [2] - 631:8, 666:22
**stubs** [1] - 567:16
**stuff** [5] - 514:15, 519:9, 575:5, 688:10, 731:17
**subheading** [1] - 564:12
**subject** [2] - 559:8, 709:1
**submit** [5] - 466:19, 467:10, 495:21, 509:7, 510:2
**submitted** [2] - 437:16, 682:19
**submitting** [2] - 613:23, 614:1
**subpart** [4] - 738:25, 739:2, 739:3, 739:5
**subparts** [2] - 737:22, 738:18
**subsection** [4] - 518:10, 681:17, 682:21, 726:3
**subsections** [2] - 726:1, 737:21
**subservient** [1] - 676:19
**substantial** [10] - 568:7, 614:19, 689:1, 689:10, 695:15, 708:3, 708:18, 708:22, 709:1
**substantially** [2] - 682:15, 733:25
**sudden** [1] - 643:6
**sued** [5] - 472:23, 605:24, 607:9, 607:16, 675:2
**sues** [2] - 494:4, 594:3
**suffered** [6] - 691:1, 724:22, 727:15, 727:21, 729:9, 730:11
**suffering** [2] - 684:1, 703:19
**sufficient** [7] - 571:22, 578:9, 578:10, 583:8, 700:9, 701:11, 705:9
**suggest** [2] - 442:10, 614:5
**suggested** [3] - 642:3, 700:15, 732:13
**suggesting** [4] - 660:19, 668:11, 671:21, 720:19
**suggestions** [1] - 718:4
**suing** [1] - 669:9
**suit** [1] - 675:15
**Suite** [4] - 436:3, 436:6, 436:9, 436:12
**suited** [1] - 629:15
**suits** [1] - 623:7
**summarize** [3] - 439:12, 441:24, 445:7
**summary** [4] - 578:13, 687:17, 687:20,

687:22
**sun** [1] - 686:9
**super** [1] - 573:18
**superficial** [8] - 716:22, 717:1, 717:10, 719:9, 719:10, 719:14, 721:18, 724:2
**supervisor** [1] - 556:8
**supplied** [1] - 578:7
**supplying** [1] - 709:23
**support** [4] - 623:6, 656:1, 683:19, 695:8
**supported** [2] - 716:13, 721:12
**supporting** [1] - 473:22
**supports** [1] - 720:22
**suppose** [3] - 628:20, 664:7, 701:6
**supposed** [7] - 511:4, 605:10, 630:15, 634:21, 691:12, 723:14, 743:16
**supposedly** [3] - 657:17, 666:18, 678:10
**Supreme** [8] - 683:1, 683:10, 734:22, 735:8, 735:17, 735:21, 735:23
**surely** [1] - 671:13
**surprise** [1] - 641:5
**surprising** [1] - 639:8
**Suspect** [1] - 589:3
**suspect** [7] - 465:11, 491:6, 491:8, 566:11, 586:2, 647:7, 668:7
**suspected** [5] - 528:3, 539:1, 599:19, 600:2, 600:8
**Suspected** [1] - 443:20
**suspicion** [2] - 496:11, 498:24
**suspicious** [7] - 449:5, 449:9, 510:10, 510:13, 538:23, 539:17, 540:8
**sustained** [4] - 457:1, 486:25, 495:6, 673:25
**sworn** [5] - 437:10, 512:18, 555:7, 609:3, 620:21
**sympathetic** [1] - 667:11
**system** [66] - 441:8, 443:12, 448:18, 448:19, 457:17, 460:16, 460:19, 470:8, 471:20, 472:9, 472:18, 472:22, 473:15, 480:9, 481:5, 481:18, 481:23, 482:2, 484:17, 485:14, 485:18, 487:15, 487:25, 488:12, 488:18, 489:2, 489:9, 489:19, 495:24, 496:15, 497:25, 498:3, 507:24, 511:22, 519:14, 522:19, 528:23, 564:14, 564:15, 564:20, 569:7, 569:8, 574:19, 575:9, 578:17, 578:18, 579:15, 591:10, 594:14, 596:14, 597:6, 608:8, 626:24, 630:25, 631:12, 634:6, 634:7, 634:9, 634:12, 634:13, 634:24, 636:18, 636:25, 651:4
**systemic** [2] - 569:9, 569:11
**systemically** [2] - 569:7, 591:9
**systems** [2] - 448:16, 629:23

