1                   IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF OREGON

3   MATTHEW SPONER,                  )
                                     )
4              Plaintiff,            )  No. 3:17-cv-02035-HZ
                                     )
5         vs.                        )  August 30, 2019
                                     )
6   EQUIFAX INFORMATION SERVICES,    )  Portland, Oregon
    LLC and WELLS FARGO BANK, N.A.,  )
7                                    )
               Defendants.           )
8   ---------------------------------

9

10

11

12

13

14                           **TRIAL - DAY 4**

15                       TRANSCRIPT OF PROCEEDINGS

16              BEFORE THE HONORABLE MARCO A. HERNANDEZ

17                 UNITED STATES DISTRICT COURT JUDGE

18

19

20

21

22

23

24

25

```
 1                          APPEARANCES

 2    FOR THE PLAINTIFF:     Jeffrey B. Sand
                            Weiner & Sand LLC
 3                          800 Battery Avenue SE
                            Suite 100
 4                          Atlanta, GA  30339

 5                          Kelly D. Jones
                            Kelly D. Jones, Attorney at Law
 6                          819 S. E. Morrison Street
                            Suite 255
 7                          Portland, OR  97214

 8                          Michael R. Fuller
                            OlsenDaines
 9                          111 S. W. Fifth Avenue
                            Suite 3150
10                          Portland, OR  97204

11                          Robert S. Sola
                            Robert S. Sola, P.C.
12                          1500 S. W. First Avenue
                            Suite 800
13                          Portland, OR  97201

14    FOR THE DEFENDANT
15    WELLS FARGO BANK:     Robert E. Sabido
                            Timothy J. Fransen
16                          Daniel C. Peterson
                            Julie Annette Smith
17                          Cosgrave Vergeer Kester, LLP
                            900 S. W. Fifth Avenue
18                          24th Floor
                            Portland, OR  97204
19
20    COURT REPORTER:       Nancy M. Walker, CSR, RMR, CRR
                            United States District Courthouse
20                          1000 S. W. Third Avenue, Room 301
21                          Portland, OR  97204
                            (503) 326-8186
22

23

24

25
```

1              P R O C E E D I N G S

2         (The Court, counsel, and the parties reconvene.)

3         THE COURT:  Good morning.  Be seated.

4         Let's finish up the motions for judgment of

5    acquittal, and then we'll talk about instructions and allow

6    you all to make your record.

7         I said "judgment of acquittal."  I meant motions for

8    judgment as a matter of law.

9         I told the parties that I would review *Cooper* and the

10   *Drew* case in order to figure out whether or not *Cooper* did

11   away with the notion of damages that were not pecuniary

12   damages in the FCRA.  And after engaging in that exercise, I

13   find that *Cooper* doesn't direct a verdict on that issue, and

14   *Drew* is still good law.  So the motion for judgment as a

15   matter of law is still denied.

16        I don't remember if I left anything else on the table

17   as regards your halftime motions.

18        MS. SMITH:  I'm not sure this is on.  Is it on?

19        Your Honor, I think that the rest of the reserved

20   rulings bear more on the instructions.

21        THE COURT:  That's my recollection as well.

22        So then I'll turn to the instructions.  The big issue

23   that was a change for me was I did a review of all the cases I

24   was able to read last night on the issue of "but for"

25   causation.  And there was a recent decision that came out of

1  the Ninth Circuit just last week called *Murray v. The Mayo*
2  *Clinic*.  It was an ADA case, but they were analyzing language
3  in that statute, talking about on the basis of disability and
4  whether that created a "but for" causation requirement; and if
5  it did, they were going to have to directly overrule a prior
6  case.

7       The Ninth Circuit did so and cited to a number of
8  cases that were looking at language that included "because
9  of," "by reason of," and "because."

10      I also did a survey of a number of other cases out of
11 the Supreme Court.  I looked at this *Philbin* case out of the
12 Third Circuit.  And I conclude that the language in the FCRA,
13 "as a result of" is the critical language, and that that
14 requires a "but for" analysis.  And I have included an
15 instruction that reflects my change in perspective on that
16 issue.

17      That's the big one.  And then other than that, I gave
18 you copies of the jury instructions.  I know you haven't had
19 an opportunity to read through them entirely and digest them.
20 But if you're ready at this point to put on your objections
21 and for me to overrule them, now would be a good time.

22      I hope we can do that in a relatively short period of
23 time so that we can get to the jury at a reasonable hour.

24      MS. SMITH:  Your Honor, can I have maybe five minutes
25 to read what I just got, the instructions that you just

1    handed?

2              THE COURT:  Sure.  I'll step off the bench in order

3    for you to do that.  I wanted to alert you, though, to the one

4    change I made on that particular issue.

5              MS. SMITH:  So, Your Honor, did you make a ruling on

6    the scope of the damages issue?  Is that going to be obvious

7    in looking at the instructions?

8              THE COURT:  And that is the question as to whether or

9    not those other categories of damages should or should not be

10   included in instructions to the jury?

11             MS. SMITH:  Correct, including -- including the

12   reputation and denial of credit.

13             THE COURT:  I made a decision.  All of those

14   categories will remain in the case.

15             MS. SMITH:  Okay.

16             THE COURT:  Okay.  And I think that's reflected in

17   the instructions.  I hope it is.

18             MS. SMITH:  We'll review them.  Thank you, Your

19   Honor.

20             THE COURT:  Yeah, I just got them myself.  And we

21   worked late and I was here early.  We were both here early,

22   trying to get them wrapped up, so I need to read through them

23   myself.

24             Why don't you take a few minutes.  I'll take the

25   bench; and at that point be prepared to put on your objections

1  with a short statement as to your support for those

2  objections.

3        And, by the way, if you need further time in order to

4  do that and kind of flesh out your arguments, again, I'll give

5  you an opportunity to do that.  After I instruct the jury and

6  send them out, I can give you an opportunity to do that.

7        MS. SMITH:  The only thing I want to mention right

8  now is that we just got a copy of the Court's verdict form.

9        THE COURT:  Yes.  Oh, let me raise at least one issue

10  as regards that point.

11        My proposed verdict form is a little bit different

12  than the ones that were submitted to me.  And my question to

13  the parties has to do with whether or not a willful violation

14  can be found of the Fair Credit Reporting Act if there is no

15  negligent finding of the Fair Credit Reporting Act.

16        MS. SMITH:  That would be an inconsistent verdict.

17        THE COURT:  I would think so as well.

18        MR. SOLA:  No, Your Honor.  The jury could say this

19  is willful and not -- you know, they just go right to willful.

20  It's not negligent; it's willful.

21        And these have been the questions that have always

22  been asked.  I just think we take a big risk.  The jury

23  doesn't see negligence and willful the way we do.  You know,

24  what if they think it's willful, and they say no, and you

25  don't let them go to the next question, they say no on

1  negligence and they don't go to the next question?

2          THE COURT:  Well, my question is that -- because

3  generally willful would encompass negligence, in the same way

4  that intentional encompasses all of those mental states.

5          MR. SOLA:  I don't think so here.

6          This is really important.  I mean, what if they do

7  want to find willful and they don't get to that question?  I

8  mean, then we don't get the correct verdict.

9          THE COURT:  That's why I'm posing the question.

10          MR. SOLA:  Okay.  We do not object to the form as is.

11          THE COURT:  All right.  And you might -- I mean, you

12  have a whole army of lawyers there.  If you want to send one

13  out to give me authority that says, no, that you can make a

14  finding of negligence without making a finding of willfulness

15  on the same facts, I'd love to see it.

16          MS. SMITH:  Your Honor, if I could just make two

17  points about the current version of the verdict form.

18          THE COURT:  Sure.

19          MS. SMITH:  I assume it was intentional to leave out

20  the causation instruction that we had included.

21          THE COURT:  Indeed.

22          MS. SMITH:  But I did want to say that the

23  instructions, at least the version I saw last night, said that

24  the jury had to find that it caused harm before awarding

25  damages.

1              THE COURT:  Yes.

2              MS. SMITH:  So we would ask that the Court include an

3    instruction similar to the one that we just -- or a question

4    similar to the one that we included in the verdict form we

5    filed last night:  Did the FCRA violations cause plaintiff

6    harm?

7              THE COURT:  Right.

8              No.

9              MS. SMITH:  Thank you.  I understand your ruling.

10             THE COURT:  All right.

11             Okay.  Take a few minutes.  I'll be back.

12             MR. PETERSON:  Thank you, Your Honor.

13             (A recess is then taken.)

14             (The Court, counsel, and the parties reconvene.)

15             THE COURT:  Be seated.

16             While I listen to your objections on the jury

17   instructions, one thing that you might want to be thinking

18   about was that last point regarding the verdict form.

19             One way to address the issue is to put the

20   issue -- the question of whether or not it was willful as the

21   first question, and then say, "If the answer to this is yes,

22   let's talk about damages.  If the answer is no, then answer

23   the second question, was it negligent?"

24             So that would be one way to kind of do it, so you get

25   to willfulness first.  And then, again, if the answer is no,

1    then you get to negligence.

2            Second thought -- I don't know that any of this

3    matters because I'm going to instruct them that the defendant

4    admits that they were negligent in at least some of the ways

5    alleged.  So it seems to me that it's going to be pretty weird

6    for them to return a verdict of no negligence on that

7    question.  Damages is different.  But that's part of the

8    instructions that I'm giving in this case at the request of

9    the defense.  Second thought.

10           Third thought, to the legal point that I was raising,

11   which is whether or not negligence is -- lives within the

12   definition of willfulness, it does, but the problem is not

13   that legal issue.  The problem is we don't have an instruction

14   that explains that to the jury, and I'm not going to give them

15   one.

16           And so one of the things -- the way the instruction

17   works kind of addresses the plaintiff's point; and that is

18   that the jury may feel that the behavior was so outrageous

19   that it wasn't just negligent, it was willful.  And that would

20   explain what we, as lawyers, might see as an inconsistent

21   result not really being inconsistent at all, because if they

22   have that feeling in their head, that would explain that kind

23   of a result.

24           Now, that's not legally correct, but it is correct

25   given the way that we're instructing them and that we're not

1   giving them an instruction that says, "If you find

2   willfulness, you must automatically find negligence."

3           So those are just my thoughts on that issue.  You can

4   just tuck that aside, and let's get to your objections so that

5   we can get the jury out here.

6           MR. SOLA:  Your Honor, if I may, I just think that

7   there might have been a mistake on one of them.

8           THE COURT:  We'll get to them.

9           Go ahead.  You're the plaintiff.  You get to go

10  first.  What do you want to tell me?

11          MR. SOLA:  Well, let me start first, because I don't

12  know that I have any exceptions.

13          Actually, on No. 17, the last sentence, I think the

14  proper word there is harmed by the "violation."  I think

15  that's -- you know, as a result of the "violation," just more

16  of a technical change.

17          THE COURT:  Okay.  Anything else?

18          MR. SOLA:  Yes.  Then on the punitive damages

19  instruction, No. 23, you omitted the reference to

20  consideration of financial condition, which is in the model

21  rule; and we have an instruction on the financial condition of

22  Wells Fargo.  We think that has to be in there.

23          THE COURT:  Okay.  Thank you.

24          Anything else?

25          MR. SOLA:  No.  Thank you.

1              THE COURT:  All right.

2              MS. SMITH:  Your Honor, I'll be quick, but I do have

3     a few.  Some of it is just reviewing issues that were

4     discussed thoroughly earlier.

5              No. 5, the Stipulation of Fact instruction, defendant

6     renews the objections already stated on the record regarding

7     the admissibility of Wells Fargo's net worth.  It also just

8     occurred to me, just in looking at it right now, that it says

9     "Wells Fargo," where in other places in the jury instructions

10    we say "defendant."  So it's not consistent with the way the

11    other instructions are worded.

12             So briefly on that, it's not admissible under

13    Rule 401 or 403; and allowing the jury to consider net worth

14    is only going to incite an unconstitutional verdict.

15             Skipping ahead, the next one is what is currently

16    No. 14, the Descriptions of Claims and Defenses.  I'm sorry

17    for not raising this earlier, but it just occurred to us that

18    this last phrase, where it says "and denies that plaintiff

19    suffered any actual damages," it's going to be inconsistent

20    with the closing arguments in this case.  So I would just

21    suggest removing that clause, the very last clause, "and

22    denies that plaintiff suffered any actual damages."

23             If I'm going too fast, please stop me.

24             THE COURT:  And is that because you're admitting

25    negligence?

1          MS. SMITH:  Yes, we are admitting some negligence,

2     and we're going to admit some harm.  I think it's just better

3     to say nothing about that.

4          THE COURT:  Okay.

5          MS. SMITH:  Moving along to No. 16, it's called

6     "Reasonable Investigation."  Just briefly renewing the

7     objections raised yesterday, we had proposed some additional

8     language based on *Gorman*, which said that an investigation can

9     be reasonable even if the result turns out to be inaccurate.

10          On No. 17 -- no, sorry, skipping ahead, on

11     No. 18 -- this is the negligence and willfulness instruction,

12     just renewing, very briefly, the objections we already placed

13     on the record regarding the second paragraph, and we had also

14     talked on the record about how the *Safeco v. Burr* case expands

15     on the definition of reckless disregard in a way that I think

16     would be meaningful to the jury in this case.  The Court

17     overruled our objection, but I'm just restating it for the

18     record.

19          Instruction No. 20, the Proof and Measure of Damages

20     instruction, again, just renewing the objections raised

21     earlier.  As we pointed out earlier, the losses should be

22     limited to plaintiff's emotional distress and not to the other

23     categories.  And I would also renew the request for the fifth

24     special instruction that defendants offered relating to the

25     limitation of damages to emotional distress.

1          Relating to causation, I don't have any objection at

2     all to Instruction No. 21, as you might guess.  But we also

3     had offered language addressing the proximate cause

4     requirement.

5          I assume the Court has concluded there is no

6     proximate cause requirement?

7               THE COURT:  Correct.

8               MS. SMITH:  So I'm just renewing that.

9               THE COURT:  On that Instruction No. 21, I'm going to

10    take out the quotation marks.

11              MS. SMITH:  Okay.  That makes sense to me.

12              THE COURT:  Did you get that for the plaintiff?  I

13    just don't want to highlight that point.

14              MR. SOLA:  Yes, I get that.  And I actually wanted to

15    take exception to that.  I did not mention it.

16              MS. SMITH:  Your Honor, both sets of quotation marks?

17              THE COURT:  Yes.

18              MS. SMITH:  Okay.

19              Finally, the objections that we did not have an

20    opportunity to put on the record yesterday were the ones

21    regarding punitive damages, because we discussed that

22    instruction after the court reporter left for the day.  So

23    I'll talk a little bit more at length about that right now.

24              We had proposed yesterday adding language to the

25    third paragraph, after the word "perceived," to make this

1    instruction -- the definition of reckless disregard in the

2    instruction consistent with the definition under the FCRA.

3    And that language would be after the word "perceived,"

4    "unjustifiably high risk."  The Court did overrule that

5    request.

6            The other thing I would raise is that the instruction

7    tells the jury that it can consider actual harm posed to

8    people who are not parties to this case.  We objected.  We

9    continue to object to that part of the instruction.  *State

10   Farm v. Campbell*, the case that addresses that issue, it says

11   a defendant should not -- a defendant should be punished for

12   the conduct that harmed the plaintiff, not for being an

13   unsavory individual or business.  Due process does not permit

14   Courts, in the calculation of punitive damages, to adjudicate

15   the merits of other parties' hypothetical claims against a

16   defendant under the guise of the reprehensibility analysis.

17           The Court goes on to talk about what kind of evidence

18   has to be on the record in order to -- for a plaintiff to rely

19   on harm to others.  And there is no evidence in this record to

20   support that part of the instruction under *State Farm v.*

21   *Campbell*.

22           And then the other thing that we talked about

23   yesterday, last night, was our proposed instruction had

24   included some factors that the jury can consider in -- in

25   deciding reprehensibility.  And those are based on three

 1   Supreme Court cases that discuss those factors.  The current

 2   instruction includes only one of those factors, which is the

 3   one we just discussed under *State Farm v. Campbell*.  And

 4   including one without including them all I think gives too

 5   much weight to one factor.  It's something that we talked

 6   about yesterday, but it wasn't on the record, so I just wanted

 7   to repeat it from yesterday.

 8            And that's all I have.

 9            THE COURT:  Thank you.

10            On the Description of Claims and Defenses, the last

11   phrase, "and denies the plaintiff suffered any actual

12   damages," will be removed from the instruction.

13            On Instruction 17, Elements, the phrase "negligence

14   or willfulness of the defendant" will be removed and it will

15   simply say "the violation."

16            All other objections are overruled.

17            MR. SOLA:  May I be heard, Your Honor?

18            On the financial condition, we have a stipulation on

19   that word.  And so what is the purpose of that fact being

20   entered?

21            (The Court and the law clerk confer off the record.)

22            THE COURT:  Thank you.  I heard what you said.

23            Anything else?

24            MR. SOLA:  So my question is, for my closing

25   argument, can I tell the jury that they can consider the net

 1  worth in terms of --

 2              THE COURT:  Yes.

 3              MR. SOLA:  -- assessing punitives?

 4              THE COURT:  Yes.

 5              MS. SMITH:  Are you agreeing to include it in the

 6  instruction, then?

 7              THE COURT:  No.

 8              MS. SMITH:  All right.  Well, I'll just say for the

 9  record, we object to it being included in plaintiff's closing.

10              THE COURT:  Thank you.

11              Anything else?

12              MR. SOLA:  No, Your Honor.

13              THE COURT:  So as regards the verdict form, let's

14  just take a couple minutes, please, to see what you want to do

15  about the verdict form.  I made some alternative suggestions

16  for you.

17              What's your pleasure, starting with plaintiff?

18              MR. SOLA:  We would like to keep the verdict form as

19  it is.

20              THE COURT:  Okay.  Thank you.

21              MS. SMITH:  May I confer for just a moment?

22              THE COURT:  Yes.  Of course.

23              MS. SMITH:  Thank you.

24              (Defense counsel confer off the record.)

25              MS. SMITH:  Your Honor, is it your practice not to

1   include the word "unanimous" in the introduction?

2           THE COURT:  No, it's not my practice to do that.  I

3   don't know if it was oversight, but we can include the

4   language "unanimous."

5           MS. SMITH:  Yes, please.

6           And then as far as your suggested changes, defense

7   would like to leave it as is, without waiving the objection

8   that we made to not having a causation instruction on the

9   record.

10           THE COURT:  Then I will leave it as is and have the

11   words that the jury "unanimously finds as follows."

12           MS. SMITH:  Thank you, Your Honor.

13           THE COURT:  Okay.

14           MR. SOLA:  Where is the word "unanimously" going to

15   go?

16           THE COURT:  "We, the jury, being duly impaneled and

17   sworn to try the above-entitled case, do unanimously find as

18   follows."

19           MR. SOLA:  Thank you.

20           THE COURT:  I always ask at the end of the trial

21   whether their decision was unanimous or not.

22           Okay?

23           MS. SMITH:  All right.  Thank you.

24           THE COURT:  All right.  Try to have fun with it.

25           I'll give you a few minutes to gather your wits, and

Closing Argument - Plaintiff

1    then we'll get started.

2            (A recess is then taken.)

3            (The Court, counsel, the parties, and the jury

4    reconvene.)

5            THE COURT:  Good morning.  Please be seated.

6            Closing argument.

7            MR. SOLA:  Thank you, Your Honor.

8            Thank you, ladies and gentlemen, for serving on the

9    jury.  We appreciate your attention throughout the case.  I

10   know there have been a lot of documents and exhibits.  That's

11   the type of case this is.  I'm not going to show you more

12   documents today.

13           There are so many documents in this case because

14   Mr. Sponer had to keep disputing over and over again to try to

15   get Wells Fargo to take the fraudulent account off of his

16   credit report.

17           Now, I told you at the beginning of the case that

18   Wells Fargo broke the law, and now you've seen the proof.

19   Wells Fargo broke the law 10 times, every time it got an ACDV

20   and responded by saying the fraudulent account belonged to

21   Mr. Sponer.

22           Wells Fargo is one of the biggest banks in the

23   country.  As you will hear, they have a net worth of

24   $165 billion.  It is a company with immense power over

25   people's lives.

Closing Argument - Plaintiff

1          Credit reports are used in almost every facet of our
2     economy.  Wells Fargo's power to report credit information is
3     really the power to control a life.  You heard what happened
4     to Matthew Sponer.  Wells Fargo allowed a thief to open an
5     account in his name, despite the fact he had told them he
6     would be out of the country for more than a year.  Then Wells
7     Fargo reported this fraudulent account to the three major
8     credit reporting agencies, and you heard how this affected his
9     life and his family for the next 14 months.
10          He was a victim once by the identity thief.  But he
11     became a victim again of Wells Fargo's corporate
12     irresponsibility.
13          We are asking you to enforce the law.  The Fair
14     Credit Reporting Act allows for a civil action, such as this
15     one.  That is one of the primary ways this law is enforced:
16     through people like Matthew Sponer being brave enough to take
17     on a big corporation like Wells Fargo; and people like you
18     serving on the jury and saying to Wells Fargo, "Stop breaking
19     the law."
20          No company, no matter how large, is above the law.
21     We ask that you enforce the law for the benefit of everybody,
22     all consumers.
23          The law is strict, as it should be, because of the
24     importance of information in credit reports.  Wells Fargo must
25     conduct a reasonable investigation of information that is

Closing Argument - Plaintiff

1    disputed to determine if it is accurate.

2            I know you've heard that sentence many times, because

3    it is a fundamental right, not just for Mr. Sponer, but for

4    all consumers.

5            Credit reports must be accurate.  They are the

6    linchpin of our credit-based economy.  And this accuracy does

7    not just benefit consumers; it benefits everybody who uses

8    credit reports.  Inaccurate credit reports hurt our economy.

9            But Wells Fargo does not care about the accuracy of

10   the credit information it reports, nor does it care about the

11   law.  Its established procedures, its own policies and

12   procedures, violate the law.

13           This case is not just about Mr. Sponer.  Wells

14   Fargo's investigation procedures affect the hundreds of

15   thousands of persons that send disputes to Wells Fargo Dealer

16   Services every year.

17           Every consumer has the right to dispute information

18   on their credit report.  That provision is designed to ensure

19   that inaccurate information gets corrected.  But when Wells

20   Fargo violates the law, then the whole system is polluted with

21   inaccurate information, as you saw here.

22           A dispute by a consumer is the consumer's only

23   opportunity to correct inaccurate information on their credit

24   report.  All the information is in Wells Fargo's control,

25   except for that right that the law gives to the consumer to

Closing Argument - Plaintiff

1  dispute.  And when a dispute is made, Wells Fargo has a

2  responsibility, a very important responsibility, to

3  investigate the dispute in accordance with the law.

4       The evidence shows that Wells Fargo subverts that

5  right of consumers and ignores its responsibility; and the

6  results are in credit reports.  You saw the evidence.  I won't

7  repeat it all, but I do want to go through some of the facts,

8  because it's hard to remember everything.

9       The first dispute to Wells Fargo was through

10  Mr. Sponer's attorney, James Charne, through a letter on

11  October 19, 2016.  It is a very detailed letter.  It informs

12  Wells Fargo that Mr. Sponer is the victim of identity theft.

13  Mr. Charne gives Wells Fargo all the details about the

14  criminal case, because the thief has been caught.  He gives

15  the name of the detective, Tugashov; his phone number; and

16  indicates that the thief who bought the car with the loan from

17  Wells Fargo is now in custody and the automobile has been

18  recovered and will be returned to Wells Fargo.

19       Mr. Charne tells Wells Fargo that Detective Tugashov

20  can confirm all these facts.  And a few days later, Detective

21  Tugashov does confirm all those facts.

22       Mr. Charne asks that no damaging information be

23  reported about Mr. Sponer; and if any damaging information

24  related to the account has been reported, that it be corrected

25  because, as you've heard, Mr. Sponer is relying on his credit

Closing Argument - Plaintiff

1    card because he's overseas.

2            But Wells Fargo does not heed this request.  It has

3    reported the fraudulent account on Mr. Sponer's report and

4    refuses to correct it.

5            A week later Wells Fargo talks with Detective

6    Tugashov; and Wells Fargo makes a record in the account notes,

7    also called the iTop notes, of that call.  Detective Tugashov

8    tells Wells Fargo that a man named Jason Yochum purchased the

9    car after he stole the customer's identity and that the car

10   will be held as evidence in the prosecution of that thief.

11           The words Detective Tugashov said could not be

12   clearer:  Jason Yochum stole Mr. Sponer's identity.  Wells

13   Fargo, from that point on, knows the loan was the result of

14   identity theft.  But it does not remove the loan from

15   Mr. Sponer's credit report.

16           On November 3rd Wells Fargo has another conversation

17   with Detective Tugashov, which also is reflected in the

18   account notes maintained by Wells Fargo, quote:  Suspect pled

19   guilty and sentencing is on November 30th.

20           Now they not only know they've caught the thief, he's

21   pled guilty.  And it indicates that the car is still being

22   held as evidence.

23           If you're a bank like Wells Fargo, you really cannot

24   have better proof of identity theft than the police telling

25   you that the consumer is the victim of identity theft, the

Closing Argument - Plaintiff

1  suspect pled guilty, and the police are holding the car as

2  evidence.

3          Think about it.  The police wouldn't have the car if

4  it wasn't identity theft; the true, honest owner of the car

5  would have it.  The expert witnesses agree that as of that

6  point in time, this proves identity theft.  Even Mr. Kelley,

7  Wells Fargo's expert, agreed.

8          Now, Wells Fargo has this information in its records

9  when Mr. Sponer disputes over the next 14 months.  But as you

10 saw, Wells Fargo ignores this information and keeps insisting

11 that the debt belongs to him.

12         To make things worse, Mr. Sponer is a longtime

13 customer of Wells Fargo, with a credit card and other

14 accounts.  Wells Fargo knows who he is and that this account

15 is fraudulent, but it will not remove it.

16         Mr. Charne, around this same time, late October, is

17 also contacting the credit reporting agencies, telling them

18 that Mr. Sponer is the victim of identity theft.  Then those

19 credit reporting agencies, which we call CRAs, they send

20 notices of Mr. Sponer's disputes to Wells Fargo.

21         And once Wells Fargo gets these notices or ACDVs,

22 then it must comply with the Fair Credit Reporting Act.  It

23 must do a reasonable investigation to determine if the account

24 resulted from identity theft.  But instead of doing a

25 reasonable investigation, as the law requires, and using the

Closing Argument - Plaintiff

1    information it has in its own records, Wells Fargo does a

2    useless comparison of the identifying information.  It is not

3    a real investigation.  You heard Evan Hendricks, an expert in

4    credit reporting, say it wasn't an actual investigation.

5              And then you heard the testimony of Ashley Grier, one

6    of the Wells Fargo employees who processed an ACDV.  Although

7    the dispute stated that it was being disputed as identity

8    theft, she did not investigate whether the account was the

9    result of identity theft.  She only compared the identifying

10   information of Mr. Sponer that Equifax put on the ACDV with

11   the identifying information that Wells Fargo had in its

12   records.  Because the first and last name, the Social Security

13   number, and the date of birth matched between those two

14   databases, she verified the account was accurate.  And she

15   confirmed that she followed Wells Fargo's policies and

16   procedures in doing the investigation.

17             I think you've heard that a lot through this trial,

18   and Wells Fargo itself insists that everybody followed the

19   procedures.  That's very important, because this isn't the

20   case where one of the employees made a mistake.  The employees

21   followed the procedures.  It's the procedures that are the

22   problem, as I'll explain more.

23             Well, there's an example right there.  The procedure

24   is to verify the ID.  But verifying the ID doesn't show that

25   the account is not identity theft.  Identity theft is when a

Closing Argument - Plaintiff

1   thief uses a consumer's ID.  So the accountholder, the thief

2   who opened the account, they're giving Mr. Sponer's

3   identification to Wells Fargo when they open the account.

4          So when Mr. Sponer disputes, he's using his

5   identification, and there's going to be a match, at least in

6   large part.  Here the address did not match, which actually is

7   an indication often of identity theft.

8          But doing this cursory comparison of identifying

9   information is useless in investigating identity theft.  And

10  Wells Fargo's own expert, Brian Kelley, agreed.

11         Wells Fargo knows this is not a reasonable

12  investigation.  A reasonable investigation would involve

13  looking at the information that Wells Fargo has, looking in

14  its own records, including information from the police

15  confirming that Mr. Sponer is a victim of identity theft.  But

16  this is the system that Wells Fargo uses because it's fast and

17  it's cheap.

18         You saw the testimony of Montressa Ebron.  She stated

19  that she followed Wells Fargo's same procedure of matching

20  identifying information that was used by Ashley Grier.  And

21  she confirmed this was according to the policy and procedure

22  of Wells Fargo.

23         Now, Mr. Sponer, he called as witnesses in his case

24  the Wells Fargo employees who actually processed the ACDVs.  I

25  hesitate to say "investigated" the disputes, because there

Closing Argument - Plaintiff

really was no investigation.  These are the only people that
know what was done to investigate the dispute, and they
confirmed it was just a superficial matching of identifying
information.

Oddly enough, Wells Fargo, they did not want to call
and did not call as witnesses any of the employees who worked
on the ACDVs.  These are the people with the knowledge of the
most important issue in the case:  What was done when Wells
Fargo received the ACDV?  Was a reasonable investigation to
determine accuracy done?  Only those employees know.  We
wanted them to testify because what they said proved there was
not a reasonable investigation done.  Wells Fargo did not call
them, did not want you to hear what was done.

The FCRA requires an investigation of Mr. Sponer's
dispute to determine if the account is identity theft.  But
Wells Fargo's procedures do not result in a reasonable
investigation.  They plainly violate the FCRA.

And you heard what is probably the most outrageous
policy of all:  Wells Fargo does not let their ACDV employees
investigate a dispute of identity theft.  That is a willful
violation of the FCRA.  Wells Fargo has prohibited its
employees from doing the investigation that the law requires
they do.

It takes time to do a reasonable investigation.  But
Wells Fargo puts profits over people.  The employees have a

Closing Argument - Plaintiff

1   quota of 10 disputes an hour.  This means that they spend an

2   average of six minutes per dispute.  That does not allow time

3   for a reasonable investigation, but merely the matching of

4   information.

5          You heard both Brian Funsch and Colin Hollomon, who

6   are Wells Fargo employees who process ACDVs, expressly state

7   that they had this quota of 10 disputes an hour.

8          Mr. Sponer, after these disputes through Mr. Charne,

9   he gets his TransUnion credit report dated November 9, 2016.

10  The fraudulent Wells Fargo account is on there.  He expected

11  it would all be resolved.  The police have already told Wells

12  Fargo it's identity theft, back in October.  But he sees it's

13  still on his credit report, a balance of $29,000.  And it's

14  now showing 60 days late.  As he testified, his credit before

15  the identity theft was perfect.

16         TransUnion sends a notification to Wells Fargo on

17  November 13th.  TransUnion is blocking the account as

18  fraudulent, after the November 9th report.  The notification

19  tells Wells Fargo that TransUnion has blocked the account as

20  fraudulent.  They're the experts on credit reporting, and

21  they've determined the account is fraudulent, and they haven't

22  even talked to the police.

23         But they tell Wells Fargo something else that it must

24  do.  I quote:  "Take all of the necessary steps to ensure this

25  account is not reported by you or by a third party -- i.e.,

Closing Argument - Plaintiff

1  collection agency -- in your behalf."

2      TransUnion is concerned about accuracy.  They know

3  it's fraud.  They're telling Wells Fargo, "This is fraud.

4  Don't report it."  But Wells Fargo always reports it.

5      It gets more ACDV notices in 2016.  But despite

6  knowing the account is identity theft, it verifies that it's

7  accurate to the CRAs, so it remains on Mr. Sponer's credit

8  report.

9      Then we move into January 2017.  During this month

10  the thief is convicted and Wells Fargo gets the car back

11  because the criminal prosecution is over.  This is the final,

12  ultimately conclusive proof that the account resulted from

13  identity theft, if any more proof was needed.

14      Even Wells Fargo's representative, Megan Braxton,

15  agreed that after the conviction, there was no question that

16  it was identity theft in Wells Fargo's eyes.  But Wells Fargo

17  still reports the account as belonging to plaintiff, and it

18  still verifies it on six more ACDVs.

19      Also in January Mr. Sponer sends a letter to Wells

20  Fargo with a fraud affidavit and a police report.  But again,

21  Wells Fargo ignores that information when it processes the

22  ACDV.

23      Now, you heard some testimony yesterday about -- from

24  Wells Fargo's witnesses about, "Oh, but Mr. Sponer didn't send

25  in his Social Security card or his driver's license.  He only

Closing Argument - Plaintiff

1    sent us the fraud affidavit and the police report."

2           But again, as Megan Braxton said, in January, after

3    the conviction, there was no question it was identity theft in

4    Wells Fargo's eyes.  They didn't need anything else.

5           During this time period of November, December,

6    January of 2016 and into 2017, it's also a time that

7    Mr. Sponer suffers significant damages.  He had been sailing

8    in New Zealand.  And the plan, as he said, was to put the boat

9    in the marina.  They actually bought a used car.  And the plan

10   was to travel around New Zealand for a few months.  As

11   Mr. Sponer said, he loves nature.  His family loves nature.

12   It's why they sail.  It's why they camp.  And this was going

13   to be a real special time for them in New Zealand.

14          But those plans don't happen.  He sees that the Wells

15   Fargo account is still on his credit report.  Other fraudulent

16   accounts are also on his credit report.  I'm not going to

17   mislead you.  He's working on more than Wells Fargo at this

18   time, but Wells Fargo is the biggest and of the most concern

19   to him.

20          So he rents an office to try to deal with this, an

21   office that has good Internet, so that he can deal with these

22   identity theft accounts.

23          And you heard the testimony of Mr. Sponer and his

24   wife, Ana Rodighiero.  After disputing the Wells Fargo account

25   while on their trip, they ended the family's vacation because

Closing Argument - Plaintiff

of the fear that Wells Fargo would shut down their credit card

while they were overseas.  Ms. Rodighiero explained to you

that had Wells Fargo deleted the account at the latter part of

2016 from Mr. Sponer's credit report, then the family would

have proceeded with their sailing trip, a long sailing trip,

after their visit to New Zealand, to Japan, Alaska, and

eventually back to the Pacific Northwest.

        Yes, she was going to donate a kidney to her brother.

She was going to leave for a while.  But the plan was that she

was just going to go away for a few weeks and then come back

to the family as they were living on the sailboat.  But that

never happened.  Wells Fargo took that away.

        Then on February 15, 2017, Wells Fargo sends a

response to Mr. Sponer's January dispute letter.  It states

that it has verified that the information being sent to the

consumer reporting agencies on this account is accurate.  I

mean, that's literally impossible, because it's not accurate.

        And then the second paragraph is very odd.  It tells

Mr. Sponer if he has cancelled checks or receipts, he should

provide them to Wells Fargo.

        His dispute was clearly identity theft.  He said it

was identity theft.  He included what we call a fraud

affidavit or an identity theft affidavit.  He included a

police report about the identity theft.  But Wells Fargo

clearly doesn't even read what he sends, because they write

Closing Argument - Plaintiff

1   back as if he was claiming there was some kind of billing

2   error or unrecorded payment.

3          Mr. Sponer testified that this letter caused him fear

4   and shock.  He was worried this wasn't going to be easy.  Ana

5   Rodighiero testified that Mr. Sponer felt vulnerable, like at

6   any moment Wells Fargo would collect the debt or cut off his

7   credit.

8          In August 2017 Mr. Sponer sends Wells Fargo another

9   dispute, but Wells Fargo does not even respond.

10          On November 3, 2017 Mr. Sponer sends another dispute

11   to Wells Fargo.  He again informs them that the account arose

12   from identity theft and asks them to remove it.  He details

13   all the previous correspondence he had with Wells Fargo.

14          You may remember his testimony.  He's writing these

15   letters.  They're not working, so he's wondering, "Okay.  My

16   August letter, I'm going to have to put something different

17   than my January letter, because they didn't even read my

18   January letter."

19          So then in November he says, "I've got to put in more

20   information than my August letter."  As you might recall, the

21   letters keep getting longer and longer, and he includes a

22   chronology in each letter so whoever gets it can know the

23   whole story, beginning with the identity theft and the first

24   Mr. Charne contact in October.  He's desperate.  He's looking

25   for something that will get Wells Fargo to remove it, but they

Closing Argument - Plaintiff

1    won't.

2         He encloses his passport in the November 2017 letter

3    and the pages of the passport that have the stamps from when

4    he's entered different countries, because that will show Wells

5    Fargo that he was not in the United States at the time the

6    vehicle was purchased; and, therefore, it could not be his

7    debt.

8         A few weeks later he gets Wells Fargo's response

9    dated November 21.  Wells Fargo states, quote, Before we can

10   proceed with our investigation, we'll need to receive a copy

11   of your Social Security card.

12        You heard Mr. Sponer testify that it was like being

13   kicked in the gut.  He felt sick to his stomach.  He felt they

14   were blowing him off.  He was stuck in a maze that Wells Fargo

15   made up.

16        Wells Fargo did not need his Social Security card to

17   investigate if the account was identity theft.  Wells Fargo

18   already knew it was identity theft, because the police had

19   told them and the thief had been convicted and they had gotten

20   their car back.

21        In addition, Mr. Sponer had already sent

22   identification documents, including his passport.  And the

23   other thing is that Mr. Sponer has been a customer of Wells

24   Fargo for 20 years.  They know who he is.  They have his

25   Social.  They have his date of birth.  They have his

Closing Argument - Plaintiff

1    identifying information.

2            But the person who wrote that letter, William Brady,

3    he testified; and he said that that letter went out pursuant

4    to Wells Fargo's policy.  I asked him, "You're saying you

5    weren't going to remove the account unless you got the Social

6    Security card?"  And he answered, "That was the policy."

7            This policy is needless and unreasonable, because in

8    this case they had all the information they needed to know it

9    was identity theft.  But their procedure is "We're not going

10   to remove it unless the consumer provides a Social Security

11   card."

12           You heard plaintiff's experts, Evan Hendricks and

13   Thomas Tarter, both testify that this is a totally needless

14   policy.  Evan Hendricks referred to it -- he called it a

15   flimsy excuse for doing nothing.  And, really, that's a lot of

16   what Wells Fargo did was nothing.  That fraud department did

17   nothing.

18           Now, they will say, "Oh, we sent Mr. Sponer a letter

19   on October 26, 2016, right after Mr. Charne contacted us.  We

20   sent Mr. Sponer a letter asking for his Social Security card,

21   his driver's license, a police report, and a fraud affidavit,

22   and he didn't send it."

23           That's true he didn't send it.  He was traveling.

24   Okay.  But they didn't need it.  If they wanted a police

25   report, they had the police report number.  They had talked to

Closing Argument - Plaintiff

1    the police.  It was a lot easier for them to get the police

2    report than it was for Mr. Sponer, who was far away.

3            A fraud affidavit is an allegation by a consumer that

4    they're the victim of fraud, but it's only an allegation,

5    okay.  They had something much better.  They had the police

6    saying it was fraud, not merely a consumer, okay.

7            Driver's license, that has nothing to do with whether

8    it's fraud.  Social Security card, that has nothing to do with

9    whether it's fraud.

10           Now, Mr. Sponer is also disputing with Equifax at

11   this time.  He's taking another approach:  "Wells Fargo is not

12   removing it when I contact them.  I'll contact Equifax and

13   then see if I can get it removed."

14           And Equifax does what it's required to do under the

15   Fair Credit Reporting Act.  It contacts Wells Fargo.  But

16   Wells Fargo responds that -- by verifying the account belongs

17   to Mr. Sponer.  It does not do a reasonable investigation.

18           Mr. Sponer gets results from Equifax dated

19   November 20.  Equifax says that Wells Fargo has verified that

20   the account belongs to him.  Mr. Sponer has now been disputing

21   for more than one year.  And Wells Fargo has known for more

22   than one year that the account resulted from identity theft,

23   but it will not remove it.  It will not tell him that this

24   $29,000 debt is not his.

25           He worries about that.  $29,000, that's a lot of

Closing Argument - Plaintiff

1   money.  And Wells Fargo is a big, strong company with vast

2   resources.  He testified he worried, "Are they going to sue

3   me?  Are they just going to take the money out of my account?"

4   He's vulnerable because Wells Fargo is his bank.

5          He writes another letter to Wells Fargo on

6   December 1st.  He's very persistent.  He's frustrated, but

7   he's not giving up.  He sends this letter and tells Wells

8   Fargo he does not have his Social Security card and that they

9   have more than enough information to investigate the account.

10         He recounts all the facts, the previous

11   correspondence.  He encloses credit card charges.  He says,

12   "I'll try this.  I'll give them the credit card charges that I

13   made that will show where I was at the time the car was

14   purchased, and it wasn't in California."

15         But that doesn't get them to change either.  He gets

16   a response on December 5th, 2017.  Wells Fargo says, "Thank

17   you for your letter.  We have forwarded your request to the

18   fraud department."

19         As you heard him say, he was crushed and sad.  He

20   felt nobody was reading his letters, like Groundhog Day.  He

21   has already been disputing with the fraud department for over

22   a year, but nothing is getting done.  And now this form letter

23   comes back to him saying, "We're sending it to the fraud

24   department," which has already been aware of it for a year and

25   done nothing.

Closing Argument - Plaintiff

1              And he keeps disputing with Equifax, and Wells Fargo

2    keeps verifying to Equifax that the account belongs to him.

3              You heard the deposition testimony that was read of

4    the Equifax representative, Celestina Gobin.  And she went

5    through all those ACDVs, and for each one, it was the same:

6    "We got this dispute from Mr. Sponer.  Our procedure is to

7    contact the source of the disputed information, the

8    furnisher," because in an identity theft situation, the

9    furnisher is going to know a lot more than about whether it's

10   identity theft than a credit reporting agency, which is

11   basically a third party.

12             Equifax writes to Wells Fargo, sends them the ACDV.

13   We know the law requires a reasonable investigation, and so

14   does Equifax.  They expect a reasonable investigation by Wells

15   Fargo.  Wells Fargo sends back a response.

16             And I asked Ms. Gobin, "Okay.  When you get that

17   response, is your understanding, when Wells Fargo verifies the

18   account as accurate, that they are saying it is not identity

19   theft?"  And she says, "Yes.  We understand they're

20   investigating it and they're finding it's not identity theft,"

21   because that's the law, that's what they have to do.  She

22   doesn't know they're not doing that.

23             And she said, "We relied on Wells Fargo to tell us if

24   it was inaccurate or not.  And based on their response that it

25   was accurate, we kept reporting it."

Closing Argument - Plaintiff

1          Mr. Sponer gets more results from Equifax, more

2    failure.  "It's like someone keeps kicking me" is how he

3    described it.  He gets another letter from Wells Fargo dated

4    December 14, 2017.  It states that he may be the victim of

5    identity theft.

6          Wells Fargo has known he's a victim of identity

7    theft.  There's no "may."  And why are they telling him now,

8    December 14th, 2017, he may be the victim of identity theft?

9    He has been telling them that for over a year.  He felt nobody

10   was reading his disputes.  He said it was like going in

11   circles.

12         Wells Fargo has not read or understood any of the

13   information he has sent over the prior year if it's now just

14   telling him he may be the victim of identity theft.

15         But all that information about identity theft from

16   the police, from Mr. Charne, from Mr. Sponer, that's all in

17   Wells Fargo's records.  You've seen it.  It's the exhibits.

18   It's the account notes.  It's all there.  They have it.  They

19   just don't use it.  They ignore it.

20         The CRAs end up sending 10 ACDVs to Wells Fargo about

21   this account.  And as the evidence clearly showed, not once

22   did Wells Fargo do a reasonable investigation, as the law

23   requires.

24         Seeing it as hopeless, Mr. Sponer sues Wells Fargo on

25   December -- late December 2017.  As he stated, he saw no other

Closing Argument - Plaintiff

1  way he could get his credit report fixed.

2          But suing Wells Fargo is what finally gets their

3  attention.  But five weeks after the lawsuit, Wells Fargo

4  tells him that the identity theft claim is now considered

5  valid.

6          You heard William Brady, who works for the fraud

7  department at Wells Fargo, and he testified -- I asked him,

8  "Did you do more research that led to your conclusion that the

9  identity theft claim appeared to be valid?"  He said, "I can't

10  remember."

11          I go, "How did it end up that you were now

12  determining it was valid?"  And he said, "Well, legal got

13  involved, the legal department.  And then my manager came up

14  to me and said, 'Validate this dispute.'"

15          The only reason that Wells Fargo fixed Mr. Sponer's

16  credit report was because he sued them.  A consumer should not

17  have to sue a bank like Wells Fargo to get it to do what the

18  law requires.

19          For 15 months Mr. Sponer has worried about this

20  $29,000 debt that Wells Fargo insisted he owed.  At first,

21  while they were in New Zealand, he worried that Wells Fargo

22  would cut off his credit card.  You heard his wife, Ana

23  Rodighiero, testify that was the main reason that they decided

24  to end their sailing trip and come back to the United States.

25          Mr. Sponer was also worried that they would just take

Closing Argument - Plaintiff

1    the money out of one of his accounts.  He did not know what

2    this big bank might do to collect the money that it insisted

3    he owed.  He worried about it.

4           Now, the Fair Credit Reporting Act is the law we're

5    suing under.  In the opening statement I showed you the

6    provisions of the Fair Credit Reporting Act and Wells Fargo's

7    duties upon getting a notice of dispute from a CRA, which is

8    the ACDV.  And the Court will instruct you on the provisions

9    of the Fair Credit Reporting Act that Wells Fargo must follow.

10          The primary provision, as we've stated, is the one

11   requiring that Wells Fargo conduct a reasonable investigation

12   to determine if the disputed information is accurate.  And you

13   might remember that Evan Hendricks, the expert witness we

14   called, he said it's a procedure with a purpose.

15          The purpose of the reasonable investigation is to get

16   inaccurate information corrected.  It's not just to do an

17   investigation.  That doesn't help.  The point is you do a

18   reasonable investigation so you know, is the information

19   accurate?  And then if you learn that it's not accurate, it

20   gets taken off the credit report.  That's the whole purpose.

21   That's the Fair Credit Reporting Act:  accuracy.

22          And the Court will instruct you that to satisfy that

23   requirement of the Fair Credit Reporting Act, the

24   investigation must be reasonable.  That's why I keep saying,

25   "Did they do a reasonable investigation?"  Because that's the

Closing Argument - Plaintiff

1    legal standard.

2            The Court will also instruct you that in addition to

3    doing a reasonable investigation, Wells Fargo must review all

4    the relevant information provided by the CRA.

5            Now, we have a claim, and there are different

6    elements that plaintiff must prove to prevail on his claim.

7    He must prove that Wells Fargo received a notice of a dispute

8    from a CRA regarding the accuracy of the information that was

9    being disputed.

10           This is not contested.  There's 10 ACDVs.  Those are

11   the notices that invoke Wells Fargo's duty.  So the first

12   element, did they get a dispute notice from a CRA?  Yes.

13           The second was whether Wells Fargo violated one or

14   more of the provisions of the Fair Credit Reporting Act.  And,

15   again, they clearly violated the one requiring that a

16   reasonable investigation be done.

17           Next, did the violation result from negligence or

18   willfulness?  I'll talk about those a little bit later,

19   because those terms have to be defined.

20           And then the fourth:  Was Mr. Sponer harmed?  He was

21   harmed in many ways, which I will also discuss.

22           Breaking it down even a little bit finer, we have two

23   claims under the Fair Credit Reporting Act.  The first is

24   negligent violation, and the Court is going to instruct you on

25   the meaning of negligence, which is -- negligence is failing

Closing Argument - Plaintiff

1  to do something that a reasonably prudent person would do or

2  doing something that a reasonably prudent person would not do

3  under the circumstances that existed.  So is it reasonable

4  conduct, reasonably prudent conduct?

5           The negligence in this case is obvious.  Wells Fargo

6  repeatedly failed to do a reasonable investigation despite its

7  legal obligation to do so.  It ignored all the information it

8  had.  Instead, it simply matched the identification

9  information.  That's a useless procedure in identity theft

10 disputes.

11          But really, it's way more than negligence here.  It's

12 willful, and that's our second claim, that Wells Fargo

13 willfully violated the Fair Credit Reporting Act.

14          And the judge will instruct you, what's the meaning

15 of willful?  He will tell you that an act is done willfully if

16 it is done knowing that it will violate the FCRA or with a

17 reckless disregard of a statutory duty under the FCRA.  And

18 you will also be instructed that reckless disregard means an

19 action entailing an unjustifiably high risk of harm that is

20 either known or so obvious that it should be known.

21          Now, that's a mouthful of legal stuff that I don't

22 expect necessarily you're familiar with or even fully

23 understand just hearing it the first time.  But here, it's

24 reckless disregard.  That's what constitutes willfulness.  And

25 we have reckless disregard.  I mean, we have willful

Closing Argument - Plaintiff

1    disregard, we have intentional disregard, because the

2    violations were pursuant to a policy.  The policy violated the

3    law.

4           Let's talk about some of the evidence of willfulness.

5    So the statutory right is to have the information reasonably

6    investigated.  But Wells Fargo's procedure is to just verify

7    ID by matching the name, address, Social Security number, and

8    date of birth.  That's not a reasonable investigation.  So

9    their policy subverts the law.  They knew it was identity

10   theft, but they kept verifying.

11          That's another fact showing willfulness.  They did

12   the same unreasonable investigation 10 times.  That shows how

13   willful and reckless their conduct was.

14          But here's the big one:  The policy of Wells Fargo

15   prohibits the ACDV operators from investigating identity

16   theft.  As you heard Megan Braxton say, and other people,

17   identity theft is a very common problem.  It's unfortunate,

18   but we have a plague of identity theft in this country.  With

19   all these data breaches, you know, everybody is vulnerable.

20   So there are a lot of disputes about identity theft.  Megan

21   Braxton agreed with that.  She couldn't put a number on that,

22   but she said it was a common dispute.

23          So when Wells Fargo's ACDV operators get one of these

24   common disputes saying identity theft, they need to be able to

25   investigate that dispute.  That's what the law requires.  But

Closing Argument - Plaintiff

1  Wells Fargo has a policy that the ACDV people cannot

2  investigate identity theft.  You heard that over and over,

3  okay.  That's a willful violation.

4          Wells Fargo kept verifying the account, even after

5  the conviction and getting the car back.  They kept verifying

6  the account after the January 2017 letter with the fraud

7  affidavit and a police report.  They ignored all the

8  information in their own records.  They ignored a TransUnion

9  block notice and the instruction to stop reporting.  They

10  failed to meet industry standards.

11          You heard Thomas Tarter.  He has 50 years in banking,

12  more banking experience than any other expert that testified

13  here.  And he said the Wells Fargo procedures don't meet

14  industry standards.  And that's pretty obvious, because one of

15  the industry standards is accuracy, because credit reports

16  have to be accurate; and they obviously didn't have a standard

17  that met an accuracy standard.

18          They require 10 disputes an hour be investigated.

19  That's unreasonable.  That's reckless.  You should give these

20  people the time to do a reasonable investigation, however long

21  it takes, because the stakes are so high.  Someone has

22  disputed information on their credit report.  They're entitled

23  to have a reasonable investigation done.  It's the right thing

24  to do even if it wasn't the law.

25          They didn't even read his letters.  They did not

Closing Argument - Plaintiff

1    respond to some of his letters.  He's a customer of Wells

2    Fargo, who they knew.  But look how they treated him.  No

3    other creditor refused to delete it.  Yes, there were some he

4    had to write more than once, but nobody was like Wells Fargo.

5    It only got fixed because he sued them.

6         Now, you'll hear -- and I think Wells Fargo has said

7    it already -- that they have approximately 30 days to do the

8    investigation.  It's a little bit less, because the CRA has a

9    total of 30 days, and so by the time they send it to Wells

10   Fargo, some days have elapsed, so a little bit less than 30

11   days to do the investigation.

12        Why did Congress give 30 days?  Because they wanted a

13   thorough investigation.  They didn't give 30 minutes or five

14   days.  They gave 30 days.  But Wells Fargo takes six minutes.

15   Wells Fargo is not willing to invest so that the ACDV agents

16   have enough time to do a thorough investigation.

17        You heard the testimony of Thomas Tarter.  And he

18   stated Wells Fargo's procedures do not meet the banking

19   industry standard.  He said he had never seen a policy where

20   the ACDV employees cannot investigate identity theft.  And I

21   don't know if you remember, he has been involved in

22   literally -- I think it was 1600 different cases.  He was in

23   banking for decades.  He knows this industry.  And he's never

24   seen a policy like this one.  Why?  Because it's illegal.

25        Wells Fargo has inadequate procedures because the

Closing Argument - Plaintiff

1    credit bureau department is not a profit center.  That's what

2    else Mr. Tarter said.  They don't make money doing

3    investigations, so they don't want to invest in the

4    investigation department.  It's an expense.

5           Now, Wells Fargo's defense, among others, is, well,

6    the credit bureau department does not need to do the

7    investigation because that's what the fraud department is for.

8           Okay.  A lot of problems with this procedure.  One,

9    the fraud department is not dealing with the credit bureaus.

10   Wells Fargo's witnesses admitted that.  I asked them that.

11   It's only the credit bureau department that's dealing with the

12   credit bureaus.  And what Mr. Sponer wants is his credit

13   report fixed.  What this case is about it the Fair Credit

14   Reporting Act.  Our case is about credit reports.  The fraud

15   department doesn't correct credit reports.

16          In fact, Megan Braxton, Wells Fargo's head of the

17   credit bureau department, says that department is solely the

18   one handling the ACDVs and is responsible for the accuracy of

19   information reported to the CRAs.  So those ACDVs, they're

20   going to the right department.  They're going to the

21   department that's responsible for the credit report accuracy.

22   The fraud department is not involved.

23          But, also, there is some testimony that the credit

24   bureau people, they will look in the records to see if the

25   fraud department has done on investigation.  And the fraud

Closing Argument - Plaintiff

1   department, if they've done an investigation and they've

2   concluded it's fraud and they put that in the iTop records and

3   the ACDV person looks at the iTop records and they see that

4   it's been determined as fraud, then it will get removed as

5   fraud.  There is a very circuitous way to get it removed, but

6   it has to be a determination of the fraud department.

7        Another big problem in this case, as you saw, the

8   fraud department didn't do anything.  All they did was send

9   that letter of October 26, 2016 to Mr. Sponer, asking him for

10   four pieces of information.

11        I asked William Brady.  He was up there.  I said,

12   "Okay.  You're the fraud department.  Did you contact the

13   police?"  I mean, there is a record, of course, of contact

14   with the police, Detective Tugashov.  But the fraud department

15   never followed up with the police.  Those contacts with the

16   police were about getting the car back.  Wells Fargo was only

17   interested in getting the car back.

18        But I also asked Mr. Brady, "Okay.  What about

19   getting the police report?  Did you do that?"

20        "No."

21        "What about contacting the dealer who sold the car,

22   maybe getting some information from him or that office about

23   the person who bought the car, if there was a driver's

24   license?  What about looking at the loan application documents

25   and looking at signatures?  What about doing something to

Closing Argument - Plaintiff

1    investigate?"

2           But his response was "We're waiting to get the

3    documents back from Mr. Sponer."  They did nothing.  There's

4    no evidence they did any investigation.

5           So while this policy might sound good in the

6    abstract, that the fraud department does the investigation,

7    it's not, again, because the fraud department does not

8    communicate with the credit bureaus and, here, because the

9    fraud department doesn't do anything.

10          More than a year goes by and the fraud investigation

11   is still pending.  Those ACDV operators in November and

12   December of 2017, some of them did testify that they looked at

13   the iTop notes.  When they got the ACDV, they did their

14   superficial matching, but they looked at the iTop notes to see

15   if there was a fraud determination.  But there wasn't.  It was

16   still pending.  It was always pending.  It never got completed

17   until Mr. Sponer sued Wells Fargo.

18          Now, Evan Hendricks was a very important witness.

19   And as you heard him testify, he has been a expert witness in

20   this field for decades.  He has testified before Congress.

21   When they go to amend the Fair Credit Reporting Act, which was

22   done in 1996 and in 2003, he's part of the people they call to

23   testify to guide Congress in what to do.  And he pointed out

24   that the most important standard for accuracy -- the most

25   important standard for credit reporting is accuracy.  And the

Closing Argument - Plaintiff

1   ACDV dispute system is designed to ensure that inaccurate

2   information is corrected.

3           And he points out, when corporations that are in the

4   credit reporting industry have policies, those policies have

5   to be built around accuracy.  Doing a reasonable investigation

6   of the ACDVs, in his opinion, was the most important duty to

7   ensure that inaccurate information was corrected.  But his

8   opinion was they disregarded that duty.  I think you could see

9   that without Mr. Hendricks's opinion, but that was his

10  opinion.

11          He also said he'd never seen a company that has

12  procedures that prohibit the ACDV employees from investigating

13  identity theft.  He said when he learned that in this case, it

14  was stunning.

15          He pointed out identity theft is such a rampant

16  problem that on the ACDV they have a special box that says

17  "delete fraud."  I don't know if you remember.  We were

18  looking at some of those ACDVs -- and I can understand if you

19  don't remember because they're pretty hard to read.  But they

20  have four response boxes.  I would think of them as a check

21  box, but of course it's all electronic.  One is "verify as

22  reported," one is "modify," one is "delete," and one is

23  "delete fraud."  As Mr. Hendricks said, it's such a common

24  problem in the credit reporting industry that there's a box

25  solely dedicated to "delete fraud."  Why?  So that fraudulent

Closing Argument - Plaintiff

1   information can be quickly corrected.

2          Wells Fargo, he also said, has been on notice for

3   more than 10 years, through the enforcement authorities, that

4   the kind of superficial investigation they're doing does not

5   comply with the Fair Credit Reporting Act.

6          Next I want to talk about the burden of proof.  Now,

7   the Court will instruct you on this term.  Mr. Sponer has the

8   burden of proof in his case, and he accepts the burden of

9   proof.  He will meet the -- he has met the burden of proof.

10  He has to prove a negligent violation and he has to prove a

11  willful violation.  But this is a civil case, so the standard

12  of proof in a civil case is that it is more probably true than

13  not, sometimes said more likely than not.  In other words, is

14  it more probably true than not that Wells Fargo violated the

15  FCRA?

16         We are not in a criminal court.  We've all heard

17  those words, "beyond a reasonable doubt."  That's a very high

18  standard.  That's a criminal standard.  That doesn't apply

19  here, okay.  We are in a civil court.

20         So what is more probably true than not?  The way I

21  like to think about it is a scale, just your typical

22  old-fashioned scale, and, you know, there's two trays.  All

23  Mr. Sponer has to do is tip the scale to his side, I mean,

24  just any amount, 51 percent, even 50.1 percent.  If it's more

25  likely true than not that they violated, he's met his burden

Closing Argument - Plaintiff

1   of proof.  That is very important.

2          Wells Fargo repeatedly broke the law, and that's why

3   we're here, to enforce the law.  Wells Fargo doesn't care.  It

4   ignores its legal responsibility.  But we need to hold this

5   corporation responsible.

6          You have the power to enforce the law.  And, as I

7   said, this case is not just about Mr. Sponer.  It's about

8   Wells Fargo's policies and procedures.  They have a system

9   that breaks the law.  These procedures are applied to all

10  identity theft disputes, hundreds of thousands of disputes

11  every year.

12          How many consumers have been hurt by Wells Fargo's

13  misconduct?  How many credit reports have been polluted with

14  false information from Wells Fargo?

15          Now I'd like to talk about damages.  There are two

16  types of damages that Mr. Sponer is seeking in this case.  The

17  first is called actual damages, which are the damages awarded

18  to compensate him for the harm and damage he has suffered.

19  The second is punitive damages.

20          So let me first talk about actual damages.  These

21  include non-monetary losses.  As you saw in this case, most of

22  Mr. Sponer's damages -- actually all of his damages are not

23  monetary.  They're different.  They're real.  They're just not

24  money out of his pocket.  And Congress has allowed consumers

25  to seek these non-monetary damages because they understand

Closing Argument - Plaintiff

that inaccurate credit reports cause a lot of different kind
of damage than just monetary.  They cause emotional distress
and discomfort.  And these are the kinds of damages we're
seeking here.

There's five categories:  emotional distress and
discomfort, damage to reputation, interference with his normal
and usual activities -- what it basically means is he couldn't
do the things he wanted to do in life because he was dealing
with this Wells Fargo problem -- not seeking credit, and
invasion of privacy.

The Court will instruct you on these different types
of damages to be considered; and it will instruct you that to
award damages, you need to find that they arose as a result of
the violations.

Now, you've heard a lot about Mr. Sponer's damages.
You heard about the emotional distress, the frustration, the
worry, the changes in plans, the effect on that special
relationship with his daughter Farah, and other damages.

So let's start with emotional distress and
discomfort.  This is a big category.  You heard about
emotional distress that Mr. Sponer went through.  And there
were so many documents, and each of those documents is
evidence of the emotional distress.  Every letter, every
response, every credit report, every e-mail, all that was
emotional distress.  It was not fun doing that.  Everything

1    related to Wells Fargo.

2            And, as you know from his testimony, when he writes a

3    letter, he researches that letter.  He does research and he

4    puts a lot of care in and he has to get information.  So

5    there's a lot of time, but there's a lot of stress.  Every

6    interaction with Wells Fargo caused stress, 15 months.

7            He was a long-term customer of Wells Fargo.  He

8    trusted them, but they broke that trust.  He said he felt

9    dehumanized by the process with Wells Fargo.  He worried about

10   his credit card being shut down.  He worried about Wells Fargo

11   taking money out of his account.  He worried about getting

12   sued.  He felt like nobody at Wells Fargo would listen to him.

13   And the record clearly shows that nobody did.

14           He was constantly looking for what he could do to get

15   this fixed.  He e-mailed his neighbor.  You know, he paid

16   Mr. Charne.  He didn't want to keep paying -- he e-mailed his

17   neighbor, a lawyer, asking for help.  He sent e-mails to the

18   police:  "Can I get more court documentation?"  You saw those.

19   And Equifax had this account listed under Wells Fargo as

20   collection.  He worried about that.

21           And the damages, the emotional distress, it built up

22   over time.  That's just natural.  When you have a problem and

23   then you can't solve it and then you can't solve it again and

24   then you can't solve it again, it gets a lot more stressful, a

25   lot more frustrating; and that's what happened with him.

Closing Argument - Plaintiff

So by November and December of 2017 he said he felt helpless, he felt powerless.  He had no control over his own credit.  He felt sick to his stomach.  He had headaches.  He was not sleeping well.  His wife, Ana Rodighiero, described how he was sleeping poorly and how he lost his ambitions and his motivation.  He was having headaches, she said.

His mother, who saw him during this time, said when she'd see him, he was sad.  He wasn't sleeping.  He had circles under his eyes.

Now, Mr. Sponer is a problem solver.  He's a computer guy.  That's what they do.  They get a problem and they try to fix it.  And a lot of times, my understanding with computers, it's not so easy to fix.  You've got to take a lot of different routes.  But this is one problem he couldn't fix, and he felt bad about that.  He felt like a failure.  He said it lowered his self-esteem.  Throughout this whole process, he just wanted someone to read his letters.  He just wanted to be treated like a human being.

Now, we know it is hard to decide -- we know it's hard for you to decide -- I'm going to ask Mr. Wolf to help me here, just to write down these categories of damages.

And so the first one is -- we know it's hard to decide the amount of damages for something like emotional distress and discomfort, but we would suggest a range of $100,000 to $200,000.  Now, this is just guidance.  This is

Closing Argument - Plaintiff

 1    your decision, and Mr. Sponer trusts you to award a fair

 2    amount, but that's just something we would suggest for

 3    guidance, something in that range.  You can go higher.  You

 4    can go lower.  You do what's fair.

 5          The next category is interference with normal and

 6    usual relations -- or normal and usual activities.  Excuse me.

 7    So this is disruption of his usual life.  We talked about how

 8    they couldn't travel around New Zealand.  They had bought a

 9    used car, but they could only travel -- I think he indicated

10    they traveled two or three weeks at the end of the period

11    between November and February, but they had planned to travel

12    that whole period.

13          They had to end their dream sailing trip because the

14    Wells Fargo was not deleted.  That's what Ana Rodighiero

15    testified.  She said, "It was the Wells Fargo account that

16    worried us, because that's what we relied on.  And we didn't

17    want to go off on some sailing trip across the Pacific,

18    knowing that at any moment Wells Fargo might cancel the credit

19    card."  His mother also testified that they cut that trip

20    short because they were worried about Wells Fargo closing the

21    credit account.

22          He spent time writing letters, doing research,

23    sending disputes to the CRAs, talking to the police, the

24    district attorney, time reviewing credit reports, time

25    gathering all the documents to send, time at that office in

Closing Argument - Plaintiff

1  New Zealand.

2          And then there's his daughter, Farah, who has that

3  profound intellectual disability.  You might recall his mother

4  talking about their relationship, how he gets up in the

5  morning with Farah.  He gets her out of bed and he showers her

6  and he helps her on the toilet and he dresses her and he feeds

7  her; and then if she's going to school, he helps her get to

8  school.  It's a very, very close relationship.  And you heard

9  Mr. Sponer talk about it.

10          Because for Farah, the only way to socialize is to be

11  right next to somebody, be in the moment.  She cannot talk.

12  So the way they communicate is by being next to each other, by

13  touching, by looking each other in the eye.

14          But he wasn't there.  He was doing work to try to get

15  Wells Fargo fixed.  And that -- that was a terrible loss for

16  him, time that he'll never get back.

17          Now, I'm a father.  I have two children, and they're

18  grown up now.  And I really value those moments I had with my

19  children because I know it will never be the same.

20          And with Farah, she is very fragile.  You might have

21  heard that she had a surgery when they moved here.  But every

22  moment with her is precious because there's really no

23  guarantee that she'll be around or that she'll be healthy

24  enough to communicate even in the limited way that she can.

25          You heard Mr. Sponer's mother talk about that special

Closing Argument - Plaintiff

relationship.  And she observed how that caused suffering for
Mr. Sponer, being away.  There was time away from Farah when
he was renting that office in New Zealand.  There was time
away from Farah especially in November and December of 2017.

And then when she was going to be enrolled in school,
you remember, he talked about it and his wife, Ana Rodighiero,
talked about it.  Because she's special needs, it's a very
complicated process of setting up plans for her; and it's
normally something both Mr. Sponer and his wife do together
with the school.  But he was occupied with Wells Fargo and he
didn't participate as much as he wanted in enrolling her in
school, and he said he felt like he wasn't there for her.  He
could see her regress in her habits.

It's hard to place a value on all this loss, this
what I call interference with normal and usual activities, all
the things they wanted to do they couldn't do, the time he
wished to spend, because even being -- even being across the
room from Farah, that's like being in another city.  She
doesn't have the intellectual ability to really comprehend if
someone is not right in her field of vision.  So if he's off
at the computer, it's like he's not there.

So for this category, we would suggest $100,000 to
$200,000.

The next item of damage is damage to his reputation.
Your credit report is your reputation in terms of

Closing Argument - Plaintiff

1    trustworthiness, honesty, paying your bills.  All your credit

2    history is on that report.  And he had perfect credit.  He was

3    proud of that.  He maintained perfect credit.  But it got

4    ruined.

5           Now, we concede there were a lot of other fraudulent

6    accounts.  That's one of the terrible things about identity

7    theft.  Those fraudsters, they tend not to open just one

8    account, but 10.  He had 10, maybe more.  Wells Fargo is part

9    of that, okay.

10           But he thought this was the worst, this Wells Fargo

11    account.  It was $29,000, and he said it felt like he had

12    stolen a car.  They were portraying him as having stolen a

13    car, because what it indicated was that he bought a car, he

14    drove it away, and he never made a payment.

15           So that's what his reputation was.  He knows his

16    insurance company saw that; and they look at that report and

17    they think he bought a car and didn't pay for it.  His reports

18    went to the insurance company.  They went to Equifax.  They

19    went to TransUnion.  I mean, the Wells Fargo information was

20    reported to those three bureaus.

21           Now, Ana Rodighiero, his wife, she said that since

22    college, it was important for him to have credit.

23           So we would suggest for this damage to reputation

24    $25,000 to $50,000.

25           The next category of damage is not seeking credit.

Closing Argument - Plaintiff

1    And I think you see how various the damages are when a company

2    like Wells Fargo breaks the law.  It's not just some little

3    minor injury.  There are a lot of different injuries that are

4    caused.  One of them was not seeking credit.

5          He testified there were two items that he wanted in

6    terms of credit.  One was the Visa mileage card and the other

7    was a loan, that they were going to make an improvement in

8    their home and make it into an ADU and rent out part of the

9    home for some more income.  But they knew they needed

10   financing for that ADU, and they knew they either wouldn't get

11   financing or it would be at an unreasonable interest rate

12   because they had a $29,000 charge-off on their credit report.

13   You heard Mr. Hendricks testify that a charge-off is a very

14   derogatory status.

15         So we would ask, for this area of damage, $10,000 to

16   $20,000.

17         The next category is invasion of privacy.  Now,

18   that's a broad term.  There are different ways privacy can be

19   invaded.  His privacy was invaded in that if Wells Fargo would

20   have just removed it originally, he wouldn't have to

21   communicate with them, with the credit bureaus, but he did.

22   So he had to send out disputes and put his Social Security

23   number on there and sometimes enclose other documents, send

24   them out to the credit bureau, send them out to Wells Fargo.

25         Well, you can understand, as a victim of identity

1  theft, he's really not too pleased about having to send out

2  correspondence that has his Social Security number on there.

3        So that's an invasion of his privacy.  His private

4  information has to be disclosed because Wells Fargo won't fix

5  it.  And then he has no control over his credit information.

6  Wells Fargo has control.  You heard him say that.  So that's

7  an aspect of this, too.  And you saw the letters.  I mean,

8  there are a lot of letters.

9        We would ask $15,000 to $30,000 for the invasion of

10 privacy.

11       Now, I mentioned other creditors, other fraudulent

12 accounts.  Those were there, okay.  Mr. Sponer is not seeking

13 any damage for any of these other creditors.  He introduced

14 his correspondence with Wells Fargo.  The exhibits in this

15 case that he introduced, except for one rebuttal exhibit,

16 they're all about Wells Fargo.  He's not claiming any damage

17 related to any other creditor in this case.  In fact, the

18 people who introduced the documents about the other creditors,

19 that was Wells Fargo.  They're the ones to try to introduce

20 these other creditors into the case.  So that's not part of

21 this case.

22       But Wells Fargo is also different than these other

23 creditors.  It was by far the largest.  If you look at his

24 fraud affidavit, Wells Fargo is $29,000, and the next highest

25 one is $3,000.  There was a collection that was on one of his

Closing Argument - Plaintiff

1    reports.  The only other item on his report at the end of

2    2017, besides Wells Fargo, was a collection account for $93.

3          Wells Fargo was the biggest.  It was on his report

4    the longest.  He had many, many more disputes with Wells Fargo

5    than anybody else.  It was his bank.  It had power over him.

6    He had his credit card with them.  You know, if it's something

7    like Home Depot, they couldn't cut off access to his money, if

8    Home Depot had an account, but Wells Fargo could.

9          And it treated him badly, the form letter, form

10   letter, form letter, when he's putting so much energy into

11   writing a letter to get it fixed, not responding to his

12   letters, requesting his Social Security card.  It's pretty

13   ironic, you're the victim of identity theft, and Wells Fargo's

14   policy is "Mail us your Social Security card."  What victim of

15   identity theft wants to mail their Social Security card?

16         If you look at some of the e-mails -- I'm not saying

17   you need to go back, but he did e-mail his neighbor, Denise

18   Stern, asking for help.  The only creditor he mentioned by

19   name is Wells Fargo.

20         He e-mails James Charne, I think around December or

21   November of 2017, because he's just not getting this fixed.

22   He's thinking, "Maybe there's some magic words, maybe there's

23   some magic language that the lawyer would know that I could

24   put in my letter to get Wells Fargo to fix it."  So he e-mails

25   Mr. Charne and he says, "Wells Fargo is being willfully

Closing Argument - Plaintiff

1    stupid."  He's angry.  He's justifiably angry.  He's not

2    mentioning any other creditor.  It's Wells Fargo that's much,

3    much worse and treats him much differently than any other

4    creditor.

5         Now, the other kind of damage that the law allows

6    Mr. Sponer to recover is punitive damages.  These are allowed

7    under the FCRA.  Punitive damages are allowed because the

8    accuracy of credit reports is so important.  Punitive damages,

9    as you'll hear from the Court, are designed to punish and

10   deter.  And I'll get into that a little bit more.  But

11   punitive damages is typically something intended -- it's not

12   "typically."  It is intended to get a lawbreaker to change, to

13   get somebody doing something wrong to stop.

14        Here they violated the FCRA 10 times.  They blatantly

15   disregarded the law.  If a person or corporation breaks the

16   law, they should be punished.  That's our American system of

17   justice.  And that's what punitive damages are.  You break the

18   law; you get a punishment.  You don't get to go home free,

19   because you've got to pay a penalty.  And that's what the

20   punitive damages are.

21        But they need to be big to affect a bank like Wells

22   Fargo because a bank like Wells Fargo, money is the only thing

23   they understand.  It's the only way you're going to get them

24   to change is to put some severe monetary penalty.  And this

25   FCRA, it allows that.  Not every law does, but this one does,

 1   because credit reports are so important.

 2           Now, the Court will instruct you on punitive damages,

 3   because it's a different standard than the actual damages.  I

 4   mentioned willful.  I told you what willful meant, reckless

 5   disregard.  And that's -- that's pretty much what the punitive

 6   damages -- I mean, the conduct could be malicious, it could be

 7   oppressive, but it doesn't have to be.  It only has to be

 8   reckless disregard.  I think the evidence here shows that the

 9   conduct was malicious, it was oppressive.  But all we need to

10   show is reckless disregard.

11           The purpose of punitive damages, as the Court will

12   tell you, is to punish the defendant and deter acts in the

13   future, not just deter them, but to deter others.

14           So let's talk about each of these purposes.  First,

15   should you punish Wells Fargo?  Yes, because that's justice.

16   They broke the law.  They should be penalized.  Don't let them

17   get away with it.

18           You should punish them for their violation of the

19   law.  You should punish them for their procedures that

20   disregard the law and for their continuing violations.  Their

21   procedures haven't changed.  You heard their witness.  I asked

22   Megan Braxton, "Same procedures now as with Mr. Sponer?"

23   "Yeah."  They're still breaking the law today.  I guess that

24   goes more to deter in the future.

25           So the Court will instruct you, also, that in

Closing Argument - Plaintiff

1    considering the amount of punitive damages, you may consider

2    the degree of reprehensibility of Wells Fargo's conduct,

3    reprehensibility, how reprehensible was it.  And one thing you

4    can consider in reprehensibility is whether the conduct that

5    harmed plaintiff also caused actual harm or posed a risk of

6    harm to people that are not parties to this case.  In other

7    words, other people out there, did Wells Fargo's conduct cause

8    harm or risk of harm to them?  Certainly.

9          You heard Megan Braxton say they get 31,000 disputes

10   a month.  That's about 370,000 a year.  And these procedures

11   are applied to everyone who makes an identity theft dispute.

12   So their conduct causes harm to others.  It poses a

13   substantial risk of harm to many, many consumers.  You saw

14   their system.  It's a quick, unreasonable investigation.

15         And that's something else that you've been able to

16   see.  You've been able to see inside this credit reporting

17   industry.  Very few people know what you now know, how it

18   really works.  You have that special knowledge, and you also

19   have a special power, and you have a special responsibility.

20         But their system is done quick and cheap.  It's

21   faster and more profitable to continue to use their procedures

22   when they don't really investigate.  That deserves punishment.

23         They're using these procedures and they're making

24   money or saving money because they're using these procedures

25   that violate the law.  They should not get away with profiting

Closing Argument - Plaintiff

1   from breaking the law.  That is not just.

2          You heard Thomas Tarter, our banking expert.  When

3   asked, "Why would companies have inadequate procedures to

4   correct credit reporting errors?," he said, "Because this is

5   not a profit center.  This is a cost.  And some companies

6   don't want to invest in their investigation departments

7   because they don't make any money doing it."

8          That's what we have here.  It's cheaper to have

9   people do 10 disputes an hour than to give them the time that

10  they really need to do a reasonable investigation.

11         Same with the fraud department.  They don't

12  investigate.  They just send a letter to the consumer and say,

13  "You do all the work."

14         Think of that.  You're making a fraud dispute; and

15  rather than investigating, they're putting the burden back on

16  you.  They shift the burden to the consumers.  Wells Fargo

17  doesn't investigate, and it saves them money.

18         These are ill-gotten gains.  Take some of that money

19  away.  They are an immensely wealthy company.  Their net

20  worth, as you will hear, is $165 billion.  I mean, it's really

21  hard to wrap your mind around that kind of number.  But they

22  have accumulated that money by breaking the law.

23         The other purpose of punitive damages is to deter

24  similar acts in the future.  This is very important.  This

25  might be the most important reason we're here, to get it to

Closing Argument - Plaintiff

1   stop.  And you can award these punitive damages to deter them

2   from breaking the law in the future.

3        As I said, they're still using these illegal

4   procedures today.  They continue to violate the law.  You can

5   make them stop if you punish them severely enough.

6        A big company like this understands only one thing:

7   money.  A mild punishment won't change Wells Fargo; only a

8   severe punishment will.  You can make them change.  You can

9   make them follow the law and protect every consumer.  But you

10  can only do it by awarding punitive damages in a number that

11  will affect them.  A few million dollars is nothing to them.

12  It's like pennies to anyone else.  I mean, that might sound

13  odd, but when you have billions, millions are insignificant.

14       You need to award an amount that will get the

15  attention of the board of directors.  If you award large

16  punitive damages, they'll change.  But if you don't, they

17  won't.  They'll walk out of this courtroom and say, "We don't

18  have to change.  The jury didn't punish us."

19       That's why punitive damages are in the Fair Credit

20  Reporting Act.  That's the enforcement in the Fair Credit

21  Reporting Act.  That's your tool.  That's the power you have.

22  That's our jury system, where there's a level playing field.

23       Now, a third reason for punitive damages is to deter

24  similar acts by others.  You can do real good for all

25  consumers by awarding punitive damages.  The other banks and

Closing Argument - Plaintiff

1    the credit furnishers, they'll hear about this award, and

2    they'll be on notice that they, too, better follow the law or

3    they may get punished as well.  You can send a message to the

4    whole industry that they've got to comply with the law.

5    You'll be helping everybody.  That's the civil justice system.

6         Wells Fargo broke the law multiple times.  They must

7    pay a penalty.  You have the power to tell them to obey the

8    law.  We all have to obey the law.  We live in a country

9    that's ruled by law.  No one should profit from breaking the

10   law.

11        Now, the Court will instruct you that in considering

12   the amount of punitive damages, I already said, you can

13   consider reprehensibility.  But here, it's not just a

14   violation of the law, but their policies and procedures that

15   require the law be violated over and over again.

16        But another thing you can consider in determining the

17   amount of punitive damages is their financial worth, that

18   $165 billion.  Why can you consider it?  Because the purpose

19   of punitive damages is to punish and deter.  And, obviously,

20   it takes a different amount to punish and deter a

21   multi-billion dollar company than it would a small company.

22        So what kind of number do you come up with when you

23   have $165 billion company?  I mean, if you give a few million,

24   someone in middle management will just write a check.  None of

25   the big shots at Wells Fargo will even hear about it.  Nothing

Closing Argument - Plaintiff

1   is going to change.  They'd be getting away with it.

2           But it's your job to enforce the law, and I know you

3   take your responsibility seriously.  You have the power to

4   tell them to stop, and stop hurting our economy with these

5   false reports.

6           Wells Fargo has immense power.  The power to report

7   on credit information is the power to control people's lives.

8   It's even a power to destroy, to destroy a family's plans, to

9   destroy someone's peace of mind, to destroy someone's

10  reputation.  They have that power, and they abused it.

11          The average consumer can't touch Wells Fargo.  Look

12  at Mr. Sponer.  He tried.  He was innocent.  It wasn't his

13  account.  They knew it.  He tried over and over again.  But he

14  couldn't touch them.  He couldn't make them listen.  He

15  couldn't make them do the right thing, because their system

16  broke the law.

17          The only time an average consumer can make a big

18  company like Wells Fargo change the law -- or change and obey

19  the law is right now, you, the power of the jury.  That's our

20  great system.  The jury trial makes a level playing field.

21  They cannot hide behind all their wealth and power.

22          Eight people, you folks, you're going to decide.

23  This is your opportunity.  You have that power now, as a jury,

24  but only now.  You won't have it when you leave that jury room

25  and go back to your regular lives.  Then you'll just be the

Closing Argument - Plaintiff

1   average person.  You won't have the power to take on Wells

2   Fargo or to make them change.

3         So take advantage of that opportunity.  You're the

4   prosecutor here.  You can enforce the law and make sure there

5   is justice.  You can turn the tide on this corporate

6   misconduct.  Tell one big company, "You're going to stop.

7   We're going to make you stop."

8         But what amount?  One percent?  I mean, that's

9   often -- that seems like a small number, 1 percent of net

10  worth.  Okay.  But with Wells Fargo, 1 percent of the net

11  worth is $1.65 billion.  I know you'll never award $1.65

12  billion.  I'm not asking you to award $1.65 billion.

13        But that's the problem with such a big company,

14  because it's only 1 percent.  One-tenth of 1 percent of

15  $165 billion, that's $165 million.  It still seems like an

16  enormous amount, okay.  But you have to put it in context.

17  It's not enormous to Wells Fargo.

18        Let's say you have a million dollar corporation, a

19  smaller business.  Okay.  For a million dollar corporation,

20  one-tenth of 1 percent is $1,000.  I think if you were

21  considering penalizing a million dollar corporation for

22  breaking the law, you'd probably think $1,000 is too small.

23  But that's what $165 million is to Wells Fargo, one-tenth of

24  1 percent.

25        You know, I can't -- I can't give you a number.  I

Closing Argument - Plaintiff

mean, I think one-tenth of 1 percent is reasonable, but that's
your call.  $165 million, would it make them change?  I don't
know.  Something lower probably won't.  It's just dealing with
a company this wealthy, it's really hard to come up with the
appropriate punishment.

        Now, the last thing is the verdict form.  I just want
to address that, because that's what you will do when you go
back into your jury room.  You will have a form that has
various questions.  And the first question is:  "Has
Mr. Sponer proven that Wells Fargo negligently violated the
Fair Credit Reporting Act?"  And we ask that you answer that
"Yes."  I think that's obvious.

        But I want to also advise you that we have a second
question, a much more important question, and that question
is:  "Has Wells Fargo willfully violated the Fair Credit
Reporting Act?"  And that should be answered, "Yes."

        So it's only if you find a willful violation that you
can award punitive damages.  And as we said here, as much as
it's important to compensate Mr. Sponer for his damages, it's
more important to punish Wells Fargo and deter them from
similar conduct, because that's going to benefit consumers and
that's going to show the law has to be obeyed.

        The evidence leads to no other conclusion but that
Wells Fargo willfully violated the Act; and, again, that
includes reckless disregard.  And all we have to show is that

Closing Argument - Plaintiff

their willfulness was more probably true than not.  Remember
the burden of proof.  All it is is a little bit on the scale.
If you find reckless conduct more probably true than not, you
answer Question 2 "Yes."

          And then the verdict form goes on to damages, and
we've given you some numbers for his actual damages, but we
trust your judgment.

          Realize that you can do some good here.  You can
enforce the law, and you can protect consumers.  You can stop
this company from breaking the law and end this corporate
misconduct.  You can punish them for that misconduct.

          You have the power to do justice.  It's a gift, but
it is a burden and it is a responsibility.  But all of you
serving here, you accepted that responsibility.  You agreed to
serve on a jury, which is the bedrock of our justice system.
So by using that power, you can enforce the law and tell Wells
Fargo that they can't get away with breaking it anymore.

          Thank you.

          THE COURT:  Members of the jury, why don't we go
ahead and take at least a 15-minute recess.  I'm going to talk
to the lawyers about whether we should break for lunch or not.
I'll let you know in about five minutes.  But go ahead and
step into your room in the meantime.

          (The jury leaves the courtroom.)

          THE COURT:  Please be seated.

 1              Mr. Peterson, are you doing closing argument for the

 2    defense?

 3              MR. PETERSON:  I am, Your Honor.

 4              THE COURT:  What's your pleasure?  We can take 15

 5    minutes and work through the lunch hour or I can send them to

 6    lunch now and we can start fresh after their lunch hour.

 7              MR. PETERSON:  Your Honor, I think I'd prefer to

 8    start fresh after lunch.

 9              THE COURT:  So I will send them to lunch and have

10    them come back at 12:25, and then we'll start with closing

11    argument at that point.

12              MR. PETERSON:  Your Honor, I have a brief matter for

13    the Court, to put on the record.

14              THE COURT:  Okay.

15              MR. PETERSON:  Your Honor, plaintiff just invited the

16    jury to make a clearly unconstitutional punitive damages

17    award.  They suggested a maximum actual damages of $500,000,

18    and they invited a punitive damages award of $165 million,

19    which is more than 300 times the amount they're asking for

20    actual damages.

21              I believe that invitation to the jury was improper.

22    And I don't know what the best way to deal with that at this

23    point is, for you to instruct the jury or -- I don't have an

24    answer.

25              I'd like to include Ms. Smith in this conversation as

1  well.

2          MS. SMITH:  Your Honor, I hate to even bring up the

3  word "mistrial," but asking for the amount of damages that

4  plaintiff's counsel asked for in light of the type of harm in

5  this case was clearly improper under the due process clause.

6          The alternative is that the -- I think the jury must

7  be instructed that they cannot consider Wells Fargo's net

8  worth in determining punitive damages, in light of plaintiff's

9  counsel's argument.

10          I've done quite a bit of research on FCRA cases.

11  And especially in cases involving only non-economic losses,

12  the constitutional ratio is either 1 to 1 or 4 to 1, so not,

13  you know -- there's been a lot of different cases on that

14  issue over the years, and the Supreme Court started out with

15  saying kind of a 9-to-1 ratio.  But in cases like this, the

16  Courts are finding any ratio that's over 1 to 1, or 1 to 4 in

17  some cases -- and it depends on the facts -- unconstitutional.

18          And that's -- I mean, that's not even mentioning the

19  concern I raised earlier about the piling on of economic -- or

20  non-economic damages by listing them separately.  Plaintiff's

21  counsel did exactly what I predicted he would do, which was

22  come up with numbers for each category and just pile them on,

23  when each category is really just a subset of what an

24  emotional distress damage claim is.

25          THE COURT:  So what do you want me to do?

1              MS. SMITH:  If we're taking the lunch hour --

2              THE COURT:  Yeah, you can think about it.

3              MS. SMITH:  I think that we need to have some

4    conversations.

5              THE COURT:  Thank you.

6              You can respond after the lunch hour.

7              MR. SOLA:  Okay.

8              MR. PETERSON:  Your Honor, what time are we coming

9    back?

10             THE COURT:  25 after.

11             MR. PETERSON:  Thank you, Your Honor.

12             (A lunch recess is then taken.)

13             (The Court, counsel, and the parties reconvene.)

14             THE COURT:  Good afternoon.  Be seated.

15             Yes, Ms. Smith.

16             MS. SMITH:  Good afternoon, Your Honor.

17             Defendant Wells Fargo does move for a mistrial in

18   this case, based on the improper comments of counsel during

19   his closing argument.  Motions for mistrial can be based on

20   improper comments made in closing arguments, and the comments

21   were improper for the reasons already stated.  They were

22   clearly meant to incite an unconstitutional verdict from this

23   jury.

24             Over the lunch hour I sent the Court an e-mail -- I'm

25   sorry for the informality -- but it includes some references

1   to the cases I referred to earlier that talk about what is a

2   proper ratio, a constitutional ratio.

3          So -- but in addition to inciting the jury to reach

4   an amount that would be obviously unconstitutional under

5   controlling case law, counsel also made a number of other

6   remarks during his closing.

7          He -- as you'll recall, we had objected to allowing

8   an instruction on harm to others, based on *State Farm v.*

9   *Campbell*.  And the harm to others that counsel described in

10  his closing was just this -- pretty much every customer of

11  Wells Fargo who has ever raised a dispute, an ACDV dispute,

12  without any evidence that every customer who has ever raised

13  an ACDV dispute was harmed or really at risk of harm.

14         There's more comments that he made that just

15  objectively were improper, talking about a few million dollars

16  meaning nothing to Wells Fargo, asking the jury to send a

17  message to the entire industry -- I'm looking through my

18  notes, just so I can cover them all -- if you award just a few

19  million, they'll be getting away with it.  There is more.

20         But in the alternative to our motion for a new trial,

21  we ask that the jury be instructed that it may not consider

22  defendant's financial condition or net worth in awarding

23  punitive damages in this case; and really, actually probably

24  should say that the jury can't consider the financial worth or

25  net worth or financial condition in awarding any of the

Motion for Mistrial

1    damages in this case, because given the closing argument,

2    defendant is seriously concerned that -- that both awards are

3    going to be excessive.

4         This is -- this is a case about emotional distress in

5    the absence of any physical injury, and counsel has asked the

6    jury to award $500,000 in non-economic damages and up to

7    $165 million in punitive damages.

8         That's all I have to say, unless the Court has

9    questions.

10        THE COURT:  Thank you.

11        What do you want to tell me?

12        MR. SOLA:  Yes, Your Honor.

13        On the constitutional argument, there's no verdict.

14   All the cases she cites, as far as I know, are reviews of a

15   verdict for a ratio.  And, we all accept there is a due

16   process right, but I'm not aware --

17        THE COURT:  Well, let me ask you this.  If the jury

18   did what you asked them to do and awarded $165 million, is

19   there any question in your mind that there is a due process

20   violation with that award?

21        MR. SOLA:  It depends on the actual damages.  But

22   that -- that's for the Court to review.

23        THE COURT:  My question is this:  Is there any

24   question in your mind that upon review, if they gave you

25   everything you asked for, that the award would be

1    unconstitutional at $165 million?

2          MR. SOLA:  Well, first, I don't -- I don't think I

3    asked for that.

4          THE COURT:  Why do you have so much trouble answering

5    my question?  If the jury awards $165 million, is that a due

6    process problem?

7          MR. SOLA:  I'm answering your question, because all

8    the cases I've read say there's no bright line.  And there are

9    cases -- they all say there's no bright line and it's an

10   individual case analysis.

11         THE COURT:  So are you looking at me with a straight

12   face and telling me that if the jury came back with $500,000

13   in damages and $165 million in punitive damages, that that is

14   not a due process problem?

15         MR. SOLA:  No, I'm not saying that.  I think almost

16   every judge would reduce that award.

17         THE COURT:  Every judge would, not almost.  Every

18   judge would.

19         MR. SOLA:  Okay.

20         THE COURT:  And if it went to a Court of Appeals

21   because a judge didn't do his or her job, the Court of Appeals

22   would reverse, right?

23         MR. SOLA:  I think so.  But, again, I guess we're

24   presuming -- there is a ratio.  We don't know what they might

25   give in actual damages.

 1          THE COURT:  So the ratio cannot be 1 to 330, which is

 2     what it would be under that scenario.  It cannot be.  Nothing

 3     1 to 330 has been sustained, at least not in recent history.

 4     You know that, right?

 5          MR. SOLA:  I really don't know -- I mean, I don't

 6     know all the ratios.  But there is a TXO case that was a

 7     really big award.

 8          THE COURT:  1 to 330?

 9          MR. SOLA:  I don't know, Your Honor.

10          THE COURT:  So the problem is this.  The problem is

11     that it is my sense that making such an argument to a jury is

12     contrary to the law, and asking them to do something that is

13     contrary to the law is simply something that shouldn't happen

14     in closing argument.  That's where their issue comes up.  And

15     I think I agree with the notion that you can't ask juries to

16     do something that is clearly contrary to the law.

17          MR. SOLA:  Well, Your Honor, I said it was their

18     decision.  And it is their decision.  I never said, "This is

19     the number you should use."  I said, "It's your decision."

20     And I said quite a bit of times that this is really difficult.

21     It's really hard to come up with a number.  And I gave an

22     example of, you know, different percentages.

23          You know, I didn't -- I didn't ask for a hundred

24     and -- I don't feel I asked for that number.  I said, "It's

25     your call."  I asked for a big number, a couple million, she's

1    right.

2              But, you know, if you want to say -- if I should say

3    something in rebuttal, if you want to give an instruction --

4              THE COURT:  Let's talk about that.  What's a good way

5    to fix this problem without granting a mistrial?

6              MR. SOLA:  I value the right to a jury trial, so

7    maybe -- what about -- the instruction itself says they should

8    consider the amount of punitives in relation to the actual

9    harm, I believe.

10             THE COURT:  It does.

11             MR. SOLA:  Yeah, "You may consider the relationship

12   of any award of punitive damages to any actual harm inflicted

13   on the plaintiff," which I figure that Wells Fargo would argue

14   in their -- and I'm happy to say that, too, in my rebuttal.

15             MS. SMITH:  Your Honor, at this point I do not think

16   there is a way to unring this bell.  It was emphasized so

17   heavily during the closing argument.

18             I have offered an alternative, but -- but it is our

19   position that this is a case in which a mistrial is absolutely

20   warranted.

21             Counsel did not have good faith -- a good faith basis

22   to make that comment to the jury.  And he did ask -- and not

23   only did he ask for $165 million, but he made it very clear

24   that several million would not be enough.  Even several

25   million is going to be an unconstitutional verdict in this

Motion for Mistrial

1  case.

2           MR. SOLA:  Well --

3           THE COURT:  Go ahead.

4           MR. SOLA:  No.  I mean, several million, $4 million,

5  $3 million, $2 million, if they give 5 or $600,000, then we're

6  under 9 to 1.  So that is not unconstitutional.  You could

7  remit it.  So several million is not unconstitutional, so --

8           MS. SMITH:  That's not what he said, Your Honor.

9           THE COURT:  Just a minute.

10          MR. SOLA:  I said several million was inadequate, I

11  did, you know, I mean, because the purpose of the punitive

12  damages are to punish and deter.

13          You know, we wouldn't oppose a jury instruction.

14  Obviously I don't want a mistrial.  So if you wanted to give a

15  jury instruction, we would not oppose that.

16          THE COURT:  Thank you.

17          (There is a brief pause in the proceedings.)

18          THE COURT:  Did you have anything else you want to

19  tell me?

20          MS. SMITH:  No, Your Honor.  Thank you.

21          THE COURT:  The motion for mistrial is denied.

22          The question before the Court is whether defendant

23  can receive a fair trial in light of all the comments made

24  during closing argument by the plaintiff.

25          The most concerning comment to the Court was a

1    suggestion that the jury could grant and award punitive

2    damages in the amount of $165 million, and that amount clearly

3    raised due process issues in light of all the evidence in this

4    case.

5         Nonetheless, I believe a curative instruction will

6    provide the defendant with a fair trial in light of all the

7    circumstances.  I'm going to instruct the jury that they not

8    consider the agreed-to net value of Wells Fargo in reaching

9    its decisions in this case.

10        Any questions from plaintiff?

11        MR. SOLA:  No, Your Honor.

12        THE COURT:  Any questions from defense?

13        MS. SMITH:  Your Honor, I would ask that that

14   instruction be tied to a reference to the closing arguments,

15   because I think the jury needs to know that what was said by

16   plaintiff's counsel in closing arguments was improper.

17        I appreciate the effort to cure this problem,

18   but -- and this does go some way towards doing that, but I

19   think that a comment needs to be specifically made about the

20   improper statement that was made during closing argument.

21        THE COURT:  I will not phrase it that way.  I will

22   simply tell them that they're not to consider the agreed-to

23   net value of Wells Fargo in reaching any of its decisions in

24   this case.

25        I haven't quite drafted it yet, because I was writing

Motion for Mistrial

1   as I was thinking right now, but it will probably something

2   like, "You heard statements regarding the net worth of Wells

3   Fargo.  You're not to consider that in determining any of the

4   decisions in this case."

5           MS. SMITH:  Thank you, Your Honor.

6           Only one point of clarification, or at least a

7   comment, is we would like the opportunity before the jury is

8   discharged today to be able to review the verdict and to

9   decide whether there are some issues that we need to raise

10  before the jury is officially discharged.

11          I just wanted to flag that issue for the Court.

12          THE COURT:  Do you mean after the jury comes back?

13          MS. SMITH:  Post verdict, when we're reviewing the

14  verdict, before the jury is discharged.

15          THE COURT:  Sure.

16          MS. SMITH:  Thank you.

17          MR. SOLA:  Your Honor, do I need to be heard on their

18  second argument about harm to others?

19          THE COURT:  No.  I'm only using the curative

20  instruction, which I just described to you.

21          MS. SMITH:  Your Honor, if I wasn't clear enough, we

22  would --

23          THE COURT:  You were clear enough.

24          MS. SMITH:  Okay.  Thank you.  I was just talking

25  about the harm to others.

1          THE COURT:  I know.  You want to move for mistrial an
2     all those bases.
3          MS. SMITH:  No.  No.  I think that it would be
4     appropriate to have a curative instruction on that, too,
5     because he really went off the rails on what's permissible.
6          THE COURT:  Okay.
7          So the way I have drafted the instruction, it will
8     say, "I instruct you that you are not to consider the net
9     value of Wells Fargo in reaching any decisions in this case."
10         MR. SOLA:  I think you mean "net worth."
11         THE COURT:  Thank you.
12         MS. SMITH:  And then if I may propose one other
13    limiting instruction, Your Honor --
14         THE COURT:  Sure.
15         MS. SMITH:  -- something to the effect of "You may
16    not award" -- "You may not consider" -- "In determining
17    reprehensibility, you may not consider" -- sorry, I'm drafting
18    it in my head as I go along -- "risks to others."
19         I withdraw it.  I'm sorry.  I can't find one that
20    isn't just going to highlight it more.
21         THE COURT:  Okay.  Thank you.
22         Do you want me to give that instruction as the jury
23    comes out?
24         MR. PETERSON:  That would be my preference, Your
25    Honor?

Closing Argument - Defendant

1            THE COURT:  I'm sorry?

2            MR. PETERSON:  Yes, please.

3            THE COURT:  Thank you.

4            Go get them.

5            And so you know, in the pile of instructions, I'm

6     pulling out the net worth instruction.

7            MR. PETERSON:  Thank you, Your Honor.

8            THE COURT:  Okay.

9            (The jury enters the courtroom.)

10            THE COURT:  Good afternoon.  Be seated.

11            Members of the jury, I instruct you, you are not to

12    consider the net worth of Wells Fargo in reaching any

13    decisions in this case.

14            Closing argument for the defense.

15            MR. PETERSON:  Thank you, Your Honor.

16            Good afternoon, ladies and gentlemen.  I want to add

17    my thanks to those of Mr. Sola.  The lawyers, the parties, the

18    Court, we all very much appreciate your time and your

19    attention and your consideration to this case.

20            In a little bit you're going to be asked to decide

21    three general questions.  There are going to be some subparts,

22    but there are three basic issues that you need to decide in

23    this case:  Did Wells Fargo negligently violate the Fair

24    Credit Reporting Act in the way it investigated and responded

25    to the ACDVs in this case?

Closing Argument - Defendant

1          Did Wells Fargo willfully violate the FCRA in the way

2     it investigated and responded to the ACDVs?

3          And if the answer to either of those questions is

4     yes, then what damages should you award to Mr. Sponer?  What

5     damages were the result of Wells Fargo's actions?  What

6     damages would not have occurred without Wells Fargo's actions?

7          And the starting point, of course, for your

8     consideration is what the FCRA requires of a furnisher like

9     Wells Fargo.

10         In response to receiving an ACDV from a consumer

11    reporting agency, the FCRA requires Wells Fargo to conduct a

12    reasonable investigation of the dispute.  Wells Fargo must

13    review the information provided by the CRA and must report the

14    results of the investigation back to the CRA, the consumer

15    reporting agency, within 30 days.  And, as a reminder, that 30

16    days, that clock starts ticking when the customer disputes

17    with the CRA, not necessarily -- not when the CRA sends it to

18    Wells Fargo.

19         The FCRA does not require that Wells Fargo agree with

20    the plaintiff's dispute when it receives an ACDV.  The FCRA

21    requires an investigation.

22         We're going to discuss all this in more detail

23    shortly, but I want you to have these things in mind as we

24    discuss the evidence you've seen over the past few days.

25         As we talked about the first time I had a chance to

Closing Argument - Defendant

1   speak with you on Tuesday, this matter started in the summer

2   of 2016, somewhere spring, summer, when a criminal, a thief in

3   Southern California, stole Matthew Sponer's identity.  The

4   criminal was sophisticated.  In July of 2016 the criminal

5   purchased a car at a used car dealership using the identity

6   that he had stolen from Mr. Sponer.

7          You heard testimony from both sides about the

8   problems with identity theft.  We all know it's a huge

9   problem.  It's a substantial issue, and it causes significant

10  pain to its victims and, I don't disagree, it causes

11  significant harm to the economy.  We're a credit-based

12  economy.  I agree with that.

13         But Mr. Sponer was a victim of the identity thief, of

14  the criminal that stole his identity and wreaked havoc on his

15  financial life.

16         Mr. Sponer learned of the identity theft in October

17  of 2016.  And at that time he hired an attorney, a man named

18  James Charne, who notified Wells Fargo on or about

19  October 19th, 2016, that -- of the issue, that they believed

20  the account was not Mr. Sponer's.  And you've seen that --

21  that letter.

22         And then on October 26th, Wells Fargo responded.  An

23  individual named William Brady, who you heard from -- he sat

24  right there and talked to you a bit -- he's from the fraud

25  department at Wells Fargo.  And Mr. Brady -- this is from

Closing Argument - Defendant

1  Exhibit 32, the iTop notes, what we've referred to as the

2  system of record.  Mr. Brady spoke to Jim Charne on the phone,

3  and he mailed a letter to Mr. Charne.  I think it was actually

4  faxed, faxed a letter to Mr. Charne with the understanding, as

5  it says there in the notes, that it would be forwarded to

6  Mr. Sponer for his review and attention.

7          That letter went out on October 26th and, as you'll

8  recall, it requested certain information that they wanted to

9  have returned, provided a mailing address and contact

10  information.  And in that letter Mr. Brady, an individual with

11  an extension number, a desk in Greenville, North Carolina,

12  invited Mr. Sponer to call if he had any questions.

13          You heard Mr. Sponer testify at one point, you know,

14  he's very frustrated in situations like this, dealing with big

15  companies, because he never feels like he knows who to call.

16  Wells Fargo told him who to call.  They told him to call

17  Mr. Brady if he had questions, gave him a name, a direct dial

18  number, and a person familiar with his case.

19          As I said, this was October 26th of 2016.  And right

20  around this same time Wells Fargo received -- began receiving

21  ACDVs.  I think what the evidence shows is that in that

22  initial time frame, October of 2016, there were

23  four -- actually, into November 2016 there were four ACDVs

24  that it received.

25          And you learned a lot about ACDVs over the last few

Closing Argument - Defendant

1    days, and you're probably tired of all these little acronyms.
2    But as a reminder, here's what happens.  The consumer issues a
3    complaint with the credit reporting agency, or the consumer
4    reporting agency.  The CRA then forwards the notice of dispute
5    to the furnisher; in this case, Wells Fargo.  And the
6    furnisher's 30-day obligation to investigate starts ticking on
7    the date that the consumer lodges the report or the dispute
8    with the CRA.

9         And it's important to keep in mind, especially in
10   light of some of the other evidence you've seen about the
11   number and quantities of ACDVs -- it's important to keep in
12   mind that ACDVs are sent for a wide variety of disputes.
13   Remember, these aren't just fraud and identity theft.  These
14   are "Wells Fargo, you have the wrong balance on my account,"
15   or "Wells Fargo, I paid this off three months ago.  Wells
16   Fargo, I didn't miss that payment in December.  You're saying
17   I did."  Those are all common types of ACDVs.

18        And Ms. Braxton, who you heard from, she testified
19   about the numbers, and we heard from plaintiff again, these
20   large numbers of disputes.  But that was a reference to all
21   ACDVs that the auto department receives, not just identity
22   theft, so I wanted to clarify that point for you.

23        And the reason we've talked about ACDVs so much and
24   why you're going to hear me talk about it a little bit more is
25   that that's the key to the case.  That's the primary issue,

Closing Argument - Defendant

1    because it's Wells Fargo's investigation of the disputes in

2    the ACDVs that form the basis for plaintiff's complaint, for

3    his claims against Wells Fargo in this case.

4            There isn't a claim in this case about the direct

5    disputes, the letters that Mr. Sponer sent directly to Wells

6    Fargo, and their responses to those.  There's no claim that

7    Wells Fargo mishandled the responses to Mr. Sponer's letters.

8    The claim in this case is that the investigation that Wells

9    Fargo conducted into the ACDVs, that that was unreasonable.

10           You've also heard a lot about policies and

11   procedures.  So what were the policies and procedures at Wells

12   Fargo at the time?  What was relevant?  And I'm going

13   to -- I'm not going to flash them up on the screen.  Don't

14   worry.  But I'm going to ask you to take a careful look at

15   them when you're back in the jury room.

16           The relevant policies and procedures are found in

17   Exhibit 560 dealing with the credit bureau team, and

18   Exhibits 509 and 510.  You recall Mr. Cooper's testimony about

19   a slight change in the policies and procedures between '16 and

20   '17, 2016 and 2017.  So 509 and 510 and 560.

21           And those procedures, you'll find, are concise,

22   they're clear, plain language, and easy to understand.  And so

23   I want you to very carefully review those so -- you've heard a

24   lot of people tell you what the policies are.  You're going to

25   have an opportunity to look at them and see what they say and

Closing Argument - Defendant

1    see what the people you heard from, both on video and live,
2    see what they actually were following.

3          So an ACDV comes in from the credit bureau.  Wells
4    Fargo has the obligation to conduct a reasonable
5    investigation.  And as set forth in Exhibit 560, the team
6    members who review those ACDVs, they review the ACDV itself.
7    They review any attachments that come with the ACDVs.
8    Sometimes there are attachments with those initial complaints.
9    Sometimes there may already be a fraud affidavit that the
10   consumer sent to the CRA.  That would get forwarded along with
11   the ACDV.

12         So they review the ACDV itself and any attachments.
13   And, importantly, they look at the iTop notes.  You've heard
14   about the iTop notes, the system of record.  They look at
15   those.  That's the universe of information that they look at,
16   that they're required to look at.

17         And they determine -- under the policies and
18   procedures, they determine first whether this is an account
19   that easily can be determined to be fraud, and that takes them
20   down one path, or an account that can't easily be determined
21   to be fraud, takes them down a second path.

22         And if it's not easily determinable to be fraud,
23   their obligation under the policies and procedures is to
24   forward that dispute to the fraud team, trained people who
25   have the experience and training within Wells Fargo to

Closing Argument - Defendant

1    investigate the issues specific to fraud.

2            And you heard experts, Mr. Kelley, discuss those

3    specific issues, some of those problems with fraud.  Identity

4    theft, it's -- one of the really awful things about identity

5    theft is it causes this difficulty.  Verifying these things is

6    difficult because of the very nature of it, the fact that the

7    thief stole all the information that in any other circumstance

8    would be all you'd need.  But in identity theft you need more.

9            Now, you heard experts from both sides.  No one

10   disagreed that there's absolutely nothing wrong with having a

11   policy and procedure where two different departments within

12   the bank handle these ACDVs.  At Wells Fargo, as you heard, it

13   starts with the credit bureau team; and if there's an

14   indication of fraud, it goes to the fraud team.

15           You heard testimony from Brian Kelley, one of

16   defendant's expert witnesses, that Wells Fargo's policies and

17   procedures related to its ACDVs and responses were reasonable

18   and are in compliance with the requirements of the FCRA.  And

19   that opinion was based on his 35 years of actually working in

20   the banking industry, his eight years as a consultant and

21   expert witness for both plaintiffs and defendants, and his

22   review of the relevant documents in this case.

23           We all know -- we heard that the FCRA does require a

24   speedy response, and you heard from Ms. Braxton that

25   internally Wells Fargo works on a 15-day window because they

Closing Argument - Defendant

1    don't want to be late in their response.  So that gives them a

2    little bit of room on the front end if the credit bureau

3    doesn't get it to them right away, gives them a little room on

4    the back end.  They work in a 15-day window.

5            And the determination needs to be made.  And under

6    Wells Fargo's policies and procedures, the credit bureau team

7    member looks again to Wells Fargo's system of record to make

8    their determination.

9            And Mr. Kelley again confirmed for you yesterday that

10   the furnisher -- in this case, Wells Fargo -- does not have an

11   obligation under the FCRA to look outside of the information

12   that it has.  It's allowed -- Wells Fargo is allowed to look

13   at their own records.  In other words, Wells Fargo's

14   reasonable investigation, the requirement of the FCRA, can

15   consist of investigating the information that it has in its

16   possession.

17           And, in fact, just a few minutes ago Mr. Sola told

18   you the same thing.  They need to look at their own records.

19   They need to look at what they have.  And there was no

20   rebuttal to that testimony yesterday from Mr. Kelley.  And

21   today in argument, Mr. Sola agreed.  Wells Fargo just needs to

22   look at its own records.

23           Plaintiff would have you believe in this case in a

24   false premise, that Wells Fargo's policy to review the ACDV,

25   the ACDV attachments, and the Wells Fargo system of record is

1    not an investigation under the law.  It is.  It's what's

2    required.

3            So with that background, the inquiry, then, is what

4    did the ACDV operators see in this case?  What was in the

5    system of record?  What information did that person who is

6    doing the work, what did they have when they responded to each

7    ACDV?

8            And you heard testimony that if a fraud investigation

9    is open, that's noted in the iTop record, that shows in the

10   system of record.  There's a fraud investigation going.  It's

11   open.

12           It doesn't matter whether that fraud investigation

13   was started as a result of a prior ACDV or if it was started

14   as a result of a letter or an e-mail or some sort of direct

15   dispute from the consumer.  Either way it shows up in the iTop

16   that there is an ongoing fraud investigation.

17           So what information did the ACDV operator have, and

18   what information could be found upon investigation of the

19   system of record?

20           And it's important here to remember the timeline.

21   And I have a copy of it over here, and you're probably not

22   going to be able to see much, but this time frame right in

23   here -- this was my PowerPoint during opening -- that time

24   frame right in there (indicating), that's the first set of

25   ACDVs that were received.  They were received October 29th

839

Closing Argument - Defendant

1    through November 17th of 2016, and they were responded to

2    between November 3rd and December 2nd of 2016.  And you have

3    those exhibits in the record.

4            So that November 3rd to December 2nd, that's a key

5    time frame for this, because that's the first time in this

6    case that you, as the jury, need to evaluate the

7    reasonableness of what Wells Fargo did.

8            So what did Wells Fargo have at that time, in the

9    fall of 2016, in November of 2016?

10           They had the letter from Mr. Charne.  There was the

11   letter from Mr. Brady, from Wells Fargo to Mr. Charne and

12   Mr. Sponer, requesting the information.  That shows up in the

13   iTop report.  It says "fraud packet sent."  They didn't have

14   any response to that request for information.

15           The iTop notes showed that a fraud investigation had

16   been initiated.  The iTop notes showed that Wells Fargo,

17   someone in auto, in Wells Fargo Dealer Services or Wells Fargo

18   Auto, that someone there had spoken to the detective in

19   California.

20           But, again, Exhibit 32, the iTop, the system of

21   record, those entries about speaking with Detective Tugashov,

22   at that time they will clearly show that the defendant hadn't

23   pled guilty -- initially hadn't pled guilty, certainly hadn't

24   been convicted.  And then even after the notes show that he

25   did plead guilty, it says, "But he can change his mind at any

Closing Argument - Defendant

1    time."

2              So at that point I fully agree, there was information

3    that there was a police investigation ongoing, but there was

4    no -- and it certainly states in there that the police

5    believed it was fraud.  But there was no -- there was no

6    confirmation of that.  There was no conviction.  The police's

7    fraud investigation hadn't yet resulted in a conviction.

8              Those are the four things that Wells Fargo knew at

9    the time that it made those initial responses.

10             It is also true that Mr. Sponer is a longtime

11   customer of Wells Fargo.  But you heard witnesses from Wells

12   Fargo Auto tell you that their system of record, their

13   employees, don't have access to the records of other divisions

14   in the bank.  They don't have access to the credit card

15   division records.  They don't have access to the account

16   deposit -- the deposit accounts records.  They don't have

17   access to mortgage records, any of the other divisions of the

18   bank.

19             And Mr. Kelley, based on his 35 years of experience

20   in the banking industry, confirmed for you that that's

21   standard within the industry to have those type of firewalls,

22   especially within a large bank like this.

23             You remember when we were doing jury selection on

24   Tuesday and there was a question about, "Who has had accounts

25   at Wells Fargo Bank?," a lot of people raised their hand.

Closing Argument - Defendant

1    Wells Fargo Bank is a big bank with a lot of accounts.  That's

2    not a secret to anybody.

3          And there are very good reasons, including privacy

4    and other related concerns, to make it so that every employee

5    doesn't have access to all the information about every

6    customer.  So the fact that Mr. Sponer was making charges in

7    Tahiti, that wasn't information that the Auto Dealer Services

8    people had, and there's good reason for that, and it's

9    standard in the industry.

10         At this time, as of December 2nd, 2016, the ACDV

11   operator didn't have sufficient information to validate this

12   as fraud, and the fraud department had not yet completed its

13   investigation.

14         And, again, plaintiff asserts and his experts stated

15   that Wells Fargo conducted no investigation.  But as set forth

16   above just a minute ago, the ACDV team did, in fact, conduct a

17   reasonable investigation of the system of record, as required

18   by the FCRA.

19         Now, plaintiff also complained and their experts

20   testified that the fraud team did no investigation because

21   they were waiting for information to be returned from

22   Mr. Sponer, from the consumer.  But, again, that requires you,

23   the jury, to take a step that defies common sense.

24         Take a step back.  To agree with plaintiff's position

25   on that, it requires you to agree with another false premise:

Closing Argument - Defendant

1    that gathering information from the consumer is not

2    investigating, is not an investigation.  As Mr. Kelley told

3    you, and stated it, I thought, very well:  That's precisely

4    what investigators do.  They gather information.  And one of

5    the best sources of information in a case like this is what

6    the consumer, the person making the dispute, what information

7    do they have?  What can they provide?

8            As Mr. Brady testified, Will Brady testified, sending

9    the letter is part of his investigation.  That was an

10   investigation.

11           And as of December 2nd, 2016, the last response, that

12   investigation in the fraud department was still going on.

13   Accordingly, the fraud investigation wasn't complete.  And as

14   Mr. Kelley told you, the ACDV operators then had no option but

15   to verify the account on the information that they reviewed in

16   their investigation, the information that Wells Fargo had as

17   of December 2nd, 2016.

18           Now, in late January 2017 Wells Fargo received a

19   letter from Mr. Sponer.  And you've seen the correspondence.

20   We've got reference to it up there.  This was the first time

21   that Wells Fargo heard directly from Mr. Sponer.  He provided

22   a fraud affidavit and a copy of the police report.  And as has

23   been relayed to you, those were two of the four items that

24   were requested initially.

25           And I want to talk to you briefly about the

Closing Argument - Defendant

1  information that was requested of Mr. Sponer and that's

2  requested of all consumers who are disputing this kind of

3  account, the fraud affidavit packet, or the fraud packet.  So

4  you're looking for a fraud affidavit, a police report, a copy

5  of a government ID, and a copy of the Social Security card.

6      Mr. Cooper, head of the fraud department, explained

7  to you why it is that Wells Fargo seeks those specific

8  documents.  He testified about the reasonableness of that

9  request.  The reason for taking those documents is to have

10  multiple verification points, multiple things to compare.

11      So, for example, you've heard a suggestion that,

12  well, Will Brady should have called the dealership in

13  California and got a copy of the photo ID or looked at the

14  signatures that were on the auto loan application.  But

15  without information from the real Mr. Sponer, there would be

16  nothing to compare that information from the car dealership

17  with.

18      And so, intuitively, it doesn't make any sense.  It

19  doesn't do any good to get all this information from the car

20  dealership in the investigation when you have nothing to

21  compare it to.  That's why you ask for information from the

22  consumer at the start of your investigation, so you have a

23  reference point, somewhere to start.

24      And Mr. Cooper also explained to you -- there's been

25  a lot of complaint about the Social Security card, the copy of

Closing Argument - Defendant

 1   the Social Security card.  No one was asking him to send his

 2   actual card, but a copy of the Social Security card.  You

 3   heard a lot of complaint about that, but Mr. Cooper explained

 4   the reason that Wells Fargo seeks that is because identity

 5   thieves don't fake them, they don't take the time or make the

 6   effort to process those fake documents, because no one needs

 7   them.  To apply for a store card at Best Buy or Office Depot

 8   or Home Depot or any of the other number of stores that the

 9   identity thief used Mr. Sponer's identity at, you don't need

10   to show your Social Security card.

11         You just need ID information and the number to

12   purchase a car.  I don't think any of us have experienced

13   having to put your Social Security card on the table when

14   showing the other documentation to the car dealer.  The

15   identity thieves don't need the card.

16         And so that's why Wells Fargo asked for it, because

17   the card itself is going to be an indication, just another

18   indication -- it's not proof.  Nothing is definitive.  It's

19   just another point of contact, another point of reference,

20   something for them to have to compare, another opportunity to

21   confirm the identity.

22         Dean Binder, another one of defendant's experts,

23   along with Mr. Kelley, Brian Kelley, explained that the

24   documents Mr. Brady requested are reasonable to investigate a

25   fraud claim.  And even plaintiff's expert, Mr. Hendricks,

Closing Argument - Defendant

1   begrudgingly -- it took him a little while, but he

2   acknowledged that a Social Security card is a good way to

3   prove that the person you're talking to is who they say they

4   are.

5           Now, the testimony you heard about the January 24th

6   letter is that it should have been forwarded to Will Brady and

7   the fraud department, but it doesn't appear that it was.  It

8   appears that that letter, Mr. Sponer's January 2017 letter,

9   should have -- it went to the credit bureau team, should have

10  gone to the fraud team.  Somehow it didn't.  Wells Fargo

11  acknowledges -- acknowledged that that was a mistake.  It

12  should have gone to the fraud team and it didn't.

13          I told you at the beginning, you're going to have a

14  couple of things you have to decide today, and one of them is

15  whether or not Wells Fargo was negligent.  You're going to

16  hear the Court's instructions before you go to deliberate

17  about these legal standards.  And the standard for negligence

18  is failing to do something that a reasonably prudent person

19  would do or doing something that a reasonably prudent person

20  would not do under the circumstances that existed.

21          At this time frame, Wells Fargo acknowledges that the

22  letter should have been forwarded to the fraud department,

23  that a reasonably prudent person would have forwarded that

24  letter to the fraud department, to the right department it

25  should have gone to.

Closing Argument - Defendant

1           And as I told you a few minutes ago, while there's no

2    claim in this case that Wells Fargo mishandled the direct

3    disputes, this mistake matters, because had this letter made

4    it to the correct place within Wells Fargo, to the fraud

5    department, to Mr. Brady's desk, it's likely that it would

6    have changed the results in 2017, in November of 2017, when

7    Wells Fargo next received ACDVs, because, remember, what

8    matters is what they had on the date they responded to the

9    ACDVs.

10          So Wells Fargo responded on February 15th, and it was

11   the wrong department.  The letter admittedly comes off tone

12   deaf.  I would have been very frustrated had I got that as

13   well.  Ms. Braxton explained that to you.  They don't use that

14   letter anymore for those reasons exactly.  But, again, there's

15   no claim in this case nor a request for you to award any

16   damages related to that letter, related to that response.

17          After the February 15th letter goes out, we get to

18   the first lengthy period with no communications with

19   Mr. Sponer, approximately six months between February of 2017

20   and at least August of 2017.  I'll talk about that in a

21   minute.

22          The testimony you heard from Mr. Sponer was that when

23   he received that February 15th letter, he had shock -- he was

24   shocked and had fear, shock and fear.  But he took no action.

25   And for approximately six months there's no evidence that

1   during that time period he wrote any letters to any creditors.

2   There is evidence that there are lots of creditors at this

3   time frame who are seeking accounts.  But no -- no

4   correspondence, nothing to try to do -- shock and fear, but no

5   affirmative steps to try to fix anything.

6          On August 18th of 2017 Mr. Sponer sent a second

7   letter to Wells Fargo.  You heard the testimony.  Wells Fargo

8   has no record of receipt of this and Mr. Sponer has no record

9   of delivery.  And it should be noted -- and you can look at

10  this in the exhibits -- the other letters that Mr. Sponer sent

11  do have indication that they were mailed in one case, an

12  indication actually that they were received in another, but

13  not the August letter.  That one doesn't have any indication

14  attached with the document that shows that.  So it's unclear

15  what happened to that letter.  Wells Fargo doesn't have record

16  of it.

17         And, you know, Mr. Sponer might not like the

18  responses he got from Wells Fargo, but Wells Fargo responded

19  to the letters.  They responded to the January of 2017 letter.

20  They responded to the November 3rd letter that we're going to

21  talk about in a minute.  They didn't respond to the August

22  letter, but they don't have any record of receiving it, and

23  Mr. Sponer has no record of sending it.

24         But, again, regardless, that's not a claim in this

25  case, failing to respond to the August 17th letter, because it

1    wasn't an ACDV.

2            And this letter in August, that's the first time that

3    Mr. Sponer, in an effort to communicate with the creditor,

4    with Wells Fargo, includes a copy of his passport, a copy of

5    his photo ID.  There's still not a Social Security card, but

6    there is the photo ID.

7            And then following that letter, a couple more months

8    passed, and we move into November of 2017.  And that's the

9    first time Wells Fargo has record of receiving his passport,

10   receiving Mr. Sponer's picture ID.

11           And then on November 21st -- this is Exhibit

12   18 -- again Mr. Brady responds.  I think this is important.

13   This was a year later, a year following the first dispute, a

14   year following Mr. Brady's letter to Mr. Sponer requesting

15   information.  And a year later the November 3rd letter made it

16   to Mr. Brady's desk, because Mr. Brady was the individual, the

17   person who was handling the issue of Mr. Sponer's account.

18           And in that letter Mr. Brady requested that

19   Mr. Sponer send a copy of his Social Security card, the last

20   of the four pieces of information that Wells Fargo had been

21   requesting.  It gives an address, a way to contact him,

22   including, again, a phone number and a direct dial line:  "If

23   you have questions, please call me.  Here's my line.  Here's

24   how to get in touch with me.  Here's when I'm available."

25           Now, you heard testimony from John Cooper, head of

Closing Argument - Defendant

1    the fraud department, that here, by November 21st, when

2    Mr. Brady sent this letter, after -- at this point the

3    identity thief had, in fact, gone through with his guilty plea

4    and been convicted.  Wells Fargo had, in fact, by this point

5    gotten the car back.  Wells Fargo had received communication

6    from Mr. Sponer, and Wells Fargo had received Mr. Sponer's

7    picture ID, still hadn't received the Social Security card.

8           But at this point you heard Mr. Cooper, the head of

9    the fraud department, testify that Wells Fargo had enough

10   information for Will Brady and his supervisor, for the fraud

11   team to validate this claim as fraud.  Mr. Cooper told you

12   they should have done that.  A reasonably prudent

13   person -- and Wells Fargo, for purposes of the statute in this

14   case, is a person.  A reasonably prudent person at that point

15   would have validated this claim as fraud.

16          And this matters because on November 19th, Wells

17   Fargo received the next ACDV from Mr. Sponer.  And, remember,

18   it's only the ACDV investigations that matter in this case.

19   What did they have when they received the ACDV?

20          Wells Fargo had enough information from Mr. Brady to

21   make that decision.  But Mr. Brady made a decision to seek the

22   fourth piece of information.  Nonetheless, under the

23   circumstances as they existed, the account could have and

24   should have been validated as fraud and deleted from

25   Mr. Sponer's credit report.

Closing Argument - Defendant

1          You understand from the policies and procedures that
2    the first thing the ACDV team does -- and you can look at this
3    in the exhibits -- is check the iTop.  And so if the -- if the
4    fraud would have been validated, if the account would have
5    been validated as fraud in November of 2017 when this
6    additional information came in, then at the end of November
7    when the ACDV -- the first of the second set of ACDVs come in,
8    then the account operator would have looked at the iTop
9    records and would have seen that the fraud had been confirmed.
10   And the ACDV -- under the policies and procedures, at that
11   point the response would have been fraud, it would have been
12   validated, and the account would have been removed.
13          So for purposes -- well, so Wells Fargo acknowledges
14   that it was negligent in responding to the ACDV on
15   November 24th.  And for purposes of your decision today, it
16   doesn't matter when in between December 2nd of 2016, its last
17   response in the first set of ACDVs, and November 24th, 2017,
18   the first response of the last group of ACDVs, it doesn't
19   matter when in that time frame Wells Fargo received
20   information.  What matters is that it had it on November 24th,
21   2017.  For purposes of what matters in this lawsuit, it's the
22   information as of the date of the ACDV response.  And that is
23   where, for purposes of your decisions today, the story ends,
24   the timeline ends.
25          Now, we know, of course, that shortly after this time

Closing Argument - Defendant

 1  frame, in January of 2018, the account was deleted.  And it

 2  was resolved -- the timing is clear to everybody.  It was

 3  resolved in the timeline after this lawsuit was filed.

 4          And Mr. Brady told you that the fraud team was aware

 5  that a lawsuit had been filed.  But he also told you, when he

 6  was sitting there, that he and his team, his manager, looked

 7  at the record; and it was at that point they validated the

 8  fraud.  It wasn't a situation where it was an edict from

 9  someone:  "Delete this."  It was acknowledged that it was

10  within the legal department, but they still did the work.

11  They looked at it, and they validated the fraud.

12          And it's important to note that Mr. Sponer testified

13  that his credit is fixed now.  His credit is clear.  He

14  believes it's back to normal.

15          Now, Will Brady also told you, based on Wells Fargo's

16  policies and procedures, based on his experience within the

17  fraud department, that if he had received information from

18  Mr. Sponer sooner -- for example, "I don't have a Social

19  Security card.  Is there anything else I can do, anything else

20  I can give you?  Here's a picture ID" -- if Mr. Brady would

21  have gotten that information sooner, he would have deleted the

22  account sooner.  But, again, that timing for your decisions

23  that you have to make today isn't relevant, because what

24  matters is what they had at the time of the ACDV response.

25          As you were told by Mr. Sola and as the Court will

Closing Argument - Defendant

1    instruct you shortly, Mr. Sponer also asserts that Wells Fargo

2    was willful in its violation.  And you'll hear this

3    instruction shortly.

4         Willfulness is a reckless disregard of a statutory

5    duty under the Fair Credit Reporting Act.  Reckless disregard,

6    under the statute, is defined as an action entailing an

7    unjustifiably high risk of harm that is either known or so

8    obvious that it should be known.  That will be part of the

9    instructions that you will get shortly.

10        Wells Fargo made mistakes in this case.  But the

11   policies that Wells Fargo has, the procedures in place to

12   properly and appropriately investigate the dispute, as

13   required by the FCRA, both Mr. Binder and Mr. Kelley have

14   confirmed for you that they're reasonable.  And, again, I

15   invite you to look at those policies yourselves and determine

16   what you think.

17        All the experts on both sides confirm that it's

18   reasonable or at least not unreasonable to have two different

19   departments investigating a fraud as part of the ACDV fraud

20   investigation.  In Wells Fargo's case, it's the credit bureau

21   dispute team and it's the fraud department.  And Mr. Kelley

22   confirmed for you -- and plaintiff agrees -- that there's no

23   obligation to go outside of your own records, your system of

24   record.

25        There's not sufficient evidence on the record before

Closing Argument - Defendant

1    you to determine a willful violation of the FCRA, an action

2    entailing an unjustifiably high risk of harm that is either

3    known or so obvious that it should be known.

4         Mr. Sponer is also asking that you award damages.

5    The purpose of damages is to reasonably and fairly compensate

6    the plaintiff.  And that's important in this case, because you

7    heard a lot of evidence.  But damages are meant to reasonably

8    and fairly compensate the plaintiff.  You're not looking to

9    the damages of his family members or others when determining

10   the damages that he suffered.

11        And part of the instruction you're going to get is

12   that your determination of damages has to be based on the

13   evidence that you've received, not on speculation, not on

14   guesswork, but on the evidence.

15        And you're also going to receive an instruction that

16   your determination of those damages starts on the date where

17   you first determine that there was a violation of the FCRA.

18   That's the starting point for damages in our timeline and the

19   timeline you've heard over the last few days, from the date of

20   the first violation.

21        And, as Mr. Sola acknowledged, Mr. Sponer isn't

22   asking you to compensate for any out-of-pocket loss, any

23   economic damages.  He's not asking you to reimburse him for

24   the office he rented in New Zealand or any other monetary

25   expenses.  But what he's asking you for are damages for a

1   variety of injuries, alleged injuries, that are admittedly a

2   little bit harder to quantify.

3          The first one is damage to reputation.  On the record

4   as you've seen it, there is no evidence of damage to

5   Mr. Sponer's reputation.  There was evidence that an insurance

6   company pulled the credit report.  There's evidence that

7   Experian or Equifax -- I can't remember exactly who, which

8   entity -- saw the credit report.  But what you didn't hear was

9   any evidence from an insurance agent that said, "We looked at

10  that credit report, and we had an unfavorable opinion of

11  Mr. Sponer after seeing that."  There's no evidence of damage

12  to his reputation.

13         The second category of damages you're being asked to

14  look at is emotional distress and discomfort.  The third is

15  interference with normal and usual activities.  The fourth is

16  inconvenience.

17         It is -- the testimony is clear, this was a stressful

18  and emotional time for Mr. Sponer.  There's no doubt that the

19  identity theft, the theft of Mr. Sponer's identity by the

20  criminal in California, caused him distress, it caused him to

21  invest time and energy, and it caused him concern.

22         But you need to be able to determine for this

23  case -- and you'll be instructed on this as well -- what of

24  that is Wells Fargo's responsibility?  The standard you'll be

25  looking at in determining damages is "as a result of,"  the

 1    damages that he alleges to have suffered as a result of Wells

 2    Fargo's actions.

 3         Damages are sustained as a result of -- i.e., caused

 4    by -- a Fair Credit Reporting Act violation if the injury

 5    would not have occurred without the violation.

 6         The other two areas of injury are Mr. Sponer not

 7    seeking credit.  His testimony was that they had plans to

 8    apply for a mileage credit card and plans to build an ADU.  I

 9    think it's telling, however, that in the time since the Wells

10    Fargo account was deleted and Mr. Sponer testified his credit

11    is perfect, neither of those two credit opportunities -- they

12    haven't done either.  Mr. Sponer testified they're not working

13    on the ADU and they haven't applied for the credit card.

14         And, finally, invasion of privacy.

15         But, again, if you determine that Mr. Sponer suffered

16    injury in those categories, you need to decide if those

17    damages were sustained as a result of a Fair Credit Reporting

18    Act violation by Wells Fargo.

19         So what is the evidence around this time frame?  At

20    all relevant times in this lawsuit, everything that you've

21    heard from all parties -- this isn't in dispute -- Mr. Sponer

22    was dealing with multiple accounts.  And the best thing for us

23    to look at for that is when he wrote his letters.

24         The January 2017 letter, which you'll see at

25    Exhibit 11 -- which I should note, there was testimony about

Closing Argument - Defendant

1    the decision to cut the trip short and return home, but I

2    believe the testimony was that this decision was made around

3    this time, when Mr. Sponer is sending letters to multiple

4    creditors.  It might have been a little later.  It was end of

5    January, beginning of February.  I think that is what

6    Mr. Sponer's wife testified to, so right around this time

7    frame, when he's dealing with multiple creditors.

8          He sends this letter to Wells Fargo, but at that same

9    time, within days of each other, he sends a letter to

10   McCarthy, Burgess & Wolf, which is a collection agency, and

11   they were collecting for Verizon.  That letter can be found at

12   Exhibit 527.  He sent a letter to Best Buy, Exhibit 528.  He

13   sent a letter to Home Depot, Exhibit 529; to Kohl's, Exhibit

14   530; to Macy's, Exhibit 531; to Office Depot, Exhibit 532.

15         This time frame, when Mr. Sponer wrote this letter to

16   Wells Fargo, it wasn't the only creditor he was dealing with.

17   It wasn't the only creditor who had taken no action to correct

18   the adverse marks on his credit report.

19         His next set of letters, approximately six months

20   later, in August 2017 -- and the letter to Wells Fargo is at

21   Exhibit 13 -- at that time he also wrote a letter to Caine &

22   Weiner, also a collection agency, collecting on behalf of

23   Progressive, and that's Exhibit 533; to Ad Astra, another, I

24   believe, collection agency, collecting for Speedy Cash, and

25   that's Exhibit 534; for Home Depot again -- they were in that

1    first set of letters -- Home Depot again, Exhibit 535; JH

2    Portfolio for Citibank, but I believe the testimony was that

3    that Citibank may have been related to one of the store

4    cards -- I can't remember which one -- and that's Exhibit 536;

5    to Diversified Consultants, another collection agency,

6    collecting for AT&T; and to AT&T itself.

7            So in this same time frame, when Mr. Sponer testified

8    that he suffered damages as a result of the Wells Fargo issue,

9    the Wells Fargo account, he was still dealing with these

10   multiple other accounts that were caused by the thief who

11   stole his identity, and, again, multiple that were being

12   disputed for a second time.

13           His next set of communications with Wells Fargo was

14   November of 2017.  He sent another letter, November 30, 2016,

15   Exhibit 13 -- as I'm thinking about it standing here, I

16   believe it's Exhibit 15.  At that time he sent a lot of

17   letters.  I asked Mr. Sponer if he could remember how many

18   letters he sent at this time, and he said he couldn't recall.

19   And we didn't show a lot of them because there are a lot of

20   papers in this case already.

21           But two that stuck out to me was he wrote a letter to

22   Office Depot.  That's one of the companies that he had to

23   write to way back in January of 2017 as well.  That's

24   Exhibit 544.  And he wrote a letter to Home Depot,

25   Exhibit 546.  He was still dealing with some of the creditors

Closing Argument - Defendant

1   that he had began dealing with a year earlier.  And that's

2   not -- it shouldn't take that long, but it happens, and it was

3   something that he was dealing with.

4          And so when you look to attribute -- this is, again,

5   the time frame where he's making complaints, where he's

6   alleging that he suffered injuries related to emotional

7   distress, related to sleeplessness, related to his feelings,

8   related to his inability to interact with his family, he's

9   asking you to hold Wells Fargo liable for those damages.  But

10  it's clear there were other things happening, there were other

11  entities who were collecting.

12         And, you know, there's testimony that Wells Fargo

13  never assigned this to collection.  Wells Fargo never made

14  collection calls.  Other entities did.

15         There were other things related to this identity

16  theft that were happening to Mr. Sponer at this same time

17  frame.  There was testimony that he had a lot of other things

18  going on in his life.  His wife was undergoing a major surgery

19  related to a family member of hers who was very sick.

20  Mr. Sponer had a lot going on with Farah, his daughter,

21  understandably.  But there's a lot going on outside of what is

22  being caused by Wells Fargo, if anything.

23         There are some issues in this case that are difficult

24  to talk about because Mr. Sponer is unquestionably a victim in

25  this case, a victim of the identity thief.  And Wells Fargo

Closing Argument - Defendant

1    has acknowledged that there are things it could have done

2    better.

3            But as you heard Mr. Kelley talk about, within the

4    industry there is some expectation that the consumer, the

5    person making the dispute, will participate in the process.

6    It's a difficult process to fix your credit like this, to

7    clean this up.  It takes time and effort is what Mr. Kelley

8    told you.  But there were large swaths of time where there

9    wasn't any efforts being made.  There were phone calls being

10   requested by Wells Fargo -- "Here's a number.  Here's a person

11   to call" -- and no calls being received.

12           Those are Exhibit 501.  Mr. Brady said, "Give us a

13   call."  Exhibit 12, even the February 15, 2017 letter, gave a

14   number.  "Give us a call."  Exhibit 18, again, right to

15   Mr. Brady's desk.

16           Exhibit 21, which we haven't talked about that yet,

17   that was an e-mail from someone in the Office of the

18   President, the highest customer relations at Wells Fargo that

19   by early December 2017 it had escalated to that division.  And

20   that person gave a name, a telephone number, and an extension:

21   "Give us a call."  And no call was made.

22           The damages that Mr. Sponer suffered in this case, in

23   light of everything else that was going on, it is very

24   difficult for you as the jury to say -- as you have to under

25   the instructions you're going to get, under the law -- that

Closing Argument - Defendant

1    those damages were the result of action or inaction by Wells

2    Fargo.

3              There's another key or another piece of damages that

4    we have to talk about.  If you determine willfulness -- and

5    I -- the record doesn't support that determination.  But if

6    you determine willfulness, you're going to be asked to decide

7    whether or not to award punitive damages.  As I said, on the

8    evidence, there's no evidence for the determination of

9    willfulness.

10             And willfulness, to be clear, that's the threshold

11   for punitive damages.  You have to get to willfulness first.

12   But even if you decide that there's willfulness in this case,

13   you don't have to award punitive damages.  You can, but you

14   don't have to.

15             So what's your consideration with respect to punitive

16   damages?  You can determine to award punitive damages -- and

17   this also -- you can determine punitive damages if you

18   determine that Wells Fargo's actions were malicious; that's

19   accompanied by ill will or spite for the purpose of injuring

20   plaintiff.

21             You can award punitive damages if you determine Wells

22   Fargo's conduct in this case was oppressive; that's

23   unnecessary harshness or severity.

24             You can award punitive damages if there's reckless

25   disregard, unjustifiably high risk.

Closing Argument - Defendant

1          Even if you determine there's willfulness, you don't

2    have to award punitive damages, and the facts of this case

3    don't support such an award.  The facts of this case, where

4    Wells Fargo has proper policies and procedures, where Wells

5    Fargo has trained employees, where Wells Fargo's policies and

6    procedures comply with the FCRA, but where some human beings

7    made mistakes, that does not justify willfulness and it does

8    not justify an award of punitive damages.

9          So what is it Wells Fargo is asking you to do?  Wells

10   Fargo acknowledges that it made a mistake, that it failed to

11   ensure that the January 2017 letter made it to the fraud

12   department, and that in November of 2017 it had enough

13   information to validate the account as fraud and it didn't do

14   so.

15         On those facts and on those omissions by Wells Fargo,

16   Wells Fargo admits that its responses to the November 2017

17   ACDVs were negligent.  And then your task, as the jury, is to

18   determine what compensation Mr. Sponer is entitled to.

19         But on these facts, I urge you to return a verdict

20   that Wells Fargo's actions resulting from human error were not

21   willful violations and, as a result of that determination,

22   that you don't reach the issue of punitive damages.

23         Again, I thank you for your time and for your

24   attention to this matter.

25         THE COURT:  Members of the jury, let's take our mid

Rebuttal Closing Argument - Plaintiff

1    afternoon recess at this time.  We'll be in recess for 15

2    minutes.

3            Thank you.

4            (A recess is then taken.)

5            (The Court, counsel, the parties, and the jury

6    reconvene.)

7            THE COURT:  Be seated.

8            Rebuttal for plaintiff.

9            MR. SOLA:  Thank you, Your Honor.

10           I told you in the opening statement that Wells Fargo

11   may decide to admit some negligence, because this case is

12   before a jury.  And now they have.  But Wells Fargo never

13   admitted any wrongdoing before.  They always denied liability.

14   Both their corporate witnesses, Ms. Berg and Ms. Braxton, said

15   that Wells Fargo did not violate the Fair Credit Reporting Act

16   as recently as last week.

17           Wells Fargo had many opportunities to fix the problem

18   for Mr. Sponer, to remove that fraudulent account, but it

19   didn't do so until he sued them.  And now they don't admit to

20   anything until the last day of trial.  Just yesterday their

21   experts said all their conduct was reasonable.

22           Wells Fargo knows it has broken the law and is

23   worried that you will hold them accountable, so that's the

24   reason for this courtroom conversion.  But it's only done to

25   avoid damages.

Rebuttal Closing Argument - Plaintiff

1         Now, Wells Fargo's counsel has said a few times in

2    his closing that the direct disputes and the responses to the

3    direct disputes are not part of the case.

4         Now, Mr. Charne sent that letter on October 19th,

5    2016.  That was a direct dispute.  And in response to that

6    direct dispute, William Brady sent the letter of October 26,

7    2016, requesting the documents.  They're saying that's not

8    part of the case.  But you could see almost their entire

9    defense is based on that October 26 request for documents and

10   their claim that they didn't get them and, therefore, they

11   didn't have to do anything.

12        Also, you have the direct disputes that Mr. Sponer

13   made in 2017.  And then we've seen that November 21 response,

14   asking for the Social Security card.  They're saying now those

15   are not part of the case, but then they want to cite to that

16   November 21 letter asking for the Social Security card and

17   saying Mr. Sponer should have sent it.  They cannot have it

18   both ways.

19        Now, we're talking about the ACDVs and what was the

20   investigation that was done.  We know what was done.  We heard

21   Ashley Grier.  We heard Montressa Ebron.  They said all they

22   did was match the identifying information.  And every person

23   that testified said that's what they did:  Mr. Hollomon,

24   Mr. Funsch, okay.

25        And then yesterday Mr. Brian Kelley, he said that

Rebuttal Closing Argument - Plaintiff

1   matching ID was not a real investigation.  You may recall, I

2   had to ask him a couple times about his deposition testimony

3   in which he said that, but at the very end he finally agreed

4   that was his sworn deposition testimony.  That's not a

5   reasonable investigation.  Their own expert agrees.

6          In closing argument counsel talked about they got the

7   identity thief and he's pled guilty, but he could change his

8   plea.  As Mr. Hendricks said, this is a civil case, and when

9   you're looking for identity theft, Wells Fargo doesn't require

10  a conviction.  Their procedure, if you look at the fraud

11  department, is they require a driver's license, a Social

12  Security card, a fraud affidavit, and a police report.

13  There's no conviction there.

14         As I said, a fraud affidavit is simply an assertion

15  of fraud.  A police report can be just somebody going to the

16  police and saying they're a victim of fraud.  Now, I'm not

17  saying those would be false.  But that's not a conviction of

18  anybody.  But now they want to say, "Well, even though we had

19  an assertion from the police" -- which is essentially equal to

20  a police report -- "that there was identity theft, until we

21  got a conviction, we weren't 100 percent sure."

22         Well, of course, that's not the standard.  That's not

23  the standard they apply in the fraud department.  And it's not

24  the standard for a reasonable investigation, because a

25  reasonable investigation is to determine if the information is

Rebuttal Closing Argument - Plaintiff

1  accurate.

2          And so even taking Wells Fargo's position that it

3  knew of the thief, but there wasn't 100 percent certainty that

4  it was identity theft because he hadn't been convicted, there

5  also isn't 100 percent certainty that it's not identity theft.

6  In other words, I think they'd agree, this looks like it's

7  probably identity theft.

8          But what they're asked to do in the ACDV process is

9  to verify if the information is accurate.  They could not say

10 that information was accurate once they knew about the capture

11 of the identity thief, but that's what they reported to the

12 bureaus.  They assured the bureaus it was accurate when they

13 knew it probably was not accurate, even taking their own

14 position there.

15         Now, counsel also said, what better person to contact

16 to investigate identity theft than the consumer?  Well, I

17 would say in this situation it would be the police.  They'll

18 know all about the crime.  They arrested the thief.  Rather,

19 they think it's better to ask for information from a consumer

20 who they've been told is not even in the country.

21         They're not trying to investigate here.  They're

22 stalling.  It costs money to investigate.  And they'll just

23 push it off on the consumer.  They don't call the police,

24 except there were contacts with the police.  It was to get the

25 car back.  They just wanted their collateral.  They didn't

Rebuttal Closing Argument - Plaintiff

1    care about the credit reporting.

2           I mean, they didn't even ask the police for the

3    police report.  They demanded that Mr. Sponer send it.  But it

4    would be a lot easier to get it from the police.  Mr. Sponer

5    didn't have it at that time.  They were basically saying,

6    "Mr. Sponer, you go get the police report and you send it to

7    us," rather than simply calling the police, Detective

8    Tugashov, who they're actually speaking to frequently, and

9    asking for a copy.

10          Now, they said that Mr. Sponer's January 2017 letter

11   went to the wrong department and it should have gone to the

12   fraud department.  They said it went to the credit bureau

13   department.

14          Well, you've heard all throughout this case, their

15   defense is it doesn't matter that the credit bureau department

16   doesn't do the kind of -- doesn't investigate identity theft,

17   which everybody agrees the credit bureau department does not

18   do -- but that doesn't matter, because the credit bureau

19   department is working closely with the fraud department.

20          But if Mr. Sponer's letter of January 2017 went to

21   the credit bureau department, why didn't they share it with

22   the fraud department if they're working so closely together?

23   I mean, the letter was clearly about fraud.  He said he was

24   the victim of identity theft.  He included a police report.

25   He included the fraud affidavit.

1             No.   The truth is the credit bureau department was

2    not working with the fraud department.

3             You also heard a version that Mr. Brady, after

4    Mr. Sponer sent the December 1st letter in 2017 saying he

5    didn't have a copy of his Social Security card, that Mr. Brady

6    sat down with his manager, went through the records, and they

7    were going to fix it.

8             That's totally contrary to Mr. Brady's testimony.  I

9    invite you, watch the videotape, okay, because in that

10   videotape you'll see that when I asked Mr. Brady, "Did you do

11   any research on or about January" -- well, he wrote a letter

12   on January 30th saying that they've completed the research,

13   and the identity theft claim appears to be valid.  And I asked

14   him, "What did you do to complete the research?"  He said, "I

15   can't recall."

16            And I said, "Can you give us any" -- no, then I said,

17   "What did you do to determine the identity theft claim was

18   valid?"  And he said, "I can't remember the details,"

19   something like that.

20            And I said, "Well, don't give me the details.  Just

21   give me whatever you remember."  And he said, "What I remember

22   is legal got involved, and then my manager told me to validate

23   the dispute as fraud."

24            There was no discussion of any meeting with the

25   manager, other than the manager dictating, and that was after

1    the lawsuit.

2            Also, if they were going to consider the December 1st

3    letter as sufficient to validate the dispute, why didn't it

4    get validated in December?  Why was it not fixed until after

5    he sued, for another almost two months?  It wasn't fixed until

6    the end of January.  So they weren't going to fix it with the

7    December 1st letter.

8            Now, there was also a reference to Mr. Binder, saying

9    something about his testimony.  If you remember, when I

10   questioned Mr. Binder, I had one question:  "Is any of your

11   testimony that you've just given relevant to the ACDVs?"  And

12   he said, "No."  So I stopped asking him questions, because

13   this case is about the ACDVs.  Nothing Mr. Binder said is

14   relevant to this case.

15           Now, damages, there's a question of when do the

16   damages begin; and you will get an instruction that says you

17   should only award damages that are sustained on or after the

18   date you find the first violation of the FCRA.

19           And I would posit to you that that date is

20   November 3, 2016.  It's the first ACDV.  Because by then,

21   they've already got the information from Charne.  They've got

22   the information from the police.  By then they've got enough

23   to conclude it's identity theft.  And, like I say, even if

24   they don't have enough to convince them it's identity theft,

25   they certainly don't have a basis for saying it's accurate.

Rebuttal Closing Argument - Plaintiff

1    They know it may not be accurate, but they verify anyway.  So

2    the first violation is November 3rd, 2016.

3            Now, you saw some letters.  There was January 19,

4    2017, Mr. Sponer's letter to Wells Fargo.  And then you saw

5    that at that same time, around that same time, he wrote

6    letters to other creditors.  But we're not seeking any claim

7    for those damages to other creditors.  You know, it's very

8    easy to separate out the damages.  When he writes a letter to

9    Wells Fargo, that's damage and time he's spending on Wells

10   Fargo.  When he's writing a letter to somebody else, that's

11   damage that's attributable to somebody else.

12           We've not even offered any of those letters.  We're

13   not trying to -- we don't want to make it any harder for you

14   than it is.  Our evidence is all about Wells Fargo, and that's

15   all the damages we're claiming.  This idea that there's

16   somehow some other damage that he's claiming related to the

17   other letters is wrong, because we've never even offered those

18   letters.  And that goes the same with the August 2017 letter.

19   He wrote Wells Fargo, he wrote others, but all we're asking

20   for is what he did with Wells Fargo.

21           You also heard Mr. Sponer and his wife and his

22   mother, they talked about the damages caused by Wells Fargo,

23   all right.

24           Now, on punitive damages, you saw some slides with

25   the standard for punitive damages.  You saw there was malice

Rebuttal Closing Argument - Plaintiff

1  or malicious and oppressive.  Then there was reckless

2  disregard, not too much discussion of that one.  That's the

3  lowest threshold.  But reckless disregard of plaintiff's

4  rights, that's enough for punitive damages.  And conduct is in

5  reckless disregard of plaintiff's rights if the defendant acts

6  in the face of a perceived risk that its action will violate

7  the plaintiff's rights under federal law.  And the federal law

8  here is the FCRA.

9       So all you need to find is that they acted in the

10  face of a perceived risk that their actions would violate

11  plaintiff's rights under federal law.

12       Well, obviously they knew that if they weren't

13  investigating identity theft when the law required that they

14  have to investigate the dispute, there's a risk they're

15  violating federal law.  I think it's much more than a

16  perceived risk.  It's a knowing.  But there is abundant

17  evidence they acted in reckless disregard of plaintiff's

18  rights.

19       Some of that evidence we've already discussed:  the

20  policy to prohibit the ACDV operators from investigating

21  identity theft, the fact that they ignored all the information

22  that they had in their own records, doing a reasonable

23  investigation.  I think we've all agreed on that.  They have

24  to use the information in the records.  There is some question

25  whether they have to go outside their records, but we all

Rebuttal Closing Argument - Plaintiff

1   agree they have to use the information in their records, and

2   they didn't.

3          But let's just look at -- make it simple.  This was a

4   fraud account.  Mr. Sponer disputed it 10 times, each time

5   saying it was fraud or identity theft.  It was never fixed.

6   Obviously there is some serious problem with Wells Fargo's

7   procedures if in 10 times, when they're required to do a

8   reasonable investigation, every time they couldn't discover

9   that it was inaccurate when it was.  That, by itself, is

10  clearly reckless.

11         And just briefly on damage to reputation, Wells Fargo

12  argues there's no evidence of damage to reputation.  But we

13  all agree, and Mr. Sponer proved that his report was seen by

14  his insurance company.  That's noted on the Equifax report as

15  an inquiry.  I remember the date:  March 6th, 2017, Foremost

16  Insurance.  And Equifax also testified that they gave the

17  report to the insurance company on that date.  And we know the

18  Wells Fargo account was on that report.  It was a charge-off,

19  a highly derogatory status.

20         Wells Fargo says that's not damage to reputation.

21  The insurance company, seeing a credit report with a false

22  charge-off that Mr. Sponer considers portrays him as someone

23  who stole a car, Wells Fargo says that's not damage.

24         Well, maybe that's why Wells Fargo does not have

25  procedures to assure maximum possible accuracy, because to

Jury Instructions

1   them, they don't think that this kind of false, derogatory

2   reporting causes damage; therefore, they're not really very

3   concerned about fixing it.

4          Finally, why are we here?  That's what I said at the

5   very beginning of this case, that we're here because Wells

6   Fargo broke the law.  We're here in a court of justice.  And

7   no one is above the law.  Wells Fargo broke the law over and

8   over.  And we ask you to enforce that law.  Hold this

9   corporation accountable for its illegal conduct.  You have the

10  power.  Do justice.

11         Thank you.

12         THE COURT:  Members of the jury, now that you've

13  heard all the evidence and the arguments of the attorneys, it

14  is my duty to instruct you as to the law of the case.  A copy

15  of these instructions will be sent to the jury room for you to

16  consult during your deliberations.

17         It's your duty to find the facts from all the

18  evidence in this case.  To those facts you will apply the law

19  as I give it to you.  You must follow the law as I give it to

20  you, whether you agree with it or not.

21         You must not be influenced by your own personal likes

22  or dislikes, opinions, prejudices, or sympathy.  This means

23  you must decide the case solely on the evidence before you and

24  according to the law.  You will recall that you took an oath

25  to do so.

Jury Instructions

1        Whether or not you took notes, you should rely on

2   your own memory of the evidence.  Notes are only to assist

3   your memory.  You should not be overly influenced by your

4   notes or those of other jurors.

5        The evidence you are to consider in deciding what the

6   facts are consists of, one, the sworn testimony of witnesses;

7   two, the exhibits which have been admitted into evidence;

8   three, any facts to which all the lawyers have agreed; and,

9   four, any facts that I have instructed you to accept as

10  proved.

11       In reaching your verdict, you may consider only the

12  testimony and exhibits received into evidence.  Certain things

13  are not evidence, and you may not consider them in deciding

14  what the facts are.  I will list them for you.

15       Arguments and statements by lawyers are not evidence.

16  The lawyers are not witnesses.  What they said in their

17  opening statements and closing arguments and at other times is

18  intended to help you interpret the evidence, but it is not

19  evidence.  If the facts as you remember them differ from the

20  way the lawyers have stated them, your memory of them

21  controls.

22       Questions and objections by the lawyers are not

23  evidence.  Attorneys have a duty to their clients to object

24  when they believe a question is improper under the rules of

25  evidence.  You should not be influenced by the objection or by

Jury Instructions

1   the Court's ruling on it.

2           Testimony that has been excluded or stricken or that

3   you've been instructed to disregard is not evidence and must

4   not be considered.  In addition, sometimes testimony or

5   exhibits are received for a limited purpose.  When I have

6   instructed you to consider evidence for only a limited

7   purpose, you must do so and you may not consider that evidence

8   for any other purpose.

9           Anything you have seen or heard when the Court was

10  not in session is not evidence.  You are to decide the case

11  solely on the evidence received at trial.

12          A deposition is the sworn testimony of a witness

13  taken before a trial.  The witness is placed under oath to

14  tell the truth, and the lawyers for each party may ask

15  questions.  The questions and answers are recorded.  When a

16  person is unavailable to testify at trial, that deposition of

17  that person may be used at the trial.  Insofar as possible,

18  you should consider deposition testimony presented to you in

19  court in lieu of live testimony in the same way as if the

20  witness had been present to testify.

21          Certain charts and summaries not admitted into

22  evidence have been shown to you in order to help explain the

23  contents of books, records, documents, or other evidence in

24  the case.  Charts and summaries are only as good as the

25  underlying evidence that supports them.  You should,

Jury Instructions

1  therefore, give them only such weight as you think the

2  underlying evidence deserves.

3          Evidence may be direct or circumstantial.  Direct

4  evidence is direct proof of a fact, such as testimony by a

5  witness about what that witness personally saw or heard or

6  did.  Circumstantial evidence is proof of one or more facts

7  from which you could find another fact.

8          You should consider both kinds of evidence.  The law

9  makes no distinction between the weight to be given either

10 direct or circumstantial evidence.  It's for you to decide how

11 much weight to give any evidence.

12         In deciding the facts in this case, you may have to

13 decide which testimony to believe and which testimony not to

14 believe.  You may believe everything a witness says or part of

15 it or none of it.

16         In considering the testimony of any witness, you may

17 take into account the opportunity and ability of the witness

18 to see or hear or know the things testified to; the witness's

19 memory; the witness's manner while testifying; the witness's

20 interest in the outcome of the case, if any; whether other

21 evidence contradicted the witness's testimony; the

22 reasonableness of the witness's testimony in light of all the

23 evidence; and any other factors that bear on believability.

24         Sometimes a witness may say something that is not

25 consistent with something else he or she said.  Sometimes

Jury Instructions

1    different witnesses will give different versions of what

2    happened.  People often forget things or make mistakes in what

3    they remember.  Also, two people may see the same event, but

4    remember it differently.  You may consider these differences

5    but do not decide the testimony is untrue just because it

6    differs from other testimony.

7            However, if you decide that a witness has

8    deliberately testified untruthfully about something important,

9    you may choose not to believe anything that witness said.

10           On the other hand, if you think the witness testified

11   untruthfully about some things but told the truth about

12   others, you may accept the part you think is true and ignore

13   the rest.

14           The weight of evidence as to a fact does not

15   necessarily depend on the number of witnesses who testify.

16   What's important is how believable the witnesses were and how

17   much weight you think their testimony deserves.

18           Some witnesses, because of education or experience,

19   are permitted to state opinions and the reasons for their

20   opinions.  Opinion testimony should be judged just like any

21   other testimony.  You may accept it or reject it and give it

22   as much weight as you think it deserves, considering the

23   witness's education and experience, the reasons given for the

24   opinions, and all the other evidence in the case.

25           (Interruption.)

Jury Instructions

1        THE COURT:  Siri thinks I'm talking to her.  I had no

2    idea she was listening.  I don't even know how to turn her

3    off.

4        (Pause) My apologies.

5        Hypothetical questions have been asked.  A

6    hypothetical question asks a witness to assume that certain

7    facts are true and then to give an answer based on those

8    assumed facts.  If you find that any of the facts assumed and

9    relied upon by a witness when answering a question were not

10   established by the evidence or were untrue, you must disregard

11   that answer.

12       When a party has the burden of proof on any claim by

13   a preponderance of the evidence, it means you must be

14   persuaded by the evidence that the claim is more probably true

15   than not.  You should base your decision on all the evidence,

16   regardless of which party presented it.

17       All parties are equal before the law, and a bank is

18   entitled to the same fair and conscientious consideration by

19   you as any party.

20       Under the law, a corporation is considered to be a

21   person.  It can only act through its employees, agents,

22   directors, or officers.  Therefore, a corporation is

23   responsible for the acts of its employees, agents, directors,

24   and officers performed within the scope of authority.

25       I'll now summarize the plaintiff's claims and the

1  defendant's defenses.  The plaintiff claims the defendant
2  negligently and willfully violated the Fair Credit Reporting
3  Act and that the plaintiff suffered actual damages as a
4  result.  The plaintiff has the burden of proving these claims
5  by a preponderance of the evidence.

6      The defendant admits that it negligently violated the
7  Fair Credit Reporting Act in some but not all of the ways
8  alleged by the plaintiff.  The defendant denies that it
9  willfully violated the Fair Credit Reporting Act.

10     Plaintiff claims the defendant violated the Fair
11 Credit Reporting Act.  Under the Fair Credit Reporting Act,
12 after receiving notice of a dispute with regard to the
13 completeness or accuracy of any information provided by a
14 person to a consumer reporting agency, the person shall, one,
15 conduct an investigation with respect to the disputed
16 information; two, review all relevant information provided by
17 the consumer reporting agency; and, three, report the results
18 of the investigation to the consumer reporting agency.

19     To satisfy the requirements of the Fair Credit
20 Reporting Act, a furnisher's investigation of the disputed
21 information must be a reasonable investigation.

22     In order to prevail on his claim, the plaintiff must
23 prove by a preponderance of the evidence, one, that the
24 defendant received notice of a dispute regarding the accuracy
25 of information from a credit reporting agency; two, that the

1    defendant violated one or more of the requirements of the Fair

2    Credit Reporting Act listed above; three, that the violation

3    or violations of the Act resulted from the negligence or

4    willfulness of the defendant; and, four, that the plaintiff

5    was harmed by the violation.

6         The plaintiff contends that the defendant negligently

7    and willfully failed to comply with the Fair Credit Reporting

8    Act.  Negligence is failing to do something that a reasonably

9    prudent person would do or doing something that a reasonably

10   prudent person would not do under the circumstances that

11   existed.

12        An act is done willfully if it is done knowing that

13   it will violate the Fair Credit Reporting Act or with a

14   reckless disregard of a statutory duty under the Fair Credit

15   Reporting Act.  Reckless disregard means an action entailing

16   an unjustifiably high risk of harm that is either known or so

17   obvious that it should have been known.

18        The defendant has 30 days within which to conduct and

19   complete the investigation.  The 30-day period began on the

20   date the consumer reporting agency received the dispute from

21   the plaintiff, not the date the plaintiff received -- excuse

22   me, not the date the defendant received the notice from the

23   consumer reporting agency.

24        It is the duty of the Court to instruct you about the

25   measure of damages.  By instructing you on damages, the Court

Jury Instructions

does not mean to suggest for which party your verdict should be rendered.

If you find for the plaintiff on his claim, you must determine the plaintiff's damages.  The plaintiff has the burden of proving damages by a preponderance of the evidence.

Damages mean the amount of money which will reasonably and fairly compensate the plaintiff for any injury you find was caused by the defendant.  You should consider damage to reputation, emotional distress and discomfort, interference with normal and usual activities, inconvenience, not seeking credit, and invasion of privacy.

It is for you to determine what damages, if any, have been proved.  Your award must be based upon evidence and not upon speculation, guesswork, or conjecture.

If you find that plaintiff is entitled to recover damages for his injuries, you may award damages only for injuries he sustained as a result of a violation of the Fair Credit Reporting Act.  Damages are sustained as a result of -- i.e., caused by -- a Fair Credit Reporting Act's violation if the injury would not have occurred without the violation.

If you find that the plaintiff is entitled to recover damages, you may award only damages he sustained after the date on which you determine that the defendant first violated the Fair Credit Reporting Act.

Jury Instructions

1    If you find the defendant willfully violated the Fair
2    Credit Reporting Act, you may but are not required to award
3    punitive damages.  The purpose of punitive damages are to
4    punish a defendant and to deter similar acts in the future.
5    Punitive damages may not be awarded to compensate a plaintiff.
6    The plaintiff has the burden of proving by a
7    preponderance of the evidence that punitive damages should be
8    awarded and, if so, the amount of any such damages.
9    You may award punitive damages only if you find the
10   defendant's conduct that harmed the plaintiff was malicious,
11   oppressive, or in reckless disregard of the plaintiff's
12   rights.
13   Conduct is malicious if it is accompanied by ill will
14   or spite or if it is for the purpose of injuring the
15   plaintiff.
16   Conduct is in reckless disregard of the plaintiff's
17   rights if, under the circumstances, it reflects complete
18   indifference to the plaintiff's safety or rights or if the
19   defendant acts in the face of a perceived risk that its
20   actions will violate the plaintiff's rights under federal law.
21   An act or omission is oppressive if the defendant
22   injures or damages or otherwise violates the right of the
23   plaintiff with unnecessary harshness or severity, such as by
24   the misuse or abuse of authority or power or by taking
25   advantage of some weakness or disability or misfortune of the

1   plaintiff.

2         If you find that punitive damages are appropriate,

3   you must use reason in setting the amount.  Punitive damages,

4   if any, should be in an amount sufficient to fulfill their

5   purposes, but should not reflect bias, prejudice, or sympathy

6   toward any party.

7         In considering the amount of any punitive damages,

8   consider the degree of reprehensibility of the defendant's

9   conduct, including whether the conduct that harmed the

10  plaintiff was particularly reprehensible because it also

11  caused actual harm or posed a substantial risk of harm to

12  people who are not parties to this case.

13        You may not, however, set the amount of any punitive

14  damages in order to punish the defendant for harm to anyone

15  other than the plaintiff in this case.  In addition, you may

16  consider the relationship of any award of punitive damages to

17  any actual harm inflicted on the plaintiff.

18        Before you begin your deliberations, elect one of

19  your member to act as presiding juror.  The presiding juror

20  will preside over the deliberations and serve as the

21  spokesperson for the jury in court.

22        You shall diligently strive to reach agreement with

23  all the other jurors, if you can do so.  Your verdict must be

24  unanimous.  Each of you must decide the case for yourself, but

25  you should do so only after you have considered all the

1   evidence, discussed it fully with the other jurors, listened
2   to the views of your fellow jurors.

3        Do not be afraid to change your opinion if the
4   discussion persuades you that you should, but do not come to a
5   decision simply because other jurors think it is right.  It is
6   important that you attempt to reach a unanimous verdict, but,
7   of course, only if each of you can do so after having made
8   your own conscientious decision.

9        Do not be unwilling to change your opinion if the
10  discussion persuades you that you should.  But do not come to
11  a decision simply because other jurors think it is right or
12  change an honest belief about the weight and effect of the
13  evidence simply to reach a verdict.

14        A special verdict form has been prepared for your
15  convenience.  You will have that form with you in the jury
16  room.

17        This is it.  It has the caption and title of the case
18  at top.  It reads as follows:  "We, the jury, being duly
19  impaneled and sworn to try the above-entitled case, do
20  unanimously find as follows."  And then there are some numbers
21  and questions.  The first one:  "Did defendant negligently
22  violate the Fair Credit Reporting Act?"  There's a place for
23  the answer.  It is yes or no.

24        "Question 2:  Did defendant willfully violate the
25  Fair Credit Reporting Act?"  Same thing, a place for the

Jury Instructions

 1  answer, yes or no.

 2          If your answers to both Question 1 and Question 2 are

 3  no, your verdict is for Wells Fargo, and the presiding juror

 4  should sign and date the form.

 5          "Question 3: What are plaintiff's actual damages, if

 6  any?"

 7          And "Question 4:  What amount of punitive damages, if

 8  any, do you impose on defendant for its willful violations of

 9  the Fair Credit Reporting Act?"  There's a place for the

10  answer.

11          It says, "Do not answer 4 unless you answered

12  Question" -- excuse me -- "unless you answered yes to

13  Question 2."  That's the willfulness question.

14          And then it goes on to say the presiding juror should

15  then sign and date the verdict form and then tell Jennifer

16  that you're ready to come out.

17          The instructions continue:  You will note that there

18  are questions.  The answer to each question must be the

19  unanimous answer of the jury.  Your presiding juror will write

20  the unanimous answer of the jury in the spaces provided.

21          All jurors should participate in all deliberations

22  and vote on each question.  The presiding juror will then date

23  and sign the form as completed.  And you'll, again, let

24  Jennifer know you're ready to return to the courtroom.  We

25  will then be reconvened, and then we will take your verdict.

Jury Instructions

1    Your verdict must be based solely on the evidence and

2  on the law as I have given it to you in these instructions.

3  Nothing I have said or done is intended to suggest what your

4  verdict should be.  That is entirely for you to decide.

5    Because you must base your verdict only on the

6  evidence received in the case and these instructions, I remind

7  you that you must not be exposed to any other information

8  about the case or the issues it involves.  Except for

9  discussing the case with your fellow jurors during your

10  deliberations, do not communicate with anyone in any way, do

11  not let anyone else communicate with you in any way about the

12  merits of the case or anything to do with it.

13    This includes discussing the case in person, in

14  writing, by phone or electronic means, via e-mail, text

15  messaging, Internet chat room, blog, website or application,

16  including but not limited to Facebook, YouTube, Twitter,

17  Instagram, LinkedIn, Snapchat, or any other form of social

18  media.  This applies to communicating with your family

19  members, your employer, the media, or the people involved in

20  the trial.

21    If you are asked or approached in any way about your

22  jury service or anything about this case, you must respond

23  that you've been ordered not to discuss the matter and report

24  such contact to the Court.

25    Once again, do not read, watch, listen to any news or

1   media or accounts or commentary about the case or anything to

2   do with it.  Do not do any research, such as consulting

3   dictionaries, searching the Internet, using other reference

4   materials.  And do not make any investigation in any other

5   way -- excuse me -- or in any other way try to learn about the

6   case on your own.

7            Do not visit or view any place discussed in the case.

8   Do not use Internet programs or other devices to search for or

9   view any place discussed in the trial.  Also, do not do any

10  research about the case, the law, the people involved, the

11  parties, the witnesses, or the lawyers until you've been

12  excused as a juror.

13           If you happen to read or hear anything touching on

14  this case, turn away, report the contact to the Court.

15           These rules protect each party's right to have the

16  case decided only on the evidence that's been presented here

17  in court.  If you do any research or investigation outside the

18  courtroom or gain any information through improper

19  communication, then your verdict may be influenced by

20  inaccurate, incomplete, or misleading information that has not

21  been tested by the trial process.

22           Each of the parties is entitled to a fair and

23  impartial jury; and if you decide the case based on

24  information not presented in court, you will have denied the

25  parties a fair trial.

1    Remember, you've taken an oath to follow the rules,

2    and it's important that you do so.  The law requires these

3    restrictions to ensure the parties have a fair trial based on

4    the same evidence that each party has had an opportunity to

5    address.  A juror who violates these restrictions jeopardizes

6    the fairness of the proceedings.  Again, if any juror is

7    exposed to outside information, please notify the Court

8    immediately.

9    If it becomes necessary during your deliberations for

10   you to communicate with me, you may send a note through

11   Jennifer, signed by your presiding juror or by one or more

12   members of the jury.  No member of the jury should ever

13   attempt to communicate with me except by a signed writing.

14   Until you've reached your verdict, I will only communicate

15   with jury members on anything concerning the case in writing

16   or orally here in open court.

17   If you send out a question, I will consult the

18   parties before answering it, which may take some time.  You

19   may continue your deliberations while waiting for the answer

20   to any question.

21   Remember, you're not to tell anyone, including me,

22   how you stand numerically or otherwise until after you have

23   reached your unanimous verdict or have been discharged.

24   Ms. Paget, do you have an oath?

25   THE CLERK:  (Handing).

1           THE COURT:  This is a witness oath, and you are not a

2  witness.

3           THE CLERK:  (Handing).

4           (The bailiff is then sworn.)

5           THE COURT:  Jennifer will escort you into the jury

6  room.  You will have with you a method of looking at all the

7  of the exhibits, the instructions -- I think we have a copy

8  for each of you -- and the verdict form.

9           As you get settled into the jury room, she's then

10 going to leave.  Don't begin deliberating until she comes back

11 and says the following three words:  "You may begin."  Wait

12 for those three words before you start your deliberations.

13          Also, it's 3:00.  You get to drive the bus.  So at

14 some point you may want to discuss how you want to conduct

15 yourselves, how late you want to work.  You get to do whatever

16 you want.

17          If you decide that you want to work into the evening,

18 we will provide food for you, if that's what you decide to do.

19 But talk amongst yourselves.  Let Jennifer know what it is you

20 want to do, and then we will report to the parties how you

21 want to conduct yourselves as regards your deliberations.

22          With that, thank you.  Go ahead.

23          (The jury leaves the courtroom.)

24          THE COURT:  Please be seated.

25          Other than the objections, are there any exceptions

1    on the part of the plaintiff?

2             MR. SOLA:  No, Your Honor.

3             THE COURT:  No additional exceptions.  Thank you.

4             And I will say, rather going through and trying to

5    remind you of each objection you made and you want to take it

6    as an exception, we'll just agree amongst everybody that you

7    don't have to do that and that all your objections have now

8    become exceptions.

9             MR. SOLA:  Thank you.  We agree with that.

10            THE COURT:  Okay.  Do you have any additional

11   exceptions?

12            MS. SMITH:  One that's slightly different.  On the

13   punitive damages instruction, on the harm to others part of

14   it -- I know I've raised this before, but we ask the Court to

15   remove from the written instruction the harm to others part of

16   it, starting with the word "because" that's at the bottom of

17   the page.

18            THE COURT:  You already made that objection.

19            MS. SMITH:  I did, but I just want to say one small

20   thing about it -- this is just something slightly new -- is I

21   want that removed based on plaintiff's comments during

22   closing, which were improper for reasons we've already stated

23   on the record and fall outside the scope of what's permissible

24   under *State Farm v. Campbell.*

25            And the other thing I want to say about that is I

want to point out that during rebuttal, plaintiff's counsel did focus heavily on the different language that appears in the punitive damages instruction with respect to reckless disregard.

In addition to that, I'd just re-raise again the issue that we raised in motions in limine briefly.  We had asked that the Court instruct counsel not to talk about the timing of any admissions that Wells Fargo might make, and I was under the impression that counsel had agreed not to talk about that timing, but it's unclear to me.

But his focus during his rebuttal was definitely on the timing of the admission of liability and said, "As recently as last week, Wells Fargo had denied liability."

THE COURT:  Can you hang on a second?

MS. SMITH:  I'm sorry.

THE COURT:  We're talking about exceptions to the jury instructions.

MS. SMITH:  Oh, I'm sorry.  I was jumping ahead.

THE COURT:  They can't start deliberating until I tell them that they can start deliberating, and I won't do that until after I've ruled on the exceptions.

MS. SMITH:  I apologize.

THE COURT:  The exceptions you've made this afternoon, they are overruled.  Do you have any other exceptions for me to rule on?

Motion for Mistrial

1              MS. SMITH:  Nothing new, Your Honor.

2              THE COURT:  Jennifer, go ahead and let the jury start

3     their deliberations.

4              Okay.

5              MS. SMITH:  During rebuttal counsel said, "As

6     recently as last week, Wells Fargo denied liability.  And on

7     the last day of trial, they admit liability for the very first

8     time," and referred to that as a "courtroom conversion."

9              So I'm just reiterating that -- that that's why we

10    had moved in limine to preclude that.

11             THE COURT:  Okay.  Is there anything you want me to

12    do?

13             I mean, it's interesting information, but unless you

14    ask me to do something, I sit and shrug my shoulders and say,

15    "Very interesting."

16             MS. SMITH:  Well, I think it supports the motion for

17    mistrial that we made earlier in the case, which you've

18    already denied.

19             THE COURT:  Oh, okay.  Maybe you're making another

20    motion for mistrial, based on everything you already said and,

21    in addition, that new information that came out during

22    rebuttal.

23             MS. SMITH:  Yes, Your Honor.

24             THE COURT:  Denied.

25             MS. SMITH:  Thank you.

1                    THE COURT:  All right.  Thank you.

2                    Anything else?  You all gave me a workout.

3                    Thank you very much.  We're in recess.

4                    We'll keep you posted.  They'll let us know what it

5          is their plans are, and we'll let you know as soon as we know.

6          Leave a number, if you're going to leave the area, for

7          Jennifer to get ahold of you.

8                    I would kind of hang out closely for just a few

9          minutes so that we can kind of let you know what their plans

10         are.

11                   MR. PETERSON:  Thank you, Your Honor.

12                   THE COURT:  You're welcome.

13                   (A recess is then taken.)

14                   (The Court, counsel, and defendant's representative

15         reconvene.)

16                   THE COURT:  Be seated.

17                   So almost immediately they came back with a question.

18         It reads as follows:  "Your Honor, it is true that

19         under" -- excuse me.  "Is it true that under the FCRA, a

20         creditor can temporarily remove a debt from the creditor's

21         report while they investigate the fraud," question mark.

22                   "Sincerely, Angela Huss."

23                   My proposed response:  "I cannot answer this

24         question.  Decide the case only on the evidence received and

25         the instructions I have given."

1            Any objection from plaintiff to my response?

2            MR. SOLA:  Yes.

3            THE COURT:  What would you propose that I do?

4            MR. SOLA:  You're saying that this would require

5    information that wasn't part of the trial?

6            THE COURT:  Exactly.

7            MR. SOLA:  Okay.  Then no objection, Your Honor.

8            MR. PETERSON:  No objection, Judge.

9            THE COURT:  Okay.  That's what I will do and sign it

10   and send them on their way.

11           That's all for now.  They haven't told us what their

12   plans are yet.

13           MR. PETERSON:  We'll stick around for a while.

14           (A recess is then taken.)

15           (The proceedings are adjourned on August 30, 2019 and

16   reconvened on September 3, 2019.)

17

18

19

20

21

22

23

24

25

1                           --oOo--

2

3          I certify, by signing below, that the

4       foregoing is a correct transcript of the record

5       of proceedings in the above-titled cause.  A

6       transcript without an original signature,

7       conformed signature or digitally signed signature

8       is not certified.

9

10

11

        /s/ Nancy M. Walker                10-16-19
12      _____      _____
        NANCY M. WALKER, CSR, RMR, CRR         DATE
13      Official Court Reporter
        Oregon CSR No. 90-0091
14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1,000** [2] - 814:20, 814:22
**$1.65** [3] - 814:11, 814:12
**$10,000** [1] - 804:15
**$100,000** [2] - 799:25, 802:22
**$15,000** [1] - 805:9
**$165** [16] - 764:24, 810:20, 812:18, 812:23, 814:15, 814:23, 815:2, 817:18, 821:7, 821:18, 822:1, 822:5, 822:13, 824:23, 826:2
**$20,000** [1] - 804:16
**$200,000** [2] - 799:25, 802:23
**$25,000** [1] - 803:24
**$29,000** [7] - 773:13, 780:24, 780:25, 784:20, 803:11, 804:12, 805:24
**$3,000** [1] - 805:25
**$30,000** [1] - 805:9
**$50,000** [1] - 803:24
**$500,000** [3] - 817:17, 821:6, 822:12
**$600,000** [1] - 825:5
**$93** [1] - 806:2

## '

**'16** [1] - 834:19
**'17** [1] - 834:20
**'Validate** [1] - 784:14

## /

**/s** [1] - 894:11

## 1

**1** [18] - 814:9, 814:10, 814:14, 814:20, 814:24, 815:1, 818:12, 818:16, 823:1, 823:3, 823:8, 825:6, 884:2
**10** [14] - 764:19, 773:1, 773:7, 783:20, 786:10, 788:12, 789:18, 795:3, 803:8, 807:14, 810:9, 871:4, 871:7
**10-16-19** [1] - 894:11
**100** [4] - 748:3, 864:21, 865:3, 865:5
**1000** [1] - 748:20
**11** [1] - 855:25
**111** [1] - 748:9
**12** [1] - 859:13
**12:25** [1] - 817:10
**13** [2] - 856:21, 857:15
**13th** [1] - 773:17
**14** [1] - 757:16, 765:9, 769:9, 783:4
**14th** [1] - 783:8
**15** [7] - 776:13, 784:19, 798:6, 817:4, 857:16, 859:13, 862:1
**15-day** [2] - 836:25, 837:4
**15-minute** [1] - 816:20
**1500** [1] - 748:12
**15th** [3] - 846:10, 846:17, 846:23
**16** [1] - 758:5
**1600** [1] - 790:22

**17** [3] - 756:13, 758:10, 761:13
**17th** [2] - 839:1, 847:25
**18** [3] - 758:11, 848:12, 859:14
**18th** [1] - 847:6
**19** [2] - 767:11, 869:3
**1996** [1] - 793:22
**19th** [3] - 831:19, 849:16, 863:4
**1st** [4] - 781:6, 867:4, 868:2, 868:7

## 2

**2** [5] - 816:4, 825:5, 883:24, 884:2, 884:13
**20** [3] - 758:19, 778:24, 780:19
**2003** [1] - 793:22
**2016** [28] - 767:11, 773:9, 774:5, 775:6, 776:4, 779:19, 792:9, 831:2, 831:4, 831:17, 831:19, 832:19, 832:22, 832:23, 834:20, 839:1, 839:2, 839:9, 841:10, 842:11, 842:17, 850:16, 857:14, 863:5, 863:7, 868:20, 869:2
**2017** [45] - 774:9, 775:6, 776:13, 777:8, 777:10, 778:2, 781:16, 783:4, 783:8, 783:25, 789:6, 793:12, 799:1, 802:4, 806:2, 806:21, 834:20, 842:18, 845:8, 846:6, 846:19, 846:20, 847:6, 847:19, 848:8, 850:5, 850:17, 850:21, 855:24, 856:20, 857:14, 857:23, 859:13, 859:19, 861:11, 861:12, 861:16, 863:13, 866:10, 866:20, 867:4, 869:4, 869:18, 871:15
**2018** [1] - 851:1
**2019** [3] - 747:5, 893:15, 893:16
**21** [6] - 759:2, 759:9, 778:9, 859:16, 863:13, 863:16
**21st** [2] - 848:11, 849:1
**23** [1] - 756:19
**24th** [5] - 748:18, 845:5, 850:15, 850:17, 850:20
**25** [1] - 819:10
**255** [1] - 748:6
**26** [4] - 779:19, 792:9, 863:6, 863:9
**26th** [3] - 831:22, 832:7, 832:19
**29th** [1] - 838:25
**2nd** [6] - 839:2, 839:4, 841:10, 842:11, 842:17, 850:16

## 3

**3** [5] - 777:10, 825:5, 868:20, 884:5, 893:16
**30** [12] - 747:5, 790:7, 790:9, 790:10, 790:12, 790:13, 790:14, 830:15, 857:14, 879:18, 893:15
**30-day** [2] - 833:6, 879:19
**300** [1] - 817:19
**301** [1] - 748:20
**30339** [1] - 748:4
**30th** [2] - 768:19, 867:12
**31,000** [1] - 809:9

**3150** [1] - 748:9
**32** [2] - 832:1, 839:20
**326-8186** [1] - 748:21
**330** [3] - 823:1, 823:3, 823:8
**35** [2] - 836:19, 840:19
**370,000** [1] - 809:10
**3:00** [1] - 888:13
**3:17-cv-02035-HZ** [1] - 747:4
**3rd** [6] - 768:16, 839:2, 839:4, 847:20, 848:15, 869:2

## 4

**4** [6] - 747:14, 818:12, 818:16, 825:4, 884:7, 884:11
**401** [1] - 757:13
**403** [1] - 757:13

## 5

**5** [2] - 757:5, 825:5
**50** [1] - 789:11
**50.1** [1] - 795:24
**501** [1] - 859:12
**503** [1] - 748:21
**509** [2] - 834:18, 834:20
**51** [1] - 795:24
**510** [2] - 834:18, 834:20
**527** [1] - 856:12
**528** [1] - 856:12
**529** [1] - 856:13
**530** [1] - 856:14
**531** [1] - 856:14
**532** [1] - 856:14
**533** [1] - 856:23
**534** [1] - 856:25
**535** [1] - 857:1
**536** [1] - 857:4
**544** [1] - 857:24
**546** [1] - 857:25
**560** [3] - 834:17, 834:20, 835:5
**5th** [1] - 781:16

## 6

**60** [1] - 773:14
**6th** [1] - 871:15

## 8

**800** [2] - 748:3, 748:12
**819** [1] - 748:6

## 9

**9** [2] - 773:9, 825:6
**9-to-1** [1] - 818:15
**90-0091** [1] - 894:13
**900** [1] - 748:17
**97201** [1] - 748:13

**97204** [3] - 748:10, 748:18, 748:21
**97214** [1] - 748:7
**9th** [1] - 773:18

# A

**ability** [2] - 802:19, 875:17
**able** [7] - 749:24, 788:24, 809:15, 809:16, 827:8, 838:22, 854:22
**above-entitled** [2] - 763:17, 883:19
**above-titled** [1] - 894:5
**absence** [1] - 821:5
**absolutely** [2] - 824:19, 836:10
**abstract** [1] - 793:6
**abundant** [1] - 870:16
**abuse** [1] - 881:24
**abused** [1] - 813:10
**accept** [4] - 821:15, 873:9, 876:12, 876:21
**accepted** [1] - 816:14
**accepts** [1] - 795:8
**access** [6] - 806:7, 840:13, 840:14, 840:15, 840:17, 841:5
**accompanied** [2] - 860:19, 881:13
**accordance** [1] - 767:3
**according** [2] - 771:21, 872:24
**accordingly** [1] - 842:13
**account** [72] - 764:15, 764:20, 765:5, 765:7, 767:24, 768:3, 768:6, 768:18, 769:14, 769:23, 770:8, 770:14, 770:25, 771:2, 771:3, 772:15, 773:10, 773:17, 773:19, 773:21, 773:25, 774:6, 774:12, 774:17, 775:15, 775:24, 776:3, 776:16, 777:11, 778:17, 779:5, 780:16, 780:20, 780:22, 781:3, 781:9, 782:2, 782:18, 783:18, 783:21, 789:4, 789:6, 798:11, 798:19, 800:15, 800:21, 803:8, 803:11, 806:2, 806:8, 813:13, 831:20, 833:14, 835:18, 835:20, 840:15, 842:15, 843:3, 848:17, 849:23, 850:4, 850:8, 850:12, 851:1, 851:22, 855:10, 857:9, 861:13, 862:18, 871:4, 871:18, 875:17
**accountable** [2] - 862:23, 872:9
**accountholder** [1] - 771:1
**accounts** [13] - 769:14, 775:16, 775:22, 785:1, 803:6, 805:12, 840:16, 840:24, 841:1, 847:3, 855:22, 857:10, 886:1
**accumulated** [1] - 810:22
**accuracy** [17] - 766:6, 766:9, 772:10, 774:2, 785:21, 786:8, 789:15, 789:17, 791:18, 791:21, 793:24, 793:25, 794:5, 807:8, 871:25, 878:13, 878:24
**accurate** [19] - 766:1, 766:5, 770:14, 774:7, 776:16, 776:17, 782:18, 782:25, 785:12, 785:19, 789:16, 865:1, 865:9, 865:10, 865:12, 865:13, 868:25, 869:1
**ACDV** [51] - 764:19, 770:6, 770:10,

772:9, 772:19, 774:5, 774:22, 782:12, 785:8, 788:15, 788:23, 789:1, 790:15, 790:20, 792:3, 793:11, 793:13, 794:1, 794:12, 794:16, 820:11, 820:13, 830:10, 830:20, 835:3, 835:6, 835:11, 835:12, 837:24, 837:25, 838:4, 838:7, 838:13, 838:17, 841:10, 841:16, 842:14, 848:1, 849:17, 849:18, 849:19, 850:2, 850:7, 850:10, 850:14, 850:22, 851:24, 852:19, 865:8, 868:20, 870:20
**ACDVs** [38] - 769:21, 771:24, 772:7, 773:6, 774:18, 782:5, 783:20, 786:10, 791:18, 791:19, 794:6, 794:18, 829:25, 830:2, 832:21, 832:23, 832:25, 833:11, 833:12, 833:17, 833:21, 833:23, 834:2, 834:9, 835:6, 835:7, 836:12, 836:17, 838:25, 846:7, 846:9, 850:7, 850:17, 850:18, 861:17, 863:19, 868:11, 868:13
**acknowledged** [5] - 845:2, 845:11, 851:9, 853:21, 859:1
**acknowledges** [4] - 845:11, 845:21, 850:13, 861:10
**acquittal** [2] - 749:5, 749:7
**acronyms** [1] - 833:1
**act** [5] - 787:15, 877:21, 879:12, 881:21, 882:19
**Act** [43] - 752:14, 752:15, 765:14, 769:22, 780:15, 785:4, 785:6, 785:9, 785:21, 785:23, 786:14, 786:23, 787:13, 791:14, 793:21, 795:5, 811:20, 811:21, 815:11, 815:16, 815:24, 829:24, 852:5, 855:4, 855:18, 862:15, 878:3, 878:7, 878:9, 878:11, 878:20, 879:2, 879:3, 879:8, 879:13, 879:15, 880:18, 880:25, 881:2, 882:22, 883:25, 884:9
**Act's** [1] - 880:19
**acted** [2] - 870:9, 870:17
**action** [9] - 765:14, 787:19, 846:24, 852:6, 853:1, 856:17, 860:1, 870:6, 879:15
**actions** [7] - 830:5, 830:6, 855:2, 860:18, 861:20, 870:10, 881:20
**activities** [5] - 797:7, 800:6, 802:15, 854:15, 880:10
**acts** [7] - 808:12, 810:24, 811:24, 870:5, 877:23, 881:4, 881:19
**actual** [21] - 757:19, 757:22, 760:7, 761:11, 770:4, 796:17, 796:20, 808:3, 809:5, 816:6, 817:17, 817:20, 821:21, 822:25, 824:8, 824:12, 844:2, 878:3, 882:11, 882:17, 884:5
**Ad** [1] - 856:23
**ADA** [1] - 750:2
**add** [1] - 829:16
**adding** [1] - 759:24
**addition** [7] - 778:21, 786:2, 820:3, 874:4, 882:15, 890:5, 891:21

**additional** [4] - 758:7, 850:6, 889:3, 889:10
**address** [7] - 754:19, 771:6, 788:7, 815:7, 832:9, 848:21, 887:5
**addresses** [2] - 755:17, 760:10
**addressing** [1] - 759:3
**adjourned** [1] - 893:15
**adjudicate** [1] - 760:14
**admissibility** [1] - 757:7
**admissible** [1] - 757:12
**admission** [1] - 890:12
**admissions** [1] - 890:8
**admit** [4] - 758:2, 862:11, 862:19, 891:7
**admits** [3] - 755:4, 861:16, 878:6
**admitted** [4] - 791:10, 862:13, 873:7, 874:21
**admittedly** [2] - 846:11, 854:1
**admitting** [2] - 757:24, 758:1
**ADU** [4] - 804:8, 804:10, 855:8, 855:13
**advantage** [2] - 814:3, 881:25
**adverse** [1] - 856:18
**advise** [1] - 815:13
**affect** [3] - 766:14, 807:21, 811:11
**affected** [1] - 765:8
**affidavit** [15] - 774:20, 775:1, 776:23, 779:21, 780:3, 789:7, 805:24, 835:9, 842:22, 843:3, 843:4, 864:12, 864:14, 866:25
**afraid** [1] - 883:3
**afternoon** [6] - 819:14, 819:16, 829:10, 829:16, 862:1, 890:24
**agencies** [4] - 765:8, 769:17, 769:19, 776:16
**agency** [16] - 774:1, 782:10, 830:11, 830:15, 833:3, 833:4, 856:10, 856:22, 856:24, 857:5, 878:14, 878:17, 878:18, 878:25, 879:20, 879:23
**agent** [1] - 854:9
**agents** [3] - 790:15, 877:21, 877:23
**ago** [4] - 833:15, 837:17, 841:16, 846:1
**agree** [13] - 769:5, 823:15, 830:19, 831:12, 840:2, 841:24, 841:25, 865:6, 871:1, 871:13, 872:20, 889:6, 889:9
**agreed** [12] - 769:7, 771:10, 774:15, 788:21, 816:14, 826:8, 826:22, 837:21, 864:3, 870:23, 873:8, 890:9
**agreed-to** [2] - 826:8, 826:22
**agreeing** [1] - 762:5
**agreement** [1] - 882:22
**agrees** [3] - 852:22, 864:5, 866:17
**ahead** [9] - 756:9, 757:15, 758:10, 816:20, 816:22, 825:3, 888:22, 890:18, 891:2
**ahold** [1] - 892:7
**Alaska** [1] - 776:6
**alert** [1] - 751:3
**allegation** [2] - 780:3, 780:4
**alleged** [3] - 755:5, 854:1, 878:8
**alleges** [1] - 855:1

**alleging** [1] - 858:6
**allow** [2] - 749:5, 773:2
**allowed** [6] - 765:4, 796:24, 807:6, 807:7, 837:12
**allowing** [2] - 757:13, 820:7
**allows** [3] - 765:14, 807:5, 807:25
**almost** [6] - 765:1, 822:15, 822:17, 863:8, 868:5, 892:17
**alternative** [4] - 762:15, 818:6, 820:20, 824:18
**ambitions** [1] - 799:5
**amend** [1] - 793:21
**American** [1] - 807:16
**amount** [23] - 795:24, 799:23, 800:2, 809:1, 811:14, 812:12, 812:17, 812:20, 814:8, 814:16, 817:19, 818:3, 820:4, 824:8, 826:2, 880:6, 881:8, 882:3, 882:4, 882:7, 882:13, 884:7
**Ana** [7] - 775:24, 777:4, 784:22, 799:4, 800:14, 802:6, 803:21
**analysis** [3] - 750:14, 760:16, 822:10
**analyzing** [1] - 750:2
**Angela** [1] - 892:22
**angry** [1] - 807:1
**Annette** [1] - 748:16
**answer** [19] - 754:21, 754:22, 754:25, 815:11, 816:4, 817:24, 830:3, 877:7, 877:11, 883:23, 884:1, 884:10, 884:11, 884:18, 884:19, 884:20, 887:19, 892:23
**answered** [4] - 779:6, 815:16, 884:11, 884:12
**answering** [4] - 822:4, 822:7, 877:9, 887:18
**answers** [2] - 874:15, 884:2
**anyway** [1] - 869:1
**apologies** [1] - 877:4
**apologize** [1] - 890:22
**Appeals** [2] - 822:20, 822:21
**appear** [1] - 845:7
**APPEARANCES** [1] - 748:1
**appeared** [1] - 784:9
**application** [3] - 792:24, 843:14, 885:15
**applied** [2] - 796:9, 809:11, 855:13
**applies** [1] - 885:18
**apply** [5] - 795:18, 844:7, 855:8, 864:23, 872:18
**appreciate** [3] - 764:9, 826:17, 829:18
**approach** [1] - 780:11
**approached** [1] - 885:21
**appropriate** [3] - 815:5, 828:4, 882:2
**appropriately** [1] - 852:12
**area** [2] - 804:15, 892:6
**areas** [1] - 855:6
**argue** [1] - 824:13
**argues** [1] - 871:12
**argument** [17] - 761:25, 764:6, 817:1, 817:11, 818:9, 819:19, 821:1, 821:13, 823:11, 823:14, 824:17, 825:24,

826:20, 827:18, 829:14, 837:21, 864:6
**arguments** [8] - 752:4, 757:20, 819:20, 826:14, 826:16, 872:13, 873:15, 873:17
**army** [1] - 753:12
**arose** [2] - 777:11, 797:13
**arrested** [1] - 865:18
**Ashley** [3] - 770:5, 771:20, 863:21
**aside** [1] - 756:4
**aspect** [1] - 805:7
**assertion** [2] - 864:14, 864:19
**asserts** [2] - 841:14, 852:1
**assessing** [1] - 762:3
**assigned** [1] - 858:13
**assist** [1] - 873:2
**assume** [3] - 753:19, 759:5, 877:6
**assumed** [1] - 877:8
**assure** [1] - 871:25
**assured** [1] - 865:12
**Astra** [1] - 856:23
**AT&T** [2] - 857:6
**Atlanta** [1] - 748:4
**attached** [1] - 847:14
**attachments** [4] - 835:7, 835:8, 835:12, 837:25
**attempt** [2] - 883:6, 887:13
**attention** [6] - 764:9, 784:3, 811:15, 829:19, 832:6, 861:24
**attorney** [3] - 767:10, 800:24, 831:17
**Attorney** [1] - 748:5
**attorneys** [2] - 872:13, 873:23
**attributable** [1] - 869:11
**attribute** [1] - 858:4
**August** [13] - 747:5, 777:8, 777:16, 777:20, 846:20, 846:6, 847:13, 847:21, 847:25, 848:2, 856:20, 869:18, 893:15
**authorities** [1] - 795:3
**authority** [3] - 753:13, 877:24, 881:24
**auto** [3] - 833:21, 839:17, 843:14
**Auto** [3] - 839:18, 840:12, 841:7
**automatically** [1] - 756:2
**automobile** [1] - 767:17
**available** [1] - 848:24
**Avenue** [5] - 748:3, 748:9, 748:12, 748:17, 748:20
**average** [4] - 773:2, 813:11, 813:17, 814:1
**avoid** [1] - 862:25
**award** [38] - 797:13, 800:1, 811:1, 811:14, 811:15, 812:1, 814:11, 814:12, 815:18, 817:17, 817:18, 820:18, 821:6, 821:20, 821:25, 822:16, 823:7, 824:12, 826:1, 828:16, 830:4, 846:15, 853:4, 860:7, 860:13, 860:16, 860:21, 860:24, 861:2, 861:3, 861:8, 868:17, 880:13, 880:16, 880:23, 881:2, 881:9, 882:16
**awarded** [4] - 796:17, 821:18, 881:5,

881:8
**awarding** [5] - 753:24, 811:10, 811:25, 820:22, 820:25
**awards** [2] - 821:2, 822:5
**aware** [3] - 781:24, 821:16, 851:4
**awful** [1] - 836:4

### B

**background** [1] - 838:3
**bad** [1] - 799:15
**badly** [1] - 806:9
**bailiff** [1] - 888:4
**balance** [2] - 773:13, 833:14
**BANK** [2] - 747:6, 748:15
**bank** [13] - 768:23, 781:4, 784:17, 785:2, 806:5, 807:21, 807:22, 836:12, 840:14, 840:18, 840:22, 841:1, 877:17
**Bank** [2] - 840:25, 841:1
**banking** [7] - 789:11, 789:12, 790:18, 790:23, 810:2, 836:20, 840:20
**banks** [2] - 764:22, 811:25
**base** [2] - 877:15, 885:5
**based** [21] - 758:8, 760:25, 766:6, 782:24, 819:18, 819:19, 820:8, 831:11, 836:19, 840:19, 851:15, 851:16, 853:12, 863:9, 877:7, 880:13, 885:1, 886:23, 887:3, 889:21, 891:20
**bases** [1] - 828:2
**basic** [1] - 829:22
**basis** [4] - 750:3, 824:21, 834:2, 868:25
**Battery** [1] - 748:3
**bear** [2] - 749:20, 875:23
**became** [1] - 765:11
**become** [1] - 889:8
**becomes** [1] - 887:9
**bed** [1] - 801:5
**bedrock** [1] - 816:15
**BEFORE** [1] - 747:16
**began** [3] - 832:20, 858:1, 879:19
**begin** [4] - 868:16, 882:18, 888:10, 888:11
**beginning** [5] - 764:17, 777:23, 845:13, 856:5, 872:5
**begrudgingly** [1] - 845:1
**behalf** [2] - 774:1, 856:22
**behavior** [1] - 755:18
**behind** [1] - 813:21
**beings** [1] - 861:6
**belief** [1] - 883:12
**believability** [1] - 875:23
**believable** [1] - 876:16
**believes** [1] - 851:14
**bell** [1] - 824:16
**belonged** [1] - 764:20
**belonging** [1] - 774:17
**belongs** [4] - 769:1, 780:16, 780:20, 782:2
**below** [1] - 894:3

**bench** [2] - 751:2, 751:25
**benefit** [3] - 765:21, 766:7, 815:21
**benefits** [1] - 766:7
**Berg** [1] - 862:14
**Best** [2] - 844:7, 856:12
**best** [3] - 817:22, 842:5, 855:22
**better** [7] - 758:2, 768:24, 780:5, 812:2, 859:2, 865:15, 865:19
**between** [7] - 770:13, 800:11, 834:19, 839:2, 846:19, 850:16, 875:9
**beyond** [1] - 795:17
**bias** [1] - 882:5
**big** [19] - 749:22, 750:17, 752:22, 765:17, 781:1, 785:2, 788:14, 792:7, 797:20, 807:21, 811:6, 812:25, 813:17, 814:6, 814:13, 823:7, 823:25, 832:14, 841:1
**biggest** [3] - 764:22, 775:18, 806:3
**billing** [1] - 777:1
**billion** [9] - 764:24, 810:20, 812:18, 812:21, 812:23, 814:11, 814:12, 814:15
**billions** [1] - 811:13
**bills** [1] - 803:1
**binder** [4] - 852:13, 868:8, 868:10, 868:13
**Binder** [1] - 844:22
**birth** [3] - 770:13, 778:25, 788:8
**bit** [15] - 752:11, 759:23, 786:18, 786:22, 790:8, 790:10, 807:10, 816:2, 818:10, 823:20, 829:20, 831:24, 833:24, 837:2, 854:2
**blatantly** [1] - 807:14
**block** [1] - 789:9
**blocked** [1] - 773:19
**blocking** [1] - 773:17
**blog** [1] - 885:15
**blowing** [1] - 778:14
**board** [1] - 811:15
**boat** [1] - 775:8
**books** [1] - 874:23
**bottom** [1] - 889:16
**bought** [6] - 767:16, 775:9, 792:23, 800:8, 803:13, 803:17
**box** [3] - 794:16, 794:21, 794:24
**boxes** [1] - 794:20
**Brady** [30] - 779:2, 784:6, 792:11, 792:18, 831:23, 831:25, 832:2, 832:10, 832:17, 839:11, 842:8, 843:12, 844:24, 845:6, 848:12, 848:16, 848:18, 849:2, 849:10, 849:20, 849:21, 851:4, 851:15, 851:20, 859:12, 863:6, 867:3, 867:5, 867:10
**Brady's** [5] - 846:5, 848:14, 848:16, 859:15, 867:8
**brave** [1] - 765:16
**Braxton** [11] - 774:14, 775:2, 788:16, 788:21, 791:16, 808:22, 809:9, 833:18, 836:24, 846:13, 862:14

**breaches** [1] - 788:19
**break** [2] - 807:17, 816:21
**breaking** [10] - 765:18, 786:22, 808:23, 810:1, 810:22, 811:2, 812:9, 814:22, 816:10, 816:17
**breaks** [3] - 796:9, 804:2, 807:15
**Brian** [5] - 771:10, 773:5, 836:15, 844:23, 863:25
**brief** [2] - 817:12, 825:17
**briefly** [6] - 757:12, 758:6, 758:12, 842:25, 871:11, 890:6
**bright** [2] - 822:8, 822:9
**bring** [1] - 818:2
**broad** [1] - 804:18
**broke** [9] - 764:18, 764:19, 796:2, 798:8, 808:16, 812:6, 813:16, 872:6, 872:7
**broken** [1] - 862:22
**brother** [1] - 776:8
**build** [1] - 855:8
**built** [2] - 794:5, 798:21
**burden** [13] - 795:6, 795:8, 795:9, 795:25, 810:15, 810:16, 816:2, 816:13, 877:12, 878:4, 880:5, 881:6
**bureau** [19] - 791:1, 791:6, 791:11, 791:17, 791:24, 804:24, 834:17, 835:3, 836:13, 837:2, 837:6, 845:9, 852:20, 866:12, 866:15, 866:17, 866:18, 866:21, 867:1
**bureaus** [7] - 791:9, 791:12, 793:8, 803:20, 804:21, 865:12
**Burgess** [1] - 856:10
**Burr** [1] - 758:14
**bus** [1] - 888:13
**business** [2] - 760:13, 814:19
**Buy** [2] - 844:7, 856:12

**C**

**Caine** [1] - 856:21
**calculation** [1] - 760:14
**California** [5] - 781:14, 831:3, 839:19, 843:13, 854:20
**camp** [1] - 775:12
**Campbell** [5] - 760:10, 760:21, 761:3, 820:9, 889:24
**cancel** [1] - 800:18
**cancelled** [1] - 776:19
**cannot** [10] - 768:23, 789:1, 790:20, 801:11, 813:21, 818:7, 823:1, 823:2, 863:17, 892:23
**caption** [1] - 883:17
**capture** [1] - 865:10
**car** [30] - 767:16, 768:9, 768:21, 769:1, 769:3, 769:4, 774:10, 775:9, 778:20, 781:13, 789:5, 792:16, 792:17, 792:21, 792:23, 800:9, 803:12, 803:13, 803:17, 831:5, 843:16, 843:19, 844:12, 844:14, 849:5, 865:25, 871:23

**card** [43] - 768:1, 769:13, 774:25, 776:1, 778:11, 778:16, 779:6, 779:11, 779:20, 780:8, 781:8, 781:11, 781:12, 784:22, 798:10, 800:19, 804:6, 806:6, 806:12, 806:14, 806:15, 840:14, 843:5, 843:25, 844:1, 844:2, 844:7, 844:10, 844:13, 844:15, 844:17, 845:2, 848:5, 848:19, 849:7, 851:19, 855:8, 855:13, 863:14, 863:16, 864:12, 867:5
**cards** [1] - 857:4
**care** [5] - 766:9, 766:10, 796:3, 798:4, 866:1
**careful** [1] - 834:14
**carefully** [1] - 834:23
**Carolina** [1] - 832:11
**case** [125] - 749:10, 750:2, 750:6, 750:11, 751:14, 755:8, 757:20, 758:14, 758:16, 760:8, 760:10, 763:17, 764:9, 764:11, 764:13, 764:17, 766:13, 767:14, 770:20, 771:23, 772:8, 779:8, 787:5, 791:13, 791:14, 792:7, 794:13, 795:8, 795:11, 795:12, 796:7, 796:16, 796:21, 805:15, 805:17, 805:20, 805:21, 809:6, 818:5, 819:18, 820:5, 820:23, 821:1, 821:4, 822:10, 823:6, 824:19, 825:1, 826:4, 826:9, 826:24, 827:4, 828:9, 829:13, 829:19, 829:23, 829:25, 832:18, 833:5, 833:25, 834:3, 834:4, 834:8, 836:22, 837:10, 837:23, 838:4, 839:6, 842:5, 846:2, 846:15, 847:11, 847:25, 849:14, 849:18, 852:10, 852:20, 853:6, 854:23, 857:20, 858:23, 858:25, 859:22, 860:12, 860:22, 861:2, 861:3, 862:11, 863:3, 863:8, 863:15, 864:8, 866:14, 868:13, 868:14, 872:5, 872:14, 872:18, 872:23, 874:10, 874:24, 875:12, 875:20, 876:24, 882:12, 882:15, 882:24, 883:17, 883:19, 885:6, 885:8, 885:9, 885:12, 885:13, 885:22, 886:1, 886:6, 886:7, 886:10, 886:14, 886:16, 886:23, 887:15, 891:17, 892:24
**cases** [14] - 749:23, 750:8, 750:10, 761:1, 790:22, 818:10, 818:11, 818:13, 818:15, 818:17, 820:1, 821:14, 822:8, 822:9
**Cash** [1] - 856:24
**categories** [6] - 751:9, 751:14, 758:23, 797:5, 799:21, 855:16
**category** [8] - 797:20, 800:5, 802:22, 803:25, 804:17, 818:22, 818:23, 854:13
**caught** [2] - 767:14, 768:20
**causation** [5] - 749:25, 750:4, 753:20, 759:1, 763:8
**caused** [16] - 753:24, 777:3, 798:6, 802:1, 804:4, 809:5, 854:20, 854:21,

855:3, 857:10, 858:22, 869:22, 880:8, 880:19, 882:11
**causes** [5] - 809:12, 831:9, 831:10, 836:5, 872:2
**Celestina** [1] - 782:4
**center** [2] - 791:1, 810:5
**certain** [4] - 832:8, 873:12, 874:21, 877:6
**certainly** [4] - 809:8, 839:23, 840:4, 868:25
**certainty** [2] - 865:3, 865:5
**certified** [1] - 894:8
**certify** [1] - 894:3
**chance** [1] - 830:25
**change** [22] - 749:23, 750:15, 751:4, 756:16, 781:15, 807:12, 807:24, 811:7, 811:8, 811:16, 811:18, 813:1, 813:18, 814:2, 815:2, 834:19, 839:25, 864:7, 883:3, 883:9, 883:12
**changed** [2] - 808:21, 846:6
**changes** [2] - 763:6, 797:17
**charge** [4] - 804:12, 804:13, 871:18, 871:22
**charge-off** [4] - 804:12, 804:13, 871:18, 871:22
**charges** [3] - 781:11, 781:12, 841:6
**Charne** [20] - 767:10, 767:13, 767:19, 767:22, 769:16, 773:8, 777:24, 779:19, 783:16, 798:16, 806:20, 806:25, 831:18, 832:2, 832:3, 832:4, 839:10, 839:11, 863:4, 868:21
**charts** [2] - 874:21, 874:24
**chat** [1] - 885:15
**cheap** [2] - 771:17, 809:20
**cheaper** [1] - 810:8
**check** [3] - 794:20, 812:24, 850:3
**checks** [1] - 776:19
**children** [2] - 801:17, 801:19
**choose** [1] - 876:9
**chronology** [1] - 777:22
**circles** [2] - 783:11, 799:9
**Circuit** [3] - 750:1, 750:7, 750:12
**circuitous** [1] - 792:5
**circumstance** [1] - 836:7
**circumstances** [6] - 787:3, 826:7, 845:20, 849:23, 879:10, 881:17
**circumstantial** [3] - 875:3, 875:6, 875:10
**cite** [1] - 863:15
**cited** [1] - 750:7
**cites** [1] - 821:14
**Citibank** [2] - 857:2, 857:3
**city** [1] - 802:18
**civil** [6] - 765:14, 795:11, 795:12, 795:19, 812:5, 864:8
**claim** [23] - 784:4, 784:9, 786:5, 786:6, 787:12, 818:24, 834:4, 834:6, 834:8, 844:25, 846:2, 846:15, 847:24, 849:11, 849:15, 863:10, 867:13, 867:17, 869:6, 877:12, 877:14,

878:22, 880:3
**claiming** [4] - 777:1, 805:16, 869:15, 869:16
**claims** [7] - 760:15, 786:23, 834:3, 877:25, 878:1, 878:4, 878:10
**Claims** [2] - 757:16, 761:10
**clarification** [1] - 827:6
**clarify** [1] - 833:22
**clause** [3] - 757:21, 818:5
**clean** [1] - 859:7
**clear** [9] - 824:23, 827:21, 827:23, 834:22, 851:2, 851:13, 854:17, 858:10, 860:10
**clearer** [1] - 768:12
**clearly** [13] - 776:21, 776:25, 783:21, 786:15, 798:13, 817:16, 818:5, 819:22, 823:16, 826:2, 839:22, 866:23, 871:10
**clerk** [1] - 761:21
**CLERK** [2] - 887:25, 888:3
**clients** [1] - 873:23
**Clinic** [1] - 750:2
**clock** [1] - 830:16
**close** [1] - 801:8
**closely** [3] - 866:19, 866:22, 892:8
**closing** [23] - 757:20, 761:24, 762:9, 764:6, 800:20, 817:1, 817:10, 819:19, 819:20, 820:6, 820:10, 821:1, 823:14, 824:17, 825:24, 826:14, 826:16, 826:20, 829:14, 863:2, 864:6, 873:17, 889:22
**Colin** [1] - 773:5
**collateral** [1] - 865:25
**collect** [2] - 777:6, 785:2
**collecting** [5] - 856:11, 856:22, 856:24, 857:6, 858:14
**collection** [10] - 774:1, 798:20, 805:25, 806:2, 856:10, 856:22, 856:24, 857:5, 858:13, 858:14
**college** [1] - 803:22
**coming** [1] - 819:8
**comment** [4] - 824:22, 825:25, 826:19, 827:7
**commentary** [1] - 886:1
**comments** [6] - 819:18, 819:20, 820:14, 825:23, 889:21
**common** [4] - 788:17, 788:22, 788:24, 794:23, 833:17, 841:23
**communicate** [10] - 793:8, 801:12, 801:24, 804:21, 848:3, 885:10, 885:11, 887:10, 887:13, 887:14
**communicating** [1] - 885:18
**communication** [2] - 849:5, 886:19
**communications** [2] - 846:18, 857:13
**companies** [4] - 810:3, 810:5, 832:15, 857:22
**company** [21] - 764:24, 765:20, 781:1, 794:11, 803:16, 803:18, 804:1, 810:19, 811:6, 812:21, 812:23, 813:18, 814:6, 814:13, 815:4, 816:10,

854:6, 871:14, 871:17, 871:21
**compare** [4] - 843:10, 843:16, 843:21, 844:20
**compared** [1] - 770:9
**comparison** [2] - 770:2, 771:8
**compensate** [7] - 796:18, 815:19, 853:5, 853:8, 853:22, 880:7, 881:5
**compensation** [1] - 861:18
**complained** [1] - 841:19
**complaint** [4] - 833:3, 834:2, 843:25, 844:3
**complaints** [2] - 835:8, 858:5
**complete** [4] - 842:13, 867:14, 879:19, 881:17
**completed** [4] - 793:16, 841:12, 867:12, 884:23
**completeness** [1] - 878:13
**compliance** [1] - 836:18
**complicated** [1] - 802:8
**comply** [5] - 769:22, 795:5, 812:4, 861:6, 879:7
**comprehend** [1] - 802:19
**computer** [2] - 799:10, 802:21
**computers** [1] - 799:12
**concede** [1] - 803:5
**concern** [3] - 775:18, 818:19, 854:21
**concerned** [4] - 774:2, 821:2, 872:3
**concerning** [2] - 825:25, 887:15
**concerns** [1] - 841:4
**concise** [1] - 834:21
**conclude** [2] - 750:12, 868:23
**concluded** [2] - 759:5, 792:2
**conclusion** [2] - 784:8, 815:23
**conclusive** [1] - 774:12
**condition** [5] - 756:20, 756:21, 761:18, 820:22, 820:25
**conduct** [30] - 760:12, 765:25, 785:11, 787:4, 788:13, 808:6, 808:9, 809:2, 809:4, 809:7, 809:12, 815:21, 816:3, 830:11, 835:4, 841:16, 860:22, 862:21, 870:4, 872:9, 878:15, 879:18, 881:10, 881:13, 881:16, 882:9, 888:14, 888:21
**conducted** [2] - 834:9, 841:15
**confer** [3] - 761:21, 762:21, 762:24
**confirm** [4] - 767:20, 767:21, 844:21, 852:17
**confirmation** [1] - 840:6
**confirmed** [8] - 770:15, 771:21, 772:3, 837:9, 840:20, 850:9, 852:14, 852:22
**confirming** [1] - 771:15
**conformed** [1] - 894:7
**Congress** [4] - 790:12, 793:20, 793:23, 796:24
**conjecture** [1] - 880:14
**conscientious** [2] - 877:18, 883:8
**consider** [33] - 757:13, 760:7, 760:24, 761:25, 809:1, 809:4, 812:13, 812:16, 812:18, 818:7, 820:21, 820:24, 824:8, 824:11, 826:8, 826:22, 827:3, 828:8,

828:16, 828:17, 829:12, 868:2, 873:5, 873:11, 873:13, 874:6, 874:7, 874:18, 875:8, 876:4, 880:8, 882:8, 882:16
**consideration** [5] - 756:20, 829:19, 830:8, 860:15, 877:18
**considered** [5] - 784:4, 797:12, 874:4, 877:20, 882:25
**considering** [6] - 809:1, 812:11, 814:21, 875:16, 876:22, 882:7
**considers** [1] - 871:22
**consist** [1] - 837:15
**consistent** [3] - 757:10, 760:2, 875:25
**consists** [1] - 873:6
**constantly** [1] - 798:14
**constitutes** [1] - 787:24
**constitutional** [3] - 818:12, 820:2, 821:13
**consult** [2] - 872:16, 887:17
**consultant** [1] - 836:20
**Consultants** [1] - 857:5
**consulting** [1] - 886:2
**consumer** [33] - 766:17, 766:22, 766:25, 768:25, 776:16, 779:10, 780:3, 780:6, 784:16, 810:12, 811:9, 813:11, 813:17, 830:10, 830:14, 833:2, 833:3, 833:7, 835:10, 838:15, 841:22, 842:1, 842:6, 843:22, 859:4, 865:16, 865:19, 865:23, 878:14, 878:17, 878:18, 879:20, 879:23
**consumer's** [2] - 766:22, 771:1
**consumers** [12] - 765:22, 766:4, 766:7, 767:5, 796:12, 796:24, 809:13, 810:16, 811:25, 815:21, 816:9, 843:2
**contact** [12] - 777:24, 780:12, 782:7, 792:12, 792:13, 832:9, 844:19, 848:21, 865:15, 885:24, 886:14
**contacted** [1] - 779:19
**contacting** [2] - 769:17, 792:21
**contacts** [3] - 780:15, 792:15, 865:24
**contends** [1] - 879:6
**contents** [1] - 874:23
**contested** [1] - 786:10
**context** [1] - 814:16
**continue** [5] - 760:9, 809:21, 811:4, 884:17, 887:19
**continuing** [1] - 808:20
**contradicted** [1] - 875:21
**contrary** [4] - 823:12, 823:13, 823:16, 867:8
**control** [6] - 765:3, 766:24, 799:2, 805:5, 805:6, 813:7
**controlling** [1] - 820:5
**controls** [1] - 873:21
**convenience** [1] - 883:15
**conversation** [2] - 768:16, 817:25
**conversations** [1] - 819:4
**conversion** [2] - 862:24, 891:8
**convicted** [5] - 774:10, 778:19, 839:24, 849:4, 865:4
**conviction** [9] - 774:15, 775:3, 789:5,

840:6, 840:7, 864:10, 864:13, 864:17, 864:21
**convince** [1] - 868:24
**Cooper** [9] - 749:9, 749:10, 749:13, 843:6, 843:24, 844:3, 848:25, 849:8, 849:11
**Cooper's** [1] - 834:18
**copies** [1] - 750:18
**copy** [16] - 752:8, 778:10, 838:21, 842:22, 843:4, 843:5, 843:13, 843:25, 844:2, 848:4, 848:19, 866:9, 867:5, 872:14, 888:7
**corporate** [4] - 765:11, 814:5, 816:10, 862:14
**corporation** [9] - 765:17, 796:5, 807:15, 814:18, 814:19, 814:21, 872:9, 877:20, 877:22
**corporations** [1] - 794:3
**correct** [12] - 751:11, 753:8, 755:24, 759:7, 766:23, 768:4, 791:15, 810:4, 846:4, 856:17, 894:4
**corrected** [6] - 766:19, 767:24, 785:16, 794:2, 794:7, 795:1
**correspondence** [6] - 777:13, 781:11, 805:2, 805:14, 842:19, 847:4
**Cosgrave** [1] - 748:17
**cost** [1] - 810:5
**costs** [1] - 865:22
**counsel** [22] - 749:2, 754:14, 762:24, 764:3, 818:4, 818:21, 819:13, 819:18, 820:5, 820:9, 821:5, 824:21, 826:16, 862:5, 863:1, 864:6, 865:15, 890:1, 890:7, 890:9, 891:5, 892:14
**counsel's** [1] - 818:9
**countries** [1] - 778:4
**country** [5] - 764:23, 765:6, 788:18, 812:8, 865:20
**couple** [5] - 762:14, 823:25, 845:14, 848:7, 864:2
**course** [7] - 762:22, 792:13, 794:21, 830:7, 850:25, 864:22, 883:7
**COURT** [113] - 747:1, 747:17, 748:19, 749:3, 749:21, 751:2, 751:8, 751:13, 751:16, 751:20, 752:9, 752:17, 753:2, 753:9, 753:11, 753:18, 753:21, 754:1, 754:7, 754:10, 754:15, 756:8, 756:17, 756:23, 757:1, 757:24, 758:4, 759:7, 759:9, 759:12, 759:17, 761:9, 761:22, 762:2, 762:4, 762:7, 762:10, 762:13, 762:20, 762:22, 763:2, 763:10, 763:13, 763:16, 763:20, 763:24, 764:5, 816:19, 816:25, 817:4, 817:9, 817:14, 818:25, 819:2, 819:5, 819:10, 819:14, 821:10, 821:17, 821:23, 822:4, 822:11, 822:17, 822:20, 823:1, 823:8, 823:10, 824:4, 824:10, 825:3, 825:9, 825:16, 825:18, 825:21, 826:12, 826:21, 827:12, 827:15, 827:19, 827:23, 828:1, 828:6, 828:11, 828:14, 828:21, 829:1, 829:3, 829:8,

829:10, 861:25, 862:7, 872:12, 877:1, 888:1, 888:5, 888:24, 889:3, 889:10, 889:18, 890:14, 890:16, 890:19, 890:23, 891:2, 891:11, 891:19, 891:24, 892:1, 892:12, 892:16, 893:3, 893:6, 893:9
**court** [10] - 759:22, 795:16, 795:19, 798:18, 872:6, 874:19, 882:21, 886:17, 886:24, 887:16
**Court** [46] - 749:2, 750:11, 754:2, 754:14, 758:16, 759:5, 760:4, 760:17, 761:1, 761:21, 764:3, 785:8, 785:22, 786:2, 786:24, 795:7, 797:11, 807:9, 808:2, 808:11, 808:25, 812:11, 817:13, 818:14, 819:13, 819:24, 821:8, 821:22, 822:20, 822:21, 825:22, 825:25, 827:11, 829:18, 851:25, 862:5, 874:9, 879:24, 879:25, 885:24, 886:14, 887:7, 889:14, 890:7, 892:14, 894:13
**Court's** [3] - 752:8, 845:16, 874:1
**Courthouse** [1] - 748:20
**courtroom** [8] - 811:17, 816:24, 829:9, 862:24, 884:24, 886:18, 888:23, 891:8
**Courts** [2] - 760:14, 818:16
**cover** [1] - 820:18
**CRA** [12] - 785:7, 786:4, 786:8, 786:12, 790:8, 830:13, 830:14, 830:17, 833:4, 833:8, 835:10
**CRAs** [5] - 769:19, 774:7, 783:20, 791:19, 800:23
**created** [1] - 750:4
**credit** [115] - 751:12, 764:16, 765:1, 765:2, 765:8, 765:24, 766:5, 766:6, 766:8, 766:10, 766:18, 766:23, 767:6, 767:25, 768:15, 769:13, 769:17, 769:19, 770:4, 773:9, 773:13, 773:14, 773:20, 774:7, 775:15, 775:16, 776:1, 776:4, 777:7, 781:11, 781:12, 782:10, 784:1, 784:16, 784:22, 785:20, 789:15, 789:22, 791:1, 791:6, 791:9, 791:11, 791:12, 791:14, 791:15, 791:17, 791:21, 791:23, 793:8, 793:25, 794:4, 794:24, 796:13, 797:1, 797:9, 797:24, 798:10, 799:3, 800:18, 800:21, 800:24, 802:25, 803:1, 803:2, 803:3, 803:22, 803:25, 804:4, 804:6, 804:12, 804:21, 804:24, 805:5, 806:6, 807:8, 808:1, 809:16, 810:4, 812:1, 813:7, 831:11, 833:3, 834:17, 835:3, 836:13, 837:2, 837:6, 840:14, 845:9, 849:25, 851:13, 852:20, 854:6, 854:8, 854:10, 855:7, 855:8, 855:10, 855:11, 855:13, 856:18, 859:6, 866:1, 866:12, 866:15, 866:17, 866:18, 866:21, 867:1, 871:21, 878:25, 880:11
**Credit** [42] - 752:14, 752:15, 765:14, 769:22, 780:15, 785:4, 785:6, 785:9, 785:21, 785:23, 786:14, 786:23, 787:13, 791:13, 793:21, 795:5,

811:19, 811:20, 815:11, 815:15,
829:24, 852:5, 855:4, 855:17, 862:15,
878:2, 878:7, 878:9, 878:11, 878:19,
879:2, 879:7, 879:13, 879:14, 880:18,
880:19, 880:25, 881:2, 883:22,
883:25, 884:9
**credit-based** [2] - 766:6, 831:11
**creditor** [9] - 790:3, 805:17, 806:18,
807:2, 807:4, 848:3, 856:16, 856:17,
892:20
**creditor's** [1] - 892:20
**creditors** [12] - 805:11, 805:13, 805:18,
805:20, 805:23, 847:1, 847:2, 856:4,
856:7, 857:25, 869:6, 869:7
**crime** [1] - 865:18
**criminal** [9] - 767:14, 774:11, 795:16,
795:18, 831:2, 831:4, 831:14, 854:20
**critical** [1] - 750:13
**CRR** [2] - 748:19, 894:12
**crushed** [1] - 781:19
**CSR** [3] - 748:19, 894:12, 894:13
**curative** [3] - 826:5, 827:19, 828:4
**cure** [1] - 826:17
**current** [2] - 753:17, 761:1
**cursory** [1] - 771:8
**custody** [1] - 767:17
**customer** [10] - 769:13, 778:23, 790:1,
798:7, 820:10, 820:12, 830:16,
840:11, 841:6, 859:18
**customer's** [1] - 768:9
**cut** [5] - 777:6, 784:22, 800:19, 806:7,
856:1

# D

**damage** [24] - 796:18, 797:2, 797:6,
802:24, 803:23, 803:25, 804:15,
805:13, 805:16, 807:5, 818:24, 854:3,
854:4, 854:11, 869:9, 869:11, 869:16,
871:11, 871:12, 871:20, 871:23,
872:2, 880:9
**Damages** [1] - 758:19
**damages** [150] - 749:11, 749:12, 751:6,
751:9, 753:25, 754:22, 755:7, 756:18,
757:19, 757:22, 758:25, 759:21,
760:14, 761:12, 775:7, 796:15,
796:16, 796:17, 796:19, 796:20,
796:22, 796:25, 797:3, 797:12,
797:13, 797:15, 797:18, 798:21,
799:21, 799:23, 804:1, 807:6, 807:7,
807:8, 807:11, 807:17, 807:20, 808:2,
808:3, 808:6, 808:11, 809:1, 810:23,
811:1, 811:10, 811:16, 811:19,
811:23, 811:25, 812:12, 812:17,
812:19, 815:18, 815:19, 816:5, 816:6,
817:16, 817:17, 817:18, 817:20,
818:3, 818:8, 818:20, 820:23, 821:1,
821:6, 821:7, 821:21, 822:13, 822:25,
824:12, 825:12, 826:2, 830:4, 830:5,
830:6, 846:16, 853:4, 853:5, 853:7,

853:9, 853:10, 853:12, 853:16,
853:18, 853:23, 853:25, 854:13,
854:25, 855:1, 855:3, 855:17, 857:8,
858:9, 859:22, 860:1, 860:3, 860:7,
860:11, 860:13, 860:16, 860:17,
860:21, 860:24, 861:2, 861:8, 861:22,
862:25, 868:15, 868:16, 868:17,
869:7, 869:8, 869:15, 869:22, 869:24,
869:25, 870:4, 878:3, 879:25, 880:4,
880:5, 880:6, 880:12, 880:16, 880:18,
880:23, 881:3, 881:5, 881:7, 881:8,
881:9, 881:22, 882:2, 882:3, 882:7,
882:14, 882:16, 884:5, 884:7, 889:13,
890:3
**damaging** [2] - 767:22, 767:23
**Daniel** [1] - 748:16
**data** [1] - 788:19
**databases** [1] - 750:14
**DATE** [1] - 894:12
**date** [19] - 770:13, 778:25, 788:8, 833:7,
846:8, 850:22, 853:16, 853:19,
868:18, 868:19, 871:15, 871:17,
879:20, 879:21, 879:22, 880:24,
884:4, 884:15, 884:22
**dated** [4] - 773:9, 778:9, 780:18, 783:3
**daughter** [1] - 797:18, 801:2, 858:20
**DAY** [1] - 747:14
**days** [16] - 767:20, 773:14, 790:7, 790:9,
790:10, 790:11, 790:12, 790:14,
830:15, 830:16, 830:24, 833:1,
853:19, 856:9, 879:18
**deaf** [1] - 846:12
**deal** [3] - 775:20, 775:21, 817:22
**dealer** [2] - 792:21, 844:14
**Dealer** [3] - 766:15, 839:17, 841:7
**dealership** [4] - 831:5, 843:12, 843:16,
843:20
**dealing** [13] - 791:9, 791:11, 797:8,
815:3, 832:14, 834:17, 855:22, 856:7,
856:16, 857:9, 857:25, 858:1, 858:3
**Dean** [1] - 844:22
**debt** [6] - 769:11, 777:6, 778:7, 780:24,
784:20, 892:20
**decades** [2] - 790:23, 793:20
**December** [23] - 775:5, 781:6, 781:16,
783:4, 783:8, 783:25, 793:12, 799:1,
802:4, 806:20, 833:16, 839:2, 839:4,
841:10, 842:11, 842:17, 850:16,
859:19, 867:4, 868:2, 868:4, 868:7
**decide** [24] - 799:19, 799:20, 799:23,
813:22, 827:9, 829:20, 829:22,
845:14, 855:16, 860:6, 860:12,
862:11, 872:23, 874:10, 875:10,
875:13, 876:5, 876:7, 882:24, 885:4,
886:23, 888:17, 888:18, 892:24
**decided** [2] - 784:23, 886:16
**deciding** [4] - 760:25, 873:5, 873:13,
875:12
**decision** [16] - 749:25, 751:13, 763:21,
800:1, 823:18, 823:19, 849:21,

850:15, 856:1, 856:2, 877:15, 883:5,
883:8, 883:11
**decisions** [7] - 826:9, 826:23, 827:4,
828:9, 829:13, 850:23, 851:22
**dedicated** [1] - 794:25
**DEFENDANT** [1] - 748:14
**defendant** [33] - 755:3, 757:5, 757:10,
760:11, 760:16, 761:14, 808:12,
821:2, 825:22, 826:6, 839:22, 870:5,
878:1, 878:6, 878:8, 878:10, 878:24,
879:1, 879:4, 879:6, 879:18, 879:22,
880:8, 880:24, 881:1, 881:4, 881:19,
881:21, 882:14, 883:21, 883:24, 884:8
**Defendant** [1] - 819:17
**defendant's** [7] - 820:22, 836:16,
844:22, 878:1, 881:10, 882:8, 892:14
**defendants** [2] - 758:24, 836:21
**Defendants** [1] - 747:7
**defense** [9] - 755:9, 762:24, 763:6,
791:5, 817:2, 826:12, 829:14, 863:9,
866:15
**Defenses** [2] - 757:16, 761:10
**defenses** [1] - 878:1
**defies** [1] - 841:23
**defined** [2] - 786:19, 852:6
**definitely** [1] - 890:11
**definition** [4] - 755:12, 758:15, 760:1,
760:2
**definitive** [1] - 844:18
**degree** [2] - 809:2, 882:8
**dehumanized** [1] - 798:9
**delete** [6] - 790:3, 794:17, 794:22,
794:23, 794:25, 851:9
**deleted** [6] - 776:3, 800:14, 849:24,
851:1, 851:21, 855:10
**deliberate** [1] - 845:16
**deliberately** [1] - 876:8
**deliberating** [3] - 888:10, 890:19,
890:20
**deliberations** [10] - 872:16, 882:18,
882:20, 884:21, 885:10, 887:9,
887:19, 888:12, 888:21, 891:3
**delivery** [1] - 847:9
**demanded** [1] - 866:3
**denial** [1] - 751:12
**denied** [8] - 749:15, 825:21, 862:13,
886:24, 890:13, 891:6, 891:18, 891:24
**denies** [4] - 757:18, 757:22, 761:11,
878:8
**Denise** [1] - 806:17
**department** [58] - 779:16, 781:18,
781:21, 781:24, 784:7, 784:13, 791:1,
791:4, 791:6, 791:7, 791:9, 791:11,
791:15, 791:17, 791:20, 791:21,
791:22, 791:25, 792:1, 792:6, 792:8,
792:12, 792:14, 793:6, 793:7, 793:9,
810:11, 831:25, 833:21, 841:12,
842:12, 843:6, 845:7, 845:22, 845:24,
846:5, 846:11, 849:1, 849:9, 851:10,
851:17, 852:21, 861:12, 864:11,

864:23, 866:11, 866:12, 866:13, 866:15, 866:17, 866:19, 866:21, 866:22, 867:1, 867:2
**departments** [3] - 810:6, 836:11, 852:19
**deposit** [2] - 840:16
**deposition** [6] - 782:3, 864:2, 864:4, 874:12, 874:16, 874:18
**Depot** [10] - 806:7, 806:8, 844:7, 844:8, 856:13, 856:14, 856:25, 857:1, 857:22, 857:24
**derogatory** [3] - 804:14, 871:19, 872:1
**described** [4] - 783:3, 799:4, 820:9, 827:20
**Description** [1] - 761:10
**Descriptions** [1] - 757:16
**deserves** [4] - 809:22, 875:2, 876:17, 876:22
**designed** [3] - 766:18, 794:1, 807:9
**desk** [4] - 832:11, 846:5, 848:16, 859:15
**desperate** [1] - 777:24
**despite** [3] - 765:5, 774:5, 787:6
**destroy** [4] - 813:8, 813:9
**detail** [1] - 830:22
**detailed** [1] - 767:11
**details** [4] - 767:13, 777:12, 867:18, 867:20
**Detective** [9] - 767:19, 767:20, 768:5, 768:7, 768:11, 768:17, 792:14, 839:21, 866:7
**detective** [2] - 767:15, 839:18
**deter** [13] - 807:10, 808:12, 808:13, 808:24, 810:23, 811:1, 811:23, 812:19, 812:20, 815:20, 825:12, 881:4
**determinable** [1] - 835:22
**determination** [9] - 792:6, 793:15, 837:5, 837:8, 853:12, 853:16, 860:5, 860:8, 861:21
**determine** [25] - 766:1, 769:23, 772:10, 772:15, 785:12, 835:17, 835:18, 852:15, 853:1, 853:17, 854:22, 855:15, 860:4, 860:6, 860:16, 860:17, 860:18, 860:21, 861:1, 861:18, 864:25, 867:17, 880:4, 880:12, 880:24
**determined** [4] - 773:21, 792:4, 835:19, 835:20
**determining** [7] - 784:12, 812:16, 818:8, 827:3, 828:16, 853:9, 854:25
**devices** [1] - 886:8
**dial** [2] - 832:17, 848:22
**dictating** [1] - 867:25
**dictionaries** [1] - 886:3
**differ** [1] - 873:19
**differences** [1] - 876:4
**different** [23] - 752:11, 755:7, 777:16, 778:4, 786:5, 790:22, 796:23, 797:1, 797:11, 799:14, 804:3, 804:18, 805:22, 808:3, 812:20, 818:13, 823:22, 836:11, 852:18, 876:1, 889:12, 890:2
**differently** [2] - 807:3, 876:4

**differs** [1] - 876:6
**difficult** [5] - 823:20, 836:6, 858:23, 859:6, 859:24
**difficulty** [1] - 836:5
**digest** [1] - 750:19
**digitally** [1] - 894:7
**diligently** [1] - 882:22
**direct** [15] - 749:13, 832:17, 834:4, 838:14, 846:2, 848:22, 863:2, 863:3, 863:5, 863:6, 863:12, 875:3, 875:4, 875:10
**directly** [3] - 750:5, 834:5, 842:21
**directors** [3] - 811:15, 877:22, 877:23
**disability** [3] - 750:3, 801:3, 881:25
**disagree** [1] - 831:10
**disagreed** [1] - 836:10
**discharged** [4] - 827:8, 827:10, 827:14, 887:23
**disclosed** [1] - 805:4
**discomfort** [6] - 797:3, 797:6, 797:20, 799:24, 854:14, 880:9
**discover** [1] - 871:8
**discuss** [7] - 761:1, 786:21, 830:22, 830:24, 836:2, 885:23, 888:14
**discussed** [7] - 757:4, 759:21, 761:3, 870:19, 883:1, 886:7, 886:9
**discussing** [2] - 885:9, 885:13
**discussion** [4] - 867:24, 870:2, 883:4, 883:10
**dislikes** [1] - 872:22
**dispute** [48] - 766:17, 766:22, 767:1, 767:3, 767:9, 770:7, 772:2, 772:15, 772:20, 773:2, 776:14, 776:21, 777:9, 777:10, 782:6, 784:14, 785:7, 786:7, 786:12, 788:22, 788:25, 794:1, 809:11, 810:14, 820:11, 820:13, 830:12, 830:20, 833:4, 833:7, 835:24, 838:15, 842:6, 848:13, 852:12, 852:21, 855:21, 859:5, 863:5, 863:6, 867:23, 868:3, 870:14, 878:12, 878:24, 879:20
**disputed** [10] - 766:1, 770:7, 782:7, 785:12, 786:9, 789:22, 857:12, 871:4, 878:15, 878:20
**disputes** [29] - 766:15, 769:9, 769:20, 771:4, 771:25, 773:1, 773:7, 773:8, 783:10, 787:10, 788:20, 788:24, 789:18, 796:10, 800:23, 804:22, 806:4, 809:9, 810:9, 830:16, 833:12, 833:20, 834:1, 834:5, 846:3, 863:2, 863:3, 863:12
**disputing** [7] - 764:14, 775:24, 780:10, 780:20, 781:21, 782:1, 843:2
**disregard** [27] - 758:15, 760:1, 787:17, 787:18, 787:24, 787:25, 788:1, 808:5, 808:8, 808:10, 808:20, 815:25, 852:4, 852:5, 860:25, 870:2, 870:3, 870:5, 870:17, 874:3, 877:10, 879:14, 879:15, 881:11, 881:16, 890:4
**disregarded** [2] - 794:8, 807:15

**disruption** [1] - 800:7
**distinction** [1] - 875:9
**distress** [17] - 758:22, 758:25, 797:2, 797:5, 797:16, 797:19, 797:21, 797:23, 797:25, 798:21, 799:24, 818:24, 821:4, 854:14, 854:20, 858:7, 880:9
**District** [1] - 748:20
**district** [1] - 800:24
**DISTRICT** [3] - 747:1, 747:2, 747:17
**Diversified** [1] - 857:5
**division** [2] - 840:15, 859:19
**divisions** [2] - 840:13, 840:17
**document** [1] - 847:14
**documentation** [2] - 798:18, 844:14
**documents** [25] - 764:10, 764:12, 764:13, 778:22, 792:24, 793:3, 797:22, 800:25, 804:23, 805:18, 836:22, 843:8, 843:9, 844:6, 844:24, 863:7, 863:9, 874:23
**dollar** [2] - 812:21, 814:18, 814:19, 814:21
**dollars** [2] - 811:11, 820:15
**donate** [1] - 776:8
**done** [25] - 772:2, 772:8, 772:10, 772:12, 772:13, 781:22, 781:25, 786:16, 787:15, 787:16, 789:23, 791:25, 792:1, 793:22, 809:20, 818:10, 849:12, 855:12, 859:1, 862:24, 863:20, 879:12, 885:3
**doubt** [2] - 811:11, 854:18
**down** [7] - 776:1, 786:22, 798:10, 799:21, 835:20, 835:21, 867:6
**drafted** [2] - 826:25, 828:7
**drafting** [1] - 828:17
**dream** [1] - 800:13
**dresses** [1] - 801:6
**Drew** [2] - 749:10, 749:14
**drive** [1] - 888:13
**driver's** [5] - 774:25, 779:21, 780:7, 792:23, 864:11
**drove** [1] - 803:14
**due** [7] - 760:13, 818:5, 821:15, 821:19, 822:5, 822:14, 826:3
**duly** [2] - 763:16, 883:18
**during** [18] - 774:9, 775:5, 799:7, 819:18, 820:6, 824:17, 825:24, 826:20, 838:23, 847:1, 872:16, 885:9, 887:9, 889:21, 890:11, 891:5, 891:21
**duties** [1] - 785:7
**duty** [10] - 786:11, 787:17, 794:6, 794:8, 852:5, 872:14, 872:17, 873:23, 879:14, 879:24

# E

**e-mail** [6] - 797:24, 806:17, 819:24, 838:14, 859:17, 885:14
**e-mailed** [2] - 798:15, 798:16

**e-mails** [4] - 798:17, 806:16, 806:20, 806:24
**early** [3] - 751:21, 859:19
**easier** [2] - 780:1, 866:4
**easily** [3] - 835:19, 835:20, 835:22
**easy** [4] - 777:4, 799:13, 834:22, 869:8
**Ebron** [2] - 771:18, 863:21
**economic** [5] - 818:11, 818:19, 818:20, 821:6, 853:23
**economy** [6] - 765:2, 766:6, 766:8, 813:4, 831:11, 831:12
**edict** [1] - 851:8
**education** [2] - 876:18, 876:23
**effect** [3] - 797:17, 828:15, 883:12
**effort** [4] - 826:17, 844:6, 848:3, 859:7
**efforts** [1] - 859:9
**Eight** [1] - 813:22
**eight** [1] - 836:20
**either** [11] - 781:15, 787:20, 804:10, 818:12, 830:3, 838:15, 852:7, 853:2, 855:12, 875:9, 879:16
**elapsed** [1] - 790:10
**elect** [1] - 882:18
**electronic** [2] - 794:21, 885:14
**element** [1] - 786:12
**Elements** [1] - 761:13
**elements** [1] - 786:6
**emotional** [17] - 758:22, 758:25, 797:2, 797:5, 797:16, 797:19, 797:21, 797:23, 797:25, 798:21, 799:23, 818:24, 821:4, 854:14, 854:18, 858:6, 880:9
**emphasized** [1] - 824:16
**employee** [1] - 841:4
**employees** [16] - 770:6, 770:20, 771:24, 772:6, 772:10, 772:19, 772:22, 772:25, 773:6, 790:20, 794:12, 840:13, 861:5, 877:21, 877:23
**employer** [1] - 885:19
**enclose** [1] - 804:23
**encloses** [2] - 778:2, 781:11
**encompass** [1] - 753:3
**encompasses** [1] - 753:4
**end** [14] - 763:20, 783:20, 784:11, 784:24, 800:10, 800:13, 806:1, 816:10, 837:2, 837:4, 850:6, 856:4, 864:3, 868:6
**ended** [1] - 775:25
**ends** [2] - 850:23, 850:24
**energy** [2] - 806:10, 854:21
**enforce** [9] - 765:13, 765:21, 796:3, 796:6, 813:2, 814:4, 816:9, 816:16, 872:8
**enforced** [1] - 765:15
**enforcement** [2] - 795:3, 811:20
**engaging** [1] - 749:12
**enormous** [2] - 814:16, 814:17
**enrolled** [1] - 802:5
**enrolling** [1] - 802:11

**ensure** [6] - 766:18, 773:24, 794:1, 794:7, 861:11, 887:3
**entailing** [1] - 787:19, 852:6, 853:2, 879:15
**entered** [2] - 761:20, 778:4
**enters** [1] - 829:9
**entire** [2] - 820:17, 863:8
**entirely** [2] - 750:19, 885:4
**entities** [2] - 858:11, 858:14
**entitled** [8] - 763:17, 789:22, 861:18, 877:18, 880:15, 880:22, 883:19, 886:22
**entity** [1] - 854:8
**entries** [1] - 839:21
**equal** [2] - 864:19, 877:17
**EQUIFAX** [1] - 747:6
**Equifax** [17] - 770:10, 780:10, 780:12, 780:14, 780:18, 780:19, 782:1, 782:2, 782:4, 782:12, 782:14, 783:1, 798:19, 803:18, 854:7, 871:14, 871:16
**error** [2] - 777:2, 861:20
**errors** [1] - 810:4
**escalated** [1] - 859:19
**escort** [1] - 888:5
**especially** [4] - 802:4, 818:11, 833:9, 840:22
**essentially** [1] - 864:19
**established** [2] - 766:11, 877:10
**esteem** [1] - 799:16
**evaluate** [1] - 839:6
**Evan** [5] - 770:3, 779:12, 779:14, 785:13, 793:18
**evening** [1] - 888:17
**event** [1] - 876:3
**eventually** [1] - 776:7
**evidence** [84] - 760:17, 760:19, 767:4, 767:6, 768:10, 768:22, 769:2, 783:21, 788:4, 793:4, 797:23, 808:8, 815:23, 820:12, 826:3, 830:24, 832:21, 833:10, 846:25, 847:2, 852:25, 853:7, 853:13, 853:14, 854:4, 854:5, 854:6, 854:9, 854:11, 855:19, 860:8, 869:14, 870:17, 870:19, 871:12, 872:13, 872:18, 872:23, 873:2, 873:5, 873:7, 873:12, 873:13, 873:15, 873:18, 873:19, 873:23, 873:25, 874:3, 874:6, 874:7, 874:10, 874:11, 874:22, 874:23, 874:25, 875:2, 875:3, 875:4, 875:6, 875:8, 875:10, 875:11, 875:21, 875:23, 876:14, 876:24, 877:10, 877:13, 877:14, 877:15, 878:5, 878:23, 880:5, 880:13, 881:7, 883:1, 883:13, 885:1, 885:6, 886:16, 887:4, 892:24
**exactly** [4] - 818:21, 846:14, 854:7, 893:6
**example** [4] - 770:23, 823:22, 843:11, 851:18
**except** [5] - 766:25, 805:15, 865:24, 885:8, 887:13

**exception** [2] - 759:15, 889:6
**exceptions** [9] - 756:12, 888:25, 889:3, 889:8, 889:11, 890:16, 890:21, 890:23, 890:25
**excessive** [1] - 821:3
**excluded** [1] - 874:2
**excuse** [6] - 779:15, 800:6, 879:21, 884:12, 886:5, 892:19
**excused** [1] - 886:12
**exercise** [1] - 749:12
**exhibit** [1] - 805:15
**Exhibit** [25] - 832:1, 834:17, 835:5, 839:20, 848:11, 855:25, 856:12, 856:13, 856:14, 856:21, 856:23, 856:25, 857:1, 857:4, 857:15, 857:16, 857:24, 857:25, 859:12, 859:13, 859:14, 859:16
**Exhibits** [1] - 834:18
**exhibits** [10] - 764:10, 783:17, 805:14, 839:3, 847:10, 850:3, 873:7, 873:12, 874:5, 888:7
**existed** [4] - 787:3, 845:20, 849:23, 879:11
**expands** [1] - 758:14
**expect** [2] - 782:14, 787:22
**expectation** [1] - 859:4
**expected** [1] - 773:10
**expense** [1] - 791:4
**expenses** [1] - 853:25
**Experian** [1] - 854:7
**experience** [6] - 769:12, 835:25, 840:19, 851:16, 876:18, 876:23
**experienced** [1] - 844:12
**expert** [12] - 769:5, 769:7, 770:3, 771:10, 785:13, 789:12, 793:19, 810:2, 836:16, 836:21, 844:25, 864:5
**experts** [9] - 773:20, 779:12, 836:2, 836:9, 841:14, 841:19, 844:22, 852:17, 862:21
**explain** [4] - 755:20, 755:22, 770:22, 874:22
**explained** [6] - 776:2, 843:6, 843:24, 844:3, 844:23, 846:13
**explains** [1] - 755:14
**exposed** [2] - 885:7, 887:7
**expressly** [1] - 773:6
**extension** [2] - 832:11, 859:20
**eye** [1] - 801:13
**eyes** [3] - 774:16, 775:4, 799:9

**F**

**face** [4] - 822:12, 870:6, 870:10, 881:19
**Facebook** [1] - 885:16
**facet** [1] - 765:1
**Fact** [1] - 757:5
**fact** [15] - 761:19, 765:5, 788:11, 791:16, 805:17, 836:6, 837:17, 841:6, 841:16, 849:3, 849:4, 870:21, 875:4, 875:7, 876:14

**factor** [1] - 761:5
**factors** [4] - 760:24, 761:1, 761:2, 875:23
**facts** [22] - 753:15, 767:7, 767:20, 767:21, 781:10, 818:17, 861:2, 861:3, 861:15, 861:19, 872:17, 872:18, 873:6, 873:8, 873:9, 873:14, 873:19, 875:6, 875:12, 877:7, 877:8
**failed** [4] - 787:6, 789:10, 861:10, 879:7
**failing** [4] - 786:25, 845:18, 847:25, 879:8
**failure** [2] - 783:2, 799:15
**fair** [8] - 800:1, 800:4, 825:23, 826:6, 877:18, 886:22, 886:25, 887:3
**Fair** [42] - 752:14, 752:15, 765:13, 769:22, 780:15, 785:4, 785:6, 785:9, 785:21, 785:23, 786:14, 786:23, 787:13, 791:13, 793:21, 795:5, 811:19, 811:20, 815:11, 815:15, 829:23, 852:5, 855:4, 855:17, 862:15, 878:2, 878:7, 878:9, 878:10, 878:11, 878:19, 879:1, 879:7, 879:13, 879:14, 880:17, 880:19, 880:25, 881:1, 883:22, 883:25, 884:9
**fairly** [3] - 853:5, 853:8, 880:7
**fairness** [1] - 887:6
**faith** [2] - 824:21
**fake** [2] - 844:5, 844:6
**fall** [2] - 839:9, 889:23
**false** [7] - 796:14, 813:5, 837:24, 841:25, 864:17, 871:21, 872:1
**familiar** [2] - 787:22, 832:18
**family** [8] - 765:9, 775:11, 776:4, 776:11, 853:9, 858:8, 858:19, 885:18
**family's** [2] - 775:25, 813:8
**far** [4] - 763:6, 780:2, 805:23, 821:14
**Farah** [9] - 797:18, 801:2, 801:5, 801:10, 801:20, 802:2, 802:4, 802:18, 858:20
**FARGO** [2] - 747:6, 748:15
**Fargo** [324] - 756:22, 757:9, 764:15, 764:18, 764:19, 764:22, 765:4, 765:7, 765:17, 765:18, 765:24, 766:9, 766:15, 766:20, 767:1, 767:4, 767:9, 767:12, 767:13, 767:17, 767:18, 767:19, 768:2, 768:5, 768:6, 768:8, 768:13, 768:16, 768:18, 768:23, 769:8, 769:10, 769:13, 769:14, 769:20, 769:21, 770:1, 770:6, 770:11, 770:18, 771:3, 771:11, 771:13, 771:16, 771:22, 771:24, 772:5, 772:9, 772:12, 772:19, 772:21, 772:25, 773:6, 773:10, 773:12, 773:16, 773:19, 773:23, 774:3, 774:4, 774:10, 774:16, 774:20, 774:21, 775:15, 775:17, 775:18, 775:24, 776:1, 776:3, 776:12, 776:13, 776:20, 776:24, 777:6, 777:8, 777:9, 777:11, 777:13, 777:25, 778:5, 778:9, 778:14, 778:16, 778:17, 778:24, 779:16, 780:11,

780:15, 780:16, 780:19, 780:21, 781:1, 781:4, 781:5, 781:8, 781:16, 782:1, 782:12, 782:15, 782:17, 782:23, 783:3, 783:6, 783:12, 783:20, 783:22, 783:24, 784:2, 784:3, 784:7, 784:15, 784:17, 784:20, 784:21, 785:9, 785:11, 786:3, 786:7, 786:13, 787:5, 787:12, 788:14, 789:1, 789:4, 789:13, 790:2, 790:4, 790:6, 790:10, 790:14, 790:15, 790:25, 792:16, 793:17, 795:2, 795:14, 796:2, 796:3, 796:14, 797:9, 798:1, 798:6, 798:7, 798:9, 798:10, 798:12, 798:19, 800:14, 800:15, 800:18, 800:20, 801:15, 802:10, 803:8, 803:10, 803:19, 804:2, 804:19, 804:24, 805:4, 805:6, 805:14, 805:16, 805:19, 805:22, 805:24, 806:2, 806:3, 806:4, 806:8, 806:19, 806:24, 806:25, 807:2, 807:22, 808:15, 810:16, 811:7, 812:6, 812:25, 813:6, 813:11, 813:18, 814:2, 814:10, 814:17, 814:23, 815:10, 815:15, 815:20, 815:24, 816:17, 819:17, 820:11, 820:16, 824:13, 826:8, 826:23, 827:3, 828:9, 829:12, 829:23, 830:1, 830:9, 830:11, 830:12, 830:18, 830:19, 831:18, 831:22, 831:25, 832:16, 832:20, 833:5, 833:14, 833:15, 833:16, 834:3, 834:6, 834:7, 834:9, 834:12, 835:4, 835:25, 836:12, 836:25, 837:10, 837:12, 837:21, 837:25, 839:7, 839:8, 839:11, 839:16, 839:17, 840:8, 840:11, 840:12, 840:25, 841:1, 841:15, 842:16, 842:18, 842:21, 843:7, 844:4, 844:16, 845:10, 845:15, 845:21, 846:2, 846:4, 846:7, 846:10, 847:7, 847:15, 847:18, 848:4, 848:9, 848:20, 849:4, 849:5, 849:6, 849:9, 849:13, 849:17, 849:20, 850:13, 850:19, 852:1, 852:10, 852:11, 855:10, 855:18, 856:8, 856:16, 856:20, 857:8, 857:9, 857:13, 858:9, 858:12, 858:13, 858:22, 858:25, 859:10, 859:18, 860:2, 861:4, 861:5, 861:9, 861:10, 861:15, 861:16, 862:10, 862:12, 862:15, 862:17, 862:22, 864:9, 869:4, 869:9, 869:10, 869:14, 869:19, 869:20, 869:22, 871:11, 871:18, 871:20, 871:23, 871:24, 872:6, 872:7, 884:3, 890:8, 890:13, 891:6
**Fargo's** [50] - 757:7, 765:2, 765:11, 766:14, 766:24, 769:7, 770:15, 771:10, 771:19, 772:16, 774:14, 774:16, 774:24, 775:4, 778:8, 779:4, 783:17, 785:6, 786:11, 788:6, 788:23, 790:18, 791:5, 791:10, 791:16, 796:8, 796:12, 806:13, 809:2, 809:7, 818:7, 830:5, 830:6, 834:1, 836:16, 837:6, 837:7, 837:13, 837:24, 851:15, 852:20, 854:24, 855:2, 860:18,

860:22, 861:5, 861:20, 863:1, 865:2, 871:6
**Farm** [5] - 760:10, 760:20, 761:3, 820:8, 889:24
**fashioned** [1] - 795:22
**fast** [2] - 757:23, 771:16
**faster** [1] - 809:21
**father** [1] - 801:17
**faxed** [2] - 832:4
**FCRA** [31] - 749:12, 750:12, 754:5, 760:2, 772:14, 772:17, 772:21, 787:16, 787:17, 795:15, 807:7, 807:14, 807:25, 818:10, 830:1, 830:8, 830:11, 830:19, 830:20, 836:18, 836:23, 837:11, 837:14, 841:18, 852:13, 853:1, 853:17, 861:6, 868:18, 870:8, 892:19
**fear** [5] - 776:1, 777:3, 846:24, 847:4
**February** [4] - 776:13, 800:11, 846:10, 846:17, 846:19, 846:23, 856:5, 859:13
**federal** [5] - 870:7, 870:11, 870:15, 881:20
**feeds** [1] - 801:6
**feelings** [1] - 858:7
**fellow** [2] - 883:2, 885:9
**felt** [14] - 777:5, 778:13, 781:20, 783:9, 798:8, 798:12, 799:1, 799:2, 799:3, 799:15, 802:12, 803:11
**few** [20] - 751:24, 754:11, 757:3, 763:25, 767:20, 775:10, 776:10, 778:8, 809:17, 811:11, 812:23, 820:15, 820:18, 830:24, 832:25, 837:17, 846:1, 853:19, 863:1, 892:8
**field** [4] - 793:20, 802:20, 811:22, 813:20
**Fifth** [2] - 748:9, 748:17
**fifth** [1] - 758:23
**figure** [2] - 749:10, 824:13
**filed** [3] - 754:5, 851:3, 851:5
**final** [1] - 774:11
**finally** [5] - 759:19, 784:2, 855:14, 864:3, 872:4
**financial** [8] - 756:20, 756:21, 761:18, 812:17, 820:22, 820:24, 820:25, 831:15
**financing** [2] - 804:10, 804:11
**finer** [1] - 786:22
**finish** [1] - 749:4
**firewalls** [1] - 840:21
**first** [41] - 754:21, 754:25, 756:10, 756:11, 767:9, 770:12, 777:23, 784:20, 786:11, 786:23, 787:23, 796:17, 796:20, 799:22, 808:14, 815:9, 822:2, 830:25, 835:18, 838:24, 839:5, 842:20, 846:18, 848:2, 848:9, 848:13, 850:2, 850:7, 850:17, 850:18, 853:17, 853:20, 854:3, 857:1, 860:11, 868:18, 868:20, 869:2, 880:24, 883:21, 891:7
**First** [1] - 748:12

**five** [5] - 750:24, 784:3, 790:13, 797:5, 816:22
**fix** [11] - 799:12, 799:13, 799:14, 805:4, 806:24, 824:5, 847:5, 859:6, 862:17, 867:7, 868:6
**fixed** [12] - 784:1, 784:15, 790:5, 791:13, 798:15, 801:15, 806:11, 806:21, 851:13, 868:4, 868:5, 871:5
**fixing** [1] - 872:3
**flag** [1] - 827:11
**flash** [1] - 834:13
**flesh** [1] - 752:4
**flimsy** [1] - 779:15
**Floor** [1] - 748:18
**focus** [2] - 890:2, 890:11
**folks** [1] - 813:22
**follow** [5] - 785:9, 811:9, 812:2, 872:19, 887:1
**followed** [5] - 770:15, 770:18, 770:21, 771:19, 792:15
**following** [5] - 835:2, 848:7, 848:13, 848:14, 888:11
**follows** [5] - 763:11, 763:18, 883:18, 883:20, 892:18
**food** [1] - 888:18
**FOR** [3] - 747:2, 748:2, 748:14
**foregoing** [1] - 894:4
**Foremost** [1] - 871:15
**forget** [1] - 876:2
**form** [24] - 752:8, 752:11, 753:10, 753:17, 754:4, 754:18, 762:13, 762:15, 762:18, 781:22, 806:9, 806:10, 815:6, 815:8, 816:5, 834:2, 883:14, 883:15, 884:4, 884:15, 884:23, 885:17, 888:8
**forth** [2] - 835:5, 841:15
**forward** [1] - 835:24
**forwarded** [6] - 781:17, 832:5, 835:10, 845:6, 845:22, 845:23
**forwards** [1] - 833:4
**four** [9] - 792:10, 794:20, 832:23, 840:8, 842:23, 848:20, 873:9, 879:4
**fourth** [3] - 786:20, 849:22, 854:15
**fragile** [1] - 801:20
**frame** [14] - 832:22, 838:22, 838:24, 839:5, 845:21, 847:3, 850:19, 851:1, 855:19, 856:7, 856:15, 857:7, 858:5, 858:17
**Fransen** [1] - 748:15
**fraud** [112] - 774:3, 774:20, 775:1, 776:22, 779:16, 779:21, 780:3, 780:4, 780:6, 780:8, 780:9, 781:18, 781:21, 781:23, 784:6, 789:6, 791:7, 791:9, 791:14, 791:22, 791:25, 792:2, 792:4, 792:5, 792:6, 792:8, 792:12, 792:14, 793:6, 793:7, 793:9, 793:10, 793:15, 794:17, 794:23, 794:25, 805:24, 810:11, 810:14, 831:24, 833:13, 835:9, 835:19, 835:21, 835:22, 835:24, 836:1, 836:3, 836:14, 838:8,

838:10, 838:12, 838:16, 839:13, 839:15, 840:5, 840:7, 841:12, 841:20, 842:12, 842:13, 842:22, 843:3, 843:4, 843:6, 844:25, 845:7, 845:10, 845:12, 845:22, 845:24, 846:4, 849:1, 849:9, 849:10, 849:11, 849:15, 849:24, 850:4, 850:5, 850:9, 850:11, 851:4, 851:8, 851:11, 851:17, 852:19, 852:21, 861:11, 861:13, 864:10, 864:12, 864:14, 864:15, 864:16, 864:23, 866:12, 866:19, 866:22, 866:23, 866:25, 867:2, 867:23, 871:4, 871:5, 892:21
**fraudsters** [1] - 803:7
**fraudulent** [14] - 764:15, 764:20, 765:7, 768:3, 769:15, 773:10, 773:18, 773:20, 773:21, 775:15, 794:25, 803:5, 805:11, 862:18
**free** [1] - 807:18
**frequently** [1] - 866:8
**fresh** [2] - 817:6, 817:8
**front** [1] - 837:2
**frustrated** [3] - 781:6, 832:14, 846:12
**frustrating** [1] - 798:25
**frustration** [1] - 797:16
**fulfill** [1] - 882:4
**fuller** [1] - 748:8
**fully** [3] - 787:22, 840:2, 883:1
**fun** [2] - 763:24, 797:25
**fundamental** [1] - 766:3
**Funsch** [2] - 773:5, 863:24
**furnisher** [5] - 782:8, 782:9, 830:8, 833:5, 837:10
**furnisher's** [2] - 833:6, 878:20
**furnishers** [1] - 812:1
**future** [5] - 808:13, 808:24, 810:24, 811:2, 881:4

## G

**GA** [1] - 748:4
**gain** [1] - 886:18
**gains** [1] - 810:18
**gather** [2] - 763:25, 842:4
**gathering** [2] - 800:25, 842:1
**general** [1] - 829:21
**generally** [1] - 753:3
**gentlemen** [2] - 764:8, 829:16
**gift** [1] - 816:12
**given** [8] - 755:25, 816:6, 821:1, 868:11, 875:9, 876:23, 885:2, 892:25
**Gobin** [2] - 782:4, 782:16
**Gorman** [1] - 758:8
**government** [1] - 843:5
**grant** [1] - 826:1
**granting** [1] - 824:5
**great** [1] - 813:20
**Greenville** [1] - 832:11
**Grier** [3] - 770:5, 771:20, 863:21
**Groundhog** [1] - 781:20

**group** [1] - 850:18
**grown** [1] - 801:18
**guarantee** [1] - 801:23
**guess** [3] - 759:2, 808:23, 822:23
**guesswork** [2] - 853:14, 880:14
**guidance** [2] - 799:25, 800:3
**guide** [1] - 793:23
**guilty** [8] - 768:19, 768:21, 769:1, 839:23, 839:25, 849:3, 864:7
**guise** [1] - 760:16
**gut** [1] - 778:13
**guy** [1] - 799:11

## H

**habits** [1] - 802:13
**halftime** [1] - 749:17
**hand** [2] - 840:25, 876:10
**handed** [1] - 751:1
**handing** [2] - 887:25, 888:3
**handle** [1] - 836:12
**handling** [2] - 791:18, 848:17
**hang** [2] - 890:14, 892:8
**happy** [1] - 824:14
**hard** [9] - 767:8, 794:19, 799:19, 799:20, 799:22, 802:14, 810:21, 815:4, 823:21
**harder** [2] - 854:2, 869:13
**harm** [31] - 753:24, 754:6, 758:2, 760:7, 760:19, 787:19, 796:18, 809:5, 809:6, 809:8, 809:12, 809:13, 818:4, 820:8, 820:9, 820:13, 824:9, 824:12, 827:18, 827:25, 831:11, 852:7, 853:2, 879:16, 882:11, 882:14, 882:17, 889:13, 889:15
**harmed** [7] - 756:14, 760:12, 786:20, 786:21, 809:5, 820:13, 879:5, 881:10, 882:9
**harshness** [2] - 860:23, 881:23
**hate** [1] - 818:2
**havoc** [1] - 831:14
**head** [6] - 755:22, 791:16, 828:18, 843:6, 848:25, 849:8
**headaches** [2] - 799:3, 799:6
**healthy** [1] - 801:23
**hear** [13] - 764:23, 772:13, 790:6, 807:9, 810:20, 812:1, 812:25, 833:24, 845:16, 852:2, 854:8, 875:18, 886:13
**heard** [75] - 761:17, 761:22, 765:3, 765:8, 766:2, 767:25, 770:3, 770:5, 770:17, 772:18, 773:5, 774:23, 775:23, 778:12, 779:12, 781:19, 782:3, 784:6, 784:22, 788:16, 789:2, 789:11, 790:17, 793:19, 795:16, 797:15, 797:16, 797:20, 801:8, 801:21, 801:25, 804:13, 805:6, 808:21, 809:9, 810:2, 827:2, 827:17, 831:7, 831:23, 832:13, 833:18, 833:19, 834:10, 834:23, 835:1, 835:13, 836:2, 836:9, 836:12, 836:15,

836:23, 836:24, 838:8, 840:11, 842:21, 843:11, 844:3, 845:5, 846:22, 847:7, 848:25, 849:8, 853:7, 853:19, 855:21, 859:3, 863:20, 863:21, 866:14, 867:3, 869:21, 872:13, 874:9, 875:5
**hearing** [1] - 787:23
**heavily** [2] - 824:17, 890:2
**heed** [1] - 768:2
**held** [2] - 768:10, 768:22
**help** [6] - 785:17, 798:17, 799:20, 806:18, 873:18, 874:22
**helping** [1] - 812:5
**helpless** [1] - 799:2
**helps** [2] - 801:6, 801:7
**Hendricks** [5] - 770:3, 779:12, 779:14, 785:13, 793:18, 794:23, 804:13, 844:25, 864:8
**Hendricks's** [1] - 794:9
**HERNANDEZ** [1] - 747:16
**hesitate** [1] - 771:25
**hide** [1] - 813:21
**high** [8] - 760:4, 787:19, 789:21, 795:17, 852:7, 853:2, 860:25, 879:16
**higher** [1] - 800:3
**highest** [2] - 805:24, 859:18
**highlight** [2] - 759:13, 828:20
**highly** [1] - 871:19
**hired** [1] - 831:17
**history** [2] - 803:2, 823:3
**hold** [4] - 796:4, 858:9, 862:23, 872:8
**holding** [1] - 769:1
**Hollomon** [2] - 773:5, 863:23
**home** [4] - 804:8, 804:9, 807:18, 856:1
**Home** [7] - 806:7, 806:8, 844:8, 856:13, 856:25, 857:1, 857:24
**honest** [2] - 769:4, 883:12
**honesty** [1] - 803:1
**Honor** [45] - 749:19, 750:24, 751:5, 751:19, 752:18, 753:16, 754:12, 756:6, 757:2, 759:16, 761:17, 762:12, 762:25, 763:12, 764:7, 817:3, 817:7, 817:12, 817:15, 818:2, 819:8, 819:11, 819:16, 821:12, 823:9, 823:17, 824:15, 825:8, 825:20, 826:11, 826:13, 827:5, 827:17, 827:21, 828:13, 828:25, 829:7, 829:15, 862:9, 889:2, 891:1, 891:23, 892:11, 892:18, 893:7
**HONORABLE** [1] - 747:16
**hope** [2] - 750:22, 751:17
**hopeless** [1] - 783:24
**hour** [10] - 750:23, 773:1, 773:7, 789:18, 810:9, 817:5, 817:6, 819:1, 819:6, 819:24
**huge** [1] - 831:8
**human** [3] - 799:18, 861:6, 861:20
**hundred** [1] - 823:23
**hundreds** [2] - 766:14, 796:10
**hurt** [2] - 766:8, 796:12

**hurting** [1] - 813:4
**Huss** [1] - 892:22
**hypothetical** [3] - 760:15, 877:5, 877:6

## I

**i.e** [3] - 773:25, 855:3, 880:19
**ID** [13] - 770:24, 771:1, 788:7, 843:5, 843:13, 844:11, 848:5, 848:6, 848:10, 849:7, 851:20, 864:1
**idea** [2] - 869:15, 877:2
**identification** [4] - 771:3, 771:5, 778:22, 787:8
**identifying** [8] - 770:2, 770:9, 770:11, 771:8, 771:20, 772:3, 779:1, 863:22
**identity** [104] - 765:10, 767:12, 768:9, 768:12, 768:14, 768:24, 768:25, 769:4, 769:6, 769:18, 769:24, 770:7, 770:9, 770:25, 771:7, 771:9, 771:15, 772:15, 772:20, 773:12, 773:15, 774:6, 774:13, 774:16, 775:3, 775:22, 776:21, 776:22, 776:23, 776:24, 777:12, 777:23, 778:17, 778:18, 779:9, 780:22, 782:8, 782:10, 782:18, 782:20, 783:5, 783:6, 783:8, 783:14, 783:15, 784:4, 784:9, 787:9, 788:9, 788:15, 788:17, 788:18, 788:20, 788:24, 789:2, 790:20, 794:13, 794:15, 796:10, 803:6, 804:25, 806:13, 806:15, 809:11, 831:3, 831:5, 831:8, 831:13, 831:14, 831:16, 833:13, 833:21, 836:3, 836:4, 836:8, 844:4, 844:9, 844:15, 844:21, 849:3, 854:19, 857:11, 858:15, 858:25, 864:7, 864:9, 864:20, 865:4, 865:5, 865:7, 865:11, 865:16, 866:16, 866:24, 867:13, 867:17, 868:23, 868:24, 870:13, 870:21, 871:5
**ignore** [2] - 783:19, 876:12
**ignored** [4] - 787:7, 789:7, 789:8, 870:21
**ignores** [4] - 767:5, 769:10, 774:21, 796:4
**ill** [3] - 810:18, 860:19, 881:13
**ill-gotten** [1] - 810:18
**illegal** [3] - 790:24, 811:3, 872:9
**immediately** [2] - 887:8, 892:17
**immense** [2] - 764:24, 813:6
**immensely** [1] - 810:19
**impaneled** [2] - 763:16, 883:19
**impartial** [1] - 886:23
**importance** [1] - 765:24
**important** [27] - 753:6, 767:2, 770:19, 772:8, 793:18, 793:24, 793:25, 794:6, 796:1, 803:22, 807:8, 808:1, 810:24, 810:25, 815:14, 815:19, 815:20, 833:9, 833:11, 838:20, 848:12, 851:12, 853:6, 876:8, 876:16, 883:6, 887:2
**importantly** [1] - 835:13

**impose** [1] - 884:8
**impossible** [1] - 776:17
**impression** [1] - 890:9
**improper** [11] - 817:21, 818:5, 819:18, 819:20, 819:21, 820:15, 826:16, 826:20, 873:24, 886:18, 889:22
**improvement** [1] - 804:7
**IN** [1] - 747:1
**inability** [1] - 858:8
**inaccurate** [12] - 758:9, 766:8, 766:19, 766:21, 766:23, 782:24, 785:16, 794:1, 794:7, 797:1, 871:9, 886:20
**inaction** [1] - 860:1
**inadequate** [3] - 790:25, 810:3, 825:10
**incite** [2] - 757:14, 819:22
**inciting** [1] - 820:3
**include** [6] - 754:2, 762:5, 763:1, 763:3, 796:21, 817:25
**included** [11] - 750:8, 750:14, 751:10, 753:20, 754:4, 760:24, 762:9, 776:22, 776:23, 866:24, 866:25
**includes** [6] - 761:2, 777:21, 815:25, 819:25, 848:4, 885:13
**including** [11] - 751:11, 761:4, 771:14, 778:22, 841:3, 848:22, 882:9, 885:16, 887:21
**income** [1] - 804:9
**incomplete** [1] - 886:20
**inconsistent** [4] - 752:16, 755:20, 755:21, 757:19
**inconvenience** [2] - 854:16, 880:10
**indeed** [1] - 753:21
**indicated** [2] - 800:9, 803:13
**indicates** [2] - 767:16, 768:21
**indicating** [1] - 838:24
**indication** [7] - 771:7, 836:14, 844:17, 844:18, 847:11, 847:12, 847:13
**indifference** [1] - 881:18
**individual** [5] - 760:13, 822:10, 831:23, 832:10, 848:16
**industry** [15] - 789:10, 789:14, 789:15, 790:19, 790:23, 794:4, 794:24, 809:17, 812:4, 820:17, 836:20, 840:20, 840:21, 841:9, 859:4
**inflicted** [2] - 824:12, 882:17
**influenced** [4] - 872:21, 873:3, 873:25, 886:19
**informality** [1] - 819:25
**INFORMATION** [1] - 747:6
**information** [117] - 765:2, 765:24, 765:25, 766:10, 766:17, 766:19, 766:21, 766:23, 766:24, 767:22, 767:23, 769:8, 769:10, 770:1, 770:2, 770:10, 770:11, 771:9, 771:13, 771:14, 771:20, 772:4, 773:4, 774:21, 776:15, 777:20, 779:1, 779:8, 781:9, 782:7, 783:13, 783:15, 785:12, 785:16, 785:18, 786:4, 786:8, 787:7, 787:9, 788:5, 789:8, 789:22, 791:19, 792:10, 792:22, 794:2, 794:7, 795:1,

796:14, 798:4, 803:19, 805:4, 805:5, 813:7, 830:13, 832:8, 832:10, 835:15, 836:7, 837:11, 837:15, 838:5, 838:17, 838:18, 839:12, 839:14, 840:2, 841:5, 841:7, 841:11, 841:21, 842:1, 842:4, 842:5, 842:6, 842:15, 842:16, 843:1, 843:15, 843:16, 843:19, 843:21, 844:11, 848:15, 848:20, 849:10, 849:20, 849:22, 850:6, 850:20, 850:22, 851:17, 851:21, 861:13, 863:22, 864:25, 865:9, 865:10, 865:19, 868:21, 868:22, 870:21, 870:24, 871:1, 878:13, 878:16, 878:21, 878:25, 885:7, 886:18, 886:20, 886:24, 887:7, 891:13, 891:21, 893:5

**informs** [2] - 767:11, 777:11
**initial** [3] - 832:22, 835:8, 840:9
**initiated** [1] - 839:16
**injures** [1] - 881:22
**injuries** [6] - 804:3, 854:1, 858:6, 880:16, 880:17
**injuring** [2] - 860:19, 881:14
**injury** [7] - 804:3, 821:5, 855:4, 855:6, 855:16, 880:7, 880:20
**innocent** [1] - 813:12
**inquiry** [2] - 838:3, 871:15
**inside** [1] - 809:16
**insignificant** [1] - 811:13
**insisted** [2] - 784:20, 785:2
**insisting** [1] - 769:10
**insists** [1] - 770:18
**insofar** [1] - 874:17
**Instagram** [1] - 885:17
**instead** [2] - 769:24, 787:8
**instruct** [21] - 752:5, 755:3, 785:8, 785:22, 786:2, 786:24, 787:14, 795:7, 797:11, 797:12, 808:2, 808:25, 812:11, 817:23, 826:7, 828:8, 829:11, 852:1, 872:14, 879:24, 890:7
**instructed** [7] - 787:18, 818:7, 820:21, 854:23, 873:9, 874:3, 874:6
**instructing** [2] - 755:25, 879:25
**Instruction** [4] - 758:19, 759:2, 759:9, 761:13
**instruction** [44] - 750:15, 753:20, 754:3, 755:13, 755:16, 756:1, 756:19, 756:21, 757:5, 758:11, 758:20, 758:24, 759:22, 760:1, 760:2, 760:6, 760:9, 760:20, 760:23, 761:2, 761:12, 762:6, 763:8, 789:9, 820:8, 824:3, 824:7, 825:13, 825:15, 826:5, 826:14, 827:20, 828:4, 828:7, 828:13, 828:22, 829:6, 852:3, 853:11, 853:15, 868:16, 889:13, 889:15, 890:3
**instructions** [24] - 749:5, 749:20, 749:22, 750:18, 750:25, 751:7, 751:10, 751:17, 753:23, 754:17, 755:8, 757:9, 757:11, 829:5, 845:16, 852:9, 859:25, 872:15, 884:17, 885:2,

885:6, 888:7, 890:17, 892:25
**insurance** [7] - 803:16, 803:18, 854:5, 854:9, 871:14, 871:17, 871:21
**Insurance** [1] - 871:16
**intellectual** [2] - 801:3, 802:19
**intended** [4] - 807:11, 807:12, 873:18, 885:3
**intentional** [3] - 753:4, 753:19, 788:1
**interact** [1] - 858:8
**interaction** [1] - 798:6
**interest** [2] - 804:11, 875:20
**interested** [1] - 792:17
**interesting** [2] - 891:13, 891:15
**interference** [5] - 797:6, 800:5, 802:15, 854:15, 880:10
**internally** [1] - 836:25
**Internet** [4] - 775:21, 885:15, 886:3, 886:8
**interpret** [1] - 873:18
**Interruption** [1] - 876:25
**introduce** [1] - 805:19
**introduced** [3] - 805:13, 805:15, 805:18
**introduction** [1] - 763:1
**intuitively** [1] - 843:18
**invaded** [2] - 804:19
**invasion** [6] - 797:10, 804:17, 805:3, 805:9, 855:14, 880:11
**invest** [4] - 790:15, 791:3, 810:6, 854:21
**investigate** [23] - 767:3, 770:8, 772:2, 772:20, 778:17, 781:9, 788:25, 789:2, 790:20, 793:1, 809:22, 810:12, 810:17, 833:6, 836:1, 844:24, 852:12, 865:16, 865:21, 865:22, 866:16, 870:14, 892:21
**investigated** [5] - 771:25, 788:6, 789:18, 829:24, 830:2
**investigating** [10] - 771:9, 782:20, 788:15, 794:12, 810:15, 837:15, 842:2, 852:19, 870:13, 870:20
**Investigation** [1] - 758:6
**investigation** [95] - 758:8, 765:25, 766:14, 769:23, 769:25, 770:3, 770:4, 770:16, 771:12, 772:1, 772:9, 772:12, 772:14, 772:17, 772:22, 772:24, 773:3, 778:10, 780:17, 782:13, 782:14, 783:22, 785:11, 785:15, 785:17, 785:18, 785:24, 785:25, 786:3, 786:16, 787:6, 788:8, 788:12, 789:20, 789:23, 790:8, 790:11, 790:13, 790:16, 791:4, 791:7, 791:25, 792:1, 793:4, 793:6, 793:10, 794:5, 795:4, 809:14, 810:6, 810:10, 830:12, 830:14, 830:21, 834:1, 834:8, 835:5, 837:14, 838:1, 838:8, 838:10, 838:12, 838:16, 838:18, 839:15, 840:3, 840:7, 841:13, 841:15, 841:17, 841:20, 842:2, 842:9, 842:10, 842:12, 842:13, 842:16, 843:20, 843:22, 852:20, 863:20, 864:1, 864:5, 864:24, 864:25, 870:23, 871:8, 878:15, 878:18,

878:20, 878:21, 879:19, 886:4, 886:17
**investigations** [2] - 791:3, 849:18
**investigators** [1] - 842:4
**invitation** [1] - 817:21
**invite** [2] - 852:15, 867:9
**invited** [3] - 817:15, 817:18, 832:12
**invoke** [1] - 786:11
**involve** [1] - 771:12
**involved** [6] - 784:13, 790:21, 791:22, 867:22, 885:19, 886:10
**involves** [1] - 885:8
**involving** [1] - 818:11
**ironic** [1] - 806:13
**irresponsibility** [1] - 765:12
**issue** [23] - 749:13, 749:22, 749:24, 750:16, 751:4, 751:6, 752:9, 754:19, 754:20, 755:13, 756:3, 760:10, 772:8, 818:14, 823:14, 827:11, 831:9, 831:19, 833:25, 848:17, 857:8, 861:22, 890:6
**issues** [9] - 757:3, 826:3, 827:9, 829:22, 833:2, 836:1, 836:3, 858:23, 885:8
**item** [2] - 802:24, 806:1
**items** [2] - 804:5, 842:23
**iTop** [16] - 768:7, 792:2, 792:3, 793:13, 793:14, 832:1, 835:13, 835:14, 838:9, 838:15, 839:13, 839:15, 839:16, 839:20, 850:3, 850:8
**itself** [7] - 770:18, 824:7, 835:6, 835:12, 844:17, 857:6, 871:9

## J

**James** [3] - 767:10, 806:20, 831:18
**January** [23] - 774:9, 774:19, 775:2, 775:6, 776:14, 777:17, 777:18, 789:6, 842:18, 845:5, 845:8, 847:19, 851:1, 855:24, 856:5, 857:23, 861:11, 866:10, 866:20, 867:11, 867:12, 868:6, 869:3
**Japan** [1] - 776:6
**Jason** [2] - 768:8, 768:12
**Jeffrey** [1] - 748:2
**Jennifer** [7] - 884:15, 884:24, 887:11, 888:5, 888:19, 891:2, 892:7
**jeopardizes** [1] - 887:5
**JH** [1] - 857:1
**Jim** [1] - 832:2
**job** [2] - 813:2, 822:21
**John** [1] - 848:25
**Jones** [2] - 748:5, 748:5
**judge** [5] - 787:14, 822:16, 822:17, 822:18, 822:21
**JUDGE** [1] - 747:17
**Judge** [1] - 893:8
**judged** [1] - 876:20
**judgment** [5] - 749:4, 749:7, 749:8, 749:14, 816:7
**Julie** [1] - 748:16
**July** [1] - 831:4

14

**jumping** [1] - 890:18
**juries** [1] - 823:15
**juror** [10] - 882:19, 884:3, 884:14, 884:19, 884:22, 886:12, 887:5, 887:6, 887:11
**jurors** [8] - 873:4, 882:23, 883:1, 883:2, 883:5, 883:11, 884:21, 885:9
**jury** [86] - 750:18, 750:23, 751:10, 752:5, 752:18, 752:22, 753:24, 754:16, 755:14, 755:18, 756:5, 757:9, 757:13, 758:16, 760:7, 760:24, 761:25, 763:11, 763:16, 764:3, 764:9, 765:18, 811:18, 811:22, 813:19, 813:20, 813:23, 813:24, 815:8, 816:15, 816:19, 816:24, 817:16, 817:21, 817:23, 818:6, 819:23, 820:3, 820:16, 820:21, 820:24, 821:6, 821:17, 822:5, 822:12, 823:11, 824:6, 824:22, 825:13, 825:15, 826:1, 826:7, 826:15, 827:7, 827:10, 827:12, 827:14, 828:22, 829:9, 829:11, 834:15, 839:6, 840:23, 841:23, 859:24, 861:17, 861:25, 862:5, 862:12, 872:12, 872:15, 882:21, 883:15, 883:18, 884:19, 884:20, 885:22, 886:23, 887:12, 887:15, 888:5, 888:9, 888:23, 890:17, 891:2
**justice** [8] - 807:17, 808:15, 812:5, 814:5, 816:12, 816:15, 872:6, 872:10
**justifiably** [1] - 807:1
**justify** [2] - 861:7, 861:8

## K

**keep** [8] - 762:18, 764:14, 777:21, 785:24, 798:16, 833:9, 833:11, 892:4
**keeps** [4] - 769:10, 782:1, 782:2, 783:2
**Kelley** [16] - 769:6, 771:10, 836:2, 836:15, 837:9, 837:20, 840:19, 842:2, 842:14, 844:23, 852:13, 852:21, 859:3, 859:7, 863:25
**Kelly** [2] - 748:5, 748:5
**kept** [4] - 782:25, 788:10, 789:4, 789:5
**Kester** [1] - 748:17
**key** [3] - 833:25, 839:4, 860:3
**kicked** [1] - 778:13
**kicking** [1] - 783:2
**kidney** [1] - 776:8
**kind** [17] - 752:4, 754:24, 755:17, 755:22, 760:17, 777:1, 795:4, 797:1, 807:5, 810:21, 812:22, 818:15, 843:2, 866:16, 872:1, 892:8, 892:9
**kinds** [2] - 797:3, 875:8
**knowing** [5] - 774:6, 787:16, 800:18, 870:16, 879:12
**knowledge** [2] - 772:7, 809:18
**known** [10] - 780:21, 783:6, 787:20, 852:7, 852:8, 853:3, 879:16, 879:17
**knows** [7] - 768:13, 769:14, 771:11, 790:23, 803:15, 832:15, 862:22

**Kohl's** [1] - 856:13

## L

**ladies** [2] - 764:8, 829:16
**language** [12] - 750:2, 750:8, 750:12, 750:13, 758:8, 759:3, 759:24, 760:3, 763:4, 806:23, 834:22, 890:2
**large** [6] - 765:20, 771:6, 811:15, 833:20, 840:22, 859:8
**largest** [1] - 805:23
**last** [23] - 749:24, 750:1, 753:23, 754:5, 754:18, 756:13, 757:18, 757:21, 760:23, 761:10, 770:12, 815:6, 832:25, 842:11, 848:19, 850:16, 850:18, 853:19, 862:16, 862:20, 890:13, 891:6, 891:7
**late** [7] - 751:21, 769:16, 773:14, 783:25, 837:1, 842:18, 888:15
**latter** [1] - 776:3
**law** [94] - 749:8, 749:14, 749:15, 761:21, 764:18, 764:19, 765:13, 765:15, 765:19, 765:20, 765:21, 765:23, 766:11, 766:12, 766:20, 766:25, 767:3, 769:25, 772:22, 782:13, 782:21, 783:22, 784:18, 785:4, 788:3, 788:9, 788:25, 789:24, 796:2, 796:3, 796:6, 796:9, 804:2, 807:5, 807:15, 807:16, 807:18, 807:25, 808:16, 808:19, 808:20, 808:23, 809:25, 810:1, 810:22, 811:2, 811:4, 811:9, 812:2, 812:4, 812:6, 812:8, 812:9, 812:10, 812:14, 812:15, 813:2, 813:16, 813:18, 813:19, 814:4, 814:22, 815:22, 816:9, 816:10, 816:16, 820:5, 823:12, 823:13, 823:16, 838:1, 859:25, 862:22, 870:7, 870:11, 870:13, 870:15, 872:6, 872:7, 872:8, 872:14, 872:18, 872:19, 872:24, 875:8, 877:17, 877:20, 881:20, 885:2, 886:10, 887:2
**Law** [1] - 748:5
**lawbreaker** [1] - 807:12
**lawsuit** [6] - 784:3, 850:21, 851:3, 851:5, 855:20, 868:1
**lawyer** [2] - 798:17, 806:23
**lawyers** [11] - 753:12, 755:20, 816:21, 829:17, 873:8, 873:15, 873:16, 873:20, 873:22, 874:14, 886:11
**leads** [1] - 815:23
**learn** [2] - 785:19, 886:5
**learned** [3] - 794:13, 831:16, 832:25
**least** [9] - 752:9, 753:23, 755:4, 771:5, 816:20, 823:3, 827:6, 846:20, 852:18
**leave** [8] - 753:19, 763:7, 763:10, 776:9, 813:24, 888:10, 892:6
**leaves** [2] - 816:24, 888:23
**led** [1] - 784:8
**left** [2] - 749:16, 759:22
**legal** [11] - 755:10, 755:13, 784:12,

784:13, 786:1, 787:7, 787:21, 796:4, 845:17, 851:10, 867:22
**legally** [1] - 755:24
**length** [1] - 759:23
**lengthy** [1] - 846:18
**less** [2] - 790:8, 790:10
**letter** [93] - 767:10, 767:11, 774:19, 776:14, 777:3, 777:16, 777:17, 777:18, 777:20, 777:22, 778:2, 779:2, 779:3, 779:18, 779:20, 781:5, 781:7, 781:17, 781:22, 783:3, 789:6, 792:9, 797:23, 798:3, 806:9, 806:10, 806:11, 806:24, 810:12, 831:21, 832:3, 832:4, 832:7, 832:10, 838:14, 839:10, 839:11, 842:9, 842:19, 845:6, 845:8, 845:22, 845:24, 846:3, 846:11, 846:14, 846:16, 846:17, 846:23, 847:7, 847:13, 847:15, 847:19, 847:20, 847:22, 847:25, 848:2, 848:7, 848:14, 848:15, 848:18, 849:2, 855:24, 856:8, 856:9, 856:11, 856:12, 856:13, 856:15, 856:20, 856:21, 857:14, 857:21, 857:24, 859:13, 861:11, 863:4, 863:6, 863:16, 866:10, 866:20, 866:23, 867:4, 867:11, 868:3, 868:7, 869:4, 869:8, 869:10, 869:18
**letters** [26] - 777:15, 777:21, 781:20, 789:25, 790:1, 799:17, 800:22, 805:7, 805:8, 806:12, 834:5, 834:7, 847:1, 847:10, 847:19, 855:23, 856:3, 856:19, 857:1, 857:17, 857:18, 869:3, 869:6, 869:12, 869:17, 869:18
**level** [2] - 811:22, 813:20
**liability** [5] - 862:13, 890:12, 890:13, 891:6, 891:7
**liable** [1] - 858:9
**license** [5] - 774:25, 779:21, 780:7, 792:24, 864:11
**lieu** [1] - 874:19
**life** [6] - 765:3, 765:9, 797:8, 800:7, 831:15, 858:18
**light** [8] - 818:4, 818:8, 825:23, 826:3, 826:6, 833:10, 859:23, 875:22
**likely** [3] - 795:13, 795:25, 846:5
**limine** [2] - 890:6, 891:10
**limitation** [1] - 758:25
**limited** [5] - 758:22, 801:24, 874:5, 874:6, 885:16
**limiting** [1] - 828:13
**linchpin** [1] - 766:6
**line** [4] - 822:8, 822:9, 848:22, 848:23
**LinkedIn** [1] - 885:17
**list** [1] - 873:14
**listed** [2] - 798:19, 879:2
**listen** [4] - 754:16, 798:12, 813:14, 885:25
**listened** [1] - 883:1
**listening** [1] - 877:2
**listing** [1] - 818:20
**literally** [2] - 776:17, 790:22

**live** [3] - 812:8, 835:1, 874:19
**lives** [4] - 755:11, 764:25, 813:7, 813:25
**living** [1] - 776:11
**LLC** [2] - 747:6, 748:2
**LLP** [1] - 748:17
**loan** [6] - 767:16, 768:13, 768:14, 792:24, 804:7, 843:14
**lodges** [1] - 833:7
**long-term** [1] - 798:7
**longest** [1] - 806:4
**longtime** [2] - 769:12, 840:10
**look** [25] - 790:2, 791:24, 803:16, 805:23, 806:16, 813:11, 834:14, 834:25, 835:13, 835:14, 835:15, 835:16, 837:11, 837:12, 837:18, 837:19, 837:22, 847:9, 850:2, 852:15, 854:14, 855:23, 858:4, 864:10, 871:3
**looked** [8] - 750:11, 793:12, 793:14, 843:13, 850:8, 851:6, 851:11, 854:9
**looking** [18] - 750:8, 751:7, 757:8, 771:13, 777:24, 792:24, 792:25, 794:18, 798:14, 801:13, 820:17, 822:11, 843:4, 853:8, 854:25, 864:9, 888:6
**looks** [3] - 792:3, 837:7, 865:6
**loss** [3] - 801:15, 802:14, 853:22
**losses** [3] - 758:21, 796:21, 818:11
**lost** [1] - 799:5
**love** [1] - 753:15
**loves** [2] - 775:11
**lower** [2] - 800:4, 815:3
**lowered** [1] - 799:16
**lowest** [1] - 870:3
**lunch** [10] - 816:21, 817:5, 817:6, 817:8, 817:9, 819:1, 819:6, 819:12, 819:24

**M**

**Macy's** [1] - 856:14
**magic** [2] - 806:22, 806:23
**mail** [7] - 797:24, 806:15, 806:17, 819:24, 838:14, 859:17, 885:14
**Mail** [1] - 806:14
**mailed** [4] - 798:15, 798:16, 832:3, 847:11
**mailing** [1] - 832:9
**mails** [4] - 798:17, 806:16, 806:20, 806:24
**main** [1] - 784:23
**maintained** [2] - 768:18, 803:3
**major** [2] - 765:7, 858:18
**malice** [1] - 869:25
**malicious** [6] - 808:6, 808:9, 860:18, 870:1, 881:10, 881:13
**man** [2] - 768:8, 831:17
**management** [1] - 812:24
**manager** [6] - 784:13, 851:6, 867:6, 867:22, 867:25
**manner** [1] - 875:19
**March** [1] - 871:15

**MARCO** [1] - 747:16
**marina** [1] - 775:9
**mark** [1] - 892:21
**marks** [3] - 759:10, 759:16, 856:18
**match** [3] - 771:5, 771:6, 863:22
**matched** [2] - 770:13, 787:8
**matching** [6] - 771:19, 772:3, 773:3, 788:7, 793:14, 864:1
**materials** [1] - 886:4
**matter** [13] - 749:8, 749:15, 765:20, 817:12, 831:1, 838:12, 849:18, 850:16, 850:19, 861:24, 866:15, 866:18, 885:23
**matters** [7] - 755:3, 846:3, 846:8, 849:16, 850:20, 850:21, 851:24
**Matthew** [3] - 765:4, 765:16, 831:3
**MATTHEW** [1] - 747:3
**maximum** [2] - 817:17, 871:25
**Mayo** [1] - 750:1
**maze** [1] - 778:14
**McCarthy** [1] - 856:10
**mean** [26] - 753:6, 753:8, 753:11, 776:17, 787:25, 792:13, 795:23, 803:19, 805:7, 808:6, 810:20, 811:12, 812:23, 814:8, 815:1, 818:18, 823:5, 825:4, 825:11, 827:12, 828:10, 866:2, 866:23, 880:1, 880:6, 891:13
**meaning** [3] - 786:25, 787:14, 820:16
**meaningful** [1] - 758:16
**means** [7] - 773:1, 787:18, 797:7, 872:22, 877:13, 879:15, 885:14
**meant** [4] - 749:7, 808:4, 819:22, 853:7
**meantime** [1] - 816:23
**measure** [1] - 879:25
**Measure** [1] - 758:19
**media** [3] - 885:18, 885:19, 886:1
**meet** [4] - 789:10, 789:13, 790:18, 795:9
**meeting** [1] - 867:24
**Megan** [7] - 774:14, 775:2, 788:16, 788:20, 791:16, 808:22, 809:9
**member** [4] - 837:7, 858:19, 882:19, 887:12
**members** [9] - 816:19, 829:11, 835:6, 853:9, 861:25, 872:12, 885:19, 887:12, 887:15
**memory** [4] - 873:2, 873:3, 873:20, 875:19
**mental** [1] - 753:4
**mention** [2] - 752:7, 759:15
**mentioned** [3] - 805:11, 806:18, 808:4
**mentioning** [2] - 807:2, 818:18
**merely** [2] - 773:3, 780:6
**merits** [2] - 760:15, 885:12
**message** [2] - 812:3, 820:17
**messaging** [1] - 885:15
**met** [3] - 789:17, 795:9, 795:25
**method** [1] - 888:6
**Michael** [1] - 748:8
**mid** [1] - 861:25

**middle** [1] - 812:24
**might** [18] - 753:11, 754:17, 755:20, 756:7, 759:2, 777:20, 785:2, 785:13, 793:5, 800:18, 801:3, 801:20, 810:25, 811:12, 822:24, 847:17, 856:4, 890:8
**mild** [1] - 811:7
**mileage** [2] - 804:6, 855:8
**million** [27] - 811:11, 812:23, 814:15, 814:18, 814:19, 814:21, 814:23, 815:2, 817:18, 820:15, 820:19, 821:7, 821:18, 822:1, 822:5, 822:13, 823:25, 824:23, 824:24, 824:25, 825:4, 825:5, 825:7, 825:10, 826:2
**millions** [1] - 811:13
**mind** [8] - 810:21, 813:9, 821:19, 821:24, 830:23, 833:9, 833:12, 839:25
**minor** [1] - 804:3
**minute** [4] - 825:9, 841:16, 846:21, 847:21
**minutes** [14] - 750:24, 751:24, 754:11, 762:14, 763:25, 773:2, 790:13, 790:14, 816:22, 817:5, 837:17, 846:1, 862:2, 892:9
**misconduct** [4] - 796:13, 814:6, 816:11
**misfortune** [1] - 881:25
**mishandled** [2] - 834:7, 846:2
**mislead** [1] - 775:17
**misleading** [1] - 886:20
**miss** [1] - 833:16
**mistake** [5] - 756:7, 770:20, 845:11, 846:3, 861:10
**mistakes** [3] - 852:10, 861:7, 876:2
**mistrial** [10] - 818:3, 819:17, 819:19, 824:5, 824:19, 825:14, 825:21, 828:1, 891:17, 891:20
**misuse** [1] - 881:24
**model** [1] - 756:20
**modify** [1] - 794:22
**moment** [5] - 762:21, 777:6, 800:18, 801:11, 801:22
**moments** [1] - 801:18
**monetary** [6] - 796:21, 796:23, 796:25, 797:2, 807:24, 853:24
**money** [18] - 781:1, 781:3, 785:1, 785:2, 791:2, 796:24, 798:11, 806:7, 807:22, 809:24, 810:7, 810:17, 810:18, 810:22, 811:7, 865:22, 880:6
**month** [2] - 774:9, 809:10
**months** [11] - 765:9, 769:9, 775:10, 784:19, 798:6, 833:15, 846:19, 846:25, 848:7, 856:19, 868:5
**Montressa** [2] - 771:18, 863:21
**morning** [3] - 749:3, 764:5, 801:5
**Morrison** [1] - 748:6
**mortgage** [1] - 840:17
**most** [9] - 772:8, 772:18, 775:18, 793:24, 794:6, 796:21, 810:25, 825:25
**mother** [5] - 799:7, 800:19, 801:3, 801:25, 869:22
**motion** [5] - 749:14, 820:20, 825:21,

891:16, 891:20

**motions** [5] - 749:4, 749:7, 749:17, 819:19, 890:6
**motivation** [1] - 799:6
**mouthful** [1] - 787:21
**move** [4] - 774:9, 819:17, 828:1, 848:8
**moved** [2] - 801:21, 891:10
**moving** [1] - 758:5
**MR** [55] - 752:18, 753:5, 753:10, 754:12, 756:6, 756:11, 756:18, 756:25, 759:14, 761:17, 761:24, 762:3, 762:12, 762:18, 763:14, 763:19, 764:7, 817:3, 817:7, 817:12, 817:15, 819:7, 819:8, 819:11, 821:12, 821:21, 822:2, 822:7, 822:15, 822:19, 822:23, 823:5, 823:9, 823:17, 824:6, 824:11, 825:2, 825:4, 825:10, 826:11, 827:17, 828:10, 828:24, 829:2, 829:7, 829:15, 862:9, 889:2, 889:9, 892:11, 893:2, 893:4, 893:7, 893:8, 893:13
**MS** [54] - 749:18, 750:24, 751:5, 751:11, 751:15, 751:18, 752:7, 752:16, 753:16, 753:19, 753:22, 754:2, 754:9, 757:2, 758:1, 758:5, 759:8, 759:11, 759:16, 759:18, 762:5, 762:8, 762:21, 762:23, 762:25, 763:5, 763:12, 763:23, 818:2, 819:1, 819:3, 819:16, 824:15, 825:8, 825:20, 826:13, 827:5, 827:13, 827:16, 827:21, 827:24, 828:3, 828:12, 828:15, 889:12, 889:19, 890:15, 890:18, 890:22, 891:1, 891:5, 891:16, 891:23, 891:25
**multi** [1] - 812:21
**multi-billion** [1] - 812:21
**multiple** [8] - 812:6, 843:10, 855:22, 856:3, 856:7, 857:10, 857:11
**Murray** [1] - 750:1
**must** [34] - 756:2, 765:24, 766:5, 769:22, 769:23, 773:23, 785:9, 785:24, 786:3, 786:6, 786:7, 812:6, 818:6, 830:12, 830:13, 872:19, 872:21, 872:23, 874:3, 874:7, 877:10, 877:13, 878:21, 878:22, 880:3, 880:13, 882:3, 882:23, 882:24, 884:18, 885:1, 885:5, 885:7, 885:22

## N

**N.A** [1] - 747:6
**name** [7] - 765:5, 767:15, 770:12, 788:7, 806:19, 832:17, 859:20
**named** [3] - 768:8, 831:17, 831:23
**Nancy** [1] - 894:11
**nancy** [1] - 748:19
**NANCY** [1] - 894:12
**natural** [1] - 798:22
**nature** [3] - 775:11, 836:6
**necessarily** [3] - 787:22, 830:17, 876:15
**necessary** [2] - 773:24, 887:9
**need** [30] - 751:22, 752:3, 775:4,

778:10, 778:16, 779:24, 788:24, 791:6, 796:4, 797:13, 806:17, 807:21, 808:9, 810:10, 811:14, 819:3, 827:9, 827:17, 829:22, 836:8, 837:18, 837:19, 839:6, 844:9, 844:11, 844:15, 854:22, 855:16, 870:9
**needed** [3] - 774:13, 779:8, 804:9
**needless** [2] - 779:7, 779:13
**needs** [6] - 802:7, 826:15, 826:19, 837:5, 837:21, 844:6
**negligence** [21] - 752:23, 753:1, 753:3, 753:14, 755:1, 755:6, 755:11, 756:2, 757:25, 758:1, 758:11, 761:13, 786:17, 786:25, 787:5, 787:11, 845:17, 862:11, 879:3, 879:8
**negligent** [10] - 752:15, 752:20, 754:23, 755:4, 755:19, 786:24, 795:10, 845:15, 850:14, 861:17
**negligently** [6] - 815:10, 829:23, 878:2, 878:6, 879:6, 883:21
**neighbor** [3] - 798:15, 798:17, 806:17
**net** [17] - 757:7, 757:13, 761:25, 764:23, 810:19, 814:9, 814:10, 818:7, 820:22, 820:25, 826:8, 826:23, 827:2, 828:8, 828:10, 829:6, 829:12
**never** [17] - 776:12, 790:19, 790:23, 792:15, 793:16, 794:11, 801:16, 801:19, 803:14, 814:11, 823:18, 832:15, 858:13, 862:12, 869:17, 871:5
**new** [4] - 820:20, 889:20, 891:1, 891:21
**New** [9] - 775:8, 775:10, 775:13, 776:6, 784:21, 800:8, 801:1, 802:3, 853:24
**news** [1] - 885:25
**next** [18] - 752:25, 753:1, 757:15, 765:9, 769:9, 786:17, 795:6, 800:5, 801:11, 801:12, 802:24, 803:25, 804:17, 805:24, 846:7, 849:17, 856:19, 857:13
**night** [4] - 749:24, 753:23, 754:5, 760:23
**Ninth** [2] - 750:1, 750:7
**nobody** [5] - 781:20, 783:9, 790:4, 798:12, 798:13
**non** [5] - 796:21, 796:25, 818:11, 818:20, 821:6
**non-economic** [3] - 818:11, 818:20, 821:6
**non-monetary** [2] - 796:21, 796:25
**none** [2] - 812:24, 875:15
**nonetheless** [2] - 826:5, 849:22
**normal** [7] - 797:6, 800:5, 800:6, 802:15, 851:14, 854:15, 880:10
**normally** [1] - 802:9
**North** [1] - 832:11
**Northwest** [1] - 776:7
**note** [4] - 851:12, 855:25, 884:17, 887:10
**noted** [3] - 838:9, 847:9, 871:14
**notes** [17] - 766:8, 768:7, 768:18, 783:18, 793:13, 793:14, 820:18, 832:1, 832:5, 835:13, 835:14, 839:15,

839:16, 839:24, 873:1, 873:2, 873:4
**nothing** [21] - 758:3, 779:15, 779:16, 779:17, 780:7, 780:8, 781:22, 781:25, 793:3, 811:11, 812:25, 820:16, 823:2, 836:10, 843:16, 843:20, 844:18, 847:4, 868:13, 885:3, 891:1
**notice** [10] - 785:7, 786:7, 786:12, 789:9, 795:2, 812:2, 833:4, 878:12, 878:24, 879:22
**notices** [4] - 769:20, 769:21, 774:5, 786:11
**notification** [2] - 773:16, 773:18
**notified** [1] - 831:18
**notify** [1] - 887:7
**notion** [2] - 749:11, 823:15
**November** [41] - 768:16, 768:19, 773:9, 773:17, 773:18, 775:5, 777:10, 777:19, 778:2, 778:9, 780:19, 793:11, 799:1, 800:11, 802:4, 806:21, 832:23, 839:1, 839:2, 839:4, 839:9, 846:6, 847:20, 848:8, 848:11, 848:15, 849:1, 849:16, 850:5, 850:6, 850:15, 850:17, 850:20, 857:14, 861:12, 861:16, 863:13, 863:16, 868:20, 869:2
**number** [30] - 750:7, 750:10, 767:15, 770:13, 779:25, 788:7, 788:21, 804:23, 805:2, 810:21, 811:10, 812:22, 814:9, 814:25, 820:5, 823:19, 823:21, 823:24, 823:25, 832:11, 832:18, 833:11, 844:8, 844:11, 848:22, 859:10, 859:14, 859:20, 876:15, 892:6
**numbers** [5] - 816:6, 818:22, 833:19, 833:20, 883:20
**numerically** [1] - 887:22

## O

**oath** [5] - 872:24, 874:13, 887:1, 887:24, 888:1
**obey** [3] - 812:7, 812:8, 813:18
**obeyed** [1] - 815:22
**object** [4] - 753:10, 760:9, 762:9, 873:23
**objected** [2] - 760:8, 820:7
**objection** [9] - 758:17, 759:1, 763:7, 873:25, 889:5, 889:18, 893:1, 893:7, 893:8
**objections** [14] - 750:20, 751:25, 752:2, 754:16, 756:4, 757:6, 758:7, 758:12, 758:20, 759:19, 761:16, 873:22, 888:25, 889:7
**objectively** [1] - 820:15
**obligation** [6] - 787:7, 833:6, 835:4, 835:23, 837:11, 852:23
**observed** [1] - 802:1
**obvious** [8] - 751:6, 787:5, 787:20, 789:14, 815:12, 852:8, 853:3, 879:17
**obviously** [6] - 789:16, 812:19, 820:4, 825:14, 870:12, 871:6
**occupied** [1] - 802:10

**occurred** [5] - 757:8, 757:17, 830:6, 855:5, 880:20
**October** [16] - 767:11, 769:16, 773:12, 777:24, 779:19, 792:9, 831:16, 831:19, 831:22, 832:7, 832:19, 832:22, 838:25, 863:4, 863:6, 863:9
**odd** [2] - 776:18, 811:13
**oddly** [1] - 772:5
**OF** [2] - 747:2, 747:15
**offered** [5] - 758:24, 759:3, 824:18, 869:12, 869:17
**Office** [4] - 844:7, 856:14, 857:22, 859:17
**office** [6] - 775:20, 775:21, 792:22, 800:25, 802:3, 853:24
**officers** [2] - 877:22, 877:24
**Official** [1] - 894:13
**officially** [1] - 827:10
**often** [3] - 771:7, 814:9, 876:2
**old** [1] - 795:22
**old-fashioned** [1] - 795:22
**OlsenDaines** [1] - 748:8
**omission** [1] - 881:21
**omissions** [1] - 861:15
**omitted** [1] - 756:19
**once** [6] - 765:10, 769:21, 783:21, 790:4, 865:10, 885:25
**one** [90] - 750:17, 751:3, 752:9, 753:12, 754:3, 754:4, 754:17, 754:19, 754:24, 755:15, 755:16, 756:7, 757:15, 761:2, 761:3, 761:4, 761:5, 764:22, 765:15, 770:5, 770:20, 780:21, 780:22, 782:5, 785:1, 785:10, 786:13, 786:15, 788:14, 788:23, 789:14, 790:24, 791:8, 791:18, 794:21, 794:22, 799:14, 799:22, 803:6, 803:7, 804:4, 804:6, 805:15, 805:25, 807:25, 809:3, 811:6, 812:9, 814:8, 814:8, 814:14, 814:20, 814:23, 815:1, 827:6, 828:12, 828:19, 832:13, 835:20, 836:4, 836:9, 836:15, 842:4, 844:1, 844:6, 844:22, 845:14, 847:11, 847:13, 854:3, 857:3, 857:4, 857:22, 868:10, 870:2, 872:7, 873:6, 875:6, 878:14, 878:23, 879:1, 882:18, 883:21, 887:11, 889:12, 889:19
**one-tenth** [4] - 814:14, 814:20, 814:23, 815:1
**ones** [3] - 752:12, 759:20, 805:19
**ongoing** [2] - 838:16, 840:3
**oOo** [1] - 894:1
**open** [6] - 765:4, 771:3, 803:7, 838:9, 838:11, 887:16
**opened** [1] - 771:2
**opening** [4] - 785:5, 838:23, 862:10, 873:17
**operator** [3] - 838:17, 841:11, 850:8
**operators** [6] - 788:15, 788:23, 793:11, 838:4, 842:14, 870:20
**opinion** [9] - 794:6, 794:8, 794:9,

794:10, 836:19, 854:10, 876:20, 883:3, 883:9
**opinions** [4] - 872:22, 876:19, 876:20, 876:24
**opportunities** [2] - 855:11, 862:17
**opportunity** [12] - 750:19, 752:5, 752:6, 759:20, 766:23, 813:23, 814:3, 827:7, 834:25, 844:20, 875:17, 887:4
**oppose** [2] - 825:13, 825:15
**oppressive** [6] - 808:7, 808:9, 860:22, 870:1, 881:11, 881:21
**option** [1] - 842:14
**OR** [5] - 748:7, 748:10, 748:13, 748:18, 748:21
**orally** [1] - 887:16
**order** [7] - 749:10, 751:2, 752:3, 760:18, 874:22, 878:22, 882:14
**ordered** [1] - 885:23
**OREGON** [1] - 747:2
**Oregon** [2] - 747:6, 894:13
**original** [1] - 894:6
**originally** [1] - 804:20
**otherwise** [2] - 881:22, 887:22
**out-of-pocket** [1] - 853:22
**outcome** [1] - 875:20
**outrageous** [2] - 755:18, 772:18
**outside** [5] - 837:11, 852:23, 858:21, 870:25, 886:17, 887:7, 889:23
**overly** [1] - 873:3
**overrule** [3] - 750:5, 750:21, 760:4
**overruled** [3] - 758:17, 761:16, 890:24
**overseas** [2] - 768:1, 776:2
**oversight** [1] - 763:3
**owed** [2] - 784:20, 785:3
**own** [17] - 766:11, 770:1, 771:10, 771:14, 789:8, 799:2, 837:13, 837:18, 837:22, 852:23, 864:5, 865:13, 870:22, 872:21, 873:2, 883:8, 886:6
**owner** [1] - 769:4

**P**

**P.C** [1] - 748:11
**Pacific** [2] - 776:7, 800:17
**packet** [3] - 839:13, 843:3
**page** [1] - 889:17
**pages** [1] - 778:3
**Paget** [1] - 887:24
**paid** [2] - 798:15, 833:15
**pain** [1] - 831:10
**papers** [1] - 857:20
**paragraph** [3] - 758:13, 759:25, 776:18
**part** [22] - 755:7, 760:9, 760:20, 771:6, 776:3, 793:22, 803:8, 804:8, 805:20, 842:9, 852:8, 852:19, 853:11, 863:3, 863:8, 863:15, 875:14, 876:12, 889:1, 889:13, 889:15, 893:5
**participate** [3] - 802:11, 859:5, 884:21
**particular** [1] - 751:4
**particularly** [1] - 882:10

**parties** [19] - 749:2, 749:9, 752:13, 754:14, 760:8, 764:3, 809:6, 819:13, 829:17, 855:21, 862:5, 877:17, 882:12, 886:11, 886:22, 886:25, 887:3, 887:18, 888:20
**parties'** [1] - 760:15
**party** [9] - 773:25, 782:11, 874:14, 877:12, 877:16, 877:19, 880:1, 882:6, 887:4
**party's** [1] - 886:15
**passed** [1] - 848:8
**passport** [5] - 778:2, 778:3, 778:22, 848:4, 848:9
**past** [1] - 830:24
**path** [2] - 835:20, 835:21
**pause** [2] - 825:17, 877:4
**pay** [3] - 803:17, 807:19, 812:7
**paying** [2] - 798:16, 803:1
**payment** [3] - 777:2, 803:14, 833:16
**peace** [1] - 813:9
**pecuniary** [1] - 749:11
**penalized** [1] - 808:16
**penalizing** [1] - 814:21
**penalty** [3] - 807:19, 807:24, 812:7
**pending** [3] - 793:11, 793:16
**pennies** [1] - 811:12
**people** [27] - 760:8, 765:16, 765:17, 772:1, 772:7, 772:25, 788:16, 789:1, 789:20, 791:24, 793:22, 805:18, 809:6, 809:7, 809:17, 810:9, 813:22, 834:24, 835:1, 835:24, 840:25, 841:8, 876:2, 876:3, 882:12, 885:19, 886:10
**people's** [2] - 764:25, 813:7
**per** [1] - 773:2
**perceived** [6] - 759:25, 760:3, 870:6, 870:10, 870:16, 881:19
**percent** [13] - 795:24, 814:8, 814:9, 814:10, 814:14, 814:20, 814:24, 815:1, 864:21, 865:3, 865:5
**percentages** [1] - 823:22
**perfect** [4] - 773:15, 803:2, 803:3, 855:11
**performed** [1] - 877:24
**period** [7] - 750:22, 775:5, 800:10, 800:12, 846:18, 847:1, 879:19
**permissible** [2] - 828:5, 889:23
**permit** [1] - 760:13
**permitted** [1] - 876:19
**persistent** [1] - 781:6
**person** [31] - 779:2, 787:1, 787:2, 792:3, 792:23, 807:15, 814:1, 832:18, 838:5, 842:6, 845:3, 845:18, 845:19, 845:23, 848:17, 849:13, 849:14, 859:5, 859:10, 859:20, 863:22, 865:15, 874:16, 874:17, 877:21, 878:14, 879:9, 879:10, 885:13
**personal** [1] - 872:21
**personally** [1] - 875:5
**persons** [1] - 766:15
**perspective** [1] - 750:15

**persuaded** [1] - 877:14
**persuades** [2] - 883:4, 883:10
**PETERSON** [14] - 754:12, 817:3, 817:7, 817:12, 817:15, 819:8, 819:11, 828:24, 829:2, 829:7, 829:15, 892:11, 893:8, 893:13
**Peterson** [1] - 817:1
**peterson** [1] - 748:16
**Philbin** [1] - 750:11
**phone** [5] - 767:15, 832:2, 848:22, 859:9, 885:14
**photo** [3] - 843:13, 848:5, 848:6
**phrase** [4] - 757:18, 761:11, 761:13, 826:21
**physical** [1] - 821:5
**picture** [3] - 848:10, 849:7, 851:20
**piece** [2] - 849:22, 860:3
**pieces** [2] - 792:10, 848:20
**pile** [2] - 818:22, 829:5
**piling** [1] - 818:19
**place** [8] - 802:14, 846:4, 852:11, 883:22, 883:25, 884:9, 886:7, 886:9
**placed** [2] - 758:12, 874:13
**places** [1] - 757:9
**plague** [1] - 788:18
**plain** [1] - 834:22
**plainly** [1] - 772:17
**plaintiff** [51] - 754:5, 756:9, 757:18, 757:22, 759:12, 760:12, 760:18, 761:11, 762:17, 774:17, 786:6, 809:5, 817:15, 824:13, 825:24, 826:10, 833:19, 837:23, 841:14, 841:19, 852:22, 853:6, 853:8, 860:20, 862:8, 878:1, 878:3, 878:4, 878:8, 878:10, 878:22, 879:4, 879:6, 879:21, 880:3, 880:4, 880:7, 880:15, 880:22, 881:5, 881:6, 881:10, 881:15, 881:23, 882:1, 882:10, 882:15, 882:17, 889:1, 893:1
**Plaintiff** [1] - 747:4
**PLAINTIFF** [1] - 748:2
**plaintiff's** [26] - 755:17, 758:22, 762:9, 779:12, 818:4, 818:8, 818:20, 826:16, 830:20, 834:2, 841:24, 844:25, 870:3, 870:5, 870:7, 870:11, 870:17, 877:25, 880:4, 881:11, 881:16, 881:18, 881:20, 884:5, 889:21, 890:1
**plaintiffs** [1] - 836:21
**plan** [3] - 775:8, 775:9, 776:9
**planned** [1] - 800:11
**plans** [9] - 775:14, 797:17, 802:8, 813:8, 855:7, 855:8, 892:5, 892:9, 893:12
**playing** [2] - 811:22, 813:20
**plea** [2] - 849:3, 864:8
**plead** [1] - 839:25
**pleased** [1] - 805:1
**pleasure** [2] - 762:17, 817:4
**pled** [6] - 768:18, 768:21, 769:1, 839:23, 864:7
**pocket** [2] - 796:24, 853:22
**point** [30] - 750:20, 751:25, 752:10,

754:18, 755:10, 755:17, 759:13, 768:13, 769:6, 785:17, 817:11, 817:23, 824:15, 827:6, 830:7, 832:13, 833:22, 840:2, 843:23, 844:19, 849:2, 849:4, 849:8, 849:14, 850:11, 851:7, 853:18, 888:14, 890:1
**pointed** [3] - 758:21, 793:23, 794:15
**points** [3] - 753:17, 794:3, 843:10
**police** [44] - 768:24, 769:1, 769:3, 771:14, 773:11, 773:22, 774:20, 775:1, 776:24, 778:18, 779:21, 779:24, 779:25, 780:1, 780:5, 783:16, 789:7, 792:13, 792:14, 792:15, 792:16, 792:19, 798:18, 800:23, 840:3, 840:4, 842:22, 843:4, 864:12, 864:15, 864:16, 864:19, 864:20, 865:17, 865:23, 865:24, 866:2, 866:3, 866:4, 866:6, 866:7, 866:24, 868:22
**police's** [1] - 840:6
**policies** [22] - 766:11, 770:15, 794:4, 796:8, 812:14, 834:10, 834:11, 834:16, 834:19, 834:24, 835:17, 835:23, 836:16, 837:6, 850:1, 850:10, 851:16, 852:11, 852:15, 861:4, 861:5
**policy** [18] - 771:21, 772:19, 779:4, 779:6, 779:7, 779:14, 788:2, 788:9, 788:14, 789:1, 790:19, 790:24, 793:5, 806:14, 836:11, 837:24, 870:20
**polluted** [2] - 766:20, 796:13
**poorly** [1] - 799:5
**Portfolio** [1] - 857:2
**Portland** [6] - 747:6, 748:7, 748:10, 748:13, 748:18, 748:21
**portraying** [1] - 803:12
**portrays** [1] - 871:22
**posed** [3] - 760:7, 809:5, 882:11
**poses** [1] - 809:12
**posing** [1] - 753:9
**posit** [1] - 868:19
**position** [4] - 824:19, 841:24, 865:2, 865:14
**possession** [1] - 837:16
**possible** [2] - 871:25, 874:17
**post** [1] - 827:13
**posted** [1] - 892:4
**power** [22] - 764:24, 765:2, 765:3, 796:6, 806:5, 809:19, 811:21, 812:7, 813:3, 813:6, 813:7, 813:8, 813:10, 813:19, 813:21, 813:23, 814:1, 816:12, 816:16, 872:10, 881:24
**powerless** [1] - 799:2
**PowerPoint** [1] - 838:23
**practice** [2] - 762:25, 763:2
**precious** [1] - 801:22
**precisely** [1] - 842:3
**preclude** [1] - 891:10
**predicted** [1] - 818:21
**prefer** [1] - 817:7
**preference** [1] - 828:24
**prejudice** [1] - 882:5

**prejudices** [1] - 872:22
**premise** [2] - 837:24, 841:25
**prepared** [2] - 751:25, 883:14
**preponderance** [5] - 877:13, 878:5, 878:23, 880:5, 881:7
**present** [1] - 874:20
**presented** [4] - 874:18, 877:16, 886:16, 886:24
**preside** [1] - 882:20
**President** [1] - 859:18
**presiding** [7] - 882:19, 884:3, 884:14, 884:19, 884:22, 887:11
**presuming** [1] - 822:24
**pretty** [6] - 755:5, 789:14, 794:19, 806:12, 808:5, 820:10
**prevail** [2] - 786:6, 878:22
**previous** [2] - 777:13, 781:10
**primary** [3] - 765:15, 785:10, 833:25
**privacy** [9] - 797:10, 804:17, 804:18, 804:19, 805:3, 805:10, 841:3, 855:14, 880:11
**private** [1] - 805:3
**problem** [22] - 755:12, 755:13, 770:22, 788:17, 792:7, 794:16, 794:24, 797:9, 798:22, 799:10, 799:11, 799:14, 814:13, 822:6, 822:14, 823:10, 824:5, 826:17, 831:9, 862:17, 871:6
**problems** [3] - 791:8, 831:8, 836:3
**procedure** [11] - 770:23, 771:19, 771:21, 779:9, 782:6, 785:14, 787:9, 788:6, 791:8, 836:11, 864:10
**procedures** [41] - 766:11, 766:12, 766:14, 770:16, 770:19, 770:21, 772:16, 789:13, 790:18, 790:25, 794:12, 796:8, 796:9, 808:19, 808:21, 808:22, 809:10, 809:21, 809:23, 809:24, 810:3, 811:4, 812:14, 834:11, 834:16, 834:19, 834:21, 835:18, 835:23, 836:17, 837:6, 850:1, 850:10, 851:16, 852:11, 861:4, 861:6, 871:7, 871:25
**proceed** [1] - 778:10
**proceeded** [1] - 776:5
**proceedings** [4] - 825:17, 887:6, 893:15, 894:5
**PROCEEDINGS** [1] - 747:15
**process** [16] - 760:13, 773:6, 798:9, 799:16, 802:8, 818:5, 821:16, 821:19, 822:6, 822:14, 826:3, 844:6, 859:5, 859:6, 865:8, 886:21
**processed** [2] - 770:6, 771:24
**processes** [1] - 774:21
**profit** [3] - 791:1, 810:5, 812:9
**profitable** [1] - 809:21
**profiting** [1] - 809:25
**profits** [1] - 772:25
**profound** [1] - 801:3
**programs** [1] - 886:8
**Progressive** [1] - 856:23
**prohibit** [2] - 794:12, 870:20

**prohibited** [1] - 772:21
**prohibits** [1] - 788:15
**Proof** [1] - 758:19
**proof** [15] - 764:18, 768:24, 774:12, 774:13, 795:6, 795:8, 795:9, 795:12, 796:1, 816:2, 844:18, 875:4, 875:6, 877:12
**proper** [3] - 756:14, 820:2, 861:4
**properly** [1] - 852:12
**propose** [2] - 828:12, 893:3
**proposed** [5] - 752:11, 758:7, 759:24, 760:23, 892:23
**prosecution** [2] - 768:10, 774:11
**prosecutor** [1] - 814:4
**protect** [3] - 811:9, 816:9, 886:15
**proud** [1] - 803:3
**prove** [6] - 786:6, 786:7, 795:10, 845:3, 878:23
**proved** [4] - 772:11, 871:13, 873:10, 880:13
**proven** [1] - 815:10
**proves** [1] - 769:6
**provide** [4] - 776:20, 826:6, 842:7, 888:18
**provided** [7] - 786:4, 830:13, 832:9, 842:21, 878:13, 878:16, 884:20
**provides** [1] - 779:10
**proving** [3] - 878:4, 880:5, 881:6
**provision** [2] - 766:18, 785:10
**provisions** [3] - 785:6, 785:8, 786:14
**proximate** [2] - 759:3, 759:6
**prudent** [10] - 787:1, 787:2, 787:4, 845:18, 845:19, 845:23, 849:12, 849:14, 879:9, 879:10
**pulled** [1] - 854:6
**pulling** [1] - 829:6
**punish** [14] - 807:9, 808:12, 808:15, 808:18, 808:19, 811:5, 811:18, 812:19, 812:20, 815:20, 816:11, 825:12, 881:4, 882:14
**punished** [3] - 760:11, 807:16, 812:3
**punishment** [5] - 807:18, 809:22, 811:7, 811:8, 815:5
**punitive** [61] - 756:18, 759:21, 760:14, 796:19, 807:6, 807:7, 807:8, 807:11, 807:17, 807:20, 808:2, 808:5, 808:11, 809:1, 810:23, 811:1, 811:10, 811:16, 811:19, 811:23, 811:25, 812:12, 812:17, 812:19, 815:18, 817:16, 817:18, 818:8, 820:23, 821:7, 822:13, 824:12, 825:11, 826:1, 860:7, 860:11, 860:13, 860:15, 860:16, 860:17, 860:21, 860:24, 861:2, 861:8, 861:22, 869:24, 869:25, 870:4, 881:3, 881:5, 881:7, 881:9, 882:2, 882:3, 882:7, 882:13, 882:16, 884:7, 889:13, 890:3
**punitives** [2] - 762:3, 824:8
**purchase** [1] - 844:12
**purchased** [4] - 768:8, 778:6, 781:14, 831:5

**purpose** [15] - 761:19, 785:14, 785:15, 785:20, 808:11, 810:23, 812:18, 825:11, 853:5, 860:19, 874:5, 874:7, 874:8, 881:3, 881:14
**purposes** [7] - 808:14, 849:13, 850:13, 850:15, 850:21, 850:23, 882:5
**pursuant** [2] - 779:3, 788:2
**push** [1] - 865:23
**put** [16] - 750:20, 751:25, 754:19, 759:20, 770:10, 775:8, 777:16, 777:19, 788:21, 792:2, 804:22, 806:24, 807:24, 814:16, 817:13, 844:13
**puts** [2] - 772:25, 798:4
**putting** [2] - 806:10, 810:15

**Q**

**quantify** [1] - 854:2
**quantities** [1] - 833:11
**questioned** [1] - 868:10
**questions** [17] - 752:21, 815:9, 821:9, 826:10, 826:12, 829:21, 830:3, 832:12, 832:17, 848:23, 868:12, 873:22, 874:15, 877:5, 883:21, 884:18
**quick** [2] - 757:2, 809:14, 809:20
**quickly** [1] - 795:1
**quite** [3] - 818:10, 823:20, 826:25
**quota** [2] - 773:1, 773:7
**quotation** [2] - 759:10, 759:16
**quote** [3] - 768:18, 773:24, 778:9

**R**

**rails** [1] - 828:5
**raise** [4] - 752:9, 760:6, 827:9, 890:5
**raised** [9] - 758:7, 758:20, 818:19, 820:11, 820:12, 826:3, 840:25, 889:14, 890:6
**raising** [2] - 755:10, 757:17
**rampant** [1] - 794:15
**range** [2] - 799:24, 800:3
**rate** [1] - 804:11
**rather** [4] - 810:15, 865:18, 866:7, 889:4
**ratio** [8] - 818:12, 818:15, 818:16, 820:2, 821:15, 822:24, 823:1
**ratios** [1] - 823:6
**re** [1] - 890:5
**re-raise** [1] - 890:5
**reach** [5] - 820:3, 861:22, 882:22, 883:6, 883:13
**reached** [2] - 887:14, 887:23
**reaching** [5] - 826:8, 826:23, 828:9, 829:12, 873:11
**read** [14] - 749:24, 750:19, 750:25, 751:22, 775:26, 777:17, 782:3, 783:12, 789:25, 794:19, 799:17, 822:8, 885:25, 886:13
**reading** [2] - 781:20, 783:10
**reads** [2] - 883:18, 892:18

**ready** [3] - 750:20, 884:16, 884:24
**real** [6] - 770:3, 775:13, 796:23, 811:24, 843:15, 864:1
**realize** [1] - 816:8
**really** [26] - 753:6, 755:21, 765:3, 768:23, 772:1, 779:15, 787:11, 801:18, 801:22, 802:19, 805:1, 809:18, 809:22, 810:10, 810:20, 815:4, 818:23, 820:13, 820:23, 823:5, 823:7, 823:20, 823:21, 828:5, 836:4, 872:2
**reason** [11] - 750:9, 784:15, 784:23, 810:25, 811:23, 833:23, 841:8, 843:9, 844:4, 862:24, 882:3
**Reasonable** [1] - 758:6
**reasonable** [47] - 750:23, 758:9, 765:25, 769:23, 769:25, 771:11, 771:12, 772:9, 772:12, 772:16, 772:24, 773:3, 780:17, 782:13, 782:14, 783:22, 785:11, 785:15, 785:18, 785:24, 785:25, 786:3, 786:16, 787:3, 787:6, 788:8, 789:20, 789:23, 794:5, 795:17, 810:10, 815:1, 830:12, 835:4, 836:17, 837:14, 841:17, 844:24, 852:14, 852:18, 862:21, 864:5, 864:24, 864:25, 870:22, 871:8, 878:21
**reasonableness** [3] - 839:7, 843:8, 875:22
**reasonably** [14] - 787:1, 787:2, 787:4, 788:5, 845:18, 845:19, 845:23, 849:12, 849:14, 853:5, 853:7, 879:8, 879:9, 880:7
**reasons** [6] - 819:21, 841:3, 846:14, 876:19, 876:23, 889:22
**rebuttal** [9] - 805:15, 824:3, 824:14, 837:20, 862:8, 890:1, 890:11, 891:5, 891:22
**receipt** [1] - 847:8
**receipts** [1] - 776:19
**receive** [3] - 778:10, 825:23, 853:15
**received** [28] - 772:9, 786:7, 832:20, 832:24, 838:25, 842:18, 846:7, 846:23, 847:12, 849:5, 849:6, 849:7, 849:17, 849:19, 850:19, 851:17, 853:13, 859:11, 873:12, 874:5, 874:11, 878:24, 879:20, 879:21, 879:22, 885:6, 892:24
**receives** [2] - 830:20, 833:21
**receiving** [6] - 830:10, 832:20, 847:22, 848:9, 848:10, 878:12
**recent** [2] - 749:25, 823:3
**recently** [3] - 862:16, 890:13, 891:6
**recess** [10] - 754:13, 764:2, 816:20, 819:12, 862:1, 862:4, 892:3, 892:13, 893:14
**reckless** [26] - 758:15, 760:1, 787:17, 787:18, 787:24, 787:25, 788:13, 789:19, 808:4, 808:8, 808:10, 815:25, 816:3, 852:4, 852:5, 860:24, 870:1, 870:3, 870:5, 870:17, 871:10, 879:14,

879:15, 881:11, 881:16, 890:3
**recollection** [1] - 749:21
**reconvene** [6] - 749:2, 754:14, 764:4, 819:13, 862:6, 892:15
**reconvened** [2] - 884:25, 893:16
**record** [42] - 749:6, 757:6, 758:13, 758:14, 758:18, 759:20, 760:18, 760:19, 761:6, 761:21, 762:9, 762:24, 763:9, 768:6, 792:13, 798:13, 817:13, 832:2, 835:14, 837:7, 837:25, 838:5, 838:9, 838:10, 838:19, 839:3, 839:21, 840:12, 841:17, 847:8, 847:15, 847:22, 847:23, 848:9, 851:7, 852:24, 852:25, 854:3, 860:5, 889:23, 894:4
**recorded** [1] - 874:15
**records** [24] - 769:8, 770:1, 770:12, 771:14, 783:17, 789:8, 791:24, 792:2, 792:3, 837:13, 837:18, 837:22, 840:13, 840:15, 840:16, 840:17, 850:9, 852:23, 867:6, 870:22, 870:24, 870:25, 871:1, 874:23
**recounts** [1] - 781:10
**recover** [3] - 807:6, 880:15, 880:22
**recovered** [1] - 767:18
**reduce** [1] - 822:16
**reference** [8] - 756:19, 826:14, 833:20, 842:20, 843:23, 844:19, 868:8, 886:3
**references** [1] - 819:25
**referred** [4] - 779:14, 820:1, 832:1, 891:8
**reflect** [1] - 882:5
**reflected** [2] - 751:16, 768:17
**reflects** [2] - 750:15, 881:17
**refused** [1] - 790:3
**refuses** [1] - 768:4
**regard** [1] - 878:12
**regarding** [7] - 754:18, 757:6, 758:13, 759:21, 786:8, 827:2, 878:24
**regardless** [2] - 847:24, 877:16
**regards** [4] - 749:17, 752:10, 762:13, 888:21
**regress** [1] - 802:13
**regular** [1] - 813:25
**reimburse** [1] - 853:23
**reiterating** [1] - 891:9
**reject** [1] - 876:21
**related** [15] - 767:24, 798:1, 805:17, 836:17, 841:4, 846:16, 857:3, 858:6, 858:7, 858:8, 858:15, 858:19, 869:16
**relating** [2] - 758:24, 759:1
**relation** [1] - 824:8
**relations** [2] - 800:6, 859:18
**relationship** [6] - 797:18, 801:4, 801:8, 802:1, 824:11, 882:16
**relatively** [1] - 750:22
**relayed** [1] - 842:23
**relevant** [9] - 786:4, 834:12, 834:16, 836:22, 851:23, 855:20, 868:11, 868:14, 878:16
**relied** [3] - 782:23, 800:16, 877:9

**rely** [2] - 760:18, 873:1
**relying** [1] - 767:25
**remain** [1] - 751:14
**remains** [1] - 774:7
**remarks** [1] - 820:6
**remember** [28] - 749:16, 767:8, 777:14, 784:10, 785:13, 790:21, 794:17, 794:19, 802:6, 816:1, 833:13, 838:20, 840:23, 846:7, 849:17, 854:7, 857:4, 857:17, 867:18, 867:21, 868:9, 871:15, 873:19, 876:3, 876:4, 887:1, 887:21
**remind** [2] - 885:6, 889:5
**reminder** [2] - 830:15, 833:2
**remit** [1] - 825:7
**remove** [10] - 768:14, 769:15, 777:12, 777:25, 779:5, 779:10, 780:23, 862:18, 889:15, 892:20
**removed** [8] - 761:12, 761:14, 780:13, 792:4, 792:5, 804:20, 850:12, 889:21
**removing** [2] - 757:21, 780:12
**rendered** [1] - 880:2
**renew** [1] - 758:23
**renewing** [4] - 758:6, 758:12, 758:20, 759:8
**renews** [1] - 757:6
**rent** [1] - 804:8
**rented** [1] - 853:24
**renting** [1] - 802:3
**rents** [1] - 775:20
**repeat** [2] - 761:7, 767:7
**repeatedly** [2] - 787:6, 796:2
**report** [63] - 764:16, 765:2, 766:18, 766:24, 768:3, 768:15, 773:9, 773:13, 773:18, 774:4, 774:8, 774:20, 775:1, 775:15, 775:16, 776:4, 776:24, 779:21, 779:25, 780:2, 784:1, 784:16, 785:20, 789:7, 789:22, 791:13, 791:21, 792:19, 797:24, 802:25, 803:2, 803:16, 804:12, 806:1, 806:3, 813:6, 830:13, 833:7, 839:13, 842:22, 843:4, 849:25, 854:6, 854:8, 854:10, 856:18, 864:12, 864:15, 864:20, 866:3, 866:6, 866:24, 871:13, 871:14, 871:17, 871:18, 871:21, 878:17, 885:23, 886:14, 888:20, 892:21
**reported** [9] - 765:7, 767:23, 767:24, 768:3, 773:25, 791:19, 794:22, 803:20, 865:11
**reporter** [1] - 759:22
**REPORTER** [1] - 748:19
**Reporter** [1] - 894:13
**reporting** [26] - 765:8, 769:17, 769:19, 770:4, 773:20, 776:16, 782:10, 782:25, 789:9, 793:25, 794:4, 794:24, 809:16, 810:4, 830:11, 830:15, 833:3, 833:4, 866:1, 872:2, 878:14, 878:17, 878:18, 878:25, 879:20, 879:23
**Reporting** [42] - 752:14, 752:15, 765:14, 769:22, 780:15, 785:4, 785:6, 785:9,

785:21, 785:23, 786:14, 786:23, 787:13, 791:14, 793:21, 795:5, 811:20, 811:21, 815:11, 815:16, 829:24, 852:5, 855:4, 855:17, 862:15, 878:2, 878:7, 878:9, 878:11, 878:20, 879:2, 879:7, 879:13, 879:15, 880:18, 880:19, 880:25, 881:2, 883:22, 883:25, 884:9
**reports** [20] - 765:1, 765:24, 766:5, 766:8, 766:10, 767:6, 774:4, 774:17, 789:15, 791:14, 791:15, 796:13, 797:1, 800:24, 803:17, 806:1, 807:8, 808:1, 813:5
**reprehensibility** [8] - 760:16, 760:25, 809:2, 809:3, 809:4, 812:13, 828:17, 882:8
**reprehensible** [2] - 809:3, 882:10
**representative** [3] - 774:14, 782:4, 892:14
**reputation** [14] - 751:12, 797:6, 802:24, 802:25, 803:15, 803:23, 813:10, 854:3, 854:5, 854:12, 871:11, 871:12, 871:20, 880:9
**request** [9] - 755:8, 758:23, 760:5, 768:2, 781:17, 839:14, 843:9, 846:15, 863:9
**requested** [7] - 832:8, 842:24, 843:1, 843:2, 844:24, 848:18, 859:10
**requesting** [5] - 806:12, 839:12, 848:14, 848:21, 863:7
**require** [7] - 789:18, 812:15, 830:19, 836:23, 864:9, 864:11, 893:4
**required** [8] - 780:14, 835:16, 838:2, 841:17, 852:13, 870:13, 871:7, 881:2
**requirement** [5] - 750:4, 759:4, 759:6, 785:23, 837:14
**requirements** [3] - 836:18, 878:19, 879:1
**requires** [14] - 750:14, 769:25, 772:14, 772:22, 782:13, 783:23, 784:18, 788:25, 830:8, 830:11, 830:21, 841:22, 841:25, 887:2
**requiring** [2] - 785:11, 786:15
**research** [10] - 784:8, 798:3, 800:22, 818:10, 867:11, 867:12, 867:14, 886:2, 886:10, 886:17
**researches** [1] - 798:3
**reserved** [1] - 749:19
**resolved** [3] - 773:11, 851:2, 851:3
**resources** [1] - 781:2
**respect** [3] - 860:15, 878:15, 890:3
**respond** [6] - 777:9, 790:1, 819:6, 847:21, 847:25, 885:22
**responded** [11] - 764:20, 829:24, 830:2, 831:22, 838:6, 839:1, 846:8, 846:10, 847:18, 847:19, 847:20
**responding** [2] - 806:11, 850:14
**responds** [2] - 780:16, 848:12
**response** [24] - 776:14, 778:8, 781:16, 782:15, 782:17, 782:24, 793:2,

794:20, 797:24, 830:10, 836:24, 837:1, 839:14, 842:11, 846:16, 850:11, 850:17, 850:18, 850:22, 851:24, 863:5, 863:13, 892:23, 893:1
**responses** [7] - 834:6, 834:7, 836:17, 840:9, 847:18, 861:16, 863:2
**responsibility** [9] - 767:2, 767:5, 796:4, 809:19, 813:3, 816:13, 816:14, 854:24
**responsible** [4] - 791:18, 791:21, 796:5, 877:23
**rest** [2] - 749:19, 876:13
**restating** [1] - 758:17
**restrictions** [1] - 887:3, 887:5
**result** [23] - 750:13, 755:21, 755:23, 756:15, 758:9, 768:13, 770:9, 772:16, 786:17, 797:13, 830:5, 838:13, 838:14, 854:25, 855:1, 855:3, 855:17, 857:8, 860:1, 861:21, 878:4, 880:17, 880:18
**resulted** [5] - 769:24, 774:12, 780:22, 840:7, 879:3
**resulting** [1] - 861:20
**results** [6] - 767:6, 780:18, 783:1, 830:14, 846:6, 878:17
**return** [4] - 755:6, 856:1, 861:19, 884:24
**returned** [3] - 767:18, 832:9, 841:21
**reverse** [1] - 822:22
**review** [17] - 749:9, 749:23, 751:18, 786:3, 821:22, 821:24, 827:8, 830:13, 832:6, 834:23, 835:6, 835:7, 835:12, 836:22, 837:24, 878:16
**reviewed** [1] - 842:15
**reviewing** [3] - 757:3, 800:24, 827:13
**reviews** [1] - 821:14
**rights** [9] - 870:4, 870:5, 870:7, 870:11, 870:18, 881:12, 881:17, 881:18, 881:20
**risk** [17] - 752:22, 760:4, 787:19, 809:5, 809:8, 809:13, 820:13, 852:7, 853:2, 860:25, 870:6, 870:10, 870:14, 870:16, 879:16, 881:19, 882:11
**risks** [1] - 828:18
**RMR** [2] - 748:19, 894:12
**Robert** [3] - 748:11, 748:11, 748:15
**Rodighiero** [8] - 775:24, 776:2, 777:5, 784:23, 799:4, 800:14, 802:6, 803:21
**Room** [1] - 748:20
**room** [12] - 802:18, 813:24, 815:8, 816:23, 834:15, 837:2, 837:3, 872:15, 883:16, 885:15, 888:6, 888:9
**routes** [1] - 799:14
**ruined** [1] - 803:4
**Rule** [1] - 757:13
**rule** [2] - 756:21, 890:25
**ruled** [2] - 812:9, 890:21
**rules** [3] - 873:24, 886:15, 887:1
**ruling** [3] - 751:5, 754:9, 874:1
**rulings** [1] - 749:20

## S

**Sabido** [1] - 748:15
**sad** [2] - 781:19, 799:8
**Safeco** [1] - 758:14
**safety** [1] - 881:18
**sail** [1] - 775:12
**sailboat** [1] - 776:11
**sailing** [6] - 775:7, 776:5, 784:24, 800:13, 800:17
**sand** [1] - 748:2
**Sand** [1] - 748:2
**sat** [2] - 831:23, 867:6
**satisfy** [2] - 785:22, 878:19
**saves** [1] - 810:17
**saving** [1] - 809:24
**saw** [19] - 753:23, 766:21, 767:6, 769:10, 771:18, 783:25, 792:7, 796:21, 798:18, 799:7, 803:16, 805:7, 809:13, 854:8, 869:3, 869:4, 869:24, 869:25, 875:5
**scale** [4] - 795:21, 795:22, 795:23, 816:2
**scenario** [1] - 823:2
**school** [5] - 801:7, 801:8, 802:5, 802:10, 802:12
**scope** [3] - 751:6, 877:24, 889:23
**screen** [1] - 834:13
**SE** [1] - 748:3
**search** [1] - 886:8
**searching** [1] - 886:3
**seated** [9] - 749:3, 754:15, 764:5, 816:25, 819:14, 829:10, 862:7, 888:24, 892:16
**second** [16] - 754:23, 755:2, 755:9, 758:13, 776:18, 786:13, 787:12, 796:19, 815:13, 827:18, 835:21, 847:6, 850:7, 854:13, 857:12, 890:14
**secret** [1] - 841:2
**Security** [30] - 770:12, 774:25, 778:11, 778:16, 779:6, 779:10, 779:20, 780:8, 781:8, 788:7, 804:22, 805:2, 806:12, 806:14, 806:15, 843:5, 843:25, 844:1, 844:2, 844:10, 844:13, 845:2, 848:5, 848:19, 849:7, 851:19, 863:14, 863:16, 864:12, 867:5
**see** [24] - 752:23, 753:15, 755:20, 762:14, 780:13, 791:24, 792:3, 793:14, 794:8, 799:8, 802:13, 804:1, 809:16, 834:25, 835:1, 835:2, 838:4, 838:22, 855:24, 863:8, 867:10, 875:18, 876:3
**seeing** [3] - 783:24, 854:11, 871:21
**seek** [2] - 796:25, 849:21
**seeking** [10] - 796:16, 797:4, 797:9, 803:25, 804:4, 805:12, 847:3, 855:7, 869:6, 880:11
**seeks** [2] - 843:7, 844:4
**sees** [2] - 773:12, 775:14
**selection** [1] - 840:23

**self** [1] - 799:16
**self-esteem** [1] - 799:16
**send** [26] - 752:6, 753:12, 766:15, 769:19, 774:24, 779:22, 779:23, 790:9, 792:8, 800:25, 804:22, 804:23, 804:24, 805:1, 810:12, 812:3, 817:5, 817:9, 820:16, 844:1, 848:19, 866:3, 866:6, 887:10, 887:17, 893:10
**sending** [6] - 781:23, 783:20, 800:23, 842:8, 847:23, 856:3
**sends** [12] - 773:16, 774:19, 776:13, 776:25, 777:8, 777:10, 781:7, 782:12, 782:15, 830:17, 856:8, 856:9
**sense** [4] - 759:11, 823:11, 841:23, 843:18
**sent** [25] - 775:1, 776:15, 778:21, 779:18, 779:20, 783:13, 798:17, 819:24, 833:12, 834:5, 835:10, 839:13, 847:6, 847:10, 849:2, 856:12, 856:13, 857:14, 857:16, 857:18, 863:4, 863:6, 863:17, 867:4, 872:15
**sentence** [2] - 756:13, 766:2
**sentencing** [1] - 768:19
**separate** [1] - 869:8
**separately** [1] - 818:20
**September** [1] - 893:16
**serious** [1] - 871:6
**seriously** [2] - 813:3, 821:2
**serve** [2] - 816:15, 882:20
**service** [1] - 885:22
**Services** [3] - 766:16, 839:17, 841:7
**SERVICES** [1] - 747:6
**serving** [3] - 764:8, 765:18, 816:14
**session** [1] - 874:10
**set** [9] - 835:5, 838:24, 841:15, 850:7, 850:17, 856:19, 857:1, 857:13, 882:13
**sets** [1] - 759:16
**setting** [2] - 802:8, 882:3
**settled** [1] - 888:9
**several** [5] - 824:24, 825:4, 825:7, 825:10
**severe** [2] - 807:24, 811:8
**severely** [1] - 811:5
**severity** [2] - 860:23, 881:23
**shall** [2] - 878:14, 882:22
**share** [1] - 866:21
**shift** [1] - 810:16
**shock** [4] - 777:4, 846:23, 846:24, 847:4
**shocked** [1] - 846:24
**short** [4] - 750:22, 752:1, 800:20, 856:1
**shortly** [5] - 830:23, 850:25, 852:1, 852:3, 852:9
**shots** [1] - 812:25
**shoulders** [1] - 891:14
**show** [11] - 764:11, 770:24, 778:4, 781:13, 808:10, 815:22, 815:25, 839:22, 839:24, 844:10, 857:19
**showed** [4] - 783:21, 785:5, 839:15, 839:16
**showers** [1] - 801:5

**showing** [3] - 773:14, 788:11, 844:14
**shown** [1] - 874:22
**shows** [9] - 767:4, 788:12, 798:13, 808:8, 832:21, 838:9, 838:15, 839:12, 847:14
**shrug** [1] - 891:14
**shut** [2] - 776:1, 798:10
**sick** [3] - 778:13, 799:3, 858:19
**side** [1] - 795:23
**sides** [3] - 831:7, 836:9, 852:17
**sign** [4] - 884:4, 884:15, 884:23, 893:9
**signature** [3] - 894:6, 894:7
**signatures** [2] - 792:25, 843:14
**signed** [3] - 887:11, 887:13, 894:7
**significant** [3] - 775:7, 831:9, 831:11
**signing** [1] - 894:3
**similar** [6] - 754:3, 754:4, 810:24, 811:24, 815:21, 881:4
**simple** [1] - 871:3
**simply** [9] - 761:15, 787:8, 823:13, 826:22, 864:14, 866:7, 883:5, 883:11, 883:13
**sincerely** [1] - 892:22
**Siri** [1] - 877:1
**sit** [1] - 891:14
**sitting** [1] - 851:6
**situation** [3] - 782:8, 851:8, 865:17
**situations** [1] - 832:14
**six** [6] - 773:2, 774:18, 790:14, 846:19, 846:25, 856:19
**skipping** [2] - 757:15, 758:10
**sleeping** [3] - 799:4, 799:5, 799:8
**sleeplessness** [1] - 858:7
**slides** [1] - 869:24
**slight** [1] - 834:19
**slightly** [2] - 889:12, 889:20
**small** [4] - 812:21, 814:9, 814:22, 889:19
**smaller** [1] - 814:19
**SMITH** [54] - 749:18, 750:24, 751:5, 751:11, 751:15, 751:18, 752:7, 752:16, 753:16, 753:19, 753:22, 754:2, 754:9, 757:2, 758:1, 758:5, 759:8, 759:11, 759:16, 759:18, 762:5, 762:8, 762:21, 762:23, 762:25, 763:5, 763:12, 763:23, 818:2, 819:1, 819:3, 819:16, 824:15, 825:8, 825:20, 826:13, 827:5, 827:13, 827:16, 827:21, 827:24, 828:3, 828:12, 828:15, 889:12, 889:19, 890:15, 890:18, 890:22, 891:1, 891:5, 891:16, 891:23, 891:25
**Smith** [3] - 748:16, 817:25, 819:15
**Snapchat** [1] - 885:17
**Social** [31] - 770:12, 774:25, 778:11, 778:16, 778:25, 779:5, 779:10, 779:20, 780:8, 781:8, 788:7, 804:22, 805:2, 806:12, 806:14, 806:15, 843:5, 843:25, 844:1, 844:2, 844:10, 844:13, 845:2, 848:5, 848:19, 849:7, 851:18,

**social** [1] - 885:17
**socialize** [1] - 801:10
**Sola** [6] - 748:11, 829:17, 837:17, 837:21, 851:25, 853:21
**SOLA** [41] - 752:18, 753:5, 753:10, 756:6, 756:11, 756:18, 756:25, 759:14, 761:17, 761:24, 762:3, 762:12, 762:18, 763:14, 763:19, 764:7, 819:7, 821:12, 821:21, 822:2, 822:7, 822:15, 822:19, 822:23, 823:5, 823:9, 823:17, 824:6, 824:11, 825:2, 825:4, 825:10, 826:11, 827:17, 828:10, 862:9, 889:2, 889:9, 893:2, 893:4, 893:7
**sola** [1] - 748:11
**sold** [1] - 792:21
**solely** [5] - 791:17, 794:25, 872:23, 874:11, 885:1
**solve** [3] - 798:23, 798:24
**solver** [1] - 799:10
**someone** [10] - 783:2, 789:21, 799:17, 802:20, 812:24, 839:17, 839:18, 851:9, 859:17, 871:22
**sometimes** [7] - 795:13, 804:23, 835:8, 835:9, 874:4, 875:24, 875:25
**somewhere** [2] - 831:2, 843:23
**soon** [1] - 892:5
**sooner** [3] - 851:18, 851:21, 851:22
**sophisticated** [1] - 831:4
**sorry** [8] - 757:16, 758:10, 819:25, 828:17, 828:19, 829:1, 890:15, 890:18
**sort** [1] - 838:14
**sound** [2] - 793:5, 811:12
**source** [1] - 782:7
**sources** [1] - 842:5
**Southern** [1] - 831:3
**spaces** [1] - 884:20
**speaking** [2] - 839:21, 866:8
**special** [10] - 758:24, 775:13, 794:16, 797:17, 801:25, 802:7, 809:18, 809:19, 883:14
**specific** [3] - 836:1, 836:3, 843:7
**specifically** [1] - 826:19
**speculation** [2] - 853:13, 880:14
**speedy** [1] - 836:24
**Speedy** [1] - 856:24
**spend** [2] - 773:1, 802:17
**spending** [1] - 869:9
**spent** [1] - 800:22
**spite** [2] - 860:19, 881:14
**spoken** [1] - 839:18
**spokesperson** [1] - 882:21
**Sponer** [124] - 764:14, 764:21, 765:4, 765:16, 766:3, 766:13, 767:12, 767:23, 767:25, 769:9, 769:12, 769:18, 770:10, 771:4, 771:15, 771:23, 773:8, 774:19, 774:24, 775:7, 775:11, 775:23, 776:19, 777:3, 777:5, 777:8, 777:10, 778:12, 778:21,

863:14, 863:16, 864:11, 867:5

778:23, 779:18, 779:20, 780:2, 780:10, 780:17, 780:18, 780:20, 782:6, 783:1, 783:16, 783:24, 784:19, 784:25, 786:20, 791:12, 792:9, 793:3, 793:17, 795:7, 795:23, 796:7, 796:16, 797:21, 799:10, 800:1, 801:9, 802:2, 802:9, 805:12, 807:6, 808:22, 813:12, 815:10, 815:19, 830:4, 831:6, 831:13, 831:16, 832:6, 832:12, 832:13, 834:5, 839:12, 840:10, 841:6, 841:22, 842:19, 842:21, 843:1, 843:15, 846:19, 846:22, 847:6, 847:8, 847:10, 847:17, 847:23, 848:3, 848:14, 848:19, 849:6, 849:17, 851:12, 851:18, 852:1, 853:4, 853:21, 854:11, 854:18, 855:6, 855:10, 855:12, 855:15, 855:21, 856:3, 856:15, 857:7, 857:17, 858:16, 858:20, 858:24, 859:22, 861:18, 862:18, 863:12, 863:17, 866:3, 866:4, 866:6, 867:4, 869:21, 871:4, 871:13, 871:22
**SPONER** [1] - 747:3
**Sponer's** [29] - 767:10, 768:3, 768:12, 768:15, 769:20, 771:2, 772:14, 774:7, 776:4, 776:14, 784:15, 796:22, 797:15, 801:25, 831:3, 831:20, 834:7, 844:9, 845:8, 848:10, 848:17, 849:6, 849:25, 854:5, 854:19, 856:6, 866:10, 866:20, 869:4
**spring** [1] - 831:2
**stakes** [1] - 789:21
**stalling** [1] - 865:22
**stamps** [1] - 778:3
**stand** [1] - 887:22
**standard** [18] - 786:1, 789:16, 789:17, 790:19, 793:24, 793:25, 795:11, 795:18, 808:3, 840:21, 841:9, 845:17, 854:24, 864:22, 864:23, 864:24, 869:25
**standards** [4] - 789:10, 789:14, 789:15, 845:17
**standing** [1] - 857:15
**start** [11] - 756:11, 797:19, 817:6, 817:8, 817:10, 843:22, 843:23, 888:12, 890:19, 890:20, 891:2
**started** [5] - 764:1, 818:14, 831:1, 838:13
**starting** [4] - 762:17, 830:7, 853:18, 889:16
**starts** [4] - 830:16, 833:6, 836:13, 853:16
**State** [5] - 760:9, 760:20, 761:3, 820:8, 889:24
**state** [2] - 773:6, 876:19
**statement** [4] - 752:1, 785:5, 826:20, 862:10
**statements** [3] - 827:2, 873:15, 873:17
**States** [3] - 748:20, 778:5, 784:24
**states** [5] - 753:4, 776:14, 778:9, 783:4, 840:4

**STATES** [2] - 747:1, 747:17
**status** [2] - 804:14, 871:19
**statute** [3] - 750:3, 849:13, 852:6
**statutory** [4] - 787:17, 788:5, 852:4, 879:14
**step** [4] - 751:2, 816:23, 841:23, 841:24
**steps** [2] - 773:24, 847:5
**Stern** [1] - 806:18
**stick** [4] - 893:13
**still** [18] - 749:14, 749:15, 768:21, 773:13, 774:17, 774:18, 775:15, 793:11, 793:16, 808:23, 811:3, 814:15, 842:12, 848:5, 849:7, 851:10, 857:9, 857:25
**stipulation** [1] - 761:18
**Stipulation** [1] - 757:5
**stole** [7] - 768:9, 768:12, 831:3, 831:14, 836:7, 857:11, 871:23
**stolen** [3] - 803:12, 831:6
**stomach** [2] - 778:13, 799:3
**Stop** [1] - 765:18
**stop** [10] - 757:23, 789:9, 807:13, 811:1, 811:5, 813:4, 814:6, 814:7, 816:9
**stopped** [1] - 868:12
**store** [2] - 844:7, 857:3
**stores** [1] - 844:8
**story** [2] - 777:23, 850:23
**straight** [1] - 822:11
**Street** [1] - 748:6
**stress** [2] - 798:5, 798:6
**stressful** [2] - 798:24, 854:17
**stricken** [1] - 874:2
**strict** [1] - 765:23
**strive** [1] - 882:22
**strong** [1] - 781:1
**stuck** [2] - 778:14, 857:21
**stuff** [1] - 787:21
**stunning** [1] - 794:14
**stupid** [1] - 807:1
**submitted** [1] - 752:12
**subparts** [1] - 829:21
**subset** [1] - 818:23
**substantial** [3] - 809:13, 831:9, 882:11
**subverts** [2] - 767:4, 788:9
**sue** [2] - 781:2, 784:17
**sued** [6] - 784:16, 790:5, 793:17, 798:12, 862:19, 868:5
**sues** [1] - 783:24
**suffered** [11] - 757:19, 757:22, 761:11, 796:18, 853:10, 855:1, 855:15, 857:8, 858:6, 859:22, 878:3
**suffering** [1] - 802:1
**suffers** [1] - 775:7
**sufficient** [4] - 841:11, 852:25, 868:3, 882:4
**suggest** [7] - 757:21, 799:24, 800:2, 802:22, 803:23, 880:1, 885:3
**suggested** [2] - 763:6, 817:17
**suggestion** [2] - 826:1, 843:11

**suggestions** [1] - 762:15
**suing** [2] - 784:2, 785:5
**Suite** [4] - 748:3, 748:6, 748:9, 748:12
**summaries** [2] - 874:21, 874:24
**summarize** [1] - 877:25
**summer** [2] - 831:1, 831:2
**superficial** [3] - 772:3, 793:14, 795:4
**supervisor** [1] - 849:10
**support** [2] - 752:1, 760:20, 860:5, 861:3
**supports** [2] - 874:25, 891:16
**Supreme** [3] - 750:1, 761:1, 818:14
**surgery** [2] - 801:21, 858:18
**survey** [1] - 750:10
**suspect** [2] - 768:18, 769:1
**sustained** [7] - 823:3, 853:3, 855:17, 868:17, 880:17, 880:18, 880:23
**swaths** [1] - 859:8
**sworn** [6] - 763:17, 864:4, 873:6, 874:12, 883:19, 888:4
**sympathy** [2] - 872:22, 882:5
**system** [23] - 766:20, 771:16, 794:1, 796:8, 807:16, 809:14, 809:20, 811:22, 812:5, 813:15, 813:20, 816:15, 832:2, 835:14, 837:7, 837:25, 838:5, 838:10, 838:19, 839:20, 840:12, 841:17, 852:23

---

# T

**table** [2] - 749:16, 844:13
**Tahiti** [1] - 841:7
**talks** [1] - 768:5
**Tarter** [5] - 779:13, 789:11, 790:17, 791:2, 810:2
**task** [1] - 861:17
**team** [16] - 834:17, 835:5, 835:24, 836:13, 836:14, 837:6, 841:16, 841:20, 845:9, 845:10, 845:12, 849:11, 850:2, 851:4, 851:6, 852:21
**technical** [1] - 756:16
**telephone** [1] - 859:20
**temporarily** [1] - 892:20
**tend** [1] - 803:7
**tenth** [4] - 814:14, 814:20, 814:23, 815:1
**term** [3] - 795:7, 798:7, 804:18
**terms** [4] - 762:1, 786:19, 802:25, 804:6
**terrible** [2] - 801:15, 803:6
**tested** [1] - 886:21
**testified** [26] - 773:14, 777:3, 777:5, 779:3, 781:2, 784:7, 789:12, 793:20, 800:15, 800:19, 804:5, 833:18, 841:20, 842:8, 843:8, 851:12, 855:10, 855:12, 856:6, 857:7, 863:23, 871:16, 873:18, 876:8, 876:10
**testify** [13] - 772:11, 778:12, 779:13, 784:23, 793:12, 793:19, 793:23, 804:13, 832:13, 849:9, 874:16, 874:20, 876:15

**testifying** [1] - 875:19
**testimony** [48] - 770:5, 771:18, 774:23, 775:23, 777:14, 782:3, 790:17, 791:23, 798:2, 831:7, 834:18, 836:15, 837:20, 838:8, 845:5, 846:22, 847:7, 848:25, 854:17, 855:7, 855:25, 856:2, 857:2, 858:12, 858:17, 864:2, 864:4, 867:8, 868:9, 868:11, 873:6, 873:12, 874:2, 874:4, 874:12, 874:18, 874:19, 875:4, 875:13, 875:16, 875:21, 875:22, 876:5, 876:6, 876:17, 876:20, 876:21
**text** [1] - 885:14
**THE** [117] - 747:1, 747:2, 747:16, 748:2, 748:14, 749:3, 749:21, 751:2, 751:8, 751:13, 751:16, 751:20, 752:9, 752:17, 753:2, 753:9, 753:11, 753:18, 753:21, 754:1, 754:7, 754:10, 754:15, 756:8, 756:17, 756:23, 757:1, 757:24, 758:4, 759:7, 759:9, 759:12, 759:17, 761:9, 761:22, 762:2, 762:4, 762:7, 762:10, 762:13, 762:20, 762:22, 763:2, 763:10, 763:13, 763:16, 763:20, 763:24, 764:5, 816:19, 816:25, 817:4, 817:9, 817:14, 818:25, 819:2, 819:5, 819:10, 819:14, 821:10, 821:17, 821:23, 822:4, 822:11, 822:17, 822:20, 823:1, 823:8, 823:10, 824:4, 824:10, 825:3, 825:9, 825:16, 825:18, 825:21, 826:12, 826:21, 827:12, 827:15, 827:19, 827:23, 828:1, 828:6, 828:11, 828:14, 828:21, 829:1, 829:3, 829:8, 829:10, 861:25, 862:7, 872:12, 877:1, 887:25, 888:1, 888:3, 888:5, 888:24, 889:3, 889:10, 889:18, 890:14, 890:16, 890:19, 890:23, 891:2, 891:11, 891:19, 891:24, 892:1, 892:12, 892:16, 893:3, 893:6, 893:9
**theft** [87] - 767:12, 768:14, 768:24, 768:25, 769:4, 769:6, 769:18, 769:24, 770:8, 770:9, 770:25, 771:7, 771:9, 771:15, 772:15, 772:20, 773:12, 773:15, 774:6, 774:13, 774:16, 775:3, 775:22, 776:21, 776:22, 776:23, 776:24, 777:12, 777:23, 778:17, 778:18, 779:9, 780:22, 782:8, 782:10, 782:19, 782:20, 783:5, 783:7, 783:8, 783:14, 783:15, 784:4, 784:9, 787:9, 788:10, 788:16, 788:17, 788:18, 788:20, 788:24, 789:2, 790:20, 794:13, 794:15, 796:10, 803:7, 805:1, 806:13, 806:15, 809:11, 831:8, 831:16, 833:13, 833:22, 836:4, 836:5, 836:8, 854:19, 858:16, 864:9, 864:20, 865:4, 865:5, 865:7, 865:16, 866:16, 866:24, 867:13, 867:17, 868:23, 868:24, 870:13, 870:21, 871:5
**therefore** [5] - 778:6, 863:10, 872:2, 875:1, 877:22

**they've** [10] - 768:20, 773:21, 792:1, 812:4, 865:20, 867:12, 868:21, 868:22
**thief** [21] - 765:4, 765:10, 767:14, 767:16, 768:10, 768:20, 771:1, 774:10, 778:19, 831:2, 831:13, 836:7, 844:9, 849:3, 857:10, 858:25, 864:7, 865:3, 865:11, 865:18
**thieves** [2] - 844:5, 844:15
**thinking** [4] - 754:17, 806:22, 827:1, 857:15
**thinks** [1] - 877:1
**third** [6] - 755:10, 759:25, 773:25, 782:11, 811:23, 854:14
**Third** [2] - 748:20, 750:12
**Thomas** [4] - 779:13, 789:11, 790:17, 810:2
**thorough** [2] - 790:13, 790:16
**thoroughly** [1] - 757:4
**thoughts** [1] - 756:3
**thousands** [2] - 766:15, 796:10
**three** [12] - 760:25, 765:7, 800:10, 803:20, 829:21, 829:22, 833:15, 873:8, 878:17, 879:2, 888:11, 888:12
**threshold** [2] - 860:10, 870:3
**throughout** [3] - 764:9, 799:16, 866:14
**ticking** [2] - 830:16, 833:6
**tide** [1] - 814:5
**tied** [1] - 826:14
**timeline** [5] - 838:20, 850:24, 851:3, 853:18, 853:19
**timing** [5] - 851:2, 851:22, 890:8, 890:10, 890:12
**Timothy** [1] - 748:15
**tip** [1] - 795:23
**tired** [1] - 833:1
**title** [1] - 883:17
**titled** [1] - 894:5
**today** [9] - 764:12, 808:23, 811:4, 827:8, 837:21, 845:14, 850:15, 850:23, 851:23
**together** [2] - 802:9, 866:22
**toilet** [1] - 801:6
**tone** [1] - 846:11
**took** [5] - 776:12, 845:1, 846:24, 872:24, 873:1
**tool** [1] - 811:21
**top** [1] - 883:18
**total** [1] - 790:9
**totally** [2] - 779:13, 867:8
**touch** [3] - 813:11, 813:14, 848:24
**touching** [2] - 801:13, 886:13
**toward** [1] - 882:6
**towards** [1] - 826:18
**trained** [2] - 835:24, 861:5
**training** [1] - 835:25
**TRANSCRIPT** [1] - 747:15
**transcript** [2] - 894:4, 894:6
**TransUnion** [7] - 773:9, 773:16, 773:17, 773:19, 774:2, 789:8, 803:19

**travel** [4] - 775:10, 800:8, 800:9, 800:11
**traveled** [1] - 800:10
**traveling** [1] - 779:23
**trays** [1] - 795:22
**treated** [3] - 790:2, 799:18, 806:9
**treats** [1] - 807:3
**TRIAL** [1] - 747:14
**trial** [19] - 763:20, 770:17, 813:20, 820:20, 824:6, 825:23, 826:6, 862:20, 874:11, 874:13, 874:16, 874:17, 885:20, 886:9, 886:21, 886:25, 887:3, 891:7, 893:5
**tried** [2] - 813:12, 813:13
**trip** [8] - 775:25, 776:5, 784:24, 800:13, 800:17, 800:19, 856:1
**trouble** [1] - 822:4
**true** [14] - 769:4, 779:23, 795:12, 795:14, 795:20, 795:25, 816:1, 816:3, 840:10, 876:12, 877:7, 877:14, 892:18, 892:19
**trust** [2] - 798:8, 816:7
**trusted** [1] - 798:8
**trusts** [1] - 800:1
**trustworthiness** [1] - 803:1
**truth** [3] - 867:1, 874:14, 876:11
**try** [12] - 763:17, 763:24, 764:14, 775:20, 781:12, 799:11, 801:14, 805:19, 847:4, 847:5, 883:19, 886:5
**trying** [4] - 751:22, 865:21, 869:13, 889:4
**tuck** [1] - 756:4
**Tuesday** [2] - 831:1, 840:24
**Tugashov** [10] - 767:15, 767:19, 767:21, 768:6, 768:7, 768:11, 768:17, 792:14, 839:21, 866:8
**turn** [4] - 749:22, 814:5, 877:2, 886:14
**turns** [1] - 758:9
**Twitter** [1] - 885:16
**two** [19] - 753:16, 770:13, 786:22, 795:22, 796:15, 800:10, 801:17, 804:5, 836:11, 842:23, 852:18, 855:6, 855:11, 857:21, 868:5, 873:7, 876:3, 878:16, 878:25
**TXO** [1] - 823:6
**type** [3] - 764:11, 818:4, 840:21
**types** [2] - 796:16, 797:11, 833:17
**typical** [1] - 795:21
**typically** [2] - 807:11, 807:12

## U

**ultimately** [1] - 774:12
**unanimous** [8] - 763:1, 763:4, 763:21, 882:24, 883:6, 884:19, 884:20, 887:23
**unanimously** [4] - 763:11, 763:14, 763:17, 883:20
**unavailable** [1] - 874:16
**unclear** [2] - 847:14, 890:10
**unconstitutional** [9] - 757:14, 817:16, 818:17, 819:22, 820:4, 822:1, 824:25,

825:6, 825:7
**under** [43] - 757:12, 760:2, 760:16, 760:20, 761:3, 780:14, 785:5, 786:23, 787:3, 787:17, 798:19, 799:9, 807:7, 818:5, 820:4, 823:2, 825:6, 835:17, 835:23, 837:5, 837:11, 838:1, 845:20, 849:22, 850:10, 852:5, 852:6, 859:24, 859:25, 870:7, 870:11, 873:24, 874:13, 877:20, 878:11, 879:10, 879:14, 881:17, 881:20, 889:24, 890:9, 892:19
**undergoing** [1] - 858:18
**underlying** [2] - 874:25, 875:2
**understandably** [1] - 858:21
**understood** [1] - 783:12
**unfavorable** [1] - 854:10
**unfortunate** [1] - 788:17
**United** [3] - 748:20, 778:5, 784:24
**UNITED** [2] - 747:1, 747:17
**universe** [1] - 835:15
**unjustifiably** [6] - 760:4, 787:19, 852:7, 853:2, 860:25, 879:16
**unless** [6] - 779:5, 779:10, 821:8, 884:11, 884:12, 891:13
**unnecessary** [2] - 860:23, 881:23
**unquestionably** [1] - 858:24
**unreasonable** [7] - 779:7, 788:12, 789:19, 804:11, 809:14, 834:9, 852:18
**unrecorded** [1] - 777:2
**unring** [1] - 824:16
**unsavory** [1] - 760:13
**untrue** [2] - 876:5, 877:10
**untruthfully** [2] - 876:8, 876:11
**unwilling** [1] - 883:9
**up** [25] - 749:4, 751:22, 778:15, 781:7, 783:20, 784:11, 784:13, 792:11, 792:15, 798:21, 801:4, 801:18, 802:8, 812:22, 815:4, 818:2, 818:22, 821:6, 823:14, 823:21, 834:13, 838:15, 839:12, 842:20, 859:7
**urge** [1] - 861:19
**useless** [3] - 770:2, 771:9, 787:9
**uses** [3] - 766:7, 771:1, 771:16
**usual** [7] - 797:7, 800:6, 800:7, 802:15, 854:15, 880:10

## V

**vacation** [1] - 775:25
**valid** [5] - 784:5, 784:9, 784:12, 867:13, 867:18
**validate** [5] - 841:11, 849:11, 861:13, 867:22, 868:3
**validated** [8] - 849:15, 849:24, 850:4, 850:5, 850:12, 851:7, 851:11, 868:4
**value** [5] - 801:18, 802:14, 824:6, 826:8, 826:23, 828:9
**variety** [2] - 833:12, 854:1
**various** [2] - 804:1, 815:9
**vast** [1] - 781:1

**vehicle** [1] - 778:6
**verdict** [39] - 749:13, 752:8, 752:11, 752:16, 753:8, 753:17, 754:4, 754:18, 755:6, 757:14, 762:13, 762:15, 762:18, 815:6, 816:5, 819:22, 821:13, 821:15, 824:25, 827:8, 827:13, 827:14, 861:19, 873:11, 880:1, 882:23, 883:6, 883:13, 883:14, 884:3, 884:15, 884:25, 885:1, 885:4, 885:5, 886:19, 887:14, 887:23, 888:8
**Vergeer** [1] - 748:17
**verification** [1] - 843:10
**verified** [3] - 770:14, 776:15, 780:19
**verifies** [3] - 774:6, 774:18, 782:17
**verify** [6] - 770:24, 788:6, 794:21, 842:15, 865:9, 869:1
**verifying** [7] - 770:24, 780:16, 782:2, 788:10, 789:4, 789:5, 836:5
**Verizon** [1] - 856:11
**version** [3] - 753:17, 753:23, 867:3
**versions** [1] - 876:1
**via** [1] - 885:14
**victim** [19] - 765:10, 765:11, 767:12, 768:25, 769:18, 771:15, 780:4, 783:4, 783:6, 783:8, 783:14, 804:25, 806:13, 806:14, 831:13, 858:24, 858:25, 864:16, 866:24
**victims** [1] - 831:10
**video** [1] - 835:1
**videotape** [2] - 867:9, 867:10
**view** [2] - 886:7, 886:9
**views** [1] - 883:2
**violate** [14] - 766:12, 772:17, 787:16, 809:25, 811:4, 829:23, 830:1, 862:15, 870:6, 870:10, 879:13, 881:20, 883:22, 883:24
**violated** [18] - 786:13, 786:15, 787:13, 788:2, 795:14, 795:25, 807:14, 812:15, 815:10, 815:15, 815:24, 878:2, 878:6, 878:9, 878:10, 879:1, 880:24, 881:1
**violates** [3] - 766:20, 881:22, 887:5
**violating** [1] - 870:15
**violation** [28] - 752:13, 756:14, 756:15, 761:15, 772:21, 786:17, 786:24, 789:3, 795:10, 795:11, 808:18, 812:14, 815:17, 821:20, 852:2, 853:1, 853:17, 853:20, 855:4, 855:5, 855:18, 868:18, 869:2, 879:2, 879:5, 880:17, 880:20, 880:21
**violations** [7] - 754:5, 788:2, 797:14, 808:20, 861:21, 879:3, 884:8
**Visa** [1] - 804:6
**vision** [1] - 802:20
**visit** [2] - 776:6, 886:7
**vote** [1] - 884:22
**vs** [1] - 747:5
**vulnerable** [3] - 777:5, 781:4, 788:19

## W

**wait** [1] - 888:11
**waiting** [3] - 793:2, 841:21, 887:19
**waiving** [1] - 763:7
**walk** [1] - 811:17
**Walker** [2] - 748:19, 894:11
**WALKER** [1] - 894:12
**wants** [2] - 791:12, 806:15
**warranted** [1] - 824:20
**watch** [2] - 867:9, 885:25
**ways** [6] - 755:4, 765:15, 786:21, 804:18, 863:18, 878:7
**weakness** [1] - 881:25
**wealth** [1] - 813:21
**wealthy** [2] - 810:19, 815:4
**website** [1] - 885:15
**week** [5] - 750:1, 768:5, 862:16, 890:13, 891:6
**weeks** [4] - 776:10, 778:8, 784:3, 800:10
**weight** [8] - 761:5, 875:1, 875:9, 875:11, 876:14, 876:17, 876:22, 883:12
**Weiner** [2] - 748:2, 856:22
**weird** [1] - 755:5
**welcome** [1] - 892:12
**WELLS** [2] - 747:6, 748:15
**Wells** [374] - 756:22, 757:7, 757:9, 764:15, 764:18, 764:19, 764:22, 765:2, 765:4, 765:6, 765:11, 765:17, 765:18, 765:24, 766:9, 766:13, 766:15, 766:19, 766:24, 767:1, 767:4, 767:9, 767:12, 767:13, 767:17, 767:18, 767:19, 768:2, 768:5, 768:6, 768:8, 768:12, 768:16, 768:18, 768:23, 769:7, 769:8, 769:10, 769:13, 769:14, 769:20, 769:21, 770:1, 770:6, 770:11, 770:15, 770:18, 771:3, 771:10, 771:11, 771:13, 771:16, 771:19, 771:22, 771:24, 772:5, 772:8, 772:12, 772:16, 772:19, 772:21, 772:25, 773:6, 773:10, 773:11, 773:16, 773:19, 773:23, 774:3, 774:4, 774:10, 774:14, 774:16, 774:19, 774:21, 774:24, 775:4, 775:14, 775:17, 775:18, 775:24, 776:1, 776:3, 776:12, 776:13, 776:20, 776:24, 777:6, 777:8, 777:9, 777:11, 777:13, 777:25, 778:4, 778:8, 778:9, 778:14, 778:16, 778:17, 778:23, 779:4, 779:16, 780:11, 780:15, 780:16, 780:19, 780:21, 781:1, 781:4, 781:5, 781:7, 781:16, 782:1, 782:12, 782:14, 782:15, 782:17, 782:23, 783:3, 783:6, 783:12, 783:17, 783:20, 783:22, 783:24, 784:2, 784:3, 784:7, 784:15, 784:17, 784:20, 784:21, 785:6, 785:9, 785:11, 786:3, 786:7, 786:11, 786:13, 787:5, 787:12, 788:6, 788:14, 788:23, 789:1, 789:4, 789:13, 790:1, 790:4, 790:6, 790:9, 790:14, 790:15, 790:18, 790:25, 791:5, 791:10, 791:16, 792:16, 793:17, 795:2, 795:14, 796:2, 796:3, 796:8, 796:12, 796:14, 797:9, 798:1, 798:6, 798:7, 798:9, 798:10, 798:12, 798:19, 800:14, 800:15, 800:18, 800:20, 801:15, 802:10, 803:8, 803:10, 803:19, 804:2, 804:19, 804:24, 805:4, 805:6, 805:14, 805:16, 805:19, 805:22, 805:24, 806:2, 806:3, 806:4, 806:8, 806:13, 806:19, 806:24, 806:25, 807:2, 807:21, 807:22, 808:15, 809:2, 809:7, 810:16, 811:7, 812:6, 812:25, 813:6, 813:11, 813:18, 814:1, 814:10, 814:17, 814:23, 815:10, 815:15, 815:20, 815:24, 816:16, 818:7, 819:17, 820:11, 820:16, 824:13, 826:8, 826:23, 827:2, 828:9, 829:12, 829:23, 830:1, 830:5, 830:6, 830:9, 830:11, 830:12, 830:18, 830:19, 831:18, 831:22, 831:25, 832:16, 832:20, 833:5, 833:14, 833:15, 834:1, 834:3, 834:5, 834:7, 834:8, 834:11, 835:3, 835:25, 836:12, 836:16, 836:25, 837:6, 837:7, 837:10, 837:12, 837:13, 837:21, 837:24, 837:25, 839:7, 839:8, 839:11, 839:16, 839:17, 840:8, 840:11, 840:25, 841:1, 841:15, 842:16, 842:18, 842:21, 843:7, 844:4, 844:16, 845:10, 845:15, 845:21, 846:2, 846:4, 846:7, 846:10, 847:7, 847:15, 847:18, 848:4, 848:9, 848:20, 849:4, 849:5, 849:6, 849:9, 849:13, 849:16, 849:20, 850:13, 850:19, 851:15, 852:1, 852:10, 852:11, 852:20, 854:24, 855:1, 855:9, 855:18, 856:8, 856:16, 856:20, 857:8, 857:9, 857:13, 858:9, 858:12, 858:13, 858:22, 858:25, 859:10, 859:18, 860:1, 860:18, 860:21, 861:4, 861:5, 861:9, 861:15, 861:16, 861:20, 862:10, 862:12, 862:15, 862:17, 862:22, 863:1, 864:9, 865:2, 869:4, 869:9, 869:14, 869:19, 869:20, 869:22, 871:6, 871:11, 871:18, 871:20, 871:23, 871:24, 872:5, 872:7, 884:3, 890:8, 890:13, 891:6
**whole** [7] - 753:12, 766:20, 777:23, 785:20, 799:16, 800:12, 812:4
**wide** [1] - 833:12
**wife** [9] - 775:24, 784:22, 799:4, 802:6, 802:9, 803:21, 856:6, 858:18, 869:21
**willful** [24] - 752:13, 752:19, 752:20, 752:23, 752:24, 753:3, 753:7, 754:20, 755:19, 772:20, 787:12, 787:15, 787:25, 788:13, 789:3, 795:11, 808:4, 815:17, 852:2, 853:1, 861:21, 884:8
**willfully** [12] - 787:13, 787:15, 806:25, 815:15, 815:24, 830:1, 878:2, 878:9, 879:7, 879:12, 881:1, 883:24

**willfulness** [22] - 753:14, 754:25, 755:12, 756:2, 758:11, 761:14, 786:18, 787:24, 788:4, 788:11, 816:1, 852:4, 860:4, 860:6, 860:9, 860:10, 860:11, 860:12, 861:1, 861:7, 879:4, 884:13
**William** [5] - 779:2, 784:6, 792:11, 831:23, 863:6
**willing** [1] - 790:15
**window** [2] - 836:25, 837:4
**wished** [1] - 802:17
**withdraw** [1] - 828:19
**witness** [21] - 785:13, 793:18, 793:19, 808:21, 836:21, 874:12, 874:13, 874:20, 875:5, 875:14, 875:16, 875:17, 875:24, 876:7, 876:9, 876:10, 877:6, 877:9, 888:1, 888:2
**witness's** [6] - 875:18, 875:19, 875:21, 875:22, 876:23
**witnesses** [15] - 769:5, 771:23, 772:6, 774:24, 791:10, 836:16, 840:11, 862:14, 873:6, 873:16, 876:1, 876:15, 876:16, 876:18, 886:11
**wits** [1] - 763:25
**Wolf** [2] - 799:20, 856:10
**wondering** [1] - 777:15
**word** [8] - 756:14, 759:25, 760:3, 761:19, 763:1, 763:14, 818:3, 889:16
**worded** [1] - 757:11
**words** [10] - 763:11, 768:11, 795:13, 795:17, 806:22, 809:7, 837:13, 865:6, 888:11, 888:12
**workout** [1] - 892:2
**works** [4] - 755:17, 784:6, 809:18, 836:25
**worried** [13] - 777:4, 781:2, 784:19, 784:21, 784:25, 785:3, 798:9, 798:10, 798:11, 798:20, 800:16, 800:20, 862:23
**worries** [1] - 780:25
**worry** [2] - 797:17, 834:14
**worse** [2] - 769:12, 807:3
**worst** [1] - 803:10
**worth** [16] - 757:7, 757:13, 762:1, 764:23, 810:20, 812:17, 814:10, 814:11, 818:8, 820:22, 820:24, 820:25, 827:2, 828:10, 829:6, 829:12
**wrap** [1] - 810:21
**wrapped** [1] - 751:22
**wreaked** [1] - 831:14
**write** [6] - 776:25, 790:4, 799:21, 812:24, 857:23, 884:19
**writes** [4] - 781:5, 782:12, 798:2, 869:8
**writing** [8] - 777:14, 800:22, 806:11, 826:25, 869:10, 885:14, 887:13, 887:15
**written** [1] - 889:15
**wrongdoing** [1] - 862:13
**wrote** [11] - 779:2, 847:1, 855:23, 856:15, 856:21, 857:21, 857:24,

867:11, 869:5, 869:19

## Y

**year** [16] - 765:6, 766:16, 780:21, 780:22, 781:22, 781:24, 783:9, 783:13, 793:10, 796:11, 809:10, 848:13, 848:14, 848:15, 858:1
**years** [7] - 778:24, 789:11, 795:3, 818:14, 836:19, 836:20, 840:19
**yesterday** [11] - 758:7, 759:20, 759:24, 760:23, 761:6, 761:7, 774:23, 837:9, 837:20, 862:20, 863:25
**Yochum** [2] - 768:8, 768:12
**yourself** [1] - 882:24
**yourselves** [4] - 852:15, 888:15, 888:19, 888:21
**YouTube** [1] - 885:16

## Z

**Zealand** [9] - 775:8, 775:10, 775:13, 776:6, 784:21, 800:8, 801:1, 802:3, 853:24