# T

**tailored** [1] - 654:15
**talks** [4] - 646:23, 682:12, 686:1, 723:21

**tandem** [1] - 631:21
**tape** [2] - 442:3, 448:21
**tapes** [1] - 447:21
**Tarter** [3] - 495:8, 496:4, 540:4
**task** [2] - 559:21, 560:9
**tasked** [1] - 651:25
**tasks** [1] - 559:22
**tax** [1] - 667:22
**team** [81] - 446:14, 453:22, 453:24, 456:3, 456:19, 457:20, 458:7, 458:17, 459:17, 459:22, 461:9, 461:14, 471:8, 471:16, 474:1, 474:7, 476:1, 476:10, 476:18, 480:11, 481:9, 487:14, 502:25, 503:16, 504:3, 504:11, 504:25, 507:14, 507:15, 507:25, 509:15, 509:18, 514:7, 514:10, 514:20, 515:1, 515:5, 515:8, 520:17, 520:18, 521:3, 523:15, 523:17, 523:18, 555:22, 555:24, 556:7, 556:8, 556:9, 557:15, 557:21, 557:25, 558:14, 558:18, 558:20, 559:3, 560:10, 561:5, 564:2, 564:10, 569:20, 574:12, 576:20, 579:9, 579:10, 579:14, 579:16, 582:7, 583:22, 584:2, 585:3, 590:6, 593:15, 593:16, 596:6, 600:8, 600:9, 610:9, 636:25
**team's** [1] - 576:15
**teams** [3] - 558:22, 593:13, 610:8
**telephone** [3] - 519:1, 519:7, 527:19
**teller** [2] - 520:23, 520:24
**tend** [1] - 736:15
**tens** [2] - 469:15, 469:17
**term** [2] - 683:7, 735:10
**terms** [26] - 437:19, 494:24, 603:20, 624:2, 624:9, 625:6, 626:24, 629:20, 629:24, 636:22, 640:18, 641:7, 643:10, 644:2, 645:4, 648:25, 654:19, 654:25, 662:17, 664:8, 672:14, 674:3, 695:15, 706:25, 709:2, 733:24
**terribly** [1] - 638:11
**test** [5] - 689:10, 708:18, 708:19, 709:2, 734:24
**testified** [34] - 438:3, 438:6, 449:21, 459:2, 470:24, 478:10, 490:11, 501:22, 511:16, 520:6, 524:13, 541:23, 545:6, 546:17, 559:24, 561:19, 565:15, 572:23, 573:12, 574:7, 574:18, 578:20, 581:22, 600:12, 623:16, 623:17, 646:7, 653:1, 653:7, 665:15, 704:12, 704:25
**testifies** [5] - 437:10, 512:18, 555:7, 609:3, 620:21
**testify** [2] - 698:2, 706:12
**testifying** [5] - 442:4, 448:21, 501:6, 624:13, 676:25
**testimony** [64] - 441:9, 456:10, 459:2, 459:10, 459:12, 461:24, 464:24, 471:6, 471:7, 478:6, 487:2, 490:13, 490:14, 495:13, 496:4, 506:6, 506:7, 506:16, 507:21, 510:22, 511:1,

534:15, 541:13, 543:4, 545:14, 546:8, 551:24, 552:2, 573:21, 576:12, 576:13, 611:21, 616:2, 619:23, 626:21, 627:15, 628:9, 631:10, 631:25, 632:8, 635:15, 638:8, 639:15, 639:20, 641:2, 642:16, 642:20, 657:5, 657:19, 660:7, 664:2, 671:22, 672:1, 677:9, 677:20, 678:1, 678:12, 679:7, 679:10, 682:7, 705:1, 710:12, 735:3
**textbook** [2] - 632:24, 733:7
**THE** [260] - 435:1, 435:2, 435:16, 436:2, 436:14, 437:4, 440:20, 440:22, 454:5, 456:11, 456:13, 457:1, 457:25, 458:6, 458:7, 467:6, 467:7, 468:5, 473:5, 473:6, 477:21, 486:25, 495:6, 500:14, 500:21, 501:18, 501:20, 505:17, 506:14, 512:9, 512:10, 512:11, 512:13, 512:20, 512:22, 531:18, 534:16, 534:18, 541:14, 541:16, 548:11, 553:9, 553:13, 553:16, 554:1, 554:8, 554:12, 554:18, 554:24, 555:3, 555:9, 555:11, 561:14, 561:16, 577:17, 579:12, 579:15, 579:18, 584:5, 607:22, 608:14, 608:17, 608:19, 608:20, 608:21, 608:23, 609:5, 609:7, 618:25, 619:14, 620:5, 620:7, 620:10, 620:13, 620:17, 620:23, 620:25, 633:16, 633:22, 643:15, 664:14, 664:16, 664:18, 669:17, 669:20, 669:21, 670:3, 673:25, 677:24, 678:3, 678:15, 679:25, 680:3, 680:5, 680:8, 680:10, 680:25, 681:5, 681:7, 681:9, 681:15, 681:19, 684:13, 684:22, 685:11, 685:25, 686:15, 687:5, 687:7, 687:13, 689:24, 690:5, 690:7, 690:13, 690:21, 690:25, 691:25, 692:7, 693:5, 693:9, 693:17, 693:24, 694:20, 694:25, 696:4, 696:9, 696:17, 696:25, 697:4, 697:11, 697:14, 697:17, 698:24, 699:5, 699:17, 699:21, 700:3, 700:5, 700:23, 702:13, 703:8, 703:20, 705:3, 705:16, 705:24, 707:1, 707:6, 707:9, 707:16, 707:19, 708:1, 708:9, 708:11, 708:15, 708:23, 709:6, 709:11, 709:13, 709:18, 709:25, 710:2, 710:5, 710:10, 710:14, 710:19, 710:21, 710:23, 711:21, 712:3, 712:5, 712:23, 712:25, 713:2, 713:5, 713:13, 713:18, 713:22, 714:2, 714:8, 714:17, 714:20, 714:24, 715:3, 715:9, 715:16, 715:23, 716:6, 716:9, 716:18, 718:3, 718:14, 719:1, 719:3, 719:16, 720:9, 721:2, 721:13, 721:22, 722:7, 722:11, 722:22, 723:10, 724:6, 724:13, 724:18, 724:23, 725:9, 725:22, 727:1, 727:7, 727:12, 727:19, 727:25, 728:9, 728:13, 728:21, 728:23, 729:5, 729:14, 729:24, 730:2, 730:7, 730:15, 730:17, 731:11, 731:25, 732:11, 733:4, 733:6, 734:11, 736:5, 736:18,

736:22, 737:2, 737:5, 737:15, 738:14, 739:2, 739:9, 739:13, 740:1, 740:4, 740:12, 740:17, 740:23, 740:25, 741:4, 741:10, 741:13, 741:18, 741:25, 742:3, 742:9, 743:2, 743:10, 743:17, 744:7, 744:13, 744:21, 745:3
**theft** [193] - 449:3, 453:20, 453:21, 455:7, 455:13, 455:15, 455:23, 459:21, 461:7, 461:12, 461:13, 461:18, 461:19, 462:1, 462:15, 465:20, 465:22, 466:6, 469:8, 469:16, 469:21, 470:2, 470:7, 471:23, 471:24, 471:25, 472:4, 472:15, 475:6, 475:20, 476:24, 477:6, 477:14, 477:15, 477:16, 477:17, 477:19, 477:23, 478:1, 478:3, 478:4, 478:6, 478:14, 479:12, 480:8, 480:14, 481:22, 483:13, 483:18, 483:21, 484:9, 485:9, 486:12, 486:23, 489:25, 491:10, 496:18, 496:19, 497:20, 497:21, 497:23, 501:8, 502:25, 506:18, 509:16, 514:13, 514:14, 516:4, 516:22, 517:25, 524:18, 526:7, 532:12, 532:14, 533:1, 533:23, 534:4, 535:1, 543:8, 543:18, 543:21, 544:7, 547:17, 547:23, 548:3, 548:8, 556:19, 557:24, 562:6, 564:22, 565:10, 565:11, 565:23, 568:1, 571:17, 572:16, 575:21, 577:2, 577:5, 578:15, 578:16, 578:23, 580:18, 584:15, 585:14, 586:8, 586:10, 586:13, 586:17, 586:21, 586:25, 587:3, 587:6, 590:23, 591:14, 591:25, 602:25, 603:2, 604:18, 605:11, 606:19, 611:15, 612:23, 613:18, 615:25, 620:2, 624:24, 625:5, 625:13, 625:17, 625:21, 626:3, 627:2, 627:12, 627:13, 627:18, 628:4, 628:13, 628:19, 629:11, 629:13, 631:2, 631:20, 632:16, 633:7, 638:14, 638:15, 638:21, 639:4, 641:1, 646:25, 647:1, 647:6, 647:20, 648:1, 648:2, 648:4, 649:24, 650:12, 650:20, 651:2, 652:10, 652:12, 652:24, 654:12, 654:17, 656:25, 657:7, 657:14, 658:5, 658:16, 658:23, 659:1, 660:12, 662:25, 663:1, 663:3, 663:6, 665:2, 665:14, 666:16, 673:7, 673:19, 674:18, 676:7, 676:13, 678:7, 679:1, 679:2, 694:9, 702:24, 721:9
**themselves** [3] - 606:22, 654:7, 661:6
**thereafter** [1] - 494:16
**therefore** [1] - 602:22
**they've** [6] - 491:19, 494:5, 498:6, 499:10, 637:22, 742:21
**thick** [1] - 583:4
**thief** [21] - 479:10, 482:3, 492:12, 585:23, 590:17, 590:18, 603:5, 603:21, 604:2, 604:5, 604:25, 615:4, 638:5, 647:17, 650:12, 661:14,

664:12, 664:24, 665:11, 673:23, 674:22
**thinking** [4] - 584:22, 661:17, 722:22, 742:1
**thinks** [1] - 702:20
**third** [20] - 450:25, 517:19, 526:2, 561:9, 580:10, 596:1, 596:17, 618:17, 618:18, 641:13, 688:19, 691:23, 694:5, 694:7, 695:24, 702:20, 737:11, 739:3, 739:6, 741:16
**Third** [1] - 436:20
**third-party** [2] - 596:1, 596:17
**Thomas** [2] - 495:8, 518:11
**thorough** [14] - 532:13, 532:21, 533:19, 533:24, 534:7, 536:25, 540:22, 548:17, 548:20, 565:6, 594:20, 595:2, 595:9, 595:22
**thousands** [8] - 469:15, 469:16, 469:17, 606:6, 606:10, 616:22, 654:17, 655:3
**three** [30] - 449:20, 497:10, 510:13, 520:7, 527:12, 530:2, 541:23, 551:2, 560:22, 569:16, 580:24, 585:10, 621:16, 622:11, 622:15, 624:1, 626:8, 633:9, 633:11, 637:21, 638:3, 666:22, 677:7, 692:6, 726:1, 726:5, 737:20, 737:21, 738:5, 738:18
**threshold** [1] - 641:7
**throughout** [4] - 618:1, 621:13, 622:1, 726:16
**throw** [2] - 720:15, 744:17
**throwing** [1] - 723:8
**tie** [2] - 707:3, 707:10
**tied** [4] - 704:6, 707:10, 719:12, 733:1
**ties** [2] - 733:20, 743:7
**timeline** [1] - 631:23
**timeliness** [1] - 648:25
**timing** [2] - 551:20, 554:4
**Timothy** [1] - 436:15
**title** [5] - 555:19, 555:20, 725:7, 735:9, 739:17
**titled** [3] - 630:9, 730:13, 746:5
**today** [33] - 455:14, 455:16, 455:20, 455:21, 455:22, 456:7, 456:17, 456:18, 456:19, 470:15, 471:8, 478:2, 478:10, 491:11, 491:15, 499:15, 501:11, 513:6, 516:9, 520:10, 546:25, 565:22, 570:15, 574:13, 579:8, 583:6, 585:2, 599:4, 646:18, 657:22, 668:8, 669:9, 679:12
**together** [3] - 552:4, 567:4, 635:21
**tomorrow** [3] - 680:15, 680:22
**ton** [1] - 633:5
**took** [9] - 460:10, 490:11, 495:18, 505:1, 531:9, 597:2, 598:20, 700:19, 706:20
**tools** [3] - 563:7, 563:8, 563:19
**top** [2] - 517:19, 578:13
**topics** [1] - 558:20
**tort** [1] - 685:21
**total** [1] - 554:6
**totality** [1] - 718:20

**totally** [2] - 688:15, 692:22
**touch** [2] - 581:24, 582:7
**touched** [2] - 629:6, 629:14
**toward** [2] - 578:10, 578:11
**towards** [2] - 518:22, 566:2
**tracing** [1] - 476:13
**tracking** [2] - 722:18
**tracks** [1] - 731:1
**trade** [5] - 466:25, 467:11, 488:5, 488:6, 618:21
**train** [1] - 640:22
**trained** [4] - 532:6, 594:22, 655:13, 655:16
**training** [8] - 514:17, 514:19, 514:24, 514:25, 515:3, 558:13, 558:16, 629:21
**trainings** [1] - 558:15
**TRANSCRIPT** [1] - 435:15
**transcript** [4] - 506:9, 657:20, 746:4, 746:6
**transferring** [1] - 559:14
**transmission** [1] - 669:1
**TransUnion** [3] - 449:18, 689:7, 695:9
**treat** [4] - 449:10, 496:8, 498:5, 713:8
**treated** [2] - 496:2, 497:3
**treating** [1] - 498:2
**trial** [11] - 598:2, 625:12, 650:23, 687:2, 687:9, 687:22, 689:8, 695:5, 706:11, 712:15, 712:20
**TRIAL** [1] - 435:14
**trick** [3] - 495:24, 496:13, 510:17
**tried** [4] - 692:2, 695:2, 726:20, 726:24
**trier** [2] - 700:9, 701:11
**triggered** [6] - 742:25, 743:19, 743:20, 743:23, 743:25
**triggers** [3] - 633:11, 742:21, 743:9
**trouble** [2] - 732:12, 737:7
**true** [29] - 456:23, 497:23, 546:25, 565:18, 567:7, 568:14, 573:1, 575:14, 577:11, 581:5, 585:21, 588:12, 590:15, 591:20, 593:8, 594:6, 594:18, 597:13, 598:3, 598:20, 601:19, 605:21, 629:12, 644:17, 648:3, 655:9, 659:2, 692:4, 719:6
**truly** [5] - 471:3, 480:13, 496:18, 605:2, 646:24
**truthful** [1] - 459:16
**truthfully** [1] - 473:23
**try** [21] - 453:15, 495:24, 544:5, 557:22, 563:5, 563:7, 568:5, 570:7, 570:17, 582:19, 588:14, 593:12, 599:11, 602:15, 602:22, 657:9, 698:14, 703:3, 712:20, 716:11, 717:25
**trying** [37] - 479:9, 481:13, 484:19, 488:20, 496:13, 497:25, 498:3, 510:17, 556:12, 558:9, 560:9, 562:13, 566:19, 566:25, 567:3, 568:22, 570:2, 570:8, 582:4, 582:5, 587:1, 588:4, 600:20, 603:3, 603:7, 603:9, 604:10, 605:14, 624:10, 642:11, 681:13, 685:14, 685:23, 696:13, 698:13,

727:5, 731:2
**Tugashov** [2] - 588:22, 589:3
**turn** [7] - 564:25, 572:22, 574:17, 580:10, 581:3, 581:14, 718:8
**turnaround** [2] - 632:2, 632:5
**turned** [2] - 539:25, 700:21
**turning** [4] - 575:15, 635:7, 657:17, 678:10
**turns** [6] - 683:9, 717:19, 717:23, 718:1, 720:25, 721:7
**twice** [4] - 659:17, 690:11, 714:16, 714:25
**two** [50] - 449:6, 502:7, 510:14, 524:20, 526:20, 553:12, 554:7, 575:22, 580:20, 594:11, 613:10, 621:14, 622:13, 631:5, 637:11, 637:15, 638:2, 638:3, 640:19, 645:3, 645:20, 646:10, 650:2, 653:3, 675:16, 682:21, 686:20, 686:22, 690:16, 692:13, 693:11, 696:25, 697:4, 699:5, 704:7, 704:9, 704:12, 704:13, 704:16, 704:17, 707:14, 715:6, 716:4, 724:24, 725:2, 725:6, 728:21
**type** [14] - 447:14, 525:2, 562:11, 563:10, 577:24, 621:25, 622:16, 637:4, 637:9, 655:23, 700:2, 717:5
**types** [9] - 556:16, 557:17, 558:15, 559:5, 559:6, 559:10, 566:6, 578:20, 615:8
**typical** [4] - 625:13, 626:4, 629:19, 631:6
**typically** [6] - 466:21, 536:15, 536:16, 687:18, 692:7, 736:14
**typo** [1] - 732:17

## U

**U.S** [2] - 735:17, 736:4
**ultimately** [6] - 528:13, 530:5, 574:13, 610:8, 667:25, 721:8
**unavailability** [1] - 675:10
**unaware** [2] - 616:17, 617:6
**unclear** [1] - 734:14
**uncommon** [2] - 495:20, 495:25
**unconstitutional** [2] - 711:5, 711:20
**under** [66] - 455:24, 457:12, 460:25, 483:23, 484:14, 489:16, 494:23, 497:18, 507:19, 518:3, 518:10, 520:15, 521:5, 524:8, 525:2, 529:12, 530:17, 564:12, 564:17, 568:19, 569:18, 571:25, 573:25, 576:4, 578:13, 582:15, 585:3, 586:13, 613:2, 623:21, 630:25, 634:19, 644:25, 645:10, 646:11, 648:6, 649:9, 652:25, 659:11, 663:17, 669:8, 669:9, 676:18, 679:19, 679:22, 681:17, 682:20, 682:23, 686:9, 698:15, 701:1, 709:3, 717:14, 720:15, 721:17, 721:17, 722:2, 722:20, 722:25, 723:13, 723:24, 733:24, 735:10, 736:8

**underlying** [1] - 718:9
**understandable** [3] - 664:10, 676:25, 677:3
**understandably** [1] - 658:3
**understood** [3] - 487:3, 488:2, 533:15
**undertake** [1] - 558:13
**underwriter** [1] - 556:9
**underwriters** [1] - 557:1
**unfortunate** [2] - 665:19, 668:7
**unfortunately** [3] - 595:4, 613:25, 615:25
**Unfortunately** [1] - 529:3
**unique** [7] - 625:15, 625:16, 625:17, 626:1, 626:3, 629:16, 654:15
**unit** [19] - 450:5, 451:6, 451:10, 525:22, 579:8, 627:17, 627:20, 627:23, 628:7, 629:18, 631:8, 657:17, 657:25, 668:3, 678:10, 703:11, 704:21, 704:23, 705:5
**United** [1] - 436:20
**UNITED** [2] - 435:1, 435:17
**units** [1] - 654:25
**universal** [1] - 637:11
**unjustifiable** [1] - 733:15
**unknown** [1] - 556:12
**unless** [6] - 482:5, 508:14, 542:15, 682:17, 691:3, 694:5
**unlikely** [1] - 660:20
**unnecessary** [1] - 723:17
**unpaid** [1] - 692:16
**unquestionable** [1] - 638:14
**unravel** [1] - 640:1
**unreasonable** [14] - 630:19, 631:4, 682:8, 716:22, 717:9, 717:11, 717:15, 719:5, 719:9, 719:14, 721:10, 721:19, 722:13, 724:4
**unscrupulous** [2] - 613:25, 614:6
**unsettled** [2] - 686:13, 686:15
**unsolicited** [1] - 697:6
**unsure** [1] - 681:11
**unusual** [10] - 443:20, 449:5, 466:9, 528:3, 539:1, 556:12, 561:5, 599:19, 600:2, 600:9
**up** [62] - 437:21, 438:16, 444:8, 449:12, 450:1, 451:16, 452:16, 467:19, 467:23, 474:22, 479:16, 495:18, 495:22, 508:11, 512:13, 515:12, 519:21, 525:7, 528:15, 532:11, 546:9, 553:16, 554:15, 560:17, 563:20, 564:9, 564:19, 565:15, 574:9, 574:17, 574:24, 587:14, 608:8, 610:3, 610:6, 611:19, 622:6, 622:13, 625:19, 626:16, 626:22, 627:9, 631:18, 633:25, 640:11, 645:18, 664:12, 664:16, 665:10, 676:10, 681:14, 683:9, 687:2, 689:4, 698:15, 712:10, 714:21, 717:18, 718:8, 723:2, 734:4
**updated** [4] - 438:21, 509:7, 630:10, 635:16
**updates** [2] - 470:16, 583:17
**upgrade** [1] - 624:10

**upset** [1] - 707:22
**useful** [2] - 636:11, 638:4
**uses** [2] - 478:5, 741:6
**usual** [5] - 696:21, 699:2, 699:11, 701:13, 702:15
**Utah** [1] - 667:23
**utilize** [2] - 563:7, 605:9
**utilized** [1] - 578:17
**utilizing** [4] - 457:21, 503:17, 504:3, 504:11

### V

**vaguely** [3] - 515:19, 533:14, 545:4
**Valentine** [2] - 693:11, 694:12
**valid** [9] - 497:22, 499:11, 543:9, 543:18, 543:21, 544:8, 550:23, 614:2, 659:2
**validate** [12] - 541:11, 541:16, 542:5, 542:25, 543:3, 546:13, 547:10, 551:6, 551:15, 552:2, 571:23, 603:24
**Validate** [1] - 552:9
**validated** [13] - 530:6, 530:7, 530:24, 531:6, 541:17, 543:12, 546:16, 546:17, 547:2, 551:20, 582:24, 605:20, 605:23
**validating** [1] - 566:3
**validation** [8] - 529:25, 530:1, 530:22, 541:19, 546:3, 553:15, 578:8, 578:10
**valuable** [1] - 615:6
**value** [3] - 690:7, 691:2, 691:13
**variances** [1] - 614:22
**variety** [3] - 699:4, 699:5, 699:7
**various** [1] - 607:2
**vehicle** [3] - 526:24, 656:6, 661:21
**vendor** [1] - 563:8
**vendors** [1] - 596:1
**vendors'** [1] - 596:17
**verbatim** [1] - 734:17
**verdict** [5] - 689:16, 689:18, 711:6, 711:20, 729:25
**Vergeer** [1] - 436:17
**verification** [2] - 638:6, 647:24
**Verified** [4] - 439:14, 442:25, 444:21, 445:9, 445:21, 446:12
**verified** [23] - 438:21, 439:14, 441:25, 459:11, 460:21, 461:1, 461:2, 471:2, 472:23, 479:20, 483:24, 484:14, 484:16, 485:12, 485:13, 487:9, 488:2, 488:25, 490:1, 493:4, 493:24, 528:14, 607:16
**verifies** [3] - 492:19, 493:10, 494:9
**verify** [34] - 447:19, 447:22, 447:25, 459:7, 459:10, 459:21, 459:22, 463:15, 470:8, 470:18, 471:9, 471:12, 471:17, 472:5, 481:2, 481:5, 481:12, 481:13, 481:16, 482:5, 497:21, 505:1, 507:17, 543:24, 568:12, 583:9, 602:15, 602:17, 602:19, 631:14, 637:16, 647:20, 651:11, 651:16

**verifying** [9] - 447:11, 470:22, 471:6, 472:16, 485:23, 487:7, 490:18, 607:8
**version** [5] - 482:14, 482:16, 565:16, 641:3, 725:2
**versus** [1] - 690:17
**victim** [32] - 475:6, 475:20, 476:24, 521:18, 521:22, 522:12, 525:17, 533:9, 534:8, 534:13, 535:5, 538:19, 548:5, 563:12, 568:1, 568:23, 569:1, 570:2, 573:17, 585:14, 586:13, 586:16, 586:21, 586:25, 587:2, 587:6, 613:1, 616:1, 638:21, 648:3, 676:7, 694:9
**victim's** [1] - 537:20
**victims** [5] - 516:4, 625:5, 638:17, 658:19, 658:23
**video** [1] - 513:5
**videos** [1] - 651:23
**videotape** [1] - 651:13
**videotapes** [1] - 459:4
**view** [8] - 473:1, 473:9, 616:10, 624:6, 676:19, 688:15, 712:13
**viewed** [1] - 690:11
**violate** [1] - 734:19
**violated** [10] - 724:21, 727:14, 727:20, 728:15, 729:6, 729:8, 730:8, 730:10, 732:7, 732:8
**violates** [1] - 717:15
**violating** [3] - 623:19, 682:15, 733:25
**violation** [7] - 682:6, 682:13, 726:21, 730:1, 731:24, 733:23, 734:15
**violations** [4] - 687:3, 689:19, 689:21, 689:22
**visible** [1] - 636:22
**volunteered** [1] - 621:22
**volunteering** [1] - 624:5
**vs** [1] - 435:5

### W

**wait** [21] - 467:21, 509:3, 509:4, 534:3, 534:7, 534:10, 534:20, 535:6, 538:18, 541:7, 545:1, 568:22, 574:1, 596:21, 681:11, 694:18, 722:11, 722:24, 745:3
**Wait** [1] - 745:3
**waiting** [9] - 535:10, 540:15, 544:23, 591:4, 591:7, 632:6, 656:20, 671:15, 672:19
**waiving** [1] - 722:16
**walk** [4] - 552:9, 562:24, 577:23, 578:1
**Walker** [2] - 436:19, 746:11
**WALKER** [1] - 746:12
**walks** [1] - 630:14
**wants** [5] - 656:1, 662:20, 672:11, 721:20, 738:6
**warning** [4] - 564:13, 564:14, 564:16
**Washington** [1] - 667:23
**watch** [1] - 651:22
**watching** [1] - 559:14
**ways** [4] - 567:1, 584:19, 729:7, 730:9

**week** [2] - 625:12, 632:18

**weeks** [5] - 494:4, 579:25, 598:2, 640:8, 675:16

**weight** [4] - 536:20, 714:12, 715:4, 715:5

**Weiner** [1] - 436:2

**welcome** [1] - 702:6

**well-established** [1] - 688:11

**Wells** [272] - 437:15, 440:17, 447:1, 447:18, 448:5, 448:9, 448:11, 448:13, 448:16, 449:19, 449:21, 450:5, 451:10, 451:20, 453:13, 454:20, 455:5, 455:9, 455:15, 456:7, 457:3, 457:12, 458:4, 458:13, 460:13, 460:16, 460:19, 461:11, 461:17, 461:18, 461:24, 462:8, 462:21, 462:24, 463:11, 463:15, 465:4, 465:10, 466:4, 466:9, 466:16, 467:3, 468:12, 468:14, 468:25, 469:1, 469:10, 469:17, 469:21, 470:2, 472:24, 473:1, 473:9, 473:17, 474:3, 474:13, 475:3, 478:5, 479:1, 479:13, 479:19, 480:16, 481:2, 482:12, 482:14, 482:22, 483:6, 483:23, 484:14, 484:25, 485:11, 486:11, 487:3, 487:12, 487:21, 488:16, 488:23, 489:16, 489:25, 490:17, 491:2, 491:8, 492:4, 492:17, 493:3, 493:9, 493:10, 493:23, 494:4, 494:8, 495:16, 496:13, 498:2, 498:4, 499:23, 504:13, 504:21, 508:6, 513:8, 513:9, 513:10, 513:15, 513:17, 513:21, 513:23, 514:9, 515:3, 515:16, 518:4, 521:7, 523:7, 523:22, 525:14, 526:7, 529:7, 532:17, 538:1, 538:3, 538:11, 538:15, 539:13, 539:14, 544:14, 544:25, 547:17, 547:23, 548:2, 548:17, 550:22, 552:14, 552:17, 552:22, 555:18, 555:21, 555:22, 556:4, 556:5, 556:17, 557:16, 557:20, 558:17, 558:21, 566:4, 568:6, 571:11, 571:16, 574:6, 580:9, 580:17, 580:25, 581:19, 583:8, 584:14, 585:13, 585:17, 586:4, 588:21, 589:2, 589:6, 589:17, 590:8, 590:13, 590:19, 590:22, 591:13, 591:15, 591:19, 591:24, 592:4, 592:16, 592:19, 594:3, 594:5, 596:10, 597:1, 601:12, 602:10, 606:8, 606:14, 606:22, 606:25, 607:2, 607:3, 607:7, 611:4, 611:11, 611:17, 614:15, 616:6, 618:21, 619:24, 627:16, 630:11, 630:25, 632:8, 634:12, 636:18, 639:18, 640:14, 642:17, 642:24, 644:16, 644:18, 645:11, 645:15, 647:7, 647:19, 648:6, 649:2, 649:11, 649:18, 650:4, 650:7, 650:24, 652:1, 652:4, 652:5, 652:10, 655:3, 655:6, 656:5, 656:9, 658:1, 659:1, 659:6, 659:11, 659:22, 660:10, 660:23, 662:13, 662:19, 662:25,

663:5, 663:17, 664:3, 664:25, 665:1, 665:14, 665:23, 669:5, 670:1, 670:19, 672:11, 672:16, 674:3, 674:10, 674:18, 674:22, 674:23, 675:1, 676:19, 679:19, 679:21, 682:1, 682:2, 682:4, 689:3, 689:16, 689:19, 689:21, 695:14, 695:18, 702:23, 713:7, 713:11, 719:17, 736:7, 736:8, 742:17, 743:24

**WELLS** [2] - 435:6, 436:15

**West** [1] - 621:18

**Western** [1] - 621:17

**Westlaw** [1] - 735:10

**wheels** [1] - 669:2

**whole** [11] - 503:12, 567:3, 594:4, 622:5, 648:4, 667:18, 722:9, 723:18, 726:24, 735:16, 740:21

**wholesale** [1] - 513:10

**wide** [1] - 612:19

**wife** [4] - 663:4, 663:16, 704:12, 704:25

**willful** [9] - 682:6, 700:10, 729:21, 734:19, 735:17, 735:18, 736:1, 736:11, 736:15

**willfully** [8] - 724:21, 727:14, 727:20, 728:11, 728:14, 729:8, 730:10, 736:8

**willfulness** [8] - 682:5, 682:9, 682:12, 687:11, 687:12, 687:18, 700:6, 737:12

**WILLIAM** [2] - 512:16, 512:22

**William** [4] - 443:25, 512:12, 512:22, 519:23

**willing** [1] - 514:8

**winter** [1] - 522:24

**Winterville** [4] - 451:9, 451:23, 518:16, 518:18

**wish** [1] - 641:20

**withdrawal** [1] - 540:1

**withdrawn** [1] - 682:20

**witness** [28] - 437:2, 437:9, 460:11, 500:19, 503:16, 504:3, 504:11, 505:15, 512:11, 512:17, 554:25, 555:6, 608:15, 608:21, 609:2, 610:20, 611:2, 611:3, 620:8, 620:14, 620:20, 623:5, 623:9, 624:18, 633:20, 680:1, 680:6

**WITNESS** [17] - 440:22, 456:13, 458:7, 467:7, 468:5, 473:6, 501:20, 512:10, 512:22, 534:18, 541:16, 555:11, 579:15, 608:20, 609:7, 620:25, 669:20

**witnesses** [3] - 447:21, 554:1, 638:2

**WJB** [3] - 444:2, 520:2, 528:7

**word** [14] - 628:15, 699:5, 699:20, 715:25, 724:11, 725:17, 728:13, 741:6, 741:21, 742:5, 742:7, 743:14, 744:14, 744:17

**words** [29] - 447:4, 455:18, 479:10, 482:1, 482:21, 487:21, 501:8, 535:12, 537:13, 542:10, 542:14, 588:22, 593:18, 617:10, 638:2, 650:17, 650:18, 651:7, 674:17, 690:16, 699:6, 700:20, 701:17, 720:2, 723:7, 727:11,

728:15, 729:3

**works** [2] - 460:19, 729:14

**world** [1] - 624:9

**worries** [1] - 681:15

**worth** [12] - 705:3, 705:4, 710:20, 710:22, 711:2, 711:3, 711:9, 711:25, 712:18, 712:21, 713:7, 713:11

**worthy** [1] - 705:20

**wreck** [1] - 640:23

**write** [3] - 538:9, 588:3, 734:3

**writing** [4] - 475:6, 507:11, 562:18, 642:4

**written** [5] - 473:13, 507:4, 570:15, 640:5, 681:1

**wrote** [5] - 585:13, 592:10, 607:4, 639:17, 669:4

## X

**XB** [2] - 564:3, 564:6

**XC** [8] - 438:22, 439:15, 441:25, 444:23, 445:9, 445:21, 446:12, 486:3

## Y

**year** [16] - 441:19, 468:9, 469:5, 469:17, 470:16, 527:12, 533:12, 555:25, 556:5, 559:18, 597:9, 621:11, 623:8, 626:9, 658:19

**yearly** [1] - 558:16

**years** [16] - 513:25, 520:7, 530:2, 551:3, 551:4, 556:6, 609:15, 609:24, 610:12, 610:19, 611:3, 621:15, 621:21, 623:11, 625:20

**yesterday** [12] - 437:14, 440:5, 440:24, 447:8, 447:21, 508:4, 513:4, 632:1, 682:4, 682:24, 686:17, 689:4

**Yochum** [6] - 465:5, 465:19, 588:23, 659:23, 660:3, 660:18

**yourself** [1] - 560:1

## Z

**zero** [1] - 622:13

**zoom** [7] - 438:17, 439:8, 439:21, 440:8, 441:15, 443:16, 612:9

**zooming** [1] - 451:1